# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

RODNEY D. PIERCE and
MOSES MATTHEWS,

     Plaintiffs,

  v.

THE NORTH CAROLINA STATE BOARD
OF ELECTIONS, ALAN HIRSCH, in his
official capacity as Chair of the North
Carolina State Board of Elections, JEFF
CARMON III in his official capacity as
Secretary of the North Carolina State Board
of Elections, STACY "FOUR" EGGERS IV
in his official capacity as a member of the
North Carolina State Board of Elections,
KEVIN N. LEWIS in his official capacity as
a member of the North Carolina State Board
of Elections, SIOBHAN O'DUFFY
MILLEN in her official capacity as a
member of the North Carolina State Board of
Elections, PHILIP E. BERGER in his official
capacity as President Pro Tem of the North
Carolina Senate, and TIMOTHY K.
MOORE in his official capacity as Speaker
of the North Carolina House of
Representatives,

     Defendants.

Case No. 4:23-cv-193

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

  Plaintiffs Rodney D. Pierce and Moses Matthews file this Complaint for Declaratory and

Injunctive Relief against the North Carolina State Board of Elections ("NCSBE"), NCSBE Chair

Alan Hirsch in his official capacity, NCSBE Secretary Jeff Carmon III in his official capacity,

NCSBE members Stacy "Four" Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, all in

their official capacities, Philip E. Berger in his official capacity as President Pro Tem of the North

Carolina Senate, and Timothy K. Moore in his official capacity as Speaker of the North Carolina

House of Representatives, and allege as follows:

1. Plaintiffs bring this action to challenge Senate Bill 758 (2023-2024 Session) (SB 758), Session Law 2023-146, which establishes new state Senate districts for North Carolina, on the ground that it violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

2. SB 758 was enacted on October 25, 2023. Despite having ample evidence of racially polarized voting and a history of discrimination in the "Black Belt counties" of northeastern North Carolina, and an obligation under the Voting Rights Act to analyze that evidence before drawing districts, the North Carolina General Assembly adopted a Senate plan that unlawfully deprives Black voters of the opportunity to elect candidates of their choice.

3. SB 758 is just the most recent episode in North Carolina's "long history of race discrimination generally and race-based vote suppression in particular." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016).

4. The Black population in North Carolina's Black Belt counties is sufficiently numerous and geographically compact to form a majority-minority district. Voting in the region is also highly polarized along racial lines—Black voters there are politically cohesive, but white voters vote sufficiently as a bloc to usually defeat minority candidates of choice. Nonetheless, SB 758 "cracks" Black voters in the region across multiple districts, including Senate District 2, which stretches more than 160 miles from the Virginia border to Carteret County on the Atlantic Ocean. When considered against the totality of the circumstances, SB 758's cracking of Black voters in this region dilutes their voting strength in violation of Section 2 of the Voting Rights Act.

5. Accordingly, Plaintiffs seek an order (1) declaring that SB 758 violates Section 2 of the Voting Rights Act; (2) enjoining Defendants from conducting future elections under SB 758; (3) ordering a remedial plan that includes a minority opportunity district in the Black Belt

counties; and (4) providing any such additional relief as is appropriate.

## JURISDICTION AND VENUE

6. Plaintiffs bring this action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

7. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and assert the deprivation of federal statutory rights under color of state law.

8. Venue is proper because a substantial part of the events that give rise to Plaintiffs' claims have occurred, and will occur, in this District. 28 U.S.C. § 1391(b).

9. This Court has authority to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

10. Plaintiffs are citizens of the United States and are registered to vote in North Carolina.

11. Plaintiff Rodney D. Pierce is a lifelong resident of Halifax County, North Carolina. He is presently employed as a social studies teacher by Northampton County Schools. Mr. Pierce is Black and registered to vote in Halifax County in 1996 upon reaching his 18th birthday. He has voted in most, if not all, elections in Halifax County since then. Defendants have assigned him and all other Halifax County voters to Senate District 2 in the 2023 enacted map, thereby diluting the weight of his vote compared to the vote of white citizens. Senate District 2 in the 2023 enacted map is a majority-white district in which Black voters like Mr. Pierce do not have an opportunity to elect their preferred candidates. A majority-Black district could be drawn incorporating all of Halifax County, including Mr. Pierce's residence.

12. Plaintiff Moses Matthews has resided in Martin County since 1974. He was

employed as a chemist by Weyerhaeuser until his retirement and is now engaged in various projects in Martin and neighboring counties. Mr. Matthews is Black and registered to vote in Martin County in 1976. He has voted in most, if not all elections, since then. Defendants have assigned him and all other Martin County voters to Senate District 2 in the 2023 enacted map, thereby diluting the weight of his vote compared to the vote of white citizens. Senate District 2 in the 2023 enacted map is a majority-white district in which Black voters like Mr. Matthews do not have an opportunity to elect their preferred candidates. A majority-Black district could be drawn incorporating all of Martin County, including Mr. Matthews' residence.

13.     Defendant NCSBE is a state agency charged with administering the election laws of the State of North Carolina.

14.     Defendant Alan Hirsch is the Chair of NCSBE. He is sued in his official capacity only.

15.     Defendant Jeff Carmon III is the Secretary of NCSBE. He is sued in his official capacity only.

16.     Defendant Stacy "Four" Eggers IV is a Board Member of NCSBE. He is sued in his official capacity only.

17.     Defendant Kevin N. Lewis is a Board Member of NCSBE. He is sued in his official capacity only.

18.     Defendant Siobhan O'Duffy Millen is a Board Member of NCSBE. She is sued in her official capacity only.

19.     Defendant Philip E. Berger is the President Pro Tem of the North Carolina Senate. He is sued in his official capacity only.

20.     Defendant Timothy K. Moore is the Speaker of the North Carolina House of Representatives. He is sued in his official capacity only.

4

## LEGAL BACKGROUND

21.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution. A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [Black voters] in that [Black voters] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see Allen v. Milligan*, 599 U.S. 1, 24-25 (2023).

22.     The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

23.     In *Thornburg v. Gingles*, the United States Supreme Court identified three necessary preconditions (the "*Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51; *see Allen*, 599 U.S. at 18.

24.     Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Judiciary Committee Report

("Senate Report") on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors ("Senate factors") that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2. S. Rep. 97-417, at 28-29 (1982).

25.     The Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness in the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

26.     Under settled law, "there is no requirement that any particular number of factors be proved, or [even] that a majority of them point one way or the other." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (quoting *Gingles*, 478 U.S. at 45). "Instead, courts must undertake 'a searching practical evaluation of the past and present reality, [with] a functional view of the political process.'" *Id.* (quoting *Gingles*, 478 U.S. at 45); *see also*

*id.* ("Courts must make 'an intensely local appraisal of the design and impact of' electoral administration 'in the light of past and present reality.'" (quoting *Gingles*, 478 U.S. at 78)).

27.    In *Stephenson v. Bartlett*, 562 S.E.2d 377 (N.C. 2002), the North Carolina Supreme Court clarified the interplay between Section 2 of the Voting Rights Act and the North Carolina Constitution's Whole-County Provisions, N.C. Const. art. 2, §§ 3(3), 5(3), which express a preference for keeping counties whole in legislative districting plans. The court held that Section 2 preempts the Whole-County Provisions to the extent necessary to comply with federal law. 562 S.E.2d at 396.

28.    Accordingly, the North Carolina General Assembly must start each legislative redistricting process by analyzing whether Section 2 requires drawing any districts to give minority voters an opportunity to elect a representative of their choice. *Id.* at 396-97. Only after drawing those "districts required by the [Voting Rights Act]" may the legislature draw "non-VRA districts" based on the Whole-County Provisions and other state redistricting criteria. *Id.* at 396-97.

## FACTUAL ALLEGATIONS

### A.    North Carolina's 2023 Redistricting Process

29.    In November 2021, following the 2020 decennial census, the North Carolina General Assembly enacted new congressional and state legislative maps. 2021 N.C. Sess. Laws 174 (congressional); 2021 N.C. Sess. Laws 173 (state Senate); 2021 N.C. Sess. Laws 175 (state House). In 2022, the North Carolina Supreme Court enjoined those maps as unlawful partisan gerrymanders under the state Constitution. *Harper v. Hall* (*Harper I*), 868 S.E.2d 499, 551-52 (N.C. 2022), *overruled on reh'g by Harper v. Hall* (*Harper III*), 886 S.E.2d 393 (N.C. 2023); *see Harper v. Hall*, 867 S.E.2d 554 (N.C. 2022) (order preceding issuance of *Harper I*). The state Supreme Court directed the General Assembly to submit new maps and remanded the case to the three-judge trial court to assess their constitutionality. *Harper I*, 868 S.E.2d at 552, 559-60.

7

30.     On February 23, 2022, the trial court issued a remedial order approving the General Assembly's new state House and Senate maps. *See Harper v. Hall* (*Harper II*), 881 S.E.2d 156, 162 (N.C. 2022), *withdrawn and superseded on reh'g by Harper III*, 886 S.E.2d 393. The approved state House and Senate maps were used in the 2022 elections. *Harper III*, 886 S.E.2d at 407.

31.     On December 16, 2022, the North Carolina Supreme Court reversed the trial court's decision accepting the remedial state Senate map. *Harper II*, 881 S.E.2d at 181. The North Carolina Supreme Court subsequently granted rehearing of its decision in *Harper II*. *Harper v. Hall*, 882 S.E.2d 548 (N.C. 2023) (rehearing order).

32.     On April 28, 2023, in *Harper III*, the North Carolina Supreme Court overruled *Harper I*, withdrew its decision in *Harper II*, and vacated the trial court's February 23, 2022 order concerning the remedial plans. *Harper III*, 886 S.E.2d at 449. The court authorized the General Assembly to enact new state House and Senate maps. *Id.*

33.     In October 2023—approximately six months after *Harper III*—the General Assembly enacted new districting plans. 2023 N.C. Sess. Laws 146 (state Senate) (SB 758); 2023 N.C. Sess. Laws 149 (state House) (HB 898).

34.     Under Article II, Section 22 of the North Carolina Constitution, redistricting legislation may not be vetoed by the state governor. N.C. Const. art. II, § 22(5)(b)-(d); *see Harper III*, 886 S.E.2d at 419. Accordingly, the 2023 redistricting bills took effect upon passage.

35.     SB 758, the state Senate redistricting bill, was passed and ratified on October 25, 2023. 2023 N.C. Sess. Laws 146.

**B.      The 2023 State Senate Redistricting Plan**

36.     Northeastern North Carolina includes a number of counties that are part of the Black Belt—a crescent-shaped region historically stretching from Virginia to Texas that was originally named for its rich black soil, but over time came to be associated with the slave labor

that soil attracted. As Booker T. Washington explained in 1901, the Black Belt was "the part of the South where the slaves were most profitable, and consequently they were taken there in the largest numbers." Today, the Black Belt refers to the counties with the largest Black populations in a number of Southern states, including North Carolina.

37.     Black Belt counties in North Carolina, all located in the northeast part of the state, include Bertie, Hertford, Edgecombe, Northampton, and Halifax Counties, each of which has a greater than 50 percent Black voting age population according to 2020 census data. Nearby Vance, Warren, Martin, and Washington Counties have greater than 40 percent Black voting age populations. Gates and Chowan Counties, located in the same area, have between 31 and 32 percent Black voting age populations. The Black voting age population of the State as a whole is 21 percent.

38.     At the time of the 2023 redistricting, the General Assembly had 2020 census data on the racial composition of each county in North Carolina. The General Assembly had also received a letter from the Southern Coalition for Social Justice (SCSJ) that enclosed expert analysis finding evidence of racially polarized voting in the Black Belt counties in recent elections, and that urged the General Assembly to conduct its own examination of racially polarized voting.

39.     At the time of the 2023 redistricting, the General Assembly also knew that in the 2022 general election, two Black Senate candidates in districts that encompassed Black Belt counties had been defeated by white candidates: longtime incumbent Toby Fitch in Senate District 4 and Valerie Jordan in Senate District 3.

40.     Section 2 of the Voting Rights Act required the General Assembly to draw any districts necessary to comply with the Voting Rights Act before applying North Carolina's Whole-County Provisions and other state redistricting principles. *See Stephenson*, 562 S.E.2d at 396-97.

9

41.     Nonetheless, the General Assembly either failed to conduct or failed to consider any Voting Rights Act analysis with respect to its 2023 state Senate plan.

42.     Instead, the General Assembly enacted SB 758, which cracks North Carolina's Black Belt counties across multiple districts, diluting the ability of minority voters in those counties to elect representatives of their choice.

43.     Under the map enacted by SB 758 (the "enacted map"), Senate District 1 includes Northampton, Bertie, Hertford, and Gates Counties, while Senate District 2 includes Warren, Halifax, Martin, Washington, and Chowan Counties. Edgecombe and Vance Counties are in Senate Districts 5 and 11, respectively.

44.     The demonstrative below illustrates how the enacted map cracks Black voters in the Black Belt counties between Senate Districts 1 and 2:



### C. Black North Carolinians in the Black Belt Counties Are Sufficiently Numerous and Geographically Compact To Constitute a Majority-Minority District

45. Rather than crack Black voters across these districts, the General Assembly could have drawn the Black Belt counties into a majority-minority district that would have met the Voting Rights Act's requirements while adhering to North Carolina's redistricting criteria.

46. It was feasible for the General Assembly to create a majority-minority district for the Black Belt counties that was compact, reasonably configured, and made up of whole counties, such as the one shown below:



47. As the demonstrative above shows, it was feasible to create a majority-minority district while leaving fully intact the current minority opportunity district in Pitt and Edgecombe Counties. The Black voting age population in this demonstration district is 51.47%, and the Black citizen voting age population is 53.12%.

48. In fact, it is feasible to create a majority-minority district without altering any

cluster or district in the enacted 2023 Senate map except two, i.e., the two districts that currently crack voters across the Black Belt counties. The following demonstration district (labeled B-1) is compact, reasonably configured, requires the alteration of only SD1 and SD2, preserves the county clusters required by *Stephenson* to the greatest possible extent, preserves the current minority opportunity district in Pitt and Edgecombe counties, and only splits a single county:



49.     The Black voting age population for this demonstration district (B-1) is slightly less than 50%, but the Black citizen voting age population is 50.19%.

50.     Together, the two districts in this demonstrative (demonstration districts B-1 and B-2) comprise exactly the same area as SD1 and SD2 in the 2023 enacted map.

### D.    Voting in the Relevant Area Is Racially Polarized

51.     As the Fourth Circuit observed in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), there is an "inextricable link between race and politics" in North Carolina. *Id.* at 214. Voting in many areas of the state "is racially polarized." *Id.* That is,

"the race of voters correlates with the selection of a certain candidate or candidates." *Id.* (quoting *Gingles*, 478 U.S. at 62 (discussing North Carolina)); *see also id.* at 225 (reiterating district court finding and admissions by state defendants at trial that "racially polarized voting between African Americans and whites remains prevalent in North Carolina" and that "African-American race is a better predictor for voting Democratic than party registration").

52.     Voting is highly racially polarized in the region of the Black Belt counties. Black voters there are politically cohesive and overwhelmingly support Democratic candidates. The white majority in the surrounding area is also politically cohesive, overwhelmingly supports Republican candidates, and historically votes as a bloc to defeat Black voters' candidates of choice.

53.     Under the state Senate map enacted in 2022 (i.e., the Senate map used in the 2022 elections), Senate District 3 includes Warren, Halifax, Martin, Bertie, Hertford, and Gates Counties, but also includes two majority-white counties, Currituck and Camden, and omits Vance and Washington Counties. In the 2022 elections, white voters in Senate District 3 voted as a racial bloc to elect their candidate of choice, defeating Black voters' candidate of choice.

54.     Federal courts have repeatedly identified racially polarized voting in the Black Belt counties. For example, in *Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266 (4th Cir. 1993), the Fourth Circuit found "a history of racially polarized voting" in the town of Ahoskie and the surrounding Hertford County. *Id.* at 1269. Over the twenty-two elections preceding the decision, 93 percent of Black voters voted for Black candidates, while 93.4% of white voters supported white candidates. *Id.* The town defendants in *Hines* stipulated that the town's system for electing its town council "diluted black voting strength in violation of § 2 of the [Voting Rights] Act." *Id.*; *see also, e.g.*, *Johnson v. Halifax County*, 594 F. Supp. 161, 165-66 (E.D.N.C. 1984) (crediting expert analysis finding racial polarization in Halifax County between 1968 and 1982).

55.     In addition, the Supreme Court's landmark opinion in *Thornburg v. Gingles*, 478 U.S. 30 (1986), affirmed the conclusions of a three-judge court in this district that made detailed findings of racially polarized voting in seven North Carolina state legislative districts. *Id.* at 34, 80. The three-judge panel "found that all of the challenged districts," which included several of North Carolina's Black Belt counties as well as certain other areas of the state, "exhibit[ed] severe and persistent racially polarized voting." *Id.* at 35 nn.1-2, 41; *see id.* at 52-54 ("Based on all of the evidence before it, the trial court concluded that each of the districts experienced racially polarized voting in a persistent and severe degree." (quotation marks omitted)); *see McCrory*, 831 F.3d at 224-25 (discussing *Gingles*).

56.     More recently, the district court in *North Carolina State Conference of NAACP v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019), *rev'd on other grounds sub nom. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020), examined expert analysis of data postdating the Fourth Circuit's 2016 *McCrory* decision and concluded that the state's electorate remained "extremely polarized" along racial lines. *Id.* at 30.

57.     North Carolina's racially polarized voting is an outgrowth of the State's "troubled racial history." *McCrory*, 831 F.3d at 226.

## E.     The Totality of the Circumstances Establishes That the Enacted Plan Has the Effect of Denying Black Voters an Equal Opportunity To Participate in the Political Process and To Elect Candidates of Their Choice

58.     Under the totality of the circumstances, as informed by each the Senate factors, *see supra* ¶¶ 25-26, Black voters in the Black Belt counties have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

### 1.  North Carolina's History of Racial Discrimination

59.     "Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223; *see also*

*Raymond*, 981 F.3d at 311 ("there is a long and shameful history of race-based voter suppression in North Carolina").

60.     The district court in *Gingles* found that North Carolina "had officially discriminated against its black citizens with respect to their exercise of the voting franchise from approximately 1900 to 1970 by employing at different times a poll tax, a literacy test, a prohibition against bullet (single-shot) voting and designated seat plans for multimember districts." 478 U.S. at 38-39 (footnotes omitted). Even after the removal of poll tax, literacy test, and other barriers, Black voter registration "remained relatively depressed" compared to white voter registration, including in the districts challenged in *Gingles*. *Id.* at 39. The district court attributed the discrepancy, "at least in part, to the historical pattern of statewide official discrimination." *Id.*

61.     Picking up where *Gingles* left off, the record in *McCrory* was "replete with evidence of instances since the 1980s in which the North Carolina legislature … attempted to suppress and dilute the voting rights of African Americans." *McCrory*, 831 F.3d at 223.

62.     Before the U.S. Supreme Court invalidated Section 5 of the Voting Rights Act in *Shelby County v. Holder*, 570 U.S. 529 (2013), 40 of North Carolina's 100 counties were subject to Section 5's preclearance requirement, including nearly all of the Black Belt counties. *McCrory*, 831 F.3d at 215. Between 1980 and 2013, the U.S. Department of Justice issued "over fifty objection letters to proposed election law changes in North Carolina—including several since 2000—because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *McCrory*, 831 F.3d at 224 (citing Department of Justice records). The Department of Justice or federal courts determined in some of these cases that the General Assembly had acted with discriminatory intent, while other actions produced discriminatory results. *Id.* at 223.

63.     "During the same period, private plaintiffs brought fifty-five successful cases under § 2 of the Voting Rights Act" to challenge North Carolina voting practices and restrictions. *Id.* at 224. Ten of those cases "ended in judicial decisions finding that electoral schemes in counties and municipalities across the state had the effect of discriminating against minority voters." *Id.* (collecting cases). Forty-five other cases "were settled favorably for plaintiffs out of court or through consent [decrees] that altered the challenged voting laws." *Id.* (collecting additional cases). The United States intervened or filed its own suits "[o]n several occasions." *Id.*

64.     The day after the *Shelby County* decision was issued, however, the Chairman of the North Carolina Senate Rules Committee announced an intention to enact an omnibus election law. *See McCrory*, 831 F.3d at 216. Before introducing the legislation, the General Assembly requested data on the use, by race, of a number of voting practices, including early voting, same-day registration, out-of-precinct voting, and preregistration by young voters before turning eighteen. *See id.* at 216-18. The data showed that each of these practices were used disproportionately by Black voters. *Id.* at 216-18. The legislature also requested data on possession of identification by North Carolinians, which showed that Black North Carolinians disproportionately lacked photo IDs issued by the state Department of Motor Vehicles. *Id.* at 216.

65.     The General Assembly soon enacted Session Law 2013-381, which imposed ID requirements that disproportionately burdened Black voters and restricted each of the voting practices that Black voters disproportionately used—early voting, same-day registration, out-of-precinct voting, and preregistration. *Id.* at 214-16. Multiple groups of plaintiffs challenged those restrictions. *See id.* at 218.

66.     The Fourth Circuit found that these provisions of the statute were motivated by discriminatory intent to target Black voters and diminish their electoral influence, violating Section

2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. *Id.* at 238.

67.     The Fourth Circuit observed that Session Law 2013-381 "target[ed] African Americans with almost surgical precision." *Id.* at 214.

### 2. North Carolina's History of Unlawful Race-Based Redistricting

68.     North Carolina has an extensive history of taking unlawful approaches to race in redistricting over the past several decades.

69.     In *Gingles*, the Supreme Court rejected a 1982 redistricting plan for state legislative districts because its use of multimember districts caused Black voters to have less opportunity than white voters to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act. 487 U.S. at 80.

70.     In the 1990s, a pair of U.S. Supreme Court decisions held that the General Assembly's 1991 congressional redistricting map included a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment. *Shaw v. Hunt*, 517 U.S. 899, 918 (1996); *see Shaw v. Reno*, 509 U.S. 630, 658 (1993) (finding plaintiffs stated a claim under the Equal Protection Clause).

71.     In *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017), a three-judge district court held that a congressional map adopted in 2011 was an unconstitutional racial gerrymander, ruling for the plaintiffs on claims that the plan packed Black voters into two districts to reduce their influence on other districts. *Id.* at 604, 609-11. The Supreme Court affirmed. *Cooper*, 581 U.S. at 322-23.

72.     Similarly, in *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017), a three-judge district court held that twenty-eight state legislative districts were racial gerrymanders in violation of the Equal Protection Clause. *Id.* at 176-77. The Supreme Court affirmed without argument. 581 U.S. at 1015.

### 3. Ongoing Effects of North Carolina's History of Discrimination

73.     In *Gingles*, the Supreme Court affirmed findings by the district court on circumstances in North Carolina that resulted in Black voters having less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice under Section 2 of the Voting Rights Act. 478 U.S. at 80; *see McCrory*, 831 F.3d at 225.

74.     In particular, the *Gingles* district court found that Black North Carolinians' ability to participate equally and elect their chosen candidates was "impair[ed]" by several factors, including "the legacy of official discrimination in voting matters, education, housing, employment, and health services." 478 U.S. at 80; *see id.* at 39.

75.     Another district court decision from the same period enjoined the method for electing the county commission in Halifax County based in part on similar considerations. *Johnson*, 594 F. Supp. at 162-63. The court there noted that in Halifax County, "Black political participation is also impaired by the present day socioeconomic effects resulting from racial discrimination in education, employment and other areas." *Id.* at 169; *see also id.* at 169-70 ("Compared to whites in Halifax County, blacks have lower educational, employment and income levels, and dis-proportionately more blacks live in poverty and have less adequate housing.").

76.     The *McCrory* litigation demonstrated that these effects continued into the 2010s. The district court in *McCrory* found that Black North Carolinians "currently lag behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability." *League of Women Voters of N.C.*, 769 F.3d at 246. Those effects were attributable to "North Carolina's history of official discrimination" against Black citizens. *Id.* at 235.

77.     The ongoing effects continue today. Black North Carolinians, including in the Black Belt counties, are significantly more likely to be impoverished than white North Carolinians.

They likewise face discrimination in education, housing, employment, and healthcare, and are less able to participate effectively in the political process.

### 4. History of Racial Appeals in North Carolina Political Campaigns

78.     The *Gingles* district court also found consistent and ongoing use of "racial appeals" in North Carolina political campaigns, with examples in the record from the 1890s through a 1984 U.S. Senate race. 478 U.S. at 40. The court found that use of racial appeals in North Carolina campaigns, "ranging in style from overt and blatant to subtle and furtive," had the effect of lessening Black citizens' opportunity to participate effectively in the political process and elect their chosen candidates. *Id.*

79.     The 1984 Senate campaign that *Gingles* discussed included white Republican candidate Jesse Helms charging that his Democratic opponent was colluding with Reverend Jesse Jackson to register hundreds of thousands of Black voters who would vote as a bloc against him.

80.     Helms again used racial appeals in his 1990 Senate race to attack his Black opponent, Charlotte Mayor Harvey Gantt. In one advertisement, Helms accused Gantt of exploiting his position as mayor and his minority status for personal financial gain by obtaining a free television station license and then selling it to a white-owned corporation. The advertisement claimed that the Black community felt betrayed by Gantt's actions.

81.     In the same campaign, Helms ran an infamous advertisement in which a pair of white hands crumples a job rejection letter, with the blame for the rejection placed on a minority candidate.

82.     Such tactics have persisted to the present day. Political campaigns in North Carolina have continued to be characterized by overt or subtle racial appeals, including discriminatory campaign tactics and racial appeals in elections deliberately and demonstrably designed to keep Black North Carolinians from registering and turning out to vote. Such tactics continue to affect

the ability of prospective and registered Black voters to participate in the political process.

83.     For example, in the 2020 race for a western North Carolina congressional district, then-Representative Madison Cawthorn attacked his Democratic opponent, Moe Davis, for allegedly associating himself with people who wanted to "ruin white males." In 2022, during the U.S. Senate race between then-Congressman Ted Budd and former North Carolina Supreme Court Chief Justice Cheri Beasley, advertisements blamed Beasley for crimes committed by individuals after early release from prison, echoing the infamous 1988 "Willie Horton" ad that targeted Democratic presidential candidate Michael Dukakis. The advertisements used imagery of white victims and photographs of Black men in custody alongside images of Beasley.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 2 of the Voting Rights Act—Vote Dilution

84.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

85.     Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race or color. 52 U.S.C. § 10301(a).

86.     The district boundaries created by SB 758 crack Black voters in the Black Belt counties in northeastern North Carolina, resulting in the dilution of their electoral strength in violation of Section 2 of the Voting Rights Act.

87.     Black North Carolinians in the Black Belt counties are sufficiently numerous and geographically compact to constitute a majority-minority district.

88.     Black voters in the Black Belt counties are politically cohesive, and elections in the

region reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black-preferred candidates.

89. The totality of the circumstances establishes that the enacted state Senate districting plan has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

90. In enforcing the district boundaries in SB 758, Defendants have acted and, absent relief from this Court, will act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that SB 758 violates Section 2 of the Voting Rights Act;

B. Grant preliminary and permanent injunctive relief barring Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of Senate Districts 1 and 2 as drawn in SB 758, including barring Defendants from conducting any Senate elections using those district boundaries;

C. Take actions necessary to order the adoption of a valid state Senate plan that includes a minority opportunity district in northeastern North Carolina, while leaving intact the current district comprised of Pitt and Edgecombe Counties, in time to use the remedial plan in the 2024 Senate elections (and, as part of the remedial order, waive the one-year residency requirement for candidates under N.C. Const. art. II, § 6, for newly drawn remedial districts);

D. Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: November 20, 2023

**ARNOLD & PORTER**
    **KAYE SCHOLER LLP**

R. Stanton Jones*
Stanton.Jones@arnoldporter.com
Elisabeth S. Theodore*
Elisabeth.Theodore@arnoldporter.com
Samuel I. Ferenc*
Sam.Ferenc@arnoldporter.com
601 Massachusetts Ave. NW
Washington, DC 20001-3743
202.942.5000

Respectfully submitted,

**POYNER SPRUILL LLP**

By: /s/ Edwin M. Speas, Jr.
    Edwin M. Speas, Jr.
    N.C. State Bar No. 4112
    espeas@poynerspruill.com
    P.O. Box 1801
    Raleigh, NC 27602-1801
    919.783.6400

    *Attorneys for Plaintiffs*
    **Notices of Special Appearance forthcoming*