**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

| | |
|---|---|
| RODNEY D. PIERCE and MOSES MATTHEWS, <br><br> Plaintiffs, <br><br> *v.* <br><br> THE NORTH CAROLINA STATE BOARD OF ELECTIONS, ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections, JEFF CARMON III in his official capacity as Secretary of the North Carolina State Board of Elections, STACY "FOUR" EGGERS IV in his official capacity as a member of the North Carolina State Board of Elections, KEVIN N. LEWIS in his official capacity as a member of the North Carolina State Board of Elections, SIOBHAN O'DUFFY MILLEN in her official capacity as a member of the North Carolina State Board of Elections, PHILIP E. BERGER in his official capacity as president pro tem of the North Carolina Senate, and TIMOTHY K. MOORE in his official capacity as Speaker of the North Carolina House of Representatives, <br><br> Defendants. | Case No. 4:23-cv-193-D |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

NATURE OF THE CASE ..................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

    A.    Northeastern North Carolina's Black Belt Counties .............................................. 3

    B.    The General Assembly's 2023 Enacted Senate Map ............................................. 3

    C.    Plaintiffs' Lawsuit ............................................................................................... 6

LEGAL STANDARD ........................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

   I.  Plaintiffs Are Likely To Prevail on the Merits ................................................... 8

    A.    Legal Framework ................................................................................................. 8

    B.    *Gingles* Precondition One: A compact and reasonably configured majority-minority district can be drawn in northeastern North Carolina .............. 9

    C.    *Gingles* Precondition Two: Black voters in northeastern North Carolina's Black Belt counties are politically cohesive ........................................................ 11

    D.    *Gingles* Precondition Three: White voters as a bloc usually defeat the candidates supported by Black voters ................................................................. 12

    E.    Totality of the Circumstances: The 2023 enacted map denies Black North Carolinians equal access to the process of electing state Senators ....................... 14

       1.  Senate Factor One: North Carolina has an ongoing history of official, voting-related discrimination ............................................................................................. 15

       2.  Senate Factor Two: Voting is racially polarized in the Black Belt counties ........ 17

       3.  Senate Factor Three: North Carolina's voting practices enhance the opportunity for discrimination ............................................................................................... 17

       4.  Senate Factor Four: History of candidate slating in local elections ..................... 17

       5.  Senate Factor Five: North Carolina's discrimination has produced severe socioeconomic disparities ................................................................................. 17

       6.  Senate Factor Six: North Carolina political campaigns feature racial appeals ..... 19

       7.  Senate Factor Seven: Black candidates are underrepresented in public office ..... 20

       8.  Senate Factor Eight: North Carolina is not responsive to its Black voters .......... 20

       9.  Senate Factor Nine: Any justification for splitting the Black Belt counties in the new Senate map is tenuous ............................................................................... 20

  II.  Plaintiffs and Other Black Voters Face Irreparable Harm Absent an Injunction ............ 21

  III.  The Balance of Equities and Public Interest Favor a Preliminary Injunction .................. 21

IV. *Purcell* Does Not Counsel Against a Preliminary Injunction Here ................................. 22

CONCLUSION ........................................................................................................ 25

Case 4:23-cv-00193-D-RN   Document 17   Filed 11/22/23   Page 3 of 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
    599 U.S. 1 (2023) .................................................................................................8, 9, 11, 12

*Cromartie v. Hunt,*
    34 F. Supp. 2d 1089 (1998) ........................................................................................23

*Disability Rights N.C. v. N.C. State Bd. of Elections,*
    No. 5:21-CV-361-BO, 2022 WL 2678884 (E.D.N.C. July 11, 2022) ....................21

*Gingles v. Edmisten,*
    590 F. Supp. 345 (E.D.N.C. 1984)..............................................................................19

*Hall v. Virginia,*
    385 F.3d 421 (4th Cir. 2004) ......................................................................................21

*Harper v. Hall,*
    865 S.E.2d 301 (N.C. 2021).........................................................................................23

*Harper v. Hall,*
    867 S.E.2d 554 (N.C. 2022)...........................................................................................4

*Harper v. Hall (Harper I),*
    868 S.E.2d 499 (N.C. 2022).............................................................................................3

*Harper v. Hall (Harper II),*
    881 S.E.2d 156 (N.C. 2022)...........................................................................................4

*Harper v. Hall,*
    882 S.E.2d 548 (N.C. 2023)...........................................................................................4

*Harper v. Hall (Harper III)*
    886 S.E.2d 393 (N.C. 2023) ..........................................................................................3

*Harper v. Lewis,*
    No. 19 CVS 012667 (N.C. Super Ct. Nov. 20, 2019) ...........................................23

*Harper v. Lewis,*
    No. 19 CVS 012667 (N.C. Super Ct. Dec. 2, 2019) .......................................22, 23

*Harris v. McCrory,*
    159 F. Supp. 3d 600 (M.D.N.C. 2016) .....................................................................14

*Hines v. Mayor & Town Council of Ahoskie*,
    998 F.2d 1266 (4th Cir. 1993) .............................................................14

*Johnson v. De Grandy*,
    512 U.S. 997 (1994).............................................................................8

*Johnson v. Halifax County*,
    594 F. Supp. 161 (E.D.N.C. 1984).......................................................13

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...............................................7, 15, 17, 21

*LULAC v. Perry*,
    548 U.S. 399 (2006).............................................................................15

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022)...........................................................................24

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) .............................................................7, 21

*N.C. League, of Conservation Voters, Inc. v. Hall*,
    No. 21 CVS 015426, 2022 WL 2610499 (N.C. Super. Ct. Feb. 23, 2022) ...........................22

*N.C. State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ...............................................................15

*North Carolina State Conference of NAACP v. Cooper*,
    430 F. Supp. 3d 15 (M.D.N.C. 2019) ...................................................14

*North Carolina State Conference of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ........................................................ *passim*

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)................................................................................22

*Shaw v. Hunt*,
    517 U.S. 599 (1996)............................................................................23

*Shelby County v. Holder*,
    570 U.S. 529 (2013), 40........................................................................16

*Stephenson v. Bartlett*,
    562 S.E.2d 377 (N.C. 2002).............................................................9, 10

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)..................................................................... *passim*

**Statutes**

52 U.S.C. § 10301(a) ....................................................................................................8

52 U.S.C. § 10301(b) ....................................................................................................8

1998 N.C. Sess. Laws 2 ..............................................................................................23

2023 N.C. Sess. Laws 146 .............................................................................................4

2023 N.C. Sess. Laws 149 .............................................................................................4

Voting Rights Act ................................................................................................ *passim*

**Other Authorities**

*11/08/22 Official General Election Results - Statewide: NC State Senate District 1* ....................4

*11/08/22 Official General Election Results - Statewide: NC State Senate District 3* ...............4, 12

*11/08/22 Official General Election Results - Statewide: NC State Senate District 11* ................................................................................................4

Booker T. Washington, *Up From Slavery: An Autobiography* (1st elec. ed. 1997) ........................3

*Candidate Filing for 2022 Elections to Resume on February 24*, North Carolina State Board of Elections (Feb. 9, 2022) ..................................................................................22

## NATURE OF THE CASE

This case involves an egregious and clear-cut violation of Section 2 of the Voting Rights Act (VRA), and seeks a limited and straightforward remedy. The new state Senate map enacted by the General Assembly on October 25, 2023 cracks Black voters in northeastern North Carolina's Black Belt counties between Districts 1 and 2, diluting the voting power of Plaintiffs and other Black North Carolinians in this region. Under the 2023 enacted Senate map, Black voters in the Black Belt counties will not be able to elect candidates of their choice, because their votes will be drowned out by white majorities in both districts who vote against Black-preferred candidates. The prior Senate map, enacted in 2022, likewise split Black voters in the Black Belt counties at issue between Districts 1, 3, and 11—none of which elected a Black-preferred candidate. The 2023 enacted map makes matters worse by *reducing* the Black population in what is now District 2 and eliminating any conceivable chance that Black voters could ever elect their candidates of choice.

Anyone looking at the 2023 map can see the egregious cracking of Black voters:



Plaintiffs are overwhelmingly likely to prevail in establishing that the 2023 map's cracking of Black voters in the Black Belt counties violates Section 2. As demonstrated by the analyses of Plaintiffs' experts, Black voters in the Black Belt counties are sufficiently numerous and geographically compact to form a majority-minority district, voting in the region is highly racially polarized, and the totality of the circumstances establishes that the enacted map dilutes Black voting power.

The proper remedy in this case is equally straightforward. As explained below, Plaintiffs' proposed remedial plan modifies only the boundary between Senate Districts 1 and 2 in the enacted map—it does not alter the boundaries of *any* other district in the enacted map. And this remedial plan creates a district with majority Black voting-age citizens that will give Black voters the opportunity to elect candidates of their choice, while adhering to traditional redistricting criteria.

The other preliminary injunction factors are readily satisfied. Plaintiffs and other Black voters in the Black Belt counties will suffer irreparable harm if they are forced to vote in districts that unlawfully prevent them from electing a Senate candidate of their choice. And the balance of equities and public interest strongly favor immediate relief to establish lawful districts now.

It is not too late to order this relief. The primaries are three-and-a-half months away. Candidate filing is set to begin on December 4, but it is routine in North Carolina for a court to approve a remedial map within 24 hours of candidate filing or even on the day of—indeed, that is what has happened in the last two election cycles in this State. Accordingly, if the Court acts expeditiously, it can grant a preliminary injunction and adopt a remedial map without any alteration to the election schedule. If necessary, however, the Court could and should stay candidate filing, which also has happened in the last two election cycles in this State due to legal challenges to maps. Regardless, the Court should order preliminary relief to prevent irreparable harm and ensure that northeastern North Carolina's Senate districts comply with Section 2 of the VRA in 2024.

2

## STATEMENT OF FACTS

### A.    Northeastern North Carolina's Black Belt Counties

Northeastern North Carolina includes a number of counties that are part of the historic Black Belt—a region stretching across the South characterized by its "thick, dark, and naturally rich soil." Booker T. Washington, *Up From Slavery: An Autobiography* 107-08 (1st elec. ed. 1997), https://docsouth.unc.edu/fpn/washington/washing.html. Because the soil in the Black Belt made it "the part of the South where the slaves were most profitable … they were taken there in the largest numbers," outnumbering white populations. *Id.* at 108.

Today, eight counties in North Carolina—specifically, the northeastern part of the State—have a total population that is majority-Black. *See* Report of Blakeman B. Esselstyn ("Esselstyn Rep."), attached as Exhibit 1, ¶ 17. These eight majority-Black counties are: Bertie, Hertford, Edgecombe, Northampton, Halifax, Vance, Warren, and Washington. *Id.* Other nearby counties have substantial Black populations, including Martin, Gates, and Chowan Counties. *Id.* attach. C.

On a statewide basis, North Carolina's population increased by more than 900,000 people between the 2010 and 2020 censuses, a total increase of roughly 9.5%. *See* Esselstyn Rep. ¶ 14; Report of Dr. Matt Barreto ("Barreto Rep."), attached as Exhibit 2, ¶¶ 9, 13. The Black population grew at a substantially higher rate than the white population over the last decade. Esselstyn Rep. ¶¶ 15, 16; Barreto Rep. ¶ 13. The white share of the State's total population actually declined over this period. Esselstyn Rep. ¶ 16; Barreto Rep. ¶ 13.

### B.    The General Assembly's 2023 Enacted Senate Map

In November 2021, following the 2020 census, the General Assembly enacted new congressional and state legislative maps. In 2022, the North Carolina Supreme Court enjoined those maps as unconstitutional. The state Supreme Court directed the General Assembly to submit new maps and remanded the case to the three-judge trial court to assess their constitutionality. *Harper*

*v. Hall* (*Harper I*), 868 S.E.2d 499, 551-52, 559-60 (N.C. 2022), *overruled on reh'g by Harper v. Hall* (*Harper III*), 886 S.E.2d 393 (N.C. 2023); *see Harper v. Hall*, 867 S.E.2d 554 (N.C. 2022).

On February 23, 2022, the trial court approved the General Assembly's new House and Senate maps. *See Harper v. Hall* (*Harper II*), 881 S.E.2d 156, 162 (N.C. 2022), *withdrawn and superseded on reh'g by Harper III*, 886 S.E.2d 393. The approved House and Senate maps were used in the 2022 elections, *Harper III*, 886 S.E.2d at 407. Under the 2022 map, Black-preferred candidates lost in Senate Districts 3 and 11, and a white-preferred candidate won an unopposed race in Senate District 1. *See 11/08/22 Official General Election Results - Statewide: NC State Senate District 11*, https://bit.ly/3Ra44hR; *11/08/22 Official General Election Results - Statewide: NC State Senate District 3*, https://bit.ly/47zPxBC; *11/08/22 Official General Election Results - Statewide: NC State Senate District 1*, https://bit.ly/3QIuo16.

On December 16, 2022, in *Harper II*, the North Carolina Supreme Court reversed the trial court's decision approving the remedial Senate map. 881 S.E.2d at 181. The state Supreme Court later granted rehearing of its decision in *Harper II*. *Harper v. Hall*, 882 S.E.2d 548 (N.C. 2023).

On April 28, 2023, in *Harper III*, the North Carolina Supreme Court overruled *Harper I*, withdrew its decision in *Harper II*, and vacated the trial court's February 23, 2022 order concerning the remedial maps. *Harper III*, 886 S.E.2d at 449. The state Supreme Court authorized the General Assembly to enact new state House and Senate maps. *Id.*

In October 2023—six months after the North Carolina Supreme Court's decision in *Harper III*—the General Assembly enacted new maps. 2023 N.C. Sess. Laws 146 (state Senate) (SB 758); 2023 N.C. Sess. Laws 149 (state House) (HB 898). SB 758, the Senate redistricting bill, was passed and ratified on October 25, 2023. 2023 N.C. Sess. Laws 146. Because the Governor cannot veto redistricting legislation, the 2023 redistricting bills took effect upon passage.

At the time of the 2023 redistricting, the General Assembly had 2020 census data on the racial composition of each county in North Carolina. *See* N.C. Gen. Assembly, *SL 2023-146 - StatPack Report w Race*, https://bit.ly/3R7Xw3q. The General Assembly had also received an analysis finding racially polarized voting in the Black Belt counties in recent elections. *See* Barreto Rep. ¶ 22. The General Assembly also knew that in 2022, two Black-preferred candidates in Senate districts containing Black Belt counties had been defeated by white candidates: Mark Speed in Senate District 11 and Valerie Jordan in Senate District 3. *See supra* p.4.

Nonetheless, the General Assembly either failed to conduct or failed to consider any VRA analysis with respect to Senate districts. Instead, the General Assembly enacted a Senate map that cracks Black voters in the Black Belt counties across multiple districts, diluting those voters' electoral influence. Barreto Rep. ¶¶ 15, 33. Specifically, in the 2023 enacted map, Senate District 1 includes Northampton, Bertie, Hertford, and Gates Counties, while Senate District 2 includes Warren, Halifax, Martin, Washington, and Chowan Counties. *See* S.L. 2023-146 Senate, https://bit.ly/47zTlCU. Black voters cannot elect candidates of their choice in either of these districts. Barreto Rep. ¶ 33. This cracking is vividly illustrated by the figure below, which superimposes the district boundaries on a heat map showing North Carolina voting districts shaded by the percentage of the voting age population that is Black:



Esselstyn Rep. at 10 fig. 5; *see also* S.L. 2023-146 Senate, https://bit.ly/47zTlCU.

### C.    Plaintiffs' Lawsuit

Plaintiffs filed this lawsuit two days ago, on November 20, 2023, and filed a First Amended Complaint earlier today. Plaintiffs assert that the 2023 enacted Senate map violates Section 2 of the VRA by cracking Black voters in northeastern North Carolina between Senate Districts 1 and 2. Plaintiffs are Black voters who live in the region that the enacted Senate map cracks. *See* Decl. of Rodney D. Pierce, attached as Exhibit 4; Decl. of Moses Matthews, attached as Exhibit 5. They seek a remedial map that would replace Senate Districts 1 and 2 with two new districts, one of which will give Black voters the opportunity to elect candidates of their choice. Plaintiffs' proposed remedial map does not alter the boundaries of any other district in the 2023 enacted map.

### LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must show that "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of

hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). When the government is the opposing party, the third and fourth factors "merge." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

## ARGUMENT

Plaintiffs satisfy all the requirements for a preliminary injunction. They are likely to succeed on the merits of their claim that the 2023 enacted Senate map violates Section 2 of the VRA. The enacted map unlawfully cracks Black voters in the Black Belt counties between Senate Districts 1 and 2, depriving those voters of the opportunity to elect candidates of their choice. The prior 2022 enacted map likewise denied Black voters in the Black Belt counties an opportunity to elect a candidate of their choice. Plaintiffs will suffer immediate, irreparable harm if they are forced once again to vote in districts that unlawfully dilute their votes and deny them equal political participation. And the equities and public interest favor granting immediate relief. The Court accordingly should grant a preliminary injunction barring use of enacted Senate Districts 1 and 2.

The remedy for this violation is limited and straightforward. Plaintiffs' proposed remedial map adjusts the boundaries of *only* Senate Districts 1 and 2—leaving *all* other districts in the 2023 enacted map wholly untouched—before the 2024 election cycle begins. The proposed remedial map includes a district (Demonstration District B-1) that will give Black voters in the Black Belt counties the opportunity to elect candidates of their choice. This remedial district is also more compact than Districts 1 and 2 in the 2023 enacted map, preserves rather than divides the community of interest formed by Black Belt counties, and adheres to other traditional redistricting criteria. And again, Plaintiffs' proposed remedy leaves *fully intact* Districts 3-50 in the 2023 enacted map.

The *Purcell* doctrine poses no bar to preliminary relief now. The 2024 primaries are still more than three months away. If the Court acts expeditiously, it can enjoin the enacted map and

adopt the remedial map without any adjustment to the election calendar. And if necessary, the Court can stay candidate filing, as courts have done in the last two election cycles in this State.

In all events, preliminary relief should be granted so that Black voters in northeastern North Carolina's Black Belt counties are not forced to vote next year in districts that dilute their votes in violation of Section 2 of the Voting Rights Act.

## I.  Plaintiffs Are Likely To Prevail on the Merits

Plaintiffs are overwhelmingly likely to prevail in establishing that the 2023 enacted Senate map violates Section 2 of the VRA. Plaintiffs easily satisfy all three of the preconditions the Supreme Court identified in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and the "totality of the circumstances," 52 U.S.C. § 10301(b), establishes that the cracking of Black voters in the Black Belt counties dilutes their votes and prevents them from electing candidates of their choice.

### A.  Legal Framework

Section 2 of the VRA prohibits States from imposing any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A districting map violates Section 2 if it "dilute[s] the voting strength of politically cohesive minority group members," including "by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Section 2 prohibits such a map "where its result, interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Id.* (citations omitted).

As the U.S. Supreme Court reaffirmed in *Allen v. Milligan*, 599 U.S. 1 (2023), courts evaluate Section 2 claims under the three-part framework developed in *Gingles*. To prevail, plaintiffs must show that (1) the relevant minority group is "sufficiently large and geographically compact

to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51; *see Milligan*, 599 U.S. at 18. If those preconditions are satisfied, courts must consider "the totality of the circumstances"—which may include, but is not limited to, nine factors identified in the Senate Report accompanying the 1982 amendments to the VRA—to determine whether, as a result of the district boundaries, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. *Gingles*, 478 U.S. at 36-37, 43-44 (quoting 52 U.S.C. § 10301(b)); *see Milligan*, 599 U.S. at 18.

North Carolina state law requires the General Assembly to begin redistricting by conducting a VRA analysis to determine whether Section 2 requires drawing any districts to give minority voters an opportunity to elect a representative of their choice. *See Stephenson v. Bartlett*, 562 S.E.2d 377, 396-97 (N.C. 2002). Only after drawing those "districts required by the VRA" may the General Assembly draw "non-VRA districts" using other state-law redistricting principles and rules, including county grouping or clustering requirements. *Id.* at 396-97.

## B. *Gingles* Precondition One: A compact and reasonably configured majority-minority district can be drawn in northeastern North Carolina

The first *Gingles* precondition is satisfied here because a compact and reasonably configured majority-minority district can be drawn in the Black Belt counties. *Milligan*, 599 U.S. at 18. The Black population thus "has the potential to elect a representative of its own choice in some single-member district" that "comports with traditional districting criteria." *Id.* (citations omitted). Plaintiffs' expert Blakeman Esselstyn presents a majority-minority demonstrative district, labeled Demonstration District A, that is compact, reasonably configured, and made up of whole counties:



Esselstyn Rep. at 12 fig. 6. The Black voting age population in Demonstration District A is 51.47%, and the Black citizen voting age population is 53.12%. *Id.* at 12 tbl. 3. Demonstration District A is more compact than both Senate District 1 and 2 in the 2023 enacted map, *id.* ¶ 43 & tbls. 2-3, and adheres to other traditional redistricting criteria, *id.* ¶¶ 38-47.

Mr. Esselstyn has also shown that it is feasible to create a majority-minority district without altering any county cluster or district in the enacted 2023 Senate map except two, *i.e.*, enacted Districts 1 and 2 which crack Black voters in the Black Belt counties. Demonstration District B-1, shown in the illustration below, is compact, reasonably configured, requires the alteration of only Senate Districts 1 and 2 from the 2023 enacted map, preserves the county clusters required by *Stephenson* to the greatest possible extent, preserves the current minority opportunity district in Pitt and Edgecombe Counties (Senate District 5), and splits only a single county:



Esselstyn Rep. at 15 fig. 8; *see id.* ¶¶ 35, 37, 39-51. Demonstration District B-1 has a 50.19%

Black citizen voting age population, and its Black voting age population is just shy of 50%. *Id.* at

13 tbl. 4. It is also more compact than enacted Senate Districts 1 and 2, Esselstyn Rep. ¶¶ 42-43 &

tbls. 2, 4, and adheres to other traditional redistricting criteria, *id.* ¶¶ 38-51.

Plaintiffs accordingly meet the first *Gingles* precondition.

**C.** **_Gingles_ Precondition Two: Black voters in northeastern North Carolina's Black Belt counties are politically cohesive**

The second *Gingles* precondition is satisfied because Black voters in northeastern North

Carolina's Black Belt counties are politically cohesive. *Gingles*, 478 U.S. at 51; *see Milligan*, 599

U.S. at 18. "Bloc voting by blacks tends to prove that the black community is politically cohesive,

that is, it shows that blacks prefer certain candidates whom they could elect in a single-member,

black majority district." *Gingles*, 478 U.S. at 68. Plaintiffs' expert Dr. Matt Barreto found, based

on his analysis of 31 elections in 2020 and 2022, that voting in the Black Belt counties is highly

racially polarized. Barreto Rep. ¶¶ 11, 22, 27, 29. Black voters in the region voted in unified and cohesive fashion, consistently supporting the same candidates by a ratio of roughly 9-to-1 or greater. *Id.* ¶¶ 22, 24. The voting patterns for the state legislative elections are even starker: 98-99% of Black voters voted cohesively in 2020 and 2022. *Id.* ¶ 26. Federal elections such as U.S. Senate and President reveal the same patterns of statistically significant racially polarized voting. *Id.* ¶ 28. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Gingles*, 478 U.S. at 56; *see Milligan*, 599 U.S. at 18-19.

Plaintiffs thus satisfy the second *Gingles* precondition.

### D. *Gingles* Precondition Three: White voters as a bloc usually defeat the candidates supported by Black voters

Dr. Barreto's analysis also shows that in northeastern North Carolina, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate," satisfying the third precondition. *Gingles*, 478 U.S. at 51; *see Milligan*, 599 U.S. at 18. Across 31 elections in 2020 and 2022, white voters in the region opposed Black voters' candidates of choice at rates as high as 85 percent. Barreto Rep. ¶¶ 24-26; *see also id.* ¶ 11. White voters regularly voted in the exact opposite pattern of Black voters. *Id.* ¶ 24. "Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice." *Gingles*, 478 U.S. at 68. Notably, white bloc voting against Black candidates of choice is consistently more extreme in northeastern North Carolina than in other parts of the State. Barreto Rep. ¶ 29. For example, in 2022, white voters in then-Senate District 3 elected their candidate of choice, Bobby Hanig, defeating Black voters' candidate of choice, Valerie Jordan. *See 11/08/22 Official General Election Results - Statewide: NC State Senate District 3*, https://bit.ly/47zPxBC.

In sum, voting is highly racially polarized in the Black Belt Counties—Black voters are politically cohesive, and white voters vote as a bloc to usually defeat Black-preferred candidates. Dr. Barreto presented a scatterplot depicting precinct-by-precinct voting in the Black Belt counties in the 2020 gubernatorial election, starkly illustrating the racial polarization:



Barreto Rep. at 12 fig. 4.

Consistent with Dr. Barreto's analysis, federal courts have found racially polarized voting in the Black Belt counties. The Supreme Court in *Gingles* affirmed findings of racially polarized voting in areas of North Carolina including a state Senate district consisting of "Northampton, Hertford, Gates, Bertie, and Chowan Counties, and parts of Washington, Martin, Halifax, and Edgecombe Counties." 478 U.S. at 34, 35 n.1, 80. The district court in *Gingles* found that all of the challenged districts "exhibit[ed] severe and persistent racially polarized voting." *Id.* at 35 nn.1-2, 41, 52-54; *see also, e.g.*, *Johnson v. Halifax County*, 594 F. Supp. 161, 165-66, 171 (E.D.N.C.

1984) (enjoining Halifax County's method for electing its Board of Commissioners based in part on expert analysis finding racially polarized voting in the County).

The Fourth Circuit similarly recognized "a history of racially polarized voting" in the town of Ahoskie and the surrounding Hertford County in *Hines v. Mayor & Town Council of Ahoskie*. 998 F.2d 1266, 1269 (4th Cir. 1993); *see id.* (noting that over twenty-two recent elections, 93 percent of Black voters voted for Black candidates and 93.4 percent of white voters supported white candidates). The Fourth Circuit later observed in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), that there is an "inextricable link between race and politics" in North Carolina and that voting in "many areas" of the State "is racially polarized." *Id.* at 214. In 2019, the district court in *North Carolina State Conference of NAACP v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019), *rev'd on other grounds sub nom. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020), examined recent data and concluded that North Carolina's electorate remained "extremely polarized" along racial lines. *Id.* at 30. Dr. Barreto's analyses of the latest data from the 2020 census and elections in 2020 and 2022 confirm that these courts' findings remain accurate and that racially polarized voting persists in this area of the State.

Plaintiffs thus satisfy the third and final *Gingles* precondition.

### E.    Totality of the Circumstances: The 2023 enacted map denies Black North Carolinians equal access to the process of electing state Senators

Considering the "totality of the circumstances," the 2023 enacted map deprives Black residents of the Black Belt counties of an equal opportunity to elect candidates of their to choice to the state Senate. *See Gingles*, 478 U.S. at 47. As courts have explained, "[i]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Harris v. McCrory*,

159 F. Supp. 3d 600, 623 (M.D.N.C. 2016) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017).

The factors outlined in the Senate Report accompanying the 1982 VRA amendments guide this analysis. These "Senate Factors" are "typically relevant to a § 2 claim." *LULAC v. Perry*, 548 U.S. 399, 426 (2006). As noted, they are not exclusive, and "there is no requirement that any particular number of factors be proved, or [even] that a majority of them point one way or the other." *League of Women Voters of N.C.*, 769 F.3d at 240 (quoting *Gingles*, 478 U.S. at 45). "Instead, courts must undertake 'a searching practical evaluation of the "past and present reality,"' [with] a "functional" view of the political process.'" *Id.* at 241 (quoting *Gingles*, 478 U.S. at 45). Here, the Senate factors overwhelmingly support Plaintiffs' claim that the map violates Section 2.

### 1. Senate Factor One: North Carolina has an ongoing history of official, voting-related discrimination

"[T]here is a long and shameful history of race-based voter suppression in North Carolina." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020); *see also McCrory*, 831 F.3d at 223 ("Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular."). North Carolina "officially discriminated against its black citizens with respect to their exercise of the voting franchise from approximately 1900 to 1970 by employing at different times a poll tax, a literacy test, a prohibition against bullet (single-shot) voting and designated seat plans for multimember districts." *Gingles*, 478 U.S. at 38-39 (footnotes omitted). Even after removal of these official barriers, Black voter registration "remained relatively depressed" due, "at least in part, to the historical pattern of statewide official discrimination." *Id.* at 39; *see also McCrory*, 831 F.3d at 223 ("North Carolina's pre-1965 history of pernicious discrimination informs [judicial] inquiry" into modern voting legislation.).

Official discrimination against North Carolina's Black voters continued after *Gingles*. Throughout the 1980s, "the North Carolina legislature … attempted to suppress and dilute the voting rights of African Americans." *McCrory*, 831 F.3d at 223. Before the U.S. Supreme Court invalidated Section 5 of the Voting Rights Act in *Shelby County v. Holder*, 570 U.S. 529 (2013), 40 of North Carolina's 100 counties were subject to Section 5's preclearance requirement, including nearly all of the Black Belt counties. *McCrory*, 831 F.3d at 215. Between 1980 and 2013, the U.S. Department of Justice issued "over fifty objection letters to proposed election law changes in North Carolina—including several since 2000—because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *Id.* at 224 (citing U.S. Dep't of Justice, Civil Rights Div., Voting Determination Letters for North Carolina (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-north-carolina). The Department of Justice or federal courts determined in some of these cases that the General Assembly had acted with discriminatory intent, while other actions produced discriminatory results. *Id.* at 223.

"During the same period, private plaintiffs brought fifty-five successful cases under § 2" to challenge North Carolina voting practices and restrictions. *Id.* at 224. Ten of these cases "ended in judicial decisions finding that electoral schemes in counties and municipalities across the state had the effect of discriminating against minority voters." *Id.* (citing as examples *Ward v. Columbus Cnty.*, 782 F. Supp. 1097 (E.D.N.C. 1991); *Johnson v. Halifax Cnty.*, 594 F. Supp. 161 (E.D.N.C. 1984)). Forty-five other cases "were settled favorably for plaintiffs out of court or through consent [decrees] that altered the challenged voting laws." *Id.* (citing as examples *Daniels v. Martin Cnty. Bd. of Comm'rs*, No. 4:89-cv-00137 (E.D.N.C. 1992); *Hall v. Kennedy*, No. 3:88-cv-00117 (E.D.N.C. 1989)). "On several occasions, the United States intervened in cases or filed suit independently." *Id.* (citing, *e.g.*, *United States v. Granville Cnty. Bd. of Educ.*, No. 5:87-cv-00353 (E.D.N.C. 1989); *United States v. Lenoir Cnty.*, No. 87-105-cv-84 (E.D.N.C. 1987)).

And in *McCrory*, the Fourth Circuit found that provisions of the General Assembly's omnibus election law, enacted immediately after the *Shelby County* decision, were motivated by discriminatory intent to target Black voters and diminish their electoral influence, violating Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. 831 F.3d at 238. These provisions "target[ed] African Americans with almost surgical precision." *Id.* at 214.

2. **Senate Factor Two: Voting is racially polarized in the Black Belt counties**

As discussed above, voting in North Carolina, especially in the Black Belt counties, is highly racially polarized, with white citizens voting as a bloc to usually defeat Black voters' candidates of choice. *See supra* section I.C-D; Barreto Rep. ¶¶ 11, 22-29.

3. **Senate Factor Three: North Carolina's voting practices enhance the opportunity for discrimination**

As discussed above, since the 19th century, North Carolina has employed a variety of voting practices designed to discriminate against Black voters. *See supra* section I.E.1.

4. **Senate Factor Four: History of candidate slating in local elections**

Because North Carolina's state Senate elections do not use a slating process, this factor is not relevant here.

5. **Senate Factor Five: North Carolina's discrimination has produced severe socioeconomic disparities**

As courts have recognized, Black North Carolinians "lag behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability." *League of Women Voters of N.C.*, 769 F.3d at 246. In the district court proceedings in *McCrory*, the plaintiffs presented unchallenged statistics showing:

> "[A]s of 2011–12, 34% of African American North Carolinians live below the federal poverty level, compared to 13% of whites; (2) as of the fourth quarter of 2012, unemployment rates in North Carolina were 17.3% for African Americans and 6.7% for whites; (3) 15.7% of African American North Carolinians over age 24 lack a high school degree, as compared to 10.1%

of whites; (4) 27% of poor African American North Carolinians do not have access to a vehicle, compared to 8.8% of poor whites; and (5) 75.1% of whites in North Carolina live in owned homes as compared to 49.8% of African Americans."

*Id.* at 235; *see also id.* at 246.

Plaintiffs' expert Dr. Traci Burch found that these disparities—which hinder participation in the political process—continue today and are especially pronounced in the Black Belt counties. *See* Report of Traci Burch ("Burch Rep."), attached as Exhibit 3, at 10. The median annual income of households headed by Black North Carolinians is more than $20,000 less than corresponding white households, with the gap even greater in some Black Belt counties. *Id.* at 10-11. Similarly, the poverty rate for families headed by Black North Carolinians is 17.3 percent, compared to 6.3 percent for white-headed households. *Id.* at 10-11. In some of the Black Belt counties, the Black family poverty rate is *triple* the rate for white families. *Id.* at 11-12. The same effects are clear for unemployment, with the statewide Black unemployment rate nearly double the rate for white North Carolinians, with even greater disparities in the Black Belt counties. *Id.* at 11, 13. Black North Carolinians also have lower rates of homeownership; nearly three-quarters of white householders own their homes, compared with just under half of Black householders. *Id.* at 13.

Marked differences in education also continue. *Id.* at 3-5. North Carolina was slow to dismantle de jure segregation following *Brown v. Board of Education*, and recent research shows that school segregation has actually *increased* since the 1990s. *Id.* at 4-5. Today, in multiple Black Belt counties, elementary school segregation is considered moderate or high. *Id.* at 5. Statewide, North Carolina has a persistent gap in proficiency between Black and white students. *Id.* In the Black Belt counties, Black students' reading and math test scores are lower than white students' scores across the board. *Id.* at 5-8. These historical and contemporary educational disparities have led to substantial ongoing discrepancies in education attainment. *Id.* at 8-10. Black North Carolinians

also have poorer health outcomes than whites across numerous measures, and are disproportion-ately likely to interact with the criminal justice system. *Id.* at 13-16.

Each of these factors reduces Black North Carolinians' access to the ballot and ability to elect candidates of their choice, especially in the Black Belt counties. *Id.* at 17. Lower socioeconomic status, educational attainment, and employment rates make it more difficult to obtain and maintain the resources and make the time to vote consistently, as does poorer health. *See id.* at 3-4, 10, 13-14. These factors, traceable at least in part to historical and contemporary discrimination, reduce Black North Carolinians' opportunity to participate in the political process.

### 6. Senate Factor Six: North Carolina political campaigns feature racial appeals

Racial appeals have been a consistent element of North Carolina political campaigns for well over a century. In *Gingles*, the district court found that "[f]rom the Reconstruction era to the present time, appeals to racial prejudice against black citizens have been effectively used by persons, either candidates or their supporters, as a means of influencing voters in North Carolina political campaigns." *Gingles v. Edmisten*, 590 F. Supp. 345, 364 (E.D.N.C. 1984). Pamphlets and other election materials "reveal[ed] an unmistakable intention by their disseminators to exploit existing fears and prejudices and to create new fears and prejudices on the part of white citizens in regard to black citizens and to black citizens' participation in the political processes of the state." *Id.* The effect was "to lessen to some degree the opportunity of black citizens to participate effectively in the political processes and to elect candidates of their choice." *Id.*; *see Gingles*, 478 U.S. at 40. The campaign tactics of U.S. Senate candidate Jesse Helms in 1984 and 1990 are prominent examples of racial appeals in North Carolina elections. Burch Rep. at 19.

Racial appeals in North Carolina elections persist today. In a 2020 congressional race, then-Representative Madison Cawthorn attacked his Democratic opponent, Moe Davis, for allegedly associating himself with people who wanted to "ruin white males." *Id.* at 20. In 2022, during the

19

U.S. Senate race between then-Congressman Ted Budd and former North Carolina Supreme Court Chief Justice Cheri Beasley, advertisements blamed Beasley for crimes committed by individuals after early release from prison, echoing the infamous 1988 "Willie Horton" ad that targeted presidential candidate Michael Dukakis. *Id.* at 19-20. The ads used imagery of white victims and photographs of Black men in custody alongside images of Beasley. *Id.* at 19-20.

### 7.    Senate Factor Seven: Black candidates are underrepresented in public office

Black North Carolinians are slightly underrepresented in some offices relative to their share of the State's population. Burch Rep. at 21. No Black North Carolinians have been elected governor of the State, though current Republican Lieutenant Governor Mark Robinson is a 2024 gubernatorial candidate. *Id.* North Carolina has had no Black U.S. senators and only 11 Black representatives have been elected to the U.S. House. *Id.* In the state legislature, 21.6 percent of House members are Black, but just 18 percent of state senators. *Id.* at 21-22.

### 8.    Senate Factor Eight: North Carolina is not responsive to its Black voters

North Carolina's failure to remedy the persistent and dramatic socioeconomic disparities between Black and white North Carolinians shows the State's lack of responsiveness to the needs of its Black residents, especially in the Black Belt counties. *See supra* section I.E.5.

### 9.    Senate Factor Nine: Any justification for splitting the Black Belt counties in the new Senate map is tenuous

Finally, no legitimate governmental interest justifies denying Black voters in the Black Belt counties the opportunity to ability to elect state Senate candidates of their choice. There is no plausible justification for the 2023 enacted Senate map's crack of Black voters in this region, when Section 2 of the VRA so squarely requires creation of a minority opportunity district there.

## II. Plaintiffs and Other Black Voters Face Irreparable Harm Absent an Injunction

Plaintiffs and other Black voters in the Black Belt counties will suffer irreparable harm if they are forced to vote in districts that unlawfully dilute their votes and prevent them from electing candidates of choice in violation of Section 2 of the VRA. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C.*, 769 F.3d at 247. Discriminatory voting policies "are 'the kind of serious violation of ... the Voting Rights Act for which courts have granted immediate relief.'" *Id.* (quoting *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986)). "[O]nce the election occurs, there can be no do-over and no redress," so the injury to impacted voters "is real and completely irreparable if nothing is done." *Id.*

Both Mr. Pierce and Mr. Matthews are Black registered voters who live in Senate District 2 under the 2023 enacted map. Pierce Decl. ¶¶ 2-4; Matthews Decl. ¶¶ 2-4.[1] Mr. Pierce and Mr. Matthews live in Halifax County and Martin County, respectively, and they will be irreparably harmed if they are forced to vote in a district that dilutes their votes in violation of the VRA.

## III. The Balance of Equities and Public Interest Favor a Preliminary Injunction

The balance of equities and public interest—which merge when the government is the opposing party—support a preliminary injunction. *Miranda*, 34 F.4th at 365. "The public interest is served by protecting federally guaranteed voting rights in North Carolina." *Disability Rights N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *7 (E.D.N.C. July 11, 2022); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("By definition, '[t]he public interest ... favors permitting as many qualified voters to vote as possible'" in districts where those votes will not be diluted. (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012))).

---

[1] For the same reasons, Plaintiffs have standing to bring this action. *See Hall v. Virginia*, 385 F.3d 421, 427 n.10 (4th Cir. 2004).

## IV. *Purcell* Does Not Counsel Against a Preliminary Injunction Here

Ordinarily, a plaintiff who satisfies all the legal requirements for obtaining a preliminary injunction gets one. In some cases, on the eve of an election, injunctive relief may be denied where it would cause voter confusion or otherwise interfere with the running of an orderly election. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006). The *Purcell* doctrine does not bar relief here.

Granting a preliminary injunction will not hinder in any way the running of orderly elections in North Carolina in 2024. The 2024 elections are many months away. The state legislative primaries are set for Tuesday, March 5, 2024, and the general election is Tuesday, November 5, 2024. The window for candidate filing for these elections is set to begin at noon on Monday, December 4, 2023, and end at noon on Friday, December 15, 2023. If the Court decides Plaintiffs' motion by December 1, 2023, candidate filing can open in remedial districts without delay.

Indeed, in the last two North Carolina election cycles, maps were finalized within 24 hours before—or on the day of—candidate filing. In 2022, the court issued an order altering dozens of districts in the House and Senate maps and all the districts in the congressional map on February 23, 2022, and candidate filing began at 8 a.m. the next day, February 24, 2022. *See* Order on Remedial Plans, *N.C. League, of Conservation Voters, Inc. v. Hall*, No. 21 CVS 015426, 2022 WL 2610499 (N.C. Super. Ct. Feb. 23, 2022); *Candidate Filing for 2022 Elections to Resume on February 24*, N.C. State Bd. of Elections, https://bit.ly/3sLTLY4. In 2020, the court issued an order on December 2, 2019 approving a remedial congressional map and ordered candidate filing (which it had previously delayed) to commence "immediately." Order, *Harper v. Lewis*, No. 19 CVS 012667 (N.C. Super. Ct. Dec. 2, 2019), https://bit.ly/3G7QMfL.

Nor will the proposed preliminary injunction here cause any voter confusion. At most, the injunction impacts candidate filing for two districts, not any elections under the map. The 2023 enacted Senate map has only been in place for four weeks and no one has ever voted under the

enacted districts. What's more, remedying the VRA violation only requires changing the boundary between two Senate districts, allowing all 48 other districts to remain untouched. And unlike Senate District 2 in the 2023 enacted map and then-Senate District 3 in the 2022 enacted map, Demonstration District B-1 will give Black voters the opportunity to elect a candidate of their choice.

If the Court issues its preliminary injunction decision on or after December 4, the Court could also pause or postpone the candidate filing deadline without disrupting the orderly running of the 2024 elections. That, too, has repeatedly happened in North Carolina, including in the 2022 elections and the 2020 elections. *See Harper v. Hall*, 865 S.E.2d 301, 302 (N.C. 2021) (staying candidate filing for all 2022 elections); Order, *Harper v. Lewis*, No. 19 CVS 012667 (N.C. Super Ct. Nov. 20, 2019), https://bit.ly/47mkvxx (staying candidate filing for 2020 congressional elections). Here, moreover, the Court need only pause or postpone the candidate filing deadline in SD1 and SD2, and not in any of the 48 other Senate districts across the state; candidate filing can begin in those districts without delay regardless of the outcome of the preliminary injunction motion or the timing of the Court's consideration of the motion.

North Carolina has thus successfully dealt with far more disruptive and extensive map changes at much later dates than the ones Plaintiffs request here. For example, on March 31, 1997 the General Assembly enacted a new congressional map in response to the U.S. Supreme Court's decision in *Shaw v. Hunt*, 517 U.S. 599 (1996). On April 18, 1998, a three-judge federal district court panel invalidated that map. *Cromartie v. Hunt*, 34 F. Supp. 2d. 1089 (1998). Five weeks later, on May 21, 1998, the General Assembly enacted a new map that was used in the November 1998 elections. 1998 N.C. Sess. Laws 2.

Again, all of these cases involved far more districts than the two at issue here. Delaying the primary is also an option, and it also happened in the last election cycle. *See Harper*, 865

S.E.2d at 302 (delaying primaries from March until May). But there is no need to do so given how clearcut the Section 2 violation is and how limited the remedy is.

The *Purcell* doctrine accordingly does not weigh against preliminary relief under these circumstances. In *Merrill v. Milligan*, 142 S. Ct. 879 (2022), the Supreme Court stayed a district court injunction where there were only 7 weeks to go until the primary election—here, however, the election is not close, but over three and half months away. And as Justices Kavanaugh and Alito explained in *Merrill*, even where *Purcell* applies, it "might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* at 881 (Kavanaugh, J., concurring). Here, the merits are entirely clearcut—indeed, the Supreme Court resoundingly reaffirmed in its later merits decision in *Merrill* that Section 2 of the VRA requires the creation of an additional minority opportunity district where the *Gingles* factors are satisfied, as here. Plaintiffs would suffer irreparable harm under binding Fourth Circuit precedent described above. Plaintiffs conducted the requisite expert analysis, brought this lawsuit, and sought a preliminary injunction within weeks of the passage of the map. And the changes in question—which involve altering two districts in a single map—can easily be achieved without significant cost, confusion, and hardship.

Finally, to the extent there is any time pressure here, it is entirely the fault of the General Assembly, which waited six months to pass new maps after the North Carolina Supreme Court authorized new maps in *Harper III*. The burden from the General Assembly's delay should not fall on Black voters in northeastern North Carolina—particularly where the remedy is limited in scope and not disruptive to the election schedule.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction, enjoin use of Senate Districts 1 and 2 in the 2023 enacted map, and order use of Plaintiffs' proposed remedial districts (Demonstration Districts B-1 and B-2) instead. The Court should also waive the North Carolina Constitution's one-year residency requirement for candidates in the two remedial districts.

Dated: November 22, 2023

**ARNOLD & PORTER
KAYE SCHOLER LLP**

R. Stanton Jones*
Stanton.Jones@arnoldporter.com
Elisabeth S. Theodore*
Elisabeth.Theodore@arnoldporter.com
Samuel I. Ferenc*
Sam.Ferenc@arnoldporter.com
601 Massachusetts Ave. NW
Washington, DC 20001-3743
202.942.5000

Respectfully submitted,

**POYNER SPRUILL LLP**

By: /s/ Edwin M. Speas, Jr.
    Edwin M. Speas, Jr.
    N.C. State Bar No. 4112
    espeas@poynerspruill.com
    P.O. Box 1801
    Raleigh, NC 27602-1801
    919.783.6400

    *Attorneys for Plaintiffs*
    *\*Notices of Special Appearance forthcoming*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.2(f), undersigned counsel hereby certifies that the foregoing memorandum contains 7,217 words.

Dated: November 22, 2023

By: /s/ Edwin M. Speas, Jr.
     Edwin M. Speas, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel and parties registered in said system, and that I served the foregoing via email as follows:

> Paul Cox
> North Carolina State Board of Elections
> paul.cox@ncsbe.gov
> *On behalf of Defendants The North Carolina State Board of Elections,*
> *Alan Hirsch, Jeff Carmon III, Stacy "Four" Eggers IV, Kevin N. Lewis,*
> *and Siobhan O'Duffy Millen*

Dated: November 22, 2023

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.