# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | |
|---|---|
| RODNEY D. PIERCE and MOSES MATTHEWS,<br><br>       Plaintiffs,<br><br>  v.<br><br>THE NORTH CAROLINA STATE BOARD OF ELECTIONS, ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections, JEFF CARMON III in his official capacity as Secretary of the North Carolina State Board of Elections, STACY "FOUR" EGGERS IV in his official capacity as a member of the North Carolina State Board of Elections, KEVIN N. LEWIS in his official capacity as a member of the North Carolina State Board of Elections, SIOBHAN O'DUFFY MILLEN in her official capacity as a member of the North Carolina State Board of Elections, PHILIP E. BERGER in his official capacity as President Pro Tem of the North Carolina Senate, and TIMOTHY K. MOORE in his official capacity as Speaker of the North Carolina House of Representatives,<br><br>       Defendants. | No. 4:23-cv-193 |

**BRIEF OF AMICI CURIAE
GOVERNOR ROY A. COOPER, III AND
ATTORNEY GENERAL JOSHUA H. STEIN
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Governor Roy A. Cooper, III and Attorney General Joshua H. Stein respectfully submit this amicus brief in support of Plaintiffs' motion for a preliminary injunction.

## INTRODUCTION

Plaintiffs Rodney D. Pierce and Moses Matthews are two Black voters who live in Halifax and Martin counties in northeastern North Carolina. In this lawsuit, they seek a preliminary injunction preventing the North Carolina Senate district into which their homes have been drawn from being used in future elections. They seek this relief because the enacted Senate districts illegally divide them from neighboring Black voters, preventing them from joining together to elect their preferred candidates. This division violates the Voting Rights Act.

The Voting Rights Act is one of the most successful and important laws in our nation's history. Since its enactment in 1965, it has been essential in helping Black Americans secure a meaningful role in our nation's civic life, especially in the South after decades of discrimination under Jim Crow. But the Act's work is far from done. In North Carolina, the Act's protections remain urgently needed. In recent years, Black North Carolinians have been repeatedly targeted by discriminatory laws making it harder for them to vote and exercise their political rights. Fortunately, the Supreme Court reaffirmed just a few months ago that the Voting Rights Act provides robust protections to voters like Mr. Pierce and Mr. Matthews, granting them the right to join together with other Black voters to elect candidates of their choice.

When the General Assembly drew new Senate districts this year, however, it failed to follow the law. It drew Plaintiffs into a serpentine district that winds its way from deep inland at the Virginia border far away to the distant Outer Banks. By separating Plaintiffs from other Black voters who live nearby, the new Senate districts will have the effect of preventing Black voters in northeastern North Carolina from electing candidates of their choice.

1

Because these districts clearly violate Section 2 of the Voting Rights Act, the Governor and the Attorney General respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction. They also respectfully request that this Court do so promptly, so that no elections are held under the illegal districts enacted by the legislature.[1]

## ARGUMENT

### I. The Voting Rights Act Is One of the Most Important and Effective Laws in American History.

The Voting Rights Act has been—and remains—one of the most significant and successful statutes that Congress has ever enacted. As President George W. Bush observed when he signed the law reauthorizing the Act in 2006, the Act's passage allowed Black Americans to appear "on the voting rolls" in the South for the first time "since Reconstruction." *President Bush Signs Voting Rights Act Reauthorization and Amendments Act of 2006*, The White House (July 27, 2006), https://tinyurl.com/p5upu3au. By doing so, the Act finally "broke the segregationist lock on the ballot box" that had prevented Black Americans from playing the role in "the civic life of our nation" that they deserved. *Id.* Given this accomplishment, Congress has declared the Act to be "the most successful civil rights statute in the history of the Nation." S. Rep. No. 97-417, at 111 (1982).

Section 2 of the Act has been central to its success. It prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This test is satisfied when "the totality of the circumstances" show that a state's "political processes . . . are not equally open to participation" by minority voters. *Id.* § 10301(b). And political processes are not

---

[1] The Attorney General has recused himself from representing the North Carolina State Board of Elections, its members, or any of the other defendants in this case.

2

Case 4:23-cv-00193-D-RN    Document 31-1    Filed 12/12/23    Page 4 of 13

equally open when minority voters "have less opportunity" than others "to elect representatives of their choice." *Id.*

The current text of Section 2 dates from 1982. That year, President Ronald Reagan signed amendments to Section 2 into law after large bipartisan majorities in Congress enacted considerable revisions to its text. *See* Thomas M. Boyd & Stephen J. Markman, *The 1982 Amendments to the Voting Rights Act: A Legislative History*, 40 Wash. & Lee L. Rev. 1347, 1424-25 (1983). Congress amended Section 2 to clarify that voting practices violate the statute when they have a discriminatory effect—even when they are not motivated by discriminatory intent. S. Rep. No. 97-417, at 2.

These amendments also made clear that Section 2 prohibits districting plans that have the effect of diluting minority voting power. In 1986, for instance, the Supreme Court held in *Thornburg v. Gingles* that North Carolina's use of a districting plan that elected multiple legislators from certain districts violated Section 2 because it "caused black voters . . . to have less opportunity than white voters to elect representatives of their choice." 478 U.S. 30, 80 (1986). In so holding, the Court explained that unlawful vote dilution can be caused both by "the dispersal of blacks into districts in which they constitute an ineffective minority of voters" or by their concentration "into districts where they constitute an excessive majority." *Id.* at 46 n.11.

These principles continue to apply today. Earlier this year, in *Allen v. Milligan*, the Supreme Court reaffirmed *Gingles*'s holding that Section 2 prohibits districting plans that "operate[ ] to minimize" the ability of minority voters "to elect their preferred candidates." 599 U.S. 1, 17-18 (2023). The Court specifically held that Alabama had violated Section 2 by enacting a congressional map with only one majority-black district, where it was possible to create "two majority-black districts that comported with traditional districting criteria." *Id.* at 20.

3

Thus, while the Voting Rights Act has played a vital role in helping our country move past the worst abuses of the Jim Crow era, the Act's work is far from done. As President Bush observed when the Act was reauthorized in 2006, although our country has "made progress toward equality" since 1965, "the work for a more perfect union is never ending." White House, *supra*. And as this year's decision in *Milligan* confirms, the political process is still "not equally open to participation" for voters of all races in our country. 52 U.S.C. § 10301(b). As a result, Section 2 remains a vital tool to secure equal rights for all voters.

**II.     The Voting Rights Act's Protections Are Needed in North Carolina.**

Section 2 remains urgently needed to secure equal voting rights in North Carolina. It is no accident that the leading case construing Section 2, *Gingles*, arose here: North Carolina sadly has a long and shameful history of discrimination against Black Americans.

As the Court explained in *Gingles*, after emancipation, Black North Carolinians continued to suffer from "historic discrimination in education, housing, employment, and health services." 478 U.S. at 39. This social discrimination was paired with political discrimination: During Jim Crow, North Carolina "officially discriminated against its black citizens with respect to their exercise of the voting franchise," employing tools like "a poll tax" and "a literacy test" to prevent African Americans from voting. *Id.* at 38.

While the Voting Rights Act ended some of North Carolina's most egregiously discriminatory voting practices, discrimination has still continued. For example, between 1982 and 2006, private plaintiffs "brought fifty-five successful cases" challenging North Carolina voting practices under Section 2. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 224 (4th Cir. 2016). Less than a decade ago, moreover, the Fourth Circuit struck down an "omnibus" election law enacted by the North Carolina General Assembly that restricted voting "in five

4

different ways, all of which disproportionately affected African Americans." *Id.* at 214. This law violated the Equal Protection Clause because its provisions intentionally "target[ed] African Americans with almost surgical precision," seeking to make it harder for them to vote. *Id.* Since this ruling, the list of discriminatory actions taken by the General Assembly to limit the voting rights of Black North Carolinians has continued to grow. Indeed, the Supreme Court affirmed two judgments holding that the General Assembly had racially gerrymandered North Carolina's congressional and legislative districts, diluting the voting power of Black voters by overconcentrating them in certain districts. *See North Carolina v. Covington*, 138 S. Ct. 2548, 2553-54 (2018) (per curiam); *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

In sum, North Carolina's history is replete with examples of discrimination against Black North Carolinians, stretching back to the State's founding and continuing to the present. Against this backdrop, Section 2 of the Voting Rights Act remains critically necessary to secure equal rights for Black voters in North Carolina.

### III. Plaintiffs Have Demonstrated a Strong Likelihood of Success on Their Voting Rights Act Claim.

This case provides a clear example of why the Voting Rights Act's protections remain so important in North Carolina.

This October, the General Assembly enacted new congressional and legislative districts, including for the North Carolina Senate. *See, e.g.*, Act of Oct. 25, 2023, S.L. No. 2023-146. The resulting districts provide yet another example of how North Carolina has worked to minimize the power of Black voters. As Plaintiffs have shown, the General Assembly diluted Black voting power by drawing Senate districts for northeastern North Carolina that disperse Black voters across multiple districts, such that these voters "constitute an ineffective minority" in those districts. *Gingles*, 478 U.S. at 46 n.11. Because this vote dilution is a textbook violation of the

5

Voting Rights Act, the Governor and the Attorney General respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction.

In *Allen v. Milligan*, as noted, the Supreme Court recently reaffirmed *Gingles*'s test for determining where legislatures must create districts in which minority voters will be able "to elect their preferred candidates." 599 U.S. at 17-18. Under this standard, legislatures must first assess 1) whether a minority group is sufficiently geographically compact to constitute a majority in a reasonably configured district, 2) whether the minority group is politically cohesive, and 3) whether bloc voting by the white majority will work to defeat the minority group's preferred candidate. *Id.* at 18. If these criteria are satisfied, then a district where minority voters can elect their preferred candidate must be drawn if the totality of the circumstances show that the political process is not equally open to those voters. *Id.*

Here, as in *Milligan*, all of these criteria are easily satisfied. As Plaintiffs have shown, the distribution of Black voters in northeastern North Carolina is sufficiently compact that, with no difficulty, a reasonably configured district can be drawn where they constitute a majority:



Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 11, ECF No. 17.

The remaining *Gingles* criteria are easily satisfied as well. Black voters within this area are politically cohesive, in that they regularly support the same candidates by margins of nine-to-one or greater. *Id.* at 11-12. White voters, furthermore, vote together in sufficient numbers in this area to defeat the preferred candidates of Black voters. *Id.* at 5, 12. And finally, the long and shameful history of discrimination against Black Americans in North Carolina results in its political processes not being equally open to them. *Id.* at 14-20; *see also supra* pp 4-5. Given all these considerations, the Voting Rights Act requires that a district be drawn where Black voters can elect their preferred candidate. As in *Milligan*, the question of whether such a district must be created is not an especially "close one." 599 U.S. at 16.

But rather than following the law, the General Assembly went out of its way to dilute Black voting power, dividing northeastern North Carolina's counties with Black majorities between multiple districts. One of these districts is Senate district 2, where Plaintiffs reside. First Am. Compl. ¶¶ 11-12, ECF No. 13. This snake-shaped district begins deep inland along the Virginia border, then twists south and north and south again across the coastal plain, and finally arrives at distant Ocracoke Island on the Outer Banks, dozens of miles off-shore:



Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 6, ECF No. 17. The district is so irregularly shaped that, as one North Carolina reporter has observed, travelling across its length appears to require a six-hour drive that, to be possible at all, must utilize two separate ferries whose ports are located beyond the district's boundaries:



See Colin Campbell (@RaleighReporter), X (formerly Twitter) (Oct. 23, 2023, 3:11 PM), https://tinyurl.com/2s3pa7mv.

Compliance with the Voting Rights Act would have made such a misshapen district impossible. That Plaintiffs' proposed district is so much more compact than the one the General Assembly enacted only underscores that Plaintiffs are likely to succeed on the merits of their claim. This Court should therefore grant Plaintiffs' motion for a preliminary injunction.

It should also do so expeditiously, so that no elections are held using a serpentine district that illegally deprives Black voters in northeastern North Carolina of the representation that they are guaranteed under the Voting Rights Act. Acting in advance of the next election is especially appropriate here, where primaries are still more than two and a half months away and where complying with the law requires modifying the boundaries of only two districts. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 23-24, ECF No. 17. Only by acting promptly can this Court ensure that the rights of Black voters in northeastern North Carolina to "to elect their preferred candidates" are vindicated in this coming election. *Milligan,* 599 U.S. at 18.

## CONCLUSION

Governor Cooper and Attorney General Stein respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction.

Dated: December 12, 2023

Respectfully submitted,

JOSHUA H. STEIN
Attorney General

<u>/s/ Ryan Y. Park</u>
Ryan Y. Park
Solicitor General
N.C. State Bar No. 52521

*Counsel for Amici Curiae Governor Roy A. Cooper, III and Attorney General Joshua H. Stein*

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains complies with Local Rule 7.2(f), because it contains 2274 words, excluding the parts of the brief exempted by Local Rule 7.2(f)(1).

Dated: December 12, 2023

/s/ Ryan Y. Park
Ryan Y. Park

## CERTIFICATE OF SERVICE

I certify that on this 12th day of December, 2023, I filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

/s/ Ryan Y. Park
Ryan Y. Park
