IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:23-CV-193-D

RODNEY D. PIERCE and            )
MOSES MATTHEWS,                 )
                                )
                Plaintiffs,     )
                                )
        v.                      )        **ORDER**
                                )
THE NORTH CAROLINA STATE        )
BOARD OF ELECTIONS, et al.,     )
                                )
                Defendants.     )

"Racial classifications with respect to voting carry particular dangers." Shaw v. Reno, 509
U.S. 630, 657 (1993) ("Shaw I"). "Racial gerrymandering, even for remedial purposes, may
balkanize us into competing racial factions . . . ." Id. "[I]t threatens to carry us further from the goal
of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth
Amendments embody, and to which the Nation continues to aspire." Id. Thus, "race-based
districting by our state legislatures demands close judicial scrutiny." Id.

This case does not involve the North Carolina General Assembly engaging in race-based
districting. Indeed, the record demonstrates that when the General Assembly created the Senate
districts in North Carolina Senate Bill 758 ("SB 758") in October 2023 for use in the 2024 elections,
the General Assembly did not have racial data in the computer. The General Assembly did not have
racial data in the computer in 2023, in part, because federal litigation from 2011 to 2016 helped to
show that there was not legally significant racially polarized voting in North Carolina, including in
the counties in northeast North Carolina at issue in this case. See Covington v. North Carolina, 316

F.R.D. 117, 124, 128, 142–65, 167–74 (M.D.N.C. 2016) (three-judge court), aff'd, 581 U.S. 1015 (2017); Harris v. McCrory, 159 F. Supp. 3d 600, 624–25 (M.D.N.C. 2016) (three-judge court), aff'd sub nom. Cooper v. Harris, 581 U.S. 285 (2017).

This case involves two plaintiffs who contend that the General Assembly violated Section 2 of the Voting Rights Act of 1965 by not engaging in race-based districting and not creating a racially gerrymandered majority-black Senate district in northeast North Carolina. See Am. Compl. [D.E. 13] ¶¶ 4, 5, 84–98. On November 20, 2023, plaintiffs filed suit. On November 22, 2023, plaintiffs moved for the extraordinary remedy of a mandatory preliminary injunction. In their motion for a preliminary injunction, plaintiffs ask the court to enjoin the use of SB 758 in the 2024 Senate elections and mandate the creation of remedial Senate districts in North Carolina (including a racially gerrymandered majority-black Senate district in northeast North Carolina). Plaintiffs make this extraordinary request even though (1) the 2024 Senate elections are underway in North Carolina, (2) plaintiffs presented no evidence that anyone provided the General Assembly in 2023 a strong basis in evidence to believe that Section 2 required the General Assembly to create a majority-black Senate district in northeast North Carolina, and (3) insufficient evidence shows that Section 2 requires a majority-black Senate district in northeast North Carolina.

The Supreme Court has described "sort[ing] voters on the basis of race" as "odious." Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 401 (2022) (per curiam). The Supreme Court has assumed that complying with Section 2 of the VRA is a compelling state interest that permits the "race-based sorting of voters" where such sorting "is narrowly tailored to comply with the" Voting Rights Act. Id.

Plaintiffs have failed to demonstrate that Section 2 of the Voting Rights Act requires an extraordinary, mandatory preliminary injunction compelling the race-based sorting of voters for the

2

2024 Senate elections in North Carolina. On the current record, plaintiffs are not likely to succeed on the merits of their Section 2 claim and are not likely to suffer irreparable harm absent the requested extraordinary, mandatory preliminary injunction. Moreover, the balance of hardships does not tip in plaintiffs' favor, and the requested mandatory preliminary injunction is not in the public interest. In fact, the requested injunction would constitute a textbook violation of Purcell v. Gonzalez, 549 U.S. 1, 4–6 (2006) (per curiam), and its progeny. The 2024 Senate elections in North Carolina are underway. Absentee ballots are in the mail. Purcell teaches that a federal court in a case involving state elections should not enjoin a state redistricting plan "just weeks before an election," much less enjoin an ongoing state election. Id. at 4. Such federal injunctions result in voter confusion and chaos and are not warranted especially where the facts in the case are "hotly contested." Id. at 4–5. The court declines plaintiffs' invitation to issue the requested extraordinary, mandatory preliminary injunction and thereby inflict voter confusion and chaos on the 2024 Senate elections in North Carolina. Thus, the court denies plaintiffs' motion for a preliminary injunction.

I.

A.

On November 20, 2023, Rodney D. Pierce ("Pierce") and Moses Matthews ("Matthews") (collectively "plaintiffs") filed a complaint against the North Carolina State Board of Elections and its five members in their official capacities (collectively "the Board defendants"), Philip E. Berger in his official capacity as President pro tempore of the North Carolina Senate ("Berger"), and Timothy K. Moore in his official capacity as Speaker of the North Carolina House of Representatives ("Moore") (collectively "the legislative defendants") alleging that SB 758, which establishes new state Senate districts for North Carolina, violates Section 2 of the Voting Rights Act ("VRA") of 1965, codified at 52 U.S.C. § 10301 ("Section 2") [D.E. 1]. Plaintiffs ask the court to (1) "[d]eclare

3

that SB 758 violates Section 2 of the Voting Rights Act;" (2) "[g]rant preliminary and permanent injunctive relief barring Defendants . . . from enforcing or giving any effect to the boundaries of Senate Districts 1 and 2 as drawn in SB 758, including barring Defendants from conducting any Senate elections using those district boundaries;" (3) "[t]ake actions necessary to order the adoption of a valid state Senate plan that includes a minority opportunity district in northeastern North Carolina, while leaving intact the current district comprised of Pitt and Edgecombe Counties, in time to use the remedial plan in the 2024 Senate elections (and, as part of the remedial order, waive the one-year residency requirement for candidates under N.C. Const. art. II, § 6, for newly drawn remedial districts);" and (4) "[g]rant such other or further relief the [c]ourt deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs." Id. at 21.

On November 22, 2023, plaintiffs filed an amended complaint [D.E. 13], moved to enjoin SB 758 [D.E. 16], filed a memorandum in support [D.E. 17], and filed expert reports totaling 406 pages [D.E. 17-1, 17-2, 17-3]. On December 22, 2023, the legislative defendants responded in opposition to plaintiffs' motion for a preliminary injunction [D.E. 39] and filed exhibits (including expert reports) totaling 340 pages [D.E. 39-1 to 39-8]. On December 22, 2023, the Board defendants informed the court of their schedule concerning the 2024 North Carolina elections and took no position on plaintiffs' motion for a preliminary injunction [D.E. 40, 41]. On December 26, 2023, plaintiffs replied [D.E. 42]. On December 29, 2023, the court scheduled a hearing on plaintiffs' motion for a preliminary injunction for January 10, 2024 [D.E. 43].

On December 29, 2023, plaintiffs filed an interlocutory appeal and argued that the court's decision to schedule a hearing constituted a de facto denial of their motion [D.E. 44]. On January 9, 2024, the United States Court of Appeals for the Fourth Circuit dismissed plaintiffs' appeal [D.E. 50] but did not issue the mandate. See [D.E. 51]. Thus, jurisdiction did not return to this court.

4

Nonetheless, on January 10, 2024, with the parties' consent, the court held its scheduled hearing on plaintiffs' motion for a preliminary injunction [D.E. 53].

On January 12, 2024, plaintiffs submitted a supplemental declaration from Dr. Matthew Barreto ("Dr. Barreto"). See [D.E. 55-1]. On January 16, 2024, the Fourth Circuit issued its mandate and jurisdiction returned to this court. See [D.E. 56]. On January 17, 2024, the court permitted defendants to respond to plaintiffs' supplemental information from Dr. Barreto. See [D.E. 57]. On January 19, 2024, the legislative defendants answered the amended complaint. See [D.E. 58]. On January 22, 2024, the legislative defendants submitted a response to Dr. Barreto's supplemental declaration. See [D.E. 60].

B.

Pierce is a black voter who resides in Halifax County, North Carolina. See Am. Compl. ¶ 11. Matthews is a black voter who resides in Martin County, North Carolina. See id. at ¶ 12. Bertie, Hertford, Edgecombe, Northampton, and Halifax Counties have majority-black voting age populations. See id. at ¶ 37. Vance, Warren, Martin, and Washington Counties have black voting age populations exceeding 40 percent. See id. Gates and Chowan Counties have black voting age populations between 31 and 32 percent. See id.

On October 25, 2023, the North Carolina General Assembly enacted SB 758, which establishes new state Senate districts for North Carolina. See id. at ¶¶ 1–2. In SB 758, Senate District 1 ("SD1") contains Northampton, Hertford, Bertie, Gates, Perquimans, Pasquotank, Camden, Currituck, Tyrrell, and Dare Counties. See id. at ¶ 44. Senate District 2 ("SD2") contains Warren, Halifax, Martin, Chowan, Washington, Hyde, Pamlico, and Carteret Counties. See id. Senate District 5 includes Edgecombe and Pitt Counties. See id. Senate District 11 includes Vance, Franklin, and Nash Counties. See id.

5

Plaintiffs allege that the electoral boundaries in northeast North Carolina dilute black voters' votes in violation of Section 2. See id. at ¶¶ 84–98. Plaintiffs contend that Section 2 requires a majority-black Senate district in northeast North Carolina. See id. Thus, plaintiffs contend that the General Assembly violated Section 2 when it enacted SB 758 without a majority-black Senate district in northeast North Carolina. See id. at ¶¶ 1, 2, 84–98; [D.E. 17] 26, 30.

Section 2 does not require the General Assembly to employ "race-based districting" unless the General Assembly has "a strong basis in evidence for concluding that" Section 2 required such race-based districting. Cooper v. Harris, 581 U.S. 285, 292–93 (2017) (quotation omitted); see Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 278 (2015). Without a contemporaneous strong basis in evidence in 2023 that Section 2 required the General Assembly to create a VRA district by grouping citizens by race in order to form a majority-black Senate district, the General Assembly would have violated the Fourteenth Amendment. See, e.g., Abbott v. Perez, 138 S. Ct. 2305, 2315 (2018); Cooper, 581 U.S. at 322–23; Shaw v. Hunt, 517 U.S. 899, 907–09 (1996) ("Shaw II"); Miller v. Johnson, 515 U.S. 900, 927–28 (1995); Covington, 316 F.R.D. at 178. Section 2 does not require crossover districts. See Bartlett v. Strickland, 556 U.S. 1, 23 (2009) (principal opinion). Thus, in order for Section 2 to have required the General Assembly to create a majority-black Senate district in northeast North Carolina, the legislative record in 2023 must contain a strong basis in evidence for such remedial action before the General Assembly enacted SB 758. See Cooper, 581 U.S. at 304 ("To have a strong basis in evidence to conclude that § 2 demands . . . race-based steps, the State must carefully evaluate whether a plaintiff could establish the Gingles preconditions . . . . We see nothing in the legislative record that fits that description.").[1]

---

[1] See Thornburg v. Gingles, 478 U.S. 30 (1986).

Case 4:23-cv-00193-D-RN   Document 61   Filed 01/26/24   Page 6 of 69

For example, on October 19, 2021, the American Civil Liberties Union, ACLU of Alabama, NAACP Legal Defense and Educational Fund ("LDF"), Alabama State Conference of the NAACP, and Greater Birmingham Ministries sent a letter to the members of the Alabama Legislative Reapportionment Committee detailing Section 2's requirements and how the Gingles factors required two majority-black congressional districts in Alabama. See Milligan v. Allen, No. 2:21-cv-1530 (N.D. Ala. Dec. 7, 2021), [D.E. 53] ¶¶ 86–87. The letter noted that "a Congressional redistricting plan that includes only one majority-minority district likely violates the Voting Rights Act." LDF et al., Re: Duty to Comply with the U.S. Constitution and Voting Rights Act in Alabama's Redistricting Process 4, available at https://www.aclualabama.org/en/press-releases/civil -rights-groups-send-letter-legislature-ahead-redistricting-special-session (last visited Jan. 25, 2024). Alabama ultimately enacted a congressional redistricting plan that included just one majority-black congressional congressional district. See Singleton v. Merrill, 582 F. Supp. 3d 924, 935 (N.D. Ala. 2022) (three-judge court) (per curiam), aff'd sub nom. Allen v. Milligan, 599 U.S. 1 (2023). In Singleton, after an extensive preliminary injunction hearing, the three-judge court held that the plaintiffs were "likely to establish that [Alabama's redistricting plan] violates Section Two of the Voting Rights Act." Id. at 936. The Supreme Court affirmed. See Milligan, 599 U.S. at 9–10.

Absent a contemporaneous strong basis in evidence, the General Assembly would have committed the same mistake in 2023 that it did in Covington in 2011 when it created numerous majority-black House and Senate districts and in Harris in 2011 when it created two majority-black Congressional districts without a strong basis in evidence that Section 2 required the General Assembly to group citizens by race and to create such majority-black districts. See Covington, 316 F.R.D. at 124, 128, 142–65, 167–74; Harris, 159 F. Supp. 3d at 624–25. Instead of making that same mistake in 2023, the General Assembly did not have race in the computer when it created the Senate,

7

House, and Congressional redistricting plans in 2023. See [D.E. 39-5] 4–5. Thus, in 2023, the General Assembly did not sort any citizens by race. See id.

As for SD1 and SD2 in particular, the General Assembly considered the North Carolina Constitution's Whole County Provision, communities of interest, and traditional redistricting principles in creating SD1 and SD2. SD1 kept together four of North Carolina's five finger counties. See [D.E. 39-5] 8. Moreover, many SD1 residents in these counties "work or travel frequently to the Virginia Tidewater" region. Id. Furthermore, seven of SD1's ten counties and 81% of SD1's population are in the Norfolk, Virginia media market. See id. at 8–9. SD2 follows the Roanoke River from Warren County to Washington County. See id. at 9. Five of SD2's eight counties are in the Greenville, North Carolina media market. See id. And, SD1 and SD2 both include their respective incumbent senator's residence. See id. at 9–10.

Plaintiffs cite no evidence that anyone submitted information to the General Assembly before the General Assembly enacted SB 758 in 2023 that Section 2 required a majority-black Senate district in northeast North Carolina. Cf. [D.E. 39] 10 & n.4. Unlike, for example, in Milligan, where the NAACP notified the Alabama legislature that it would violate Section 2 if it did not create two majority-black congressional districts, plaintiffs cite no evidence that they or anyone else submitted comparable information to the General Assembly before it enacted SB 758 in October 2023.

Before the General Assembly enacted SB 758 in October 2023, the General Assembly held public hearings throughout North Carolina, including one in Elizabeth City in northeast North Carolina, to gather public input on the proposed Senate districts. See [D.E. 39] 9. The General Assembly also accepted public comments through an online portal on the General Assembly's website. See [D.E. 39-4] 3. Moreover, before the General Assembly enacted SB 758 in October 2023, the Senate Redistricting and Elections Committee Co-Chairman, Senator Ralph Hise ("Senator

8

Hise"), recognized that "in order for the predominant use of race to be justified under Section 2, there must be a strong basis in evidence of three Gingles conditions" and "the use of race to draw districts must also be supported by the totality of the circumstances." [D.E. 39-5] 4. Senator Hise observed that court decisions "demonstrate that to this point nowhere in North Carolina can anyone provide evidence of the three Gingles preconditions." Id. Senator Hise stated that "the chairs elected not to use race in drawing these proposed [Senate] districts [in SB 758] strictly to protect the state from lawsuits alleging illegal racial gerrymandering." Id.

After the Senate prepared SB 758 without racial data in the computer and before the General Assembly enacted SB 758, Senator Hise then directed the General Assembly's central staff "to load racial data into the Maptitude software" for the first time and "make that information publicly available on the General Assembly website as soon as possible." Id. at 5. Senator Hise noted that the Senate Redistricting and Elections Committee would meet again the following week to "consider any evidence that a member of this committee or a third party advocating altering plans for racial reasons brings forth that provides a strong basis in evidence that the Gingles preconditions are present in a particular area of the state." Id. at 5–6. "Only then [would] the chairs consider using race in amending the districts to protect the state from liability under Section 2 of the Voting Rights Act." Id. at 6.

Despite Senator Hise's invitation, the Senate Redistricting and Elections Committee did not receive any evidence that the three Gingles preconditions could be satisfied anywhere in North Carolina. See [D.E. 39] 10 n.4. The Southern Coalition for Social Justice "asked that the county grouping for SD 1 and 2 be changed to the alternate county grouping used in 2022" but "did not request any majority-minority districts." Id.

9

The need for plaintiffs to cite a strong basis in evidence when the General Assembly enacted SB 758 in October 2023 for concluding that Section 2 required a majority-black Senate district in order to get their requested mandatory preliminary injunction for the 2024 Senate elections finds support "in the need for workable standards and sound judicial and legislative administration" and the standard needed to get the requested injunction. Strickland, 556 U.S. at 17; see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (describing standard needed for a preliminary injunction); In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525–26 (4th Cir. 2003) (describing preliminary showing needed for a federal court to consider issuing a mandatory preliminary injunction). Nonetheless, plaintiffs now allege a Section 2 violation without citing a contemporaneous strong basis in evidence in front of the General Assembly in 2023 before it enacted SB 758. Plaintiffs also propose a remedial redistricting plan for the 2024 Senate elections that creates a majority-black Senate district by altering the boundaries of SD1 and SD2 to group Warren, Halifax, Martin, Bertie, Chowan, Northampton, Hertford, Gates, and a portion of Pasquotank Counties within the same Senate district and to group Camden, Currituck, Dare, Tyrrell, Washington, Hyde, Pamlico, Carteret, and a portion of Pasquotank Counties in another Senate district. See Am. Compl. ¶ 48.

Plaintiffs make this extraordinary request notwithstanding the findings in Covington and Harris concerning the absence of legally significant racially polarized voting in North Carolina. See Covington, 316 F.R.D. at 124, 128, 142–65, 167–74; Harris, 159 F. Supp. 3d at 624–25. Plaintiffs also make this extraordinary request even though the 2003 Senate redistricting plan did not have any majority-black Senate districts, yet black Senators were regularly elected in North Carolina (including in northeast North Carolina). See Covington, 316 F.R.D. at 126. Likewise, although the General Assembly enacted ten majority-black Senate districts in the 2011 redistricting cycle and

10

justified them in part on Section 2 and Section 5 of the VRA, the Covington court held that the General Assembly lacked a strong basis in evidence for race-based districting due to the absence of a strong basis in evidence to believe that legally significant racially polarized voting existed in North Carolina. See id. at 167–76. The remedial Senate districting plan after Covington included no majority-black Senate districts. See Covington v. North Carolina, No. 1:15-CV-399, [D.E. 184-6] 22, [D.E. 220] 22, 33, 36, [D.E. 242] 2 (M.D.N.C. Jan. 21, 2018). Moreover, in the November 2022 Senate elections, North Carolina citizens elected nine black Senators out of 50 Senators, including a black Senator from Edgecombe and Pitt Counties. See N.C. Gen. Assembly, North Carolina Senators, https://www.ncleg.gov/Members/MemberList/S (last visited Jan. 25, 2024). Edgecombe and Pitt Counties are in northeast North Carolina. Plaintiffs have presented no evidence that black Senators were not elected under the Covington remedial Senate districting plan and no evidence that any of the nine black Senators who were elected in November 2022 were elected from Senate districts containing a majority black voting age population.

## II.

Redistricting "is primarily the duty and responsibility of the State," and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." Miller, 515 U.S. at 915 (cleaned up). The "good faith of [the] state legislature must be presumed." Id. "Because the States do not derive their reapportionment authority from the Voting Rights Act, but rather from independent provisions of state and federal law, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements." Voinovich v. Quilter, 507 U.S. 146, 156 (1993) (cleaned up).

Section 2 places the burden of "proving an apportionment's invalidity squarely on plaintiffs' shoulders." Id. at 155. "Before courts can find a violation of § 2, . . . they must conduct an intensely

11

local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." Milligan, 599 U.S. at 19 (quotation omitted). "Courts cannot find § 2 effects violations on the basis of uncertainty." Perez, 138 S. Ct. at 2333 (emphasis in original).

"The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The notice requirement ensures the adverse party has "a fair opportunity to oppose the application and to prepare for such opposition." Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 432 n.7 (1974). Rule 65 does not expressly require an evidentiary hearing and oral argument. See Fundamental Admin. Servs., LLC v. Anderson, Civ. No. 13-1708, 2015 WL 2340831, at *1 (D. Md. May 13, 2015) (unpublished). Where the parties dispute facts, however, hearings are "highly desirable," if not "necessary," before a court resolves a motion for a preliminary injunction. Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988); see Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 223 (1st Cir. 2003); GlaxoSmithKline, LLC v. Brooks, No. 8:22-cv-364, 2022 WL 2916170, at *2 (D. Md. July 25, 2022) (unpublished).

A preliminary injunction "is an extraordinary remedy." Winter, 555 U.S. at 24. "The rationale behind a grant of a preliminary injunction has been explained as preserving the status quo so that a court can render a meaningful decision after a trial on the merits." Hazardous Waste Treatment Council v. South Carolina, 945 F.2d 781, 788 (4th Cir. 1991) (quotation omitted). A mandatory preliminary injunction, however, "alter[s] the status quo." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). "Mandatory preliminary injunctive relief," which "goes well beyond simply maintaining the status quo pendente lite," is "disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (quotation omitted); see In re Microsoft Corp. Antitrust Litig., 333 F.3d at 525. "That is to say, a mandatory preliminary injunction must be necessary both to protect against

12

irreparable harm in deteriorating circumstances created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." Id. at 526. "If that need is not presented, then a preliminary injunction should not be considered." Id. (emphasis added).

Challenges to the process of state elections that come "immediately before or immediately after the preparation and printing of ballots [are] particularly disruptive and costly for state governments." Perry v. Judd, 471 F. App'x 219, 225 (4th Cir. 2012) (per curiam) (unpublished); see Purcell, 549 U.S. at 4–6; Merrill v. Milligan, 142 S. Ct. 879, 879–82 (2022) (Kavanaugh, J., concurring). "[T]here must be a substantial regulation of elections if . . . some sort of order, rather than chaos, is to accompany the democratic processes." Anderson v. Celebrezze, 460 U.S. 780, 788 (1983) (quotation omitted). A federal court should be "loath to reach a result that would only precipitate a more disorderly [election] process." Perry, 471 F. App'x at 225.

In election cases, state actions "establish the status quo." Wise v. Circosta, 978 F.3d 93, 98 (4th Cir. 2020) (en banc). Thus, the General Assembly established the status quo when it enacted SB 758 in October 2023 and the Board began the detailed process of working with North Carolina's 100 county boards of elections to assign voters to their correct Senate districts through geocoding, generating and proofing ballots, coding voting machines, and training election officials. Cf. [D.E. 41] ¶¶ 3–6 (declaration of Executive Director Karen Brinson Bell of the North Carolina State Board of Elections).

Mandatory preliminary injunctive relief is particularly extraordinary where plaintiffs seek a remedial electoral districting plan which would "sort voters on the basis of race" because such districting plans "are by their very nature odious." Wis. Legislature, 595 U.S. at 401 (quotation omitted). Of course, the Supreme Court has "assumed that complying with the VRA is a compelling interest." Id. Nonetheless, the party seeking to use race as the predominant factor to place voters

13

in or out of a district bears "the burden of showing that the design of that district withstands strict scrutiny." Id. A party "can satisfy strict scrutiny if it proves that its race-based sorting of voters is narrowly tailored to comply with the VRA." Id.

If plaintiffs demonstrate the "need to protect the status quo and to prevent irreparable harm during the pendency of the litigation to preserve the court's ability in the end to render a meaningful judgment on the merits," then a district court may exercise its "discretion" and determine whether plaintiffs have demonstrated the four requirements to obtain a preliminary injunction. In re Microsoft Antitrust Litig., 333 F.3d at 526. Plaintiffs seeking a preliminary injunction must "demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013); see Winter, 555 U.S. at 20; Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Courts consider each factor separately, and the movant must prove each factor "as articulated." Pashby, 709 F.3d at 320–21 (quotation omitted).

### III.

### A.

Plaintiffs have failed to demonstrate the extraordinary circumstances needed for a mandatory preliminary injunction. See In re Microsoft Antitrust Litig., 333 F.3d at 526; Taylor, 34 F.3d at 270 n.2. They have failed to demonstrate "a need to protect the status quo and to prevent irreparable harm during the pendency of the litigation to render a meaningful judgment on the merits." In re Microsoft Antitrust Litig., 333 F.3d at 526. Rather, plaintiffs wish to disrupt the status quo that exists from the General Assembly enacting SB 758 in October 2023 and the 2024 North Carolina Senate elections moving forward consistent with North Carolina law.

14

Notably, on December 15, 2023, candidate filing ended for the 2024 North Carolina primary elections. See [D.E. 40] 1. On January 19, 2024, North Carolina's 100 county boards of elections began distributing absentee ballots. See id. at 2. On February 15, 2024, in-person early voting begins. See id. March 5, 2024, is primary election day. See id. at 1. Accordingly, absentee voting throughout North Carolina already has begun. In-person early voting begins 20 days after the court issues this order. Primary election day is just 39 days after the court issues this order.

A mandatory preliminary injunction is not necessary to preserve the status quo and "preserve the court's ability in the end to render a meaningful judgment on the merits." In re Microsoft Antitrust Litig., 333 F.3d at 526. Rather, after discovery and a trial on the merits, the court could render a meaningful judgment concerning plaintiffs' Section 2 claim and grant relief for the 2026 Senate elections and beyond if plaintiffs were able to prove their Section 2 claim. Because plaintiffs have failed to demonstrate the extraordinary circumstances needed for the court to consider issuing the requested mandatory preliminary injunction, the court need not consider whether plaintiffs have demonstrated the four requirements to obtain a preliminary injunction. See id.; Taylor, 34 F.3d at 270 n.2; AVX Corp. v. Corning Inc., No. 5:15-CV-543, 2020 WL 2527936, at *3–4 (E.D.N.C. May 18, 2020) (unpublished); Wheelihan v. Bingham, 345 F. Supp. 2d 550, 553–54 (M.D.N.C. 2004).

B.

Alternatively, the court considers whether plaintiffs have demonstrated the four requirements for a preliminary injunction. As for demonstrating a likelihood of success on the merits, Section 2 provides that no state may impose a "voting qualification or prerequisite to voting or standard, practice, or procedure . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a Section 2 violation, plaintiffs must demonstrate that, based on the totality of the circumstances,

15

"the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 10301(b).

Under Section 2, plaintiffs who allege impermissible vote dilution must demonstrate, first, that their minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." Milligan, 599 U.S. at 18 (cleaned up). "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Id. "Second, the minority group must be able to show that it is politically cohesive." Gingles, 478 U.S. at 51. Third, plaintiffs must show that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Id.; see Milligan, 599 U.S. at 18. Courts refer to this third Gingles factor as "racially polarized voting." See, e.g., Covington, 316 F.R.D. at 167. "Finally, a plaintiff who demonstrates the three preconditions must also show, under the totality of circumstances, that the political process is not equally open to minority voters." Milligan, 599 U.S. at 18 (quotation omitted); see Johnson v. De Grandy, 512 U.S. 997, 1011–12 (1994); Gingles, 478 U.S. at 36–38.

## C.

As for the first Gingles precondition, plaintiffs must prove their minority group (i.e., African-Americans) "is sufficiently large and geographically compact to constitute a majority in a reasonably configured district." Milligan, 599 U.S. at 18 (cleaned up); see Wis. Legislature, 595 U.S. at 402; Gingles, 478 U.S. at 50. This precondition requires plaintiffs "to establish that the minority has the potential to elect a representative of its own choice." Milligan, 599 U.S. at 18 (quotation omitted); see Strickland, 556 U.S. at 15–16; Growe v. Emison, 507 U.S. 25, 40–41 (1993). A minority group

16

is "sufficiently large" if plaintiffs show that their minority voting-age population exceeds 50 percent. See Strickland, 556 U.S. at 19–20; Hall v. Virginia, 385 F.3d 421, 429–30 (4th Cir. 2004). Section 2 "does not require crossover districts," which are districts in which black voters are "not a majority of the voting-age population" but "could get enough support from crossover [white] voters to elect" the black voters' preferred candidate. Strickland, 556 U.S. at 9, 23. "A district will be reasonably configured . . . if it comports with traditional districting criteria . . . ." Milligan, 599 U.S. at 18; see id. at 43 (Kavanaugh, J., concurring); Abrams v. Johnson, 521 U.S. 74, 91–92 (1997). "[T]raditional race-neutral districting principles" include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." Ala. Legis. Black Caucus, 575 U.S. at 272 (cleaned up).

Plaintiffs offer two demonstration districts that they contend meet the first Gingles precondition: Demonstration District A and Demonstration District B-1. See [D.E. 17] 15–17. Plaintiffs' expert Blakeman Esselstyn ("Esselstyn") drew these demonstration districts. See id.; [D.E. 17-1] ¶¶ 33–37.

Plaintiffs' Demonstration District A includes Vance, Warren, Halifax, Northampton, Hertford, Bertie, Martin, and Washington Counties. See [D.E. 17-1] ¶ 33. According to plaintiffs, Demonstration District A has a 51.47% black voting-age population ("BVAP") and a 53.12% black citizen voting-age population ("CVAP"). See id. at fig. 6, table 3. Plaintiffs rely on Demonstration District A to meet the first Gingles precondition. See [D.E. 42] 5 ("Plaintiffs are not urging adoption of Demonstration District A for use in any election—it is presented solely for illustrative purposes to satisfy Gingles One."); [D.E. 17-1] ¶ 52 (Esselstyn opining that "it is possible to create a majority-Black State Senate district in northeastern North Carolina that splits no counties or VTDs and is in accordance with other traditional redistricting principles").

17

Esselstyn also drew Demonstration Districts B-1 and B-2. Demonstration District B-1 contains Bertie, Chowan, Gates, Halifax, Hertford, Martin, Northampton, and Warren Counties in their entirety and a portion of Pasquotank County. See [D.E. 17-1] ¶ 35. According to plaintiffs, Demonstration District B-1 has a 48.41% BVAP and a 50.19% black CVAP. See id. at fig. 7, table 4. Plaintiffs' Demonstration Districts B-1 and B-2 are solely composed of the counties that constitute SD1 and SD2 in SB 758, but they split Pasquotank County and rearrange the counties within SD1 and SD2. See id. at ¶ 35; [D.E. 17] 16.

1.

The legislative defendants contend that Demonstration District A is not reasonably configured in light of North Carolina's Whole County Provisions ("WCP"). See [D.E. 39] 14–18. Plaintiffs reply that "the VRA trumps" the WCP. [D.E. 42] 4–5. Both parties chide the other for "circular" logic. See [D.E. 39] 15; [D.E. 42] 5. The parties' dispute concerns how to interpret Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377 (2002) ("Stephenson I"), and Stephenson v. Bartlett, 357 N.C. 301, 582 S.E.2d 247 (2003) ("Stephenson II").

a.

In Stephenson I, the Supreme Court of North Carolina analyzed the interplay between the North Carolina Constitution and federal law in the apportionment of House and Senate districts in North Carolina. The North Carolina Constitution specifically enumerates four limitations upon the redistricting and reapportionment authority of the General Assembly in drawing Senate and House

18

districts. See N.C. Const. art. II, §§ 3, 5.[2] In Stephenson I, the Supreme Court of North Carolina summarized them as follows:

(1) Each Senator and Representative shall represent, as nearly as possible, an equal number of inhabitants.

(2) Each senate and representative district shall at all times consist of contiguous territory.

(3) No county shall be divided in the formation of a senate or representative district.

(4) Once established, the senate and representative districts and apportionment of Senators and Representatives shall remain unaltered until the next decennial census of population taken by order of Congress.

Stephenson I, 355 N.C. at 362–63, 562 S.E.2d at 384; see N.C. Const. art. II, §§ 3, 5. The third limitation is known as the Whole County Provision ("WCP"). Id. at 363, 562 S.E.2d at 384. The Stephenson I court noted that federal law required the General Assembly to comply with (1) "one-person, one-vote" principles requiring some measure of population equality between state legislative districts as articulated in Baker v. Carr, 369 U.S. 186 (1962), and Reynolds v. Sims, 377 U.S. 533 (1964), and their progeny; and (2) the Voting Rights Act of 1965, including Section 2 of the VRA and Section 5 of the VRA. See Stephenson I, 355 N.C. at 363–64, 562 S.E.2d at 384–85.[3]

The Stephenson I court reviewed the significant historical roles of counties as political subdivisions of the State of North Carolina. See id. at 364–66, 562 S.E.2d at 385–86. The Stephenson I court described the "long-standing tradition of respecting county lines during the

<hr>

[2] The Governor of North Carolina has no veto power under the North Carolina Constitution concerning the redistricting and reapportionment of the General Assembly. See N.C. Const. art. II, § 22(5)(b)–(c).

[3] Since Shelby County v. Holder, 570 U.S. 529, 557 (2013), North Carolina and the 40 North Carolina counties previously covered under Section 5 need not comply with the coverage formula in Section 5 of the VRA.

19

redistricting process." Id. at 366, 562 S.E.2d at 386. The Stephenson I court then reviewed the development of redistricting jurisprudence in North Carolina from 1965 to 1983. See id. at 366–68, 562 S.E.2d at 386–88. The Stephenson I court explained why the WCP remains enforceable throughout North Carolina to the extent not preempted or otherwise superseded by federal law. See id. at 369–72, 562 S.E.2d at 388–90. The Stephenson I court observed that the North Carolina Constitution's limitations "upon redistricting and apportionment uphold what the United States Supreme Court has termed traditional districting principles, including compactness, contiguity, and respect for political subdivisions." Id. at 371, 562 S.E.2d at 389 (cleaned up). The Stephenson I court noted the Supreme Court of the United States' observation that "those criteria are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." Id., 562 S.E.2d at 389 (quotation omitted). The Stephenson I court then observed that "the right of the people of this State to legislative districts which do not divide counties is not absolute," but the WCP is not "rendered a legal nullity if its beneficial purposes can be preserved consistent with federal law and reconciled with other state constitutional guarantees." Id., 562 S.E.2d at 389.

The Stephenson I court invalidated the 2001 House redistricting plan and the 2001 Senate redistricting plan and held that "the WCP remains valid and binding upon the General Assembly during the redistricting and reapportionment process . . . , except to the extent superseded by federal law." Id. at 371, 562 S.E.2d at 390. The Stephenson I court held that where "the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible." Id. at 374, 562 S.E.2d at 391. The Stephenson I court observed that "[a]lthough no federal law has preempted this Court's authority to

20

interpret the WCP as it applies statewide, we acknowledge that complete compliance with federal law is the first priority before enforcing the WCP." Id. at 374 n.4, 562 S.E.2d at 391 n.4.

The Stephenson I court then provided its remedial analysis. See id. at 375–86, 562 S.E.2d at 392–98. As part of that analysis, the Stephenson I court held that the North Carolina Constitution required single-member House and Senate districts. Id. at 382, 562 S.E.2d at 396. As for federal law, the Stephenson I court observed that "operation of federal law does not preclude states from recognizing traditional political subdivisions when drawing their legislative districts." Id. at 381, 562 S.E.2d at 396. Rather, federal law "preempts the State Constitution only to the extent that the WCP actually conflicts with the VRA and other federal requirements relating to state legislative redistricting and reapportionment." Id., 562 S.E.2d at 396 (emphasis added).

With respect to reconciling the WCP, the rest of the North Carolina Constitution, and federal law, the Stephenson I court held that "the boundaries of single-member districts . . . may not cross county lines except as outlined" in Stephenson I. Id. at 382, 562 S.E.2d at 396. The Stephenson I court directed the trial court to ensure that legislative districts "required by" Section 2 or Section 5 of the VRA are "formed prior to the creation of non-VRA districts." Id. at 383, 562 S.E.2d at 396–97.[4] The Stephenson I court also instructed that "[t]o the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established for all redistricting plans and districts throughout the State." Id., 562 S.E.2d at 397. As for the federal one-person, one-vote requirement, "any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent." Id., 562 S.E.2d at 397.

---

[4] The Stephenson I court then discussed Section 5 and non-retrogression. See id., 562 S.E.2d at 397. As mentioned, under Shelby County, the coverage formula in Section 5 no longer applies. See Shelby Cnty., 570 U.S. at 557.

21

The Stephenson I court held that in counties having a census population "sufficient to support the formation of one non-VRA legislative district falling at or within plus or minus five percent deviation from the ideal population consistent with 'one-person, one-vote' requirements, the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county." Id., 562 S.E.2d at 397. The Stephenson I court also held that:

> When two or more non-VRA legislative districts may be created within a single county, which districts fall at or within plus or minus five percent deviation from the ideal population consistent with "one-person, one-vote" requirements, single-member non-VRA districts shall be formed within said county. Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.

Id., 562 S.E.2d at 397.

As for "counties having a non-VRA population pool which cannot support at least one legislative district at or within plus or minus five percent of the ideal population for a legislative district or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the at or within plus or minus five percent 'one-person, one-vote' standard," then

> the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard.

Id. at 383–84, 562 S.E.2d at 397. The Stephenson I court emphasized that the "intent underlying the WCP must be enforced to the maximum extent possible." Id. at 384, 562 S.E.2d at 397 (emphasis

22

added). "[T]hus, only the smallest number of counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard shall be combined, and communities of interest should be considered in the formation of compact and contiguous electoral districts." Id., 562 S.E.2d at 397 (emphasis added).

Finally, the Stephenson I court directed that "any new redistricting plans, . . . , shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law." Id., 562 S.E.2d at 397. The Stephenson I court closed by observing that "[e]nforcement of the WCP will, in all likelihood, foster improved voter morale, voter turnout, and public respect for State government, and specifically the General Assembly as an institution." Id. at 385, 562 S.E.2d at 398. The Stephenson I court also opined that enforcing the WCP "will assist election officials in conducting elections at lower cost to the taxpayers of this State," and "will instill a renewed sense of community and regional cooperation within the respective countywide or regionally formed legislative delegations mandated by the WCP." Id., 562 S.E.2d at 398.

In Stephenson II, the Supreme Court of North Carolina affirmed the trial court's decision that the General Assembly's 2002 revised redistricting plans failed to attain "strict compliance with the legal requirements set forth in Stephenson I and are unconstitutional." Stephenson II, 357 N.C. at 314, 582 S.E.2d at 254 (quotation omitted). In reaching this conclusion, the Stephenson II court explained how in Stephenson I, "this Court harmonized the provisions of Article I, Sections 2, 3, and 5, and the WCP of Article II, Sections 3(3) and 5(3) of the State Constitution and mandated that in creating legislative districts, counties shall not be divided except to the extent necessary to comply with federal law, including the 'one-person, one-vote' principle and the VRA." Id. at 309, 582 S.E.2d at 251. The General Assembly's deficiencies in 2002 included "excessive division of

23

counties; deficiencies in county groupings; and substantial failures in compactness, contiguity, and communities of interest." Id., 582 S.E.2d at 252.

This court construes Stephenson I and Stephenson II to require harmonizing the VRA and the WCP (including the requirement of county groupings). See id. at 309–14, 582 S.E.2d at 251–54; Stephenson I, 355 N.C. at 369–75, 381–86, 562 S.E.2d at 388–92, 396–98. The Supreme Court of North Carolina held in Stephenson I that the WCP gives way when "required by the VRA." Id. at 383, 562 S.E.2d at 396–97 (emphasis added). Thus, the court must examine Section 2 to determine whether Section 2 requires a majority-black Senate district in northeast North Carolina. See id., 562 S.E.2d at 396–97.

b.

This conclusion that a court must examine Section 2 to determine whether Section 2 requires a majority-black Senate district in northeast North Carolina comports with Pender County v. Bartlett, 361 N.C. 491, 649 S.E.2d 364 (2007), aff'd sub nom. Bartlett v. Strickland, 556 U.S. 1 (2009). In Pender County, the Supreme Court of North Carolina revisited the interplay between Section 2 of the VRA and the North Carolina Constitution's WCP and confirmed that redistricting must comport with federal law. See id. at 493, 649 S.E.2d at 366. State constitutional limits (such as the WCP), however, "are binding upon the General Assembly except to the extent superseded by federal law." Id., 649 S.E.2d at 366 (quotation omitted). "Although federal law is supreme, when the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible." Id., 649 S.E.2d at 366 (quotation omitted). "Moreover, the WCP cannot be applied in isolation or in a manner that fails to comport with other requirements of the State Constitution." Id., 649 S.E.2d at 366 (quotation omitted).

24

The Pender County court stated that the first Gingles precondition requires that a minority group of voting age citizens be sufficiently large and geographically compact to constitute a majority in a single-member district. See id. at 503–06, 649 S.E.2d at 372–73. The Pender County court noted that its interpretation of Section 2 comported with Section 2, provided a "bright line rule," and provided a safe harbor for the General Assembly for determining when the first Gingles condition is met. Id. at 504–05, 649 S.E.2d at 373. The Pender County court also noted the tension between the first Gingles precondition and the third Gingles precondition if crossover districts were permitted to satisfy Section 2's requirements. See id. at 506, 649 S.E.2d at 373–74. After all, "a high level of crossover voting is inconsistent with the majority bloc voting defined in the third Gingles precondition and weakens the possibility of vote dilution." Id., 649 S.E.2d at 374. Because black voters in the House district at issue in Pender County were not a numerical majority of citizens of voting age, such black voters lacked the power to decide independently the outcome of an election, and their voting power was not diluted by the lack of a majority-black legislative district. See id. at 506–07, 649 S.E.2d at 374. Accordingly, the Pender County court held that the first Gingles precondition was not satisfied. See id., 649 S.E.2d at 374.

In finding that the House district at issue did not meet the first Gingles precondition, the Pender County court noted that the district contained a black voting age population of 39.36 percent, and the record did "not reveal the number of voting-age African-Americans who are citizens, [but] that number cannot exceed the total minority voting age population." Id. at 507, 649 S.E.2d at 374. The Pender County court then observed that "the formation of legislative districts must comport with the requirements of our State Constitution, unless federal law supercedes those provisions." Id., 649 S.E.2d at 374. Because Section 2 did not require the formation of the House district at issue, Section 2 did not control the formation of that district or supercede the requirements of the North Carolina

25

Constitution, including the WCP and its county grouping rule. See id. at 507–09, 649 S.E.2d at 375. Thus, the House district had to be "drawn in accordance with the WCP and the Stephenson I requirements." Id. at 509, 649 S.E.2d at 375.

The Supreme Court of the United States affirmed the judgment of the Supreme Court of North Carolina. See Strickland, 556 U.S. at 26. In Justice Kennedy's plurality opinion, joined by Justice Alito and Chief Justice Roberts and joined separately in the judgment by Justice Scalia and Justice Thomas, the Supreme Court held that "[o]nly when a geographically compact group of minority voters could form a majority in a single-member district has the first Gingles requirement been met." Id. The Supreme Court reached this conclusion, in part, to avoid the obvious tension that a contrary statutory interpretation of Section 2 would create between the first Gingles precondition and the third Gingles precondition. See id. at 16–17. The Supreme Court also found "support for the majority-minority requirement in the need for workable standards and sound judicial and legislative administration." Id. at 17.

The Supreme Court invoked the canon of constitutional avoidance in construing Section 2 to require the majority-minority standard for the first Gingles precondition. See id. at 21–22. After all, "the moral imperative of racial neutrality is the driving force of the Equal Protection Clause, and racial classifications are permitted only as a last resort." Id. at 21 (cleaned up). "Racial classifications with respect to voting carry particular dangers." Id. (quotation omitted). "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." Id. (quotation omitted).

Case 4:23-cv-00193-D-RN   Document 61   Filed 01/26/24   Page 26 of 69

c.

The legislative defendants argue that Demonstration District A fails the first Gingles precondition because it is not "reasonably configured" in light of the WCP and the county grouping rule under the WCP. See [D.E. 39] 14–15; Milligan, 599 U.S. at 18, 20; id. at 43 (Kavanaugh, J., concurring) ("Gingles requires the creation of a majority-minority district only when, among other things, . . . a plaintiff's proposed alternative map and proposed majority-minority district are reasonably configured—namely, by respecting compactness principles and other traditional districting criteria such as county, city, and town lines." (quotation omitted)); Perez, 138 S. Ct. at 2332–33 (Texas did not have to break the "County Line Rule" in the Texas Constitution in order to create a second Section 2 Latino district with a portion of Nueces County voters); Abrams, 521 U.S. at 91–92 (the first Gingles precondition requires a "reasonably compact" district and "the § 2 compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries" (quotation omitted)); Shaw II, 517 U.S. at 917.

As discussed, the North Carolina Constitution prohibits any county from being "divided in the formation of a senate district." N.C. Const. art. II, § 3(3); see id. art. II, § 5(3) (same for House districts). If a county's population is too small to form a district alone, then the North Carolina Constitution (as construed in Stephenson I) requires the General Assembly to meet the WCP requirements "by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard." Stephenson I, 355 N.C. at 383–84, 562 S.E.2d at 397. After each decennial census, in order to comply with Stephenson I and its progeny, the General Assembly uses an algorithm to determine county groupings for each chamber in the General Assembly to minimize the number of counties traversed by district lines. See [D.E. 17-1] ¶ 20.

27

After the 2020 U.S. Census, mathematicians (including Esselstyn) produced two optimal county groupings for Senate districts in northeast North Carolina. See id. at fig. 3; Christopher Cooper, et al., NC General Assembly County Clusterings from the 2020 Census 2, available at https://sites.duke.edu/quantifyinggerrymandering/files/2021/08/countyClusters2020.pdf (last visited Jan. 25, 2024). Both optimal groupings keep Warren, Halifax, and Martin Counties together. See [D.E. 17-1] fig. 3. Neither optimal grouping includes Vance County. See id. The algorithm groups Vance County with Franklin and Nash Counties. See Cooper, NC General Assembly County Clusterings from the 2020 Census 1.

Demonstration District A (which Esselstyn drew) groups Vance County with Warren, Halifax, and Martin Counties. See id. at fig. 6; cf. id. at ¶ 40. Legislative defendants' expert Dr. Sean P. Trende ("Dr. Trende") examined Demonstration District A and observed that "Franklin and Nash [C]ounties do not have sufficient population to support a single Senate district on their own." [D.E. 39-6] 7. Accordingly, under the WCP as interpreted in Stephenson I, Stephenson II, and Pender County, Dr. Trende opined that the General Assembly would have to combine Franklin and Nash Counties with another county or counties, leading to "a cascade of changes that are difficult to sort out." Id. In other words, under North Carolina law, Demonstration District A would reset the county grouping algorithm and necessitate a new statewide Senate districting plan. Cf. [D.E. 39] 15.[5] In so doing, the legislative defendants argue that Demonstration District A would disrupt North Carolina's traditional redistricting principles, including respect for county groupings under Stephenson I and II. See Stephenson I, 355 N.C. at 371, 385, 562 S.E.2d at 389, 398. The legislative defendants also argue that Section 2 does not require such a district. See Milligan, 599 U.S. at 18,

---

[5] Esselstyn's expert report does not explain his decision to create Demonstration District A by ignoring the county grouping algorithm that he helped to prepare.

28

20; see, e.g., Perez, 138 S. Ct. at 2332–34; Abrams, 521 U.S. at 91–92; Shaw II, 517 U.S. at 917; see also Milligan, 599 U.S. at 43 (Kavanaugh, J., concurring). And, according to the legislative defendants, Stephenson I, Stephenson II, and Pender County do not either. See Stephenson I, 355 N.C. at 383, 562 S.E.2d at 396–97 (holding the WCP only gives way in drafting districts when "required by the VRA" (emphasis added)); see, e.g., Pender Cnty., 361 N.C. at 507, 649 S.E.2d at 374 (holding that a district "not required by Section 2" must comply with Stephenson I and its progeny); Stephenson II, 357 N.C. at 309, 314, 582 S.E.2d at 251, 254.

The legislative defendants also argue that plaintiffs have not proven that Demonstration District A can be part of a reasonably configured Senate plan in North Carolina. See [D.E. 39] 16. According to the legislative defendants, plaintiffs seeking Section 2 relief customarily present an entire redistricting plan including any majority-minority districts that Section 2 allegedly requires, instead of presenting simply a single district. See, e.g., Milligan, 599 U.S. at 19–21. The legislative defendants argue that plaintiffs must present Demonstration District A within the confines of an entire Senate redistricting plan due to the county grouping rule under Stephenson I to ensure that the proposed majority-black Senate district is reasonably configured itself and does not turn the entire plan into a "monstrosity." Id. at 28 (quoting Miller, 515 U.S. at 909). Because plaintiffs failed to present an entire Senate redistricting plan with Demonstration District A and because the county-grouping rule under Stephenson I and its progeny governs the entire state, the legislative defendants argue that plaintiffs have failed to meet the first Gingles precondition of being reasonably configured. See [D.E. 39] 17.

In support of this latter argument, the legislative defendants note that the enacted SD1 and SD2 border SD5 in northeast North Carolina, which has a BVAP of 40.35% and likely qualifies as

29

a crossover district. See id.[6] Neighboring SD11 also may qualify as a crossover district with a BVAP of 36.65%. See id. According to the legislative defendants, "[a]lthough §2 does not mandate crossover districts, states may create them 'as a matter of legislative choice or discretion' [under Bartlett, 556 U.S. at 23], and §2 can 'be satisfied by crossover districts,' Cooper, 581 U.S. at 305." Id. According to the legislative defendants, Demonstration District A "dismantles SD 1, 2, and 11," reconfigures the county groupings under Stephenson I and its progeny in the other 92 counties, and may, in turn, "dismantle districts like SD 5 that currently provide equal minority opportunity." Id. at 17–18. Moreover, according to the legislative defendants, "dismantling one district for some minority voters (in SD5) to create another district for other minority voters (Demonstrative A) is improper." Id. at 18 (citing Shaw II, 517 U.S. at 917; De Grandy, 512 U.S. at 1019). "Without establishing the impact of Demonstration District A on minority opportunity elsewhere, [Demonstration District A merely shows] 'that lines could have been drawn elsewhere, nothing more.'" Id. (quoting De Grandy, 512 U.S. at 1015).

The legislative defendants' arguments concerning whether Demonstration District A is a "reasonably configured district" under the first Gingles precondition have force. Nonetheless, the court need not resolve the merits of those arguments in order to resolve plaintiffs' motion for a preliminary injunction. Instead, the court assumes without deciding that Demonstration District A meets the first Gingles precondition.

---

[6] SD5 includes Edgecombe County and Pitt County. Senator Kandie Smith (an African-American Democrat) currently represents this Senate district. See N.C. Gen. Assembly, Senator Kandie D. Smith (Dem), https://www.ncleg.gov/Members/Biography/S/447 (last visited Jan. 25, 2024).

2.

As for Demonstration District B-1, the legislative defendants contend that it "does not satisfy the numerosity requirement" because "its BVAP of 48.4% is 'shy of 50%.'" [D.E. 39] 13 (quoting [D.E. 17] 17). Plaintiffs reply that black CVAP "is a proper statistic in this context," and Demonstration District B-1 has a black CVAP over 50%; therefore, plaintiffs argue that Demonstration District B-1 meets the first Gingles precondition. [D.E. 42] 5–6. The parties' dispute concerns whether the court should consider BVAP or black CVAP when evaluating Demonstration District B-1 under the first Gingles precondition.

Some courts decline to use CVAP in redistricting cases when "there is no evidence of a significant noncitizen population." Pope v. Cnty. of Albany, No. 1:11-CV-736, 2014 WL 316703, at *13 (N.D.N.Y. Jan. 28, 2014) (unpublished); see, e.g., Barnett v. City of Chicago, 141 F.3d 699, 705 (7th Cir. 1998) (holding courts should use voting-age population where "noncitizens [are] not a significant part of the relevant population"); Negron v. City of Miami Beach, 113 F.3d 1563, 1568 (11th Cir. 1997) ("Of course, [a previous Section 2 decision] did not address [CVAP], because there was no indication in that case that there was any disparity between black and white citizenship rates. Nor is there likely to be any disparity in citizenship rates, except in a case, such as this one, where the minority population includes a substantial number of immigrants."); cf. United States v. Village of Port Chester, 704 F. Supp. 2d 411, 419–20 (S.D.N.Y. 2010) (requiring CVAP statistics for a Hispanic community within a geographic area that was more than one-third noncitizen). Here, as in Pope, plaintiffs cite no significant black noncitizen population in the counties at issue in this case. See Pope, 2014 WL 316703, at *13.

CVAP relies on the United States Census Bureau's American Community Survey ("ACS"). See [D.E. 17-1] ¶ 33 n.6. The "ACS is based on a sample, rather than all housing units and people."

31

U.S. Census Bureau, Understanding and Using American Community Survey Data: What All Data Users Need to Know 1, available at https://www.census.gov/programs-surveys/acs/library/handbooks/general.html (last visited Jan. 25, 2024). Thus, "ACS estimates have a degree of uncertainty associated with them" called sampling error. Id. The Census Bureau designed ACS "to provide estimates of the characteristics of the population, not to provide counts of the population in different ... population subgroups." U.S. Census Bureau, Understanding and Using American Community Survey Data: What State and Local Government Users Need to Know 5, available at https://www.census.gov/programs-surveys/acs/library/handbooks/state-local.html (last visited Jan. 25, 2024). Accordingly, "CVAP data is less reliable than VAP." Pope, 2014 WL 316703, at *13. Indeed, the Census Bureau has warned users that ACS data is "not intended to be used in redistricting." Id. at *13 n.22.

In any event, even if the court were to entertain using black CVAP to evaluate Demonstration District B-1, this court agrees with the Supreme Court of North Carolina that "the number of voting-age African-Americans who are citizens ... cannot exceed the total minority voting age population" in this case. Pender Cnty., 361 N.C. at 506–07, 649 S.E.2d at 374. Plaintiffs do not explain why black CVAP is higher than BVAP in Demonstration District B-1. Cf. Perez v. Abbott, No. 11-cv-360, 2017 WL 1406379, at *56 (W.D. Tex. Apr. 20, 2017) (unpublished) (explaining that white CVAP was higher than white VAP in a district because the Hispanic VAP included "many Mexican nationals").[7]

---

[7] Likewise, plaintiffs fail to explain how CVAP in Demonstration District A is higher than BVAP in Demonstration District A. Although Demonstration District A's BVAP exceeds 50%, Demonstration District A's black CVAP suffers the same deficiencies as Demonstration District B-1's black CVAP. See Pender Cnty., 361 N.C. at 506–07, 649 S.E.2d at 374.

32

The court recognizes its discretion to use either black CVAP or BVAP when evaluating whether Demonstration District B-1 satisfies the first Gingles precondition of being a majority-black district. See, e.g., Barnett, 141 F.3d at 705; Negron, 113 F.3d at 1568; Pope, 2014 WL 316703, at *13. In exercising that discretion, the court has reviewed Esselstyn's black CVAP calculations upon which plaintiffs rely. The Redistricting Data Hub disaggregated the U.S. Census Bureau's block-group-level CVAP data. See Redistricting Data Hub, https://redistrictingdatahub.org/wp-content/uploads/2022/04/readme_nc_cvap_2020_2020_b.txt (last visited Jan. 25, 2024). Esselstyn used the Redistricting Data Hub's disaggregated CVAP data to calculate black CVAP totals at the precinct level for the black CVAP statistics in his report. See [D.E. 17-1] 35. Esselstyn and the Redistricting Data Hub rely on the U.S. Census Bureau's CVAP Special Tabulation from the 2016–2020 5-Year American Community Survey. See id. at 34–35; Redistricting Data Hub, 2020 Citizen Voting Age Population (CVAP) Data for North Carolina from the American Community Survey (ACS) 5-Year Estimates (2016–2020) Disaggregated to 2020 Census Blocks, https://redistrictingdatahub.org/wp-content/uploads/2022/04/readme_nc_cvap_2020_2020_b.txt; see also U.S. Census Bureau, Citizen Voting Age Population by Race and Ethnicity, https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2020.html (last visited Jan. 25, 2024).

The median margin of error in the U.S. Census Bureau's block group level data is 57.6%. See U.S. Census Bureau, BlockGr.csv, available at https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2020.html (last visited Jan. 25, 2024).[8] The average margin of error in the U.S. Census Bureau's block group level data is 85.5%. See id. The maximum

---

[8] The court only has access to the U.S. Census Bureau's data in CSV format, which does not include the entire nationwide dataset because the dataset is too large for Microsoft Excel. The court's calculations in this paragraph do not include block groups with zero estimated citizens of voting age.

33

margin of error in the U.S. Census Bureau's block group level data is 4,475%. See id. The Redistricting Data Hub does not discuss these margins of error or explain how it took the margins of error into account when it disaggregated the U.S. Census Bureau's CVAP block group level data. Esselstyn does not discuss these margins of error or explain how he took the margins of error into account when he reaggregated the data to calculate precinct-level black CVAP in his report. Plaintiffs do not discuss these margins of error in their briefs. In light of these margins of error, this court has no confidence in relying on Esselstyn's black CVAP conclusions when considering the black CVAP in either Demonstration District A or B-1.

After discovery, plaintiffs may be able to demonstrate why the court should use black CVAP and why black CVAP is higher than BVAP in Demonstration District B-1. At this preliminary stage, however, the court declines to use black CVAP instead of BVAP as an appropriate measure of whether plaintiffs' minority group is "sufficiently large" to constitute a majority in Demonstration District B-1 in light of CVAP's questionable reliability and plaintiffs' failure to explain how they arrived at their black CVAP figures. See Milligan, 599 U.S. at 18; Strickland, 556 U.S. at 12; Hall, 385 F.3d at 430; Barnett, 141 F.3d at 705; Negron, 113 F.3d at 1568; Pope, 2014 WL 316703, at *13.

In opposition to this conclusion, plaintiffs cite the Supreme Court of North Carolina decision in Pender County, which the Supreme Court affirmed in Strickland. In Pender County, however, the Supreme Court of North Carolina did not have black CVAP figures and instead relied on BVAP. See Pender Cnty., 361 N.C. at 506–07, 649 S.E.2d at 374. Plaintiffs also cite Holloway v. City of Va. Beach, 531 F. Supp. 3d 1015 (E.D. Va. 2021), vacated and remanded, 42 F.4th 266 (4th Cir. 2022), to support their use of black CVAP. In Holloway, black CVAP and BVAP data produced the same results. See Holloway, 531 F. Supp. 3d at 1057. Thus, the court did not need to decide which

34

measure was more appropriate. Regardless, the Fourth Circuit vacated the district court opinion in Holloway. See Holloway v. City of Va. Beach, 42 F.4th 266, 278 (4th Cir. 2022). Accordingly, the court rejects plaintiffs' argument and declines to use black CVAP to evaluate whether Demonstration District B-1 meets the first Gingles precondition.

Demonstration District B-1 has a 48.41% BVAP. See [D.E. 17-1] table 4. Thus, black voters in Demonstration District B-1 would need "support from crossover [white] voters to elect" their preferred candidate. Strickland, 556 U.S. at 9. Section 2 does not require such districts, and such districts do not meet the first Gingles precondition. See id. at 23. Accordingly, Demonstration District B-1 fails the first Gingles precondition. See id. Thus, plaintiffs are not likely to succeed on the first Gingles precondition with Demonstration District B-1.

D.

As for the second Gingles precondition, plaintiffs must show that their minority group is "politically cohesive." Gingles, 478 U.S. at 51; see Milligan, 599 U.S. at 18. Plaintiffs may show political cohesion by "showing that a significant number of minority group members usually vote for the same candidates." Gingles, 478 U.S. at 56. "Unlike the first Gingles prong, which has an established bright-line test of 50%+, there is no cutoff for political cohesion." Pope v. Cnty. of Albany, 94 F. Supp. 3d 302, 333 (N.D.N.Y. 2015) (quotation and alteration omitted). Plaintiffs' expert Dr. Barreto notes that black voters in North Carolina "vote for candidates of choice by roughly a 9-to-1 margin or greater." [D.E. 17-2] ¶ 22. Dr. Barreto also observes that in North Carolina elections he analyzed, black voters voted "for the same candidates of choice with clear support in the 95% range." Id. at ¶ 24. In some elections, over 98% of black voters voted for the same candidates. Id. at ¶ 26.

35

The legislative defendants do not contest political cohesion. See [D.E. 39] 13–25. Accordingly, plaintiffs are likely to succeed on the second Gingles precondition. See, e.g., Milligan, 599 U.S. at 22; Pope, 94 F. Supp. 3d at 333–36.

E.

As for the third Gingles precondition, plaintiffs must show that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Gingles, 478 U.S. at 51; see Milligan, 599 U.S. at 18. The third Gingles precondition "requires racial bloc voting that is 'legally significant.'" Covington, 316 F.R.D. at 167. In other words, as the Covington court explained, "a general finding regarding the existence of any racially polarized voting, no matter the level, is not enough." Id.; see Bush v. Vera, 517 U.S. 952, 994 (1996) (O'Connor, J., concurring) (observing that a party "cannot simply rely on generalized assumptions about the prevalence of racial bloc voting"). Accordingly, courts must consider "whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice if no remedial district were drawn." Covington, 316 F.R.D. at 168 (cleaned up). When considering this precondition, courts should ask "merely whether . . . voters are racially polarized," not "why." United States v. Charleston Cnty., 365 F.3d 341, 348 (4th Cir. 2004). "[C]ausation is relevant," but only "in the totality of the circumstances inquiry," not the three Gingles preconditions. Id. at 347–48; see Lewis v. Alamance Cnty., 99 F.3d 600, 615–16 & n.12 (4th Cir. 1996).[9]

---

[9] The legislative defendants contend that "North Carolina voting patterns lack legal significance for the additional reason that they reflect a partisan, not a racial, divide." [D.E. 39] 22. The legislative defendants cite their expert, Dr. John Alford ("Dr. Alford"). See id. at 22–23; [D.E. 39-7] (Dr. Alford's report). The court considers Dr. Alford's report as part of the totality of the circumstances. See Charleston Cnty., 365 F.3d at 347–49; Lewis, 99 F.3d at 615–16 & n.12.

Case 4:23-cv-00193-D-RN   Document 61   Filed 01/26/24   Page 36 of 69

Dr. Barreto conducted racially polarized voting analysis in North Carolina. See [D.E. 17-2] ¶ 11. Dr. Barreto used election results and voter file data obtained from the Board. See id. at ¶ 20. Dr. Barreto used eiCompare software to conduct ecological inference ("EI") analysis. See id. at ¶¶ 20–21. Courts frequently review EI analysis in vote dilution cases. See, e.g., Balt. Cnty. Branch of Nat'l Ass'n for the Advancement of Colored People v. Balt. Cnty., No. 21-cv-3232, 2022 WL 657562, at *8 n.4 (D. Md. Feb. 22, 2022) (unpublished); Covington, 316 F.R.D. at 169 & n.47.

Dr. Barreto performed "more than 350 ecological inference statistical models . . . across 31 recent elections in 2020 and 2022." [D.E. 17-2] ¶ 23. In "elections most closely resembling endogenous elections," i.e., elections in northeast North Carolina, Dr. Barreto's "EI models report that 98–99% of Black voters are cohesive in voting for their candidates of choice" in the 2020 and 2022 elections. Id. at ¶ 26. By contrast, Dr. Barreto's EI model reports that between 80–88% of white voters in northeast North Carolina vote against black voters' candidate of choice. Id. Dr. Barreto opined that "white voters vote in the exact opposite direction [as black voters] in every one of these elections" he analyzed. Id. at ¶ 27. Dr. Barreto evaluated plaintiffs' demonstration districts. See id. at App'x B. According to Dr. Barreto's evaluation, black voters' candidates of choice would have won Demonstration District A and Demonstration District B-1 in every election if those districts were in place in 2020 and 2022. See id. By contrast, black voters' candidates of choice would have lost SD1 and SD2 in all but one election if those districts were in place in 2020 and 2022. See id. Notably, according to Dr. Barreto, the one election a black-voter-preferred candidate would have won in SB 758's districts was the 2022 North Carolina Senate race in SD2. See id. at 21, table B1. Moreover, Dr. Barreto's analysis of SD2 in 2022 was one of just four elections Dr. Barreto analyzed that most directly concerned whether black voters can elect Senate candidates of choice in SD1 or SD2, and one of the two Senate districts that plaintiffs attack in this case. See id.

37

The court asked about this startling piece of plaintiffs' evidence concerning SD2 at the hearing on plaintiffs' motion for a preliminary injunction. See, e.g., Johnson v. Hamrick, 196 F.3d 1216, 1222 (11th Cir. 1999) (holding that endogenous elections are "more probative than exogenous elections"). Plaintiffs responded that this figure must have been a typo and asked to supplement Dr. Barreto's report. The court granted the request. On January 12, 2024, plaintiffs filed a supplemental declaration from Dr. Barreto in which he stated that this figure was not a typo. See [D.E. 55-1]. Instead, Dr. Barreto opined that his model estimated a victory for the black-preferred candidate in the SD2 race in 2022 because he excluded consideration of votes cast in other uncontested elections. See id. at 1–2. Dr. Barreto opined that if his model incorporated the uncontested elections, the figure in his table would reflect a loss for the black-preferred candidate. See id.

On January 22, 2024, the legislative defendants responded to Dr. Barreto's supplemental declaration. See [D.E. 60]. The legislative defendants note that Dr. Barreto "declares that his table includes only vote shares in Halifax, Warren, and Martin" Counties. Id. at 2; cf. [D.E. 55-1] 1. That admission shows that Dr. Barreto is doing an unusual form of reconstituted election analysis. See [D.E. 60] 2–3; cf. Rodriguez v. Bexar Cnty., 385 F.3d 853, 861 (5th Cir. 2004) ("Reconstituted election analysis is a relatively simple method that extracts actual election results from a variety of statewide and local races that subsume the area being analyzed and determines, precinct-by-precinct within the new district, the racial composition of the vote and the 'winner' within the new district."). The legislative defendants also correctly argue that Dr. Barreto's new representation "cannot seem to be cabined to the contests he would prefer the Court ignore." [D.E. 60] 3. The legislative defendants also chide Dr. Barreto for performing "back-of-the napkin math" in his supplemental declaration to support his ultimate conclusion that black-preferred candidates cannot win in SD1 or SD2. Id. at 4. The legislative defendants understandably ask why Dr. Barreto did not do that

38

analysis in his initial report or across the board in his supplemental declaration if "that were the right way to do the analysis." Id. The legislative defendants contend that Dr. Barreto's supplemental declaration, at a minimum, shows "why experts in [redistricting] cases should be subject to vigorous cross examination and thorough expert rebuttal reports." Id.

The court agrees with the legislative defendants. Dr. Barreto's belated explanation undercuts all of Dr. Barreto's conclusions by demonstrating that fuller data sets could change his estimated outcomes. Dr. Barreto does not explain the profound discrepancies between the methods of analysis he performed in his initial report and in his supplemental declaration. Dr. Barreto also fails to explain why the court should credit any of his estimated outcomes for elections in SD2 in light of his supplemental declaration. These figures have important implications for the third Gingles precondition in plaintiffs' case. Accordingly, Dr. Barreto's unpersuasive explanation demonstrates, at a minimum, that this case would greatly benefit from discovery, including, for example, Dr. Barreto's deposition and Dr. Barreto producing his complete data files to the legislative defendants. This hotly contested factual issue weighs in favor of the court preserving the status quo ante litem. See Purcell, 549 U.S. at 5–6; Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980).

Dr. Barreto opined that "there is a clear, consistent, and statistically significant finding of racially polarized voting in North Carolina statewide as well as within the Northeast region in particular." [D.E. 17-2] at ¶ 22. Dr. Barreto also opined that the population of black voters "in the northeast region of North Carolina is large and geographically compact and can form a majority-Black State Senate district that will elect Black candidates of choice." Id. at ¶ 32. Notwithstanding his own analysis of SD2 in 2022, Dr. Barreto also opined that black voters' "candidates of choice cannot win office in either Senate District 1 or 2." Id. at ¶ 33.

Case 4:23-cv-00193-D-RN   Document 61   Filed 01/26/24   Page 39 of 69

The legislative defendants respond that Dr. Barreto found "statistically significant" racially polarized voting but not "legally significant" racially polarized voting because Dr. Barreto did not conduct the proper analysis. [D.E. 39] 20–21 (quotation omitted). Plaintiffs disagree. See [D.E. 42] 8.

Courts have emphasized the "crucial difference between legally significant and statistically significant racially polarized voting." Covington, 316 F.R.D. at 170 (emphasis in original). The term "racially polarized voting" only means "different racial groups 'vote in blocs for different candidates.'" Id. (quoting Gingles, 478 U.S. at 62); see [D.E. 17-2] ¶ 16 (defining "racially polarized voting" as "voters of different racial or ethnic groups exhibiting different candidate preferences in an election"). As the Covington court explained, courts reject statistically significant racially polarized voting to show the third Gingles precondition because that label "applies equally well where there is only a minimal degree of polarization." Covington, 316 F.R.D. at 170. Instead, the third Gingles precondition "is concerned only with legally significant racially polarized voting, which occurs when the majority group votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Id. (cleaned up); see Gingles, 478 U.S. at 51, 55–56.

To demonstrate legally significant racially polarized voting, an expert must engage in a "district effectiveness analysis," which is "a district-specific evaluation used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for . . . voters of that minority group to elect candidates of their choice." Covington, 316 F.R.D. at 168 n.46. In other words, an expert must determine if black voters' candidates of choice "would usually be defeated without a VRA remedy." Id. at 168. As discussed, Section 2 does not require crossover districts. See Strickland, 556 U.S. at 23. Thus, a proper district effectiveness analysis supporting plaintiffs' challenge must show that black voters' candidates of choice cannot

40

win elections unless BVAP in the contested districts exceeds 50% plus one vote. See, e.g., Bethune-Hill v. Va. State Bd. of Elections, 580 U.S. 178, 194–95 (2017); Covington, 316 F.R.D. at 170.

As an example of such a district effectiveness analysis, the legislative defendants submitted the expert report of Dr. Lisa Handley that Dr. Handley submitted on behalf of the plaintiffs in Common Cause v. Lewis, No. 18-cvs-14001, 2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019), abrogated by Harper v. Hall, 384 N.C. 292, 886 S.E.2d 393 (2023) ("Harper III"). In Lewis, the plaintiffs challenged the General Assembly's legislative districts on a theory of partisan gerrymandering. See id. at *1–2. The defendants (members of the General Assembly) raised Section 2 as a federal defense. See id. at *100–03. The Lewis court held that the General Assembly failed to "establish the existence of legally sufficient racially polarized voting in any area of North Carolina, or any particular House or state Senate district." Id. at *100 (emphasis added). Instead, the Lewis court had evidence from Dr. Handley demonstrating a lack of legally significant racially polarized voting across every legislative district she analyzed because her district effectiveness analyses showed black voters' candidates of choice could win the challenged districts with less than 50% BVAP. See [D.E. 39-7] 33–75.

Plaintiffs correctly note that Dr. Handley cabined the value of her report in Lewis, noting that her "analysis cannot be extrapolated to other counties and districts not analyzed in this report." Id. at 33; see [D.E. 42] 9. Dr. Handley, however, completed a district effectiveness analysis. See [D.E. 39-7] 33–75. Dr. Barreto did not. Thus, Dr. Handley's report demonstrates another deep flaw in Dr. Barreto's report.

At the hearing on plaintiffs' motion for a preliminary injunction, plaintiffs contended that, under Covington, they could meet their burden to show legally significant racially polarized voting through either a district effectiveness analysis or a statistically significant racially polarized voting

41

analysis plus an analysis of election results in the Senate districts they challenge. Plaintiffs are incorrect. In Covington and Common Cause (among other cases), the General Assembly raised Section 2 as a defense to racial and partisan gerrymandering claims. See Covington, 316 F.R.D. at 124; Common Cause, 2019 WL 4569584, at *100–01, *131–32. Thus, the General Assembly had to show legally significant racially polarized voting that justified its use of race to create majority-black districts. See Covington, 316 F.R.D. at 167–68; Common Cause, 2019 WL 4569584, at *131–32. The courts held that the General Assembly failed to meet its burden to justify using race to create majority-black House and Senate districts because the General Assembly presented no evidence that majority-black districts were necessary for black-preferred candidates usually to win. See Covington, 316 F.R.D. at 168–69; Common Cause, 2019 WL 4569584, at *100–01.

The method to determine whether a majority-black district is necessary under Section 2 is through a proper district effectiveness analysis. See Covington, 316 F.R.D. at 168–69 & n.46. Just as a legislature cannot use Section 2 to justify creating a majority-black district without a proper district effectiveness analysis, a plaintiff cannot either. See id.; see also Cooper, 581 U.S. at 306 ("We by no means insist that a state legislature, when redistricting, determine precisely what percent minority population § 2 of the VRA demands. But neither will we approve a racial gerrymander whose necessity is supported by no evidence . . . ." (cleaned up)); Bethune-Hill, 580 U.S. at 194–95.

At the hearing on plaintiffs' motion for a preliminary injunction, plaintiffs conceded that Dr. Barreto failed to provide a district effectiveness analysis. Dr. Barreto merely compared hypothetical election results between plaintiffs' demonstration districts and Senate Districts 1 and 2. See [D.E. 17-2] 21–23. Dr. Barreto did not find the level of BVAP in Demonstration Districts A and B-1 below which black voters' candidates of choice stop winning elections and start losing them. Cf. [D.E. 39-7] 33–74 (Dr. Handley's analysis). Indeed, as discussed, plaintiffs' Demonstration District

42

B-1 has a BVAP below 50%. See [D.E. 17] 17. Dr. Barreto, however, estimated that black voters' candidates of choice would have won every election in Demonstration District B-1 in 2020 and 2022. See [D.E. 17-2] 21–23. Thus, when using the BVAP of 48.4%, Dr. Barreto's analysis undermines plaintiffs' challenge to SB 758 by demonstrating that Demonstration District B-1 is a crossover district. Moreover, the scatterplots in Dr. Barreto's report show that black voters' candidates of choice begin winning precincts in the North Carolina counties at issue in this case when BVAP meets or exceeds 30–40%. See id. at 12–13. Although Dr. Barreto did not do a district effectiveness analysis, his report suggests that a proper district effectiveness analysis for plaintiffs' demonstration districts likely would yield a "minority voting-age population level" below 50% which provides "a realistic opportunity for . . . voters of that minority group to elect candidates of their choice." Covington, 316 F.R.D. at 168 n.46.

Tellingly, plaintiffs ask the court to issue an extraordinary mandatory preliminary injunction but leave Senate District 5 intact because it is a "minority opportunity district." See, e.g., [D.E. 17] 16. Senate District 5 in northeast North Carolina combines Edgecombe County and Pitt County and has a 40.35% BVAP. See [D.E. 17-1] 11.[10] Thus, plaintiffs implicitly concede that legally significant racially polarized voting does not exist in Senate District 5. See id.; Strickland, 556 U.S. at 9.

Other evidence further undermines plaintiffs' attempt to satisfy the third Gingles precondition. In 2022, North Carolina courts approved a new electoral redistricting plan for North Carolina's congressional districts to be used in the 2022 congressional elections. See Order, N.C. League of Women Voters, Inc. v. Hall, No. 21 CVS 15426 (N.C. Super. Ct. Feb. 23, 2022). In that

---

[10] As mentioned, Senator Kandie Smith (an African-American Democrat) currently represents Senate District 5.

43

redistricting plan, North Carolina's First Congressional District ("CD1") contains all of the counties at issue in this case and is composed of Bertie, Chowan, Edgecombe, Franklin, Gates, Greene, Halifax, Hertford, Martin, Nash, Northampton, Pasquotank, Perquimans, Tyrrell, Vance, Warren, Washington, and Wilson Counties and a portion of Pitt County. See N.C. Gen. Assembly, North Carolina Congressional District Plan, https://www.ncleg.gov/Redistricting/DistrictPlanMap/C2022C (last visited Jan. 25, 2024). CD1 has a BVAP of approximately 40%. Cf. U.S. Census Bureau, My Congressional District, https://www.census.gov/mycd/?st=37&cd=01 (last visited Jan. 25, 2024) (listing demographic data for congressional districts used in the 2022 elections). Nonetheless, in 2022, Don Davis—an African-American Democrat—won CD1. See North Carolina State Board of Elections, 11/08/2022 Official General Election Results - Statewide, https://er.ncsbe.gov/contest_details.html?election_dt=11/08/2022&county_id=0&contest_id=1364 (last visited Jan. 25, 2024). The 2022 election results in CD1 provide additional evidence of white crossover voting in northeast North Carolina, including in the counties at issue in plaintiffs' proposed remedial majority-black Senate district.[11]

"If the lesson of Gingles is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order

---

[11]    Congressman Davis's experience with North Carolina voters is not unique. Congresswoman Alma Adams represents the people in Congressional District 12, which encompasses a portion of Mecklenburg County and Cabarrus County. Congresswoman Valerie Foushee represents the people in Congressional District 4, which encompasses Alamance County, Durham County, Granville County, Orange County, Person County, and a portion of Caswell County. Congresswoman Adams and Congresswoman Foushee are African-American Democrats. They were elected in districts in 2022 with a black voting-age population below 50%.

44

to elect candidates of their choice." De Grandy, 512 U.S. at 1020. On the current record, the court finds that the black voting-age population in the counties at issue in this case live and work in such communities. Likewise, on the current record, the court finds that the white voting-age population in the communities at issue do not vote as a bloc against black-preferred candidates to enable the white bloc usually to defeat the black-preferred candidates.

Of course, the court recognizes that not every candidate in every election represents "perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." Id. On the current record, the court finds the black and white voting-age populations in the counties at issue in this case do "pull, haul, and trade to find common political ground." Id.

At this stage of the case, plaintiffs fail to demonstrate legally significant racially polarized voting in northeast North Carolina in the counties at issue in this case. See, e.g., Covington, 316 F.R.D. at 169. Where plaintiffs fail "to demonstrate Gingles' third precondition—sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice," then "it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." Voinovich, 507 U.S. at 158 (quotation omitted). Thus, plaintiffs fail to demonstrate they are likely to succeed on the merits of the third Gingles precondition.

F.

Generally, courts consider whether a violation of Section 2 has occurred based on the totality of the circumstances only after a party has established the three Gingles preconditions. See Strickland, 556 U.S. at 11–12; see Covington, 316 F.R.D. at 167. As discussed, plaintiffs fail to satisfy all three Gingles preconditions; therefore, they fail to show a likelihood of success on the

45

merits of their Section 2 claim. Nonetheless, in the alternative, the court considers the parties' arguments about the totality of the circumstances.

Plaintiffs who prove the three Gingles preconditions also must prove, "under the totality of the circumstances, that the political process is not equally open to minority voters." Milligan, 599 U.S. at 18 (quotations omitted); see 52 U.S.C. § 10301(b); De Grandy, 512 U.S. at 1011–12 ("[I]f Gingles so clearly identified the three [preconditions] as generally necessary to prove a § 2 claim, it just as clearly declined to hold them sufficient . . . . [C]ourts must also examine other evidence in the totality of circumstances . . . ."); Gingles, 478 U.S. at 45–46; Covington, 316 F.R.D. at 125. The Gingles inquiry is "peculiarly dependent upon the facts of each case." Milligan, 599 U.S. at 19 (quotation omitted). Thus, courts "must conduct an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." Id. (quotation omitted); see Gingles, 478 U.S. at 79; Charleston Cnty., 365 F.3d at 349.

1.

Among other local considerations, courts consider: (1) the extent of the state's historical discrimination concerning the right to vote against plaintiffs' minority group; (2) the extent of racially polarized voting; (3) the extent to which the state has adopted other voting practices that may exacerbate discrimination against the minority group; (4) whether members of plaintiffs' minority group have been denied access to a candidate slating process; (5) whether members of plaintiffs' minority group in the state "bear the effects of discrimination" in education, employment, or health, hindering their ability to participate in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of plaintiffs' minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness by the state's elected officials to the "particularized needs" of plaintiffs'

46

minority group; and (9) whether the state's policy underlying its use of the challenged voting procedure is tenuous. See Gingles, 478 U.S. at 36–38; S. Rep. No. 97-417, at 28–29 (1982). Courts refer to Gingles's non-exclusive list as the "Senate factors." See, e.g., Milligan, 599 U.S. at 69–70 (Thomas, J., dissenting); United States v. Charleston Cnty., 318 F. Supp. 2d 302, 321 (D.S.C. 2002).

Plaintiffs discuss each Senate factor. First, plaintiffs contend that North Carolina historically discriminated against black voters. See [D.E. 17] 21–23. In support, plaintiffs cite very old voting practices and cases. See id. Plaintiffs cite just one case from the last 30 years in which a court found the General Assembly acted with discriminatory intent when it enacted a voting law. See id. (citing N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 238 (4th Cir. 2016)). The court gives little weight to plaintiffs' overwhelmingly outdated evidence.

As for the second Senate factor, plaintiffs repeat their argument that North Carolina voters are "highly racially polarized." [D.E. 17] 23. As discussed, plaintiffs fail to demonstrate legally significant racially polarized voting. See, e.g., Covington, 316 F.R.D. at 169. Instead, the record, including plaintiffs' own evidence, demonstrates "substantial crossover voting" in North Carolina. Strickland, 556 U.S. at 24; see Covington, 316 F.R.D. at 128, 142–65, 167–74; see also [D.E. 17-2] 12–13, 21–23. Accordingly, the court rejects this argument. This factor weighs in favor of the legislative defendants.

Third, plaintiffs argue that North Carolina has designed voting practices to discriminate against black voters "since the 19th century." [D.E. 17] 23. The legislative defendants respond that this factor focuses on "whether the challenged scheme interacts with other [voting] mechanisms in the present to enhance the discriminatory impact of the challenged system." [D.E. 39] 24 (emphasis in original). Plaintiffs reply that the legislative defendants' argument is "incorrect on [its] own terms." [D.E. 42] 9.

47

Courts construe the third Senate factor to consider whether the jurisdiction presently employs voting practices designed to discriminate against minority voters. See, e.g., Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama, 612 F. Supp. 3d 1232, 1306–07 (M.D. Ala. 2020); Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. East Ramapo Sch. Dist., 462 F. Supp. 3d 368, 400–02 (S.D.N.Y. 2020); Luna v. Cnty. of Kern, 291 F. Supp. 3d 1088, 1135–36 (E.D. Cal. 2018); Montes v. City of Yakima, 40 F. Supp. 3d 1377, 1410–12 (E.D. Wash. 2014); United States v. City of Euclid, 580 F. Supp. 2d 584, 607–08 (N.D. Ohio 2008). Indeed, plaintiffs' argument (if accepted) would render the third Senate factor superfluous in light of the first Senate factor. Plaintiffs fail to cite evidence that North Carolina presently employs other voting practices that may enhance the opportunity for discrimination against black voters. See [D.E. 17] 23. Accordingly, this factor favors the legislative defendants.

Fourth, North Carolina does not use a candidate slating process. See id. Accordingly, this factor does not apply. See, e.g., Montes, 40 F. Supp. 3d at 1412–13.

Fifth, plaintiffs contend that "North Carolina's discrimination has produced severe socioeconomic disparities" between black and white North Carolinians. See [D.E. 17] 23–25. In support, plaintiffs cite the opinion of their expert Dr. Traci Burch. See id.; [D.E. 17-3] (Dr. Burch's report). Dr. Burch's report, however, contains no statistical analysis demonstrating that race discrimination by North Carolina caused the socioeconomic disparities that Dr. Burch discusses in her report. Accordingly, this factor does not help plaintiffs.

Sixth, plaintiffs contend "North Carolina political campaigns feature racial appeals." [D.E. 17] 25–26. In support, plaintiffs cite: (1) the "campaign tactics of U.S. Senate candidate Jesse Helms in 1984 and 1990"; (2) a comment from then-candidate for the House of Representatives Madison Cawthorn in 2020 that Cawthorn's Democratic opponent allegedly associated himself "with

48

people who wanted to ruin white males"; and (3) an advertisement then-Congressman Ted Budd ran involving former Supreme Court of North Carolina Chief Justice Cheri Beasley in 2022 that "blamed Beasley for crimes committed by individuals after early release from prison." Id.; see [D.E. 17-3] 20–21. The legislative defendants contend that "the evidence does not support" plaintiffs' argument. [D.E. 39] 25.

Racial appeals can take various forms. See City of Euclid, 580 F. Supp. 2d at 610; Williams v. City of Dallas, 734 F. Supp. 1317, 1360 n.119 (N.D. Tex. 1990). The court gives little weight to Jesse Helms's campaign tactics in 1984 and 1990 because they occurred "decades ago." Luna, 291 F. Supp. 3d at 1139. The court finds that Ted Budd's 2022 advertisement, which "never explicitly mention[ed] race," [D.E. 17-3] 20, was not a racial appeal. Thus, plaintiffs are left with Madison Cawthorn's statement in a 2020 congressional campaign in western North Carolina. See id. at 20–21. North Carolina, however, has hosted hundreds of thousands of political campaigns since 1965 at the federal, state, and local levels. Assuming without deciding plaintiffs' example constitutes an overt or subtle racial appeal, it does not "characterize" North Carolina campaigns in 2023 and 2024. See, e.g., Rose v. Raffensperger, No. 1:20-cv-2921, 2022 WL 670080, at *3 (N.D. Ga. Mar. 7, 2022) (unpublished) ("[T]hese two examples [from 2020] are simply not sufficient to show that political campaigns in Georgia are 'characterized' by such odious appeals."); City of Euclid, 580 F. Supp. 2d at 610 (finding "the evidence in this case refers to two disparate pieces of literature, from different sources, put out decades apart" and was "not . . . particularly compelling"). Thus, this factor does not support plaintiffs' argument.

Seventh, plaintiffs contend that black North Carolinians "are slightly underrepresented in some offices relative to their share of the State's population." [D.E. 17] 26. The legislative defendants respond that Section 2 does not require proportional representation. See [D.E. 39] 24.

49

"Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing [Section] 2." Milligan, 599 U.S. at 28; see 52 U.S.C. § 10301(b); Covington, 316 F.R.D. at 133 n.13. Instead, courts consider whether "no members of a minority group have been elected to office over an extended period of time." S. Rep. No. 97-417, at 28 n.115. The election of just "a few minority candidates," however, does not necessarily foreclose the possibility of dilution of the minority group's vote. Id. Dr. Burch concedes that the current Lieutenant Governor of North Carolina is a black Republican and that black members of the General Assembly are "close to parity" with the share of black people in North Carolina's population. [D.E. 17-3] 22–23. Moreover, Senator Blue is the minority leader of the North Carolina Senate, and Representative Reives is the minority leader of the North Carolina House of Representatives. Senator Blue and Representative Reives are African-American Democrats. In addition, numerous black candidates consistently have won election to statewide appellate judgeships. Accordingly, plaintiffs fail to demonstrate that few black candidates have won elections in North Carolina. This factor favors the legislative defendants. Cf. Ala. State Conf. of NAACP, 612 F. Supp. 3d at 1311–15.

Eighth, plaintiffs cite "the persistent and dramatic socioeconomic disparities" between black and white North Carolinians as evidence that North Carolina elected officials are "not responsive" to black voters. [D.E. 17] 26. The court, however, "cannot accept the plaintiffs' argument that only unresponsiveness—and not responsiveness—is relevant to a [Section] 2 inquiry." N.A.A.C.P., Inc. v. City of Niagara Falls, 65 F.3d 1002, 1023 (2d Cir. 1995). Instead, this Senate factor "involves review of tangible efforts of elected officials and the impact of these efforts on particular members of the community." Id. at 1023 n.24. Plaintiffs offer no evidence of elected officials' responsiveness or unresponsiveness to black voters. See [D.E. 17] 26. Instead, plaintiffs ask the court to infer that North Carolina elected officials are unresponsive to black voters based on socioeconomic inequality

50

between black and non-black North Carolinians. See id. The court declines to draw that unjustified inference. See, e.g., Rose, 2022 WL 670080, at *3. Accordingly, this factor does not support plaintiffs' argument.

Ninth, plaintiffs contend that "no legitimate governmental interest justifies" SB 758. [D.E. 17] 26. As discussed, however, the legislative defendants enacted SB 758 to comply with federal law and the WCP and in light of traditional redistricting principles of "compactness, contiguity, respect for existing political subdivisions, political considerations[,] and incumbent residence." [D.E. 39-5] 3; see Stephenson I, 355 N.C. at 383, 562 S.E.2d at 396–97. Accordingly, the court rejects plaintiffs' argument and finds that this factor weighs in favor of the legislative defendants.

2.

The legislative defendants contend that, under the totality of circumstances, voting is politically polarized, not racially polarized, and cite Dr. Alford's report in support. See [D.E. 39] 22–23. Plaintiffs do not meaningfully respond to this argument. See [D.E. 42] 8. Instead, plaintiffs contend it is "irrelevant." Id.

Courts properly consider whether partisanship drives polarization rather than race when considering the totality of the circumstances. See Charleston Cnty., 365 F.3d at 347–48; see, e.g., Cooper, 581 U.S. at 307–08 (discussing a "partisanship defense" when plaintiffs accuse a state of impermissible racial gerrymandering); cf. Whitcomb v. Chavis, 403 U.S. 124, 153 (1971) (rejecting plaintiffs' position that, where black voters had equal opportunity to participate in the political process, "invidious discrimination" resulted when "Democrats[] suffer[ed] the disaster of losing too many elections"). In other words, "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." Baird v. Consol. City of Indianapolis, 976 F.2d 357, 361 (7th Cir. 1992). Courts, of course, must

51

engage in "a searching practical evaluation of the past and present reality" and can, after that evaluation, conclude that divergent voting patterns between black and white voters are better explained by party affiliation instead of racial bloc voting. See, e.g., League of United Latin Am. Citizens, Council No. 4434 v. Clements, 999 F.2d 831, 860–61 (5th Cir. 1993) (en banc).

Dr. Barreto failed to provide Dr. Alford with the data files and EI procedures that Dr. Barreto used to prepare his report. See [D.E. 39-7] 3.[12] Nonetheless, Dr. Alford reviewed Dr. Barreto's report and attempted to "match as closely as possible the data and analysis assumptions described" in Dr. Barreto's report. Id. Dr. Alford used the same EI methods as Dr. Barreto to analyze the same elections as Dr. Barreto. See id. at 3–6. Dr. Alford observes that Dr. Barreto "provides no analysis of Democratic primary elections, something that is commonly included" in these analyses. Id. at 5; see, e.g., id. at 46–50, 52–55 (Dr. Handley's report).

Dr. Alford first analyzed the U.S. Senate elections in North Carolina in 2020 (featuring a white Republican (Thom Tillis) against a white Democrat (Cal Cunningham)) and in 2022 (featuring a white Republican (Ted Budd) against a black Democrat (Cheri Beasley)). See id. at 6–7. Dr. Alford opined that black voters were "only three-tenths of one percent more supportive of the Black Democrat compared to the White Democrat statewide (and support is similarly essentially identical in the regional results)." Id. at 7. Moreover, white voters were "not more likely to oppose a Black Democrat compared to a White Democrat" and were actually "slightly more supportive of the Black Democrat in 2022 compared to the White Democrat in 2020." Id.

---

[12] At the hearing on plaintiffs' motion for a preliminary injunction, plaintiffs explained that the legislative defendants asked plaintiffs for Dr. Barreto's underlying Excel spreadsheet files. Plaintiffs reported that the software package that Dr. Barreto uses does not produce those. Plaintiffs directed the legislative defendants to Dr. Barreto's footnotes to find Dr. Barreto's input data from publicly available sources and replicate Dr. Barreto's statistical methods. During discovery, defendants are entitled to have Dr. Barreto produce his input data.

52

Next, Dr. Alford analyzed three 2020 state supreme court elections. See id. at 7–8. Two elections featured white Republicans against white Democrats, and one election featured a white Republican against a black Democrat. See id. at 8. Dr. Alford opined that black voters' support for black Democrats and white Democrats was "essentially idential." Id. Moreover, white voters were "not more likely to oppose a Black Democrat compared to a White Democrat." Id.

Next, Dr. Alford analyzed five 2020 state appellate court elections. See id. at 8–9. Three elections featured white Republicans against white Democrats, one election featured a white Republican against a black Democrat, and one election featured a black Republican against a white Democrat. See id. Dr. Alford opined that the "almost exact similarity of the voting patterns" is "notable." Id. at 9. The black Republican candidate received no more black voter support and no less white voter support than the average white Republican candidate. See id. The black Democratic candidate received no more black voter support and no less white voter support than the average white Democratic candidate. See id.

Next, Dr. Alford analyzed all 2020 and 2022 elections. See id. at 9–13. Dr. Alford observed that black voters were highly supportive of Democrats and white voters were supportive of Republicans. See id. at 10. This observation comports "with a polarized response to the party affiliation indicated on the ballot." Id. The "race of the candidates does not appear to have a polarizing impact on vote choice" and is "essentially indetectable." Id.; see id. at 12–13.

Dr. Alford opined that "it is clear that Black voters cohesively support Democratic candidates, and that the majority of White voters support Republican candidates." Id. at 13. According to Dr. Alford, Dr. Barreto's analysis does not support the conclusion that black voters support black candidates while white voters support white candidates. See id. Dr. Alford concluded that Dr. Barreto's analysis "clearly demonstrates that the party affiliation of the candidates is

53

sufficient to fully explain the divergent voting preferences of Black and White voters in the 2020 and 2022 North Carolina elections." Id. at 15.

Plaintiffs respond that minority-preferred candidates need not themselves be members of the minority group. See [D.E. 42] 8; Lewis, 99 F.3d at 606. True. Dr. Alford, however, demonstrates that when the model accounts for a candidate's race, partisanship better explains polarized voting in North Carolina than race. In Charleston County, the Fourth Circuit affirmed the trial court's rejection of Charleston County's argument that partisanship drove polarized voting because "there was no systematic proof to support [the county's] claim." Charleston Cnty., 365 F.3d at 352. The trial court had found that in Charleston County, South Carolina, "minority voters g[a]ve more cohesive support to minority Democratic candidates than to white Democratic candidates." Id. at 353. The trial court also found that the opposite was true for white voters in Charleston County, South Carolina. See id. The Fourth Circuit held that these trial court findings were not clearly erroneous. See id.

By contrast, Dr. Alford persuasively shows that black North Carolinians are not more likely to support black Democratic candidates than white Democratic candidates. See, e.g., [D.E. 39-7] 7–10, 12–13. Dr. Alford also persuasively shows that white North Carolinians are not less likely to support black Democratic candidates than white Democratic candidates. See, e.g., id. Accordingly, on the current record, under the totality of circumstances, plaintiffs fail to show that the political process "is not equally open to minority voters." Milligan, 599 U.S. at 18 (quotation omitted); see, e.g., League of United Latin Am. Citizens, Council No. 4434, 999 F.2d at 860–61 (concluding that plaintiffs failed to establish a Section 2 claim where the evidence "unmistakably shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation").

54

In analyzing the totality of the circumstances, the court notes that the General Assembly did not enact SB 758 in a vacuum. In 2003, the General Assembly enacted a new legislative redistricting plan for the General Assembly that departed from the WCP. See Strickland, 556 U.S. at 7–8. The Supreme Court of the United States and the Supreme Court of North Carolina held that Section 2 did not justify that departure. See id. at 23; Pender Cnty., 361 N.C. at 510, 649 S.E.2d at 376. In 2011, the General Assembly again redistricted and hired an expert to conduct a polarized voting study to determine North Carolina's obligations under Section 2. See Covington, 316 F.R.D. at 168–69. The expert concluded that voting was racially polarized in certain places in North Carolina; therefore, the General Assembly drew 28 majority-black House and Senate districts in order to comply with Section 2. See id. at 132–33, 142–65. In Covington, in 2016, the three-judge court enjoined North Carolina's 2011 legislative redistricting plan for the General Assembly, in part, because there was no evidence of legally significant racially polarized voting. Thus, Section 2 did not justify using race to draw majority-black districts. See id. at 167–74. The Supreme Court summarily affirmed the three-judge court's opinion. See North Carolina v. Covington, 581 U.S. 1015 (2017).

In Harris, in 2016, a three-judge court enjoined North Carolina's 2011 congressional redistricting plan in part because there was no evidence of racially polarized voting in northeast North Carolina that justified using Section 2 to engage in race-based districting and create a majority-black congressional district in northeast North Carolina, including in the counties at issue in this case. See Harris, 159 F. Supp. 3d at 611–15, 622–25. As the Harris court observed, "the composition and election results under earlier versions of CD1 vividly demonstrate that, though not previously a majority-BVAP district, the white majority did not vote as a bloc to defeat African-Americans' candidate of choice." Id. at 625 (emphasis added). "In fact, precisely the opposite

55

occurred [in CD1]: significant crossover voting by white voters supported the African-American candidate." Id. (emphasis added). The Harris court then noted that Section 2 does not "require racial balkanization where, as here, citizens have not voted as racial blocs, [and] where crossover voting has naturally occurred." Id.

The Supreme Court in Cooper affirmed. See Cooper, 581 U.S. at 322–23. In affirming, the Supreme Court upheld the three-judge court's finding, in relevant part, that the same portion of northeast North Carolina at issue in this case had "a longtime pattern of white crossover voting" and lacked evidence of "effective white bloc-voting" to defeat the African-Americans' candidate of choice. Id. at 304. As the Supreme Court in Cooper observed, "electoral history [in CD1] provided no evidence that a § 2 plaintiff could demonstrate the third Gingles prerequisite—effective white bloc-voting." Id. at 302. Moreover, with respect to the third Gingles precondition in northeast North Carolina, the Supreme Court in Cooper rejected North Carolina's Section 2 defense to the majority-black CD1 as "downplay[ing] the significance of white crossover voting in the area that would form the core of redrawn [Congressional] District 1." Id. at 304 (cleaned up).

In 2018, plaintiffs (represented by the same counsel representing plaintiffs in this case) challenged the General Assembly's 2017 redistricting plan based on alleged partisan gerrymandering. See Lewis, 2019 WL 4569584, at *1–2. In Lewis, the court restricted the General Assembly's consideration of race during redistricting. See id. at *133. In 2021, the General Assembly drew a new redistricting plan without using racial data. See N.C. League of Conservation Voters, Inc. v. Hall, Nos. 21 CVS 15426, 21 CVS 500085, 2022 WL 124616, at *9 (N.C. Super. Ct. Jan. 11, 2022) (unpublished), rev'd, Harper v. Hall, 380 N.C. 317, 868 S.E.2d 499 (2022) ("Harper I"), abrogated by Harper III, 384 N.C. 292, 886 S.E.2d 393 (2023). Plaintiffs challenged that redistricting plan as a partisan gerrymander. See id. at *1. The Supreme Court of North Carolina

56

invalidated that redistricting plan for partisan gerrymandering. See Harper I, 380 N.C. at 403–04, 868 S.E.2d at 559–60. In Harper's remedial phase, the Supreme Court of North Carolina concluded that Section 2 liability would not arise from the General Assembly's remedial districts because federal law "do[es] not require the General Assembly to create functioning crossover districts." Harper v. Hall, 383 N.C. 89, 124, 881 S.E.2d 156, 180 (2022) ("Harper II"), withdrawn and superseded on reh'g, Harper III, 384 N.C. 292, 886 S.E.2d 393 (2023). The Supreme Court of North Carolina ultimately reheard Harper, reversed its prior ruling, held that partisan gerrymandering claims were not justiciable, and permitted the General Assembly to redraw North Carolina's legislative and congressional districts in 2023. See Harper III, 384 N.C. at 378–79, 886 S.E.2d at 448–49. On October 25, 2023, the General Assembly responded to Harper III by enacting SB 758. The General Assembly enacted SB 758 after it conducted public hearings across North Carolina and accepted online comments. See [D.E. 39] 8–9.

When the General Assembly enacted SB 758 in October 2023, state and federal courts had repeatedly affirmed that the General Assembly must draw legislative districts without reference to race because legally significant racially polarized voting did not exist in North Carolina. Accordingly, the General Assembly did so. See, e.g., [D.E. 39-5] 3–5 (invoking Harris and Covington). In drawing the Senate, House, and Congressional redistricting plans in 2023, the General Assembly used only "political data, not racial data." Id. at 4.

At this preliminary stage of the case, the totality of the circumstances do not support plaintiffs' Section 2 claim or their request for a mandatory preliminary injunction to sort voters by race in order to form a majority-black Senate district in northeast North Carolina. As noted, sorting "voters on the basis of race" is "by [its] very nature odious." Wis. Legislature, 595 U.S. at 401. Sorting voters based on the color of their skin risks "engaging in the offensive and demeaning

57

assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." Miller, 515 U.S. at 911–12 (cleaned up); Harris, 159 F. Supp. 3d at 604. Anyone who wants to sort voters on the basis of race in a legislative district must show "that the design of [the] district withstands strict scrutiny." Wis. Legislature, 595 U.S. at 401. A party "can satisfy strict scrutiny if it proves that its race-based sorting of voters is narrowly tailored to comply with the VRA." Id. On the current preliminary and hotly contested record, plaintiffs are not likely to succeed on the totality of the circumstances under Section 2.

As the case progresses, the parties will be able to enjoy the benefit of written discovery, depositions, and vigorous cross examination of the witnesses. At trial, the court will enjoy the benefit of a more fulsome record. At present, plaintiffs have failed to demonstrate a likelihood of success on their Section 2 claim.

IV.

As for irreparable harm, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original). Plaintiffs contend that "they will be irreparably harmed if they are forced to vote in a district that dilutes their votes in violation of the VRA." [D.E. 17] 27.

Plaintiffs are unlikely to succeed on the merits of their Section 2 claim. Accordingly, plaintiffs fail to demonstrate they will suffer irreparable harm absent a preliminary injunction against SB 758 in the 2024 Senate elections. See, e.g., Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022); League of United Latin Am. Citizens v. Abbott, 601 F. Supp. 3d 147, 183 (W.D. Tex. 2022) (three-judge court); Dhillon v. Wobensmith, 475 F. Supp. 3d 456, 462 (D. Md. 2020); Talleywhacker, Inc. v. Cooper, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020); Aslanturk v. Hott, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020).

58

# V.

## A.

As for the balance of equities and the public interest, "[t]hese factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009); see Miranda, 34 F.4th at 365. Notwithstanding plaintiffs' failure to demonstrate that the General Assembly had a strong basis in evidence for concluding in October 2023 that Section 2 required a majority-black Senate district in northeast North Carolina, plaintiffs seek "an extraordinary remedy" enjoining SB 758 for use in the 2024 Senate elections and mandating that the General Assembly redraw a new Senate redistricting plan with a majority-black Senate district in northeast North Carolina for use in the 2024 Senate elections. Winter, 555 U.S. at 24.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017). When a court sits in equity, it "look[s] to the practical realities and necessities inescapably involved in reconciling competing interests." Lemon v. Kurtzman, 411 U.S. 192, 201 (1973) (plurality opinion). In so doing, the court considers that "equity ministers to the vigilant, not to those who sleep upon their rights." Perry, 471 F. App'x at 224 (quotation omitted); see Curtin v. Va. State Bd. of Elections, 463 F. Supp. 3d 653, 659–60 (E.D. Va. 2020).

The court has considered these equitable principles and the practicalities of "sound . . . legislative administration." Strickland, 556 U.S. at 17. Plaintiffs waited 26 days after the General Assembly enacted SB 758 to file suit and 28 days to seek a preliminary injunction concerning the 2024 elections. See [D.E. 23] 2. Plaintiffs then proposed a completely unreasonable schedule for the court and the other parties. See id. After this court scheduled a hearing on plaintiffs' motion for

59

a preliminary injunction, plaintiffs then filed an interlocutory appeal, which divested this court of jurisdiction to act upon their motion for a preliminary injunction. See [D.E. 44].

Once the Fourth Circuit dismissed the interlocutory appeal but did not issue the mandate, the court held a hearing on plaintiffs' motion for a preliminary injunction. See [D.E. 53]. The record presented to the court for its consideration at the hearing reflected that neither plaintiffs nor anyone else presented a strong basis in evidence to the General Assembly in 2023 that Section 2 required a majority-black Senate district in northeast North Carolina. Likewise, after considering the evidence that the parties presented concerning plaintiffs' motion for a preliminary injunction, plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their Section 2 claim or that they will suffer irreparable injury absent the requested mandatory preliminary injunction. By contrast, "enjoining North Carolina (through its public officials) from enforcing [SB 758 in the 2024 Senate elections] would constitute a form of irreparable injury." Sharma v. Hirsch, No. 5:23-CV-506, 2023 WL 7406791, at *14 (E.D.N.C. Oct. 30, 2023) (unpublished); see Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); Law v. Gast, 641 F. Supp. 3d 580, 604 (S.D. Iowa 2022).

Inequity would result if the court enjoined the use of SB 758 in the 2024 Senate elections. Plaintiffs have failed to demonstrate that (1) the General Assembly had a strong basis in evidence when it enacted SB 758 in 2023 that Section 2 required a majority-black Senate district in northeast North Carolina or (2) they are likely to succeed on the merits of their Section 2 claim. Thus, the balance of equities and the public interest weigh in favor of the legislative defendants and against a mandatory preliminary injunction. See, e.g., N. Va. Hemp & Agric. LLC v. Virginia, ___ F. Supp. 3d ___, 2023 WL 7130853, at *13 (E.D. Va. Oct. 30, 2023); Sharma, 2023 WL 7406791, at *14; see

also Int'l Refugee Assistance Project, 582 U.S. at 579; Purcell, 549 U.S. at 4–6; Lemon, 411 U.S. at 200–01; Perry, 471 F. App'x at 224–28; Curtin, 463 F. Supp. 3d at 659–61.

B.

Alternatively, even if the plaintiffs satisfied all three Gingles preconditions (and they have not), demonstrated the totality of the circumstances under Section 2 weighed in their favor (and they have not), and showed irreparable injury (and they have not), the Purcell principle teaches that a federal court should not issue the requested mandatory federal preliminary injunction of North Carolina's 2024 Senate elections. Under Purcell, "federal district courts ordinarily should not enjoin state election laws in the period close to an election." Merrill, 142 S. Ct. at 879 (Kavanaugh, J., concurring); see Purcell, 549 U.S. at 4–6; Voinovich, 507 U.S. at 152. The Purcell principle allows elections to proceed and "provide[s] the courts with a better record on which to judge" the challenged statute. Purcell, 549 U.S. at 6 (Stevens, J., concurring).

The Purcell principle is not new. In Reynolds, plaintiffs moved to enjoin a primary election that was over a month away. See Reynolds, 377 U.S. at 542. The three-judge district court "stat[ed] its tentative views that an injunction was not required" before the primary election and, two weeks later, declined to enjoin the primary before fully ruling on the merits of the case. Id. The Supreme Court held that the district court "acted wisely in declining to stay the impending primary election." Id. at 586.

In Merrill, Justices Kavanaugh and Alito wrote that "the Purcell principle requires that we stay the District Court's injunction" where "the primary elections begin (via absentee voting) just seven weeks from now." Merrill, 142 S. Ct. at 879, 882 (Kavanaugh, J., concurring). The Supreme Court has made clear that the Purcell principle is not just a yellow caution light for federal courts considering an injunction against a redistricting plan when elections under the redistricting plan are

61

imminent. In such circumstances, the Purcell principle is a heavy gate with flashing red lights amplified by loud sirens reminding federal courts not to alter such a state redistricting plan in the period close to a state election. Thus, the Supreme Court routinely stays such disruptive federal injunctions in the period close to a state election. See, e.g., Merrill v. People First of Ala., 141 S. Ct. 25, 25 (2020) (staying a September 30, 2020 injunction issued 34 days before the November 2020 elections); Andino v. Middleton, 141 S. Ct. 9, 9–10 (2020) (staying a September 18, 2020 injunction ahead of the November 2020 elections); id. at 10 (Kavanaugh, J., concurring) (invoking the Purcell principle); Democratic Nat'l Comm. v. Wis. State Legislature, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) (concurring in the denial of the application to vacate a stay of an injunction entered "just six weeks before the November [2020] election and after absentee voting had already begun").

"[I]t is the domain of the States, and not the federal courts, to conduct apportionment . . . ." Voinovich, 507 U.S. at 156. Thus, if a federal court were to decide to enjoin the use of SB 758 in the 2024 Senate elections, the court "must provide the North Carolina General Assembly with a reasonable opportunity to draw remedial districts in the first instance." Covington, 316 F.R.D. at 177 (quotation omitted); see North Carolina v. Covington, 138 S.Ct. 2548, 2554–55 (2018) (per curiam) ("[A] legislature's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of federal law." (cleaned up)); Wise v. Lipscomb, 437 U.S. 535, 540 (1978).

In this counterfactual scenario where a federal court enjoined the use of SB 758 for use in the 2024 Senate elections and accepted plaintiffs' argument that the General Assembly would first have to draw a majority-black VRA district in northeast North Carolina before drawing "non-VRA districts using other state-law redistricting principles and rules, including county grouping or

62

clustering requirements" under Stephenson I, [D.E. 17] 15 (quotations omitted), then the General Assembly could draw Demonstration District A as the remedial VRA majority-black district. If the General Assembly chose to enact Demonstration District A as a VRA-required majority-black Senate district, it would thereby remedy the alleged Section 2 violation and meet its obligation under the Fourteenth Amendment to ensure that the remedy is narrowly tailored. See Shaw II, 517 U.S. at 917; cf. [D.E. 39] 15; [D.E. 39-6] 7.[13] In this counterfactual scenario, the General Assembly would then have to regroup the remaining 92 counties under Stephenson I and its progeny and redraw all other Senate districts.

As discussed, on December 15, 2023, candidate filing ended for the North Carolina primary elections. See [D.E. 40] 1. On January 19, 2024, North Carolina's 100 county boards of elections began distributing absentee ballots. See id. at 2. On February 15, 2024, in-person early voting begins. See id. March 5, 2024, is primary election day. See id. at 1. Accordingly, absentee voting throughout North Carolina already has begun. In-person early voting begins 20 days after the court issues this order. Primary election day is just 39 days after the court issues this order.

If a federal court were to issue a mandatory preliminary injunction enjoining the use of SB 758 in the 2024 Senate elections and requiring the General Assembly to enact a new Senate redistricting plan with a majority-black Senate district in northeast North Carolina, then county boards of elections would have to discard completed absentee ballots, including the ballots of the numerous North Carolina citizens in the United States military who are deployed overseas. The

---

[13] Plaintiffs ask the court enjoin only "use of Senate Districts 1 and 2 in the 2023 enacted map, and order use of Plaintiffs' proposed remedial districts (Demonstration Districts B-1 and B-2) instead." [D.E. 17] 31. The court, however, may not circumscribe the General Assembly's "freedom of choice" when it draws remedial districts. Covington, 138 S.Ct. at 2554–55; see Wise, 437 U.S. at 540.

Board would have to conduct its geocoding process again to reassign voters to the proper districts. See [D.E. 41] ¶¶ 4–5, 10. Candidates would have to refile. See id. at ¶ 10. The Board would have to regenerate and proof new ballots, which "is complex and involves multiple technical systems and quality-control checkpoints" including "preparation and proofing of official ballots, certified vendors printing and delivering those ballots to the county board offices, and county board staff creating outgoing absentee ballot packages." Id. at ¶ 6. The Board would also have to redistribute those new ballots. See id. The Board would have to move March primary elections to May or later and create a new runoff date in July or August. See id. at ¶¶ 12–13; cf. [D.E. 40] 3–4. A new Senate redistricting plan would adversely affect the ongoing 2024 Senate elections in numerous primary elections across North Carolina. Thus, Purcell teaches that a federal court should not issue a mandatory federal injunction against SB 758 for the 2024 Senate elections. See, e.g., Purcell, 549 U.S. at 4–6; Merrill, 142 S. Ct. at 879, 882 (Kavanaugh, J., concurring).

Notably, on December 19, 2023, Common Cause and the North Carolina NAACP filed a lawsuit in the United States District Court for the Middle District of North Carolina alleging, inter alia, the General Assembly violated federal law by drawing various House and Senate districts, including SD1 and SD2. See N.C. State Conf. of the NAACP v. Berger, No. 1:23-cv-1104 (M.D.N.C. Dec. 19, 2023), [D.E. 1] ¶¶ 138–45. Plaintiffs in that suit did not seek a mandatory preliminary injunction to change the House and Senate district boundaries for the 2024 elections. That suit provides additional evidence that, under Purcell, a federal court should not issue mandatory preliminary injunctive relief in this case because the case comes too late to justify mandatory preliminary injunctive relief in North Carolina during the 2024 Senate election cycle.

In opposition to this conclusion, plaintiffs contend that "in the last two North Carolina election cycles, maps were finalized within 24 hours before—or on the day of—candidate filing."

64

[D.E. 17] 28. Plaintiffs also contend the court could "pause or postpone the candidate filing deadline" or delay the March 2024 Senate primary elections in North Carolina. See id. at 28–29. North Carolina state courts, however, issued the orders plaintiffs cite to support their argument. See id. By contrast, "Purcell is about federal court intervention," not state court intervention. Wise, 978 F.3d at 99 (emphasis in original). Accordingly, the court rejects this argument.

At oral argument, plaintiffs also argued that their proposed remedy involving Demonstration Districts B-1 and B-2 would affect only two Senate districts. Cf. [D.E. 17] 31. Thus, according to plaintiffs, Purcell should not apply if the General Assembly affirmatively chooses to adopt Demonstration District A and redraw the entire Senate redistricting plan.

Plaintiffs misunderstand Purcell and its progeny. Plaintiffs concede that if a federal court enjoined the use of SB 758 in the 2024 Senate elections, the court must give the General Assembly the first opportunity to redraw state Senate districts, including any majority-black Senate district in northeast North Carolina that Section 2 requires. See Voinovich, 507 U.S. at 156; Wise, 437 U.S. at 540; Covington, 316 F.R.D. at 177. Therefore, under plaintiffs' reading of Stephenson I, the General Assembly would have the discretion to draw new Senate districts after drawing the one VRA-mandated majority-black Senate district. See Stephenson I, 355 N.C. at 383–85, 562 S.E.2d at 396–98. As discussed, the General Assembly could choose to enact Demonstration District A as its remedial majority-black Senate district. If it did, the root cause of any ensuing upheaval would be the federal court injunction prohibiting the use of SB 758 in the 2024 Senate elections and requiring the General Assembly to remedy an alleged Section 2 violation in northeast North Carolina for the 2024 Senate elections. Such a federal court injunction would be a textbook violation of Purcell. See, e.g., Purcell, 549 U.S. at 4–6; Merrill, 142 S. Ct. at 881 (Kavanaugh, J., concurring);

65

<u>Wise</u>, 978 F.3d at 99. After all, absent the federal court injunction, the 2024 Senate elections in North Carolina would continue to proceed as they are currently proceeding and without disruption.

C.

Alternatively, even if plaintiffs had demonstrated that they were likely to succeed on the merits of their Section 2 claim (and they have not) and even if the General Assembly chose just to rearrange the Senate district boundaries within the 18 counties encompassing SD1 and SD2 in response to a federal court injunction (and it need not), such a federal court mandatory preliminary injunction also would violate the <u>Purcell</u> principle. If a federal court were to enter a mandatory preliminary injunction concerning SB 758 for the 2024 Senate elections, the General Assembly could choose to configure the remedial majority-black Senate district differently than plaintiffs' Demonstration Districts B-1 and B-2, or the General Assembly could choose to enact Demonstration Districts B-1 and B-2. <u>See, e.g.</u>, <u>Covington</u>, 138 S.Ct. at 2554–55; <u>Wise</u>, 437 U.S. at 540. Either way, the Board would have to reassign voters and candidates would have to refile, which could result in contested primaries in the two new Senate districts. <u>See</u> [D.E. 41] ¶¶ 4, 5, 10. The Board would have to generate, proof, and distribute new ballots. <u>See id.</u> at ¶ 6, 11. The Board would have to schedule any contested primary elections in these districts in May 2024 or later. <u>See id.</u> at ¶¶ 12–13; <u>cf.</u> [D.E. 40] 3–4. If a runoff were needed, the Board would have to schedule and hold a special election in July or August 2024. <u>Cf.</u> [D.E. 41] ¶ 15. The federal court injunction would be the cause of all this disruption.

The <u>Purcell</u> principle teaches that a federal court should not sow such chaos and voter confusion in Senate elections within the 18 North Carolina counties encompassing SD1 and SD2. Moreover, such a federal court preliminary injunction (which would require scheduling new primary elections and setting a special runoff election if needed) would contradict the Supreme Court's

66

repeated and clear admonition against a federal court ordering special elections absent a compelling justification. See Covington, 581 U.S. at 488–89. Accordingly, even if plaintiffs were likely to succeed on their Section 2 claim (and they are not) and even if the General Assembly were to limit its remedy in 2024 to the counties within SD1 and SD2 (and it need not), the court rejects plaintiffs' arguments concerning Purcell. Instead, this court heeds Purcell's heavy gate, blaring sirens, and flashing red lights and declines to sow chaos and voter confusion in North Carolina given that the 2024 Senate elections are underway. See, e.g., Purcell, 549 U.S. at 4–6; Merrill, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

## D.

Finally, plaintiffs contend that "even where Purcell applies, it 'might be overcome . . . if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.'" [D.E. 17] 30 (quoting Merrill, 142 S. Ct. at 881 (Kavanaugh, J., concurring)).

On the current record, the underlying merits of plaintiffs' Section 2 claim are not "entirely clearcut in favor of the" plaintiffs. Rather, plaintiffs are unlikely to succeed on the merits of their Section 2 claim and would not suffer irreparable harm absent the requested mandatory preliminary injunction. Moreover, plaintiffs unduly delayed bringing this case by waiting 26 days after the General Assembly enacted SB 758 to file suit and waiting 28 days after the General Assembly enacted SB 758 to seek a preliminary injunction. "[E]quity ministers to the vigilant, not to those who sleep upon their rights." Texaco P.R., Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 879 (1st Cir. 1993). Furthermore, as discussed, any remedial changes to North Carolina's 2024 Senate

67

districting plan at this stage would come with extraordinary cost, confusion, and hardship. See, e.g., Purcell, 549 U.S. at 4–6; Merrill, 142 S. Ct. at 881–82 (Kavanaugh, J., concurring). The Purcell principle controls. Thus, the balance of equities and public interest weigh against a federal court issuing the requested mandatory preliminary injunction.

E.

On December 12, 2023, the Solicitor General of North Carolina filed a motion for leave to file an amicus brief on behalf of Governor Roy A. Cooper, III and Attorney General Joshua H. Stein in support of plaintiffs' motion for a preliminary injunction [D.E. 31]. The accompanying brief [D.E. 32] recounts the self-evident political interest that Governor Cooper and Attorney General Stein have in the requested mandatory preliminary injunction. The brief, however, adds no new evidence concerning the legal issues. For example, the brief does not contain any contemporaneous correspondence that Governor Cooper, Attorney General Stein, or the North Carolina Solicitor General sent to the General Assembly before it enacted SB 758 explaining why they believed that a strong basis in evidence existed to group citizens by race in northeast North Carolina in order to create a majority-black Senate district. Likewise, as for the legal analysis, the brief merely parrots the conclusions in the plaintiffs' brief and fails to provide any legal analysis or to grapple with the profound deficiencies in plaintiffs' efforts to establish the Gingles preconditions or the totality of the circumstances under Section 2. The brief also fails to grapple with Covington or Harris and the findings in 2016 that white voters in North Carolina (including in the relevant counties in northeast North Carolina) do not "vote as a bloc to defeat African-Americans' candidate of choice." Harris, 159 F. Supp. 3d at 625; see Covington, 316 F.R.D. at 142, 167–74. Although the court grants Governor Cooper's and Attorney General Stein's motion to file an amicus brief, the court rejects their arguments as factually and legally unsupported.

68

## VI.

In sum, the court GRANTS the motion of Governor Roy A. Cooper, III and Attorney General Joshua H. Stein to file an amicus brief [D.E. 31] and DENIES plaintiffs' motion for a preliminary injunction [D.E. 16]. The parties SHALL meet and confer. The parties SHALL submit a proposed scheduling order no later than February 16, 2024. If the parties cannot agree on a proposed schedule, the joint submission shall contain the proposed schedule of each party for each topic in the scheduling order.

SO ORDERED. This 26 day of January, 2024.

JAMES C. DEVER III
United States District Judge