# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:23-CV-00193-D

```
                                    )
RODNEY D. PIERCE AND                )
MOSES MATTHEWS,                     )
                                    )
        PLAINTIFFS,                 )
                                    )
v.                                  )
                                    )
THE NORTH CAROLINA STATE BOARD      )
OF ELECTIONS, ET AL.,               )
                                    )
        DEFENDANTS.                 )
------------------------------------
```

DEPOSITION OF BLAKE ESSELSTYN
(TAKEN by DEFENDANTS)
ATTENDING VIA ZOOM IN MAASTRICHT, NETHERLANDS
SEPTEMBER 17, 2024

REPORTED BY:     Meredith R. Schramek
                 Registered Professional Reporter
                 Notary Public
                 (via Zoom in Mecklenburg County)

1

---

A P P E A R A N C E S

For the Plaintiffs:
    ELISABETH S. THEODORE, ESQ.
    Arnold & Porter Kaye Scholer LLP
    601 Massachusetts Avenue Northwest
    Washington, DC 20001
    202-942-5000
    elisabeth.theodore@arnoldporter.com

    EDWIN M. SPEAS, JR., ESQ.
    Poyner Spruill LLP
    301 Fayetteville Street, Suite 1900
    Raleigh, North Carolina 27601
    919-783-2819
    espeas@poynerspruill.com

For the Legislative Defendants:
    ALYSSA M. RIGGINS, ESQ.
    JORDAN A. KOONTS, ESQ.
    Nelson Mullins Riley & Scarborough LLP
    301 Hillsborough Street
    Suite 1400
    Raleigh, North Carolina 27603
    919-877-3800
    alyssa.riggins@nelsonmullins.com

    PATRICK T. LEWIS, ESQ.
    Baker & Hostetler LLP
    127 Public Square
    Suite 2000
    Cleveland, Ohio 44114
    216-621-0200
    plewis@bakerlaw.com

2

---

Deposition of Blake Esselstyn, taken by the defendants via Zoom on the 17th day of September, 2024, at 9:02 a.m., before Meredith R. Schramek, RPR, Notary Public.

C O N T E N T S

The Witness:     BLAKE ESSELSTYN

Examination By Ms. Riggins ..........................5
Examination By Ms. Theodore ......................224
Examination By Ms. Riggins ........................230

I N D E X of the E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Report dated 5/31/24 .................22 | |
| Exhibit 2 | Rebuttal report dated 8/30/24 ........24 | |
| Exhibit 3 | 2022 CVAP publication data ..........150 | |
| Exhibit 4 | National sample size document .......167 | |
| Exhibit 5 | North Carolina sample size ..........170 | |
| Exhibit 6 | U.S. ACS response rates ............172 | |
| Exhibit 7 | ACS item allocation rates ..........175 definitions | |
| Exhibit 8 | ACS item allocation rates ..........180 | |
| Exhibit 9 | Census Bureau press release .........185 | |
| Exhibit 10 | Increased margin of error ..........189 document | |
| Exhibit 11 | ACS glossary definitions ............190 | |

3

---

| Exhibit 12 | 2023 Senate plan ....................219 |
|---|---|
| Exhibit 13 | Esselstyn backup spreadsheet ........224 |
| Exhibit 14 | Press release dated 3/17/22 .........227 |

4

1 (Pages 1 to 4)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 2 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1          P R O C E E D I N G S
2            BLAKE ESSELSTYN,
3        having been duly sworn,
4     was examined and testified as follows:
5     EXAMINATION BY COUNSEL FOR DEFENDANTS
6  BY MS. RIGGINS:
7     Q.  Good morning, Mr. Esselstyn.  Did I say that
8  correctly?
9     A.  It's Esselstyn.
10    Q.  Esselstyn.  I was close-ish.  My name is
11 Alyssa Riggins.  I'm with the law firm Nelson Mullins.
12 We represent the legislative defendants in this matter,
13 which is Pierce, et al., versus the North Carolina
14 State Board, et al., that's pending in the Eastern
15 District of North Carolina.
16     I appreciate you making yourself available
17 your afternoon for me to ask you a few questions.
18     So, Mr. Esselstyn, can you please state your
19 full name for the record.
20    A.  My first name is Blakeman.  Middle name is
21 Bingham.  Last name is Esselstyn.
22    Q.  And what is your current address today?
23    A.  The address is Gaffellaan, which is
24 G-a-f-f-e-l-l-a-a-n, 11 in Maastricht, which is
25 M-a-a-s-t-r-i-c-h-t, postal code 6225KK in the

5

1 Netherlands.
2    Q.  Mr. Esselstyn, what's your permanent U.S.
3 address, if you have one?
4    A.  Yes.  49 North Street.  That's in Asheville,
5 North Carolina 28801.
6    Q.  Mr. Esselstyn, have you ever been deposed
7 before?
8    A.  I have.
9    Q.  Okay.  When was the last time you were
10 deposed?
11    A.  2023, I believe.
12    Q.  So fairly recently?
13    A.  Yes.
14    Q.  Was that by Zoom, or was it in person?
15    A.  It was by Zoom.
16    Q.  Perfect.  So you're a veteran.
17     So I will just say in Zoom depositions, it's
18 really important that we try not to talk over each
19 other.  Oftentimes you're going to know where I'm
20 headed and you want to help me out.
21     I appreciate that, but can you please try to
22 let me get my full question out before you give a
23 response?
24    A.  Yes.
25    Q.  And I know we're trying to get this done

6

1 before it gets too late your time, but this isn't an
2 endurance test.  If you need a break at any point,
3 please let me know.  I'm happy to take one, but can you
4 please answer my question pending before we take a
5 break?
6    A.  Yes.
7    Q.  Okay.  Mr. Esselstyn, is there anything that
8 would prevent you from answering my questions
9 truthfully or honestly today?
10    A.  No.
11    Q.  So, Mr. Esselstyn, were you retained by
12 plaintiffs in this case as an expert?
13    A.  By plaintiffs' counsel, I believe, yes.
14    Q.  Which member of plaintiffs' counsel
15 specifically retained you?
16    A.  This may be a legal distinction.  My first
17 conversation was with Elisabeth Theodore, who's on this
18 call or in this present -- present at this virtual
19 meeting, but I believe the letter of engagement was
20 with another partner, Stanton Jones.
21    Q.  Okay.  And as we're going through our
22 questions today, I may ask something and in your mind,
23 it might say, oh, I have this.  I know this because of
24 Ms. Theodore or Mr. Jones or maybe an attorney at
25 Poyner Spruill.

7

1     I do not want to know about conversations you
2 had with any of the attorneys at Arnold and Porter or
3 Poyner Spruill.  So will you please let me know if you
4 think a question that I've asked calls for something
5 that is privileged in your response?
6    A.  I will.
7    Q.  Sure.  All right.  Mr. Esselstyn, do you
8 recall when you were first retained in this matter as
9 an expert?
10    A.  I think so, roughly.
11    Q.  And when was that?
12    A.  Fall of last year.
13    Q.  So that would be the fall of 2023?
14    A.  Correct.
15    Q.  Do you have an understanding as to which
16 North Carolina senate districts are being challenged in
17 this case?
18    A.  Perhaps a partial understanding.
19    Q.  What is your partial understanding?
20    A.  I am -- this may just be a legal distinction.
21 I expect -- my understanding is that Senate District 2
22 is being challenged.
23     I don't know if the complaint or the
24 challenge specifically mentions neighboring districts,
25 but I could imagine that because an alteration of

8

2 (Pages 5 to 8)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 3 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  Senate District 2 would affect neighboring districts
2  and the configuration involves multiple districts, that
3  it may assert that other districts aren't suitable as
4  they are as well.
5      Q.  Is it your understanding that the state
6  senate map is challenged statewide, all districts are
7  challenged in this case?
8          MS. THEODORE:  Objection.  I think this calls
9  for a legal conclusion about the nature of our
10 complaint.
11         MS. RIGGINS:  Well, Elisabeth, I'm asking
12 what he understands as a layperson and an expert to be
13 the nature of the complaint.
14         It's like if he thinks that his home county
15 of Asheville is challenged, that's a little bit
16 different.  So I'm testing his understanding of what --
17 it also goes to what he was asked to do.
18         So are you instructing him not to answer?
19         MS. THEODORE:  I guess I'll let him answer.
20 I would just say that, you know, I think it would be
21 more appropriate to ask him about what he was
22 instructed to do as opposed to his understanding about
23 the complaint.  But I'll let him answer that -- that
24 particular question.
25         THE WITNESS:  If you could repeat the

9

1  question, Ms. Riggins.
2  BY MS. RIGGINS:
3      Q.  Mr. Esselstyn, do you understand plaintiffs
4  to challenge the entire North Carolina State Senate
5  Plan or only a region of the state?
6      A.  My understanding is that it is not the entire
7  plan that's being challenged.
8      Q.  So, Mr. Esselstyn, what were you asked to
9  provide an expert opinion on in this case?
10     A.  Just to clarify the question, are you looking
11 for what I was initially asked to provide an opinion
12 about, or through the entirety of my retention by the
13 plaintiffs' counsel?
14     Q.  The entirety of your retention.
15     A.  Okay.  I was asked to provide an opinion
16 about the feasibility of creating a senate district in
17 northeastern North Carolina that met certain
18 characteristics.  I think maybe a shorthand would be
19 Gingles 1.
20         And that -- I'm just taking my time to think.
21 The preliminary injunction phase seems like a long time
22 ago.  But, yes, primarily it was providing an expert
23 opinion on the feasibility of creating Gingles 1
24 districts in northeastern North Carolina.
25         More recently, it has also been to provide an

10

1  opinion about the expert report provided by Dr. -- I
2  apologize if I'm mispronouncing his last name.  I
3  believe it's Dr. Trende.
4          I'm just reviewing to think if there's
5  anything else.  I'm going to -- I have hard copies of
6  my initial expert report and rebuttal report in front
7  of me, and I know in both of those I sort of -- I
8  outlined at the beginning of the report what I was
9  asked to do.  So I just want to make sure --
10     Q.  And so, Mr. Esselstyn, I have not shown you
11 those exhibits, and I'd ask that you put them away for
12 now.
13     A.  Okay.
14         MS. RIGGINS:  Do you have any objection to
15 that, Elisabeth?
16         MS. THEODORE:  No.  That's fine.
17 BY MS. RIGGINS:
18     Q.  And we'll get to those, and I think it's
19 great you have a hard copy.  I just -- you know,
20 sometimes you end up forgetting to put something in the
21 report, so I'm just kind of asking.
22     A.  Okay.  I see.
23         So let me -- without reference to that, I
24 just want to think about whether there were other --
25 anything else that I was asked to provide an opinion on

11

1  other than, as I said, basically Gingles 1 districts
2  and reviewing Dr. Trende's report.
3          I think at a high level, that covers it.
4      Q.  All right.  And I believe in response to my
5  previous question, you indicated that you were asked to
6  draw districts that met certain characteristics.  Does
7  that sound right to you?
8      A.  I think so.
9      Q.  What did you mean when you said "met certain
10 characteristics"?
11     A.  As conforming to traditional redistricting
12 criteria.  So the districts need to be within the
13 permissible population deviation, for example.  They
14 should be compact districts.  They should endeavor to
15 keep political subdivisions whole to the extent
16 possible.  They should also consider precincts, for
17 example.
18         There are a number of traditional
19 redistricting criteria that I mention -- I itemize in
20 my first -- and when I say my first report, I'm
21 referring to the report from May of this year, not the
22 preliminary injunction report.
23         So I know I itemize criteria that were
24 identified by the general assembly as guidelines, and
25 then in addition, one of the characteristics would be

12

3 (Pages 9 to 12)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 4 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  that the districts be majority black voting age
2  population and/or majority black citizen voting age
3  population.
4       And when I say -- some of the districts that
5  I drew were adjacent districts or accompanying
6  districts to the demonstration districts that would
7  have had -- for example, in Demonstration District A,
8  some of the districts that are in Demonstration Map A
9  do not have majority black voting age populations.
10      Q.   Okay.  And when you say "majority black," do
11  you mean greater than 50 percent?
12      A.   Yes.
13      Q.   Sorry.  We just have to make sure the
14  record's clear.  Sometimes people have different
15  definitions.  I know that sounds like a dumb question.
16      So you brought up something a minute ago,
17  Mr. Esselstyn.  You drew a total of five demonstration
18  districts across your May and August reports; is that
19  right?
20      A.   Depending on how you define "demonstration
21  districts."
22      Q.   So that's what I'm trying to get at.
23      So you drew what I would call primary
24  Demonstration Districts A, B, C, D, and E, and then
25  other districts around those majority black districts;

13

1  is that right?
2      A.   Correct, yes.
3      Q.   Can I call them, Demonstrative Districts A,
4  B, C, D, and E, "primary demonstration districts" and
5  you know what I mean?
6      A.   Yes.
7      Q.   And so, Mr. Esselstyn, I know you said you
8  had a copy of your May and August report in front of
9  you.  Do you have anything else in front of you?
10      A.   I have Dr. Trende's report as well.
11      Q.   Okay.  Do you have --
12      A.   And I have a pair of eyeglasses and a water
13  glass and some pens on my desk, but no other documents.
14      Q.   Okay.  And do you have anything other than
15  the Zoom deposition up on your computer screen?
16      A.   I do not.
17      Q.   Okay.  So I think it's great that you have
18  those printed copies.  I have a lot of paper in front
19  of me, as you can see.
20      I would just ask that -- I will be
21  transmitting exhibits through the chat for the record.
22  Some of them you may have in front of you.  If you want
23  to use your paper copy, that's fine.  I'd ask that
24  you, you know, not look ahead.
25      Is that fair?

14

1      A.   Yes.
2      Q.   Okay.  Mr. Esselstyn, do you know what fields
3  you're being offered as an expert in?
4      A.   I can't remember seeing that specified.
5      Q.   Sure.  Do you consider yourself to be an
6  expert in political science?
7      A.   I don't think I have described myself as an
8  expert in political science before.
9      Q.   Do you consider yourself an expert in
10  political science now?
11      A.   I think this is the first time I've been
12  asked that question.  So maybe certain aspects of
13  political science.
14      Q.   Okay.  What aspects would those be?
15      A.   Electoral redistricting.
16      Q.   Anything else?
17      A.   And demographics of elections, North Carolina
18  elections, redistricting in the -- I mean, I guess this
19  is -- that would be a subcategory of redistricting --
20  local government, North Carolina municipal annexation,
21  which is arguably part of political science.
22      I've taught a graduate-level course in the
23  public affairs department at Western Carolina
24  University.  So, yes, I would say there are aspects of
25  political science that I do have expertise in.

15

1      Q.   Do you hold any degrees in political science?
2      A.   No.
3      Q.   Have you ever drawn any statewide
4  redistricting maps for a state governing authority?
5      A.   Just to clarify, the state governing
6  authority being the client?
7      Q.   Yes.
8      A.   I don't believe so, although I have drawn
9  statewide maps for a legal proceeding that I think were
10  contemplated as being used for legislative statewide
11  use or use as the legislative districts.
12      Q.   And I believe you said you considered
13  yourself an expert in North Carolina elections.  What
14  do you mean by that?
15      A.   I have lived in North Carolina most of my
16  adult life, worked in local government for more than
17  10 years.  I have worked as an election judge, chief
18  judge in Buncombe County elections, as well as an
19  assistant judge.
20      And since starting my consulting firm in
21  2015, a lot of my work has been related to
22  North Carolina elections.  I have worked as a
23  consulting expert on cases related to North Carolina
24  elections.
25      Some -- I've coauthored articles that have

16

4  (Pages 13 to 16)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 5 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    been used in issues related in North Carolina
2    elections.  So -- and in a case in Georgia, I was
3    actually asked to provide expert testimony about
4    election administration in North Carolina.
5        Q.  Other than serving as an election judge and
6    an assistant election judge in Buncombe County, what
7    experience do you have in election administration in
8    North Carolina?
9        A.  I have been involved with -- I consider folks
10   at the Buncombe County Board of Elections to be -- one
11   of them is someone I worked with previously in my
12   capacity as the -- working in local government because
13   the department that I was in was responsible for
14   coordinating with the county board of elections about
15   updating maps with regard to jurisdictions and changing
16   of jurisdictions between elections, and through that
17   became familiar with kind of the structure of the
18   database that the North Carolina election boards use.
19       Q.  Have you ever served on the North Carolina
20   State Board of Elections?
21       A.  I have not.
22       Q.  Have you ever served on the Buncombe County
23   Board of Elections?
24       A.  I have not.
25       Q.  Have you ever served on any other county

17

1    board of elections?
2        A.  No.
3        Q.  What election administration experience do
4    you have that is not serving as a county election
5    judge, an assistant county election judge, or related
6    to redistricting?
7            MS. THEODORE:  Objection to form.
8        BY MS. RIGGINS:
9        Q.  You can answer.
10       A.  I'm thinking I sort of answered this question
11   before in talking about my experience working as the
12   GIS steward for geographic data that was relied upon by
13   the Buncombe County Board of Elections and working in
14   concert with the employees of that board to make sure
15   that they had the information that they needed in a
16   form that was useful to them.
17           So as a government employee who was
18   collaborating with staff for the board of elections, I
19   became familiar with a lot of the technical aspects.
20   And it's not exactly redistricting.  It has more to do
21   with who gets to vote in municipal elections in
22   Buncombe County, for example.
23       Q.  Sure.  So what's your election administration
24   experience outside of Buncombe County?
25       A.  I worked as a poll worker in King County,

18

1    Washington.
2        Q.  Anything else?
3        A.  I would say I have been a close observer of
4    redistricting in North Carolina and how new
5    redistricting plans are then able to be implemented by
6    boards of elections without -- you know, not in a paid
7    capacity, but that's something I've observed and
8    studied.
9        Q.  Anything else?
10       A.  And, again, your question was specifically
11   related to experience related to election
12   administration in North Carolina?
13       Q.  Yes.
14       A.  Just reading what other academics in
15   North Carolina write about the subject.
16       Q.  Do you consider yourself to be an expert in
17   North Carolina communities of interest?
18       A.  I think so.
19       Q.  In what way?
20       A.  So in 2021, I worked as part of a team called
21   the Local Redistricting Service where I as a
22   demographer and GIS expert collaborated with attorneys
23   to provide redistricting services across the state to
24   various levels of government that needed redistricting
25   after the census data came out.

19

1            And so our clients were as far west as
2    Catawba County and Iredell County, and really across to
3    eastern counties as well, Craven County.  And so in
4    doing that work, driving thousands of miles and paying
5    site visits to all these locations and considering the
6    communities that were important communities of interest
7    that were important in these jurisdictions, I developed
8    a much deeper understanding on that topic.
9            And then I have also been an observer, a
10   student, and a -- well, a student in the sense of
11   somebody who studies the topic at the statewide level
12   of previous redistricting plans.
13           There -- as you're probably aware, there have
14   been quite a number of plans that have been overturned
15   and redrawn at the state level, legislative maps as
16   well as congressional maps, and also a proposal to
17   change a lot of the judicial district maps, which is
18   something I spent a lot of time looking at when that
19   was proposed.
20           And also just being a North Carolina native,
21   being someone who, as I said, has lived in
22   North Carolina for most of my adult life and being a
23   geography nerd, I pay a lot of attention to different
24   geographies and communities within the state.
25       Q.  So you said you were a North Carolina native.

20

5 (Pages 17 to 20)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 6 of 96
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  Where are you from?

2      A.  Charlotte, Mecklenburg County.

3      Q.  Nice.

4          Mr. Esselstyn, apart from the topics we've

5  already covered, do you consider yourself to be an

6  expert in any other fields?

7          MS. THEODORE:  Objection to form.

8          THE WITNESS:  I have been deemed to be an

9  expert in previous legal proceedings in geographic

10  information systems, in demographics, in municipal

11  redistricting -- I'm sorry -- municipal annexation as

12  well as municipal redistricting.

13          But you had said -- I think your question --

14  well, in addition to redistricting, if you didn't say

15  redistricting, I do consider myself to be an expert in

16  redistricting as well as demographics, geographic

17  information systems, municipal annexation in

18  North Carolina.

19          As I mentioned, in another legal

20  proceeding -- well, no, no.  We've already covered

21  election stuff.

22          I have a professional certification as an

23  urban planner.  I've held that for more than 10 years

24  and worked in the urban planning context.  I have

25  presented at planning-related conferences.  So I have

21

---

1  fairly deep experience in urban planning or urban and

2  regional planning.

3  BY MS. RIGGINS:

4      Q.  All right.  And I believe you said you have

5  paper copies of your May report and your August report

6  with you; is that right?

7      A.  That's right.  I should say I do not have all

8  the attachments.  I just printed out basically the body

9  of the report.

10      Q.  Okay.  Is it fair to say that the report you

11  did in November of 2023, that material is also included

12  in your May report?

13      A.  I would say that most of it is.  It's been

14  long enough that I've looked at the November report

15  to -- there may be something that I'm forgetting, but I

16  believe that most of -- yes, most of what's in the

17  November report would also be in the May report.

18      Q.  Okay.

19      A.  I'm sorry.  I'm just going to step away from

20  my desk literally for five seconds to close the door to

21  my office.  I'm just being distracted by some noise.

22  One moment.

23          Sorry about that.

24          (Exhibit 1 Marked for Identification.)

25

22

---

1  BY MS. RIGGINS:

2      Q.  And so, Mr. Esselstyn, was the May report,

3  was that submitted by you on May 31, 2024?

4          And you're free to look at it.

5          MS. RIGGINS:  I'll ask Jordan to go ahead and

6  transfer it through the chat.

7          And Meredith, we'd like to mark this as

8  Exhibit 1 for the record when you do the transcript.

9          THE WITNESS:  It's -- I actually didn't

10  include the signature page which would have that date,

11  so I will -- you said this will be showing up in the

12  chat?

13  BY MS. RIGGINS:

14      Q.  Yes.  It looks like it was just transmitted

15  and you can download it and open it.

16      A.  Okay.

17      Q.  The signature page is page 33 of the PDF, if

18  that's helpful.

19      A.  Okay.  Yes.  That says May 31st.  Indeed.

20      Q.  All right.  Were you aware, Mr. Esselstyn,

21  that you had until July 16, 2024, to update this

22  initial report?

23      A.  I was not aware of that.

24      Q.  So you didn't make a choice -- a willful

25  choice not to provide updates between May 31st and

23

---

1  July 16th when the report was due?

2      A.  No.

3          MS. THEODORE:  Object to form.

4          THE WITNESS:  No.

5          (Exhibit 2 Marked for Identification.)

6  BY MS. RIGGINS:

7      Q.  And then you authored a rebuttal report in

8  this case -- which we can also transmit, please,

9  Jordan, through the chat and mark as Exhibit 2 --

10  that's dated August 30, 2024; is that right?

11      A.  That's correct.

12      Q.  In drafting either of these reports, did you

13  rely on any sources other than those identified in the

14  reports in the appendices?

15      A.  I don't think so.

16      Q.  So I'd like to spend the bulk of our time for

17  the next little bit with your May 2024 report.

18          In the PDF, Mr. Esselstyn, can you please

19  turn to page 34, which is Attachment A.

20      A.  Yes.  Just one moment.  I'm just opening up

21  the August report as well.

22          So yes, I am at Attachment A.

23      Q.  For the May report?

24      A.  Correct.

25      Q.  Okay.  And this looks like a cover sheet, and

24

6 (Pages 21 to 24)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 7 of 96
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  then your CV is behind it; is that right?
2      A.  That's right.
3      Q.  Okay.  I'd like to ask you a couple questions
4  about your CV, if I may.
5          So under "Employment," the first bullet says
6  "Redistricting Consultant at Mapfigure Consulting (and
7  as Blake Esselstyn)"; is that right?
8      A.  Yes.
9      Q.  Okay.  Is Mapfigure Consulting an LLC or a
10 corporation?
11     A.  No.  There is a Dutch business entity called
12 "Mapfigure BV," which was created in 2022 for the
13 purposes of doing business while living in the
14 Netherlands.  But Mapfigure Consulting is a d/b/a for
15 the LLC mentioned in the next bullet.
16     Q.  And is that FrontWater, LLC?
17     A.  Correct.
18     Q.  Other than redistricting work, what does
19 FrontWater, LLC, do, if anything?
20     A.  Oh, yeah.  GIS consulting and urban
21 planning-related consulting.
22     Q.  Okay.  And it looks like you're the principal
23 consultant of that LLC?
24     A.  Correct.
25     Q.  Are you the managing member of that LLC?

25

1  and things like the extraterritorial jurisdiction,
2  things like that.
3      Q.  And at any time when you were an --
4      A.  Sorry.
5      Q.  Go ahead.
6      A.  I neglected to mention that I was also the
7  department -- the City's liaison to the Census Bureau.
8      Q.  It looks like you anticipated my next
9  question.
10         So did your work as an urban planner and GIS
11 specialist involve the use of census data?
12     A.  Very much, yes.
13     Q.  Were you responsible for any redistricting
14 while you were an urban planner for the City of
15 Asheville?
16     A.  Define what you mean by "redistricting,"
17 please.
18     Q.  Did you help the City draw any sort of
19 municipal districts for city council races or things
20 like that?
21     A.  In other words, electoral districts?
22     Q.  Yes.
23     A.  Okay.  Because drawing of administrative
24 districts was happening all the time.  Election
25 districts, no.

27

1      A.  Yes.
2      Q.  And do you employ anybody else through that
3  LLC?
4      A.  No.
5      Q.  And prior to forming that LLC in 2014, it
6  looks like you spent about a decade working for the
7  City of Asheville in various roles; is that right?
8      A.  That's right.
9      Q.  Can you tell me a little bit about what you
10 were doing as an urban planner II and III for the City
11 of Asheville.
12     A.  Yes.  The way I've often described it to
13 folks in the past is that I was the GIS person for the
14 planning department for the City of Asheville.
15         So, as the title suggests, there was also
16 work that I did that was related to -- or was similar
17 to work that other planners were doing, being involved
18 in development review, for example, or helping with
19 long-range planning, but I would say the -- and I also
20 co-coordinated the city's annexation program.
21         But a large part of my responsibilities were
22 essentially managing the GIS assets, the data related
23 to the planning department, meaning not only things
24 like zoning districts, but also the planning department
25 was tasked with maintaining the municipal boundary data

26

1      Q.  All right.  So I'd like to move on to the
2  next page, which is page 2 of your CV, page 36 of the
3  PDF.  Under the heading "Litigation Experience," do you
4  see that, Mr. Esselstyn?
5      A.  Yes.
6      Q.  Okay.  I believe the first bullet under this
7  list is for this case; is that right?
8      A.  Yes.
9      Q.  And then the second bullet is for a case
10 called Grant versus Raffensperger; is that right?
11     A.  Yes.
12     Q.  Is that the case that you mentioned earlier?
13     A.  Yes.
14     Q.  Okay.  Can you tell me a little bit about
15 what you did as an expert in this case in Georgia.
16     A.  Yes.  There were challenges to both the
17 Georgia state house and Georgia state senate
18 legislative plans, Section 2 challenges, and I was
19 asked to provide demonstrative maps in support of the
20 Gingles 1 recondition.
21     Q.  And did you testify in court in this action?
22     A.  I did.
23     Q.  Okay.  Did the Court credit your testimony?
24     A.  Yes.
25     Q.  Okay.  Did the Court exclude any part of your

28

7 (Pages 25 to 28)

testimony?

A.   No, not that I'm -- no.  I don't think so.

Q.   And then the next bullet, it says you were a consulting expert in the League of United Latin American Citizens versus Abbott in a Texas case in 2022; is that right?

A.   Yes.

Q.   Okay.  And when you say "consulting expert," what do you mean by that term?

A.   I provided consulting services to plaintiffs' counsel.

Q.   Did you prepare any reports or testify in that case?

A.   I prepared exhibits that were used in another expert's reports.  When I say "exhibits," figures, graphics, I suppose, would be the more appropriate word.

Q.   Do you know what kind of case that was?

A.   I believe that was also a Section 2 case.

Q.   And then the next bullet is the Rivera versus Schwab case in Kansas; is that right?

A.   Yes.

Q.   Did you perform similar consulting work there as you did in the Texas case in the bullet above?

A.   Yes.

29

Q.   And then the next two bullets under that are the Harper versus Lewis case in Wake County and the Common Cause versus Lewis case in Wake County; is that right?

A.   Yes.

Q.   I notice you've got the 2019 date between the Harper v. Lewis case; is that right?

A.   Yes.

Q.   Okay.  Did your work stretch into the iteration of that case that went on from 2021 to 2023 also?

A.   No.

Q.   So you did not prepare maps and figures for Dr. Chris Cooper and his expert report in that case?

A.   Which case?

Q.   Well, there were three cases.  The North Carolina Supreme Court called it Harper.  At the trial court level, it was NCLCB in January of 2022.

A.   Okay.  I did not do any work related to that case in 2021 or in any year since 2021.  Does that answer your question?

Q.   It does.  What would you say if Mr. Cooper testified otherwise?

MS. THEODORE:  Objection to form.

THE WITNESS:  Mr. Cooper may have included

30

maps in later reports that I prepared, but I didn't -- I did not collaborate with -- and I should say not Mr. Cooper --

BY MS. RIGGINS:

Q.   Dr. Cooper.  I'm sorry.

A.   -- Dr. Cooper.  I did not collaborate with him.  I recommended another expert for him to work with that he may have considered that a contribution.

But your question was what?  What would I say?  I stand by my answer that I did not do any work in 2021 or any year since then related to that case.

However, I would understand it's possible that Dr. Cooper has credited me for having designed maps that he continued to use or maybe designed sort of a template for a map that he continued to use or whatever expert he worked with might have used.

Q.   Okay.

A.   I don't know.  Frankly, I'm puzzled.  I don't know.

Q.   I just thought maybe you forgot to leave it off -- or put it on your CV.  So, no worries.

What kind of consulting work did you do in the Common Cause v. Lewis case?

A.   So I would say two categories -- general categories.  One would be similar to what we've

31

mentioned in earlier cases where I helped design visuals, maps, and other figures to go in another expert's report.

I also worked with the files that had been created by the late Dr. Hoffler and worked with analyzing those files.

Q.   Did any of your work in the Common Cause v. Lewis case involve racial data?

A.   I honestly don't recall.  I have a vague recollection that there were some files in the Dr. Hoffler files that involved racial data.  That's all that comes to mind right now.

Q.   Is it your understanding that both the Common Cause and the Harper versus Lewis cases were partisan gerrymandering cases?

A.   I'm sorry.  Could you repeat the question.

Is it my understanding -- please repeat the question.

Q.   Sure.  Is it your understanding that the Common Cause versus Lewis and the Harper versus Lewis cases were partisan gerrymandering cases?

A.   The parts of them that I was involved with, I would say yes.  Again, I did not remain involved in the later iterations that you referenced, so I don't know.

Q.   Okay.  Is there a particular reason that you

32

8  (Pages 29 to 32)

Case 4:23-cv-00193-D-RN     Document 87-6     Filed 10/18/24     Page 9 of 96
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  were not involved in the later iterations of the Harper
2  case?
3          MS. THEODORE: Objection. I think I'm going
4  to instruct him not to answer. I mean, I think this
5  would necessarily involve communications with
6  attorneys.
7          MS. RIGGINS: Yeah. I can try to rephrase
8  it.
9  BY MS. RIGGINS:
10         Q. Mr. Esselstyn, did you choose not to be
11 involved in the later iterations of the Harper case?
12         A. Yes.
13         Q. Okay. Any particular reason why without --
14 if you can answer this question without revealing
15 conversations you had with Ms. Theodore or any other
16 attorney at Poyner Spruill?
17         A. The primary reason was that I was getting --
18 in 2021, as I mentioned, I was involved with this
19 collaboration called the Local Redistricting Service,
20 which is offering nonpartisan redistricting services.
21         And there was concern that my involvement in
22 that case, a fairly high-profile North Carolina case,
23 might suggest that I was not acting in a nonpartisan
24 manner, or the perception that that might be the case.
25 So I chose to focus on the local redistricting projects

                                                       33

1  instead.
2          Q. Okay. Thank you.
3          The next bullet says "Preparation of
4  redistricting map exhibits used in" -- I might butcher
5  this -- is it "Vesilind"?
6          MS. THEODORE: Patrick --
7          THE WITNESS: "Vesilind."
8  BY MS. RIGGINS:
9          Q. "Vesilind" -- okay -- "versus the Virginia
10 State Board of Elections."
11         Who retained you in that case?
12         A. That was pro bono, but my primary contact was
13 Brian Cannon.
14         Q. Did he represent a party in that case?
15         A. He was working with a team of attorneys
16 representing the plaintiffs, I believe.
17         Q. And then the last three bullets on this page
18 involve expert work you did for the City of Asheville;
19 is that right?
20         A. That's right.
21         Q. And was this work completed while you were a
22 City of Asheville employee?
23         A. Yes.
24         Q. Okay. So the first bullet here, City of
25 Asheville -- or Jensen versus the City of Asheville,

                                                       34

1  what was this case about?
2          A. Municipal annexation.
3          Q. All right. Are the two cases listed below it
4  on this list also about municipal annexation?
5          A. They are.
6          Q. Okay. What sort of expert analysis did you
7  do in that case?
8          MS. THEODORE: Objection to form.
9          THE WITNESS: So the laws have changed, but
10 in city-initiated annexations in North Carolina, for
11 areas to qualify as eligible for annexation, they have
12 to meet one of -- or they had to meet one of a series
13 of tests, essentially.
14         All of these cases were challenges to
15 annexations that the City of Asheville had carried out,
16 and I was being asked to testify about the propriety, I
17 guess, the correctness of the analysis showing that the
18 areas that were annexed did indeed satisfy the test or
19 tests that needed to be satisfied.
20 BY MS. RIGGINS:
21         Q. And were you accepted as an expert witness in
22 each of these three cases?
23         A. Yes.
24         Q. Did the Court credit your opinion --
25         A. Yes.

                                                       35

1          Q. -- in each of these three cases?
2          All right. We can go to the next page, the
3  "Public Project Redistricting Experience."
4          And here, it's a long list. It looks like
5  you've got a bunch of bullets here for electoral
6  redistricting work done in 2021; is that right?
7          A. And 2022 and 2023 and 2024.
8          Q. Okay. So the first bullet covers 2023 and
9  2024 for Buncombe County; is that right?
10         A. For the Board of Education, correct.
11         Q. And then the Wake County Board of Education
12 in 2021 and 2022 in the second bullet?
13         A. Correct.
14         Q. Okay. And then below that -- so on the --
15 starting on the third bullet to the next-to-the-last
16 bullet, all of that work was done in 2021; is that
17 right?
18         A. The next-to-the-last bullet on that page?
19         Q. On that page, yes.
20         A. Correct.
21         Q. Okay. And was this the work that you were
22 doing with the Local Redistricting Service that you
23 referenced earlier?
24         A. Correct.
25         Q. Okay. Did anyone else -- scratch that.

                                                       36

9  (Pages 33 to 36)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 10 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Who did you work with on the Local
2  Redistricting Service?
3    A.  There were, I guess, four primary attorneys
4  that I worked with.  Marshall Hurley is one.  Adam
5  Mitchell is one.  Deborah Stagner is one.  Caroline
6  Mackie is one.
7    There was another attorney at Poyner Spruill
8  whose name I'm blanking on, who was also working on a
9  couple of them.  I remember Craven County, for example,
10  Fayetteville, but primarily those four attorneys.
11    And yes, I can identify the firms that --
12  other than Caroline worked for -- well, Caroline Mackie
13  works at Poyner Spruill.  I don't know if I said that
14  explicitly, but --
15    Q.  Did you work with any nonattorneys with the
16  Local Redistricting Services project?
17    A.  There was an administrative person at Poyner
18  Spruill who helped with some of the administrative
19  aspects whose name is Sheila.  I'm not remembering her
20  last name.
21    There was another demographer who was part
22  of the project, but he and I did not collaborate
23  specifically on any given project, but we kind of
24  traded notes from time to time about software, things
25  like that, but we were not working together on any one

                                                        37

1  project.
2    Q.  And what was the name of that demographer?
3    A.  Bill Gilkeson.  And he -- just to be clear,
4  your question was about nonattorneys.  Bill
5  Gilkeson had earlier in his career worked as an
6  attorney.
7    Q.  Yes, for the legislature.
8    A.  I think that's right, and private practice, I
9  think.
10    Q.  Did Mr. Gilkeson assist you in drawing any of
11  the electoral redistricting plans in 2021 for the Local
12  Redistricting Service that are listed on this page?
13    A.  No.
14    Q.  Were you compensated by the Local
15  Redistricting Service for your work drawing these
16  electoral redistricting plans?
17    A.  I would not describe it that way.
18    Q.  How would you describe it?
19    MS. THEODORE:  Objection to form.
20    THE WITNESS:  Typically, the clients
21  contracted with the attorneys or their firms, and then
22  I was compensated by those firms.  Essentially -- yeah,
23  I think that's a succinct way of putting it.
24  BY MS. RIGGINS:
25    Q.  Did you use the 2020 decennial census data to

                                                        38

1  draw the plans for the Local Redistricting Services
2  municipalities listed here?
3    A.  Yes, with an asterisk.
4    Q.  What's the asterisk mean?
5    A.  The Town of Cary is there twice, perhaps you
6  noticed --
7    Q.  Yes.
8    A.  -- and at the bottom of the page, you can see
9  that they actually requested a new set of plans based
10  on estimated population data in advance of the delivery
11  of census data.
12    So that was the only instance where I was
13  working with something other than decennial census
14  data.
15    Q.  Okay.  What source did you use for the
16  estimated census data in that instance?
17    A.  Data that had been provided by the Town of
18  Cary staff.
19    Q.  Do you recall if it was ACS data?
20    A.  I recall that it was not ACS data.
21    Q.  Did you draw any statewide redistricting
22  plans in North Carolina following the 2020 decennial
23  census?
24    A.  I think so.  Just -- I think I did.
25    Q.  Do you recall if those were submitted to

                                                        39

1  anyone for a project, or was it just, you know, you
2  were just doing it to see what it would look like?
3    MS. THEODORE:  Objection to form.
4    THE WITNESS:  I would say these would have
5  been my own research and exploration, not submitted to
6  an external entity.
7  BY MS. RIGGINS:
8    Q.  Were you hired by any public or private
9  entity to draw statewide redistricting maps in
10  North Carolina following the decennial census?
11    A.  The 2020 decennial census?
12    Q.  Yes.
13    A.  I was not.
14    Q.  For the counties and municipalities that you
15  worked with on this list through the Local
16  Redistricting Service, are any of these areas in a
17  challenged area of this complaint?
18    MS. THEODORE:  Objection to form.
19  BY MS. RIGGINS:
20    Q.  That was a bad question.
21    So, Mr. Esselstyn, did you perform any
22  municipal or county electoral redistricting services
23  for any of the counties in Senate District 1?
24    MS. THEODORE:  Objection to form.
25    You can answer.

                                                        40

10  (Pages 37 to 40)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 11 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    THE WITNESS:  When you say "Senate District
2  1," the current and active Senate District 1?
3  BY MS. RIGGINS:
4    Q.  Yes.
5    A.  Okay for me to refer to the earlier part of
6  my -- this report we're looking at?
7    Q.  Sure.  Why don't we turn, actually --
8    A.  I believe --
9    Q.  -- to page -- I think it's Figure 3 would be
10  helpful, so on page 8.
11    A.  Okay.  I'm looking at Figure 6 on page 13,
12  which shows --
13    Q.  No.  Can you go to Figure 3 for me on page 8.
14    A.  Sure.
15    Q.  There's a group of counties here in Figure 3
16  that are bordered in green lines.  Do you see that?
17    A.  Yes.
18    Q.  Okay.  Did you perform any redistricting
19  services for any of the counties or municipalities
20  within the counties within these green lines?
21    A.  I don't believe so.
22    Q.  And so for the work that you did for counties
23  and municipalities in 2021, did you use Maptitude to
24  draw those electoral districts?
25    A.  I did not.

41

1    Q.  What did you use?
2    A.  I just want to make clear for the record,
3  too, that some of the entities that I provided services
4  to in 2021 and subsequent years were not just cities
5  and counties, but also school boards.
6    Q.  Okay.  Did you do any work for any school
7  boards in the green highlighted area --
8    A.  No.
9    Q.  -- in Figure 3?
10    A.  No.
11    Q.  So you've never performed any work for any
12  county, municipality, any government agency in the
13  highlighted green areas in Figure 3?
14    MS. THEODORE:  Objection to form.
15    THE WITNESS:  I believe the answer is that
16  your statement is correct.
17  BY MS. RIGGINS:
18    Q.  Did you use any map-drawing software to
19  complete the work that you did for the Local
20  Redistricting Services engagement in 2021?
21    A.  Yes, I used multiple tools.  I used a piece
22  of software that is mentioned in one of the attachments
23  to my reports, which is called QGIS, which is a GIS
24  tool that has a module for redistricting.
25    And I also had a license for the Esri

42

1  redistricting software tool, which is -- Esri is the
2  largest company in the world of GIS, and they offer a
3  product that's a competitor to Maptitude, and during
4  that time, I was -- I had the license for the Esri
5  software and was not using Maptitude.
6    Q.  Did you use the Esri software to produce any
7  work in this case?
8    A.  No.
9    Q.  Would you consider a census block a
10  geographic unit?
11    A.  A geographic unit.  I think so.
12    Q.  What about a VTD, or a voting tabulation
13  district?  Do you think that's a geographic unit?
14    A.  Yes.
15    Q.  Okay.  Would your answer be the same for a
16  precinct?
17    A.  Yes.
18    Q.  Okay.  Did you -- what geographic unit did
19  you draw -- do you generally start with when drawing
20  redistricting plans?
21    MS. THEODORE:  Objection to form.
22    THE WITNESS:  I think it depends on the plan.
23  There's not a one-size-fits-all approach that I would
24  say I use.
25

43

1  BY MS. RIGGINS:
2    Q.  So if you're drawing, say, electoral
3  redistricting plans for the City of Fayetteville for
4  city council, do you recall what geographic unit you
5  started drawing with there?
6    A.  Yeah.  I'm struggling with this question a
7  little bit because this sort of "starting with drawing"
8  implies that I'm -- like I have a blank page and I just
9  am sort of putting together pieces starting with a
10  blank slate.
11    I think maybe the best answer to your
12  question is that the geographic unit that I start
13  with -- or that I did in the case of the City of
14  Fayetteville was the existing districts.
15    In many cases, our process in the Local
16  Redistricting Service was to seek the input of the
17  board and basically ask for their direction as far as
18  what considerations we should be prioritizing and
19  taking into account.
20    So I believe -- and I'm not a hundred percent
21  certain, but I believe in the case of Fayetteville,
22  they did specify that preserving precincts intact
23  should be a consideration, but that was one of a number
24  of considerations.  So --
25    Q.  Mr. Esselstyn --

44

11  (Pages 41 to 44)
Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 12 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    A.  -- I'll leave my answer there for now.
2    Q.  Okay.  Did you submit any redistricting plans
3  to the North Carolina General Assembly for
4  consideration in 2023?
5    A.  I did not.
6    Q.  Did you submit any maps to the North Carolina
7  General Assembly for consideration in 2021?
8    A.  I did not.
9    Q.  So I would like to look at page 7 -- I'm
10  sorry -- page 9 of your CV.
11    A.  I'm there.
12    Q.  Under the -- do you see the header "Published
13  Work" in -- it's about the center of the page?
14    A.  Yes.
15    Q.  By "Published Work," is this peer-reviewed
16  work?
17    A.  In the sense that professional peers reviewed
18  it prior to publication, one could say yes, but not the
19  same way that a publication in a scientific journal
20  would be.
21    Q.  Okay.  Were any of the articles in the three
22  bullets listed here published in a scientific journal?
23    MS. THEODORE:  Objection to form.
24  BY MS. RIGGINS:
25    Q.  I'm sorry, I'm not sure.  Did you answer,

45

1  Mr. Esselstyn?  I'm not sure I could hear you over
2  Ms. Theodore.
3    A.  My answer is no.
4    Q.  I would like to move on to Attachment B to
5  your May report, which is on page 47 of the PDF is
6  where it starts.
7    A.  Okay.  I'm there.
8    Q.  Can you explain what Attachment B is, please.
9    A.  Attachment B is an explanation of the data
10  sources I used, the software that I used, and the
11  methodology that I used in the process of preparing the
12  report.
13    Q.  Okay.  And in paragraph 1, there are five
14  sublettered bullets here.  Do you see that?
15    A.  Yes.
16    Q.  Okay.  In Bullet A, there's something called
17  TIGER/Line files; is that right?
18    A.  That's right.
19    Q.  Okay.  What's a TIGER/Line file?
20    A.  These are essentially the files that
21  represent the shapes, if you will.  So the geography,
22  the way that the area census geographies look on a map.
23    Q.  Okay.  And what sort of data is found in the
24  link in Bullet Point B?
25    A.  That would be the population data associated

46

1  with each of those census geographies.  So counties,
2  VTDs, blocks.
3    Q.  And is that data based on the 2020 decennial
4  census?
5    A.  Yes.
6    Q.  What sort of data is found in the link in
7  Bullet C?
8    A.  That's -- essentially it is a database file
9  that allows you to link the geographies from Bullet A
10  to the numbers from Bullet B --
11    Q.  What sort --
12    A.  -- or to other data.
13    Q.  Okay.  What data is found in the link at
14  Bullet D?
15    A.  That is the special tabulation for citizen
16  voting age population, also from the census base.
17  Yeah.
18    Q.  So is that sort colloquially known as ACS, or
19  American Community Survey data?
20    A.  It is one subset of ACS data, correct.
21    Q.  And then Bullet E, what sort of data is found
22  at this link?
23    A.  This link has data comparing results from the
24  2020 census to census numbers from the 2010 census.
25    Q.  Paragraph 2 references information found on

47

1  the North Carolina legislative website redistricting
2  tab; is that right?
3    A.  I'm not sure what you mean by "tab," but
4  there is text of the section of the website dedicated
5  to redistricting, and that's what the link was intended
6  to represent.
7    Q.  In preparing your report, Mr. Esselstyn, did
8  you look at data from any other portions of the
9  North Carolina General Assembly's website other than
10  the redistricting web page?
11    A.  Could you repeat the first part of your
12  question again, please.
13    Q.  Did you look at any other portion of the
14  North Carolina General Assembly's website other than
15  the redistricting portion of the web page?
16    A.  Not that I recall.
17    Q.  So you don't recall if you looked at any of
18  the Senate Committee on Redistricting materials?
19    A.  I certainly have looked at those in the past.
20  I was wondering about the Senate Plan Criteria
21  document, whether that might have been linked to one of
22  those pages.  But as I say at the time I wrote this, I
23  said that that also included the criteria document.
24    That's the only thing I can --
25    Q.  Did you -- go ahead.

48

12  (Pages 45 to 48)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 13 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    A.   That's the only thing I can think of that
2 might have been in another section of the web page
3 or another -- yeah, another section of the website,
4 would be the criteria document.
5    Q.   Did you listen to any audio recordings on any
6 Senate Committee on Redistricting and Elections
7 hearings about redistricting?
8    A.   Not as part of preparing this report.
9    Q.   Did you listen to audio recordings of Senate
10 Redistricting and Elections Committee meetings
11 pertaining to redistricting for any other purpose?
12    MS. THEODORE:  Objection to form.
13    THE WITNESS:  I think I may have in the 2021
14 cycle.
15 BY MS. RIGGINS:
16    Q.   And did you listen to any audio of Senate
17 Redistricting Committee hearings regarding the drawing
18 of the 2023 redistricting plans?
19    A.   Not that I recall.
20    Q.   Okay.  Have you seen any transcripts of those
21 committee meetings?
22    A.   I don't think so.
23    Q.   So flipping the page -- I think it's to
24 page 48 in the PDF -- the next bullet says "To
25 determine the home precincts of incumbent senators in

49

---

1 BY MS. RIGGINS:
2    Q.   Did you make a public records request of the
3 general assembly to get incumbent information?
4    A.   I did not.
5    Q.   Did you do anything to verify the accuracy of
6 the addresses that were given to you by counsel?
7    A.   I did.
8    Q.   What did you do?
9    A.   I think I mentioned this.  Yes, I allude to
10 this in paragraph 9 in this attachment.
11    I looked up the voter registration
12 information for the senators whose residential
13 addresses were in relevant districts.
14    Q.   What website did you use to look up that
15 information?
16    A.   The North Carolina State Board of Elections.
17    Q.   Thank you.
18    All right.  Paragraph 4 references a dataset
19 from the Redistricting Data Hub or RDH; is that right?
20    A.   Yes.
21    Q.   Okay.  What is RDH?
22    A.   The Redistricting Data Hub.
23    Q.   So what does the Redistricting Data Hub do
24 generally?  What is it?
25    A.   They provide data related to redistricting,

51

---

1 districts that correspond to districts in the
2 demonstration maps, I consulted a document provided to
3 me by counsel."
4    Did I read that correctly?
5    A.   Yes.
6    Q.   Did you produce this document as part of your
7 backup data with your expert report?
8    A.   I don't think so.
9    Q.   Okay.  Do you know -- do you have any
10 understanding as to the origin of this document
11 other -- like how counsel might have obtained it?
12    A.   I believe my understanding is that they
13 requested --
14    MS. THEODORE:  Hang on a minute.  Sorry.
15    Can you repeat the question, Alyssa.
16    MS. RIGGINS:  I'm asking if he has any
17 understanding of the source of the data that was
18 provided to him.
19    MS. THEODORE:  I'll just instruct him to
20 answer only to the extent that he has an understanding
21 that isn't a basis -- you know, doesn't result from
22 discussions with counsel.
23    THE WITNESS:  I don't know what I can say.  I
24 mean, all of my understanding of the source of that
25 document is based on discussions with counsel.

50

---

1 as well as kind of educational products.  They provide
2 videos, for example, and kind of instructional videos.
3    And they had -- they hosted webinars during
4 the redistricting cycle to basically provide in a
5 one-stop shop a lot of the information that would be
6 relevant for people who were drawing redistricting
7 plans or analyzing redistricting plans as well as some
8 datasets they produce themselves.
9    Q.   Is Redistricting Data Hub run by the U.S.
10 Census Bureau?
11    A.   No.
12    Q.   Can you explain how you used RDH data in this
13 case.
14    A.   Yes.  So in -- it's summarized in this
15 paragraph.
16    The Redistricting Data Hub takes the CVAP
17 special tabulation from the U.S. Census Bureau American
18 Community Survey and does a -- performs a
19 disaggregation to make that data available at the block
20 level.
21    And that block-level data is what I used in
22 the software when I was calculating black CVAP numbers
23 and other CVAP numbers for the demonstration districts.
24    Q.   Okay.  And is this data needed because --
25    A.   And just --

52

---

13  (Pages 49 to 52)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 14 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.  Okay.

2    A.  My previous answer wasn't quite complete.  I

3  also calculated black CVAP data for inactive districts

4  as well as demonstration districts.

5    Q.  Is this RDH data needed because the ACS

6  publishes the CVAP data at the block group level as

7  opposed to the block level?

8    A.  I wouldn't characterize it that way.

9    Q.  Okay.  How would you characterize it?

10    MS. THEODORE:  Objection to form.

11    THE WITNESS:  All of the demonstration

12  districts in this report keep VTDs intact.  So had the

13  ACS data been provided at the VTD level, that would

14  have been sufficient.

15  BY MS. RIGGINS:

16    Q.  But ACS data is not provided at the VTD

17  level, is it?

18    A.  It is not.

19    Q.  Okay.  Is ACS data provided at something

20  called the block group level?

21    A.  Some ACS data, yes.

22    Q.  Okay.  Is the ACS data that you used in this

23  case provided at the block group level?

24    A.  Yes.

25    Q.  Okay.  What's a block group?

53

1    We talked already about how the decennial

2  census information is available at the block level,

3  whereas the ACS data is not.  The decennial census data

4  has a much deeper, more granular way of looking at the

5  race and ethnicity categories or classifications than

6  the ACS data.

7    The ACS data is based on a five-year period

8  as opposed to a -- essentially the census is intended

9  to be looking at a snapshot from the census year.  And

10  the ACS data is based on samples and not a full count

11  the way the census is.  So those data are reported as

12  estimates, whereas the decennial data is considered a

13  count.

14    There may be other dissimilarities, but those

15  are the major ones that come to mind.

16    Q.  Why did you choose to use Redistricting Data

17  Hub as the source for the disaggregated data you used?

18    A.  Well, the CVAP special tabulation is

19  considered the best, the authoritative source for

20  making determinations about citizen voting age

21  population and distributions of various racial groups

22  in their citizen voting age population.

23    So the Redistricting Data Hub starts with

24  that authoritative dataset.  It's considered the -- you

25  know, the best one that is available for researchers

55

1    A.  As the name suggests, it's a group of blocks.

2  It's sort of a tier on the -- one of the census

3  hierarchies between a census tract and a census block.

4    So some tracts may just have a single block

5  group.  Other tracts have multiple block groups, and

6  it's -- as I said, it's a collection of census blocks.

7    Q.  Is the data from RDH that you use and is

8  referenced in paragraph 4 similar to the decennial

9  census data that you referenced in Bullet 1(b)?  Is it

10  the same type of data?

11    A.  There are similarities and dissimilarities.

12    Q.  Okay.  So what are some of the similarities?

13    A.  The data provides counts of the population

14  and counts for certain subgroups by age and race and

15  ethnicity.  That's true of both.

16    I'm sorry.  I've forgotten.  Did you ask for

17  what the similarities are?

18    Q.  Yes, I did.

19    A.  And they're provided at multiple

20  geographies -- geographic levels.

21    Q.  What are the dissimilarities between the two

22  datasets?

23    A.  The ACS data that I used includes citizenship

24  information.  The decennial census data does not

25  include citizenship information.

54

1  and practitioners.  And then they apply a recognized,

2  robust disaggregation process that is well documented,

3  and it seems to have become sort of the standard

4  dataset to use for this type of analysis.

5    Q.  And is the RDH method of disaggregation, is

6  that included in the link here in paragraph 4?  The

7  second link.  I'm sorry.

8    A.  I believe so.

9    Q.  Okay.  Do you know how to disaggregate block

10  group level data down to the block level?

11    A.  Yes.

12    Q.  Have you ever done it before yourself?

13    A.  I have, I believe, yes.

14    Q.  When do you believe you've done it?

15    A.  Either 2021 or 2022.

16    Q.  Did you do anything to verify that RDH had

17  conducted the disaggregation correctly?

18    A.  In 2021 and 2022?

19    Q.  In preparing this report.

20    A.  I did not.

21    Q.  So paragraph 5 is "...the software

22  application I used in the analysis of maps and the

23  creation of demonstration districts is Maptitude for

24  Redistricting produced by the Caliber Corporation."

25    Did I read that correctly?

56

14  (Pages 53 to 56)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 15 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

A. I'm sorry. I thought of just one other thing
to add to your previous question.

Q. Can you answer my previous question first?
Sorry.

A. When you say your previous question, the one
you just asked?

Q. The one you just asked. Sorry.

I'm trying, Mr. Esselstyn, to also -- I'm
trying to balance getting you out of here at a
reasonable hour with the long pauses. So --

A. I apologize.

Q. -- go ahead.

MS. THEODORE: Let me just object. Interject
a -- you know, it's fine to answer the most recent
question first, but, you know, you should feel free to
add if you feel like you need to supplement a prior
answer to make it complete.

THE WITNESS: Okay. I also have a
clarification about the software question, so --

BY MS. RIGGINS:

Q. I'd like you to add anything you'd like to
add to your answers about my questions to paragraph 4
in Attachment B, and then we'll move on.

You let me know when you're done talking
about paragraph 4 and I'll move on.

57

A. Thank you. And, again, I apologize for the
pause.

I was going to add that Dr. Trende and
Dr. Collingwood also use the RDH CVAP data and
recognize it as a standard and I think have trust in
the methodology used by Redistricting Data Hub.

And I think your question about the software,
I believe you read the first sentence of the paragraph.
The one thing I wasn't sure I heard is the very first
word, which is that the Maptitude for redistricting is
"one" software application I use.

BY MS. RIGGINS:

Q. Sure.

Okay. Did you work with Dr. Collingwood in
the preparation of either of your reports in this case?

A. No.

Q. Are you aware that Dr. Collingwood has his
own methodology for disaggregating ACS CVAP data in its
public package?

MS. THEODORE: Objection to form.

THE WITNESS: I didn't hear -- I think the
objection, I didn't hear the last -- I apologize. I
didn't hear the last few words.

That Dr. Collingwood has his own methodology
for disaggregation of census data and something about a

58

public package?

BY MS. RIGGINS:

Q. That's published in an EI package.

A. I've reviewed his report, and I saw something
about the fact that he had -- he's contributed to
certain coding packages that are available.

I was not aware that he had personally come
up with or that he has a methodology that -- I was not
aware of that.

Q. So you didn't use Dr. Collingwood's publicly
available EI package to disaggregate any CVAP data in
this case, did you?

A. I did not.

Q. Okay. So moving on to paragraph 5, did you
primarily use Maptitude for redistricting in the
creation of the demonstration districts in this case?

A. It kind of varied. I don't think that I
would answer that I primarily -- I used Maptitude for
redistricting as one of -- I tend to use multiple
tools, like my previous answer about what I use for the
Local Redistricting Service.

Q. Okay. Did you load any data into Maptitude?

A. I think in this instance I used the data
provided that's included with the software.

Q. Is the data provided by the Caliber

59

Corporation, the decennial census data?

A. That is part of the data.

Q. What other data is included in Caliber's
package?

A. Oh, all kinds of geographic data that is not
related to any specific decennial census data. I mean,
they have relations, but, for example, a lot of other
geographic features that are visible are things that
one can turn on. They also by default -- I mean, they
have layers on things like ZIP codes and things like
that, landmarks, et cetera.

Q. Did the Caliber Corporation package that you
used in drawing this report contain any ACS data?

A. No.

Q. Did you load any ACS data into Maptitude for
your use in drawing?

A. For this specific project, I did not.

Q. And you can correct me if I'm wrong. It's
been a long time since I've seen a Maptitude pane
myself.

Is it still the case that you can have a view
pane that can show you district statistics as you are
drawing, like up in the corner?

A. Yes.

Q. Okay. Do you utilize that ability when

60

15 (Pages 57 to 60)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 16 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

61

```
 1    you're drawing districts?
 2        A.  Sometimes.
 3        Q.  Did you have -- I'm going to ask you.
 4        Mr. Esselstyn, is there a correct name for
 5    that data box?  I've never known.
 6        A.  Yeah.  Well, there are sort of two.  There's
 7    the data view, but there's the pane that's like the --
 8    what is it called?  Another tool called, like, the
 9    preview.  I'm blanking.  I can picture it clear as day,
10    but I'm blanking on what it says in the title.
11        But I think I know.  There's one that you can
12    see, for example, how the population in a district
13    would change if you were to make a certain change
14    before you commit to that change.
15        Q.  Like a preview pane or something like that?
16    That's what I've colloquially called it, but I'm sure
17    that's not right.
18        Okay.  Did you have the data view pane up
19    while you were drawing any of the demonstrative
20    districts in this case?
21        A.  Yes.
22        Q.  What data was displayed on that?
23        A.  So I believe it has the total population, the
24    deviation for the district from the ideal district
25    population, the voting age population, the -- they
```

62

```
 1    allow in the data view, now you can turn on react
 2    compactness and Polsby-Popper compactness.
 3        So those are available in the data view pane.
 4    Those do not show up in the preview pane, though, the
 5    compactness scores.
 6        And the -- any part black voting age
 7    population, those are the columns that I -- I may be
 8    forgetting one, but I believe those are the columns in
 9    the data view.
10        Q.  The any part black voting age population
11    metric, is that from the decennial census data that's
12    loaded into Caliber?
13        A.  Correct.
14        Q.  Did you have any political or election data
15    up while you were drawing in the data view pane?
16        A.  No.
17        Q.  Did you use any political or election data at
18    all when you drew the demonstrative districts?
19        A.  No.  And I mention this in the later part of
20    the attachment we're looking at.  The only -- yeah, the
21    short answer is no.
22        Q.  Did you load any socioeconomic data into
23    Maptitude?
24        A.  No.
25        Q.  Did you use Caliber's socioeconomic data and
```

63

```
 1    put it up in the data view pane when you were drawing?
 2        A.  No.
 3        Q.  Flipping the page, paragraph 7, you say "I
 4    also used software called DRA 2020."
 5        Is this Dave's Redistricting?
 6        A.  Yes.  The "DRA" stands for Dave's
 7    Redistricting App.  I think they're trying to brand it
 8    more as DRA.  Yeah.
 9        Q.  All right.  I came up in some of these cases
10    when it was first available, so in my mind it's Dave's.
11        And then paragraph 9, is this the paragraph
12    you were mentioning earlier when I asked you about
13    election and partisan data?
14        A.  Yes.
15        Q.  Okay.  So why did you choose not to look at
16    any partisan election information?
17        A.  I don't think I had any reason to.
18        MS. RIGGINS:  Is now a good time for like a
19    quick five-, seven-minute break?
20        MS. THEODORE:  Sounds good to me.
21        (Off the record 10:47 a.m. to 10:55 a.m.)
22    BY MS. RIGGINS:
23        Q.  So, Mr. Esselstyn, can we go to page 50 of
24    this PDF, which I believe is Attachment C to your
25    report?
```

64

```
 1        A.  Yes.
 2        Q.  All right.  I believe you called this a
 3    "Demographic summary for North Carolina counties"; is
 4    that right?
 5        A.  That's correct.
 6        Q.  Did you use a program like Maptitude to
 7    create this attachment?
 8        A.  I believe so.
 9        Q.  Do you recall what program you used?
10        A.  I think I used Maptitude to export a subset
11    of a data view, and then as a CSV file, like a commonly
12    separated values file, and then brought that into Excel
13    and used Excel to clean up the formatting a little bit.
14        Q.  Okay.  And is this utilizing 2020 decennial
15    census data?
16        A.  Yes.
17        Q.  Okay.  And is this total population or voting
18    age population?
19        A.  Total population.
20        Q.  All right.  I would like to turn to
21    Attachment E in your report, which I believe is on
22    page 157 of this PDF.
23        A.  Okay.
24        Q.  And I believe that this contains -- this
25    attachment contains two items.  First, the "2023 Senate
```

16 (Pages 61 to 64)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 17 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Plan 'Stat Pack with Race,'" and then "Enacted 2023

2    plan CVAP statistics," which was prepared by you; is

3    that right?

4        A.  I think so, yes.

5        Q.  And did you pull the 2023 Senate Plan Stat

6    Pack with race down from the North Carolina General

7    Assembly's web page?

8        A.  I believe so, yes.

9        Q.  Okay.  And so I believe the attachment that

10   you created is on about page 300-ish of the PDF --

11       A.  Yes.

12       MS. THEODORE:  I think it's 301.

13       MS. RIGGINS:  Is it 301?  I was close.  I was

14   trying to do a little subtraction.

15   BY MS. RIGGINS:

16       Q.  Can you tell me a little bit about what

17   Item 2 in Attachment E is.

18       A.  Yes.  So this is providing the key figures

19   that were used to generate the black CVAP percentage

20   numbers that I report for the relevant enacted 2023

21   senate districts.

22       Q.  How did you go about creating this Item 2 in

23   Attachment E?

24       A.  I believe that I would have created this in a

25   similar fashion to the attachment -- the spreadsheet we

                                              65

1    were talking about a few moments ago.

2        In other words, exporting a CSV file from my

3    redistricting tool and then formatting it in Excel.

4        Q.  Do you recall --

5        A.  Honestly -- go ahead.

6        Q.  I was going to ask what redistricting tool

7    you exported this from.

8        A.  Either QGIS or DRA.

9        Q.  Okay.  And for the CVAP statistics, does this

10   use the 2016 to 2020 ACS five-year Community Survey

11   data?

12       A.  Yes.

13       Q.  Okay.  And is this total population or voting

14   age population that's reported here?

15       A.  Voting age population.

16       Q.  Okay.  If we can flip --

17       A.  To be more precise, it's citizen voting age

18   population.

19       Q.  Can we turn one page down to Attachment F,

20   please.

21       A.  Yes.

22       Q.  All right.  So this contains two items.  The

23   first is "Demographic summaries for Demonstration Maps

24   A, B, C, and D," and then "CVAP statistics for

25   Demonstration Maps A, B, C, and D"; is that right?

                                              66

1        A.  That's right.

2        Q.  Okay.  So I'd like to first look at page 303.

3        Can you -- so it says at the top "Plan Name:

4    Demonstration Map A"; is that right?

5        A.  Yes.

6        Q.  Okay.  And it looks like this is from

7    Maptitude for Redistricting; is that right?

8        A.  Yes.

9        Q.  Okay.  So can you explain to me what this

10   exhibit shows.

11       A.  This exhibit shows for the five districts in

12   Demonstration Map A, sort of a summary of various

13   demographic statistics.

14       So starting with overall population, and then

15   some deviation statistics, and then percentages for

16   various race and ethnicity categories.

17       Q.  And --

18       A.  And then there's summary statistics

19   underneath that for them, mostly having to do with the

20   total population numbers.

21       Q.  And this uses decennial -- or 2020 decennial

22   census data; is that right?

23       A.  That's correct.

24       Q.  And it looks like the column on the far

25   right, it says "Percentage 18 plus_AP_BLK"; is that

                                              67

1    right?

2        A.  That's right.

3        Q.  All right.  And is that the percentage of any

4    part-black voting age population in the district that's

5    reported in that column?

6        A.  Yes.

7        Q.  Okay.  And for the other columns like

8    "Percent AP_BLK," that's total population, not voting

9    age population; is that right?

10       A.  That's right.

11       Q.  Okay.  And are the same statistics reported

12   for Demonstration Districts B, C, and D on the next

13   three pages?

14       A.  I believe so.  Let me quickly check.  That

15   was my intent.

16       Yes.

17       Q.  All right.  And then we get to -- after that

18   we get to something called -- I think it's the start of

19   Item 2 in Attachment F, a set of citizen voting age

20   population statistics for Primary Demonstrative A and

21   the accompanying districts; is that right?

22       A.  That's right.

23       Q.  Okay.  And does this also use 2016 to 2020

24   ACS data from the five-year Community Survey?

25       A.  American Community Survey, yes.

                                              68

17 (Pages 65 to 68)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 18 of 96
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    Q.   And did you load this into either QGIS and/or
2  DRA to produce this item?
3    A.   I wouldn't say I loaded it in.  I exported
4  data from one of those two pieces of software and then
5  loaded it into Excel to create this.
6    Q.   Does DRA come load any ACS five-year Survey data
7  already loaded?
8    A.   Yes.
9    Q.   Does QGIS?
10   A.   No.
11   Q.   Did you load any ACS data into QGIS?
12   A.   I did.
13   Q.   Okay.  Do you have a specific recollection of
14 creating this item in front of you at page 307 in this
15 PDF using QGIS?
16   A.   Again, I don't recall if I exported the data
17 from QGIS or DRA.  I used DRA as a corroboration of the
18 numbers that I got in QGIS.  So the numbers were the
19 same, and I think those tools make it similarly easy to
20 export data.  So I honestly don't recall.
21   Q.   Okay.  The next -- well, actually, and then
22 are these same citizen voting age population statistics
23 reported for Demonstration Districts B, C, and D on the
24 next three pages?
25   A.   Demonstration Maps, yes, B, C, and D, and the

69

1  nearby districts, yes.
2    Q.   I'd like to turn to Attachment G, which I
3  think is at page 312 of your report.
4    A.   Thank you.  You clarified something I had
5  been uncertain about before.  It looks like this URL
6  was from one of the committee pages, so --
7    Q.   Okay.  And are you looking at the "2023
8  Senate Plan Criteria" found at page 312 of your report?
9    A.   Yes.
10   Q.   And you downloaded this from the
11 North Carolina General Assembly's website?
12   A.   Yes.
13   Q.   Okay.  So let's walk through these criteria.
14       Did you comply with the equal population
15 criteria in drawing Primary Demonstration Districts A,
16 B, C, D, and E?
17   A.   Yes.
18   Q.   How did you go about making sure of that
19 criterion?
20   A.   Please repeat the question.  How did --
21 please repeat the question.
22   Q.   Sure.  How did you go about ensuring this
23 criterion was met in Demonstration Plans A, B, C, D,
24 and E?
25   A.   This is a very basic standard function of any

70

1  redistricting tool that it shows the population for any
2  district that's being drafted or analyzed and also what
3  the deviation from what the ideal population would be.
4        And QGIS even color-codes it if you're
5  meeting the population deviation.  So it's just a
6  visual examination to compare the number to -- the
7  deviation number to plus or minus 5 percent.
8    Q.   Okay.  In the first sentence of the "Equal
9  Population" criterion, it says "The Committee chairs
10 will use the 2020 federal decennial census data as the
11 sole basis of population for the establishment of
12 districts in the 2023 Senate Plan."
13       Did I read that correctly?
14   A.   I think so, yes.
15   Q.   Okay.  Did you only use the 2020 federal
16 decennial census data to calculate your equal
17 population scores?
18   A.   Yes.
19   Q.   Did you attempt to see what the population
20 deviation would be using ACS five-year Community Survey
21 estimates?
22   A.   No.
23   Q.   Why not?
24   A.   I don't think there would have been any
25 reason to.

71

1    Q.   Why not?
2    A.   I'm not aware that -- of any instance where
3  ACS data would be considered -- would be used for the
4  population count.
5    Q.   Is there a particular reason why you wouldn't
6  use ACS data for the population count?
7        MS. THEODORE:  Objection to form.
8        THE WITNESS:  In my professional experience,
9  decennial census data is what's used for the population
10 count and for complying with equal population.
11 BY MS. RIGGINS:
12   Q.   And is that because it's a hard count, the
13 decennial censuses?
14   A.   It's interesting.  This is an interesting
15 question.  It's a convention.  It's a standard that I
16 don't know that I've ever heard anyone question before.
17       I know the U.S. Constitution references the
18 census, the decennial census, and establishes the
19 requirement for the census, and my understanding is
20 part of the reason for that was for rebalancing
21 population in the U.S. House of Representatives.
22       I think my best answer is just that that's --
23 in everything I've ever seen, the decennial census data
24 is what's used for the population counts for --
25   Q.   Would -- go ahead.  I'm sorry.

72

1    A.   Just as far as it relates to the deviation
2  from -- establishing ideal population and how district
3  populations deviate from that.
4        As I mentioned, there was the case in the
5  Town of Cary where they specifically requested
6  districts be drawn based on population numbers that
7  their staff -- municipal staff had generated.  I'm not
8  aware of departures from that for drawing like general
9  assembly districts or congressional districts.
10   Q.   Would you feel comfortable reporting
11 population deviation information using ACS five-year
12 Community Survey estimates?
13       MS. THEODORE:  Objection to form.
14       THE WITNESS:  Would I feel comfortable
15 reporting?
16       I mean, if I identified that as what it was
17 and I was confident that I had made the calculations
18 correctly, I suppose I would feel comfortable
19 reporting, but I don't --
20 BY MS. RIGGINS:
21   Q.   Sure.  Would you feel comfortable testifying
22 under oath that a specific district was within plus or
23 minus 5 percent of the ideal population using ACS
24 five-year Community Survey estimates?
25       MS. THEODORE:  Objection to form.

73

1        THE WITNESS:  It seems like a lot of
2  speculation.  I think it would depend on the situation.
3  BY MS. RIGGINS:
4    Q.   Have you ever seen an expert report
5  population deviation limits within plus or minus
6  5 percent using ACS five-year Community Survey data?
7    A.   Not that I recall.
8    Q.   All right.  The next bullet on the list is
9  "Counting Groupings and Traversals," and this is
10 commonly known as the Stephenson grouping requirement;
11 isn't that right, Mr. Esselstyn?
12   A.   Part of what's discussed here is -- has to do
13 with groupings, yes.
14   Q.   Okay.  Why don't you explain to me what this
15 criterion means to you.
16   A.   So there was a court case and various
17 opinions related to that court case and sort of
18 subsequent related cases that are referenced in the
19 document that we're looking at, and these opinions
20 provided guidance on drawing state legislative
21 districts in North Carolina, including guidance on how
22 counties should be grouped, and also compliance with
23 the Voting Rights Act.
24   Q.   Okay.
25   A.   But there's also some mention in here about

74

1  traversals specifically, and so that's -- one could
2  argue that's separate from the grouping piece.
3    Q.   In what way?
4    A.   The convention is -- or the expectation, as I
5  understand it, is that if a county is to be divided, it
6  should be divided in such a way as to minimize the
7  number of traversals.
8        In other words, if you're going to have to
9  draw a line against a county, it should be one line
10 separating the two districts, not two separate lines
11 that are putting one corner of one county into another
12 district and then another corner of that county into
13 the same other district.
14       And that, to my mind, is independent of the
15 grouping piece.
16   Q.   Okay.  So talking just about the grouping
17 piece for a minute, how did you go about complying with
18 the county grouping piece of this criterion?
19   A.   In the context of this report?
20   Q.   Yes.
21   A.   I relied on groupings generated by
22 Dr. Mattingly.
23       So based on what we've today been calling the
24 primary demonstration district in each of these maps,
25 Dr. Mattingly looked at what groupings would be based

75

1  on those demonstration districts, and then I drew the
2  nearby districts based on those groupings.
3        In the instance of Demonstration Map A, he
4  also froze another enacted district in addition to
5  Demonstration District A.
6    Q.   Do you recall what enacted district that was?
7    A.   It's the district -- I don't know the number
8  off the top of my head, but it's the district
9  containing Pitt County and Edgecombe County.
10   Q.   Did you rely on the county groupings that
11 Dr. Mattingly provided to you, or did you do any
12 independent analysis separate from Dr. Mattingly?
13   A.   The former.
14   Q.   And I believe you mentioned the VRA when you
15 were explaining your understanding of this criterion;
16 is that right?
17   A.   Yes.
18   Q.   Okay.  And if I say "VRA," do you understand
19 that I mean the Voting Rights Act of 1965?
20   A.   Yes.
21   Q.   Okay.  How does the VRA impact your
22 understanding of this criterion?
23       MS. THEODORE:  Objection to form and
24 objection to the extent it calls for a legal
25 conclusion.  But you can answer.

76

19 (Pages 73 to 76)

Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 20 of 96
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    MS. RIGGINS: I'm asking for his

2  understanding of the criterion.

3    THE WITNESS: The opinion that -- or opinions

4  that set forth and clarify the grouping process, both

5  the opinions that I've looked at as well as other

6  people's kind of summaries or distillations of the

7  opinions, always point out that the Voting Rights Act

8  needs to be complied with, and that part of complying

9  with Stephenson is complying with the Voting Rights

10  Act.

11  BY MS. RIGGINS:

12    Q.  So, Mr. Esselstyn, let's say that the

13  North Carolina General Assembly determined that all

14  three of the Gingles factors in the totality of the

15  circumstances were met in Buncombe County, and they

16  needed to draw a Voting Rights Act district in Buncombe

17  County.

18    How would -- would that district in your

19  understanding get drawn before the country grouping

20  formula?

21    A.  I'm sorry.  I think it actually is relevant

22  to your question.  Are you talking about a senate

23  district or a house district?

24    Q.  Senate district.

25    A.  Say it again.

77

1    Q.  I don't think it's actually relevant.  We'll

2  call it senate district.

3    A.  I have seen analysis saying that VRA

4  districts should be drawn first.

5    Q.  Do you agree with that analysis?

6    MS. THEODORE: Objection to the extent it

7  calls for a legal conclusion.

8    THE WITNESS: In that I am -- the particular

9  summary that I'm thinking of was on the general

10  assembly's website, and -- yeah.  I'm hesitating

11  because I think it's a legal conclusion.

12    It's the process -- whether the process needs

13  to be done in one specific way every time, I'm not

14  ready to offer an opinion on that.

15  BY MS. RIGGINS:

16    Q.  Okay.  Let's say the general assembly was

17  going to adopt your Demonstrative -- Primary

18  Demonstrative District A.  It's not within any

19  preexisting North Carolina county groupings, is it?

20    MS. THEODORE: Objection to form.

21    THE WITNESS: I don't know the answer to that

22  question because I have not studied all preexisting

23  county groupings.

24  BY MS. RIGGINS:

25    Q.  Okay.  We'll come back to this later.

78

1    Is it your understanding that you drew

2  compact districts for Demonstrative Primary Plans A,

3  B, C, D, and E, Mr. Esselstyn?

4    A.  Yes.

5    Q.  Okay.  And are all of the districts that you

6  drew contiguous?

7    A.  Yes.

8    Q.  How did you comply with the criterion enacted

9  by the general assembly not to use racial data?

10    A.  As I state in my report, I did consult racial

11  data by necessity.  It was -- I couldn't have done the

12  analysis that I was asked to do without consulting

13  racial data.

14    Q.  All right.  And the Senate Plan Criteria also

15  called for partisan or political considerations when

16  drawing a map; is that right?

17    A.  I believe it says they may consider partisan

18  advantage and incumbency protection.

19    Q.  Do you understand that the North Carolina

20  Senate considered incumbency and partisan advantage in

21  drawing the 2023 Senate Plan?

22    MS. THEODORE: Objection to form.

23    THE WITNESS: My understanding is that it was

24  considered.

25

79

1  BY MS. RIGGINS:

2    Q.  Did you consider partisan advantage in

3  drawing any of your demonstration maps?

4    A.  No.

5    Q.  Then let's turn to Attachment J in your

6  report, please.  And I think it's the very last page of

7  the report.

8    A.  Got it.

9    Q.  All right.  So here you report something

10  called "political subdivision splits"; is that right,

11  Mr. Esselstyn?

12    A.  Yes.

13    Q.  And it looks like these statistics were

14  generated from Maptitude; is that right?

15    A.  Yes.

16    Q.  And you report both counties split statewide

17  and VTDs split statewide for both the enacted 2022 and

18  2023 plans; is that right?

19    A.  Yes.

20    Q.  Why did you include the enacted 2022 plan?

21    A.  I think at the time I started my work on this

22  case, that might have still been the plan that was in

23  effect, and -- yeah.

24    Q.  So, Mr. Esselstyn, is it your testimony

25  that you were retained as an expert to challenge

80

20  (Pages 77 to 80)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 21 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    redistricting plans that were not yet enacted by the
2    North Carolina General Assembly?
3        A.  At the time I was retained, I believe they
4    were not enacted, but the -- let me just see.  I want
5    to make sure because I know in my report -- I'm going
6    to look at the paper copy of this same report we're
7    looking at.  I just think it might be faster because I
8    know I included the date the 2023 plans were enacted.
9    October 25th.
10       I may be wrong about whether these had been
11   enacted at the time I was retained, but they're still
12   the most -- as of the time we're talking, they are the
13   most recent enacted plans that had been used in an
14   election.
15       Q.  And it appears that both the 2022 enacted and
16   the 2023 enacted plans both split 15 counties
17   statewide; is that right?
18       A.  Yes.
19       Q.  Okay.  The statistics that you're reporting
20   for Demonstration Map A, B, C, and D are statewide; is
21   that right?
22       A.  Correct.
23       Q.  Did you draw any statewide maps for this
24   report, Mr. Esselstyn?
25       A.  No.  Well, I think technically in Maptitude I

81

1    used a statewide map, but there's a note -- you see the
2    note in this attachment that says "Statewide statistics
3    for demonstration maps assume all districts outside of
4    the maps are identical to the 2023 enacted districts."
5        Q.  So that's an assumption that you made,
6    Mr. Esselstyn; is that right?
7        A.  I would say it's an assumption that I used
8    for the statistics, yes.  And as I said, in Maptitude,
9    the demonstration districts were part of a statewide
10   plan where all those -- any of the districts I didn't
11   change were identical.
12       So, again, the verb "assume" there is being
13   used in reference to these statistics.  I don't think
14   characterizing my assertion as an assumption.  I have
15   total confidence that all the other districts that were
16   used in generating these statistics are indeed
17   identical.
18       Q.  And is that because they were part of a
19   statewide map?
20       A.  Yes.  As I said, in Maptitude, I -- the
21   enacted plan was my starting point, and then I authored
22   a subset of districts within that.
23       Q.  Which enacted plan was your starting point?
24       A.  The 2023 enacted plan.
25       Q.  Did you produce the statewide plan for each

82

1    demonstration map that you're referring to?
2        A.  What do you mean by "produce"?
3        Q.  Is it included in the backup data to your
4    report?
5        A.  I don't think so.  It seemed to me that it
6    would be redundant.
7        Q.  Even though you used the statewide map to
8    bolster your findings in Attachment J?
9        MS. THEODORE:  Objection to form.
10       THE WITNESS:  I could have achieved the same
11   numbers that I provide in Attachment J purely by logic
12   and comparing the number of split counties in the
13   districts in the enacted map, the districts that I
14   changed, comparing that to the districts from the
15   demonstration maps and then simply added that number,
16   the whatever additional split counties.
17       So I could have obtained these numbers
18   without having the entire map in Maptitude, as I've
19   described.  I honestly -- I don't see why regurgitating
20   the same statistics that are in the stat packs that I
21   provided for the enacted districts -- there's also text
22   in the body of the report that specifies which counties
23   were split relative in each of the demonstration maps.
24       So I don't -- I don't know if that answers
25   your question.

83

1    BY MS. RIGGINS:
2        Q.  Do you understand that the general assembly
3    has to draw state senate districts in the concept of an
4    entire statewide plan, Mr. Esselstyn?
5        MS. THEODORE:  Objection to form.
6        THE WITNESS:  I don't know that I agree with
7    that statement.
8    BY MS. RIGGINS:
9        Q.  Okay.  So after the 2020 decennial census,
10   could the general assembly have decided just to change
11   Senate Districts 1 and 2 and leave the rest of them as
12   they were for the previous decade?
13       A.  I don't think they would have passed the
14   legal test of "One Person, One Vote," but they could
15   have tried to do that, I suppose.
16       Q.  I guess what I'm getting at, Mr. Esselstyn,
17   is we're just kind of required to take your word for it
18   that there aren't any other county splits and that the
19   rest of the enacted 2023 plan stays the exact same with
20   your new demonstrative plans because you didn't provide
21   us any backup data to test that.
22       MS. THEODORE:  Objection to form.
23   BY MS. RIGGINS:
24       Q.  Is that fair?
25       A.  I don't think it's fair at all.  So do you

84

21 (Pages 81 to 84)

1    remember when we were scrolling through and the stat
2    pack was more than a hundred pages?
3        Q.  Sure.
4        A.  Yeah.  The Political Subdivision Split Report
5    is a lengthy document, and since the vast majority of
6    the districts in each of my demonstration maps is
7    unchanged, that information is already in the stat
8    packs.  The second line on this report says it's a
9    summary of statistics from those reports.
10           I would also say that you can see pretty
11   clearly in the actual maps provided in my report where
12   the county splits are, and it's consistent with where I
13   describe them to be in the prose that I include.
14           I also provided Shake-Files.  It's not that
15   hard for folks who are comfortable working with
16   Shake-Files to import those into mapping software, and
17   those would also indicate where county splits occurred.
18           Yeah.  I do not agree that this is somehow
19   presenting information without enough corroborating
20   evidence being supplied.
21       Q.  Sure.  You didn't produce any Shake-Files for
22   statewide plans with your backup data, did you,
23   Mr. Esselstyn?
24       A.  No.  The -- all the districts outside of the
25   districts I provided in the Shake-Files were identical

                                                     85

1    to the enacted districts.
2        Q.  But you didn't produce Shake-Files for us to
3    verify that there was a cohesive statewide plan using
4    these demonstrative maps, did you?
5        A.  Again, I would say that using the Shake-Files
6    that I did provide, a properly equipped analyst could
7    very easily determine that no other districts -- no
8    other part of the statewide plan was affected.
9        Q.  They could do it because you did not provide
10   any statewide Shake-Files associated with any of your
11   demonstrative plans?
12           MS. THEODORE:  Objection to form.
13           THE WITNESS:  I guess I've asserted under
14   oath that the districts I provided were the districts
15   that were modified in any way.
16           If someone were to believe that I erred
17   somehow, as I say, it would be -- I would invite anyone
18   to try and find a mistake or some -- I'm -- frankly,
19   I'm sort of puzzled because I struggle to see a
20   scenario where I would have somehow tried to
21   surreptitiously modify other districts.
22           Again, I'm struggling to --
23   BY MS. RIGGINS:
24       Q.  That's not what I'm asking.  I'm just saying
25   we can't see the entire statewide plan that you say you

                                                     86

1    were viewing in Maptitude because we didn't get the
2    files --
3            MS. THEODORE:  Objection to form.
4    BY MS. RIGGINS:
5        Q.  -- did we?
6        A.  I would say that you can see the relevant
7    component parts for the districts.  When I say
8    "component parts," the reports and geography and
9    documentation that was provided by the general
10   assembly, some of which we've looked at so far today,
11   which provide information about all the enacted
12   districts which are the districts that I did not
13   provide information for myself, as I said, because I
14   felt it to be redundant.
15       Q.  Okay.  So when you started drawing
16   Demonstrative Plans A, B, C, and D, the primary
17   demonstrative plans, I believe you testified earlier
18   that you started with the 2023 enacted plan; is that
19   right?
20       A.  When I was working in Maptitude, I used the
21   entire plan.
22       Q.  How did you start drawing Demonstrative A,
23   Mr. Esselstyn?
24       A.  I think the first exploration was in DRA, and
25   I remember looking at the enacted 2022 and 2023.  At

                                                     87

1    that point the -- I think they had been adopted at that
2    point -- or enacted, but I think in that case, I may
3    have started sort of my initial exploration with a
4    blank slate.
5        Q.  Okay.
6        A.  I mean, I may have had both of them up in
7    different windows on my computer, but I didn't import
8    any enacted plan into DRA when I began.
9        Q.  Okay.  What sort of exploration did you do in
10   DRA with regard to Demonstrative A?
11           MS. THEODORE:  Objection to form.
12           THE WITNESS:  I mean, the classic process of
13   drafting districts, sort of trying out different
14   configurations, seeing how they are on compactness, on
15   population deviation, on communities of interest, the
16   criteria we've described or we went through earlier
17   looking at another attachment, as well as the
18   demographics of the district.
19   BY MS. RIGGINS:
20       Q.  The demographics of the district?  What do
21   you mean?
22       A.  The -- well, the population equality, but
23   also the black voting age population.
24       Q.  Did you save any of these testing maps that
25   you were working on in DRA?

                                                     88

                                    22  (Pages 85 to 88)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 23 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1     A.  I don't think I saved, like, different
2  variations that I tried.  Basically in DRA you work
3  within a project and, you know, come back to it and
4  make changes, as with many other computer files.  I
5  don't recall keeping separate copies of things that I
6  tried.
7     Q.  Did you import any of your work in DRA over
8  to Maptitude?
9     A.  Yes.  Well, it may have actually been from
10 QGIS to Maptitude.
11    Q.  Did you begin drawing Demonstratives B, C,
12 and D in DRA also?
13    A.  I apologize for the pause.  I'm trying to
14 think through sort of how that process unfolded.  I'm
15 not a hundred percent sure, but I think so.
16    Q.  Do you recall which demonstration plan you
17 started drawing first?
18    A.  I think it was A.
19    Q.  Okay.  Did you start with a specific county?
20    A.  Not that I recall.
21    Q.  At what point did you switch over from
22 drawing in DRA to drawing in Maptitude?
23        MS. THEODORE:  Objection to form.
24        THE WITNESS:  As I sort of alluded to -- not
25 sort of -- I alluded to earlier, my process, I tend to

89

1  use different tools for different parts.
2         And as soon as I'm curious about compactness
3  scores -- after, you know, the years I've spent doing
4  this, I'm pretty comfortable judging compactness just
5  based on looking at things.  But when I become
6  interested in actual compactness scores, that's one
7  moment when I would typically work in Maptitude for
8  redistricting, for example.  I feel that it has the
9  best tools for analyzing compactness.
10        But I don't have, like, a defined
11 step-by-step process that I follow every time and, you
12 know, in step three, I go over to Maptitude for
13 redistricting.
14 BY MS. RIGGINS:
15    Q.  Did you draw an entire demonstration map in
16 Dave's Redistricting and only Dave's Redistricting?
17    A.  Entire map.  As I mentioned, I used QGIS to
18 corroborate the CVAP statistics for the demonstration
19 plan's districts, as well as enacted plan's -- well,
20 the districts.
21        So part of the process included -- for all
22 of the plans included analysis in QGIS.  And for
23 compactness, as I said, I used Maptitude for
24 redistricting as well as for generating the demographic
25 reports that we looked at earlier.

90

1         So part of my process for the creation and
2  finalizing of those as plans that I was going to
3  present involved using the three tools I've mentioned.
4     Q.  So is the answer to my question no?
5         MS. THEODORE:  Objection to form.
6         THE WITNESS:  I think the answer depends on
7  how you -- your question was something along the lines
8  of did I complete the drawing of the districts using
9  DRA.
10 BY MS. RIGGINS:
11    Q.  Did you exclusively use Dave's Redistricting
12 to draw any demonstration district in this case?
13    A.  I think that depends on what you -- how you
14 would define "draw."
15    Q.  Did you use Dave's Redistricting exclusively
16 to create any of the demonstration districts in this
17 case?
18    A.  Insofar as the process involves, as I
19 mentioned, checking compactness scores, checking other
20 demographic characteristics, I was using other tools.
21    Q.  When you were moving the lines around to
22 create Demonstration District A, were you primarily
23 doing it in Dave's Redistricting?
24    A.  Primarily, yes.
25    Q.  When you were moving the lines around to

91

1  create the other demonstrative districts of B, C, and
2  D, were you primarily using Dave's Redistricting?
3     A.  I think with B and D and C, I used QGIS and
4  Maptitude more.
5     Q.  Mr. Esselstyn, can you walk me through how
6  you created Demonstration Map A.
7     A.  I think some of that is maybe privileged, and
8  you asked me earlier at the very beginning of this
9  conversation not to get into territory that might be
10 privileged, so --
11    Q.  Skipping the privilege, how did you get
12 started?
13        MS. THEODORE:  I'm sorry.  What was the first
14 word in that question, Alyssa?
15 BY MS. RIGGINS:
16    Q.  Skipping the privileged information, how did
17 you get started?
18    A.  I think the start of the process involves
19 privileged information.
20    Q.  Does any part of the process involve
21 nonprivileged information?
22    A.  Yes.
23    Q.  Can you tell me about the nonprivileged
24 portion of drafting or creating Demonstration
25 District A.

92

23 (Pages 89 to 92)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 24 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1      A.   I think I've already discussed that, the
2  process of trial and error and, as you said, moving the
3  lines back and forth and seeing how that impacts the
4  various criteria that I mentioned earlier.
5      Q.   Did you produce any Dave's Redistricting
6  files with your backup data in this case?
7      A.   I don't think there's such a thing as a
8  Dave's Redistricting file in the current -- in the 2020
9  version.
10         The previous decade's version did have, like,
11  software specific.  But mostly what you would export
12  from Dave's Redistricting App are just things like
13  Shake-Files or -- you know what?  I'm questioning --
14  there may be an XML format that I've never tried to
15  export.
16      Q.   Can you export BAF files from Dave's
17  Redistricting?
18      A.   I think I exported the BAF files from --
19  honestly, I have to say I'm not a hundred percent sure
20  that the block assignment files -- I think I provided
21  block assignment files in the PI phase.
22         But block assignment files from Dave's
23  Redistricting App would look virtually identical -- I
24  mean, except for maybe the column headings -- to ones
25  that were generated from Maptitude for Redistricting or

93

1      Q.   Okay.  About how long did it take to draw
2  Demonstrative District A -- or Map A?  I'm sorry.
3      A.   That's hard to say.  Around a day, all pieces
4  considered.  And I say a day, I meant eight to ten
5  hours roughly.
6      Q.   Did it take about the same amount of time to
7  draw Demonstrative Maps B, C, and D, or did it take
8  less time?
9      A.   I think D took less time.  D is quite similar
10  to B.
11      Q.   Were you trying to get Demonstrative
12  District A or Demonstrative -- yeah, Primary
13  Demonstrative District A to a specific black voting age
14  population level?
15      A.   I think the answer to that is no.
16      Q.   You were not trying to get Demonstrative --
17  Primary Demonstrative District A to a black voting age
18  population to above 50 percent?
19      A.   I think the answer to that is yes.  When I
20  heard you say "specific level," to me that suggests
21  like a specific number, one target number.  Yes -- no.
22  I was asked to -- that's one of the things counsel
23  asked me to do was to create a majority black district.
24      Q.   Can you look at page 5 of your May report,
25  please, Mr. Esselstyn.

95

1  from QGIS.
2         So -- but I think what I provided were for --
3  in accompanying this report were Shake-Files, and I
4  don't think that I exported those from Dave's
5  Redistricting.  I think I exported them from QGIS.
6      Q.   Okay.  Did you load a partial version of
7  Demonstrative Plan A from Dave's Redistricting into
8  Maptitude at any point in this case?
9      A.   A partial version?
10      Q.   Or an entire version?  Any version?
11      A.   Yes.  Yes, I think so.
12      Q.   How did you go about doing that?
13      A.   Using a block equivalency file.
14      Q.   Did you include that block equivalency file
15  in your backup data in this case?
16      A.   No.  Your question was about a partial
17  version of Demonstration Map A; correct?
18      Q.   Did you include any block equivalency files
19  exported from Dave's Redistricting in the backup data
20  produced in this case?
21      A.   Possibly in the PI phase.
22      Q.   With the May 2024 report, did you include any
23  block equivalency files exported from Dave's
24  Redistricting with your backup data?
25      A.   No.

94

1      A.   Page 5 in the PDF or -- I guess it's the
2  same.  Yep.  I'm there.
3      Q.   Okay.  I'd like to look at Figure 1, please.
4         Did you use Maptitude to create this graphic?
5      A.   No.
6      Q.   What did you use?
7      A.   QGIS.
8      Q.   Okay.  And does Figure 1 represent the eight
9  majority black North Carolina counties?
10      A.   Yes.  As specified in the paragraph that
11  precedes the figure, this is looking at total
12  population, which is why that attachment that we looked
13  at earlier listed total population, the one showing all
14  the counties.
15      Q.   All right.  Did you ever consider offering
16  this eight-county grouping as a demonstration district
17  in this case?
18      A.   I don't think so.
19      Q.   Why not?
20      A.   I don't think it would meet -- I'm not a
21  hundred percent certain, but I don't think the
22  population is right.
23      Q.   And you can correct me if I'm wrong,
24  Mr. Esselstyn, but I don't believe that any of your
25  demonstrative districts, A, B, C, D, or E, the primary

96

24  (Pages 93 to 96)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 25 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    districts include Edgecombe County; is that right?
2        A.  That's right.
3        Q.  Why not?
4        A.  That was part of the direction from counsel.
5        Q.  I would like to turn to page 7, please.
6        A.  Okay.
7        Q.  Can you tell me what Figure 2 depicts,
8    please.
9        A.  Yes.  Figure 2 is a map of northeastern
10   North Carolina that shows county lines, and then within
11   those counties, the voting districts or VTDs are also
12   shown represented by a shade of green ranging from very
13   light green to dark green depending on the percentage
14   of the voting age population that is black.
15       Q.  Did you use QGIS to create this?
16       A.  I did.
17       Q.  I want to ask you a couple questions about
18   the shading, if I can.
19           So the lightest green is zero to
20   14.99 percent; is that right?
21       A.  It is.
22       Q.  Okay.  And the darkest green encompasses
23   50 percent and above; is that right?
24       A.  That's right.
25       Q.  Okay.  And this map was drawn at the VTD

97

1        Q.  Okay.  And so, I'm not trying to be difficult
2    here.  I'm just trying to make sure the record is
3    clear.
4            You're not showing the entire state of
5    North Carolina here in Figure 2, are you,
6    Mr. Esselstyn?
7        A.  I'm not.  The title, yes, it's northeastern
8    North Carolina.
9        Q.  So the left-most vertical line in this
10   rectangle, that's a boundary of the figure, not a
11   county line for the counties that would otherwise be
12   running through this map; is that right?
13       A.  Correct.
14       Q.  Okay.  But then, you know, in the
15   northeastern -- very northeastern corner of the state,
16   you've got gray lines that are representing county
17   boundaries; is that right?
18       A.  Correct.
19       Q.  When you were drawing Demonstrative District
20   or Map A in Dave's Redistricting, were you using VTDs
21   as the smallest drawing block?
22       A.  No.
23       Q.  What drawing block were you using?
24       A.  Counties.
25       Q.  Counties.  Okay.  Did you use any other

99

1    level -- is that right? -- the shading drawn at the VTD
2    level?
3        A.  Yes.
4        Q.  Okay.  And so the darkest green shading, that
5    VTD could either be 50.1 percent or 99.9 percent black
6    voting age population; is that right?
7        A.  Theoretically.
8        Q.  Okay.  And percentage of black voting age
9    population, is this the decennial census data that
10   you're using here?
11       A.  Yes.
12       Q.  Okay.  And if I keep saying "decennial census
13   data," will you understand that I mean 2020 decennial
14   census data?
15       A.  Yes.  Yes.
16       Q.  I'm not suggesting you used 2010 decennial
17   census data to draw this.  I understand.  Yeah.
18       A.  I think there's a footnote here basically
19   saying those are data I'm relying on unless I state
20   otherwise.
21       Q.  Okay.  And then on Figure 2, the counties,
22   are those borders depicted in the same, you know, gray
23   lines that border the figure itself?
24       A.  There is a rectangle around the figure that
25   looks like a similar shade of gray.

98

1    drawing block throughout your creation of Demonstrative
2    Map A?
3        A.  Yes.
4        Q.  What other drawing blocks did you use?
5        A.  VTDs.
6        Q.  Did you use census blocks at all?
7        A.  I don't believe so.
8        Q.  Okay.  So I would like to look at
9    Section III -- Roman numeral III of your report that
10   starts on page 7 about the Stephenson county grouping
11   requirements, and specifically I'd like to look at
12   page 8.
13       A.  I'm there.
14       Q.  All right.  So Figure 3 is entitled "Two
15   county cluster alternatives for northeastern
16   North Carolina"; is that right?
17       A.  Yes.
18       Q.  And then in the top box it says "Two
19   Initially Identified Senate District County Grouping
20   Options Following the 2020 Census"; is that right?
21       A.  Yes.
22       Q.  Okay.  And just so the record is clear, is it
23   your understanding that "county groupings" and "county
24   clusters" refer to the same thing, Mr. Esselstyn?
25       A.  In one of the papers that Dr. Mattingly

100

25  (Pages 97 to 100)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 26 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    created or cocreated, coauthored, there's a distinction
2    made between "clusters" and "clusterings."
3        Q.  That wasn't my question.
4        A.  I'm trying to answer your question.
5            And I think the word "grouping" is sometimes
6    used as both a synonym for "cluster" and a synonym for
7    what Dr. Mattingly calls "clusterings."
8        Q.  So you've titled this figure two different
9    ways.  Does it mean two different things because you
10   used the term "grouping" versus "cluster" in one of
11   them?
12       A.  In this instance, no.
13       Q.  There are two different groupings depicted in
14   Figure 3; is that right?
15       A.  Two different grouping options, yes.
16       Q.  Okay.  And do you know if the grouping option
17   on the right is enacted Senate Districts 1 and 2 in the
18   2023 Senate Plan?
19       A.  I believe that's correct.
20       Q.  Okay.  And the map on the left-hand side, is
21   this enacted Senate Districts 1 and 3 in the 2022
22   Enacted Senate Plan?
23       A.  The short answer is yes.  I suppose this is
24   meant to show groupings and not districts, but the
25   districts you mentioned were created consistent with

101

1    these groupings for both 2022 and 2023.
2        Q.  Right.  So in other words, the entire
3    district is the grouping itself?
4        A.  Yes.  Or it was created using that, yeah.
5        Q.  The portion of paragraph 21 that's above
6    Figure 3, do you see a sentence that starts "In 2021,
7    after the release of the 2020 census data"?
8        A.  Yes.
9        Q.  Okay.  And it's got a footnote at the end of
10   that sentence, Footnote 5; is that right?
11       A.  Yes.
12       Q.  And it says "Those results were described in
13   a paper of which I was a coauthor"; is that right?
14       A.  Yes.
15       Q.  Okay.  Can you tell me a little bit about
16   this paper.
17       A.  Yes.  There were five of us, I believe, who
18   had been collaborating, all folks who were interested
19   in the Stephenson requirements and interested in being
20   able to provide those -- the groupings that would be
21   generated using Dr. Mattingly and Dr. Hershlag's
22   algorithm in an expeditious way when the data -- the
23   census data were released.
24           And the five of us had collaborated on
25   another document using population estimates just sort

102

1    of trying to look ahead at what the county groupings
2    might look like.
3            And so we had, as I said, collaborated on a
4    previous paper and then collaborated on this paper that
5    essentially once the county-level population data were
6    released describing what the groupings would be based
7    on the assumption that race was not taken into account,
8    and the paper basically lays out the groupings and
9    tries to describe them and show them graphically as
10   well.
11       Q.  Do you know why the assumption was made that
12   race did not need to be taken into account?
13       A.  I would say that the coauthors had
14   recognized, for example, in the 2010 cycle that
15   groupings that had been identified as the optimal
16   groupings were provided and were not challenged on the
17   basis of VRA issues within the groupings.
18           So that was an example of a 10-year period
19   when the groupings had been generated without taking
20   race into account, and as I said, to my knowledge, were
21   not challenged as having any issues with not complying
22   with the VRA.
23           And also the VRA piece could produce a
24   variable that could make it -- that it's an unknown.
25   If one were to take that into account, I don't think we

103

1    would have been able to produce the paper.  Certainly
2    not with the quick turnaround that we did.
3        Q.  Okay.  Can we turn to page 11.  I'd like to
4    talk about Figure 5 of your report, please.
5            So this shows "Selected enacted 2022 North
6    Carolina State Senate districts"; is that right?
7        A.  Yes.
8        Q.  Did you use the enacted 2022 state senate
9    districts as the basis for drawing any of your
10   demonstrative maps?
11       A.  I'm just considering the way you asked that.
12   As the basis for drawing them, yes, I did.
13       Q.  Okay.  And you included in Table 1 below
14   Figure 5 statistics for these districts; is that right?
15       A.  Yes.
16       Q.  Okay.  I notice that Senate District -- what
17   was Senate District 2 is not labeled on this map; is
18   that right?
19       A.  That's correct.
20       Q.  Okay.  And you also don't report any
21   statistics for Senate District 2; is that right?
22       A.  That's correct.
23       Q.  Why did you not include Senate District 2 in
24   any of your analysis?
25       A.  None of my -- so the numbering changes

104

26 (Pages 101 to 104)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 27 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  slightly.  So, for example, the -- and I just want to
2  confirm that my memory is right here.
3          The district containing one county in Halifax
4  County in the 2023 plan is District 2, whereas in the
5  2022 plan it's District 3.
6          And I believe that District 2 in the 2022
7  plan is the district composed of Lenoir, Craven and
8  Beaufort Counties.
9      Q.  So in Figure 5, it's one of the unlabeled
10  districts here?
11      A.  Yes.  And that three-county grouping was not
12  changed or affected or -- none of my demonstration maps
13  involve any of those counties as I recall, so it
14  seemed -- it's part of the enacted plan that is
15  unaffected by any of the demonstration plans.
16      Q.  Okay.  But none of your demonstration plans
17  involve any of Pitt or Edgecombe County as well, so why
18  did you report statistics for Pitt and Edgecombe County
19  but not Lenoir, Craven and Beaufort?
20      A.  Good question.  Earlier in the report, I
21  believe I point out that the majority black counties
22  that I had identified, we looked at the figure before.
23  I think it's the first figure in report -- yes,
24  Figure 1 -- mentioning that.
25          So in paragraph 27, I mention that in the

105

1  2022 plan, those counties are assigned to four
2  different districts, namely 1, 3, 5, and 11, none of
3  which is majority black.  And see Figure 5.
4          So I included District 5 as a way of
5  corroborating my statement that the districts
6  containing these majority-black districts are not
7  majority black -- sorry.  The districts containing
8  these majority-black counties are not majority-black
9  districts.
10      Q.  And did you use QGIS to create Figure 5 also?
11      A.  Yes.
12      Q.  Okay.  Does QGIS allow you to place the names
13  of the counties wherever you like on the map?
14      A.  There is that option, yes.  And just for the
15  sake of time, all of the maps in this report were
16  created using QGIS, and I think I say as much in
17  Attachment B.
18      Q.  Okay.  Thank you.
19          Is it your understanding that Vance County
20  does not border Nash County?
21      A.  Yes.  It looks like the district label for
22  District 11 obscured the county -- the Franklin County
23  label.
24      Q.  Obscured or is lacking the Franklin County
25  label?

106

1      A.  The way the software works is that one
2  layer's label can supplant another.  So I would
3  maybe more accurately the District 11 label has
4  supplanted the Franklin County label on this map.
5      Q.  Okay.  So you did not label Franklin County
6  on this map?
7      A.  I would characterize it the way I just did,
8  that the district label supplanted the county label in
9  this particular map, yes.
10      Q.  Okay.  But you would agree with me that
11  Senate District 11 as enacted in 2022 is made up of
12  Vance, Franklin and Nash Counties; is that right?
13      A.  Yes.  In fact, Table 1 says that explicitly.
14      Q.  And your failure to include Franklin County
15  on this map, does it render it unreliable in any way?
16          MS. THEODORE:  Objection to form.
17          THE WITNESS:  No.  I don't agree with that
18  characterization at all.
19  BY MS. RIGGINS:
20      Q.  Did you choose not to put Franklin County's
21  label on this map?
22      A.  No, I would not characterize it that way.
23      Q.  So was it an error?
24      A.  I honestly don't remember if I -- I may have
25  recognized that the location of the District 11 label

107

1  was in such a place that it had supplanted the county
2  label, but I think there are other maps -- I just
3  looked at Figure 1, for example, where Franklin County
4  is clearly labeled, and as I pointed out, it's in the
5  table below.
6          But on an 8-and-a-half by 11 piece of paper,
7  sometimes not every label, I think -- I don't know.  I
8  don't think I specified anything about that in
9  Attachment B, but --
10      Q.  Because I can easily look at a map of
11  North Carolina and say that's Franklin County; right?
12  So it's not a big deal, in your opinion?
13          MS. THEODORE:  Objection to form.
14          THE WITNESS:  In this instance, I do not feel
15  that the fact that the label for District 11 supplanted
16  the Franklin County label diminishes the validity of
17  this map.
18  BY MS. RIGGINS:
19      Q.  Can we look at Figure 6 on page 13, please.
20      A.  Yes.
21      Q.  And this is a similar map, but only of the
22  Enacted 2023 State Senate Districts; is that right?
23      A.  That's right.
24      Q.  Okay.  And as we noted earlier, there's been
25  renumbering in the region, so Senate District 1 is now

108

27 (Pages 105 to 108)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 28 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    in the very northeastern corner of North Carolina; is
2    that right?
3         A.  This is the northeasternmost district, yeah.
4    I'll describe it as being the northeastern --
5    northeasternmost district.
6         Q.  Okay.  And then Senate District 2 goes from
7    Warren County to Carteret County; is that right?
8         A.  That's right.
9         Q.  Okay.  Was there any change to Senate
10   Districts 4, 11, or 5 between 2022 and 2023?
11        A.  I don't believe so.
12        Q.  And is Senate District 9 also the same?
13        A.  I think so.
14        Q.  And what was Senate District 2 and is now
15   Senate District 3, though granted, unmarked Senate
16   District 3, also the same from 2022 to 2023?
17        A.  That's correct --
18        Q.  Okay.
19        A.  And -- yes, with the exception of its number.
20        Q.  Okay.  Geographically made up of the same
21   three counties?
22        A.  Correct.
23        Q.  Okay.  And are Districts 1 and 2 -- we
24   already talked about those earlier.  The entire
25   district is the county grouping; is that right?

                                                   109

1         A.  That's right.
2         Q.  Okay.  Do you know if Senate District 5 is
3    also an entire county grouping?
4         A.  I believe it is.
5         Q.  Okay.  What about Senate District 11?
6         A.  Yes.
7         Q.  Senate District 4, same thing?
8         A.  Yes.
9         Q.  And Senate District 9, is that the same
10   thing?
11        A.  No.
12        Q.  Why not?
13        A.  Senate District 9 involves a split county.
14        Q.  Sampson County; is that right?
15        A.  Yes.
16        Q.  And do you denote the other district that
17   Sampson County is split in two in any way on this map?
18        A.  On this map, no, but I do reference it in the
19   text.
20        Q.  Okay.  And then Lenoir, Craven, and Beaufort,
21   that is also a single-district county grouping; is that
22   right?
23        A.  That's right.
24        Q.  So I'd like to look at page 15, please, which
25   is Figure 7.

                                                   110

1         Is Primary Demonstration District A outlined
2    in purple in this map?
3         A.  Yes.
4         Q.  Okay.  And we already discussed that you
5    began drawing this district in DRA; is that right?
6         A.  I believe that's right.
7         Q.  Okay.  And you began drawing based on whole
8    counties; is that right?
9         A.  Yes.  I'm on -- I'm thinking just a few
10   calories would -- and then just if I could take a --
11        Q.  I maybe have three or four more questions
12   about this figure, and then I was going to offer to
13   take a lunch/dinner break.  Is that okay?
14        A.  Yeah, that works.
15        Q.  Okay.  How did you choose which whole
16   counties went into Demonstration District A?
17        A.  I've -- I hesitate to repeat myself, but it's
18   the process we've discussed before.  Classic
19   redistricting, you know, trial and error, trying to
20   create a district that meets multiple criteria;
21   population equality, compactness, communities of
22   interest, and in this case, also making it majority
23   black.  So just iterative process.
24        MS. RIGGINS:  Okay.  I lied.  I didn't have
25   four questions.  We can take a lunch break or dinner

                                                   111

1    break.
2         (Off the record 12:27 p.m. to 1:01 p.m.)
3    BY MS. RIGGINS:
4         Q.  So, Mr. Esselstyn, can you please turn to
5    page 17 of your report.  I'd like to look at Figure 9.
6         A.  Yes.
7         Q.  Okay.  And Figure 9 depicts Primary
8    Demonstrative A and then the associated Demonstrative
9    Districts A-C, A-4, A-9, and A-11; is that right?
10        A.  Yes.
11        (Discussion off the record.)
12   BY MS. RIGGINS:
13        Q.  Okay.  And then it appears that Edgecombe,
14   Pitt, Lenoir, Craven, and Beaufort are shaded out, for
15   lack of a better way to put it; is that right?
16        A.  Yes.
17        Q.  Okay.  Why are these five counties shaded
18   differently?
19        A.  Well, the title is -- of the figure says that
20   it's showing districts that differ from the enacted
21   2023 plan, and those counties' districts do not differ
22   from the enacted plan in Demonstration Map A.
23        Q.  Okay.  And is that why Onslow is shaded out
24   also?
25        A.  Yes.

                                                   112

                              28  (Pages 109 to 112)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 29 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.  And then Onslow County district, it doesn't
2    cede out all the way to the Atlantic Ocean, right, in
3    the enacted plan?  It's enclosed at the line; is that
4    right?
5         MS. THEODORE:  Objection to form.
6         THE WITNESS:  The Onslow County district
7    is -- consists of Onslow County.
8    BY MS. RIGGINS:
9    Q.  Okay.
10    A.  I believe it's a single district.  I'm pretty
11   sure.
12    Q.  It is.  Okay.  When you were drawing
13   Districts A-C, A-4, A-9 and A-11, did you intentionally
14   draw those districts to exclude Edgecombe, Pitt,
15   Beaufort, Craven, and Lenoir Counties?
16    A.  Yes.
17    Q.  Okay.  And so District A-2, this lists
18   Carteret County; is that right?
19    A.  That's right.
20    Q.  Okay.  And so that's split between
21   District A-2 and A-9; correct?
22    A.  That's correct.
23    Q.  Okay.  And Wilson County is split between
24   A-11 and A-4; is that right?
25    A.  That's right.

113

1    Q.  Okay.  And Sampson County is split between
2    A-4, A-9, and another unnamed district; is that right?
3    A.  It is not shown in Figure 9 because it does
4    not differ from the enacted 2023 plan.  It is named
5    elsewhere in the report.
6    Q.  Right.  But under Demonstration Map A,
7    Sampson County would be split between three districts;
8    is that right?
9    A.  That's correct.
10    Q.  On Demonstration -- Primary Demonstration
11   District A, looking back if we could just for a minute
12   to Table 15 -- or page 15, Table 3, this has a black
13   voting age population of 51.47 percent; is that right?
14    A.  Demonstration District A, yes.
15    Q.  Okay.  And so could you have met either the
16   equal population criteria or the criteria that this
17   district be majority black voting age population
18   without including any one of these counties?  Could you
19   just press "delete" to, say, Washington County?
20    A.  I honestly don't know.  Just sitting here, as
21   I recall the -- no.  That -- I'm pretty sure that I
22   could not, for example, delete Washington County
23   because the population deviation was already pretty
24   close to the threshold.
25    Q.  Is there a particular reason why you included

114

1    Washington County in this district instead of, say,
2    Beaufort County?
3    A.  I think I was generally trying to keep the
4    black vote counties, that community of interest intact.
5         And I think it's -- Beaufort County, I
6    believe, is not a majority black -- or it's -- yeah.
7    It's not a county that I would identify as one of the
8    black belt counties -- or that I did identify as one of
9    the black belt counties.
10    Q.  I'd like to flip to page 16 and look at
11   Figure 8 for a minute, if we could.
12    A.  I'm there.
13    Q.  So these are the differing county groups that
14   were used in the maps that we just looked at in
15   Figure 9; is that right?
16    A.  That's right.
17    Q.  Okay.  And so it looks like the district --
18   Demonstrative District Primary District A is county
19   grouping 1; is that right?
20    A.  Here the numbers aren't meant to be
21   identifying a county grouping.  The numbers are meant
22   to be indicating the number of districts in that
23   grouping.
24    Q.  Okay.  But if --
25    A.  Go ahead.

115

1    Q.  They're the same counties in the area
2    labeled 1 on Figure 8 as Demonstrative District A, the
3    primary demonstrative district?
4    A.  That's correct.
5    Q.  Okay.  And Dr. Mattingly created the
6    groupings on -- the additional grouping on this map; is
7    that right?
8    A.  Yes.  Yes.
9    Q.  Okay.  Do you have an understanding of how
10   Dr. Mattingly created that alternate county grouping?
11    A.  Generally, yes.
12    Q.  What is your general understanding?
13    A.  My general understanding is that he used the
14   code that allows for the freezing of a subset of
15   counties, and he froze the counties in Demonstration
16   District A as well as Edgecombe and Pitt Counties, and
17   then ran the algorithm with those counties frozen.
18    Q.  Okay.  And so there are only two groupings
19   present in Figure 8; is that right?
20    A.  That's right.
21    Q.  Okay.  And then you would attempt to create,
22   as you did, five districts out of the second grouping;
23   is that right?
24    A.  That's right.  Well, as I've mentioned, one
25   of the districts doesn't change.  I left one of the

116

29  (Pages 113 to 116)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 30 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  districts identical to the way it was.
2      So really the districts that I was
3  configuring, I wouldn't include the fifth, the one with
4  Lee and Harnett Counties.
5      Q.  Okay.  But five districts would now make up
6  this county grouping; is that right?
7      A.  Yes.
8      Q.  Okay.  This is a 23-county grouping as drawn.
9  Are you aware of any county grouping in North Carolina
10 currently that makes up that many counties?
11     A.  Off the top of my head, I am not.
12     Q.  Okay.  And do you know how many counties
13 there are in North Carolina, Mr. Esselstyn?
14     A.  I do.
15     Q.  Is it a hundred?
16     A.  Yes.
17     Q.  This county grouping represents 23 percent of
18 the counties in North Carolina; is that right?
19     A.  That's right.
20     Q.  Look at the lawyer doing math.  Thank God it's a
21 hundred counties.
22     Okay.  So why is Wayne County missing from
23 this map?
24     A.  I don't agree with the way your question is
25 formulated.

117

1  Q.  Okay.  Is Wayne County missing a county
2  label?
3      A.  There does not appear to be a label for Wayne
4  County.
5      Q.  Where's the county label for Camden County?
6      A.  It also does not appear to be part of the
7  map.
8      Q.  By "not a part of the map," you mean it's
9  still a county in North Carolina; you just failed to
10 label it in Figure 8?
11     MS. THEODORE:  Objection to form.
12     THE WITNESS:  I wouldn't characterize it that
13 way.
14 BY MS. RIGGINS:
15     Q.  Is there a particular reason you didn't
16 identify Camden County on this map?
17     A.  GIS software, mapping software in general
18 uses a -- the labeling process involves an algorithmic
19 series of determinations, and there are settings that
20 you can change.
21     And I believe for this map I was using a
22 setting that was trying to avoid crowding of labels or
23 overlapping of labels, and sometimes what the software
24 will do is make the determination that placing the
25 label in sort of the default location would mean it

118

1  would be too close to an adjacent label.
2      So it's not like I manually labeled each
3  county here.  I relied on the software to place the
4  labels, and apparently the algorithm made the
5  determination that putting those labels in would have
6  been too crowded, and so those counties aren't labeled.
7      But they are clearly labeled in Figure 5 and
8  Figure 1.
9      Q.  So it's possible to label these counties?
10 They just were not labeled in this figure?
11     A.  Yes.
12     Q.  Okay.  Would you consider this an error in
13 this figure?
14     A.  No.
15     Q.  Okay.  So let's look at Figure 9 again on the
16 next page.
17     So here, Camden and Wayne Counties are
18 labeled, but it appears that the label "Sampson County"
19 has been moved, so it's partially in Bladen County and
20 partially in Sampson County.
21     Did the algorithm do that, or did you do that
22 yourself, Mr. Esselstyn?
23     A.  So I'm just looking around at the map.  There
24 are a number of instances where one part of the label
25 overlaps in part a portion of another county.

119

1      Q.  Because it's crowded?
2      A.  Yes.
3      Q.  Right.
4      A.  But I would -- the label for Sampson is --
5  the majority of it is definitely within Sampson County.
6  I don't think -- I'm not concerned that a reader would
7  think that that label was applying to Bladen County,
8  which is clearly labeled as Bladen County.
9      As to whether I moved that label, I honestly
10 don't recall.
11     Q.  Okay.  But you have the ability to move the
12 labels; right?
13     A.  Yes.
14     Q.  Okay.  Because if you look back at Figure 6,
15 the label for Sampson County is in a much different
16 place, but here if you put it in the same place on
17 Figure 9, you would have a hard time seeing the
18 district lines; is that fair?
19     A.  I'm looking back for Figure 6.
20     Yes.  If the label for Sampson County was in
21 the same location that it is in Figure 6, it would be
22 probably overlapping with the district line.
23     Q.  So this was probably done, you know, for
24 clarity purposes, so you could still see the district
25 line; is that fair to say?

120

30  (Pages 117 to 120)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 31 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    MS. THEODORE: Objection to form.

2    THE WITNESS: That would be a reasonable

3  explanation.

4    I don't feel comfortable saying that's

5  probably why it was done, but that could be an

6  explanation for why.

7  BY MS. RIGGINS:

8    Q. And so we said earlier that Figure 9 shows

9  the five additional districts that would make up the

10  five-county cluster in Figure 8; is that right?

11    MS. THEODORE: Objection to form.

12    THE WITNESS: I don't agree with your

13  statement.

14  BY MS. RIGGINS:

15    Q. Did you draw the additional -- one, two,

16  three, four -- five districts in the county

17  grouping identified in Figure 8?

18    A. I drew the four districts that differ from

19  the enacted 2023 plan.

20    Q. And you also -- which district does not

21  differ from the enacted 2023 plan?

22    A. The district including Harnett and Lee and a

23  portion of Sampson.

24    Q. Okay. So looking at Figure 8, which shows

25  Lee and Harnett Counties, are you aware that this

121

1  five-district county grouping is only available because

2  Pitt/Edgecombe were frozen in addition to Demonstrative

3  District A.

4    MS. THEODORE: Objection to form.

5    THE WITNESS: I don't agree with the

6  characterization of your question.

7  BY MS. RIGGINS:

8    Q. Did you test out to see what the county

9  groupings would look like with Demonstration District A

10  if you did not freeze Pitt and Edgecombe Counties?

11    A. I did not.

12    Q. Okay. So is it possible that the 23-county

13  pod would not be available if Pitt/Edgecombe were not

14  frozen?

15    MS. THEODORE: Objection to form.

16    THE WITNESS: Is it possible that the

17  23-county -- I find that wording a little tricky to

18  follow. Is it --

19  BY MS. RIGGINS:

20    Q. I can rephrase.

21    All right. So you agree with me that

22  Demonstration District A is frozen; correct?

23    A. Yes.

24    Q. Okay. And that in addition to that,

25  Dr. Mattingly froze Pitt and Edgecombe Counties;

122

1  correct?

2    A. For Demonstration Map A groupings, yes.

3    Q. Okay. Do you know if you would get a

4  different grouping system if Pitt/Edgecombe were not

5  frozen?

6    A. Different from the one shown in Figure 8?

7    Q. Yes.

8    A. I believe that's correct.

9    Q. Let's please turn to page 18. I'd like to

10  talk about Demonstration District B, please.

11    A. I'm there.

12    Q. Did you start drawing Demonstration

13  District B in Dave's Redistricting?

14    A. I think so.

15    Q. Okay. And did you export any work product

16  from Dave's Redistricting into Maptitude or QGIS?

17    A. I honestly don't recall.

18    Q. Okay. That's fine. It's not a memory test.

19    How did you -- I know that you started in

20  Dave's Redistricting, but how did you make the

21  determination to include this specific geography in

22  Demonstration District B?

23    A. I'm trying to just be concise. It's an

24  answer very much similar to the answer I've given

25  before maybe three times, about iterative process,

123

1  trial and error, looking at other possible

2  configurations, weighing different criteria.

3    Q. Okay. So it looks like this is very similar

4  to Demonstration District A except for Vance County is

5  not in Demonstration B; is that right?

6    A. There are other -- that is one thing that's

7  different.

8    Q. Okay. But it includes a lot of the other

9  majority-black counties that you identified; is that

10  right?

11    A. A number of them, yeah.

12    Q. Okay. It also includes a portion of

13  Pasquotank County; is that right?

14    A. Yes.

15    Q. Okay. Demonstration District B splits

16  Pasquotank County; is that right?

17    A. Yes.

18    Q. How did you make the determination as to what

19  portion of Pasquotank County would end up in Primary

20  Demonstration District B?

21    A. The consideration of multiple factors.

22    I definitely was trying to keep Elizabeth

23  City intact or mostly intact. It's not possible to

24  keep Elizabeth City entirely intact unless Camden

25  County is included. So -- but trying to keep as much

124

31 (Pages 121 to 124)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 32 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    of Elizabeth county intact as I could while also
2    keeping VTDs intact.
3           This was built out of VTDs, and basically,
4    the resulting process is kind of the northern part of
5    the county plus most of Elizabeth City, and I thought
6    that was a way of dividing the county in harmony with
7    the various redistricting criteria that I've talked
8    about before.
9       Q.  Is all of the portion of Elizabeth City
10   that's in Pasquotank County located in Primary
11   Demonstration District B?
12      A.  All of it?  No.
13      Q.  So Elizabeth City is also split between --
14   Elizabeth City is split between Demonstrative Primary
15   District B and then what is, I believe, B-2 in
16   Figure 11 on page 20; is that right?
17      A.  Yes.  And a small portion of Elizabeth City
18   in Pasquotank County is Demonstration District B-2.
19      Q.  Okay.  And did the Enacted Senate Plans keep
20   Pasquotank County whole in 2023?
21      A.  Yes.
22      Q.  Okay.  Could you have kept Pasquotank County
23   whole and met the equal population criteria for
24   Demonstration District B?
25           MS. THEODORE:  Objection to form.

125

1           THE WITNESS:  When you say the "population
2    criteria," the population equality criteria?
3    BY MS. RIGGINS:
4       Q.  Yes.  I'm sorry.  I thought I said equal
5    population criteria.  Perhaps I didn't.  I guess that's
6    why Elisabeth objected.
7           Could you, you know, have met the plus or
8    minus 5 percent population criterion without splitting
9    Pasquotank County?
10      A.  I don't think I can say that just off the top
11   of my head because I didn't -- I don't remember trying
12   all kinds of combinations using other counties and
13   other parts of the district.  I don't -- I don't think
14   I can provide an answer to that question.  I mean a yes
15   or no answer.
16      Q.  And you so you have the same shading on this
17   map that we talked about earlier -- is that right? --
18   the green shading?
19      A.  Yes.
20      Q.  And this still shows the decennial census
21   data's black voting age population percent; right?
22      A.  Yes.
23      Q.  Okay.  So it looks like the southern
24   southeastern portion of Pasquotank County that is put
25   into District B-2 has lighter shades of green; is that

126

1    right?
2       A.  Compared to what?
3       Q.  Compared to the portion that was included in
4    Demonstration District B.
5       A.  I don't agree with the characterization as
6    you've formulated it.
7       Q.  Okay.  So the outline of Pasquotank County,
8    it's south of Camden.  It's that gray-silver line by
9    Gates; is that right?
10      A.  Yes.
11      Q.  Okay.  And that portion of the district, that
12   VTD is 30 to 39.99 percent black voting age population;
13   is that right?
14      A.  Yes.
15      Q.  Okay.  And then directly southeast, the VTD
16   that borders that in Pasquotank County, that's between
17   15 and 29.99 percent black voting age population; is
18   that right?
19      A.  Yes.
20      Q.  Okay.  And then the green that's obscured by
21   the district line, do you know what color that is?
22   What shading?
23      A.  So there is more than one VTD in there.  I
24   believe there is both the 40 to 49.99 percent as well
25   as 50 percent and above in that area.

127

1       Q.  Okay.  And, in fact, if you flip back to
2    Figure 6 where Pasquotank County is kept whole, it
3    shows shading of both the 40 to 49.99 percent range and
4    the 50 percent and above range; is that right?
5       A.  I've just gone back to Figure 9, which
6    presumably --
7       Q.  Excuse me.  Figure 6 on page 13.
8       A.  Okay.  I think I -- I'll look at Figure 6.
9           Yes.  I think what you said is true.
10      Q.  Okay.  And then if we go back to Figure 10
11   that we were just talking about, the shading that's
12   directly below the purple district boundary, that's
13   15 to 29.99 percent black voting age population; right?
14      A.  I see two districts that are directly below
15   the district boundary -- two VTD.
16      Q.  Yeah.  The VTD that's primarily due south.
17   Not south and west, but south.
18      A.  Let's say the one that -- you're talking
19   about the one that extends across from the western side
20   of the county to the eastern side of the county?
21      Q.  Yes, the one that spans the whole county.
22      A.  And it is also south of the district line?
23   Yes, that appears to be 15 percent to 29.99 percent.
24      Q.  Okay.  And then sort of above that VTD we
25   were just talking about and to the left of the district

128

32  (Pages 125 to 128)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 33 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  boundary, that VTD is between 30 and 39 percent --
2       A.  Correct.
3       Q.  -- black voting age population?
4       A.  Correct.
5       Q.  Okay.  And then the final VTD block in
6  Pasquotank County, the southernmost, is between zero
7  and 14.99 percent black voting age population; is that
8  right?
9       A.  Yes.
10      Q.  Okay.  So the only voting tabulation district
11 with 50 percent or more black voting age population is
12 in Demonstration District B in Pasquotank County; is
13 that right?
14      A.  I don't know that I agree with the way your
15 question is formulated.
16          I can say that the -- none of the VTDs in
17 Pasquotank County that are in Demonstration
18 District B-2 are above 50 percent BVAP.
19      Q.  I believe in paragraph 41 you state that you
20 "Set out to ascertain whether a majority black state
21 senate district could be created wholly within the
22 outer boundary of the county groupings shown in
23 Figure 3 while adhering to traditional districting
24 criteria"; is that right?
25      A.  Yes.

                                                    129

1  majority black counties identified in Figure 1 with the
2  exception of Edgecombe County?
3       A.  I'm just flipping to Figure 1 in the paper
4  copy here to allow for comparison.
5          No.
6       Q.  Okay.  Which other --
7       A.  I'm sorry.  Hang on one moment.
8          Sorry, but I spoke too soon.  I think the way
9  you presented it, if you indicated that one of them is
10 just partial, then yes, that's correct.
11      Q.  Okay.  I apologize if I asked you this
12 earlier, Mr. Esselstyn.
13          Does Figure 1 represent counties that are
14 commonly known as the "black belt" in North Carolina?
15      A.  When you say does Figure 1 -- so Figure 1
16 shows a lot of counties.
17      Q.  But the shaded counties, are those what's
18 commonly known as the "black belt counties," the ones
19 shaded in gray?
20      A.  I'm not aware of one particular agreed-upon
21 definition.  I think those shaded counties would --
22 most, if not all of them, would probably fit into if
23 people are talking about those counties, but I'm not
24 aware of one sort of authoritative group definition.
25      Q.  Okay.  All right.  Turning back to page 22,

                                                    131

1       Q.  Okay.  So looking back at Figure 3 briefly --
2  it's on page 8.
3       A.  Thank you.  I'm there.
4       Q.  Were you trying to fit Demonstration
5  District B into one of the two county groupings shown
6  in Figure 3 or the county groupings if they were
7  combined together into one group?
8       A.  The latter.
9       Q.  Okay.  So let's turn back to page -- well, we
10 haven't been here yet -- page 19, please, Table 5.
11      A.  I'm there.
12      Q.  Demonstration District B has a black voting
13 age population based on the decennial census of
14 48.41 percent; is that right?
15      A.  Yes.
16      Q.  And a black CVAP under the 2016 to 2020
17 five-year ACS Community Survey estimates of
18 50.19 percent; is that right?
19      A.  Yes.
20      Q.  Okay.  So let's turn the page to page 20.
21 Let's talk about -- I'm sorry -- page 21.  We can talk
22 about Demonstration District C.
23      A.  I'm on page 21.
24      Q.  Okay.  So am I correct that Demonstration
25 District C contains either whole or portions of the

                                                    130

1  Figure 12.
2       A.  Twelve is on page 21?
3       Q.  Yes.  Page 21, Figure 12.
4       A.  Okay.
5       Q.  How did you determine that these counties and
6  portions of Vance County should go together in
7  Demonstration District C?
8       A.  It's an iterative process, trying out various
9  configurations, weighing things like compactness,
10 population equality, communities of interest.
11          In this particular case, as I reference in my
12 rebuttal report, I considered configurations in Vance
13 County that had a higher BVAP than Demonstration
14 District C ultimately, the version shown here, but that
15 divided the municipality of Henderson more.
16          So in that particular area, I definitely was
17 looking at trying to preserve municipalities intact to
18 the extent possible.  I think I mentioned compactness
19 earlier.
20          Again, my answer is very similar to ones I've
21 given before.
22      Q.  But the city of Henderson is still split
23 between Demonstration District C and then Map
24 District C-11 on Figure 14; is that right?
25      A.  Yes.  I think something like -- it's in my

                                                    132

                                        33 (Pages 129 to 132)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 34 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    rebuttal report. May I look at the rebuttal report?

2      Q. I'm just asking if it's your recollection

3    that Henderson is still split between the two

4    districts?

5      A. Yeah, I think something in the neighbor of

6    like 2 percent of the population of Henderson is

7    outside Demonstration District C.

8      Q. A few minutes ago you talked about

9    communities of interest. So what communities of

10    interest are present in Demonstration District C?

11      A. I think more than I can name.

12      Q. Can you name me a couple.

13      A. Sure. There are municipalities within the

14    black belt counties that are kept whole.

15       I know I call out the black belt counties,

16    the black belt area of North Carolina as a community of

17    interest that's kept more intact in Demonstration

18    District C, and as well as the other demonstration

19    districts compared to the enacted maps. We've talked

20    about Henderson, the city of Henderson. We've talked

21    about south Henderson in the rebuttal report as well.

22       As far as municipalities, I believe that

23    Halifax is one -- Halifax is the county name. Sorry.

24    There is a -- I know three decent-sized cities in this

25    district, one of which -- Roanoke Rapids, I think, is

1    one that I'm -- anyway, I know that there are three

2    good-sized municipalities that are in this area that I

3    believe are all preserved intact.

4      Q. So three municipalities in all of -- three

5    pretty large municipalities in all of Demonstration

6    District C, or in Halifax specifically?

7      A. In Demonstration District C.

8      Q. Okay.

9      A. And there are other municipalities. I

10    just -- I know that there are three larger ones that I

11    remember looking at and specifically for -- looking at

12    their boundaries and populations and such.

13      Q. Do you recall what those three municipalities

14    were?

15      A. I think Roanoke Rapids is one, and I'm

16    forgetting the names of the other two.

17      Q. Do you know what the Research Triangle Park

18    is, Mr. Esselstyn?

19      A. Do I know what it is?

20      Q. Mm-hmm.

21      A. Yes.

22      Q. Do you know that Vance County and Henderson

23    specifically are part of the Research Triangle Park?

24      MS. THEODORE: Objection to form.

25      THE WITNESS: I don't know whether or not

1    that's the case.

2    BY MS. RIGGINS:

3      Q. Okay. Have you ever heard whether Bertie

4    County was part of the Research Triangle park?

5      A. I'm sorry. Bertie County?

6      Q. Yes.

7      A. I have not heard that that I recall. I don't

8    recall hearing that.

9      Q. Do you believe that Bertie County is part of

10    the Research Triangle Park?

11      A. I don't have an opinion.

12      Q. Do you know what the industry is like in

13    Vance County?

14      MS. THEODORE: Objection to form.

15    BY MS. RIGGINS:

16      Q. Sure. Do you know who the top employers are

17    in Vance County?

18      A. I cannot say off the top of my head right

19    now.

20      Q. Do you know if the largest employer in Vance

21    County is a private employer?

22      A. Did you say do I know that it is, or do I

23    know if it is?

24      Q. Do you know if it is?

25      A. Off the top of my head, I don't.

1      Q. Do you know how large Vance County's largest

2    employer is?

3      A. Even if I did, which I don't, I'm not sure

4    what -- how -- what kind of quantification you would be

5    seeking, so I think the answer is no.

6      Q. Are you aware that the North Carolina Chamber

7    of Commerce and the North Carolina Department of

8    Commerce both publish statistics every year that show

9    the counties' largest employers for all 100 counties in

10    North Carolina?

11      MS. THEODORE: Objection to form.

12      THE WITNESS: I'm aware that statistics like

13    that are published and provided. As to whether that

14    specific presentation of statistics that you described

15    is provided in the manner you describe, I can't say

16    whether I was aware of that.

17    BY MS. RIGGINS:

18      Q. Did you consider when drawing Demonstration

19    District C any specific types of industries that were

20    present in these counties?

21      A. Yes.

22      Q. How so?

23      A. I know that a lot of -- when you say

24    industries, I know that one of the significant

25    employers and forms of work in these counties is

34 (Pages 133 to 136)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 35 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  agriculture as well as -- so both farming and
2  livestock, livestock-related industries, and that there
3  are some similarities in terms of crops or types of
4  livestock that are produced in these areas.
5         I remember seeing that years ago and seeing
6  that map, sort of primary crops and primary animals
7  that are raised. So that is something I was thinking
8  about keeping together because, as I recall from the
9  maps that I had seen, that there were kind of
10  concentrations of similar agriculture and livestock
11  operations in this area.
12     Q. Did you consult any of those agricultural or
13  livestock maps specifically in drawing Demonstration
14  District C?
15     A. No.
16     Q. What about any other demonstration district
17  that you drew?
18     A. No.
19     Q. Do you recall when you last saw an
20  agriculture or livestock map for this region?
21     A. Not exactly.
22     Q. Okay. Do you believe that Vance County has a
23  primarily agriculture-heavy economy?
24     A. Primarily agriculture heavy?
25     Q. Yeah. Do you believe that one of the largest

137

1  industries in Vance County is agriculture?
2     A. I don't have an opinion one way or another on
3  that as we sit here. It would not be hard for me to
4  find that out, but I don't have an opinion off the top
5  of my head.
6     Q. Okay. Are there counties in the
7  Demonstration District C that you had in mind when you
8  were just testifying about the agriculture and farm
9  regions?
10     A. Yes.
11     Q. Which counties would those be?
12     A. Warren, Halifax, Northampton, Bertie,
13  Hertford.
14     Q. Okay.
15     A. I just want to turn on a light, and I need to
16  move away from the headphones to do so. It will take
17  me less than a minute.
18     Q. That's fine.
19     A. Thank you.
20     Q. So in the list of counties you just gave me,
21  you didn't mention Pasquotank. Do you happen to know
22  who the largest employer is in Pasquotank?
23     A. Off the top of my head, I do not.
24     Q. Would it surprise you to learn that it's the
25  federal government?

138

1         MS. THEODORE: Objection to form.
2         THE WITNESS: I don't -- I wouldn't say it
3  would surprise me.
4  BY MS. RIGGINS:
5     Q. And is that because the areas around
6  Elizabeth City have a lot of military installations?
7     A. Is what because?
8     Q. That it wouldn't surprise you that the
9  largest employer in Pasquotank County is the federal
10  government because there are military installations
11  around Elizabeth City?
12     A. I -- actually my rationale was more that it's
13  not uncommon for there to be federal agency presences
14  of one sort of another in a county. I was not
15  specifically thinking of military installations.
16     Q. Did you take into account the location of any
17  military installations when drawing your demonstrative
18  districts?
19     A. I do remember seeing something on a map in
20  Maptitude, but it's a vague recollection. And
21  generally if I do see those and it's possible to keep
22  them intact, that's one of the things I try to do, but,
23  again, my recollection is hazy.
24     Q. I'd like to ask you one more question about
25  Vance County specifically.

139

1         Did you ever consider moving the county label
2  for Vance County for Demonstration District C so that
3  it would not obscure the district line?
4     A. Your question is did I ever consider moving
5  the label?
6     Q. Yes.
7     A. I don't recall.
8     Q. Because it's hard to see, but I believe --
9  and please correct me if I'm wrong -- but under the
10  county label for Vance County, it looks like there's
11  one or more VTDs that are 50 percent or above black
12  voting age population; is that right?
13     A. One or more. Yes, that appears to be true.
14  It may be easier to see in another map.
15     Q. Actually, I'll represent to you,
16  Mr. Esselstyn, it's not, because the label for Vance
17  County never moves.
18         MS. THEODORE: Objection to form.
19         MS. RIGGINS: It wasn't a question.
20  BY MS. RIGGINS:
21     Q. Let's turn to Figure 13.
22     A. I'm sorry. I'm just curious about this.
23     Q. Well, you can be curious on your counsel's
24  time or your own time. I'm sorry, Mr. Esselstyn. I'm
25  on the clock.

140

35 (Pages 137 to 140)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 36 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Can you please turn to page 22.
2    A.  Yes.  I'm there.
3    Q.  All right.  So these are -- Figure 13 on
4  22 -- page 22 represents the modified county groupings
5  used in Demonstration Map C; is that right?
6    A.  Yes.
7    Q.  Okay.  And did Dr. Mattingly draw these
8  county groupings for you?
9    A.  He generated them.
10   Q.  Okay.  And Camden and Wayne County labels are
11 also missing from this map; is that right?
12   A.  That appears to be true.
13   Q.  And did you use the same algorithm we talked
14 about in discussing -- I believe it was Figure 8
15 earlier to generate the labels for these counties?
16   MS. THEODORE:  Objection to form.
17   THE WITNESS:  I can't say with certainty.
18 BY MS. RIGGINS:
19   Q.  Okay.  Do you know why Camden and Wayne
20 Counties aren't labeled in this map?
21   A.  I think my answer would be similar to the one
22 that I gave before, that there are algorithms that make
23 choices about placing labels, and they can do so in a
24 way to minimize or reduce kind of crowding or overlap.
25   Q.  All right.  Let's look at Figure 14 on the

141

1  next page.
2    A.  I'm there.
3    Q.  In Figure 14, it looks like you drew District
4  C-2, C-11, and C-4 to -- in addition to Demonstration
5  District C; is that right?
6    A.  I believe so, yes.
7    Q.  And Wilson County is split between
8  District C-11 and C-4; is that right?
9    A.  That is right.
10   Q.  Okay.  And then District C-11 is the county
11 that the remainder of Vance County is in, in addition
12 to Demonstration District C; is that right?
13   A.  That's right.
14   Q.  Okay.  All right.  We can turn the page to
15 page 24.  I would like to look at Figure 15.
16   This is a map of Demonstration District D; is
17 that right?
18   A.  That's right.
19   Q.  I believe you testified earlier, but please
20 correct me if I'm wrong, that Demonstration District D
21 is a modified version of Demonstration District B; is
22 that right?
23   A.  I don't think that's what I said before.
24   Q.  Okay.  Then why don't you tell me how you
25 drew Demonstration District D.

142

1    A.  So drawing districts is typically an
2  iterative process that involves trying different
3  combinations and in -- investigating whether different
4  combinations of counties might provide a reasonably
5  configured district that had a higher black CVAP than
6  Demonstration District B.
7    I -- you know, basically this has counties in
8  it that are different from Demonstration District B,
9  but otherwise, they're similar.  And, again, always
10 considering things like compactness and preservation of
11 communities of interest, population equality, all of
12 those factors.
13   Q.  Okay.  And is District D otherwise the same
14 as -- I'm sorry.
15   Is Demonstration District D otherwise the
16 same as Demonstration District B but for the fact that
17 Tyrrell County is included in Demonstration District D,
18 whereas Chowan County is included in Demonstration
19 District B?
20   A.  I want to say that Washington also differs,
21 but I'm -- that's --
22   Q.  You are correct.  You are correct.
23   So it's Washington and Tyrrell are included
24 in Demonstration District D, but they are not
25 included -- that's right -- for population purposes?

143

1  All right.
2    A.  For population?  Well --
3    Q.  Sorry.  The swap.  You had to -- because
4  Tyrrell and Washington are very small population.
5    A.  Yeah.  And I --
6    Q.  Okay.
7    A.  For the record, I would not pronounce two of
8  those counties the way you did, but that's okay.  I
9  know which ones you're talking about.
10   Q.  How do you pronounce Chowan County?
11   A.  "Chowan."
12   Q.  Oh, interesting.  I deposed somebody from
13 there earlier this week, and they said it the way I
14 said it, so -- how do you pronounce Tyrrell County?
15   A.  "Tyrrell."
16   Q.  People from the east and people from the west
17 of North Carolina, very different pronunciations, just
18 like the barbecue.
19   All right.  So can we compare -- you might
20 want your paper copy for this.  So I'd like to compare
21 Table 8 with Table 5 if we could.
22   A.  Okay.  Table 5.  Maybe you can speed me up.
23 What page is it on?
24   Q.  Page 19.
25   A.  Yes.  Okay.  I have Table 8 in front of me on

144

36 (Pages 141 to 144)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 37 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

the screen and Table 5 in front of me on paper.

Q. Okay. Perfect.

So the black voting age population for Demonstration District D in Table 8 is 49.22 percent; is that right?

A. For Demonstration District D, yes.

Q. Okay. And is that about 8/10 of a percent higher than the BVAP level of Demonstration District B in Table 5?

A. Roughly.

Q. And the black CVAP of Demonstration District D in Table 8 is 50.81 percent; is that right?

A. Yes.

Q. And that's using the 2016 to 2020 five-year ACS Survey estimates; is that right?

A. That's correct.

Q. Okay. And that's about 6/10 of a percentage higher than Demonstration District B's black CVAP percentage; is that right?

A. Roughly, yes.

Q. Okay. The Reock score for Demonstration District D, it's lower than Demonstration District B; is that right?

A. Yes.

Q. Okay. And the Polsby-Popper score for

145

Demonstration District D is also lower than Demonstration District B; is that right?

A. Yes.

Q. Okay. So is it fair to say that Demonstration District D is less compact than Demonstration District B under these two measures?

A. These scores for those two measures are lower per district for Demonstration District D than for Demonstration District B.

Q. And is it your understanding that for both Reock and Polsby-Popper, the closer you are to one, the more compact the district is, generally?

A. Yes.

Q. Okay. So Demonstration District D, using the Reock and Popper methods, are less compact than Demonstration District B?

A. Based on those two measures, yes.

Q. And what are some other measures of compactness?

A. Schwartzberg, area divided by a convex hull. Split edges. Some people just use a -- there's like a length-width test. There's a basic perimeter test. I think Maptitude offers close to ten or a dozen different options.

Q. All right. You only reported Reock and

146

Polsby-Popper measures of compactness throughout your May 2024 report; is that right?

A. That's right.

Q. Now, I do have one last question on Demonstration District D. Pasquotank County is split here again; is that right?

A. That's right.

Q. Is that the same split that's present in Demonstration District B in Pasquotank County?

A. That's right.

MS. THEODORE: Sorry. Can we go off the record for a sec.

MS. RIGGINS: Sure.

(Off the record 1:59 p.m. to 2:06 p.m.)

BY MS. RIGGINS:

Q. Okay. Mr. Esselstyn, I would like to turn to your August rebuttal report, which we'd like to mark as Exhibit 2.

We transmitted that through the chat earlier. Do you still have a copy?

A. I do.

Q. And you have a paper copy in front of you as well; is that right?

A. That's right.

Q. Okay. So on paragraph 3, which spans pages 1

147

and 2, you noted that in your initial report you relied upon the ACS five-year estimates from 2016 through 2020; is that right?

A. That's right.

Q. Then you note that "On June 24, 2024, the redistricting data had made available disaggregated data from the Census Bureau's 2022 CVAP calculation which reflects five-year estimates from 2018 to 2022"; is that right?

A. I think you said the word "calculation" where I wrote "tabulation."

Q. Tabulation. Okay. That's fine.

So for your rebuttal report, did you use the five-year estimates from 2018 to 2022?

A. I did.

Q. Okay. And so you acknowledge that the Redistricting Data Hub published this disaggregated data on June 24, 2024; is that right?

A. That's right.

Q. And that was three weeks before your report was due in this case; is that right?

MS. THEODORE: Objection to form.

BY MS. RIGGINS:

Q. Correct?

A. I have learned since the submittal of this

148

37 (Pages 145 to 148)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 38 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  report we're looking at now, the report submitted at
2  the end of August.  So only within the last week was I
3  aware that there was a deadline other than the May
4  deadline.
5       Q.  Okay.  Do you know when the five-year ACS
6  estimates were first published?
7            MS. THEODORE:  Objection to form.
8            THE WITNESS:  Do I know when the five-year
9  ACS estimates were first published?
10 BY MS. RIGGINS:
11      Q.  From 2018 to 2022?
12      A.  Not exactly.
13      Q.  Do you think it was close in time to
14 June 24th?
15      A.  I suppose it depends.  I studied geology as
16 an undergraduate, so "close in time" on it -- sorry.
17      Q.  Do you think it was within a month of
18 June 24, 2024?
19      A.  I'm not -- I'm not certain.  Possibly within
20 a month or two.
21      Q.  Do you generally --
22      A.  When you're talking about the -- you're
23 talking about the five-year estimates?
24      Q.  For 2018 to 2022.
25      A.  Yeah.  I believe it was sometime in May,

149

1  but --
2       Q.  Do you generally?
3       A.  -- earlier in the spring.  Yes.  Sorry.  Go
4  ahead.
5       Q.  Do you generally keep up with new census data
6  releases?
7       A.  The Census releases a ton of data, so I would
8  say I keep up with the ones that are of particular
9  interest.
10      Q.  And are the five-year ACS Survey results like
11 the 2018 to 2022 estimates something that's of
12 particular interest to you?
13      A.  Yes.
14          (Exhibit 3 Marked for Identification.)
15 BY MS. RIGGINS:
16      Q.  I would like to transmit through the chat
17 something I would like to mark as Exhibit 3.  It's the
18 2022 CVAP publication data.
19      A.  Okay.  I see it.  I am downloading.  I am
20 opening the PDF.
21      Q.  Have you ever seen this document before,
22 Mr. Esselstyn?
23      A.  So this is a PDF, and I don't think I've ever
24 seen this PDF before.  This appears to be similar to
25 the information from a website, and the information at

150

1  the top would suggest that it's a website.
2       Q.  I'll represent to you, Mr. Esselstyn, because
3  I can't mark as an exhibit an interactive website, that
4  this is a print-to-PDF of the official U.S. government
5  website, and you can -- you know, it's from the census
6  data.
7            And if you go to the last page, the very
8  bottom, do you see that it says "Page Last Revised -
9  January 23, 2024"?
10      A.  Yes.
11      Q.  Okay.  And above that directly there are four
12 bullets, the second of which from the top says "CVAP
13 2018 through 2022, five-year ACS Data - CSV Format."
14 Do you see that?
15      A.  Yes.
16      Q.  Okay.  So the 2018 to 2022 ACS data with CVAP
17 was available January 23, 2024, on the Census Bureau's
18 website; is that right?
19      A.  That's what this page seems to represent that
20 is -- again, I mentioned that I wasn't confident in my
21 memory.  I don't think -- yeah, the --
22      Q.  That's fine.  It's not a memory test.
23      A.  -- that's what this appears to represent.
24      Q.  Okay.  And then, so the data wasn't
25 disaggregated by RDH until June of 2024, about five

151

1  months later.
2            So did you make any attempt to disaggregate
3  this CVAP data published directly by the ACS between
4  its publication date on January 23rd and the date that
5  your expert report was due on May 31, 2024?
6       A.  I did not.
7       Q.  Do you know how to?
8       A.  Yes.
9       Q.  Okay.  And are you aware that Dr. Collingwood
10 was using disaggregated ACS data in other cases in
11 March of 2024?
12           MS. THEODORE:  Objection to form.
13           THE WITNESS:  And I apologize, but -- I
14 answered your previous question yes.  I would like to
15 qualify that, I am aware of a methodology for doing so,
16 or I guess technically two methodologies for doing so.
17 So I can -- I have, yes.  I'll leave it at that.
18           And then I'm sorry.  You asked another
19 question about whether I was aware of Dr. Collingwood
20 having used disaggregated data.  Could you repeat that
21 question.
22 BY MS. RIGGINS:
23      Q.  Sure.  Let's just move on.
24           Did you ever -- in any of the cases that you
25 were a testifying expert in that we talked about

152

38  (Pages 149 to 152)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 39 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    earlier, did you ever disaggregate ACS data yourself?

2        A.  Not in the Georgia case.  I might have going

3    back to the municipal annexation cases.

4        Q.  Those weren't redistricting cases, were they?

5        A.  They were not.

6        Q.  Okay.  All right.  So turning back to

7    paragraph 4 in your August report, which is on page 2,

8    you indicate that you updated the black CVAP

9    percentages in your Demonstration Districts B and D;

10   is that right?

11       A.  I'm just parsing this carefully because I

12   want to make sure I'm answering your question

13   carefully.

14           The text in this paragraph is talking about

15   calculations using the more recent tabulation.

16       Q.  Okay.  So to answer my question, you

17   retabulated the percentage of black CVAP using the new

18   updated 2018 to 2022 ACS estimates; is that right?

19       A.  That's right.

20       Q.  Okay.

21       A.  I didn't -- your previous question seemed to

22   ask if I specifically state that in paragraph 4, so --

23       Q.  And you state in paragraph 4 that "For both

24   Demonstration Districts B and D, the black CVAP

25   percentages were lower using the 2022 tabulation data";

153

1    the requirement of being a 50 percent or more black

2    citizen voting age population that you state was one of

3    your goals; correct?

4        A.  That's correct.

5        Q.  And in exchange, it looks like you now

6    present an additional Demonstration District E with a

7    black CVAP above 50 percent using the 2022 tabulation;

8    is that right?

9        A.  I don't agree with the first part of your

10   question.

11       Q.  You present now in that you present an

12   additional district?

13       A.  Yes.  You said "in exchange."

14       Q.  Okay.

15       A.  I agree that I present an additional

16   district.

17       Q.  Okay.  And you could have drawn this

18   Demonstration District E at any point after the release

19   of the 2022 ACS data in January; is that right?

20       A.  I don't agree with that characterization.

21       Q.  The 2018 to 2022 ACS data was released in

22   January of 2024; is that right, Mr. Esselstyn?

23       A.  That is what the most recent exhibit that

24   you've shown appears to present.

25       Q.  Okay.  And do you have any reason to believe

155

1    correct?

2        A.  Yes.

3        Q.  Okay.  And, in fact, in the case of

4    Demonstration District B, the black CVAP percentage

5    fell below 50 percent using the five five-year 2022

6    estimates; is that right?

7        A.  The black CVAP percentage for District B,

8    correct.

9        Q.  Is it your intention to still offer to the

10   Court Demonstration District B as an alternative

11   district even though it does not meet the 50 percent

12   threshold under either a black CVAP or a black voting

13   age population?

14           MS. THEODORE:  Objection to form.

15           THE WITNESS:  I believe I state in the report

16   that it is no -- it's not a majority black CVAP

17   district according to the more recent CVAP tabulation.

18   BY MS. RIGGINS:

19       Q.  So are you withdrawing it as a demonstration

20   district moving forward?

21           MS. THEODORE:  Objection to form.

22           THE WITNESS:  I don't state anything in my

23   report to indicate that.

24   BY MS. RIGGINS:

25       Q.  But Demonstration District B no longer meets

154

1    that I cannot accurately print out something from the

2    Census Bureau's website?

3            MS. THEODORE:  Objection to form.

4            THE WITNESS:  We haven't known each other

5    very long.  I don't know how to answer that question.

6            MS. RIGGINS:  Can we go off the record?

7            (Off the record 2:20 p.m. to 2:22 p.m.)

8    BY MS. RIGGINS:

9        Q.  Mr. Esselstyn, do you have any reason to

10   believe that Exhibit 3 as it was transmitted through

11   the chat is not a true and accurate printout from the

12   Census website?

13       A.  No.

14       Q.  Okay.  And that printout shows the ACS 2018

15   to 2022 data was published in January of 2024; is that

16   right?

17       A.  It appears to.

18       Q.  Okay.  And so if you presented an additional

19   Demonstration District E using the 2022 -- 2018 to 2022

20   ACS data, you could have done that at any time after it

21   was published; is that right?

22       A.  I don't think that's right.

23       Q.  Is it because you needed the RDH

24   disaggregation to draw your demonstrative districts?

25       A.  Correct.

156

39  (Pages 153 to 156)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 40 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

Q. Okay.

A. I feel that the RDH disaggregation is the most recognized source for doing that and has a robust, recognized methodology.

Q. Okay. All right. So I'd like to look at page 6 of your rebuttal report, please.

And it might be easiest if you take out pages 6 and 7 of your rebuttal report because I'm going to ask you to compare to the 2016 to 2020 data that's present in your initial report.

If we go to page 15 of your May report, I'm looking at Table 3, the black reported CVAP decrease using the new 2018 to 2022 data. I'm comparing Table 3 to -- in your original report to Table 3-A in your rebuttal report.

A. Yes.

Q. And let's turn to page 19 in your May report and page 7 in your August report.

So we've already talked about Demonstration District B. The BVAP there lowered below 50 percent -- the CVAP, I'm sorry -- lowered below 50 percent; is that right?

A. Black CVAP?

Q. Yes. Okay. And then Table 6-A, can we compare that to the -- to Table 6 on page 21 of your

157

August report?

A. Yes.

Q. Did the black CVAP lower here as well using the 2022 data?

A. Yes, the percentage is lower.

Q. Okay.

MS. THEODORE: You mean Table 6 of the May report, not the August report; right?

MS. RIGGINS: Yes. It's Table 6-A, and Table 6 of the May report.

BY MS. RIGGINS:

Q. And then looking at Table 8 in your May report, which is on page 24, and Table 8-A on page 7, did the black CVAP percentage lower there also?

A. 50 -- sorry. The answer is yes.

Q. Let's look at page 10 of your August report, please.

A. Just a moment.

Okay. I'm on page 10.

Q. All right. So that's Figure E, Demonstration Map -- Figure 1, Demonstration Map E; is that right?

A. Yes.

Q. Okay. How did you start drawing Demonstration Map E?

A. I think the starting point for this was

158

Demonstration District D, using that as a starting point and then moving from there.

Q. Okay. And in moving from there, you now include all of the portion of Elizabeth City located within Pasquotank County in Demonstration District E; is that right?

A. All of the populated portion of Elizabeth City.

Q. In Demonstration District E; is that right?

A. Yes. Yes.

Q. Okay. And --

A. Yes. I think what you said -- you limited it to Pasquotank County. I just wanted to clarify that it was not including the portion in Camden County.

Q. It's unhelpful that Elizabeth City is split between two counties.

All right. And the 2022 black CVAP of Demonstrative District E is higher than the 2022 black CVAP of Demonstration District D; is that right?

(Reporter clarification.)

BY MS. RIGGINS:

Q. Is the 2022 black CVAP in Demonstrative District E higher than the 2022 black CVAP of Demonstration District B -- I'm sorry -- D?

A. Yes.

159

Q. Okay. Did you make any other changes to Demonstration Map E from Demonstration Map D other than including all of Elizabeth City located in Pasquotank County in Demonstration District E?

A. Yes.

Q. What other changes did you make between Demonstration Districts D and E?

A. There is a VTD -- in fact, you may remember we spoke about this specific VTD earlier today -- that is included in its entirety in Demonstration -- Demonstration District E that was not in Demonstration District D.

It's -- of the three we discussed in southern Pasquotank County, it's the northern one of those three. So that is included, and parts of that are not within the Elizabeth City incorporated area. They're not -- it's not Elizabeth City corporate limits.

And then on the northern and eastern side of the city, there are changes made that were in addition to the inclusion of the Elizabeth City population, basically. Yeah.

Q. So now it looks like Demonstration District E, there's a small portion northeast-ish of the district line with Elizabeth City on the border with Camden that is now not included in District E,

160

40 (Pages 157 to 160)

Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 41 of 96
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    whereas that portion of the district it looked like
2    followed the county line in Demonstration District D;
3    is that right?
4         A.   I think that's a fair characterization, yes.
5         Q.   All right.  And you report compactness
6    scores for Demonstration District E; is that right?  On
7    the next page?
8         A.   I see them on page 10, which is the page that
9    I was on, so yeah.
10        Q.   And they're also on page 11 compared to the
11   enacted district?
12        A.   Oh, okay.  The comparison, yes, I see.  I was
13   just looking at the last two columns in Table 9, which
14   are compactness scores, but yes, there's -- yes.
15        Q.   And is District -- do you know if District E
16   is more or less compact than District D?
17        A.   I've still got Table 8-A in front of me, and
18   the orientation is pivoted, so I just want to make sure
19   I'm looking at this correctly.
20             The scores are the same for Demonstration
21   District D and Demonstration District E.
22        Q.   And you calculated the split VTDs in the same
23   manner that we talked about earlier when we talked
24   about your Attachment J; is that right?
25             MS. THEODORE:  Objection to form.

161

1         A.   I am not aware of any alternative source that
2    is considered to have the same level of reliability
3    and, you know, having the imprimatur of the Census
4    Bureau.  As I said, I am -- I'm not aware of any
5    alternative dataset that is commonly used and relied
6    upon in these types of cases or this type of analysis.
7         Q.   You also drew demonstration districts to
8    satisfy Gingles 1 in the Raffensperger case in Georgia
9    earlier this decade; is that right?
10        A.   That's right.
11        Q.   Okay.  Did you use ACS data in any of those
12   reports?
13        A.   No.
14        Q.   Why not?
15        A.   There was not any -- I was not asked to
16   generate any analysis of CVAP numbers.
17        Q.   Okay.  Would you agree with me that in both
18   the Raffensperger case and in this case, you're drawing
19   demonstrative districts in an attempt to satisfy the
20   Gingles 1 requirement?
21        A.   In an attempt to satisfy the Gingles 1
22   requirement.  I would say that I am -- yes, the
23   demonstration districts were drawn in order to show
24   that districts meeting the Gingles 1 precondition can
25   be drawn.

163

1             THE WITNESS:  I would say that I generated
2    the statistics for split VTDs using Maptitude similar
3    to the way that I did for the -- yes, in the May
4    report.
5    BY MS. RIGGINS:
6         Q.   Okay.  So I'd like to turn back to page 4 for
7    a minute, if we can, of your August report,
8    paragraph 7.
9         A.   I'm there.
10        Q.   And in paragraph 7, you state that "The
11   American Community Survey five-year estimates are
12   considered the authoritative source for analysis like
13   mine looking at race and/or ethnicities as well as
14   citizenship"; is that right?
15        A.   That's right.
16        Q.   Okay.  And then you say "These data don't
17   offer the same level of granularity or precision as the
18   data from the decennial census, which offers no
19   citizenship information, but they are considered the
20   best available for this purpose and are widely used";
21   is that right?
22        A.   That's right.
23        Q.   Okay.  So why do you say that the ACS
24   five-year estimates are best available and widely used
25   for this purpose?

162

1         Q.   Okay.  And in your August report, are you
2    representing that the ACS five-year estimates are the
3    best available for the purpose of offering
4    demonstrative districts in support of Gingles 1 --
5             MS. THEODORE:  Objection to form.
6    BY MS. RIGGINS:
7         Q.   -- used?
8             MS. THEODORE:  Sorry.  Sorry to interrupt.
9             Objection to form and to the extent it calls
10   for a legal conclusion.
11            THE WITNESS:  Could you repeat your question,
12   please.
13   BY MS. RIGGINS:
14        Q.   I'll rephrase.
15             So you state here in paragraph 7 that "The
16   American Community five-year estimates are considered
17   the best available for this purpose."
18             And we talked -- isn't that right, in
19   paragraph 7?
20        A.   That sentence talks about this purpose.  The
21   previous sentence refers to the analysis that's looking
22   at both race and citizenship -- race and/or ethnicity
23   as well as citizenship.
24        Q.   Did you look at racial data when you drew
25   demonstrative districts in Georgia?

164

41  (Pages 161 to 164)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 42 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    A.  Yes.

2    Q.  And you looked at the decennial 2020 census

3  data in the Georgia case; is that right?

4    A.  Yes.

5    Q.  You did not --

6    A.  There are many Section 2 cases where CVAP

7  data is used either instead of or in addition to

8  decennial census data.

9    Q.  Have you been a testifying expert in any of

10  those cases?

11    A.  The only one that I think I could answer yes

12  to is this one.  I haven't testified yet, but I'm

13  prepared to be a testifying expert, and maybe what I'm

14  doing now is considered testimony.

15       Other than this case, I have not been a

16  testifying expert in a redistricting case that used

17  CVAP data.

18    Q.  And the only other Section 2 case that you've

19  been a testifying expert in was in the Raffensperger

20  case; right?

21    A.  That's right.

22    Q.  And so the only other Section 2 case that

23  you've been a testifying expert in, you declined to use

24  the American Community Survey five-year estimates; is

25  that right?

165

---

1       MS. THEODORE:  Objection to form.

2       THE WITNESS:  I was not directed to provide

3  CVAP numbers.

4  BY MS. RIGGINS:

5    Q.  Were you directed to provide CVAP numbers

6  here by anyone?

7    A.  Yes.

8    Q.  Did you in Georgia when you testified in the

9  Raffensperger opinion of your own accord say I want to

10  use ACS data because it's the best available for this

11  purpose?

12       MS. THEODORE:  Objection to form.

13       THE WITNESS:  Again, I'm going to -- there's

14  that sentence that says "the best available for this

15  purpose," and I think "this purpose" is representing --

16  referring back to the previous sentence which talks

17  about analysis looking at race and ethnicity as well as

18  citizenship.

19       And in the Raffensperger case, the

20  citizenship piece was not something I was asked to

21  examine.  Had I been asked to examine citizenship and

22  percentages in the citizen voting age population, this

23  is the data I would have used.

24  BY MS. RIGGINS:

25    Q.  Do you have any understanding of why you were

166

---

1  asked to use citizen voting age population here?

2       MS. THEODORE:  Only if you can answer without

3  revealing our conversations.

4       THE WITNESS:  Then I have nothing to say.

5  BY MS. RIGGINS:

6    Q.  Okay.  I think we've talked about this

7  earlier, but the ACS five-year Survey results, these

8  are estimates; is that right, Mr. Esselstyn?

9    A.  Yes.

10    Q.  Okay.  Do you know about how many people the

11  ACS Survey initially contacts every year?

12    A.  Initially contacts?

13    Q.  Mm-hmm.

14    A.  Off the top of my head, no.

15       (Exhibit 4 Marked for Identification.)

16  BY MS. RIGGINS:

17    Q.  I would like to mark Exhibit 4 and transmit

18  through the chat the National Sample Size document,

19  which I will represent to you is a print-to-PDF from

20  the Census website.

21    A.  Okay.  I see it.  Downloading it.  It's

22  downloaded.  I am opening it up.

23       I can see it.

24    Q.  Okay.  And for years 2021 through 2023, it

25  appears that there were approximately 3.5 million

167

---

1  initial addresses selected under the "Housing Units"

2  category; is that right?

3    A.  That's right.

4    Q.  Okay.  And for "Group Quarters," it appears

5  there were between 140 and roughly 153,000 people

6  selected; is that right?

7    A.  Roughly.

8    Q.  Okay.  Number of initial addresses selected

9  in 2020 for housing units is lower; is that right?

10    A.  Lower than?

11    Q.  The numbers for 2021 through 2023?

12    A.  Yes.

13    Q.  Okay.  It's roughly 2.87 million; is that

14  right?

15    A.  Yes.

16    Q.  Okay.  And it looks like in 2020,

17  approximately 1.4 million final interviews were

18  conducted, is that right, for the housing units?

19    A.  Yes.

20    Q.  And for 2022, it looks like that number is

21  almost 2 million final interviews conducted for the

22  housing units; is that right?

23    A.  Yes.

24    Q.  Okay.  And do you see for the "Group Quarter"

25  section of the chart, you've got three columns,

168

---

42  (Pages 165 to 168)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 43 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  "Initial Sample Selected, Final Actual Interviews" and
2  then something called "Final Synthetic Interviews."
3      Do you see that?
4      A.  Yes.
5      Q.  Do you know what a "final synthetic
6  interview" is?
7      A.  I've seen the term before, and off the top of
8  my head I'm not remembering at this moment, but there's
9  a note there that I could look at.
10     Q.  Sure.  And if you look at -- it's the first
11 note at the bottom, the second sentence, it says
12 "Synthetic interviews were created by imputing the
13 characteristics of interviewed group quarters persons
14 into group quarters facilities that were not in the
15 sample that year or period"; is that right?
16     A.  That's what that sentence says, yes.
17     Q.  Okay.  So the synthetic interviews were not
18 interviews conducted in that period of actual
19 individuals; is that right?
20     A.  Could you restate the question -- sorry, not
21 restate.  Just repeat.
22     Q.  Sure.  So the synthetic interviews are not
23 interviews with actual people; is that right?
24     A.  I think -- I think that is accurate.
25     Q.  And let's just use 2022 as an example.  So

169

1  that roughly 3.5 million initial addresses selected
2  number for 2022, do you know about how many addresses
3  were selected for North Carolina?
4      A.  I don't.
5      (Exhibit 5 Marked for Identification.)
6  BY MS. RIGGINS:
7      Q.  Okay.  Let's transmit what I'd like to mark
8  as Exhibit 5 through the chat, and I'll represent to
9  you, Mr. Esselstyn, that these are the ACS -- nope,
10 that's not the sample.
11     I want to represent to you something that I
12 don't know what it is.
13     Okay.  The sample is not -- should be the one
14 that just transmitted, the North Carolina sample size.
15     A.  Okay.  Should I download the other one too?
16 Okay.
17     Q.  We'll get to it probably in a little bit.  If
18 it'll cause you confusion, feel free to delete it.  I
19 just deleted it out of the chat.
20     A.  Okay.  No, I've already got it and I don't
21 think it's going to cause me any confusion.
22     Okay.  I'm looking at the one called
23 "North Carolina Sample Size."
24     Q.  Okay.  And so for the year 2022, do you see
25 that roughly 110,000 initial addresses were selected?

170

1      A.  Yes.
2      Q.  And of that, around half of that number,
3  about 60,000 had final interviews conducted; is that
4  right?
5      A.  I wouldn't call that about half, but around
6  61,000.  Sure.
7      Q.  Okay.  Do you know approximately how many
8  people there were in North Carolina according to the
9  2020 decennial census?
10     A.  Approximately, yes.
11     Q.  How many?
12     A.  10 million.
13     Q.  Are you aware of any ACS source that
14 publishes data for initial addresses selected at a
15 smaller level than statewide, like by county?
16     A.  Could you repeat the question, please.
17     Q.  Sure.  Are you aware of any ACS data that
18 reports the addresses or individuals selected for
19 survey based on the county they live in?
20     A.  I am not aware of such a publication or
21 dataset, but that's -- yeah.  I'm not aware of what you
22 describe.
23     Q.  So would you agree with me that we don't know
24 how many people the ACS might have surveyed in Bertie
25 County in 2022?

171

1      A.  What do you mean by "we"?
2      Q.  Sitting here today, you and I do not know
3  that?
4      A.  I can say that I don't know that.
5      Q.  Okay.  Are you aware of any ACS publication
6  that would show the number of houses or individuals
7  surveyed in Bertie County in 2022?
8      A.  I am not aware of such a publication.
9      Q.  Okay.  Nationally, do you know what the U.S.
10 response rates are to the ACS survey?
11     A.  Not off the top of my head.
12     (Exhibit 6 Marked for Identification.)
13 BY MS. RIGGINS:
14     Q.  Okay.  We'll transmit what we'll mark as
15 Exhibit 6 through the chat, and these are the U.S.
16 response rates according to the Census website.
17     Let me know when you can see that,
18 Mr. Esselstyn.
19     A.  I am downloading it.
20     And I have it open.
21     Q.  And so in 2022, the response rate was 84.4;
22 is that right?
23     A.  Yes.
24     Q.  For the --
25     A.  Yes.

172

43 (Pages 169 to 172)
Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 44 of 96
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    Q.  For the housing units?

2    A.  Yes.

3    Q.  Okay.  And that's fairly consistent with the

4  response rate for 2021 and 2023, isn't it?

5    A.  Fairly consistent, yes.

6    Q.  Okay.  What was the response rate in 2020

7  according to this document?

8    A.  71.2.

9    Q.  And before 2019 -- so from 2020, which is the

10  first year there's data, through 2018 the response

11  rates appear to be the majority of the time above

12  90 percent; is that right?

13    A.  I was a little confused.  I thought you were

14  saying that 2020 was the first year there was data, but

15  I think I understand what you're asking.

16    Q.  Yeah.  So for the years --

17    A.  In the years prior to 2019, it does appear

18  that response rates were typically, though not

19  universally, above 90 percent.

20    Q.  But since 2019, the response rates have been

21  below 90 percent; is that right?

22    A.  Since 2019, yes.

23    Q.  Do you have any reason to believe that

24  North Carolina's response rates are materially

25  different than the national averages?

173

1    A.  Sitting here now, I don't have reason to say

2  they would be similar or dissimilar.

3    Q.  Okay.  Well, we can show you the

4  North Carolina-specific response rates, which is --

5  we're transmitting it through the chat again, but

6  that's what you had earlier.  It might be easier to

7  download it.

8    A.  This is "ACS Response Rates, NC"?

9    Q.  Mm-hmm.

10    A.  Okay.  I have it open.

11    Q.  And the response rates for North Carolina are

12  fairly similar to the national average; is that right?

13  A little bit higher for 2021 and 2022?

14    A.  And 2023, it looks like, but yeah, fairly

15  similar.

16    Q.  And then the North Carolina-specific response

17  rate is 71.6 for 2022; is that right?

18    MS. THEODORE:  Objection.  I think you meant

19  2020.

20  BY MS. RIGGINS:

21    Q.  I'm sorry.  For 2020?

22    A.  The response rate for 2020 in North Carolina

23  appears to be 71.6.

24    Q.  Okay.  Do you know how the ACS Survey handles

25  nonresponses to specific ACS Survey questions?

174

1    A.  It's something that I read about and have

2  been aware of, but I can't remember enough of that as I

3  sit here to formulate an answer.

4    Q.  Does the term "item allocation" or "item

5  assignment" sound familiar to you?

6    A.  It does ring a bell.

7    (Exhibit 7 Marked for Identification.)

8  BY MS. RIGGINS:

9    Q.  Let's go ahead and transmit what I'd like

10  marked as Exhibit 7 through the chat.

11    And I'll represent to you, Mr. Esselstyn,

12  that while you're getting this open, this is a printout

13  from the Census website called -- the section is called

14  "Item Allocation Rates Definitions"?

15    A.  Okay.

16    Okay.  I have it in front of me.

17    Q.  Okay.  And do you see at the top bolded

18  bullet, we'll call it, Number 1 says "What is item

19  nonresponse?"

20    A.  Yes.

21    Q.  Okay.  And do you see that the ACS considers

22  failing to provide an answer to a question as an item

23  nonresponse?

24    A.  Yes.

25    Q.  Okay.  And in the last sentence of that

175

1  bullet, "The ACS also considers invalid answers as item

2  nonresponse."  Do you see that?

3    A.  I do.

4    Q.  Do you have an idea as to what an invalid

5  answer is?

6    A.  I think so.

7    Q.  What do you think an invalid answer is?

8    A.  Something where the answer that was provided

9  is not within the domain of appropriate responses for

10  the question or item.  So, for example -- well, that's

11  the sort of general description I would give.

12    Q.  So maybe if someone answered the race

13  question as "Female," that would be an example of an

14  invalid answer?

15    A.  Okay.

16    Q.  Would you agree with me that that would be an

17  example of an invalid answer?

18    A.  When you say "the race question" --

19    Q.  If there's a question that asks "What is your

20  race?" and someone wrote "Female," would you consider

21  that to be an invalid answer?

22    A.  I know there's an "Other" category for race.

23  I honestly -- it's not a standard answer.  I don't -- I

24  can't say for sure whether that would be considered

25  invalid or just in that instance would be classified as

176

44  (Pages 173 to 176)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 45 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    "Other."

2        I know people put "Human." I am aware of

3    folks who write in "Human" in order to say that they're

4    human race. I don't know if that's considered -- I

5    honestly don't know if that's classified as invalid or

6    just "Other."

7        So your particular example, I'm not sure.

8        Q.   And then Bullet 2 on this page says "How does

9    the ACS correct for item nonresponse?"

10       Do you see that?

11       A.   Yes.

12       Q.   Okay. And it looks like there are two

13   imputation methods, assignment and allocation; is that

14   right?

15       A.   Yes.

16       Q.   Okay. And for assignment, it appears that

17   the ACS fills in the appropriate -- what they deem to

18   be the appropriate response based on implications

19   created in response to the same survey; is that right?

20       A.   I'm sorry. I'm struggling to read this at

21   the same time as listening to your question, so why

22   don't I --

23       Q.   Why don't you read this and let me know when

24   you're done, just Bullet 2.

25       A.   All of Bullet 2?

177

1        Q.   Yes.

2        A.   Okay.

3        Q.   Okay. So for assignment, would you agree

4    that the ACS is implying what the missing response

5    should be based on responses to other questions within

6    the same survey?

7        A.   I wouldn't use the word "implying." It says

8    that one response can imply the value for a response.

9    I don't think that the Census Bureau is implying data.

10       Q.   What's the difference between "implying" and

11   "imputing," in your expert opinion?

12       A.   I would say implying is when one value

13   suggests an appropriate value for another question. So

14   that's -- the value is suggesting or presenting a

15   certain appropriate value for another question.

16       Imputation is the actual generation or

17   insertion of data according to the implication that I

18   just described.

19       Q.   Okay. And is that what it appears the ACS is

20   doing with the assignment method? They're imputing a

21   response to questions that are left blank that's

22   implied by the value of another question?

23       A.   Either left blank or an invalid answer was

24   provided. I think that is a fair characterization.

25       Q.   Okay. Do you know if the ACS publishes any

178

1    data on the number of questions that they assign

2    answers to based on the assignment portion of

3    nonresponse?

4        A.   Sitting here, no, I can't say whether they do

5    or they don't.

6        Q.   Have you ever seen any data on how many

7    answers in an ACS Survey are assigned through the

8    assignment process?

9        A.   I don't recall.

10       Q.   And the second way that the ACS corrects for

11   item nonresponse is allocation; is that right?

12       A.   That's what this document is indicating.

13       Q.   Okay. And that's where, in colloquial terms,

14   the ACS uses statistics to fill in missing responses

15   using the data gathered by the next-nearest neighbor;

16   is that right?

17       A.   This document references nearest neighbor

18   matrices, and I think that's different than necessarily

19   going to a -- the specific nearest neighbor. My

20   understanding is that nearest neighbor matrices would

21   include multiple neighbors.

22       Q.   Okay. So in allocation, the ACS is filling

23   in blank answers using data from either individuals

24   within the same household or from the nearest neighbor

25   matrices; is that right?

179

1        A.   I think that's a fair characterization, yes.

2        Q.   Do you know if the ACS publishes any item

3    allocation rates?

4        A.   Sitting here now, I can't say with confidence

5    whether they do or they don't.

6        (Exhibit 8 Marked for Identification.)

7    BY MS. RIGGINS:

8        Q.   And we'll go ahead and transmit through the

9    chat, and I'd like to mark this as Exhibit 8, the ACS

10   Item Allocation Rate.

11       This is a printout for item allocation rates

12   for the years 2018 through 2023 nationwide published on

13   the Census website.

14       Let me know when you have that open.

15       A.   Okay. I have it open.

16       Q.   Okay. And so unfortunately -- I didn't want

17   to manipulate any of the printouts, but the column

18   headers are contained on the first page, so that's

19   "Item," and then there are five years in descending

20   order in the next five columns from 2023 down to -- on

21   the left-hand side to 2019 on the right-hand side.

22       Do you see that?

23       A.   Yes.

24       Q.   Okay. And then on the next page, page 2, the

25   category -- the top category "Overall housing

180

45 (Pages 177 to 180)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 46 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    allocation rate," and it ranges from 5 percent in 2022,
2    which would be the second numbered column, to
3    4.7 percent in 2019.
4        Do you see that?
5        A. Yep.
6        Q. And just for the record, I'm not asking you
7    about 2023 because I know you didn't have that data
8    available to you, so I don't think that's fair game.
9        All right. And then the overall person
10   allocation rate for 2022 ranges from 13.4 percent in
11   2022 to 10.6 percent in 2019; is that right?
12       A. Well, there's a higher value than 13.4. So
13   it's not -- when you say it ranges from 13.4 to 10.6,
14   there's a value that is outside that range.
15       Q. Okay. And so in 2021, it is 13.5 percent;
16   is that right? It's higher?
17       A. That's right.
18       Q. Okay. Let's look at page 4 of this document.
19   Do you see the bold header --
20       A. I'm sorry. Hang on one second.
21       Okay. Yes, I think I'm looking at page 4.
22       Q. Okay. Do you see middle-ish part of the page
23   a bold header called "Population Basic Demographics"?
24       A. I do.
25       Q. Okay. And the first row underneath is "Race,

                                                      181

1    total population." Do you see that?
2        A. Yes.
3        Q. Okay. And the imputation rates there -- I'm
4    sorry -- the allocation rates there range from
5    1.4 percent in 2021 all the way to 1.7 percent in 2019;
6    is that right?
7        A. Again, there's a value that's outside the
8    range that you just described. You said the range was
9    from 1.4 to 1.7, but --
10       Q. It's 1.2 in 2020; is that right?
11       A. Yes. I think so.
12       Q. Then down close to the bottom quarter of the
13   page, do you see another bolded row that says
14   "Population: Origin and Language"?
15       A. I do.
16       Q. And do you see the second row under that
17   header is "Citizenship, total population"?
18       A. I do.
19       Q. Okay. Do you see that the allocation rate
20   for 2022 was 9.8 percent?
21       A. Yes.
22       Q. Okay. It was 10.1 percent in 2021?
23       A. Yes.
24       Q. And it was 9.4 percent in 2020?
25       A. Yes.

                                                      182

1        Q. And it was 7.4 percent in 2019; is that
2    right?
3        A. Yes.
4        Q. Okay. And the "Year of naturalization" and
5    "Year of entry" questions in the rows below, those are
6    fairly high allocation rates in the grand scheme of
7    things? It's over a quarter of -- or approximately a
8    quarter of the responses; is that right?
9            MS. THEODORE: Objection to form.
10           THE WITNESS: To say "high" implies a
11   comparison, and I'm not sure what it's being compared
12   to --
13   BY MS. RIGGINS:
14       Q. Sure.
15       A. -- but they are in the neighborhood of
16   25 percent for year of naturalization, and a little
17   lower than that for year of entry.
18   BY MS. RIGGINS:
19       Q. Okay. I think that -- actually, let's look
20   at the very -- next-to-last page, and I almost said
21   very last, but next-to-last page of this exhibit.
22           There's an endnote labeled 3 here on page 7.
23       A. I see it.
24       Q. Okay. And it says "The effects of the
25   pandemic on ACS activities in 2020 impacted the

                                                      183

1    allocation rates"; is that right?
2        A. It does say that.
3        Q. Okay. Are you aware that low sample size and
4    low response rates caused other issues with the 2020
5    ACS data?
6            MS. THEODORE: Objection to form.
7            THE WITNESS: I am aware that the conditions
8    in 2020 disrupted the data collection from the ACS, and
9    I believe that had multiple impacts.
10   BY MS. RIGGINS:
11       Q. And we looked earlier at the households that
12   were surveyed, and it was lower for the year 2020;
13   isn't that right?
14       A. Yes.
15       Q. And the response rate was also lower than,
16   say, 2022 for the year 2020; is that right?
17       A. 2020 response rates were indeed lower than
18   2022 response rates.
19       Q. Are you aware that this created data quality
20   issues with the ACS 2020 data?
21           MS. THEODORE: Objection to form.
22           THE WITNESS: Data quality issues. I'm aware
23   that the Census Bureau has presented information saying
24   that the data that was collected and the data that they
25   generated did not meet the same standards as previous

                                                      184

46 (Pages 181 to 184)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 47 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  years.

2       (Exhibit 9 Marked for Identification.)

3  BY MS. RIGGINS:

4       Q.  I would like to transmit through the chat and

5  mark as Exhibit 9 a Census Bureau press release,

6  please.  Let me know when you've got it.

7       A.  Okay.  I have it.  I'm opening it up.

8       Q.  Okay.  Have you ever seen this document

9  before -- or it's a printout of the web page.  Have you

10  ever seen the web page itself before?

11       A.  I have seen a page -- I have memories of

12  seeing a page like this.  I'm not sure if it was this

13  particular press release, but yes, about the decision

14  not to release the one-year estimates.

15       Q.  Okay.  And this was released on July 29,

16  2021; is that right?

17       A.  It appears to be, yes.

18       Q.  In the first sentence of the second paragraph

19  here, it says "The standard 2020 ACS one-year estimates

20  do not meet the Census Bureau's statistical data

21  quality standards."

22            Do you see that?

23       A.  Yes.

24       Q.  Okay.  And then on the next page -- and it's

25  hard to tell because of the way this is formatted.

185

1  There's not a lot of paragraph indentions.

2            I think this is the first full paragraph on

3  the second page.  Do you see the second sentence that

4  says "As a result, the ACS collected only two-thirds of

5  the responses it usually collects in a survey year" for

6  2020?

7       A.  I see that sentence.

8       Q.  Okay.  Do you have any reason to doubt that

9  the ACS only collected two-thirds of the responses it

10  usually collected for the survey year 2020?

11       A.  I don't have a reason to challenge what's

12  reported here, this sentence that you pointed out.

13       Q.  And the second part of that sentence reads

14  "And the people who did respond to the survey had

15  significantly different social, economic, and housing

16  characteristics from those who did not."

17            And then it says "This is called 'nonresponse

18  bias.'"

19            Do you see that?

20       A.  Mm-hmm.

21       Q.  Do you have any reason to doubt these

22  conclusions by the Census?

23       A.  I think it's interesting wording.  "People

24  who did respond had significantly...social, economic

25  and housing characteristics from those who did not."

186

1       Q.  Your question was do I have any reason to

2  challenge that assertion?

3       Q.  It's the conclusions reached by the Census

4  here?

5       A.  Yeah.  I don't have a reason to challenge

6  that conclusion.

7       Q.  And then not the next paragraph, but the

8  paragraph after that that starts "The Census Bureau is

9  committed to providing," do you see that?

10       A.  Yes.

11       Q.  And in this paragraph, does it quote Census

12  Bureau Acting Director Ron Jarmin as saying that "The

13  one-year estimates for the '20 ACS don't meet our

14  standards, so we can't release them"?

15       A.  The 2020 ACS.  I see that.

16       Q.  Okay.  So let's go to the last page of this

17  exhibit, please.

18       A.  Okay.

19       Q.  And it says the "2016 to 2020 ACS five-year

20  Estimates."  There's a bold header there.  Do you see

21  that?

22       A.  Yes.

23       Q.  All right.  And it says that "The Census

24  Bureau is still reviewing the quality of the 2016 to

25  2020 ACS five-year estimates against our statistical

187

1  quality standards and tentatively plans to release them

2  in December.  More details to be announced this fall."

3            Did I read that correctly?

4       A.  I think so.

5       Q.  And you used the 2016 to 2020 ACS five-year

6  estimates in your May report; is that right?

7       A.  That's right.

8       Q.  Okay.  So the Census did, in fact, release

9  them?

10       A.  I'm sorry?

11            MS. RIGGINS:  Can we go off the record for a

12  minute.

13            (Technical interruption.)

14            (Discussion off the record.)

15  BY MS. RIGGINS:

16       Q.  All right.  I would like -- well, let me ask

17  you this:  Mr. Esselstyn, are you aware of when the ACS

18  released the 2016 to 2020 five-year estimates if it

19  came with any warnings from the Census?

20       A.  I do believe it came with statements that

21  indicated that there had been these issues in 2020 like

22  we've been looking at.  I remember seeing a document

23  talking about that, or rather --

24       Q.  I'm going -- go ahead.

25       A.  I said a document.  I think it was a web page

188

47  (Pages 185 to 188)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 48 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    probably.
2         (Exhibit 10 Marked for Identification.)
3    BY MS. RIGGINS:
4         Q.  Okay.  I'd like to transmit through the chat
5    a PDF printout of one of the Census's web pages, and I
6    will mark this as Exhibit 10.  Thank you.
7         Let me know, Mr. Esselstyn, when you've got
8    this up.
9         A.  I am looking at this document.
10        Q.  And it's called -- or at least the bold text
11   at the top is "Increased Margins of Error in the
12   five-year Estimates containing Data Collected in 2020";
13   is that right?
14        A.  Yes.
15        Q.  I'll tell you what.  I'll give you a
16   minute -- it's a pretty short little article.  I'll
17   give you a minute to read this, and then I'm going to
18   ask you if you've ever seen it before.
19        A.  I believe I have seen this before, yes.
20        Q.  Okay.  On the bottom of the first page, the
21   last full sentence, do you see that it says "For each
22   estimate, the median census tract-level CV is
23   calculated and compared to the benchmark of 0.30"?
24        Do you see that?
25        A.  I do.

                                                          189

1         Q.  Do you know what "CV" stands for in this
2    instance?
3         A.  I believe it's the coefficient of variation.
4         Q.  And is that usually reported as a decimal or
5    a percentage?
6         A.  I think a decimal.
7         Q.  Okay.  But .3 is 30 percent; is that right?
8         A.  The coefficient of variation, I'm not --
9    sitting here right now, I don't know that it's
10   appropriate to also say that that's a percentage.
11        (Exhibit 11 Marked for Identification.)
12        MS. RIGGINS:  Jordan, can you transmit the
13   glossary definitions for the ACS through the chat.
14   BY MS. RIGGINS:
15        Q.  And we can go to page 2 whenever you have
16   this up, Mr. Esselstyn.
17        A.  Okay.  I have it up.
18        Q.  Do you see on page 2 it defines "Coefficient
19   of Variation (CV)," in parentheses?
20        A.  I do.
21        Q.  And CVs are usually expressed in terms of
22   percentages; is that right?
23        A.  That's what this says.
24        Q.  Okay.  And then I would like to mark this as
25   Exhibit 11 for the record.

                                                          190

1         Going back to Exhibit 10, so it says "For
2    each estimate, the median census tract-level CV is
3    calculated and compared to the benchmark of .30."
4         So is that 30 percent?
5         A.  A decimal value of .30 corresponds to
6    30 percent.
7         Q.  So the answer to my question is yes?
8         A.  I believe so, yes.
9         Q.  Turning to page 2 of Exhibit 10, the first
10   sentence of the first full paragraph says "In a typical
11   year, 12 to 13 of the 17 key estimates passed the
12   threshold and the quality standard is met"; is that
13   right?
14        A.  Yes.
15        Q.  Okay.  So do you know what 12 divided by 17
16   is roughly?
17        A.  Roughly 70 percent.
18        Q.  Yeah.  And that makes sense, because if the
19   threshold that we just talked about on the previous
20   page was 30 percent, the mirror would be 70 percent; is
21   that right?
22        A.  I'm not sure I agree that 12 out of
23   17 percentage is -- you said the mirror of the
24   30 percent?
25        Q.  Right.  So let me ask it this way:  So "In a

                                                          191

1    typical year, 12 to 13 of the 17 key estimates," that's
2    about 70 percent.
3         So could you put this sentence another way to
4    say "In a typical year, approximately 70 percent of the
5    17 key estimates passed the threshold and the quality
6    standard is met"?
7         A.  Well, 13 out of 17 is significantly higher,
8    but approximately, I mean, something in the 70 to
9    75 percent range.
10        Q.  Okay.  Perfect.  Then the next sentence,
11   "However, in 2020, the ACS faced numerous data
12   collection challenges as the result of the 2020
13   COVID-19 pandemic"; is that right?
14        A.  That's part of the sentence, yes.
15        Q.  So then it goes on to reference a blog post;
16   is that right?
17        A.  Yes.
18        Q.  All right.  And then going down towards the
19   end of this paragraph, do you see it says "This reduced
20   the number of interviews in the 2020 portion of the
21   2016 to 2020 five-year estimates caused an increase in
22   the CVs by approximately 15 to 20 percent in relative
23   terms."
24        A.  I see that.
25        Q.  Okay.  And then the next sentence, "We would

                                                          192

                                        48  (Pages 189 to 192)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 49 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  expect to see similar relative increases in the
2  published margins of error as well"?
3      A.  I see that.
4      Q.  Okay.  And then they go on to conclude that
5  because of those, "As a result, 18" -- or I'm sorry --
6  "8 of the 17 key estimates passed the threshold"; is
7  that right?
8              (Technical interruption.)
9          (Off the record 3:28 p.m. to 3:39 p.m.)
10  BY MS. RIGGINS:
11      Q.  Back on the record.  We've had a technical
12  glitch.  I'm going to repeat a couple of my questions,
13  Mr. Esselstyn, just to make sure the record is clear.
14      A.  I understand.
15      Q.  Okay.  So we're looking at the second page of
16  Exhibit 10.
17          In the second full paragraph where it says
18  "As a result, only 8 of the 17 key estimates passed the
19  threshold, with 9 of the 17 estimates having a median
20  tract-level CV that exceeded .3," or 30 percent; is
21  that right?
22      A.  That's what it says.
23      Q.  Okay.  And then the article goes on to note
24  that "Most of these 'new' estimates that have failed
25  previously had failed in the range of .25 to .30," but

193

1  this year the range was .30 to .35; is that right?
2      A.  I think you put the word "failed" in a place
3  that the sentence that I'm reading does not.  So --
4      Q.  "The 'new' estimates that failed previously
5  had a CV in the range of .25 to .30 and this year fell
6  in the range of .30 to .35"?
7          Do you see that?
8      A.  I see that, yes.
9      Q.  Okay.  And so 9 of the 17 estimates failed in
10  2020; is that right?
11      A.  Nine did not meet that threshold.
12      Q.  And as a result -- and I'm looking at the
13  last sentence of this paragraph -- "The 2016 to 2020
14  ACS five-year data fails the quality standard
15  requirement based on this criterion"; is that right?
16      A.  I see that sentence.
17      Q.  Okay.  And then in the next paragraph, it
18  states that they're going to continue to publish the
19  data under the waiver process; is that right?
20      A.  That's part of the sentence.
21      Q.  Okay.  And then in the very last sentence of
22  this paragraph, it says "While users are always
23  encouraged to make use of the margins of error in their
24  decision making, we further stress to use caution when
25  using estimates with high margin of error"; is that

194

1  right?
2      A.  I see that sentence, yes.
3      Q.  Okay.  Did you take the ACS's encouragement
4  to use caution when using the 2016 to 2020 ACS
5  five-year data?
6          MS. THEODORE:  Objection to form.
7          THE WITNESS:  I would say that I was
8  generally aware of these quality issues with the ACS
9  five-year estimates and that they did not meet the
10  standards of previous five-year estimates.
11  BY MS. RIGGINS:
12      Q.  Did you note that anywhere in your
13  May 2021 -- 2024 or August 2024 reports?
14      A.  The difference that the -- what I just said
15  about how the five-year estimates including 2020 data
16  did not meet the standard of previous five-year
17  estimates, that's what you're asking if I mentioned in
18  my reports?
19      Q.  Yes.
20      A.  I don't think so.
21      Q.  Okay.  Because -- and you kind of got at my
22  next couple of questions.
23          The very last paragraph in this article
24  says -- just a single sentence, "We anticipate similar
25  impacts the margins of error in future five-year

195

1  products that contain the 2020 data."
2          Do you see that?
3      A.  I see that.
4      Q.  Okay.  And so the 2018 to 2022 five-year
5  estimates contain 2020 data; is that right?
6      A.  Yes.
7      Q.  Okay.  And both the 2016 to the 2022 -- both
8  the 2016 to 2020 and the 2018 to 2022 datasets also
9  contain 2021 data where we looked at the allocation
10  rates earlier; is that right?
11          MS. THEODORE:  Objection to form.
12          THE WITNESS:  I don't agree with that
13  statement.
14  BY MS. RIGGINS:
15      Q.  So the -- I'm sorry.  So the 2020 -- the
16  2018 to 2022 data includes 2021 data; is that right?
17      A.  Yes.
18      Q.  And we looked at allocation rates for the
19  years 2019 through 2022 earlier; is that right?
20      A.  Yes.
21      Q.  Okay.
22      A.  Well, those were among the years we looked
23  at.
24      Q.  Okay.  Did you take into account in any way
25  the allocation rates for 2021 data in your report?

196

49  (Pages 193 to 196)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 50 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    MS. THEODORE: Objection to form.
2    THE WITNESS: Did I take into account the
3  allocation rates from 2021 in my report?
4    I -- I would -- I don't think that I can
5  respond affirmatively to that question as you phrased
6  it.
7  BY MS. RIGGINS:
8    Q.  2018, 2019, and 2020 data are present in both
9  the 2016 to '20 five-year estimates and the 2018 to
10 2022 five-year estimates; is that right?
11   A.  I'm sorry.  Could you repeat that.
12   Q.  Data for the years 2018, 2019, and 2020 are
13 present in both the 2016 to 2020 five-year survey and
14 the 2018 to 2022 five-year survey; is that right?
15   A.  I think so, yes.
16   Q.  Okay.  And you were aware at the time you
17 authored your original report in this case in May that
18 there were data quality issues with the 2016 through
19 2020 five-year estimates; is that right?
20   A.  So my original report in this case was not
21 the May report, but I was aware at the time I authored
22 the May report that there had been these issues that
23 I've discussed in previous answers.
24   Q.  And you were also aware in November of 2023,
25 weren't you, Mr. Esselstyn, that this data contained --

197

1  or that this data did not meet the standard -- the data
2  quality standards of the Census; is that right?
3    MS. THEODORE: Objection to form.
4    THE WITNESS: I would word it the way that I
5  had worded in previous responses, that the data did not
6  meet the same standards as -- for these particular
7  datasets as previous five-year surveys.
8  BY MS. RIGGINS:
9    Q.  Let's go back to page 2.  I asked you about
10 this sentence earlier in the center of the page.
11   "Thus, the 2016 to 2020 ACS five-year data
12 fails the quality standard requirement based on this
13 criterion."  Is it your understanding that the
14 five-year ACS surveys for 2016 through 2020 fails the
15 data quality standard from the Census?
16   MS. THEODORE: Objection to form.
17   THE WITNESS: This -- this standard based on
18 this criterion is what's being described in this
19 sentence.  So that's -- to me, it's specifying a
20 certain standard and a certain threshold, but it goes
21 on to talk about the -- that they feel it's an
22 important source of data.
23   And I would note that, as has been mentioned
24 before, the CVAP data from the census data is the go-to
25 dataset for CVAP analysis, so this -- this is still

198

1  considered the best option that's available.
2  BY MS. RIGGINS:
3    Q.  So it's still considered the best option
4  available even with high margins of error?
5    MS. THEODORE: Objection to form.
6    THE WITNESS: I don't agree with the way you
7  characterized it.
8  BY MS. RIGGINS:
9    Q.  Okay.  So the Census characterized this data
10 as having high margins of error in this article.
11   MS. THEODORE: Objection to form.
12   THE WITNESS: High relative to some -- well,
13 it indicates -- let me -- I would say higher margins of
14 error, but saying "high," I don't think that's
15 consistent with my understanding.
16 BY MS. RIGGINS:
17   Q.  Sure.  But this article doesn't say there are
18 "higher margins of error."  It says there are "high
19 margins of error" with this data?
20   MS. THEODORE: Objection to form.
21   THE WITNESS: At the end, it says "We further
22 stress to use caution when using estimates with high
23 margins of error."
24 BY MS. RIGGINS:
25   Q.  Yes.

199

1    A.  I don't read that sentence as necessarily
2  saying -- the margin of error depends on the level of
3  geography, for example, so they're -- again, I don't
4  agree with the way you've characterized it in the
5  question you asked.
6    Q.  Okay.  But you're aware that the Census
7  publicly stated the 2022 data failed to meet Census
8  data quality standards?
9    MS. THEODORE: Objection to form.
10   THE WITNESS: The 2022 data?
11 BY MS. RIGGINS:
12   Q.  Yes -- I'm sorry.  The 2020 data.  We looked
13 at this article earlier.  It has the director publicly
14 stated that it failed to meet Census data quality
15 standards?
16   A.  It says "It fails the quality standard
17 requirement based on this criterion."
18   Q.  And the Census noted that there would be
19 "Similar impacts to the margin of error in future
20 five-year products containing 2020 data"; is that
21 right?
22   A.  It says they anticipated that.
23   Q.  Yes.  And the 2018 to 2020 data -- 2022 data
24 contains 2020 data; right?
25   A.  Yes.

200

50 (Pages 197 to 200)
Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 51 of 96
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    Q. Okay. Did you use any caution when using
2  this data?
3         MS. THEODORE: Objection to form.
4         THE WITNESS: I'd like to think that I am
5  always using caution when I'm doing analysis with data.
6  I'm not a reckless analyst. I strive to be careful and
7  use the data that provides the best -- the most
8  reliable results that I can.
9  BY MS. RIGGINS:
10   Q. And you didn't think it was important for the
11 Court to know that the Census had found the 2020 data
12 to have quality concerns?
13        MS. THEODORE: Objection to form.
14        THE WITNESS: I think I did not include
15 mention of the 2020 challenges in my report, I don't
16 believe. I know, as with so many aspects of society in
17 2020 and during the peak COVID disruption, it was
18 widely reported that the Census Bureau was facing
19 challenges, so I did not include mention of it in my
20 report -- either report.
21 BY MS. RIGGINS:
22   Q. Did you do any robustness checks or anything
23 else on your datasets including 2020 ACS data?
24   A. As I have mentioned multiple times, I
25 corroborated the results that I was getting using two

201

1  pieces of software.
2        And as I have said, I used the -- what's
3  considered the best option available for citizen voting
4  age population data broken down by race and age and
5  what I consider and others consider to be the best
6  option for the disaggregated data, so I think I was
7  using -- proceeding with data quality in mind.
8    Q. You think that proceeding with data quality
9  in mind includes using data that the source has warned
10 has data quality issues, and not including a
11 disclaimer?
12        MS. THEODORE: Objection --
13 BY MS. RIGGINS:
14   Q. I just want to be clear that that's your
15 testimony, Mr. Esselstyn.
16        MS. THEODORE: Objection to form.
17        THE WITNESS: Could you repeat the question,
18 please.
19 BY MS. RIGGINS:
20   Q. Is it your testimony today, Mr. Esselstyn,
21 that you knowingly included 2020 ACS data with data
22 quality issues without a disclaimer in your report?
23        MS. THEODORE: Objection to form.
24        THE WITNESS: It is my testimony that I feel
25 I was using the best data available both for the

202

1  primary source as well as the disaggregated data, and
2  if there's no better alternative -- well, that I was
3  using the most appropriate and highest quality option
4  that I felt was available to me.
5  BY MS. RIGGINS:
6    Q. Could you have used one-year ACS estimates
7  for 2021?
8    A. I don't think -- I don't think so.
9    Q. Why not?
10   A. I don't believe they're available at the
11 block group level, and I am fairly certain that there
12 are no disaggregated datasets based on one-year
13 data. I'm, as I say, fairly certain. Maybe some
14 source is generating them, but I don't think the RDH
15 does.
16   Q. Could you have disaggregated one-year data
17 down to the block level yourself?
18   A. As I said, I don't think it's available at
19 the block group level, so it would mean -- I think I
20 could have done so, but I don't think it would be a
21 recommended practice.
22   Q. Okay. I'd like to turn back to what I think
23 is Exhibit 2, which is your rebuttal.
24   A. Got it.
25   Q. Look at paragraph 31, please.

203

1    A. Can you give me a page number.
2    Q. Page 16.
3    A. Yes. I'm there.
4    Q. Okay. And in paragraph 31 on page 16, you
5  criticize Dr. Trende for reporting the 90 percent error
6  margin estimate as plus or minus 315 citizens, and
7  instead, that the true margin of error for the total
8  CVAP population is plus or minus 13 -- 313; is that
9  right?
10   A. Yes.
11   Q. And is that 313 citizens?
12   A. Yes.
13   Q. Do some of your demonstrative districts split
14 block groups, Mr. Esselstyn?
15   A. I'm sorry. I know I -- this has been a
16 problem before. I -- going back to your previous
17 question, again, I apologize. But you asked if that
18 number, 313, was citizens, but I believe since it's
19 citizen voting age population, it would be adult
20 citizens, yes.
21   Q. Citizens of 18 -- citizens of voting age; is
22 that right?
23   A. Correct.
24   Q. I apologize. I should have caught that.
25 Thank you for the clarification.

204

51 (Pages 201 to 204)

1     All right.  Do any of your demonstrative
2  districts flip block groups, Mr. Esselstyn?
3     A.  Yes.
4     Q.  Okay.  Which demonstrative districts would
5  those be?
6     A.  Demonstrative -- I'm going to focus on
7  primary demonstrative districts.
8     Q.  Yes, please.  I should have limited my
9  question.
10    A.  B, C, D, and E.
11    Q.  Is that all the primary demonstrative
12 districts except for A?
13    A.  Yes.
14    Q.  So how do you allocate the population among a
15 split block group?
16    A.  So the population, the total population is --
17 it's not really an allocation.  You use the population
18 number that's reported for that census block in the
19 decennial census.
20    Q.  Okay.  How do you allocate citizen voting age
21 population amongst split block groups?
22    A.  You say how do I allocate?  My process
23 involved using the disaggregated block level data, so
24 that allocation had already been done in the data that
25 I was using.

205

1     Q.  Okay.  And can you explain to me based on
2  your understanding how Redistricting Data Hub
3  disaggregated the citizen voting age population from
4  the block group reported by the ACS to the block?
5     A.  They counted.
6     Q.  Can you please explain it.
7     A.  Yes, I will, sort of a high-level
8  explanation.  There are a number of steps, but at -- if
9  my high-level explanation isn't sufficient, I trust
10 you'll ask me to go into more detail.
11    Essentially, the process of allocation is
12 done by looking at the block group populations, both
13 the stated citizen voting age population for the block
14 group and the combined black citizen voting age
15 population for the block group.  And then using the
16 proportion of the block group's population that is in
17 each block based on the decennial census -- in other
18 words, looking at the voting age population reported
19 for each block and the specified black voting age
20 population -- there's a specific characterization of
21 the black voting age population for each block that's
22 used.
23    Those numbers taken as a -- again, as a
24 proportion of the total numbers for those figures for
25 the block group are -- that proportion is applied to

206

1  the numbers for the entire block group, and that's how
2  the total CVAP and the black CVAP numbers get allocated
3  to blocks.
4     Q.  Okay.  Is this taking into account that there
5  might be a disproportional share of the black voting
6  age population across the block group?
7     A.  I don't understand your question.
8     Q.  Sure.  So in a given block group, would you
9  agree with me that it's possible that a large
10 proportion of the black voting age population might
11 live in one block versus another block of the block
12 group?
13    A.  Yes.
14    Q.  Okay.  So how does the methodology that you
15 described in the question before last take into account
16 the disproportional black voting age population in the
17 different census blocks?
18    A.  I don't know that I agree with the term
19 "disproportionate," but as I tried to explain earlier,
20 if you're looking at the proportion of a -- the block
21 groups, the black voting age population that resides in
22 that block -- let's say that 40 percent of the black
23 voting age population, again, using the appropriate
24 characterization of black voting age people.
25    If 40 percent of the black voting age

207

1  population of the block group is in that block, then
2  40 percent of the citizen -- black citizen voting age
3  population would be allocated to that block.
4     Q.  And so you know the percentage of black
5  voting age population down to the census block because
6  the Census Bureau reports it in the decennial census --
7  is that right? -- so you can cross-reference?
8     A.  Correct.
9     Q.  So you need the 2020 decennial census data in
10 order to do the disaggregation of the ACS data down to
11 the census block level; is that right?
12    A.  Certainly, using the method I described, yes.
13    Q.  Can we look at page 23, paragraph 46.
14    A.  I'm there.
15    Q.  Okay.  So here in paragraph 46 in Figure 3,
16 you've pointed out something called the Fishing Creek
17 VTD in Warren County; is that right?
18    A.  That's right.
19    Q.  Okay.  And you comment "The majority of
20 population identifies as Native American"; is that
21 right?
22    A.  That's right.
23    Q.  Okay.  One of your goals, Mr. Esselstyn, was
24 to draw districts that were either majority black
25 voting age population or majority black citizen voting

208

52  (Pages 205 to 208)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 53 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1 age population.

2     So why does the fact that this one VTD is

3 majority Native American, how was that relevant in a

4 Section 2 case?

5     A.   Sure.  So the discussion shown here on

6 page 23 is part of my report where I am indicating that

7 I think the -- I'm glad you mentioned this, by the way.

8     There's a section of this report where

9 essentially I'm saying that Dr. Trende's so-called "dot

10 plot maps" are misrepresenting.  They're not using the

11 appropriate comparator.

12     So by just comparing the black population to

13 the white population, it is misleading the person

14 looking at these maps as far as understanding the

15 composition of the district.

16     So in this case, this voting district, this

17 VTD based on the map here presented by Dr. Trende

18 appears to have a majority black population.  One

19 looking at this map would -- the implication is -- let

20 me put it this way.

21     By using white voting age persons as the

22 comparator rather than persons that don't identify as

23 black as the comparator, this is an example of an area

24 of the map where the impression is given that it is a

25 black majority VTD when, in fact, it is not a black

209

1 majority VTD.

2     Q.   That's the impression you got about this VTD;

3 is that right?

4     A.   As soon as I saw that these -- the answer's

5 no.

6     Q.   Okay.  Are you aware that the U.S. Supreme

7 Court has endorsed this use for shapes for black voting

8 age population and shapes for white voting

9 population in previous redistricting cases?

10     MS. THEODORE:  Objection.  Objection.  Calls

11 for a legal conclusion.

12     MS. RIGGINS:  It doesn't call for a legal

13 conclusion.  I'm asking if he's aware of something.

14     MS. THEODORE:  Okay.  I'll also object to

15 form.

16     THE WITNESS:  I am not aware of such an

17 endorsement.

18 BY MS. RIGGINS:

19     Q.   Okay.  So you're not aware that the U.S.

20 Supreme Court credited a nearly identical analysis done

21 in a redistricting case last decade?

22     MS. THEODORE:  Objection to form.

23     THE WITNESS:  I am not aware of what you

24 describe.

25

210

1 BY MS. RIGGINS:

2     Q.   Okay.  Let's turn the page and talk about

3 your criticisms of Dr. Trende in paragraph 50, please.

4     So in this paragraph, you criticize

5 Dr. Trende to use an X for a white voter, a circle for

6 a black -- I'm sorry -- for a white -- for white voting

7 age population and a blue circle for black voting age

8 population, and the relative area that these shapes

9 take up; is that right?

10     A.   That is one -- yes.  That is the main

11 argument in this paragraph.

12     Q.   Okay.  And you go on to criticize the

13 transparency and the fill of the symbols in

14 paragraph 51 bullet below that; is that right?

15     A.   Among other things, yes.

16     Q.   Okay.  Would you agree that you can color in

17 a circle, like a shape, color it in?

18     A.   Sure.

19     Q.   Okay.  How do you color inside an X?

20     A.   I think Figure 4 is maybe a good visual

21 answer to your question.  If the X is not just composed

22 of, you know, fine dark lines, there aren't lines to

23 color within.

24     If it were just a pure X, you know, of two

25 intersecting straight lines, I could see how there

211

1 wouldn't be space to color in, but on the left-hand

2 side of Figure 4, you can clearly see that there is --

3 the X has width into which color can be placed.

4     Q.   And that's because the stroke value was

5 widened so you could see it better; is that right?

6     A.   I believe that's just one -- that the stroke

7 further makes the X -- the X would already be larger

8 than the dot regardless of the stroke value, I believe.

9     Q.   Okay.  And you criticize the different levels

10 in opaqueness between the dots and the Xs in

11 paragraph 51; is that right?

12     A.   I do.

13     Q.   Okay.  Did you create a map with identical

14 levels of size and transparency to fix all of the

15 issues that you allege were present in Dr. Trende's dot

16 plots?

17     A.   It would take me some time to answer your

18 specific question on all of the issues I mentioned

19 about the dot plots.  I believe that the dot density

20 map that I created addresses most, if not all.  If you

21 like, I can go item by item and make sure I agree with

22 the statement of "all," but I feel comfortable saying

23 most, if not all.

24     Q.   So let's go to the figure you were just

25 talking about, Figure 5 on page 27.

212

53 (Pages 209 to 212)

Case 4:23-cv-00193-D-RN     Document 87-6     Filed 10/18/24     Page 54 of 96
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

1    A.  I'm there.

2    Q.  So here, are your blue and orange dots of

3  identical size?

4    A.  Yes.

5    Q.  Do they share the same level of opaqueness?

6    A.  Yes.

7    Q.  Are they -- do they have the same fill and

8  stroke values?

9    A.  They're -- yes.  I will say yes.

10    Q.  And so let's just look at your dot density

11  map.  It looks like the largest concentration of blue

12  dots within this portion of Demonstration District C

13  that you're showing here is in -- I believe this is

14  Henderson; is that right?

15    A.  In the Henderson area.

16    Q.  Sure.  The greater Henderson area?

17    A.  Yeah.

18    Q.  Okay.  And then there are more isolated blue

19  dots as you get up, you know, closer to the edge of

20  Demonstration District C towards the Virginia border

21  and Lake Gaston; is that right?

22    A.  I think generally I agree with your

23  statement.  I -- yes.  I'm not confident from memory

24  that that lake is Lake Gaston, but I will -- if you are

25  representing that it is, then I agree.

                                                      213

1    Q.  I think it's Lake Gaston or one of the

2  tributaries to Lake Gaston.

3    A.  As I said, I'm not remembering at this

4  moment, but there are more isolated, less densely

5  concentrated dots in that area.

6    Q.  So let me ask you this, Mr. Esselstyn:  If

7  someone who was color blind was looking at your map,

8  could they tell the difference between the black and

9  the white populations represented by these dots?

10    A.  So there are two pieces to that, and I make

11  this clear in my report, that I actually didn't use the

12  black and white characterization.

13    You can see in the legend and it's also

14  clarified elsewhere in the report that the orange dots

15  are indicating no part black, which I believe is the

16  more appropriate comparator to be using in this kind of

17  map.

18    So shall I answer your question about color

19  blindness having made that, or do you want to repeat

20  the question?

21    Q.  Sure.  The colors of the dots, could someone

22  who's color blind tell the difference showing what this

23  map is, you know, the showing with the two different

24  colors?

25    A.  I would say, from what I've seen, 99-plus

                                                      214

1  percent of color blind people can distinguish between

2  orange and blue.

3    It's considered one of the best, if you're

4  using a two-color combination, then orange and blue,

5  yes.  Ninety-nine-plus percent of color blind people

6  should be able to distinguish those colors.

7    Q.  What if someone printed this in black and

8  white?

9    MS. THEODORE:  Objection to form.

10  BY MS. RIGGINS:

11    Q.  Would they be able to distinguish between the

12  two colored dots?

13    A.  I don't know.

14    Q.  Would it be more difficult than if it was a

15  different shape, if one symbol was like a triangle and

16  one was a circle?

17    A.  I wouldn't -- it depends on how the map is

18  made, honestly.  I think I mention in a footnote that

19  were that a concern in 2024 that somebody reproducing a

20  color exhibit in black and white, then using different

21  shapes, I would recommend use the same shape and

22  rotating it.

23    Q.  You report compactness scores for all your

24  demonstration districts; is that right?

25    A.  Yes.

                                                      215

1    Q.  And you also reported compactness scores for

2  the 2022 and 2023 enacted plans; is that right?

3    A.  For the districts that were analogous or

4  districts that I was showing statistics for some other

5  reason, yes.

6    Q.  Did you make any attempt to measure the

7  compactness of the minority population specifically

8  within your demonstrative districts?

9    MS. THEODORE:  Objection to form.

10    THE WITNESS:  If I'm understanding your

11  question correctly, I think the answer is no.

12  BY MS. RIGGINS:

13    Q.  Do you understand, Mr. Esselstyn, that there

14  are peer-reviewed methods for how to measure population

15  compactness?

16    A.  I believe that's an accurate statement.

17    Q.  Did you employ any of those peer-reviewed

18  methods to measure the compactness of any population

19  within any of your demonstrative districts?

20    A.  Other than the compactness scores that we've

21  talked about previously, I did not calculate

22  compactness metrics.

23    Q.  You only computed compactness metrics for the

24  districts themselves; is that right?

25    A.  Yes.

                                                      216

54  (Pages 213 to 216)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 55 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

Q. Let's look back at page 7, please, of your rebuttal report, your August report.

A. I'm there.

Q. The 2022 black CVAP of District C was reported as 51.24 percent; is that right?

A. That's right.

Q. And I know there's been a lot of dispute in various expert reports about margins of error.

Sitting here today, do you know what the margin of error is on this black -- 2022 black CVAP calculation for the entire Demonstrative District C?

A. I think the answer to that is no.

Q. And is that because margin of error is calculated at either the block or the block group level?

A. I would not give that as an explanation for why I answered no.

Q. Okay. Sitting here today, do you know what the margin of error is for the 2022 black CVAP for Demonstration District D?

A. I know that a margin of error has been calculated by Dr. Collingwood for Demonstration District D, and I -- so I know that there is the margin of error that he calculated for Demonstration District D.

217

Q. And do you know if that's for the block groups within the district or the entire district?

A. It is based on the block groups as well as the counties.

Q. Sitting here today, do you know what the margin of error is for Demonstration District A for the 2022 black CVAP calculations?

A. Listening to you ask that question makes me realize that your question is asking about "the margin of error calculation" or "the margin of error figure." There is not necessarily just one, so I want to -- I should have mentioned that in replying to your previous questions about margins of error.

And then as for your question about Demonstration District A, I am not aware of a margin of error for the black CVAP percentage reported for Demonstration District A.

Q. Okay. Are you aware of any -- sitting here today of any margin of error for the 2022 black CVAP of Demonstrative District E?

A. Yes.

Q. And what is that?

A. It is stated in Dr. Collingwood's record, and I don't want to rely on my memory because I'm not confident that I would get it exactly right, but --

218

Q. So you'd like to rely on Dr. Collingwood and his report for that calculation; is that fair to say?

A. Yes. And I believe he provides two margins of error.

MS. RIGGINS: Let's take a five-minute break. I might be done.

(Off the record 4:28 p.m. to 4:41 p.m.)

BY MS. RIGGINS:

Q. Mr. Esselstyn, can you please look at your May report in this case, and I'd like to go to page 15 and look at Figure 7 for just a minute, if we could.

A. I am there.

(Exhibit 12 Marked for Identification.)

MS. RIGGINS: And I'm going to ask Jordan to transmit what I'd like to mark as Exhibit 12 through the chat.

MS. THEODORE: I'm sorry. Can you just repeat what page you asked him to look at.

MS. RIGGINS: Page 15. I'm looking at Figure 7, which is the map of Demonstrative District A.

MS. THEODORE: Of the rebuttal or of the original?

MS. RIGGINS: The May report.

MS. THEODORE: The May report. Okay. Thank you.

219

MS. RIGGINS: All right. Jordan, you can go ahead and send it through the chat.

BY MS. RIGGINS:

Q. I will represent to you, Mr. Esselstyn, that this is a PDF pulled down from the general assembly's redistricting website of the 2023 Senate Plan.

Can you let me know when you have it up?

A. I have it up.

Q. And do you see that there is a legend on this map?

A. Yes.

Q. Okay. And the county groupings are in -- are bordered in dark blue. Do you see that?

A. I do.

Q. Okay. And the counties have black borders?

A. I do. Yeah, I see that.

Q. And then the districts themselves are shaded different colors. Do you see that?

A. Yes. That's not made explicit in the legend, but I see how it's represented in the map.

Q. And Senate District 1 is the northeasternmost district in the state; is that right?

A. In this map, yes.

Q. In this map, yes. All right. The entire district that's tan colored is bordered in a blue

220

55 (Pages 217 to 220)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 56 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    county grouping border; is that right?
2         A.   That's right.
3         Q.   And then Senate District 2 is depicted in a
4    light green color below and to the west of Senate
5    District 1; is that right?
6         A.   Yes.
7         Q.   And that also is bordered by a blue county
8    grouping boundary; is that right?
9         A.   That's right.
10        Q.   Okay.  And then District 11 is shaded in pink
11   on this map.  Do you see that?
12        A.   Yes.
13        Q.   And it too is also bordered in its entirety
14   by a blue county grouping distinction; is that right?
15        A.   Yes.
16        Q.   Okay.  And Senate District 11 contains Vance
17   County; is that right?
18        A.   Yes.
19        Q.   So let's compare this map in front of you
20   that's Exhibit 12 to Figure 7 of Exhibit 1, which is
21   your map of Demonstrative A.
22        A.   Okay.  I'm going to bring that up in paper
23   just --
24        Q.   Sure.  Yeah.
25        A.   I could do it on the screen, but I think this

                                                          221

1    will be faster.
2         Okay.  I'm looking at Figure 7 on paper.
3         Q.   And so demonstration district as drawn goes
4    across three different county groupings in the 2023
5    enacted plan; is that right?
6         A.   Yes.
7         MS. RIGGINS:  I have no further questions at
8    this time.  I may have some more questions depending on
9    what your counsel asks.
10        I will say while we are on the record,
11   Elisabeth, we would like copies of Mr. Esselstyn's
12   backup for the full maps that he was looking at that he
13   referenced earlier and the Shake-Files for the full
14   statewide plans.  We think that we're entitled to those
15   under Rule 26.
16        We also think that we are entitled to any
17   BEQ, BAF, any kind of files that were ever exported
18   from Dave's Redistricting into QGIS or into Maptitude.
19        It's pretty clear that those were concept
20   maps or concepts that were being drawn and used in the
21   drawing of the final plans, and we'd like to request
22   those.
23        We can certainly follow up in writing about
24   that, but we are going to reserve the right to hold
25   this deposition open until we -- until and if we get

                                                          222

1    those materials, seek intervention from the Court if we
2    do not.  And even if we do, once we've seen them,
3    potentially seek to reopen discovery into this matter
4    depending on what they were to get.
5         MS. THEODORE:  Okay.  I mean, I think, you
6    know, with respect to the sort of question of
7    Shake-Files containing the entirety of the map, I think
8    I'm going to ask a follow-up question that will
9    probably moot that issue.
10        Like, I'm not sure the basis for your
11   characterization about the Dave's concept plans.  I
12   don't think that Mr. Esselstyn testified to that, but,
13   you know, we can address that issue as it arises.
14        MS. RIGGINS:  Well, I will say, Elisabeth,
15   that he testified that he started drawing at least
16   Demonstration A in Dave's, and at one point he
17   mentioned that he was aware that you can export data
18   out of Dave's, the BAQ files, and he was not sure if
19   anything was loaded into Maptitude or QGIS.
20        So if you are willing to make a
21   representation that those things don't exist or
22   there's no backup of the initial draws in Dave's,
23   that's fine, I guess, but we'd like that representation
24   if that's the case, if there's no backup data for it.
25   I understand that Dave's is kind of like WhatsApp in

                                                          223

1    that respect.
2         MS. THEODORE:  Okay.  All right.  How much do
3    you have left?  Ms. Schramek, if you could tell us what
4    the time is for Alyssa's questioning?
5         THE COURT REPORTER:  If we're stopping right
6    this second, 6:28 plus six minutes.
7         MS. THEODORE:  All right.  Why don't we take
8    a quick break so I can prepare my follow-up questions,
9    and maybe like 10 minutes.
10        Does that work for folks?
11        (Off the record 4:49 p.m. to 5:05 p.m.)
12             EXAMINATION
13   BY MS. THEODORE:
14        Q.   Mr. Esselstyn, you were asked a question
15   about whether your backup data included the incumbent
16   locations that you relied upon.
17        Do you recall that?
18        A.   Yes.
19        (Exhibit 13 Marked for Identification.)
20   BY MS. THEODORE:
21        Q.   All right.  I'm going to drop into the chat
22   the folder that contains your backup data if I am
23   allowed to drop a folder.  I'm going to drop into the
24   chat a file from your backup data, which I'm going to
25   mark this as Exhibit 13.

                                                          224

                                        56  (Pages 221 to 224)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 57 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Does this refresh your recollection that you
2  did provide with your backup data the list of incumbent
3  locations that you relied upon?
4    A.  Yes.
5    Q.  Great.  You provided Shake-Files in your
6  backup data of all the districts that you created for
7  Demonstration Maps A, B, C, D and E; is that right?
8    A.  Yes.
9    Q.  And you were asked some questions by
10  Ms. Riggins about whether you provided Shake-Files for
11  districts that you did not change, but that would
12  accompany the districts you did change in Demonstration
13  Maps A, B, C, D, and E; correct?
14    A.  I was asked those questions, correct.
15    Q.  Okay.  And you note in your report that you
16  relied on the representations of the enacted state set
17  of plans on the legislature's website; correct?
18    A.  Correct.
19    Q.  And that's referring to Shake-Files?
20    A.  I believe that I used Shake-Files, yes.
21    Q.  And anyone who wanted to know the shapes of
22  the districts you did not change from the 2023 map
23  could use those same Shake-Files from the legislature's
24  website; correct?
25    A.  Correct.

                                                      225

1    Q.  Okay.  Do you recall ever actually creating
2  and exporting Shake-Files from Maptitude that contained
3  both the districts that you changed in the
4  demonstration districts and the demonstration maps that
5  you drew and the districts that were unchanged from the
6  2023 enacted plan?
7    A.  I do not recall doing that.
8    Q.  Okay.  And you were asked some questions
9  about the county-split data that you presented in your
10  report from Maptitude.  Do you recall those questions?
11    A.  Yes.
12    Q.  Could that data be generated in Maptitude
13  without ever generating Shake-Files that contained both
14  the districts that you changed and the districts that
15  you didn't change?
16    A.  Yes.
17    Q.  All right.  You were asked some questions in
18  the deposition about generating block equivalency files
19  from DRA.  Do you recall that?
20    A.  Yes.
21    Q.  Do you recall generating any block
22  equivalency files in DRA that involved any districts
23  that were differently configured than the districts
24  that you turned over in Shake-File form as part of your
25  backup data?

                                                      226

1    A.  I do not recall doing so.
2    Q.  Okay.  And the Shake-Files that you turned
3  over can be converted into block equivalency files;
4  correct?
5    A.  Yes.
6    Q.  And the Shake-Files that you turned over
7  allow anyone to see the shapes of the districts that
8  you present and rely upon in your report -- let me
9  rephrase -- of the districts that you created for
10  purposes of your report?
11    A.  That's correct.
12    (Exhibit 14 Marked for Identification.)
13  BY MS. THEODORE:
14    Q.  All right.  I am going to drop another
15  document into the chat that I'm going to mark as
16  Exhibit 14.  Let me know when you have that open.
17    A.  I have it open.
18    Q.  Okay.  You see this is a press release from
19  the Census Bureau dated March 17, 2022, titled "New
20  Statistics Available From the 2016 to 2020 American
21  Community Survey 2020 Estimates"?
22    A.  I do.
23    Q.  All right.  And you see about midway the
24  through the first paragraph, it says "Following
25  pandemic-related data collection disruptions, the

                                                      227

1  Census Bureau revised its methodology to reduce
2  nonresponse bias and data collected in 2020.  After
3  evaluating the effectiveness of this methodology, the
4  Census Bureau that the standard, full suite of 2016 to
5  2020 ACS five-year data are fit for public release,
6  government and business uses."
7    Do you see that?
8    A.  Yes.
9    Q.  Okay.  And then the next paragraph, an ACS
10  official states that "While the COVID-19 pandemic posed
11  significant challenges for the ACS data collection, we
12  have worked tirelessly over the last few months to
13  refine our methodology and reduce the impact of
14  nonresponse bias in the 2016 to 2020 ACS five-year data
15  products."
16    A.  I see that, yes.
17    Q.  All right.  You were asked a number of
18  questions, you recall, about the reliability of the
19  2016 to 2020 five-year ACS estimates; is that right?
20    A.  Yes.
21    Q.  You've updated all of your black CVAP
22  percentage figures to use the 2018 to 2022 five-year
23  ACS estimates; is that correct?
24    A.  That's correct.
25    Q.  And those are the numbers -- the numbers from

                                                      228

57 (Pages 225 to 228)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 58 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  2018 to 2022 five-year tabulation are the numbers that
2  you intend to rely on going forward in this case?
3      A.  Yes.
4      Q.  Okay.  And you were and you are presenting
5  two districts as demonstration districts as majority
6  black districts based on black CVAP percentage alone;
7  is that correct?
8      A.  That's correct.
9      Q.  And Demonstration Districts D and E are those
10 two districts?
11     A.  Correct.
12     Q.  All right.  And Dr. Collingwood has
13 calculated the margins of error for both of those
14 districts based on margins of error provided by the
15 Census Bureau; is that correct?
16     A.  Yes.
17     Q.  Okay.  And do the margins of error take into
18 account nonresponse rates and other sampling issues?
19     A.  My understanding is yes.
20     Q.  All right.  Finally, I believe you wanted to
21 identify a typo in your report?
22     A.  That's true, yes.  On page 25, the last
23 footnote, footnote 22, in the last line of that very
24 near the end of the footnote where it says "in Figure 2
25 above," question mark, that should be "Figure 3."

229

1      Q.  Thanks.
2      A.  So that Number 2 should be -- Figure 2 should
3  be Figure 3 in the last line of Footnote 22.
4      MS. THEODORE:  Okay.  Thank you.  Those are
5  my questions.
6      MS. RIGGINS:  I just have a couple quick
7  follow-up questions that I think will clarify previous
8  testimony, and the narrow the scope of discovery
9  disagreement, Elisabeth.
10         EXAMINATION
11 BY MS. RIGGINS:
12     You were shown Exhibit 13 by your counsel,
13 Mr. Esselstyn.  Is that the document that you received
14 from counsel referenced in your report?
15     A.  I believe so.
16     Q.  Okay.  And did you use Maptitude to make any
17 changes to district lines in any of your demonstrative
18 districts?
19     MS. THEODORE:  Object to the form.
20     THE WITNESS:  Possibly.
21 BY MS. RIGGINS:
22     Q.  So it's possible --
23     A.  I'm not certain one way or the other.
24     Q.  Okay.  So it's possible that after you drew
25 district lines in Dave's Redistricting and imported

230

1  that into Maptitude, that further changes were made to
2  the demonstrative districts?
3      A.  So there are a couple of pieces of the way
4  you asked that question.
5      In some cases, I think it was actually faster
6  for me to just reselect the geographic units from a
7  district rather than go through the process of
8  exporting and importing.  So, for example, District --
9  Demonstration District A is all whole counties, and
10 then testing compactness scores for different options.
11     For example, I might have -- as I mentioned,
12 it's an iterative process, seeing what the compactness
13 score was for one option and then gone back.  But I
14 can't say with certainty whether I made changes in
15 Maptitude to a district that I had -- a configuration
16 that I had previously created in DRA that then became
17 the final version provided in the report.
18     Q.  Okay.  Sitting here today, can you say with
19 absolute certainty that the Shake-Files that were
20 ultimately exported in your backup data from Maptitude
21 are the exact same as the concept maps you were working
22 on in Dave's Redistricting?
23     MS. THEODORE:  Objection to form and the
24 question about the concept maps.  But go ahead.
25     THE WITNESS:  I think the answer is, can I

231

1  say that with absolute certainty, the answer would be
2  no, I cannot say that with absolute certainty.
3      The -- I feel quite certain that that
4  wouldn't be the case with the primary demonstration
5  districts.  Where I'm less certain is with the adjacent
6  demonstration districts.
7  BY MS. RIGGINS:
8      Q.  Did you attempt to save any of the concepts
9  or partial districts that you were working on in Dave's
10 Redistricting in any way?
11     A.  I honestly don't recall.  Generally my
12 practice was, as we talked about before, you kind of
13 have a working file and make changes to that, and I
14 don't tend to sort of save a snapshot of variations as
15 I go.
16     Q.  Okay.  And you're aware that Maptitude can
17 save that in the background; right?
18     A.  It can be configured to do so, yes.
19     Q.  Did you configure your Maptitude to do that?
20     A.  To do -- save?  To do what?
21     Q.  To save the iterations of the line drawing
22 like you were just talking about.
23     A.  I think kept it at the default setting, which
24 I believe is to -- I don't think I changed it from the
25 default setting.

232

58 (Pages 229 to 232)

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 59 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.  And you testified earlier, I believe,
2  Mr. Esselstyn, when you were looking at your
3  demonstration districts in Maptitude, you kept -- they
4  were part of a statewide file; is that right?
5    A.  Certainly when I was checking the VTD splits,
6  that was the case.
7    Q.  And is it possible to export that statewide
8  file into Maptitude -- out of Maptitude?  I'm sorry.
9    A.  I believe it would be.
10   Q.  Okay.  I'd like to look at Exhibit 8, please.
11   A.  Can you remind me what the title might be of
12 the file.
13   Q.  That is the U.S. Allocation Rate.
14      (Discussion off the record.)
15 BY MS. RIGGINS:
16   Q.  Is there 2023 data on this document?
17   A.  I just want to make sure I'm looking at the
18 correct -- this is the PDF whose file name is "ACS Item
19 Allocation Rates"?
20   Q.  Yes.  And when you pull it up, it says "Item
21 Allocations Rates 2019 through 2023 for United States."
22   A.  I'm looking at that document.
23      And your question was whether it includes
24 information for 2023?
25   Q.  Yes?

233

1    A.  It appears to, yes.
2    Q.  Okay.  And you testified earlier about
3  Endnote 3 on this document, which is on the
4  second-to-last page.
5    A.  I don't remember expressing an opinion about
6  it, but if you -- if it was one of those things and
7  asked me if you had read it, I --
8    Q.  This endnote still talks about the effects of
9  the pandemic on ACS activities in 2020 and the impact
10 on allocation rates; correct?
11   A.  That endnote does discuss what you just said,
12 yes.
13      MS. RIGGINS:  Okay.  We don't have any
14 further questions.  We can go off the record.
15      (Off the record 5:23 p.m. to 5:30 p.m.)
16      MS. RIGGINS:  I think our standard order,
17 Meredith, with Denise is 14 days.  We might need it a
18 little sooner than that.  Can we do ten instead?
19      THE COURT REPORTER:  Yes, I can do that.
20 And, Ms. Theodore?  Ten days for you?
21      MS. THEODORE:  I think that's fine.
22      (Signature not reserved.)
23      (Deposition adjourned 5:30 p.m.)
24
25

234

1              CERTIFICATE OF REPORTER
2  STATE OF NORTH CAROLINA        )
3  COUNTY OF MECKLENBURG          )
4      I, MEREDITH R. SCHRAMEK, hereby certify that the
5  witness whose testimony appears in the foregoing
6  deposition was duly sworn by me; that the testimony of
7  said witness was taken by me to the best of my ability
8  and thereafter reduced to typewriting under my
9  direction; that I am neither counsel for, related to,
10 nor employed by any of the parties to the action in
11 which this deposition was taken; and, further, that I
12 am not a relative or employee of any attorney or
13 counsel employed by the parties thereto, nor
14 financially or otherwise interested in the outcome of
15 the action.
16     I further certify that I have no direct contract
17 with any party in this action, and my compensation is
18 based solely on the terms of my subcontractor
19 agreement.
20     Nothing in the arrangements made for this
21 proceeding impacts my absolute commitment to serve all
22 parties as an impartial officer of the court.
23     This, the 25th day of September, 2024.
24     _____
25     MEREDITH R. SCHRAMEK, RPR, CCR 3040

235

59  (Pages 233 to 235)
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 60 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

| A |
|---|

**A-11** 112:9
113:13,24
**A-2** 113:17,21
**A-4** 112:9
113:13,24
114:2
**A-9** 112:9
113:13,21
114:2
**A-C** 112:9
113:13
**a.m** 3:3 63:21,21
**Abbott** 29:5
**ability** 60:25
120:11 235:7
**able** 19:5 102:20
104:1 215:6,11
**absolute** 231:19
232:1,2 235:21
**academics** 19:14
**accepted** 35:21
**accompany**
225:12
**accompanying**
13:5 68:21
94:3
**accord** 166:9
**account** 44:19
103:7,12,20,25
139:16 196:24
197:2 207:4,15
229:18
**accuracy** 51:5
**accurate** 156:11
169:24 216:16
**accurately** 107:3
156:1
**achieved** 83:10
**acknowledge**
148:16
**ACS** 3:19,20,21
3:25 39:19,20
47:18,20 53:5
53:13,16,19,21
53:22 54:23
55:3,6,7,10
58:18 60:13,15
66:10 68:24
69:6,11 71:20

72:3,6 73:11
73:23 74:6
130:17 145:15
148:2 149:5,9
150:10 151:13
151:16 152:3
152:10 153:1
153:18 155:19
155:21 156:14
156:20 162:23
163:11 164:2
166:10 167:7
167:11 170:9
171:13,17,24
172:5,10 174:8
174:24,25
175:21 176:1
177:9,17 178:4
178:19,25
179:7,10,14,22
180:2,9 183:25
184:5,8,20
185:19 186:4,9
187:13,15,19
187:25 188:5
188:17 190:13
192:11 194:14
195:4,8 198:11
198:14 201:23
202:21 203:6
206:4 208:10
228:5,9,11,14
228:19,23
233:18 234:9
**ACS's** 195:3
**Act** 74:23 76:19
77:7,10,16
**acting** 33:23
187:12
**action** 28:21
235:10,15,17
**active** 41:2
**activities** 183:25
234:9
**actual** 85:11
90:6 169:1,18
169:23 178:16
**Adam** 37:4
**add** 57:2,16,21
57:22 58:3

**added** 83:15
**addition** 12:25
21:14 76:4
122:2,24 142:4
142:11 160:19
165:7
**additional** 83:16
116:6 121:9,15
155:6,12,15
156:18
**address** 5:22,23
6:3 223:13
**addresses** 51:6
51:13 168:1,8
170:1,2,25
171:14,18
212:20
**adhering** 129:23
**adjacent** 13:5
119:1 232:5
**adjourned**
234:23
**administration**
17:4,7 18:3,23
19:12
**administrative**
27:23 37:17,18
**adopt** 78:17
**adopted** 88:1
**adult** 16:16
20:22 204:19
**advance** 39:10
**advantage** 79:18
79:20 80:2
**affairs** 15:23
**affect** 9:1
**affirmatively**
197:5
**afternoon** 5:17
**age** 13:1,2,9
47:16 54:14
55:20,22 61:25
62:6,10 64:18
66:14,15,17
68:4,9,19
69:22 88:23
95:13,17 97:14
98:6,8 114:13
114:17 126:21
127:12,17

128:13 129:3,7
129:11 130:13
140:12 145:3
154:13 155:2
166:22 167:1
202:4,4 204:19
204:21 205:20
206:3,13,14,18
206:19,21
207:6,10,16,21
207:23,24,25
208:2,5,25
209:1,21 210:8
210:8 211:7,7
208:3
**agency** 42:12
139:13
**ago** 10:22 13:16
66:1 133:8
137:5
**agree** 78:5 84:6
85:18 107:10
107:17 117:24
121:12 122:5
122:21 127:5
129:14 155:9
155:15,20
163:17 171:23
176:16 178:3
191:22 196:12
199:6 200:4
207:9,18
211:16 212:21
213:22,25
**agreed-upon**
131:20
**agreement**
235:19
**agricultural**
137:12
**agriculture**
137:1,10,20,24
138:1,8
**agriculture-he...**
137:23
**ahead** 14:24
23:5 27:5
48:25 57:12
66:5 72:25
103:1 115:25
150:4 175:9

180:8 188:24
220:2 231:24
**al** 1:9 5:13,14
**algorithm**
102:22 116:17
119:4,21
141:13
**algorithmic**
118:18
**algorithms**
141:22
**allege** 212:15
**allocate** 205:14
205:20,22
**allocated** 207:2
208:3
**allocation** 3:20
3:21 175:4,14
177:13 179:11
179:22 180:3
180:10,11
181:1,10 182:4
182:19 183:6
184:1 196:9,18
196:25 197:3
205:17,24
206:11 233:13
233:19 234:10
**Allocations**
233:21
**allow** 62:1
106:12 131:4
227:7
**allowed** 224:23
**allows** 47:9
116:14
**allude** 51:9
**alluded** 89:24,25
**alteration** 8:25
**alternate** 116:10
**alternative**
154:10 163:1,5
203:2
**alternatives**
100:15
**Alyssa** 2:13 5:11
50:15 92:14
**Alyssa's** 224:4
**alyssa.riggins...**
2:16

**American** 29:5
47:19 52:17
68:25 162:11
164:16 165:24
208:20 209:3
227:20
**amount** 95:6
**analogous** 216:3
**analysis** 35:6,17
56:4,22 76:12
78:3,5 79:12
90:22 104:24
162:12 163:6
163:16 164:21
166:17 198:25
201:5 210:20
**analyst** 86:6
201:6
**analyzed** 71:2
**analyzing** 32:6
52:7 90:9
**and/or** 13:2 69:1
162:13 164:22
**animals** 137:6
**annexation**
15:20 21:11,17
26:20 35:2,4
35:11 153:3
**annexations**
35:10,15
**annexed** 35:18
**announced**
188:2
**answer** 7:4 9:18
9:19,23 18:9
30:21 31:10
33:4,14 40:25
42:15 43:15
44:11 45:1,25
46:3 50:20
53:2 57:3,14
57:17 59:18,20
62:21 72:22
76:25 78:21
91:4,6 95:15
95:19 101:4,23
123:24,24
126:14,15
132:20 136:5
141:21 153:16

156:5 158:15
165:11 167:2
175:3,22 176:5
176:7,8,14,17
176:21,23
178:23 191:7
211:21 212:17
214:18 216:11
217:12 231:25
232:1
**answer's** 210:4
**answered** 18:10
152:14 176:12
217:17
**answering** 7:8
153:12
**answers** 57:22
83:24 176:1
179:2,7,23
197:23
**anticipate**
195:24
**anticipated** 27:8
200:22
**anybody** 26:2
**anyway** 134:1
**AP_BLK** 68:8
**apart** 21:4
**apologize** 11:2
57:11 58:1,22
89:13 131:11
152:13 204:17
204:24
**App** 63:7 93:12
93:23
**apparently**
119:4
**appear** 118:3,6
173:11,17
**appears** 81:15
112:13 119:18
128:23 140:13
141:12 150:24
151:23 155:24
156:17 167:25
168:4 174:23
177:16 178:19
185:17 209:18
234:1 235:5
**appendices**

24:14
**application**
56:22 58:11
**applied** 206:25
**apply** 56:1
**applying** 120:7
**appreciate** 5:16
6:21
**approach** 43:23
**appropriate**
9:21 29:16
176:9 177:17
177:18 178:13
178:15 190:10
203:3 207:23
209:11 214:16
**approximately**
167:25 168:17
171:7,10 183:7
192:4,8,22
**area** 40:17 42:7
46:22 116:1
127:25 132:16
133:16 134:2
137:11 146:20
160:16 209:23
211:8 213:15
213:16 214:5
**areas** 35:11,18
40:16 42:13
137:4 139:5
**arguably** 15:21
**argue** 75:2
**argument**
211:11
**arises** 223:13
**Arnold** 2:4 8:2
**arrangements**
235:20
**article** 189:16
193:23 195:23
199:10,17
200:13
**articles** 16:25
45:21
**ascertain** 129:20
**Asheville** 6:4
9:15 26:7,11
26:14 27:15
34:18,22,25,25

35:15
**asked** 8:4 9:17
10:8,11,15
11:9,25 12:5
15:12 17:3
28:19 35:16
57:6,7 63:12
79:12 92:8
95:22,23
104:11 131:11
152:18 163:15
166:20,21
167:1 198:9
200:5 204:17
219:18 224:14
225:9,14 226:8
226:17 228:17
231:4 234:7
**asking** 9:11
11:21 50:16
77:1 86:24
133:2 173:15
181:6 195:17
210:13 218:9
**asks** 176:19
222:9
**aspects** 15:12,14
15:24 18:19
37:19 201:16
**assembly** 12:24
45:3,7 51:3
73:9 77:13
78:16 79:9
81:2 84:2,10
87:10
**assembly's** 48:9
48:14 65:7
70:11 78:10
220:5
**assert** 9:3
**asserted** 86:13
**assertion** 82:14
187:2
**assets** 26:22
**assign** 179:1
**assigned** 106:1
179:7
**assignment**
93:20,21,22
175:5 177:13

177:16 178:3
178:20 179:2,8
**assist** 38:10
**assistant** 16:19
17:6 18:5
**associated** 46:25
86:10 112:8
**assume** 82:3,12
**assumption** 82:5
82:7,14 103:7
103:11
**asterisk** 39:3,4
**Atlantic** 113:2
**attachment**
24:19,22 46:4
46:8,9 51:10
57:23 62:20
63:24 64:7,21
64:25 65:9,17
65:23,25 66:19
68:19 70:2
80:5 82:2 83:8
83:11 88:17
96:12 106:17
108:9 161:24
**attachments**
22:8 42:22
**attempt** 71:19
116:21 152:2
163:19,21
216:6 232:8
**ATTENDING**
1:16
**attention** 20:23
**attorney** 7:24
33:16 37:7
38:6 235:12
**attorneys** 8:2
19:22 33:6
34:15 37:3,10
38:21
**audio** 49:5,9,16
**August** 13:18
14:8 22:5
24:10,21
147:17 149:2
153:7 157:18
158:1,8,16
162:7 164:1
195:13 217:2

237

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 62 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**authored** 24:7
82:21 197:17
197:21
**authoritative**
55:19,24
131:24 162:12
**authority** 16:4,6
**available** 5:16
52:19 55:2,25
59:6,11 62:3
63:10 122:1,13
148:6 151:17
162:20,24
164:3,17
166:10,14
181:8 199:1,4
202:3,25 203:4
203:10,18
227:20
**Avenue** 2:5
**average** 174:12
**averages** 173:25
**avoid** 118:22
**aware** 20:13
23:20,23 58:17
59:7,9 72:2
73:8 117:9
121:25 131:20
131:24 136:6
136:12,16
149:3 152:9,15
152:19 163:1,4
171:13,17,20
171:21 172:5,8
175:2 177:2
184:3,7,19,22
188:17 195:8
197:16,21,24
200:6 210:6,13
210:16,19,23
218:15,18
223:17 232:16

**B**

**B** 3:12 13:24
14:4 46:4,8,9
46:24 47:10
57:23 66:24,25
68:12 69:23,25
70:16,23 79:3

81:20 87:16
89:11 92:1,3
95:7,10 96:25
106:17 108:9
123:10,13,22
124:5,15,20
125:11,15,24
127:4 129:12
130:5,12
142:21 143:6,8
143:16,19
145:8,22 146:2
146:6,9,16
147:9 153:9,24
154:4,7,10,25
157:20 159:24
205:10 225:7
225:13
**B's** 145:18
**B-2** 125:15,18
126:25 129:18
**back** 78:25 89:3
93:3 114:11
120:14,19
128:1,5,10
130:1,9 131:25
153:3,6 162:6
166:16 191:1
193:11 198:9
203:22 204:16
217:1 231:13
**background**
232:17
**backup** 4:2 50:7
83:3 84:21
85:22 93:6
94:15,19,24
222:12 223:22
223:24 224:15
224:22,24
225:2,6 226:25
231:20
**bad** 40:20
**BAF** 93:16,18
222:17
**Baker** 2:18
**balance** 57:9
**BAQ** 223:18
**barbecue** 144:18
**base** 47:16

**based** 39:9 47:3
50:25 55:7,10
73:6 75:23,25
76:2 90:5
103:6 111:7
130:13 146:17
171:19 177:18
178:5 179:2
194:15 198:12
198:17 200:17
203:12 206:1
206:17 209:17
218:3 229:6,14
235:18
**basic** 70:25
146:22 181:23
**basically** 12:1
22:8 44:17
52:4 89:2
98:18 103:8
125:3 143:7
160:21
**basis** 50:21
71:11 103:17
104:9,12
223:10
**Beaufort** 105:8
105:19 110:20
112:14 113:15
115:2,5
**began** 88:8
111:5,7
**beginning** 11:8
92:8
**believe** 6:11 7:13
7:19 11:3 12:4
16:8,12 22:4
22:16 28:6
29:19 34:16
41:8,21 42:15
44:20,21 50:12
56:8,13,14
58:8 61:23
62:8 63:24
64:2,8,21,24
65:8,9,24
68:14 76:14
79:17 81:3
86:16 87:17
96:24 100:7

101:19 102:17
105:6,21
109:11 110:4
111:6 113:10
115:6 118:21
123:8 125:15
127:24 129:19
133:22 134:3
135:9 137:22
137:25 140:8
141:14 142:6
142:19 149:25
154:15 155:25
156:10 173:23
184:9 188:20
189:19 190:3
191:8 201:16
203:10 204:18
212:6,8,19
213:13 214:15
216:16 219:3
225:20 229:20
230:15 232:24
233:1,9
**bell** 175:6
**belt** 115:8,9
131:14,18
133:14,15,16
**benchmark**
189:23 191:3
**BEQ** 222:17
**Bertie** 135:3,5,9
138:12 171:24
172:7
**best** 44:11 55:19
55:25 72:22
90:9 162:20,24
164:3,17
166:10,14
199:1,3 201:7
202:3,5,25
215:3 235:7
**better** 112:15
203:2 212:5
**bias** 228:2,14
**bias.'** 186:18
**big** 108:12
**Bill** 38:3,4
**Bingham** 5:21
**bit** 9:15 24:17

26:9 28:14
44:7 64:13
65:16 102:15
170:17 174:13
**black** 13:1,2,9
13:10,25 52:22
53:3 62:6,10
65:19 88:23
95:13,17,23
96:9 97:14
98:5,8 105:21
106:3,7 111:23
114:12,17
115:4,6,8,9
126:21 127:12
127:17 128:13
129:3,7,11,20
130:12,16
131:1,14,18
133:14,15,16
140:11 143:5
145:3,11,18
153:8,17,24
154:4,7,12,12
154:16 155:1,7
157:12,23
158:3,14
159:17,18,22
159:23 206:14
206:19,21
207:2,5,10,16
207:21,22,24
207:25 208:2,4
208:24,25
209:12,18,23
209:25,25
210:7 211:6,7
214:8,12,15
215:7,20 217:4
217:10,10,19
218:7,16,19
220:15 228:21
229:6,6
**Bladen** 119:19
120:7,8
**Blake** 1:14 3:1,7
5:2 25:7
**Blakeman** 5:20
**blank** 44:8,10
88:4 178:21,23

238

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 63 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

179:23
**blanking** 37:8
  61:9,10
**blind** 214:7,22
  215:1,5
**blindness**
  214:19
**block** 43:9 52:19
  53:6,7,20,23
  53:25 54:3,4,5
  55:2 56:9,10
  93:20,21,22
  94:13,14,18,23
  99:21,23 100:1
  129:5 203:11
  203:17,19
  204:14 205:2
  205:15,18,21
  205:23 206:4,4
  206:12,13,15
  206:16,17,19
  206:21,25
  207:1,6,8,11
  207:11,11,20
  207:22 208:1,1
  208:3,5,11
  217:14,14
  218:1,3 226:18
  226:21 227:3
**block-level**
  52:21
**blocks** 47:2 54:1
  54:6 100:4,6
  207:3,17
**blog** 192:15
**blue** 211:7 213:2
  213:11,18
  215:2,4 220:13
  220:25 221:7
  221:14
**board** 1:8 5:14
  17:10,14,20,23
  18:1,13,14,18
  34:10 36:10,11
  44:17 51:16
**boards** 17:18
  19:6 42:5,7
**body** 22:8 83:22
**bold** 181:19,23
  187:20 189:10

**bolded** 175:17
  182:13
**bolster** 83:8
**bono** 34:12
**border** 98:23
  106:20 160:24
  213:20 221:1
**bordered** 41:16
  220:13,25
  221:7,13
**borders** 98:22
  127:16 220:15
**bottom** 39:8
  151:8 169:11
  182:12 189:20
**boundaries**
  99:17 134:12
**boundary** 26:25
  99:10 128:12
  128:15 129:1
  129:22 221:8
**box** 61:5 100:18
**brand** 63:7
**break** 7:2,5
  63:19 111:13
  111:25 112:1
  219:5 224:8
**Brian** 34:13
**briefly** 130:1
**bring** 221:22
**broken** 202:4
**brought** 13:16
  64:12
**built** 125:3
**bulk** 24:16
**bullet** 25:5,15
  28:6,9 29:3,20
  29:24 34:3,24
  36:8,12,15,16
  36:18 46:16,24
  47:7,9,10,14
  47:21 49:24
  54:9 74:8
  175:18 176:1
  177:8,24,25
  211:14
**bullets** 30:1
  34:17 36:5
  45:22 46:14
  151:12

**bunch** 36:5
**Buncombe**
  16:18 17:6,10
  17:22 18:13,22
  18:24 36:9
  77:15,16
**Bureau** 3:22
  27:7 52:10,17
  163:4 178:9
  184:23 185:5
  187:8,12,24
  201:18 208:6
  227:19 228:1,4
  229:15
**Bureau's** 148:7
  151:17 156:2
  185:20
**business** 25:11
  25:13 228:6
**butcher** 34:4
**BV** 25:12
**BVAP** 129:18
  132:13 145:8
  157:20

—— **C** ——
**C** 2:1 3:6 5:1
  13:24 14:4
  47:7 63:24
  66:24,25 68:12
  69:23,25 70:16
  70:23 79:3
  81:20 87:16
  89:11 92:1,3
  95:7 96:25
  130:22,25
  132:7,14,23
  133:7,10,18
  134:6,7 136:19
  137:14 138:7
  140:2 141:5
  142:5,12
  205:10 213:12
  213:20 217:4
  217:11 225:7
  225:13
**C-11** 132:24
  142:4,8,10
**C-2** 142:4
**C-4** 142:4,8

**calculate** 71:16
  216:21
**calculated** 53:3
  161:22 189:23
  191:3 217:14
  217:22,24
  229:13
**calculating**
  52:22
**calculation**
  148:7,10
  217:11 218:10
  219:2
**calculations**
  73:17 153:15
  218:7
**Caliber** 56:24
  59:25 60:12
  62:12
**Caliber's** 60:3
  62:25
**call** 7:18 13:23
  14:3 78:2
  133:15 171:5
  175:18 210:12
**called** 19:20
  25:11 28:10
  30:17 33:19
  42:23 46:16
  53:20 61:8,8
  61:16 63:4
  64:2 68:18
  79:15 80:10
  169:2 170:22
  175:13,13
  181:23 186:17
  189:10 208:16
**calling** 75:23
**calls** 8:4 9:8
  76:24 78:7
  101:7 164:9
  210:10
**calories** 111:10
**Camden** 118:5
  118:16 119:17
  124:24 127:8
  141:10,19
  159:14 160:25
**Cannon** 34:13
**capacity** 17:12

19:7
**career** 38:5
**careful** 201:6
**carefully** 153:11
  153:13
**Carolina** 1:1,8
  2:9,15 3:18
  5:13,15 6:5
  8:16 10:4,17
  10:24 15:17,20
  15:23 16:13,15
  16:22,23 17:1
  17:4,8,18,19
  19:4,12,15,17
  20:20,22,25
  21:18 30:17
  33:22 35:10
  39:22 40:10
  45:3,6 48:1,9
  48:14 51:16
  64:3 65:6
  70:11 74:21
  77:13 78:19
  79:19 81:2
  96:9 97:10
  99:5,8 100:16
  104:6 108:11
  109:1 117:9,13
  117:18 118:9
  131:14 133:16
  136:6,7,10
  144:17 170:3
  170:14,23
  171:8 174:11
  174:22 235:2
**Carolina's**
  173:24
**Carolina-spec...**
  174:4,16
**Caroline** 37:5,12
  37:12
**carried** 35:15
**Carteret** 109:7
  113:18
**Cary** 39:5,18
  73:5
**case** 7:12 8:17
  9:7 10:9 17:2
  24:8 28:7,9,12
  28:15 29:5,13

239

29:18,19,21,24
30:2,3,7,10,14
30:15,20 31:11
31:23 32:8
33:2,11,22,22
33:24 34:11,14
35:1,7 43:7
44:13,21 52:13
53:23 58:15
59:12,16 60:21
61:20 73:4
74:16,17 80:22
88:2 91:12,17
93:6 94:8,15
94:20 96:17
111:22 132:11
135:1 148:21
153:2 154:3
163:8,18,18
165:3,15,16,18
165:20,22
166:19 197:17
197:20 209:4
209:16 210:21
219:10 223:24
229:2 232:4
233:6
**cases** 16:23
30:16 32:1,14
32:15,21,21
35:3,14,22
36:1 44:15
63:9 74:18
152:10,24
153:3,4 163:6
165:6,10 210:9
231:5
**Catawba** 20:2
**categories** 31:24
31:25 55:5
67:16
**category** 168:2
176:22 180:25
180:25
**caught** 204:24
**cause** 30:3 31:23
32:7,14,20
170:18,21
**caused** 184:4
192:21

**caution** 194:24
195:4 199:22
201:1,5
**CCR** 235:25
**cede** 113:2
**census** 3:22
19:25 27:7,11
38:25 39:11,13
39:16,23 40:10
40:11 43:9
46:22 47:1,4
47:16,24,24,24
52:10,17 54:2
54:3,3,6,9,24
55:2,3,8,9,11
58:25 60:1,6
62:11 64:15
67:22 71:10,16
72:9,18,18,19
72:23 84:9
98:9,12,14,17
100:6,20 102:7
102:23 126:20
130:13 148:7
150:5,7 151:5
151:17 156:2
156:12 162:18
163:3 165:2,8
167:20 171:9
172:16 175:13
178:9 180:13
184:23 185:5
185:20 186:22
187:3,8,11,23
188:8,19
189:22 191:2
198:2,15,24
199:9 200:6,7
200:14,18
201:11,18
205:18,19
206:17 207:17
208:5,6,6,9,11
227:19 228:1,4
229:15
**Census's** 189:5
**censuses** 72:13
**center** 45:13
198:10
**certain** 10:17

12:6,9 15:12
44:21 54:14
59:6 61:13
96:21 149:19
178:15 198:20
198:20 203:11
203:13 230:23
232:3,5
**certainly** 48:19
104:1 208:12
222:23 233:5
**certainty** 141:17
231:14,19
232:1,2
**CERTIFICATE**
235:1
**certification**
21:22
**certify** 235:4,16
**cetera** 60:11
**chairs** 71:9
**challenge** 8:24
10:4 80:25
186:11 187:2,5
**challenged** 8:16
8:22 9:6,7,15
10:7 40:17
103:16,21
**challenges** 28:16
28:18 35:14
192:12 201:15
201:19 228:11
**Chamber** 136:6
**change** 20:17
61:13,13,14
82:11 84:10
109:9 116:25
118:20 225:11
225:12,22
226:15
**changed** 35:9
83:14 105:12
226:3,14
232:24
**changes** 89:4
104:25 160:1,6
160:19 230:17
231:1,14
232:13
**changing** 17:15

**characteristics**
10:18 12:6,10
12:25 91:20
169:13 186:16
186:25
**characterizati...**
107:18 122:6
127:5 155:20
161:4 178:24
180:1 206:20
207:24 214:12
223:11
**characterize**
53:8,9 107:7
107:22 118:12
**characterized**
199:7,9 200:4
**characterizing**
82:14
**Charlotte** 21:2
**chart** 168:25
**chat** 14:21 23:6
23:12 24:9
147:19 150:16
156:11 167:18
170:8,19
172:15 174:5
175:10 180:9
185:4 189:4
190:13 219:16
220:2 224:21
224:24 227:15
**check** 68:14
**checking** 91:19
91:19 233:5
**checks** 201:22
**chief** 16:17
**choice** 23:24,25
**choices** 141:23
**choose** 33:10
55:16 63:15
107:20 111:15
**chose** 33:25
**Chowan** 143:18
144:10,11
**Chris** 30:14
**circle** 211:5,7,17
215:16
**circumstances**
77:15

**cities** 42:4
133:24
**citizen** 13:2
47:15 55:20,22
66:17 68:19
69:22 155:2
166:22 167:1
202:3 204:19
205:20 206:3
206:13,14
208:2,2,25
**citizens** 29:5
204:6,11,18,20
204:21,21
**citizenship**
54:23,25
162:14,19
164:22,23
166:18,20,21
182:17
**city** 26:7,10,14
27:14,18,19
34:18,22,24,25
35:15 44:3,4
44:13 124:23
124:24 125:5,9
125:13,14,17
132:22 133:20
139:6,11 159:4
159:8,15 160:3
160:16,17,19
160:20,24
**city's** 26:20 27:7
**city-initiated**
35:10
**clarification**
57:19 159:20
204:25
**clarified** 70:4
214:14
**clarify** 10:10
16:5 77:4
159:13 230:7
**clarity** 120:24
**classic** 88:12
111:18
**classifications**
55:5
**classified** 176:25
177:5

240

clean 64:13
clear 13:14 38:3
  42:2 61:9 99:3
  100:22 193:13
  202:14 214:11
  222:19
clearly 85:11
  108:4 119:7
  120:8 212:2
Cleveland 2:19
client 16:6
clients 20:1
  38:20
clock 140:25
close 19:3 22:20
  65:13 114:24
  119:1 146:23
  149:13,16
  182:12
close-ish 5:10
closer 146:11
  213:19
cluster 100:15
  101:6,10
  121:10
clusterings
  101:2,7
clusters 100:24
  101:2
co-coordinated
  26:20
coauthor 102:13
coauthored
  16:25 101:1
coauthors
  103:13
cocreated 101:1
code 5:25 116:14
codes 60:10
coding 59:6
coefficient 190:3
  190:8,18
cohesive 86:3
collaborate 31:2
  31:6 37:22
collaborated
  19:22 102:24
  103:3,4
collaborating
  18:18 102:18

collaboration
  33:19
collected 184:24
  186:4,9,10
  189:12 228:2
collection 54:6
  184:8 192:12
  227:25 228:11
collects 186:5
Collingwood
  58:4,14,17,24
  152:9,19
  217:22 219:1
  229:12
Collingwood's
  59:10 218:23
colloquial
  179:13
colloquially
  47:18 61:16
color 127:21
  211:16,17,19
  211:23 212:1,3
  214:7,18,22
  215:1,5,20
  221:4
color-codes 71:4
colored 215:12
  220:25
colors 214:21,24
  215:6 220:18
column 67:24
  68:5 93:24
  180:17 181:2
columns 62:7,8
  68:7 161:13
  168:25 180:20
combination
  215:4
combinations
  126:12 143:3,4
combined 130:7
  206:14
come 55:15 59:7
  69:6 78:25
  89:3
comes 32:12
comfortable
  73:10,14,18,21
  85:15 90:4

121:4 212:22
comment 208:19
Commerce
  136:7,8
commit 61:14
commitment
  235:21
committed
  187:9
committee 48:18
  49:6,10,17,21
  70:6 71:9
Common 30:3
  31:23 32:7,13
  32:20
commonly 64:11
  74:10 131:14
  131:18 163:5
communicatio...
  33:5
communities
  19:17 20:6,6
  20:24 88:15
  111:21 132:10
  133:9,9 143:1
community
  47:19 52:18
  66:10 68:24,25
  71:20 73:12,24
  74:6 115:4
  130:17 133:16
  162:11 164:16
  165:24 227:21
compact 12:14
  79:2 146:5,12
  146:15 161:16
compactness
  62:2,2,5 88:14
  90:2,4,6,9,23
  91:19 111:21
  132:9,18
  143:10 146:19
  147:1 161:5,14
  215:23 216:1,7
  216:15,18,20
  216:22,23
  231:10,12
company 43:2
comparator
  209:11,22,23

214:16
compare 71:6
  144:19,20
  157:9,25
  221:19
compared 127:2
  127:3 133:19
  161:10 183:11
  189:23 191:3
comparing
  47:23 83:12,14
  157:13 209:12
comparison
  131:4 161:12
  183:11
compensated
  38:14,22
compensation
  235:17
competitor 43:3
complaint 8:23
  9:10,13,23
  40:17
complete 42:19
  53:2 57:17
  91:8
completed 34:21
compliance
  74:22
complied 77:8
comply 70:14
  79:8
complying 72:10
  75:17 77:8,9
  103:21
component 87:7
  87:8
composed 105:7
  211:21
composition
  209:15
computed
  216:23
computer 14:15
  88:7 89:4
concentrated
  214:5
concentration
  213:11
concentrations

137:10
concept 84:3
  222:19 223:11
  231:21,24
concepts 222:20
  232:8
concern 33:21
  215:19
concerned 120:6
concerns 201:12
concert 18:14
concise 123:23
conclude 193:4
conclusion 9:9
  76:25 78:7,11
  164:10 187:6
  210:11,13
conclusions
  186:22 187:3
conditions 184:7
conducted 56:17
  168:18,21
  169:18 171:3
conferences
  21:25
confidence
  82:15 180:4
confident 73:17
  151:20 213:23
  218:25
configuration
  9:2 231:15
configurations
  88:14 124:2
  132:9,12
configure
  232:19
configured
  143:5 226:23
  232:18
configuring
  117:3
confirm 105:2
conforming
  12:11
confused 173:13
confusion
  170:18,21
congressional
  20:16 73:9

241

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 66 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

consider 12:16
15:5,9 17:9
19:16 21:5,15
43:9 79:17
80:2 96:15
119:12 136:18
140:1,4 176:20
202:5,5
consideration
44:23 45:4,7
124:21
considerations
44:18,24 79:15
considered
16:12 31:8
55:12,19,24
72:3 79:20,24
95:4 132:12
162:12,19
163:2 164:16
165:14 176:24
177:4 199:1,3
202:3 215:3
considering 20:5
104:11 143:10
considers
175:21 176:1
consistent 85:12
101:25 173:3,5
199:15
consists 113:7
Constitution
72:17
consult 79:10
137:12
consultant 25:6
25:23
consulted 50:2
consulting 16:20
16:23 25:6,9
25:14,20,21
29:4,8,10,23
31:22 79:12
contact 34:12
contacts 167:11
167:12
contain 60:13
196:1,5,9
contained
180:18 197:25

226:2,13
containing 76:9
105:3 106:6,7
189:12 200:20
223:7
contains 64:24
64:25 66:22
130:25 200:24
221:16 224:22
contemplated
16:10
context 21:24
75:19
contiguous 79:6
continue 194:18
continued 31:14
31:15
contract 235:16
contracted
38:21
contributed
59:5
contribution
31:8
convention
72:15 75:4
conversation
7:17 92:9
conversations
8:1 33:15
167:3
converted 227:3
convex 146:20
Cooper 30:14,22
30:25 31:3,5,6
31:13
coordinating
17:14
copies 11:5
14:18 22:5
89:5 222:11
copy 11:19 14:8
14:23 81:6
131:4 144:20
147:20,22
corner 60:23
75:11,12 99:15
109:1
corporate
160:17

corporation
25:10 56:24
60:1,12
correct 8:14
14:2 24:11,24
25:17,24 36:10
36:13,20,24
42:16 47:20
60:18 61:4
62:13 64:5
67:23 81:22
94:17 96:23
99:13,18
101:19 104:19
104:22 109:17
109:22 113:21
113:22 114:9
116:4 122:22
123:1,8 129:2
129:4 130:24
131:10 140:9
142:20 143:22
143:22 145:16
148:24 154:1,8
155:3,4 156:25
177:9 204:23
208:8 225:13
225:14,17,18
225:24,25
227:4,11
228:23,24
229:7,8,11,15
233:18 234:10
correctly 5:8
50:4 56:17,25
71:13 73:18
161:19 188:3
216:11
correctness
35:17
corrects 179:10
correspond 50:1
corresponds
191:5
corroborate
90:18
corroborated
201:25
corroborating
85:19 106:5

corroboration
69:17
council 27:19
44:4
counsel 5:5 7:13
7:14 10:13
29:11 50:3,11
50:22,25 51:6
95:22 97:4
222:9 230:12
230:14 235:9
235:13
counsel's 140:23
count 55:10,13
72:4,6,10,12
counted 206:5
counties 20:3
40:14,23 41:15
41:19,20,22
42:5 47:1 64:3
74:22 80:16
81:16 83:12,16
83:22 96:9,14
97:11 98:21
99:11,24,25
105:8,13,21
106:1,8,13
107:12 109:21
111:8,16
112:17 113:15
114:18 115:4,8
115:9 116:1,15
116:15,16,17
117:4,10,12,18
117:21 119:6,9
119:17 121:25
122:10,25
124:9 126:12
131:1,13,16,17
131:18,21,23
132:5 133:14
133:15 136:9
136:20,25
138:6,11,20
141:15,20
143:4,7 144:8
159:16 218:4
220:15 231:9
counties' 112:21
136:9

Counting 74:9
country 77:19
counts 54:13,14
72:24
county 1:22 9:14
16:18 17:6,10
17:14,22,25
18:4,5,13,22
18:24,25 20:2
20:2,3 21:2
30:2,3 36:9,11
37:9 40:22
42:12 75:5,9
75:11,12,18
76:9,9,10
77:15,17 78:19
78:23 84:18
85:12,17 89:19
97:1,10 99:11
99:16 100:10
100:15,19,23
100:23 103:1
105:3,4,17,18
106:19,20,22
106:22,24
107:4,5,8,14
108:1,3,11,16
109:7,7,25
110:3,13,14,17
110:21 113:1,6
113:7,18,23
114:1,7,19,22
115:1,2,5,7,13
115:18,21
116:10 117:6,9
117:17,22
118:1,1,4,5,5,9
118:16 119:3
119:18,19,20
119:25 120:5,7
120:8,15,20
121:16 122:1,8
124:4,13,16,19
124:25 125:1,5
125:6,10,18,20
125:22 126:9
126:24 127:7
127:16 128:2
128:20,20,21
129:6,12,17,22

242
Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 67 of 96
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

130:5,6 131:2
132:6,13
133:23 134:22
135:4,5,9,13
135:17,21
137:22 138:1
139:9,14,25
140:1,2,10,10
140:17 141:4,8
141:10 142:7
142:10,11
143:17,18
144:10,14
147:5,9 159:5
159:13,14
160:4,14 161:2
171:15,19,25
172:7 208:17
220:12 221:1,7
221:14,17
222:4 235:3
**County's** 107:20
136:1
**county-level**
103:5
**county-split**
226:9
**couple** 25:3 37:9
97:17 133:12
193:12 195:22
230:6 231:3
**course** 15:22
**court** 1:1 28:21
28:23,25 30:17
30:18 35:24
74:16,17
154:10 201:11
210:7,20 223:1
224:5 234:19
235:22
**cover** 24:25
**covered** 21:5,20
**covers** 12:3 36:8
**COVID** 201:17
**COVID-19**
192:13 228:10
**Craven** 20:3
37:9 105:7,19
110:20 112:14
113:15

**create** 64:7 69:5
91:16,22 92:1
95:23 96:4
97:15 106:10
111:20 116:21
212:13
**created** 25:12
32:5 65:10,24
92:6 101:1,25
102:4 106:16
116:5,10
129:21 169:12
177:19 184:19
212:20 225:6
227:9 231:16
**creating** 10:16
10:23 65:22
69:14 92:24
226:1
**creation** 56:23
59:16 91:1
100:1
**credit** 28:23
35:24
**credited** 31:13
210:20
**Creek** 208:16
**criteria** 12:12,19
12:23 48:20,23
49:4 70:8,13
70:15 79:14
88:16 93:4
111:20 114:16
114:16 124:2
125:7,23 126:2
126:2,5 129:24
**criterion** 70:19
70:23 71:9
74:15 75:18
76:15,22 77:2
79:8 126:8
194:15 198:13
198:18 200:17
**criticisms** 211:3
**criticize** 190:5
211:4,12 212:9
**crops** 137:3,6
**cross-reference**
208:7
**crowded** 119:6

120:1
**crowding**
118:22 141:24
**CSV** 64:11 66:2
151:13
**curious** 90:2
140:22,23
**current** 5:22
41:2 93:8
**currently** 117:10
**CV** 25:1,4 28:2
31:21 45:10
189:22 190:1
190:19 191:2
193:20 194:5
**CVAP** 3:16
52:16,22,23
53:3,6 55:18
58:4,18 59:11
65:2,19 66:9
66:24 90:18
130:16 143:5
145:11,18
148:7 150:18
151:12,16
152:3 153:8,17
153:24 154:4,7
154:12,16,17
155:7 157:12
157:21,23
158:3,14
159:17,19,22
159:23 163:16
165:6,17 166:3
166:5 198:24
198:25 204:8
207:2,2 217:4
217:10,19
218:7,16,19
228:21 229:6
**CVs** 190:21
192:22
**cycle** 49:14 52:4
103:14

_____
**D**
**D** 1:5 3:12 5:1
13:24 14:4
47:14 66:24,25
68:12 69:23,25

70:16,23 79:3
81:20 87:16
89:12 92:2,3
95:7,9,9 96:25
142:16,20,25
143:13,15,17
143:24 145:4,6
145:12,22
146:1,5,8,14
147:5 153:9,24
159:1,19,24
160:2,7,12
161:2,16,21
205:10 217:20
217:23,25
225:7,13 229:9
**d/b/a** 25:14
**dark** 97:13
211:22 220:13
**darkest** 97:22
98:4
**data** 3:16 18:12
19:25 26:22,25
27:11 32:8,11
38:25 39:10,11
39:14,16,17,19
39:20 46:9,23
46:25 47:3,6
47:12,13,19,20
47:21,23 48:8
50:7,17 51:19
51:22,23,25
52:9,12,16,19
52:21,24 53:3
53:5,6,13,16
53:19,21,22
54:7,9,10,13
54:23,24 55:3
55:3,6,7,10,11
55:12,16,17,23
56:10 58:4,6
58:18,25 59:11
59:22,23,25
60:1,2,3,5,6,13
60:15 61:5,7
61:18,22 62:1
62:3,9,11,14
62:15,17,22,25
63:1,13 64:11
64:15 66:11

67:22 68:24
69:4,6,11,16
69:20 71:10,16
72:3,6,9,23
74:6 79:9,11
79:13 83:3
84:21 85:22
93:6 94:15,19
94:24 98:9,13
98:14,17,19
102:7,22,23
103:5 148:6,7
148:17,18
150:5,7,18
151:6,13,16,24
152:3,10,20
153:1,25
155:19,21
156:15,20
157:9,13 158:4
162:16,18
163:11 164:24
165:3,7,8,17
166:10,23
171:14,17
173:10,14
178:9,17 179:1
179:6,15,23
181:7 184:5,8
184:19,20,22
184:24,24
185:20 189:12
192:11 194:14
194:19 195:5
195:15 196:1,5
196:9,16,16,25
197:8,12,18,25
198:1,1,5,11
198:15,22,24
198:24 199:9
199:19 200:7,8
200:10,12,14
200:20,23,23
200:24 201:2,5
201:7,11,23
202:4,6,7,8,9
202:10,21,21
202:25 203:1
203:13,16
205:23,24

206:2 208:9,10
223:17,24
224:15,22,24
225:2,6 226:9
226:12,25
227:25 228:2,5
228:11,14
231:20 233:16
**data's** 126:21
**database** 17:18
47:8
**dataset** 51:18
55:24 56:4
163:5 171:21
198:25
**datasets** 52:8
54:22 196:8
198:7 201:23
203:12
**date** 23:10 30:6
81:8 152:4,4
**dated** 3:14,15
4:3 24:10
227:19
**Dave's** 63:5,6,10
90:16,16 91:11
91:15,23 92:2
93:5,8,12,16
93:22 94:4,7
94:19,23 99:20
123:13,16,20
222:18 223:11
223:16,18,22
223:25 230:25
231:22 232:9
**day** 3:2 61:9
95:3,4 235:23
**days** 234:17,20
**DC** 2:5
**deadline** 149:3,4
**deal** 108:12
**Deborah** 37:5
**decade** 26:6
84:12 163:9
210:21
**decade's** 93:10
**December** 188:2
**decennial** 38:25
39:13,22 40:10
40:11 47:3

54:8,24 55:1,3
55:12 60:1,6
62:11 64:14
67:21,21 71:10
71:16 72:9,13
72:18,23 84:9
98:9,12,13,16
126:20 130:13
162:18 165:2,8
171:9 205:19
206:17 208:6,9
**decent-sized**
133:24
**decided** 84:10
**decimal** 190:4,6
191:5
**decision** 185:13
194:24
**declined** 165:23
**decrease** 157:12
**dedicated** 48:4
**deem** 177:17
**deemed** 21:8
**deep** 22:1
**deeper** 20:8 55:4
**default** 60:9
118:25 232:23
232:25
**defendants** 1:10
1:15 2:12 3:2
5:5,12
**define** 13:20
27:16 91:14
**defined** 90:10
**defines** 190:18
**definitely** 120:5
124:22 132:16
**definition**
131:21,24
**definitions** 3:20
3:25 13:15
175:14 190:13
**degrees** 16:1
**delete** 114:19,22
170:18
**deleted** 170:19
**delivery** 39:10
**demographer**
19:22 37:21
38:2

**demographic**
64:3 66:23
67:13 90:24
91:20
**demographics**
15:17 21:10,16
88:18,20
181:23
**demonstration**
13:6,7,8,17,20
13:24 14:4
50:2 52:23
53:4,11 56:23
59:16 66:23,25
67:4,12 68:12
69:23,25 70:15
70:23 75:24
76:1,3,5 80:3
81:20 82:3,9
83:1,15,23
85:6 89:16
90:15,18 91:12
91:16,22 92:6
92:24 94:17
96:16 105:12
105:15,16
111:1,16
112:22 114:6
114:10,10,14
116:15 122:9
122:22 123:2
123:10,12,22
124:4,5,15,20
125:11,18,24
127:4 129:12
129:17 130:4
130:12,22,24
132:7,13,23
133:7,10,17,18
134:5,7 136:18
137:13,16
138:7 140:2
141:5 142:4,12
142:16,20,21
142:25 143:6,8
143:15,16,17
143:18,24
145:4,6,8,11
145:18,21,22
146:1,2,5,6,8,9

146:14,16
147:5,9 153:9
153:24 154:4
154:10,19,25
155:6,18
156:19 157:19
158:20,21,24
159:1,5,9,19
159:24 160:2,2
160:4,7,10,11
160:11,22
161:2,6,20,21
163:7,23
213:12,20
215:24 217:20
217:22,24
218:6,15,17
222:3 223:16
225:7,12 226:4
226:4 229:5,9
231:9 232:4,6
233:3
**demonstrative**
14:3 28:19
61:19 62:18
68:20 78:17,18
79:2 84:20
86:4,11 87:16
87:17,22 88:10
92:1 94:7 95:2
95:7,11,12,13
95:16,17 96:25
99:19 100:1
104:10 112:8,8
115:18 116:2,3
122:2 125:14
139:17 156:24
159:18,22
163:19 164:4
164:25 204:13
205:1,4,6,7,11
216:8,19
217:11 218:20
219:20 221:21
230:17 231:2
**Demonstratives**
89:11
**Denise** 234:17
**denote** 110:16
**densely** 214:4

**density** 212:19
213:10
**department**
15:23 17:13
26:14,23,24
27:7 136:7
**departures** 73:8
**depend** 74:2
**depending** 13:20
97:13 222:8
223:4
**depends** 43:22
91:6,13 149:15
200:2 215:17
**depicted** 98:22
101:13 221:3
**depicts** 97:7
112:7
**deposed** 6:6,10
144:12
**deposition** 1:14
3:1 14:15
222:25 226:18
234:23 235:6
235:11
**depositions** 6:17
**descending**
180:19
**describe** 38:17
38:18 85:13
103:9 109:4
136:15 171:22
210:24
**described** 15:7
26:12 83:19
88:16 102:12
136:14 178:18
182:8 198:18
207:15 208:12
**describing** 103:6
**description** 3:13
176:11
**design** 32:1
**designed** 31:13
31:14
**desk** 14:13 22:20
**detail** 206:10
**details** 188:2
**determination**
118:24 119:5

244

123:21 124:18
**determinations**
55:20 118:19
**determine** 49:25
86:7 132:5
**determined**
77:13
**developed** 20:7
**development**
26:18
**deviate** 73:3
**deviation** 12:13
61:24 67:15
71:3,5,7,20
73:1,11 74:5
88:15 114:23
**differ** 112:20,21
114:4 121:18
121:21
**difference**
178:10 195:14
214:8,22
**different** 9:16
13:14 20:23
88:7,13 89:1
90:1,1 101:8,9
101:13,15
106:2 120:15
123:4,6 124:2
124:7 143:2,3
143:8 144:17
146:24 173:25
179:18 186:15
207:17 212:9
214:23 215:15
215:20 220:18
222:4 231:10
**differently**
112:18 226:23
**differing** 115:13
**differs** 143:20
**difficult** 99:1
215:14
**diminishes**
108:16
**dinner** 111:25
**direct** 235:16
**directed** 166:2,5
**direction** 44:17
97:4 235:9

**directly** 127:15
128:12,14
151:11 152:3
**director** 187:12
200:13
**disaggregate**
56:9 59:11
152:2 153:1
**disaggregated**
55:17 148:6,17
151:25 152:10
152:20 202:6
203:1,12,16
205:23 206:3
**disaggregating**
58:18
**disaggregation**
52:19 56:2,5
56:17 58:25
156:24 157:2
208:10
**disagreement**
230:9
**disclaimer**
202:11,22
**discovery** 223:3
230:8
**discuss** 234:11
**discussed** 74:12
93:1 111:4,18
160:13 197:23
**discussing**
141:14
**discussion**
112:11 188:14
209:5 233:14
**discussions**
50:22,25
**displayed** 61:22
**disproportional**
207:5,16
**disproportion...**
207:19
**dispute** 217:7
**disrupted** 184:8
**disruption**
201:17
**disruptions**
227:25
**dissimilar** 174:2

**dissimilarities**
54:11,21 55:14
**distillations** 77:6
**distinction** 7:16
8:20 101:1
221:14
**distinguish**
215:1,6,11
**distracted** 22:21
**distributions**
55:21
**district** 1:1,1
5:15 8:21 9:1
10:16 13:7
20:17 40:23
41:1,2 43:13
60:22 61:12,24
61:24 68:4
71:2 73:2,22
75:12,13,24
76:4,5,6,7,8
77:16,18,23,23
77:24 78:2,18
88:18,20 91:12
91:22 92:25
95:2,12,13,17
95:23 96:16
99:19 100:19
102:3 104:16
104:17,21,23
105:3,4,5,6,7
106:4,21,22
107:3,8,11,25
108:15,25
109:3,5,6,12
109:14,15,16
109:25 110:2,5
110:7,9,13,16
111:1,5,16,20
113:1,6,10,17
113:21 114:2
114:11,14,17
115:1,17,18,18
116:2,3,16
120:18,22,24
121:20,22
122:3,9,22
123:10,13,22
124:4,15,20
125:11,15,18

125:24 126:13
126:25 127:4
127:11,21
128:12,15,22
128:25 129:10
129:12,18,21
130:5,12,22,25
132:7,14,23,24
133:7,10,18,25
134:6,7 136:19
137:14,16
138:7 140:2,3
142:3,5,8,10
142:12,16,20
142:21,25
143:5,6,8,13
143:15,16,17
143:19,24
145:4,6,8,12
145:18,22,22
146:1,2,5,6,8,8
146:9,12,14,16
147:5,9 154:4
154:7,10,11,17
154:20,25
155:6,12,16,18
156:19 157:20
159:1,5,9,18
159:19,23,24
160:4,11,12,23
160:24,25
161:1,2,6,11
161:15,15,16
161:21,21
209:15,16
213:12,20
217:4,11,20,23
217:25 218:2,2
218:6,15,17,20
219:20 220:21
220:22,25
221:3,5,10,16
222:3 230:17
230:25 231:7,8
231:9,15
**districting**
129:23
**districts** 8:16,24
9:1,2,3,6 10:24
12:1,6,12,14

13:1,4,5,6,6,8
13:18,21,24,25
13:25 14:3,4
16:11 26:24
27:19,21,24,25
41:24 44:14
50:1,1 51:13
52:23 53:3,4
53:12 56:23
59:16 61:1,20
62:18 65:21
67:11 68:12,21
69:23 70:1,15
71:12 73:6,9,9
74:21 75:10
76:1,2 78:4
79:2,5 82:3,4,9
82:10,15,22
83:13,13,14,21
84:3,11 85:6
85:24,25 86:1
86:7,14,14,21
87:7,12,12
88:13 90:19,20
91:8,16 92:1
96:25 97:1,11
101:17,21,24
101:25 104:6,9
104:14 105:10
106:2,5,6,7,9
108:22 109:10
109:23 112:9
112:20,21
113:13,14
114:7 115:22
116:22,25
117:1,2,5
121:9,16,18
128:14 133:4
133:19 139:18
143:1 153:9,24
156:24 160:7
163:7,19,23,24
164:4,25
204:13 205:2,4
205:7,12
208:24 215:24
216:3,4,8,19
216:24 220:17
225:6,11,12,22

245

226:3,4,5,14
226:14,22,23
227:7,9 229:5
229:5,6,9,10
229:14 230:18
231:2 232:5,6
232:9 233:3
**divided** 75:5,6
132:15 146:20
191:15
**dividing** 125:6
**DIVISION** 1:2
**document** 3:17
3:24 48:21,23
49:4 50:2,6,10
50:25 74:19
85:5 102:25
150:21 167:18
173:7 179:12
179:17 181:18
185:8 188:22
188:25 189:9
227:15 230:13
233:16,22
234:3
**documentation**
87:9
**documented**
56:2
**documents**
14:13
**doing** 20:4 25:13
26:10,17 36:22
40:2 90:3
91:23 94:12
152:15,16
157:3 165:14
178:20 201:5
226:7 227:1
**domain** 176:9
**door** 22:20
**dot** 209:9 212:8
212:15,19,19
213:10
**dots** 212:10
213:2,12,19
214:5,9,14,21
215:12
**doubt** 186:8,21
**download** 23:15

170:15 174:7
**downloaded**
70:10 167:22
**downloading**
150:19 167:21
172:19
**dozen** 146:23
**Dr** 11:1,3 12:2
14:10 30:14
31:5,6,13 32:5
32:11 58:3,4
58:14,17,24
59:10 75:22,25
76:11,12
100:25 101:7
102:21,21
116:5,10
122:25 141:7
152:9,19 204:5
209:9,17 211:3
211:5 212:15
217:22 218:23
219:1 229:12
**DRA** 63:4,6,8
66:8 69:2,6,17
69:17 87:24
88:8,10,25
89:2,7,12,22
91:9 111:5
226:19,22
231:16
**drafted** 71:2
**drafting** 24:12
88:13 92:24
**draw** 12:6 27:18
39:1,21 40:9
41:24 43:19
75:9 77:16
81:23 84:3
90:15 91:12,14
95:1,7 98:17
113:14 121:15
141:7 156:24
208:24
**drawing** 27:23
38:10,15 43:19
44:2,5,7 49:17
52:6 60:13,16
60:23 61:1,19
62:15 63:1

70:15 73:8
74:20 79:16,21
80:3 87:15,22
89:11,17,22,22
91:8 99:19,21
99:23 100:1,4
104:9,12 111:5
111:7 113:12
123:12 136:18
137:13 139:17
143:1 158:23
163:18 222:21
223:15 232:21
**drawn** 16:3,8
73:6 77:19
78:4 97:25
98:1 117:8
155:17 163:23
163:25 222:3
222:20
**draws** 223:22
**drew** 13:5,17,23
62:18 76:1
79:1,6 121:18
137:17 142:3
142:25 163:7
164:24 226:5
230:24
**driving** 20:4
**drop** 224:21,23
224:23 227:14
**due** 24:1 128:16
148:21 152:5
**duly** 5:3 235:6
**dumb** 13:15
**Dutch** 25:11

─────────
**E**
**E** 2:1,1 3:6,12,12
5:1,1 13:24
14:4 47:21
64:21 65:17,23
70:16,24 79:3
96:25 155:6,18
156:19 158:20
158:21,24
159:5,9,18,23
160:2,4,7,11
160:23,25
161:6,15,21

205:10 218:20
225:7,13 229:9
**earlier** 28:12
32:1 36:23
38:5 41:5
63:12 87:17
88:16 89:25
90:25 92:8
93:4 96:13
105:20 108:24
109:24 121:8
126:17 131:12
132:19 141:15
142:19 144:13
147:19 150:3
153:1 160:9
161:23 163:9
167:7 174:6
184:11 196:10
196:19 198:10
200:13 207:19
222:13 233:1
234:2
**easier** 140:14
174:6
**easiest** 157:7
**easily** 86:7
108:10
**east** 144:16
**eastern** 1:1,2
5:14 20:3
128:20 160:18
**easy** 69:19
**economic** 186:15
186:24
**economy** 137:23
**edge** 213:19
**Edgecombe** 76:9
97:1 105:17,18
112:13 113:14
116:16 122:10
122:25 131:2
**edges** 146:21
**Education** 36:10
36:11
**educational** 52:1
**EDWIN** 2:7
**effect** 80:23
**effectiveness**
228:3

**effects** 183:24
234:8
**EI** 59:3,11
**eight** 95:4 96:8
**eight-county**
96:16
**either** 24:12
56:15 58:15
66:8 69:1 98:5
114:15 130:25
154:12 165:7
178:23 179:23
201:20 208:24
217:14
**election** 16:17
17:4,5,6,7,18
18:3,4,5,23
19:11 21:21
27:24 62:14,17
63:13,16 81:14
**elections** 1:9
15:17,18 16:13
16:18,22,24
17:2,10,14,16
17:20,23 18:1
18:13,18,21
19:6 34:10
49:6,10 51:16
**electoral** 15:15
27:21 36:5
38:11,16 40:22
41:24 44:2
**eligible** 35:11
**Elisabeth** 2:4
7:17 9:11
11:15 126:6
222:11 223:14
230:9
**elisabeth.theo...**
2:6
**Elizabeth**
124:22,24
125:1,5,9,13
125:14,17
139:6,11 159:4
159:7,15 160:3
160:16,17,20
160:24
**employ** 26:2
216:17

246

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 71 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

employed 235:10,13
employee 18:17 34:22 235:12
employees 18:14
employer 135:20 135:21 136:2 138:22 139:9
employers 135:16 136:9 136:25
Employment 25:5
enacted 65:1,20 76:4,6 79:8 80:17,20 81:1 81:4,8,11,13 81:15,16 82:4 82:21,23,24 83:13,21 84:19 86:1 87:11,18 87:25 88:2,8 90:19 101:17 101:21,22 104:5,8 105:14 107:11 108:22 112:20,22 113:3 114:4 121:19,21 125:19 133:19 161:11 216:2 222:5 225:16 226:6
enclosed 113:3
encompasses 97:22
encouraged 194:23
encouragement 195:3
endeavor 12:14
endnote 183:22 234:3,8,11
endorsed 210:7
endorsement 210:17
endurance 7:2
engagement 7:19 42:20
ensuring 70:22

entire 10:4,6 83:18 84:4 86:25 87:21 90:15,17 94:10 99:4 102:2 109:24 110:3 207:1 217:11 218:2 220:24
entirely 124:24
entirety 10:12 10:14 160:10 221:13 223:7
entities 42:3
entitled 100:14 222:14,16
entity 25:11 40:6 40:9
entry 183:5,17
equal 70:14 71:8 71:16 72:10 114:16 125:23 126:4
equality 88:22 111:21 126:2 132:10 143:11
equipped 86:6
equivalency 94:13,14,18,23 226:18,22 227:3
erred 86:16
error 3:23 93:2 107:23 111:19 119:12 124:1 189:11 193:2 194:23,25 195:25 199:4 199:10,14,18 199:19,23 200:2,19 204:5 204:7 217:8,10 217:13,19,21 217:24 218:6 218:10,10,13 218:16,19 219:4 229:13 229:14,17
espeas@poyn... 2:10
ESQ 2:4,7,13,13

2:17
Esri 42:25 43:1 43:4,6
Esselstyn 1:14 3:1,7 4:2 5:2,7 5:9,10,18,21 6:2,6 7:7,11 8:7 10:3,8 11:10 13:17 14:7 15:2 21:4 23:2,20 24:18 25:7 28:4 33:10 40:21 44:25 46:1 48:7 57:8 61:4 63:23 74:11 77:12 79:3 80:11,24 81:24 82:6 84:4,16 85:23 87:23 92:5 95:25 96:24 99:6 100:24 112:4 117:13 119:22 131:12 134:18 140:16,24 147:16 150:22 151:2 155:22 156:9 167:8 170:9 172:18 175:11 188:17 189:7 190:16 193:13 197:25 202:15,20 204:14 205:2 208:23 214:6 216:13 219:9 220:4 223:12 224:14 230:13 233:2
Esselstyn's 222:11
essentially 26:22 35:13 38:22 46:20 47:8 55:8 103:5 206:11 209:9
establishes 72:18
establishing

73:2
establishment 71:11
estimate 189:22 191:2 204:6
estimated 39:10 39:16
estimates 55:12 71:21 73:12,24 102:25 130:17 145:15 148:2,8 148:14 149:6,9 149:23 150:11 153:18 154:6 162:11,24 164:2,16 165:24 167:8 185:14,19 187:13,20,25 188:6,18 189:12 191:11 192:1,5,21 193:6,18,19,24 194:4,9,25 195:9,10,15,17 196:5 197:9,10 197:19 199:22 203:6 227:21 228:19,23
et 1:9 5:13,14 60:11
ethnicities 162:13
ethnicity 54:15 55:5 67:16 164:22 166:17
evaluating 228:3
evidence 85:20
exact 84:19 231:21
exactly 18:20 137:21 149:12 218:25
examination 3:8 3:9,10 5:5 71:6 224:12 230:10
examine 166:21 166:21
examined 5:4
example 12:13

12:17 13:7 18:22 26:18 37:9 52:2 60:7 61:12 90:8 103:14,18 105:1 108:3 114:22 169:25 176:10,13,17 177:7 200:3 209:23 231:8 231:11
exceeded 193:20
Excel 64:12,13 66:3 69:5
exception 109:19 131:2
exchange 155:5 155:13
exclude 28:25 113:14
exclusively 91:11,15
Excuse 128:7
exhibit 3:14,15 3:16,17,18,19 3:20,21,22,23 3:25 4:1,2,3 22:24 23:8 24:5,9 67:10 67:11 147:18 150:14,17 151:3 155:23 156:10 167:15 167:17 170:5,8 172:12,15 175:7,10 180:6 180:9 183:21 185:2,5 187:17 189:2,6 190:11 190:25 191:1,9 193:16 203:23 215:20 219:13 219:15 221:20 221:20 224:19 224:25 227:12 227:16 230:12 233:10
exhibits 11:11 14:21 29:14,15 34:4

247
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 72 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

exist 223:21
existing 44:14
expect 8:21
  193:1
expectation 75:4
expeditious
  102:22
experience 17:7
  18:3,11,24
  19:11 22:1
  28:3 36:3 72:8
expert 7:12 8:9
  9:12 10:9,22
  11:1,6 15:3,6,8
  15:9 16:13,23
  17:3 19:16,22
  21:6,9,15
  28:15 29:4,8
  30:14 31:7,16
  34:18 35:6,21
  50:7 74:4
  80:25 152:5,25
  165:9,13,16,19
  165:23 178:11
  217:8
expert's 29:15
  32:3
expertise 15:25
explain 46:8
  52:12 67:9
  74:14 206:1,6
  207:19
explaining 76:15
explanation
  46:9 121:3,6
  206:8,9 217:16
explicit 220:19
explicitly 37:14
  107:13
exploration 40:5
  87:24 88:3,9
export 64:10
  69:20 93:11,15
  93:16 123:15
  223:17 233:7
exported 66:7
  69:3,16 93:18
  94:4,5,19,23
  222:17 231:20
exporting 66:2

226:2 231:8
expressed
  190:21
expressing
  234:5
extends 128:19
extent 12:15
  50:20 76:24
  78:6 132:18
  164:9
external 40:6
extraterritorial
  27:1
eyeglasses 14:12

                F
F 66:19 68:19
faced 192:11
facilities 169:14
facing 201:18
fact 59:5 107:13
  108:15 128:1
  143:16 154:3
  160:8 188:8
  209:2,25
factors 77:14
  124:21 143:12
failed 118:9
  193:24,25
  194:2,4,9
  200:7,14
failing 175:22
fails 194:14
  198:12,14
  200:16
failure 107:14
fair 14:25 22:10
  84:24,25
  120:18,25
  146:4 161:4
  178:24 180:1
  181:8 219:2
fairly 6:12 22:1
  33:22 173:3,5
  174:12,14
  183:6 203:11
  203:13
fall 8:12,13
  188:2
familiar 17:17

18:19 175:5
far 20:1 44:17
  67:24 73:1
  87:10 133:22
  209:14
farm 138:8
farming 137:1
fashion 65:25
faster 81:7 222:1
  231:5
Fayetteville 2:8
  37:10 44:3,14
  44:21
feasibility 10:16
  10:23
features 60:8
federal 71:10,15
  138:25 139:9
  139:13
feel 57:15,16
  73:10,14,18,21
  90:8 108:14
  121:4 157:2
  170:18 198:21
  202:24 212:22
  232:3
fell 154:5 194:5
felt 87:14 203:4
Female 176:13
  176:20
fields 15:2 21:6
fifth 117:3
figure 41:9,11
  41:13,15 42:9
  42:13 96:3,8
  96:11 97:7,9
  98:21,23,24
  99:5,10 100:14
  101:8,14 102:6
  104:4,14 105:9
  105:22,23,24
  106:3,10 108:3
  108:19 110:25
  111:12 112:5,7
  112:19 114:3
  115:11,15
  116:2,19
  118:10 119:7,8
  119:10,13,15
  120:14,17,19

120:21 121:8
  121:10,16,17
  121:24 123:6
  125:16 128:2,5
  128:7,8,10
  129:23 130:1,6
  131:1,3,13,15
  131:15 132:1,3
  132:24 140:21
  141:3,14,25
  142:3,15
  158:20,21
  208:15 211:20
  212:2,24,25
  218:10 219:11
  219:20 221:20
  222:2 229:24
  229:25 230:2,3
figures 29:15
  30:13 32:2
  65:18 206:24
  228:22
file 46:19 47:8
  64:11,12 66:2
  93:8 94:13,14
  224:24 232:13
  233:4,8,12,18
files 32:4,6,10,11
  46:17,20 87:2
  89:4 93:6,16
  93:18,20,21,22
  94:18,23
  222:17 223:18
  226:18,22
  227:3
fill 179:14
  211:13 213:7
filling 179:22
fills 177:17
final 129:5
  168:17,21
  169:1,2,5
  171:3 222:21
  231:17
finalizing 91:2
Finally 229:20
financially
  235:14
find 86:18
  122:17 138:4

findings 83:8
fine 11:16 14:23
  57:14 123:18
  138:18 148:12
  151:22 211:22
  223:23 234:21
firm 5:11 16:20
firms 37:11
  38:21,22
first 5:20 7:16
  8:8 12:20,20
  15:11 25:5
  28:6 34:24
  36:8 48:11
  57:3,15 58:8,9
  63:10 64:25
  66:23 67:2
  71:8 78:4
  87:24 89:17
  92:13 105:23
  149:6,9 155:9
  169:10 173:10
  173:14 180:18
  181:25 185:18
  186:2 189:20
  191:9,10
  227:24
Fishing 208:16
fit 130:4 131:22
  228:5
five 13:17 22:20
  46:13 67:11
  102:17,24
  112:17 116:22
  117:5 121:9,16
  151:25 180:19
  180:20
five- 63:19
five-county
  121:10
five-district
  122:1
five-minute
  219:5
five-year 55:7
  66:10 68:24
  69:6 71:20
  73:11,24 74:6
  130:17 145:14
  148:2,8,14

248

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 73 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

149:5,8,23
150:10 151:13
154:5 162:11
162:24 164:2
164:16 165:24
167:7 187:19
187:25 188:5
188:18 189:12
192:21 194:14
195:5,9,10,15
195:16,25
196:4 197:9,10
197:13,14,19
198:7,11,14
200:20 228:5
228:14,19,22
229:1
**fix** 212:14
**flip** 66:16 115:10
128:1 205:2
**flipping** 49:23
63:3 131:3
**focus** 33:25
205:6
**folder** 224:22,23
**folks** 17:9 26:13
85:15 102:18
177:3 224:10
**follow** 90:11
122:18 222:23
**follow-up** 223:8
224:8 230:7
**followed** 161:2
**following** 39:22
40:10 100:20
227:24
**follows** 5:4
**footnote** 98:18
102:9,10
215:18 229:23
229:23,24
230:3
**foregoing** 235:5
**forgetting** 11:20
22:15 62:8
134:16
**forgot** 31:20
**forgotten** 54:16
**form** 18:7,16
21:7 24:3

30:24 35:8
38:19 40:3,18
40:24 42:14
43:21 45:23
49:12 53:10
58:20 72:7
73:13,25 76:23
78:20 79:22
83:9 84:5,22
86:12 87:3
88:11 89:23
91:5 107:16
108:13 113:5
118:11 121:1
121:11 122:4
122:15 125:25
134:24 135:14
136:11 139:1
140:18 141:16
148:22 149:7
152:12 154:14
154:21 156:3
161:25 164:5,9
166:1,12 183:9
184:6,21 195:6
196:11 197:1
198:3,16 199:5
199:11,20
200:9 201:3,13
202:16,23
210:15,22
215:9 216:9
226:24 230:19
231:23
**format** 93:14
151:13
**formatted**
185:25
**formatting**
64:13 66:3
**former** 76:13
**forming** 26:5
**forms** 136:25
**formula** 77:20
**formulate** 175:3
**formulated**
117:25 127:6
129:15
**forth** 77:4 93:3
**forward** 154:20

229:2
**found** 46:23
47:6,13,21,25
70:8 201:11
**four** 37:3,10
106:1 111:11
111:25 121:16
121:18 151:11
**Franklin** 106:22
106:24 107:4,5
107:12,14,20
108:3,11,16
**frankly** 31:18
86:18
**free** 23:4 57:15
170:18
**freeze** 122:10
**freezing** 116:14
**front** 11:6 14:8,9
14:18,22 69:14
144:25 145:1
147:22 161:17
175:16 221:19
**FrontWater**
25:16,19
**froze** 76:4
116:15 122:25
**frozen** 116:17
122:2,14,22
123:5
**full** 5:19 6:22
55:10 186:2
189:21 191:10
193:17 222:12
222:13 228:4
**function** 70:25
**further** 194:24
199:21 212:7
222:7 231:1
234:14 235:11
235:16
**future** 195:25
200:19

──────────
        **G**
──────────
**G** 5:1 70:2
**G-a-f-f-e-l-l-a-...**
5:24
**Gaffellaan** 5:23
**game** 181:8

**Gaston** 213:21
213:24 214:1,2
**Gates** 127:9
**gathered** 179:15
**general** 12:24
31:24 45:3,7
48:9,14 51:3
65:6 70:11
73:8 77:13
78:9,16 79:9
81:2 84:2,10
87:9 116:12,13
118:17 176:11
220:5
**generally** 43:19
51:24 115:3
116:11 139:21
146:12 149:21
150:2,5 195:8
213:22 232:11
**generate** 65:19
141:15 163:16
**generated** 73:7
75:21 80:14
93:25 102:21
103:19 141:9
162:1 184:25
226:12
**generating**
82:16 90:24
203:14 226:13
226:18,21
**generation**
178:16
**geographic**
18:12 21:9,16
43:10,11,13,18
44:4,12 54:20
60:5,8 231:6
**Geographically**
109:20
**geographies**
20:24 46:22
47:1,9 54:20
**geography**
20:23 46:21
87:8 123:21
200:3
**geology** 149:15
**Georgia** 17:2

28:15,17,17
153:2 163:8
164:25 165:3
166:8
**gerrymanderi...**
32:15,21
**getting** 33:17
57:9 84:16
175:12 201:25
**Gilkeson** 38:3,5
38:10
**Gingles** 10:19,23
12:1 28:20
77:14 163:8,20
163:21,24
164:4
**GIS** 18:12 19:22
25:20 26:13,22
27:10 42:23
43:2 118:17
**give** 6:22 176:11
189:15,17
204:1 217:16
**given** 37:23 51:6
123:24 132:21
207:8 209:24
**glad** 209:7
**glass** 14:13
**glitch** 193:12
**glossary** 3:25
190:13
**go** 23:5 27:5
32:2 36:2
41:13 48:25
57:12 63:23
65:22 66:5
70:18,22 72:25
75:17 90:12
94:12 115:25
128:10 132:6
147:11 150:3
151:7 156:6
157:11 175:9
180:8 187:16
188:11,24
190:15 193:4
198:9 206:10
211:12 212:21
212:24 219:10
220:1 231:7,24

249

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 74 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

232:15 234:14
**go-to** 198:24
**goals** 155:3
208:23
**God** 117:20
**goes** 9:17 109:6
192:15 193:23
198:20 222:3
**going** 6:19 7:21
11:5 22:19
33:3 58:3 61:3
66:6 75:8
78:17 81:5
91:2 111:12
153:2 157:8
166:13 170:21
179:19 188:24
189:17 191:1
192:18 193:12
194:18 204:16
205:6 219:14
221:22 222:24
223:8 224:21
224:23,24
227:14,15
229:2
**good** 5:7 63:18
63:20 105:20
211:20
**good-sized**
134:2
**governing** 16:4
16:5
**government**
15:20 16:16
17:12 18:17
19:24 42:12
138:25 139:10
151:4 228:6
**graduate-level**
15:22
**grand** 183:6
**Grant** 28:10
**granted** 109:15
**granular** 55:4
**granularity**
162:17
**graphic** 96:4
**graphically**
103:9

**graphics** 29:16
**gray** 98:22,25
99:16 131:19
**gray-silver**
127:8
**great** 11:19
14:17 225:5
**greater** 13:11
213:16
**green** 41:16,20
42:7,13 97:12
97:13,13,19,22
98:4 126:18,25
127:20 221:4
**group** 41:15
53:6,20,23,25
54:1,5 56:10
130:7 131:24
168:4,24
169:13,14
203:11,19
205:15 206:4
206:12,14,15
206:25 207:1,6
207:8,12 208:1
217:14
**group's** 206:16
**grouped** 74:22
**grouping** 74:10
75:2,15,16,18
77:4,19 96:16
100:10,19
101:5,10,15,16
102:3 105:11
109:25 110:3
110:21 115:19
115:21,23
116:6,10,22
117:6,8,9,17
121:17 122:1
123:4 221:1,8
221:14
**groupings** 74:9
74:13 75:21,25
76:2,10 78:19
78:23 100:23
101:13,24
102:1,20 103:1
103:6,8,15,16
103:17,19

116:6,18 122:9
123:2 129:22
130:5,6 141:4
141:8 220:12
222:4
**groups** 54:5
55:21 115:13
204:14 205:2
205:21 207:21
218:2,3
**guess** 9:19 15:18
35:17 37:3
84:16 86:13
96:1 126:5
152:16 223:23
**guidance** 74:20
74:21
**guidelines** 12:24

**H**

**H** 3:12
**half** 171:2,5
**Halifax** 105:3
133:23,23
134:6 138:12
**handles** 174:24
**Hang** 50:14
131:7 181:20
**happen** 138:21
**happening**
27:24
**happy** 7:3
**hard** 11:5,19
72:12 85:15
95:3 120:17
138:3 140:8
185:25
**harmony** 125:6
**Harnett** 117:4
121:22,25
**Harper** 30:2,7
30:17 32:14,20
33:1,11
**hazy** 139:23
**head** 76:8
117:11 126:11
135:18,25
138:5,23
167:14 169:8
172:11

**headed** 6:20
**header** 45:12
181:19,23
182:17 187:20
**headers** 180:18
**heading** 28:3
**headings** 93:24
**headphones**
138:16
**hear** 46:1 58:21
58:22,23
**heard** 58:9
72:16 95:20
135:3,7
**hearing** 135:8
**hearings** 49:7,17
**heavy** 137:24
**held** 21:23
**help** 6:20 27:18
**helped** 32:1
37:18
**helpful** 23:18
41:10
**helping** 26:18
**Henderson**
132:15,22
133:3,6,20,20
133:21 134:22
213:14,15,16
**Hershlag's**
102:21
**Hertford** 138:13
**hesitate** 111:17
**hesitating** 78:10
**hierarchies** 54:3
**high** 12:3 183:6
183:10 194:25
199:4,10,12,14
199:18,22
**high-level** 206:7
206:9
**high-profile**
33:22
**higher** 132:13
143:5 145:8,18
159:18,23
174:13 181:12
181:16 192:7
199:13,18
**highest** 203:3

**highlighted** 42:7
42:13
**Hillsborough**
2:14
**hired** 40:8
**Hoffler** 32:5,11
**hold** 16:1 222:24
**home** 9:14 49:25
**honestly** 7:9
32:9 66:5
69:20 83:19
93:19 107:24
114:20 120:9
123:17 176:23
177:5 215:18
232:11
**hosted** 52:3
**Hostetler** 2:18
**hour** 57:10
**hours** 95:5
**house** 28:17
72:21 77:23
**household**
179:24
**households**
184:11
**houses** 172:6
**housing** 168:1,9
168:18,22
173:1 180:25
186:15,25
**Hub** 51:19,22,23
52:9,16 55:17
55:23 58:6
148:17 206:2
**hull** 146:20
**human** 177:2,3
177:4
**hundred** 44:20
85:2 89:15
93:19 96:21
117:15,21
**Hurley** 37:4

**I**

**idea** 176:4
**ideal** 61:24 71:3
73:2,23
**identical** 82:4,11
82:17 85:25

250

93:23 117:1
210:20 212:13
213:3
**Identification**
22:24 24:5
150:14 167:15
170:5 172:12
175:7 180:6
185:2 189:2
190:11 219:13
224:19 227:12
**identified** 12:24
24:13 73:16
100:19 103:15
105:22 121:17
124:9 131:1
**identifies** 208:20
**identify** 37:11
115:7,8 118:16
209:22 229:21
**identifying**
115:21
**II** 26:10
**III** 26:10 100:9,9
**imagine** 8:25
**impact** 76:21
228:13 234:9
**impacted** 183:25
**impacts** 93:3
184:9 195:25
200:19 235:21
**impartial** 235:22
**implemented**
19:5
**implication**
178:17 209:19
**implications**
177:18
**implied** 178:22
**implies** 44:8
183:10
**imply** 178:8
**implying** 178:4
178:7,9,10,12
**import** 85:16
88:7 89:7
**important** 6:18
20:6,7 198:22
201:10
**imported** 230:25

**importing** 231:8
**impression**
209:24 210:2
**imprimatur**
163:3
**imputation**
177:13 178:16
182:3
**imputing** 169:12
178:11,20
**inactive** 53:3
**include** 23:10
54:25 80:20
85:13 94:14,18
94:22 97:1
104:23 107:14
117:3 123:21
159:4 179:21
201:14,19
**included** 22:11
30:25 48:23
56:6 59:24
60:3 81:8 83:3
90:21,22
104:13 106:4
114:25 124:25
127:3 143:17
143:18,23,25
160:10,15,25
202:21 224:15
**includes** 54:23
124:8,12
196:16 202:9
233:23
**including** 74:21
114:18 121:22
159:14 160:3
195:15 201:23
202:10
**inclusion** 160:20
**incorporated**
160:16
**increase** 192:21
**Increased** 3:23
189:11
**increases** 193:1
**incumbency**
79:18,20
**incumbent**
49:25 51:3

224:15 225:2
**indentions** 186:1
**independent**
75:14 76:12
**indicate** 85:17
153:8 154:23
**indicated** 12:5
131:9 188:21
**indicates** 199:13
**indicating**
115:22 179:12
209:6 214:15
**individuals**
169:19 171:18
172:6 179:23
**industries**
136:19,24
137:2 138:1
**industry** 135:12
**information**
18:15 21:10,17
47:25 51:3,12
51:15 52:5
54:24,25 55:2
63:16 73:11
85:7,19 87:11
87:13 92:16,19
92:21 150:25
150:25 162:19
184:23 233:24
**initial** 11:6
23:22 88:3
148:1 157:10
168:1,8 169:1
170:1,25
171:14 223:22
**initially** 10:11
100:19 167:11
167:12
**injunction** 10:21
12:22
**input** 44:16
**insertion** 178:17
**inside** 211:19
**Insofar** 91:18
**installations**
139:6,10,15,17
**instance** 39:12
39:16 59:23
72:2 76:3

101:12 108:14
176:25 190:2
**instances** 119:24
**instruct** 33:4
50:19
**instructed** 9:22
**instructing** 9:18
**instructional**
52:2
**intend** 229:2
**intended** 48:5
55:8
**intent** 68:15
**intention** 154:9
**intentionally**
113:13
**interactive**
151:3
**interest** 19:17
20:6 88:15
111:22 115:4
132:10 133:9
133:10,17
143:11 150:9
150:12
**interested** 90:6
102:18,19
235:14
**interesting**
72:14,14
144:12 186:23
**Interject** 57:13
**interrupt** 164:8
**interruption**
188:13 193:8
**intersecting**
211:25
**intervention**
223:1
**interview** 169:6
**interviewed**
169:13
**interviews**
168:17,21

169:1,2,12,17
169:18,22,23
171:3 192:20
**invalid** 176:1,4,7
176:14,17,21
176:25 177:5
178:23
**investigating**
143:3
**invite** 86:17
**involve** 27:11
32:8 33:5
34:18 92:20
105:13,17
**involved** 17:9
26:17 32:11,22
32:23 33:1,11
33:18 91:3
205:23 226:22
**involvement**
33:21
**involves** 9:2
91:18 92:18
110:13 118:18
143:2
**Iredell** 20:2
**isolated** 213:18
214:4
**issue** 223:9,13
**issues** 17:1
103:17,21
184:4,20,22
188:21 195:8
197:18,22
202:10,22
212:15,18
229:18
**it'll** 170:18
**item** 3:20,21
65:17,22 68:19
69:2,14 175:4
175:4,14,18,22
176:1,10 177:9
179:11 180:2
180:10,11,19
212:21,21
233:18,20
**itemize** 12:19,23
**items** 64:25
66:22

**iteration** 30:10
**iterations** 32:24
  33:1,11 232:21
**iterative** 111:23
  123:25 132:8
  143:2 231:12

——————
            **J**
——————
**J** 80:5 83:8,11
  161:24
**January** 30:18
  151:9,17 152:4
  155:19,22
  156:15
**Jarmin** 187:12
**Jensen** 34:25
**Jones** 7:20,24
**Jordan** 2:13
  23:5 24:9
  190:12 219:14
  220:1
**journal** 45:19,22
**JR** 2:7
**judge** 16:17,18
  16:19 17:5,6
  18:5,5
**judging** 90:4
**judicial** 20:17
**July** 23:21 24:1
  185:15
**June** 148:5,18
  149:14,18
  151:25
**jurisdiction** 27:1
**jurisdictions**
  17:15,16 20:7

——————
            **K**
——————
**Kansas** 29:21
**Kaye** 2:4
**keep** 12:15
  53:12 98:12
  115:3 124:22
  124:24,25
  125:19 139:21
  150:5,8
**keeping** 89:5
  125:2 137:8
**kept** 125:22
  128:2 133:14

**133**:17 232:23
  233:3
**key** 65:18
  191:11 192:1,5
  193:6,18
**kind** 11:21 17:17
  29:18 31:22
  37:23 52:1,2
  59:17 77:6
  84:17 125:4
  136:4 137:9
  141:24 195:21
  214:16 222:17
  223:25 232:12
**kinds** 60:5
  126:12
**King** 18:25
**know** 6:19,25
  7:3,23 8:1,3,23
  9:20 11:7,19
  12:23 13:15
  14:5,7,24 15:2
  19:6 29:18
  31:18,19 32:24
  37:13 40:1
  50:9,21,23
  55:25 56:9
  57:14,15,24
  61:11 72:16,17
  76:7 78:21
  81:5,8 83:24
  84:6 89:3 90:3
  90:12 93:13
  98:22 99:14
  101:16 103:11
  108:7 110:2
  111:19 114:20
  117:12 120:23
  123:3,19 126:7
  127:21 129:14
  133:15,24
  134:1,10,17,19
  134:22,25
  135:12,16,20
  135:22,23,24
  136:1,23,24
  138:21 141:19
  143:7 144:9
  149:5,8 151:5
  152:7 156:5

**161**:15 163:3
  167:10 169:5
  170:2,12 171:7
  171:23 172:2,4
  172:9,17
  174:24 176:22
  177:2,4,5,23
  178:25 180:2
  180:14 181:7
  185:6 189:7
  190:1,9 191:15
  201:11,16
  204:15 207:18
  208:4 211:22
  211:24 213:19
  214:23 215:13
  217:7,9,18,21
  217:23 218:1,5
  220:7 223:6,13
  225:21 227:16
**knowingly**
  202:21
**knowledge**
  103:20
**known** 47:18
  61:5 74:10
  131:14,18
  156:4
**KOONTS** 2:13

——————
            **L**
——————
**label** 106:21,23
  106:25 107:2,3
  107:4,5,8,8,21
  107:25 108:2,7
  108:15,16
  118:2,3,5,10
  118:25 119:1,9
  119:18,24
  120:4,7,9,15
  120:20 140:1,5
  140:10,16
**labeled** 104:17
  108:4 116:2
  119:2,6,7,10
  119:18 120:8
  141:20 183:22
**labeling** 118:18
**labels** 118:22,23
  119:4,5 120:12

**141**:10,15,23
**lack** 112:15
**lacking** 106:24
**lake** 213:21,24
  213:24 214:1,2
**landmarks**
  60:11
**Language**
  182:14
**large** 26:21
  134:5 136:1
  207:9
**larger** 134:10
  212:7
**largest** 43:2
  135:20 136:1,9
  137:25 138:22
  139:9 213:11
**late** 7:1 32:5
**Latin** 29:4
**law** 5:11
**laws** 35:9
**lawyer** 117:20
**layer's** 107:2
**layers** 60:10
**layperson** 9:12
**lays** 103:8
**League** 29:4
**learn** 138:24
**learned** 148:25
**leave** 31:20 45:1
  84:11 152:17
**Lee** 117:4
  121:22,25
**left** 116:25
  128:25 178:21
  178:23 224:3
**left-hand** 101:20
  180:21 212:1
**left-most** 99:9
**legal** 7:16 8:20
  9:9 16:9 21:9
  21:19 76:24
  78:7,11 84:14
  164:10 210:11
  210:12
**legend** 214:13
  220:9,19
**legislative** 2:12
  5:12 16:10,11

**20**:15 28:18
  48:1 74:20
**legislature** 38:7
**legislature's**
  225:17,23
**length-width**
  146:22
**lengthy** 85:5
**Lenoir** 105:7,19
  110:20 112:14
  113:15
**let's** 70:13 77:12
  78:16 80:5
  119:15 123:9
  128:18 130:9
  130:20,21
  140:21 141:25
  152:23 157:17
  158:16 169:25
  170:7 175:9
  181:18 183:19
  187:16 198:9
  207:22 211:2
  212:24 213:10
  217:1 219:5
  221:19
**letter** 7:19
**level** 12:3 20:11
  20:15 30:18
  52:20 53:6,7
  53:13,17,20,23
  55:2 56:10,10
  95:14,20 98:1
  98:2 145:8
  162:17 163:2
  171:15 200:2
  203:11,17,19
  205:23 208:11
  213:5 217:15
**levels** 19:24
  54:20 212:9,14
**Lewis** 2:17 30:2
  30:3,7 31:23
  32:8,14,20,20
**liaison** 27:7
**license** 42:25
  43:4
**lied** 111:24
**life** 16:16 20:22
**light** 97:13

                                                                          252
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 77 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

138:15 221:4
**lighter** 126:25
**lightest** 97:19
**limited** 159:12
205:8
**limits** 74:5
160:17
**line** 75:9,9 85:8
99:9,11 113:3
120:22,25
127:8,21
128:22 140:3
160:24 161:2
229:23 230:3
232:21
**lines** 41:16,20
75:10 91:7,21
91:25 93:3
97:10 98:23
99:16 120:18
211:22,22,25
230:17,25
**link** 46:24 47:6,9
47:13,22,23
48:5 56:6,7
**linked** 48:21
**list** 28:7 35:4
36:4 40:15
74:8 138:20
225:2
**listed** 35:3 38:12
39:2 45:22
96:13
**listen** 49:5,9,16
**listening** 177:21
218:8
**lists** 113:17
**literally** 22:20
**Litigation** 28:3
**little** 9:15 24:17
26:9 28:14
44:7 64:13
65:14,16
102:15 122:17
170:17 173:13
174:13 183:16
189:16 234:18
**live** 171:19
207:11
**lived** 16:15

20:21
**livestock** 137:2,4
137:10,13,20
**livestock-relat...**
137:2
**living** 25:13
**LLC** 25:9,15,16
25:19,23,25
26:3,5
**LLP** 2:4,8,14,18
**load** 59:22 60:15
62:22 69:1,11
94:6
**loaded** 62:12
69:3,5,7
223:19
**local** 15:20
16:16 17:12
19:21 33:19,25
36:22 37:1,16
38:11,14 39:1
40:15 42:19
44:15 59:21
**located** 125:10
159:4 160:3
**location** 107:25
118:25 120:21
139:16
**locations** 20:5
224:16 225:3
**logic** 83:11
**long** 10:21 22:14
36:4 57:10
60:19 95:1
156:5
**long-range**
26:19
**longer** 154:25
**look** 14:24 23:4
40:2 45:9
46:22 48:8,13
51:14 63:15
67:2 81:6
93:23 95:24
96:3 100:8,11
103:1,2 108:10
108:19 110:24
112:5 115:10
117:20 119:15
120:14 122:9

128:8 133:1
141:25 142:15
157:5 158:16
164:24 169:9
169:10 181:18
183:19 203:25
208:13 213:10
217:1 219:9,11
219:18 233:10
**looked** 22:14
48:17,19 51:11
75:25 77:5
87:10 90:25
96:12 105:22
108:3 115:14
161:1 165:2
184:11 196:9
196:18,22
200:12
**looking** 10:10
20:18 41:6,11
55:4,9 62:20
70:7 74:19
81:7 87:25
88:17 90:5
96:11 114:11
119:23 120:19
121:24 124:1
130:1 132:17
134:11,11
149:1 157:12
158:12 161:13
161:19 162:13
164:21 166:17
170:22 181:21
188:22 189:9
193:15 194:12
206:12,18
207:20 209:14
209:19 214:7
219:19 222:2
222:12 233:2
233:17,22
**looks** 23:14
24:25 25:22
26:6 27:8 36:4
67:6,24 70:5
80:13 98:25
106:21 115:17
124:3 126:23

140:10 142:3
155:5 160:22
168:16,20
174:14 177:12
213:11
**lot** 14:18 16:21
18:19 20:17,18
20:23 52:5
60:7 74:1
124:8 131:16
136:23 139:6
186:1 217:7
**low** 184:3,4
**lower** 145:22
146:1,7 153:25
158:3,5,14
168:9,10
183:17 184:12
184:15,17
**lowered** 157:20
157:21
**lunch** 111:25
**lunch/dinner**
111:13

**M**

**M** 2:7,13
**M-a-a-s-t-r-i-c...**
5:25
**Maastricht** 1:16
5:24
**Mackie** 37:6,12
**main** 211:10
**maintaining**
26:25
**major** 55:15
**majority** 13:1,2
13:9,10,25
85:5 95:23
96:9 105:21
106:3,7 111:22
114:17 115:6
120:5 129:20
131:1 154:16
173:11 208:19
208:24,25
209:3,18,25
210:1 229:5
**majority-black**
106:6,8,8

124:9
**making** 5:16
55:20 70:18
111:22 194:24
**managing** 25:25
26:22
**manipulate**
180:17
**manner** 33:24
136:15 161:23
**manually** 119:2
**map** 9:6 13:8
31:15 34:4
46:22 67:4,12
76:3 79:16
81:20 82:1,19
83:1,7,13,18
90:15,17 92:6
94:17 95:2
97:9,25 99:12
99:20 100:2
101:20 104:17
106:13 107:4,6
107:9,15,21
108:10,17,21
110:17,18
111:2 112:22
114:6 116:6
117:23 118:7,8
118:16,21
119:23 123:2
126:17 132:23
137:6,20
139:19 140:14
141:5,11,20
142:16 158:21
158:21,24
160:2,2 209:17
209:19,24
212:13,20
213:11 214:7
214:17,23
215:17 219:20
220:10,20,23
220:24 221:11
221:19,21
223:7 225:22
**map-drawing**
42:18
**Mapfigure** 25:6

253

25:9,12,14
mapping 85:16
118:17
maps 16:4,9
17:15 20:15,16
20:17 28:19
30:13 31:1,14
32:2 40:9 45:6
50:2 56:22
66:23,25 69:25
75:24 80:3
81:23 82:3,4
83:15,23 85:6
85:11 86:4
88:24 95:7
104:10 105:12
106:15 108:2
115:14 133:19
137:9,13
209:10,14
222:12,20
225:7,13 226:4
231:21,24
Maptitude
41:23 43:3,5
56:23 58:10
59:15,18,22
60:15,19 62:23
64:6,10 67:7
80:14 81:25
82:8,20 83:18
87:1,20 89:8
89:10,22 90:7
90:12,23 92:4
93:25 94:8
96:4 123:16
139:20 146:23
162:2 222:18
223:19 226:2
226:10,12
230:16 231:1
231:15,20
232:16,19
233:3,8,8
March 152:11
227:19
margin 3:23
194:25 200:2
200:19 204:6,7
217:10,13,19

217:21,23
218:6,9,10,15
218:19
margins 189:11
193:2 194:23
195:25 199:4
199:10,13,18
199:19,23
217:8 218:13
219:3 229:13
229:14,17
mark 23:7 24:9
147:17 150:17
151:3 167:17
170:7 172:14
180:9 185:5
189:6 190:24
219:15 224:25
227:15 229:25
marked 22:24
24:5 150:14
167:15 170:5
172:12 175:7
175:10 180:6
185:2 189:2
190:11 219:13
224:19 227:12
Marshall 37:4
Massachusetts
2:5
material 22:11
materially
173:24
materials 48:18
223:1
math 117:20
matrices 179:18
179:20,25
matter 5:12 8:8
223:3
MATTHEWS
1:5
Mattingly 75:22
75:25 76:11,12
100:25 101:7
102:21 116:5
116:10 122:25
141:7
mean 12:9 13:11
14:5 15:18

16:14 27:16
29:9 33:4 39:4
48:3 50:24
60:6,9 73:16
76:19 83:2
88:6,12,21
93:24 98:13
101:9 118:8,25
126:14 158:7
172:1 192:8
203:19 223:5
meaning 26:23
means 74:15
meant 95:4
101:24 115:20
115:21 174:18
measure 216:6
216:14,18
measures 146:6
146:7,17,18
147:1
Mecklenburg
1:22 21:2
235:3
median 189:22
191:2 193:19
meet 35:12,12
96:20 154:11
184:25 185:20
187:13 194:11
195:9,16 198:1
198:6 200:7,14
meeting 7:19
71:5 163:24
meetings 49:10
49:21
meets 111:20
154:25
member 7:14
25:25
memories
185:11
memory 105:2
123:18 151:21
151:22 213:23
218:24
mention 12:19
27:6 62:19
74:25 105:25
138:21 201:15

201:19 215:18
mentioned 21:19
25:15 28:12
32:1 33:18
42:22 51:9
73:4 76:14
90:17 91:3,19
93:4 101:25
116:24 132:18
151:20 195:17
198:23 201:24
209:7 212:18
218:12 223:17
231:11
mentioning
63:12 105:24
mentions 8:24
Meredith 1:21
3:3 23:7
234:17 235:4
235:25
met 10:17 12:6,9
70:23 77:15
114:15 125:23
126:7 191:12
192:6
method 56:5
178:20 208:12
methodologies
152:16
methodology
46:11 58:6,18
58:24 59:8
152:15 157:4
207:14 228:1,3
228:13
methods 146:15
177:13 216:14
216:18
metric 62:11
metrics 216:22
216:23
Middle 5:20
middle-ish
181:22
midway 227:23
miles 20:4
military 139:6
139:10,15,17
million 167:25

168:13,17,21
170:1 171:12
mind 7:22 32:12
55:15 63:10
75:14 138:7
202:7,9
mine 162:13
minimize 75:6
141:24
minority 216:7
minus 71:7
73:23 74:5
126:8 204:6,8
minute 13:16
50:14 75:17
114:11 115:11
138:17 162:7
188:12 189:16
189:17 219:11
minutes 133:8
224:6,9
mirror 191:20
191:23
misleading
209:13
mispronouncing
11:2
misrepresenting
209:10
missing 117:22
118:1 141:11
178:4 179:14
mistake 86:18
Mitchell 37:5
Mm-hmm
134:20 167:13
174:9 186:20
modified 86:15
141:4 142:21
modify 86:21
module 42:24
moment 22:22
24:20 90:7
131:7 158:18
169:8 214:4
moments 66:1
month 149:17
149:20
months 152:1
228:12

254

moot 223:9
morning 5:7
MOSES 1:5
move 28:1 46:4
    57:23,25
    120:11 138:16
    152:23
moved 119:19
    120:9
moves 140:17
moving 59:14
    91:21,25 93:2
    140:1,4 154:20
    159:2,3
Mullins 2:14
    5:11
multiple 9:2
    42:21 54:5,19
    59:19 111:20
    124:21 179:21
    184:9 201:24
municipal 15:20
    18:21 21:10,11
    21:12,17 26:25
    27:19 35:2,4
    40:22 73:7
    153:3
municipalities
    39:2 40:14
    41:19,23
    132:17 133:13
    133:22 134:2,4
    134:5,9,13
municipality
    42:12 132:15

**N**

N 2:1 3:6,6,12
    5:1
name 5:10,19,20
    5:20,21 11:2
    37:8,19,20
    38:2 54:1 61:4
    67:3 133:11,12
    133:23 233:18
named 114:4
names 106:12
    134:16
narrow 230:8
Nash 106:20

107:12
national 3:17
    167:18 173:25
    174:12
Nationally 172:9
nationwide
    180:12
native 20:20,25
    208:20 209:3
naturalization
    183:4,16
nature 9:9,13
NC 174:8
NCLCB 30:18
near 229:24
nearby 70:1
    76:2
nearest 179:17
    179:19,20,24
nearly 210:20
necessarily 33:5
    179:18 200:1
    218:11
necessity 79:11
need 7:2 12:12
    57:16 103:12
    138:15 208:9
    234:17
needed 18:15
    19:24 35:19
    52:24 53:5
    77:16 156:23
needs 77:8 78:12
neglected 27:6
neighbor 133:5
    179:15,17,19
    179:20,24
neighborhood
    183:15
neighboring
    8:24 9:1
neighbors
    179:21
neither 235:9
Nelson 2:14 5:11
nerd 20:23
Netherlands
    1:16 6:1 25:14
never 42:11 61:5
    93:14 140:17

new 19:4 39:9
    84:20 150:5
    153:17 154:5
    157:13 227:19
new' 193:24
    194:4
next-nearest
    179:15
next-to-last
    183:20,21
next-to-the-last
    36:15,18
Nice 21:3
Nine 194:11
Ninety-nine-pl...
    215:5
noise 22:21
nonattorneys
    37:15 38:4
nonpartisan
    33:20,23
nonprivileged
    92:21,23
nonresponse
    175:19,23
    176:2 177:9
    179:3,11
    186:17 228:2
    228:14 229:18
nonresponses
    174:25
nope 170:9
North 1:1,8 2:9
    2:15 3:18 5:13
    5:15 6:4,5 8:16
    10:4,17,24
    15:17,20 16:13
    16:15,22,23
    17:1,4,8,18,19
    19:4,12,15,17
    20:20,22,25
    21:18 30:17
    33:22 35:10
    39:22 40:10
    45:3,6 48:1,9
    48:14 51:16
    64:3 65:6
    70:11 74:21
    77:13 78:19
    79:19 81:2

96:9 97:10
    99:5,8 100:16
    104:5 108:11
    109:1 117:9,13
    117:18 118:9
    131:14 133:16
    136:6,7,10
    144:17 170:3
    170:14,23
    171:8 173:24
    174:4,11,16,22
    235:2
Northampton
    138:12
northeast-ish
    160:23
northeastern
    10:17,24 97:9
    99:7,15,15
    100:15 109:1,4
northeastern...
    109:3,5 220:21
northern 125:4
    160:14,18
Northwest 2:5
Notary 1:22 3:3
note 82:1,2
    148:5 169:9,11
    193:23 195:12
    198:23 225:15
noted 108:24
    148:1 200:18
notes 37:24
notice 30:6
    104:16
noticed 39:6
November 22:11
    22:14,17
    197:24
number 3:13
    12:18 20:14
    44:23 71:6,7
    75:7 76:7
    83:12,15 95:21
    95:21 109:19
    115:22 119:24
    124:11 168:8
    168:20 170:2
    171:2 172:6
    175:18 179:1

192:20 204:1
    204:18 205:18
    206:8 228:17
    230:2
numbered 181:2
numbering
    104:25
numbers 47:10
    47:24 52:22,23
    65:20 67:20
    69:18,18 73:6
    83:11,17
    115:20,21
    163:16 166:3,5
    168:11 206:23
    206:24 207:1,2
    228:25,25
    229:1
numeral 100:9
numerous
    192:11

**O**

O 3:6 5:1
oath 73:22 86:14
object 24:3
    57:13 210:14
    230:19
objected 126:6
objection 9:8
    11:14 18:7
    21:7 30:24
    33:3 35:8
    38:19 40:3,18
    40:24 42:14
    43:21 45:23
    49:12 53:10
    58:20,22 72:7
    73:13,25 76:23
    76:24 78:6,20
    79:22 83:9
    84:5,22 86:12
    87:3 88:11
    89:23 91:5
    107:16 108:13
    113:5 118:11
    121:1,11 122:4
    122:15 125:25
    134:24 135:14
    136:11 139:1

140:18 141:16
148:22 149:7
152:12 154:14
154:21 156:3
161:25 164:5,9
166:1,12
174:18 183:9
184:6,21 195:6
196:11 197:1
198:3,16 199:5
199:11,20
200:9 201:3,13
202:12,16,23
210:10,10,22
215:9 216:9
231:23
**obscure** 140:3
**obscured** 106:22
106:24 127:20
**observed** 19:7
**observer** 19:3
20:9
**obtained** 50:11
83:17
**occurred** 85:17
**Ocean** 113:2
**October** 81:9
**offer** 43:2 78:14
111:12 154:9
162:17
**offered** 15:3
**offering** 33:20
96:15 164:3
**offers** 146:23
162:18
**office** 22:21
**officer** 235:22
**official** 151:4
228:10
**Oftentimes** 6:19
**oh** 7:23 25:20
60:5 144:12
161:12
**Ohio** 2:19
**okay** 6:9 7:7,21
10:15 11:13,22
13:10 14:11,14
14:17 15:2,14
22:10,18 23:16
23:19 24:25

25:3,9,22
27:23 28:6,14
28:23,25 29:8
30:9,19 31:17
32:25 33:13
34:2,9,24 35:6
36:8,14,21,25
39:15 41:5,11
41:18 42:6
43:15,18 45:2
45:21 46:7,13
46:16,19,23
47:13 49:20
50:9 51:21
52:24 53:1,9
53:19,22,25
54:12 56:9
57:18 58:14
59:14,22 60:25
61:18 63:15
64:14,17,23
65:9 66:9,13
66:16 67:2,6,9
68:7,11,23
69:13,21 70:7
70:13 71:8,15
74:14,24 75:16
76:18,21 78:16
78:25 79:5
81:19 84:9
87:15 88:5,9
89:19 94:6
95:1 96:3,8
97:6,22,25
98:4,8,12,21
99:1,14,25
100:8,22
101:16,20
102:9,15 104:3
104:13,16,20
105:16 106:12
106:18 107:5
107:10 108:24
109:6,9,18,20
109:23 110:2,5
110:20 111:4,7
111:13,15,24
112:7,13,17,23
113:9,12,17,20
113:23 114:1

114:15 115:17
115:24 116:5,9
116:18,21
117:5,8,12,22
118:1 119:12
119:15 120:11
120:14 121:24
122:12,24
123:3,15,18
124:3,8,12,15
125:19,22
126:23 127:7
127:11,15,20
128:1,8,10,24
129:5,10 130:1
130:9,20,24
131:6,11,25
132:4 134:8
135:3 137:22
138:6,14 141:7
141:10,19
142:7,10,14,24
143:13 144:6,8
144:22,25
145:2,7,17,21
145:25 146:4
146:14 147:16
147:25 148:12
148:16 149:5
150:19 151:11
151:16,24
152:9 153:6,16
153:20 154:3
155:5,14,17,25
156:14,18
157:1,5,24
158:6,19,23
159:3,11 160:1
161:5,12 162:6
162:16,23
163:11,17
164:1 167:6,10
167:21,24
168:4,8,13,16
168:24 169:17
170:7,13,15,16
170:20,22,24
171:7 172:5,9
172:14 173:3,6
174:3,10,24

175:15,16,17
175:21,25
176:15 177:12
177:16 178:2,3
178:19,25
179:13,22
180:15,16,24
181:15,18,21
181:22,25
182:3,19,22
183:4,19,24
184:3 185:7,8
185:15,24
186:8 187:16
187:18 188:8
189:4,20 190:7
190:17,24
191:15 192:10
192:25 193:4
193:15,23
194:9,17,21
195:3,21 196:4
196:7,21,24
197:16 199:9
200:6 201:1
203:22 204:4
205:4,20 206:1
207:4,14
208:15,19,23
210:6,14,19
211:2,12,16,19
212:9,13
213:18 217:18
218:18 219:24
220:12,15
221:10,16,22
222:2 223:5
224:2 225:15
226:1,8 227:2
227:18 228:9
229:4,17 230:4
230:16,24
231:18 232:16
233:10 234:2
234:13
**once** 103:5 223:2
**one-size-fits-all**
43:23
**one-stop** 52:5
**one-year** 185:14

175:15,16,17 ... 
**ones** 55:15 93:24
131:18 132:20
134:10 144:9
150:8
**Onslow** 112:23
113:1,6,7
**opaqueness**
212:10 213:5
**open** 23:15
172:20 174:10
175:12 180:14
180:15 222:25
227:16,17
**opening** 24:20
150:20 167:22
185:7
**operations**
137:11
**opinion** 10:9,11
10:15,23 11:1
11:25 35:24
77:3 78:14
108:12 135:11
138:2,4 166:9
178:11 234:5
**opinions** 11:4
74:19 77:3,5,7
**opposed** 9:22
53:7 55:8
**optimal** 103:15
**option** 101:16
106:14 199:1,3
202:3,6 203:3
231:13
**options** 100:20
101:15 146:24
231:10
**orange** 213:2
214:14 215:2,4
**order** 163:23
177:3 180:20
208:10 234:16
**orientation**
161:18
**origin** 50:10
182:14
**original** 157:14
197:17,20

256

219:22
**outcome** 235:14
**outer** 129:22
**outline** 127:7
**outlined** 11:8
   111:1
**outside** 18:24
   82:3 85:24
   133:7 181:14
   182:7
**overall** 67:14
   180:25 181:9
**overlap** 141:24
**overlapping**
   118:23 120:22
**overlaps** 119:25
**overturned**
   20:14

_____

**P**

**P** 2:1,1 5:1
**p.m** 112:2,2
   147:14,14
   156:7,7 193:9
   193:9 219:7,7
   224:11,11
   234:15,15,23
**pack** 65:1,6 85:2
**package** 58:19
   59:1,3,11 60:4
   60:12
**packages** 59:6
**packs** 83:20 85:8
**page** 3:13 23:10
   23:17,17 24:19
   28:2,2,2 34:17
   36:2,18,19
   38:12 39:8
   41:9,10,11,13
   44:8 45:9,10
   45:13 46:5
   48:10,15 49:2
   49:23,24 63:3
   63:23 64:22
   65:7,10 66:19
   67:2 69:14
   70:3,8 80:6
   95:24 96:1
   97:5 100:10,12
   104:3 108:19

110:24 112:5
114:12 115:10
119:16 123:9
125:16 128:7
130:2,9,10,20
130:20,21,23
131:25 132:2,3
141:1,4 142:1
142:14,15
144:23,24
151:7,8,19
153:7 157:6,11
157:17,18,25
158:13,13,16
158:19 161:7,8
161:8,10 162:6
177:8 180:18
180:24,24
181:18,21,22
182:13 183:20
183:21,22
185:9,10,11,12
185:24 186:3
187:16 188:25
189:20 190:15
190:18 191:9
191:20 193:15
198:9,10 204:1
204:2,4 208:13
209:6 211:2
212:25 217:1
219:10,18,19
229:22 234:4
**pages** 48:22
   68:13 69:24
   70:6 85:2
   147:25 157:8
   189:5
**paid** 19:6
**pair** 14:12
**pandemic**
   183:25 192:13
   228:10 234:9
**pandemic-rela...**
   227:25
**pane** 60:19,22
   61:7,15,18
   62:3,4,15 63:1
**paper** 14:18,23
   22:5 81:6

102:13,16
103:4,4,8
104:1 108:6
131:3 144:20
145:1 147:22
221:22 222:2
**papers** 100:25
**paragraph**
   46:13 47:25
   51:10,18 52:15
   54:8 56:6,21
   57:22,25 58:8
   59:14 63:3,11
   63:11 96:10
   102:5 105:25
   129:19 147:25
   153:7,14,22,23
   162:8,10
   164:15,19
   185:18 186:1,2
   187:7,8,11
   191:10 192:19
   193:17 194:13
   194:17,22
   195:23 203:25
   204:4 208:13
   208:15 211:3,4
   211:11,14
   212:11 227:24
   228:9
**parentheses**
   190:19
**park** 134:17,23
   135:4,10
**parsing** 153:11
**part** 15:21 19:20
   26:21 28:25
   37:21 41:5
   48:11 49:8
   50:6 60:2 62:6
   62:10,19 72:20
   74:12 77:8
   82:9,18 86:8
   90:21 91:1
   92:20 97:4
   105:14 118:6,8
   119:24,25
   125:4 134:23
   135:4,9 155:9
   181:22 186:13

192:14 194:20
209:6 214:15
226:24 233:4
**part-black** 68:4
**partial** 8:18,19
   94:6,9,16
   131:10 232:9
**partially** 119:19
   119:20
**particular** 9:24
   32:25 33:13
   72:5 78:8
   107:9 114:25
   118:15 131:20
   132:11,16
   150:8,12 177:7
   185:13 198:6
**parties** 235:10
   235:13,22
**partisan** 32:14
   32:21 63:13,16
   79:15,17,20
   80:2
**partner** 7:20
**parts** 32:22 87:7
   87:8 90:1
   126:13 160:15
**party** 34:14
   235:17
**Pasquotank**
   124:13,16,19
   125:10,18,20
   125:22 126:9
   126:24 127:7
   127:16 128:2
   129:6,12,17
   138:21,22
   139:9 147:5,9
   159:5,13 160:3
   160:14
**passed** 84:13
   191:11 192:5
   193:6,18
**Patrick** 2:17
   34:6
**pause** 58:2 89:13
**pauses** 57:10
**pay** 20:23
**paying** 20:4
**PDF** 23:17 24:18

28:3 46:5
49:24 63:24
64:22 65:10
69:15 96:1
150:20,23,24
189:5 220:5
233:18
**peak** 201:17
**peer-reviewed**
   45:15 216:14
   216:17
**peers** 45:17
**pending** 5:14 7:4
**pens** 14:13
**people** 13:14
   52:6 131:23
   144:16,16
   146:21 167:10
   168:5 169:23
   171:8,24 177:2
   186:14,23
   207:24 215:1,5
**people's** 77:6
**percent** 13:11
   44:20 68:8
   71:7 73:23
   74:6 89:15
   93:19 95:18
   96:21 97:20,23
   98:5,5 114:13
   117:17 126:8
   126:21 127:12
   127:17,24,25
   128:3,4,13,23
   128:23 129:1,7
   129:11,18
   130:14,18
   133:6 140:11
   145:4,7,12
   154:5,11 155:1
   155:7 157:20
   157:21 173:12
   173:19,21
   181:1,3,10,11
   181:15 182:5,5
   182:20,22,24
   183:1,16 190:7
   191:4,6,17,20
   191:20,24
   192:2,4,9,22

257

193:20 204:5 207:22,25 208:2 215:1,5 217:5

**percentage** 65:19 67:25 68:3 97:13 98:8 145:17,19 153:17 154:4,7 158:5,14 190:5 190:10 191:23 208:4 218:16 228:22 229:6

**percentages** 67:15 153:9,25 166:22 190:22

**perception** 33:24

**Perfect** 6:16 145:2 192:10

**perform** 29:23 40:21 41:18

**performed** 42:11

**performs** 52:18

**perimeter** 146:22

**period** 55:7 103:18 169:15 169:18

**permanent** 6:2

**permissible** 12:13

**person** 6:14 26:13 37:17 84:14 181:9 209:13

**personally** 59:7

**persons** 169:13 209:21,22

**pertaining** 49:11

**phase** 10:21 93:21 94:21

**phrased** 197:5

**PI** 93:21 94:21

**picture** 61:9

**piece** 42:21 75:2 75:15,17,18 103:23 108:6 166:20

**pieces** 44:9 69:4 95:3 202:1 214:10 231:3

**Pierce** 1:5 5:13

**pink** 221:10

**Pitt** 76:9 105:17 105:18 112:14 113:14 116:16 122:10,25

**Pitt/Edgecombe** 122:2,13 123:4

**pivoted** 161:18

**place** 106:12 108:1 119:3 120:16,16 194:2

**placed** 212:3

**placing** 118:24 141:23

**plaintiffs** 1:6 2:3 7:12 10:3 34:16

**plaintiffs'** 7:13 7:14 10:13 29:10

**plan** 4:1 10:5,7 43:22 48:20 65:1,2,5 67:3 70:8 71:12 79:14,21 80:20 80:22 82:10,21 82:23,24,25 84:4,19 86:3,8 86:25 87:18,21 88:8 89:16 94:7 101:18,22 105:4,5,7,14 106:1 112:21 112:22 113:3 114:4 121:19 121:21 220:6 222:5 226:6

**plan's** 90:19,19

**planner** 21:23

**planning** 26:10 27:10,14

**planners** 26:17

**planning** 21:24 22:1,2 26:14 26:19,23,24

**planning-relat...**

21:25 25:21

**plans** 19:5 20:12 20:14 28:18 38:11,16 39:1 39:9,22 43:20 44:3 45:2 49:18 52:7,7 70:23 79:2 80:18 81:1,8 81:13,16 84:20 85:22 86:11 87:16,17 90:22 91:2 105:15,16 125:19 188:1 216:2 222:14 222:21 223:11 225:17

**please** 5:18 6:21 7:3,4 8:3 24:8 24:18 27:17 32:17 46:8 48:12 66:20 70:20,21 80:6 95:25 96:3 97:5,8 104:4 108:19 110:24 112:4 123:9,10 130:10 140:9 141:1 142:19 157:6 158:17 164:12 171:16 185:6 187:17 202:18 203:25 205:8 206:6 211:3 217:1 219:9 233:10

**plewis@baker...**

2:20

**plot** 209:10

**plots** 212:16,19

**plus** 71:7 73:22 74:5 125:5 126:7 204:6,8 224:6

**plus_AP_BLK** 67:25

**pod** 122:13

**point** 7:2 46:24 77:7 82:21,23 88:1,2 89:21

94:8 105:21 155:18 158:25 159:2 223:16

**pointed** 108:4 186:12 208:16

**political** 12:15 15:6,8,10,13 15:21,25 16:1 62:14,17 79:15 80:10 85:4

**poll** 18:25

**Polsby-Popper** 62:2 145:25 146:11 147:1

**Popper** 146:15

**populated** 159:7

**population** 12:13 13:2,3 39:10 46:25 47:16 54:13 55:21,22 61:12 61:23,25,25 62:7,10 64:17 64:18,19 66:13 66:14,15,18 67:14,20 68:4 68:8,9,20 69:22 70:14 71:1,3,5,9,11 71:17,19 72:4 72:6,9,10,21 72:24 73:2,6 73:11,23 74:5 88:15,22,23 95:14,18 96:12 96:13,22 97:14 98:6,9 102:25 103:5 111:21 114:13,16,17 114:23 125:23 126:1,2,5,8,21 127:12,17 128:13 129:3,7 129:11 130:13 132:10 133:6 140:12 143:11 143:25 144:2,4 145:3 154:13 155:2 160:20 166:22 167:1

181:23 182:1 182:14,17 202:4 204:8,19 205:14,16,16 205:17,21 206:3,13,15,16 206:18,20,21 207:6,10,16,21 207:23 208:1,3 208:5,20,25 209:1,12,13,18 210:8,9 211:7 211:8 216:7,14 216:18

**populations** 13:9 73:3 134:12 206:12 214:9

**Porter** 2:4 8:2

**portion** 48:13,15 92:24 102:5 119:25 121:23 125:9,17 126:24 127:3 127:11 159:4,7 159:14 160:23 161:1 179:2 192:20 213:12

**portions** 48:8 130:25 132:6

**posed** 228:10

**possible** 12:16 31:12 119:9 122:12,16 124:1,23 132:18 139:21 207:9 230:22 230:24 233:7

**Possibly** 94:21 149:19 230:20

**post** 192:15

**postal** 5:25

**potentially** 223:3

**Poyner** 2:8 7:25 8:3 33:16 37:7 37:13,17

**practice** 38:8 203:21 232:12

258

practitioners
  56:1
precedes 96:11
precinct 43:16
precincts 12:16
  44:22 49:25
precise 66:17
precision 162:17
precondition
  163:24
preexisting
  78:19,22
preliminary
  10:21 12:22
preparation
  34:3 58:15
prepare 29:12
  30:13 224:8
prepared 29:14
  31:1 65:2
  165:13
preparing 46:11
  48:7 49:8
  56:19
presences
  139:13
present 7:18,18
  91:3 116:19
  133:10 136:20
  147:8 155:6,11
  155:11,15,24
  157:10 197:8
  197:13 212:15
  227:8
presentation
  136:14
presented 21:25
  131:9 156:18
  184:23 209:17
  226:9
presenting
  85:19 178:14
  229:4
preservation
  143:10
preserve 132:17
preserved 134:3
preserving
  44:22
press 3:22 4:3

114:19 185:5
  185:13 227:18
presumably
  128:6
pretty 85:10
  90:4 113:10
  114:21,23
  134:5 189:16
  222:19
prevent 7:8
preview 61:9,15
  62:4
previous 12:5
  20:12 21:9
  53:2 57:2,3,5
  59:20 84:12
  93:10 103:4
  152:14 153:21
  164:21 166:16
  184:25 191:19
  195:10,16
  197:23 198:5,7
  204:16 210:9
  218:12 230:7
previously 17:11
  193:25 194:4
  216:21 231:16
primarily 10:22
  37:10 59:15,18
  91:22,24 92:2
  128:16 137:23
  137:24
primary 13:23
  14:4 33:17
  34:12 37:3
  68:20 70:15
  75:24 78:17
  79:2 87:16
  95:12,17 96:25
  111:1 112:7
  114:10 115:18
  116:3 124:19
  125:10,14
  137:6,6 203:1
  205:7,11 232:4
principal 25:22
print 156:1
print-to-PDF
  151:4 167:19
printed 14:18

22:8 215:7
printout 156:11
  156:14 175:12
  180:11 185:9
  189:5
printouts 180:17
prior 26:5 45:18
  57:16 173:17
prioritizing
  44:18
private 38:8
  40:8 135:21
privilege 92:11
privileged 8:5
  92:7,10,16,19
pro 34:12
probably 20:13
  120:22,23
  121:5 131:22
  170:17 189:1
  223:9
problem 204:16
proceeding 16:9
  21:20 202:7,8
  235:21
proceedings
  21:9
process 44:15
  46:11 56:2
  77:4 78:12,12
  88:12 89:14,25
  90:11,21 91:1
  91:18 92:18,20
  93:2 111:18,23
  118:18 123:25
  125:4 132:8
  143:2 179:8
  194:19 205:22
  206:11 231:7
  231:12
produce 43:6
  50:6 52:8 69:2
  82:25 83:2
  85:21 86:2
  93:5 103:23
  104:1
produced 56:24
  94:20 137:4
product 43:3
  123:15

products 52:1
  196:1 200:20
  228:15
professional
  1:21 21:22
  45:17 72:8
program 26:20
  64:6,9
project 36:3
  37:16,22,23
  38:1 40:1
  60:17 89:3
projects 33:25
pronounce
  144:7,10,14
pronunciations
  144:17
properly 86:6
proportion
  206:16,24,25
  207:10,20
proposal 20:16
proposed 20:19
propriety 35:16
prose 85:13
protection 79:18
provide 10:9,11
  10:15,25 11:25
  17:3 19:23
  23:25 28:19
  51:25 52:1,4
  83:11 84:20
  86:6,9 87:11
  87:13 102:20
  126:14 143:4
  166:2,5 175:22
  225:2
provided 11:1
  29:10 39:17
  42:3 50:2,18
  53:13,16,19,23
  54:19 59:24,25
  74:20 76:11
  83:21 85:11,14
  85:25 86:14
  87:9 93:20
  94:2 103:16
  136:13,15
  176:8 178:24
  225:5,10

229:14 231:17
provides 54:13
  201:7 219:3
providing 10:22
  65:18 187:9
public 1:22 2:18
  3:4 15:23 36:3
  40:8 51:2
  58:19 59:1
  228:5
publication 3:16
  45:18,19
  150:18 152:4
  171:20 172:5,8
publicly 59:10
  200:7,13
publish 136:8
  194:18
published 45:12
  45:15,22 59:3
  136:13 148:17
  149:6,9 152:3
  156:15,21
  180:12 193:2
publishes 53:6
  171:14 178:25
  180:2
pull 65:5 233:20
pulled 220:5
pure 211:24
purely 83:11
purple 111:2
  128:12
purpose 49:11
  162:20,25
  164:3,17,20
  166:11,15,15
purposes 25:13
  120:24 143:25
  227:10
put 11:11,20
  31:21 63:1
  107:20 112:15
  120:16 126:24
  177:2 192:3
  194:2 209:20
putting 38:23
  44:9 75:11
  119:5
puzzled 31:18

259

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 84 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

86:19

**Q**

**QGIS** 42:23
66:8 69:1,9,11
69:15,17,18
71:4 89:10
90:17,22 92:3
94:1,5 96:7
97:15 106:10
106:12,16
123:16 222:18
223:19
**qualify** 35:11
152:15
**quality** 184:19
184:22 185:21
187:24 188:1
191:12 192:5
194:14 195:8
197:18 198:2
198:12,15
200:8,14,16
201:12 202:7,8
202:10,22
203:3
**quantification**
136:4
**quarter** 168:24
182:12 183:7,8
**quarters** 168:4
169:13,14
**question** 6:22
7:4 8:4 9:24
10:1,10 12:5
13:15 15:12
18:10 19:10
21:13 27:9
30:21 31:9
32:16,18 33:14
38:4 40:20
44:6,12 48:12
50:15 57:2,3,5
57:15,19 58:7
70:20,21 72:15
72:16 77:22
78:22 83:25
91:4,7 92:14
94:16 101:3,4
105:20 117:24

122:6 126:14
129:15 139:24
140:4,19 147:4
152:14,19,21
153:12,16,21
155:10 156:5
164:11 169:20
171:16 175:22
176:10,13,18
176:19 177:21
178:13,15,22
187:1 191:7
197:5 200:5
202:17 204:17
205:9 207:7,15
211:21 212:18
214:18,20
216:11 218:8,9
218:14 223:6,8
224:14 229:25
231:4,24
233:23
**questioning**
93:13 224:4
**questions** 5:17
7:8,22 25:3
57:22 97:17
111:11,25
174:25 178:5
178:21 179:1
183:5 193:12
195:22 218:13
222:7,8 224:8
225:9,14 226:8
226:10,17
228:18 230:5,7
234:14
**quick** 63:19
104:2 224:8
230:6
**quickly** 68:14
**quite** 20:14 53:2
95:9 232:3
**quote** 187:11

**R**

**R** 1:21 2:1 3:3
5:1 235:4,25
**race** 54:14 55:5
65:6 67:16

103:7,12,20
162:13 164:22
164:22 166:17
176:12,18,20
176:22 177:4
181:25 202:4
**Race,'** 65:1
**races** 27:19
**racial** 32:8,11
55:21 79:9,10
79:13 164:24
**Raffensperger**
28:10 163:8,18
165:19 166:9
166:19
**raised** 137:7
**Raleigh** 2:9,15
**ran** 116:17
**range** 128:3,4
181:14 182:4,8
182:8 192:9
193:25 194:1,5
194:6
**ranges** 181:1,10
181:13
**ranging** 97:12
**Rapids** 133:25
134:15
**rate** 172:21
173:4,6 174:17
174:22 180:10
181:1,10
182:19 184:15
233:13
**rates** 3:19,20,21
172:10,16
173:11,18,20
173:24 174:4,8
174:11 175:14
180:3,11 182:3
182:4 183:6
184:1,4,17,18
196:10,18,25
197:3 229:18
233:19,21
234:10
**rationale** 139:12
**RDH** 51:19,21
52:12 53:5
54:7 56:5,16

58:4 151:25
156:23 157:2
203:14
**reached** 187:3
**react** 62:1
**read** 50:4 56:25
58:8 71:13
175:1 177:20
177:23 188:3
189:17 200:1
234:7
**reader** 120:6
**reading** 19:14
194:3
**reads** 186:13
**ready** 78:14
**realize** 218:9
**really** 6:18 20:2
117:2 205:17
**reason** 32:25
33:13,17 63:17
71:25 72:5,20
114:25 118:15
155:25 156:9
173:23 174:1
186:8,11,21
187:1,5 216:5
**reasonable**
57:10 121:2
**reasonably**
143:4
**rebalancing**
72:20
**rebuttal** 3:15
11:6 24:7
132:12 133:1,1
133:21 147:17
148:13 157:6,8
157:15 203:23
217:2 219:21
**recall** 8:8 32:9
39:19,20,25
44:4 48:16,17
49:19 64:9
66:4 69:16,20
74:7 76:6 89:5
89:16,20
105:13 114:21
120:10 123:17
134:13 135:7,8

137:8,19 140:7
179:9 224:17
226:1,7,10,19
226:21 227:1
228:18 232:11
**received** 230:13
**reckless** 201:6
**recognize** 58:5
**recognized** 56:1
103:14 107:25
157:3,4
**recollection**
32:10 69:1
133:2 139:20
139:23 225:1
**recommend**
215:21
**recommended**
31:7 203:21
**recondition**
28:20
**record** 5:19
14:21 23:8
42:2 63:21
99:2 100:22
112:2,11 144:7
147:12,14
156:6,7 181:6
188:11,14
190:25 193:9
193:11,13
218:23 219:7
222:10 224:11
233:14 234:14
234:15
**record's** 13:14
**recordings** 49:5
49:9
**records** 51:2
**rectangle** 98:24
99:10
**redistricting**
12:11,19 15:15
15:18,19 16:4
18:6,20 19:4,5
19:21,23,24
20:12 21:11,12
21:14,15,16
25:6,18 27:13
27:16 33:19,20

260

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 85 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

33:25 34:4
36:3,6,22 37:2
37:16 38:11,12
38:15,16 39:1
39:21 40:9,16
40:22 41:18
42:20,24 43:1
43:20 44:3,16
45:2 48:1,5,10
48:15,18 49:6
49:7,10,11,17
49:18 51:19,22
51:23,25 52:4
52:6,7,9,16
55:16,23 56:24
58:6,10 59:15
59:19,21 63:5
63:7 66:3,6
67:7 71:1 81:1
90:8,13,16,16
90:24 91:11,15
91:23 92:2
93:5,8,12,17
93:23,25 94:5
94:7,19,24
99:20 111:19
123:13,16,20
125:7 148:6,17
153:4 165:16
206:2 210:9,21
220:6 222:18
230:25 231:22
232:10
**redrawn** 20:15
**reduce** 141:24
228:1,13
**reduced** 192:19
235:8
**redundant** 83:6
87:14
**refer** 41:5
100:24
**reference** 11:23
82:13 110:18
132:11 192:15
**referenced**
32:24 36:23
54:8,9 74:18
222:13 230:14
**references** 47:25

51:18 72:17
179:17
**referring** 12:21
83:1 166:16
225:19
**refers** 164:21
**refine** 228:13
**reflects** 148:8
**refresh** 225:1
**regard** 17:15
88:10
**regarding** 49:17
**regardless** 212:8
**region** 10:5
108:25 137:20
**regional** 22:2
**regions** 138:9
**Registered** 1:21
**registration**
51:11
**regurgitating**
83:19
**related** 16:21,23
17:1 18:5
19:11,11 26:16
26:22 30:19
31:11 51:25
60:6 74:17,18
235:9
**relates** 73:1
**relations** 60:7
**relative** 83:23
192:22 193:1
199:12 211:8
235:12
**release** 3:22 4:3
102:7 155:18
185:5,13,14
187:14 188:1,8
227:18 228:5
**released** 102:23
103:6 155:21
185:15 188:18
**releases** 150:6,7
**relevant** 51:13
52:6 65:20
77:21 78:1
87:6 209:3
**reliability** 163:2
228:18

**reliable** 201:8
**relied** 18:12
75:21 119:3
148:1 163:5
224:16 225:3
225:16
**rely** 24:13 76:10
218:24 219:1
227:8 229:2
**relying** 98:19
**remain** 32:23
**remainder**
142:11
**remember** 15:4
37:9 85:1
87:25 107:24
126:11 134:11
137:5 139:19
160:8 175:2
188:22 234:5
**remembering**
37:19 169:8
214:3
**remind** 233:11
**render** 107:15
**renumbering**
108:25
**Reock** 145:21
146:11,15,25
**reopen** 223:3
**repeat** 9:25
32:16,17 48:11
50:15 70:20,21
111:17 152:20
164:11 169:21
171:16 193:12
197:11 202:17
214:19 219:18
**rephrase** 33:7
122:20 164:14
227:9
**replying** 218:12
**report** 3:14,15
11:1,6,6,8,21
12:2,20,21,22
14:8,10 22:5,5
22:9,10,12,14
22:17,17 23:2
23:22 24:1,7
24:17,21,23

30:14 32:3
41:6 46:5,12
48:7 49:8 50:7
53:12 56:19
59:4 60:13
63:25 64:21
65:20 70:3,8
74:4 75:19
79:10 80:6,7,9
80:16 81:5,6
81:24 83:4,22
85:4,8,11 94:3
94:22 95:24
100:9 104:4,20
105:18,20,23
106:15 112:5
114:5 132:12
133:1,1,21
147:2,17 148:1
148:13,20
149:1,1 152:5
153:7 154:15
154:23 157:6,8
157:10,11,14
157:15,17,18
158:1,8,8,10
158:13,16
161:5 162:4,7
164:1 188:6
196:25 197:3
197:17,20,21
197:22 201:15
201:20,20
202:22 209:6,8
214:11,14
215:23 217:2,2
219:2,10,23,24
225:15 226:10
227:8,10
229:21 230:14
231:17
**reported** 1:21
55:11 66:14
68:5,11 69:23
146:25 157:12
186:12 190:4
201:18 205:18
206:4,18 216:1
217:5 218:16
**Reporter** 1:21

159:20 224:5
234:19 235:1
**reporting** 73:10
73:15,19 81:19
204:5
**reports** 13:18
24:12,14 29:12
29:15 31:1
42:23 58:15
85:9 87:8
90:25 163:12
171:18 195:13
195:18 208:6
217:8
**represent** 5:12
34:14 46:21
48:6 96:8
131:13 140:15
151:2,19,23
167:19 170:8
170:11 175:11
220:4
**representation**
223:21,23
**representations**
225:16
**Representatives**
72:21
**represented**
97:12 214:9
220:20
**representing**
34:16 99:16
164:2 166:15
213:25
**represents**
117:11 141:4
**reproducing**
215:19
**request** 51:2
222:21
**requested** 39:9
50:13 73:5
**required** 84:17
**requirement**
72:19 74:10
155:1 163:20
163:22 194:15
198:12 200:17
**requirements**

261

Case 4:23-cv-00193-D-RN   Document 87-6   Filed 10/18/24   Page 86 of 96
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

100:11 102:19

**research** 40:5
134:17,23
135:4,10

**researchers**
55:25

**reselect** 231:6

**reserve** 222:24

**reserved** 234:22

**residential**
51:12

**resides** 207:21

**respect** 223:6
224:1

**respond** 186:14
186:24 197:5

**response** 3:19
6:23 8:5 12:4
172:10,16,21
173:4,6,10,18
173:20,24
174:4,8,11,16
174:22 177:18
177:19 178:4,8
178:8,21 184:4
184:15,17,18

**responses** 176:9
178:5 179:14
183:8 186:5,9
198:5

**responsibilities**
26:21

**responsible**
17:13 27:13

**rest** 84:11,19

**restate** 169:20
169:21

**result** 50:21
186:4 192:12
193:5,18
194:12

**resulting** 125:4

**results** 47:23
102:12 150:10
167:7 201:8,25

**retabulated**
153:17

**retained** 7:11,15
8:8 34:11
80:25 81:3,11

**retention** 10:12
10:14

**revealing** 33:14
167:3

**review** 26:18

**reviewed** 45:17
59:4

**reviewing** 11:4
12:2 187:24

**revised** 151:8
228:1

**Riggins** 2:13 3:8
3:10 5:6,11
9:11 10:1,2
11:14,17 18:8
22:3 23:1,5,13
24:6 31:4 33:7
33:9 34:8
35:20 38:24
40:7,19 41:3
42:17 44:1
45:24 49:15
50:16 51:1
53:15 57:20
58:12 59:2
63:18,22 65:13
65:15 72:11
73:20 74:3
77:1,11 78:15
78:24 80:1
84:1,8,23
86:23 87:4
88:19 90:14
91:10 92:15
107:19 108:18
111:24 112:3
112:12 113:8
118:14 121:7
121:14 122:7
122:19 126:3
135:2,15
136:17 139:4
140:19,20
141:18 147:13
147:15 148:23
149:10 150:15
152:22 154:18
154:24 156:6,8
158:9,11
159:21 162:5

164:6,13 166:4
166:24 167:5
167:16 170:6
172:13 174:20
175:8 180:7
183:13,18
184:10 185:3
188:11,15
189:3 190:12
190:14 193:10
195:11 196:14
197:7 198:8
199:2,8,16,24
200:11 201:9
201:21 202:13
202:19 203:5
210:12,18
211:1 215:10
216:12 219:5,8
219:14,19,23
220:1,3 222:7
223:14 225:10
230:6,11,21
232:7 233:15
234:13,16

**right** 8:7 12:4,7
13:19 14:1
22:4,6,7 23:20
24:10 25:1,2,7
26:7,8 28:1,7
28:10 29:6,21
30:4,7 32:12
34:19,20 35:3
36:2,6,9,17
38:8 46:17,18
48:2 51:18,19
61:17 63:9
64:2,4,20 65:3
66:22,25 67:1
67:4,7,22,25
68:1,2,3,9,10
68:17,21,22
74:8,11 76:16
79:14,16 80:9
80:10,14,18
81:17,21 82:6
87:19 96:15,22
97:1,2,20,23
97:24 98:1,6
99:12,17

100:14,16,20
101:14,17
102:2,10,13
104:6,14,18,21
105:2 107:12
108:11,22,23
109:2,7,8,25
110:1,14,22,23
111:5,6,8
112:9,15 113:2
113:4,18,19,24
113:25 114:2,6
114:8,13
115:15,16,19
116:7,19,20,23
116:24 117:6
117:18,19
120:3,12
121:10 122:21
124:5,10,13,16
125:16 126:17
126:21 127:1,9
127:13,18
128:4,13 129:8
129:13,24
130:14,18
131:25 132:24
135:18 140:12
141:3,5,11,25
142:5,8,9,12
142:13,14,17
142:18,22
143:25 144:1
144:19 145:5
145:12,15,19
145:23 146:2
146:25 147:2,3
147:6,7,10,23
147:24 148:3,4
148:9,18,19,21
151:18 153:6
153:10,18,19
154:6 155:8,19
155:22 156:16
156:21,22
157:5,22 158:8
158:20,21
159:6,9,17,19
161:3,5,6,24
162:14,15,21

162:22 163:9
163:10 164:18
165:3,20,21,25
167:8 168:2,3
168:6,9,14,18
168:22 169:15
169:19,23
171:4 172:22
173:12,21
174:12,17
177:14,19
179:11,16,25
181:9,11,16,17
182:6,10 183:2
183:8 184:1,13
184:16 185:16
187:23 188:6,7
188:16 189:13
190:7,9,22
191:13,21,25
192:13,16,18
193:7,21 194:1
194:10,15,19
195:1 196:5,10
196:16,19
197:10,14,19
198:2 200:21
200:24 204:9
204:22 205:1
208:7,11,17,18
208:21,22
210:3 211:9,14
212:5,11
213:14,21
215:24 216:2
216:24 217:5,6
218:25 220:1
220:22,24
221:1,2,5,8,9
221:14,17
222:5,24 224:2
224:5,7,21
225:7 226:17
227:14,23
228:17,19
229:12,20
232:17 233:4

**right-hand**
180:21

**Rights** 74:23

262

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 87 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

77:16
**Riley** 2:14
**ring** 175:6
**Rivera** 29:20
**Roanoke** 133:25
  134:15
**robust** 56:2
  157:3
**robustness**
  201:22
**RODNEY** 1:5
**roles** 26:7
**Roman** 100:9
**Ron** 187:12
**rotating** 215:22
**roughly** 8:10
  95:5 145:10,20
  168:5,7,13
  170:1,25
  191:16,17
**row** 181:25
  182:13,16
**rows** 183:5
**RPR** 3:3 235:25
**Rule** 222:15
**run** 52:9
**running** 99:12

————————
**S**
**S** 2:1,4 3:6,12
  5:1
**sake** 106:15
**sample** 3:17,18
  167:18 169:1
  169:15 170:10
  170:13,14,23
  184:3
**samples** 55:10
**sampling** 229:18
**Sampson** 110:14
  110:17 114:1,7
  119:18,20
  120:4,5,15,20
  121:23
**satisfied** 35:19
**satisfy** 35:18
  163:8,19,21
**save** 88:24 232:8
  232:14,17,20
  232:21

**saved** 89:1
**saw** 59:4 137:19
  210:4
**saying** 78:3
  86:24 98:12,19
  121:4 173:14
  184:23 187:12
  199:14 200:2
  209:9 212:22
**says** 23:19 25:5
  29:3 34:3
  49:24 61:10
  67:3,25 71:9
  79:17 82:2
  85:8 100:18
  102:12 107:13
  112:19 151:8
  151:12 166:14
  169:11,16
  175:18 177:8
  178:7 182:13
  183:24 185:19
  186:4,17
  187:19,23
  189:21 190:23
  191:1,10
  192:19 193:17
  193:22 194:22
  195:24 199:18
  199:21 200:16
  200:22 227:24
  229:24 233:20
**Scarborough**
  2:14
**scenario** 86:20
**scheme** 183:6
**Scholer** 2:4
**school** 42:5,6
**Schramek** 1:21
  3:3 224:3
  235:4,25
**Schwab** 29:21
**Schwartzberg**
  146:20
**science** 15:6,8,10
  15:13,21,25
  16:1
**scientific** 45:19
  45:22
**scope** 230:8

**score** 145:21,25
  231:13
**scores** 62:5
  71:17 90:3,6
  91:19 146:7
  161:6,14,20
  215:23 216:1
  216:20 231:10
**scratch** 36:25
**screen** 14:15
  145:1 221:25
**scrolling** 85:1
**sec** 147:12
**second** 28:9
  36:12 56:7
  85:8 116:22
  151:12 169:11
  179:10 181:2
  181:20 182:16
  185:18 186:3,3
  186:13 193:15
  193:17 224:6
**second-to-last**
  234:4
**seconds** 22:20
**section** 28:18
  29:19 48:4
  49:2,3 100:9
  165:6,18,22
  168:25 175:13
  209:4,8
**see** 11:22 14:19
  28:4 39:8 40:2
  41:16 45:12
  46:14 61:12
  71:19 81:4
  82:1 83:19
  85:10 86:19,25
  87:6 102:6
  106:3 120:24
  122:8 128:14
  139:21 140:8
  140:14 150:19
  151:8,14 161:8
  161:12 167:21
  167:23 168:24
  169:3 170:24
  172:17 175:17
  175:21 176:2
  177:10 180:22

181:4,19,22
  182:1,13,16,19
  183:23 185:22
  186:3,7,19
  187:9,15,20
  189:21,24
  190:18 192:19
  192:24 193:1,3
  194:7,8,16
  195:2 196:2,3
  211:25 212:2,5
  214:13 220:9
  220:13,16,18
  220:20 221:11
  227:7,18,23
  228:7,16
**seeing** 15:4
  88:14 93:3
  120:17 137:5,5
  139:19 185:12
  188:22 231:12
**seek** 44:16 223:1
  223:3
**seeking** 136:5
**seen** 49:20 60:19
  72:23 74:4
  78:3 137:9
  150:21,24
  169:7 179:6
  185:8,10,11
  189:18,19
  214:25 223:2
**selected** 104:5
  168:1,6,8
  169:1 170:1,3
  170:25 171:14
  171:18
**senate** 4:1 8:16
  8:21 9:1,6 10:4
  10:16 28:17
  40:23 41:1,2
  48:18,20 49:6
  49:9,16 64:25
  65:5,21 70:8
  71:12 77:22,24
  78:2 79:14,20
  79:21 84:3,11
  100:19 101:17
  101:18,21,22
  104:6,8,16,17

104:21,23
  107:11 108:22
  108:25 109:6,9
  109:12,14,15
  109:15 110:2,5
  110:7,9,13
  125:19 129:21
  220:6,21 221:3
  221:4,16
**senators** 49:25
  51:12
**send** 220:2
**sense** 20:10
  45:17 191:18
**sentence** 58:8
  71:8 102:6,10
  164:20,21
  166:14,16
  169:11,16
  175:25 185:18
  186:3,7,12,13
  189:21 191:10
  192:3,10,14,25
  194:3,13,16,20
  194:21 195:2
  195:24 198:10
  198:19 200:1
**separate** 75:2,10
  76:12 89:5
**separated** 64:12
**separating**
  75:10
**September** 1:17
  3:2 235:23
**series** 35:12
  118:19
**serve** 235:21
**served** 17:19,22
  17:25
**Service** 19:21
  33:19 36:22
  37:2 38:12,15
  40:16 44:16
  59:21
**services** 19:23
  29:10 33:20
  37:16 39:1
  40:22 41:19
  42:3,20
**serving** 17:5

263

18:4
**set** 39:9 68:19
77:4 129:20
225:16
**setting** 118:22
232:23,25
**settings** 118:19
**seven-minute**
63:19
**shade** 97:12
98:25
**shaded** 112:14
112:17,23
131:17,19,21
220:17 221:10
**shades** 126:25
**shading** 97:18
98:1,4 126:16
126:18 127:22
128:3,11
**Shake-File**
226:24
**Shake-Files**
85:14,16,21,25
86:2,5,10
93:13 94:3
222:13 223:7
225:5,10,19,20
225:23 226:2
226:13 227:2,6
231:19
**shape** 211:17
215:15,21
**shapes** 46:21
210:7,8 211:8
215:21 225:21
227:7
**share** 207:5
213:5
**sheet** 24:25
**Sheila** 37:19
**shop** 52:5
**short** 62:21
101:23 189:16
**shorthand** 10:18
**show** 60:22 62:4
101:24 103:9
136:8 163:23
172:6 174:3
**showing** 23:11

35:17 96:13
99:4 112:20
213:13 214:22
214:23 216:4
**shown** 11:10
97:12 114:3
123:6 129:22
130:5 132:14
155:24 209:5
230:12
**shows** 41:12
67:10,11 71:1
97:10 104:5
121:8,24
126:20 128:3
131:16 156:14
**side** 101:20
128:19,20
160:18 180:21
180:21 212:2
**signature** 23:10
23:17 234:22
**significant**
136:24 228:11
**significantly**
186:15,24
192:7
**similar** 26:16
29:23 31:25
54:8 65:25
95:9 98:25
108:21 123:24
124:3 132:20
137:10 141:21
143:9 150:24
162:2 174:2,12
174:15 193:1
195:24 200:19
**similarities**
54:11,12,17
137:3
**similarly** 69:19
**simply** 83:15
**single** 54:4
113:10 195:24
**single-district**
110:21
**sit** 138:3 175:3
**site** 20:5
**sitting** 114:20

172:2 174:1
179:4 180:4
190:9 217:9,18
218:5,18
231:18
**situation** 74:2
**six** 224:6
**size** 3:17,18
167:18 170:14
170:23 184:3
212:14 213:3
**Skipping** 92:11
92:16
**slate** 44:10 88:4
**slightly** 105:1
**small** 125:17
144:4 160:23
**smaller** 171:15
**smallest** 99:21
**snapshot** 55:9
232:14
**so-called** 209:9
**social** 186:15,24
**society** 201:16
**socioeconomic**
62:22,25
**software** 37:24
42:18,22 43:1
43:5,6 46:10
52:22 56:21
57:19 58:7,11
59:24 63:4
69:4 85:16
93:11 107:1
118:17,17,23
119:3 202:1
**sole** 71:11
**solely** 235:18
**somebody** 20:11
144:12 215:19
**soon** 90:2 131:8
210:4
**sooner** 234:18
**sorry** 13:13
21:11 22:19,23
27:4 31:5
32:16 45:10,25
50:14 54:16
56:7 57:1,4,7
72:25 77:21

92:13 95:2
106:7 126:4
130:21 131:7,8
133:23 135:5
140:22,24
143:14 144:3
147:11 149:16
150:3 152:18
157:21 158:15
159:24 164:8,8
169:20 174:21
177:20 181:20
182:4 188:10
193:5 196:15
197:11 200:12
204:15 211:6
219:17 233:8
**sort** 11:7 18:10
27:18 31:14
35:6 44:7,9
46:23 47:6,11
47:18,21 54:2
56:3 61:6
67:12 74:17
86:19 88:3,9
88:13 89:14,24
89:25 102:25
118:25 128:24
131:24 137:6
139:14 176:11
206:7 223:6
232:14
**sound** 12:7
175:5
**sounds** 13:15
63:20
**source** 39:15
50:17,24 55:17
55:19 157:3
162:12 163:1
171:13 198:22
202:9 203:1,14
**sources** 24:13
46:10
**south** 127:8
128:16,17,17
128:22 133:21
**southeast**
127:15
**southeastern**

126:24
**southern** 126:23
160:13
**southernmost**
129:6
**space** 212:1
**spans** 128:21
147:25
**SPEAS** 2:7
**special** 47:15
52:17 55:18
**specialist** 27:11
**specific** 60:6,17
69:13 73:22
78:13 89:19
93:11 95:13,20
95:21 123:21
136:14,19
160:9 174:25
179:19 206:20
212:18
**specifically** 7:15
8:24 19:10
37:23 73:5
75:1 100:11
134:6,11,23
137:13 139:15
139:25 153:22
216:7
**specified** 15:4
96:10 108:8
206:19
**specifies** 83:22
**specify** 44:22
**specifying**
198:19
**speculation** 74:2
**speed** 144:22
**spend** 24:16
**spent** 20:18 26:6
90:3
**split** 80:16,17
81:16 83:12,16
83:23 85:4
110:13,17
113:20,23
114:1,7 125:13
125:14 132:22
133:3 142:7
146:21 147:5,8

264

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 89 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

159:15 161:22
162:2 204:13
205:15,21
**splits** 80:10
84:18 85:12,17
124:15 233:5
**splitting** 126:8
**spoke** 131:8
160:9
**spreadsheet** 4:2
65:25
**spring** 150:3
**Spruill** 2:8 7:25
8:3 33:16 37:7
37:13,18
**Square** 2:18
**staff** 18:18 39:18
73:7,7
**Stagner** 37:5
**stand** 31:10
**standard** 56:3
58:5 70:25
72:15 176:23
185:19 191:12
192:6 194:14
195:16 198:1
198:12,15,17
198:20 200:16
228:4 234:16
**standards**
184:25 185:21
187:14 188:1
195:10 198:2,6
200:8,15
**stands** 63:6
190:1
**Stanton** 7:20
**start** 43:19
44:12 68:18
87:22 89:19
92:18 123:12
158:23
**started** 44:5
80:21 87:15,18
88:3 89:17
92:12,17
123:19 223:15
**starting** 16:20
36:15 44:7,9
67:14 82:21,23

**starts** 46:6 55:23
100:10 102:6
187:8
**stat** 65:1,5 83:20
85:1,7
**state** 1:8 5:14,18
9:5 10:4,5 16:4
16:5 17:20
19:23 20:15,24
28:17,17 34:10
51:16 74:20
79:10 84:3
98:19 99:4,15
104:6,8 108:22
129:19,20
153:22,23
154:15,22
155:2 162:10
164:15 220:22
225:16 235:2
**stated** 200:7,14
206:13 218:23
**statement** 42:16
84:7 106:5
121:13 196:13
212:22 213:23
216:16
**statements**
188:20
**states** 1:1 194:18
228:10 233:21
**statewide** 9:6
16:3,9,10
20:11 39:21
40:9 80:16,17
81:17,20,23
82:1,2,9,19,25
83:7 84:4
85:22 86:3,8
86:10,25
171:15 222:14
233:4,7
**statistical**
185:20 187:25
**statistics** 60:22
65:2 66:9,24
67:13,15,18
68:11,20 69:22
80:13 81:19

82:2,8,13,16
83:20 85:9
90:18 104:14
104:21 105:18
136:8,12,14
162:2 179:14
216:4 227:20
**stays** 84:19
**step** 22:19 90:12
**step-by-step**
90:11
**Stephenson**
74:10 77:9
100:10 102:19
**steps** 206:8
**steward** 18:12
**stopping** 224:5
**straight** 211:25
**Street** 2:8,14 6:4
**stress** 194:24
199:22
**stretch** 30:9
**strive** 201:6
**stroke** 212:4,6,8
213:8
**structure** 17:17
**struggle** 86:19
**struggling** 44:6
86:22 177:20
**student** 20:10,10
**studied** 19:8
78:22 149:15
**studies** 20:11
**stuff** 21:21
**subcategory**
15:19
**subcontractor**
235:18
**subdivision**
80:10 85:4
**subdivisions**
12:15
**subgroups** 54:14
**subject** 19:15
**sublettered**
46:14
**submit** 45:2,6
**submittal**
148:25
**submitted** 23:3

39:25 40:5
149:1
**subsequent** 42:4
74:18
**subset** 47:20
64:10 82:22
116:14
**subtraction**
65:14
**succinct** 38:23
**sufficient** 53:14
206:9
**suggest** 33:23
151:1
**suggesting** 98:16
178:14
**suggests** 26:15
54:1 95:20
178:13
**suitable** 9:3
**suite** 2:8,15,19
228:4
**summaries**
66:23 77:6
**summarized**
52:14
**summary** 64:3
67:12,18 78:9
85:9
**supplant** 107:2
**supplanted**
107:4,8 108:1
108:15
**supplement**
57:16
**supplied** 85:20
**support** 28:19
164:4
**suppose** 29:16
73:18 84:15
101:23 149:15
**Supreme** 30:17
210:6,20
**sure** 8:7 11:9
13:13 15:5
18:14,23 32:19
41:7,14 45:25
46:1 48:3 58:9
58:13 61:16
70:18,22 73:21

81:5 85:3,21
89:15 93:19
99:2 113:11
114:21 133:13
135:16 136:3
147:13 152:23
153:12 161:18
169:10,22
171:6,17
176:24 177:7
183:11,14
185:12 191:22
193:13 199:17
207:8 209:5
211:18 212:21
213:16 214:21
221:24 223:10
223:18 233:17
**surprise** 138:24
139:3,8
**surreptitiously**
86:21
**survey** 47:19
52:18 66:10
68:24,25 69:6
71:20 73:12,24
74:6 130:17
145:15 150:10
162:11 165:24
167:7,11
171:19 172:10
174:24,25
177:19 178:6
179:7 186:5,10
186:14 197:13
197:14 227:21
**surveyed** 171:24
172:7 184:12
**surveys** 198:7,14
**swap** 144:3
**switch** 89:21
**sworn** 5:3 235:6
**symbol** 215:15
**symbols** 211:13
**synonym** 101:6
101:6
**synthetic** 169:2
169:5,12,17,22
**system** 123:4
**systems** 21:10

265

21:17

**T**

T 2:17 3:6,6,12
tab 48:2,3
table 104:13
  107:13 108:5
  114:12,12
  130:10 144:21
  144:21,22,25
  145:1,4,9,12
  157:12,13,14
  157:24,25
  158:7,9,10,12
  158:13 161:13
  161:17
tabulation 43:12
  47:15 52:17
  55:18 129:10
  148:11,12
  153:15,25
  154:17 155:7
  229:1
take 7:3,4 84:17
  95:1,6,7
  103:25 111:10
  111:13,25
  138:16 139:16
  157:7 195:3
  196:24 197:2
  207:15 211:9
  212:17 219:5
  224:7 229:17
taken 1:15 3:1
  103:7,12
  206:23 235:7
  235:11
takes 52:16
talk 6:18 104:4
  123:10 130:21
  130:21 198:21
  211:2
talked 55:1
  109:24 125:7
  126:17 133:8
  133:19,20
  141:13 152:25
  157:19 161:23
  161:23 164:18
  167:6 191:19

216:21 232:12
talking 18:11
  57:24 66:1
  75:16 77:22
  81:12 128:11
  128:18,25
  131:23 144:9
  149:22,23
  153:14 188:23
  212:25 232:22
talks 164:20
  166:16 234:8
tan 220:25
target 95:21
tasked 26:25
taught 15:22
team 19:20
  34:15
technical 18:19
  188:13 193:8
  193:11
technically
  81:25 152:16
tell 26:9 28:14
  65:16 92:23
  97:7 102:15
  142:24 185:25
  189:15 214:8
  214:22 224:3
template 31:15
ten 95:4 146:23
  234:18,20
tend 59:19 89:25
  232:14
tentatively 188:1
term 29:9
  101:10 169:7
  175:4 207:18
terms 137:3
  179:13 190:21
  192:23 235:18
territory 92:9
test 7:2 35:18
  84:14,21 122:8
  123:18 146:22
  146:22 151:22
testified 5:4
  30:23 87:17
  142:19 165:12
  166:8 223:12

223:15 233:1
  234:2
testify 28:21
  29:12 35:16
testifying 73:21
  138:8 152:25
  165:9,13,16,19
  165:23
testimony 17:3
  28:23 29:1
  80:24 165:14
  202:15,20,24
  230:8 235:5,6
testing 9:16
  88:24 231:10
tests 35:13,19
Texas 29:5,24
text 48:4 83:21
  110:19 153:14
  189:10
Thank 34:2
  51:17 58:1
  70:4 106:18
  117:20 130:3
  138:19 189:6
  204:25 219:24
  230:4
Thanks 230:1
Theodore 2:4
  3:9 7:17,24 9:8
  9:19 11:16
  18:7 21:7 24:3
  30:24 33:3,15
  34:6 35:8
  38:19 40:3,18
  40:24 42:14
  43:21 45:23
  46:2 49:12
  50:14,19 53:10
  57:13 58:20
  63:20 65:12
  72:7 73:13,25
  76:23 78:6,20
  79:22 83:9
  84:5,22 86:12
  87:3 88:11
  89:23 91:5
  92:13 107:16
  108:13 113:5
  118:11 121:1

121:11 122:4
  122:15 125:25
  134:24 135:14
  136:11 139:1
  140:18 141:16
  147:11 148:22
  149:7 152:12
  154:14,21
  156:3 158:7
  161:25 164:5,8
  166:1,12 167:2
  174:18 183:9
  184:6,21 195:6
  196:11 197:1
  198:3,16 199:5
  199:11,20
  200:9 201:3,13
  202:12,16,23
  210:10,14,22
  215:9 216:9
  219:17,21,24
  223:5 224:2,7
  224:13,20
  227:13 230:4
  230:19 231:23
  234:20,21
Theoretically
  98:7
thereto 235:13
thing 48:24 49:1
  57:1 58:9 93:7
  100:24 110:7
  110:10 124:6
things 26:23
  27:1,2,19
  37:24 60:8,10
  60:10 89:5
  90:5 93:12
  95:22 101:9
  132:9 139:22
  143:10 183:7
  211:15 223:21
  234:6
think 8:4,10 9:8
  9:20 10:18,20
  11:4,18,24
  12:3,8 14:17
  15:7,11 16:9
  19:18 21:13
  24:15 29:2

33:3,4 38:8,9
  38:23 39:24,24
  41:9 43:11,13
  43:22 44:11
  49:1,13,22,23
  50:8 51:9 58:5
  58:7,21 59:17
  59:23 61:11
  63:7,17 64:10
  65:4,12 68:18
  69:19 70:3
  71:14,24 72:22
  74:2 77:21
  78:1,11 80:6
  80:21 81:7,25
  82:13 83:5
  84:13,25 87:24
  88:1,2 89:1,14
  89:15,18 91:6
  91:13 92:3,7
  92:18 93:1,7
  93:18,20 94:2
  94:4,5,11 95:9
  95:15,19 96:18
  96:20,21 98:18
  101:5 103:25
  105:23 106:16
  108:2,7,8
  109:13 115:3,5
  120:6,7 123:14
  126:10,13
  128:8,9 131:8
  131:21 132:18
  132:25 133:5
  133:11,25
  134:15 136:5
  141:21 142:23
  146:23 148:10
  149:13,17
  150:23 151:21
  156:22 158:25
  159:12 161:4
  165:11 166:15
  167:6 169:24
  169:24 170:21
  173:15 174:18
  176:6,7 178:9
  178:24 179:18
  180:1 181:8,21
  182:11 183:19

266

186:2,23 188:4
188:25 190:6
194:2 195:20
197:4,15
199:14 201:4
201:10,14
202:6,8 203:8
203:8,14,18,19
203:20,22
209:7 211:20
213:22 214:1
215:18 216:11
217:12 221:25
222:14,16
223:5,7,12
230:7 231:5,25
232:23,24
234:16,21
**thinking** 18:10
78:9 111:9
137:7 139:15
**thinks** 9:14
**third** 36:15
**thought** 31:20
57:1 125:5
126:4 173:13
**thousands** 20:4
**three** 30:16
34:17 35:22
36:1 45:21
68:13 69:24
77:14 90:12
91:3 109:21
111:11 114:7
121:16 123:25
133:24 134:1,4
134:4,10,13
148:20 160:13
160:15 168:25
222:4
**three-county**
105:11
**threshold**
114:24 154:12
191:12,19
192:5 193:6,19
194:11 198:20
**tier** 54:2
**TIGER/Line**
46:17,19

**time** 6:9 7:1
10:20,21 15:11
20:18 24:16
27:3,24 37:24
37:24 43:4
48:22 60:19
63:18 78:13
80:21 81:3,11
81:12 90:11
95:6,8,9
106:15 120:17
140:24,24
149:13,16
156:20 173:11
177:21 197:16
197:21 212:17
222:8 224:4
**times** 123:25
201:24
**tirelessly** 228:12
**title** 26:15 61:10
99:7 112:19
233:11
**titled** 101:8
227:19
**today** 5:22 7:9
7:22 75:23
87:10 160:9
172:2 202:20
217:9,18 218:5
218:19 231:18
**ton** 150:7
**tool** 42:24 43:1
61:8 66:3,6
71:1
**tools** 42:21
59:20 69:19
90:1,9 91:3,20
**top** 67:3 76:8
100:18 117:11
126:10 135:16
135:18,25
138:4,23 151:1
151:12 167:14
169:7 172:11
175:17 180:25
189:11
**topic** 20:8,11
**topics** 21:4
**total** 13:17 61:23

64:17,19 66:13
67:20 68:8
82:15 96:11,13
182:1,17 204:7
205:16 206:24
207:2
**totality** 77:14
**Town** 39:5,17
73:5
**tract** 54:3
**tract-level**
189:2 191:2
193:20
**tracts** 54:4,5
**traded** 37:24
**traditional**
12:11,18
129:23
**transcript** 23:8
**transcripts**
49:20
**transfer** 23:6
**transmit** 24:8
150:16 167:17
170:7 172:14
175:9 180:8
185:4 189:4
190:12 219:15
**transmitted**
23:14 147:19
156:10 170:14
**transmitting**
14:21 174:5
**transparency**
211:13 212:14
**traversals** 74:9
75:1,7
**Trende** 11:3
58:3 204:5
209:17 211:3,5
**Trende's** 12:2
14:10 209:9
212:15
**trial** 30:18 93:2
111:19 124:1
**triangle** 134:17
134:23 135:4
135:10 215:15
**tributaries**
214:2

**tricky** 122:17
**tried** 84:15
86:20 89:2,6
93:14 207:19
**tries** 103:9
**true** 54:15 128:9
140:13 141:12
156:11 204:7
229:22
**trust** 58:5 206:9
**truthfully** 7:9
**try** 6:18,21 33:7
86:18 139:22
**trying** 6:25
13:22 57:8,9
63:7 65:14
88:13 89:13
95:11,16 99:1
99:2 101:4
103:1 111:19
115:3 118:22
123:23 124:22
124:25 126:11
130:4 132:8,17
143:2
**turn** 24:19 41:7
60:9 62:1
64:20 66:19
70:2 80:5 97:5
104:3 112:4
123:9 130:9,20
138:15 140:21
141:1 142:14
147:16 157:17
162:6 203:22
211:2
**turnaround**
104:2
**turned** 226:24
227:2,6
**turning** 131:25
153:6 191:9
**Twelve** 132:2
**twice** 39:5
**two** 30:1 31:24
35:3 54:21
61:6 64:25
66:22 69:4
75:10,10
100:14,18

101:8,9,13,15
110:17 116:18
121:15 128:14
128:15 130:5
133:3 134:16
144:7 146:6,7
146:17 149:20
152:16 159:16
161:13 177:12
201:25 211:24
214:10,23
215:12 219:3
229:5,10
**two-color** 215:4
**two-thirds** 186:4
186:9
**type** 54:10 56:4
163:6
**types** 136:19
137:3 163:6
**typewriting**
235:8
**typical** 191:10
192:1,4
**typically** 38:20
90:7 143:1
173:18
**typo** 229:21
**Tyrrell** 143:17
143:23 144:4
144:14,15

**U**

**U.S** 3:19 6:2
52:9,17 72:17
72:21 151:4
172:9,15 210:6
210:19 233:13
**ultimately**
132:14 231:20
**unaffected**
105:15
**uncertain** 70:5
**unchanged** 85:7
226:5
**uncommon**
139:13
**undergraduate**
149:16
**underneath**

267

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 92 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

67:19 181:25
understand 10:3
31:12 75:5
76:18 79:19
84:2 98:13,17
173:15 193:14
207:7 216:13
223:25
understanding
8:15,18,19,21
9:5,16,22 10:6
20:8 32:13,17
32:19 50:10,12
50:17,20,24
72:19 76:15,22
77:2,19 79:1
79:23 100:23
106:19 116:9
116:12,13
146:10 166:25
179:20 198:13
199:15 206:2
209:14 216:10
229:19
understands
9:12
unfolded 89:14
unfortunately
180:16
unhelpful
159:15
unit 43:10,11,13
43:18 44:4,12
United 1:1 29:4
233:21
units 168:1,9,18
168:22 173:1
231:6
universally
173:19
University 15:24
unknown
103:24
unlabeled 105:9
unmarked
109:15
unnamed 114:2
unreliable
107:15
update 23:21

updated 153:8
153:18 228:21
updates 23:25
updating 17:15
urban 21:23,24
22:1,1 25:20
26:10 27:10,14
URL 70:5
use 14:23 16:11
16:11 17:18
27:11 31:14,15
38:25 39:15
41:23 42:1,18
43:6,24 51:14
54:7 55:16
56:4 58:4,11
59:10,15,19,20
60:16 62:17,25
64:6 66:10
68:23 71:10,15
72:6 79:9 90:1
91:11,15 96:4
96:6 97:15
99:25 100:4,6
104:8 106:10
141:13 146:21
148:13 163:11
165:23 166:10
167:1 169:25
178:7 194:23
194:24 195:4
199:22 201:1,7
205:17 210:7
211:5 214:11
215:21 225:23
228:22 230:16
useful 18:16
users 194:22
uses 67:21
118:18 179:14
228:6
usually 186:5,10
190:4,21
utilize 60:25
utilizing 64:14

_____
          V
v 1:7 30:7 31:23
32:7
vague 32:9

139:20
validity 108:16
value 178:8,12
178:13,14,15
178:22 181:12
181:14 182:7
191:5 212:4,8
values 64:12
213:8
Vance 106:19
107:12 124:4
132:6,12
134:22 135:13
135:17,20
136:1 137:22
138:1 139:25
140:2,10,16
142:11 221:16
variable 103:24
variation 190:3
190:8,19
variations 89:2
232:14
varied 59:17
various 19:24
26:7 55:21
67:12,16 74:16
93:4 125:7
132:8 217:8
vast 85:5
verb 82:12
verify 51:5
56:16 86:3
version 93:9,10
94:6,9,10,10
94:17 132:14
142:21 231:17
versus 5:13
28:10 29:5,20
30:2,3 32:14
32:20,20 34:9
34:25 101:10
207:11
vertical 99:9
Vesilind 34:5,7
34:9
veteran 6:16
videos 52:2,2
view 60:21 61:7
61:18 62:1,3,9

62:15 63:1
64:11
viewing 87:1
Virginia 34:9
213:20
virtual 7:18
virtually 93:23
visible 60:8
visits 20:5
visual 71:6
211:20
visuals 32:2
vote 18:21 84:14
115:4
voter 51:11
211:5
voting 13:1,2,9
43:12 47:16
55:20,22 61:25
62:6,10 64:17
66:13,15,17
68:4,8,19
69:22 74:23
76:19 77:7,9
77:16 88:23
95:13,17 97:11
97:14 98:6,8
114:13,17
126:21 127:12
127:17 128:13
129:3,7,10,11
130:12 140:12
145:3 154:12
155:2 166:22
167:1 202:3
204:19,21
205:20 206:3
206:13,14,18
206:19,21
207:5,10,16,21
207:23,24,25
208:2,5,25,25
209:16,21
210:7,8 211:6
211:7
VRA 76:14,18
76:21 78:3
103:17,22,23
VTD 43:12
53:13,16 97:25

98:1,5 127:12
127:15,23
128:15,16,24
129:1,5 160:8
160:9 208:17
209:2,17,25
210:1,2 233:5
VTDs 47:2
53:12 80:17
97:11 99:20
100:5 125:2,3
129:16 140:11
161:22 162:2

_____
          W
waiver 194:19
Wake 30:2,3
36:11
walk 70:13 92:5
want 6:20 8:1
11:9,24 14:22
42:2 81:4
97:17 105:1
138:15 143:20
144:20 153:12
161:18 166:9
170:11 180:16
202:14 214:19
218:11,24
233:17
wanted 159:13
225:21 229:20
warned 202:9
warnings 188:19
Warren 109:7
138:12 208:17
Washington 2:5
19:1 114:19,22
115:1 143:20
143:23 144:4
wasn't 53:2 58:9
101:3 140:19
151:20,24
water 14:12
way 19:19 26:12
38:17,23 45:19
46:22 53:8
55:4,11 75:3,6
78:13 86:15
102:22 104:11

268
Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 93 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

106:4 107:1,7
107:15,22
110:17 112:15
113:2 117:1,24
118:13 125:6
129:14 131:8
138:2 141:24
144:8,13 162:3
179:10 182:5
185:25 191:25
192:3 196:24
198:4 199:6
200:4 209:7,20
230:23 231:3
232:10
**Wayne** 117:22
118:1,3 119:17
141:10,19
**ways** 101:9
**we'll** 11:18
57:23 78:1,25
170:17 172:14
172:14 175:18
180:8
**we're** 6:25 7:21
41:6 62:20
74:19 81:6,12
84:17 149:1
174:5 193:15
222:14 224:5
**we've** 21:4,20
31:25 75:23
87:10 88:16
111:18 133:19
133:20 157:19
167:6 188:22
193:11 216:20
223:2
**web** 48:10,15
49:2 65:7
185:9,10
188:25 189:5
**webinars** 52:3
**website** 48:1,4,9
48:14 49:3
51:14 70:11
78:10 150:25
151:1,3,5,18
156:2,12
167:20 172:16

175:13 180:13
220:6 225:17
225:24
**week** 144:13
149:2
**weeks** 148:20
**weighing** 124:2
132:9
**went** 30:10
88:16 111:16
**weren't** 153:4
197:25
**west** 20:1 128:17
144:16 221:4
**western** 15:23
128:19
**WhatsApp**
223:25
**white** 209:13,21
210:8 211:5,6
211:6 214:9,12
215:8,20
**wholly** 129:21
**widely** 162:20
162:24 201:18
**widened** 212:5
**width** 212:3
**willful** 23:24
**willing** 223:20
**Wilson** 113:23
142:7
**windows** 88:7
**withdrawing**
154:19
**witness** 3:7 9:25
21:8 23:9 24:4
30:25 34:7
35:9,21 38:20
40:4 41:1
42:15 43:22
49:13 50:23
53:11 57:18
58:21 72:8
73:14 74:1
77:3 78:8,21
79:23 83:10
84:6 86:13
88:12 89:24
91:6 107:17
108:14 113:6

118:12 121:2
121:12 122:5
122:16 126:1
134:25 136:12
139:2 141:17
149:8 152:13
154:15,22
156:4 162:1
164:11 166:2
166:13 167:4
183:10 184:7
184:22 195:7
196:12 197:2
198:4,17 199:6
199:12,21
200:10 201:4
201:14 202:17
202:24 210:16
210:23 216:10
230:20 231:25
235:5,7
**wondering**
48:20
**word** 29:17
58:10 84:17
92:14 101:5
148:10 178:7
194:2 198:4
**worded** 198:5
**wording** 122:17
186:23
**words** 27:21
58:23 66:2
75:8 102:2
206:18
**work** 16:21 20:4
25:18 26:16,17
27:10 29:23
30:9,19 31:7
31:10,22 32:7
34:18,21 36:6
36:16,21 37:1
37:15 38:15
41:22 42:6,11
42:19 43:7
45:13,15,16
58:14 80:21
89:2,7 90:7
123:15 136:25
224:10

**worked** 16:16,17
16:22 17:11
18:25 19:20
21:24 31:16
32:4,5 37:4,12
38:5 40:15
228:12
**worker** 18:25
**working** 17:12
18:11,13 26:6
34:15 37:8,25
39:13 85:15
87:20 88:25
231:21 232:9
232:13
**works** 37:13
107:1 111:14
**world** 43:2
**worries** 31:21
**wouldn't** 53:8
69:3 72:5
117:3 118:12
139:2,8 171:5
178:7 212:1
215:17 232:4
**write** 19:15
177:3
**writing** 222:23
**wrong** 60:18
81:10 96:23
140:9 142:20
**wrote** 48:22
148:11 176:20

_____
### X
**X** 3:12,12 211:5
211:19,21,24
212:3,7,7
**XML** 93:14
**Xs** 212:10

_____
### Y
**yeah** 25:20 33:7
38:22 44:6
47:17 49:3
61:6 62:20
63:8 78:10
80:23 85:4,18
95:12 98:17
102:4 109:3

111:14 115:6
124:11 128:16
133:5 137:25
144:5 149:25
151:21 160:21
161:9 171:21
173:16 174:14
187:5 191:18
213:17 220:16
221:24
**year** 8:12 12:21
30:20 31:11
55:9 136:8
167:11 169:15
170:24 173:10
173:14 183:4,5
183:16,17
184:12,16
186:5,10
191:11 192:1,4
194:1,5
**years** 16:17
21:23 42:4
90:3 137:5
167:24 173:16
173:17 180:12
180:19 185:1
196:19,22
197:12
**Yep** 96:2 181:5

_____
### Z
**zero** 97:19 129:6
**ZIP** 60:10
**zoning** 26:24
**Zoom** 1:16,22
3:2 6:14,15,17
14:15

_____
### 0
**0.30** 189:23

_____
### 1
**1** 3:14 10:19,23
12:1 22:24
23:8 28:20
40:23 41:2,2
46:13 84:11
96:3,8 101:17
101:21 104:13

269

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 94 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

105:24 106:2
107:13 108:3
108:25 109:23
115:19 116:2
119:8 131:1,3
131:13,15,15
147:25 158:21
163:8,20,21,24
164:4 175:18
220:21 221:5
221:20
**1(b)** 54:9
**1.2** 182:10
**1.4** 168:17 182:5
182:9
**1.7** 182:5,9
**1:01** 112:2
**1:59** 147:14
**10** 3:23 16:17
21:23 128:10
158:16,19
161:8 171:12
189:2,6 191:1
191:9 193:16
224:9
**10-year** 103:18
**10.1** 182:22
**10.6** 181:11,13
**10:47** 63:21
**10:55** 63:21
**100** 136:9
**11** 3:25 5:24
104:3 106:2,22
107:3,11,25
108:6,15
109:10 110:5
125:16 161:10
190:11,25
221:10,16
**110,000** 170:25
**12** 4:1 132:1,3
191:11,15,22
192:1 219:13
219:15 221:20
**12:27** 112:2
**127** 2:18
**13** 4:2 41:11
108:19 128:7
140:21 141:3
191:11 192:1,7

204:8 224:19
224:25 230:12
**13.4** 181:10,12
181:13
**13.5** 181:15
**14** 4:3 132:24
141:25 142:3
227:12,16
234:17
**14.99** 97:20
129:7
**140** 168:5
**1400** 2:15
**15** 81:16 110:24
114:12,12
127:17 128:13
128:23 142:15
157:11 192:22
219:10,19
**150** 3:16
**153,000** 168:5
**157** 64:22
**16** 23:21 115:10
204:2,4
**167** 3:17
**16th** 24:1
**17** 1:17 112:5
191:11,15,23
192:1,5,7
193:6,18,19
194:9 227:19
**170** 3:18
**172** 3:19
**175** 3:20
**17th** 3:2
**18** 67:25 123:9
193:5 204:21
**180** 3:21
**185** 3:22
**189** 3:23
**19** 130:10
144:24 157:17
**190** 3:25
**1900** 2:8
**1965** 76:19

————————
**2**
————————
**2** 3:15 8:21 9:1
24:5,9 28:2,18
29:19 47:25

65:17,22 68:19
84:11 97:7,9
98:21 99:5
101:17 104:17
104:21,23
105:4,6 109:6
109:14,23
133:6 147:18
148:1 153:7
165:6,18,22
168:21 177:8
177:24,25
180:24 190:15
190:18 191:9
198:9 203:23
209:4 221:3
229:24 230:2,2
**2.87** 168:13
**2:06** 147:14
**2:20** 156:7
**2:22** 156:7
**20** 125:16
130:20 187:13
192:22 197:9
**2000** 2:19
**20001** 2:5
**2010** 47:24
98:16 103:14
**2014** 26:5
**2015** 16:21
**2016** 66:10
68:23 130:16
145:14 148:2
157:9 187:19
187:24 188:5
188:18 192:21
194:13 195:4
196:7,8 197:9
197:13,18
198:11,14
227:20 228:4
228:14,19
**2018** 148:8,14
149:11,24
150:11 151:13
151:16 153:18
155:21 156:14
156:19 157:13
173:10 180:12
196:4,8,16

197:8,9,12,14
200:23 228:22
229:1
**2019** 30:6 173:9
173:17,20,22
180:21 181:3
181:11 182:5
183:1 196:19
197:8,12
233:21
**202-942-5000**
2:6
**2020** 38:25
39:22 40:11
47:3,24 63:4
64:14 66:10
67:21 68:23
71:10,15 84:9
93:8 98:13
100:20 102:7
130:16 145:14
148:3 157:9
165:2 168:9,16
171:9 173:6,9
173:14 174:19
174:21,22
182:10,24
183:25 184:4,8
184:12,16,17
184:20 185:19
186:6,10
187:15,19,25
188:5,18,21
189:12 192:11
192:12,20,21
194:10,13
195:4,15 196:1
196:5,8,15
197:8,12,13,19
198:11,14
200:12,20,23
200:24 201:11
201:15,17,23
202:21 208:9
227:20,21
228:2,5,14,19
234:9
**2021** 19:20
30:10,20,20
31:11 33:18

36:6,12,16
38:11 41:23
42:4,20 45:7
49:13 56:15,18
102:6 167:24
168:11 173:4
174:13 181:15
182:5,22
185:16 195:13
196:9,16,25
197:3 203:7
**2022** 3:16 25:12
29:6 30:18
36:7,12 56:15
56:18 80:17,20
81:15 87:25
101:21 102:1
104:5,8 105:5
105:6 106:1
107:11 109:10
109:16 148:7,8
148:14 149:11
149:24 150:11
150:18 151:13
151:16 153:18
153:25 154:5
155:7,19,21
156:15,19,19
157:13 158:4
159:17,18,22
159:23 168:20
169:25 170:2
170:24 171:25
172:7,21
174:13,17
181:1,10,11
182:20 184:16
184:18 196:4,7
196:8,16,19
197:10,14
200:7,10,23
216:2 217:4,10
217:19 218:7
218:19 227:19
228:22 229:1
**2023** 4:1 6:11
8:13 22:11
30:10 36:7,8
45:4 49:18
64:25 65:1,5

270

Case 4:23-cv-00193-D-RN    Document 87-6    Filed 10/18/24    Page 95 of 96
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

65:20 70:7
71:12 79:21
80:18 81:8,16
82:4,24 84:19
87:18,25
101:18 102:1
105:4 108:22
109:10,16
112:21 114:4
121:19,21
125:20 167:24
168:11 173:4
174:14 180:12
180:20 181:7
197:24 216:2
220:6 222:4
225:22 226:6
233:16,21,24
**2024** 1:17 3:2
23:3,21 24:10
24:17 36:7,9
94:22 147:2
148:5,18
149:18 151:9
151:17,25
152:5,11
155:22 156:15
195:13,13
215:19 235:23
**21** 102:5 130:21
130:23 132:2,3
157:25
**216-621-0200**
2:20
**219** 4:1
**22** 3:14 131:25
141:1,4,4
229:23 230:3
**224** 3:9 4:2
**227** 4:3
**23** 117:17 151:9
151:17 208:13
209:6
**23-county** 117:8
122:12,17
**230** 3:10
**23rd** 152:4
**24** 3:15 142:15
148:5,18
149:18 158:13

**24th** 149:14
**25** 183:16
193:25 194:5
229:22
**25th** 81:9 235:23
**26** 222:15
**27** 105:25
212:25
**27601** 2:9
**27603** 2:15
**28801** 6:5
**29** 185:15
**29.99** 127:17
128:13,23

---
### 3

**3** 3:16 41:9,13
41:15 42:9,13
100:14 101:14
101:21 102:6
105:5 106:2
109:15,16
114:12 129:23
130:1,6 147:25
150:14,17
156:10 157:12
157:13 183:22
190:7 193:20
208:15 229:25
230:3 234:3
**3-A** 157:14
**3.5** 167:25 170:1
**3/17/22** 4:3
**3:28** 193:9
**3:39** 193:9
**30** 24:10 127:12
129:1 190:7
191:3,4,5,6,20
191:24 193:20
193:25 194:1,5
194:6
**300-ish** 65:10
**301** 2:8,14 65:12
65:13
**303** 67:2
**3040** 235:25
**307** 69:14
**31** 23:3 152:5
203:25 204:4
**312** 70:3,8

**313** 204:8,11,18
**315** 204:6
**31st** 23:19,25
**33** 23:17
**34** 24:19
**35** 194:1,6
**36** 28:2
**39** 129:1
**39.99** 127:12

---
### 4

**4** 3:17 51:18
54:8 56:6
57:22,25
109:10 110:7
153:7,22,23
162:6 167:15
167:17 181:18
181:21 211:20
212:2
**4.7** 181:3
**4:23-CV-0019...**
1:2
**4:28** 219:7
**4:41** 219:7
**4:49** 224:11
**40** 127:24 128:3
207:22,25
208:2
**41** 129:19
**44114** 2:19
**46** 208:13,15
**47** 46:5
**48** 49:24
**48.41** 130:14
**49** 6:4
**49.22** 145:4
**49.99** 127:24
128:3

---
### 5

**5** 3:8,18 56:21
59:14 71:7
73:23 74:6
95:24 96:1
102:10 104:4
104:14 105:9
106:2,3,4,10
109:10 110:2
119:7 126:8

130:10 144:21
144:22 145:1,9
170:5,8 181:1
212:25
**5/31/24** 3:14
**5:05** 224:11
**5:23** 234:15
**5:30** 234:15,23
**50** 13:11 63:23
95:18 97:23
127:25 128:4
129:11,18
140:11 154:5
154:11 155:1,7
157:20,21
158:15 211:3
**50.1** 98:5
**50.19** 130:18
**50.81** 145:12
**51** 211:14
212:11
**51.24** 217:5
**51.47** 114:13

---
### 6

**6** 3:19 41:11
108:19 120:14
120:19,21
128:2,7,8
157:6,8,25
158:7,10
172:12,15
**6-A** 157:24
158:9
**6/10** 145:17
**6:28** 224:6
**60,000** 171:3
**601** 2:5
**61,000** 171:6
**6225KK** 5:25

---
### 7

**7** 3:20 45:9 63:3
97:5 100:10
110:25 157:8
157:18 158:13
162:8,10
164:15,19
175:7,10
183:22 217:1

219:11,20
221:20 222:2
**7.4** 183:1
**70** 191:17,20
192:2,4,8
**71.2** 173:8
**71.6** 174:17,23
**75** 192:9

---
### 8

**8** 3:21 41:10,13
100:12 115:11
116:2,19
118:10 121:10
121:17,24
123:6 130:2
141:14 144:21
144:25 145:4
145:12 158:12
180:6,9 193:6
193:18 233:10
**8-A** 158:13
161:17
**8-and-a-half**
108:6
**8/10** 145:7
**8/30/24** 3:15
**84.4** 172:21

---
### 9

**9** 3:22 45:10
51:10 63:11
109:12 110:9
110:13 112:5,7
114:3 115:15
119:15 120:17
121:8,16 128:5
161:13 185:2,5
193:19 194:9
**9.4** 182:24
**9.8** 182:20
**9:02** 3:3
**90** 173:12,19,21
204:5
**919-783-2819**
2:9
**919-877-3800**
2:16
**99-plus** 214:25
**99.9** 98:5

271