**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION**

| | |
|---|---|
| RODNEY D. PIERCE and<br>MOSES MATTHEWS,<br><br>     Plaintiffs,<br><br>  v.<br><br>THE NORTH CAROLINA STATE BOARD<br>OF ELECTIONS, *et al.*,<br><br>     Defendants. | Case No. 4:23-cv-193-D |

## PLAINTIFFS' OPPOSITION TO LEGISLATIVE DEFENDANTS' MOTION *IN LIMINE*

Legislative Defendants' motion to exclude Plaintiffs' Demonstration District E should be denied because that district is proper rebuttal evidence, and the timing of disclosure is harmless. D.E. 86.

In his May 31, 2024 opening report, Plaintiffs' expert Blakeman Esselstyn opined that it was possible to draw a reasonably configured majority-Black district contained entirely within enacted Senate Districts 1 and 2, relying on Demonstration Districts B and D. Defendants' expert Sean Trende then criticized those districts, asserting that Mr. Esselstyn should have drawn districts that had over 50% Black Citizen Voting Age Population (CVAP) using 2022 figures rather than 2020 figures; that Demonstration Districts B and D improperly split Elizabeth City; and that race explained the split. In direct response to those criticisms, Mr. Esselstyn made changes to the boundaries of *four* precincts (only two of which impacted populated areas) to form Demonstration District E. Demonstration District E does not split Elizabeth City, yet has a higher BVAP and Black CVAP than Demonstration District D, rebutting Dr. Trende's claims that race drove the prior split of Elizabeth City. Demonstration District E also is over 50% Black CVAP using the

newly-released 2022 numbers, rebutting Dr. Trende's opinion relating to whether a majority-Black district can be drawn contained entirely within enacted Districts 1 and 2.

That is textbook rebuttal evidence. Legislative Defendants do not cite a single case, in any court, holding that an expert cannot make small changes to a demonstrative district in direct response to specific criticisms offered by the other side's experts. Indeed, such districts are routinely presented in rebuttal in redistricting cases.

In any event, the disclosure of Demonstration District E was harmless, and Rule 37 accordingly prohibits exclusion even if it were not proper rebuttal evidence (which it is). Demonstration District E does not reflect a new methodology—it makes small boundary adjustments to form a new district that is nearly identical to Demonstration District D but eliminates the Elizabeth City split and accounts for population changes between 2020 and 2022. Legislative Defendants deposed Mr. Esselstyn (and Plaintiffs' other experts) about Demonstration District E; they do not contend that their experts would opine that any of the statistics associated with Demonstration District E, like Black CVAP% or compactness, are incorrect; and they do not identify any specific expert evidence that they would have offered to rebut Demonstration District E or explain in any way how their presentation at trial would be prejudiced. Under binding precedent, litigants seeking to exclude purportedly late-disclosed expert evidence must take steps to *mitigate* any prejudice. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 194 (4th Cir. 2017). Here, Legislative Defendants have done the opposite, apparently instructing their expert *not* to evaluate Demonstration District E despite ample time to do so.

## BACKGROUND

On April 1, 2024, pursuant to the Court's order, D.E. 65, the parties submitted scheduling proposals containing dates for fact and expert discovery. Despite some differences, both sides

agreed that Plaintiffs' opening expert reports would be due on May 31, 2024, and that Defendants' responsive reports would be due on July 12, 2024. D.E. 70-1 at 1; D.E. 70-2 at 1. The Court did not act on the scheduling proposal, but the parties proceeded on the understanding that it was operative. All parties served initial disclosures on the dates in the proposed schedules, and Plaintiffs served four expert reports on May 31, 2024, including one from Mr. Esselstyn. Legislative Defendants advised that they were likewise planning to follow the proposed schedules and serve expert reports on July 12, 2024, unless the Court directed otherwise. *See* Email from Cassie A. Holt to Stanton Jones (June 14, 2024) (attached as **Exhibit 1**).

On June 26, 2024, the Court entered a new order directing the parties to submit a scheduling proposal. D.E. 79. After conferring, the parties submitted a proposal on July 1; it again contained some differences, but the parties each proposed a deadline of July 15 for Defendants' responsive reports and August 9 for Plaintiffs' rebuttal reports. D.E. 80-1, 80-2. The parties advised that Plaintiffs had already served their opening reports on May 31. D.E. 80 at 1. On July 2, the Court issued a new scheduling order setting a new deadline for initial disclosures (July 12), a new deadline for Plaintiffs' expert reports (July 16), and deadlines for Defendants' expert reports (August 16) and Plaintiffs' rebuttal reports (August 30). D.E. 81. The Court also set a deadline of September 13 for rebuttals to "any new experts disclosed by Plaintiffs." *Id.* at 1.

In his May 31 report, Mr. Esselstyn opined that it was possible to create a majority-Black district that complies with "traditional redistricting principles" and "lie[s] entirely within the area occupied by current enacted State Senate districts 1 and 2." D.E. 87-1 at 19, 24, 33 (Esselstyn Rep. at 18, 23, 32).[1] In support, he offered two Demonstration Districts, B and D, that fall entirely

---

[1] Citations throughout are to ECF page numbers, rather than internal page numbering.

within enacted Districts 1 and 2 and that were above 50% Black CVAP.[2]  As in his prior report in this case, D.E. 17-1, Mr. Esselstyn relied on Black CVAP numbers disaggregated down to the block level by the "Redistricting Data Hub," which at the time Mr. Esselstyn served his opening report were only available for 2020.

In response, Defendants' expert Dr. Trende offered two criticisms of Mr. Esselstyn's opinion that it was possible to draw a reasonably configured majority-Black district within enacted Districts 1 and 2.  First, Dr. Trende contended that the more appropriate data was Black CVAP data from *2022*; the Redistricting Data Hub released this data disaggregated to the block level on June 24, 2024.  D.E. 87-4 at 25.  Dr. Trende agreed that the Redistricting Data Hub is "a source for redistricting data widely used by social scientists and the broader redistricting community." *Id.* at 7.  He contended that, because the Black population changed between 2020 and 2022, Demonstration District B dropped below 50% Black CVAP using the 2022 data.  *Id.* at 25. Demonstration District D remained above 50%, but it dropped from 50.81% using 2020 numbers to 50.14% using 2022 numbers.  *Compare* D.E. 87-1 at 25 *with* D.E. 87-5 at 3 (Esselstyn Rebuttal Rep. at 2).  The estimated margin of error for Demonstration District D is plus-or-minus 0.594%. *See* D.E. 87-8 at 16 (Collingwood Rebuttal Rep. at 15).  Dr. Trende opined that, under the 2022 numbers, the lower bound of the margin-of-error range for Demonstration District D fell below 50%, and that, in his opinion, Mr. Esselstyn had accordingly not offered any majority-Black district entirely within enacted Districts 1 and 2.  D.E. 87-4 at 25.[3]

Notably, although Dr. Trende presented margin-of-error calculations for the Black CVAP percentages of the demonstration districts, the rebuttal report of Plaintiff's expert Dr. Loren

_____

[2] He also offered Demonstration Districts A and C, which are above 50% Black Voting Age Population based on the 2020 Census.  D.E. 87-1 at 15-18, 21-24.
[3] Plaintiffs will dispute this at trial, but whether Dr. Trende is correct is not material at present.

4

Collingwood exposed numerous significant errors in Dr. Trende's calculations, *see* D.E. 87-8 at

8-19—errors that Dr. Trende conceded:

> Q: [E]very margin of error number presented in your report is incorrect. Is that true?
>
> A: Certainly of the black estimates of CVAP. I don't know if there are any other ones in there,[4] but, yeah, the error margin for the black estimates of CVAP are wrong.
>
> Q: Okay. So every error margin you calculate for the black CVAP percentage of the demonstration district is wrong and unreliable. Is that correct?
>
> A: It is wrong. Yeah.

Deposition of Dr. Sean Trende at 83:1-84:6 (attached as **Exhibit 2**).[5]

Second, Dr. Trende presented maps purportedly shaded by the racial composition of the

population that "'zoom in' on the split in Pasquotank County" in Demonstration Districts B and

D. D.E. 87-4 at 32-36. Dr. Trende noted that those districts "split Elizabeth City," and offered

Figure 15 purporting to show the Black population of the portions of Elizabeth City that were

included and not included in Demonstration Districts B and D. *Id.*; *see id.* at 42 (noting that the

Pasquotank County split is identical in Demonstration District B and D). Based on these maps,

Dr. Trende opined that the split "appear[s] to be largely made on a racial basis." *Id.* at 36. In his

preliminary injunction report, Dr. Trende had not offered such an opinion, had not analyzed the

racial makeup of the portions of Elizabeth City that were included or excluded, and had not

criticized the same demonstration districts for splitting Elizabeth City. D.E. 39-6.

In direct response, Mr. Esselstyn presented a minor variation on Demonstration District D,

labeled Demonstration District E, that preserves all of Elizabeth City in Pasquotank County. D.E.

87-6 at 41 (Esselstyn Dep. 158:23-159:8); D.E. 87-5 at 12-13 (Esselstyn Rebuttal Rep.). The new

---

[4] There are not.

[5] Dr. Trende has conceded that many other calculations in his report are wrong, too.

district incorporates the precinct that contained the part of Elizabeth City that had not been in Demonstration District D. D.E. 87-6 at 41 (Esselstyn Dep. 158:23-160:21); *see also* D.E. 87-5 at 58 (bottom left precinct). Correspondingly, the new district moves a portion of the population in a different precinct not involving Elizabeth City into the adjoining district. D.E. 87-6 at 41 (Esselstyn Dep. 160:22-161:4); *see* D.E. 87-5 at 12. It also makes slight modifications to two other precincts that impact "wholly unpopulated stretches of water in the Pasquotank River." D.E. 87-5 at 12. The new district's population is 199,064, *see id.* at 53, materially identical to Demonstration District D's population of 199,039, *see* D.E. 87-1 at 307. Demonstration District E has identical compactness to Demonstration District D using both the Reock and Polsby-Popper methods. D.E. 87-5 at 8, 11. Demonstration District E has a higher BVAP and Black CVAP%. *Id.* at 8, 11. The Demonstration Map accompanying Demonstration District E is identical to the Demonstration Map accompanying Demonstration District D in every way except for the four precincts that were changed around Elizabeth City. *Compare* D.E. 87-1 at 27 *with* D.E. 87-5 at 11.

The expert schedule had a built-in date for sur-rebuttal reports from Defendants, set on September 13, two weeks after Plaintiffs' rebuttal reports were due. *See* D.E. 81. That deadline allowed Legislative Defendants to file sur-rebuttals as a matter of right for new experts, and nothing precluded Legislative Defendants from seeking permission to file a sur-rebuttal related to Demonstration District E. Indeed, that deadline would have given Legislative Defendants precisely the same amount of time to respond to Mr. Esselstyn's rebuttal report as Mr. Esselstyn had to prepare it. Legislative Defendants did not seek permission to file a sur-rebuttal report. To the contrary, they did not ask their expert Dr. Trende to review Demonstration District E, and instead they appear to have directed him to avoid considering Demonstration District E or forming

any opinions on it. Dr. Trende testified that he had not reviewed Demonstration District E, Ex. 2 at 34 (Trende Dep. 136:15-20), and counsel directed him not to answer the question whether it was "your choice not to form any opinions about demonstration district E," on the ground that it would necessarily reveal conversations with counsel, *id.* at 56-57 (Trende Dep. 224:4-24, 228:14-17).

Legislative Defendants deposed Mr. Esselstyn about Demonstration District E. *See, e.g.*, D.E. 87-6 at 41 (Esselstyn Dep. 158:23-160:21).

## ARGUMENT

**I.  Making Minor Changes to a Demonstration District In Response to Criticisms from an Opposing Expert Is Proper Rebuttal**

Courts in this district and Circuit have repeatedly affirmed that an expert rebuttal report is proper as long as it "responds to the opposing party's expert reports," such as by "contradict[ing]," "address[ing]," or "attempt[ing] to disprove" the defendant's experts. *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 2021 WL 1555776, at *2 (E.D.N.C. Apr. 20, 2021) (quotation marks omitted). There is no prohibition on presenting new (or modified) data or analysis in a rebuttal report, so long as it responds to the other side's experts. "Rebuttal reports 'may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert.'" *Funderburk v. S.C. Elec. & Gas Co.*, 2019 WL 3406814, at *4 (D.S.C. July 9, 2019) (citing *Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013)); *see also City Grill Hosp. Grp., Inc. v. Nationwide Mut. Ins. Co.*, 2013 WL 6092231, at *3 (E.D.N.C. Nov. 19, 2013) (rebuttal evidence is proper if it responds to "new evidence" from opposing reports). Indeed, "in many cases, the rebuttal expert will seek to direct the finder of fact to a different form of analysis or set of facts." *Houston Cas. Co. v. Trident Constr. Servs., LLC*, 2023 WL 8713370, at *2 (D.S.C. Dec. 18, 2023).

Demonstration District E is proper rebuttal evidence. It does not reflect new theories or

opinions—or even methodologies; instead, it responds to Dr. Trende's criticisms of Demonstration Districts B and D, which Mr. Esselstyn presented to support his opinion that a reasonably configured majority-Black district can be drawn within the enacted Districts 1 and 2. First, Demonstration District E directly responds to Dr. Trende's opinion that the prior split of Pasquotank County "appears to largely be made on a racial basis." D.E. 87-4 at 36. It similarly responds to Dr. Trende's Figure 15, which purports to show that portions of Elizabeth City were excluded from Demonstration Districts B and D to increase the districts' Black population. *Id.* at 34. These opinions (and Figure 15) did not appear in Dr. Trende's preliminary injunction report. D.E. 39-6. And Legislative Defendants apparently intend to rely on Dr. Trende's report to support an (erroneous) argument that Demonstration Districts B and D do not satisfy *Gingles* One because "race predominated" in drawing them. *See generally Allen v. Milligan*, 599 U.S. 1, 31 (2023).

Demonstration District E directly disproves this argument, because it shows that a district that includes *all* of Elizabeth City would actually have a *greater* Black population. D.E. 87-5 at 8, 11. It is proper rebuttal for this reason alone. It establishes—as Mr. Esselstyn will testify—that he drew Demonstration Districts B and D to (among other things) balance the goals of preserving municipalities with a goal of avoiding splitting voting tabulation districts, not to split Elizabeth City along racial lines. D.E. 87-6 at 32-33, 38 (Esselstyn Dep. 124:15-125:18, 147:4-10). Indeed, it is hard to see how Dr. Trende could be allowed to testify that racial considerations drove the Pasquotank and Elizabeth City split if the Court prohibits rebuttal evidence showing that they did *not*.

Demonstration District E is also proper rebuttal because it directly addresses Dr. Trende's criticisms about using 2020 versus 2022 American Community Survey (ACS) data. Dr. Trende criticized Mr. Esselstyn's initial analysis because, using 2022 figures, Demonstration District B's

Black CVAP% is below 50%, and while Demonstration District D is still 50.14% Black, Dr. Trende contended that the confidence interval drops below 50% using 2022 figures. D.E. 87-4 at 24.

Mr. Esselstyn's rebuttal report directly responded by showing that it is possible to draw a reasonably configured majority-Black district using *2022* figures, even accounting for confidence intervals, just by tweaking a few precincts in Demonstration District D. D.E. 87-5 at 9-14. It is hard to understand Legislative Defendants' argument that this is not proper rebuttal. Its point is to "address" and "respond to the specific opinions or conclusions" of Dr. Trende. *Pa. Nat'l Mut. Cas. Ins. Co.*, 2021 WL 1555776, at *2 (quoting *Boles v. United States*, 2015 WL 1508857, at *3 (M.D.N.C. Apr. 1, 2015)); *see* D.E. 87-5 at 10 ("in light of the fact that Demonstration District D's Black CVAP decreased using the 2022 ACS data, I have created a Demonstration District E and Demonstration Map E to respond to Dr. Trende").

In redistricting cases, experts routinely offer additional demonstrative plans in rebuttal to respond to criticisms of their initial demonstrative plans. That happened in *Allen v. Milligan*, the Supreme Court's most recent VRA Section 2 decision. The district court explained that Plaintiffs' demographer "Mr. Cooper offered a seventh illustrative plan in his rebuttal report, which also includes two congressional districts with a BVAP over 50% using the any-part Black metric." *Caster v. Merrill*, 2022 WL 264819, at *35 (N.D. Ala. Jan. 24, 2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023). He offered that district "in response to criticism from the Defendants' expert, Thomas Bryan, that the first six Cooper plans were insufficiently compact." *Id.* at *37.

Likewise, in *Ohio A. Philip Randolph Institute v. Smith*, 2019 WL 428371 (S.D. Ohio 2019), the defense expert criticized plaintiffs' initial demonstrative plans for considering

incumbency data from 2018 rather than 2011. *Id.* at *2-3. The defense expert also argued that the demonstrative plans failed to protect 2011 incumbents as well as the enacted 2012 plan and thus did not support the plaintiffs' expert's opinion about the existence of alternative, incumbent-protecting maps that had a different partisan makeup than the enacted plan. *Id.* at *3. In response, the plaintiffs' expert offered two new demonstration plans that were "similar to" the original plans but that "took into account 2011 incumbents rather than 2018 incumbents," and explained that using 2011 (rather than 2018) incumbency data "did not hinder my ability to draw a map" that had a different partisan composition than the enacted plan yet protected incumbents. *Id.*

The court rejected defendants' motion to strike, holding that the two new plans were valid "rebuttal" evidence. *Id.* at 3. The court explained that "rebuttal testimony is responsive to new information by the other party," and that a "rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Id.* at *2 (internal quotation marks omitted). Although the new report "does include new hypothetical[] [plans], those hypotheticals are of the 'same subject matter' as Dr. Hood's report because they respond to Dr. Hood's use of the 2011 incumbents—in particular, incumbent pairings analogous to the 2012 Plan—to critique the Proposed Plan." *Id.* Accordingly, they were proper rebuttal. *Id.* The same is true here.

Legislative Defendants have not identified any case from any court that has struck additional demonstrative plans offered in a redistricting expert's rebuttal report to address criticisms of the initial demonstrative plans.

The cases offered by Legislative Defendants are readily distinguishable or support Plaintiffs' position. In *U.S. ex rel. Brown v. Celgene Corp.*, 2016 WL 6542730 (C.D. Cal. June 29, 2016), the challenged rebuttal report was submitted by an entirely new expert after the final

expert disclosure deadline. *Id.* at *1. Nonetheless, the court *denied* the motion to strike the report, explaining that "the fact that evidence could have been addressed in a party's case-in-chief does not necessarily preclude its admission in rebuttal." *Id.* at *4 (citing *Benedict v. United States*, 822 F.2d 1426, 1428 (6th Cir. 1987)). "All that is required is for the information to repel other expert testimony," which "may require a party to marshal evidence and argument in a rebuttal report to explain why the opposing party's expert is wrong." *Id.* (citing *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004)). "As one court explained, '[a]n opening expert report is an early salvo in the process of defining issues for trial, and thus it is more understandable at the expert discovery stage that a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports.'" *Id.* (quoting *Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, 2010 WL 3894444, at *15 n.13 (N.D. Ill. 2010)). A rebuttal expert also "may properly use new methodologies 'for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness.'" *Id.* (quoting *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009)). Nothing about this *Brown* case supports excluding Demonstration District E.

In *Smith v. State Farm Fire & Casualty Co.*, 164 F.R.D. 49 (S.D.W. Va. 1995), the plaintiffs served twelve expert reports, ten of which were labeled "preliminary reports," contained essentially no opinions, and purported to incorporate voluminous document productions and interrogatory answers written by plaintiffs' counsel that were themselves incomplete and generalized. *Id.* at 50-53. The court struck the reports as non-compliant with Rule 26. *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005), involved failure to file written expert reports at all. Those cases are nothing like this one.

In *McKiver v. Murphy-Brown LLC*, No. 7:14-CV-180-BR, 2018 WL 1832964 (E.D.N.C.

Apr. 17, 2018), the court granted in part and denied in part a motion to exclude a defense expert who was first disclosed on rebuttal, not for defendant's case-in-chief. *Id.* at *1, *3-4. The court found that some of the expert's opinions were proper rebuttal because they responded to the plaintiffs' expert, while others were beyond the scope of rebuttal and thus were excluded "[b]ecause defendant did not designate [the expert] as a case-in-chief expert." *Id.* at *2. Notably, the court explained that "[r]ebuttal reports 'may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert.'" *Id.* at *1 (quoting *Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013)).

In *Gravitt v. Mentor Worldwide LLC*, 342 F.R.D. 130 (N.D. Ill. 2022), the court excluded a rebuttal report by an entirely new expert who expressed opinions that "should have been disclosed in an opening exp[e]rt report because they pertain[ed] to a key element of Plaintiffs' claims." *Id.* at 134-35. Again, that is nothing like this case. Mr. Esselstyn's opinions were disclosed in his opening report.

In *Grace Christian Fellowship v. KJG Investments Inc.*, 2008 WL 2412981 (E.D. Wis. June 12, 2008), the court held six days of hearings on the plaintiff's preliminary injunction motion over six months. *Id.* at *1. During the final hearing, the plaintiff filed a motion seeking permission to offer testimony from three new rebuttal witnesses. *Id.* The court found that some of the proposed testimony was proper rebuttal, but declined to admit "new" evidence, which would not "serve [the] purpose" of preliminary injunction proceedings "designed to address some imminent harm." *Id.* at *6. The court noted, however, that "the fact that evidence could have been addressed in the plaintiff's case-in-chief does not necessarily preclude its admission in rebuttal." *Id.* at *1 (citing *Benedict*, 822 F.2d at 1428 (6th Cir. 1987)).

In *Snider-Jefferson v. Amigo Mobility International*, 2016 WL 4424954 (E.D. Va. Aug.

17, 2016), the court denied as moot a motion to exclude the plaintiff's rebuttal expert report, which "presented new *opinions*" distinct from those proffered in the expert's opening report, including "changing his opinion on whether the [challenged product] design was unreasonably dangerous." *See id.* at *1-2, *4 (emphasis added). The Court explained that the "very purpose of a reply report" is "to refute a defendant's expert's initial opinions." *Id.* at *4 (internal quotation marks omitted). Legislative Defendants reference the court's observation that a rebuttal report is not the time for "correct[ing] mistakes," *id.*, but that is just an observation that the rebuttal and supplementation standards are different. And Mr. Esselstyn was not correcting "mistakes."

In *Boles v. United States*, 2015 WL 1508857 (M.D.N.C. Apr. 1, 2015), the court granted a motion to exclude the plaintiff's rebuttal expert reports, which were produced only in response to the defendant's reports and authored by experts the plaintiff failed to disclose previously. *Id.* at *1. Plaintiff's experts "primarily put forth opinions on topics completely unforeseen by Defendant," including two new theories of damages that the plaintiff had previously disclaimed. *Id.* at *9.

In *East Bridge Lofts Property Owners Ass'n, Inc. v. Crum & Forster Specialty Insurance Co.*, 2015 WL 12831677 (D.S.C. July 9, 2015), the plaintiff disclosed a new expert at 11:19pm on the night the discovery deadline closed under a scheduling order that did not provide for rebuttal expert reports. *Id.* at *1. Nonetheless, the court rejected the defendant's motion to strike the report.

Finally, in *Matthew Enterprise, Inc. v. Chrysler Group LLC*, 2016 WL 4272430 (N.D. Cal. Aug. 15, 2016), a price discrimination case, the court admitted rebuttal evidence that is no different in kind—and rather contained far more changes to the initial report—than Demonstration District E. For example, the Court admitted a "new lost sales estimate using, for

the first time," post-discrimination sales, to respond to the other side's assertion that the expert's "initial lost sales analysis fails because it was benchmarked to the pre-discrimination period." *Id.* at *6. This rebuttal evidence "challenge[d] [the opposing expert's] opinion by suggesting that, even accepting [his] criticism, [the rebuttal expert's original] analysis that lost sales resulted survives." *Id.* Mr. Esselstyn tweaked a few precincts to show that it is possible to draw a demonstration district within Districts 1 and 2 that is majority-Black, even (1) incorporating all of Elizabeth City and (2) using 2022 data—directly responding to Dr. Trende's criticisms. *See* D.E. 87-5 at 9-14. Like in *Matthew Enterprise*, the goal was to show that "even accepting [Dr. Trende's] criticisms," Mr. Esselstyn's analysis that it is possible to draw such a district survives.

To the extent *Matthew Enterprise* said that rebuttal reports cannot present "new evidence," *id.* at *2, it is inconsistent with the rule courts in the Fourth Circuit apply. *See supra* at 7. In any event, what the court meant was that rebuttal reports cannot present "new evidence" *if* the evidence does not respond to the other side's reports, and the court repeatedly admitted "new evidence" that was directly responsive to the defense expert's reports. In addition to the example just given, the court admitted a new *regression* on rebuttal because it was offered to "contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Id.* at *3 (quotation marks omitted). The court likewise allowed a revision to the expert's initial methodology for simulating sales, based on a different market definition, because it "directly rebutt[ed] [the defense expert's] contention that [the plaintiffs' expert's] model falls apart when a smaller area is used." *Id.* at *5. The court distinguished between new analysis that was not "[]tethered to deficiencies identified by Defendant" and new analysis that was. *Id.*

Demonstration District E is proper rebuttal under the caselaw. First, it rebuts Dr. Trende's argument that the way in which the prior Demonstration Districts split Elizabeth City was

primarily based on race.  Offering a different demonstration district that does not split Elizabeth City but has a higher Black population directly and conclusively refutes that argument.  Legislative Defendants do not address this point in their motion.

Second, it directly rebuts Dr. Trende's argument that Mr. Esselstyn's opinion about the ability to draw a majority-Black district entirely within enacted Districts 1 and 2 does not hold up using 2022 data.  D.E. 87-4 at 26.  Legislative Defendants argue (Mot. 8) that Mr. Esselstyn does not dispute Dr. Trende's calculation of Demonstration District B and D's Black CVAP% using the 2022 data.[6]  But Demonstration District E is offered to respond to Dr. Trende's conclusion about the *implications* of using 2022 data on Mr. Esselstyn's opinion about drawing a majority-Black district within Districts 1 and 2.  It is offered to "defuse the impact of the evidence offered by an adverse party" and rebut the claim that the opinion "falls apart" using the new data, *Matthew Enter.*, 2016 WL 4272430, at \*3, \*5, by explaining that small tweaks to a district can reach the same result as under the 2020 data.

Legislative Defendants argue that Mr. Esselstyn should have used 2022 data in his initial report, but they concede that, at the time he submitted his report, it was not publicly available in disaggregated form from the Redistricting Data Hub, which Dr. Trende admits is a standard source for redistricting experts.  Mot. 11; D.E. 87-4 at 7.  They contend that Mr. Esselstyn should have disaggregated the data himself, but if he had done so, they would surely have criticized him for changing his methodology, since he relied on the Redistricting Data Hub disaggregation in his preliminary injunction report.  D.E. 17-1.  And Mr. Esselstyn testified without contradiction that the Redistricting Data Hub "appl[ies] a recognized, robust disaggregation process that is well

---

[6] Several of Dr. Trende's other calculations relating to Demonstration Districts B and D are incorrect, but the parties agree on the baseline Black CVAP% calculations for the districts.

documented, and it seems to have become sort of the standard dataset to use for this type of analysis." D.E. 87-6 at 15 (Esselstyn Dep. 55:23-56:4). Mr. Esselstyn stated that he was aware of at least two methodologies for disaggregation, and that he had never disaggregated ACS data himself in a redistricting case. *Id.* at 39-40 (Esselstyn Dep. 152:13-153:5).

In any event, there is no "assumption of the risk" element to evaluating whether something is proper rebuttal. *Contra* Mot. 7. The *only* question is whether the material is responsive to the other side's expert reports. The point of rebuttal is to allow experts to address issues identified by the other side. Indeed, the very case Legislative Defendants cite refutes their position, explaining that the rebuttal rule "does not automatically exclude anything an expert could have included in his or her original report." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004). "All that is required [to establish proper rebuttal] is for the information to repel other expert testimony," as Mr. Esselstyn's rebuttal report does here. *Id.* The portion of *Crowley* on which Legislative Defendants rely excludes rebuttal from an expert who had relied in his initial report on 8 summaries of deposition testimony prepared by plaintiffs' counsel and sought to expand his opinions to include 30 more depositions that had been available at the time of his initial report. *Id.* That testimony was excluded because it was not responsive to any other expert. *Id.*

## II. Demonstration District E Is Independently Admissible as Proper Supplementation

Even if Demonstration District E were not proper rebuttal (and it is), it is admissible as a supplementation to Mr. Esselstyn's initial report under Rule 26, which allows supplementation of an expert report before the party's pretrial disclosures under Rule 26(a)(3) are due. *See* Fed. R. Civ. P. 26(e).

Here, Mr. Esselstyn's initial report did not contain analysis of the 2022 Black CVAP figures because those figures were not available in disaggregated form on May 31, 2024, when he served that report. Demonstration District E supplements that report by incorporating the newly-

released 2022 numbers, and making minor tweaks to the previously disclosed demonstration districts to account for changes in the distribution in North Carolina's Black population. D.E. 87-5 at 9-14. Again, Mr. Esselstyn did not change his opinions or methodology; he simply updated his demonstration districts to account for new data, and presented the exact same statistics about the new demonstration district that he had presented about the old ones. *See id.* That is proper supplementation. And the supplementation was timely offered well before pretrial disclosures were due—indeed, well before discovery closed and well before Mr. Esselstyn's deposition.

Legislative Defendants say that supplementation does not allow experts to "deepen, strengthen or expand existing opinions," Mot. 10 (quoting *Hous. Auth. of the City of L.A. v. PCC Tech. Indus., Inc.*, 2015 WL 13864845, at *2 (C.D. Cal. Mar. 4, 2015)), and that it does not allow experts to offer "new opinions [or] double the amount of damages," *id.* (quoting *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1353 (Fed. Cir. 2005)), or to "employ a new methodology," Mot. 11 (quoting *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011)).

But Demonstration District E does none of those things. It is offered in support of Mr. Esselstyn's original opinion that it is possible to draw a reasonably configured majority-Black district within enacted Districts 1 and 2, using the same methodology, just with the new 2022 data.

Legislative Defendants also argue that Mr. Esselstyn could have disaggregated the 2022 data himself, or could have filed an updated report on July 16, 2024. Mot. 11. For the reasons already discussed, however, it was perfectly appropriate for Mr. Esselstyn to choose to rely on the gold-standard Redistricting Data Hub disaggregation—the same one he relied on before, and that Dr. Trende admitted is "widely used by social scientists and the broader redistricting community," D.E. 87-4 at 7—rather than performing a disaggregation that he had never done in a redistricting

case.[7]  Legislative Defendants would surely have criticized him for changing his methodology if he had chosen to use a disaggregation method that was different from the Redistricting Data Hub.

Legislative Defendants also contend that Mr. Esselstyn could have supplemented his report on July 16, 2024.  Mot. 8 n.10.  But the Court's order extending the deadline for Plaintiffs' expert reports came on July 2, 2024—two weeks before that deadline and during a period that Plaintiffs' experts had not set aside to work on these reports.  Plaintiffs' counsel did not ask their experts to prepare supplemental reports during that period and were not yet aware that the Redistricting Data Hub had released its 2022 numbers.  In any event, Rule 37 requires supplementation before the pre-trial disclosure deadline, not at the earliest possible opportunity.

Legislative Defendants rely on *Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624 (E.D.N.C. 2008), but that case is readily distinguishable.  There, an expert had calculated lost revenue in his initial report; the defendants moved for summary judgment; and the expert provided a supplemental report *changing* his lost revenue figure in response to the "numerous problems in the expert report that plaintiffs discussed in moving for summary judgment."  *Id.* at 629, 631.  The new report was filed after the expert's deposition, "over eleven months past the deadline in the Scheduling Order, over ten months past the expert disclosure deadline to which the parties agreed, and over nine months past the amended deadline to complete discovery."  *Id.* at 629.  That is dissimilar to this case in every respect.

## III.    The Timing of the Disclosure Was Harmless or Substantially Justified

Mr. Esselstyn's Demonstration District E is proper rebuttal or proper supplementation. There is accordingly no occasion to consider whether any failure to disclose that district in his

---

[7] Mr. Esselstyn testified that he could not remember whether he had ever disaggregated ACS data in municipal annexation cases.  D.E. 87-6 at 39-40 (Esselstyn Dep. 152:24-153:5).  Even if he had, such a disaggregation would not have involved Black CVAP disaggregation.

initial report was "substantially justified or is harmless" under Federal Rule of Civil Procedure 37(c)(1). If the Court disagrees, though, any failure to disclose was "substantially justified" or "harmless," and Rule 37 accordingly does not support exclusion.

The Fourth Circuit directs district courts to consider five factors under Rule 37, known as the *Southern States* factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). "The first four factors listed above relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190.

The harmlessness exception is satisfied here. First, there is no surprise. Demonstration District E was disclosed over 5 months before trial, and 1 month before expert discovery closed. Legislative Defendants deposed Mr. Esselstyn about Demonstration District E. Mr. Esselstyn's deposition was held on Sept. 17—over two weeks after the district was disclosed. In other words, Legislative Defendants had more time to prepare to depose Mr. Esselstyn about Demonstration District E than Mr. Esselstyn had to create it. Demonstration District E was not drawn using any different methodology than any of the other Demonstration Districts, and it is nearly identical to Demonstration District D. *See supra* at 6. The statistics that Mr. Esselstyn presented about Demonstration District E, like compactness, population, and splits, are easily verifiable by opening the shapefile in a mapping program like Dave's Redistricting or Maptitude, *see* D.E. 87-1 at 48-50, and they are the same statistics that Mr. Esselstyn presented about his other four demonstration

districts. Legislative Defendants have not challenged any of the statistics Mr. Esselstyn reported with respect to any of the demonstration districts, including his Black CVAP calculations based on the Redistricting Data Hub disaggregation of the 2022 (or 2020) ACS data. They do not contend they will do so with respect to Demonstration District E.

Nor is there any surprise with respect to the complementary analysis that Drs. Mattingly and Collingwood did to accompany Demonstration District E. Legislative Defendants note that Plaintiffs supplied rebuttal "expert reports from Mattingly and Collingwood with similar analyses of District E as their opening reports provided for Districts A through D." Mot. 4. Dr. Mattingly simply applied his publicly accessible *Stephenson* algorithm to show that the 48 county groupings other than Districts 1 and 2 remain the same if Demonstration District E is treated as a VRA district; that analysis is entirely uncontroversial and literally identical to his analysis of Demonstration Districts B and D. *Compare* D.E. 87-2 at 8-11 (Mattingly Report at 8-11) *with* D.E. 87-7 at 3-4 (Mattingly Rebuttal Report at 2-3). Legislative Defendants had a full opportunity to depose Dr. Mattingly about anything having to do with Demonstration District E, and they did not challenge his conclusions.

Similarly, Dr. Collingwood's performance analysis of Demonstration District E (see Mot. 3-4) used the exact same methodology as his performance analysis of Demonstration Districts A through D. D.E. 87-8 at 27-33. Legislative Defendants did not offer a rebuttal expert on Dr. Collingwood's performance analysis of Demonstration Districts A through D in the first place and are not challenging the accuracy or reliability of that performance analysis. They offer no explanation of what rebuttal evidence they would have offered in response to Dr. Mattingly and Dr. Collingwood's analysis of Demonstration District E.

The Fourth Circuit's holding in *Bresler* makes clear that there is no unfair surprise here.

There, the expert witness had served his initial report in June 2012, calculating the amount of shortfall in a particular trust. 855 F.3d at 190. The district court had allowed supplementation by August 21, 2012, but the expert did not supplement, and expert witness discovery closed on October 23, 2012. *Id.* Then, *over a year later*, and two months before trial, the expert disclosed a thumb drive containing a new formula and calculations for calculating the trust shortfall. *Id.* at 191-92. The Fourth Circuit observed that the formula should have been disclosed in June 2012, and explained that "[e]ven if we were to view [the exhibit] as being a supplement to the June 2012 report," it was late because the parties had an agreed deadline for supplementation. *Id.* at 193.

But the court concluded that there was still no *surprise* and that the testimony should be admitted, because the defendants had been aware in June 2012 that the expert might update information based on "additional information [he] could obtain at a later date," and because the damages calculations decreased, and thus the defense was not "'blindsided' by an expert witness' testimony that damages would be greater." *Id.* The court further cited approvingly a Sixth Circuit case determining that a late disclosure was "harmless, in part because defendant possessed information relevant to calculations and knew plaintiffs were reconsidering their calculations, which plaintiffs had realized might be flawed." *Id.* at 193-94.

*Bresler* precludes a finding of surprise here. Legislative Defendants received Demonstration District E well before trial, and Mr. Esselstyn signaled in his opening report that he might update his conclusions if new data became available. D.E. 87-1 at 34. Given that their own expert contended that the newly-released 2022 5-year ACS estimates were the proper ones to use, Legislative Defendants cannot be surprised that Mr. Esselstyn provided a slightly modified Demonstration District to account for the change in the distribution of the Black population in the 2022 5-year estimates compared to the 2020 5-year estimates.

For similar reasons, the "ability to cure" factor cuts against exclusion. As noted, Legislative Defendants deposed Mr. Esselstyn about Demonstration District E. They also deposed Dr. Mattingly about the county groupings that his algorithm generated for Demonstration District E. Deposition of Dr. Jonathan Mattingly 65:9-20 (attached hereto as **Exhibit 3**). Legislative Defendants had the opportunity to depose Dr. Collingwood about his analysis of Demonstration District E, but did not ask him any questions about it or indeed about *any* specific demonstration district that he analyzed. Instead, they asked him general questions about how his performance and other analyses worked—questions that were applicable to his analysis of all the demonstration districts. *See, e.g.*, Deposition of Loren Collingwood at 127:24-129:24 (attached hereto as **Exhibit 4**) (margin of error analysis); *id.* at 67:2-68:2 (performance).

In *Bresler*, the Fourth Circuit held that the "ability to cure" factor cut against exclusion where the defendant "had access to [the challenged exhibit] and its associated net-in-trust formula for nearly two months before the trial began," but "[d]uring that period, [the defendant] did not seek to depose [the expert] or to take any other steps to mitigate the purported surprise caused by the plaintiffs' delayed disclosure of the net-in-trust formula." 855 F.3d at 194. Here, Legislative Defendants have had access to Demonstration District E for five months before trial will began and *did* depose Mr. Esselstyn and other experts about Demonstration District E. They had a full opportunity to take "other steps to mitigate the purported surprise," but they did not.

To the contrary, Legislative Defendants took steps to *exacerbate* any purported surprise: they either did not ask their expert Dr. Trende to review Demonstration District E during the full month before his September 30, 2024 deposition, or—as appears more likely—they affirmatively instructed him not to do so. Ex. 2 at 34, 56, 57 (Trende Dep. 136:15-20, 224:4-24, 228:14-17). Having had the opportunity to review Demonstration District E since August 30, 2024, when trial

22

was 5 months away and expert discovery was ongoing, Legislative Defendants instead chose to wait 2 months, until after expert discovery closed, and then move to exclude the district on the ground that trial is now only 3 months away.

Moreover, Legislative Defendants do not identify *any* additional specific evidence that they could or would have introduced if Demonstration District E had been disclosed earlier. They do not challenge any of Mr. Esselstyn's calculations. Nor is Demonstration District E the equivalent of a complex new mathematical formula or new methodology. Anyone can look at the district lines and draw conclusions or ask questions about them. Legislative Defendants are not prejudiced at all by the timing of the disclosure. As in *Bresler*, "the record does not show that [Esselstyn's additional district] and [its] timing affected [Legislative Defendants'] ability to conduct [their] defense in any material respect." *Id.* at 194.

Third, allowing this testimony could not possibly disrupt the trial, which is still 3 months away. Mr. Esselstyn has already been deposed about this district, and the district supports his prior opinion offered in his opening report that it is possible to draw a reasonably configured majority-Black district wholly within enacted Districts 1 and 2. *See* D.E. 87-1 at 4-5. He will offer that opinion regardless, and testimony about one additional demonstration district supporting that opinion could not possibly "disrupt" the trial. In *Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017), the Fourth Circuit held that this factor favored admission where the belatedly disclosed evidence "did not 'interject an additional, and considerably complex, legal theory' into the case, nor did it 'substantially change the character of the case and render obsolete much of the parties' trial preparation.'" *Id.* at 508. That is true here, which also reaffirms that factor four supports admission.

Ultimately, the Fourth Circuit has explained that "the similarity of the undisclosed

testimony to the disclosed testimony of [other experts] causes the first three factors to weigh in favor of" admitting the late-disclosed testimony. *Baker v. United States*, 645 F. App'x 266, 270 (4th Cir. 2016). Here, Demonstration District E is highly similar to Demonstration District D, and all of the analysis performed on Demonstration District E is identical to the analysis performed on the previous four demonstration districts.

To establish prejudice, Legislative Defendants rely on obviously distinguishable out-of-circuit cases and vague assertions—never explaining *what* exactly it is that they've been prevented from responding to. As for the cases: In *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182 (S.D. Cal. 2016), the court excluded an expert who provided opinions on the quality of drinking water in a case involving a claim for environmental remediation, because the expert had not been disclosed at *all* until seven months after the deadline for opening expert reports and offered entirely new *opinions* that were critical to the case-in-chief. *Id.* at 1992-93. That is entirely different from this case, where at most Mr. Esselstyn is offering a slight tweak on a previous demonstration district in support of opinions that were previously disclosed in his opening report.

In *Vance ex rel. Hammons v. United States*, 182 F.3d 920 (6th Cir. 1999), the court affirmed exclusion where the plaintiff had initially submitted a four-page affidavit in June 1997, and then submitted a more detailed, supplemental affidavit in November 1997 as part of an opposition to the defendant's motion for summary judgment—two months after expert discovery had closed and, of course, *after* the deadline for dispositive motions. *Id.* at *2. That is nothing like the situation here.

In *Beller ex rel. Beller v. United States,* 221 F.R.D. 696 (D.N.M. 2003), the expert's supplemental report was provided "six weeks after the August 5, 2003 discovery termination date, and after [the expert] had been deposed," and the "the opinions expressed in the supplemental

report [were] different than the opinions contained in [the expert's initial] report." *Id.* at 697, 702. Here, none of that is true: the report was provided before Mr. Esselstyn was deposed and the opinions are the same as the opinions in the initial report. In *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 312 (M.D.N.C. 2002), the expert report was submitted after discovery closed and even though the discovery plan had not allowed for *any* rebuttal reports. And in *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010), the court excluded the expert's report because it was only 2 pages and did not actually disclose the expert's opinion, not for any timeliness reason.

Legislative Defendants say that the scheduling order "does not permit any response" to Demonstration District E. Mot. 13. But even assuming arguendo that Demonstration District E is not proper rebuttal, Legislative Defendants fail to articulate what they would say or how they would respond to Demonstration District E. Again, this is not some new regression analysis that requires intensive expert work. And if they had genuinely wanted to respond to Demonstration District E—instead of intentionally forming no opinions about it in an apparent effort to sandbag Plaintiffs with the instant motion—they could have sought leave to file a responsive report. That is precisely what the Fourth Circuit has said litigants should do in these circumstances. *See Bresler*, 855 F.3d at 194. Having deliberately failed to take no action during the discovery period to respond to Demonstration District E, Legislative Defendants cannot claim prejudice now.

Finally, any delay was substantially justified under *Southern States* factor 5. Mr. Esselstyn had no reason to anticipate that Dr. Trende would opine that the split of Elizabeth City was made principally for racial reasons. Dr. Trende notably did not make the same claims in his preliminary injunction report, D.E. 39-6, which he had a month to draft and which addressed Demonstration District B, which splits Pasquotank in the exact same manner as Demonstration District D. It is

hard to see how Mr. Esselstyn could have drawn a district to rebut this criticism that had never previously been made; there are millions of ways to draw any one district, and it is not fair or reasonable to require experts to initially draw a district that responds to every possible criticism a subsequent expert might make. Notably, Mr. Esselstyn presented Demonstration District E well before the close of discovery and only two weeks after the report to which it responded was served.

Finally, Mr. Esselstyn's changes to Demonstration District D were also substantially justified based on the fact that the 2022 disaggregated ACS data was not available when he served his initial report on May 31, 2024. It was also substantially justified to disclose that district on August 30 instead of July 16. Providing an update on July 16 would have required Plaintiffs to ask three of their four experts to update their reports between July 2, 2024 and July 16, 2024, at a time when none of those experts reasonably expected to be working on this matter in light of the parties' shared understanding of the schedule for proceedings at that point. This was not feasible, and it certainly was not required to avoid exclusion of evidence.

## CONCLUSION

The Court should deny Legislative Defendants' motion.

Dated: October 28, 2024                      Respectfully submitted,

**ARNOLD & PORTER**
    **KAYE SCHOLER LLP**

By: */s/ R. Stanton Jones*

    R. Stanton Jones*
    Stanton.Jones@arnoldporter.com
    Elisabeth S. Theodore*
    Elisabeth.Theodore@arnoldporter.com
    Samuel I. Ferenc*
    Sam.Ferenc@arnoldporter.com
    601 Massachusetts Ave. NW
    Washington, DC 20001-3743
    202.942.5000

**POYNER SPRUILL LLP**

    Edwin M. Speas, Jr.
    N.C. State Bar No. 4112
    espeas@poynerspruill.com
    Caroline Mackie
    N.C. State Bar No. 41512
    CMackie@poynerspruill.com
    P.O. Box 1801
    Raleigh, NC 27602-1801
    919.783.6400

    *Attorneys for Plaintiffs*
    *\*Special Appearance*

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Local Rule 7.2(f), undersigned counsel hereby certifies that the foregoing

memorandum contains 8,276 words.


Dated: October 28, 2024

By: <u>/s/ R. Stanton Jones</u>
    R. Stanton Jones

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel and parties registered in said system, and that I served the foregoing via email as follows.

Dated: October 28, 2024

/s/ R. Stanton Jones
R. Stanton Jones