# Exhibit 2

IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Case No. 4:23-CV-00193-D

RODNEY D. PIERCE and MOSES          )
MATTHEWS                            )
                                    )
        Plaintiffs,                 )
                                    )
    vs.                             )
                                    )
THE NORTH CAROLINA STATE            )
BOARD OF ELECTIONS, et al.,         )
                                    )
        Defendants.                 )

    The videoconference deposition of SEAN TRENDE,
PH.D. taken pursuant to notice before Vincent J.
Bailey, Certified Shorthand Reporter, on September 30,
2024, at the hour of 1:25 p.m.

1

---

APPEARANCES:
Elisabeth S. Theodore - via videoconference
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001-3743
Elisabeth.theodore@arnoldporter.com
appeared on behalf of plaintiffs;
Phillip Strach and Jordan Koonts - via videoconference
Nelson Mullins
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Phil.strach@nelsonmullins.com
-and-
Erika Prouty - via videoconference
Baker Hostetler
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
Eprouty@bakerlaw.com
appeared on behalf of defendants.

2

---

                    I N D E X
DEPONENT:  SEAN TRENDE, PH.D.          PAGE
Examination by Ms. Theodore          4

                E X H I B I T S

DEPOSITION EXHIBITS                  MARKED

Exhibit 1            10
Exhibit 2            35
Exhibit 3            41
Exhibit 4            46
Exhibit 5            57
Exhibit 6            67
Exhibit 7            72
Exhibit 8            74
Exhibit 9            79
Exhibit 10           81
Exhibit 11           94
Exhibit 12           98
Exhibit 13           166
Exhibit 5            179
Exhibit 14           204
Exhibit 15           219

3

---

SEAN TRENDE, PH.D.,
the deponent herein, having first been
duly sworn on oath, was examined and
testified as follows:
            EXAMINATION
BY MS. THEODORE:
    Q.  All right.  Good morning, Dr. Trende.  My name
is Elisabeth Theodore from the law firm of Arnold &
Porter.
        Can you please state your full name for
the record?
    A.  Yeah.  It is Sean Patrick Trende, T-r-e-n-d-e.
The first name is S-e-a-n.
    Q.  All right.  You have been deposed a number of
times before.  Is that right?
    A.  Yes.
    Q.  Including as a Zoom deposition?
    A.  Yes.
    Q.  All right.  There will be a transcript of
everything we say, so we should try not to talk over
each other, and I'll just ask that you wait until my
questions are done before answering.  Is that fair?
    A.  I'll do my best, yes.
    Q.  Okay.  You understand that if your counsel
objects, you still have to answer the question unless

4

1 (Pages 1 to 4)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 2 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  your counsel specifically instructs you not to answer
2  the question?
3      A.  Yes.
4      Q.  All right.  Is there any reason you couldn't
5  give complete, accurate, truthful testimony today?
6      A.  No.
7      Q.  All right.  If you want to break, just let me
8  know, but I just ask that you not ask to take any
9  breaks in the middle of a question.  Is that fair?
10     A.  Yes.
11     Q.  Okay.  What did you do to prepare for this
12  deposition?
13     A.  I spoke with counsel.  I reviewed my report and
14  the reports of, or the rebuttal reports of
15  Dr. Collingwood and Mr. Esselstyn.
16     Q.  Okay.  Did you review the opening report of
17  Mr. Esselstyn as well?
18     A.  No.
19     Q.  Okay.  Did you review Dr. Collingwood's opening
20  report?
21     A.  No.  I've never read that.
22     Q.  Okay.  Did you review any of Dr. Mattingly's
23  reports in preparation of this deposition?
24     A.  No.
25     Q.  Okay.  Did you review any other documents in

5

1  preparation for this deposition?
2      A.  Not that I remember.
3      Q.  Okay.  Did you speak with anyone besides your
4  lawyers in preparation for this deposition?
5      A.  My wife.
6      Q.  Okay.  Did you bring any documents or notes
7  with you to the deposition?
8      A.  No.  I may have a hard copy of my report and
9  the two rebuttal reports later, but I don't have any
10  documents with me.
11     Q.  Okay.  Do you have anything on your computer
12  screen besides the Zoom window?
13     A.  No.
14     Q.  All right.  You currently live in Ohio.  Is
15  that right?
16     A.  Yes.
17     Q.  How long have you lived there?
18     A.  Since 2011.
19     Q.  Okay.  Have you lived in North Carolina
20  previously?
21     A.  Yes.
22     Q.  When was that?
23     A.  1998 to 2001.
24     Q.  That's while you were getting a law degree at
25  Duke?

6

1      A.  That's correct.
2      Q.  Where in North Carolina did you live then?
3      A.  Durham.
4      Q.  Okay.  Did you ever, have you ever lived in
5  North Carolina other than during the period of time
6  when you were getting a law degree at Duke?
7      A.  No.
8      Q.  Okay.  Have you ever lived anywhere else in
9  North Carolina besides Durham?
10     A.  No.
11     Q.  Have you ever been to any of the counties that
12  are included in any of the demonstration districts
13  Mr. Esselstyn drew in this case?
14     A.  I have to look at them to be sure, but, yeah, I
15  think so.
16     Q.  All right.  Which of those counties have you
17  been to?
18     A.  Certainly Dare.
19     Q.  Dare County?
20     A.  Yes.
21     Q.  Okay.  It is your understanding that Dare
22  County is part of the demonstration districts
23  Mr. Esselstyn drew in this case?
24     A.  Yes.  I mean, I guess you can define
25  demonstration districts and maybe the answer is no,

7

1  but it's part of the area where he was drawing.
2      Q.  All right.  Have you been to Vance County?
3      A.  Probably.  But I'd have to look at the map to
4  be sure.
5      Q.  Okay.  Have you been to Henderson?
6      A.  I'd have to look at the map.
7      Q.  So sitting here right now, you don't know if
8  you've been to Henderson?
9      A.  No.
10     Q.  Do you know where Henderson is?
11     A.  Not exactly off the top of my head, no.
12     Q.  Is it a county or a city?
13         MR. STRACH:  Objection.
14     A.  I think the answer is a city.  It might be
15  both.  I'd have to look at a map.
16     Q.  Okay.  Do you know what county it is in?
17     A.  No.
18     Q.  Okay.  Have you ever been to Edgecombe or Pitt
19  County?
20     A.  I'd have to look at a street map.
21     Q.  You'd have to look at a street map?  Why is
22  that?
23     A.  Well, because the street map would tell me
24  where the roads to the Outer Banks go, which would
25  tell me whether I've been to Edgecombe or Pitt County.

8

2  (Pages 5 to 8)
Case 4:23-cv-00193-D-RN      Document 88-2      Filed 10/28/24      Page 3 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

Q.  Got it.  Have you ever been to Edgecombe or Pitt County other than driving through to go to the Outer Banks?

A.  I don't know.

Q.  All right.  Do you understand what I mean when I refer to the black belt counties?

A.  Yes.

Q.  All right.  Other than driving through to go somewhere else in North Carolina, have you ever been to the black belt counties?

A.  I don't know.

Q.  All right.  When were you first approached about serving as an expert in this litigation?

A.  Some time before the preliminary injunction reports were filed.

Q.  All right.  Actually, let me ask you one more question.  Have you ever been to Elizabeth City?

A.  I don't remember.

Q.  Okay.  Do you know what county Elizabeth City is in?

A.  I believe it's in Pasquotank, but I'm not sure.

Q.  All right.  Do you recall you submitted a report at the preliminary injunction stage of this case in December of 2023?

A.  Yes.

9

Q.  Do you recall how many hours you spent preparing the preliminary injunction stage report?

A.  No.

Q.  Do you have a guess?

A.  No.

Q.  All right.  You submitted a report on August 16, 2024?

A.  That's right.

Q.  All right.  I'm going to transmit that and mark it as Exhibit 1.

(Deposition Exhibit No. 1 marked for identification.)

BY MS. THEODORE:

Q.  Do you recognize this document as the expert report you submitted in this case in August 2024?

A.  I have to open it, okay.

Technical assistance, please.

(Discussion off the record.)

THE WITNESS:  All right.

Yes.  This is the expert report from this matter.

BY MS. THEODORE:

Q.  Okay.  Was your assignment for this August 2024 report to respond to the reports of plaintiffs' experts Mr. Esselstyn and Dr. Mattingly?

10

A.  Yes.

Q.  All right.  Do you recall receiving the reports from Mr. Esselstyn and Dr. Mattingly around May 31, 2024?

A.  That sounds reasonable.  I don't remember when I got them.

Q.  Okay.  When did you begin working on your August report in this case?

A.  I probably did some of it around the time I got it.  We were out of the country for most of June, but I believe I wanted to at least familiarize myself with them before we left.  But I think most of the work was done in July.

Q.  Okay.  Do you recall approximately how many hours you spent preparing the August report?

A.  No.

Q.  Was it less than 50?

A.  I don't know.

Q.  All right.  Did anyone other than counsel help you in any way with your work on the August expert report in this case?

A.  No.

Q.  Okay.  Did anyone other than counsel help you in any way with your work on the preliminary injunction stage expert report in this case?

11

A.  No.

Q.  All right.  We talked earlier about what you did in preparation for this deposition.  In general have you reviewed the reports of plaintiffs' expert Dr. Burch in this case?

A.  Not to prepare for this deposition, but I think I might have read it at the PI phase.

Q.  Okay.  Do you recall whether you have read her reports at the subsequent phase of the case?

A.  I don't believe so.  I guess I recall, but I don't believe I've read them.

Q.  Okay.  You are not expressing any opinion about Dr. Burch's work in this case.  Is that correct?

A.  I don't know if there's anything that I wrote that might indirectly touch on her work, but I certainly didn't write it directly in response to her.

Q.  Can you think of anything right now that might indirectly touch on her work?

A.  I don't see how I could possibly do that, not having read her reports, but no.

Q.  Have you reviewed all of Dr. Collingwood's rebuttal report or just parts?

A.  I believe I read the whole thing.  I think I spent less time on the performance part than what we might call the ACS part, but I did look at it.

12

3 (Pages 9 to 12)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 4 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    Q. Okay. Did you review Dr. Mattingly's rebuttal
2 report?
3    A. Yes.
4    Q. All right. Have you ever read
5 Dr. Collingwood's opening report?
6    A. No.
7    Q. Okay. Did you review any of Dr. Collingwood's
8 data or code that he used for any of his reports?
9    A. No.
10    Q. You could have done that, right?
11    A. If those documents were produced to counsel, I
12 guess I could have.
13    Q. Okay. You never asked for those, for those
14 documents?
15    A. No.
16    Q. Okay. Other than reviewing the rebuttal
17 reports in this case, have you done any other further
18 work or analysis in this case since receiving the
19 rebuttal reports?
20    A. I mean, other than reviewing the rebuttal
21 reports and evaluating their claims, no.
22    Q. Okay. To evaluate their claims, you didn't do
23 any, perform any additional analysis?
24    A. I mean, if you are evaluating claims you are
25 analyzing them and thinking about them, so I guess in

13

that sense the answer is I did. But in the sense that
2 I think you are using that term, I guess the answer is
3 no.
4    Q. You didn't create any new maps?
5    A. I did not.
6    Q. Okay. You didn't perform any additional data
7 crunching?
8    A. I don't believe I did.
9    Q. You didn't write any additional code?
10    A. I don't think so.
11    Q. All right.
12    A. I assume we are going to spend some quality
13 time with these reports, and if I remember having done
14 something with code I'll let you know. But as I sit
15 here, I don't remember anything.
16    Q. All right. Let's scroll to page 48 of what I
17 marked as Exhibit 1, which is your expert report from
18 August.
19    A. (Witness complies.)
20    Q. Do you see your CV there?
21    A. Yes.
22    Q. Okay. Is this a current accurate copy of your
23 CV?
24    A. I believe so, yes.
25    Q. Are there any updates that you need to make?

14

1 Are there any, for example, are there any expert
2 engagements that aren't listed here?
3    A. I think the only thing I'm required to disclose
4 is where I've testified or been deposed, if I recall
5 correctly. So the last case here is Stone v. Allen.
6 I was deposed in Milligan v. Allen as well.
7    Q. All right. Have you served an expert report in
8 any case that is not listed on this list?
9    A. Yes.
10    Q. What are those cases?
11    A. There is the, what I call the big case in North
12 Carolina. I can't think of the name of it right now,
13 but it is the consolidated case regarding
14 Congressional districts, Senate districts and House
15 districts.
16    Q. Okay.
17    A. Then there have been a number of reports in
18 Nassau County, New York, and two reports in Onondaga
19 County, New York.
20    Q. Okay. When were the Nassau County reports
21 served?
22    A. June and July.
23    Q. What about Onondaga County?
24    A. That I believe was all done in September.
25    Q. What are those cases about?

15

1    A. Political gerrymandering at the county
2 legislative level.
3    Q. Okay. They don't include any VRA analysis?
4    A. No. There are VRA claims in Nassau County. I
5 don't know if there's VRA claim in Onondaga or if it
6 is state VRA, John Lewis Voting Rights Act.
7    Q. Okay. Did you analyze VRA issues in those
8 cases?
9    A. There's some engagement in the rebuttal reports
10 with the VRA claims.
11    Q. What was the nature of that engagement?
12    A. I believe it had to do with performance,
13 whether districts performed. There was some
14 ecological inference analysis. Most of the dispute
15 there is which elections are most appropriate for
16 evaluating performance in a county legislative
17 district. So I ran ecological inference on some years
18 that plaintiff's expert did not include.
19    Q. Okay. All right. So other than the other
20 North Carolina case and the Nassau County and Onondaga
21 cases, there aren't any other cases in which you have
22 served as an expert that are not listed in the CV that
23 we have been discussing?
24    A. I don't think that's right. I think I also
25 said Allen v. Milligan.

16

4 (Pages 13 to 16)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 5 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**Page 17**

1    Q.  Okay.  Other than North Carolina case, Allen
2  versus Milligan, Nassau County and Onondaga, are there
3  any other cases in which you have served as an expert
4  that are not listed on the CV?
5    A.  Yes.  There is also a report in Florida.
6    Q.  What was that?
7    A.  Regarding their state -- it is Hodges.  It is a
8  14th amendment claim.
9    Q.  Have you served a report in that case already?
10    A.  Yes.
11    Q.  What was the nature of your assignment in
12  Hodges?
13    A.  It was evaluating demonstration districts or
14  illustrative districts.
15    Q.  All right.  You are currently employed at
16  RealClear Politics.  Is that correct?
17    A.  Yes.
18    Q.  All right.  Let's flip to page 1 of your
19  report?
20    A.  (Witness complies.)
21    Q.  You say there that you collaborate in rating
22  the competitiveness of presidential, senate, house and
23  gubernatorial races.  Is that correct?
24    A.  Yes.
25    Q.  I assume senate and house in that sentence

**Page 18**

1  refer to the U.S. Senate and U.S. House?
2    A.  That's right.
3    Q.  Does your job at RealClear Politics involve any
4  analysis of state senate races?
5    A.  Not typically.
6    Q.  State house races?
7    A.  Not typically.
8    Q.  Have you ever analyzed any North Carolina state
9  senate races for your job at RealClear Politics?
10    A.  Not that I can remember.
11    Q.  Okay.  You say that in carrying out your
12  responsibilities at RealClear Politics, "I have
13  studied and written extensively about demographic
14  trends in the country, exit poll data at the state and
15  federal, public opinion polling, voter turnout and
16  voting behavior."
17      Did I read that right?
18    A.  Yes.
19    Q.  Okay.  Your expert report in this case does not
20  include any analysis of demographic trends in this
21  country.  Is that correct?
22    A.  I don't know about that.  We are looking at the
23  trends in CVAP in northeastern North Carolina.  So I
24  don't know that I would completely disclaim that.
25    Q.  Okay.  So other than reporting on CVAP in North

**Page 19**

1  Carolina in 2020 -- sorry, strike that.
2      Other than reporting on CVAP in North
3  Carolina using data from the Census Bureau in 2020 and
4  2022, does your expert report include any analysis of
5  demographic trends in this country?
6    A.  Not that I can remember.
7    Q.  Okay.  Does your expert report in this case
8  include any analysis of exit poll data?
9    A.  No.
10    Q.  Does your expert report in this case include
11  any analysis of public opinion polling?
12    A.  No.
13    Q.  Does your expert report in this case include
14  any analysis of voter turnout?
15    A.  I don't believe so.
16    Q.  Does your expert report in this case include
17  any analysis of voting behavior?
18    A.  No.
19    Q.  All right.  Have you ever published anything
20  that relates to North Carolina?
21    A.  What do you mean by published?
22    Q.  Well, how do you understand the term published?
23    A.  Well, from the point of view of academia, that
24  usually means publishing in a peer reviewed journal.
25      From the point of view of, say, my

**Page 20**

1  RealClear Politics job, it will mean writing stuff for
2  RealClear Politics or for AI or any other number of
3  places.
4    Q.  All right.  Have you ever written any articles
5  in any context relating specifically to North
6  Carolina?
7    A.  Yes.
8    Q.  Okay.  What is the topic of those articles?
9    A.  I did the North Carolina chapters for the
10  Almanac of American Politics in 2014.
11    Q.  Okay.
12    A.  Analysis of North Carolina was included in my
13  book.  And I'm sure I've analyzed senate races and
14  congressional races in North Carolina over the course
15  of the past decade and a half.
16    Q.  You are referring to the United States Senate
17  races?
18    A.  Yes.
19    Q.  Okay.  What did you talk about in your book
20  with respect to North Carolina?
21    A.  Well, the book is over 200 page book, so I
22  don't remember every citation or usage there, but it
23  was talking about the development of political trends
24  across the country, and North Carolina was part of
25  that.

5  (Pages 17 to 20)
Case 4:23-cv-00193-D-RN     Document 88-2     Filed 10/28/24     Page 6 of 95
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

1   Q.  Does the book cover -- when was the book
2   published?
3       A.  I believe it was published in 2012.
4       Q.  So it doesn't cover any trend in North Carolina
5   over the last decade.  Is that right?
6       A.  That's right.
7       Q.  Okay.  So your dissertation was entitled
8   "Application of Spatial Analysis to Contemporary
9   Problems in Political Science."  Is that right?
10      A.  I think that's right.
11      Q.  Was that published in any peer-reviewed
12  journal?
13      A.  No.
14      Q.  Did you ever try to get the dissertation
15  published?
16      A.  Oh, no.
17      Q.  Okay.  So on page 2 of your report you describe
18  three chapters in the dissertation, and the second
19  chapter you describe as involving the "application of
20  integrated nested Laplace approximations to enable the
21  incorporation of spatial statistical analysis in the
22  study of U.S. elections."  Is that right?
23      A.  Yes.
24      Q.  Can you explain what that means?
25      A.  Yes.  So traditionally in the study of

                                                        21

1   elections you have had aerial units like precincts or
2   counties, even states, that have been the basis of the
3   analysis and people will run their regression analyses
4   with these units as, you know, the for lack of better
5   word the cluster of the relevant data.  When you do
6   that, you treat the units as if they were independent
7   of each other.
8           Well, that's a big assumption, because we
9   know that precincts and counties and even states
10  aren't truly independent of each other.  Knowing one
11  thing about one county or one precinct will typically
12  give you analysis or give you insight into what the
13  relevant values are for adjacent or nearby precincts.
14          And so one of the reasons that this hasn't
15  been taken into account is that running, writing the
16  code to take account of this statistical
17  interdependence in JADS, which is the traditional
18  Bayesian programming language is cumbersome, can take
19  a long time.
20          So there is a newer approach, which rather
21  than restating it, I'll just call by its acronym INLA,
22  that does it quickly.  So it explored the application
23  of INLA to the study of elections and with a couple of
24  case studies noted that when you did so some of the
25  traditional effects that have been found disappear.

                                                        22

1   Q.  What traditional effects disappeared?
2       A.  So there's a long-standing body of research on
3   ballot order effect, finding whoever is listed first
4   on the ballot tends to get a bonus, if you will, on
5   their vote share, but when you run it on -- when you
6   run it in a spatial model, at least in Arizona, that
7   effect disappears.
8       Q.  Okay.  Did your dissertation discuss North
9   Carolina at all?
10      A.  I don't believe so.  If it did, it was in
11  passing.
12      Q.  Have you ever published any peer reviewed
13  academic work?
14      A.  Yes.
15      Q.  What work have you published that's peer
16  reviewed?
17      A.  It is listed on my CV.  Let me pull that up.
18          It's the joint article from 2022,
19  "Reconsidering Bellwether Locations in U.S.
20  Presidential Elections."
21      Q.  I see.  Okay.  Does that article discuss the
22  Voting Rights Act?
23      A.  If it does, it is only in passing.
24          I don't remember any instances of it.
25      Q.  Okay.  So to your knowledge, you have never

                                                        23

1   published any academic work about the Voting Rights
2   Act?
3       A.  Not -- to my knowledge, that's correct.
4       Q.  Okay.  Have you ever published any academic
5   work about the use of citizen voting age population
6   data?
7       A.  I don't believe so.
8       Q.  Have you ever published any academic work about
9   minority politics for voting behavior?
10      A.  I don't believe so.
11          By the way, for the record, I have a hard
12  copy of my report in front of me now.
13      Q.  Okay.  Great.
14          Do you consider yourself to be an expert
15  on minority politics or minority voting behavior?
16      A.  That's one of those questions that brings in a
17  legal angle to it.  And to the extent that the legal
18  test is, you know, higher -- for an expert
19  qualification is, you know, basically greater than a
20  lay witness, then I suppose that's true.
21          But to the extent that there's a
22  subdiscipline of political science that's race and
23  ethnicity studies, then, no, I wouldn't in that sense.
24          I guess the way to answer that is that
25  I'll interpose my own objection to the extent it calls

                                                        24

                                    6 (Pages 21 to 24)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 7 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    for a legal conclusion, but to the extent you are
2    asking about something in terms of political science
3    discipline, the answer would be no.
4        Q. Have minority politics or voting behaviors been
5    the subject of any of your academic work?
6        A. I think it was related to the communities of
7    interest article in my dissertation when we were
8    looking at different ways to define communities of
9    interest -- I guess that's not published so, no. In
10   peer reviewed, literature, no.
11       Q. What fields of expertise do you believe you
12   have that are germane to the topics addressed in your
13   report in this case?
14       A. Well, I have considerable experience testifying
15   on the Voting Rights Act. I teach it in my class. I
16   teach minority politics and voting behavior in my
17   class. I write about it extensively in my work.
18           I've drawn demonstration districts
19   previously. I've drawn real districts previously in
20   states that have involved the Voting Rights Act. I've
21   been an advisor to counsel with respect to Voting
22   Rights Act.
23           That's all I can think of off the top of
24   my head.
25       Q. All right. Do you consider yourself an expert

25

1    in North Carolina communities of interest?
2        A. I don't know about that.
3        Q. Do you consider yourself to be an expert in
4    North Carolina's political geography?
5        A. Yes.
6        Q. What's the basis for your expertise in North
7    Carolina's political geography?
8        A. Well, I've been testifying in North Carolina
9    cases regarding their politics and political geography
10   for about a decade now. North Carolina has been a
11   competitive state for call it 15 years at the
12   presidential level, longer than that at the Senate
13   level, so understanding various political coalitions
14   in North Carolina is certainly crucial to being able
15   to understand how a Senate race is likely to go or to
16   interpret cross tabs in those races. Those are some
17   examples.
18       Q. Okay. Have you ever been an expert in a case
19   involving North Carolina that focused on the black
20   belt region?
21       A. Yes.
22       Q. What case was that?
23       A. Well, Dickson v. Rucho and Covington -- now we
24   are going back a decade, so I may misremember, but I
25   believe they involve legislative districts in the

26

1    black belt. Those are the first two cases listed
2    here.
3            Common Cause v. Rucho.
4        Q. Okay.
5        A. I think that was a part of NCLCV v. Hall, but I
6    wasn't deeply involved in that case.
7        Q. All right.
8        A. I think that's it.
9        Q. Okay. Do you consider yourself an expert in
10   the use of Census Bureau data?
11       A. Yes. That doesn't mean you know everything
12   about it, but I would say I'm an expert in it.
13       Q. What's the basis for that expertise?
14       A. I mean, it's been crucial to my work for over a
15   decade now.
16       Q. Okay.
17       A. I use ACS data in my dissertation.
18       Q. All right. Has your testimony or expert report
19   ever been excluded by a court?
20       A. Yes.
21       Q. Which cases?
22       A. I think the only one it was ever excluded was
23   the Fair Fight Action versus Raffensperger case.
24       Q. Is it fair to say that many other courts have
25   declined to credit your testimony?

27

1        A. That's certainly happened.
2        Q. Have you ever been an expert on behalf of a
3    plaintiff in a Section 2 case?
4        A. Yes.
5        Q. Which cases?
6        A. One that comes to mind is the Michigan case.
7        Q. Agee versus Benson?
8        A. Yes.
9        Q. Okay. Any others?
10       A. I don't believe so.
11       Q. All right. Have you ever served as an expert
12   on behalf of a government entity contending that the
13   government entity was justified in creating a majority
14   minority district or a minority opportunity district?
15           MR. STRACH: Objection. Can you repeat
16   it?
17       Q. Sure. Have you ever served as an expert on
18   behalf of a government entity, contending that the
19   government entity was justified in creating a majority
20   minority district or a minority opportunity district?
21           MR. STRACH: Objection.
22           Go ahead.
23       A. I don't know. Certainly in the Nairne case in
24   Louisiana there were examples of districts in my
25   report where I thought that there was a sufficiently

28

7 (Pages 25 to 28)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 8 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  compact minority group that we would have no objection
2  to the demonstration districts drawn by their expert.
3  So I guess in that, but I never did the full -- I
4  didn't do Gingles.
5      Q.  Okay.  Have you ever taken a position as part
6  of any expert work or any consulting work that a VRA
7  district was required in a particular instance?
8          MR. STRACH:  Objection.
9          Go ahead.
10     A.  Was it required?  I don't know that I've ever
11 taken that position directly.  But there's certainly
12 claims to that effect that I have not contested.  The
13 work as the Voting Rights Act expert -- well, I don't
14 know about that.  There were certainly cases where I
15 wouldn't have objected to it, but I can't think of any
16 off the top of my head.
17         I guess the only way as a defendant for
18 state you would do that would be if you were offering
19 that as a defense to a 14th amendment claim.  I don't
20 think I've ever done that, but I'm not sure.
21     Q.  Okay.  You primarily work as an expert for
22 defendants, correct?
23     A.  I think that's right.
24     Q.  Okay.  Other than in Nairne, have you ever come
25 to the conclusion in your work as an expert that

                                                    29

1      Q.  Okay.  All right.  Which of the cases that are
2  listed in this CV have involved -- let me ask it this
3  way.  Can you identify the cases that are listed on
4  this CV in which you engaged in analysis of Gingles 1?
5      A.  I can do my best.
6          I can't remember if we did in Carter v.
7  Chapman.
8          LULAC v. Abbott.
9          Moore v. Lee.
10         Agee v. Benson.
11         Coca v. City of Dodge City.
12         Milligan v. Allen.
13         Nairne v. Ardoin.
14         Robin -- well, I don't remember Robinson
15 v. Ardoin.
16         Stone v. Allen.
17     Q.  Okay.  All right.  Let's turn to your opinions
18 in this case.  You wrote code for purposes of the
19 report, your August report.  Is that right?
20     A.  That's right.
21     Q.  Has any of that code been peer reviewed?
22     A.  No.
23     Q.  All right.  What computer program or software
24 did you use when you were working on your report?
25     A.  R.  Just the letter R.

                                                    31

1  Gingles 1 was satisfied?
2          MR. STRACH:  Objection.
3      A.  Yeah, I don't know the answer to that,
4  primarily because there may be instances where I came
5  to that conclusion, but it wasn't in a report and so
6  didn't become a subject of testimony.
7          I can't remember.  Some examples of where,
8  I know that in the Lamone case, there were places
9  where we froze three of the Congressional districts in
10 Maryland because of VRA issues.  I can't remember if
11 we concluded that they were fully required or if they,
12 we were just doing it arguendo.
13         I certainly thought, but I didn't -- well,
14 yeah, I came to the conclusion in LULAC v. Abbott
15 there were required VRA districts, but then the
16 Galveston County case I'm not sure that's true any
17 more.
18         Oh, yeah, in the Moore v. Lee case in
19 Tennessee, I came to the conclusion that there was a
20 VRA required district.
21         Obviously as a plaintiff in Agee v.
22 Benson, I thought there were a lot of VRA required
23 districts.
24         Talked about Nairne.
25         Yeah, that's all I can think of.

                                                    30

1      Q.  Is that the only one?
2      A.  Oh, yeah.  So Dr. Mattingly's stuff is in
3  Python.
4      Q.  Anything else?
5      A.  I think that's it.
6      Q.  Okay.  Did you use any redistricting software
7  or platform as part of your work?
8      A.  I might have looked at stuff in Dave's
9  Redistricting, but I don't remember.
10     Q.  What would you have looked at in Dave's
11 Redistricting?
12     A.  Well, you can look at maps that way.
13     Q.  Right.  What maps did you look at in Dave's
14 Redistricting?
15     A.  Well, I think I looked at demonstration
16 districts that had been proposed, but I'm not sure.
17     Q.  Okay.
18         (Recess taken.)
19 BY MS. THEODORE:
20     Q.  All right.  Dr. Trende, did you draw any
21 districts as part of your work for this case?
22     A.  I don't believe so.
23     Q.  Okay.  Did you attempt any adjustments of
24 Mr. Esselstyn's district configurations for any of
25 your work in this case?

                                                    32

8  (Pages 29 to 32)
Case 4:23-cv-00193-D-RN     Document 88-2     Filed 10/28/24     Page 9 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    A. I don't remember doing that.
2    Q. Okay.
3    A. If we go through the report and I remember
4 doing it, I'll let you know, but I really don't.
5    Q. Okay. So you don't, right now you don't
6 remember attempting to draw any alternative district
7 configurations for this case?
8    A. Not as I sit here, no.
9    Q. Okay. All right. I'm going to refer to
10 citizen voting age population data as CVAP data. Is
11 that fair?
12    A. Yes.
13    Q. All right. You have previously used CVAP data
14 to calculate the minority population of a potential
15 majority minority district in your work as an expert.
16 Is that right?
17    A. Yes.
18    Q. Okay. Are you aware of any CVAP data that is
19 more reliable than the data produced by the Census
20 Bureau in the American Communities Survey?
21    A. No.
22    Q. Are you aware of any CVAP data that is
23 available other than the data produced by Census
24 Bureau in the American Communities Survey?
25    A. No. There was an attempt to get an actual

33

1 citizenship question on the Census that failed, in
2 which case we wouldn't have this headache. So, no. I
3 think the ACS is it.
4    Q. Okay. Would it surprise you to learn that the
5 black CVAP percentage in a particular region is
6 greater than the black voting age population
7 percentage?
8    A. I mean, no. There's error markings involved
9 with the data, it is just a sample. So it could be
10 zero when the VAP is 95 percent. That's just the
11 vagaries of sampling.
12    Q. I'm not sure I understood your answer. I'm
13 asking -- I'm not asking about any particular sample.
14 I'm just asking would it surprise you to learn that
15 the black CVAP percentage in a particular region is
16 greater than the black voting age population
17 percentage?
18    A. No. I understood your question. My response
19 is it doesn't or it wouldn't, because the CVAP we have
20 is a sample, which means that there's quite a lot of
21 variety that we might get compared to the actual VAP
22 population or compared to the actual citizen voting
23 age population, for that matter.
24    Q. I'm asking you about the actual citizen voting
25 age population. You agree that there's a true number.

34

1 If you did a count, you could find the true number of
2 black citizens of voting age population and all
3 citizens of voting age population, correct?
4    MR. STRACH: Objection.
5    Go ahead.
6    A. Yes. If there had been a citizenship question
7 on the Census, we would know the true count of black
8 citizens in these districts, at least as of 2020.
9    Q. Right. So I'm asking you would it surprise you
10 to learn that the black citizen voting age population
11 percentage in a particular region is higher than the
12 black voting age population in a particular region?
13    MR. STRACH: Objection.
14    Answer again.
15    A. Yeah. I mean, the answer, if you are taking
16 away variability from the Census data or the ACS data,
17 the answer is I wouldn't be surprised either way.
18    MS. THEODORE: I'm going to mark this
19 document as Exhibit 2.
20    (Deposition Exhibit No. 2 marked for
21 identification.)
22 BY MS. THEODORE:
23    Q. Dr. Trende, do you recognize this as a memo you
24 wrote in December --
25    A. Hold on, please. I need to -- I have the old

35

1 document up. Now I've got to get this document,
2 download it.
3    Okay. The Bernie memo.
4    Q. Do you recognize this as a memo that you wrote
5 in 2021 relating to Virginia's redistricting plans?
6    A. Yes. I co-wrote this with Bernie Grofman.
7    Q. Can you turn to page 8, please?
8    A. (Witness complies.)
9    Okay.
10    Q. All right. Do you see you say that "the
11 presence of non-citizen Latinos and Asian Americans in
12 a district can raise the black CVAP share above the
13 black VAP share making it a useful metric for
14 assessing a district's actual electorate"?
15    Did you read that correctly?
16    A. Yes.
17    Q. Okay. You agree with that?
18    A. Yes, it is possible.
19    Like I said, it wouldn't surprise me
20 either way if you gave me the actual CVAP number and
21 it was higher or lower.
22    Q. Are you aware of whether the response date for
23 an American Community Survey data collection in 2020
24 was lower than normal as a consequence of the Covid 19
25 pandemic?

36

1     A.  I don't know whether it was higher or lower.  I
2   know the 2020 ACS data, I think they even have a
3   disclaimer out on it --
4     Q.  Okay.
5     A.  -- "they" being the Census Bureau.
6     Q.  You yourself have relied on CVAP data from the
7   ACS that includes responses from 2020 in prior expert
8   reports, correct?
9     A.  Yeah.  I don't think the CVAP is, on its -- I
10   don't think the ACS data is on its own terms
11   unreliable.  It just has error markings.
12     Q.  Okay.  Do you recall, have you ever included a
13   disclaimer about collection issues for the 2020
14   collection in any of your prior expert reports?
15        MR. STRACH:  Objection.
16        Go ahead.
17     A.  No.  I mean, this report we are using 2019 ACS
18   data.  I don't recall putting -- I think in the
19   Stone case in the expert report there, whether or not
20   I think that was directly raised, but, you know,
21   maybe -- I'm assuming you have some other reports to
22   walk through, so maybe we can address this
23   specifically as we get there.
24     Q.  I'm asking you right now, do you recall in any
25   report where you have used ACS data from 2020

                                                          37

1   including a disclaimer relating to the response rate
2   for ACS data collection in 2020?
3     A.  Yes.
4     Q.  Which cases?
5     A.  Stone case.
6     Q.  Okay.  What did you say in that disclaimer?
7     A.  I said that there were issues with the 2020 ACS
8   data and that the Census Bureau had put out a warning
9   on using those data.
10     Q.  Are you aware of whether higher socioeconomic
11   status households became more likely to respond to the
12   ACS during the pandemic?
13     A.  I don't know.
14     Q.  Okay.  Are higher socioeconomic status
15   households in the northeastern region of North
16   Carolina more likely to be white or black?
17     A.  As a generalization, black -- I'm sorry, white.
18     Q.  Okay.  So I want to assume with me that
19   higher socioeconomic status households became
20   relatively more likely to respond to the ACS during
21   the pandemic and that those households are more likely
22   to be white than black.  Are you with me so far?
23     A.  Okay.
24        MR. STRACH:  Objection.
25        Go ahead.

                                                          38

1     Q.  If both of those things are true, then the
2   response bias in ACS responses would result in
3   estimates that the black population there are likely
4   to be lower than the true number.  Is that correct?
5        MR. STRACH:  Objection.
6        Go ahead.
7     A.  If that is the only source of error and
8   response bias in ACS, then that would be the case.  If
9   your assumption is true and if it is the only source
10   of response bias.  Of course, there would still be
11   sampling error involved.
12     Q.  All right.  When you say if that were the only
13   source of response bias, are you suggesting that that
14   bias might be cancelled out by some other source of
15   response bias that would make the black population
16   likely to be oversampled?
17        MR. STRACH:  Objection.
18        Go ahead.
19     A.  No.  I'm saying, you've given me a set of
20   assumptions to operate under.  I can answer the
21   question under that set of assumptions, as long as we
22   are clear that those are the only set of assumptions
23   that I've been given.  Then the answer to your
24   question is yes.
25        But if there's any other sources of

                                                          39

1   response bias, then I can't answer it as clearly.
2   This transcript is going to follow me for the rest of
3   my life, as I've learned, so I want to be as clear
4   about what it is I'm admitting and what I'm not as
5   possible.
6     Q.  Okay.  Sitting here right now are you aware of
7   any source of response bias for the ACS data
8   collection from 2020 that resulted in oversampling of
9   black households?
10        MR. STRACH:  Objection.
11        Go ahead.
12     A.  No.
13     Q.  Okay.  Would you agree that it is common for
14   experts in VRA cases to use CVAP data from American
15   Community Survey that is disaggregated down to the
16   block level?
17     A.  Sure.
18     Q.  You've done that before yourself, correct?
19     A.  Yes.
20     Q.  Okay.  Have you relied on a redistricting data
21   hub in your work as an expert?
22     A.  Yes.
23     Q.  You agree that it is a reliable source for
24   redistricting data?
25     A.  It's a reliable source for redistricting data.

                                                          40

                              10  (Pages 37 to 40)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 11 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  They have their methods for doing things that have
2  their own drawbacks or shortcomings you should make
3  yourself aware of.  And what they do to disaggregate
4  it isn't that different from what I would do in other
5  areas.  It's not that they have magically cured the
6  problems that come with disaggregating down to the
7  block group, but they do a good job and on its own
8  terms it does what it says it does.
9      Q.  Right.  You are not aware of any mistakes or
10  errors in the methodology that the redistricting data
11  hub uses to disaggregate CVAP data down to the block
12  level, are you?
13          MR. STRACH:  Objection.
14      A.  I'm not aware of any errors in the way they
15  carry out the methodology.  I think it does exactly
16  what they say it does.  That doesn't mean that the
17  methodology doesn't have its limitations or drawbacks.
18      Q.  Okay.
19          MS. THEODORE:  All right.  I'm going to
20  transmit what I'm going to mark I believe as
21  Exhibit 3.
22          (Deposition Exhibit No. 3 marked for
23  identification.)
24  BY MS. THEODORE:
25      Q.  Let me know when you have it open?

                                                    41

1  transcript?
2      A.  (Witness complies.)
3          Okay.
4      Q.  All right.  You see you are discussing there
5  the alternative remedial district that you drew?
6      A.  Okay.  I haven't looked at this transcript in a
7  long time, but okay.
8      Q.  Is that right?
9      A.  Can you repeat the question?
10      Q.  Yeah.  Are you discussing on this page of the
11  transcript the alternative remedial district that you
12  drew?
13      A.  Yes.
14      Q.  Okay.  In drawing that district, I'm looking at
15  lines 17 through 19, you treated it as a requirement
16  that your remedial district have a Hispanic citizen
17  voting age population over 50 percent.  Is that
18  correct?
19      A.  Yes.  That's what counsel wanted.
20      Q.  That's what you did?
21      A.  Yeah.  I don't think there's a legal
22  requirement for it, but counsel wanted the number to
23  be above 50 percent, so I said, okay, I can do that.
24      Q.  Okay.  So you were presenting remedial
25  districts to the court that in your review had a

                                                    43

1      A.  Okay.
2      Q.  All right.  Do you recognize this as a
3  transcript of an evidentiary hearing in a case called
4  Soto Palmer versus Hobbs in the Western District of
5  Washington?
6      A.  Yes.
7      Q.  This was held on March 8, 2024?
8      A.  That's right.
9      Q.  You testified in this hearing?
10      A.  Yes.
11      Q.  Okay.  Is this a case in which the Court found
12  that Washington State's legislative plans diluted
13  Latino voting power in violation of Section 2 of the
14  VRA?
15      A.  Yeah.  I wasn't involved in the merits phase,
16  but that's my understanding.
17      Q.  Okay.  You were brought in as an expert at the
18  remedial stage for the defendants?
19      A.  That's right.
20      Q.  All right.  Then you evaluated potential
21  remedial districts and also drew a potential
22  alternative remedial district yourself.  Is that
23  correct?
24      A.  Yeah.  That's right.
25      Q.  Okay.  Can you turn to page 87 of this

                                                    42

1  Hispanic CVAP population of above 50 percent, correct?
2      A.  That's what the point estimate was, sure.
3          We are well past Gingles 1 at this point,
4  so the 50 percent line doesn't really carry legal
5  significance.  Counsel wanted me to get the point
6  estimate above 50, so I did that.
7      Q.  Okay.  You were asked in this case and you
8  didn't produce any maps to the court with a Hispanic
9  CVAP population of less than 50 percent, right?  You
10  said that's correct?
11      A.  That's right.  The point estimates were all
12  above 50 percent.  Again, I don't think there's
13  anything wrong with using ACS or CVAP data.
14          Where it becomes a problem is where
15  there's a legally imposed 50 percent plus 1.  I mean,
16  if defendants in these cases, who sometimes say that
17  Bartlett v. Strickland required remedial districts to
18  be 50 percent plus 1, are correct, and the Cooper v.
19  Harris view of things is not right, well, then at the
20  remedial phase 50 percent plus 1 threshold becomes
21  more important.  But where I was at the time it didn't
22  have the legal significance.  It is just what counsel
23  had asked me to do.
24      Q.  Dr. Trende, you represented to the Court that
25  your districts had a Hispanic citizen voting age

                                                    44

                              11  (Pages 41 to 44)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 12 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  population above 50 percent.  Isn't that right true?
2      A.  I was asked whether my districts had a CVAP
3  above 50 percent plus 1 at the remedial phase in a
4  case where the CVAP had been used throughout.  So I
5  think that was truthful testimony in the context of
6  the case.
7      Q.  I'm just asking a very simple question.  You
8  represented to the Court that your remedial district
9  had a Hispanic CVAP population above 50 percent.
10  Isn't that true?
11      MR. STRACH:  Objection.
12      Answer again.
13      A.  Yeah, I'll answer it again.  The testimony
14  there is that the districts were above 50 percent plus
15  1, but it comes in a remedial phase where we are well
16  past any Gingles 1 concerns.
17      The CVAP data had been used throughout the
18  case, it's a little bit late to raise a collateral
19  attack on the CVAP data at the remedial phase.  So I
20  used the point estimate, and the point estimates in
21  those districts are above 50 percent plus 1.
22      Q.  Okay.  And do you use the term "point estimate"
23  on this page of the transcript?
24      A.  No.
25      Q.  Okay.  I'm going to mark Exhibit 4.

45

1      (Deposition Exhibit No. 4 marked for
2  identification.)
3  BY MS. THEODORE:
4      Q.  Let me know when you have it open?
5      A.  Okay.
6      Q.  Do you recognize this as a supplemental expert
7  report you filed on February 23, 2024, in the Soto
8  Palmer case?
9      A.  Yes.
10      Q.  All right.  This is the report in which you
11  drew an alternative remedial district for the state
12  legislature in Washington?
13      A.  Yes.
14      Q.  Okay.  You use the term minority majority
15  district in this report.  Is that the same as a
16  majority minority district?
17      A.  I don't know where I picked it up the opposite
18  way around, but I do that.
19      Q.  Okay.  So minority majority, you're not
20  intending that to mean anything different than
21  majority minority?
22      A.  That's right.
23      Q.  Okay.  Let's go to page 2.  You say on page 2,
24  I'm in the methodology paragraph, that your goal was
25  to create a minority majority district.  Is that

46

1  right?
2      A.  Yes.
3      Q.  Then you stated, even though this was your
4  goal, in your view racial considerations did not
5  predominate because you also considered minimizing
6  county and jurisdictional splits.  Is that a fair
7  characterization of what you are saying here?
8      A.  I think what it says is that it was a goal to
9  draw majority minority district, but I didn't let
10  these concerns predominate prioritizing traditional
11  principles of minimizing county and jurisdictional
12  splits, respecting communities of interest, including
13  the requests of the Yakama Nation and drawing
14  reasonably compact contiguous districts.
15      Q.  Okay.  You further state: "It is likely
16  possible to draw a district with a higher HCVAP or
17  Democratic performance by allowing race or politics to
18  predominate over these concerns.  These maps were
19  excluded from consideration."
20      Is that accurate?
21      A.  Yes.
22      Q.  Okay.  Is what you are saying there that the
23  likely existence of maps that had a higher HCVAP was
24  evidence that racial concerns were not predominating
25  in your map drawn?

47

1      MR. STRACH:  Objection.
2      Go ahead.
3      A.  No.
4      Q.  Okay.  So what are you saying there?
5      A.  I'm saying that I could have drawn a higher
6  HCVAP or democratic performance map if I had allowed
7  race or politics to predominate, but I didn't include
8  those.
9      Q.  You are citing the fact that you didn't include
10  those as evidence that you did not allow race or
11  politics to predominate.  Is that correct?
12      A.  Maybe I do that elsewhere, I don't know.  I
13  don't remember doing that.  But in this sentence all
14  it says is it's possible, it's probably possible to
15  draw a district with a higher HCVAP or Democratic
16  performance by allowing race or politics to
17  predominate over these concerns.  I didn't include
18  those maps or consider them.
19      Q.  What is the point you were trying to make with
20  this sentence, Dr. Trende?
21      MR. STRACH:  Objection.
22      Go ahead.
23      A.  Well, this was six months ago, so I don't
24  remember the exact point being made by the sentence.
25  I think on its own terms it just says that, yes, you

48

12  (Pages 45 to 48)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 13 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  might be able to raise the HCVAP or Democratic
2  performance of the districts. What I found was to do
3  so would require allowing race or politics to
4  predominate and so I didn't include those maps.
5      Q.  Did your maps include any jurisdictional
6  splits?
7      A.  I -- there's certainly at least one, because as
8  I note, one of the things I was trying to respect were
9  the requests of the Yakama Nation and, as I recall,
10  the Yakama Nation boundaries go across jurisdictions.
11      This whole mess, for lack of a better
12  word, which led to this evidentiary hearing in March
13  was that the proposed remedial maps had split grounds
14  of the Yakama Nation. And so we had to revisit the
15  remedial maps that had been discussed to try to find
16  ways to craft a remedy that would also respect the
17  request of the Yakama Nation.
18      And so, like I said, I remember there is a
19  jurisdiction where the Yakama Nation's boundaries
20  traverse the jurisdiction and my recollection is that
21  I didn't split the jurisdiction, but, again, this is
22  going on six months ago and I haven't reviewed this in
23  depth since.
24      Q.  I'm just trying to figure out, so you drew a
25  map here that had a goal of getting the HCVAP above

49

1  50 percent, correct?
2      A.  Right. Point estimate up to 50 percent,
3  because that was what counsel asked for.
4      Q.  I'm trying to understand in your view how do
5  you determine whether racial concerns are
6  predominating when someone has that goal?
7      A.  Well, that might be what you are getting at,
8  but that wasn't the question you asked me. The
9  question you asked me was whether I split
10  jurisdictions.
11      Q.  Dr. Trende, I'm asking you that question now.
12      A.  Okay. What is your question now?
13      Q.  My question is, when the goal is to draw a
14  district that has minority CVAP or minority BVAP
15  population above 50 percent, how do you know when
16  racial concerns are predominating in drawing that map
17  in your view?
18      MR. STRACH: Objection.
19      Go ahead.
20      A.  Well, that's a very tricky thing to do.
21  Supreme Court guidance on this is sometimes all over
22  the place. When I drew it, I know what's going on in
23  my head, so I know that I'm not letting race
24  predominate. I had a generalized idea of where the
25  Hispanic population in the area was, but I didn't go

50

1  in and slice out or at least I tried not to go in and
2  slice out Hispanic communities. And when there was a
3  choice between slicing out Hispanic communities or
4  allowing other traditional redistricting criteria to
5  predominate, I generally didn't defer to the question
6  of Hispanic communities.
7      It is a little tricky here, because,
8  again, the context of this whole thing was requests of
9  the Yakama Nation, which is intertwined with race, but
10  that was a directive from the Court that we had to
11  take account of, so...
12      Q.  Okay. When you are reviewing the report of
13  another expert who has drawn a map that has an above
14  50 percent minority CVAP or VAP population, what's
15  your methodology for determining whether that expert
16  allowed racial considerations to predominate?
17      MR. STRACH: Objection.
18      A.  Again, the Supreme Court's guidance on here is
19  a little more wishy washy than I think most social
20  scientists or even lawyers would like. Sometimes the
21  Court has even referenced looking to see if there are
22  ungainly or strange arms or appendages to the
23  district.
24      A lot of it does boil down to an eyeball
25  test, but you can look at the data, you can look and

51

1  see the way when a district does slice up
2  jurisdictions, or pick one jurisdiction over the
3  other, you can look at the way it has been cut. But I
4  don't think the Court has ever proscribed a 50 percent
5  plus 1 rule -- sorry, a specific rule that you can
6  use.
7      Q.  Do you have a methodology that's more specific
8  than you can look at the data for determining whether
9  a district allows racial considerations to
10  predominate?
11      MR. STRACH: Objection.
12      Go ahead.
13      A.  So I think I just gave a rather lengthy
14  discourse on methodology there. So I don't think
15  that's a fair characterization. I think that the
16  Court hasn't given as much guidance as we might like
17  and that sometimes in the Courts' instructions to
18  lawyers and experts have been things like looking to
19  see if there are odd arms or appendages to districts,
20  or if they have bizarre shapes.
21      But as I said, sometimes you can look at
22  the data, you can look at the way that a map when it
23  does split jurisdictions, how it splits them, whether
24  it splits them on racial grounds. You can, if you're
25  familiar with the communities of interest, you can

52

13 (Pages 49 to 52)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 14 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  consider those.
2        You can look at when choices are made to
3  depart from compactness, if that can be ascribed to
4  racial reasons.
5        Those are the various ways I'm aware of
6  that you can do it.
7        You can also run, in some circumstances
8  you can run computer simulations, although the Court
9  has been skeptical of that I think is the fair term.
10       So I'm not entirely sure what the status
11  of that is.
12    Q.  Okay.  If there were an alternative map that
13  had a higher minority population, but did worse on
14  considerations like compactness, would you view that
15  as evidence that racial considerations did not
16  predominate?
17       MR. STRACH:  Objection.
18       Go ahead.
19    A.  It would depend on circumstances.  It might be
20  evidence.  I don't know that I'd consider it proof.
21    Q.  All right.  Let's go to page 13 of this
22  document, which is your supplemental report to Palmer.
23       Are you there?
24    A.  I think so.  Is this figure 6?
25    Q.  No.

                                                    53

1    A.  That's page 13 of the PDF.  I'm sorry.
2        Okay, I'm here.  4.3?
3    Q.  4.3, yes.  You report there that your proposed
4  map district 15 has an HCVAP of 51.1 percent using
5  2021 data and 50.3 percent using the 2020 data.  Did I
6  read that correctly?
7    A.  Yes.
8    Q.  Okay.  Does 2021 data refer to ACS one year
9  estimate from 2021?
10    A.  I don't think so.
11    Q.  What does it refer to?
12    A.  Five-year estimate.
13    Q.  The five-year 2021 estimate?
14    A.  Right.  So the data from 2021, 2020, '19, '18
15  and '17.
16    Q.  Okay.  Does the 2020 data, refers to ACS
17  five-year estimate that includes 2016 through 2020?
18    A.  That's right.
19    Q.  Okay.  This report doesn't suggest to the Court
20  that there's anything unreliable about ACS data that
21  includes 2020 responses.  Is that correct?
22       MR. STRACH:  Objection.
23       Go ahead.
24    A.  That's right.
25    Q.  Okay.  You don't include margins of error for

                                                    54

1  these estimates.  Is that correct?
2    A.  That's right.  Like I said, I came into this
3  case pretty late in the game.  But, no, there's no
4  error margins.
5    Q.  Did you calculate error margins for these
6  estimates before submitting them to the Court?
7    A.  I don't think I did.
8    Q.  Okay.  Did you believe that the figures you
9  were presenting to the Court in this case were
10  unreliable?
11       MR. STRACH:  Objection.
12    A.  I don't think so, but if someone had calculated
13  error margins they are real.
14    Q.  So you represented to the Court that your
15  district was a 50 percent plus 1 minority district
16  solely on the basis of CVAP calculations without any
17  margin of error.  Isn't that correct?
18       MR. STRACH:  Objection.
19    A.  I think I said it was 51.1 percent under the
20  2021 data and 50.3 using the 2020 data.
21       I didn't calculate error margins, because
22  this case had been going on for quite some time and no
23  one was using the error margins, but they were still
24  there.  And if someone were to say this is what the
25  error margin is, it includes 50 percent, I think you

                                                    55

1  would be forced to say, well, okay, maybe it is not
2  50 percent plus 1.
3        I don't know whether the error margins
4  here include 50 percent or not, though.
5    Q.  Okay.  To calculate these estimates -- well,
6  the districts that you presented in this report split
7  block groups.  Is that correct?
8    A.  That's right.
9    Q.  Okay.  So to calculate these estimates you
10  engaged in a disaggregation process to disaggregate
11  block group level CVAP down to the block level.  Is
12  that correct?
13    A.  That's right.
14    Q.  Was that process similar to the process used by
15  the redistricting data hub?
16    A.  Yes.
17    Q.  All right.  In your report in this case you
18  state that there are four issues with the process for
19  disaggregating block groups CVAP data down to block
20  level CVAP data.  Do you recall that?
21    A.  Where are we?
22    Q.  Page 17 of your report.
23    A.  Yes.
24    Q.  Okay.  In your report in Soto Palmer when you
25  were using CVAP level -- CVAP data at the block level,

                                                    56

                         14  (Pages 53 to 56)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 15 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  you didn't identify any of those four issues.  Is that
2  correct?
3      A.  Well, that's right.  Of course not.
4      Q.  Okay.
5      A.  We were in the remedial phase there, well past
6  Gingles 1.  But they are still present.
7      Q.  I'm going to transmit what I'm going to mark I
8  think as Exhibit 5.
9          (Deposition Exhibit No. 5 marked for
10 identification.)
11 BY MS. THEODORE:
12     Q.  Is it your view that you can present unreliable
13 data to the Court at the remedial phase?
14         MR. STRACH:  Objection.
15     A.  No.  It is my view that by the remedial phase
16 it is too late to raise collateral attacks on the
17 data.  There's ways the data have been used and it is
18 fine to use data in that sense of things.
19         I don't know whether these error margins
20 include 50 percent or not, because we didn't calculate
21 the error margins.  But all the issues present with
22 ACS data were present in all the maps drawn at the
23 remedial phase on the Soto Palmer case.
24     Q.  But you did not identify any of those issues to
25 the Court?

57

1      A.  Well, no.  We were in the remedial phase and
2  people have been using the data a given way.  I wasn't
3  asked to inspect the data.  I was asked to draw the
4  map with point estimates at above 50 percent, which is
5  what I did.
6          If Dr. Ayscue had gone back and calculated
7  error margins and said these error margins include
8  50 percent, my response would be, well, okay, these
9  aren't, I guess maybe we can't say with confidence
10 these aren't minority majority districts, but we
11 aren't in the Gingles 1 world, so there's not legal
12 significance to 50 percent plus 1 threshold, in my
13 view.
14     Q.  All right.  Your view is Dr. Ayscue should have
15 calculated margins of error for districts that you
16 were presenting?
17     A.  If he wanted to challenge my districts on that
18 ground, that would have been the way to do it.  But in
19 this case, which, again, had been going on for, to my
20 understanding, almost a year at this point, my view
21 was it was a little bit late to start talking about
22 data issues at the remedial phase.
23     Q.  Okay.  You certified the numbers in your Soto
24 Palmer report were true and correct to the best of
25 your knowledge and belief, right?

58

1      A.  That's true.
2      Q.  Okay.  You felt comfortable doing that, even
3  though you didn't present any margin of error?
4      A.  Well, yeah.
5      Q.  Okay.  Let's turn back to Exhibit 1, which is
6  your expert report, and in particular to pages 49
7  through 51, which is in the place in your CV where you
8  list prior expert engagements?
9      A.  Okay.
10     Q.  Okay.  Can you identify cases in your CV in
11 which you criticized an expert for failing to
12 calculate margins of error associated with minority
13 CVAP data?
14     A.  Stone v. Allen.
15     Q.  Okay.  Any cases other than Stone versus Allen?
16     A.  No.
17     Q.  Okay.  When was the report filed in Stone
18 versus Allen?
19     A.  I'll say spring.  It was right after my kid's
20 spring break, so late March, early April 2024.
21     Q.  Okay.  Before '24 have you ever criticized
22 another expert for failing to calculate margins of
23 error associated with minority CVAP data?
24     A.  I don't think I was ever asked to look at
25 whether their numbers showed failed the error margin.

59

1  And generally even if they're reporting CVAP numbers,
2  the VAPs are above 50 percent plus 1.  So in my view
3  it's a completely different situation for Gingles 1.
4  But, no, I haven't looked at it before then.
5      Q.  Okay.
6      A.  Stone might have been the first time I ever
7  encountered a map where the VAP was below 50 percent,
8  but instead plaintiffs were relying on CVAP to prove
9  Gingles 1.
10     Q.  In fact, in your 2023 preliminary injunction
11 report in this case you did not comment on the absence
12 of a margin of error for minority CVAP calculations.
13 Isn't that correct?
14     A.  Yeah.  I imagine I wasn't asked to look at it.
15     Q.  You weren't asked to look -- you weren't asked
16 to be an expert on Gingles 1 issues at the preliminary
17 injunction stage in this case?
18     A.  That's not what I said.  I said I wasn't asked,
19 I probably wasn't asked to look at the error margins
20 for the CVAP.  It was a preliminary injunction, so
21 things were going quickly and I was busy with other
22 cases.  I don't know if I would have had time to do it
23 even if I had been asked.
24     Q.  You had a month to write your preliminary
25 injunction report.  Isn't that right?

60

15 (Pages 57 to 60)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 16 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1     A.  I don't know how much time I had.  Like I said,
2   I was busy with other matters.  I just wrapped up a
3   trial in the Michigan case.  We were in the remedial
4   phase there.  We were fighting a war in Wisconsin and
5   it's the holidays.  So even if I had been asked to
6   look at the error margins, I don't know that I would
7   have had time to do it.
8         As I recall my preliminary injunction
9   report in this case was pretty bare bones.
10    Q.  All right.  Before 2024 had you ever calculated
11  a margin of error associated with a district CVAP
12  point estimate?
13    A.  I don't remember.
14    Q.  So sitting here today, you can't think of any
15  time before 2024 when you calculated a margin of error
16  associated with a district's CVAP point estimate?
17    A.  As I said, can't remember.
18    Q.  You understand that black CVAP estimates from
19  the ACS only -- let me start again.
20        You understand that black CVAP estimates
21  from the ACS exclude people who are part black, part
22  Hispanic?
23    A.  Yes.
24    Q.  Okay.  For purpose of black CVAP black is
25  defined by Census Bureau to include people who are

61

1     Q.  Sure.  In cases that are not coalition cases,
2   it is standard to use any part black to calculate the
3   black voting age population.  Is that fair?
4     A.  Yeah, I think that's right.
5     Q.  Okay.  Okay.  So in black CVAP calculation
6   citizens who are part black part Hispanic would be
7   included in the denominator, but the numerator.  Is
8   that right?
9     A.  I guess it would depend how they answered the
10  Census question.  If they, if the only option given to
11  them are black, Hispanic or American Indian, they
12  check black -- sorry, if they check black as the
13  answer on the ACS question, then I guess they would be
14  counted as black.
15    Q.  All right.  Dr. Trende, if they checked black
16  and Hispanic on the ACS questionnaire, they would be
17  included in the denominator for the black CVAP
18  proportion calculation, but not the numerator.  Is
19  that correct?
20    A.  I don't know if they would be counted as black
21  or not, like in the black category for the Census.  I
22  don't think you just exclude them all together from
23  all consideration.
24        But it is possible.  Depends on how they
25  answered the question.

63

1   black alone, part black and part white, and part black
2   and part American Indian.  Is that correct?
3     A.  That's correct.
4     Q.  Okay.  People who are part black and part
5   Hispanic are counted as black for purposes of the
6   Census count of black residents of voting age.  Is
7   that right?
8     A.  If you are using any part black, yes.
9     Q.  Any part black is the standard that people use
10  in redistricting cases.  Isn't that true?
11    A.  As I understand it, it is redistricting cases
12  where only one race, one racial group is at issue.  If
13  you have multiple racial groups, it is a little bit
14  more unclear.
15    Q.  Okay.
16    A.  Because your groups can add up to greater than
17  100 percent.  So if you are doing like a coalition
18  district, any part number results in pretty
19  substantial double count.
20    Q.  You understand this is not a coalition case,
21  correct?
22    A.  I know.  It is just the way you asked that
23  question.  This transcript is going to follow me
24  around.  If I catch something, I try to clarify any
25  nuances.  I do my best.

62

1     Q.  So sitting here today you don't have an
2   understanding of how people who mark that they are
3   part black and part Hispanic are included in the black
4   CVAP proportion calculation?
5     A.  Oh, so your question is -- okay.  Your question
6   is that if they answer the ACS data that they are both
7   black and Hispanic, not that that's how they identify,
8   but that's how they answered the question, they would
9   be in the denominator, but not the numerator -- or the
10  other -- yeah, they would be in the denominator, but
11  not the numerator.  That's right.
12    Q.  Okay.  Unlike in the black voting age
13  population calculation, where they would be in the
14  numerator and the denominator.  Is that right?
15    A.  Right.  Yeah.  There's lots of limitations to
16  the ACS data.  That's one of them.
17    Q.  All right.  So for that reason black CVAP
18  estimates from Census Bureau are going to tend to be
19  lower than actual number of citizens of voting age
20  population who are any part black.  Is that true?
21        MR. STRACH:  Objection.
22    A.  It is possible.
23    Q.  Well, if there's anybody in the relevant region
24  who marks on the ACS response that they are part black
25  and part Hispanic, they won't be counted as black for

64

16  (Pages 61 to 64)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 17 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  purposes of the black CVAP calculation, correct?
2        MR. STRACH: Objection.
3    A. Right.
4    Q. Okay. So isn't it true that black CVAP
5  estimates will tend to be lower than the number of
6  citizens of voting age population who are any part
7  black?
8        MR. STRACH: Objection.
9    A. Well, it depends on whether there are people
10 who fit the category that you describe who are also
11 citizens in the district.
12   Q. Okay. If there's anybody in the district who
13 is a citizen who marks that they are part black and
14 part Hispanic, then the black CVAP estimates from the
15 Census Bureau are going to be lower than the actual
16 number of citizens of voting age population who are
17 any part black. Is that correct?
18   A. If there's anyone -- not quite. If there's
19 anyone in the district who, excuse me, or in the
20 jurisdiction, who is, for example, part black or part
21 Hispanic, who is a citizen and who was surveyed by the
22 ACS, then the ACS estimates will be lower.
23   Q. The ACS black CVAP estimates will be lower than
24 the actual number of citizens of voting age population
25 who are any part black in the situation that you just

                                                    65

1    Q. So you calculated the number of Census tracts
2  in North Carolina using your R code?
3    A. Yes.
4    Q. Okay.
5    A. I downloaded the shapefile for Census tracts
6  and there were 1,776 Census tracts.
7    Q. This is all based on 2020 Census data?
8    A. To my understanding, yes.
9    Q. Okay. Then you took the number of Census
10 tracts and divided by North Carolina's 2020 Census
11 population to reach that average Census tract
12 population of 5,878?
13   A. That's my recollection.
14   Q. Okay. Is that the same for the numbers you
15 report for block groups?
16   A. That's my recollection.
17   Q. All right. This is Exhibit 6.
18       (Deposition Exhibit No. 6 marked for
19 identification.)
20 BY MS. THEODORE:
21   Q. Let me know when you have it up?
22   A. Okay.
23   Q. All right. Does this look to you like a
24 printout from Census Bureau website tallies page?
25   A. I have no idea. I can't authenticate this for

                                                    67

1  described?
2    A. Correct.
3    Q. Okay. Okay. Let's turn to page 6 of your
4  report?
5        MR. STRACH: Did we skip to Exhibit 5?
6  Are going to get to that later? You were having that
7  loaded up.
8        MS. THEODORE: That's a good point. We
9  might get to that later, but we can skip over it for
10 now.
11       MR. STRACH: Okay.
12 BY MS. THEODORE:
13   Q. Are you on page 6, Dr. Trende?
14   A. I am.
15   Q. Okay. You see there's a paragraph there
16 stating counties are then further broken into Census
17 tracts?
18   A. Yes.
19   Q. This paragraph contains basic information about
20 Census tracts and block groups and Census blocks in
21 North Carolina?
22   A. Correct.
23   Q. All right. What's the source for the
24 information in this paragraph?
25   A. My R code.

                                                    66

1  you. I don't have reason to dispute you, but I can't
2  say for sure what it is.
3    Q. Have you ever seen this page before?
4    A. Not this particular page, no.
5    Q. All right.
6    A. That I know of.
7    Q. All right. You understand that the Census
8  Bureau tabulates, creates tallies of the number of
9  Census blocks and block groups in Census tracts?
10   A. Yes.
11   Q. Okay. Let's go down to page 6.
12   A. Okay.
13   Q. All right. Do you see a table titled, "2020
14 Census Tallies of Census Tracts, Block Groups and
15 Blocks"?
16   A. Yes.
17   Q. Scroll down to row 37 of that table. Do you
18 see a row for North Carolina?
19   A. Yes.
20   Q. Okay. Do you see Census Bureau is reporting
21 that North Carolina has 2,672 Census tracts?
22   A. Yes.
23   Q. All right. Your report on page 6 says 1,776
24 Census tracts?
25   A. Yes.

                                                    68

1    Q.  So your number is wrong, isn't it?
2         MR. STRACH:  Objection.
3    A.  It might be.  That's taken from the data source
4    that Dr. Collingwood and I both used to download data,
5    but if it doesn't download it correctly, then it is
6    wrong.
7    Q.  Dr. Collingwood didn't create R code to tally
8    up Census tracts, did he?
9    A.  No.  But he says in his report that he
10   regularly uses the tidycensus package in R, which is
11   what I'm relying on.
12        But if it gets the geographies wrong, then
13   I guess that's wrong.
14   Q.  Okay.  If that number is wrong, then the number
15   you gave to the average population of a North Carolina
16   Census tract is also wrong, isn't it?
17        MR. STRACH:  Objection.
18   A.  Yeah.  I mean, that's just meant to give an
19   idea of the scope of how big these things we're
20   talking about -- yeah.  If it is 2600, then the
21   average would probably be more around 4,000 residents.
22   Q.  Right.  Okay.
23        You see on row 37 the Census Bureau is
24   reporting that North Carolina has 7,111 block groups?
25   A.  Yes.

69

1    Q.  Your report says on page 6, North Carolina has
2    4,967 block groups?
3    A.  That's right.
4    Q.  All right.  So your statement in your report
5    that there are 4,967 block groups in North Carolina is
6    wrong, isn't it?
7         MR. STRACH:  Objection.
8    A.  I don't know that that's the case.  I just know
9    that using the tidycensus data that's downloaded from
10   the Census API, that's what you come up with.  But if
11   there's not some nuance or other method to explain the
12   data, then, yeah, I guess tidycensus provides the
13   wrong data here.
14   Q.  Or you could have implemented tidycensus
15   incorrectly.  Isn't that right?
16        MR. STRACH:  Objection.
17   A.  I suppose it is possible.
18   Q.  Okay.  You say average population of a block
19   group in North Carolina was 2,102 residents on page 6,
20   right?
21   A.  Right.
22   Q.  That number is also wrong if North Carolina has
23   7,111 block groups, isn't it?
24        MR. STRACH:  Objection.
25   A.  Yes.  If it has 7,111 block groups, then

70

1    average population would probably be more like 1200,
2    1300.
3    Q.  1468 sound about right?
4    A.  I have no idea.  I can do rough estimates in my
5    head.  I can't do that.
6    Q.  All right.  Well, you understand the population
7    of North Carolina in the 2020 Census is 10,439,388?
8    A.  I'll take your word for it.
9    Q.  All right.  That 10,439,388 divided by 7,111 is
10   1468?  Does that sound about right?
11   A.  I appreciate the vote of confidence, but I
12   cannot even begin to do that in my head.
13   Q.  All right.  You say in this paragraph that the
14   largest block group in North Carolina contained 13,967
15   residents.  Do you see that?
16   A.  Yes.
17   Q.  How did you calculate that?
18   A.  That's, again, out of the tidycensus data.
19   Q.  Okay.  That's in your R code somewhere?
20   A.  Yes.
21   Q.  Okay.  Do you know where the block group in
22   North Carolina that contains 13,967 residents is
23   located?
24   A.  I would guess it is around Fayetteville, but I
25   don't know for sure.

71

1    Q.  All right.
2    A.  You get very large precincts and block groups
3    down there with the military installation that I'm
4    blanking on.
5    Q.  Are you aware that the North Carolina Office of
6    State Budget and Management publishes statistics from
7    the Census on its website?
8    A.  No.
9    Q.  All right.  Mark this as Exhibit 7.
10        (Deposition Exhibit No. 7 marked for
11   identification.)
12   BY MS. THEODORE:
13   Q.  Let me know when you have it open?
14   A.  Okay.
15   Q.  All right.  Does this look to you like a
16   printout from the website of the North Carolina Office
17   of State Budget and Management?
18   A.  I don't have a reason to dispute you on that.
19   Q.  All right.  You see it has 7,111 records
20   reflecting the 7,111 block groups?
21   A.  I see that number, yeah.
22   Q.  All right.  You want to scroll down to page 2
23   of the PDF?
24   A.  Okay.
25   Q.  You see where it says area type block group,

72

18  (Pages 69 to 72)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 19 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  then it has the number 7,111?
2      A.  Yes.
3      Q.  Okay.  All right.  Then scroll down to the last
4  page.
5      A.  Last page is blank.
6      Q.  I'm sorry, you are right.  Second to last page.
7      A.  All right.
8      Q.  All right.  Does this look like a table of the
9  block groups in North Carolina sorted by total
10  population?
11      A.  If you represent that to me, I have no reason
12  to dispute you.
13      Q.  All right.  You see it looks like the largest
14  block group in North Carolina is Wake County, it has
15  8,962 people?
16      A.  I see the table says value 8,962.
17      Q.  For total population?
18      A.  If you say so.
19      Q.  Well, it says total population right next to
20  it, doesn't it?
21      A.  Yeah, it does say that.  I just don't know that
22  that's what's actually been pulled up by this table,
23  but if that's what you represented, I don't have a
24  reason to dispute you.
25      Q.  All right.  Sitting here today do you have

73

1  confidence in your report's statement that the largest
2  block group in North Carolina contained 13,967 people?
3          MR. STRACH:  Objection.
4      A.  First, I'd want to go back and double-check
5  against what you are suggesting, but I don't -- R code
6  typically doesn't lie, so maybe there's a mistake with
7  tidycensus or maybe there's a mistake in the code.
8          The real point of this exercise, which I
9  don't think is terribly controversial, is to kind of
10  help the Court understand what Census geographies are,
11  not to talk about the average populations or whatnot.
12  You are just trying to get a sense of, okay, counties
13  break down in tracts, break down in block groups,
14  which break down in blocks.
15          MS. THEODORE:  I'll transmit the next
16  exhibit.  Can you let me know when you have it open?
17          (Deposition Exhibit No. 8 marked for
18  identification.)
19          THE WITNESS:  Okay.
20  BY MS. THEODORE:
21      Q.  All right.  You see this is another printout
22  from the North Carolina Office of State Budget and
23  Management?
24      A.  Yes.
25      Q.  All right.  You see it says it has 2,672

74

1  records?
2      A.  Yes.
3      Q.  All right.  Go down to page 2.
4      A.  Okay.
5      Q.  You see the area type described is tract?
6      A.  Yes.
7      Q.  Okay.  Why don't you scroll down to page 4?
8      A.  (Witness complies.)
9          Okay.
10      Q.  All right.  Does this look like a table from
11  the North Carolina Office of State Budget and
12  Management website that's sorting the tracts in North
13  Carolina on the basis of total population?
14      A.  I've never been to this website before, so I
15  can't say what it looks like, but I have no reason to
16  dispute you on that.
17      Q.  Do you see the largest Census tract reported on
18  this table has 14,610 people in it?
19      A.  Yes.  At least, if that's what this is actually
20  reflecting, if it is all the tracts in North Carolina
21  sorted by population.
22      Q.  Okay.  You say in your report that the largest
23  tract in North Carolina contains 34,130 residents,
24  correct?
25      A.  Correct.

75

1      Q.  Okay.  Where is that tract?
2      A.  I don't know.
3      Q.  All right.  Do you have confidence sitting here
4  today that there's a tract that contains that many
5  residents in North Carolina?
6          MR. STRACH:  Objection.
7      A.  Well, it is the same answer as before.  I'd
8  want to go back and check my data.  But I don't have
9  any reason to think that tidycensus got it wrong.
10  Maybe there's some nuance between these and what the
11  table shows.  I don't know.
12      Q.  When you say tidycensus got it wrong or your
13  implementation of tidycensus was wrong, right?
14          MR. STRACH:  Objection.
15      A.  It's possible.
16      Q.  Okay.
17      A.  By the way, I don't want to cut you off in the
18  middle of a line of questioning, but we have been
19  going for a little over an hour, so whenever you get
20  to a different change of topic, it might be a good
21  time for a break.  We can go for another hour and then
22  take lunch.
23          MS. THEODORE:  Yeah.  Why don't we take a
24  break right now, like 5 minutes.
25          (Recess taken.)

76

19  (Pages 73 to 76)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 20 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

BY MS. THEODORE:

Q. Did you discuss anything about this deposition with counsel on the break?

A. Yes.

Q. What did you discuss?

A. I said I didn't know where the discrepancy came from on the Census tracts versus -- what you report versus what the report says.

Q. Okay. What did counsel say?

MR. STRACH: I object to that, instruct him not to answer that.

A. I'll listen to counsel.

MS. THEODORE: Your position is that I'm not entitled to know what you're telling Dr. Trende during the pendency of the deposition about the deposition?

MR. STRACH: We didn't discuss any of his answers or come back in here to correct anything. Anything we discussed would have been privileged going forward.

BY MS. THEODORE:

Q. Dr. Trende, did you discuss any of your prior answers with counsel?

A. Only to the extent that I didn't know where the -- I brought it up that I didn't know where the

77

difference came from.

Q. Okay. Did counsel say anything about your prior answers?

A. No.

Q. All right. With respect to those issues we were talking about in paragraph on page 6 of your report, did you do anything to verify what tidycensus was producing from your code?

A. No. It is something that people regularly rely upon, so no.

Q. You didn't go check the Census Bureau website to make sure that when your code said 1776 Census tracts, that that was consistent with the Census Bureau website?

A. No. Again, this is a minor point in the report that doesn't have anything to do with final conclusions. It is just meant to kind of illustrate, you know, we talk about tracts and block groups and blocks, and everything. The whole point here is to kind of, in case the Court didn't already have it, give an understanding of what these things are.

So it is not the type of thing that I would have dug down and verified, anyway. But, like I said, I'm genuinely curious where the discrepancy comes from.

78

Q. All right. Okay. In your August report you state that you're calculating margins of error for the black CVAP percentage point estimates for Mr. Esselstyn's demonstration districts, correct?

A. That's right.

Q. All right. And I think you previously testified that the only time you have previously calculated margins of error for CVAP point estimates was in the Stone versus Allen case. Is that right?

A. Yes. Actually, just as you bring that up -- yeah, actually I think that's right.

Q. Okay. You say in your report that you relied on the method of calculating margins of error in chapter 8 of the American Community Survey Handbook. Is that correct?

A. That's right.

Q. All right. I'm going to mark what I just transmitted in the chat as Exhibit 9.

(Deposition Exhibit No. 9 marked for identification.)

BY MS. THEODORE:

Q. Can you let me know when you have it up?

A. Okay.

Q. All right. Do you recognize this as chapter 8 of the American Community Survey Handbook?

79

A. Yes.

Q. Okay. The black CVAP percentage in a particular region is a proportion, correct?

A. Right.

Q. All right. In particular it's the proportion created by dividing the number of black citizens of voting age by number of total citizens of voting age?

A. That's right.

Q. All right. Let's turn to page 64 of the ACS handbook.

A. (Witness complies.)

Okay.

Q. Do you see the formula in the middle of the page with number 6 in parentheses next to it?

A. Yes.

Q. All right. Is that the correct formula to use to calculate the margin of error for a black CVAP percentage point estimate?

A. Yes.

Q. All right. The formula is for calculating the margin of error of a proportion represented by X divided by Y?

A. Correct.

Q. Here X is black CVAP, and Y is total CVAP?

A. Correct.

80

20 (Pages 77 to 80)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 21 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q. All right. So first you calculate the margin
2  of error for black CVAP and for total CVAP, right?
3    A. Correct.
4    Q. Okay. Under the square root sign in the
5  formula you are supposed to start with the margin of
6  error for black CVAP squared, which is represented by
7  MOE parentheses X squared. Is that correct?
8    A. That's right.
9    Q. All right. Then you subtract the number that's
10  calculated based on margin of error for total CVAP
11  represented in the formula as MOE parentheses Y. Is
12  that right?
13    A. Correct.
14    Q. Okay. Did your code correctly implement this
15  formula?
16    A. No.
17    Q. All right. I'm going to mark as Exhibit 10.
18       (Deposition Exhibit No. 10 marked for
19  identification.)
20  BY MS. THEODORE:
21    Q. Let me know when you have this up?
22    A. Okay.
23    Q. Do you recognize this as a copy of the R code
24  you turned over in this case?
25    A. It looks like it.

81

1    Q. Okay.
2    A. I don't have any reason to dispute you on that.
3    Q. You see the first line says, C/user/Sean T, et
4  cetera?
5    A. Yeah. This isn't the form that I produced it
6  in, but it looks, like I said, it looks like what I
7  produce. I don't have any reason to believe you would
8  be less than forthcoming on it.
9       I've just also done this enough to know
10  when to leave a little wiggle room just in case and in
11  the event that something went south, but I don't have
12  a reason to dispute you. It looks like it.
13    Q. Okay. This contains the code you used to
14  calculate margin of error?
15    A. That's right.
16    Q. Let's go to page 10 of the PDF.
17    A. (Witness complies.)
18    Q. Let me know when you're there?
19    A. All right.
20    Q. In the middle do you see a line that starts
21  with D1_CVAP mutate open parentheses MOE, and then
22  continues?
23    A. Yeah. We can call the parentheses greater than
24  parentheses and then or pipe. But, yeah, D1_CVAP,
25  then mutate MOE equals 1 over CVAP, et cetera.

82

1    Q. That's the code you used to calculate the
2  margin of error for the black CVAP percentage for
3  demonstration district 1 -- for demonstration district
4  D1?
5    A. Yes.
6    Q. All right. Your code doesn't start with margin
7  of error for the black CVAP squared and then subtract
8  a number calculated based on the margin of error for
9  total CVAP, does it?
10    A. No, no. It has an error in it. Thankfully it
11  doesn't change the ultimate conclusion, but it has an
12  error in it.
13    Q. You invert black CVAP and total CVAP, correct?
14    A. That's one of the -- yeah. There's two errors
15  in it, as I recall. But, yeah, that's one of them.
16    Q. All right. So this error is replicated in all
17  the code lines that you used to calculate margin of
18  error for any of the demonstration districts using
19  2020 or 2022 ACS numbers. Is that right?
20    A. Yeah. That's right.
21    Q. All right. So every margin of error number
22  presented in your report is incorrect. Is that true?
23    A. Certainly the black estimates of CVAP. I
24  don't know if there are any other ones in there, but,
25  yeah, the error margin for the black estimates of CVAP

83

1  are wrong.
2    Q. Okay. So every error margin you calculate for
3  the black CVAP percentage of the demonstration
4  district is wrong and unreliable. Is that correct?
5       MR. STRACH: Objection.
6    A. It is wrong. Yeah.
7    Q. Okay. Did you fail to understand how the
8  margin of error formula worked when you wrote your
9  code?
10    A. No. I just coded it wrong.
11    Q. Did you check your work?
12    A. Yes.
13    Q. You just didn't notice this error?
14    A. Yes.
15    Q. You agree this is a serious error?
16       MR. STRACH: Objection.
17    A. I mean, it certainly gives the wrong answer,
18  but, like I said, it doesn't change the conclusions.
19  Even if we use what Dr. Collingwood estimated these
20  districts all still -- we can't say that they are
21  different than 50 percent. So it could have been a
22  lot worse I suppose.
23    Q. So Dr. Collingwood showed that this error had
24  the effect of substantially increasing the margin of
25  error. Do you agree with that?

84

21 (Pages 81 to 84)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 22 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    A.  I think it went from 1.8 -- or from 1.3 to 1.8.
2    Q.  All right.  This wasn't the only mistake you
3  made in calculating margin of error, was it?
4    A.  I'm not sure about that.
5    Q.  All right.  Well, to implement the formula for
6  calculating margin of error at the black CVAP
7  proportion, you first need to calculate margin of
8  error for the estimate of total black CVAP in the
9  relevant region, correct?
10   A.  That's right.
11   Q.  That's the numerator in the black CVAP
12 percentage point estimate?
13   A.  Yeah.
14   Q.  All right.  You calculate that by adding up the
15 estimates for black citizens in each of the three
16 subcategories that are black alone, black and white in
17 combination, and black and American Indian?
18   A.  Yes.  I saw that Dr. Collingwood wrote about
19 that.  I didn't really investigate that closely,
20 because it looks like that would have actually been an
21 error in plaintiffs' favor.  So I don't know if it is
22 an error or not.
23       At the end of the day I got to the end of
24 it and saw that it was still within the error margin
25 of 50 percent.  So I'm content to use

85

1    Q.  All right.  See there's a formula on that page
2  with the parentheses, with (1) next to it?
3    A.  Yes.
4    Q.  All right.  That formula explains how to
5  calculate the margin of error for an aggregated
6  estimate of multiple components?
7    A.  It looks like it.  I haven't looked at this in
8  a while.
9    Q.  You looked at it when you were writing your
10 report in this case, didn't you?
11   A.  Yeah.
12   Q.  Okay.  Is that the formula you were attempting
13 to use to calculate the margin of error for the
14 combined count of the three subcategories of black
15 citizens of voting age?
16   A.  I honestly don't remember.  Like I said, I
17 haven't looked into this issue Dr. Collingwood raised
18 that much, because it resulted in an error in
19 plaintiffs' favor, if there's an error.
20   Q.  You don't know whether this is the correct
21 formula to use to calculate the margin of error for
22 the black CVAP that's in the numerator of the black
23 CVAP proportion?
24   A.  I think it is.  This is a, what, nine page
25 document full of formula.

87

1  Dr. Collingwood's estimates.
2    Q.  Well, Dr. Trende, we'll turn to
3  Dr. Collingwood's estimate in a minute, but I just
4  want to stick with your, the numbers in your report.
5       You understand that -- so to calculate
6  margin of error for the black CVAP estimate you have
7  to combine margins of error for each of the three
8  subgroups I mentioned, right?
9    A.  Yeah.  Like I explained in my previous answer,
10 I saw that in Dr. Collingwood's report, about the
11 order in which you should be adding together the error
12 margins of the individual subgroups, and I saw that
13 when I did it it caused an error in plaintiffs' favor.
14 So I didn't really investigate that much further.  I
15 didn't really investigate much of this that much
16 further, because at the end of the day everything
17 Dr. Collingwood estimated is consistent with my
18 opinion in this case.
19       Bottom line is I don't know that that's an
20 error there.
21   Q.  Let's go to the ACS handbook that we previously
22 were looking at, I think that was Exhibit 9.  Can you
23 go to page 59?
24   A.  (Witness complies.)
25       Okay.

86

1       I know that one thing, that regarding
2  formula 6 is an error, because I did look closely at
3  that, because I was curious whether that was a mistake
4  or not.
5       I didn't look that closely into this one,
6  because it made an error in plaintiffs' favor and was
7  fairly small.  At the end of the day everything worked
8  out.
9    Q.  So you think this is the formula that you used,
10 that you are supposed to use to calculate the margin of
11 error for the black CVAP number that goes into the
12 numerator, but you are not sure.  Is that your
13 testimony?
14   A.  Yes.
15   Q.  Okay.  I want to turn to Exhibit 10, your peer
16 script, go to page 5.
17   A.  (Witness complies.)
18       Okay.
19   Q.  Okay.  You see in the middle of the page
20 there's a line that says, "CVAP_block_total_MOE equals
21 SQRT parentheses, and then it continues?
22   A.  Yes.
23   Q.  All right.  Is that the line in your code where
24 you were calculating the margin of error for the black
25 CVAP number that goes in the numerator of the black

88

22 (Pages 85 to 88)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 23 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1   CVAP proportion?

2       A.  I honestly don't remember.  It is 28 lines of

3   code.

4       Q.  Can you point to anywhere else in this code

5   where you are calculating the margin of error for the

6   black CVAP total that goes in the numerator of the

7   black CVAP proportion?

8       A.  Certainly not as I sit here.

9       Q.  All right.  You see that the code we were just

10  looking at, it squares CVAP_black_MOE, you see that?

11      A.  Yes.

12      Q.  It doesn't square CVAP_black_white_MOE,

13  correct?

14      A.  That's right.

15      Q.  It doesn't square CVAP_ NA_black_MOE, correct?

16      A.  That's right.

17      Q.  All right.  Do those categories correspond to

18  the three categories we were discussing before of

19  black CVAP, or people who are black or white -- I'm

20  sorry.  Let me start again.

21          Do those categories correspond to the

22  three categories we were discussing before that go

23  into the black CVAP calculation?

24      A.  Yes.

25      Q.  All right.

                                                    89

1       A.  Certainly larger.

2       Q.  All right.  All your margin of error

3   calculations were based on the block groups that you

4   conclude were contained in whole or in part in

5   Mr. Esselstyn's demonstration districts B and D,

6   correct?

7       A.  That's correct.

8       Q.  How did you determine which block groups were

9   contained in whole or in part in the demonstration

10  districts?

11      A.  That is through the R code.

12      Q.  Is that a function called ST Intersect?

13      A.  I believe so, yes.

14      Q.  What does that function do?

15      A.  It looks at the block groups that intersect the

16  map and prints them up.

17      Q.  Okay.  Are you aware that that function

18  ST Intersect select block groups that border a

19  particular region, but are not necessarily actually

20  contained in the region?

21      A.  I don't know.

22      Q.  You don't know if that's true today?

23      A.  I don't know if that's true today.

24      Q.  Okay.  Did you check the block groups produced

25  by the ST Intersect function to make sure that they

                                                    91

1       A.  It is black alone, part black, part white, part

2   Native American, part black.

3       Q.  All right.  Any reason you can think of why it

4   would be appropriate to square the margin of error for

5   black alone, but not the margin of error for part

6   black part white or part black part Native American?

7       A.  I don't remember.  Like I said, this was a

8   while ago.

9       Q.  Okay.  So sitting here today, you are not

10  disputing Dr. Collingwood's conclusion that you

11  implemented this part of the formula incorrectly also,

12  right?

13      A.  No.  Like I testified, I looked at it, I saw

14  that it resulted in error in plaintiffs' favor, didn't

15  change the ultimate answer.  That one I didn't dig in

16  to much.

17      Q.  All right.  The error, the first mistake that

18  we discussed caused an error in defendants' favor.

19  Isn't that right?

20      A.  That's right.

21      Q.  All right.  The size of that error in

22  defendants' favor dwarfed the size of the error in

23  plaintiffs' favor caused by the second error.  Isn't

24  that right?

25          MR. STRACH:  Objection.

                                                    90

1   were actually contained in demonstration districts B

2   and D?

3       A.  I mean, there's nothing to check it against.

4   If Mr. Esselstyn had produced a block assignment file

5   or block equivalency file, I could have done that, but

6   he didn't, and so you are reliant upon the geometries

7   that are estimated by the computer.

8       Q.  Your testimony is that it's not possible to

9   open up a shapefile and check to see what block groups

10  are in that shapefile?

11      A.  Well, when you have a map that splits block

12  groups, you can't just eyeball that and see if there's

13  differences, because there might be just slight bits

14  of overlap or a single block.  It's much easier to do

15  this with block assignment files than shapefiles.

16      Q.  Is your testimony that you couldn't have opened

17  up a shapefile in Maptitude or another redistricting

18  software and checked to see which block groups were

19  contained in the demonstration districts?

20      A.  My testimony is that having the shapefile from

21  Mr. Esselstyn, I ran it through the code in R, and

22  these are the block groups that R identified as being

23  in the district, and I don't know any reason not to

24  rely upon R's process.

25      Q.  Could you have opened up the shapefiles in

                                                    92

                              23  (Pages 89 to 92)
Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 24 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  Maptitude or other redistricting software to check to
2  see which block groups were in the districts?
3       A.  Perhaps to double-check it, I guess I could
4  have done that.
5       Q.  You didn't?
6       A.  But I didn't have a reason not to trust R's
7  approach to it.
8       Q.  You didn't open up the shapefiles to
9  double-check?
10      A.  I didn't double-check in a separate program,
11  no.
12      Q.  Okay.  When you used ST Intersect, you didn't
13  know whether it identified block groups in the
14  district or block groups that were adjoining the
15  district?
16      A.  That border the district, that's right.  If
17  there's overlap between the boundaries or if it's the
18  result of a block being read in from one place to
19  another, I don't know.
20      Q.  Okay.  Did you ever ask counsel to ask for a
21  block equivalency file from Mr. Esselstyn?
22      A.  No.
23      Q.  All right.  Have you reviewed the portion of
24  Dr. Collingwood's report where he looks at your code
25  and reports that you included block groups that are

                                                    93

1  entirely outside of demonstration districts B and D?
2       A.  I did.
3       Q.  Do you dispute that conclusion?
4       A.  I don't dispute it one way or the other.
5       Q.  You haven't gone back to check whether you were
6  correct?
7       A.  No.
8       Q.  All right.  Mark this as Exhibit 11.
9            (Deposition Exhibit No. 11 marked for
10  identification.)
11  BY MS. THEODORE:
12      Q.  Let me know when you have it open?
13      A.  Can I get a hard copy?
14           Okay.
15      Q.  Do you recognize this as a copy of
16  Dr. Collingwood's rebuttal report in this case?
17      A.  Yes.
18      Q.  All right.  Let's go to page 11.
19      A.  (Witness complies.)
20           Okay.
21      Q.  All right.  Dr. Collingwood's report lists two
22  specific block groups that your code assigns to the
23  demonstration districts.  Do you see that?
24      A.  Yes.
25      Q.  Okay.  Do you agree that your code assigns

                                                    94

1  those groups to the demonstration districts?
2       A.  I don't dispute it.  I haven't checked.
3       Q.  Okay.  You don't dispute that they are not in
4  the demonstration districts?
5       A.  I don't dispute it one way or the other.
6       Q.  All right.  You didn't think it was important
7  to go back and check to see whether your calculation
8  of the block groups was accurate after a question was
9  raised about it by another expert?
10      A.  I looked to see what his bottom line was and if
11  it changed my ultimate conclusion that I'd be
12  testifying to, and it didn't.  So as of this
13  deposition I haven't gone back and double-checked it.
14           I don't know if my testimony is going to
15  be that block group 371399606001 is in the district or
16  not, but I certainly wouldn't represent anything to
17  the Court that was incorrect.
18      Q.  You are suggesting you might go and check after
19  this deposition?
20      A.  I might check it after the deposition.
21      Q.  You've had a month since you received
22  Dr. Collingwood's report, right?
23      A.  That is true.
24      Q.  Okay.  You haven't seen fit to check that in
25  the last month?

                                                    95

1       A.  I haven't checked it in the last month.
2            Dr. Collingwood has already demonstrated
3  an error in my code, so I won't be testifying that the
4  error margin is whatever it was reported in the code,
5  which to me sort of reduced the urgency of checking
6  other things that are smaller errors.  Once I saw
7  Dr. Collingwood's estimated error margins are still,
8  would still render the district within 50 percent plus
9  1, and so my ultimate testimony wouldn't be changed,
10  that sort of reduced the fire alarm on some of these
11  other issues.
12           If there hadn't been an error in formula
13  6, I probably would have gone back and checked some of
14  these other issues a little bit more closely.
15      Q.  Okay.
16      A.  I imagine if I rerun my code, R is going to
17  identify block groups 371399606001 and 371399607012 as
18  being within the district.
19      Q.  Let's turn to page 23 and 24 of your report.
20      A.  (Witness complies.)
21      Q.  Start with page 23.  Are you there?
22      A.  Yes.
23      Q.  Okay.  What you are doing -- you see the
24  sentence that says, "the total estimated CVAP for the
25  block groups in the district D-1 is 169225?

                                                    96

24  (Pages 93 to 96)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 25 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    A.  169225, yes.
2    Q.  Thanks for that correction.
3        You see it says the total estimated black
4  CVAP for the block groups in district D-1 is 83,992?
5    A.  Yes.
6    Q.  All right.  So this isn't a margin of error
7  calculation, correct?
8    A.  Correct.
9    Q.  You are just totaling the black CVAP and CVAP
10  for the block groups in demonstration districts B
11  and D.  Is that right?
12    A.  Correct.
13    Q.  Okay.  Those calculations were performed in R
14  using the same script that we marked as Exhibit 10?
15    A.  Oh yeah.  Using the same script as Exhibit 10,
16  right.
17    Q.  Okay.  If the block groups that your R code
18  assigned to demonstration districts B and D are
19  incorrect, then that number is incorrect, isn't it?
20    A.  Yeah.  I think Mr. Esselstyn gives his own
21  estimate of the 2022 BCVAP for the district that still
22  remains, I think D-1.  So I think it was pretty much
23  the same as what I had.
24        But I think, if I recall correctly, I
25  calculated this using the disaggregated block data

97

1  from -- the disaggregated block data from
2  redistricting data hub, but I'm not sure.
3    Q.  Well, you would have calculated this using
4  disaggregated block data for block groups that you
5  assigned to district D-1, correct?
6    A.  Yeah, so there's two different ways that this
7  stuff -- I think I did, I looked at the blocks that
8  were specifically assigned to the district and using
9  the redistricting data hub data you can look only at
10  those blocks that are assigned.
11        But I honestly don't remember.  I don't
12  remember this specific issue being raised by
13  Dr. Collingwood, so I just can't say anything about it
14  as I sit here.
15    Q.  This specific -- this specific issue was raised
16  by Mr. Esselstyn, wasn't it?
17    A.  I don't remember that.
18    Q.  Okay.  I'm going to transmit what I'm going to
19  mark as Exhibit 12.
20        (Deposition Exhibit No. 12 marked for
21  identification.)
22  BY MS. THEODORE:
23    Q.  Do you recognize this as a copy of
24  Mr. Esselstyn's rebuttal report?
25    A.  Yes.

98

1    Q.  All right.  You reviewed this report?
2    A.  Yes.
3    Q.  Can you turn to page 18?
4    A.  (Witness complies.)
5        Okay.
6    Q.  All right.  Do you see there in paragraph 35
7  Mr. Esselstyn states that the numbers you provided for
8  the total estimated CVAP for the block groups in
9  district B-1 and the total estimated black CVAP for
10  block groups in district D-1?
11    A.  I see that, yes.
12    Q.  All right.  So he says that your numbers are
13  wrong, doesn't he?
14    A.  He does.
15    Q.  You haven't gone back and checked to confirm
16  whether they are right or wrong?
17    A.  No.
18    Q.  Okay.  All right.  We have already established
19  that this plus or minus 2.1 percent number on page 23
20  is wrong, correct?
21    A.  That's right.
22    Q.  The number is incorrect?
23    A.  Yes.
24    Q.  Okay.  All right.  Then on page 24, you
25  calculate the black CVAP proportion for the block

99

1  groups in district D-1 using 2020 and 2022 ACS data.
2  Is that correct?
3    A.  On page -- wait, I'm looking on his report.  24
4  of my report or his?
5    Q.  Yours.
6    A.  Okay.  Yes.
7    Q.  All right.  You understand Mr. Esselstyn states
8  that your calculations are incorrect?
9    A.  He might.  I don't remember that.
10    Q.  Why don't you flip back to his report and look
11  at paragraph 36?
12    A.  (Witness complies.)
13        Okay.
14    Q.  He states that the numbers that you calculate
15  for the black CVAP percentage of the block groups in
16  his district D-1 are incorrect, doesn't he?
17    A.  Yes.
18    Q.  Have you gone back to see whether your numbers
19  are correct?
20    A.  No.
21    Q.  Okay.  You have no basis to dispute his
22  conclusion that your numbers are incorrect?
23    A.  I don't have a basis to evaluate it one way or
24  the other, no.
25    Q.  Okay.  Looking at the paragraph on page 24 in

100

25  (Pages 97 to 100)

your report using 2022 CVAP data -- are you there?

A. Yes.

Q. Can you say with confidence sitting here today that any of the numbers you report in that paragraph are correct?

A. I thought there was some place in Mr. Esselstyn's report where he talked about the CVAP estimate for the district itself, I thought we lined up, but maybe not. I don't know.

Let's see. He says on page 7 of his report that the 2022 black CVAP for demonstration district D is 50.14 percent, which is what I report there.

Q. Okay. Other than the 50.14 percent number in that paragraph that lines up with Mr. Esselstyn's report, can you say with confidence that any other number reported in the paragraph starting using 2022 CVAP data is accurate?

A. Well, I know that the error margins are not right, but the 50.14 percent is a big deal since that's our estimate of the black CVAP for the district.

Q. I'll ask again: Other than the 50.14 number, can you say with confidence that any of the other numbers you report in the paragraph starting using

101

2022 CVAP data are accurate?

A. I'll answer again, I know the error margins are incorrect, which by my read are the other numbers here. That 50.14 percent number is very important, since that's the actual estimate for the black CVAP percent of the district. We both agree using 2022 data that it is 50.14 percent.

Q. Okay. The final sentence of this paragraph says, starts "for 2020 the block groups do have an estimated BCVAP above 50 percent (50.2 percent) but for 2020 they do not, parentheses (49.5 percent)."

Do you see that?

A. Yes.

Q. Can you say with confidence that those numbers are correct?

A. The specific numbers are not correct, but the actual conclusion that for 2020 the block groups do not have an estimated BCVAP above 50 percent, but for 2020 they do not, we are in agreement on that.

Q. Okay. Let's go back to page 23 of your report, sorry to skip around. I want to focus on this paragraph that starts at the bottom of 23, crosses over to 24, starts "even using 2020 data."

Are you with me?

A. Yes.

102

Q. Okay. So midway through the paragraph you say that Mr. Esselstyn's report in black CVAP is 50.19 percent. Do you see that?

A. Yes.

Q. Other than that number, can you say with confidence that any of the numbers you provide in this paragraph are correct?

A. Other than 50.19 percent?

Q. Yes.

A. (Witness reviewing document.)

The numbers are not correct, but the conclusion that claim overall estimated black CVAP percent for the district is above 50 percent is dependent on the error rate for the method, et cetera, we are in agreement on that.

Q. So putting aside your failure to use the correct formula, you chose to calculate the margin of error of the demonstration districts by combining the margins of error of all of the block groups that you believed were in demonstration districts B and D. Is that correct?

A. That's right. As Dr. Collingwood said, it is impossible to calculate the actual error margin for the districts.

Q. All right. Margins of error at the block group

103

level are going to be higher generally than margins of error at the county level. Is that correct?

A. Not necessarily. I'm sorry, you mean of an individual block group? Yeah. Generally speaking the error margin of an individual block group will be higher than the error margin of a county.

Q. Okay. The majority of the population in districts, demonstration districts B and D would have been whole counties, correct?

A. That's right.

Q. All right. Because districts B and D only split one county?

A. That's my recollection.

Q. All right. Census Bureau directly reports margin of error at the county level. Isn't that correct?

A. That's correct.

Q. You could have used the margins of error that the Census Bureau reported directly at the county level for purposes of counting the, calculating the margin of error for the majority of demonstration districts B and D. Isn't that correct?

A. Yeah. I actually thought of this one.

Q. Then you could have combined the calculation at the county level with calculations at the block group

104

26 (Pages 101 to 104)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 27 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  level for the portions of the demonstration districts
2  that contained only a partial county. Is that
3  correct?
4      A. Yeah.
5      Q. You considered calculating the margin of error
6  in that way?
7      A. Yeah. I just said that one I actually thought
8  about.
9      Q. Okay. Wouldn't that have been a more accurate
10  way of calculating margin of error?
11     A. So I don't know. The reason I didn't do it
12  that way was I looked at the ACS handbook, I didn't
13  see anything instructing to do it that way. I wasn't
14  sure about mixing and matching different levels of
15  Census subdivisions. So I did it aggregating the
16  block groups, so it was only the block group level.
17     Q. Talking about chapter 8 of the ACS handbook?
18     A. Right. I might have missed it, but I didn't
19  see anything in there saying to always use the largest
20  subdivision available.
21     Q. Okay. In your view is there something in the
22  ACS handbook that suggests that it would be
23  inappropriate to combine margins of error at the
24  county level with margins of error at the block group
25  level?

105

1      A. No. I didn't see guidance either way on that.
2      Q. Okay. Is there some mathematical reason why it
3  would be inappropriate to combine data at the county
4  level with data at the block group level?
5          MR. STRACH: Objection.
6          Go ahead.
7      A. No. I would just want to see some type of
8  citation or something saying that that's definitely
9  the way you have to do it.
10     Q. Is there a citation -- well, step back.
11         So you chose to aggregate all block
12  groups, right?
13     A. Yes.
14     Q. All right. Is there a citation saying that
15  that's the way it should be done?
16     A. No. I think my testimony has been I don't see
17  a citation either way. So I decided to do it keeping
18  consistent Census levels across what I aggregated
19  from.
20     Q. All right. Let's pull up Dr. Collingwood's
21  rebuttal report.
22         Let me ask you this, actually. Did you
23  ever engage in a calculation of margin of error using
24  the method of combining margins of error for counties
25  with margins of error for block groups?

106

1      A. Oh, no. No. I did it keeping the same groups
2  across. And I genuinely meant what I said, I was
3  looking for a citation, I'm kind of curious about
4  this, but I didn't see anything in Dr. Collingwood's
5  report saying this is the way you have to do it,
6  either.
7          So at the end of the day it doesn't change
8  the ultimate answer, which is that 50 percent is
9  within the error margin. So I only spent but so much
10  time digging on this, but I never found there was an
11  answer.
12     Q. Okay. Let's turn to Dr. Collingwood's rebuttal
13  report. Let's turn to page 13.
14     A. (Witness complies.)
15     Q. Are you with me?
16     A. Yes.
17     Q. Okay. You see Dr. Collingwood's rebuttal table
18  2?
19     A. Yes.
20     Q. You reviewed this table?
21     A. Yes.
22     Q. Did you identify any errors in the analysis
23  that Dr. Collingwood engaged in to produce this table?
24     A. I didn't look one way or the other.
25     Q. So sitting here today you haven't identified

107

1  any errors?
2      A. I didn't look one way or the other.
3      Q. I'm just asking, sitting here today you have
4  not identified any errors?
5      A. My answer is still I didn't look one way or the
6  other.
7          I think when you ask an expert if they
8  identified error, it has implicit in it a suggestion
9  that the expert looked. And so I want to clarify that
10  I didn't look one way or the other. I don't know if
11  there are errors in it. But I'm not going to validate
12  the data, either.
13     Q. You are not going to offer an opinion that
14  there were errors in the approach that Dr. Collingwood
15  used to produce this table, are you?
16     A. As I sit here, I don't have an opinion one way
17  or the other. Like I said, I haven't looked at it.
18     Q. All right. So Dr. Collingwood shows in this
19  table that if you -- well, let's take a step back. So
20  you agree that you can use the margins of error
21  directly reported by the Census Bureau at the county
22  level to calculate a margin of error for the black
23  CVAP proportion of each county, correct?
24     A. Well, I think what I said was this is something
25  I considered and looked and didn't find guidance one

108

27 (Pages 105 to 108)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 28 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  way or the other.  I thought the safest way to proceed
2  was to use the same levels across the board.  So I
3  don't agree or disagree one way or the other.
4     Q.  With the way Dr. Collingwood calculated margin
5  of error?
6     A.  I don't know if there's a reason to do it or
7  not.  I figured you would be safe using the same
8  Census level across the board in calculating from
9  there, rather than mixing up or mixing and matching
10  Census levels.  I don't know one way or the other if
11  that's acceptable or not.
12     Q.  Why would mixing and matching Census levels
13  matter for the equation that we looked at from chapter
14  8 of the handbook?
15     A.  Oh, gosh, I don't know.  But as we have gone
16  through the weeds here, we have seen all sorts of
17  pitfalls that can pop up using this Census data.  So
18  it's one of those unknown unknowns that made me
19  nervous when I was doing this.
20     Q.  Is the Census level an input into the margin of
21  error?
22     A.  I don't see it, but, like I said, I wasn't
23  comfortable putting different levels of Census data in
24  for calculating the error margin.  I thought it would
25  be safer to use the same level across the board.

109

1     I haven't seen any instruction one way or
2  another in the Census data.  There's no citation in
3  Dr. Collingwood's work, so I can't say one way or
4  another that it is safe to use what Dr. Collingwood
5  does.  I'm not disputing it, either.  I just don't
6  know.
7     Q.  The margin of error formula doesn't know that a
8  particular region is a block group, correct?
9     A.  No.
10     Q.  Can you think of any reason why it would be
11  appropriate to combine a block group with another
12  block group, but not combine a block group with a
13  county for purposes of the margin of error formula?
14     MR. STRACH:  Objection.
15     A.  You can ask me this as many ways as you want,
16  but the answer is going to be the same.  I don't know
17  one way or another.
18     The whole point is that there's a lot of
19  pitfalls in the Census data and it seems safe to me to
20  use the same level across the board.  I don't see any
21  citation one way or the other suggesting you ought not
22  do it that way.
23     Q.  Okay.
24     A.  I don't know.
25     Q.  Are all block groups the same size?

110

1  geographically?
2     A.  No.
3     Q.  Okay.  So when you are combining block groups
4  you are combining geographic regions that are of a
5  different physical area, correct?
6     A.  Yes.
7     Q.  And when you are combining block groups, you
8  are combining geographic regions that have different
9  populations, correct?
10     A.  Correct.
11     Q.  Okay.  So stepping away from the question of
12  combining different geographic regions for a moment, I
13  just want to ask you a basic question about Census
14  Bureau's calculation of margins of error at the county
15  level.
16     So you agree the Census Bureau directly
17  reports margins of error at the county level for black
18  CVAP and total CVAP, correct?
19     A.  Correct.
20     Q.  And you use those margins of error to directly
21  calculate margin of error for black CVAP proportion,
22  correct?
23     A.  Correct.
24     Q.  Okay.  So, in other words, the black CVAP
25  percentage margin of error at each county -- let me

111

1  start again.
2     In other words, the black CVAP percentage
3  margin of error for each county is known?
4     A.  Yes.
5     Q.  Okay.  Dr. Collingwood in his rebuttal table 2
6  shows that your method of combining block groups if
7  applied at the county level would produce margins of
8  error that are significantly higher than the known
9  black CVAP percentage margin of error reported by
10  Census Bureau at the county level.  Isn't that true?
11     A.  That's what it suggests, yeah.
12     Q.  You have no reason to dispute that?
13     A.  I don't.
14     Q.  Okay.  So, for example, his rebuttal table 2
15  shows under your method of combining block groups, you
16  would get a margin of error for the black CVAP
17  percentage in Bertie County of plus or minus 4.4
18  percentage points after adjusting for your coding
19  errors.  Is that right?
20     A.  I think that's right.
21     Q.  Okay.  The Census Bureau directly reports a
22  margin of error of plus or minus .72 percent.  Is that
23  right?
24     A.  Right.
25     Q.  Okay.  For every single county that

112

28  (Pages 109 to 112)

1    Dr. Collingwood analyzed in rebuttal table 2, you get
2    the same result that your method of combining block
3    groups produces margins of error that are higher than
4    the margins of error directly reported for counties by
5    the Census Bureau.  Is that correct?
6        A.  Well, that's right.
7        Q.  Okay.  Doesn't that suggest to you that your
8    method for calculating margins of error inflates the
9    margin of error?
10       A.  Well, I don't know.  This is a nice example of
11   what I was kind of suggesting about unknown unknowns
12   before.  I think on a spatial level if I suggested
13   calculating everything from the block group level to
14   keep things consistent across your levels of
15   estimation, spatially there wouldn't be anything wrong
16   with that.  Dr. Collingwood suggests this as a
17   potential shortcoming.
18            I don't know if there are shortcomings
19   going the other direction, using county level
20   groupings to estimate things and then combining with
21   block group groupings.  I just don't know.  We are
22   both estimating from reported Census data.
23       Q.  All right.  Let's flip to the --
24       A.  If we are going to a new topic, can I suggest
25   lunch?  I think ours is probably getting cold.

113

1    his rebuttal table 2 is that if you sum the margins of
2    error for each individual block group you will get a
3    higher margin of error than you would get for the
4    entire region containing those block groups.  Is that
5    true?
6            MR. STRACH:  Objection.
7        A.  You will get a larger error margin in these
8    counties that he investigates than summing the block
9    groups.  I don't know how far that generalizes.
10       Q.  You mean you get a larger margin of error by
11   summing the block groups than you do if you take the
12   margin of error for the county containing the block
13   groups?
14           MR. STRACH:  Objection.
15       A.  For the counties he looks at.  Again, this
16   transcript follows me.  I don't know if this is a
17   generalizable principle that he's identified or not.
18   That's true of the 10 counties he looks at.
19       Q.  One of the counties he looks at is Pasquotank
20   County, right?
21       A.  Yes.
22       Q.  Okay.  So if you add up the margin of error for
23   the block groups in a portion of Pasquotank County,
24   you are likely to get a higher margin of error than
25   the true margin of error for that portion of

115

1        Q.  Sure.  We're sort of related, but this is a
2    fine place to break.
3        A.  I don't have a problem wrapping up.
4        Q.  Probably have about half a page more questions
5    on sort of a related topic.  Totally up to you?
6        A.  That's fine.  I've just been informed reliably
7    by counsel that Panera is running slow today, so it is
8    actually not getting cold.
9        Q.  Okay.  All right.
10           Let's flip to page 33 of your report.
11       A.  (Witness complies.)
12       Q.  Do you have an understanding of whether the
13   majority of the population of Pasquotank County falls
14   in Mr. Esselstyn's demonstration districts rather than
15   the adjoining district?
16       A.  I don't, but I would suspect it's the majority.
17       Q.  Okay.  Do you agree that the actual margin of
18   error for the black CVAP proportion of a region
19   containing, say, 20 block groups will be lower than
20   the margin of error you get if you were to sum the
21   margins of error for each of those 20 block groups?
22           MR. STRACH:  Objection.
23       A.  I have no idea what you just asked.  I'm sorry.
24       Q.  Okay.  Well, let me try to rephrase.
25           So what Dr. Collingwood demonstrates in

114

1    Pasquotank County.  Is that true?
2            MR. STRACH:  Objection.
3        A.  No.  Neither Dr. Collingwood, nor I can make
4    that claim.
5            Inflated variance could come from a part
6    outside the district.  We just don't know.  I should
7    say any inflated variance could come from outside the
8    district, we just don't know.
9        Q.  So you're saying it is possible that the
10   inflated variance of the margin of error is entirely
11   attributable to block groups that are outside of the
12   demonstration district?
13           MR. STRACH:  Objection.
14           Go ahead.
15       A.  Yeah, I'm saying we don't know.  Any inflated
16   variance could be attributable to the part that's
17   outside the district.
18       Q.  Any reason to think that would be the case?
19           MR. STRACH:  Objection.
20       A.  No.  We don't know means we don't know.  We
21   just don't know where any inflated variance is coming
22   from.
23           We have a sample of 10 counties that he's
24   looked at of the 3,000 plus in the United States, so I
25   don't know if this is like a generalized issue or

116

29 (Pages 113 to 116)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 30 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  something that is very specific to this portion of
2  North Carolina, or within this portion of North
3  Carolina, if it is, you know, a rural versus urban
4  thing.  I just don't know.
5        So, no, we can't make that claim.  I don't
6  think Dr. Collingwood makes it either, unless I missed
7  it.  I might have.
8    Q.  So you don't think you can infer a general
9  principle from this rebuttal table 2 that if you sum
10  up margins of error for subgroups within a region, the
11  margin of error is likely to be higher than for the
12  region itself?
13        MR. STRACH:  Objection.
14        Go ahead.
15    A.  I don't know.  You certainly can't do it on the
16  basis of 10 counties.
17    Q.  Okay.
18    A.  We're ultimately all estimating the final
19  variance.  I don't know if the estimation formula is
20  conservative or not.
21    Q.  Can you look at page 18 of your report?
22    A.  (Witness complies.)
23    Q.  You say on page 18:  "However, because the
24  population of the district is smaller than the
25  population for all the block groups in the district

117

1  and because error margins are inversely related to
2  population, the actual error margin for the district
3  will likely be somewhat larger."
4        Do you see that?
5    A.  Yes.
6    Q.  You have no way to know whether that's true, do
7  you?
8    A.  No.
9    Q.  Okay.
10    A.  But the only reason that I don't have a way to
11  know that, it is generally true that as you eliminate
12  observations, your error margins grow.
13        There's a little slight caveat in there
14  that it is related to the variance.
15        Now, for proportion, that's different,
16  because the variance is the proportion.  But when you
17  are doing count data, you need to know the variance of
18  the count data.  So it is possible that as you
19  eliminate population expanding the error margins, you
20  have made a change to the variance as well that
21  counteracts that change.
22    Q.  I just want to -- did you look at error margins
23  for block groups in Pasquotank County to verify that
24  the error margins are inversely related to population?
25    A.  Well, here we are talking about the error

118

1  margin of the district and generally speaking error
2  margins are related to the population.  The
3  traditional formula for the error margin is whatever
4  your Z statistic is times the square root of the
5  variance over the number of observations.  So as you
6  pull people out, that denominator gets smaller and
7  your error margin increases.
8        But it is possible that as you pull people
9  out, you are altering the numerator as well, because
10  the variance will change enough.  It is possible I
11  suppose that it changes enough to offset the changes
12  in numerator, which is why I leave that wiggle room
13  there.
14        But generally speaking error margins are a
15  function of the number of people in your sample.
16    Q.  Okay.  The number of people in the sample is
17  different than the population of the block group.
18  Isn't that true?
19    A.  Well, no, because here the CVAP, we are talking
20  about the CVAP and that is something that's estimated.
21  It is your N.
22    Q.  Right.  But the error margins, when you say
23  error margin are inversely related to population, you
24  mean the error margins are inversely related to the
25  number of responses for that particular block group in

119

1  the ACS survey, don't you?
2    A.  Well, right.  But it is important to remember
3  that in the ACS, that's an estimate as well.  That's
4  why we are sitting here.  So when we are talking in
5  the context of CVAP, population that we are talking
6  about is all being estimated.  The N is an estimate.
7  That's part of why you get this complicated formula
8  for the error margins, because both your denominator
9  and numerator are estimates.
10    Q.  I just want to understand the statement you
11  make on page 18.  You say:  "However, because the
12  population of the district is smaller than the
13  populations for all the block groups in the district
14  and because error margins are inversely related to
15  population, the actual error margin for the district
16  will likely be somewhat larger."
17        And you didn't do anything to verify that
18  the error margins for block groups in Pasquotank
19  County are inversely related to the population of
20  block groups in Pasquotank County, did you?
21        MR. STRACH:  Objection.
22        Go ahead.
23    A.  Yeah, I think I've answered this a couple
24  different ways.  I think I understand getting hung up
25  on the term population, which normally when we are

120

30 (Pages 117 to 120)

Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 31 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  doing this stuff we are talking about the Decennial
2  Census numbers.
3         We are not talking about Decennial Census
4  numbers now.  We are talking about ACS data here.  The
5  population through the ACS data, the number of
6  citizens, which is our denominator, is itself
7  estimated, which is part of why you have this
8  complicated formula for the error margins.
9         I think that's where we're getting hung up
10 is mixing and matching population as reported by the
11 Decennial Census with population as reported by the
12 CVAP.
13     Q.  I just want to know what work did you do to
14 verify the statement that error margins are inversely
15 related to population in block groups in Pasquotank
16 County?
17     A.  Because error margins are inversely related to
18 population.  The number of people in your sample is
19 part of the denominator of the error margin
20 calculation.
21     Q.  Can you go to rebuttal table 3 on page 15 of
22 Dr. Collingwood's rebuttal report?
23     A.  Okay.
24     Q.  You understand that this is a table that
25 calculates margin of error for black CVAP percentage

121

1      A.  Yes.
2      Q.  Okay.  So the first block group has a lower
3  population than the second block group.  Is that
4  right?
5      A.  Lower estimated population, yes.
6      Q.  Okay.  It also has a lower estimated margin of
7  error.  Is that true?
8      A.  Yes.
9      Q.  Okay.  So that's inconsistent with your
10 conclusion that error margins are inversely related to
11 population for the block groups in Pasquotank County,
12 isn't it?
13         MR. STRACH:  Objection.
14     A.  No, because they are inversely related.
15 There's also a numerator, which is the variance, which
16 is why I don't say conclusively that the error margins
17 will be smaller.  I just say likely.
18     Q.  The numerator is black CVAP, right?
19     A.  It is the variance, I think.
20     Q.  What's the variance?
21     A.  It's the spread of the data.  How far from the
22 mean the data tend to be.
23     Q.  You are saying the variance is the numerator in
24 what proportion?
25     A.  When the Census is calculating the error

123

1  using data at the county level and then data at the
2  block group level for Pasquotank, because Pasquotank
3  is split.  Is that right?
4      A.  Correct.
5      Q.  Okay.  Do you see the block groups listed near
6  this table?
7      A.  Yes.
8      Q.  All right.  You see the first block group has a
9  total CVAP population of 890 people?
10     A.  Let me bring this up on my computer screen.
11         I'm not trying to filibuster.  I can
12 actually increase the size on my computer.
13         All right.  This is much better.  Okay.
14 Where are we?
15     Q.  You see the first block group listed in this
16 table has a total CVAP of 890 people?
17     A.  That's estimate, yes.
18     Q.  Okay.  The second block group listed has a
19 total CVAP estimate of 965 people?
20     A.  That's right.
21     Q.  Okay.  Do you see that the margin of error for
22 CVAP for that second block group is 305?
23     A.  Yes.
24     Q.  Margin of error for the CVAP for the first
25 block group is 174?

122

1  margins for -- well, so let's go straight to formula
2  6.  You have, the margin of error for p-hat is 1 over
3  Y.  So that's the fraction for total population is on
4  the bottom.  And then it is the margin of error for,
5  that's squared for x-hat minus the point estimate
6  squared, which is fraction times the margin of error
7  for y-hat squared.  So those error margins are related
8  to variance.
9         Now, if we had chapter 7 I think,
10 generally speaking the error margin for count data is
11 your Z statistic times the square root of the variance
12 over the number of observations.  So when you're using
13 count data, it's a twofold, there's two parts to it.
14 There is your number of observations, estimate of
15 CVAP, and then the variance.  So what's happening here
16 is some of those block groups probably have a greater
17 variance, which is why they have the larger error
18 margins.
19     Q.  All right.  I want to look at the third block
20 group you see that is listed, the third block group in
21 rebuttal table 3 has a black CVAP of 525.  Do you see
22 that?
23     A.  Yes.
24     Q.  Okay.  Do you see that the margin of error for
25 the black CVAP proportion is 237.45?

124

31  (Pages 121 to 124)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 32 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    A.  Yes.

2    Q.  All right.  Next block group has a black CVAP

3 of 290.  Do you see that?

4    A.  Yes.

5    Q.  The margin of error for the black CVAP estimate

6 is 219.45?

7    A.  Yes.

8    Q.  All right.  So, again, here a block group in

9 Pasquotank County with a lower black CVAP has a lower

10 margin of error than the block group with the higher

11 black CVAP.  Isn't that true?

12    A.  Yeah, probably has lower variance --

13    Q.  Okay.

14    A.  -- which is going to happen as you approach

15 zero, too.  I mean, there's no way that the district

16 with N of 40 is going to have a variance of 700, for

17 obvious reasons.

18    Q.  Okay.  So these error margins are not inversely

19 related to population, correct?

20    A.  Error margins are inversely related to

21 population.  But there's also a denominator in there

22 that can overwhelm the change in the number of

23 observations, which is why I say likely.  I don't say

24 definitely.

25    Q.  The error margins that we just looked at in

125

rebuttal table 3 are not inversely related to

2 population, are they?

3    A.  Yes, they are.  They just have a denominator as

4 well that is the variance, which overwhelms the effect

5 of the number of observations.

6        But the formula for error margins has the

7 number of observations in the denominator, which is

8 why they are inversely related.  There are other

9 effects that can overwhelm that, though, like an

10 increase in the variance.

11    Q.  If a portion of a block group that is excluded

12 from a demonstration district has fewer responses on

13 the American Community Survey than the portion of the

14 block group that is included in the demonstration

15 district, the true margin of error for the included

16 portion might actually be lower than the margin of

17 error for the entire block group.  Is that true?

18        MR. STRACH:  Objection.

19    A.  Depending on what happens with the variance of

20 the remaining portion.  Generally speaking, no.  But

21 if the portion that remains has a much lower variance,

22 you could end up with a lower error margin.

23    Q.  Okay.  And you didn't do any work in this case

24 to determine whether the portions of block groups that

25 are in the demonstration districts have lower

126

variances than the portions that are outside the

2 demonstration districts, correct?

3    A.  No.  None of us can do that.  It is impossible,

4 because only the Census has those individual responses

5 that you can calculate variances from.

6    Q.  Okay.

7        MS. THEODORE:  This is a good place to

8 break for lunch.

9        (Recess taken.)

10 BY MS. THEODORE:

11    Q.  So before we move off Dr. Collingwood, we were

12 talking about rebuttal table 2.  I just want to ask

13 you more generally:  Do you have a basis to dispute

14 any of the data or analysis in Dr. Collingwood's

15 rebuttal report?

16        MR. STRACH:  Objection.

17    A.  Well, I mean, there's -- I think I testified

18 early on that I didn't read the whole thing, so -- or

19 I didn't pay close attention to the whole thing.  I

20 know there's part of it responding to another expert,

21 Dr. Alford that I didn't read at all.

22        But I think generally speaking I agree

23 with his data.

24    Q.  Are you disputing any conclusion in his

25 rebuttal report?

127

1    A.  Well, like I said, I don't really know one way

2 or another on the, calculating the error margin from

3 counties versus block groups.  I'm not saying that to

4 be disruptive or ornery.  I'm saying I really don't

5 know.  I'm actually kind of curious and would love to

6 see citation on that.

7        But, no.  Generally speaking I think we

8 are on the same page.

9    Q.  Okay.

10    A.  I guess -- well, looking through it, he has a

11 dot plot analysis.

12    Q.  Dr. Trende, we are going to get to that.  Why

13 don't we just say excluding the dot plot analysis, are

14 you disputing any conclusion in Dr. Collingwood's

15 report?

16    A.  Yeah, I think we are generally on the same

17 page.  Can I just say I'm incorporating by reference

18 whatever the answers are to Mr. Esselstyn's dot plot

19 analysis to Dr. Collingwood?

20    Q.  You can say whatever you like, Dr. Trende.

21        All right.  Let's move on.  What is a

22 normal distribution?

23    A.  Do you want the definition of probability

24 density function?  Or, as I recall, it is one over the

25 square root of two pie times the standard deviation,

128

32  (Pages 125 to 128)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 33 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    exponentiated negative X minus mu squared over 2
2    variance, I think.
3        Q.  Okay.  When the Census Bureau is calculating a
4    margin of error for a black CVAP proportion, that
5    margin of error is based on a normal distribution.  Is
6    that correct?
7        A.  Yeah.  I think that's right.  I certainly
8    recognize the formula from that.
9        Q.  Okay.
10       A.  I don't think I've ever seen them actually come
11   out and say that, but maybe they do.
12       Q.  In a normal distribution 50 percent of the
13   values are higher than the point estimate and
14   50 percent of the values are lower than the point
15   estimate.  Is that true?
16       A.  Yes.
17       Q.  Okay.  So if a point estimate is above
18   50 percent, is it true as a statistical matter that is
19   more likely than not that the true value of the --
20   I'll start again.
21          If the point estimate for black CVAP is
22   above 50 percent, isn't it true as a statistical
23   matter that it is more likely than not that the true
24   value of the black CVAP is above 50 percent?
25          MR. STRACH:  Objection.

129

1        A.  No.
2        Q.  Why not?
3        A.  Because what's normally distributed are the
4    responses around the true population value, not the
5    true population value around the responses.  If we
6    took 100 polls, those polls would be normally
7    distributed around the true population values.  So if
8    the Census, if the Census repeated this 100 times, the
9    BCVAP estimates would be normally distributed around
10   the true population value.  It's a common mistake.
11       Q.  Okay.
12          MS. THEODORE:  Can you read back that
13   explanation, Mr. Bailey?
14          (The record was read back as requested.)
15   BY MS. THEODORE:
16       Q.  So you are saying if the Census repeated the
17   ACS 100 times, 50 percent of those values would be
18   above the point estimate?
19       A.  No.  In expectation, which is an important
20   caveat, 50 percent of those poll values would be above
21   the true population value.  So 50 percent of the -- if
22   you took 100 polls in expectation, 50 point estimates
23   would be above the true population value, and 50 point
24   estimates would be below the true population value.
25          That's why something like the RealClear

130

1    Politics averages work, because we get multiple polls
2    and it can give us a better view of what the true
3    population value is by estimating -- by averaging
4    those point estimates.  Or 538, if you prefer them.
5        Q.  All right.  To put this in more concrete terms,
6    if the point estimate is 50.5, and you assume a normal
7    distribution for margin of error, if you did 100 runs
8    of the ACS survey, 50 of those runs would be above
9    what number?
10       A.  The true population.  If the true population
11   were 50.5, and you ran the ACS 100 times in
12   expectation, 50 of those poll results would be above
13   50.5; 50 of those poll results would be below it.
14          If true population were 49.5 percent, and
15   you run the ACS 100 times, 50 percent of those poll
16   results would be above 49.5 percent, 50 percent will
17   be below.
18          You are making -- this line of inquiry is
19   making the classic mistake of frequentism, which is
20   assuming that the -- you are trying to make statements
21   about the likelihood of the true population value and
22   you're not.  You're making statements about the
23   likelihood of getting this type of result, given a
24   certain population value.
25          All the error margin means is that if you

131

1    repeat -- all a 90 percent confidence interval means
2    is if you repeated the poll 100 times, 90 percent of
3    those error margins would contain the true population
4    value somewhere within them.  We don't know where and
5    we can't say where is more likely than not within
6    those confidence levels.
7           The answer that it gives you some idea
8    about the likelihood or the probability of a true
9    population value is one of those failure statistic
10   comps answers.
11       Q.  So with respect to a point estimate that's 50.5
12   let's say, and let's suppose that the margin of error
13   at the 90 percent confidence interval is .4, what
14   statistical statement do you make about the
15   likelihood that the true value is above 50 percent?
16       A.  I can say we have -- oh, that it's above 50
17   percent?  If we are going to accept 90 percent
18   confidence, P value of .1 as sufficient, then you
19   would say you have, these data are sufficiently
20   inconsistent with the true population value being
21   50 percent, that we would reject this possibility and
22   accept the hypothesis that it is higher.
23          Or you could say, you know, 90 percent of
24   the time, since 90 percent of the time that confidence
25   interval is going to include the true population

132

33  (Pages 129 to 132)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 34 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    value, we can have a pretty high degree of confidence
2    that the true population value is somewhere between
3    50.1 and 50.9.
4        Q.   Okay.  You say on page 24, footnote 9 of your
5    report that "most social science journals still
6    require 95 percent confidence to support a claim."
7            Do you see that?
8        A.   Yes.
9        Q.   What work did you do to support the conclusion
10   that most social science journals require 95 percent
11   confidence?
12       A.   I'm sorry, which footnote are we in?
13       Q.   You know what I may --
14       A.   This is what I get for trusting the lawyers.
15       Q.   It is the last sentence of footnote 9, page 24.
16       A.   Okay.  Yeah, most social science results that I
17   see reported are to 95 percent confidence.  So
18   sometimes you will see them reported to 90 percent as
19   a finding, but it is generally 95 percent.
20       Q.   This is just based on your review of articles
21   in social science journals, you have seen a lot that,
22   where numbers are reported at 95 percent?
23       A.   It is my experience.  I mean, as someone who
24   has been through grad school fairly recently and
25   watched a lot of people trying to get results

133

1    published, and submitted stuff myself, you are going
2    for 95 percent confidence.  But sometimes you can get
3    stuff published with 90 percent.  I'm not really aware
4    of results being published below that, but maybe they
5    exist somewhere.
6        Q.   You didn't do any sort of quantitative analysis
7    to conclude that most social science journals require
8    95 percent?
9        A.   No.  It is based on my experience.
10       Q.   Okay.  You reviewed demonstration districts A
11   through D described in Mr. Esselstyn's initial report?
12       A.   Correct.
13       Q.   You agree that demonstration district A and C
14   are majority black districts?
15       A.   I think that's right, yes, because they cross
16   the ballot threshold.
17       Q.   Okay.  Are you aware that the North Carolina
18   legislature announced a set of redistricting criteria
19   when it drew the new legislative maps in 2023?
20       A.   Yes.
21       Q.   Okay.  Your report doesn't cite those criteria
22   or rely on them.  Is that correct?
23       A.   Correct.
24       Q.   Okay.  So your report doesn't offer any opinion
25   as to whether any demonstration district drawn by

134

1    Mr. Esselstyn complies with those redistricting
2    criteria, correct?
3        A.   Yeah, I think that's right.
4        Q.   Okay.  Similarly, your report doesn't offer any
5    opinion as to whether any demonstration map drawn by
6    Mr. Esselstyn complies with the redistricting
7    criteria?
8        A.   That's right.
9        Q.   Okay.  You don't dispute that every
10   demonstration district drawn by Mr. Esselstyn is as
11   compact or more compact than the enacted Senate
12   districts 1 and 2, correct?
13       A.   I haven't looked at it one way or the other, so
14   I don't dispute it or affirm it.
15       Q.   Okay.  Similarly, you don't dispute that every
16   demonstration map drawn by Mr. Esselstyn is as compact
17   or more compact than the enacted 2023 Senate map,
18   correct?
19       A.   I haven't looked at it one way or the other, so
20   I don't dispute it or not dispute it.
21       Q.   You are not offering any opinions about
22   compactness in this case, are you?
23       A.   I don't believe so.
24       Q.   Okay.  Your report doesn't offer any opinion
25   about whether any of Mr. Esselstyn's demonstration

135

1    districts are reasonably configured, correct?
2        A.   I don't know if that's in there or not.  I
3    don't think so.
4        Q.   Okay.
5        A.   Reasonably configure is like a legal term of
6    art.  There might be things that relate to that as a
7    legal term of art, but in my mind, no.
8        Q.   Okay.  Same with the maps, your report doesn't
9    offer any opinion as to whether any demonstration map
10   is reasonably configured.  Is that correct?
11       A.   Yes.  It's the same answer.  Reasonably
12   configure is a legal term of art.  So I don't know how
13   opinions I offer might relate to it, but in my mind,
14   no.
15       Q.   Did you review Mr. Esselstyn's demonstration
16   district E in his rebuttal report?
17       A.   No.
18       Q.   So you haven't formed any opinions about
19   demonstration district E?
20       A.   I have not.
21       Q.   All right.  On page 25 you discuss
22   Mr. Esselstyn's demonstration district A, correct?
23       A.   Yes.
24       Q.   All right.  You say, "because every county in
25   the district has at least 2,364 black residents of

136

34  (Pages 133 to 136)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 35 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

voting age, all counties in the map are required to
achieve a majority black district."
          Did I read that correctly?
     A.  Yeah, that one probably could have been
wordsmithed a little better, but yes.
     Q.  What did you mean by that sentence?
     A.  I didn't mean that was the only configuration
in the region that could possibly be done.  I meant
that you had to look at the black population in every
one of the counties within the district as drawn to
get to 50 percent plus 1.
          So this dates back to my testimony in the
Nairne case where I used something called the moment
of inertia approach, and in that case I used it
because there were districts that were drawn up to
like 58 percent BVAP.  And so you could make a case,
looking at the distribution of the entire black
population was unfair, because there might be a small
concentrated version in the city that would get you to
50 percent plus 1.
          So all I'm trying to say here is that for
these districts as constituted, pretty much every
black individual in the districts are needed to get to
50 percent plus 1.
     Q.  Demonstration district A has a BVAP of

                                                    137

51.47 percent?
     A.  Right.
     Q.  Your view is that every, pretty much every
black person is needed to get above 50 percent plus 1?
     A.  You can exclude from your analysis I guess
440 -- I'm sorry, that's not right -- 1240, give or
take.  And since every county has at least 2,364
residents, black residents of voting age, you need
some population from every county.
          I guess what I'm saying is if this
district were 70 percent BVAP, let's say, you wouldn't
necessarily have to look at the whole county to
identify the black population that is sufficient to
constitute 50 percent plus 1.  You know, you might
say, well, you only need the black population within
this district in one county to reach that threshold.
But that's not the case here.
     Q.  Okay.  It is also true that you couldn't delete
one of these counties while still meeting the total
population threshold, correct?
     A.  Right.  What I'm saying -- well, let's try this
a different way.  If every black resident of the
county, except maybe 20, let's say you had 20 black
residents in Bertie County, everyone else is in Vance
County, and then the other counties had zero black

                                                    138

residents, for purposes of population compactness you
would only have to look at the black population in
Vance County, because on its own that population is
sufficient to be 50 percent plus 1 of the voting age
population in that district as a whole.  So I think it
would be unfair to plaintiffs to look at the
distribution across Vance and Bertie Counties.
     Q.  Okay.
     A.  But that's not the case here.  The black
population that gets you to 50 percent plus 1 is
necessarily spread across all of these counties.
     Q.  All right.  You are not offering a moment of
inertia analysis in this case, correct?
     A.  No.
     Q.  All right.  Okay.  Then you say later in the
same paragraph that "if counties were to split, which
I understand to violate the Stephenson Rule, only
three precincts at the eastern end of Washington
County could be removed while maintaining a BVAP of
50 percent or two precincts at the western tip of
Vance County could be removed."
          Did I read that correctly?
     A.  Correct.
     Q.  All right.  What work did you do to reach the
conclusion that those were the only precincts that

                                                    139

could be removed?
     A.  Well, again, if you are looking at the, if you
are thinking of this in terms of population
compactness, which is what I'm thinking in terms of,
you way, okay, could things be snipped off of either
end -- I suppose there's black populations that could
be snipped off the center, which doesn't really
make the black population more compact.  So I just
looked at the precincts in the two counties at the
ends and looked to see how many precincts could be
removed before the black population fell below
50 percent.
     Q.  All right.  Let's turn to page 60 of
Mr. Esselstyn's rebuttal report, which I believe we
marked as Exhibit 12.
     A.  (Witness complies.)
          Page what?
     Q.  Sorry.  Page 60 of the PDF.  Are you looking at
a hard copy?
     A.  Yeah, but I can bring up the PDF.
          Okay.
     Q.  You see he demonstrates here that precincts
could be removed from Hertford County without dropping
the BVAP in demonstration district A below 50 percent?
     A.  Yeah.  Like I said, that doesn't help the

                                                    140

                                         35  (Pages 137 to 140)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 36 of 95
DISCOVERY COURT REPORTERS     www.discoverydepo.com        1-919-424-8242

population compactness. I was just looking at the ones at the ends.

Q. You see he also shows that a precinct could be removed from Bertie County without dropping the BVAP in demonstration district A below 50 percent?

A. Like I said, that doesn't help the population compactness, because you're taking a chunk out of the middle of the district. That's why I only looked at the ends.

Q. Your testimony is that Hertford County is in the middle of the district?

A. Compared to Washington or Vance, yes.

Q. Okay. I just want to sort of focus on the sentence you wrote. You say, "if counties were to be split only three precincts at the eastern end of Washington County could be removed while maintaining a BVAP of 50 percent or two precincts at the western tip of Vance County could be removed."

Is that statement accurate?

A. I'm writing in the context of population analysis. So, yeah, I probably could have wordsmithed it better to be clearer, but in context, yes, it is right.

Q. In context, and the context is?

A. Analysis of the distribution of the population.

141

Q. All right. Can you -- what would you have to add to that sentence to make it accurate?

A. I think it is accurate in the broader context. I'd make it more precise by probably adding a sentence earlier explaining a little better what's going on with the population compactness. Maybe a paragraph about the work in Nairne that I'm trying to distinguish from.

Q. Are you trying to say that these are the only two options if you wanted to make the county -- the district more compact?

A. No.

Q. So can you explain what you are saying about compactness? I'm struggling to understand the context that you say is missing?

A. I'm not sure how much clearer I can be. I admit it is not wordsmithed as well it could. It could probably use a little more explication in the context, which is that this is talking about the distribution of black voters within the county.

And, yes, suppose it is true you could remove black population from Halifax County even, right in the center, and maybe drop the BVAP below 50 percent. But that doesn't make your black population any more compact, because you are taking it

142

towards the center. You are going to make population more compact by removing it from one of the extremes and that is Vance or Washington County here.

Q. Your testimony is that it wouldn't be possible to make this distribution more compact by removing black population from Hertford County?

A. No.

MR. STRACH: Objection.

A. I think there might be also, you know, I understand that there is a kind of fundamental disagreement in these cases between plaintiffs and defendants about whether the, whether Gingles requires a compact district and whether that is independent of the compactness of the population of the district.

I understand defendants here to be arguing that what really matters is the compactness of the population of the district, which is a separate inquiry. So you would make the district less compact by removing that chunk from Bertie, I'm sure, you would fill less of the minimum balance circle and perimeter would increase. But you also would make the population less compact, because you are removing a chunk of the population near the district centroid. The way you would make the population more compact would be by removing it from the extremes, which here

143

would be Vance or Washington County.

Q. Okay. As written is it not true that the only way to maintain a BVAP of 50 percent in demonstration map A is to remove the three districts in Washington or the two districts in Vance, correct?

A. No. I still don't agree with that, because this is in the context of discussions of the population. It could have been made clear I admit with a little bit of better explication beforehand. And I can understand the source of confusion.

Q. Okay. Because this sentence says nothing about the context of compactness, correct?

A. That sentence does not say compactness, but that's the lawyerly thing of taking a sentence and ignoring the rest of the area, the rest of the section which focuses on population.

Q. Okay. The word compactness doesn't appear anywhere in the paragraph containing that sentence, does it?

A. No, but it's in a section dedicated to talking about population, so I stand by this sentence.

Q. All right.

A. If I had to do it over, I would write the paragraph a little clearer.

144

36 (Pages 141 to 144)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 37 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    Q.  Have you looked at the transcript of
2  Mr. Esselstyn's deposition in this case?
3    A.  No.
4    Q.  He was asked a question in which counsel
5  suggested that some of your dot density plots or your
6  choropleth plots have been relied on by the U.S.
7  Supreme Court.  Is it your view that the U.S. Supreme
8  Court has relied on your dot density plots or
9  choropleth plots in prior cases?
10    A.  I don't know.
11    Q.  Okay.  Sitting here today you can't identify a
12  case from the U.S. Supreme Court that has relied on
13  your dot density plots or choropleth plots?
14    A.  I honestly don't know.
15    Q.  I am asking if you can identify a U.S. Supreme
16  Court case that has relied on your plots?
17    A.  I know exactly what you are asking me.  My
18  answer is I don't know.
19    Q.  So you can't identify one?
20        MR. STRACH:  Objection.
21        Answer it again.
22    A.  My answer is still the same answer.  I don't
23  know.
24    Q.  Do you know of any 4th Circuit case that has
25  relied on any of the dot density plots or choropleth

145

plots that you use in this case?
2    A.  No.  Maybe I should be more vain and keep up to
3  date on when courts rely on my stuff, but I really
4  don't know.
5    Q.  Has any court to your knowledge relied on your
6  choropleth plots or dot density plots?
7        MR. STRACH:  Objection.
8    A.  I mean, it is the same thing.  I really don't
9  keep a tally of courts that rely on them or that don't
10  rely on them.  I don't know one way or the other.
11    Q.  Okay.  All right.  Let's go to figure 8 on page
12  27.  That's an example of one of your choropleth maps?
13    A.  Yes.
14    Q.  All right.  How did you draw this map?
15    A.  In R.
16    Q.  Okay.  I see the legend copyright Open Street
17  Map contributors at the bottom of this choropleth map?
18    A.  Yes.
19    Q.  What does that reflect?
20    A.  The underlying map, the street map.
21    Q.  Okay.  So you took the street map from Open
22  Street Map and then you used R to shade the blocks
23  based on BVAP.  Is that accurate?
24    A.  Yes.
25    Q.  Okay.  So Open Street Map data, does that have

146

BVAP data loaded in?
2    A.  No.  No.  Open Street Map is just for the
3  background map.  I thought I should acknowledge that
4  part.
5    Q.  Okay.  Can anybody contribute to Open Street
6  Map?
7    A.  Yeah.  That's my understanding.
8    Q.  Sort of like Wikipedia for maps?
9    A.  I don't know about that, but Wikipedia does get
10  a lot of stuff right.  I don't see any suggestion that
11  the underlying map is somehow wrong here.
12    Q.  Okay.  Did you do anything to verify who
13  contributed to, who created this map, any of the Open
14  Street Map maps that you use?
15    A.  No.  If it had like New York City in the middle
16  of North Carolina, I wouldn't use it.  But I have some
17  familiarity with the geography of North Carolina,
18  which reflects this map and so I certainly don't see a
19  reason not to trust it, at least at this level.
20    Q.  Okay.
21    A.  If someone wants to suggest I-95 takes a
22  different route or the Albemarle Sound is located
23  elsewhere, you know, then I guess there's an error,
24  but I don't think there is.
25    Q.  All right.  The key on the right says that the

147

color yellow represents a Census block that is
2  30 percent BVAP.  Is that correct?
3    A.  That's -- remember I round up, but yes.  Just
4  like Mr. Esselstyn truncates his maps, I truncate mine
5  at 30 percent to 70 percent.
6    Q.  Okay.  So what color is a Census block that is
7  25 percent BVAP?
8    A.  I should also before we go down this route,
9  just put out that I'm color blind.  So if we get into
10  things that are greenish, I might give the wrong
11  answer.
12        But 25 percent would be shaded as what I
13  take to be yellow.
14    Q.  Okay.  So yellow represents Census block that
15  is between zero and 30 percent?
16    A.  Yes.
17    Q.  Okay.  And would a Census block that is
18  32 percent BVAP be rounded down to 30 percent?
19    A.  It would fall within that bin.  So it is not
20  that it is rounded.  Just like if -- everyone who
21  uses choropleth maps, it's potentially one of the
22  downsides of it, has to be bin the data.  You have to
23  decide how you're going to bin it.
24    Q.  Anything in the 30 to 35 percent range is going
25  to show up as what color?

148

37  (Pages 145 to 148)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 38 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    A. Yellow.

2    Q. So yellow color then is zero to 35 percent

3  BVAP?

4    A. Right. I guess you could say that it is

5  rounded down is a way to look at it. But, yeah,

6  that's that bin.

7    Q. And then the next bin under it would be

8  35 percent to 39.9 percent. Is that right?

9    A. Yeah.

10   Q. Then the bin under that would be 40 percent to

11  44.99 percent?

12   A. Yeah, I think that's right.

13   Q. Okay. Is there anywhere where you explain this

14  in the report?

15   A. I thought I did, but it might not be in there.

16  I guess that's why we do the deposition, right.

17   Q. Okay. Can you find anywhere where you explain

18  that in the report right now?

19   A. No. I said I thought it was in there, but it

20  might not be. That's why it's good to have a chance

21  to clarify things.

22   Q. It isn't in there, is it?

23   A. I think I said I don't know.

24   Q. Okay. Do you see there are areas in figure 8

25  that are shaded white?

149

1    A. Yeah. Those are empty blocks.

2    Q. Blocks with no population?

3    A. Yeah.

4    Q. All right. The answers that you just gave with

5  the coloring and key for figure 8, are those

6  applicable to all the other choropleth maps in the

7  report?

8    A. Yes. They all use the same rates. They all

9  fill in empty spots as white.

10   Q. Okay. You say on page 27 that "these color

11  scales on these maps are truncated at 30 percent and

12  70 percent BVAP. In my experience allowing the color

13  scale to run from 0 percent to 100 percent risks

14  losing a good deal of data and differences in the

15  crucial 40 percent to 60 percent BVAP rate are blended

16  together."

17        Did I read that right?

18   A. Yes.

19   Q. Why do you describe the 40 percent to 60

20  percent BVAP range as crucial?

21   A. Because that's where when -- that's where you

22  are at the like flipping from majority BVAP precinct

23  to minority BVAP precinct. I think that data is more

24  interesting than the difference between a 0 percent

25  BVAP precinct and 10 percent BVAP precinct.

150

1    Q. So this map, for example, allows you to

2  distinguish between a precinct -- well, sorry, a

3  precinct or a block that is 50 percent BVAP versus 55

4  percent BVAP, correct?

5    A. If I weren't color blind it probably would,

6  yes.

7    Q. Fair enough. But it wouldn't allow you to

8  distinguish between a block or precinct that's

9  75 percent BVAP versus 90 percent BVAP, correct?

10   A. Correct.

11   Q. Okay. You know, assuming that the population

12  is equal, the difference between 70 percent and the

13  95 percent is likely to have a greater impact on the

14  overall BVAP percentage of the district. Isn't that

15  true?

16   A. It would have a greater impact, yeah.

17   Q. Okay. What's the purpose of these choropleth

18  maps in your view?

19   A. I was asked to create them.

20   Q. Do you draw any conclusions about demonstration

21  district A in this report on the basis of your

22  choropleth maps of demonstration district A?

23   A. I was asked to create choropleth maps for

24  demonstration district A and I created them.

25   Q. Okay. I didn't see any conclusions in your

151

1  report about demonstration district A based on these

2  maps. Am I wrong about that?

3    A. I don't know that there's direct conclusions

4  based upon these choropleths, but I was asked to

5  create them, so I created them.

6    Q. Okay. With respect to the approach of

7  truncating the maps at 30 percent and 70 percent, you

8  say on page 27, "this approach has been accepted in

9  many courts in which I have testified and has never

10  been challenged by a court."

11        Do you see that?

12   A. Yes.

13   Q. Okay. Are you aware of any court that has

14  considered and rejected criticism that your map

15  truncated data at 30 percent and 70 percent?

16   A. I don't know.

17   Q. Okay. On page 28, I want to turn to page 28

18  where you discuss demonstration district B.

19   A. Okay.

20   Q. Okay. You state that it has 77,699 black

21  residents of voting age, correct?

22   A. 77,599.

23   Q. Sorry. Yes, you are right. Okay. Then --

24   A. We all make mistakes.

25   Q. Then you say over 11,000 of those black

152

38 (Pages 149 to 152)

Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 39 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  residents live at the top of the arm of the district
2  that extends into and splits Pasquotank County to take
3  in Elizabeth City."
4       Did I read that right?
5   A.  Yes.
6   Q.  All right.  What area are you describing when
7  you say the top of the arm?
8   A.  I don't remember if that includes Gates County
9  or not.  I didn't look into this too closely, because
10  I understand Mr. Esselstyn withdrew map B.
11   Q.  So I'm just asking you about your initial
12  report, you made this statement.  When you made the
13  statement in your initial report, what did you mean
14  when you said top of the arm?
15   A.  Well -- and I just explained it may have
16  included Gates County in there as well.  I don't
17  really remember, because I haven't looked into it that
18  closely.  My understanding is Mr. Esselstyn withdrew
19  district B.  So it seemed like a waste of client money
20  to really dig down into stuff that's B specific.
21   Q.  How did you calculate this 11,000 number in
22  your initial report?
23   A.  Again, I honestly don't remember.
24   Q.  Do you think top of the arm is a term that you
25  can define with reasonable scientific certainty?

                                    153

1   A.  I think it, if I dug into the code enough and
2  looked at it I probably could.  But as I understand
3  it, this district is no longer live, so I didn't
4  really dig into Mr. Esselstyn's rebuttal on this.
5   Q.  So your representation is that your code
6  calculates this 11,000 figure?
7   A.  I'd have to look into it.  That's what I
8  assume.  But, like I said, I haven't.  And since my
9  understanding is district B-1 isn't a live district
10  right now, I doubt if I will.
11   Q.  Sitting here today you can't tell me whether
12  the top of the arm refers to just Pasquotank County,
13  or Pasquotank County and all of Gates County, or
14  Pasquotank County and some portion of Gates County?
15   A.  That's right.
16   Q.  All right.  I want to turn to page 34.
17   A.  (Witness complies.)
18   Q.  You say here:  "This county split which barely
19  raises the BVAP of the district above 50 percent
20  appears to largely made on a racial basis."
21       Do you see that?
22   A.  Yes.
23   Q.  You are referring to split of Pasquotank County
24  and demonstration district B?
25   A.  Yes.

                                    154

1   Q.  What do you mean by "largely"?
2   A.  You may have other considerations, but the
3  split, especially in the Elizabeth City area, follows
4  along the racial contours of that area, incorporating
5  all the high BVAP and excluding the whitest portions
6  of the district.
7   Q.  This is based on your dot density map in figure
8  17?
9   A.  No.  It is the concluding section for the
10  sentence -- concluding sentence for the section, so it
11  is summarizing the analysis that precedes it.
12   Q.  Are you aware that demonstration district B's
13  boundary largely tracks the boundary of Elizabeth
14  City?
15   A.  Yes.
16   Q.  Okay.  Do you know what percentage of
17  Pasquotank County's black voting age population lives
18  in Elizabeth City?
19   A.  No.
20   Q.  Are you aware that most of Pasquotank County's
21  black voting age population lives in Elizabeth City?
22       MR. STRACH:  Objection.
23   A.  No.
24   Q.  You don't know one way or the other?
25   A.  I would assume that it does looking at the

                                    155

1  choropleth maps, but I don't know for sure.
2   Q.  All right.  So if you wanted to preserve most
3  of Elizabeth City in one district, the effect of that
4  would be to place most of Pasquotank's black residents
5  in the district that contains Elizabeth City.  Is that
6  correct?
7       MR. STRACH:  Objection.
8   A.  Well, there is no district that contains
9  Elizabeth City since he splits, introduces a split of
10  Elizabeth City.  But, yeah, I mean, whichever -- if
11  you are going to split Pasquotank County, you are
12  going to split Elizabeth City, then whichever district
13  gets most of Elizabeth City is probably going to get
14  most of the black population.
15   Q.  Did you investigate whether there were other
16  alternative designs of demonstration district B that
17  would have placed a higher percentage of Pasquotank's
18  black population in the demonstration district?
19   A.  No.
20   Q.  Okay.  Looking at your figure 17, isn't it true
21  that there are highly blue areas right outside the
22  boundaries of demonstration district B that are
23  instead left in demonstration district B-2?
24   A.  Like where?
25   Q.  Well, like in the middle, you don't see any

                                    156

39 (Pages 153 to 156)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 40 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    blue areas that are just adjoining the black
2    boundaries surrounding Elizabeth City, but aren't in
3    demonstration district B-1?
4        A.   Of course there's going to be one on this map,
5    which is showing one dot as being one person.  That
6    doesn't mean that it is highly blue.  Actually, most
7    of the clusters that I see to the extent they exist
8    are away from the boundary, but maybe a little bit to
9    the kind of southwest of the district.
10           But then when you look at the map where a
11   dot is 10 residents, it doesn't really show up.  So
12   that's probably just over plotting.
13       Q.   You don't see any -- let's turn to figure 60
14   and that's your map where the dots are 10 residents?
15       A.   Yes.
16       Q.   You don't see blue dots that are right near
17   boundaries of district 1, demonstration district 1 --
18   but aren't included in demonstration district B-1?
19       A.   I see blue dots.  I know he's not getting the
20   entire black population of Pasquotank County in there.
21           But, no, I don't see anything equivalent
22   to some of the other clusters that he includes in
23   there.  But I guess that's a judgment call.
24       Q.   You don't assert in your report that any
25   demonstration district was drawn predominantly on the

157

1    basis of race, do you?
2        A.   I mean, that's a legal finding, so no.  I just
3    say it looks like split was made largely on racial
4    basis.
5            I really dislike testifying to the
6    ultimate question, but sometimes you have to, I guess.
7        Q.   Let's go to figure 14.
8        A.   (Witness complies.)
9        Q.   It looks to me based on your map that there's a
10   block that's between I guess 70 percent and
11   100 percent BVAP that's just outside the border of
12   district B-1.  Do you see that?
13       A.   I guess this is the joys of a Zoom deposition,
14   but I assume you are -- if you look at the way that
15   Elizabeth City is split, so district 1 comes into
16   Pasquotank County kind of going through on the borders
17   of that uninhibited area.  Then it kind of zigzags
18   back around Elizabeth City and there's that little arm
19   there.  And then, yeah, to the, like -- that's what I
20   was referring to on the dot density map, to the south
21   and west of that arm it looks like maybe there's
22   certainly a block of high BVAP that isn't included.
23       Q.   All right.  In sort of the northwest portion of
24   the district you see that there are blocks included --
25   like that green area that's less than 50 percent BVAP.

158

1    Do you see that?
2        A.   Yes.
3        Q.   All right.  Mr. Esselstyn could have excluded
4    that block and raised the black population in his
5    demonstration district, couldn't he have?
6        A.   I don't know if he could have with keeping
7    equal population in continuity in mind.  You have to
8    make up that population elsewhere.
9        Q.   You don't offer an opinion in this case that
10   race predominated over compactness in drawing
11   demonstration district B, correct?
12       A.   I think I answered that I don't offer an
13   opinion on predominance in general.  I just say that
14   district lines follow -- the splits appear to be made
15   on racial basis.  I don't like testifying to
16   predominance if I don't have to.
17       Q.   All right.  Do you agree that if it's possible
18   to draw a district with a higher minority population
19   that would do less well on criteria like compactness
20   or preserving municipalities, that would be a signal
21   that the district with the lower minority population
22   was not drawn primarily on the basis of race?
23           MR. STRACH:  Objection.
24       A.   Not necessarily.  Just because you could be
25   more egregious doesn't mean what you have done is not

159

1    egregious.
2        Q.   Okay.  Is it your view that if a demonstration
3    district splits a county or municipality to achieve a
4    50 percent plus 1 black population, that means that
5    race necessarily predominated in drawing the district?
6            MR. STRACH:  Objection.
7        A.   I'll confess post Allen v. Milligan I am even
8    less certain on legal basis about than I was
9    before.  So I'll mostly defer to the lawyers there.
10   But I can think of situations where a municipality
11   gets split, but it is not in a, you know, racially
12   significant way that wouldn't trigger any type of
13   analysis there.
14       Q.   All right.  Let's go to page 35 of your report.
15       A.   (Witness complies.)
16       Q.   Here you are discussing demonstration district
17   C, correct?
18       A.   Yes.
19       Q.   Okay.  You say that discussing the black
20   residents of demonstration district C you say:  "Over
21   10,000 of those black residents live at the top of the
22   arm of the district that extends into and splits Vance
23   County."
24           Did I read that right?
25       A.   Yes.

160

40  (Pages 157 to 160)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 41 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.  Okay.  How do you define top of the arm of the
2  district that extends into and splits Vance County?
3    A.  I believe that was in Vance County.
4    Q.  Okay.  So there your view is you're defining
5  top of the arm to just include all of Vance County
6  that's in demonstration district C?
7    A.  That's my recollection.
8    Q.  But that wasn't necessarily the way in which
9  you defined top of the arm when you were talking about
10  a portion of the district that split Pasquotank
11  County?
12    A.  Yeah, it is a different shape in Pasquotank and
13  Gates.
14    Q.  What about the shape of Gates makes it more
15  appropriate to consider a part of the arm with
16  Pasquotank?
17    A.  Well, because Gates includes part of the
18  portion that branches off from the rest of the
19  district and would form an arm.
20         We could debate whether Gates is really
21  the shoulder instead of the arm, but seems like a
22  pointless debate.
23    Q.  Okay.  How would you verify this claim about
24  the 10,000 residents based on your backup data?
25    A.  I'd have to look at the relevant R code.

                                                 161

1    Q.  On page -- let's turn to page 38.
2    A.  (Witness complies.)
3    Q.  You say, "overall the odd looking arm separates
4  the black population of Vance County from the white
5  population"?
6    A.  Yes.
7    Q.  Do you see that?
8    A.  Yes.  I mean, that's on 38 to 39, but yeah.
9    Q.  Okay.  What threshold did you apply to
10  determine whether the district line separate the black
11  population of Vance County from the white population?
12    A.  This gets back to where I said the Supreme
13  Court guidance on this has been less than helpful,
14  because it usually is an eyeball test.  But I think it
15  is pretty clear looking at that where the divisions
16  lie.  The boundary blocks are almost all heavily
17  white, almost all heavily white on the exterior and
18  heavily black on the interior.  It is not to say every
19  single one is, but...
20    Q.  On page 38 you conclude that 63 percent of the
21  black voting age population of Vance County is in
22  demonstration district C, correct?
23    A.  Yes.
24    Q.  37 percent of the black population is left out
25  of the district?

                                                 162

1    A.  Yes.
2    Q.  All right.  What percentage of Vance County's
3  white voting age population is in demonstration
4  district C?
5    A.  I don't know.
6    Q.  So you concluded that demonstration district C
7  separates the black population from the white
8  population of Vance County, even though you have no
9  idea how much of Vance County's white population is in
10  demonstration district C.  Is that right?
11    A.  Yes.
12    Q.  Okay.  So I want you to imagine you have two
13  kindergarten classes, and one had six boys and four
14  girls and the other had four boys and six girls.  Are
15  you with me?
16    A.  Okay.
17    Q.  Would you say the school had separated the boys
18  from the girls?
19         MR. STRACH:  Objection.
20    A.  I don't know.  For something like that you
21  could apply a T test to try to determine whether it
22  was consistent with random placement or not.  I
23  haven't done that analysis.
24         There's no spatial confirmation for the
25  students when you are doing it that way, so it's a

                                                 163

1  little different than this, since you can't just
2  randomly place Census blocks in or out of districts as
3  kind of an alternative hypothesis.  I don't think that
4  would work.
5    Q.  So you are standing by your statement that a
6  district that contains 63 percent of the black voting
7  age population and leaves out 37 percent, separates
8  the black population from the white population?
9    A.  Not always.  Depends how the district boundary
10  is drawn.
11    Q.  Okay.  Would it surprise you to learn that 42
12  percent of Vance County's white voting age population
13  is contained in demonstration district C?
14    A.  No.
15    Q.  Okay.  In your figure 21, this is your map of
16  the way in which district C splits Vance County,
17  correct?
18    A.  Yes.
19    Q.  All right.  There are multiple blocks that are
20  over 70 percent BVAP that are excluded from the
21  demonstration district, even though they are in the
22  northern part of Vance County, correct?
23    A.  Yes.
24    Q.  Okay.
25    A.  Northwest.

                                                 164

                                    41 (Pages 161 to 164)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 42 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.  Right.
2        Did you conduct any investigation of
3    whether those blocks could have been included in the
4    demonstration district without raising the population
5    above the allowable limit?
6    A.  No.
7    Q.  Okay.  Do you see the large collection of
8    yellow blocks in this figure 21 right around where the
9    number 1 label is?
10   A.  Yes.
11   Q.  That represents a collection of Census blocks
12   that are majority white, correct?
13   A.  Correct.
14   Q.  That are included in demonstration district C?
15   A.  That's right.
16   Q.  Is it your opinion that the white people in
17   those Census blocks in demonstration district C are
18   separated from the black population in demonstration
19   district C?
20   A.  Can you repeat that?
21   Q.  Is it your opinion that the white people in
22   those yellow blocks in demonstration district C are
23   separated from the black population in demonstration
24   district C?
25   A.  No.

165

1    Q.  Okay.  All right.  Do you understand that what
2    you refer to as the odd looking arm in demonstration
3    district C tracks precinct boundaries?
4    A.  Yes.
5    Q.  You understand that it incorporates 98 percent
6    of the city of Henderson?
7    A.  Yes.
8    Q.  Okay.  All right.  I'm going to drop another
9    exhibit --
10       MR. STRACH:  Can we take a quick break?
11       MS. THEODORE:  Yes.
12       (Recess taken.)
13       MS. THEODORE:  I'm going to mark what I
14   just sent over as Exhibit 13.
15       (Deposition Exhibit No. 13 marked for
16   identification.)
17   BY MS. THEODORE:
18   Q.  Do you recognize this as a map of the 2023
19   enacted Senate districts?
20   A.  Yes.
21   Q.  Okay.  I want to direct your attention to
22   what's labeled district 27 in Guilford County.  Do you
23   see that?
24   A.  Yes.
25   Q.  All right.  Is it your testimony that the arm

166

1    in demonstration district C that includes part of
2    Vance County is more odd looking than the shape of
3    district 27?
4    A.  I haven't looked at district 27 before, so I
5    don't really have testimony one way or another on it.
6    Q.  I'm asking for your opinion right now?
7        MR. STRACH:  Objection.
8        If you can, answer.
9    A.  As best I can see on this, that's a really
10   weird looking arm.
11   Q.  The one in Guilford?
12   A.  Yes.
13   Q.  All right.  Is odd looking a term that has a
14   specific meaning in political science?
15   A.  No.
16   Q.  What expertise did you apply to reach the
17   conclusion that the arm in Vance is odd looking?
18       MR. STRACH:  Objection.
19   A.  Well, as I understand the inquiry the Supreme
20   Court has asked people to engage in is to look for odd
21   looking arms and appendages on districts.  So I tried
22   to follow that.
23   Q.  Did you apply any expertise as a political
24   scientist?
25       MR. STRACH:  Objection.

167

1    A.  I don't think there's any political science
2    test for odd looking arms and appendages, but it is my
3    understanding of how the Supreme Court has instructed
4    part of the eyeball test to be conducted, so I
5    conducted it.
6    Q.  You are not suggesting you are better equipped
7    to conduct that eyeball test than a layperson, are
8    you?
9        MR. STRACH:  Objection.
10   A.  That's why I get to the point that, you know,
11   on some of these things I was just asked to draw the
12   map and I don't like to give ultimate testimony on
13   whether it's reasonably configured or not.  I think it
14   looks odd looking, but that's ultimately something for
15   the trier of fact to decide.
16       Maybe the judge will agree; maybe he
17   won't.
18   Q.  Okay.  I want to ask you some questions about
19   your dot density maps.  I think you have six of these,
20   figure 10, 13, 16, 17, 20 and 23.  Does that sound
21   right?
22   A.  I don't have a reason to dispute you on that.
23   Q.  Okay.  Did you use R to create the dot density
24   maps?
25   A.  Yes.

168

42  (Pages 165 to 168)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 43 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    Q.  Okay.  On page 27 of your report you say, "dot
2  density maps have been utilized in cases at least back
3  to the Bethune Hill case where Dr. Rodden employed
4  them to examine the distribution of residents of
5  districts."
6         Did I read that right?
7    A.  Yes.
8    Q.  Are you familiar with the dot density map that
9  Dr. Rodden used in that case?
10   A.  I've seen them, but it was a while ago.
11   Q.  Okay.  All right.  So then you say on page 27
12 that "in a dot density map Census blocks are taken as
13 the basis for the district," correct?
14   A.  Yeah, that's one I might have wordsmithed a
15 little different, saying they are taken, because you
16 can took it from BTDs, you can do it from counties if
17 you want.
18   Q.  Okay.  Okay.  In your dot density maps you use
19 one blue dot for 10 black citizens of voting age.  Is
20 that right?
21   A.  I think I have somewhere every dot is one
22 person, but that's generally how I approach it.
23   Q.  All right.  Then you use X for every one white
24 person or every 10 white people?
25   A.  Yes.

                                              169

1    Q.  How do you decide where within the Census block
2  the dot or X is placed?
3    A.  It's randomly placed by R.
4    Q.  Okay.  Did you change the placement of any dot
5  or X in any of your dot density maps in the report?
6    A.  I don't think so.
7    Q.  Okay.  So the fact that a dot or X is next to a
8  district line doesn't necessarily mean that the people
9  in that Census block live near the district line.  Is
10 that right?
11   A.  Well, that's part of why I use blocks as my
12 foundation here is that blocks are generally, not
13 always, but generally pretty small geographic units.
14 And so if a person in a block is near the district
15 line, it's probably going to be near the district
16 line.
17   Q.  Well, a block in certain areas could span like
18 hundreds of square miles, couldn't it?
19   A.  Some blocks are bigger than others, but
20 generally speaking you can look at the choropleth maps
21 and see we are talking about some pretty small units
22 geographically.
23         But, yeah, we don't know, from the Census
24 we don't know the geocodings of the locations of the
25 people, so we can't put it, you know, within a square

                                              170

1  meter.  Might be able to do with that geocoding.
2    Q.  Okay.  Can you turn to figure -- figure 16 on
3  page 33?
4    A.  (Witness complies.)
5    Q.  All right.  So if I'm looking at figure 16 on
6  the computer, I see some dots that are dark blue, some
7  dots that are sort of light blue, some dots that look
8  sort of purple.  Do you see what I mean?
9    A.  No.  I'm color blind.
10        If you are bringing red into it, like the
11 difference between blue and purple, no.  I just see
12 blue.  But I'm color blind, so that's an important
13 caveat.
14   Q.  Right, okay.  So can you explain why some dots
15 in your maps would be different shades of blue?
16   A.  No, because they all look blue to me.  They are
17 all coded as blue.  Blue is the only color.
18        It may be that for people with typical
19 color vision the orange, the red from the orange
20 interacts with the blue to make it look slightly
21 different shade.  But I'm sorry, I can't answer that
22 really.
23   Q.  Okay.  Any reason in the code why a dot would
24 appear as purple instead of blue?
25        MR. STRACH:  Objection.

                                              171

1    A.  No.  The command is to make them blue.
2    Q.  Okay.  On page --
3    A.  So they would be blue, but the eye might
4  perceive it differently, I guess.  I don't know.  They
5  all look blue to me.
6    Q.  Okay.  On page 33 you say, "we can create a
7  similar dot plot where one dot represents one person
8  though over plotting begins to become an issue
9  depicted below."
10        Did I read that correctly?
11   A.  Yeah.
12   Q.  All right.  You're referring to the figure 17
13 on page 34?
14   A.  Yes.
15   Q.  What do you mean by over plotting begins to
16 become an issue?
17   A.  You start to get, you know, for a block of
18 1,000 people or even 100 people, that maybe takes up,
19 you know, 5 by 5 millimeter area on the page, that's
20 an awful lot of dots to print in one area, so you kind
21 of get a blob, which is what I think you start to the
22 really see on this page.
23   Q.  Okay.  So it is not really possible to tell
24 from the blobs of orange like how many white people
25 are actually in the relevant region?

                                              172

43  (Pages 169 to 172)
Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 44 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    A.  It is very difficult to count some of these
2  blocks.  These start to effectively become choropleth
3  maps, because you are just kind of filling in --
4  they're like yes no choropleth maps, because you are
5  filling in regions.
6      So, I mean, people always complain no
7  matter what I do with the dot plots.  So I was trying
8  to give a couple different looks on it and explain why
9  I like the one dot equals 10 people, but...
10    Q.  Okay.  In the area of Elizabeth City in this
11 figure 17, are the blue dots that are sort of in the
12 blue blob there obscuring orange Xs for white people?
13    A.  Yeah.  That's part of the over plotting issue.
14    Q.  Okay.  So in that area of sort of the blue
15 blobs there are white people, they are just sort of
16 under the blue blob in the map.  Is that right?
17    A.  Yeah.  Like I said, this isn't my favorite
18 look.  Over plotting starts to become an issue.  But
19 sometimes people complain, so here's what it looks
20 like with one person.
21    Q.  Okay.  On page 27 -- let's flip back there --
22 you state that your dot density plots are using black
23 CVAP and white CVAP.  You see that?
24    A.  Yeah.  I think that's wrong, because I don't
25 know if that's right or not.

173

1    Q.  Okay.  I mean, just turning to page 28 where
2  you have figure 10, do you see you say one blue dot
3  equals 10 black residents of voting age?
4    A.  Yes.  I see that.  It is definitely the BVAP.
5      I shouldn't say that.  I'm pretty sure
6  it's the BVAP.
7    Q.  Sitting here today you can't, you don't know
8  whether you used BVAP or CVAP for these dot density
9  plots?
10    A.  It is VAP.
11    Q.  I'm sorry?
12    A.  It's voting age population.
13      Yes, voting age population.  I'm looking
14 at the code.
15    Q.  Okay.  Just please don't look at anything
16 without, unless I've given it to you to look at.
17    A.  You have given this to me.  This is an exhibit.
18      MR. STRACH:  He has the exhibits on the
19 computer.  That's all he's looking at.
20    A.  Remember we looked at my code earlier in the
21 deposition.
22    Q.  I do remember that.  Okay.
23      All right.  So it is voting age population
24 and this statement on page 27 is incorrect?
25      MR. STRACH:  Objection.

174

1    A.  Right.  It is residents of voting age, not
2  citizens of voting age.
3      Just to clarify, because you did give an
4  instruction, I will not look at anything that you
5  haven't given to me, but if something has been marked
6  and it's an exhibit in this deposition, I consider it
7  fair game.  I will look at it if it is helpful.
8    Q.  Okay.  Is that, the sentence that says, "I
9  employ one blue dot for 10 black citizens of voting
10 age and an orange X for 10 white citizens of voting
11 age," on page 27, did you just copy that language from
12 another report in which you use CVAP for the dot
13 density plots?
14    A.  I don't think so.  I think I was just in a
15 groove of talking about citizens of voting age and
16 made the mistake.
17    Q.  Okay.  Have you done dot density plots on the
18 basis of CVAP rather than VAP before?
19    A.  I don't think so, because that gets really,
20 that raises a lot of the issues that we have talked
21 about elsewhere in this deposition about not really
22 knowing what the CVAP would be down to the block level
23 to enable this.
24      Even at the block group level because the
25 error margins are so substantial there, I think it

175

1  would be tricky to do a dot density plot.  I'm not
2  going to say I've never done it before, I might have
3  done it and not really thought about the error margin
4  issue, but I honestly can't think of an instance where
5  I've done it.
6    Q.  Okay.  So is the goal of the dot density plots
7  to show whether the demonstration district order
8  tracks areas where black people are a majority of the
9  population?
10    A.  I think the choropleth maps are better --
11 first, I don't know how the lawyers plan to argue
12 this.  A lot of this isn't a goal.  It is I was asked
13 to create maps and I did.
14      My general view is that the choropleth
15 maps are better for tracking how the boundaries are
16 drawn and that the dot density maps are better for
17 showing distribution of the population.
18    Q.  Okay.  BVAP is calculated by comparing the
19 number of black residents of voting age to the number
20 of all residents of voting age, correct?
21    A.  Yes.
22    Q.  Not just white residents of voting age?
23    A.  Correct.
24    Q.  Okay.  If you take a district and you add a
25 precinct where black voters are less than half of the

176

44  (Pages 173 to 176)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 45 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**Page 177**

```
1    voting age population, that's going to bring down BVAP
2    percentage in your district, correct?
3         A.  Depends on if your district is majority BVAP,
4    then yes.
5              If your district is 20 percent BVAP, then
6    it wouldn't necessarily do that.
7         Q.  Fair enough.
8              All right.  If you take a majority BVAP
9    district and add a precinct where black voters are
10   less than half the voting age population, that will
11   bring down the BVAP of that district, correct?
12        A.  Yes.
13        Q.  That would be true even if the precinct had
14   more black voters than white voters?
15        A.  You mean actual voters?  Yeah.
16        Q.  More black residents of voting age population
17   than white residents of voting age population?
18        A.  Right.
19        Q.  All right.  So your dot density plots only plot
20   black people and white people, correct?
21        A.  That's right.
22        Q.  By excluding people who are of other races,
23   your dot density plots give a misleading impression of
24   how the district lines divide precincts that are
25   majority black, don't they?
```

**Page 178**

```
1              MR. STRACH:  Objection.
2         A.  No.  Like I said, in my mind the use of, the
3    utility of the dot density plot is to show
4    distribution of the black population.  It is better
5    for answering the question of is the minority group
6    compact for purposes of Gingles 1, which I understand
7    plaintiffs don't generally concede the minority group
8    itself has to be compact, but I think the choropleth
9    maps are better for showing actual racialized line
10   drawing.
11        Q.  Okay.
12        A.  Really, the orange Xs, white population is just
13   to give a general sense of the overall distribution of
14   the population, because if you just show the black
15   population on the map, you know, it doesn't tell you,
16   well, maybe there's like a bayou in the middle.  But
17   in the white population as well gives a better
18   understanding of that.
19              I wouldn't have any objection to anyone
20   coming in and showing the dot plots with Hispanic and
21   Native American added as well.
22        Q.  You have done that in other cases, haven't you?
23        A.  Well, I've done it for Hispanic population,
24   yeah.  I don't know if I've done three color dot plots
25   or not.
```

**Page 179**

```
1         I don't think adding in Native American or
2    Hispanic population here is going to make the black
3    population look any more or less compact, but I guess
4    that's a judgment call.
5         Q.  All right.  I think I transmitted this exhibit
6    already potentially, I think it is going to be --
7              MR. STRACH:  Is that Exhibit 5 that we
8    didn't use?
9              MS. THEODORE:  It's going to be marked as
10   Exhibit 5 that we didn't use.
11             (Deposition Exhibit No. 5 marked for
12   identification.)
13             THE WITNESS:  Which one is this?
14             MR. STRACH:  Go back to the list on Zoom.
15   BY MS. THEODORE:
16        Q.  It says, 251 Soto Palmer Trende initial report,
17   you see that?
18        A.  Yes.
19        Q.  Okay.  Do you recognize this as a report that
20   you filed in the Soto Palmer case we were talking
21   about earlier?
22        A.  Yes.
23        Q.  Okay.  If you go to page 32?
24        A.  Yes.
25        Q.  All right.  Does that refresh your recollection
```

**Page 180**

```
1    that you have done dot density maps that include both
2    the minority population of interest, the white
3    population, and then other populations in three
4    different colors?
5         A.  So -- yes.  But in that -- yeah.  Okay, yeah.
6    In that case the Native American population was of
7    interest as well, which was pretty much what the other
8    dots would be.
9              But, yes, I have done three way plots
10   before.
11        Q.  Was there a reason you chose not to do a three
12   way plot in this case?
13        A.  I think when you don't have large empty swaths
14   that show a concentration at least theoretically of
15   the Native American population, it doesn't add a whole
16   lot, especially since here we really are just
17   concerned with the compactness of the black
18   population.  But I don't think it is wrong to show the
19   other populations on as well.  I don't think it
20   changes the analysis any.
21        Q.  Okay.  So I want to understand how the rounding
22   works in the dot density plots that use Xs and dots to
23   represent 10 people.  Is it true that one orange X
24   could represent anywhere from 5 to 14 white people in
25   a Census block?
```

45 (Pages 177 to 180)

Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 46 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

181

1    A.  That's not quite right.  That's not quite
2  right.
3    Q.  Let me put it differently.  If there were
4  between 5 and 14 white people in a Census block, your
5  plot would show one orange X in that Census block.  Is
6  that true?
7    A.  That's right.
8    Q.  If you have two orange Xs in a Census block,
9  you could have anywhere from 15 to 24 white people in
10  that Census block.  Is that true?
11    A.  Right.  One of those dots would be 10 people
12  and the other is rounded.
13        This is precisely why I include the dot
14  plot that has one -- this is precisely the objection
15  that is why I include the dot plot that has one dot
16  being one person.  I mean, you kind of pick your
17  poison, you either include some rounding or you
18  basically transform your map into a choropleth.
19    Q.  Okay.  But I just want to focus on sort of the
20  numbers here for a minute.  One blue dot in a Census
21  block would represent -- let me start again.
22        If there's one blue blot in a Census
23  block, that means there are anywhere from 5 to 14
24  black people in that Census block.  Is that correct?
25    A.  That's correct.

182

1    Q.  Okay.
2    A.  For the maps with 10, not for the maps that
3  have one dot equals one person.
4    Q.  Right.
5        I think five of the six dot plots in your
6  report have the one dot equals 10 people.  Is that
7  right?
8    A.  Yeah.  From my point of view, it is better to
9  have the random error from rounding, which is this
10  scale probably cancels out in the aggregate, versus
11  the massive over plotting, and I think that's what
12  figure 17 suggests.
13        But if someone thinks that's misleading
14  and you have a better view using dot meaning
15  1 person, I mean, these plots are pretty easily
16  customizable and they could be produced.
17    Q.  Okay.  So in a Census block with two orange Xs
18  and one blue dot, your plot is visually depicting
19  twice as many white people as black people, right?
20    A.  Yes.
21    Q.  In reality that Census block with two orange Xs
22  and one blue dot could have 15 white people and 14
23  black people, correct?
24    A.  It is possible, yeah.
25    Q.  Okay.

183

1    A.  If it were just one block in the map, that
2  would be a pretty substantial -- that could be a
3  pretty substantial problem.  Spread out over the
4  course of hundreds of blocks, that's going to be less
5  of a problem, because you are going to get examples on
6  each extreme.
7    Q.  You would agree that 15 is nowhere near twice
8  as many as 14, right?
9    A.  I'll agree to that.
10    Q.  Okay.  Don't you think it is inaccurate to
11  portray the white population in a geographic area as
12  twice the size of the black population if, in fact,
13  there may be nearly the same number of white and black
14  people in that area?
15        MR. STRACH:  Objection.
16    A.  Well, none of these plots are perfectly
17  aggregated.  The whole point of data visualization is
18  usually -- part of the trick I should say of data
19  visualization is usually you lose some information.
20  So what the maps on pages 33 and 34 show is that you
21  kind of have choice, you can retain all the
22  information about individual level data and you end up
23  with over plotting as an issue, or you can choose to
24  have some rounding error that probably cancels out in
25  the aggregate.

184

1        So, yeah.  It is kind of pick your poison,
2  but these dot plots are accepted and you kind of have
3  a choice between one or other.  If someone has a
4  better way to do it, I'm open to it.
5    Q.  Okay.  There was a lot there, so I just want to
6  ask you a few questions.  So just to focus again on
7  figure 17, which I think is the plot you were
8  referring to that has one X per person?
9    A.  Um-hm.
10    Q.  That plot doesn't, in fact, retain all of the
11  data, because the blue blob is covering up a lot of
12  orange Xs.  Isn't that true?
13    A.  Yeah.  That's what I said in the introduction,
14  a lot of data analysis is choosing what information
15  you retain and what you're going to lose.  These two
16  plots are a great example in my mind of the trade offs
17  involved.
18    Q.  Okay.  When you say dot plots are accepted,
19  what are you referring to?
20    A.  Like I said, dot plots have been used in
21  redistricting cases going back at least to
22  Dr. Rodden's dot plots in Bethune Hill, maybe
23  longer -- I shouldn't say dot plots.  I should say dot
24  density maps, which is the more precise term.
25    Q.  Okay.  Any other examples of cases where dot

46 (Pages 181 to 184)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 47 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

density plots were accepted in redistricting cases
that come to mind?

A.  I think Michael v. McDonald used them in one of
the Virginia cases, maybe not Bethune Hill, but I'm
blanking on the name of the legislative case.

Q.  Okay.  So putting aside the question of whether
there are better options, I just want to ask the
question:  Do you think it is inaccurate to portray
the white population in a geographic area as twice the
size of the black population when, in fact, there may
be nearly the same number of white and black people in
that area?

A.  It is inaccurate at the block level.  It is not
necessarily going to be inaccurate at the map level,
which is the area that we are interested in.

Q.  All right.  What did you do to determine it
wasn't inaccurate at the map level?

A.  Well, we talked about that normal distribution
earlier.  And there's something called law of large
numbers that isn't specific to normal distribution,
but as you take more and more -- it lies kind of at
the heart of frequentism, as you take more and more
samples, your distance from the mean decreases greater
and greater.

So sometimes, yes, you will have a plot

185

that distributes, that shows 14 black residents and --
there's 14 black residents and 15 white residents.  It
shows two Xs and one dot.  But sometimes you will have
the proportions winding up at the other end of those
extremes as well.  So in the aggregate it will tend to
cancel out and give you an accurate depiction.

Q.  Is there any reason to think that the Census
blocks where you have the error in the opposite
direction are going to be near the Census blocks where
you have the error in the original direction?

A.  It is going to be randomly distributed.  So
sometimes yes, sometimes no.

Q.  On page -- let's turn to page 27 of your
report -- I'm sorry.  Let's turn to page 17 of your
report, footnote 7.

A.  (Witness complies.)

Q.  Here you are talking about distribution of
error in CVAP estimates, correct?

A.  Right.

Q.  All right.  You say here that you have good
reason to believe that errors in CVAP estimates are
not randomly distributed since populations are often
geographically clustered together in non random
fashion.

Do you see that?

186

A.  Yes.

Q.  Okay.  Isn't that also true of the populations
that you are using to create these dot density plots?

A.  Apples and oranges.

Q.  You don't agree that populations of black
people and white people for purposes of your dot
density plots may be geographically clustered together
in non random fashion?

A.  They may be clustered, but the errors wouldn't
be, because you could have -- if there are, say, 10
black individuals and 15 or 20, yeah, whether there
are 9 black individuals or 10 black individuals or 11
or 16, that type of distribution is not going to be
randomly distributed.

Where it starts to become a problem where
you can't use the weak law of large numbers is when
you have spatial heterogeneity in how you split the
district.  So when you are splitting these block
groups, you don't know whether it is just as likely
for the black population to be outside of the district
as it is inside of the district.  In fact, given that
minority populations are clustered there probably is a
pattern to how they are distributed within the
district.

That's different than literal rounding

187

area, which is what we are talking about with the dot
density plots.  It is completely different.

Q.  Are you aware of any academic work that has
validated your statement that the errors here are
going to be randomly distributed across the district?

A.  It is literal rounding error.  Yes, there will
be.

Q.  What can you point me to that would support
that conclusion?

A.  That there is a round command in R that rounds
the data up or down.  That rounding error is
completely different than the error you get by
splitting a block group where there's a good chance
the minority population and the white population
within that block group are clustered together.

Again, if someone thinks this is an issue,
they are more than welcome to produce a dot density
plot that they think shows things better for you.
I've seen an attempt at that and I think it makes
things worse for you, but, like I said, a lot of this
involves judgment calls.  That's the nature of data
visualization.

Q.  I want to understand, you have done no work in
this case to validate the assumption that the rounding
that you engaged in doesn't matter?

188

47  (Pages 185 to 188)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 48 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

MR. STRACH: Objection.

A. I'm sorry you don't understand, but I think I've been about as clear as I can be on that. That it is literal binomial rounding error, sometimes it's going to be higher, sometimes it's going to be lower. In the aggregate that type of error will cancel out, as opposed to some error from splitting a block group where we have good reason to believe that the residents are spatially constrained, where you have relatively small number of block groups, and where we don't even have any type of known distribution to compare the error rate to. So...

Q. How many block groups will it take for the rounding errors to cancel out?

A. Well, that's just it, it is not a rounding error for the block groups when it comes to splitting CVAP. You are splitting block groups in a particularized way and since the populations tend to be randomized, but generally speaking like when you start to get about 30 observations that's when you start to be able to talk about this type of cancellation working.

But even then, because we can't know true value when we are talking about the block groups being disaggregated, we have nothing ever to test against,

189

we have no idea how those errors are distributed.

Q. Okay. But, again, you didn't test how the errors were distributed in your racial dot plot?

A. No. I have no reason to believe that there's any type of pattern to how the errors exist. If one of your experts had come in and down that analysis, it might have changed my presumption, but since you just have literal rounding errors that are going to be a binomial yes no high low, in the aggregate they will tend to cancel out.

Or your experts could have run a bunch of dot plots and shown how from view to view because of that rounding error, the looks from the dot plots are radically different. But I'm fairly confident if they tried that they wouldn't be able to show the outputs are radically different, because these errors are going to cancel out.

Q. When you say that the errors are going to cancel out in your dot plots, what you mean is that if you have -- well, let me ask you this: Your reference to 30 blocks, was that referring to your assessment of when the errors cancel out in your dot plots?

A. That's just a general rule of thumb of when these type of convergence metrics become useful.

Q. So with respect to your dot plots, your racial

190

dot plots, are you suggesting that you need 30 blocks for the rounding errors to cancel out?

A. It's a rule of thumb, but, yeah, that's when I would start to expect it to work.

Q. Okay. So what that means is that if you have one block that has two orange Xs for 15 white people and one blue dot for 14 white people, then maybe another block that's 30 blocks away might have the opposite error?

MR. STRACH: Objection.

A. Or the block that's right next door might have the opposite error.

Q. You just don't know?

A. Well, no. That's the point of randomness. But when you have hundreds of blocks, you are well past the threshold of 30, and so in the aggregate those errors are going to cancel out.

Like I said, if there's a suggestion that somehow these maps are deceiving the eye, it would be very easy to demonstrate that by just replicating the map. And if this rounding error is causing huge problems, then replicating the map should give you a radically different view. But I know Dr. Collingwood produces his maps and I don't think they are radically different.

191

Q. When you say replicating the map, do you mean with a different rounding or what do you mean?

A. No. No. Just run the code. You will get a different set of roundings. It is what we were talking about earlier that like with the normal -- kind of like draws on that normal distribution idea, if you take repeated samples, you start to get a look of the true distribution. And so if this rounding is causing you to believe that there are, say, twice as many black people relative to white people in Elizabeth City, that should really quickly become apparent if you generate multiple maps.

Q. I may not be following. I thought that these dots plots are using BVAP data at the Census block level from the decennial Census. Isn't that true?

A. Yes.

Q. So your code, when your code is rounding, your code is taking data from the Census that says this block has --

A. I see what you're saying. I'm misstating. It will place it slightly different within the block. But the rounding will be same.

You can compare it to maps that I produced that have a dot, you know, one dot per person. I don't think they give a radically different view of

192

48  (Pages 189 to 192)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 49 of 95
DISCOVERY COURT REPORTERS       www.discoverydepo.com       1-919-424-8242

1    what the distribution of black people within the
2    district are.
3            Like I said, all these dot density maps no
4    matter what have this shortcoming, that you either
5    have to do some rounding or you end up with a blob.
6            I don't think it gives -- I simply
7    disagree with you that it gives any type of misleading
8    view as to the overall distribution of black people in
9    this map vis-a-vis white people.  I don't see how you
10   can think that.
11       Q.  All right.  Dr. Trende, I just want to make
12   sure the testimony is clear on sort of the way in
13   which this works.  So the rounding is, your rounding
14   is, you take the actual number from the decennial
15   Census for that Census block, right, and then you
16   round it down or up, right?
17       A.  Right.
18       Q.  That rounding is not going to change if you
19   were to replicate what you have done here, is it?
20       A.  Right.  The placement of the dots within the
21   blocks will shift, though.
22       Q.  Okay.  But that has nothing to do with
23   rounding?
24       A.  Rounding will be the same from map to map.
25       Q.  Right.  So what you said about replicating what

193

1    you did and seeing if it changes would not, you
2    couldn't actually replicate what you did using
3    different rounding and get a different map, correct?
4            MR. STRACH:  Objection.
5        A.  Well, yes.  So I was visualizing it in terms of
6    the placement of the dots and not the rounding.  But I
7    do think you could -- however you wish to do it, use
8    different rounding rules to see if it gives you a
9    radically different view of the distribution of black
10   residents of the district versus white residents of
11   the district.
12           And at the end of the day it is a trade
13   off involved with dot density maps.  But sometimes you
14   will have a block that rounds things up; sometimes you
15   will have a block that rounds things down.  In the
16   aggregate I don't have any reason to believe that it
17   wouldn't be presenting a generally acceptable view.
18       Q.  Right, but you have no basis for saying that in
19   any particular group of Census blocks that it is
20   presenting an accurate view of the number of white
21   people and black people, any particular group of 15
22   Census blocks, for example?
23           MR. STRACH:  Objection.
24       A.  I think within 15 you are getting pretty good.
25   But, again, these maps all have hundreds of Census

194

1    blocks within them, so in the aggregate I think it's
2    probably pretty good.  You can see that by comparing
3    it to the single dot plot map, I don't see things
4    radically different, but I guess that's a judgment
5    call about which reasonable minds can disagree.
6        Q.  When you say that these block plots have
7    hundreds of Census blocks, the point of the plot is to
8    show where the black and white people are located,
9    right?
10       A.  Right.
11       Q.  So if an error is corrected, if you have an
12   error in the opposite direction in one Census block
13   that's 100 miles away from another Census block, that
14   doesn't make the map more accurate, does it?
15       A.  If you have one more dot in a single Census
16   block that is surrounded by, say, five blocks that get
17   the rounding right and then -- or I shouldn't say get
18   it right.  That have what you would depict even if you
19   weren't rounding.  And then have another block
20   adjacent to that that gets the rounding error in the
21   other direction, no, I don't think you are going to
22   get a radically -- I don't even think you are going to
23   get a minorly misleading view of what's depicted.  We
24   just disagree on this.
25       Q.  Okay.  Is it your understanding that Dr. Robin

195

1    uses a version of dot density plots that require
2    rounding?
3        A.  He would have to, because he's using one dot
4    for 100 people in the Williamson case.
5        Q.  What about in the Bethune Hill case?
6        A.  I guess that's been a long time since I've
7    looked at it.
8        Q.  How much larger are the Xs that you use for
9    white people than the dots that you use for black
10   people?
11       A.  I don't know.  They both sized one in R.
12       Q.  But Xs are larger in R than dots?
13       A.  Yes.
14       Q.  Okay.  You could have chosen to make the
15   symbols the same size, right?
16       A.  Could have shrunk the Xs more, yeah.
17       Q.  Wouldn't that have been more accurate?
18           MR. STRACH:  Objection.
19       A.  No.
20       Q.  Why not?
21       A.  Because I don't think it is inaccurate to have
22   them larger.  Like I said, I think it makes the black
23   population look more dispersed to use the look that
24   Dr. Collingwood and Mr. Esselstyn are suggesting.
25       Q.  Let's flip to -- well, all right.  Before we do

196

49 (Pages 193 to 196)
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 50 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  that, you could have used dots for both black people

2  and white people, right?

3      A.  Yeah.  But being color blind I'm kind of

4  sensitive to dots are difficult to read, so I like

5  having a different shape.

6          Also, some printers aren't going to show

7  things well, show shades well.  So shapes are nice in

8  that sense.

9      Q.  Could you have used a gray background and used

10  white dots for white people and black dots for black

11  people, right?

12     A.  Maybe.

13     Q.  Okay.

14     A.  How would you do that in the three way map that

15  you all are suggesting, though?

16     Q.  Well, Dr. Trende, you didn't use a three way

17  map, did you?

18     A.  Well, no.  I know, but if you are insisting

19  that a three way map is how it is supposed to be done,

20  then a gray background with white dots and black dots

21  doesn't leave an option I don't think for the third.

22          So it's kind of my general take on all

23  these criticisms, there's no perfect data analysis.

24  They all have shortcoming and it is a question of

25  which shortcoming you are happiest with.

197

1          What I like here is that the size is

2  always one, so no one can come and yell that you use

3  size .5 here and size one here.

4          If someone thinks a better depiction gives

5  a different answer, you can always produce your

6  preferred look at the dot plots.

7          But there is to my knowledge no peer

8  reviewed text that says when you are doing dot plots

9  you should size your Xs at 0.1 and your dots at 1.

10     Q.  To your knowledge, is there any peer reviewed

11  text that says when you are doing dot plots you should

12  use Xs that are a different size for one race and dots

13  for another race?

14     A.  They aren't a different size.  They are both

15  size equals one.

16     Q.  Dr. Trende, your testimony is that the Xs in

17  your plots are not a different size than the dots?

18     A.  We can put up the R code.  They are both size

19  equal one.

20     Q.  I'm not asking about the R code.  I'm asking

21  about a human being looking at these Xs and dots.

22  Your testimony is that they are the same size?

23         MR. STRACH:  Objection.

24     A.  My testimony is that I set the size in R and

25  however R determine s size, whether it is by area, I

198

1  don't know, but they are identical.  I figure if I set

2  them identically, people would not be able to

3  complain.  I was apparently wrong, but I'm more than

4  happy to see how these things look with different

5  sizes, dots and Xs.

6          I don't think it looks better for

7  plaintiffs if you make the Xs smaller, but I could be

8  wrong.

9      Q.  Okay.  Are you aware of any peer reviewed text

10  that supports the way that you have designed the dot

11  plots in this case?

12     A.  No.  I'm not aware of peer reviewed texts on

13  how to use dot density maps in these cases in general

14  or discussing the pros and cons.  None of us seem to

15  have cited it to each other.

16          I just know how they have typically been

17  used in cases before where courts have relied on them.

18  But no matter what you do, if you are doing dot

19  density map, you either -- well, yeah.  I was changing

20  the subject there and I shouldn't.

21     Q.  Okay.  But just to be clear, you are not aware

22  of any court that has relied on a dot density plot

23  that uses Xs for white people and dots for black

24  people, are you?

25     A.  No.  I haven't done any legal research on that,

199

1  but I think the reason for using an X and a dot I've

2  explained pretty well.

3      Q.  Okay.  What's the alpha parameter on the dot

4  density plot?

5      A.  It is transparency.

6      Q.  All right.  You set the Xs representing white

7  people to be fully opaque with an alpha value of one.

8  Is that right?

9      A.  Right.

10     Q.  You set the dots representing black people to

11  be more transparent with an alpha value of .5.  Is

12  that right?

13     A.  That's right.  That's because of the over

14  plotting issue.

15     Q.  Okay.  Why did you choose to make white people

16  fully opaque and black people transparent?

17         MR. STRACH:  Objection.

18     A.  Because of the over plotting issue.

19     Q.  Why did you choose to make white people opaque

20  as opposed to black people opaque?

21         MR. STRACH:  Objection.

22     A.  Because of the over plotting issue.  I don't --

23  I don't understand what's confusing.  I'm sorry.

24     Q.  You could have done the dot plot giving the

25  alpha value of one to the blue dots, couldn't you?

200

50 (Pages 197 to 200)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 51 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

MR. STRACH: Objection.

A. But then it wouldn't address the over plotting issue since the blue dots are on the top.

Q. Why did you put blue dots on top?

MR. STRACH: Objection.

A. Because one of them has to be drawn first, one has to be drawn second.

If I had drawn the white population on top, I would have set the alpha for that to be .5 and alpha for the black population to be one to address the over plotting issue.

Q. So you drew the white people first and then the black people. Is that right?

A. Yes.

Q. Okay. What's the stroke value in these dot density plots?

A. It is the border, it is like -- so if you are drawing an X, if you can imagine like having a pen, it is how thick the pen is.

Q. Did you set the stroke value differently for the Xs representing white people and the dots representing black people?

A. Yeah, because stroke when you are dealing with circle does the exact same thing resizing it, but when you are dealing with X if you make the stroke zero you

201

don't have anything, because it is like using a pen, you have an infinitely small line.

Q. Let's pull up Dr. Collingwood's rebuttal report, page 22.

A. (Witness complies.)

Q. This is a version that Dr. Collingwood did of your figure 16 that uses the same size dots for both races and swaps out the alpha parameters. Is that right?

A. Yeah.

Q. Okay. All right. Sitting here today you don't have any basis to believe you made any error in creating this figure 5?

A. No. I'm fine with this.

Q. Okay.

A. I think it looks much worse for plaintiffs than what you drew.

Q. All right. Do you think that your figure 16 makes the white population of Pasquotank County look more substantial than it appears in Dr. Collingwood's version?

A. I mean, possibly. But it makes the black population look a lot more heavily clustered and isolated, which is the point of the dot plots.

Q. You think his figure makes the black population

202

look more heavily clustered?

A. And isolated, yeah. Like I said, I started including white population, because I thought the black population alone was kind of an unfair look, because it didn't give a sense of the overall -- like what areas are populated and what areas are not. That's all I'm -- I'm not trying to do a comparative approach of the distribution of white and black residents, which I don't think has any relevance to anything. It is all about distribution of black population.

There's just confusion about what's trying to be depicted here.

Q. All right. Can we take a five-minute break.

(Recess taken.)

BY MS. THEODORE:

Q. I want to return to one point we were talking about previously. You testified that rounding errors start canceling out after about 30 observations. Is that accurate?

A. Yeah. The rule of thumb, that's right about I'd start to think they are going to cancel each other out mostly.

Q. What's the basis for that rule of thumb?

A. What I was taught in courses.

203

Q. Is there a book that says that somewhere?

A. It is a rule of thumb, so no.

Q. Okay. You haven't done any work to test out whether that rule of thumb applies to Census blocks, correct?

A. No.

Q. Okay. No, you haven't done any work to test that out?

A. I have not done any work to test that out for Census blocks.

Q. All right. I'm going to drop in the chat another exhibit, which I think are we on 14?

(Deposition Exhibit No. 14 marked for identification.)

BY MS. THEODORE:

Q. Let me know when you have that open?

A. Okay.

Q. Okay. Scroll down to the second page.

A. Okay.

Q. Have you seen this -- well, this is a dot density plot, right?

A. Yes.

Q. Have you seen this before?

A. Yeah, this looks like one of the dot density plots from Bethune Hill.

204

51 (Pages 201 to 204)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 52 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

Q. Okay. You see there that Dr. Rodden is using black dots for black people and white dots for white people against a gray background?

A. Yeah.

Q. Okay. He's using one dot for one person. Is that right?

A. Yeah. That's why you are getting the over plotting in the urban areas.

Q. Okay. Let's scroll down to the next to page 3. Is that more zoomed in dot density plot from Dr. Rodden in Bethune Hill?

A. Right.

Q. Okay. He's also using one dot for one person?

A. Yes.

Q. Black dots for black people, white dots for white people?

A. Yeah, leaving out other races.

Q. Right. So Dr. Rodden's dot density maps in the Bethune Hill case did not use rounding. Is that correct?

A. I don't know if that's true of all of them, but it is true of the ones you have shown me.

Q. You can't point, you are not aware sitting here right now of any dot density plots that Dr. Rodden used in the Bethune Hill case that used rounding?

205

A. That's right. The one he uses in Williams have rounding. These don't, because those are done at the statewide level.

Q. Okay. What case is that? Williams? Do you know what state that involves?

A. North Carolina.

Q. Can you turn to page 17 of your report?

A. (Witness complies.)
    Okay.

Q. All right. Did you review the section of Mr. Esselstyn's rebuttal report where he states that -- let me start again.
    On page 17 you describe how to do the disaggregation process of disaggregating CVAP data at the block group level to block level?

A. Right.

Q. Okay. Did you review the portion of Mr. Esselstyn's report where he states that your description on this page is incorrect?

A. Sort of. He said the numbers for the districts were wrong, but I think the actual process which is what I was interested in was right.

Q. Okay. Do you dispute that the numbers for the districts are wrong?

A. I mean, I didn't look at it. Probably would

206

have been easier just to make up toy data, so there's no question about it to give an example of how it worked. But, yeah, the numbers might not be precise. It is the process that matters.

Q. The process you describe is to weight the CVAP data based on the BVAP data for block group, correct?

A. Well, there's a couple ways that people have used to do it. I'm just trying to give a general overview of how the process works. But the way I understand it most commonly done is to use the VAP data to weight the CVAP data, and then BVAP data to weight the BCVAP data.

Q. When you are using BVAP data to weight BCVAP data is it appropriate to appropriate to use any part black BVAP data?

A. I think that's how I've seen it done.

Q. So your testimony is that the proper weighting is to use any part black CVAP data rather than -- I'm sorry.
    Your testimony is that it is appropriate to use any part black BVAP data rather than the three VAP categories that correspond to the categories that make up black CVAP data?

MR. STRACH: Objection.

A. My testimony is that there's a bunch of

207

different ways I've seen done with or seen this done. I think the most common way is to use the BVAP data to do it.
    But, again, I don't, here I don't do this analysis on my own. I just take the redistricting data hub, because I figured using that number we could avoid a nit picky fight over the different ways to aggregate disaggregate the data. But there's no one way to do it.

Q. Okay.

MR. STRACH: I've got to run out for a little bit, so Erika is going to be in charge of objections for however longer you have to go.

MS. THEODORE: Okay.

MR. STRACH: I hope I won't see you when I get back, but if I do, then I'll step back in.

MS. THEODORE: Okay. I don't have too much longer.

BY MS. THEODORE:

Q. Can you describe the work that you did to respond to Dr. Mattingly's report in this case?

A. I took his code and ran it to see what the Stephenson clusters would be.

Q. Okay. You don't offer any opinion in your report about whether Dr. Mattingly's computer code

208

52 (Pages 205 to 208)
Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 53 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    correctly implements Stephenson.  Is that right?
2        A.  That's right.
3        Q.  Okay.  Let's turn to figure 25 on page 43 of
4    your report?
5        A.  (Witness complies.)
6        Q.  This is a figure titled, "Suggested Stephenson
7    Grouping map A."  Is that right?
8        A.  Sorry.  I was in Stephenson -- okay, yeah.
9        Q.  This is a figure which you purport to show
10   Stephenson groupings if demonstration district A is
11   frozen.  Is that right?
12       A.  Yes.
13       Q.  All right.  This figure was not produced by
14   Dr. Mattingly's code or algorithm, was it?
15       A.  That's right.
16       Q.  How did you produce this figure?
17       A.  I ran his code and it gave me lists of county
18   groupings and this is what I came up with.
19       Q.  Did you draw this in some mapping program?
20       A.  In R.  It should be in the code I produced.
21       Q.  Okay.  This figure puts Washington County in
22   the wrong place, doesn't it?
23       A.  Yes.
24       Q.  Because Washington County should be grouped
25   with demonstration district A?

                                                209

1        A.  Right.
2        Q.  Okay.  What was responsible for this mistake?
3        A.  Coding error.
4        Q.  Coding error.
5        A.  I'm sorry.  Let me be more specific, head this
6    off at the pass.  A coding error in the actual
7    production of the map, not in the Stephenson groupings
8    that were produced.
9        Q.  You told R, produce a map that has certain
10   counties in certain places?
11       A.  Yeah.  So...
12       Q.  Can you open up -- why don't you open up the
13   code that we transferred earlier and maybe could you
14   tell me where in the code this error occurs?
15       A.  I'm a step ahead of you.  I'm just trying to
16   find it.
17            This doesn't have the, this doesn't have
18   the line numbers that come in the native R
19   implementation.  But it is on like page 22 of the
20   printout, starts on page 21.
21       Q.  Okay.  Where is the error?
22       A.  On group 9, where it says Washington is in
23   group 9.  Group 9 is defined as counties.  And then
24   filter name in and then in that, the C for
25   concatenate, there's a list of counties that should be

                                                210

1    placed in group 9 and Washington ought not be placed
2    there.
3        Q.  You say on page 42, "Dr. Mattingly reruns his
4    code for determining the optimal Stephenson county
5    groupings for maps A and C.  This run forces Edgecombe
6    and Pitt counties to remain together."
7            Did I read that correctly?
8        A.  Yeah.  I think I misunderstood from his report
9    on that one.  He clarifies that he didn't need to do
10   it for I, I believe, map A, because Edgecombe and Pitt
11   would be together as a default.  So I misunderstood
12   him.
13       Q.  Okay.  So, in fact, Dr. Mattingly's run for map
14   C does not force Edgecombe and Pitt counties to remain
15   together?
16       A.  If that's the one, then yes.  I know for one of
17   them he didn't have to force them, because they
18   naturally are produced together.
19       Q.  Okay.  I'm sorry, we are going in the opposite
20   direction of your report.  Can we turn to page 41?
21       A.  (Witness complies.)
22       Q.  Here you say in middle of the first paragraph:
23   "If we arrange the Census blocks in these counties" --
24   you are talking about Edgecombe and Pitt -- "from
25   highest BVAP to lowest and place a sufficient number

                                                211

1    of blocks in a district without regard even to
2    contiguity to raise the population to the minimum
3    population threshold for a state Senate district in
4    North Carolina, the district would still be shy of
5    50 percent BVAP."
6            Do you see that?
7        A.  Yes.
8        Q.  How did you perform that analysis?
9        A.  That's in the R code as well.
10       Q.  Okay.  Did the R code spit out some sort of
11   like CSV file output?
12       A.  No.
13       Q.  What does the R code spit out that allows you
14   to reach that conclusion?
15       A.  So it takes the blocks and it arranges them
16   from highest BVAP to lowest, so it is within a data
17   frame or tibble, and then creates a cumulative list of
18   the population and the black population as you add
19   successively lower BVAP blocks to your quote unquote
20   district.  And then when you get to the minimum
21   population threshold, it looks at the BVAP of that
22   quote unquote district and it is below 50 percent.
23       Q.  That's just in the console that you are looking
24   at R in.  Is that right?
25       A.  Right.

                                                212

                        53  (Pages 209 to 212)
Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 54 of 95
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

1    Q.  Okay.  So that's not saved anywhere?
2    A.  No, but it is replicable.
3    Q.  Okay.  All right.  You are familiar with the
4  rule for creating groupings of counties described in
5  Stephenson in subsequent North Carolina Supreme Court
6  cases?
7    A.  I think so.
8    Q.  All right.  What's your understanding of that
9  rule?
10    A.  My understanding is that you draw the
11  districts, the -- I know there's dispute between the
12  parties as to exactly how you are supposed to account
13  for the Voting Rights Act.  My understanding is a
14  little firmer, setting that aside, that you draw the
15  single county districts or single county groupings
16  first.  Then you look for groupings of two counties
17  and place them together.  Three counties, so forth.
18    Q.  You say on page 25 of your report, "if counties
19  were to split, which I understand to violate the
20  Stephenson rule."
21        Do you see that?
22    A.  Yes.
23    Q.  All right.  Are you aware that the enacted
24  state Senate maps splits 15 counties?
25    A.  Yes.  It is not a per se rule against splitting

213

1  counties.
2    Q.  Okay.  Did you review the portion of
3  Dr. Mattingly's report where he explains that
4  Stephenson does not minimize the splitting of
5  counties?
6    A.  I know that to be true.
7    Q.  Okay.  Do you have an understanding of the term
8  performing crossover district in the context of the
9  Voting Rights Act?
10    A.  It's a district that is short of 50 percent
11  that's not a black majority district or a majority
12  minority district, minority majority, but that
13  nevertheless will elect an minority candidate of
14  choice, where the minority group is reliant on the
15  votes of a sufficient number of white voters.
16    Q.  Okay.  Have you done performance analysis in
17  your prior work in VRA cases?
18    A.  Yeah.
19    Q.  How do you assess whether a district is
20  performing?
21    A.  My understanding is you look to see how
22  statewide candidates have run in the district in the
23  past who are the minority candidate of choice.
24    Q.  Okay.  You agree that when assessing the
25  performance of a district with changed boundaries the

214

1  best practice is to use statewide races, correct?
2    A.  I think it is tricky to use the, to add
3  together state Senate races, because you introduce a
4  certain degree of variance for lack of a better term
5  that isn't going to be present in the statewide races.
6  You get different candidates, candidates with
7  different degrees of funding, so forth, whereas all
8  that is held constant if you are using a statewide
9  race.
10    Q.  Okay.  So the best practice when you are
11  assessing performance of a district with changed
12  boundaries is to use statewide races.
13        MS. PROUTY:  Objection.
14    A.  I would generally use the statewide races.
15  There might be like case specific instances where it
16  is better not to, but as a general rule I think that's
17  right.
18    Q.  Okay.  Do you have an understanding of the term
19  opportunity district in the context of the Voting
20  Rights Act?
21        MS. PROUTY:  Objection.
22    A.  Yeah.
23    Q.  What's your understanding?
24    A.  So I have an understanding of it.  I never had
25  it entirely fleshed out.  But my general understanding

215

1  is that it is a district where the minority group has
2  an opportunity, an ability at least in some
3  circumstances to elect its candidate of choice.  I'm
4  not sure exactly where that threshold lies, but that's
5  my understanding.
6    Q.  Have you taken the position or reached a
7  conclusion in prior expert work that a particular
8  district was an opportunity district?
9    A.  I believe in Soto Palmer we did this analysis.
10  We did some of this analysis in the Arizona and
11  Virginia cases of where the districts would perform.
12    Q.  Was there a threshold you applied for, to
13  decide whether you thought something was an
14  opportunity district?
15    A.  I don't remember.  But I think that's more of a
16  legal term than an expert term.  I mean, what
17  qualifies an opportunity for the Voting Rights Act, I
18  would say the black candidate of choice wouldn't have
19  to win all the races, but maybe more, I mean, I don't
20  know if one of 10 would cut it either, but I don't
21  know.  Maybe it is you have an opportunity if it is
22  just some race that the minority candidate of choice
23  has one.
24        I really think that's more of a legal
25  issue than an expert issue.

216

54  (Pages 213 to 216)
Case 4:23-cv-00193-D-RN   Document 88-2   Filed 10/28/24   Page 55 of 95
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

Q. Okay. Have you done any analysis of whether district 5 in the enacted Senate map is a performing crossover district?

A. No.

Q. All right. You haven't done any analysis of whether any district in the enacted Senate map is a performing crossover district, have you?

A. That's correct.

Q. All right. So you are not going to offer any opinions on that topic?

A. No. I understand that another expert is handling that portion.

Q. All right. I think that if we take like a 15-minute break right now -- can we go off the record?

(Recess taken.)

BY MS. THEODORE:

Q. Okay. All right. Dr. Trende, I just want to follow up on one thing you mentioned before. You said you thought that Dr. Rodden had done dot density plots using one dot for 100 people in a case called Williams in North Carolina. Is that right?

A. That's right.

Q. Do you know around when that case was?

A. It is, it is ongoing.

Q. Ongoing, okay.

217

Is that the name of the current case right now that involves the Senate house and Congressional districts?

A. Yeah. It is what I refer to as it. I'm sure there's two cases consolidated, so it might be the other one that most people are using.

Q. Got it. Okay. Thanks.

Okay. On page 18 of your report you say, "beginning with the 2020 Census data, data at the block level were randomly altered to mask individuals' identities including racial data."

Do you see that?

A. Yes.

Q. Okay. Data at the block level were altered on the decennial Census to mask individual identities before the 2020 Census. Isn't that true?

A. Yeah. That's right. That's another one that could have used some better wordsmithing.

For example, differential privacy could have coded, would have altered the answers on income, so that you couldn't figure out exactly what Bill Gate's income was. Or that he wouldn't skew, you know, his block group. So, yeah, there's some of that that occurs before this.

I believe the 2020 Census is when race

218

differential privacy was introduced, which is what would be a new problem for the aggregation disaggregation analysis.

Q. Your testimony is that before 2020 the Census Bureau did not alter data at the block level related to race?

A. My understanding is that's when the differential privacy rules for race were introduced, but I could be wrong on that.

Q. All right. I'm going to transmit another exhibit. I think we're at 15.

(Deposition Exhibit No. 15 marked for identification.)

BY MS. THEODORE:

Q. So I'll mark this as 15. Let me know when you have it pulled up?

A. Okay.

Q. Do you recognize this document?

A. No.

Q. You have never read this before?

A. I don't think so.

Q. This isn't the document that you cite on page 18 to support your statement that beginning with the 2020 Census data at the block level were randomly altered to mask individuals' identities including

219

racial data?

A. Okay. Then, yeah, I guess I have, if that's what this is.

All right.

Q. Is this that document?

A. I don't know. I haven't looked at the document in a very long time. But if you are representing to me that's what this is, I don't have a reason to dispute you.

Q. You filed this report in August, right?

A. Yes.

Q. So you looked at the document -- you looked at the document cited on page 18 in August?

A. Probably in July.

Q. Okay.

A. I think we have established that I've done like three cases since then, so I don't remember -- no, I don't remember what every document that I looked at looks like today.

Q. All right. Do you see there's a URL at the bottom of that document?

A. Yes.

Q. Does that look like the URL that you are citing on page 18?

A. Yes.

220

55 (Pages 217 to 220)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 56 of 95
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    Q.  Okay.  Can we scroll down to page 2 of this
2  document?
3    A.  (Witness complies.)
4    Q.  You see a section there that's titled, "due to
5  privacy concerns reported data has always been
6  different from raw data"?
7    A.  Yes.
8    Q.  Okay.  You understand that to be talking about
9  the Decennial Census, correct?
10    A.  Yes.
11    Q.  All right.  The document says, "since 2000 the
12  Bureau has used data swapping between Census blocks
13  as its main disclosure avoidance technique."
14        Do you see that?
15    A.  Yes.
16    Q.  Then it goes on to give a hypothetical example
17  in which it uses data swapping to switch data about
18  race between Census blocks.  Do you see that?
19    A.  I think that's ancestry.
20    Q.  Is it your testimony that in prior Census
21  iterations the Census Bureau swapped ancestry data
22  between Census blocks, but not race data?
23    A.  I don't know if it used, if it swapped ancestry
24  going back to 2000, but my understanding -- I could be
25  wrong on this -- my understanding was racial data was

221

1  kept invariant along with most data at the Census
2  block level with the exception of race.
3    A.  Yeah.  But something changed with what they do
4  with race and ethnicity data.  Maybe they weren't precise
5  in how I put it, but in the very next paragraph it
6  says, you highlighted, "race and ethnicity data are
7  likely to be further from the as enumerated data than
8  in past decades when data swapping was used to protect
9  small populations."
10        So something happened to make these data
11  at the block level for race worse, which is going to
12  make this aggregation disaggregation much more
13  difficult than it's been in the past, because what you are using
14  as the basis for weighting you have less confidence in
15  than we had in the past.
16    Q.  Okay.  That's because we have less confidence
17  in the decennial Census data, correct?
18    A.  Right.
19    Q.  Okay.  Do you agree that American Community
20  Survey data is used to allocate trillions of dollars
21  to communities across the United States?
22    A.  Yeah.  I don't think the ACS data is inherently
23  invalid.  That's never been my testimony or my
24  position.
25    Q.  Okay.  I want to go back to demonstration

223

1  new for 2020.
2        So like if you go to the third page where
3  things are highlighted, "race and ethnicity data are
4  likely to be further from the as enumerated data than
5  in past decades."
6    Q.  All right.  Do you see the paragraph on page 3
7  that says, "in 2010 and previous decades all of these
8  were kept invariant along with most data at the Census
9  block level with the exception of race"?
10    A.  Yes.
11    Q.  Okay.  So you understand based on that that the
12  Census Bureau was altering racial data at the Census
13  block level in Censuses prior to 2020?
14    A.  I don't, because from the sentence before it
15  something has changed, because it says, "race and
16  ethnicity data are likely to be further from the as
17  enumerated date than in past decades."
18    Q.  I'm talking about the sentence in the prior
19  paragraph.  Do you see that?
20    A.  No.  It is in the same paragraph.  I think.
21  You read the sentence in 2010 at the block level total
22  population, et cetera, were all held invariant, right.
23    Q.  No.  In the prior paragraph I read --
24    A.  Okay.
25    Q.  -- "in 2010 and previous decades all these were

222

1  district E.  You said you hadn't formed any opinions
2  about demonstration district E.  Is that right?
3    A.  Yes.
4    Q.  Was that your choice not to form any opinions
5  about demonstration district E?
6        MS. PROUTY:  Objection.  To the extent you
7  are asking for his conversations with counsel, I'm
8  going to instruct him not to answer.
9    A.  I can't answer that question.
10    Q.  You can't answer whether it was your choice
11  not to reach any conclusions about demonstration
12  district E?
13        MS. PROUTY:  Same objection.
14    A.  I can't answer that.
15    Q.  Did counsel instruct that you not to reach any
16  conclusions about demonstration district E?
17        MS. PROUTY:  Same objection.  I instruct
18  the witness not to answer.
19    A.  I can't reveal conversations with counsel.
20    Q.  Were you asked to analyze demonstration
21  district E?
22        MS. PROUTY:  Same objection.
23    A.  Same answer.  I can't reveal conversations I
24  had with counsel.
25        MS. THEODORE:  Your position is that

224

56 (Pages 221 to 224)

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 57 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  questions about what Dr. Trende was asked to do as
2  part of his expert report are privileged?
3       MS. PROUTY: I think you are asking
4  whether or not he was asked to analyze something
5  that's not currently in his report.
6       MS. THEODORE: Throughout all of these
7  depositions, including of our experts, you have asked
8  questions about what the witnesses were asked to do.
9  You are saying I can't ask Dr. Trende what he was
10 asked to do for purposes of his expert work in this
11 case?
12      MS. PROUTY: I would have to confer with
13 some of my colleagues to understand. If you want to
14 let me take the opportunity to do that, I'm happy to
15 do that. If you want to move on based on the answer
16 he's provided, we can do that as well.
17 BY MS. THEODORE:
18  Q.  Dr. Trende, you could have formed opinions
19 about demonstration district E between when it was
20 provided to you in August and today. Isn't that
21 right?
22  A.  I don't know. I haven't looked into it. I
23 assume I could have performed some sort of or come to
24 some sort of opinion about it.
25  Q.  You understand that the rebuttal report was

225

1  disclosed on August 30th, correct?
2  A.  Or thereabouts is my recollection.
3  Q.  Okay. Today is September 30th. Is that right?
4  A.  Yeah.
5  Q.  All right. Is one month long enough to reach
6  conclusions about a demonstration district?
7  A.  It depends what else you have going on in that
8  month. If you have produced 170 pages of expert
9  report in another matter, probably not.
10  Q.  I'm going to ask again: Were you instructed
11 not to analyze demonstration district E?
12      MS. PROUTY: Objection. I think the way
13 you are asking this is asking for information that is
14 protected by the attorney-client privilege.
15      To the extent you want to ask him has he
16 analyzed demonstration district E, which I believe he
17 has answered, that's different. But you are asking
18 about his instructions from counsel, which I don't
19 believe we have asked your experts about.
20      MS. THEODORE: I think you have repeatedly
21 asked our experts about questions involving
22 instructions from counsel.
23      All right. So you are instructing him not
24 to answer a question of whether he was instructed not
25 to analyze demonstration district E and you're

226

1  instructing him not to answer the question of whether
2  he was asked to analyze demonstration district E? Is
3  that right?
4       MS. PROUTY: That's correct.
5  BY MS. THEODORE:
6  Q.  Did you ever tell counsel that you would have
7  been able to analyze demonstration district E if you
8  had more time?
9       MS. PROUTY: Same objection. I'm going to
10 instruct the witness not to answer.
11  A.  I've been instructed not to answer, so I will
12 not answer.
13  Q.  Okay.
14      MS. THEODORE: All right. I'm just going
15 to take a short break. I want to confer on our
16 response to your instruction not to answer.
17      MS. PROUTY: Sure. Help me understand,
18 your first question is whether he was instructed not
19 to analyze demonstration E, correct?
20      MS. THEODORE: Correct.
21      MS. PROUTY: Your second question is
22 whether he, in fact, analyzed Demonstration E or not.
23 Is that correct?
24      MS. THEODORE: I believe that he has
25 testified that he did not analyze demonstration

227

1  district E.
2  BY MS. THEODORE:
3  Q.  That's correct, Dr. Trende, right?
4  A.  That's correct. I have not.
5       MS. THEODORE: Okay.
6       MS. PROUTY: What is your second question?
7       MS. THEODORE: My second question is
8  whether he was asked to analyze demonstration
9  district E.
10      MS. PROUTY: Okay.
11      MS. THEODORE: My third question was
12 whether he told counsel that to analyze demonstration
13 district E he would need more time?
14      MS. PROUTY: Sure. Let me confer on my
15 end as well to see if there's a way that he could
16 answer those questions, but for now those are our
17 objections and instructions.
18      MS. THEODORE: Can we come back in like 5
19 minutes?
20      MS. PROUTY: Sure.
21      (Recess taken.)
22      MS. THEODORE: I have no more questions.
23 Thank you, Dr. Trende.
24      MR. STRACH: We have no questions.
25      THE REPORTER: Read and sign?

228

57 (Pages 225 to 228)

1    MR. STRACH: Yes.

2    THE REPORTER: Are electronic transcripts

3 good for everybody?

4    MS. THEODORE: Yes.

5    MR. STRACH: Works for us. I don't think

6 we need anything expedited.

7    MS. PROUTY: We'll follow up if we do.

8    (The deposition concluded at 5:16 p.m.)

229

---

1    IN UNITED STATES DISTRICT COURT.
     FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2         EASTERN DIVISION
          Case No. 4:23-CV-00193-D
3

4    RODNEY D. PIERCE and MOSES   )
     MATTHEWS                     )
                                  )
5         Plaintiffs,             )
                                  )
6         vs.                     )
                                  )
7    THE NORTH CAROLINA STATE     )
     BOARD OF ELECTIONS, et al.,  )
8         Defendants.             )

9

     I,_____,
10   do hereby certify that I have read the foregoing
     transcript of my deposition consisting of pages _____
11   through ____, inclusive; and I find it is a true and
     correct transcript of my deposition so given as
12   aforesaid.
13        _____
14

     Subscribed and sworn to
15   before me this _____ day
     of _____, 2024.
16   _____

17   Notary Public
18
19
20
21
22
23
24
25

230

---

1    STATE OF NORTH CAROLINA  )
                              ) SS:
2    COUNTY OF GUILFORD       )

3    I, Vincent Bailey, Certified Shorthand
     Reporter, do hereby certify that SEAN TRENDE, PH.D. on
4    September 30, 2024 was by me first duly sworn to
     testify to the truth, and that the above deposition
5    was recorded stenographically by me and transcribed by
     me.

6    I FURTHER CERTIFY that the foregoing
     transcript of said deposition is a true, correct, and
7    complete transcript of the testimony given by the said
     witness at the time and place specified.

8    I FURTHER CERTIFY that I am not a relative
     or employee or attorney or employee of such attorney
9    or counsel, or financially interested directly or
     indirectly in this action.

10   IN WITNESS WHEREOF, I have set my hand.

11

12   _____

     Vincent Bailey
13   Certified Shorthand Reporter
14
15
16
17
18
19
20
21
22
23
24
25

231

58  (Pages 229 to 231)

| **A** |
|---|

**Abbott** 30:14
31:8
**ability** 216:2
**able** 26:14 49:1
171:1 189:21
190:15 199:2
227:7
**absence** 60:11
**academia** 19:23
**academic** 23:13
24:1,4,8 25:5
188:3
**accept** 132:17,22
**acceptable**
109:11 194:17
**accepted** 152:8
184:2,18 185:1
**account** 22:15
22:16 51:11
213:12
**accurate** 5:5
14:22 47:20
95:8 101:18
102:1 105:9
141:19 142:2,3
146:23 186:6
194:20 195:14
196:17 203:20
**achieve** 137:2
160:3
**acknowledge**
147:3
**acronym** 22:21
**ACS** 12:25
27:17 34:3
35:16 37:2,7
37:10,17,25
38:2,7,12,20
39:2,8 40:7
44:13 54:8,16
54:20 57:22
61:19,21 63:13
63:16 64:6,16
64:24 65:22,22
65:23 80:9
83:19 86:21
100:1 105:12
105:17,22
120:1,3 121:4

121:5 130:17
131:8,11,15
223:22
**Act** 16:6 23:22
24:2 25:15,20
25:22 29:13
213:13 214:9
215:20 216:17
**action** 27:23
231:9
**actual** 33:25
34:21,22,24
36:14,20 64:19
65:15,24 102:5
102:17 103:23
114:17 118:2
120:15 177:15
178:9 193:14
206:21 210:6
**add** 62:16
115:22 142:2
176:24 177:9
180:15 212:18
215:2
**added** 178:21
**adding** 85:14
86:11 142:4
179:1
**additional** 13:23
14:6,9
**address** 37:22
201:2,10
**addressed** 25:12
**adjacent** 22:13
195:20
**adjoining** 93:14
114:15 157:1
**adjusting**
112:18
**adjustments**
32:23
**admit** 142:17
144:9
**admitting** 40:4
**advisor** 25:21
**aerial** 22:1
**affirm** 135:14
**aforesaid** 230:12
**age** 24:5 33:10
34:6,16,23,25

35:2,3,10,12
43:17 44:25
62:6 63:3
64:12,19 65:6
65:16,24 80:7
80:7 87:15
137:1 138:8
139:4 152:21
155:17,21
162:21 163:3
164:7,12
169:19 174:3
174:12,13,23
175:1,2,10,11
175:15 176:19
176:20,22
177:1,10,16,17
**Agee** 28:7 30:21
31:10
**aggregate**
106:11 182:10
183:25 186:5
189:6 190:9
191:16 194:16
195:1 208:8
**aggregated** 87:5
106:18 183:17
**aggregating**
105:15
**aggregation**
219:2 223:12
**ago** 48:23 49:22
90:8 169:10
**agree** 34:25
36:17 40:13,23
84:15,25 94:25
102:6 108:20
109:3 111:16
114:17 127:22
134:13 144:6
159:17 168:16
183:7,9 187:5
214:24 223:19
**agreement**
102:19 103:15
**ahead** 28:22
29:9 35:5
37:16 38:25
39:6,18 40:11
48:2,22 50:19

52:12 53:18
54:23 106:6
116:14 117:14
120:22 210:15
**AI** 20:2
**al** 1:7 230:7
**alarm** 96:10
**Albemarle**
147:22
**Alford** 127:21
**algorithm**
209:14
**Allen** 15:5,6
16:25 17:1
31:12,16 59:14
59:15,18 79:9
160:7
**allocate** 223:20
**allow** 48:10
151:7
**allowable** 165:5
**allowed** 48:6
51:16
**allowing** 47:17
48:16 49:3
51:4 150:12
**allows** 52:9
151:1 212:13
**Almanac** 20:10
**alpha** 200:3,7,11
200:25 201:9
201:10 202:8
**alter** 219:5
**altered** 218:10
218:14,20
219:25
**altering** 119:9
222:12
**alternative** 33:6
42:22 43:5,11
46:11 53:12
156:16 164:3
**amendment**
17:8 29:19
**American** 20:10
33:20,24 36:23
40:14 62:2
63:11 79:14,25
85:17 90:2,6
126:13 178:21

179:1 180:6,15
223:19
**Americans**
36:11
**analyses** 22:3
**analysis** 13:18
13:23 16:3,14
18:4,20 19:4,8
19:11,14,17
20:12 21:8,21
22:3,12 31:4
107:22 127:14
128:11,13,19
134:6 138:5
139:13 141:21
141:25 155:11
160:13 163:23
180:20 184:14
190:6 208:5
212:8 214:16
216:9,10 217:1
217:5 219:3
**analyze** 16:7
224:20 225:4
226:11,25
227:2,7,19,25
228:8,12
**analyzed** 18:8
20:13 113:1
226:16 227:22
**analyzing** 13:25
**ancestry** 221:19
221:21,23
**and-** 2:8
**angle** 24:17
**announced**
134:18
**answer** 4:25 5:1
7:25 8:14 14:1
14:2 24:24
25:3 30:3
34:12 35:14,15
35:17 39:20,23
40:1 45:12,13
63:13 64:6
76:7 77:11
84:17 86:9
90:15 102:2
107:8,11 108:5
110:16 132:7

232

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 60 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

136:11 145:18
145:21,22,22
148:11 167:8
171:21 198:5
224:8,9,10,14
224:18,23
225:15 226:24
227:1,10,11,12
227:16 228:16
answered 63:9
63:25 64:8
120:23 159:12
226:17
answering 4:22
178:5
answers 77:18
77:23 78:3
128:18 132:10
150:4 218:20
anybody 64:23
65:12 147:5
anyway 78:23
API 70:10
apparent 192:12
apparently
199:3
appear 144:18
159:14 171:24
APPEARANC...
2:1
appeared 2:5,12
appears 154:20
202:20
appendages
51:22 52:19
167:21 168:2
Apples 187:4
applicable 150:6
application 21:8
21:19 22:22
applied 112:7
216:12
applies 204:4
apply 162:9
163:21 167:16
167:23
appreciate 71:11
approach 22:20
93:7 108:14
125:14 137:14

152:6,8 169:22
203:8
approached
9:12
appropriate
16:15 90:4
110:11 161:15
207:14,14,20
approximately
11:14
approximations
21:20
April 59:20
Ardoin 31:13,15
area 8:1 50:25
72:25 75:5
111:5 144:16
153:6 155:3,4
158:17,25
172:19,20
173:10,14
183:11,14
185:9,12,15
188:1 198:25
areas 41:5
149:24 156:21
157:1 170:17
176:8 203:6,6
205:8
argue 176:11
arguendo 30:12
arguing 143:15
Arizona 23:6
216:10
arm 153:1,7,14
153:24 154:12
158:18,21
160:22 161:1,5
161:9,15,19,21
162:3 166:2,25
167:10,17
arms 51:22
52:19 167:21
168:2
Arnold 2:2 4:8
arrange 211:23
arranges 212:15
art 136:6,7,12
article 23:18,21
25:7

articles 20:4,8
133:20
ascribed 53:3
Asian 36:11
aside 103:16
185:6 213:14
asked 13:13 44:7
44:23 45:2
50:3,8,9 58:3,3
59:24 60:14,15
60:15,18,19,23
61:5 62:22
114:23 145:4
151:19,23
152:4 167:20
168:11 176:12
224:20 225:1,4
225:7,8,10
226:19,21
227:2 228:8
asking 25:2
34:13,13,14,24
35:9 37:24
45:7 50:11
108:3 145:15
145:17 153:11
167:6 198:20
198:20 224:7
225:3 226:13
226:13,17
assert 157:24
assess 214:19
assessing 36:14
214:24 215:11
assessment
190:21
assigned 97:18
98:5,8,10
assignment
10:23 17:11
92:4,15
assigns 94:22,25
assistance 10:17
associated 59:12
59:23 61:11,16
assume 14:12
17:25 38:18
131:6 154:8
155:25 158:14
225:23

assuming 37:21
131:20 151:11
assumption 22:8
39:9 188:24
assumptions
39:20,21,22
attack 45:19
attacks 57:16
attempt 32:23
33:25 188:19
attempting 33:6
87:12
attention 127:19
166:21
attorney 231:8,8
attorney-client
226:14
attributable
116:11,16
August 10:7,15
10:23 11:8,15
11:20 14:18
31:19 79:1
220:10,13
225:20 226:1
authenticate
67:25
available 33:23
105:20
Ave 2:3
average 67:11
69:15,21 70:18
71:1 74:11
averages 131:1
averaging 131:3
avoid 208:7
avoidance
221:13
aware 33:18,22
36:22 38:10
40:6 41:3,9,14
53:5 72:5
91:17 134:3,17
152:13 155:12
155:20 188:3
199:9,12,21
205:23 213:23
awful 172:20
Ayscue 58:6,14

**B**

**B** 3:4 91:5 92:1
94:1 97:10,18
103:20 104:8
104:11,22
152:18 153:10
153:19,20
154:24 156:16
156:22 159:11
**B's** 155:12
**B-1** 99:9 154:9
157:3,18
158:12
**B-2** 156:23
**back** 26:24 58:6
59:5 74:4 76:8
77:18 94:5
95:7,13 96:13
99:15 100:10
100:18 102:20
106:10 108:19
130:12,14
137:12 158:18
162:12 169:2
173:21 179:14
184:21 208:16
208:16 221:24
223:25 228:18
**background**
147:3 197:9,20
205:3
**backup** 161:24
**Bailey** 1:12
130:13 231:3
231:12
**Baker** 2:9
**balance** 143:20
**ballot** 23:3,4
134:16
**Banks** 8:24 9:3
**bare** 61:9
**barely** 154:18
**Bartlett** 44:17
**based** 67:7 81:10
83:8 91:3
129:5 133:20
134:9 146:23
152:1,4 155:7
158:9 161:24
207:6 222:11

233

225:15
**basic** 66:19
  111:13
**basically** 24:19
  181:18
**basis** 22:2 26:6
  27:13 55:16
  75:13 100:21
  100:23 117:16
  127:13 151:21
  154:20 158:1,4
  159:15,22
  160:8 169:13
  175:18 194:18
  202:12 203:24
  223:14
**Bayesian** 22:18
**bayou** 178:16
**BCVAP** 97:21
  102:10,18
  130:9 207:12
  207:13
**beginning** 218:9
  219:23
**begins** 172:8,15
**behalf** 2:5,12
  28:2,12,18
**behavior** 18:16
  19:17 24:9,15
  25:16
**behaviors** 25:4
**belief** 58:25
**believe** 9:21
  11:11 12:10,11
  12:23 14:8,24
  15:24 16:12
  19:15 21:3
  23:10 24:7,10
  25:11 26:25
  28:10 32:22
  41:20 55:8
  82:7 91:13
  135:23 140:14
  161:3 186:21
  189:8 190:4
  192:9 194:16
  202:12 211:10
  216:9 218:25
  226:16,19
  227:24

**believed** 103:20
**Bellwether**
  23:19
**belt** 9:6,10 26:20
  27:1
**Benson** 28:7
  30:22 31:10
**Bernie** 36:3,6
**Bertie** 112:17
  138:24 139:7
  141:4 143:19
**best** 4:23 31:5
  58:24 62:25
  167:9 215:1,10
**Bethune** 169:3
  184:22 185:4
  196:5 204:25
  205:11,19,25
**better** 22:4
  49:11 122:13
  131:2 137:5
  141:22 142:5
  144:9 168:6
  176:10,15,16
  178:4,9,17
  182:8,14 184:4
  185:7 188:18
  198:4 199:6
  215:4,16
  218:18
**bias** 39:2,8,10,13
  39:14,15 40:1
  40:7
**big** 15:11 22:8
  69:19 101:20
**bigger** 170:19
**Bill** 218:21
**bin** 148:19,22,23
  149:6,7,10
**binomial** 189:4
  190:9
**bit** 45:18 58:21
  62:13 96:14
  144:9 157:8
  208:12
**bits** 92:13
**bizarre** 52:20
**black** 9:6,10
  26:19 27:1
  34:5,6,15,16

35:2,7,10,12
36:12,13 38:16
38:17,22 39:3
39:15 40:9
61:18,20,21,24
61:24 62:1,1,1
62:4,5,6,8,9
63:2,3,5,6,11
63:12,12,14,15
63:17,20,21
64:3,3,7,12,17
64:20,24,25
65:1,4,7,13,14
65:17,20,23,25
79:3 80:2,6,17
80:24 81:2,6
83:2,7,13,23
83:25 84:3
85:6,8,11,15
85:16,16,17
86:6 87:14,22
87:22 88:11,24
88:25 89:6,7
89:19,19,23
90:1,1,2,5,6,6
97:3,9 99:9,25
100:15 101:11
101:21 102:5
103:2,12
108:22 111:17
111:21,24
112:2,9,16
114:18 121:25
123:18 124:21
124:25 125:2,5
125:9,11 129:4
129:21,24
134:14 136:25
137:2,9,17,23
138:4,8,13,15
138:22,23,25
139:2,9 140:6
140:8,11
142:20,22,24
143:6 152:20
152:25 155:17
155:21 156:4
156:14,18
157:1,20 159:4
160:4,19,21

162:4,10,18,21
162:24 163:7
164:6,8 165:18
165:23 169:19
173:22 174:3
175:9 176:8,19
176:25 177:9
177:14,16,20
177:25 178:4
178:14 179:2
180:17 181:24
182:19,23
183:12,13
185:10,11
186:1,2 187:5
187:11,12,12
187:20 192:10
193:1,8 194:9
194:21 195:8
196:9,22 197:1
197:10,10,20
199:23 200:10
200:16,20
201:10,13,22
202:22,25
203:4,8,10
205:2,2,15,15
207:15,21,23
212:18 214:11
216:18
**blank** 73:5
**blanking** 72:4
  185:5
**blended** 150:15
**blind** 148:9
  151:5 171:9,12
  197:3
**blob** 172:21
  173:12,16
  184:11 193:5
**blobs** 172:24
  173:15
**block** 40:16 41:7
  41:11 56:7,11
  56:11,19,19,25
  66:20 67:15
  68:9,14 69:24
  70:2,5,18,23
  70:25 71:14,21
  72:2,20,25

73:9,14 74:2
74:13 78:18
91:3,8,15,18
91:24 92:4,5,9
92:11,14,15,18
92:22 93:2,13
93:14,18,21,25
94:22 95:8,15
96:17,25 97:4
97:10,17,25
98:1,4,4 99:8
99:10,25
100:15 102:9
102:17 103:19
103:25 104:4,5
104:25 105:16
105:16,24
106:4,11,25
110:8,11,12,12
110:25 111:3,7
112:6,15 113:2
113:13,21
114:19,21
115:2,4,8,11
115:12,23
116:11 117:25
118:23 119:17
119:25 120:13
120:18,20
121:15 122:2,5
122:8,15,18,22
122:25 123:2,3
123:11 124:16
124:19,20
125:2,8,10
126:11,14,17
126:24 128:3
148:1,6,14,17
151:3,8 158:10
158:22 159:4
170:1,9,14,17
172:17 175:22
175:24 180:25
181:4,5,8,10
181:21,23,24
182:17,21
183:1 185:13
187:18 188:13
188:15 189:7
189:10,13,16

234
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 62 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

189:17,24
191:6,8,11
192:14,19,21
193:15 194:14
194:15 195:6
195:12,13,16
195:19 206:15
206:15 207:6
207:18 218:10
218:14,23
219:5,24 222:9
222:13,21
223:2,11
**blocks** 66:20
68:9,15 74:14
78:19 98:7,10
146:22 150:1,2
158:24 162:16
164:2,19 165:3
165:8,11,17,22
169:12 170:11
170:12,19
173:2 183:4
186:8,9 190:21
191:1,8,15
193:21 194:19
194:22 195:1,7
195:16 204:4
204:10 211:23
212:1,15,19
221:12,18,22
**blot** 181:22
**blue** 156:21
157:1,6,16,19
169:19 171:6,7
171:11,12,15
171:16,17,17
171:20,24
172:1,3,5
173:11,12,14
173:16 174:2
175:9 181:20
181:22 182:18
182:22 184:11
191:7 200:25
201:3,4
**board** 1:7 109:2
109:8,25
110:20 230:7
**body** 23:2

**boil** 51:24
**bones** 61:9
**bonus** 23:4
**book** 20:13,19
20:21,21 21:1
21:1 204:1
**border** 91:18
93:16 158:11
201:17
**borders** 158:16
**bottom** 86:19
95:10 102:22
124:4 146:17
220:21
**boundaries**
49:10,19 93:17
156:22 157:2
157:17 166:3
176:15 214:25
215:12
**boundary**
155:13,13
157:8 162:16
164:9
**boys** 163:13,14
163:17
**branches** 161:18
**break** 5:7 59:20
74:13,13,14
76:21,24 77:3
114:2 127:8
166:10 203:14
217:14 227:15
**breaks** 5:9
**bring** 6:6 79:10
122:10 140:20
177:1,11
**bringing** 171:10
**brings** 24:16
**broader** 142:3
**broken** 66:16
**brought** 42:17
77:25
**BTDs** 169:16
**Budget** 72:6,17
74:22 75:11
**bunch** 190:11
207:25
**Burch** 12:5
**Burch's** 12:13

**Bureau** 19:3
27:10 33:20,24
37:5 38:8
61:25 64:18
65:15 67:24
68:8,20 69:23
78:11,14
104:14,19
108:21 111:16
112:10,21
113:5 129:3
219:5 221:12
221:21 222:12
**Bureau's** 111:14
**busy** 60:21 61:2
**BVAP** 50:14
137:16,25
138:11 139:19
140:24 141:4
141:17 142:23
144:3 146:23
147:1 148:2,7
148:18 149:3
150:12,15,20
150:22,23,25
150:25 151:3,4
151:9,9,14
154:19 155:5
158:11,22,25
164:20 174:4,6
174:8 176:18
177:1,3,5,8,11
192:14 207:6
207:11,13,15
207:21 208:2
211:25 212:5
212:16,19,21

_____
**C**
_____
**C** 134:13 160:17
160:20 161:6
162:22 163:4,6
163:10 164:13
164:16 165:14
165:17,19,22
165:24 166:3
167:1 210:24
211:5,14
**C/user/Sean**
82:3

**calculate** 33:14
55:5,21 56:5,9
57:20 59:12,22
63:2 71:17
80:17 81:1
82:14 83:1,17
84:2 85:7,14
86:5 87:5,13
87:21 88:10
99:25 100:14
103:17,23
108:22 111:21
127:5 153:21
**calculated** 55:12
58:6,15 61:10
61:15 67:1
79:8 81:10
83:8 97:25
98:3 109:4
176:18
**calculates**
121:25 154:6
**calculating** 79:2
79:13 80:20
85:3,6 88:24
89:5 104:20
105:5,10 109:8
109:24 113:8
113:13 123:25
128:2 129:3
**calculation** 63:5
63:18 64:4,13
65:1 89:23
95:7 97:7
104:24 106:23
111:14 121:20
**calculations**
55:16 60:12
91:3 97:13
100:8 104:25
**call** 12:25 15:11
22:21 26:11
82:23 157:23
179:4 195:5
**called** 42:3
91:12 137:13
185:19 217:20
**calls** 24:25
188:21
**cancel** 186:6

189:6,14
190:10,17,19
190:22 191:2
191:17 203:22
**canceling**
203:19
**cancellation**
189:22
**cancelled** 39:14
**cancels** 182:10
183:24
**candidate**
214:13,23
216:3,18,22
**candidates**
214:22 215:6,6
**Carolina** 1:1,7
6:19 7:2,5,9
9:9 15:12
16:20 17:1
18:8,23 19:1,3
19:20 20:6,9
20:12,14,20,24
21:4 23:9 26:1
26:8,10,14,19
38:16 66:21
67:2 68:18,21
69:15,24 70:1
70:5,19,22
71:7,14,22
72:5,16 73:9
73:14 74:2,22
75:11,13,20,23
76:5 117:2,3
134:17 147:16
147:17 206:6
212:4 213:5
217:21 230:1,7
231:1
**Carolina's** 26:4
26:7 67:10
**carry** 41:15 44:4
**carrying** 18:11
**Carter** 31:6
**case** 1:2 7:13,23
9:24 10:15
11:8,21,25
12:5,9,13
13:17,18 15:5
15:8,11,13

235

16:20 17:1,9
18:19 19:7,10
19:13,16 22:24
25:13 26:18,22
27:6,23 28:3,6
28:23 30:8,16
30:18 31:18
32:21,25 33:7
34:2 37:19
38:5 39:8 42:3
42:11 44:7
45:4,6,18 46:8
55:3,9,22
56:17 57:23
58:19 60:11,17
61:3,9 62:20
70:8 78:20
79:9 81:24
82:10 86:18
87:10 94:16
116:18 126:23
135:22 137:13
137:14,16
138:17 139:9
139:13 145:2
145:12,16,24
146:1 159:9
169:3,9 179:20
180:6,12 185:5
188:24 196:4,5
199:11 205:19
205:25 206:4
208:21 215:15
217:20,23
218:1 225:11
230:2
cases 15:10,25
16:8,21,21
17:3 26:9 27:1
27:21 28:5
29:14 31:1,3
38:4 40:14
44:16 59:10,15
60:22 62:10,11
63:1,1 143:11
145:9 169:2
178:22 184:21
184:25 185:1,4
199:13,17
213:6 214:17

216:11 218:5
220:17
catch 62:24
categories 89:17
89:18,21,22
207:22,22
category 63:21
65:10
Cause 27:3
caused 86:13
90:18,23
causing 191:21
192:9
caveat 118:13
130:20 171:13
Census 19:3
27:10 33:19,23
34:1 35:7,16
37:5 38:8
61:25 62:6
63:10,21 64:18
65:15 66:16,20
66:20 67:1,5,6
67:7,9,10,11
67:24 68:7,9,9
68:14,14,20,21
68:24 69:8,16
69:23 70:10
71:7 72:7
74:10 75:17
77:7 78:11,12
78:13 104:14
104:19 105:15
106:18 108:21
109:8,10,12,17
109:20,23
110:2,19
111:13,16
112:10,21
113:5,22 121:2
121:3,11
123:25 127:4
129:3 130:8,8
130:16 148:1,6
148:14,17
164:2 165:11
165:17 169:12
170:1,9,23
180:25 181:4,5
181:8,10,20,22

181:24 182:17
182:21 186:7,9
192:14,15,18
193:15,15
194:19,22,25
195:7,12,13,15
204:4,10
211:23 218:9
218:15,16,25
219:4,24 221:9
221:12,18,20
221:21,22
222:8,12,12
223:1,17
Censuses 222:13
center 2:10
140:7 142:23
143:1
centroid 143:23
certain 131:24
160:8 170:17
210:9,10 215:4
certainly 7:18
12:16 26:14
28:1,23 29:11
29:14 30:13
49:7 83:23
84:17 89:8
91:1 95:16
117:15 129:7
147:18 158:22
certainty 153:25
certified 1:12
58:23 231:3,13
certify 230:10
231:3,6,8
cetera 82:4,25
103:14 222:22
challenge 58:17
challenged
152:10
chance 149:20
188:13
change 76:20
83:11 84:18
90:15 107:7
118:20,21
119:10 125:22
170:4 193:18
changed 95:11

96:9 190:7
214:25 215:11
222:15 223:3
changes 119:11
119:11 180:20
194:1
changing 199:19
Chapman 31:7
chapter 21:19
79:14,24
105:17 109:13
124:9
chapters 20:9
21:18
characterizati...
47:7 52:15
charge 208:12
chat 79:18
204:11
check 63:12,12
76:8 78:11
84:11 91:24
92:3,9 93:1
94:5 95:7,18
95:20,24
checked 63:15
92:18 95:2
96:1,13 99:15
checking 96:5
choice 51:3
183:21 184:3
214:14,23
216:3,18,22
224:4,10
choices 53:2
choose 183:23
200:15,19
choosing 184:14
choropleth
145:6,9,13,25
146:6,12,17
148:21 150:6
151:17,22,23
156:1 170:20
173:2,4 176:10
176:14 178:8
181:18
choropleths
152:4
chose 103:17

106:11 180:11
chosen 196:14
chunk 141:7
143:19,23
circle 143:20
201:24
Circuit 145:24
circumstances
53:7,19 216:3
citation 20:22
106:8,10,14,17
107:3 110:2,21
128:6
cite 134:21
219:22
cited 199:15
220:13
citing 48:9
220:23
citizen 24:5
33:10 34:22,24
35:10 43:16
44:25 65:13,21
citizens 35:2,3,8
63:6 64:19
65:6,11,16,24
80:6,7 85:15
87:15 121:6
169:19 175:2,9
175:10,15
citizenship 34:1
35:6
city 8:12,14 9:17
9:19 31:11,11
137:19 147:15
153:3 155:3,14
155:18,21
156:3,5,9,10
156:12,13
157:2 158:15
158:18 166:6
173:10 192:11
Civic 2:10
claim 16:5 17:8
29:19 103:12
116:4 117:5
133:6 161:23
claims 13:21,22
13:24 16:4,10
29:12

236
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 64 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

clarifies 211:9
clarify 62:24
   108:9 149:21
   175:3
class 25:15,17
classes 163:13
classic 131:19
clear 39:22 40:3
   144:8 162:15
   189:3 193:12
   199:21
clearer 141:22
   142:16 144:25
clearly 40:1
client 153:19
close 127:19
closely 85:19
   88:2,5 96:14
   153:9,18
cluster 22:5
clustered 186:23
   187:7,9,22
   188:15 202:23
   203:1
clusters 157:7
   157:22 208:23
co-wrote 36:6
coalition 62:17
   62:20 63:1
coalitions 26:13
Coca 31:11
code 13:8 14:9
   14:14 22:16
   31:18,21 66:25
   67:2 69:7
   71:19 74:5,7
   78:8,12 81:14
   81:23 82:13
   83:1,6,17 84:9
   88:23 89:3,4,9
   91:11 92:21
   93:24 94:22,25
   96:3,4,16
   97:17 154:1,5
   161:25 171:23
   174:14,20
   192:3,17,17,18
   198:18,20
   208:22,25
   209:14,17,20

210:13,14
   211:4 212:9,10
   212:13
coded 84:10
   171:17 218:20
coding 112:18
   210:3,4,6
cold 113:25
   114:8
collaborate
   17:21
collateral 45:18
   57:16
colleagues
   225:13
collection 36:23
   37:13,14 38:2
   40:8 165:7,11
Collingwood
   5:15 69:4,7
   84:19,23 85:18
   86:17 87:17
   96:2 98:13
   103:22 107:23
   108:14,18
   109:4 110:4
   112:5 113:1,16
   114:25 116:3
   117:6 127:11
   128:19 191:23
   196:24 202:6
Collingwood's
   5:19 12:21
   13:5,7 86:1,3
   86:10 90:10
   93:24 94:16,21
   95:22 96:7
   106:20 107:4
   107:12,17
   110:3 121:22
   127:14 128:14
   202:3,20
color 148:1,6,9
   148:25 149:2
   150:10,12
   151:5 171:9,12
   171:17,19
   178:24 197:3
coloring 150:5
colors 180:4

Columbus 2:10
combination
   85:17
combine 86:7
   105:23 106:3
   110:11,12
combined 87:14
   104:24
combining
   103:18 106:24
   111:3,4,7,8,12
   112:6,15 113:2
   113:20
come 29:24 41:6
   70:10 77:18
   116:5,7 129:10
   185:2 190:6
   198:2 210:18
   225:23 228:18
comes 28:6
   45:15 78:25
   158:15 189:16
comfortable
   59:2 109:23
coming 116:21
   178:20
command 172:1
   188:10
comment 60:11
common 27:3
   40:13 130:10
   208:2
commonly
   207:10
communities
   25:6,8 26:1
   33:20,24 47:12
   51:2,3,6 52:25
   223:21
Community
   36:23 40:15
   79:14,25
   126:13 223:19
compact 29:1
   47:14 135:11
   135:11,16,17
   140:8 142:11
   142:25 143:2,5
   143:13,18,22
   143:24 178:6,8

179:3
compactness
   53:3,14 135:22
   139:1 140:4
   141:1,7 142:6
   142:14 143:14
   143:16 144:13
   144:14,18
   159:10,19
   180:17
comparative
   203:7
compare 189:12
   192:23
compared 34:21
   34:22 141:12
comparing
   176:18 195:2
competitive
   26:11
competitiveness
   17:22
complain 173:6
   173:19 199:3
complete 5:5
   231:7
completely
   18:24 60:3
   188:2,12
complicated
   120:7 121:8
complies 14:19
   17:20 36:8
   43:2 75:8
   80:11 82:17
   86:24 88:17
   94:19 96:20
   99:4 100:12
   107:14 114:11
   117:22 135:1,6
   140:16 154:17
   158:8 160:15
   162:2 171:4
   186:16 202:5
   206:8 209:5
   211:21 221:3
components
   87:6
comps 132:10
computer 6:11

31:23 53:8
   92:7 122:10,12
   171:6 174:19
   208:25
concatenate
   210:25
concede 178:7
concentrated
   137:19
concentration
   180:14
concerned
   180:17
concerns 45:16
   47:10,18,24
   48:17 50:5,16
   221:5
conclude 91:4
   134:7 162:20
concluded 30:11
   163:6 229:8
concluding
   155:9,10
conclusion 25:1
   29:25 30:5,14
   30:19 83:11
   90:10 94:3
   95:11 100:22
   102:17 103:12
   123:10 127:24
   128:14 133:9
   139:25 167:17
   188:9 212:14
   216:7
conclusions
   78:17 84:18
   151:20,25
   152:3 224:11
   224:16 226:6
conclusively
   123:16
concrete 131:5
conduct 165:2
   168:7
conducted 168:4
   168:5
confer 225:12
   227:15 228:14
confess 160:7
confidence 58:9

237

DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

71:11 74:1
76:3 101:3,16
101:24 102:14
103:6 132:1,6
132:13,18,24
133:1,6,11,17
134:2 223:14
223:16
**confident**
190:14
**configuration**
137:7
**configurations**
32:24 33:7
**configure** 136:5
136:12
**configured**
136:1,10
168:13
**confirm** 99:15
**confirmation**
163:24
**confusing**
200:23
**confusion**
144:11 203:12
**congressional**
15:14 20:14
30:9 218:2
**cons** 199:14
**consequence**
36:24
**conservative**
117:20
**consider** 24:14
25:25 26:3
27:9 48:18
53:1,20 161:15
175:6
**considerable**
25:14
**consideration**
47:19 63:23
**considerations**
47:4 51:16
52:9 53:14,15
155:2
**considered** 47:5
105:5 108:25
152:14

**consistent** 78:13
86:17 106:18
113:14 163:22
**consisting**
230:10
**console** 212:23
**consolidated**
15:13 218:5
**constant** 215:8
**constitute**
138:14
**constituted**
137:22
**constrained**
189:9
**consulting** 29:6
**contain** 132:3
**contained** 71:14
74:2 91:4,9,20
92:1,19 105:2
164:13
**containing**
114:19 115:4
115:12 144:19
**contains** 66:19
71:22 75:23
76:4 82:13
156:5,8 164:6
**Contemporary**
21:8
**contending**
28:12,18
**content** 85:25
**contested** 29:12
**context** 20:5
45:5 51:8
120:5 141:20
141:22,24,24
142:3,14,19
144:7,13 214:8
215:19
**contiguity** 212:2
**contiguous**
47:14
**continues** 82:22
88:21
**continuity** 159:7
**contours** 155:4
**contribute** 147:5
**contributed**

147:13
**contributors**
146:17
**controversial**
74:9
**convergence**
190:24
**conversations**
224:7,19,23
**Cooper** 44:18
**copy** 6:8 14:22
24:12 81:23
94:13,15 98:23
140:19 175:11
**copyright**
146:16
**correct** 7:1
12:13 17:16,23
18:21 24:3
29:22 35:3
37:8 39:4
40:18 42:23
43:18 44:1,10
44:18 48:11
50:1 54:21
55:1,17 56:7
56:12 57:2
58:24 60:13
62:2,3,21
63:19 65:1,17
66:2,22 75:24
75:25 77:18
79:4,15 80:3
80:16,23,25
81:3,7,13
83:13 84:4
85:9 87:20
89:13,15 91:6
91:7 94:6 97:7
97:8,12 98:5
99:20 100:2,19
101:5 102:15
102:16 103:7
103:11,17,21
104:2,9,16,17
104:22 105:3
108:23 110:8
111:5,9,10,18
111:19,22,23
113:5 122:4

125:19 127:2
129:6 134:12
134:22,23
135:2,12,18
136:1,10,22
138:20 139:13
139:23 144:5
144:13 148:2
151:4,9,10
152:21 156:6
159:11 160:17
162:22 164:17
164:22 165:12
165:13 169:13
176:20,23
177:2,11,20
181:24,25
182:23 186:18
194:3 204:5
205:20 207:6
215:1 217:8
221:9 223:17
226:1 227:4,19
227:20,23
228:3,4 230:11
231:6
**corrected**
195:11
**correction** 97:2
**correctly** 15:5
36:15 54:6
69:5 81:14
97:24 137:3
139:22 172:10
209:1 211:7
**correspond**
89:17,21
207:22
**counsel** 4:24 5:1
5:13 11:19,23
13:11 25:21
43:19,22 44:5
44:22 50:3
77:3,9,12,23
78:2 93:20
114:7 145:4
224:7,15,19,24
226:18,22
227:6 228:12
231:9

**count** 35:1,7
62:6,19 87:14
118:17,18
124:10,13
173:1
**counted** 62:5
63:14,20 64:25
**counteracts**
118:21
**counties** 7:11,16
9:6,10 22:2,9
66:16 74:12
104:9 106:24
113:4 115:8,15
115:18,19
116:23 117:16
128:3 137:1,10
138:19,25
139:7,11,16
140:9 141:14
169:16 210:10
210:23,25
211:6,14,23
213:4,16,17,18
213:24 214:1,5
**counting** 104:20
**country** 11:10
18:14,21 19:5
20:24
**county** 7:19,22
8:2,12,16,19
8:25 9:2,19
15:18,19,20,23
16:1,4,16,20
17:2 22:11
30:16 47:6,11
73:14 104:2,6
104:12,15,19
104:25 105:2
105:24 106:3
108:21,23
110:13 111:14
111:17,25
112:3,7,10,17
112:25 113:19
114:13 115:12
115:20,23
116:1 118:23
120:19,20
121:16 122:1

123:11 125:9
136:24 138:7,9
138:12,16,23
138:24,25
139:3,19,21
140:23 141:4
141:10,16,18
142:10,20,22
143:3,6 144:1
153:2,8,16
154:12,13,13
154:14,14,18
154:23 156:11
157:20 158:16
160:3,23 161:2
161:3,5,11
162:4,11,21
163:8 164:16
164:22 166:22
167:2 202:19
209:17,21,24
211:4 213:15
213:15 231:2
**County's** 155:17
155:20 163:2,9
164:12
**couple** 22:23
120:23 173:8
207:7
**course** 20:14
39:10 57:3
157:4 183:4
**courses** 203:25
**court** 1:1 27:19
42:11 43:25
44:8,24 45:8
50:21 51:10,21
52:4,16 53:8
54:19 55:6,9
55:14 57:13,25
74:10 78:20
95:17 145:7,8
145:12,16
146:5 152:10
152:13 162:13
167:20 168:3
199:22 213:5
230:1
**Court's** 51:18
**courts** 27:24

146:3,9 152:9
199:17
**Courts'** 52:17
**cover** 21:1,4
**covering** 184:11
**Covid** 36:24
**Covington** 26:23
**craft** 49:16
**create** 14:4
46:25 69:7
151:19,23
152:5 168:23
172:6 176:13
187:3
**created** 80:6
147:13 151:24
152:5
**creates** 68:8
212:17
**creating** 28:13
28:19 202:13
213:4
**credit** 27:25
**criteria** 51:4
134:18,21
135:2,7 159:19
**criticism** 152:14
**criticisms**
197:23
**criticized** 59:11
59:21
**cross** 26:16
134:15
**crosses** 102:22
**crossover** 214:8
217:3,7
**crucial** 26:14
27:14 150:15
150:20
**crunching** 14:7
**CSV** 212:11
**cumbersome**
22:18
**cumulative**
212:17
**cured** 41:5
**curious** 78:24
88:3 107:3
128:5
**current** 14:22

218:1
**currently** 6:14
17:15 225:5
**customizable**
182:16
**cut** 52:3 76:17
216:20
**CV** 14:20,23
16:22 17:4
23:17 31:2,4
59:7,10
**CVAP** 18:23,25
19:2 33:10,13
33:18,22 34:5
34:15,19 36:12
36:20 37:6,9
40:14 41:11
44:1,9,13 45:2
45:4,9,17,19
50:14 51:14
55:16 56:11,19
56:20,25,25
59:13,23 60:1
60:8,12,20
61:11,16,18,20
61:24 63:5,17
64:4,17 65:1,4
65:14,23 79:3
79:8 80:2,17
80:24,24 81:2
81:2,6,10
82:25 83:2,7,9
83:13,13,23,25
84:3 85:6,8,11
86:6 87:22,23
88:11,25 89:1
89:6,7,15,19
89:23 96:24
97:4,9,9 99:8,9
99:25 100:15
101:1,7,11,18
101:21 102:1,5
103:2,12
108:23 111:18
111:18,21,24
112:2,9,16
114:18 119:19
119:20 120:5
121:12,25
122:9,16,19,22

122:24 123:18
124:15,21,25
125:2,5,9,11
129:4,21,24
173:23,23
174:8 175:12
175:18,22
186:18,21
189:17 206:14
207:5,11,18,23
**CVAP_black_...**
89:10
**CVAP_black_...**
89:12
**CVAP_block_...**
88:20

---

# D

**D** 1:3 3:1 91:5
92:2 94:1
97:11,18
101:12 103:20
104:8,11,22
134:11 230:3
**D-1** 96:25 97:4
97:22 98:5
99:10 100:1,16
**D.C** 2:3
**D1** 83:4
**D1_CVAP** 82:21
82:24
**Dare** 7:18,19,21
**dark** 171:6
**data** 13:8 14:6
18:14 19:3,8
22:5 24:6
27:10,17 33:10
33:10,13,18,19
33:22,23 34:9
35:16,16 36:23
37:2,6,10,18
37:25 38:2,8,9
40:7,14,20,24
40:25 41:10,11
44:13 45:17,19
51:25 52:8,22
54:5,5,8,14,16
54:20 55:20,20
56:15,19,20,25
57:13,17,17,18

57:22 58:2,3
58:22 59:13,23
64:6,16 67:7
69:3,4 70:9,12
70:13 71:18
76:8 97:25
98:1,2,4,9,9
100:1 101:1,18
102:1,7,23
106:3,4 108:12
109:17,23
110:2,19
113:22 118:17
118:18 121:4,5
122:1,1 123:21
123:22 124:10
124:13 127:14
127:23 132:19
146:25 147:1
148:22 150:14
150:23 152:15
161:24 183:17
183:18,22
184:11,14
188:11,21
192:14,18
197:23 206:14
207:1,6,6,11
207:11,11,12
207:13,14,15
207:18,21,23
208:2,6,8
212:16 218:9,9
218:11,14
219:5,24 220:1
221:5,6,12,17
221:17,21,22
221:25 222:3,4
222:8,12,16
223:1,4,6,7,8
223:10,17,20
223:22
**date** 36:22 146:3
222:17
**dates** 137:12
**Dave's** 32:8,10
32:13
**day** 85:23 86:16
88:7 107:7
194:12 230:15

239

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 67 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

deal 101:20
  150:14
dealing 201:23
  201:25
debate 161:20
  161:22
decade 20:15
  21:5 26:10,24
  27:15
decades 222:5,7
  222:17,25
  223:8
deceiving
  191:19
December 9:24
  35:24
decennial 121:1
  121:3,11
  192:15 193:14
  218:15 221:9
  223:17
decide 148:23
  168:15 170:1
  216:13
decided 106:17
declined 27:25
decreases
  185:23
dedicated
  144:21
deeply 27:6
default 211:11
defendant 29:17
defendants 1:8
  2:12 29:22
  42:18 44:16
  143:12,15
  230:8
defendants'
  90:18,22
defense 29:19
defer 51:5 160:9
define 7:24 25:8
  153:25 161:1
defined 61:25
  161:9 210:23
defining 161:4
definitely 106:8
  125:24 174:4
definition

128:23
degree 6:24 7:6
  133:1 215:4
degrees 215:7
delete 138:18
democratic
  47:17 48:6,15
  49:1
demographic
  18:13,20 19:5
demonstrate
  191:20
demonstrated
  96:2
demonstrates
  114:25 140:22
demonstration
  7:12,22,25
  17:13 25:18
  29:2 32:15
  79:4 83:3,3,18
  84:3 91:5,9
  92:1,19 94:1
  94:23 95:1,4
  97:10,18
  101:11 103:18
  103:20 104:8
  104:21 105:1
  114:14 116:12
  126:12,14,25
  127:2 134:10
  134:13,25
  135:5,10,16,25
  136:9,15,19,22
  137:25 140:24
  141:5 144:3
  151:20,22,24
  152:1,18
  154:24 155:12
  156:16,18,22
  156:23 157:3
  157:17,18,25
  159:5,11 160:2
  160:16,20
  161:6 162:22
  163:3,6,10
  164:13,21
  165:4,14,17,18
  165:22,23
  166:2 167:1

176:7 209:10
  209:25 223:25
  224:2,5,11,16
  224:20 225:19
  226:6,11,16,25
  227:2,7,19,22
  227:25 228:8
  228:12
denominator
  63:7,17 64:9
  64:10,14 119:6
  120:8 121:6,19
  125:21 126:3,7
density 128:24
  145:5,8,13,25
  146:6 155:7
  158:20 168:19
  168:23 169:2,8
  169:12,18
  170:5 173:22
  174:8 175:13
  175:17 176:1,6
  176:16 177:19
  177:23 178:3
  180:1,22
  184:24 185:1
  187:3,7 188:2
  188:17 193:3
  194:13 196:1
  199:13,19,22
  200:4 201:16
  204:21,24
  205:10,18,24
  217:19
depart 53:3
depend 53:19
  63:9
dependent
  103:14
Depending
  126:19
depends 63:24
  65:9 164:9
  177:3 226:7
depict 195:18
depicted 172:9
  195:23 203:13
depicting 182:18
  197:23
depiction 186:6

198:4
deponent 3:2 4:2
deposed 4:14
  15:4,6
deposition 1:11
  3:5 4:17 5:12
  5:23 6:1,4,7
  10:11 12:3,6
  35:20 41:22
  46:1 57:9
  67:18 72:10
  74:17 77:2,15
  77:16 79:19
  81:18 94:9
  95:13,19,20
  98:20 145:2
  149:16 158:13
  166:15 174:21
  175:6,21
  179:11 204:13
  219:12 229:8
  230:10,11
  231:4,6
depositions
  225:7
depth 49:23
describe 21:17
  21:19 65:10
  150:19 206:13
  207:5 208:20
described 66:1
  75:5 134:11
  213:4
describing 153:6
description
  206:19
designed 199:10
designs 156:16
determine 50:5
  91:8 126:24
  162:10 163:21
  185:16 198:25
determining
  51:15 52:8
  211:4
development
  20:23
deviation 128:25
Dickson 26:23
difference 78:1

150:24 151:12
  171:11
differences
  92:13 150:14
different 25:8
  41:4 46:20
  60:3 76:20
  84:21 98:6
  105:14 109:23
  111:5,8,12
  118:15 119:17
  120:24 138:22
  147:22 161:12
  164:1 169:15
  171:15,21
  173:8 180:4
  187:25 188:2
  188:12 190:14
  190:15 191:23
  191:25 192:2,4
  192:21,25
  194:3,3,8,9
  195:4 197:5
  198:5,12,14,17
  199:4 208:1,7
  215:6,7 221:6
  226:17
differential
  218:19 219:1,8
differently
  172:4 181:3
  201:20
difficult 173:1
  197:4 223:12
dig 90:15 153:20
  154:4
digging 107:10
diluted 42:12
direct 152:3
  166:21
direction 113:19
  186:9,10
  195:12,21
  211:20
directive 51:10
directly 12:16
  29:11 37:20
  104:14,19
  108:21 111:16
  111:20 112:21

240

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 68 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

113:4 231:9
**disaggregate**
41:3,11 56:10
208:8
**disaggregated**
40:15 97:25
98:1,4 189:25
**disaggregating**
41:6 56:19
206:14
**disaggregation**
56:10 206:14
219:3 223:12
**disagree** 109:3
193:7 195:5,24
**disagreement**
143:11
**disappear** 22:25
**disappeared**
23:1
**disappears** 23:7
**discipline** 25:3
**disclaim** 18:24
**disclaimer** 37:3
37:13 38:1,6
**disclose** 15:3
**disclosed** 226:1
**disclosure**
221:13
**discourse** 52:14
**discrepancy**
77:6 78:24
**discuss** 23:8,21
77:2,5,17,22
136:21 152:18
**discussed** 49:15
77:19 90:18
**discussing** 16:23
43:4,10 89:18
89:22 160:16
160:19 199:14
**Discussion**
10:18
**discussions**
144:7
**dislike** 158:5
**dispersed**
196:23
**dispute** 16:14
68:1 72:18

73:12,24 75:16
82:2,12 94:3,4
95:2,3,5
100:21 112:12
127:13 135:9
135:14,15,20
135:20 168:22
206:23 213:11
220:9
**disputing** 90:10
110:5 127:24
128:14
**disruptive** 128:4
**dissertation**
21:7,14,18
23:8 25:7
27:17
**distance** 185:23
**distinguish**
142:8 151:2,8
**distributed**
130:3,7,9
186:11,22
187:14,23
188:5 190:1,3
**distributes**
186:1
**distribution**
128:22 129:5
129:12 131:7
137:17 139:7
141:25 142:20
143:5 169:4
176:17 178:4
178:13 185:18
185:20 186:17
187:13 189:11
192:6,8 193:1
193:8 194:9
203:8,10
**district** 1:1,1
16:17 28:14,14
28:20,20 29:7
30:20 32:24
33:6,15 36:12
42:4,22 43:5
43:11,14,16
45:8 46:11,15
46:16,25 47:9
47:16 48:15

50:14 51:23
52:1,9 54:4
55:15,15 61:11
62:18 65:11,12
65:19 83:3,3
84:4 92:23
93:14,15,16
95:15 96:8,18
96:25 97:4,21
98:5,8 99:9,10
100:1,16 101:8
101:12,22
102:6 103:13
114:15 116:6,8
116:12,17
117:24,25
118:2 119:1
120:12,13,15
125:15 126:12
126:15 134:13
134:25 135:10
136:16,19,22
136:25 137:2
137:10,25
138:11,16
139:5 140:24
141:5,8,11
142:11 143:13
143:14,17,18
143:23 151:14
151:21,22,24
152:1,18 153:1
153:19 154:3,9
154:9,19,24
155:6,12 156:3
156:5,8,12,16
156:18,22,23
157:3,9,17,17
157:18,25
158:12,15,24
159:5,11,14,18
159:21 160:3,5
160:16,20,22
161:2,6,10,19
162:10,22,25
163:4,6,10
164:6,9,13,16
164:21 165:4
165:14,17,19
165:22,24

166:3,22 167:1
167:3,4 169:13
170:8,9,14,15
176:7,24 177:2
177:3,5,9,11
177:24 187:18
187:20,21,24
188:5 193:2
194:10,11
209:10,25
212:1,3,4,20
212:22 214:8
214:10,11,12
214:19,22,25
215:11,19
216:1,8,8,14
217:2,3,6,7
224:1,2,5,12
224:16,21
225:19 226:6
226:11,16,25
227:2,7 228:1
228:9,13 230:1
230:1
**district's** 36:14
61:16
**districts** 7:12,22
7:25 15:14,14
15:15 16:13
17:13,14 25:18
25:19 26:25
28:24 29:2
30:9,15,23
32:16,21 35:8
42:21 43:25
44:17,25 45:2
45:14,21 47:14
49:2 52:19
56:6 58:10,15
58:17 79:4
83:18 84:20
91:5,10 92:1
92:19 93:2
94:1,23 95:1,4
97:10,18
103:18,20,24
104:8,8,11,22
105:1 114:14
126:25 127:2
134:10,14

135:12 136:1
137:15,22,23
144:4,5 164:2
166:19 167:21
169:5 206:20
206:24 213:11
213:15 216:11
218:3
**divide** 177:24
**divided** 67:10
71:9 80:22
**dividing** 80:6
**DIVISION** 1:2
230:2
**divisions** 162:15
**document** 10:14
35:19 36:1,1
53:22 87:25
103:10 219:18
219:22 220:5,6
220:12,13,18
220:21 221:2
221:11
**documents** 5:25
6:6,10 13:11
13:14
**Dodge** 31:11
**doing** 30:12 33:1
33:4 41:1
48:13 59:2
62:17 96:23
109:19 118:17
121:1 163:25
198:8,11
199:18
**dollars** 223:20
**door** 191:11
**dot** 128:11,13,18
145:5,8,13,25
146:6 155:7
157:5,11
158:20 168:19
168:23 169:1,8
169:12,18,19
169:21 170:2,4
170:5,7 171:23
172:7,7 173:7
173:9,22 174:2
174:8 175:9,12
175:17 176:1,6

241

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 69 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

176:16 177:19
177:23 178:3
178:20,24
180:1,22
181:13,15,15
181:20 182:3,5
182:6,14,18,22
184:2,18,20,22
184:23,23,25
186:3 187:3,6
188:1,17 190:3
190:12,13,19
190:22,25
191:1,7 192:24
192:24 193:3
194:13 195:3
195:15 196:1,3
198:6,8,11
199:10,13,18
199:22 200:1,3
200:24 201:15
202:24 204:20
204:24 205:5
205:10,13,18
205:24 217:19
217:20
**dots** 157:14,16
157:19 171:6,7
171:7,14
172:20 173:11
180:8,22
181:11 192:14
193:20 194:6
196:9,12 197:1
197:4,10,10,20
197:20 198:9
198:12,17,21
199:5,23
200:10,25
201:3,4,21
202:7 205:2,2
205:15,15
**double** 62:19
**double-check**
74:4 93:3,9,10
**double-checked**
95:13
**doubt** 154:10
**download** 36:2
69:4,5

**downloaded**
67:5 70:9
**downsides**
148:22
**Dr** 4:7 5:15,19
5:22 10:25
11:3 12:5,13
12:21 13:1,5,7
32:2,20 35:23
44:24 48:20
50:11 58:6,14
63:15 66:13
69:4,7 77:14
77:22 84:19,23
85:18 86:1,2,3
86:10,17 87:17
90:10 93:24
94:16,21 95:22
96:2,7 98:13
103:22 106:20
107:4,12,17,23
108:14,18
109:4 110:3,4
112:5 113:1,16
114:25 116:3
117:6 121:22
127:11,14,21
128:12,14,19
128:20 169:3,9
184:22 191:23
193:11 195:25
196:24 197:16
198:16 202:3,6
202:20 205:1
205:11,18,24
208:21,25
209:14 211:3
211:13 214:3
217:17,19
225:1,9,18
228:3,23
**draw** 32:20 33:6
47:9,16 48:15
50:13 58:3
146:14 151:20
159:18 168:11
209:19 213:10
213:14
**drawbacks** 41:2
41:17

**drawing** 8:1
43:14 47:13
50:16 159:10
160:5 178:10
201:18
**drawn** 25:18,19
29:2 47:25
48:5 51:13
57:22 134:25
135:5,10,16
137:10,15
157:25 159:22
164:10 176:16
201:6,7,8
**draws** 192:6
**drew** 7:13,23
42:21 43:5,12
46:11 49:24
50:22 134:19
201:12 202:17
**Drive** 2:10
**driving** 9:2,8
**drop** 142:23
166:8 204:11
**dropping** 140:23
141:4
**due** 221:4
**dug** 78:23 154:1
**Duke** 6:25 7:6
**duly** 4:3 231:4
**Durham** 7:3,9
**dwarfed** 90:22

---

**E**

**E** 3:1,4 136:16
136:19 224:1,2
224:5,12,16,21
225:19 226:11
226:16,25
227:2,7,19,22
228:1,9,13
**earlier** 12:2
142:5 174:20
179:21 185:19
192:5 210:13
**early** 59:20
127:18
**easier** 92:14
207:1
**easily** 182:15

**eastern** 1:1,2
139:18 141:15
230:1,2
**easy** 191:20
**ecological** 16:14
16:17
**Edgecombe** 8:18
8:25 9:1 211:5
211:10,14,24
**effect** 23:3,7
29:12 84:24
126:4 156:3
**effectively** 173:2
**effects** 22:25
23:1 126:9
**egregious**
159:25 160:1
**either** 35:17
36:20 106:1,17
107:6 108:12
110:5 117:6
140:5 181:17
193:4 199:19
216:20
**elect** 214:13
216:3
**elections** 1:7
16:15 21:22
22:1,23 23:20
230:7
**electorate** 36:14
**electronic** 229:2
**eliminate** 118:11
118:19
**Elisabeth** 2:2
4:8
**Elisabeth.theo...**
2:4
**Elizabeth** 9:17
9:19 153:3
155:3,13,18,21
156:3,5,9,10
156:12,13
157:2 158:15
158:18 173:10
192:11
**employ** 175:9
**employed** 17:15
169:3
**employee** 231:8

231:8
**empty** 150:1,9
180:13
**enable** 21:20
175:23
**enacted** 135:11
135:17 166:19
213:23 217:2,6
**encountered**
60:7
**ends** 140:10
141:2,9
**engage** 106:23
167:20
**engaged** 31:4
56:10 107:23
188:25
**engagement**
16:9,11
**engagements**
15:2 59:8
**entire** 115:4
126:17 137:17
157:20
**entirely** 53:10
94:1 116:10
215:25
**entitled** 21:7
77:14
**entity** 28:12,13
28:18,19
**enumerated**
222:4,17 223:7
**Eprouty@bak...**
2:11
**equal** 151:12
159:7 198:19
**equals** 82:25
88:20 173:9
174:3 182:3,6
198:15
**equation** 109:13
**equipped** 168:6
**equivalency**
92:5 93:21
**equivalent**
157:21
**Erika** 2:9 208:12
**error** 34:8 37:11
39:7,11 54:25

242

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 70 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

55:4,5,13,17
55:21,23,25
56:3 57:19,21
58:7,7,15 59:3
59:12,23,25
60:12,19 61:6
61:11,15 79:2
79:8,13 80:17
80:21 81:2,6
81:10 82:14
83:2,7,8,10,12
83:16,18,21,25
84:2,8,13,15
84:23,25 85:3
85:6,8,21,22
85:24 86:6,7
86:11,13,20
87:5,13,18,19
87:21 88:2,6
88:11,24 89:5
90:4,5,14,17
90:18,21,22,23
91:2 96:3,4,7
96:12 97:6
101:19 102:2
103:14,18,19
103:23,25
104:2,5,6,15
104:18,21
105:5,10,23,24
106:23,24,25
107:9 108:8,20
108:22 109:5
109:21,24
110:7,13
111:14,17,20
111:21,25
112:3,8,9,16
112:22 113:3,4
113:8,9 114:18
114:20,21
115:2,3,7,10
115:12,22,24
115:25 116:10
117:10,11
118:1,2,12,19
118:22,24,25
119:1,3,7,14
119:22,23,24
120:8,14,15,18

121:8,14,17,19
121:25 122:21
122:24 123:7
123:10,16,25
124:2,4,6,7,10
124:17,24
125:5,10,18,20
125:25 126:6
126:15,17,22
128:2 129:4,5
131:7,25 132:3
132:12 147:23
175:25 176:3
182:9 183:24
186:8,10,18
188:6,11,12
189:4,6,7,12
189:16 190:13
191:9,12,21
195:11,12,20
202:12 210:3,4
210:6,14,21
**errors** 41:10,14
83:14 96:6
107:22 108:1,4
108:11,14
112:19 186:21
187:9 188:4
189:14 190:1,3
190:5,8,16,18
190:22 191:2
191:17 203:18
**especially** 155:3
180:16
**Esselstyn** 5:15
5:17 7:13,23
10:25 11:3
92:4,21 93:21
97:20 98:16
99:7 100:7
135:1,6,10,16
148:4 153:10
153:18 159:3
196:24
**Esselstyn's**
32:24 79:4
91:5 98:24
101:7,15 103:2
114:14 128:18
134:11 135:25

136:15,22
140:14 145:2
154:4 206:11
206:18
**established**
99:18 220:16
**estimate** 44:2,6
45:20,22 50:2
54:9,12,13,17
61:12,16 80:18
85:8,12 86:3,6
87:6 97:21
101:8,21 102:5
113:20 120:3,6
122:17,19
124:5,14 125:5
129:13,15,17
129:21 130:18
131:6 132:11
**estimated** 84:19
86:17 92:7
96:7,24 97:3
99:8,9 102:10
102:18 103:12
119:20 120:6
121:7 123:5,6
**estimates** 39:3
44:11 45:20
55:1,6 56:5,9
58:4 61:18,20
64:18 65:5,14
65:22,23 71:4
79:3,8 83:23
83:25 85:15
86:1 120:9
130:9,22,24
131:4 186:18
186:21
**estimating**
113:22 117:18
131:3
**estimation**
113:15 117:19
**et** 1:7 82:3,25
103:14 222:22
230:7
**ethnicity** 24:23
222:3,16 223:4
223:6
**evaluate** 13:22

100:23
**evaluated** 42:20
**evaluating** 13:21
13:24 16:16
17:13
**event** 82:11
**everybody** 229:3
**evidence** 47:24
48:10 53:15,20
**evidentiary** 42:3
49:12
**exact** 48:24
201:24
**exactly** 8:11
41:15 145:17
213:12 216:4
218:21
**Examination**
3:3 4:5
**examine** 169:4
**examined** 4:3
**example** 15:1
65:20 112:14
113:10 146:12
151:1 184:16
194:22 207:2
218:19 221:16
**examples** 26:17
28:24 30:7
183:5 184:25
**exception** 222:9
223:2
**exclude** 61:21
63:22 138:5
**excluded** 27:19
27:22 47:19
126:11 159:3
164:20
**excluding**
128:13 155:5
177:22
**excuse** 65:19
**exercise** 74:8
**exhibit** 3:6,7,7,8
3:8,9,9,10,10
3:11,11,12,12
3:13,13,14
10:10,11 14:17
35:19,20 41:21
41:22 45:25

46:1 57:8,9
59:5 66:5
67:17,18 72:9
72:10 74:16,17
79:18,19 81:17
81:18 86:22
88:15 94:8,9
97:14,15 98:19
98:20 140:15
166:9,14,15
174:17 175:6
179:5,7,10,11
204:12,13
219:11,12
**exhibits** 3:5
174:18
**exist** 134:5 157:7
190:5
**existence** 47:23
**exit** 18:14 19:8
**expanding**
118:19
**expect** 191:4
**expectation**
130:19,22
131:12
**expedited** 229:6
**experience**
25:14 133:23
134:9 150:12
**expert** 9:13
10:14,20 11:20
11:25 12:4
14:17 15:1,7
16:18,22 17:3
18:19 19:4,7
19:10,13,16
24:14,18 25:25
26:3,18 27:9
27:12,18 28:2
28:11,17 29:2
29:6,13,21,25
33:15 37:7,14
37:19 40:21
42:17 46:6
51:13,15 59:6
59:8,11,22
60:16 95:9
108:7,9 127:20
216:7,16,25

243

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 71 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

217:11 225:2
225:10 226:8
**expertise** 25:11
26:6 27:13
167:16,23
**experts** 10:25
40:14 52:18
190:6,11 225:7
226:19,21
**explain** 21:24
70:11 142:13
149:13,17
171:14 173:8
**explained** 86:9
153:15 200:2
**explaining** 142:5
**explains** 87:4
214:3
**explanation**
130:13
**explication**
142:18 144:9
**explored** 22:22
**exponentiated**
129:1
**expressing**
12:12
**extends** 153:2
160:22 161:2
**extensively**
18:13 25:17
**extent** 24:17,21
24:25 25:1
77:24 157:7
224:6 226:15
**exterior** 162:17
**extreme** 183:6
**extremes** 143:2
143:25 186:5
**eye** 172:3 191:19
**eyeball** 51:24
92:12 162:14
168:4,7

**F**

**fact** 48:9 60:10
168:15 170:7
183:12 184:10
185:10 187:21
211:13 227:22

**fail** 84:7
**failed** 34:1 59:25
**failing** 59:11,22
**failure** 103:16
132:9
**fair** 4:22 5:9
27:23,24 33:11
47:6 52:15
53:9 63:3
151:7 175:7
177:7
**fairly** 88:7
133:24 190:14
**fall** 148:19
**falls** 114:13
**familiar** 52:25
169:8 213:3
**familiarity**
147:17
**familiarize**
11:11
**far** 38:22 115:9
123:21
**fashion** 186:24
187:8
**favor** 85:21
86:13 87:19
88:6 90:14,18
90:22,23
**favorite** 173:17
**Fayetteville**
71:24
**February** 46:7
**federal** 18:15
**fell** 140:11
**felt** 59:2
**fewer** 126:12
**fields** 25:11
**fight** 27:23
208:7
**fighting** 61:4
**figure** 49:24
53:24 146:11
149:24 150:5
154:6 155:7
156:20 157:13
158:7 164:15
165:8 168:20
171:2,2,5
172:12 173:11

174:2 182:12
184:7 199:1
202:7,13,18,25
209:3,6,9,13
209:16,21
218:21
**figured** 109:7
208:6
**figures** 55:8
**file** 92:4,5 93:21
212:11
**filed** 9:15 46:7
59:17 179:20
220:10
**files** 92:15
**filibuster** 122:11
**fill** 143:20 150:9
**filling** 173:3,5
**filter** 210:24
**final** 78:16 102:8
117:18
**financially**
231:9
**find** 35:1 49:15
108:25 149:17
210:16 230:11
**finding** 23:3
133:19 158:2
**fine** 57:18 114:2
114:6 202:14
**fire** 96:10
**firm** 4:8
**firmer** 213:14
**first** 4:2,13 9:12
23:3 27:1 60:6
74:4 81:1 82:3
85:7 90:17
122:8,15,24
123:2 176:11
201:6,12
211:22 213:16
227:18 231:4
**fit** 65:10 95:24
**five** 182:5
195:16
**five-minute**
203:14
**five-year** 54:12
54:13,17
**fleshed** 215:25

**flip** 17:18 100:10
113:23 114:10
173:21 196:25
**flipping** 150:22
**Florida** 17:5
**focus** 102:21
141:13 181:19
184:6
**focused** 26:19
**focuses** 144:17
**follow** 40:2
62:23 159:14
167:22 217:18
229:7
**following** 192:13
**follows** 4:4
115:16 155:3
**footnote** 133:4
133:12,15
186:15
**force** 211:14,17
**forced** 56:1
**forces** 211:5
**foregoing**
230:10 231:6
**form** 82:5
161:19 224:4
**formed** 136:18
224:1 225:18
**formula** 80:13
80:16,20 81:5
81:11,15 84:8
85:5 87:1,4,12
87:21,25 88:2
88:9 90:11
96:12 103:17
110:7,13
117:19 119:3
120:7 121:8
124:1 126:6
129:8
**forth** 213:17
215:7
**forthcoming**
82:8
**forward** 77:20
**found** 22:25
42:11 49:2
107:10
**foundation**

170:12
**four** 56:18 57:1
163:13,14
**fraction** 124:3,6
**frame** 212:17
**frequentism**
131:19 185:22
**front** 24:12
**froze** 30:9
**frozen** 209:11
**full** 4:10 29:3
87:25
**fully** 30:11 200:7
200:16
**function** 91:12
91:14,17,25
119:15 128:24
**fundamental**
143:10
**funding** 215:7
**further** 13:17
47:15 66:16
86:14,16 222:4
222:16 223:7
231:6,8

**G**

**Galveston** 30:16
**game** 55:3 175:7
**Gate's** 218:22
**Gates** 153:8,16
154:13,14
161:13,14,17
161:20
**general** 12:3
117:8 159:13
176:14 178:13
190:23 197:22
199:13 207:8
215:16,25
**generalizable**
115:17
**generalization**
38:17
**generalized**
50:24 116:25
**generalizes**
115:9
**generally** 51:5
60:1 104:1,4

244

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 72 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

118:11 119:1
119:14 124:10
126:20 127:13
127:22 128:7
128:16 133:19
169:22 170:12
170:13,20
178:7 189:19
194:17 215:14
**generate** 192:12
**genuinely** 78:24
107:2
**geocoding** 171:1
**geocodings**
170:24
**geographic**
111:4,8,12
170:13 183:11
185:9
**geographically**
111:1 170:22
186:23 187:7
**geographies**
69:12 74:10
**geography** 26:4
26:7,9 147:17
**geometries** 92:6
**germane** 25:12
**gerrymanderi...**
16:1
**getting** 6:24 7:6
49:25 50:7
113:25 114:8
120:24 121:9
131:23 157:19
194:24 205:7
**Gingles** 29:4
30:1 31:4 44:3
45:16 57:6
58:11 60:3,9
60:16 143:12
178:6
**girls** 163:14,14
163:18
**give** 5:5 22:12
22:12 69:18
78:21 131:2
138:6 148:10
168:12 173:8
175:3 177:23

178:13 186:6
191:22 192:25
203:5 207:2,8
221:16
**given** 39:19,23
52:16 58:2
63:10 131:23
174:16,17
175:5 187:21
230:11 231:7
**gives** 84:17
97:20 132:7
178:17 193:6,7
194:8 198:4
**giving** 200:24
**go** 8:24 9:2,8
26:15 28:22
29:9 33:3 35:5
37:16 38:25
39:6,18 40:11
46:23 48:2,22
49:10 50:19,25
51:1 52:12
53:18,21 54:23
68:11 74:4
75:3 76:8,21
78:11 82:16
86:21,23 88:16
89:22 94:18
95:7,18 102:20
106:6 116:14
117:14 120:22
121:21 124:1
146:11 148:8
158:7 160:14
179:14,23
208:13 217:14
222:2 223:25
**goal** 46:24 47:4
47:8 49:25
50:6,13 176:6
176:12
**goes** 88:11,25
89:6 221:16
**going** 10:9 14:12
26:24 33:9
35:18 40:2
41:19,20 45:25
49:22 50:22
55:22 57:7,7

58:19 60:21
62:23 64:18
65:15 66:6
76:19 77:19
79:17 81:17
95:14 96:16
98:18,18 104:1
108:11,13
110:16 113:19
113:24 125:14
125:16 128:12
132:17,25
134:1 142:5
143:1 148:23
148:24 156:11
156:12,13
157:4 158:16
166:8,13
170:15 176:2
177:1 179:2,6
179:9 183:4,5
184:15,21
185:14 186:9
186:11 187:13
188:5 189:5,5
190:8,17,18
191:17 193:18
195:21,22
197:6 203:22
204:11 208:12
211:19 215:5
217:9 219:10
221:24 223:11
224:8 226:7,10
227:9,14
**good** 4:7 41:7
66:8 76:20
127:7 149:20
150:14 186:20
188:13 189:8
194:24 195:2
229:3
**gosh** 109:15
**government**
28:12,13,18,19
**grad** 133:24
**gray** 197:9,20
205:3
**great** 24:13
184:16

**greater** 24:19
34:6,16 62:16
82:23 124:16
151:13,16
185:23,24
**green** 158:25
**greenish** 148:10
**Grofman** 36:6
**groove** 175:15
**ground** 58:18
**grounds** 49:13
52:24
**group** 29:1 41:7
56:11 62:12
70:19 71:14,21
72:25 73:14
74:2 95:15
103:25 104:4,5
104:25 105:16
105:24 106:4
110:8,11,12,12
113:13,21
115:2 119:17
119:25 122:2,8
122:15,18,22
122:25 123:2,3
124:20,20
125:2,8,10
126:11,14,17
175:24 178:5,7
188:13,15
189:7 194:19
194:21 206:15
207:6 210:22
210:23,23
211:1 214:14
216:1 218:23
**grouped** 209:24
**Grouping** 209:7
**groupings**
113:20,21
209:10,18
210:7 211:5
213:4,15,16
**groups** 56:7,19
62:13,16 66:20
67:15 68:9,14
69:24 70:2,5
70:23,25 72:2
72:20 73:9

74:13 78:18
91:3,8,15,18
91:24 92:9,12
92:18,22 93:2
93:13,14,25
94:22 95:1,8
96:17,25 97:4
97:10,17 98:4
99:8,10 100:1
100:15 102:9
102:17 103:19
105:16 106:12
106:25 107:1
110:25 111:3,7
112:6,15 113:3
114:19,21
115:4,9,11,13
115:23 116:11
117:25 118:23
120:13,18,20
121:15 122:5
123:11 124:16
126:24 128:3
187:19 189:10
189:13,16,17
189:24
**grow** 118:12
**gubernatorial**
17:23
**guess** 7:24 10:4
12:10 13:12,25
14:2 24:24
25:9 29:3,17
58:9 63:9,13
69:13 70:12
71:24 93:3
128:10 138:5
138:10 147:23
149:4,16
157:23 158:6
158:10,13
172:4 179:3
195:4 196:6
220:2
**guidance** 50:21
51:18 52:16
106:1 108:25
162:13
**Guilford** 166:22
167:11 231:2

245
Case 4:23-cv-00193-D-RN     Document 88-2     Filed 10/28/24     Page 73 of 95
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

**H**

**H** 3:4
**half** 20:15 114:4
  176:25 177:10
**Halifax** 142:22
**Hall** 27:5
**hand** 231:10
**handbook** 79:14
  79:25 80:10
  86:21 105:12
  105:17,22
  109:14
**handling** 217:12
**happen** 125:14
**happened** 28:1
  223:10
**happening**
  124:15
**happens** 126:19
**happiest** 197:25
**happy** 199:4
  225:14
**hard** 6:8 24:11
  94:13 140:19
**Harris** 44:19
**HCVAP** 47:16
  47:23 48:6,15
  49:1,25 54:4
**head** 8:11 25:24
  29:16 50:23
  71:5,12 210:5
**headache** 34:2
**hearing** 42:3,9
  49:12
**heart** 185:22
**heavily** 162:16
  162:17,18
  202:23 203:1
**held** 42:7 215:8
  222:22
**help** 11:19,23
  74:10 140:25
  141:6 227:17
**helpful** 162:13
  175:7
**Henderson** 8:5,8
  8:10 166:6
**Hertford** 140:23
  141:10 143:6
**heterogeneity**

187:17
**high** 133:1 155:5
  158:22 190:9
**higher** 24:18
  35:11 36:21
  37:1 38:10,14
  38:19 47:16,23
  48:5,15 53:13
  104:1,6 112:8
  113:3 115:3,24
  117:11 125:10
  129:13 132:22
  156:17 159:18
  189:5
**highest** 211:25
  212:16
**highlighted**
  222:3 223:6
**highly** 156:21
  157:6
**Hill** 169:3
  184:22 185:4
  196:5 204:25
  205:11,19,25
**Hillsborough**
  2:7
**Hispanic** 43:16
  44:1,8,25 45:9
  50:25 51:2,3,6
  61:22 62:5
  63:6,11,16
  64:3,7,25
  65:14,21
  178:20,23
  179:2
**Hobbs** 42:4
**Hodges** 17:7,12
**Hold** 35:25
**holidays** 61:5
**honestly** 87:16
  89:2 98:11
  145:14 153:23
  176:4
**hope** 208:15
**Hostetler** 2:9
**hour** 1:13 76:19
  76:21
**hours** 10:1 11:15
**house** 15:14
  17:22,25 18:1

18:6 218:2
**households**
  38:11,15,19,21
  40:9
**hub** 40:21 41:11
  56:15 98:2,9
  208:6
**huge** 191:21
**human** 198:21
**hundreds**
  170:18 183:4
  191:15 194:25
  195:7
**hung** 120:24
  121:9
**hypothesis**
  132:22 164:3
**hypothetical**
  221:16

**I**

**I-95** 147:21
**idea** 50:24 67:25
  69:19 71:4
  114:23 132:7
  163:9 190:1
  192:6
**identical** 199:1
**identically** 199:2
**identification**
  10:12 35:21
  41:23 46:2
  57:10 67:19
  72:11 74:18
  79:20 81:19
  94:10 98:21
  166:16 179:12
  204:14 219:13
**identified** 92:22
  93:13 107:25
  108:4,8 115:17
**identify** 31:3
  57:1,24 59:10
  64:7 96:17
  107:22 138:13
  145:11,15,19
**identities** 218:11
  218:15 219:25
**ignoring** 144:16
**illustrate** 78:17

**illustrative**
  17:14
**imagine** 60:14
  96:16 163:12
  201:18
**impact** 151:13
  151:16
**implement**
  81:14 85:5
**implementation**
  76:13 210:19
**implemented**
  70:14 90:11
**implements**
  209:1
**implicit** 108:8
**important** 44:21
  95:6 102:4
  120:2 130:19
  171:12
**imposed** 44:15
**impossible**
  103:23 127:3
**impression**
  177:23
**inaccurate**
  183:10 185:8
  185:13,14,17
  196:21
**inappropriate**
  105:23 106:3
**include** 16:3,18
  18:20 19:4,8
  19:10,13,16
  48:7,9,17 49:4
  49:5 54:25
  56:4 57:20
  58:7 61:25
  132:25 161:5
  180:1 181:13
  181:15,17
**included** 7:12
  20:12 37:12
  63:7,17 64:3
  93:25 126:14
  126:15 153:16
  157:18 158:22
  158:24 165:3
  165:14
**includes** 37:7

54:17,21 55:25
  153:8 157:22
  161:17 167:1
**including** 4:17
  38:1 47:12
  203:3 218:11
  219:25 225:7
**inclusive** 230:11
**income** 218:20
  218:22
**inconsistent**
  123:9 132:20
**incorporates**
  166:5
**incorporating**
  128:17 155:5
**incorporation**
  21:21
**incorrect** 83:22
  95:17 97:19,19
  99:22 100:8,16
  100:22 102:3
  174:24 206:19
**incorrectly**
  70:15 90:11
**increase** 122:12
  126:10 143:21
**increases** 119:7
**increasing** 84:24
**independent**
  22:6,10 143:13
**Indian** 62:2
  63:11 85:17
**indirectly** 12:15
  12:18 231:9
**individual** 86:12
  104:4,5 115:2
  127:4 137:23
  183:22 218:15
**individuals**
  187:11,12,12
**individuals'**
  218:10 219:25
**inertia** 137:14
  139:13
**infer** 117:8
**inference** 16:14
  16:17
**infinitely** 202:2
**inflated** 116:5,7

246

116:10,15,21
**inflates** 113:8
**information**
  66:19,24
  183:19,22
  184:14 226:13
**informed** 114:6
**inherently**
  223:22
**initial** 134:11
  153:11,13,22
  179:16
**injunction** 9:14
  9:23 10:2
  11:25 60:10,17
  60:20,25 61:8
**INLA** 22:21,23
**input** 109:20
**inquiry** 131:18
  143:18 167:19
**inside** 187:21
**insight** 22:12
**insisting** 197:18
**inspect** 58:3
**installation** 72:3
**instance** 29:7
  176:4
**instances** 23:24
  30:4 215:15
**instruct** 77:10
  224:8,15,17
  227:10
**instructed** 168:3
  226:10,24
  227:11,18
**instructing**
  105:13 226:23
  227:1
**instruction**
  110:1 175:4
  227:16
**instructions**
  52:17 226:18
  226:22 228:17
**instructs** 5:1
**integrated** 21:20
**intending** 46:20
**interacts** 171:20
**interdependen...**
  22:17

**interest** 25:7,9
  26:1 47:12
  52:25 180:2,7
**interested**
  185:15 206:22
  231:9
**interesting**
  150:24
**interior** 162:18
**interpose** 24:25
**interpret** 26:16
**intersect** 91:12
  91:15,18,25
  93:12
**intertwined** 51:9
**interval** 132:1
  132:13,25
**introduce** 215:3
**introduced**
  219:1,8
**introduces**
  156:9
**introduction**
  184:13
**invalid** 223:23
**invariant** 222:8
  222:22 223:1
**inversely** 118:1
  118:24 119:23
  119:24 120:14
  120:19 121:14
  121:17 123:10
  123:14 125:18
  125:20 126:1,8
**invert** 83:13
**investigate**
  85:19 86:14,15
  156:15
**investigates**
  115:8
**investigation**
  165:2
**involve** 18:3
  26:25
**involved** 25:20
  27:6 31:2 34:8
  39:11 42:15
  184:17 194:13
**involves** 188:21
  206:5 218:2

**involving** 21:19
  26:19 226:21
**isolated** 202:24
  203:2
**issue** 62:12
  87:17 98:12,15
  116:25 172:8
  172:16 173:13
  173:18 176:4
  183:23 188:16
  200:14,18,22
  201:3,11
  216:25,25
**issues** 16:7 30:10
  37:13 38:7
  56:18 57:1,21
  57:24 58:22
  60:16 78:5
  96:11,14
  175:20
**iterations**
  221:21

_____

**J**

**J** 1:12
**JADS** 22:17
**job** 18:3,9 20:1
  41:7
**John** 16:6
**joint** 23:18
**Jordan** 2:6
**journal** 19:24
  21:12
**journals** 133:5
  133:10,21
  134:7
**joys** 158:13
**judge** 168:16
**judgment**
  157:23 179:4
  188:21 195:4
**July** 11:13 15:22
  220:14
**June** 11:10
  15:22
**jurisdiction**
  49:19,20,21
  52:2 65:20
**jurisdictional**
  47:6,11 49:5

**jurisdictions**
  49:10 50:10
  52:2,23
**justified** 28:13
  28:19

_____

**K**

**Kaye** 2:2
**keep** 113:14
  146:2,9
**keeping** 106:17
  107:1 159:6
**kept** 222:8 223:1
**key** 147:25
  150:5
**kid's** 59:19
**kind** 74:9 78:17
  78:20 107:3
  113:11 128:5
  143:10 157:9
  158:16,17
  164:3 172:20
  173:3 181:16
  183:21 184:1,2
  185:21 192:6
  197:3,22 203:4
**kindergarten**
  163:13
**know** 5:8 8:7,10
  8:16 9:4,11,19
  11:18 12:14
  14:14 16:5
  18:22,24 22:4
  22:9 24:18,19
  26:2 27:11
  28:23 29:10,14
  30:3,8 33:4
  35:7 37:1,2,20
  38:13 41:25
  46:4,17 48:12
  50:15,22,23
  53:20 56:3
  57:19 60:22
  61:1,6 62:22
  63:20 67:21
  68:6 70:8,8
  71:21,25 72:13
  73:21 74:16
  76:2,11 77:6
  77:14,24,25

78:18 79:22
  81:21 82:9,18
  83:24 85:21
  86:19 87:20
  88:1 91:21,22
  91:23 92:23
  93:13,19 94:12
  95:14 101:9,19
  102:2 105:11
  108:10 109:6
  109:10,15
  110:6,7,16,24
  113:10,18,21
  115:9,16 116:6
  116:8,15,20,20
  116:21,25
  117:3,4,15,19
  118:6,11,17
  121:13 127:20
  128:1,5 132:4
  132:23 133:13
  136:2,12
  138:14 143:9
  145:10,14,17
  145:18,23,24
  146:4,10 147:9
  147:23 149:23
  151:11 152:3
  152:16 155:16
  155:24 156:1
  157:19 159:6
  160:11 163:5
  163:20 168:10
  170:23,24,25
  172:4,17,19
  173:25 174:7
  176:11 178:15
  178:24 187:19
  189:23 191:13
  191:23 192:24
  196:11 197:18
  199:1,16
  204:16 205:21
  206:5 211:16
  213:11 214:6
  216:20,21
  217:23 218:23
  219:15 220:6
  221:23 225:22
**knowing** 22:10

247

175:22
**knowledge**
23:25 24:3
58:25 146:5
198:7,10
**known** 112:3,8
189:11
**Koonts** 2:6

**L**

**label** 165:9
**labeled** 166:22
**lack** 22:4 49:11
215:4
**Lamone** 30:8
**language** 22:18
175:11
**Laplace** 21:20
**large** 72:2 165:7
180:13 185:19
187:16
**largely** 154:20
155:1,13 158:3
**larger** 91:1
115:7,10 118:3
120:16 124:17
196:8,12,22
**largest** 71:14
73:13 74:1
75:17,22
105:19
**late** 45:18 55:3
57:16 58:21
59:20
**Latino** 42:13
**Latinos** 36:11
**law** 4:8 6:24 7:6
185:19 187:16
**lawyerly** 144:15
**lawyers** 6:4
51:20 52:18
133:14 160:9
176:11
**lay** 24:20
**layperson** 168:7
**learn** 34:4,14
35:10 164:11
**learned** 40:3
**leave** 82:10
119:12 197:21

**leaves** 164:7
**leaving** 205:17
**led** 49:12
**Lee** 30:18 31:9
**left** 11:12 156:23
162:24
**legal** 24:17,17
25:1 43:21
44:4,22 58:11
136:5,7,12
158:2 160:8
199:25 216:16
216:24
**legally** 44:15
**legend** 146:16
**legislative** 16:2
16:16 26:25
42:12 134:19
185:5
**legislature** 46:12
134:18
**lengthy** 52:13
**let's** 14:16 17:18
31:17 46:23
53:21 59:5
66:3 68:11
80:9 82:16
86:21 94:18
96:19 101:10
102:20 106:20
107:12,13
108:19 113:23
114:10 124:1
128:21 132:12
132:12 138:11
138:21,23
140:13 146:11
157:13 158:7
160:14 162:1
173:21 186:13
186:14 196:25
202:3 205:9
209:3
**letter** 31:25
**letting** 50:23
**level** 16:2 26:12
26:13 40:16
41:12 56:11,11
56:20,25,25
104:1,2,15,20

104:25 105:1
105:16,24,25
106:4,4 108:22
109:8,20,25
110:20 111:15
111:17 112:7
112:10 113:12
113:13,19
122:1,2 147:19
175:22,24
183:22 185:13
185:14,17
192:15 206:3
206:15,15
218:10,14
219:5,24 222:9
222:13,21
223:2,11
**levels** 105:14
106:18 109:2
109:10,12,23
113:14 132:6
**Lewis** 16:6
**lie** 74:6 162:16
**lies** 185:21 216:4
**life** 40:3
**light** 171:7
**likelihood**
131:21,23
132:8,15
**limit** 165:5
**limitations**
41:17 64:15
**line** 44:4 76:18
82:3,20 86:19
88:20,23 95:10
131:18 162:10
170:8,9,15,16
178:9 202:2
210:18
**lined** 101:8
**lines** 43:15 83:17
89:2 101:15
159:14 177:24
**list** 15:8 59:8
179:14 210:25
212:17
**listed** 15:2,8
16:22 17:4
23:3,17 27:1

31:2,3 122:5
122:15,18
124:20
**listen** 77:12
**lists** 94:21
209:17
**literal** 187:25
188:6 189:4
190:8
**literature** 25:10
**litigation** 9:13
**little** 45:18 51:7
51:19 58:21
62:13 76:19
82:10 96:14
118:13 137:5
142:5,18 144:9
144:25 157:8
158:18 164:1
169:15 208:12
213:14
**live** 6:14 7:2
153:1 154:3,9
160:21 170:9
**lived** 6:17,19 7:4
7:8
**lives** 155:17,21
**LLP** 2:2
**loaded** 66:7
147:1
**located** 71:23
147:22 195:8
**locations** 23:19
170:24
**long** 6:17 22:19
39:21 43:7
196:6 220:7
226:5
**long-standing**
23:2
**longer** 26:12
154:3 184:23
208:13,18
**look** 7:14 8:3,6
8:15,20,21
12:25 32:12,13
51:25,25 52:3
52:8,21,22
53:2 59:24
60:14,15,19

61:6 67:23
72:15 73:8
75:10 88:2,5
98:9 100:10
107:24 108:2,5
108:10 117:21
118:22 124:19
137:9 138:12
139:2,6 149:5
153:9 154:7
157:10 158:14
161:25 167:20
170:20 171:7
171:16,20
172:5 173:18
174:15,16
175:4,7 179:3
192:7 196:23
196:23 198:6
199:4 202:19
202:23 203:1,4
206:25 213:16
214:21 220:23
**looked** 32:8,10
32:15 43:6
60:4 87:7,9,17
90:13 95:10
98:7 105:12
108:9,17,25
109:13 116:24
125:25 135:13
135:19 140:9
140:10 141:8
145:1 153:17
154:2 167:4
174:20 196:7
220:6,12,12,18
225:22
**looking** 18:22
25:8 43:14
51:21 52:18
86:22 89:10
100:3,25 107:3
128:10 137:17
140:2,18 141:1
155:25 156:20
162:3,15 166:2
167:2,10,13,17
167:21 168:2
168:14 171:5

248

174:13,19
198:21 212:23
**looks** 73:13
75:15 81:25
82:6,6,12
85:20 87:7
91:15 93:24
115:15,18,19
158:3,9,21
168:14 173:8
173:19 190:13
199:6 202:16
204:24 212:21
220:19
**lose** 183:19
184:15
**losing** 150:14
**lot** 30:22 34:20
51:24 84:22
110:18 133:21
133:25 147:10
172:20 175:20
176:12 180:16
184:5,11,14
188:20 202:23
**lots** 64:15
**Louisiana** 28:24
**love** 128:5
**low** 190:9
**lower** 36:21,24
37:1 39:4
64:19 65:5,15
65:22,23
114:19 123:2,5
123:6 125:9,9
125:12 126:16
126:21,22,25
129:14 159:21
189:5 212:19
**lowest** 211:25
212:16
**LULAC** 30:14
31:8
**lunch** 76:22
113:25 127:8

**— M —**

**magically** 41:5
**main** 221:13
**maintain** 144:3

**maintaining**
139:19 141:16
**majority** 28:13
28:19 33:15
46:14,16,19,21
46:25 47:9
58:10 104:7,21
114:13,16
134:14 137:2
150:22 165:12
176:8 177:3,8
177:25 214:11
214:11,12
**making** 36:13
131:18,19,22
**Management**
72:6,17 74:23
75:12
**map** 8:3,6,15,20
8:21,23 47:25
48:6 49:25
50:16 51:13
52:22 53:12
54:4 58:4 60:7
91:16 92:11
135:5,16,17
136:9 137:1
144:4 146:14
146:17,17,20
146:20,21,22
146:25 147:2,3
147:6,11,13,14
147:18 151:1
152:14 153:10
155:7 157:4,10
157:14 158:9
158:20 164:15
166:18 168:12
169:8,12
173:16 178:15
181:18 183:1
185:14,17
191:21,22
192:1 193:9,24
193:24 194:3
195:3,14
197:14,17,19
199:19 209:7
210:7,9 211:10
211:13 217:2,6

**mapping** 209:19
**maps** 14:4 32:12
32:13 44:8
47:18,23 48:18
49:4,5,13,15
57:22 134:19
136:8 146:12
147:8,14 148:4
148:21 150:6
150:11 151:18
151:22,23
152:2,7 156:1
168:19,24
169:2,18 170:5
170:20 171:15
173:3,4 176:10
176:13,15,16
178:9 180:1
182:2,2 183:20
184:24 191:19
191:24 192:12
192:23 193:3
194:13,25
199:13 205:18
211:5 213:24
**Maptitude**
92:17 93:1
**March** 42:7
49:12 59:20
**margin** 55:17,25
59:3,25 60:12
61:11,15 80:17
80:21 81:1,5
81:10 82:14
83:2,6,8,17,21
83:25 84:2,8
84:24 85:3,6,7
85:24 86:6
87:5,13,21
88:10,24 89:5
90:4,5 91:2
96:4 97:6
103:17,23
104:5,6,15,21
105:5,10
106:23 107:9
108:22 109:4
109:20,24
110:7,13
111:21,25

112:3,9,16,22
113:9 114:17
114:20 115:3,7
115:10,12,22
115:24,25
116:10 117:11
118:2 119:1,3
119:7,23
120:15 121:19
121:25 122:21
122:24 123:6
124:2,4,6,10
124:24 125:5
125:10 126:15
126:16,22
128:2 129:4,5
131:7,25
132:12 176:3
**margins** 54:25
55:4,5,13,21
55:23 56:3
57:19,21 58:7
58:7,15 59:12
59:22 60:19
61:6 79:2,8,13
86:7,12 96:7
101:19 102:2
103:19,25
104:1,18
105:23,24
106:24,25
108:20 111:14
111:17,20
112:7 113:3,4
113:8 114:21
115:1 117:10
118:1,12,19,22
118:24 119:2
119:14,22,24
120:8,14,18
121:8,14,17
123:10,16
124:1,7,18
125:18,20,25
126:6 132:3
175:25
**mark** 10:9 35:18
41:20 45:25
57:7 64:2 72:9
79:17 81:17

94:8 98:19
166:13 219:15
**marked** 3:5
10:11 14:17
35:20 41:22
46:1 57:9
67:18 72:10
74:17 79:19
81:18 94:9
97:14 98:20
140:15 166:15
175:5 179:9,11
204:13 219:12
**markings** 34:8
37:11
**marks** 64:24
65:13
**Maryland** 30:10
**mask** 218:10,15
219:25
**Massachusetts**
2:3
**massive** 182:11
**matching** 105:14
109:9,12
121:10
**mathematical**
106:2
**matter** 10:21
34:23 109:13
129:18,23
173:7 188:25
193:4 199:18
226:9
**matters** 61:2
143:16 207:4
**MATTHEWS**
1:4 230:4
**Mattingly** 10:25
11:3 211:3
**Mattingly's** 5:22
13:1 32:2
208:21,25
209:14 211:13
214:3
**McDonald**
185:3
**mean** 7:24 9:5
13:20,24 19:21
20:1 27:11,14

249

34:8 35:15
37:17 41:16
44:15 46:20
69:18 84:17
92:3 104:3
115:10 119:24
123:22 125:15
127:17 133:23
137:6,7 146:8
153:13 155:1
156:10 157:6
158:2 159:25
162:8 170:8
171:8 172:15
173:6 174:1
177:15 181:16
182:15 185:23
190:19 192:1,2
202:22 206:25
216:16,19
**meaning** 167:14
182:14
**means** 19:24
21:24 34:20
116:20 131:25
132:1 160:4
181:23 191:5
**meant** 69:18
78:17 107:2
137:8
**meeting** 138:19
**memo** 35:23
36:3,4
**mentioned** 86:8
217:18
**merits** 42:15
**mess** 49:11
**meter** 171:1
**method** 70:11
79:13 103:14
106:24 112:6
112:15 113:2,8
**methodology**
41:10,15,17
46:24 51:15
52:7,14
**methods** 41:1
**metric** 36:13
**metrics** 190:24
**Michael** 185:3

**Michigan** 28:6
61:3
**middle** 5:9 76:18
80:13 82:20
88:19 141:8,11
147:15 156:25
178:16 211:22
**midway** 103:1
**miles** 170:18
195:13
**military** 72:3
**Milligan** 15:6
16:25 17:2
31:12 160:7
**millimeter**
172:19
**mind** 28:6 136:7
136:13 159:7
178:2 184:16
185:2
**minds** 195:5
**mine** 148:4
**minimize** 214:4
**minimizing** 47:5
47:11
**minimum**
143:20 212:2
212:20
**minor** 78:15
**minority** 24:9,15
24:15 25:4,16
28:14,14,20,20
29:1 33:14,15
46:14,16,19,21
46:25 47:9
50:14,14 51:14
53:13 55:15
58:10 59:12,23
60:12 150:23
159:18,21
178:5,7 180:2
187:22 188:14
214:12,12,13
214:14,23
216:1,22
**minorly** 195:23
**minus** 99:19
112:17,22
124:5 129:1
**minute** 86:3

181:20
**minutes** 76:24
228:19
**misleading**
177:23 182:13
193:7 195:23
**misremember**
26:24
**missed** 105:18
117:6
**missing** 142:15
**misstating**
192:20
**mistake** 74:6,7
85:2 88:3
90:17 130:10
131:19 175:16
210:2
**mistakes** 41:9
152:24
**misunderstood**
211:8,11
**mixing** 105:14
109:9,9,12
121:10
**model** 23:6
**MOE** 81:7,11
82:21,25
**moment** 111:12
137:13 139:12
**money** 153:19
**month** 60:24
95:21,25 96:1
226:5,8
**months** 48:23
49:22
**Moore** 30:18
31:9
**morning** 4:7
**MOSES** 1:3
230:3
**move** 127:11
128:21 225:15
**mu** 129:1
**Mullins** 2:6
**multiple** 62:13
87:6 131:1
164:19 192:12
**municipalities**
159:20

**municipality**
160:3,10
**mutate** 82:21,25

---

## N

**N** 3:1 119:21
120:6 125:16
**NA_black_M...**
89:15
**Nairne** 28:23
29:24 30:24
31:13 137:13
142:7
**name** 4:7,10,13
15:12 185:5
210:24 218:1
**Nassau** 15:18,20
16:4,20 17:2
**Nation** 47:13
49:9,10,14,17
51:9
**Nation's** 49:19
**native** 90:2,6
178:21 179:1
180:6,15
210:18
**naturally** 211:18
**nature** 16:11
17:11 188:21
**NC** 2:7
**NCLCV** 27:5
**near** 122:5
143:23 157:16
170:9,14,15
183:7 186:9
**nearby** 22:13
**nearly** 183:13
185:11
**necessarily**
91:19 104:3
138:12 139:11
159:24 160:5
161:8 170:8
177:6 185:14
**need** 14:25
35:25 85:7
118:17 138:8
138:15 191:1
211:9 228:13
229:6

**needed** 137:23
138:4
**negative** 129:1
**Neither** 116:3
**Nelson** 2:6
**nervous** 109:19
**nested** 21:20
**never** 5:21 13:13
23:25 29:3
75:14 107:10
152:9 176:2
215:24 219:20
223:23
**nevertheless**
214:13
**new** 14:4 15:18
15:19 113:24
134:19 147:15
219:2 222:1
**newer** 22:20
**nice** 113:10
197:7
**nine** 87:24
**nit** 208:7
**non** 186:23
187:8
**non-citizen**
36:11
**normal** 36:24
128:22 129:5
129:12 131:6
185:18,20
192:5,6
**normally** 120:25
130:3,6,9
**North** 1:1,7 6:19
7:2,5,9 9:9
15:11 16:20
17:1 18:8,23
18:25 19:2,20
20:5,9,12,14
20:20,24 21:4
23:8 26:1,4,6,8
26:10,14,19
38:15 66:21
67:2,10 68:18
68:21 69:15,24
70:1,5,19,22
71:7,14,22
72:5,16 73:9

250
Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 78 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

73:14 74:2,22
75:11,12,20,23
76:5 117:2,2
134:17 147:16
147:17 206:6
212:4 213:5
217:21 230:1,7
231:1
**northeastern**
18:23 38:15
**northern** 164:22
**northwest**
158:23 164:25
**Notary** 230:17
**note** 49:8
**noted** 22:24
**notes** 6:6
**notice** 1:12
84:13
**nuance** 70:11
76:10
**nuances** 62:25
**number** 4:14
15:17 20:2
34:25 35:1
36:20 39:4
43:22 62:18
64:19 65:5,16
65:24 67:1,9
68:8 69:1,14
69:14 70:22
72:21 73:1
80:6,7,14 81:9
83:8,21 88:11
88:25 97:19
99:19,22
101:14,17,23
102:4 103:5
119:5,15,16,25
121:5,18
124:12,14
125:22 126:5,7
131:9 153:21
165:9 176:19
176:19 183:13
185:11 189:10
193:14 194:20
208:6 211:25
214:15
**numbers** 58:23

59:25 60:1
67:14 83:19
86:4 99:7,12
100:14,18,22
101:4,25 102:3
102:14,16
103:6,11 121:2
121:4 133:22
181:20 185:20
187:16 206:20
206:23 207:3
210:18
**numerator** 63:7
63:18 64:9,11
64:14 85:11
87:22 88:12,25
89:6 119:9,12
120:9 123:15
123:18,23
**NW** 2:3

_____

## O

**oath** 4:3
**object** 77:10
**objected** 29:15
**objection** 8:13
24:25 28:15,21
29:1,8 30:2
35:4,13 37:15
38:24 39:5,17
40:10 41:13
45:11 48:1,21
50:18 51:17
52:11 53:17
54:22 55:11,18
57:14 64:21
65:2,8 69:2,17
70:7,16,24
74:3 76:6,14
84:5,16 90:25
106:5 110:14
114:22 115:6
115:14 116:2
116:13,19
117:13 120:21
123:13 126:18
127:16 129:25
143:8 145:20
146:7 155:22
156:7 159:23

160:6 163:19
167:7,18,25
168:9 171:25
174:25 178:1
178:19 181:14
183:15 189:1
191:10 194:4
194:23 196:18
198:23 200:17
200:21 201:1,5
207:24 215:13
215:21 224:6
224:13,17,22
226:12 227:9
**objections**
208:13 228:17
**objects** 4:25
**obscuring**
173:12
**observations**
118:12 119:5
124:12,14
125:23 126:5,7
189:20 203:19
**obvious** 125:17
**Obviously** 30:21
**occurs** 210:14
218:24
**odd** 52:19 162:3
166:2 167:2,13
167:17,20
168:2,14
**offer** 108:13
134:24 135:4
135:24 136:9
136:13 159:9
159:12 208:24
217:9
**offering** 29:18
135:21 139:12
**Office** 72:5,16
74:22 75:11
**offs** 184:16
**offset** 119:11
**oh** 2:10 21:16
30:18 32:2
64:5 97:15
107:1 109:15
132:16
**Ohio** 6:14

**okay** 4:24 5:11
5:16,19,22,25
6:3,6,11,19 7:4
7:8,21 8:5,16
8:18 9:19
10:16,23 11:7
11:14,23 12:8
12:12 13:1,7
13:13,16,22
14:6,22 15:16
15:20 16:3,7
16:19 17:1
18:11,19,25
19:7 20:8,11
20:19 21:7,17
23:8,21,25
24:4,13 26:18
27:4,9,16 28:9
29:5,21,24
31:1,17 32:6
32:17,23 33:2
33:5,9,18 34:4
36:3,9,17 37:4
37:12 38:6,14
38:18,23 40:6
40:13,20 41:18
42:1,11,17,25
43:3,6,7,14,23
43:24 44:7
45:22,25 46:5
46:14,19,23
47:15,22 48:4
50:12 51:12
53:12 54:2,8
54:16,19,25
55:8 56:1,5,9
56:24 57:4
58:8,23 59:2,5
59:9,10,15,17
59:21 60:5
61:24 62:4,15
63:5,5 64:5,12
65:4,12 66:3,3
66:11,15 67:4
67:9,14,22
68:11,12,20
69:14,22 70:18
71:19,21 72:14
72:24 73:3
74:12,19 75:4

75:7,9,22 76:1
76:16 77:9
78:2 79:1,12
79:23 80:2,12
81:4,14,22
82:1,13 84:2,7
86:25 87:12
88:15,18,19
90:9 91:17,24
93:12,20 94:14
94:20,25 95:3
95:24 96:15,23
97:13,17 98:18
99:5,18,24
100:6,13,21,25
101:14 102:8
102:20 103:1
104:7 105:9,21
106:2 107:12
107:17 110:23
111:3,11,24
112:5,14,21,25
113:7 114:9,17
114:24 115:22
117:17 118:9
119:16 121:23
122:5,13,18,21
123:2,6,9
124:24 125:13
125:18 126:23
127:6 128:9
129:3,9,17
130:11 133:4
133:16 134:10
134:17,21,24
135:4,9,15,24
136:4,8 138:18
139:8,15 140:5
140:21 141:13
144:2,12,18
145:11 146:11
146:16,21,25
147:5,12,20
148:6,14,17
149:13,17,24
150:10 151:11
151:17,25
152:6,13,17,19
152:20,23
155:16 156:20

251

160:2,19 161:1
161:4,23 162:9
163:12,16
164:11,15,24
165:7 166:1,8
166:21 168:18
168:23 169:1
169:11,18,18
170:4,7 171:2
171:14,23
172:2,6,23
173:10,14,21
174:1,15,22
175:8,17 176:6
176:18,24
178:11 179:19
179:23 180:5
180:21 181:19
182:1,17,25
183:10 184:5
184:18,25
185:6 187:2
190:2 191:5
193:22 195:25
196:14 197:13
199:9,21 200:3
200:15 201:15
202:11,15
204:3,7,17,18
204:19 205:1,5
205:9,13 206:4
206:9,17,23
208:10,14,17
208:24 209:3,8
209:21 210:2
210:21 211:13
211:19 212:10
213:1,3 214:2
214:7,16,24
215:10,18
217:1,17,25
218:7,8,14
219:17 220:2
220:15 221:1,8
222:11,24
223:16,19,25
226:3 227:13
228:5,10
**old** 35:25
**Once** 96:6

**ones** 83:24 141:2
205:22
**ongoing** 217:24
217:25
**Onondaga** 15:18
15:23 16:5,20
17:2
**opaque** 200:7,16
200:19,20
**open** 10:16
41:25 46:4
72:13 74:16
82:21 92:9
93:8 94:12
146:16,21,25
147:2,5,13
184:4 204:16
210:12,12
**opened** 92:16,25
**opening** 5:16,19
13:5
**operate** 39:20
**opinion** 12:12
18:15 19:11
86:18 108:13
108:16 134:24
135:5,24 136:9
159:9,13
165:16,21
167:6 208:24
225:24
**opinions** 31:17
135:21 136:13
136:18 217:10
224:1,4 225:18
**opportunity**
28:14,20
215:19 216:2,8
216:14,17,21
225:14
**opposed** 189:7
200:20
**opposite** 46:17
186:8 191:9,12
195:12 211:19
**optimal** 211:4
**option** 63:10
197:21
**options** 142:10
185:7

**orange** 171:19
171:19 172:24
173:12 175:10
178:12 180:23
181:5,8 182:17
182:21 184:12
191:6
**oranges** 187:4
**order** 23:3 86:11
176:7
**original** 186:10
**ornery** 128:4
**ought** 110:21
211:1
**Outer** 8:24 9:3
**output** 212:11
**outputs** 190:15
**outside** 94:1
116:6,7,11,17
127:1 156:21
158:11 187:20
**overall** 103:12
151:14 162:3
178:13 193:8
203:5
**overlap** 92:14
93:17
**oversampled**
39:16
**oversampling**
40:8
**overview** 207:9
**overwhelm**
125:22 126:9
**overwhelms**
126:4

**P**

**P** 132:18
**p-hat** 124:2
**p.m** 1:13 229:8
**package** 69:10
**page** 3:2 14:16
17:18 20:21
21:17 36:7
42:25 43:10
45:23 46:23,23
53:21 54:1
56:22 66:3,13
67:24 68:3,4

68:11,23 70:1
70:19 72:22
73:4,5,6 75:3,7
78:6 80:9,14
82:16 86:23
87:1,24 88:16
88:19 94:18
96:19,21 99:3
99:19,24 100:3
100:25 101:10
102:20 107:13
114:4,10
117:21,23
120:11 121:21
128:8,17 133:4
133:15 136:21
140:13,17,18
146:11 150:10
152:8,17,17
154:16 160:14
162:1,1,20
169:1,11 171:3
172:2,6,13,19
172:22 173:21
174:1,24
175:11 179:23
186:13,13,14
202:4 204:18
205:9 206:7,13
206:19 209:3
210:19,20
211:3,20
213:18 218:8
219:22 220:13
220:24 221:1
222:2,6
**pages** 59:6
183:20 226:8
230:10
**Palmer** 42:4
46:8 53:22
56:24 57:23
58:24 179:16
179:20 216:9
**pandemic** 36:25
38:12,21
**Panera** 114:7
**paragraph**
46:24 66:15,19
66:24 71:13

78:6 99:6
100:11,25
101:4,15,17,25
102:8,22 103:1
103:7 139:16
142:6 144:19
144:25 211:22
222:6,19,20,23
223:5
**parameter** 200:3
**parameters**
202:8
**parentheses**
80:14 81:7,11
82:21,23,24
87:2 88:21
102:11
**part** 7:22 8:1
12:24,25 20:24
27:5 29:5 32:7
32:21 61:21,21
62:1,1,1,2,4,4
62:8,9,18 63:2
63:6,6 64:3,3
64:20,24,25
65:6,13,14,17
65:20,20,25
90:1,1,1,2,5,6
90:6,6,11 91:4
91:9 116:5,16
120:7 121:7,19
127:20 147:4
161:15,17
164:22 167:1
168:4 170:11
173:13 183:18
207:14,18,21
225:2
**partial** 105:2
**particular** 29:7
34:5,13,15
35:11,12 59:6
68:4 80:3,5
91:19 110:8
119:25 194:19
194:21 216:7
**particularized**
189:18
**parties** 213:12
**parts** 12:22

252

124:13
**Pasquotank**
9:21 114:13
115:19,23
116:1 118:23
120:18,20
121:15 122:2,2
123:11 125:9
153:2 154:12
154:13,14,23
155:17,20
156:11 157:20
158:16 161:10
161:12,16
202:19
**Pasquotank's**
156:4,17
**pass** 210:6
**passing** 23:11,23
**Patrick** 4:12
**pattern** 187:23
190:5
**pay** 127:19
**PDF** 54:1 72:23
82:16 140:18
140:20
**peer** 19:24 23:12
23:15 25:10
31:21 88:15
198:7,10 199:9
199:12
**peer-reviewed**
21:11
**pen** 201:18,19
202:1
**pendency** 77:15
**people** 22:3 58:2
61:21,25 62:4
62:9 64:2 65:9
73:15 74:2
75:18 78:9
89:19 119:6,8
119:15,16
121:18 122:9
122:16,19
133:25 165:16
165:21 167:20
169:24 170:8
170:25 171:18
172:18,18,24

173:6,9,12,15
173:19 176:8
177:20,20,22
180:23,24
181:4,9,11,24
182:6,19,19,22
182:23 183:14
185:11 187:6,6
191:6,7 192:10
192:10 193:1,8
193:9 194:21
194:21 195:8
196:4,9,10
197:1,2,10,11
199:2,23,24
200:7,10,15,16
200:19,20
201:12,13,21
201:22 205:2,3
205:15,16
207:7 217:20
218:6
**perceive** 172:4
**percent** 34:10
43:17,23 44:1
44:4,9,12,15
44:18,20 45:1
45:3,9,14,21
50:1,2,15
51:14 52:4
54:4,5 55:15
55:19,25 56:2
56:4 57:20
58:4,8,12 60:2
60:7 62:17
84:21 85:25
96:8 99:19
101:12,14,20
102:4,6,7,10
102:10,11,18
103:3,8,13,13
107:8 112:22
129:12,14,18
129:22,24
130:17,20,21
131:14,15,16
131:16 132:1,2
132:13,15,17
132:17,21,23
132:24 133:6

133:10,17,18
133:19,22
134:2,3,8
137:11,16,20
137:24 138:1,4
138:11,14
139:4,10,20
140:12,24
141:5,17
142:24 144:3
148:2,5,5,7,12
148:15,18,18
148:24 149:2,8
149:8,10,11
150:11,12,13
150:13,15,15
150:19,20,24
150:25 151:3,4
151:9,9,12,13
152:7,7,15,15
154:19 158:10
158:11,25
160:4 162:20
162:24 164:6,7
164:12,20
166:5 177:5
212:5,22
214:10
**percentage** 34:5
34:7,15,17
35:11 79:3
80:2,18 83:2
84:3 85:12
100:15 111:25
112:2,9,17,18
121:25 151:14
155:16 156:17
163:2 177:2
**perfect** 197:23
**perfectly** 183:16
**perform** 13:23
14:6 212:8
216:11
**performance**
12:24 16:12,16
47:17 48:6,16
49:2 214:16,25
215:11
**performed**
16:13 97:13

225:23
**performing**
214:8,20 217:2
217:7
**perimeter**
143:21
**period** 7:5
**person** 138:4
157:5 169:22
169:24 170:14
172:7 173:20
181:16 182:3
182:15 184:8
192:24 205:5
205:13
**PH.D** 1:12 3:2
4:1 231:3
**phase** 12:7,9
42:15 44:20
45:3,15,19
57:5,13,15,23
58:1,22 61:4
**Phil.strach@n...**
2:8
**Phillip** 2:6
**physical** 111:5
**PI** 12:7
**pick** 52:2 181:16
184:1
**picked** 46:17
**picky** 208:7
**pie** 128:25
**PIERCE** 1:3
230:3
**pipe** 82:24
**pitfalls** 109:17
110:19
**Pitt** 8:18,25 9:2
211:6,10,14,24
**place** 50:22 59:7
93:18 101:6
114:2 127:7
156:4 164:2
192:21 209:22
211:25 213:17
231:7
**placed** 156:17
170:2,3 211:1
211:1
**placement**

163:22 170:4
193:20 194:6
**places** 20:3 30:8
210:10
**plaintiff** 28:3
30:21
**plaintiff's** 16:18
**plaintiffs** 1:5 2:5
60:8 139:6
143:11 178:7
199:7 202:16
230:5
**plaintiffs'** 10:24
12:4 85:21
86:13 87:19
88:6 90:14,23
**plan** 176:11
**plans** 36:5 42:12
**platform** 32:7
**please** 4:10
10:17 35:25
36:7 174:15
**plot** 128:11,13
128:18 172:7
176:1 177:19
178:3 180:12
181:5,14,15
182:18 184:7
184:10 185:25
188:18 190:3
195:3,7 199:22
200:4,24
204:21 205:10
**plots** 145:5,6,8,9
145:13,13,16
145:25 146:1,6
146:6 173:7,22
174:9 175:13
175:17 176:6
177:19,23
178:20,24
180:9,22 182:5
182:15 183:16
184:2,16,18,20
184:22,23
185:1 187:3,7
188:2 190:12
190:13,19,22
190:25 191:1
192:14 195:6

253

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 81 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

196:1 198:6,8
198:11,17
199:11 201:16
202:24 204:25
205:24 217:19
**plotting** 157:12
172:8,15
173:13,18
182:11 183:23
200:14,18,22
201:2,11 205:8
**plus** 44:15,18,20
45:3,14,21
52:5 55:15
56:2 58:12
60:2 96:8
99:19 112:17
112:22 116:24
137:11,20,24
138:4,14 139:4
139:10 160:4
**point** 19:23,25
44:2,3,5,11
45:20,20,22
48:19,24 50:2
58:4,20 61:12
61:16 66:8
74:8 78:15,19
79:3,8 80:18
85:12 89:4
110:18 124:5
129:13,14,17
129:21 130:18
130:22,23
131:4,6 132:11
168:10 182:8
183:17 188:8
191:14 195:7
202:24 203:17
205:23
**pointless** 161:22
**points** 112:18
**poison** 181:17
184:1
**political** 16:1
20:23 21:9
24:22 25:2
26:4,7,9,13
167:14,23
168:1

**politics** 17:16
18:3,9,12 20:1
20:2,10 24:9
24:15 25:4,16
26:9 47:17
48:7,11,16
49:3 131:1
**poll** 18:14 19:8
130:20 131:12
131:13,15
132:2
**polling** 18:15
19:11
**polls** 130:6,6,22
131:1
**pop** 109:17
**populated** 203:6
**population** 24:5
33:10,14 34:6
34:16,22,23,25
35:2,3,10,12
39:3,15 43:17
44:1,9 45:1,9
50:15,25 51:14
53:13 63:3
64:13,20 65:6
65:16,24 67:11
67:12 69:15
70:18 71:1,6
73:10,17,19
75:13,21 104:7
114:13 117:24
117:25 118:2
118:19,24
119:2,17,23
120:5,12,15,19
120:25 121:5
121:10,11,15
121:18 122:9
123:3,5,11
124:3 125:19
125:21 126:2
130:4,5,7,10
130:21,23,24
131:3,10,10,14
131:21,24
132:3,9,20,25
133:2 137:9,18
138:9,13,15,20
139:1,2,3,5,10

140:3,8,11
141:1,6,20,25
142:6,22,25
143:1,6,14,17
143:22,23,24
144:8,17,22
150:2 151:11
155:17,21
156:14,18
157:20 159:4,7
159:8,18,21
160:4 162:4,5
162:11,11,21
162:24 163:3,7
163:8,9 164:7
164:8,8,12
165:4,18,23
174:12,13,23
176:9,17 177:1
177:10,16,17
178:4,12,14,15
178:17,23
179:2,3 180:2
180:3,6,15,18
183:11,12
185:9,10
187:20 188:14
188:14 196:23
201:8,10
202:19,23,25
203:3,4,11
212:2,3,18,18
212:21 222:22
**populations**
74:11 111:9
120:13 140:6
180:3,19
186:22 187:2,5
187:22 189:18
223:9
**Porter** 2:2 4:9
**portion** 93:23
115:23,25
117:1,2 126:11
126:13,16,20
126:21 154:14
158:23 161:10
161:18 206:17
214:2 217:12
**portions** 105:1

126:24 127:1
155:5
**portray** 183:11
185:8
**position** 29:5,11
77:13 216:6
223:24 224:25
**possibility**
132:21
**possible** 36:18
40:5 47:16
48:14,14 63:24
64:22 70:17
76:15 92:8
116:9 118:18
119:8,10 143:4
159:17 172:23
182:24
**possibly** 12:19
137:8 202:22
**post** 160:7
**potential** 33:14
42:20,21
113:17
**potentially**
148:21 179:6
**power** 42:13
**practice** 215:1
215:10
**precedes** 155:11
**precinct** 22:11
141:3 150:22
150:23,25,25
151:2,3,8
166:3 176:25
177:9,13
**precincts** 22:1,9
22:13 72:2
139:18,20,25
140:9,10,22
141:15,17
177:24
**precise** 142:4
184:24 207:3
223:4
**precisely** 181:13
181:14
**predominance**
159:13,16
**predominantly**

157:25
**predominate**
47:5,10,18
48:7,11,17
49:4 50:24
51:5,16 52:10
53:16
**predominated**
159:10 160:5
**predominating**
47:24 50:6,16
**prefer** 131:4
**preferred** 198:6
**preliminary**
9:14,23 10:2
11:24 60:10,16
60:20,24 61:8
**preparation**
5:23 6:1,4 12:3
**prepare** 5:11
12:6
**preparing** 10:2
11:15
**presence** 36:11
**present** 57:6,12
57:21,22 59:3
215:5
**presented** 56:6
83:22
**presenting**
43:24 55:9
58:16 194:17
194:20
**preserve** 156:2
**preserving**
159:20
**presidential**
17:22 23:20
26:12
**presumption**
190:7
**pretty** 55:3 61:9
62:18 97:22
133:1 137:22
138:3 162:15
170:13,21
174:5 180:7
182:15 183:2,3
194:24 195:2
200:2

254

previous 86:9
222:7,25
previously 6:20
25:19,19 33:13
79:6,7 86:21
203:18
primarily 29:21
30:4 159:22
principle 115:17
117:9
principles 47:11
print 172:20
printers 197:6
printout 67:24
72:16 74:21
210:20
prints 91:16
prior 37:7,14
59:8 77:22
78:3 145:9
214:17 216:7
221:20 222:13
222:18,23
prioritizing
47:10
privacy 218:19
219:1,8 221:5
privilege 226:14
privileged 77:19
225:2
probability
128:23 132:8
probably 8:3
11:9 48:14
60:19 69:21
71:1 96:13
113:25 114:4
124:16 125:12
137:4 141:21
142:4,18 151:5
154:2 156:13
157:12 170:15
182:10 183:24
187:22 195:2
206:25 220:14
226:9
problem 44:14
114:3 183:3,5
187:15 219:2
problems 21:9

41:6 191:22
proceed 109:1
process 56:10,14
56:14,18 92:24
206:14,21
207:4,5,9
produce 44:8
82:7 107:23
108:15 112:7
188:17 198:5
209:16 210:9
produced 13:11
33:19,23 82:5
91:24 92:4
182:16 192:23
209:13,20
210:8 211:18
226:8
produces 113:3
191:24
producing 78:8
production
210:7
program 31:23
93:10 209:19
programming
22:18
proof 53:20
proper 207:17
proportion
63:18 64:4
80:3,5,21 85:7
87:23 89:1,7
99:25 108:23
111:21 114:18
118:15,16
123:24 124:25
129:4
proportions
186:4
proposed 32:16
49:13 54:3
pros 199:14
proscribed 52:4
protect 223:8
protected
226:14
Prouty 2:9
215:13,21
224:6,13,17,22

225:3,12
226:12 227:4,9
227:17,21
228:6,10,14,20
229:7
prove 60:8
provide 103:6
provided 99:7
225:16,20
provides 70:12
public 18:15
19:11 230:17
published 19:19
19:21,22 21:2
21:3,11,15
23:12,15 24:1
24:4,8 25:9
134:1,3,4
publishes 72:6
publishing
19:24
pull 23:17
106:20 119:6,8
202:3
pulled 73:22
219:16
purple 171:8,11
171:24
purport 209:9
purpose 61:24
151:17
purposes 31:18
62:5 65:1
104:20 110:13
139:1 178:6
187:6 225:10
pursuant 1:12
put 38:8 131:5
148:9 170:25
181:3 198:18
201:4 223:5
puts 209:21
putting 37:18
103:16 109:23
185:6
Python 32:3

_____

**Q**

qualification
24:19

qualifies 216:17
quality 14:12
quantitative
134:6
question 4:25
5:2,9 9:17 34:1
34:18 35:6
39:21,24 43:9
45:7 50:8,9,11
50:12,13 51:5
62:23 63:10,13
63:25 64:5,5,8
95:8 111:11,13
145:4 158:6
178:5 185:6,8
197:24 207:2
224:9 226:24
227:1,18,21
228:6,7,11
questioning
76:18
questionnaire
63:16
questions 4:22
24:16 114:4
168:18 184:6
225:1,8 226:21
228:16,22,24
quick 166:10
quickly 22:22
60:21 192:11
quite 34:20
55:22 65:18
181:1,1
quote 212:19,22

_____

**R**

R 31:25,25
66:25 67:2
69:7,10 71:19
74:5 81:23
91:11 92:21,22
96:16 97:13,17
146:15,22
161:25 168:23
170:3 188:10
196:11,12
198:18,20,24
198:25 209:20
210:9,18 212:9

212:10,13,24
R's 92:24 93:6
race 24:22 26:15
47:17 48:7,10
48:16 49:3
50:23 51:9
62:12 158:1
159:10,22
160:5 198:12
198:13 215:9
216:22 218:25
219:6,8 221:18
221:22 222:3,9
222:15 223:2,4
223:6,11
races 17:23 18:4
18:6,9 20:13
20:14,17 26:16
177:22 202:8
205:17 215:1,3
215:5,12,14
216:19
racial 47:4,24
50:5,16 51:16
52:9,24 53:4
53:15 62:12,13
154:20 155:4
158:3 159:15
190:3,25
218:11 220:1
221:25 222:12
racialized 178:9
racially 160:11
radically 190:14
190:16 191:23
191:24 192:25
194:9 195:4,22
Raffensperger
27:23
raise 36:12
45:18 49:1
57:16 212:2
raised 37:20
87:17 95:9
98:12,15 159:4
raises 154:19
175:20
raising 165:4
Raleigh 2:7
ran 16:17 92:21

255

131:11 208:22
209:17
**random** 163:22
182:9 186:23
187:8
**randomized**
189:19
**randomly** 164:2
170:3 186:11
186:22 187:14
188:5 218:10
219:24
**randomness**
191:14
**range** 148:24
150:20
**rate** 38:1 103:14
150:15 189:12
**rates** 150:8
**rating** 17:21
**raw** 221:6
**reach** 67:11
138:16 139:24
167:16 212:14
224:11,15
226:5
**reached** 216:6
**read** 5:21 12:7,8
12:11,20,23
13:4 18:17
36:15 54:6
93:18 102:3
127:18,21
130:12,14
137:3 139:22
150:17 153:4
160:24 169:6
172:10 197:4
211:7 219:20
222:21,23
228:25 230:10
**real** 25:19 55:13
74:8
**RealClear** 17:16
18:3,9,12 20:1
20:2 130:25
**reality** 182:21
**really** 33:4 44:4
85:19 86:14,15
128:1,4 134:3

140:7 143:16
146:3,8 153:17
153:20 154:4
157:11 158:5
161:20 167:5,9
171:22 172:22
172:23 175:19
175:21 176:3
178:12 180:16
192:11 216:24
**reason** 5:4 64:17
68:1 72:18
73:11,24 75:15
76:9 82:2,7,12
90:3 92:23
93:6 105:11
106:2 109:6
110:10 112:12
116:18 118:10
147:19 168:22
171:23 180:11
186:7,21 189:8
190:4 194:16
200:1 220:8
**reasonable** 11:5
153:25 195:5
**reasonably**
47:14 136:1,5
136:10,11
168:13
**reasons** 22:14
53:4 125:17
**rebuttal** 5:14 6:9
12:22 13:1,16
13:19,20 16:9
94:16 98:24
106:21 107:12
107:17 112:5
112:14 113:1
115:1 117:9
121:21,22
124:21 126:1
127:12,15,25
136:16 140:14
154:4 202:3
206:11 225:25
**recall** 9:22 10:1
11:2,14 12:8
12:10 15:4
37:12,18,24

49:9 56:20
61:8 83:15
97:24 128:24
**received** 95:21
**receiving** 11:2
13:18
**Recess** 32:18
76:25 127:9
166:12 203:15
217:15 228:21
**recognize** 10:14
35:23 36:4
42:2 46:6
79:24 81:23
94:15 98:23
129:8 166:18
179:19 219:18
**recollection**
49:20 67:13,16
104:13 161:7
179:25 226:2
**Reconsidering**
23:19
**record** 4:11
10:18 24:11
130:14 217:14
**recorded** 231:5
**records** 72:19
75:1
**red** 171:10,19
**redistricting**
32:6,9,11,14
36:5 40:20,24
40:25 41:10
51:4 56:15
62:10,11 92:17
93:1 98:2,9
134:18 135:1,6
184:21 185:1
208:5
**reduced** 96:5,10
**refer** 9:6 18:1
33:9 54:8,11
166:2 218:4
**reference** 128:17
190:20
**referenced**
51:21
**referring** 20:16
154:23 158:20

172:12 184:8
184:19 190:21
**refers** 54:16
154:12
**reflect** 146:19
**reflecting** 72:20
75:20
**reflects** 147:18
**refresh** 179:25
**regard** 212:1
**regarding** 15:13
17:7 26:9 88:1
**region** 26:20
34:5,15 35:11
35:12 38:15
64:23 80:3
85:9 91:19,20
110:8 114:18
115:4 117:10
117:12 137:8
172:25
**regions** 111:4,8
111:12 173:5
**regression** 22:3
**regularly** 69:10
78:9
**reject** 132:21
**rejected** 152:14
**relate** 136:6,13
**related** 25:6
114:1,5 118:1
118:14,24
119:2,23,24
120:14,19
121:15,17
123:10,14
124:7 125:19
125:20 126:1,8
219:5
**relates** 19:20
**relating** 20:5
36:5 38:1
**relative** 192:10
231:8
**relatively** 38:20
189:10
**relevance** 203:9
**relevant** 22:5,13
64:23 85:9
161:25 172:25

**reliable** 33:19
40:23,25
**reliably** 114:6
**reliant** 92:6
214:14
**relied** 37:6 40:20
79:12 145:6,8
145:12,16,25
146:5 199:17
199:22
**rely** 78:9 92:24
134:22 146:3,9
146:10
**relying** 60:8
69:11
**remain** 211:6,14
**remaining**
126:20
**remains** 97:22
126:21
**remedial** 42:18
42:21,22 43:5
43:11,16,24
44:17,20 45:3
45:8,15,19
46:11 49:13,15
57:5,13,15,23
58:1,22 61:3
**remedy** 49:16
**remember** 6:2
9:18 11:5
14:13,15 18:10
19:6 20:22
23:24 30:7,10
31:6,14 32:9
33:1,3,6 48:13
48:24 49:18
61:13,17 87:16
89:2 90:7
98:11,12,17
100:9 120:2
148:3 153:8,17
153:23 174:20
174:22 216:15
220:17,18
**remove** 142:22
144:4
**removed** 139:19
139:21 140:1
140:11,23

141:4,16,18
**removing** 143:2
143:5,19,22,25
**render** 96:8
**repeat** 28:15
43:9 132:1
165:20
**repeated** 130:8
130:16 132:2
192:7
**repeatedly**
226:20
**rephrase** 114:24
**replicable** 213:2
**replicate** 193:19
194:2
**replicated** 83:16
**replicating**
191:20,22
192:1 193:25
**report** 5:13,16
5:20 6:8 9:23
10:2,6,15,20
10:24 11:8,15
11:21,25 12:22
13:2,5 14:17
15:7 17:5,9,19
18:19 19:4,7
19:10,13,16
21:17 24:12
25:13 27:18
28:25 30:5
31:19,19,24
33:3 37:17,19
37:25 46:7,10
46:15 51:12
53:22 54:3,19
56:6,17,22,24
58:24 59:6,17
60:11,25 61:9
66:4 67:15
68:23 69:9
70:1,4 75:22
77:7,8 78:7,15
79:1,12 83:22
86:4,10 87:10
93:24 94:16,21
95:22 96:19
98:24 99:1
100:3,4,10

101:1,4,7,11
101:12,16,25
102:20 103:2
106:21 107:5
107:13 114:10
117:21 121:22
127:15,25
128:15 133:5
134:11,21,24
135:4,24 136:8
136:16 140:14
149:14,18
150:7 151:21
152:1 153:12
153:13,22
157:24 160:14
169:1 170:5
175:12 179:16
179:19 182:6
186:14,15
202:4 206:7,11
206:18 208:21
208:25 209:4
211:8,20
213:18 214:3
218:8 220:10
225:2,5,25
226:9
**report's** 74:1
**reported** 75:17
96:4 101:17
104:19 108:21
112:9 113:4,22
121:10,11
133:17,18,22
221:5
**Reporter** 1:12
228:25 229:2
231:3,13
**reporting** 18:25
19:2 60:1
68:20 69:24
**reports** 5:14,14
5:23 6:9 9:15
10:24 11:2
12:4,9,20 13:8
13:17,19,21
14:13 15:17,18
15:20 16:9
37:8,14,21

93:25 104:14
111:17 112:21
**represent** 73:11
95:16 180:23
180:24 181:21
**representation**
154:5
**represented**
44:24 45:8
55:14 73:23
80:21 81:6,11
**representing**
200:6,10
201:21,22
220:7
**represents** 148:1
148:14 165:11
172:7
**request** 49:17
**requested**
130:14
**requests** 47:13
49:9 51:8
**require** 49:3
133:6,10 134:7
196:1
**required** 15:3
29:7,10 30:11
30:15,20,22
44:17 137:1
**requirement**
43:15,22
**requires** 143:12
**rerun** 96:16
**reruns** 211:3
**research** 23:2
199:25
**resident** 138:22
**residents** 62:6
69:21 70:19
71:15,22 75:23
76:5 136:25
138:8,8,24
139:1 152:21
153:1 156:4
157:11,14
160:20,21
161:24 169:4
174:3 175:1
176:19,20,22

177:16,17
186:1,2,2
189:9 194:10
194:10 203:9
**resizing** 201:24
**respect** 20:20
25:21 49:8,16
78:5 132:11
152:6 190:25
**respecting** 47:12
**respond** 10:24
38:11,20
208:21
**responding**
127:20
**response** 12:16
34:18 36:22
38:1 39:2,8,10
39:13,15 40:1
40:7 58:8
64:24 227:16
**responses** 37:7
39:2 54:21
119:25 126:12
127:4 130:4,5
**responsibilities**
18:12
**responsible**
210:2
**rest** 40:2 144:16
144:16 161:18
**restating** 22:21
**result** 39:2 93:18
113:2 131:23
**resulted** 40:8
87:18 90:14
**results** 62:18
131:12,13,16
133:16,25
134:4
**retain** 183:21
184:10,15
**return** 203:17
**reveal** 224:19,23
**review** 5:16,19
5:22,25 13:1,7
43:25 133:20
136:15 206:10
206:17 214:2
**reviewed** 5:13

12:4,21 19:24
23:12,16 25:10
31:21 49:22
93:23 99:1
107:20 134:10
198:8,10 199:9
199:12
**reviewing** 13:16
13:20 51:12
103:10
**revisit** 49:14
**right** 4:7,14,15
4:19 5:4,7 6:14
6:15 7:16 8:2,7
9:5,8,12,16,22
10:6,8,9,19
11:2,19 12:2
12:17 13:4,10
14:11,16 15:7
15:12 16:19,24
17:15,18 18:2
18:17 19:19
20:4 21:5,6,9
21:10,22 25:25
27:7,18 28:11
29:23 31:1,17
31:19,20,23
32:13,20 33:5
33:9,13,16
35:9 36:10
37:24 39:12
40:6 41:9,19
42:2,8,19,20
42:24 43:4,8
44:9,11,19
45:1 46:10,22
47:1 50:2
53:21 54:14,18
54:24 55:2
56:8,13,17
57:3 58:14,25
59:19 60:25
61:10 62:7
63:4,8,15
64:11,14,15,17
65:3 66:23
67:17,23 68:5
68:7,13,23
69:22 70:3,4
70:15,20,21

257

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 85 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

71:3,6,9,10,13
72:1,9,15,19
72:22 73:3,6,7
73:8,13,19,25
74:21,25 75:3
75:10 76:3,13
76:24 78:5
79:1,5,6,9,11
79:16,17,24
80:4,5,8,9,16
80:20 81:1,2,8
81:9,12,17
82:15,19 83:6
83:16,19,20,21
85:2,5,10,14
86:8 87:1,4
88:23 89:9,14
89:16,17,25
90:3,12,17,19
90:20,21,24
91:2 93:16,23
94:8,18,21
95:6,22 97:6
97:11,16 99:1
99:6,12,16,18
99:21,24 100:7
101:20 103:22
103:25 104:10
104:11,14
105:18 106:12
106:14,20
108:18 112:19
112:20,23,24
113:6,23 114:9
115:20 119:22
120:2 122:3,8
122:13,20
123:4,18
124:19 125:2,8
128:21 129:7
131:5 134:15
135:3,8 136:21
136:24 138:2,6
138:21 139:12
139:15,24
140:13 141:23
142:1,23
144:23 146:11
146:14 147:10
147:25,25

149:4,8,12,16
149:18 150:4
150:17 152:23
153:4,6 154:10
154:15,16
156:2,21
157:16 158:23
159:3,17
160:14,24
163:2,10
164:19 165:1,8
165:15 166:1,8
166:25 167:6
167:13 168:21
169:6,11,20,23
170:10 171:5
171:14 172:12
173:16,25
174:23 175:1
177:8,18,19,21
179:5,25 181:1
181:2,7,11
182:4,7,19
183:8 185:16
186:19,20
191:11 193:11
193:15,16,17
193:20,25
194:18 195:9
195:10,17,18
196:15,25
197:2,11 200:6
200:8,9,12,13
201:13 202:9
202:11,18
203:14,21
204:11,21
205:6,12,18,24
206:1,10,16,22
209:1,2,7,11
209:13,15
210:1 212:24
212:25 213:3,8
213:23 215:17
217:5,9,13,14
217:17,21,22
218:1,17
219:10 220:4
220:10,20
221:11 222:6

222:22 223:18
224:2 225:21
226:3,5,23
227:3,14 228:3
**Rights** 16:6
  23:22 24:1
  25:15,20,22
  29:13 213:13
  214:9 215:20
  216:17
**risks** 150:13
**roads** 8:24
**Robin** 31:14
  195:25
**Robinson** 31:14
**Rodden** 169:3,9
  205:1,11,24
  217:19
**Rodden's**
  184:22 205:18
**RODNEY** 1:3
  230:3
**room** 82:10
  119:12
**root** 81:4 119:4
  124:11 128:25
**rough** 71:4
**round** 148:3
  188:10 193:16
**rounded** 148:18
  148:20 149:5
  181:12
**rounding** 180:21
  181:17 182:9
  183:24 187:25
  188:6,11,24
  189:4,14,15
  190:8,13 191:2
  191:21 192:2,8
  192:17,22
  193:5,13,13,18
  193:23,24
  194:3,6,8
  195:17,19,20
  196:2 203:18
  205:19,25
  206:2
**roundings** 192:4
**rounds** 188:10
  194:14,15

**route** 147:22
  148:8
**row** 68:17,18
  69:23
**Rucho** 26:23
  27:3
**rule** 52:5,5
  139:17 190:23
  191:3 203:21
  203:24 204:2,4
  213:4,9,20,25
  215:16
**rules** 194:8
  219:8
**run** 22:3 23:5,6
  53:7,8 131:15
  150:13 190:11
  192:3 208:11
  211:5,13
  214:22
**running** 22:15
  114:7
**runs** 131:7,8
**rural** 117:3

─────── **S** ───────
**s** 2:2 3:4 198:25
**S-e-a-n** 4:13
**safe** 109:7 110:4
  110:19
**safer** 109:25
**safest** 109:1
**sample** 34:9,13
  34:20 116:23
  119:15,16
  121:18
**samples** 185:23
  192:7
**sampling** 34:11
  39:11
**satisfied** 30:1
**saved** 213:1
**saw** 85:18,24
  86:10,12 90:13
  96:6
**saying** 39:19
  47:7,22 48:4,5
  105:19 106:8
  106:14 107:5
  116:9,15

123:23 128:3,4
130:16 138:10
138:21 142:13
169:15 192:20
194:18 225:9
**says** 41:8 47:8
  48:14,25 68:23
  69:9 70:1
  72:25 73:16,19
  74:25 77:8
  82:3 88:20
  96:24 97:3
  99:12 101:10
  102:9 144:12
  147:25 175:8
  179:16 192:18
  198:8,11 204:1
  210:22 221:11
  222:7,15 223:6
**scale** 150:13
  182:10
**scales** 150:11
**Scholer** 2:2
**school** 133:24
  163:17
**science** 21:9
  24:22 25:2
  133:5,10,16,21
  134:7 167:14
  168:1
**scientific** 153:25
**scientist** 167:24
**scientists** 51:20
**scope** 69:19
**screen** 6:12
  122:10
**script** 88:16
  97:14,15
**scroll** 14:16
  68:17 72:22
  73:3 75:7
  204:18 205:9
  221:1
**se** 213:25
**Sean** 1:11 3:2
  4:1,12 231:3
**second** 21:18
  73:6 90:23
  122:18,22
  123:3 201:7

258

204:18 227:21
228:6,7
**section** 28:3
  42:13 144:16
  144:21 155:9
  155:10 206:10
  221:4
**see** 12:19 14:20
  23:21 36:10
  43:4 51:21
  52:1,19 66:15
  68:13,18,20
  69:23 71:15
  72:19,21,25
  73:13,16 74:21
  74:25 75:5,17
  80:13 82:3,20
  87:1 88:19
  89:9,10 92:9
  92:12,18 93:2
  94:23 95:7,10
  96:23 97:3
  99:6,11 100:18
  101:10 102:12
  103:3 105:13
  105:19 106:1,7
  106:16 107:4
  107:17 109:22
  110:20 118:4
  122:5,8,15,21
  124:20,21,24
  125:3 128:6
  133:7,17,18
  140:10,22
  141:3 146:16
  147:10,18
  149:24 151:25
  152:11 154:21
  156:25 157:7
  157:13,16,19
  157:21 158:12
  158:24 159:1
  162:7 165:7
  166:23 167:9
  170:21 171:6,8
  171:11 172:22
  173:23 174:2,4
  179:17 186:25
  192:20 193:9
  194:8 195:2,3

199:4 205:1
208:15,22
212:6 213:21
214:21 218:12
220:20 221:4
221:14,18
222:6,19
228:15
**seeing** 194:1
**seen** 68:3 95:24
  109:16 110:1
  129:10 133:21
  169:10 188:19
  204:20,23
  207:16 208:1,1
**select** 91:18
**senate** 15:14
  17:22,25 18:1
  18:4,9 20:13
  20:16 26:12,15
  135:11,17
  166:19 212:3
  213:24 215:3
  217:2,6 218:2
**sense** 14:1,1
  24:23 57:18
  74:12 178:13
  197:8 203:5
**sensitive** 197:4
**sent** 166:14
**sentence** 17:25
  48:13,20,24
  96:24 102:8
  133:15 137:6
  141:14 142:2,4
  144:12,14,15
  144:19,22
  155:10,10
  175:8 222:14
  222:18,21
**separate** 93:10
  143:17 162:10
**separated**
  163:17 165:18
  165:23
**separates** 162:3
  163:7 164:7
**September** 1:12
  15:24 226:3
  231:4

**serious** 84:15
**served** 15:7,21
  16:22 17:3,9
  28:11,17
**serving** 9:13
**set** 39:19,21,22
  134:18 192:4
  198:24 199:1
  200:6,10 201:9
  201:20 231:10
**setting** 213:14
**shade** 146:22
  171:21
**shaded** 148:12
  149:25
**shades** 171:15
  197:7
**shape** 161:12,14
  167:2 197:5
**shapefile** 67:5
  92:9,10,17,20
**shapefiles** 92:15
  92:25 93:8
**shapes** 52:20
  197:7
**share** 23:5 36:12
  36:13
**shift** 193:21
**short** 214:10
  227:15
**shortcoming**
  113:17 193:4
  197:24,25
**shortcomings**
  41:2 113:18
**Shorthand** 1:12
  231:3,13
**shoulder** 161:21
**show** 148:25
  157:11 176:7
  178:3,14
  180:14,18
  181:5 183:20
  190:15 195:8
  197:6,7 209:9
**showed** 59:25
  84:23
**showing** 157:5
  176:17 178:9
  178:20

**shown** 190:12
  205:22
**shows** 76:11
  108:18 112:6
  112:15 141:3
  186:1,3 188:18
**shrunk** 196:16
**shy** 212:4
**sign** 81:4 228:25
**signal** 159:20
**significance**
  44:5,22 58:12
**significant**
  160:12
**significantly**
  112:8
**similar** 56:14
  172:7
**Similarly** 135:4
  135:15
**simple** 45:7
**simply** 193:6
**simulations** 53:8
**single** 92:14
  112:25 162:19
  195:3,15
  213:15,15
**sit** 14:14 33:8
  89:8 98:14
  108:16 174:7
**sitting** 8:7 40:6
  61:14 64:1
  73:25 76:3
  90:9 101:3
  107:25 108:3
  120:4 145:11
  154:11 202:11
  205:23
**situation** 60:3
  65:25
**situations**
  160:10
**six** 48:23 49:22
  163:13,14
  168:19 182:5
**size** 90:21,22
  110:25 122:12
  183:12 185:10
  196:15 198:1,3
  198:3,9,12,14

198:15,17,18
198:22,24,25
202:7
**sized** 196:11
**sizes** 199:5
**skeptical** 53:9
**skew** 218:22
**skip** 66:5,9
  102:21
**slice** 51:1,2 52:1
**slicing** 51:3
**slight** 92:13
  118:13
**slightly** 171:20
  192:21
**slow** 114:7
**small** 88:7
  137:18 170:13
  170:21 189:10
  202:2 223:9
**smaller** 96:6
  117:24 119:6
  120:12 123:17
  199:7
**snipped** 140:5,7
**social** 51:19
  133:5,10,16,21
  134:7
**socioeconomic**
  38:10,14,19
**software** 31:23
  32:6 92:18
  93:1
**solely** 55:16
**somewhat** 118:3
  120:16
**sorry** 19:1 38:17
  52:5 54:1
  63:12 73:6
  89:20 102:21
  104:3 114:23
  133:12 138:6
  140:18 151:2
  152:23 171:21
  174:11 186:14
  189:2 200:23
  207:19 209:8
  210:5 211:19
**sort** 96:5,10
  114:1,5 134:6

259

141:13 147:8
158:23 171:7,8
173:11,14,15
181:19 193:12
206:20 212:10
225:23,24
**sorted** 73:9
75:21
**sorting** 75:12
**sorts** 109:16
**Soto** 42:4 46:7
56:24 57:23
58:23 179:16
179:20 216:9
**sound** 71:3,10
147:22 168:20
**sounds** 11:5
**source** 39:7,9,13
39:14 40:7,23
40:25 66:23
69:3 144:10
**sources** 39:25
**south** 82:11
158:20
**southwest** 157:9
**span** 170:17
**spatial** 21:8,21
23:6 113:12
163:24 187:17
**spatially** 113:15
189:9
**speak** 6:3
**speaking** 104:4
119:1,14
124:10 126:20
127:22 128:7
170:20 189:19
**specific** 52:5,7
94:22 98:12,15
98:15 102:16
117:1 153:20
167:14 185:20
210:5 215:15
**specifically** 5:1
20:5 37:23
98:8
**specified** 231:7
**spend** 14:12
**spent** 10:1 11:15
12:24 107:9

**spit** 212:10,13
**split** 49:13,21
50:9 52:23
56:6 104:12
122:3 139:16
141:15 154:18
154:23 155:3
156:9,11,12
158:3,15
160:11 161:10
187:17 213:19
**splits** 47:6,12
49:6 52:23,24
92:11 153:2
156:9 159:14
160:3,22 161:2
164:16 213:24
**splitting** 187:18
188:13 189:7
189:16,17
213:25 214:4
**spoke** 5:13
**spots** 150:9
**spread** 123:21
139:11 183:3
**spring** 59:19,20
**SQRT** 88:21
**square** 81:4
89:12,15 90:4
119:4 124:11
128:25 170:18
170:25
**squared** 81:6,7
83:7 124:5,6,7
129:1
**squares** 89:10
**SS** 231:1
**ST** 91:12,18,25
93:12
**stage** 9:23 10:2
11:25 42:18
60:17
**stand** 144:22
**standard** 62:9
63:2 128:25
**standing** 164:5
**start** 58:21
61:19 81:5
83:6 89:20
96:21 112:1

129:20 172:17
172:21 173:2
181:21 189:20
189:21 191:4
192:7 203:19
203:22 206:12
**started** 203:2
**starting** 101:17
101:25
**starts** 82:20
102:9,22,23
173:18 187:15
210:20
**state** 1:7 4:10
16:6 17:7 18:4
18:6,8,14
26:11 29:18
46:11 47:15
56:18 72:6,17
74:22 75:11
79:2 152:20
173:22 206:5
212:3 213:24
215:3 230:7
231:1
**State's** 42:12
**stated** 47:3
**statement** 70:4
74:1 120:10
121:14 132:14
141:19 153:12
153:13 164:5
174:24 188:4
219:23
**statements**
131:20,22
**states** 1:1 20:16
22:2,9 25:20
99:7 100:7,14
116:24 206:11
206:18 223:21
230:1
**statewide** 206:3
214:22 215:1,5
215:8,12,14
**stating** 66:16
**statistic** 119:4
124:11 132:9
**statistical** 21:21
22:16 129:18

129:22 132:14
**statistics** 72:6
**status** 38:11,14
38:19 53:10
**stenographica...**
231:5
**step** 106:10
108:19 208:16
210:15
**Stephenson**
139:17 208:23
209:1,6,8,10
210:7 211:4
213:5,20 214:4
**stepping** 111:11
**stick** 86:4
**Stone** 15:5 31:16
37:19 38:5
59:14,15,17
60:6 79:9
**Strach** 2:6 8:13
28:15,21 29:8
30:2 35:4,13
37:15 38:24
39:5,17 40:10
41:13 45:11
48:1,21 50:18
51:17 52:11
53:17 54:22
55:11,18 57:14
64:21 65:2,8
66:5,11 69:2
69:17 70:7,16
70:24 74:3
76:6,14 77:10
77:18 84:5,16
90:25 106:5
110:14 114:22
115:6,14 116:2
116:13,19
117:13 120:21
123:13 126:18
127:16 129:25
143:8 145:20
146:7 155:22
156:7 159:23
160:6 163:19
166:10 167:7
167:18,25
168:9 171:25

174:18,25
178:1 179:7,14
183:15 189:1
191:10 194:4
194:23 196:18
198:23 200:17
200:21 201:1,5
207:24 208:11
208:15 228:24
229:1,5
**straight** 124:1
**strange** 51:22
**street** 2:7 8:20
8:21,23 146:16
146:20,21,22
146:25 147:2,5
147:14
**Strickland**
44:17
**strike** 19:1
**stroke** 201:15,20
201:23,25
**struggling**
142:14
**students** 163:25
**studied** 18:13
**studies** 22:24
24:23
**study** 21:22,25
22:23
**stuff** 20:1 32:2,8
98:7 121:1
134:1,3 146:3
147:10 153:20
**subcategories**
85:16 87:14
**subdiscipline**
24:22
**subdivision**
105:20
**subdivisions**
105:15
**subgroups** 86:8
86:12 117:10
**subject** 25:5
30:6 199:20
**submitted** 9:22
10:6,15 134:1
**submitting** 55:6
**Subscribed**

260

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 88 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

230:14
**subsequent** 12:9
213:5
**substantial**
62:19 175:25
183:2,3 202:20
**substantially**
84:24
**subtract** 81:9
83:7
**successively**
212:19
**sufficient** 132:18
138:13 139:4
211:25 214:15
**sufficiently**
28:25 132:19
**suggest** 54:19
113:7,24
147:21
**suggested**
113:12 145:5
209:6
**suggesting** 39:13
74:5 95:18
110:21 113:11
168:6 191:1
196:24 197:15
**suggestion** 108:8
147:10 191:18
**suggests** 105:22
112:11 113:16
182:12
**Suite** 2:7,10
**sum** 114:20
115:1 117:9
**summarizing**
155:11
**summing** 115:8
115:11
**supplemental**
46:6 53:22
**support** 133:6,9
188:8 219:23
**supports** 199:10
**suppose** 24:20
70:17 84:22
119:11 132:12
140:6 142:21
**supposed** 81:5

88:10 197:19
213:12
**Supreme** 50:21
51:18 145:7,7
145:12,15
162:12 167:19
168:3 213:5
**sure** 7:14 8:4
9:21 20:13
28:17 29:20
30:16 32:16
34:12 40:17
44:2 53:10
63:1 68:2
71:25 78:12
85:4 88:12
91:25 98:2
105:14 114:1
142:16 143:19
156:1 174:5
193:12 216:4
218:4 227:17
228:14,20
**surprise** 34:4,14
35:9 36:19
164:11
**surprised** 35:17
**surrounded**
195:16
**surrounding**
157:2
**survey** 33:20,24
36:23 40:15
79:14,25 120:1
126:13 131:8
223:20
**surveyed** 65:21
**suspect** 114:16
**swapped** 221:21
221:23
**swapping**
221:12,17
223:8
**swaps** 202:8
**swaths** 180:13
**switch** 221:17
**sworn** 4:3
230:14 231:4
**symbols** 196:15

**T**

**T** 3:4 82:3
163:21
**T-r-e-n-d-e** 4:12
**table** 68:13,17
73:8,16,22
75:10,18 76:11
107:17,20,23
108:15,19
112:5,14 113:1
115:1 117:9
121:21,24
122:6,16
124:21 126:1
127:12
**tabs** 26:16
**tabulates** 68:8
**take** 5:8 22:16
22:18 51:11
71:8 76:22,23
108:19 115:11
138:7 148:13
153:2 166:10
176:24 177:8
185:21,22
189:13 192:7
193:14 197:22
203:14 208:5
217:13 225:14
227:15
**taken** 1:12 22:15
29:5,11 32:18
69:3 76:25
127:9 166:12
169:12,15
203:15 216:6
217:15 228:21
**takes** 147:21
172:18 212:15
**talk** 4:20 20:19
74:11 78:18
189:21
**talked** 12:2
30:24 101:7
175:20 185:18
**talking** 20:23
58:21 69:20
78:6 105:17
118:25 119:19
120:4,5 121:1

121:3,4 127:12
142:19 144:21
161:9 170:21
175:15 179:20
186:17 188:1
189:24 192:5
203:17 211:24
221:8 222:18
**tallies** 67:24
68:8,14
**tally** 69:7 146:9
**taught** 203:25
**teach** 25:15,16
**Technical** 10:17
**technique**
221:13
**tell** 8:23,25
154:11 172:23
178:15 210:14
227:6
**telling** 77:14
**tend** 64:18 65:5
123:22 186:5
189:18 190:10
**tends** 23:4
**Tennessee** 30:19
**term** 14:2 19:22
45:22 46:14
53:9 120:25
136:5,7,12
153:24 167:13
184:24 214:7
215:4,18
216:16,16
**terms** 25:2 37:10
41:8 48:25
131:5 140:3,4
194:5
**terribly** 74:9
**test** 24:18 51:25
162:14 163:21
168:2,4,7
189:25 190:2
204:3,7,9
**testified** 4:4 15:4
42:9 79:7
90:13 127:17
152:9 203:18
227:25
**testify** 231:4

**testifying** 25:14
26:8 95:12
96:3 158:5
159:15
**testimony** 5:5
27:18,25 30:6
45:5,13 88:13
92:8,16,20
95:14 96:9
106:16 137:12
141:10 143:4
166:25 167:5
168:12 193:12
198:16,22,24
207:17,20,25
219:4 221:20
223:23 231:7
**text** 198:8,11
199:9
**texts** 199:12
**Thank** 228:23
**Thankfully**
83:10
**Thanks** 97:2
218:7
**Theodore** 2:2
3:3 4:6,8 10:13
10:22 32:19
35:18,22 41:19
41:24 46:3
57:11 66:8,12
67:20 72:12
74:15,20 76:23
77:1,13,21
79:21 81:20
94:11 98:22
127:7,10
130:12,15
166:11,13,17
179:9,15
203:16 204:15
208:14,17,19
217:16 219:14
224:25 225:6
225:17 226:20
227:5,14,20,24
228:2,5,7,11
228:18,22
229:4
**theoretically**

261

thereabouts
226:2
thick 201:19
thing 12:23 15:3
22:11 50:20
51:8 78:22
88:1 117:4
127:18,19
144:15 146:8
201:24 217:18
things 39:1 41:1
44:19 49:8
52:18 57:18
60:21 69:19
78:21 96:6
113:14,20
136:6 140:5
148:10 149:21
168:11 188:18
188:20 194:14
194:15 195:3
197:7 199:4
222:3
think 7:15 8:14
11:12 12:6,17
12:23 14:2,10
15:3,12 16:24
16:24 21:10
25:6,23 27:5,8
27:22 29:15,20
29:23 30:25
32:5,15 34:3
37:2,9,10,18
37:20 41:15
43:21 44:12
45:5 47:8
48:25 51:19
52:4,13,14,15
53:9,24 54:10
55:7,12,19,25
57:8 59:24
61:14 63:4,22
74:9 76:9 79:6
79:11 85:1
86:22 87:24
88:9 90:3 95:6
97:20,22,22,24
98:7 106:16
108:7,24
110:10 112:20

113:12,25
116:18 117:6,8
120:23,24
121:9 123:19
124:9 127:17
127:22 128:7
128:16 129:2,7
129:10 134:15
135:3 136:3
139:5 142:3
143:9 147:24
149:12,23
150:23 153:24
154:1 159:12
160:10 162:14
164:3 168:1,13
168:19 169:21
170:6 172:21
173:24 175:14
175:14,19,25
176:4,10 178:8
179:1,5,6
180:13,18,19
182:5,11
183:10 184:7
185:3,8 186:7
188:18,19
189:2 191:24
192:25 193:6
193:10 194:7
194:24 195:1
195:21,22
196:21,22
197:21 199:6
200:1 202:16
202:18,25
203:9,22
204:12 206:21
207:16 208:2
211:8 213:7
215:2,16
216:15,24
217:13 219:11
219:21 220:16
221:19 222:20
223:22 225:3
226:12,20
229:5
thinking 13:25
140:3,4

thinks 182:13
188:16 198:4
third 124:19,20
197:21 222:2
228:11
thought 28:25
30:13,22 101:6
101:8 104:23
105:7 109:1,24
147:3 149:15
149:19 176:3
192:13 203:3
216:13 217:19
three 21:18 30:9
85:15 86:7
87:14 89:18,22
139:18 141:15
144:4 178:24
180:3,9,11
197:14,16,19
207:21 213:17
220:17
threshold 44:20
58:12 134:16
138:16,20
162:9 191:16
212:3,21 216:4
216:12
thumb 190:23
191:3 203:21
203:24 204:2,4
tibble 212:17
tidycensus 69:10
70:9,12,14
71:18 74:7
76:9,12,13
78:7
time 7:5 9:14
11:9 12:24
14:13 22:19
43:7 44:21
55:22 60:6,22
61:1,7,15
76:21 79:7
107:10 132:24
132:24 196:6
220:7 227:8
228:13 231:7
times 4:15 119:4
124:6,11

128:25 130:8
130:17 131:11
131:15 132:2
ting 174:7
tip 139:20
141:17
titled 68:13
209:6 221:4
today 5:5 61:14
64:1 73:25
76:4 90:9
91:22,23 101:3
107:25 108:3
114:7 145:11
154:11 174:7
202:11 220:19
225:20 226:3
told 210:9
228:12
top 8:11 25:23
29:16 153:1,7
153:14,24
154:12 160:21
161:1,5,9
201:3,4,9
topic 20:8 76:20
113:24 114:5
217:10
topics 25:12
total 73:9,17,19
75:13 80:7,24
81:2,10 83:9
83:13 85:8
89:6 96:24
97:3 99:8,9
111:18 122:9
122:16,19
124:3 138:19
222:21
totaling 97:9
Totally 114:5
touch 12:15,18
toy 207:1
tracking 176:15
tracks 155:13
166:3 176:8
tract 67:11
69:16 75:5,17
75:23 76:1,4
tracts 66:17,20

67:1,5,6,10
68:9,14,21,24
69:8 74:13
75:12,20 77:7
78:13,18
trade 184:16
194:12
traditional
22:17,25 23:1
47:10 51:4
119:3
traditionally
21:25
transcribed
231:5
transcript 4:19
40:2 42:3 43:1
43:6,11 45:23
62:23 115:16
145:1 230:10
230:11 231:6,7
transcripts
229:2
transferred
210:13
transform
181:18
transmit 10:9
41:20 57:7
74:15 98:18
219:10
transmitted
79:18 179:5
transparency
200:5
transparent
200:11,16
traverse 49:20
treat 22:6
treated 43:15
trend 21:4
Trende 1:11 3:2
4:1,7,12 32:20
35:23 44:24
48:20 50:11
63:15 66:13
77:14,22 86:2
128:12,20
179:16 193:11
197:16 198:16

262

217:17 225:1,9
225:18 228:3
228:23 231:3
**trends** 18:14,20
18:23 19:5
20:23
**trial** 61:3
**trick** 183:18
**tricky** 50:20
51:7 176:1
215:2
**tried** 51:1
167:21 190:15
**trier** 168:15
**trigger** 160:12
**trillions** 223:20
**true** 24:20 30:16
34:25 35:1,7
39:1,4,9 45:1
45:10 58:24
59:1 62:10
64:20 65:4
83:22 91:22,23
95:23 112:10
115:5,18,25
116:1 118:6,11
119:18 123:7
125:11 126:15
126:17 129:15
129:18,19,22
129:23 130:4,5
130:7,10,21,23
130:24 131:2
131:10,10,14
131:21 132:3,8
132:15,20,25
133:2 138:18
142:21 144:2
151:15 156:20
177:13 180:23
181:6,10
184:12 187:2
189:23 192:8
192:15 205:21
205:22 214:6
218:16 230:11
231:6
**truly** 22:10
**truncate** 148:4
**truncated**

150:11 152:15
**truncates** 148:4
**truncating**
152:7
**trust** 93:6
147:19
**trusting** 133:14
**truth** 231:4
**truthful** 5:5 45:5
**try** 4:20 21:14
49:15 62:24
114:24 138:21
163:21
**trying** 48:19
49:8,24 50:4
74:12 122:11
131:20 133:25
137:21 142:7,9
173:7 203:7,12
207:8 210:15
**turn** 31:17 36:7
42:25 59:5
66:3 80:9 86:2
88:15 96:19
99:3 107:12,13
140:13 152:17
154:16 157:13
162:1 171:2
186:13,14
206:7 209:3
211:20
**turned** 81:24
**turning** 174:1
**turnout** 18:15
19:14
**twice** 182:19
183:7,12 185:9
192:9
**two** 6:9 15:18
27:1 83:14
94:21 98:6
124:13 128:25
139:20 140:9
141:17 142:10
144:5 163:12
181:8 182:17
182:21 184:15
186:3 191:6
213:16 218:5
**twofold** 124:13

**type** 72:25 75:5
78:22 106:7
131:23 160:12
187:13 189:6
189:11,21
190:5,24 193:7
**typical** 171:18
**typically** 18:5,7
22:11 74:6
199:16

**U**

**U.S** 18:1,1 21:22
23:19 145:6,7
145:12,15
**ultimate** 83:11
90:15 95:11
96:9 107:8
158:6 168:12
**ultimately**
117:18 168:14
**Um-hm** 184:9
**unclear** 62:14
**underlying**
146:20 147:11
**understand** 4:24
9:5 19:22
26:15 50:4
61:18,20 62:11
62:20 68:7
71:6 74:10
84:7 86:5
100:7 120:10
120:24 121:24
139:17 142:14
143:10,15
144:10 153:10
154:2 166:1,5
167:19 178:6
180:21 188:23
189:2 200:23
207:10 213:19
217:11 221:8
222:11 225:13
225:25 227:17
**understanding**
7:21 26:13
42:16 58:20
64:2 67:8
78:21 114:12

147:7 153:18
154:9 168:3
178:18 195:25
213:8,10,13
214:7,21
215:18,23,24
215:25 216:5
219:7 221:24
221:25
**understood**
34:12,18
**unfair** 137:18
139:6 203:4
**ungainly** 51:22
**uninhibited**
158:17
**United** 1:1 20:16
116:24 223:21
230:1
**units** 22:1,4,6
170:13,21
**unknown**
109:18 113:11
**unknowns**
109:18 113:11
**unquote** 212:19
212:22
**unreliable** 37:11
54:20 55:10
57:12 84:4
**updates** 14:25
**urban** 117:3
205:8
**urgency** 96:5
**URL** 220:20,23
**usage** 20:22
**use** 24:5 27:10
27:17 31:24
32:6 40:14
45:22 46:14
52:6 57:18
62:9 63:2
80:16 84:19
85:25 87:13,21
88:10 103:16
105:19 108:20
109:2,25 110:4
110:20 111:20
142:18 146:1
147:14,16

150:8 168:23
169:18,23
170:11 175:12
178:2 179:8,10
180:22 187:16
194:7 196:8,9
196:23 197:16
198:2,12
199:13 205:19
207:10,14,18
207:21 208:2
215:1,2,12,14
**useful** 36:13
190:24
**uses** 41:11 69:10
148:21 196:1
199:23 202:7
206:1 221:17
**usually** 19:24
162:14 183:18
183:19
**utility** 178:3
**utilized** 169:2

**V**

**v** 15:5,6 16:25
26:23 27:3,5
30:14,18,21
31:6,8,9,10,11
31:12,13,15,16
44:17,18 59:14
160:7 185:3
**vagaries** 34:11
**vain** 146:2
**validate** 108:11
188:24
**validated** 188:4
**value** 73:16
129:19,24
130:4,5,10,21
130:23,24
131:3,21,24
132:4,9,15,18
132:20 133:1,2
189:24 200:7
200:11,25
201:15,20
**values** 22:13
129:13,14
130:7,17,20

263

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 91 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

Vance 8:2
  138:24 139:3,7
  139:21 141:12
  141:18 143:3
  144:1,5 160:22
  161:2,3,5
  162:4,11,21
  163:2,8,9
  164:12,16,22
  167:2,17
VAP 34:10,21
  36:13 51:14
  60:7 174:10
  175:18 207:10
  207:22
VAPs 60:2
variability 35:16
variance 116:5,7
  116:10,16,21
  117:19 118:14
  118:16,17,20
  119:5,10
  123:15,19,20
  123:23 124:8
  124:11,15,17
  125:12,16
  126:4,10,19,21
  129:2 215:4
variances 127:1
  127:5
variety 34:21
various 26:13
  53:5
verified 78:23
verify 78:7
  118:23 120:17
  121:14 147:12
  161:23
version 137:19
  196:1 202:6,21
versus 17:2
  27:23 28:7
  42:4 59:15,18
  77:7,8 79:9
  117:3 128:3
  151:3,9 182:10
  194:10
videoconference
  1:11 2:2,6,9
view 19:23,25

44:19 47:4
  50:4,17 53:14
  57:12,15 58:13
  58:14,20 60:2
  105:21 131:2
  138:3 145:7
  151:18 160:2
  161:4 176:14
  182:8,14
  190:12,12
  191:23 192:25
  193:8 194:9,17
  194:20 195:23
Vincent 1:12
  231:3,12
violate 139:17
  213:19
violation 42:13
Virginia 185:4
  216:11
Virginia's 36:5
vis-a-vis 193:9
vision 171:19
visualization
  183:17,19
  188:22
visualizing
  194:5
visually 182:18
vote 23:5 71:11
voter 18:15
  19:14
voters 142:20
  176:25 177:9
  177:14,14,15
  214:15
votes 214:15
voting 16:6
  18:16 19:17
  23:22 24:1,5,9
  24:15 25:4,15
  25:16,20,21
  29:13 33:10
  34:6,16,22,24
  35:2,3,10,12
  42:13 43:17
  44:25 62:6
  63:3 64:12,19
  65:6,16,24
  80:7,7 87:15

137:1 138:8
  139:4 152:21
  155:17,21
  162:21 163:3
  164:6,12
  169:19 174:3
  174:12,13,23
  175:1,2,9,10
  175:15 176:19
  176:20,22
  177:1,10,16,17
  213:13 214:9
  215:19 216:17
VRA 16:3,4,5,6
  16:7,10 29:6
  30:10,15,20,22
  40:14 42:14
  214:17
vs 1:6 230:6

_____

### W

wait 4:21 100:3
Wake 73:14
walk 37:22
want 5:7 38:18
  40:3 72:22
  74:4 76:8,17
  86:4 88:15
  102:21 106:7
  108:9 110:15
  111:13 118:22
  120:10 121:13
  124:19 127:12
  128:23 141:13
  152:17 154:16
  163:12 166:21
  168:18 169:17
  180:21 181:19
  184:5 185:7
  188:23 193:11
  203:17 217:17
  223:25 225:13
  225:15 226:15
  227:15
wanted 11:11
  43:19,22 44:5
  58:17 142:10
  156:2
wants 147:21
war 61:4

warning 38:8
Washington 2:3
  42:5,12 46:12
  139:18 141:12
  141:16 143:3
  144:1,4 209:21
  209:24 210:22
  211:1
washy 51:19
wasn't 27:6 30:5
  42:15 50:8
  58:2 60:14,18
  60:19 85:2
  98:16 105:13
  109:22 161:8
  185:17 223:4
waste 153:19
watched 133:25
way 11:20,24
  24:11,24 29:17
  31:3 32:12
  35:17 36:20
  41:14 46:18
  52:1,3,22 58:2
  58:18 62:22
  76:17 94:4
  95:5 100:23
  105:6,10,12,13
  106:1,9,15,17
  107:5,24 108:2
  108:5,10,16
  109:1,1,3,4,10
  110:1,3,17,21
  110:22 118:6
  118:10 125:15
  128:1 135:13
  135:19 138:22
  140:5 143:24
  144:3 146:10
  149:5 155:24
  158:14 160:12
  161:8 163:25
  164:16 167:5
  180:9,12 184:4
  189:18 193:12
  197:14,16,19
  199:10 207:9
  208:2,9 226:12
  228:15
ways 25:8 49:16

53:5 57:17
  98:6 110:15
  120:24 207:7
  208:1,7
we'll 86:2 229:7
we're 69:19
  114:1 117:18
  121:9 219:11
weak 187:16
website 67:24
  72:7,16 75:12
  75:14 78:11,14
weeds 109:16
weight 207:5,11
  207:12,13
weighting
  207:17 223:14
weird 167:10
welcome 188:17
went 82:11 85:1
weren't 60:15,15
  151:5 195:19
west 158:21
western 42:4
  139:20 141:17
whatnot 74:11
WHEREOF
  231:10
whichever
  156:10,12
white 38:16,17
  38:22 62:1
  85:16 89:19
  90:1,6 149:25
  150:9 162:4,11
  162:17,17
  163:3,7,9
  164:8,12
  165:12,16,21
  169:23,24
  172:24 173:12
  173:15,23
  175:10 176:22
  177:14,17,20
  178:12,17
  180:2,24 181:4
  181:9 182:19
  182:22 183:11
  183:13 185:9
  185:11 186:2

264

Case 4:23-cv-00193-D-RN    Document 88-2    Filed 10/28/24    Page 92 of 95
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

187:6 188:14
191:6,7 192:10
193:9 194:10
194:20 195:8
196:9 197:2,10
197:10,20
199:23 200:6
200:15,19
201:8,12,21
202:19 203:3,8
205:2,2,15,16
214:15
**whitest** 155:5
**wife** 6:5
**wiggle** 82:10
119:12
**Wikipedia** 147:8
147:9
**Williams** 206:1
206:4 217:20
**Williamson**
196:4
**win** 216:19
**winding** 186:4
**window** 6:12
**Wisconsin** 61:4
**wish** 194:7
**wishy** 51:19
**withdrew**
153:10,18
**witness** 10:19
14:19 17:20
24:20 36:8
43:2 74:19
75:8 80:11
82:17 86:24
88:17 94:19
96:20 99:4
100:12 103:10
107:14 114:11
117:22 140:16
154:17 158:8
160:15 162:2
171:4 179:13
186:16 202:5
206:8 209:5
211:21 221:3
224:18 227:10
231:7,10
**witnesses** 225:8

**word** 22:5 49:12
71:8 144:18
**words** 111:24
112:2
**wordsmithed**
137:5 141:21
142:17 169:14
**wordsmithing**
218:18
**work** 11:12,20
11:24 12:13,15
12:18 13:18
23:13,15 24:1
24:5,8 25:5,17
27:14 29:6,6
29:13,21,25
32:7,21,25
33:15 40:21
84:11 110:3
121:13 126:23
131:1 133:9
139:24 142:7
164:4 188:3,23
191:4 204:3,7
204:9 208:20
214:17 216:7
225:10
**worked** 84:8
88:7 207:3
**working** 11:7
31:24 189:22
**works** 180:22
193:13 207:9
229:5
**world** 58:11
**worse** 53:13
84:22 188:20
202:16 223:11
**wouldn't** 24:23
29:15 34:2,19
35:17 36:19
95:16 96:9
105:9 113:15
138:11 143:4
147:16 151:7
160:12 177:6
178:19 187:9
190:15 194:17
196:17 201:2
216:18 218:22

**wrapped** 61:2
**wrapping** 114:3
**write** 12:16 14:9
25:17 60:24
144:24
**writing** 20:1
22:15 87:9
141:20
**written** 18:13
20:4 144:2
**wrong** 44:13
69:1,6,12,13
69:14,16 70:6
70:13,22 76:9
76:12,13 84:1
84:4,6,10,17
99:13,16,20
113:15 147:11
148:10 152:2
173:24 180:18
199:3,8 206:21
206:24 209:22
219:9 221:25
**wrote** 12:14
31:18 35:24
36:4 84:8
85:18 141:14

## X

**X** 3:1,4 80:21,24
81:7 129:1
169:23 170:2,5
170:7 175:10
180:23 181:5
184:8 200:1
201:18,25
**x-hat** 124:5
**Xs** 173:12
178:12 180:22
181:8 182:17
182:21 184:12
186:3 191:6
196:8,12,16
198:9,12,16,21
199:5,7,23
200:6 201:21

## Y

**Y** 80:22,24
81:11 124:3

**y-hat** 124:7
**Yakama** 47:13
49:9,10,14,17
49:19 51:9
**yeah** 4:12 7:14
30:3,14,18,25
32:2 35:15
37:9 42:15,24
43:10,21 45:13
59:4 60:14
63:4 64:10,15
69:18,20 70:12
72:21 73:21
76:23 79:11
82:5,23,24
83:14,15,20,25
84:6 85:13
86:9 87:11
97:15,20 98:6
104:4,23 105:4
105:7 112:11
116:15 120:23
125:12 128:16
129:7 133:16
135:3 137:4
140:20,25
141:21 147:7
149:5,9,12
150:1,3 151:16
156:10 158:19
161:12 162:8
169:14 170:23
172:11 173:13
173:17,24
177:15 178:24
180:5,5 182:8
182:24 184:1
184:13 187:11
191:3 196:16
197:3 199:19
201:23 202:10
203:2,21
204:24 205:4,7
205:17 207:3
209:8 210:11
211:8 214:18
215:22 218:4
218:17,23
220:2 223:3,22
226:4

**year** 54:8 58:20
**years** 16:17
26:11
**yell** 198:2
**yellow** 148:1,13
148:14 149:1,2
165:8,22
**York** 15:18,19
147:15

---

## Z

**Z** 119:4 124:11
**zero** 34:10
125:15 138:25
148:15 149:2
201:25
**zigzags** 158:17
**Zoom** 4:17 6:12
158:13 179:14
**zoomed** 205:10

---

## 0

**0** 150:13,24
**0.1** 198:9

---

## 1

**1** 3:6 10:10,11
14:17 17:18
30:1 31:4 44:3
44:15,18,20
45:3,15,16,21
52:5 55:15
56:2 57:6
58:11,12 59:5
60:2,3,9,16
82:25 83:3
87:2 96:9
124:2 132:18
135:12 137:11
137:20,24
138:4,14 139:4
139:10 157:17
157:17 158:15
160:4 165:9
178:6 182:15
198:9
**1,000** 172:18
**1,776** 67:6 68:23
**1.3** 85:1
**1.8** 85:1,1

265

Case 4:23-cv-00193-D-RN     Document 88-2     Filed 10/28/24     Page 93 of 95
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

**1:25** 1:13
**10** 3:6,11 81:17
  81:18 82:16
  88:15 97:14,15
  115:18 116:23
  117:16 150:25
  157:11,14
  168:20 169:19
  169:24 173:9
  174:2,3 175:9
  175:10 180:23
  181:11 182:2,6
  187:10,12
  216:20
**10,000** 160:21
  161:24
**10,439,388** 71:7
  71:9
**100** 62:17 130:6
  130:8,17,22
  131:7,11,15
  132:2 150:13
  158:11 172:18
  195:13 196:4
  217:20
**11** 3:11 94:8,9
  94:18 187:12
**11,000** 152:25
  153:21 154:6
**12** 3:12 98:19,20
  140:15
**1200** 2:10 71:1
**1240** 138:6
**13** 3:12 53:21
  54:1 107:13
  166:14,15
  168:20
**13,967** 71:14,22
  74:2
**1300** 71:2
**14** 3:13 158:7
  180:24 181:4
  181:23 182:22
  183:8 186:1,2
  191:7 204:12
  204:13
**14,610** 75:18
**1400** 2:7
**1468** 71:3,10
**14th** 17:8 29:19

**15** 3:14 26:11
  54:4 121:21
  181:9 182:22
  183:7 186:2
  187:11 191:6
  194:21,24
  213:24 219:11
  219:12,15
**15-minute**
  217:14
**16** 10:7 168:20
  171:2,5 187:13
  202:7,18
**166** 3:12
**169225** 96:25
  97:1
**17** 43:15 54:15
  56:22 155:8
  156:20 168:20
  172:12 173:11
  182:12 184:7
  186:14 206:7
  206:13
**170** 226:8
**174** 122:25
**1776** 78:12
**179** 3:13
**18** 54:14 99:3
  117:21,23
  120:11 218:8
  219:23 220:13
  220:24
**19** 36:24 43:15
  54:14
**1998** 6:23

---

**2**

**2** 3:7 21:17 28:3
  35:19,20 42:13
  46:23,23 72:22
  75:3 107:18
  112:5,14 113:1
  115:1 117:9
  127:12 129:1
  135:12 221:1
**2,102** 70:19
**2,364** 136:25
  138:7
**2,672** 68:21
  74:25

**2.1** 99:19
**20** 114:19,21
  138:23,23
  168:20 177:5
  187:11
**200** 2:10 20:21
**2000** 221:11,24
**20001-3743** 2:3
**2001** 6:23
**2010** 222:7,21
  222:25
**2011** 6:18
**2012** 21:3
**2014** 20:10
**2016** 54:7
**2019** 37:17
**2020** 19:1,3 35:8
  36:23 37:2,7
  37:13,25 38:2
  38:7 40:8 54:5
  54:14,16,17,21
  55:20 67:7,10
  68:13 71:7
  83:19 100:1
  102:9,11,17,19
  102:23 218:9
  218:16,25
  219:4,24 222:1
  222:13
**2021** 36:5 54:5,8
  54:9,13,14
  55:20
**2022** 19:4 23:18
  83:19 97:21
  100:1 101:1,11
  101:17 102:1,6
**2023** 9:24 60:10
  134:19 135:17
  166:18
**2024** 1:13 10:7
  10:15,23 11:4
  42:7 46:7
  59:20 61:10,15
  230:15 231:4
**204** 3:13
**21** 164:15 165:8
  210:20
**219** 3:14
**219.45** 125:6
**22** 202:4 210:19

**23** 46:7 96:19,21
  99:19 102:20
  102:22 168:20
**237.45** 124:25
**24** 59:21 96:19
  99:24 100:3,25
  102:23 133:4
  133:15 181:9
**25** 136:21 148:7
  148:12 209:3
  213:18
**251** 179:16
**2600** 69:20
**27** 146:12
  150:10 152:8
  166:22 167:3,4
  169:1,11
  173:21 174:24
  175:11 186:13
**27603** 2:7
**28** 89:2 152:17
  152:17 174:1
**290** 125:3

---

**3**

**3** 3:7 41:21,22
  121:21 124:21
  126:1 205:9
  222:6
**3,000** 116:24
**30** 1:12 148:2,5
  148:15,18,24
  150:11 152:7
  152:15 189:20
  190:21 191:1,8
  191:16 203:19
  231:4
**301** 2:7
**305** 122:22
**30th** 226:1,3
**31** 11:3
**32** 148:18
  179:23
**33** 114:10 171:3
  172:6 183:20
**34** 154:16
  172:13 183:20
**34,130** 75:23
**35** 3:7 99:6
  148:24 149:2,8

**160**:14
**36** 100:11
**37** 68:17 69:23
  162:24 164:7
**371399606001**
  95:15 96:17
**371399607012**
  96:17
**38** 162:1,8,20
**39** 162:8
**39.9** 149:8

---

**4**

**4** 3:3,8 45:25
  46:1 75:7
  132:13
**4,000** 69:21
**4,967** 70:2,5
**4.3** 54:2,3
**4.4** 112:17
**4:23-CV-0019...**
  1:2 230:2
**40** 125:16
  149:10 150:15
  150:19
**41** 3:7 211:20
**42** 164:11 211:3
**43** 209:3
**43215** 2:10
**44.99** 149:11
**440** 138:6
**46** 3:8
**48** 14:16
**49** 59:6
**49.5** 102:11
  131:14,16
**4th** 145:24

---

**5**

**5** 3:8,13 57:8,9
  66:5 76:24
  88:16 172:19
  172:19 179:7
  179:10,11
  180:24 181:4
  181:23 198:3
  200:11 201:9
  202:13 217:2
  228:18
**5,878** 67:12

266

**5:16** 229:8
**50** 11:17 43:17
  43:23 44:1,4,6
  44:9,12,15,18
  44:20 45:1,3,9
  45:14,21 50:1
  50:2,15 51:14
  52:4 55:15,25
  56:2,4 57:20
  58:4,8,12 60:2
  60:7 84:21
  85:25 96:8
  102:10,18
  103:13 107:8
  129:12,14,18
  129:22,24
  130:17,20,21
  130:22,23
  131:8,12,13,15
  131:16 132:15
  132:16,21
  137:11,20,24
  138:4,14 139:4
  139:10,20
  140:12,24
  141:5,17
  142:24 144:3
  151:3 154:19
  158:25 160:4
  212:5,22
  214:10
**50.1** 133:3
**50.14** 101:12,14
  101:20,23
  102:4,7
**50.19** 103:3,8
**50.2** 102:10
**50.3** 54:5 55:20
**50.5** 131:6,11,13
  132:11
**50.9** 133:3
**51** 59:7
**51.1** 54:4 55:19
**51.47** 138:1
**525** 124:21
**538** 131:4
**55** 151:3
**57** 3:8
**58** 137:16
**59** 86:23

**6**

**6** 3:9 53:24 66:3
  66:13 67:17,18
  68:11,23 70:1
  70:19 78:6
  80:14 88:2
  96:13 124:2
**60** 140:13,18
  150:15,19
  157:13
**601** 2:3
**63** 162:20 164:6
**64** 80:9
**67** 3:9

**7**

**7** 3:9 72:9,10
  101:10 124:9
  186:15
**7,111** 69:24
  70:23,25 71:9
  72:19,20 73:1
**70** 138:11 148:5
  150:12 151:12
  152:7,15
  158:10 164:20
**700** 125:16
**72** 3:9 112:22
**74** 3:10
**75** 151:9
**77,599** 152:22
**77,699** 152:20
**79** 3:10

**8**

**8** 3:10 36:7 42:7
  74:17 79:14,24
  105:17 109:14
  146:11 149:24
  150:5
**8,962** 73:15,16
**81** 3:11
**83,992** 97:4
**87** 42:25
**890** 122:9,16

**9**

**9** 3:10 79:18,19
  86:22 133:4,15
  187:12 210:22

  210:23,23
  211:1
**90** 132:1,2,13,17
  132:23,24
  133:18 134:3
  151:9
**94** 3:11
**95** 34:10 133:6
  133:10,17,19
  133:22 134:2,8
  151:13
**965** 122:19
**98** 3:12 166:5

267