# Exhibit 4

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA,
2                    EASTERN DIVISION
3            *************************
4    RODNEY D. PIERCE
     and MOSES MATTHEWS
5         Plaintiffs
6         vs.              Case No 4:23-CV-00193-D
7

     THE NORTH CAROLINA
8    STATE BOARD OF ELECTIONS, et al.
             Defendants
9
10           *************************
11                Deposition of:
12            LOREN COLLINGWOOD, Ph.D.
13         Appearing Remotely via Zoom from:
                Albuquerque, New Mexico
14
15                   Taken on:
16               September 24 2024
             11:00 a.m. EST/9:00 a.m. GMT
17
18
19
20
21
22
23             Stenographic Reporter:
         Kelliann D. Linberg, RPR, Notary Public
24      Appearing Remotely from Geauga County, Ohio
25

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 2 of 85

1  (All Remote) APPEARANCES:
2  On behalf of the Plaintiffs:
3    Arnold & Porter Kaye Scholer LLP by:
      ELISABETH THEODORE, ESQ.
4    601 Massachusetts Ave NW
      Washington, DC, 20001
5    Elisabeth.theodore@arnoldporter.com.
6    Poyner Spruill, LLP
      CAROLINE MACKIE, ESQ.
7    301 Fayetteville Street
      Suite 1900
8    Raleigh, NC, 27601
      Cmackie@poynerspruill.com
9    919-978-3110
10 On behalf of the Defendants:
11   Baker & Hostetler LLP by:
      KATHERINE L. MCKNIGHT, ESQ.
12   DARIN J. GIBBONS, ESQ.
      1050 Connecticut Avenue, NW
13   Suite 1100
      Washington, D.C. 20036
14   1.202.861.1500
      Kmcknight@bakerlaw.com.
15
      ERIKA D. PROUTY, ESQ.
16   200 Civic Center Dr
      Ste 1200
17   Columbus, OH, 43215
18
19
20
21
22
23
24
25

1              INDEX OF EXHIBITS
2  DEFENDANTS      DESCRIPTION         PAGE
3  Exhibit 1    Dr. Collingwood's 5-31-2024   11
            Expert Report
4
   Exhibit 2    Copy of Dr. Collingwood's    25
5            C.V.
6  Exhibit 3    Copy of Article By Drs.      102
            Grofman, Handley and Lublin
7            Titled,Drawing Effective
            Miority Districts: A
8            Conceptual Framework and Some
            Empirical Evidence
9
   Exhibit 4    Copy of Article Titled,      104
10           Providing Black Voters with an
            Opportunity to Elect
11           Candidates of Choice to the
            North Carolina State
12           Legislature: A
            Jurisdiction-Specific,
13           Functional Analysis of Select
            House and Senate County
14           Grouping, By Lisa Handley,
            9/17/2019
15
   Exhibit 5    Copy of Article Titled, Can  105
16           States Promote Minority
            Representation? Assessing the
17           Effects of the California
            Voting Rights Act, By Drs.
18           Collingwood and Long
19 Exhibit 6    Copy of Expert Rebuttal      108
            Report of Dr. Loren
20           Collingwood, 8-30-2024
21 Exhibit 7    Copy of 2-23-2024 Expert     136
            Report of Dr. Collingwood
22
   Exhibit 8    Copy of Paper Titled,        138
23           Comparing Methods for
            Estimating Demographics in
24           Racially Polarized Voting
            Analyses, 4/21/2022
25

1              TRANSCRIPT INDEX
2
3  APPEARANCES.....................2
4  INDEX OF EXHIBITS................4
5
6
7  EXAMINATION OF LOREN COLLINGWOOD, Ph.D.:
8  BY MS. McKNIGHT..................6
9
10
11 REPORTER'S CERTIFICATE..........141
12
13
14 EXHIBIT CUSTODY:  RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25

1          - - - -
2          COURT REPORTER:  Due to the need for this
3  deposition to take place remotely, do you stipulate
4  that I may swear in the witness over the
5  videoconference and waive any objections to this manner
6  of reporting?
7          MS. McKNIGHT:  We do on behalf of
8  Defendants.
9          MS. THEODORE:  We do as well, the
10 Plaintiff's, sure.
11         LOREN COLLINGWOOD, Ph.D., of lawful age,
12 called for examination, as provided by the Ohio Rules
13 of Civil Procedure, being by me first duly sworn, as
14 hereinafter certified, deposed and said as follows:
15         - - - -
16         MS. McKNIGHT:  Thank you.  One note to put
17 on the record is that we have an attorney sitting in on
18 this deposition named, Darin Gibbons, from the law
19 firm, Baker Hofstetter.  He has not yet had an
20 opportunity to enter his appearance in this matter.  We
21 understand that Plaintiffs have no objection to his
22 participation in this deposition in this role.  Could I
23 confirm on the record that that's correct?
24         MS. THEODORE:  That's correct.
25         MS. McKNIGHT:  Okay.  Thank you.

2 (Pages 2 - 5)
Case 4:23-cv-00193-D-RN   Document 384   Filed 10/28/24   Page 3 of 85
Veritext Legal Solutions
www.veritext.com                                      888-391-3376

1     EXAMINATION OF LOREN COLLINGWOOD, Ph.D.
2 BY MS. McKNIGHT:
3     Q.   Okay, good morning, Dr. Collingwood. I'm
4 Kate McKnight with Baker Hostetler, and I am here today
5 on behalf of the Defendants in the Pierce v North
6 Carolina State Board of Elections case in Federal Court
7 in the Eastern District of North Carolina.
8     Would you state your name for the record?
9     A.   Loren Collingwood.
10     Q.   And I understand that you have been deposed
11 before; is that right?
12     A.   Correct.
13     Q.   Okay. So, I'll keep these brief, but I do
14 need to make these points. First, I'll endeavor to
15 take a break every hour or so. This is not an
16 endurance contest.
17     If you need a break between those hour
18 breaks, please let me know. I only ask that you answer
19 any pending question before we take a break. Is that
20 fair?
21     A.   Yes.
22     Q.   Second, if any of my questions are not
23 clear, I don't use a right term -- you are the expert,
24 I am not -- please let me know so we can have a clear
25 record for the court. Is that fair?

1     A.   Correct.
2     Q.   Finally, if you have -- not finally, there
3 is always one more with a lawyer -- please answer
4 clearly with a verbal answer. The court reporter
5 cannot record head nods. Do you understand that?
6     A.   Yes.
7     Q.   And, finally, let's try to not talk over
8 one another. Is that fair?
9     A.   I will do my best.
10     Q.   Okay. Great. Let's get started.
11     Let's put up as an exhibit -- I think the
12 way we need to do this is we need to share screen and
13 my colleague, Ms. Prouty, will be sharing her screen
14 with you. In exhibit -- and I'd like to ask you to
15 take a look and let me know if you recognize it.
16     A.   (Indicating). I do recognize that.
17     Q.   And what is it?
18     A.   It appears to be a correct and true copy of
19 my first report.
20     Q.   And by any chance do you have a copy of
21 your paper report with you now?
22     A.   No, I don't actually.
23     Q.   Okay. Do you have any papers or notes with
24 you now?
25     A.   I do not.

1     Q.   And do you have anything up on the screen
2 other than this video deposition?
3     A.   I do not.
4     Q.   If you'd like, we can take a moment and
5 scroll through the report. I understood you just said
6 it was a true copy. I want to make sure it is a
7 complete copy. Can you take whatever time you need to
8 make sure that it is complete?
9     A.   (Indicating). Looks good. Looks right.
10     MS. THEODORE: Sorry to interrupt. Are you
11 going to be sharing these exhibits over the chat or
12 something so we will have a copy as opposed to looking
13 on the screen?
14     MS. McKNIGHT: So, we learned just before
15 the deposition that there is not a sharing via chat
16 feature with Veritext, so I think what we can do is --
17 first, I think we can transfer control of the share
18 document to Dr. Collingwood so that he can control
19 flipping through it. Is that correct, Ms. Linberg, or,
20 Ms. Prouty? Can we transfer control to
21 Dr. Collingwood?
22     MS. THEODORE: I guess the other option
23 would be, certainly, with, like, the report, we can ask
24 Dr. Collingwood to just call up a copy on his screen so
25 that he can -- you know, on his own computer, so that

1 he would be able to look through it.
2     MS. McKNIGHT: Yes, thanks, Elisabeth.
3 BY MS. McKNIGHT:
4     Q.   So, Dr. Collingwood, what would you prefer,
5 either sort of sharing control via share screen -- I
6 think you should probably test it out before you say
7 it's okay -- or pulling up a copy on your screen?
8     A.   Probably a copy on my screen. I'm sorry. I
9 had some printing issues on my end.
10     Q.   That's okay.
11     A.   So, that's probably preferred for me
12 because, often, I have experienced a delay in -- when
13 the share screen goes and -- so, it would be, just,
14 easier. Are you able to share these documents with me,
15 or my attorney, and then I can get them via some other
16 form, or either drop in the chat or something?
17     Q.   Right. So, we can't --
18     A.   I guess you can't do that. Or email?
19     Q.   Sure. What's the best email address for
20 you? Let's get that set now so we can do it
21 throughout.
22     (Reporter asked for clarification)
23     MS. McKNIGHT: Oh, pardon me. No, we don't
24 need to stay on the record for this piece.
25     - - - - -
    (Discussion off the record.)

1          - - - - -
2  BY MS. McKNIGHT:
3      Q.  Okay.  Dr. Collingwood, I am not sure that
4  I got an answer to my question, so pardon me if this is
5  repeating.  Is this a complete copy of your report
6  submitted in this matter on May 31, 2024?
7      A.  Yes.
8      Q.  Let's mark this as Exhibit 1, Ms. Linberg.
9          (Exhibit 1 was marked for
10          identification.)
11     Q.  Dr. Collingwood, do you have any amendments
12  to this work that you have already prepared?
13     A.  No.
14     Q.  And do you have any plans to amend this
15  report in the future?
16     A.  Not at the moment, no.
17     Q.  Does this report contain all of the
18  opinions you intend to offer in this case?
19     A.  No.
20     Q.  Okay.  And what other -- what opinions do
21  you intend to offer in this case that are not included
22  in that report?
23     A.  Well, I did -- did an analysis and a
24  rebuttal report, and I think there is quite a good
25  chance that I will do another supplemental report.

1  And, so, depending on data or circumstances in the
2  case, my opinions could change or be updated.
3      Q.  Okay.  And as you sit here today, what kind
4  of supplemental report would you anticipate providing?
5      A.  Likely, a report in response to new
6  election data and, potentially, other -- other issues
7  related to race and voting that may come up in the
8  context of the case.
9      Q.  When you say election data, are you
10  referring to the upcoming election in November 2024?
11     A.  Correct.
12     Q.  Now, you have provided an expert opinion in
13  other lawsuits; is that correct?
14     A.  That's correct.
15     Q.  Has your opinion ever been submitted in any
16  of those lawsuits when it was not favorable to the
17  party that hired you to offer the opinion?
18         MS. THEODORE:  Objection to form.
19     A.  I mean, I've submitted reports that are
20  potentially not the clean results that a client who
21  hired me necessarily would have wanted, if that makes
22  sense.
23     Q.  Sure.  So, you have submitted those to
24  attorneys, and do you recall if the attorneys then
25  submitted them in those lawsuits or whether they

1  withheld them?
2         MS. THEODORE:  Objection to form.
3      A.  Well, my understanding is that the reports
4  were submitted.
5      Q.  You mentioned earlier, there may be other
6  issues related to race and voting.  What kinds of
7  issues were you referring to there?
8      A.  You know, I can't really say exactly what
9  issues.  Could be certain issues come relevant in the
10  case that are within the jurisdiction of my expertise
11  that could require a response from me.  It could be --
12  I am trying to think of some other -- in some cases, I
13  look at -- I do a deeper dive into voter turnout, a
14  deeper dive into socioeconomics.  Those are areas that
15  I have done -- presented evidence on and testified to
16  in other cases, so sometimes that becomes relevant.
17     Q.  Okay.  And this deeper dive into voter
18  turnout on socioeconomics, you did not do that in this
19  case yet; is that right?
20         MS. THEODORE:  Objection to form.
21     A.  That's not exactly true.  I did do some of
22  that in this particular report here.  The dynamics
23  might change, and so it just -- it is hard to know
24  exactly what, you know -- how a report is going to play
25  out in advance until you get data and start thinking

1  about it, and have the time to review all the relevant
2  information.
3      Q.  I see.  And, so, this -- meaning this
4  deeper dive.  You are suggesting a deeper dive may
5  happen at a later point, one that has not occurred yet;
6  is that fair?
7         MS. THEODORE:  Objection to form.
8      A.  Well, I mean, a deeper dive in the sense
9  that it could be something that I focus very deeply or
10  specifically on.  It could be, you know, a county, a
11  precinct that's, you know, unique, that needs to be
12  expounded upon.  Perhaps data in one county, or one
13  precinct, changes between elections.  That occasionally
14  happens, and there needs to be a reasonable, plausible
15  explanation for that.
16         So, while I haven't done that specific
17  thing in this report, sometimes that becomes useful in
18  future supplemental reports, to do something like that.
19     Q.  I see.  Earlier you said that sometimes
20  dynamics change and that would cause you to prepare a
21  supplemental report.  What kinds of dynamics were you
22  considering when you said that?
23         MS. THEODORE:  Objection to form.
24     A.  That was -- I wasn't really considering any
25  specific dynamic, just, you know, election or dynamic

4 (Pages 10 - 13)

Case 4:23-cv-00193-D-RN    Document 134    Filed 10/28/24    Page 5 of 85
Veritext Legal Solutions
www.veritext.com                                                                    888-391-3376

1 events, you know, in general. There could be a
2 population change within a short time period;
3 typically, not. There could be candidate differences,
4 unique candidates that are different than other
5 candidates, those types of things. But it's not
6 anything specific I have in mind right at the moment.
7     Q.   Okay. And when you mention population
8 change, what kind of population change would you expect
9 to happen between now and a trial that would occur in,
10 roughly, February 2025?
11     A.   Yeah, in that case, it would be unlikely
12 that we would see large population changes outside of
13 some huge hurricane or something, which, of course, in
14 North Carolina, is possible. But that would be
15 unlikely, and it would be also unlikely to be able to
16 see census, or American Community Survey population
17 change during that time period, probably wouldn't be
18 able to get a good read on it.
19         But there might be a situation where voter
20 turnout drastically drops or increases. And, so, that
21 -- you might need a plausible explanation for what that
22 has -- why that has happened. And you would,
23 therefore, potentially need to address the way you do
24 your statistical analysis.
25     Q.   What are some ways you would adjust the way

1 you do your statistical analysis to account for that
2 kind of change?
3     A.   Well, one thing that could happen, if there
4 is a change that eventually affects a racial group
5 differently than another racial group, you may no
6 longer have as many homogeneous or heterogeneous,
7 racially heterogeneous or racially homogeneous
8 precincts. And, so, that could have an effect on
9 results, potentially, which would require -- try to see
10 if that is true and whether that affects your
11 statistical estimate.
12         So, a lot of it requires really digging
13 deep into the data. That's why I use the term, deep
14 dive, to see if these kinds of things are there.
15     Q.   And is it your view that you conducted a
16 homogeneous precinct analysis in this case?
17     A.   I did not conduct a specific homogeneous
18 precinct analysis that people may do in these types of
19 cases, but I certainly look at the data. That's
20 probably the first thing that I do to ensure, you know,
21 the racial distribution of black versus white
22 individuals in different jurisdictions, in this area,
23 as characterized by very good data in order to conduct
24 ecological imprints.
25     Q.   So, I had asked if this report, the report

1 dated May 31, 2024, contained all of the opinions you
2 intend to offer in this case and you said, no, that you
3 also have a rebuttal report, number one, and number
4 two, you suggested you may have a supplemental report
5 at some time in the future. Did I summarize your
6 response accurately?
7         MS. THEODORE: Objection to form.
8     A.   In terms of the actual documents, yes,
9 those are the likely three documents that I will
10 produce.
11     Q.   Are there any opinions, other than those
12 that would be expressed in those three documents, as
13 you described them, that you intend to offer in this
14 case?
15     A.   In terms of a written document, that's my
16 expectation, would be these three documents. But,
17 obviously, in the context of trial testimony on cross
18 or if the judge instructs me to give my opinion on
19 something, I will do that.
20     Q.   What documents and information did you rely
21 on to prepare your reports in this case?
22     A.   I relied on election data from the North
23 Carolina State Board of Elections at the precinct
24 level, and that also incorporates vote history returns
25 of those same elections. And, that includes how many

1 black versus white, versus other individuals voted in a
2 particular election.
3         I also relied on different shapefiles and
4 geographic information systems, GIS, files, precinct
5 shapefiles, as well as election district shapefiles
6 that's available on the NCSBE website. I relied on
7 similar shapefiles and geographic information from
8 Plaintiff's attorney, and also relied on population
9 data at the Census 2020 population data at the block
10 level, county level.
11         In terms of this report, I believe that --
12 that is what I relied on.
13     Q.   Thank you. I'm jumping ahead a bit, but
14 just so I don't forget to ask the question. You
15 mentioned you submitted a rebuttal report in this
16 matter. Do you recall that?
17     A.   I do.
18     Q.   And what information or documents did you
19 rely on to prepare that rebuttal report?
20     A.   Similar set of data, but I also relied on
21 the replication and production files from defendant
22 experts as well. In addition, there was, I think, an
23 additional demonstration plan, shapefile, and -- as
24 well as some block group information that was provided
25 to me about various alternative plans.

1    Q.   Did you rely on any other documents or
2  information to prepare your rebuttal report?
3    A.   I would need to pull up the rebuttal report
4  to look at the section in terms of what I'm relying on,
5  but in terms of my memory, that is the primary set of
6  information I was relying on.
7    Q.   Okay.  So, we can return to this when we
8  look at your rebuttal report.  For now, I'd like to --
9  yeah, I'd like to move on for now.
10       So, moving to your preparation for today's
11 deposition, what did you do to prepare?
12   A.   I had, I believe, three meetings with
13 counsel and I read my reports, reviewed some of the
14 reports from -- expert defense experts.  That's what I
15 did.
16   Q.   I'm not going to ask you questions about
17 the contents of your meeting with counsel, but I would
18 like to know, roughly, when you had those meetings with
19 counsel.
20   A.   Late last week, and Sunday, and yesterday,
21 Monday.
22   Q.   Did you talk with anyone else in
23 preparation for your deposition in this case?
24       MS. THEODORE:  Objection to form.
25   A.   No, I did not.

1    Q.   Have you ever reviewed any court opinions
2  for your work in this case, whether it was to prepare
3  for deposition or to prepare your opinions?
4    A.   I have not read a full opinion or -- yeah,
5  I haven't read any; like, downloaded the document of
6  the opinion from the court and examined it.  No, I have
7  not.
8    Q.   Okay.  Have you read any part of a court
9  opinion related to this case?
10   A.   Well, I think in one of my rebuttal or
11 initial reports, I have a quote from, I think, the
12 Fourth Circuit that is used in the report, but I don't
13 think that that comes from an opinion from this Court.
14   Q.   I see.  Do you remember, roughly, when that
15 opinion came out?
16   A.   No.
17   Q.   And you said that you included that cite in
18 your opening report in this case?
19   A.   I would have to review the -- which one it
20 is.  I think it is the rebuttal report.
21   Q.   Do you know someone named Matt Baretto?
22   A.   Yes.
23   Q.   How do you know him?
24   A.   Matt and I are co-authors on some research.
25 Some of it revolves around racial polarized voting, but

1  a lot of it resolves around Latino politics and Latino
2  public opinion.
3    Q.   And about how long have you been a
4  co-author with him on different articles?
5    A.   Probably 14 years, 15 years.
6    Q.   How did you come to know him?
7    A.   He was a professor at University of
8  Washington where I got my Ph.D.
9    Q.   Pardon me, I only have a J.D. not a Ph.D.
10 Is there some formula with Ph.D.'s where you have a
11 panel of professors who give you feedback on
12 dissertation?
13   A.   Yes, that's more or less correct, yeah.
14   Q.   And is it called a panel?
15   A.   It would be called a committee.
16   Q.   Committee.  That's right.  Did Dr. Barreto
17 serve on your committee?
18   A.   He chaired it.
19   Q.   Would you consider him something of a
20 mentor?
21   A.   He was -- he and my other committee
22 members.  I mean, it is -- they do mentor you.  A lot
23 of it is, they advise you on how to be an academic, how
24 to be in the profession, what to expect when you get
25 your first academic job, how do you navigate tenure.

1  Those kinds of things.
2    Q.   Are you aware that Dr. Baretto submitted an
3  expert report in an earlier stage of this case?
4    A.   Yes.
5    Q.   And did you review that report?
6    A.   I have not seen that report.
7    Q.   Do you know anything about that report?
8        MS. THEODORE:  Objection to form.
9    A.   I do not know anything about that report.
10   Q.   Okay.  Do you have any understanding of
11 Dr. Barreto's work in this case when you prepared your
12 report?
13       MS. THEODORE:  Objection to form.
14   A.   What I know is that there was some issues
15 related to the electoral performance analysis that was
16 conducted.  That's pretty much the extent that I know
17 about what he did or did not do in this case.
18       MS. THEODORE:  Dr. Collingwood, I am going
19 to instruct you not to answer any question where your
20 response would be based on conversations with counsel.
21       THE WITNESS:  Okay.
22   Q.   Outside any conversations with counsel, did
23 you consider Dr. Baretto's issues related to electoral
24 performance analysis in doing your work in this case?
25       MS. THEODORE:  Objection to form.

6 (Pages 18 - 21)

1  A.  No.
2  Q.  Other than counsel, did you talk to anyone
3  else about Dr. Barreto's work in this case?
4  A.  I did not.
5  Q.  Did you ever reach out to Dr. Barreto about
6  your work in this case?
7  A.  Definitely not.
8  Q.  Did you ever speak with him about your work
9  in this case?
10  A.  Definitely not.
11  Q.  Did you ever email or otherwise exchange
12  written correspondence with Dr. Barreto about your work
13  in this case?
14  A.  No.
15  Q.  Earlier you said you had reviewed expert
16  reports submitted by defendants in this matter.  Do you
17  recall that answer?
18  A.  I do.
19  Q.  Okay.  Could you tell me which reports of
20  which experts you reviewed, submitted by Defendants in
21  this case?
22  A.  Dr. John Alford and Dr. Sean Trende.
23  Q.  Any others?
24  A.  No, that's it.
25  Q.  And do you recall reviewing any expert

1  reports submitted in any other North Carolina cases by
2  expert witnesses?
3  MS. THEODORE:  Objection to form.
4  A.  I may have come across an expert report
5  from, like, 15 years ago from either Alford or this
6  Professor Dick Enburg (ph), I think is his name.  But
7  it wasn't related to the work I was doing in this case.
8  It was just something I may have come across at some
9  point, probably, you know, a year or two ago.
10  Q.  I know you served as an expert witness in
11  other cases.  Have you ever served as an expert witness
12  in a lawsuit in North Carolina?
13  A.  I do not think so.
14  Q.  Okay.  Let's move on to our next exhibit.
15  And this will be a copy of your C.V., I'll give you a
16  spoiler there.  Let's pull it up.  I hope we can have
17  other exhibits in the share file after our first break,
18  but for now I think we need to stick with this format.
19  A.  Okay.
20  MS. McKNIGHT:  Ms. Prouty, would you email
21  that to Dr. Collingwood and Ms. Theodore?
22  MS. PROUTY:  Yes.  I just sent it.
23  (Exhibit 2 was marked for
24  identification.)
25  Q.  Dr. Collingwood, please let us know when

1  you receive it and you are prepared to testify.
2  A.  Okay.  I received it, downloaded it.
3  Q.  Dr. Collingwood, what is this -- let's mark
4  it as Exhibit 2, and I ask you to describe it.
5  A.  This is my curriculum vitae, C.V., that I
6  submitted in this case.
7  Q.  Okay.  Let's turn to the last page.
8  A.  Okay.
9  Q.  I see a date of May 1, 2024.  Do you see
10  that?
11  A.  Yes.
12  Q.  Being that it is September 2024, do you
13  have any updates to this resume?
14  A.  There is another -- I think I have another
15  forthcoming article and book that's getting ready for
16  submission.  If it weren't for all these cases, it
17  would have already been submitted.  Just kidding.
18  Well, not really.
19  So, yeah, I have an additional article and
20  a manuscript under preparation that's now on my C.V.
21  Q.  Okay.  What's the subject matter of that
22  article and the book?
23  A.  Academic Voting.  And the book is about
24  private prison companies and immigrant detention.
25  Q.  Was any of your work in that article or

1  book that you just described related to North Carolina
2  specifically?
3  A.  I don't think so.  I am trying to think if
4  there is an immigrant detention facility.  There might
5  be one in North Carolina, but I can't recall off the
6  top of my head.
7  But it -- it wouldn't be specifically about
8  that facility any way.  And there are -- there is data
9  on -- or are data on legislators around the country,
10  which would include North Carolina, but there is not a
11  specific focus on North Carolina in either of the
12  articles.
13  Q.  Can you confirm that this resume is
14  accurate and reflects your relevant experience to date
15  with the addition of the article and book you just
16  described?
17  A.  Yes, I can confirm.
18  Q.  Dr. Collingwood, are you a lawyer?
19  A.  No.
20  Q.  Do you offer any legal opinions in this
21  case?
22  A.  I do my best not to.
23  Q.  And why is that?
24  A.  Sometimes lawyers ask you questions that
25  you just answer and you may be accidently dropping into

Case 4:23-cv-00193-D-RN    Document 84    Filed 10/28/24    Page 8 of 85
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1 a legal opinion without your knowledge. So, I do my
2 best not to do that.
3     Q. And why do you do your best not to offer a
4 legal opinion?
5     A. Because I'm not a lawyer.
6     Q. If I use the term, statistical
7 significance, what does that mean to you?
8     A. That typically means that something is
9 likely to give a possible chance, and so you can
10 increase your confidence that if something is
11 statistically significant, that's an actual true
12 finding.
13     Q. Is it fair to say that you believe your
14 opinion can tell the Court whether something is
15 statistically significant?
16     MS. THEODORE: Objection to form.
17     A. My data and my analysis includes the
18 requisite statistics and various confident intervals
19 that allows one to determine whether an estimate that's
20 produced through statistics is statistically
21 significant or statistically different than another
22 estimate.
23     Q. If I use the term, legal significance, what
24 does that mean to you?
25     MS. THEODORE: Objection to form.

1     A. Yeah, that I don't know as well, as what
2 legal significance means.
3     Q. And is it fair to say that you are not here
4 to tell the Court what -- when something is legally
5 significant?
6     A. I believe that is true. I am here to
7 conduct statistical analyses on voting and not
8 drawing -- and to provide the Court information that
9 will allow the Court to make the decision that the
10 Court is going to make.
11     Q. Are you familiar with the Voting Rights
12 Act?
13     A. Yes.
14     Q. And I understand you are not a lawyer so
15 these questions are not looking for a legal opinion,
16 but, instead, looking for your understanding as an
17 expert in this case. Are you familiar with the legal
18 requirements imposed on states in drawing voting
19 districts under the Voting Rights Act?
20     MS. THEODORE: Objection to form.
21     A. I am familiar with the broad
22 interpretations of how experts conduct analysis under
23 the Voting Rights Act for, specifically, Section 2 of
24 the Voting Rights Act.
25     Q. Have you ever heard of a case called,

1 Thornburg versus Gingles?
2     A. Yes.
3     Q. What does that mean to you?
4     A. As a general rule, Thornburg versus Gingles
5 sets out a test, as it were, to assess whether the
6 minority voters' votes are being diluted by majority.
7 And, so, that test has three prongs.
8     The first one is whether a majority
9 minority district can be drawn in a particular area
10 under investigation. Second is whether minority voters
11 are cohesive in their support for candidates that they
12 prefer. And, then, the third prong is whether the
13 majority, typically white voters, are blocking minority
14 voters from electing their preferred candidates.
15     Q. Do you have an understanding about whether
16 the Voting Rights Act seeks to guarantee wins for black
17 voters or an opportunity to elect a candidate of
18 choice?
19     MS. THEODORE: Objection to form, and to
20 the extent it is asking for a legal conclusion.
21     A. My understanding is that it does not
22 guarantee wins and it is more about providing minority
23 voters with a good opportunity to elect their candidate
24 of choice.
25     Q. If I use the term, crossover district, do

1 you know what that means?
2     A. I think so. You may want to spell it out
3 to me so we are in agreement, but it sounds like -- it
4 is a familiar term that we might use in that area.
5     Q. Okay. What does the term, crossover
6 district, mean to you?
7     A. I would think it would be a district where
8 enough white voters vote with the large majority of,
9 say, black voters such that the black voters' preferred
10 candidate is able to get elected.
11     Q. And, again, I am not looking for a legal
12 conclusion. I am looking for your understanding as an
13 expert in this case. Do you believe that jurisdictions
14 are required to draw crossover districts?
15     MS. THEODORE: Objection to form, and to
16 the extent it is calling for a legal conclusion.
17     A. Not specifically a crossover district. I
18 think if it can be demonstrated that Gingles I through
19 III are met, then jurisdictions and, say, in this case,
20 states are required to generate districts that can be
21 then demonstrated that in this case, black voters have,
22 at least, an ability to elect their preferred
23 candidate.
24     Q. I'd like to ask you about your experience
25 performing racially polarized voting analyses for

1 submission to courts in redistricting litigation. When
2 I use the phrase, racially polarizing voting analysis,
3 do you know what that is?
4    A. I do.
5    Q. And have you ever -- I'll refer to it as
6 RPV for sake of time. Have you ever submitted an RPV
7 analysis to a court for consideration and piece of
8 litigation?
9    A. Yes, I have.
10    Q. Let's turn to Page 16 of your C.V. Does
11 this page of your C.V. identify clients for which you
12 have been hired to work to provide an RPV analysis to a
13 court for consideration?
14    A. Yes. Not all of these are RPV analyses,
15 but I would say most of them are.
16    Q. And just to make sure I am focused on the
17 right spot, are there any other clients for whom you
18 submitted RPV analysis to court for consideration, but
19 they are not listed here on Page 16?
20    A. I don't think so. I think they would be
21 all listed.
22    Q. I notice a number of these clients are in
23 California. Is that fair to say?
24    A. Certainly a -- let me see. Hold on.
25    Q. I can clarify more specifically. I notice

1 a number of these jurisdiction clients are not private
2 clients, but jurisdictions drawing maps. A number of
3 those clients are in California. I wondered if that
4 was a correct understanding.
5    MS. THEODORE: Objection to form.
6    A. I think that's a -- you know, a significant
7 amount of work I have done is based out of California.
8    Q. Have you ever been hired by a jurisdiction,
9 whether it is a locality or a state, in the phase -- in
10 the map drawing phase, when they're drawing
11 redistricting maps, to provide an RPV analysis?
12    A. Yes, I have.
13    Q. And are any of those jurisdictional clients
14 outside of California?
15    A. Yes.
16    Q. And what are those?
17    A. In the -- by the jurisdiction that was
18 drawing -- the map was Roswell Independent School
19 District in New Mexico.
20    Q. Okay.
21    A. And then I -- I have done some map drawing
22 outside in other states, but that was for, like,
23 various plaintiff -- not plaintiff -- but interested
24 parties that were looking at what possible districts
25 could look like. But that was not for a government

1 entity.
2    Q. You named Roswell Independent School
3 District in New Mexico. Are there any other
4 jurisdiction clients who hired you during the map
5 drawing phase, outside of California, to conduct an RPV
6 analysis?
7    A. I don't think so.
8    Q. I'd like to ask you about your expert
9 witness work. Have you ever been hired by defendants
10 in a redistricting lawsuit?
11    A. No.
12    Q. Have you ever offered a court the opinion
13 that voters made their voting choices based on their
14 political preferences, not racial preferences?
15    MS. THEODORE: Objection to form.
16    A. I don't think so, not in a court context. I
17 mean, we might do that analysis in a paper or something
18 where we are looking at partisanship, we are not
19 looking to raise various things, but not in a legal
20 context, no.
21    Q. I see. So, have you ever -- have you ever
22 written an article where you provide the opinion that
23 voters made choices based on partisan preference as
24 opposed to race?
25    A. I don't think so. There are certainly

1 articles I have written that looks at the role of
2 partisan identification and stuff like that, but the
3 article is not typically framed around this versus
4 that. So, I'd have to go through and read all my
5 various articles to give you a completely definitive
6 answer, which would take a while. But I don't think I
7 have provided -- I have done that specific analysis,
8 no.
9    Q. As you sit here today, you can't think of
10 anything; is that fair?
11    A. I think that's right. Nothing really pops.
12    Q. Aside from writing papers, have you ever
13 teased out why voters make their choice on the ballot,
14 to compare partisan versus racial choices?
15    MS. THEODORE: Objection to form.
16    A. In my -- certainly in my academic work, I
17 looked at that quite a bit.
18    Q. In your academic work, how is that analysis
19 done, the analysis to tease out partisanship from
20 racial choices?
21    A. It is typically a focus on history and
22 looking at key moments surrounding the civil rights
23 reforms of the 1960s and then tracing voting behavior
24 and partisan identification and race, together, moving
25 forward on both partisan identity and candidate vote

9 (Pages 30 - 33)

1 choice, and general policy attitudes.
2          So, it necessarily requires a historical
3 understanding of, basically, the rearrangement of the
4 party system around race, specifically, and how
5 partisanship and race became very intertwined, starting
6 around the mid 1960s, and potentially earlier, in some
7 localities.  So, that's the -- kind of how most of the
8 research in that area, trying to understand the party
9 realignment system is -- what it focuses on.
10     Q.    You described an intertwinement since the
11 1960s. How do you disentangle partisanship from race
12 when you see that intertwinement?
13     A.    Well, you can't really.  Partisanship and
14 race are -- especially in the south -- are extremely
15 linked.  It doesn't mean that it is for every single
16 individual voter is going to be that way, but the
17 linkages are so strong that if you were to conduct some
18 sort of analysis, I would run into a lot of statistical
19 difficulties, multicollinearities, that would make that
20 very difficult to conduct and potentially, you know,
21 quite unreliable.
22          And, so, that's one of the great challenges
23 in this area is that -- the 1964 election in particular
24 really set the stage for black voters, particularly in
25 the south, becoming overwhelmingly strong democrats and

1 then the slow realignment of white voters into the
2 republican party, you know, after that.  And, so, they
3 are just so strongly linked, in the country at large,
4 but particularly in the south.
5     Q.    You say, particularly in the south.  I
6 understand from your discussion earlier, you have not
7 submitted the RPV analysis in any court case in the
8 south before; is that fair?
9          MS. THEODORE:  Objection to form.
10     A.    Well, Texas counts.  Texas is indeed the
11 south.  It is included in the Confederacy, which is the
12 typical way that we define who is or isn't in the
13 south, and Texas was.  And, so, I have submitted RPV
14 analyses in the south.
15     Q.    And is it your view that every state in the
16 south has identical voting behavior to every other
17 state in the south, or do they have -- are they
18 distinct?
19          MS. THEODORE:  Objection to form.
20     A.    No, I would never make that sort of claim.
21 There is going to be, certainly, differences state by
22 state depending on the racial composition of the state,
23 in particular, and the racial composition of regions
24 within the state, more specifically.  So, the typical
25 way that attorneys, and political scientists who study

1 this stuff, examine voting behavior in the south in
2 this specific kind of -- at least the way that I'm
3 thinking, is, there is a deep south, there is a black
4 belt, which are areas that are high density black.  And
5 in the areas where it has historically high density
6 black, typically that's where we see the most extreme
7 racially polarized voting today.
8          We see, dating back to V.O. Key's work in
9 the 1940's and 50's, he was a famous professor who
10 studied southern politics, he was, I believe, at
11 Harvard.  He demonstrated that white opposition to
12 black voting and black academic gain was the most
13 extreme in these black belt areas.  And, so, we
14 continue to see many of those same patterns even today.
15 There are recent books that I've looked at this.
16     Q.    And, so, would you view racially polarized
17 voting in North Carolina as similar to racially
18 polarized voting in Alabama?
19          MS. THEODORE:  Objection to form.
20     A.    Well, in any kind of -- especially in a
21 legal context, if you are doing an analysis, you would
22 certainly do a state-by-state analysis.  And, so, my
23 say, priors might be that there are going to be certain
24 similarities in certain areas, particularly in areas
25 where there is, say, high density black, but as a sort

1 of expert matter, I would have to go in and do an
2 analysis in Alabama and go in and do an analysis in
3 North Carolina to determine if there are differences
4 and where there might be differences.
5     Q.    Would your answer be the same if I replaced
6 Alabama with Mississippi?
7     A.    Yeah.  Yeah, I think so.
8     Q.    Have you ever offered a court opinion that
9 racially polarized voting does not exist in a state?
10     A.    I don't think so.
11          MS. McKNIGHT:  I am at a good break point
12 and we are at a little over an hour.  I suggest we take
13 a break now.  Is five minutes okay with you?
14          MS. THEODORE:  Fine with me.
15          -   -   -   -   -
                    (Off the record.)
16          -   -   -   -   -
17 BY MS. McKNIGHT:
18     Q.    Dr. Collingwood, when were you hired to do
19 your work in this case?
20     A.    I think it was April 2024, somewhere like
21 that.
22     Q.    Do you remember, was it in the first half
23 of the month, second half of the month?  Do you have a
24 memory of that?
25     A.    It would have been closer.  I may have had

Case 4:23-cv-00193-D-RN     Veritext Legal Solutions  10/28/24     Page 11 of 85
Document 198-4     Filed
www.veritext.com                                          888-391-3376

1  -- we may have had an initial call in March, late
2  March, and then there was a week or two, and then the
3  ball got in motion, as it were.  So, it would have been
4  in, I believe, earlier April.
5      Q.   Okay.  When did you begin your work in this
6  case?
7      A.   I think that's when I would have started
8  doing that, in the first half of April, if memory
9  serves correctly.
10     Q.   And without sharing any privileged
11 information, do you have a sense of why you became
12 involved in this case?
13     A.   They needed someone to write an expert
14 report on -- and testify, potentially, on matters
15 related to racially polarized voting, and since I had
16 become one of the established people in this area,
17 without sounding arrogant or anything, it just -- it
18 made sense that I would be contacted.
19     Q.   Did anyone help you prepare your first
20 report in this matter?
21     A.   No.
22     Q.   Did anyone, other than lawyers, help you
23 prepare your rebuttal report in this matter?
24     A.   No.
25     Q.   Now, turning back to your opening report

1  that you submitted in May 2024, about how many hours
2  did you work on that report?
3      A.   A little more than 100 hours, I think.
4      Q.   And, then, after you submitted your initial
5  report dated May 31, 2024, did you prepare any other
6  report in this matter?
7      A.   Well, my rebuttal report.
8      Q.   Did you prepare any reports other than your
9  opening report and your rebuttal report in this matter?
10     A.   No.
11     Q.   Did you do any work on this case between
12 May 31, 2024 and when you began work on your rebuttal
13 report?
14     A.   No.
15     Q.   And when did you begin work on your
16 rebuttal report?
17     A.   I think it was early August, maybe.
18 Whenever the -- or maybe mid August.  I think their --
19 the Defense expert's reports were due sometime in
20 August, and then, basically, I started working on my
21 rebuttal report once those came in.
22          And I think the rebuttal report was turned
23 in, in the very end of August.  So, I think the vast
24 majority of the work I did was in the back half of
25 August.

1      Q.   About how many hours did you spend on your
2  rebuttal report?
3      A.   I think about half of what I did on my
4  initial report, which is probably in the 50-hour range.
5      Q.   Now, going to the substance of these
6  reports, do I understand correctly that you offer an
7  opinion on Gingles II and Gingles III?
8      A.   I do offer those opinions, yes.
9      Q.   And do you offer any opinion on Gingles I?
10     A.   I do.
11     Q.   And where do you offer an opinion on
12 Gingles I?
13     A.   That is in the rebuttal report.
14     Q.   Do you offer any Gingles I opinion in your
15 opening report?
16     A.   I believe there might be some reference to
17 it, which is, that it was my understanding that the
18 illustrative maps had met a Gingles I criteria, but if
19 memory serves, I did not do that analysis.  It was a
20 reference to just the general understanding of that.
21     Q.   Prior to your work in this case, have you
22 ever studied voting patterns in North Carolina?
23     A.   I did do some analysis, maybe not
24 specifically on North Carolina, but the 12 -- or, 11 or
25 12 southern states in a book I wrote that included

1  North Carolina, and I have been to the -- I believe I
2  went to University of North Carolina archives and
3  examined voting and documents of different governors,
4  and other elected officials, senators, from the 1940s
5  to '70s range.  I would have to go back and remember.
6  There was several -- this was a decade ago when I did
7  this work.
8          So, I have certainly spent time in North
9  Carolina and done analysis of specifically different
10 candidates and how they were dealing with, you know,
11 politics in North Carolina during that era.
12     Q.   And by that era, you mean between 1940 and
13 1970, roughly?
14     A.   Roughly.  Roughly.
15     Q.   And when you visited the UNC archives and
16 conducted the work you just described, was that for the
17 book regarding the 11 or 12 southern states?
18     A.   Yes.
19     Q.   And what is that book titled?
20     A.   "Campaigning in a Racially Diversifying
21 America: How and When Cross-Racial Mobilization
22 Occurs".  I think.
23     Q.   Now, I heard you say the era was 1940 to
24 the 1970s.  Is it fair to understand that you did not
25 conduct this review in North Carolina for the years

Case 4:23-cv-00193-D-RN    Document 188-4    Filed 10/28/24    Page 12 of 85
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1 1980 to present?
2          MS. THEODORE:  Objection to form.
3      A.   I would have to go back and look at
4  everything, but the focus of that work was kind of
5  around that time period.  So, I think that's probably
6  right, but I couldn't say definitively.
7      Q.   Have you ever done any work to study North
8  Carolina voting, prior to this case, for voting in the
9  past 20 to 30 years?
10      A.   Oh, yes, I have.  I conducted a -- I wrote
11 a paper that I used North Carolina election data to do
12 racially polarized voting.
13      Q.   And what was that paper?
14      A.   Hold on.
15          "Comparing BISG to CVAP Estimates in
16 Racially Polarized Voting Analyses".  Some of that
17 paper includes data in North Carolina.
18      Q.   What did you do to refresh your
19 recollection of the title of that article?
20      A.   I looked in my C.V. that we had pulled up
21 earlier.
22      Q.   Great.  And what number article is it in
23 that C.V.?
24      A.   41.
25      Q.   And can you explain for me this acronym,

1  BISG?  Does that have to do with a surname database?
2      A.   Yes.  It is Bayesian Improved Surname
3  Geocoding.
4      Q.   Okay.  And, so, I notice a reference to
5  CVAP.  Is that, Citizens Voting Age Population?
6      A.   Correct.
7      Q.   So, did that work focus on any specific
8  group of voters in the electorate?
9      A.   It examined voting patterns between whites,
10 blacks, I believe Hispanics, and Asians.  I think
11 that's -- I mean, they were included in the analysis.
12      Q.   Okay.  So, other than this book that you
13 described, and this paper, Number 41 in your C.V., have
14 you ever done any other work in North Carolina prior to
15 your work in this case?
16      A.   I am just looking at my C.V. really
17 quickly.
18      Q.   Uh-huh.
19      A.   That seems correct.  I have not.
20      Q.   And in your paper that you described, the
21 title is, "Comparing BISG to CVAP Estimates", is it
22 fair to understand that paper looked at trying to
23 determine reliability between BISG and CVAP estimates?
24          MS. THEODORE:  Objection to form.
25      A.   That paper was looking at comparing when

1  you have different inputs for the demographics into
2  racially polarized voting analysis when the results are
3  going to be similar between using the BISG method or
4  the CVAP method, and when the CVAP method begins to
5  produce unreliable estimates, whereas, the BISG method
6  may not.  So, that was the core of the paper.
7      Q.   And when do CVAP estimates begin to provide
8  less reliable estimates?
9          MS. THEODORE:  Objection to form.
10      A.   Well, in the paper, what we show -- and we
11 focus most of the analysis, by the way, on Florida, I
12 believe, and another smaller jurisdiction.  But we also
13 did -- no, sorry, Georgia.  But I also did some
14 replication in North Carolina, given the data and the
15 general finding is that in areas where there are
16 relatively few precincts and -- those are areas where
17 the CVAP estimates, when you plug those into the
18 ecological imprints models, the results appear to be
19 diverging from, kind of, logical conclusions of the way
20 that different groups are voting.
21      Q.   Other than traveling to the state to visit
22 UNC archives during the work on the book you described,
23 have you ever traveled to North Carolina other than for
24 that work?
25      A.   Yes, I have.

1      Q.   Okay.  When?
2      A.   Let me think.  Probably 2005 or 2006.
3      Q.   Have you traveled since then to North
4  Carolina?
5      A.   Well, I was there in 2012 or '13 or so,
6  maybe 2011, or something in that time range.  And then
7  I went back to North Carolina in maybe 2015, 2016.
8      Q.   Was one of the dates you just identified
9  the date when you went to work at the UNC archives?
10      A.   Not the last date.  I was there for family
11 reasons or vacation or something.
12      Q.   But the 2012, 2013 date?
13      A.   Yeah.  That sounds right.
14      Q.   Have you ever lived in North Carolina?
15      A.   No.
16      Q.   Have you ever had a job in North Carolina?
17      A.   No.
18      Q.   Have you ever spoken with any North
19 Carolina voters about their voting behavior?
20      A.   I mean, I have known people in North
21 Carolina who were professors and we talk politics, so I
22 guess the answer is, yes.
23      Q.   Okay.  Anyone other than professors?
24      A.   Probably not.
25      Q.   Would you consider yourself to be an expert

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 13 of 85
Veritext Legal Solutions
www.veritext.com                                           888-391-3376

1 in North Carolina politics?
2    A. I would not be the kind of person that
3 someone would call me and ask me my opinion about North
4 Carolina politics for, like, a media interview or
5 something.
6    Q. Would you agree with the statement that
7 black-preferred candidates are not always black?
8    A. I would agree with that.
9    Q. Would you agree that it is possible for a
10 non-majority minority district to be represented by a
11 candidate of choice of the black community?
12    MS. THEODORE: Objection.
13    A. Can you just rephrase that? I think I know
14 what you mean, but I want to be clear.
15    Q. Sure. Can a district that is drawn at a
16 below 50% minority voting age population elect a
17 candidate of choice of that minority community?
18    A. Certainly.
19    Q. Okay. Let's turn to Page 2 of your report.
20 Would you like us to share it, or do you have it,
21 Dr. Collingwood?
22    A. I have it.
23    Q. The last paragraph on Page 2 list the data
24 you relied on to form your opinions in this case; is
25 that right?

1    A. Correct.
2    Q. Did you rely on any data that is not listed
3 here?
4    A. I don't believe so.
5    Q. Let's turn to Page 4 of your report.
6    A. Okay.
7    Q. In the section where you describe
8 ecological inference, in the second paragraph, I see
9 you note that, "This method is designed to estimate
10 vote choice". Do you see that?
11    A. Yes.
12    Q. So, is it fair to say that the numbers
13 produced by your analysis are not actual figures of how
14 voters cast ballots, but their estimates?
15    MS. THEODORE: Objection to form.
16    A. Yes. Ecological inference is a statistical
17 technique that estimates, in this case, voter choice by
18 race. We do not have access to how voters of different
19 racial groups cast their ballots in terms of vote
20 choice. That is unavailable due to privacy reasons.
21    Q. On the same page, you identify a list of
22 elections analyzed. Do you see that?
23    A. I do.
24    Q. Did you analyze any primary elections?
25    A. No.

1    Q. Why not?
2    A. This is already a large number of elections
3 to analyze, I think it is in the high 40's, and the
4 results were just so overwhelming in terms of racially
5 polarized voting that it just didn't seem necessary, to
6 me, to analyze primary elections.
7    Q. Is it your understanding that primary
8 elections involve a different part of the electorate
9 than general elections?
10    A. Well, certainly there is going to be some
11 voters that vote in primaries and generals, and both,
12 but, typically, primary elections have significantly
13 lower voter turnout. And, so, they are typically not a
14 good reflection of the overall voting body. It is one
15 reason why many people, many experts put lower weight
16 on primary elections.
17    Q. Do you place lower weight on primary
18 elections?
19    A. As a general rule, general elections are
20 going to carry more weight, but it is a case-by-case
21 situation. There might be -- for example, if the
22 blocking occurs -- say, white vote blocking occurs at a
23 certain level and not another one, maybe the primary
24 elections might make more sense. Some states have top
25 two primaries where your -- you know, the pool of

1 voters would include both republicans and democrats,
2 for example, so every state is going to be different
3 with regards to how they conduct their primary
4 elections.
5    And, so, it is just a little -- typically,
6 a little less useful, primary elections. In addition,
7 the turnout rates are so low, typically, that I
8 typically place more weight on the general elections.
9    Q. And for your work in this case, did you
10 conduct any form of analysis to determine whether the
11 blocking, to use your own words, occurs at the primary
12 or general election?
13    A. No. The analysis I did -- I didn't end up
14 analyzing any primaries here, and, so, I did not
15 determine whether blocking is occurring at the primary
16 level. And, so, I focused -- you know, the blocking is
17 clearly a clearing of the general election.
18 Ultimately, at the end of the day, that's -- you know,
19 that's what matters because the person who wins the
20 general is the person who actually ascends to office.
21    Q. And based on a study of general elections
22 only, can you tell the Court anything about whether
23 white democrats preferred different primary candidates
24 than black democrats?
25    A. I did not conduct a primary analysis so I

Case 4:23-cv-00193-D-RN    Document 98-4   Filed 10/28/24   Page 14 of 85

1 can't speak on that.
2 Q. Let's go to Page 1 of your report. I
3 notice there in the second sentence, you thought "RPV
4 occurs when a majority of white voters cast ballots for
5 the same set of candidates, and the majority of
6 minority voters cast ballots for a different set of
7 candidates". Do you see that?
8 A. I do see that.
9 Q. And I see you make reference to 50% plus 1
10 to define majority. Do you see that?
11 A. I do.
12 Q. So, I am trying to get an understanding of
13 racially polarized voting and when you find it. Is it
14 correct to understand from this statement that you find
15 racially polarized voting where -- at these levels, and
16 can even be found where there is crossover voting?
17 MS. THEODORE: Objection to form.
18 A. Right. So, the technical definition, and I
19 think the one that all of us who are experts begin our
20 analysis with, specifically in a candidate -- in a two
21 candidate dynamic, which most of these elections are
22 two candidates, or two serious candidates in terms of
23 vote choice: So, you could have a situation where 51%
24 of black voters votes for one candidate, and 51% of
25 white voters vote for a different candidate.

1 So, there is substantial crossover voting
2 among white voters voting for the black-preferred
3 candidate, but that would still, typically, be RPV.
4 That's not what you are seeing in this case, obviously,
5 in the -- you know, in North Carolina. But in terms of
6 a technical definition, I would think that that would
7 -- all experts would agree that that is the racially
8 polarized voting.
9 Q. Okay. Do the terms, crossover voting and
10 cohesion, mean the same thing to you?
11 A. No, I wouldn't say they mean the same thing
12 to me.
13 Q. Can you explain the difference, in your own
14 words?
15 A. Yes. Cohesion is, more or less, the degree
16 that a racial population supports a candidate, or set
17 of candidates. So, for example, if 99% of black voters
18 support a candidate, and they do that repeatedly, they
19 are extremely cohesive.
20 Crossover voting is just -- typically, the
21 way we think about it is, what percent of white
22 voters are crossing over to vote for the
23 black-preferred candidate.
24 Q. If a group of white voters support a
25 candidate with 49% of their vote, would you view white

1 voters as cohesive around that candidate?
2 A. No.
3 Q. So, when does cohesion begin?
4 MS. THEODORE: Objection to form.
5 A. I mean, typically around 50% plus 1, and
6 then it gets more and more cohesive as you go to 60 and
7 70 and 80. So, as you go up, it gets more and more
8 cohesive.
9 Q. Do you apply a bright line number of when
10 something is cohesive or not?
11 A. I would say most social scientists
12 typically do not apply bright line rules, as is more
13 common, potentially, in the legal field, because we
14 know that situations are contextual, and sometimes
15 there are data limitations and confidence issues and --
16 not, like, personal confidence issues, statistical
17 confidence issues. And, so, I typically do not apply a
18 bright line.
19 Q. Okay. Let's turn to Page 6 and 7 of your
20 report. Here I am looking at the section titled,
21 Racially Polarized Voting - Statewide. Do you see
22 that?
23 A. I do.
24 Q. Now, reading the last paragraph on Page 7,
25 I see that you are finding that white voters supported

1 black-preferred candidates on average between 25% and
2 31% between the years 2016 and 2022 on a statewide
3 basis. Do I understand that correctly?
4 A. That is correct.
5 Q. Would it be fair to refer to this range of
6 values, 25% to 31%, as a crossover percentage?
7 A. Yes.
8 Q. If a Court wanted to determine whether this
9 voting pattern was due to a voter's racial or a
10 partisan affiliation, how would it do that?
11 A. Sorry. Say that again?
12 Q. Sure. If a Court wanted to determine
13 whether this voting pattern was due to a voter's racial
14 or partisan affiliation, how would the Court do that?
15 A. I don't -- in this particular context, that
16 really can't be done given the data, so it would have
17 to, basically, do a historical analysis, like what we
18 were talking about earlier, and look at trends across
19 time at key moments in time in order to do that.
20 So -- and that's not what we are doing
21 here. We are looking at racially polarized voting,
22 whether voters of different races vote differently.
23 Q. And that historical analysis that you
24 described earlier and just referenced, did you conduct
25 that in this case?

Veritext Legal Solutions
www.veritext.com                                                          888-391-3376

1    A.    No.

2    Q.    Okay. Let's go to Page 11 of your report.

3 I am reading the section titled, Demonstration District

4 Areas. Do you see that?

5    A.    Yes.

6    Q.    About midway through the last paragraph on

7 that page, I see a reference to, "As time goes on".

8 Can you see that?

9    A.    Yes.

10    Q.    This statement in your report, "As time

11 goes on", that refers to four election years, 2016,

12 2018, 2020 and 2022; is that correct?

13    A.    That's correct.

14    Q.    Let's go to Page 19 of your report. I am

15 looking at a section titled, Demonstration Maps. Do

16 you see that?

17    A.    Yes.

18    Q.    I see a reference here to the acronym,

19 CVAP. Does that mean Citizens Voting Age Population?

20    A.    Correct.

21    Q.    On my review of your report, this is the

22 only time you ever reference CVAP. Does that sound

23 right to you?

24    A.    In terms of an analysis. And I believe

25 this is what I was talking about earlier regarding

1 Gingles I, this section. I think --

2    Q.    Why did -- go ahead.

3    A.    No, go ahead.

4    Q.    Why didn't you use CVAP in your analysis?

5        MS. THEODORE: Objection to form.

6    A.    Yeah, could you -- what analysis? Could

7 you be a little more specific?

8    Q.    You conducted an RPV analysis in this case,

9 correct?

10    A.    That's correct.

11    Q.    Did you use CVAP numbers instead of BVAP

12 numbers in conducting that RPV analysis?

13    A.    I didn't use either of those numbers in

14 terms of when I conducted the RPV analysis.

15    Q.    And did you use CVAP in any analysis in

16 your opening report?

17    A.    I do not think so. No.

18    Q.    You mentioned that you did not use BVAP or

19 CVAP in your RPV analysis. What data did you use in

20 your RPV analysis to understand black voting age

21 population?

22    A.    Well, we have the -- as people who do this,

23 North Carolina is one of a handful of states that

24 provides race on the voter file. And in addition to

25 that, the State Board of Elections provides breakdowns

1 at the precinct, or vote tabulation district, of people

2 who voted in that election and what the race was. So,

3 tabulations of that.

4        So, when you are going to do racially

5 polarized voting in at state like North Carolina,

6 that's the data that one will use. And it's the --

7 basically, the gold standard. I wish every state had

8 that.

9        We don't have to estimate who voted and

10 what their race is, and the distributions. We just

11 know. We know the answer.

12    Q.    As somebody who has litigated these cases,

13 I agree. It would be nice if every state did this.

14        Now, I see a section in your report, and we

15 will get to it a little later, but a section in your

16 report titled, BVAP Analysis. Do you recall that

17 section?

18    A.    Yes.

19    Q.    And did you use BVAP in the analysis, in

20 that section of the report?

21    A.    Yes, I did.

22    Q.    And did you use CVAP in your analysis, in

23 that section of the report?

24    A.    No, I was focusing on voting age population

25 in that section.

1    Q.    Well, CVAP is a type of voting age

2 population, isn't it?

3    A.    It is, it is, but -- yeah, in this case, I

4 was looking at -- you know, I thought it could be

5 helpful to look at the actual voting age population

6 numbers. Some states are -- you know, look at them,

7 and so that's why we -- you know, I looked at that.

8    Q.    Is it because the BVAP figures here were

9 more accurate than CVAP figures?

10        MS. THEODORE: Objection to form.

11    A.    No. There are certain contexts where BVAP

12 might be more useful. I'd have to go back and look and

13 figure out all the -- trying to think. So, the issue

14 is, we -- we are starting with BVAP as a sort of

15 theoretical starting point.

16        So, CVAP is not really necessary because we

17 are saying, okay, let's -- in this particular

18 analysis, let's say the voting age population of blacks

19 in this area is, you know, 500 people out of 1000, so

20 50%. This analysis then takes into account the

21 estimate of the number of those people who actually

22 voted by race, both BVAP and W-VAP, or WVAP.

23        And, so, it is incorporating sort of a

24 turnout measure into the analysis. And, so, therefore,

25 CVAP doesn't really give us anything.

1  Q.  When is CVAP more useful than BVAP in
2  voting rights cases focused soley on black and white
3  voters?
4      MS. THEODORE:  Objection to form.
5      A.  Well, every case will be, you know,
6  different.  But it could be a scenario, as you get
7  further out from the census, potentially, you will
8  start to consider CVAP information to -- you know,
9  potentially, you are dealing with population changes,
10  potentially.  And, so, as you start moving further away
11  from the census, which now, obviously, that's four
12  years, the CVAP numbers might come to be, you know,
13  more useful.
14      And then, also potentially, if you're
15  looking at drawing a Gingles I district, I think CVAP
16  is the more common method because you are looking at
17  potential voters.
18  Q.  The more common method where?
19  A.  When you are drawing the Gingles I
20  district.  Because you are looking at the potential
21  electorate in those circumstances.  So, using CVAP data
22  over VAP data is often used in those contexts.
23  Q.  In Gingles I context?
24  A.  Correct.
25  Q.  Outside of the Demonstration Map section in

1  your opening report, you decided not to use CVAP for
2  the remainder of your analysis; isn't that right?
3      MS. THEODORE:  Objection to form.
4      A.  Just really wasn't -- I had -- I didn't
5  need to use it.  It wasn't necessary for what I was
6  doing.
7  Q.  Why not?
8  A.  Well, I focused primarily on racially
9  polarized voting, and that serves as the bulk of the
10  analysis.  And, there, I have data that is superior to
11  CVAP, so I am going to use that.  And then when it
12  comes to the BVAP analysis, as I already discussed, it
13  is unnecessary to use CVAP in that case, because in
14  that analysis, I am, in fact, accounting for turnout.
15      And that's really what we are focusing on.
16  We are trying to get the best estimate of the actual
17  voters in the race.  And, so -- and then the
18  performance analysis, you are just simply looking at
19  whether -- what a district looks like and whether one
20  candidate won versus another candidate won.  And, so,
21  in those contexts, the CVAP is not necessary.
22  Q.  Earlier you said that you had data that was
23  superior to CVAP, in order to conduct your analysis.
24  Do you remember saying that?
25  A.  Yes.

1  Q.  How is it superior?
2  A.  It is superior because we have an actual
3  tabulation by precincts of the racial distribution of
4  the voters.  Racial polarized voting studies is, we are
5  trying to understand how black voters vote, and how
6  white voters vote, and how, potentially, in some cases,
7  other voters vote.  It makes sense, since the data we
8  are looking at are election precinct returns, that we
9  want to look at the people who actually voted, not
10  estimates of the people who voted.
11      And in North Carolina, unlike most states,
12  we actually have the actual counts of the people who
13  voted.
14  Q.  Could you explain how CVAP is an estimate
15  of people who voted?
16      MS. THEODORE:  Objection to form.
17      A.  CVAP is not an estimate of people who
18  voted, per se, it is an estimate of the people who are
19  eligible to vote in a certain area.  You can still use
20  that data to conduct racially polarized voting, if
21  that's the data that you have.  Much of the time, the
22  results are sensible and -- I do use it in certain
23  contexts.  I am not trying to say that -- but CVAP is
24  not an estimate, let's say, of people who voted, it is
25  an estimate of people who potentially could vote.

1  Q.  Okay.  Could we turn to Pages 27 through 29
2  of your report?
3  A.  Okay.
4  Q.  Okay.  I'd like to ask you a few questions
5  about the charts on these pages.  And I will ask you
6  some questions, just, how they work, and understand
7  that they apply to whenever you put this chart forward.
8  But let me just ask the question and we can proceed
9  from there.
10      On Page 27, I am looking at an election for
11  2022 Court Appeals 08.  Do you see that?
12  A.  Sorry.  Maybe my headphone is (indicating).
13  Oh, I can hear you now.  I think.  There was -- can you
14  restate your question, please?
15  Q.  Sure.  I am looking at Figure 14 on Page 27
16  of your opening report.
17  A.  Okay.
18  Q.  This it is titled, Racially Polarized
19  Voting 2022 Contests, Statewide.  Do you see that?
20  A.  I do.
21  Q.  I am looking at the contest titled, 2022
22  Court Appeals 08.  Do you see that?
23  A.  I do.
24  Q.  I see an estimated black vote share for
25  Candidate Thompson at 95.8%.  Did I read that right?

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 17 of 85
Veritext Legal Solutions
www.veritext.com                                                              888-391-3376

1     A.   You did.
2     Q.   Is it safe to call Candidate Thompson the
3 candidate of choice of black voters in that election?
4     A.   Yes.
5     Q.   At what level would Candidate Thompson no
6 longer be deemed the minority candidate of choice in
7 your view?
8     MS. THEODORE:  Objection to form.
9     A.   In this particular scenario, if Thompson is
10 dropping in this -- say -- this is a two by two. I
11 think this election featured, maybe, a small minority
12 candidate, not racially a minority, just a smaller
13 candidate who got a very few number of votes. But to
14 say that these are the two candidates, it would be
15 below 50 -- say, you know, basically at 50%.
16     Then at that point if it is 50, there is no
17 clear candidate of choice, but if it is over 50%, then
18 Thompson would be considered the black-preferred
19 candidate.
20     Q.   I see an estimated white vote share for
21 that same candidate, Candidate Thompson, at 29.7%. Did
22 I read that correctly?
23     A.   Yes.
24     Q.   So, am I understanding correctly that,
25 roughly, a third of white voters statewide voted for

1 the black-preferred candidate in that election?
2     A.   Correct.
3     Q.   The way we just read this specific
4 election, is that the way we should read all similar
5 RPV charts in your report, as far as black vote share
6 and white vote share?
7     A.   Yes.
8     Q.   Looking now at the chart on Page 28 and 29.
9 On Page 28, we have Figure 15, Racially Polarized
10 Voting 2022 Contests, Enacted State Senate Districts 1
11 and 2. Do you see that?
12     A.   Yes.
13     Q.   And on Page 29, you have Figure 16 titled,
14 Racially Polarized Voting 2022 Contests, Demonstration
15 District County Area. Is that right?
16     A.   Correct.
17     Q.   Now, comparing the results in these charts
18 between Figure 15 and Figure 16, I am seeing almost
19 twice as much crossover voting in the 2022 contest in
20 the areas where Enacted SD1 and 2 were drawn as
21 compared to the demonstration to county areas. Would
22 you agree with that?
23     MS. THEODORE:  Objection to form.
24     A.   Twice as much? I think that's going to
25 depend on which district you are looking at. But I

1 would agree that there is more crossover voting in the
2 demonstration districts relative to the -- sorry --
3 more crossover voting in the enacted district than the
4 demonstration district.
5     Q.   So, in Figure 15, I am seeing crossover
6 voting ranging between 19.4% to 22.3%. Did I read that
7 right?
8     MS. THEODORE:  Objection to form.
9     A.   Are you -- I see lower numbers in
10 District 2.
11     Q.   Okay. Let me re-ask the question. I am
12 looking at Figure 15 in District 1. I am seeing
13 crossover voting ranging between 19.4% to 22.3%. Did I
14 read that right?
15     A.   Yes.
16     Q.   And then Figure 16, when I look at the
17 demonstration area, I am seeing crossover voting
18 ranging from 10% up to 13.4%. Did I read that
19 correctly?
20     A.   That's correct.
21     Q.   Turning to the 2020 Contest on Pages 31 and
22 32. These are Figures 17 and 18. In Figure 17 --
23     MS. THEODORE:  I'm sorry to interrupt,
24 Kate. I think you said 31 and 32. I think that's 18
25 and 19.

1     MS. McKNIGHT:  Oh, pardon me. Thank you,
2 Elisabeth. Yes, that's 18 and 19.
3     A.   Okay.
4     Q.   So, Figures 18 and 19 on Pages 31 and 32.
5 I am seeing SD1 with crossover voting ranging from 17.2
6 to 22.6%? Did I read that right?
7     A.   Yes, I think so.
8     Q.   And then in Figure 19 on Page 32, I am
9 seeing that in the demonstration area, this has
10 crossover voting with a range of 8.9 to 18%. Am I
11 reading that right?
12     A.   That looks right to me.
13     Q.   Let's go back so Page 1 of your report. I
14 have just a few more questions before we take another
15 break. Can you go on for another few minutes,
16 Dr. Collingwood?
17     A.   Yes.
18     Q.   Let's go back to Page 1 of your report.
19     A.   Okay.
20     Q.   You state that you examined how cohesive
21 black and white voters are respectively in support of
22 candidates of choice. Do you see that?
23     A.   Yes.
24     Q.   Actually, pardon me, Dr. Collingwood. I
25 think we have already gone over this and I have your

1 testimony on the points I'd like to ask here. So, we
2 can actually break here and I can start a new section
3 when we come back. Okay.
4 A. Okay.
5 MS. McKNIGHT: If we can go off the record,
6 Ms. Linberg.
7 - - - - -
(Off the record.)
8 - - - - -
9 BY MS. McKNIGHT:
10 Q. Okay. So, welcome back. During that
11 break, did you speak with counsel at all?
12 A. I did not.
13 Q. Did you speak with anyone during the break?
14 A. My wife.
15 Q. Anyone else?
16 A. My dog. He gets petted.
17 Q. He is a good boy, correct?
18 A. He is. He is a good boy.
19 Q. Okay. So, let's go back to your report.
20 On Page 1 of your report, I note that you state that
21 you examined whether the 2023-enacted SD1 and SD2 would
22 perform for black voters. And you compared those
23 results against the four demonstration plans from
24 Plaintiffs. Did I get that right?
25 A. Correct.

1 MS. THEODORE: Objection to form.
2 Q. Let's turn to Page 12 of your report.
3 There is a section here titled, Electoral Performance
4 Analysis. Is this the section that details the results
5 of your examination of the -- of whether the
6 2023-enacted plans would perform for black voters?
7 A. Yes.
8 Q. So, one question, just, I didn't understand
9 what you meant. I am trying to understand what you
10 mean. At the top of Page 13, you reference, "subset
11 the precinct data to the appropriate counties". Do you
12 mean allocate? What do you mean by subset?
13 A. For example, I might have all of the
14 precincts in the full state of North Carolina and, so,
15 I would then subset that whole data to be precincts,
16 but only in the counties that are comprising Districts
17 1 and 2, respectively.
18 Q. I see. I see. So, just -- you created a
19 subset of all precincts in the state for just those
20 precincts that are within the enacted districts; is
21 that fair?
22 A. Correct.
23 Q. Is it fair to understand, you did that same
24 thing for the demonstration area? You created a subset
25 of all the precincts in the demonstration area?

1 A. That's correct. That's how that process
2 works.
3 Q. So, I notice in the second sentence on
4 Page 13, you discuss full counties. Why are you
5 referencing full counties here when you are subsetting
6 into specific districts?
7 A. Those are the counties that comprise each
8 one of those respective districts.
9 Q. Okay. Now, on Page 16, four lines down in
10 that paragraph, you state, "In general, in situations
11 involving new districts that have not been used before,
12 statewide races involving candidates at the top of the
13 ticket are most relevant". Do you see that?
14 A. Yes.
15 Q. You would agree with me that elections in
16 SD1 and SD2 would not be statewide elections, correct?
17 A. That would be correct. Once those SD1 and
18 SD2 are -- actually have an election in them, then that
19 becomes a different -- it is not a statewide election.
20 Q. Well, is a senate district election in
21 North Carolina ever statewide?
22 A. Correct, it never is.
23 Q. And would elections in SD1 and SD2, their
24 placement on a ballot, would it be considered down
25 ballot, as compared to the top of the ticket, statewide

1 election?
2 MS. THEODORE: Objection to form.
3 A. Well, I would say down-ballot races are --
4 people might have different -- experts might have
5 different angles on this. It would be physically,
6 almost certainly, located down ballot, but so might a
7 congressional race, for example, which can induce a lot
8 of spending and a lot of attention.
9 State senate districts could be extremely
10 competitive. And, so, typically, people think of
11 down-ballot races as, you know, courts of appeals type
12 races, maybe something like a treasurer, those types of
13 -- a railroad commissioner, for example, in Texas.
14 Those tend to be the -- when we think of down ballot,
15 that's what we typically think of.
16 Q. So, would you consider a state senate
17 district race as down ballot?
18 A. Not necessarily. It could be in some cases
19 if turnout is low and there is -- for example, it is
20 not a competitive contest and, therefore, there is not
21 a lot of advertising going on. But it could be fairly
22 competitive and you could have lot of spending if the
23 contest is, you know, yeah, very competitive.
24 Q. But for your work in this case, you didn't
25 study any elections in state senate districts, correct?

Veritext Legal Solutions
www.veritext.com                                                          888-391-3376

1    A.  That's correct.
2    Q.  And, so, I see on Page 17, the second
3 sentence in the first full paragraph states, "Many of
4 the down-ballot races were more competitive". Do you
5 see that?
6    A.  Where is this?
7    Q.  Page 17, the first full paragraph, second
8 sentence.
9    A.  Yes.
10    Q.  Okay. So, based on your analysis, you --
11 and not studying any senate district elections in this
12 case, can you tell the Court anything about whether the
13 senate district elections in SD1 or SD2 would be more
14 or less competitive than top of the ticket statewide
15 elections?
16    A.  I can. Yes, I can. They would -- they
17 would be -- as currently enacted, they would be less
18 competitive. But, again, that's because I conducted a
19 performance analysis based on various contests and
20 different units, look at the full picture of it.
21       But because we have not had actual
22 elections in these districts for the post itself, I can
23 not definitively say how competitive or uncompetitive
24 it would be. We will have to wait until the next round
25 of general elections.

1    Q.  You referenced a performance analysis, but
2 that performance analysis didn't include an analysis of
3 any state senate elections, right?
4    A.  Correct.
5    Q.  So, how can you make the conclusion about
6 the performance of a state senate election and whether
7 it is more or less competitive than top of the ticket
8 election?
9    A.  Well, we -- we can -- we could, for
10 example, look at the top of ticket contest and see how
11 competitive, you know, the, say, top, you know,
12 president, governor, senate, U.S. senate, and maybe
13 lieutenant governor, attorney general; how competitive
14 those contests are statewide.
15       And then we could look at all of these
16 elections that I have included in this analysis and get
17 a general read, maybe taking some sort of overall
18 average. Or in this case, you can read down the charts
19 and you can see how competitive that jurisdiction
20 likely is going to be into the future.
21    Q.  So, are you making an assumption that an
22 election in a state senate district would fall
23 somewhere in the range of performance between a top
24 ticket contest and the lower ticket contest?
25    A.  That is a -- the sort of, built-in logic we

1 have to use when elections have not taken place. We
2 have to use, basically, previous data, and then we
3 subset it to the specific areas of the enacted
4 district. And while one individual election may be
5 more particularly useful for a variety of reasons --
6 and that's a case-by-case situation -- I think it is
7 wise to look at a large share of elections.
8       And, so, you can see if there are certain
9 elections, certain anomalies, what is possible, what's
10 not, is there an over-trend, time; those types of
11 things. And then you can get a pretty good read on how
12 that district is going to perform into the future.
13    Q.  So, I heard you answer earlier that you
14 believed that a state senate district election in SD1
15 or 2 would be less competitive than a top ticket race.
16 Did I hear you correctly?
17    A.  Yes. What -- a top of the ticket race in
18 statewide. Statewide.
19    Q.  Okay. And when I read Page 17 of your
20 report, you reference that many of the down-ballot
21 races were more competitive than top of the ticket,
22 statewide. Did I read that correctly?
23       MS. THEODORE: Objection to form.
24    A.  I think what I'm saying is, there are many
25 competitive contests, also, down ballot as well.

1    Q.  So, when you write more competitive, what
2 do you mean by, more competitive?
3    A.  I see. The election results are very
4 close.
5    Q.  What I am trying to get an understanding of
6 is, why in your report you came to a conclusion that
7 many down-ballot races were more competitive, but today
8 in deposition, you are saying that a state senate
9 district election would be less competitive. I am
10 trying to square the two.
11       MS. THEODORE: Objection to form.
12    Q.  Can you help me understand?
13    A.  The difference is, is the analysis or the
14 discussion that I had in terms of the competitive or
15 not competitive with regards to down-ballot contests is
16 specific to overall elections in the state as a whole.
17 My assessment here about State Senate Districts 1 and 2
18 will be relatively uncompetitive as currently enacted
19 is based on a subset of the statewide contest to the
20 boundaries of State Senate 1 and 2 respectively. So,
21 they are different units of analysis, as it were.
22    Q.  So, stepping back, could you tell me your
23 understanding of the phrase, district effectiveness
24 analysis?
25       MS. THEODORE: Objection to form.

1  A.  That's -- I have heard that term before.  I
2  don't use it that much.  I think if I had to speculate
3  what it means is, a certain threshold at which a
4  district -- that is, certain percentage of, say, black
5  voters, and what percentage of that percentage of black
6  voters in the area of that district, would that
7  district then tend to elect black-preferred candidates.
8  Q.  Have you ever come across a district
9  effectiveness analysis in your work?
10  A.  Well, certainly, this type of analysis is
11  conducted.  I haven't seen it that much in actual
12  expert reports, but I have seen it conducted at various
13  stages of a map drawing process, where somebody is
14  trying to, sort of, determine this number roughly.
15  And, so, I have certainly seen it.
16  Q.  Okay.  And do you believe you have provided
17  the Court a district effectiveness analysis in your
18  reports in this case?
19  A.  The -- yes, something, as I have enunciated
20  in my understanding of what it would be, I have
21  conducted one, yes.
22  Q.  And is that in a section titled, BVAP
23  Analysis, in your report?
24  A.  Correct.
25  Q.  And why did you prepare this section of

1  your report?
2  A.  Well, I -- you know, in my conversations
3  with counsel, that was something that they were
4  interested in doing.
5  MS. THEODORE:  And I'll just --
6  Dr. Collingwood, I will interject and ask you not to
7  say anything further about conversations with counsel,
8  other than what we asked you to do or not to do, for
9  purposes of the report.
10  THE WITNESS:  Okay.
11  A.  So, that's why I did that.
12  Q.  Okay.  Are you aware that the Court found
13  that Dr. Barreto failed to conduct a district
14  effectiveness analysis in his report submitted at the
15  preliminary injunction stage of this case?
16  A.  I was not aware of that.
17  Q.  Let's go to Page 23 of your report.  This
18  is where your section starts, titled, BVAP Analysis.
19  Do you see that?
20  A.  I do.
21  Q.  Okay.  And let's first turn to Page 24,
22  please.  And just to make sure I know what you are
23  talking about in your report, in the first paragraph
24  you state, I use an area -- strike that.
25  You discuss, "These include the following

1  counties".  Do you see that list of counties there?
2  A.  Yes.
3  Q.  Okay.  Are those the same counties you were
4  including in your demonstration area?
5  A.  Yes.
6  Q.  Now, the very next sentence says, "I use an
7  area wider than any of the demonstration districts".
8  Do you see that?
9  A.  I do.
10  Q.  What do you mean by that?
11  A.  So, the demonstration districts are a
12  subset -- a smaller version of all of these counties
13  that I have included in that list.  And, so, it is a
14  larger population base than the individual specific
15  districts.  So, that's what I mean by that.
16  Q.  So, you mean you looked at the
17  demonstration area and then you also looked at SD1 and
18  2.  Am I following?
19  MS. THEODORE:  Objection to form.
20  A.  Not for the BVAP analysis, but for the
21  RPV -- sorry -- for the performance analysis, that's
22  what I did.
23  Q.  So, I am asking about for the BVAP
24  analysis, and pardon me, I am not understanding what
25  you are describing.  Can you explain to me how the area

1  you used was wider than any of the demonstration
2  districts when you conducted your BVAP analysis?
3  A.  So, the BVAP analysis includes all of
4  these, I believe, 12 counties.  That's an area that's
5  just larger than State Senate District 1 or State
6  Senate District 2.  It is the area in which a black
7  majority district could be drawn.  So, I began the
8  analysis with, okay, what's the general area in the
9  region where a black majority district could be drawn.
10  And, so, given that, I then conducted the
11  BVAP analysis to look at what the best guess, based on
12  the data of black voting age population, would need to
13  be in order to give the black-preferred candidates a
14  realistically good shot at winning an election.
15  Q.  Okay.  So, I understand it now.  The
16  outside bounds are the -- it is the geography where
17  these 12 counties are; is that right?
18  A.  Correct.
19  Q.  All right.  Did you ever conduct your BVAP
20  analysis on a district level, either on demonstrative
21  districts, or on the SD1 or 2?
22  A.  No, because those all have a -- a specific
23  BVAP that's set in stone, and, so, that just, you know,
24  really wouldn't work.
25  Q.  Did you ever think to conduct this analysis

20 (Pages 74 - 77)

Case 4:23-cv-00193-D-RN    Document 98-4    Filed 10/28/24    Page 21 of 85
Veritext Legal Solutions
www.veritext.com                                                              888-391-3376

1 on the counties that cover SD1 and SD2?

2     A. Well, certainly, those are going to have a

3 large overlap with these counties here. I think there

4 -- it's almost, you know, a very similar area. So,

5 that's why I kept it to these 12 counties, because it

6 is the same general area.

7     Q. I see. So, if you looked at a map and

8 there was not overlap in the southeast of the state,

9 would you have included any of those areas where there

10 is not overlap of the 12 counties you studied?

11     A. I did not look at the southeastern portion

12 of the state. What I did is, I looked at what are the

13 unique counties that are in SS1, what are the unique

14 counties that are in SS2, let's put those together and

15 then we will conduct the BVAP analysis from there.

16     Q. Would you have conducted your BVAP analysis

17 on SD1 or SD2? Could you have you conducted your BVAP

18 analysis on SD1 or SD2?

19     A. Yeah, I think I could, but the issue is, is

20 we already know how SD1 and SD2 are -- based on the

21 electoral performance analysis, based on how those

22 districts are going to perform and they are not going

23 to perform, so -- for the black-preferred candidate.

24 And, so, it is sort of, kind of, a senseless exercise

25 to do that.

1     Q. Would you agree with me that the

2 performance analysis and your BVAP analysis are

3 different types of analyses?

4     A. They are different types of analyses, yes.

5     Q. And would you agree with me that a BVAP

6 analysis is meant to identify -- scratch that.

7     Can I ask you, what is your BVAP analysis

8 meant to identify that the performance analysis does

9 not?

10     A. Well, the performance analysis just looks

11 at the actual districts that have been enacted

12 themselves, versus illustrative districts. Those

13 districts are real, actual districts that have been

14 drawn by a demographer. And, so, there, all we need to

15 do is just look at election results.

16     The BVAP analysis is looking at a

17 hypothetical district in the general area. That is the

18 same general area as State Senate District 1 and State

19 Senate District 2. And it is looking to see if we drew

20 a district that was this percent voting age population

21 black, what are the, you know -- will a black-preferred

22 candidate win or not, i.e., will a black-preferred

23 candidate, on average, get over 50% of the vote in that

24 district.

25     So, it is more of a hypothetical scenario

1 for the BVAP analysis as a guide post, I think is what

2 I write, as opposed to the actual enacted districts and

3 what the election data show, based on 48 or so

4 elections; what the likely outcome of those districts

5 are going to be in terms of the black-preferred

6 candidate being able to win.

7     Q. Earlier on in your deposition, we discussed

8 that voting in SD1 and SD2 showed higher white

9 crossover voting than voting in the demonstration area.

10 Do you remember that discussion?

11     A. Yes.

12     Q. So, is it possible that drawing a district

13 that includes areas in SD1 and SD2 that are not part of

14 your demonstrative area analysis would produce results

15 where the BVAP necessary for that district to perform

16 would actually be lower than the BVAP you report on the

17 demonstrative area?

18     MS. THEODORE: Objection to form.

19     A. Is it possible? It may be possible, I

20 suppose, but, you know, in a very specific type of

21 district. So, it is possible to draw a district at a

22 certain BVAP that's maybe lower or even higher than

23 what I identified in the very specific nature of the

24 people who are or are not included in that district.

25     The numbers could be different. That's

1 certainly the case. But then if that district is drawn

2 and set in stone, we can then conduct an electoral

3 performance analysis on it to see how it performs.

4     Q. And you did not conduct any electoral

5 performance on any counties in North Carolina other

6 than the 12 identified in the demonstrative area in

7 your report; is that right?

8     MS. THEODORE: Objection to form.

9     A. In this report, this is what I did. I

10 think in the rebuttal report, I looked at a couple

11 other counties, but I am sure we will get to that area

12 later.

13     Q. Do you remember which counties those were?

14     A. I think it was Pitt and Edgecomb.

15     Q. Page 24 of your report, you reference

16 turnout calculations. Could you explain what you mean

17 by turnout calculations?

18     A. Right. So, much like we do with racially

19 polarized voting, we can estimate voter turnout by

20 race, and we also have -- because we have all the data

21 at the precinct units that would allow us to do that.

22 And, so, for example, if we have a BVAP, we set BVAP at

23 50%.

24     We want to know the actual share of people

25 of black voting age population who voted, and then we

21 (Pages 78 - 81)

Veritext Legal Solutions
www.veritext.com                                     888-391-3376

1 want to actually know the share of white voting age
2 that voted. And if there is a difference in that, then
3 the actual electoral composition of the share of voters
4 will change, you know. And, so, that is what the BVAP
5 analysis does, is, it accounts for turnout.
6      That's why we don't need to, say, look at
7 CVAP data, because we are accounting for turnout. And
8 then we take that information and incorporate how black
9 voters vote, how white voters vote, and that can give
10 us a fairly clean estimate as to how a particular
11 candidate in each simulation would do.
12      Q.   And when you say, number of black voters,
13 are you calculating this number on a county-by-county
14 basis, or on the area as a whole?
15      A.   No, that's calculated at the -- I am able
16 to calculate that in the 12 county region as a whole,
17 just like I am able to calculate the voting patterns of
18 blacks versus white in the region as a whole. And I
19 have data. I use data at the precinct unit in order to
20 make those estimates.
21      So, I am using the lowest possible unit in
22 order to estimate county level -- region wide level
23 turnout and, then, polarization to arrive at the -- you
24 know, how the candidate -- a theoretical candidate
25 would do in that area.

1      Q.   Does your report identify turnout rates on
2 a district basis, either enacted or demonstrative?
3      A.   The report does not look at turnout in
4 terms of a table that's presented, or something else
5 like that. It is incorporated into the BVAP analysis
6 itself. But the report is not looking at district
7 here, what's the turnout district, what's the turnout,
8 those types of things. No, I have not done that.
9      Q.   Does your analysis estimate participation
10 in the elections at issue, meaning the state senate
11 elections?
12      MS. THEODORE: Objection to form.
13      A.   I guess, could you re-clarify that
14 question?
15      Q.   Sure. Are you familiar with the term,
16 endogenous elections?
17      A.   Yes.
18      Q.   What does it mean to you?
19      A.   That would be, for example, the 2024 State
20 Senate District 1 and State Senate District 2 election.
21 Those are the jurisdictions that are under --
22 basically, under the lawsuit that -- the area where the
23 lawsuit is taking place, and the boundaries of where
24 the lawsuit is taking place.
25      Q.   You were talking about how you had turnout

1 down at the precinct level. Did I understand you
2 correctly?
3      A.   I am able to -- yes, I have that data.
4      Q.   So, did your analysis report turnout in the
5 areas of SD1 and SD2?
6      A.   I don't think so, no.
7      Q.   Does your analysis consider incumbency?
8      A.   No.
9      Q.   So, I am now on Page 24 of your report
10 where you begin discussing your simulations exercise.
11 Midway through the second paragraph you state, "In this
12 way, we know then if we fix BVAP". Do you see that
13 reference?
14      A.   Right.
15      Q.   So, in what way? When you say, "in this
16 way", what do you mean by that?
17      A.   That's the way that the simulation works,
18 is, we can simulate: In this general area, given
19 racially polarized voting estimates, and given voter
20 turnout by race estimates, we can then generate an
21 estimate: What will happen in this area when we fix
22 BVAP at 1%, at 2%, at 3%, at 4%.
23      And, so, we just keep re-doing the analysis
24 at each stage of that. And, so, as the, say, BVAP goes
25 up, and white BVAP starts to go down, we can start to

1 see whether the black-preferred candidate, how they are
2 doing. And then at some point, whether that's at 42%,
3 45%, 47%, 49%, 52%, 54%, we can see in that specific
4 contest who would have -- that I'm analyzing -- which
5 specific election that I'm analyzing, who will win at
6 that level of BVAP that we fix for the simulation.
7      Q.   So, walk me through this, if you will. In
8 the simulation, you program the BVAP to be -- to a set
9 figure, whether it is -- let's say it is 45%. And then
10 what is the instruction that you give the computers in
11 running the simulated maps? And if you could make it
12 very layman for me, I'd appreciate it.
13      A.   Well, we have previously calculated -- we
14 previously calculated what the racially polarized
15 voting is, so we know in this 12 county area, the
16 percentage of black voters that vote for the particular
17 candidate, and then the percentage of white voters that
18 vote for that same candidate and their opponent. And
19 then we store those results so we know what those are.
20      And then we estimate what the -- we have
21 already done this -- we estimate what the overall
22 turnout rate is for blacks versus white in the area.
23 And, so, we take that number and we multiply that by
24 the BVAP, and then take that inverse for the WVAP.
25      And that will then -- for example, if you

22 (Pages 82 - 85)

1 have a BVAP at 45%, but black voters are voting less
2 than the share of the electorate in a particular
3 contest, the black voters are voting less than white
4 voters, that 45 will, say, drop down to 43%. Then you
5 have 43% of the electorate, say, for example, that is
6 black, 57% that is white, and then we know black
7 voters, 99% of them, are voting for this candidate.
8     So, 99% of voters of that 43%, how many
9 estimated voters is that. We do the same thing on the
10 other side, and then we can arrive at how many -- what
11 the percentage of the vote that each of the candidates
12 would get at that BVAP level.
13     Q.   Would you turn to Page 25 in your report?
14 There is a chart here that says BVAP Simulation
15 Analysis, all 2020 - 2022 Contests. And it's labeled,
16 Figure 13. Do you see that?
17     A.   Yes.
18     Q.   What is the count indicated in the Y Axis?
19     A.   That's the number of elections that are
20 falling in that particular -- the number of election
21 contests that are falling in that particular bin.
22     Q.   And, so, is it a straight number? I see a
23 number, a 10. Is that -- does that mean, literally, 10
24 elections fell into that bin?
25     A.   Yes.

1     Q.   And, so, where does this -- where do the
2 simulations -- I've dealt with simulations before, and
3 I always see very complex charts and histogram charting
4 out the results of, you know, a very large number of
5 simulated maps. I am trying to understand where --
6 what this chart represents and where all those
7 simulated maps are, those simulated conditions are, the
8 results of your simulations.
9     A.   That's it.
10     MS. THEODORE:   Objection to form.
11     Yeah, those -- that's called an ensemble
12 simulation. That's just a different approach than what
13 I am doing. Those simulations are typically looking
14 at, you know, how -- what's the likelihood that this
15 map was drawn based on partisanship, or something like
16 that.
17     This is just a different simulation. This
18 is, hey, let's set the threshold of black voting age
19 population at different levels, let's use the tools of
20 ecological inference, racially polarized voting, to see
21 how -- you know, at what point -- so, what this plot,
22 or chart is showing is, at what point in that
23 particular election contest, in this full region, would
24 a black-preferred candidate win.
25     And, so, we are not simulating maps in a,

1 kind of, more traditional -- or ensemble method that
2 people use to simulate maps to determine whether
3 something is clearly drawn from a partisan perspective.
4     Q.   Thank you for that. So, now, if you add up
5 all of the count figures here, you'd get the roughly,
6 was it, about 27 elections? Do I remember that
7 correctly?
8     A.   Correct.
9     Q.   27 contest. Okay. So, this chart is
10 showing how much BVAP would be needed in each of those
11 contests in order for the black-preferred candidate to
12 prevail; is that right?
13     A.   That's correct. And the mean of this
14 distribution is, based on the 2022 and 2020 elections
15 that I assessed, that's the, sort of, average of what
16 the BVAP needs to be in order for the black-preferred
17 candidate, basically, to win 50% of the time, or 50.001
18 or something. So, it is about as equal opportunity as
19 one would get.
20     Q.   Am I reading your chart correctly to say
21 that 12 of the 27 contests analyzed, your simulation
22 showed that the districts drawn in the demonstration
23 area would need less than 45% BVAP to elect a candidate
24 of choice?
25     A.   I think that's right. I would have to

1 check the underlying data. Sometimes the bins are --
2 it could be over 45 depending on which side the bin is
3 falling on, whether it's open or closed.
4     Q.   If it is over 45, it would have fallen in
5 the next bin to the right of the number 45, correct?
6     A.   I think that's right. Yeah, I think that's
7 right.
8     Q.   This number, the third column over, does
9 that number appear to be number 7 to you? In the -- in
10 Figure 13, there are six columns. The third column
11 over from the left, just to the right of 45 and below
12 50. I am trying to identify the count on the --
13     A.   Yeah, that's going to be 47.
14     Q.   That would be 7 -- oh -- oh, pardon me.
15     A.   47. So, between 45 and 47.
16     Q.   Right. So, I understand that the dotted
17 vertical line is the mean at 47.07, correct?
18     A.   That's correct.
19     Q.   Okay. So, that column between 47.07 and
20 45, I believe that column indicates on the Y Axis, a
21 number 7, a count of 7. Is that the right read?
22     A.   Correct.
23     Q.   And, so, then the column, the next column
24 to the left, I believe the count there is 10. Is that
25 the right read?

23 (Pages 86 - 89)

Case 4:23-cv-00193-D-RN   Document 88-4 Filed 10/28/24   Page 24 of 85
Veritext Legal Solutions
www.veritext.com                                                888-391-3376

1   A.   Yes, I think so.
2   Q.   And then the next column over to the left,
3 it looks like that's a count of 2.  Is that the right
4 read?
5   A.   Yeah, I think so.  I have to go and look
6 under the -- you know, pull out the actual raw data and
7 look at that.  This is just a, you know, histogram
8 representation of that.  Sometimes the -- you know, the
9 charts that are made are -- you know, it is not always
10 entirely -- the axis default -- axis labeling is
11 something that the program produces.
12   Q.   I see.  So, by my count, I am seeing 19 out
13 of 27 elections analyzed fall below 47.07.  Am I
14 reading that right?
15   A.   Yeah, I think that's right.
16   Q.   And the inverse would be only 8 require --
17 8 of the elections would have required greater than
18 47.07 BVAP in order to perform.  Is that the right
19 read?
20   A.   I think that's right.
21   Q.   I mean, when I'm looking at this, it looks
22 to me like most of the elections analyzed would not
23 need 47.07 or greater BVAP to perform.  In fact, it is
24 more than twice the number of the elections over 47.07.
25 Am I reading that right?

1       MS. THEODORE:  Objection to form.
2   A.   Definitely more are under that.  That's
3 likely due to the higher turnout in presidential
4 election years, in a 2020 contest versus a 2022
5 contest.  And, so, you know, by including both years,
6 both presidential and a midterm, as it were, that's
7 going to push that number up, you know, towards 47.
8       But in the midterm years, you are going to
9 likely need an even higher number than 47% to ensure --
10 or to -- yeah, based on this analysis, to represent a
11 black voting age population.  But, you know, I wanted
12 to provide the overall, kind of -- you have this
13 election year, you have that election year, plus our,
14 kind of, best guess based on those election years.
15   Q.   Did you ever run this analysis using
16 electoral years 2018 or 2016?
17   A.   No, I didn't do that.  No, I didn't do
18 that.
19   Q.   Why not?
20   A.   No real reason.  It's just 2022 and 2020
21 are the most recent years, and so that's why I just
22 focused on those.
23   Q.   Going back to the chart, I want to sort of
24 finish the exercise of these bars.  So, we've got from
25 left to right -- correct me if I'm wrong -- I am

1 reading the first bar at a count of 2, correct?
2   A.   I mean, like, I have to look -- if you want
3 me to -- I have to pull up the underlying data to see
4 exactly what the count would be, or to see how the bin
5 looks change, but that sounds about right.
6   Q.   Okay.  Well, I am just trying to make sure
7 I am reading your chart correctly.  It looks like the
8 top of that bar is about the 2 count number.  Is that a
9 fair read?
10   A.   That's what I would also conclude.
11   Q.   Okay.  And then when you go back and look
12 at your numbers, are you expecting them to vary widely
13 from the number 2, or would it be a little over or a
14 little under?
15   A.   No, it would be very similar to this.  It's
16 just to see exactly what the -- you know, I could have,
17 you know, provide, just, like, the, you know, the
18 vector of the actual BVAP levels for each contest, or
19 something like that, that ensures a candidate will get
20 over -- a black candidate will get over 50% of the
21 vote.  And this is just a simple histogram on top of
22 that.
23   Q.   Okay.  And, so, the next bar over, we have
24 the count of 10.  Is that the right read?
25   A.   That's what it appears to be.

1   Q.   And the next bar over, we have the count of
2 7.  Is that the right read?
3   A.   That's what it appears to be.
4   Q.   Okay.  The next column over is a count of
5 1.  Is that the right read?
6   A.   Looks like it.
7   Q.   Okay.  And, so, the next bar over spans
8 from below 50 to 50.  Do you see that?
9   A.   Yes.
10   Q.   Why does it span?  What does that
11 represent?
12   A.   These are just bins of about 2 percentage
13 points or so.  The program sorts that out.  And, so,
14 what it would represent is if a -- for example, a --
15 the election contest, the simulation shows that the
16 BVAP required to elect a black-preferred candidate is,
17 say, 49.2, or it's 50.05.  That's going to fall in the
18 same bin.
19       So, that's the range in which that election
20 was falling, and that's the pictorial presentation of
21 that.
22   Q.   I see.  And, so, roughly, what is the width
23 of each bar?  Roughly, what range does that width
24 represent?
25   A.   It looks in this plot to be about 2

24 (Pages 90 - 93)

1 percentage points.
2     Q.  Okay. So, I am seeing two bars there with
3 the value of 1. Is that the right read?
4     A.  Yes.
5     Q.  And then, finally, we get over to the
6 farthest right column, and it looks to me like it
7 represents a count of 6. Is that the right read?
8     A.  Yes.
9     Q.  Do you have any sense of which elections
10 fall under this count of 6?
11     A.  I think those are the more recent
12 elections. That's my sense. I'd have to doublecheck,
13 but I think those are more recent elections.
14     Q.  So, you mean the 2022 elections?
15     A.  Yeah, that's my sense.
16     Q.  What are some reasons why a district drawn
17 at below 50% BVAP would elect candidates of choice of
18 the black community?
19     MS. THEODORE: Objection to form.
20     A.  There is two general reasons that I can
21 think of, sort of off the top of my head. The first
22 might be that the black population is -- votes at a
23 very high rate and higher than the white population,
24 and, so, they are actually representing over 50% of the
25 people who actually voted in that context.

1     If there is perfectly racially polarized
2 voting, then the black-preferred candidate would
3 naturally win. In general, that's an unlikely scenario
4 because, typically, the white turnout across the
5 country is typically higher than black turnout in terms
6 of voting.
7     And, so, the more likely, or another
8 scenario is, there is, basically, a subset of white
9 voters who prefer the black-preferred candidate, i.e.,
10 crossover voting. And, so, that -- those are the two
11 most likely explanations for why a BVAP district under
12 50% would still elect a black-preferred candidate.
13     Q.  You note on Page 24 that you only look at
14 2022 and 2020 to observe changes between presidential
15 and midterm years. Do you see that?
16     A.  Yes.
17     Q.  I think the analysis only looks at one
18 presidential year and one midterm year; is that right?
19     A.  Yes.
20     Q.  Why wouldn't you also look at one earlier
21 presidential year and one earlier midterm year to add
22 to your analysis?
23     A.  I guess, typically when I do these types of
24 analyses, or voter turnout analyses of some sort, I
25 tend to focus on the most recent rounds of elections.

1 I am not so interested in looking at some sort of
2 sustained long-term pattern of polarization like I do
3 in racially polarized voting studies.
4     And, so, it is just my typical procedure.
5 And I have done this in other cases where I look at
6 voter turnout by race. It is not exactly the same type
7 of thing, but sort of inline with this, where I look at
8 the most, you know, last two elections and just focus
9 on those.
10     Q.  Okay. Did you lack the data to conduct the
11 analysis of the 2018 and 2016 elections?
12     A.  No.
13     Q.  Did you lack the time to do the analysis?
14     A.  Well, I understand that it is maybe not so
15 much time. I was -- you know, I am very busy putting
16 these reports together. I have a lot going on. I
17 never want to use time as, sort of, an excuse, but it
18 was -- it's sort of a procedure that's conducted after
19 I do my, sort of, more typical racially polarized
20 voting and electoral performance set of analyses.
21     Q.  So, what does that mean as a result?
22     A.  Nothing. Doesn't mean --
23     MS. THEODORE: Objection to form.
24     A.  -- (overspeak) as a result.
25     MS. THEODORE: Dr. Collingwood, just let me

1 interject my objection before you answer, if you don't
2 mind.
3     (Reporter asked for answer repeat.)
4     A.  My answer was, it means nothing.
5     Q.  Is this analysis hard to do?
6     MS. THEODORE: Objection to form.
7     A.  I would say all of my analyses are hard to
8 do. Everything I do is hard to do.
9     Q.  And you are able to do it for the 2020 and
10 2022 elections. You were able to conduct BVAP analysis
11 for those two elections, correct?
12     A.  As you can see in the report, I have done
13 those analyses, yes.
14     Q.  Do you know who Bernard Grofman is?
15     A.  I do know who he is, yes.
16     Q.  Have you ever met him?
17     A.  Yes.
18     Q.  Who is he?
19     A.  He is a professor at the University of
20 California, Irvine in Political Science.
21     Q.  And do you know if he has done any work in
22 the area of the Voting Rights Act?
23     A.  He is a well known figure in this area.
24     Q.  And do you have respect for his
25 contribution to Voting Rights Act studies?

1       MS. THEODORE: Objection to form.

2       A.  He laid a lot of the earlier work in voting

3  rights, a lot of that work is -- it was conducted 20,

4  30 years ago, but he has made a good contribution.

5       Q.  And have you ever relied on his work to

6  conduct your own work?

7       MS. THEODORE: Objection to form.

8       A.  Well, I certainly read some of his -- some

9  of his articles and things like that, and some of his

10  books.

11      Q.  And do you know who Lisa Handley is?

12      A.  Yes, I know Lisa.

13      Q.  Okay.  Who is she?

14      A.  She is another expert in racially polarized

15  voting.

16      Q.  Okay.  Have you ever met her?

17      A.  Yes.

18      Q.  And what kind of work has she done -- in

19  your understanding, has she done in the area of Voting

20  Rights Act?

21      MS. THEODORE: Objection to form.

22      A.  Well, she has testified as an expert in a

23  lot of cases.  She has definitely written some articles

24  related to racially polarized voting.

25      Q.  And do you recall ever relying on her work

1  to conduct your own racially polarized voting analyses?

2       A.  Well, she and Grofman, and Richard Niemi,

3  N-I-E-M-I, I think wrote a book in 2006 or so.  So, you

4  know, I am aware of that book and have read some or

5  most of it.

6       Q.  And do you know David Lublin, L-U-B-L-I-N?

7       A.  Yes, I know David Lublin.

8       Q.  Have you ever met him?

9       A.  I have.

10      Q.  And what do you know about him in the area

11  of Voting Rights Act studies?

12      A.  He has written a couple of articles.  They

13  might all have an article, a recent article in this

14  area.  I have to doublecheck.

15          He wrote some articles about the 1990 wave

16  of redistricting.  He wrote those articles, I think, in

17  the early 2000s or so.  And I think he wrote a book in

18  that area, so I think I read that book a while ago.

19      Q.  And if those three authors published an

20  article identifying a method for drawing effective

21  districts, would you view that as useful in conducting

22  your own work in identifying BVAP necessary to draw

23  effective districts?

24      MS. THEODORE: Objection to form.

25      A.  I'd have to read the article, talk to them.

1  Certainly could be useful.

2       Q.  Are you aware of any article that they have

3  published on the topic of drawing effective districts?

4       A.  I have a vague sense that they have written

5  an article about that, maybe recently.  I haven't read

6  it, but I have a vague sense, I think.  You know, when

7  you are in this area, you kind of have a sense as to

8  what people may or may not be working on.

9       Q.  Would it surprise you to know that they

10  published an article on drawing effective districts

11  that's been cited twice by the Supreme Court and

12  multiple times by lower courts?

13      MS. THEODORE: Objection to form.

14      A.  No, that wouldn't surprise me.

15      Q.  Did you refer to any article written by

16  Drs. Grofman, Handley and Lublin in developing your own

17  BVAP analysis in this case?

18      A.  No, I don't think so.

19      Q.  And did you review any expert report

20  prepared by Dr. Handley in recent North Carolina

21  litigation in conducting your BVAP analysis in this

22  case?

23      A.  No.

24      Q.  So, is it fair to say that neither of those

25  two sources influenced your preparation of the BVAP

1  analysis in this case?

2       A.  Yes.

3       MS. THEODORE: I don't know if it would be

4  a good time to take a break or not.  We've been going

5  about an hour.

6       MS. McKNIGHT: I need a few more minutes

7  and then we can take a break.

8       MS. THEODORE: Okay.

9  BY MS. McKNIGHT:

10      Q.  Let's bring up Exhibit 3.  This is an

11  article that we've been discussing and I'd like to look

12  at a page and ask you a few questions.

13          (Exhibit 3 was marked for

14          identification.)

15      Q.  Do you see it, Dr. Collingwood?

16      A.  Yes.

17      Q.  So, this is an article dated June 1, 2001

18  titled, Drawing Effective Minority Districts: A

19  Conceptual Framework and Some Emperical Evidence".  Do

20  you see that?

21      A.  Yes.

22      Q.  And authors are listed as Bernard Grofman,

23  Lisa Handley, and David Lublin.  Do you see that?

24      A.  Yes.

25      Q.  This is a long article.  I have a specific

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 27 of 85
Veritext Legal Solutions
www.veritext.com                                                          888-391-3376

1 question for you on a chart on Page 1421. If we can,
2 turn to Page 1421.
3    A.   Okay.  Page 21?
4    Q.   Page 1421.  So, 1 4 2 1.
5    A.   I see.  Okay.
6    Q.   Do you see on that page a table titled,
7 "Table 10: Percent Black Needed for Black Candidate to
8 Win, Incorporating Cohesion and Crossover:  Selected
9 South Carolina State House Contests, 1992 to 1998".  Do
10 you see that?
11    A.   Yeah.
12    Q.   This chart indicates that the analysis
13 relied on four different election years, do you see
14 that?  1992, 1994, 1996 and 1998?
15        MS. THEODORE:  I am just going to object to
16 -- I am going to object and direct Dr. Collingwood,
17 since you have never seen this document before --
18        MS. McKNIGHT:  You can't instruct the
19 witness, Counsel.
20        MS. THEODORE:  -- you should take the time
21 you need to look at it.
22    A.   Okay.  Yes, I see -- I see that.
23    Q.   Okay.  Do you see that the analysis
24 included general elections and primary elections?
25        MS. THEODORE:  Objection to form.

1    A.   I see that those are both in the table.
2    Q.   Okay.  We can take that down and we can
3 bring up what should be marked as Exhibit 4.  This is a
4 September 17, 2019 report.  This should be marked as
5 Exhibit 4.
6        (Exhibit 4 was marked for
7        identification.)
8    A.   Okay.
9    Q.   And this is titled, Providing Black Voters
10 with an Opportunity to Elect Candidate of Choice to the
11 North Carolina State Legislature:  A
12 Jurisdiction-Specific Functional Analysis of Select
13 House and Senate County Grouping".  Do you see that?
14    A.   Yes.
15    Q.   And it is written by Dr. Lisa Handley and
16 dated September 17, 2019.  Do you see that?
17    A.   Yes.
18    Q.   Have you ever reviewed this report?
19    A.   No.
20    Q.   Is it fair to say you didn't consider the
21 methodology of this report when preparing your own
22 report in this matter?
23    A.   Well, the methodology could be the same.  I
24 mean, it is my understanding that these scholars are
25 using a very similar type of approach in terms of

1 incorporating voter turnout, RPV estimates, into the
2 functional analysis.  I mean, that's what everybody
3 does.
4        And, so, it's -- while I haven't seen this
5 exact report, you know, it is quite likely the
6 methodologies that we're employing are very similar.
7        MS. McKNIGHT:  Okay.  Those are all my
8 questions for this unit, Elisabeth.  If we want to take
9 a break now, it is 3:10 . . .
10         - - - - -
11        (Off the record.)
12         - - - - -
12 BY MS. McKNIGHT:
13    Q.   Dr. Collingwood, before the break do you
14 recall that we were just looking at Page 1421 in the
15 article titled, Drawing Effective Minority Districts?
16    A.   Yes.
17    Q.   Could we bring up Exhibit 5.?  This should
18 be in the exhibit portal.  Let me know when you see it
19 and are ready to testify.
20    A.   Okay.
21        (Exhibit 5 was marked for
22        identification.)
23    Q.   I see this as being an article titled, Can
24 States Promote Minority Representation?  Assessing the
25 Effects of the California Voting Rights Act.  Do you

1 see that?
2    A.   Yes.
3    Q.   I see you listed as the first author on
4 this article; is that fair to say?
5    A.   Yes.
6    Q.   Okay.  This article appears to be dated
7 2021.  Do you remember writing it?
8    A.   Yes.
9    Q.   Okay.  Let's turn to Page 761 of this
10 article in the section called, References.
11    A.   Yes, I see.
12    Q.   Okay.  And do you see the fourth reference
13 down on this list of references?
14    A.   Yes.
15    Q.   Does that appear to be the article we were
16 just discussing, Drawing Effective Minority Districts?
17    A.   Looks like it.
18    Q.   And I see a range of pages cited at the end
19 of it.  Do you see that?
20    A.   Yes.
21    Q.   Okay.  And by my read, that range of pages
22 includes the Page 1421 that we were just discussing
23 before the break.  Is that a correct read?
24    A.   Yeah, I think so.
25    Q.   So, is it correct to say you have never

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 28 of 85
Veritext Legal Solutions
www.veritext.com                                          888-391-3376

1  seen this article, Drawing Effective Minority
2  Districts, before?
3      A.   I mean, when I made that statement, it
4  sounded -- I don't recall seeing it.  It's possible
5  that I came across it while I was writing this article,
6  and if I remember correctly, I think Sean, my coauthor,
7  was doing the body of that type of data, or literature
8  review.
9          So, if I had seen it, I would have mostly
10 glanced at it, but not given it a full read.
11     Q.   And would you include an article as a
12 reference if you didn't consider it informative in the
13 preparation of this article?
14         MS. THEODORE:  Objection to form.
15     A.   I mean, when you write articles, you -- you
16 know, one or both authors read them in whole or part
17 and you are sort of familiar with the article.  You
18 don't necessarily always read the full article, and you
19 might focus specifically on one aspect of the article.
20 You might focus specifically on the abstract, or
21 another spec of analysis.
22         So, you know, we -- you know, we,
23 obviously, found the articles somewhat helpful in some
24 argument that we were making, or citing something on,
25 so that's why it is in there.

1      Q.   Okay.  Let's move on.  I'd like to look at
2  your reply report, or rebuttal report submitted in this
3  case.  So, this will be loaded as Exhibit 6.  Just let
4  me know when you have it, Dr. Collingwood.
5      A.   Okay.
6          (Exhibit 6 was marked for
7          identification.)
8      Q.   Now, is this -- does Exhibit 6 reflect a
9  true and accurate copy of the report you submitted in
10 this matter titled, Expert Rebuttal Report of Dr. Loren
11 Collingwood, on August 30, 2024?
12     A.   Looks correct.
13         MS. McKNIGHT:  Okay.  I'm sorry.  Could you
14 hold on just one moment?
15         - - - - -
               (Off the record.)
16         - - - - -
17 BY MS. McKNIGHT:
18     Q.   Were you able to answer my question,
19 Dr. Collingwood, whether this is a true and accurate
20 copy of your rebuttal report submitted in this matter?
21     A.   Yes, it looks like it is.
22     Q.   I'd like to ask you some questions about
23 the issue referred to as the margin of error issue that
24 you discussed in this report.
25     A.   Okay.

1      Q.   Do you recall when you were asked to look
2  at this error margin issue?
3      A.   This was, I think, right when we got the
4  report back, the defense expert reports, and counsel
5  asked me to do an analysis of the margin of error on
6  the various demonstrative plans.
7      Q.   Would that be, roughly, August?
8      A.   Sometime in August.
9      Q.   What is ACS data?
10     A.   That's short for American Community Survey.
11 It is a survey of households across the United States
12 every year that ask a lot of questions, and it is part
13 of the U.S. Census product.
14     Q.   And is it -- does the ACS provide a
15 five-year estimate?
16     A.   It does.
17     Q.   And when -- does it provide a five-year
18 estimate including 2022 data?
19         MS. THEODORE:  Objection to form.
20     A.   That is available, yes.
21     Q.   Do you know when the 2022 ACS data became
22 available?
23     A.   Sometime in the first part of 2024, I
24 think.
25     Q.   By part, do you mean, like, first half or

1  first quarter?
2      A.   Probably first quarter.
3      Q.   So, by that, you mean between January and
4  March of 2024?
5      A.   Yes.
6      Q.   Do you know a Dr. Oskooii who has submitted
7  expert reports in other VRA cases?
8      A.   Yes.
9      Q.   Have you spoken to Dr. Oskooii about any
10 litigation?
11     A.   Well, we were experts in the Washington
12 redistricting case, so we had spoken about that and
13 possible older cases that we have worked on, or that he
14 has worked on, that I have worked on once they've been
15 finished.
16     Q.   Okay.  Have you ever discussed any
17 litigation in Alabama with Dr. Oskooii?
18     A.   Not directly.  I am aware that he maybe
19 worked, or is working on that case, but we haven't
20 spoken about it in any detail.
21     Q.   Okay.  Do you know if the issue of error
22 margin related to the ACS is coming up in other pieces
23 of the area of litigation?
24         MS. THEODORE:  Objection to form.
25     A.   It seems like this is a new tact and

Case 4:23-cv-00193-D-RN    Document 338-4    Filed 10/28/24    Page 29 of 85
Veritext Legal Solutions
www.veritext.com                                                      888-391-3376

1 strategy that defense experts are somewhat recently
2 starting to use.
3     Q.   Can you describe the tact or strategy, as
4 you said?
5     A.   Basically, to attach a margin of error to
6 the CVAP estimate for the minority population to show
7 that districts that are drawn close to 50%, or so, are
8 potentially not actually 50% and, so, therefore,
9 Gingles I is not met. So, I think that's the general
10 strategy.
11     Q.   Would you agree with me that there is a
12 margin of error on CVAP?
13         MS. THEODORE: Objection to form.
14     A.   CVAP has -- is a sample survey and, so, as
15 a result, yes, there is a margin of error.
16     Q.   Is the error of margin for CVAP estimates
17 calculated for block groups or electoral districts?
18         MS. THEODORE: Objection to form.
19     A.   Both.
20     Q.   Okay. So, it's your view that a CVAP error
21 of margin is calculated for electoral districts?
22         MS. THEODORE: Objection to form.
23         MS. McKNIGHT: Could I have counsel state
24 the basis of her form objection?
25         MS. THEODORE: I mean, I think the question

1 was very unclear about who you are talking about is
2 doing the calculating, whether you are talking about it
3 when the census bureau presents these results, various
4 other lack of clarities with respect to the form of the
5 question.
6         MS. McKNIGHT: Thank you.
7 BY MS. McKNIGHT:
8     Q.   You can answer, Dr. Collingwood.
9     A.   It is -- well, it is not my opinion. The
10 data are publicly available at both the block group and
11 enacted legislative districts.
12     Q.   And how are the data available at the
13 enacted legislative district level?
14     A.   How are they available? They are on a
15 website that -- a census website, and you can download
16 that data and look at the margins of error, and the
17 estimates for different legislative districts across
18 the state, and various population count, and other
19 things like that. So, it is just publicly available
20 from the U.S. Census.
21     Q.   When you say, census website, which website
22 are you referring to?
23     A.   I would have to look. I would have to
24 look. It's fairly -- you know, fairly easy with some
25 Googling to sort that out.

1     Q.   Does Tidy Census sound right to you?
2     A.   Well, that is a -- that wasn't what I was
3 specifically referring to, but that is something that
4 you could use.
5     Q.   Were you referring to something within the
6 census.gov website?
7     A.   Correct.
8     Q.   Are you familiar with something called,
9 disaggregation of split block groups?
10     A.   Probably.
11     Q.   And what is the familiarity? What is your
12 understanding?
13     A.   Well, if you have a block group that a
14 district splits, that the boundaries of a district
15 splits, you could disaggregate the block group estimate
16 to the block level, and the blocks would be fully
17 encompassed within one side of the district or the
18 other. So, that's how you would do that.
19     Q.   And how do you -- or how does the census
20 disaggregate -- let me ask you this: Who does the
21 disaggregation down to the block level? Is it you, the
22 census, or someone else?
23     A.   No, the census wouldn't do that, at least I
24 have not seen that. I could do it using various -- a
25 code base that I use and that other experts might use.

1 And you, more or less, figure out what the -- because
2 blocks are nestled within block groups, you can, say,
3 for example, take the overall population of the block
4 group, or any estimates from racial estimate, and
5 basically split it across the -- down to the blocks,
6 weighting the data by some population count at the
7 block level.
8     Or, what I think is more common, is to use
9 Redistricting Data Hub, disaggregated data, because I
10 spend a lot of time doing it; and, so, the method is
11 very similar to how a single expert might use it. But
12 it's a bit of an arduous process. So, it is easier in
13 these cases to rely on Redistricting Data Hub data
14 that's been dropped down to the block level.
15     Q.   Did you rely on the Redistricting Data Hub
16 data in this case?
17     A.   Yes, I typically rely on redistricting
18 data. That's one of the first places I go for any case
19 that I work on.
20     Q.   And do you know how the Redistricting Data
21 Hub codes the disaggregation decision about how many
22 people to disaggregate into each block group -- into
23 each block?
24     A.   Could you rephrase the question?
25     Q.   Sure. We were just discussing

29 (Pages 110 - 113)

Case 4:23-cv-00193-D-RN    Document 188-4    Filed 10/28/24    Page 30 of 85
Veritext Legal Solutions
www.veritext.com    888-391-3376

1 disaggregation from block group down to block level,
2 and I understood you to say that Redistricting Data Hub
3 conducts its own disaggregation so that you, the
4 individual statistician, don't have to go through that
5 arduous exercise. And I my question was -- and I
6 understood that you relied on the Redistricting Data
7 Hub in this case.
8     And my question was, what is your
9 understanding of how Redistricting Data Hub conducts
10 the process of disaggregation from a block group to a
11 block level when there has been a split?
12     A.   Right. So, it would be the same general
13 process that I discussed previously. And they have,
14 and probably you have looked at it, like, a README file
15 about what they do. And, so, they are going to take
16 block group data estimates and they are going to
17 allocate those estimates down to the block based on
18 some sort of weight, which is density of voting age
19 population over population. And, so, that will then
20 get you an estimate of individuals with a different,
21 say, racial categories down to the block level.
22     Q.   Are you familiar with the term, failure
23 rate?
24     A.   I would have to know more context about
25 what specifically you mean in terms of a failure rate.

1     Q.   Okay. I am trying to understand if you can
2 have an understanding of failure rate for the
3 disaggregation of split block groups, whether that is a
4 knowable figure.
5     A.   I don't understand what you mean by failure
6 rate.
7     Q.   Okay. Let me ask it a different way. Are
8 you able to get a sense of how accurate the block level
9 disaggregation exercise is?
10     A.   Well, let me just first say, while I have
11 relied on Redistricting Data Hub data here, it is, I
12 think, the data that Sean Trende, your expert, had, you
13 know, downloaded for this specific type of question.
14 So, let me just say that, in terms of getting the
15 failure rate, or how reliable it might be, one way to
16 do that might be to see what the overall population
17 count are at the block level compared to the block
18 group level, and various demographic percentages,
19 whether areas that are high black population, or also
20 high black citizen voting population.
21     So, that's the general process as to how,
22 at least, thinkings or -- off the top of my head, how
23 one might go about validating these types of
24 disaggregations.
25     Q.   As you sit here today, are you aware of any

1 way to calculate a rate or a percentage of accuracy of
2 the disaggregation process?
3     MS. THEODORE: Objection to form.
4     A.   I haven't done that specifically, so I
5 can't speak on that.
6     Q.   Would you agree with me that we do not know
7 the actual number of CVAP in any given block group?
8     MS. THEODORE: Objection to form.
9     A.   Well, because this is a sample survey, it
10 is always going to be an estimate, but -- yeah, so it
11 is still going to be an estimate of the actual black
12 CVAP or any white CVAP, or any sort of CVAP. It is
13 still going to be an estimate.
14     Q.   Are you familiar with the census term,
15 differential privacy?
16     A.   Yeah, somewhat familiar with that.
17     Q.   What is your understanding of it?
18     A.   I think it is really to do with areas where
19 there is not a lot of population and, so, the -- either
20 the data at that level are not publicly available, or
21 they're jittered somehow. There has been some work in
22 that. I haven't spent a lot of time focused on that,
23 though.
24     Q.   Pardon me, I didn't hear the word you used,
25 jettered or jiggered?

1     A.   Jittered. It's sort of adding a little bit
2 of noise, or something, to protect individuals. But,
3 you know, this is not my area of expertise, per se, in
4 terms of differential privacy. I haven't written any
5 papers about it so I could be a little off.
6     Q.   Would you agree with me that we cannot know
7 precisely where citizens live or don't live based on
8 the Census Bureau CVAP figures?
9     A.   Not really. We are going to have a pretty
10 good read. I mean, we don't -- we have a block -- even
11 a block using census data, you typically don't have,
12 using these data, or at least, you don't know exactly
13 where any individual lives. And, so, we still kind of
14 know, like, the general areas and what things look
15 like.
16     So, I wouldn't say we don't know where they
17 live. I mean, we have pretty good, you know, estimates
18 as to where people live.
19     Q.   And pardon for me to asking again, because
20 I think I missed a word in my question, which is: We
21 cannot know precisely where citizens lived based on
22 CVAP data from the census, isn't that right?
23     A.   Well, we never know where anyone lives
24 based on the census or ACS data, any individual
25 household. We don't receive geocoded information about

1 where people are living. That data is not publicly
2 available.
3     Q. But is that other census study you just
4 described jittered, like the census district data is
5 jittered, according to your words?
6     A. In terms of differential privacy, it may
7 be. I am not exactly sure. It may be.
8     Q. Which of that data might be jittered based
9 on differential privacy rules?
10     MS. THEODORE: Objection to form.
11     A. I just -- I don't know which -- like I
12 said, I don't know for sure, and, so, I don't know.
13     Q. So, is it your testimony that it just might
14 be altered, or noise might be added to some other data,
15 based on differential privacy rules?
16     MS. THEODORE: Objection to form.
17     A. Is it my testimony? My testimony is that
18 jittering, or differential privacy, may not only occur
19 in the ACS. It may also occur in the census, Decennial
20 Census, but I don't know for sure.
21     Q. Does Decennial Census provide CVAP data?
22     A. The Decennial Census does not provide CVAP
23 data, at least not anymore.
24     Q. So, when we are talking about differential
25 privacy rules and how they effect CVAP data, we are

1 only talking about ACS and not Decennial Census data;
2 is that fair to say?
3     A. If we are talking about CVAP data, we are
4 almost always talking about ACS, not Decennial Census.
5     Q. I'd like to step back. I'd like to ask you
6 about statistical uncertainty. Are there times when
7 statistics cannot answer a question that's posed with a
8 reliable degree of certainty?
9     A. I'm not totally clear the question you are
10 asking. Maybe you could rephrase it?
11     Q. What's unclear to you?
12     A. Where statistics cannot answer. The answer
13 could be that there is no answer and so -- or, the
14 answer is not what you wanted it to be, and statistics
15 will tell you that your data are not telling you
16 whether there is or isn't an answer.
17     Q. So --
18     A. So, that's kind of just unclear to me.
19 That's what's unclear to me.
20     Q. I see. So, would that be a case where you
21 don't have a reliable degree of certainty on the
22 answer?
23     MS. THEODORE: Objection to form.
24     A. That could be. It could be that type of
25 situation, yes.

1     Q. What does the three statistical uncertainty
2 mean to you?
3     A. It's just the area around a point estimate
4 that the true answer could potentially be given the
5 data, the model, the approach that you are using to
6 estimate some sort of number.
7     Q. Do you consider yourself a statistician,
8 Dr. Collingwood?
9     A. My Ph.D. is in political science, but I
10 focused a lot on applied statistics.
11     Q. And in the study of statistics, are you
12 supposed to ignore uncertainty when it presents itself,
13 or do you consider it?
14     MS. THEODORE: Objection to form.
15     A. I think in -- in statistics in social
16 science, you don't always have some sort of uncertainty
17 available to you. You might be looking at trends, you
18 might be looking at point estimate trends across time,
19 and/or those may or may not come with some sort of
20 measures of statistical uncertainty. So, there are
21 times when it makes sense to include it, other times,
22 depending on the case, it may be, getting statistical
23 uncertainty is difficult in terms of getting a reliable
24 measure of the uncertainty itself, or there hasn't been
25 a measure that is set up to do that yet.

1     Or, if you go to do the analysis, you know
2 that you are still -- even your uncertainty estimate is
3 going to be uncertain. And, so, that's that sort of
4 the joy in statistics, I suppose, in doing this kind of
5 work is, you know, it really is a case-by-case
6 situation.
7     Q. What is the confidence interval?
8     A. A confidence interval is the typical range
9 that -- in classical statistics at least -- where the
10 true answer of the point estimate of the sample, the
11 true answer would fall if you did that same sampling
12 procedure, you know, a certain number of times. And,
13 so, the confidence interval is a typical estimate of
14 our uncertainty, given the data and given the model.
15     Q. Are you familiar with something that's
16 called an ACS Handbook?
17     A. Yes.
18     Q. And have you ever referred to the ACS
19 Handbook for information during your work in conducting
20 racially polarized voting analysis?
21     A. In conducting racially polarized voting
22 analysis, I don't think so. I may have, but I don't
23 think so, in terms of conducting racially polarized
24 voting analysis. But I can't say for sure.
25     Q. Okay. Do you ever refer to the ACS

31 (Pages 118 - 121)

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 32 of 85
Veritext Legal Solutions
www.veritext.com                                                        888-391-3376

1  handbook in conducting any of the analysis that you do,
2  either in your academic or litigation work?
3      A.   Well, I refer to the ACS handbook and the
4  margin of error calculations, et cetera, in this
5  report, and I am sure I would have referred to it in
6  some of my publications, but I can't say for sure.
7      Q.   And does the ACS handbook say anything
8  about the preferred method for calculating margin of
9  error?
10     A.   A preferred method?  It just tells you if
11 you are, for example, calculating a summation across
12 variables, here is the formula.  If you are conducting
13 an aggregation across geographic units, here's your
14 formula.  So, it gives you that information in the ACS
15 handbook.
16     Q.   Does Dr. Trende calculate margin of error
17 using data reported at the block level?
18     A.   Not for -- my understanding is not for
19 CVAP, no.
20     Q.   What is your understanding of what he did
21 for CVAP?
22     A.   He calculated margins of error using block
23 group data for the illustrative or demonstrative
24 districts produced by Mr. -- I forget -- Esopin?
25     Q.   Esselstyn.

1      A.   Eseltine, yeah.
2      Q.   Esselstyn, sorry.
3      A.   Yeah, it is a tough one for me.
4           MS. THEODORE:  It's actually, Esselstyn.
5      Q.   Okay.  So, Dr. Trende calculated the MOE
6  using data reported at the block group level.  Is that
7  what you testified?
8      A.   Yes, that's my understanding.
9      Q.   And is it fair to describe how you
10 calculated margin of error as being calculated at the
11 county level?
12     A.   No, I did -- I did block group.  I did
13 counties.  I did state senate district enacted, and I
14 did county combined with block group for illustrative
15 plans.
16     Q.   We touched on this earlier, but are you
17 familiar with the software package called, Tidy Census?
18     A.   Yes.
19     Q.   Do you have an understanding of whether the
20 Tidy Census calculates margin of error automatically?
21     A.   Automatically?  It is not just
22 automatically, but you can provide data or function --
23 not data -- data or existing estimates into various
24 functions of Tidy Census and it will calculate these
25 numbers that you are trying to estimate.

1      Q.   Okay.  Do you know when this function in
2  Tidy Census became available for use?
3      A.   I do not.
4      Q.   Do you recall when you became aware of that
5  function in Tidy Census?
6      A.   No, I do not.
7      Q.   Do you know if you knew about it at the
8  beginning of this year?
9      A.   Maybe.  I really can't recall if I was
10 using it before then or started using it this year.
11     Q.   We were discussing the census website
12 earlier.  Are you able to calculate -- does the census
13 website provide any sort of tool to calculate MOE
14 automatically in this way?
15     A.   It may.  I didn't use it so I don't know
16 for sure.  It may.
17     Q.   Would you agree with me that the margin of
18 error is an estimate and not a known set and number?
19          MS. THEODORE:  Objection to form.
20     A.   Well, it is directly calculable if you have
21 all of the underlying data and the right units.  Given
22 the data, you would always calculate the exact same
23 margin of error.  So -- you know, that's what I would
24 say.  It's given the data, and this is the data that we
25 have, you would always calculate the exact same margin

1  of error if you are looking at the exact same units, or
2  the exact same jurisdiction.
3      Q.   And, so, you mentioned it is directly
4  calculable with the underlying data.  If the underlying
5  data is an estimate, therefore, is the margin of error
6  also an estimate?
7           MS. THEODORE:  Objection to form.
8      A.   Well, I would -- I would have to look at
9  this a little bit more directly.  I guess I can imagine
10 a scenario, if the underlying data changed, then the
11 margin of error would change, but the formula would be
12 exactly the same.  But I suppose the actual estimate
13 itself could go up or down if the underlying data
14 changes.
15     Q.   We have been discussing a margin of error
16 for block groups.  I wanted to ask you if you are able
17 to calculate a margin of error for a district,
18 essentially, adding up the margins of error or
19 calculating them in some way from all the block groups
20 into the district itself?
21          MS. THEODORE:  Objection to form.
22     A.   Well, you -- you -- that is -- that's
23 theoretically possible.  Yes, you can do that.
24     Q.   And would that be an estimate for the error
25 of margin in the district?

32 (Pages 122 - 125)

Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 33 of 85
Veritext Legal Solutions
www.veritext.com                                                   888-391-3376

1    A.   Yes.
2    Q.   And how would you do that?
3    A.   Well, you would take that CVAP block group
4  data and you would, essentially, apply the margin of
5  error formula to all of that data, and -- you know,
6  that would provide you with an estimate as to the range
7  for different estimates that are already there.  So,
8  for a range of point estimates, it will provide you the
9  error estimates for those point estimates.
10   Q.   What do you mean by the margin of error
11 formula?
12   A.   Well, depends on the different -- what you
13 are trying to do.  So, the block group data would come
14 with a margin of error attached that's numeric.  And,
15 so, if there is a population count, they will give you
16 a margin of error based on population count.
17        In this case, we might be interested in the
18 proportion of, say, black people of total people in the
19 district.  And, so, the -- there is a specific
20 proportion margin of error that you would need to use
21 in order to estimate the margin of error as a
22 proportion, as opposed to just a raw count.
23   Q.   Like a proportion of the district?  Meaning
24 a --
25   A.   A proportion of, say, all individuals in

1  the districts that are black.
2    Q.   And the proportion of those members in the
3  district who are black, who are in that block group
4  level that you have the MOE for, is that what you mean?
5        MS. THEODORE:  Objection to form.
6    A.   Of the overall district.
7    Q.   Okay.  I am just missing something.  Sorry,
8  Dr. Collingwood.  So, when you are talking about a
9  proportion, you are looking at a proportion of black
10 voters in a block group as compared to the overall
11 districts?
12   A.   No, you are looking -- the goal is to use
13 the block group data to estimate the margin of error
14 for the proportion of black citizen voting age
15 population.  So, that's the goal.  And you will use the
16 underlying count data on the number of black
17 individuals or white individuals in each block group.
18        And you will use that to create an overall
19 share of the black citizen voting age population, as
20 well as a proportion estimate as to the margin of
21 error.  So, it could be plus or minus five percentage
22 points, could be plus or minus one percentage point.
23 That's what I'm talking about.
24   Q.   Did you calculate any estimate for the
25 error of margin in any districts in this case?

1    A.   Yes.
2    Q.   Which ones?
3    A.   I think I did it for all of the enacted
4  districts.  I did it for illustrative District B1 and
5  D1, and illustrative District E.
6    Q.   And did you report those findings in your
7  rebuttal report?
8    A.   Yes.
9    Q.   Okay.  Can you show me where in your
10 rebuttal report you reported those results?
11   A.   So, for all of the enacted senate
12 districts, Page 18 has a proportion margin of error for
13 percent black, and then --
14   Q.   Can we start -- sorry.  Can I ask questions
15 and then we can go to the next one?
16        The P_MOE column, how was that calculated?
17   A.   How is that calculated?  It is calculated
18 -- first, you would take the three individual racial
19 categories for each district.  So, there are three
20 different black categories in the CVAP data.  We have
21 to sum them together, both for the B-CVAP and the total
22 CVAP, and then each one of those has a separate margin
23 of error, raw number.
24        And, so, we effectively need to sum those
25 together using the MOE sum function from the Tidy

1  Census.  And, so, once you have that number, you then
2  apply the proportions formula, which is enunciated in
3  my report, and is enunciated in the ACS handbook.  And,
4  so, that's how those are calculated and effectively how
5  all of them are calculated.
6        But the senate districts are -- they come
7  with numeric margins of error directly.
8    Q.   I missed that.  Is that the column,
9  CVAPMOE?
10   A.   That's correct.  So, the CVAPMOE, for
11 example, for Senate District 1, Enacted Senate District
12 1, that's the margin of error on the total CVAP
13 population.  The BCVAP is a combination of the three
14 black categories.  That's the estimate of everyone who
15 is, basically, any part black.
16        And then the CVAPMOE is an estimate of the
17 MOE introducing those three different, you know, racial
18 categories that can get combined into the one category
19 for the purpose of estimating any part black.
20   Q.   So, column CVAP MOE for Senate District 1,
21 for example, that figure, 524, is that derived by
22 adding up the MOE for all of the block -- the blocks
23 within Senate District 1?
24   A.   No, it's not.
25   Q.   Okay.  How do you get that figure?

33 (Pages 126 - 129)

1    A.   That data is provided to us from the
2 census, or the AC -- the census product from the
3 American Community Survey at the state senate level,
4 you know, that they have created those numbers. And,
5 so, we can estimate the MOE by taking the square root.
6 So, there are three different -- there are three
7 different black categories, and we can take the square
8 root of the squared -- the squared sum of those three
9 categories, and that will produce that number.
10       And, so, that's how you get that number.
11   Q.   That will produce which number?
12   A.   The BCVAP MOE number.
13   Q.   I see.  Okay.  So, I am looking at the
14 CVAPMOE number, and you said that it was provided by
15 the ACS at the state district level.  Did I hear that
16 right?
17   A.   Correct.
18   Q.   Okay.  And so, you know, I am trying to
19 understand where the -- bridge the gap between -- ACS
20 produces data at a block level, and you can aggregate
21 it up to block group and higher and higher.  And then
22 the state itself has a redistricting plan that draws
23 out Senate District 1, Senate District 2, and so forth.
24       How does the information from the block
25 level from the ACS get calculated so that you can have

1 a CVAP MOE of 524?  How did you get that number?
2       MS. THEODORE:  Objection to form.
3    A.   That is -- this number is presented and
4 given to us from the census.  You know, the census
5 website and the ACS provide these data to us.  So,
6 however they --
7    Q.   And --
8    A.   Sorry.  What?
9    Q.   I don't -- go ahead, please.
10   A.   So, however they provide that, that's just
11 given to us.  We have that data publicly available to
12 us so we start from there.
13   Q.   And does the census -- if I go on the
14 census website, can I locate Senate District 1 on the
15 census website?
16   A.   You can download this full dataset here
17 that I have in terms of the total CVAP, the CVAP MOE,
18 and then you would have to combine the black categories
19 to get these figures that I have.
20   Q.   Right.  And, so, for CVAP MOE, that would
21 be downloaded from the site in some other format,
22 either at some different level or format, and you would
23 add it up into Senate District 1; is that right?
24   A.   It provides data to me directly in Senate
25 District 1.  The estimates are for the full Senate

1 District 1, and they have, presumably, all of the
2 underlying data to generate these numbers besides just
3 block groups or blocks, or whatever.  They actually
4 have a full sample of individuals in that district that
5 took their surveys for their households across time.
6       And, so, they can provide extremely
7 reliable and precise estimates for, you know, these
8 different units for the senate districts.
9    Q.   So, pardon me, I don't -- I really don't
10 mean to be dense.  I am trying understand why -- I just
11 can't believe that the Census Bureau has every single
12 senate district programmed into its computer from every
13 different state, and that's what it sounds like you are
14 describing, that the census provides you this data
15 already packaged for Senate District 1.
16       And, so, I am trying to understand how does
17 it get-- how does this data get packaged into Senate
18 District 1 to create that figure 524?  I think that
19 happens outside the Census Bureau.
20   A.   So, you are saying figure 524?  Oh, that
21 number?
22   Q.   Yeah.
23   A.   I don't actually know the process that the
24 census or the ACS is going through in order to make
25 their calculations, right.  I would have to interview

1 them, or they would have to tell me and -- you know, I
2 guess it is possible it is in some documentation
3 somewhere, right.  So, it's certainly publicly
4 available.
5       But they provide -- the census provides
6 these kinds of estimates for every geographic
7 jurisdiction at the block group or higher within a
8 certain range.  They provide it for county, they will
9 provide it for legislative district.  And, so, that's
10 just publicly available.  And they provide that
11 information to the public, just like they provide block
12 group data to the public.
13   Q.   Great.  Thank you.  Okay.  I interrupted
14 you when you were walking through where in your report
15 you have estimated MOE for different districts.  So,
16 you identified Rebuttal Table 5.  Were there other
17 tables where you conducted this analysis?
18   A.   Okay.  So, then on Page 15, I provide the
19 estimated margin of error for the county block group
20 analysis that I did for B1, and then, also, D1 is
21 provided there in terms of the text.  And then I
22 provide a variety of other analyses in terms of earlier
23 maps looking at block groups on Page, I think, 11.
24   Q.   Great.  Okay.  Thank you.
25   A.   And also Page 10.

Case 4:23-cv-00193-D-RN    Veritext Legal Solutions 10/28/24    Page 35 of 85
www.veritext.com                                             888-391-3376

1        MS. McKNIGHT:  I think we are at a good
2  breaking point.  I may have just one sort of unit of
3  questions left.  So, if you don't mind, let's take a
4  15-minute break.
5              - - - - -
                (Off the record).
6              - - - - -
7  BY MS. McKNIGHT:
8      Q.   Dr. Collingwood, earlier in the deposition
9  I asked you questions about what documents and
10 information you reviewed in order to support your
11 reports in this matter.  Having reviewed your rebuttal
12 report recently, is there any other data or information
13 you'd like to add to that list?  For example, did you
14 review ACS data?
15     A.   Oh, yeah, yeah, definitely.  Let me see
16 here.  Yeah.  So, I used and looked at the 2022 ACS
17 data and -- but I think I say -- I rely upon the
18 production in the original analysis and associated data
19 production as well as Drs. Alford and Trende's reports
20 and associated data production.  And, so, they do --
21 or, Dr. Trende doesn't include CVAP data in that
22 production.
23     Q.   Okay.  Do you recall serving as an expert
24 witness in a case titled, Palmer versus Hobbs,
25 challenging legislature districts in Washington?

1      A.   Yes.
2      Q.   Okay.  Let's bring up Exhibit 7, and let me
3  know when you have it and you can begin to testify.
4      A.   Okay.  I see.
5          (Exhibit 7 was marked for
6          identification.)
7      Q.   Do you recognize this document?
8      A.   I do.
9      Q.   What is it?
10     A.   This is my -- apparently, very brief expert
11 report in the remedial phase of this Palmer v Hobbs
12 case.
13     Q.   And is it dated February 23, 2024?
14     A.   Yes.
15     Q.   And do you recall authoring this report?
16     A.   I do.
17     Q.   I am looking at the second paragraph under
18 Executive Summary.  Do you see where it says, "I used
19 the recently released 2022 CVAP block group data taken
20 from the U.S. Census".  Do you see that?
21     A.   Yes.
22     Q.   It says, "I filter the block groups to
23 those appearing in each respective map, i.e., LD-15 in
24 the enacted plan, or LD-14 in the alternative plans,
25 then sum the total counts for total population,

1  non-Hispanic white alone, and Hispanic, and several
2  other minority groups".  Did I read that correctly?
3      A.   Yes.
4      Q.   Does that mean that you disaggregated the
5  2022 ACS data from the block group level to the
6  individual block level?
7      A.   In this case, what I did is -- I didn't do
8  that specific operation.  I took all of the block
9  groups, and then any block groups that were split were
10 disaggregated.
11     Q.   And did you conduct that disaggregation?
12     A.   Yes.
13     Q.   Did you do it yourself, or did you rely on
14 some sort of software package to help you?
15     A.   Well, everything I do I rely on a software
16 package, typically, R, which is a statistical program.
17     Q.   Okay.  And you did this work prior to
18 February 23, 2024; is that fair to say?
19     A.   I sure hope so.
20     Q.   Okay.  Let's bring up Exhibit 8.  Let me
21 know when you are ready to testify.
22     A.   Okay.  I'm ready.
23         (Exhibit 8 was marked for
24         identification.)
25     Q.   Okay.  Do you recognize this document?

1      A.   I do.
2      Q.   What is it?
3      A.   This is a draft of one of my papers.
4      Q.   Okay.  So, is it a paper that you wrote?
5      A.   Yes, I was the third author on this paper.
6      Q.   Okay.  And it is dated April 21, 2022; is
7  that right?
8      A.   Yes.
9      Q.   And you referenced it being a draft.  Has
10 this turned into a final form article at any point?
11     A.   Yes, it is a -- it's been accepted into --
12 it is in a journal now.
13     Q.   Okay.  And which journal?
14     A.   And this might be the final version.  I
15 just -- I don't actually know.
16     Q.   Is there a way you can tell by looking at
17 it whether it is the final version?
18     A.   I mean, I am sure if I spent a couple hours
19 looking at it and remembering what happened and in what
20 stage it was and where it was posted and things like
21 that, I could tell.  But it is going to be pretty
22 similar to the final version, I'm pretty sure about it,
23 because it wouldn't be publicly available like this if
24 it weren't very close to the final version, is my
25 suspicion.

35 (Pages 134 - 137)

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 36 of 85
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1    Q.   Okay.  And do you recall what journal it's
2  been published in?
3    A.   Sociological Methods and Research.
4    Q.   And do you recall what edition of the
5  journal, you know, timing wise?
6    A.   I don't know if that edition is out yet.
7  So, it just may not have a, you know, version, you
8  know, quarterly two, and here's a year, and here's a
9  page number.  That may not be available yet.
10    Q.   I see.  Okay.  And seeing as how it is not
11  out yet, I want to get a sense of how different this
12  might be from the final version.  You mentioned that
13  the differences may be minimal.  Could you explain that
14  a bit more?
15    A.   Well, typically, what can happen is,
16  occasionally authors will produce working papers like
17  this that are publicly available on someone's academic
18  website or something.  And it is at that point,
19  typically, going through the review process.  And it is
20  usually -- if you are going to release something
21  publicly, you typically -- it's -- or someone is, it
22  is, typically, going to be pretty close to the final
23  version.
24         And, so, that's typically what happens.
25  But there might be some final changes.  I just can't

1  recall for sure.
2    Q.   And, so, the date, April 21, 2022, that is
3  the date that it was published publicly, even though in
4  the draft form?
5    A.   I don't know.  I'm not the person that
6  would have put this on a website so I can't say.
7         MS. McKNIGHT:  Okay.  If you can just give
8  me five minutes, I think we may be done here, but let
9  me just make sure we are done and then we can conclude
10  then.  So, I just need until -- it's 4:44 now.  I need
11  to 4:50 and then I don't think it will take much
12  longer.
13         THE WITNESS:  Okay.
14              - - - - -
15               (Off the record.)
16         MS. McKNIGHT:  So, I have no further
17  questions for you today.  So, thank you for your time,
18  Dr. Collingwood, and thank you, Ms. Linberg, and
19  Elisabeth.
20         MS. THEODORE:  We'll read and sign.
21
22         (Deposition was concluded at 4:50 p.m.)
23
24
25

1    Whereupon, Counsel was requested to give instruction
2  regarding the witness's review of the transcript
3  pursuant to the Civil Rules.
4
5         SIGNATURE:
6
7    Transcript review was requested pursuant to the
8  applicable Rules of Civil Procedure.
9
10         TRANSCRIPT DELIVERY:
11  Counsel was requested to give instruction regarding
12  delivery date of transcript.
13  Original transcript?
         Ms. Mcknight:  Yes, regular delivery with a rough.
14
15  Certified transcript?
         Ms. Theodore: Yes, regular delivery.
16
17
18
19
20
21
22
23
24
25

1         REPORTER'S CERTIFICATE
2  The State of Ohio,   )
                          )  SS:
3  County of Cuyahoga.  )
4         I, KELLIANN D. LINBERG, RPR, a Notary Public
5  in and for the State of Ohio, duly commissioned and
6  qualified, certify that the within named witness, LOREN
7  COLLINGWOOD, Ph.D., was by me duly sworn to testify the
8  whole truth, in the cause aforesaid; that the testimony
9  was taken down by me in stenotypy in the presence of
10  said witness; afterwards transcribed upon a computer;
11  that the foregoing is a true and correct transcript of
12  the testimony given by said witness taken at the time
13  and place in the foregoing caption specified.
14         I further certify that I am not a relative,
15  employee, or attorney of any of the parties hereto, or
16  of any attorney or counsel employed by the parties, or
17  financially interested in the action.
18         IN WITNESS WHEREOF, I have hereunto set my
19  hand and affixed my seal of office at Cleveland, Ohio,
20  on this 4th day of OCTOBER, 2024.
21
22
23  *Kelliann D. Linberg*
         Kelliann D. Linberg, RPR
24  Notary Public within and for the State of Ohio
         My commission expires:  May 25, 2029
25

36 (Pages 138 - 141)

1   Veritext Legal Solutions
    1100 Superior Ave
2   Suite 1820
    Cleveland, Ohio 44114
3   Phone: 216-523-1313
4
    October 7, 2024
5
    To: ELISABETH THEODORE, ESQ.
6
    Case Name: Pierce Et Al v. State Board Of Elections
7
    Veritext Reference Number: 6926043
8
    Witness:  Loren Collingwood , Ph.D.      Deposition Date:  9/24/2024
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

1   DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 6926043
3   CASE NAME: Pierce Et Al v. State Board Of Elections
    DATE OF DEPOSITION: 9/24/2024
4   WITNESS' NAME: Loren Collingwood , Ph.D.
5   In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9   Date            Loren Collingwood , Ph.D.
10  Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13  They signed the foregoing Sworn
        Statement; and
14  Their execution of this Statement is of
        their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
    _____
18  Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25

1   DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 6926043
3   CASE NAME: Pierce Et Al v. State Of Elections
    DATE OF DEPOSITION: 9/24/2024
4   WITNESS' NAME: Loren Collingwood , Ph.D.
5   In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9   I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Loren Collingwood , Ph.D.
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17  They have read the transcript;
    They have listed all of their corrections
18      in the appended Errata Sheet;
    They signed the foregoing Sworn
19      Statement; and
    Their execution of this Statement is of
20      their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

1   ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2   ASSIGNMENT NO: 6926043
3   PAGE/LINE(S) /        CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____        _____
20  Date            Loren Collingwood , Ph.D.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

| & | | | |
|---|---|---|---|
| **&**  2:3,11 | **11**  4:3 40:24 41:17 54:2 133:23 | **17.2**  65:5 | **2-23-2024**  4:21 |

**&**  2:3,11

**0**

**00193**  1:6
**08**  61:11,22

**1**

**1**  4:3 10:8,9
24:9 50:2,9
52:5 63:10
64:12 65:13,18
66:20 67:17
73:17,20 77:5
79:18 83:20
84:22 93:5
94:3 101:17
102:4,4 129:11
129:12,20,23
130:23 131:14
131:23,25
132:1,15,18
**1.202.861.15...**
2:14
**10**  64:18 86:23
86:23 89:24
92:24 102:7
133:25
**100**  39:3
**1000**  57:19
**102**  4:6
**104**  4:9
**105**  4:15
**1050**  2:12
**108**  4:19

**11**  4:3 40:24
41:17 54:2
133:23
**1100**  2:13
142:1
**11:00**  1:16
**12**  40:24,25
41:17 67:2
77:4,17 78:5
78:10 81:6
82:16 85:15
88:21
**1200**  2:16
**13**  45:5 67:10
68:4 86:16
89:10
**13.4**  64:18
**136**  4:21
**138**  4:22
**14**  20:5 61:15
135:24
**141**  3:11
**1421**  102:1,2,4
104:14 105:22
**15**  20:5 23:5
63:9,18 64:5
64:12 133:18
134:4 135:23
**16**  30:10,19
63:13,18 64:16
68:9
**17**  64:22,22
70:2,7 72:19
103:4,16

**17.2**  65:5
**18**  64:22,24
65:2,4,10
128:12
**1820**  142:2
**19**  54:14 64:25
65:2,4,8 90:12
**19.4**  64:6,13
**1900**  2:7
**1940**  41:12,23
**1940's**  36:9
**1940s**  41:4
**1960s**  33:23
34:6,11
**1964**  34:23
**1970**  41:13
**1970s**  41:24
**1980**  42:1
**1990**  99:15
**1992**  102:9,14
**1994**  102:14
**1996**  102:14
**1998**  102:9,14

**2**

**2**  3:3 4:4 23:23
24:4 27:23
46:19,23 63:11
63:20 64:10
67:17 72:15
73:17,20 76:18
77:6,21 79:19
83:20 84:22
90:3 92:1,8,13
93:12,25 102:4
130:23

**2-23-2024**  4:21
**20**  42:9 98:3
143:16 144:22
145:22
**200**  2:16
**20001**  2:4
**2000s**  99:17
**2001**  101:17
**20036**  2:13
**2005**  45:2
**2006**  45:2 99:3
**2011**  45:6
**2012**  45:5,12
**2013**  45:12
**2015**  45:7
**2016**  45:7 53:2
54:11 91:16
96:11
**2018**  54:12
91:16 96:11
**2019**  103:4,16
**2020**  17:9
54:12 64:21
86:15 88:14
91:4,20 95:14
97:9
**2021**  105:7
**2022**  53:2
54:12 61:11,19
61:21 63:10,14
63:19 86:15
88:14 91:4,20
94:14 95:14
97:10 108:18
108:21 134:16

135:19 136:5
137:6 139:2
**2023** 66:21
67:6
**2024** 1:16 10:6
11:10 16:1
24:9,12 37:20
39:1,5,12
83:19 107:11
108:23 109:4
135:13 136:18
141:20 142:4
**2025** 14:10
**2029** 141:24
**21** 102:3 137:6
139:2
**216-523-1313**
142:3
**22.3** 64:6,13
**22.6** 65:6
**2225** 141:23
**23** 75:17
135:13 136:18
**24** 1:16 75:21
81:15 84:9
95:13
**25** 4:4 53:1,6
86:13 141:24
**27** 61:1,10,15
88:6,9,21
90:13
**27601** 2:8
**28** 63:8,9
**29** 61:1 63:8,13

**29.7** 62:21

**3**

**3** 4:6 84:22
101:10,13
**30** 42:9 98:4
107:11
**301** 2:7
**31** 10:6 16:1
39:5,12 53:2,6
64:21,24 65:4
**32** 64:22,24
65:4,8
**3:10** 104:9

**4**

**4** 3:4 4:9 47:5
84:22 102:4
103:3,5,6
**4/21/2022** 4:24
**40's** 48:3
**41** 42:24 43:13
**42** 85:2
**43** 86:4,5,8
**43215** 2:17
**44114** 142:2
**45** 85:3,9 86:1
86:4 88:23
89:2,4,5,11,15
89:20
**47** 85:3 89:13
89:15,15 91:7
91:9
**47.07** 89:17,19
90:18,23

**47.07.** 90:13,24
**48** 80:3
**49** 51:25 85:3
**49.2** 93:17
**4:23** 1:6
**4:44** 139:10
**4:50** 139:11,22
**4th** 141:20

**5**

**5** 4:15 104:17
104:21 133:16
**5-31-2024** 4:3
**50** 40:4 46:16
50:9 52:5
57:20 62:15,15
62:16,17 79:23
81:23 88:17
89:12 92:20
93:8,8 94:17
94:24 95:12
110:7,8
**50's** 36:9
**50.001** 88:17
**50.05.** 93:17
**500** 57:19
**51** 50:23,24
**52** 85:3
**524** 129:21
131:1 132:18
132:20
**54** 85:3
**57** 86:6

**6**

**6** 3:8 4:19
52:19 94:7,10
107:3,6,8
**60** 52:6
**601** 2:4
**6926043** 142:7
143:2 144:2
145:2

**7**

**7** 4:21 52:19,24
89:9,14,21,21
93:2 135:2,5
142:4
**70** 52:7
**70s** 41:5
**761** 105:9

**8**

**8** 4:22 90:16,17
136:20,23
**8-30-2024** 4:20
**8.9** 65:10
**80** 52:7

**9**

**9/17/2019** 4:14
**9/24/2024**
142:8 143:3
144:3
**919-978-3110**
2:9
**95.8** 61:25
**99** 51:17 86:7,8
**9:00** 1:16

| a | | | |
|---|---|---|---|
| **a.m.** 1:16,16 | **acronym** 42:25 | 137:15 | **aggregation** |
| **ability** 29:22 | 54:18 | **add** 88:4 95:21 | 122:13 |
| **able** 9:1,14 | **acs** 108:9,14,21 | 131:23 134:13 | **ago** 23:5,9 41:6 |
| 14:15,18 29:10 | 109:22 117:24 | **added** 118:14 | 98:4 99:18 |
| 80:6 82:15,17 | 118:19 119:1,4 | **adding** 117:1 | **agree** 46:6,8,9 |
| 84:3 97:9,10 | 121:16,18,25 | 125:18 129:22 | 51:7 56:13 |
| 107:18 115:8 | 122:3,7,14 | **addition** 17:22 | 63:22 64:1 |
| 124:12 125:16 | 129:3 130:15 | 25:15 49:6 | 68:15 79:1,5 |
| **above** 142:17 | 130:19,25 | 55:24 | 110:11 116:6 |
| **abstract** 106:20 | 131:5 132:24 | **additional** | 117:6 124:17 |
| **ac** 130:2 | 134:14,16 | 17:23 24:19 | **agreement** 29:3 |
| **academic** 20:23 | 136:5 | **address** 9:19 | **ahead** 17:13 |
| 20:25 24:23 | **act** 4:17 27:12 | 14:23 142:15 | 55:2,3 131:9 |
| 33:16,18 36:12 | 27:19,23,24 | **adjust** 14:25 | **al** 1:8 142:6 |
| 122:2 138:17 | 28:16 97:22,25 | **advance** 12:25 | 143:3 144:3 |
| **accepted** | 98:20 99:11 | **advertising** | **alabama** 36:18 |
| 137:11 | 104:25 143:14 | 69:21 | 37:2,6 109:17 |
| **access** 47:18 | 144:20 | **advise** 20:23 | **albuquerque** |
| **accidently** | **action** 141:17 | **affects** 15:4,10 | 1:13 |
| 25:25 | **actual** 16:8 | **affiliation** | **alford** 22:22 |
| **accordance** | 26:11 47:13 | 53:10,14 | 23:5 134:19 |
| 143:5 144:5 | 57:5 59:16 | **affixed** 141:19 | **allocate** 67:12 |
| **account** 15:1 | 60:2,12 70:21 | 143:15 144:21 | 114:17 |
| 57:20 | 74:11 79:11,13 | **aforesaid** 141:8 | **allow** 27:9 |
| **accounting** | 80:2 81:24 | **age** 5:11 43:5 | 81:21 |
| 59:14 82:7 | 82:3 90:6 | 46:16 54:19 | **allows** 26:19 |
| **accounts** 82:5 | 92:18 116:7,11 | 55:20 56:24 | **altered** 118:14 |
| **accuracy** 116:1 | 125:12 | 57:1,5,18 | **alternative** |
| **accurate** 25:14 | **actually** 7:22 | 77:12 79:20 | 17:25 135:24 |
| 57:9 107:9,19 | 49:20 57:21 | 81:25 82:1 | **amend** 10:14 |
| 115:8 | 60:9,12 65:24 | 87:18 91:11 | **amendments** |
| **accurately** 16:6 | 66:2 68:18 | 114:18 127:14 | 10:11 |
| **acknowledge** | 80:16 82:1 | 127:19 | **america** 41:21 |
| 143:11 144:16 | 94:24,25 110:8 | **aggregate** | **american** 14:16 |
| | 123:4 132:3,23 | 130:20 | 108:10 130:3 |

Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 41 of 85

**amount** 31:7
**analyses** 4:24
  27:7 29:25
  30:14 35:14
  42:16 79:3,4
  95:24,24 96:20
  97:7,13 99:1
  133:22
**analysis** 4:13
  10:23 14:24
  15:1,16,18
  21:15,24 26:17
  27:22 30:2,7
  30:12,18 31:11
  32:6,17 33:7
  33:18,19 34:18
  35:7 36:21,22
  37:2,2 40:19
  40:23 41:9
  43:11 44:2,11
  47:13 49:10,13
  49:25 50:20
  53:17,23 54:24
  55:4,6,8,12,14
  55:15,19,20
  56:16,19,22
  57:18,20,24
  59:2,10,12,14
  59:18,23 67:4
  70:10,19 71:1
  71:2,2,16
  73:13,21,24
  74:9,10,17,23
  75:14,18 76:20
  76:21,24 77:2

77:3,8,11,20,25
78:15,16,18,21
79:2,2,6,7,8,10
79:16 80:1,14
81:3 82:5 83:5
83:9 84:4,7,23
86:15 91:10,15
95:17,22 96:11
96:13 97:5,10
100:17,21
101:1 102:12
102:23 103:12
104:2 106:21
108:5 121:1,20
121:22,24
122:1 133:17
133:20 134:18
**analyze** 47:24
  48:3,6
**analyzed** 47:22
  88:21 90:13,22
**analyzing**
  49:14 85:4,5
**angles** 69:5
**anomalies** 72:9
**answer** 6:18
  7:3,4 10:4
  21:19 22:17
  25:25 33:6
  37:5 45:22
  56:11 72:13
  97:1,3,4
  107:18 111:8
  119:7,12,12,13
  119:14,16,22

120:4 121:10
121:11
**anticipate** 11:4
**anymore**
  118:23
**apparently**
  135:10
**appeals** 61:11
  61:22 69:11
**appear** 44:18
  89:9 105:15
  143:11 144:15
**appearance**
  5:20
**appearances**
  2:1 3:3
**appearing** 1:13
  1:24 135:23
**appears** 7:18
  92:25 93:3
  105:6
**appended**
  144:11,18
**applicable**
  140:8
**applied** 120:10
**apply** 52:9,12
  52:17 61:7
  126:4 129:2
**appreciate**
  85:12
**approach**
  87:12 103:25
  120:5

**appropriate**
  67:11
**april** 37:20
  38:4,8 137:6
  139:2
**archives** 41:2
  41:15 44:22
  45:9
**arduous** 113:12
  114:5
**area** 15:22 28:9
  29:4 34:8,23
  38:16 57:19
  60:19 63:15
  64:17 65:9
  67:24,25 74:6
  75:24 76:4,7
  76:17,25 77:4
  77:6,8 78:4,6
  79:17,18 80:9
  80:14,17 81:6
  81:11 82:14,25
  83:22 84:18,21
  85:15,22 88:23
  97:22,23 98:19
  99:10,14,18
  100:7 109:23
  117:3 120:3
**areas** 12:14
  36:4,5,13,24,24
  44:15,16 54:4
  63:20,21 72:3
  78:9 80:13
  84:5 115:19
  116:18 117:14

Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 42 of 85

argument 106:24

arnold 2:3

arnoldporter.... 2:5

arrive 82:23 86:10

arrogant 38:17

article 4:6,9,15 24:15,19,22,25 25:15 32:22 33:3 42:19,22 99:13,13,20,25 100:2,5,10,15 101:11,17,25 104:15,23 105:4,6,10,15 106:1,5,11,13 106:17,18,19 137:10

articles 20:4 25:12 33:1,5 98:9,23 99:12 99:15,16 106:15,23

ascends 49:20

asians 43:10

aside 33:12

asked 9:22 15:25 75:8 97:3 108:1,5 134:9

asking 28:20 76:23 117:19 119:10

aspect 106:19

assess 28:5

assessed 88:15

assessing 4:16 104:24

assessment 73:17

assignment 143:2 144:2 145:2

associated 134:18,20

assumption 71:21

attach 110:5

attached 126:14 144:7

attention 69:8

attitudes 34:1

attorney 5:17 9:15 17:8 71:13 141:15 141:16

attorneys 11:24 11:24 35:25

august 39:17 39:18,20,23,25 107:11 108:7,8

author 20:4 105:3 137:5

authoring 135:15

authorize 144:11

authors 19:24 99:19 101:22 106:16 138:16

automatically 123:20,21,22 124:14

available 17:6 108:20,22 111:10,12,14 111:19 116:20 118:2 120:17 124:2 131:11 133:4,10 137:23 138:9 138:17

ave 2:4 142:1

avenue 2:12

average 53:1 71:18 79:23 88:15

aware 21:2 75:12,16 99:4 100:2 109:18 115:25 124:4

axis 86:18 89:20 90:10,10

**b**

b 99:6 128:21

b1 128:4 133:20

back 36:8 38:25 39:24 41:5 42:3 45:7 57:12 65:13,18 66:3,10,19

73:22 91:23 92:11 108:4 119:5 142:15

baker 2:11 5:19 6:4

bakerlaw.com. 2:14

ball 38:3

ballot 33:13 68:24,25 69:3 69:6,11,14,17 70:4 72:20,25 73:7,15

ballots 47:14 47:19 50:4,6

bar 92:1,8,23 93:1,7,23

baretto 19:21 21:2

baretto's 21:23

barreto 20:16 22:5,12 75:13

barreto's 21:11 22:3

bars 91:24 94:2

base 76:14 112:25

based 21:20 31:7 32:13,23 49:21 70:10,19 73:19 77:11 78:20,21 80:3 87:15 88:14 91:10,14 114:17 117:7

Case 4:23-cv-00193-D-RN Document 88-4 Filed 10/28/24 Page 43 of 85

117:21,24
118:8,15
126:16
**basically** 34:3
39:20 53:17
56:7 62:15
72:2 83:22
88:17 95:8
110:5 113:5
129:15
**basis** 53:3
82:14 83:2
110:24
**bayesian** 43:2
**bcvap** 129:13
130:12
**becoming**
34:25
**began** 39:12
77:7
**beginning**
124:8
**begins** 44:4
**behalf** 2:2,10
5:7 6:5
**behavior** 33:23
35:16 36:1
45:19
**believe** 17:11
18:12 26:13
27:6 29:13
36:10 38:4
40:16 41:1
43:10 44:12
47:4 54:24

74:16 77:4
89:20,24
132:11
**believed** 72:14
**belt** 36:4,13
**bernard** 97:14
101:22
**best** 7:9 9:19
25:22 26:2,3
59:16 77:11
91:14
**bin** 86:21,24
89:2,5 92:4
93:18
**bins** 89:1 93:12
**bisg** 42:15 43:1
43:21,23 44:3
44:5
**bit** 17:13 33:17
113:12 117:1
125:9 138:14
**black** 4:10
15:21 17:1
28:16 29:9,9
29:21 34:24
36:3,4,6,12,12
36:13,25 46:7
46:7,11 49:24
50:24 51:2,17
51:23 53:1
55:20 58:2
60:5 61:24
62:3,18 63:1,5
65:21 66:22
67:6 74:4,5,7

77:6,9,12,13
78:23 79:21,21
79:22 80:5
81:25 82:8,12
85:1,16 86:1,3
86:6,6 87:18
87:24 88:11,16
91:11 92:20
93:16 94:18,22
95:2,5,9,12
102:7,7 103:9
115:19,20
116:11 126:18
127:1,3,9,14,16
127:19 128:13
128:20 129:14
129:15,19
130:7 131:18
**blacks** 43:10
57:18 82:18
85:22
**block** 17:9,24
110:17 111:10
112:9,13,15,16
112:21 113:2,3
113:7,14,22,23
114:1,1,10,11
114:16,17,21
115:3,8,17,17
116:7 117:10
117:11 122:17
122:22 123:6
123:12,14
125:16,19
126:3,13 127:3

127:10,13,17
129:22 130:20
130:21,24
132:3 133:7,11
133:19,23
135:19,22
136:5,6,8,9
**blocking** 28:13
48:22,22 49:11
49:15,16
**blocks** 112:16
113:2,5 129:22
132:3
**board** 1:8 6:6
16:23 55:25
142:6 143:3
144:3
**body** 48:14
106:7
**book** 24:15,22
24:23 25:1,15
40:25 41:17,19
43:12 44:22
99:3,4,17,18
**books** 36:15
98:10
**boundaries**
73:20 83:23
112:14
**bounds** 77:16
**boy** 66:17,18
**break** 6:15,17
6:19 23:17
37:11,13 65:15
66:2,11,13

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376
Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 44 of 85

101:4,7 104:9
104:13 105:23
134:4
**breakdowns**
55:25
**breaking** 134:2
**breaks** 6:18
**bridge** 130:19
**brief** 6:13
135:10
**bright** 52:9,12
52:18
**bring** 101:10
103:3 104:17
135:2 136:20
**broad** 27:21
**built** 71:25
**bulk** 59:9
**bureau** 111:3
117:8 132:11
132:19
**busy** 96:15
**bvap** 55:11,18
56:16,19 57:8
57:11,14,22
58:1 59:12
74:22 75:18
76:20,23 77:2
77:3,11,19,23
78:15,16,17
79:2,5,7,16
80:1,15,16,22
81:22,22 82:4
83:5 84:12,22
84:24,25 85:6

85:8,24 86:1
86:12,14 88:10
88:16,23 90:18
90:23 92:18
93:16 94:17
95:11 97:10
99:22 100:17
100:21,25

**c**

**c.v.** 4:5 23:15
24:5,20 30:10
30:11 42:20,23
43:13,16
**ca** 142:25
**calculable**
124:20 125:4
**calculate** 82:16
82:17 116:1
122:16 123:24
124:12,13,22
124:25 125:17
127:24
**calculated**
82:15 85:13,14
110:17,21
122:22 123:5
123:10,10
128:16,17,17
129:4,5 130:25
**calculates**
123:20
**calculating**
82:13 111:2
122:8,11
125:19

**calculations**
81:16,17 122:4
132:25
**california** 4:17
30:23 31:3,7
31:14 32:5
97:20 104:25
**call** 8:24 38:1
46:3 62:2
**called** 5:12
20:14,15 27:25
87:11 105:10
112:8 121:16
123:17
**calling** 29:16
**campaigning**
41:20
**candidate** 14:3
28:17,23 29:10
29:23 33:25
46:11,17 50:20
50:21,24,25
51:3,16,18,23
51:25 52:1
59:20,20 61:25
62:2,3,5,6,12
62:13,17,19,21
62:21 63:1
78:23 79:22,23
80:6 82:11,24
82:24 85:1,17
85:18 86:7
87:24 88:11,17
88:23 92:19,20
93:16 95:2,9

95:12 102:7
103:10
**candidates**
4:11 14:4,5
28:11,14 41:10
46:7 49:23
50:5,7,22,22
51:17 53:1
62:14 65:22
68:12 74:7
77:13 86:11
94:17
**caption** 141:13
**carolina** 1:1,7
4:11 6:6,7
14:14 16:23
23:1,12 25:1,5
25:10,11 36:17
37:3 40:22,24
41:1,2,9,11,25
42:8,11,17
43:14 44:14,23
45:4,7,14,16,19
45:21 46:1,4
51:5 55:23
56:5 60:11
67:14 68:21
81:5 100:20
102:9 103:11
**caroline** 2:6
**carry** 48:20
**case** 1:6 6:6
10:18,21 11:2
11:8 12:10,19
14:11 15:16

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 45 of 85

16:2,14,21
18:23 19:2,9
19:18 21:3,11
21:17,24 22:3
22:6,9,13,21
23:7 24:6
25:21 27:17,25
29:13,19,21
35:7 37:19
38:6,12 39:11
40:21 42:8
43:15 46:24
47:17 48:20,20
49:9 51:4
53:25 55:8
57:3 58:5
59:13 69:24
70:12 71:18
72:6,6 74:18
75:15 81:1
100:17,22
101:1 107:3
109:12,19
113:16,18
114:7 119:20
120:22 121:5,5
126:17 127:25
134:24 135:12
136:7 142:6
143:3 144:3
**cases** 12:12,16
15:19 23:1,11
24:16 56:12
58:2 60:6
69:18 96:5

98:23 109:7,13
113:13
**cast** 47:14,19
50:4,6
**categories**
114:21 128:19
128:20 129:14
129:18 130:7,9
131:18
**category**
129:18
**cause** 13:20
141:8
**census** 14:16
17:9 58:7,11
108:13 111:3
111:15,20,21
112:1,19,22,23
116:14 117:8
117:11,22,24
118:3,4,19,20
118:21,22
119:1,4 123:17
123:20,24
124:2,5,11,12
129:1 130:2,2
131:4,4,13,14
131:15 132:11
132:14,19,24
133:5 135:20
**census.gov**
112:6
**center** 2:16
**certain** 12:9
36:23,24 48:23

57:11 60:19,22
72:8,9 74:3,4
80:22 121:12
133:8
**certainly** 8:23
15:19 30:24
32:25 33:16
35:21 36:22
41:8 46:18
48:10 69:6
74:10,15 78:2
81:1 98:8
100:1 133:3
**certainty** 119:8
119:21
**certificate** 3:11
141:1 144:11
**certification**
143:1 144:1
**certified** 5:14
140:15
**certify** 141:6,14
**cetera** 122:4
**chaired** 20:18
**challenges**
34:22
**challenging**
134:25
**chance** 7:20
10:25 26:9
**change** 11:2
12:23 13:20
14:2,8,8,17
15:2,4 82:4
92:5 125:11

142:13,14
144:8 145:3
**changed**
125:10
**changes** 13:13
14:12 58:9
95:14 125:14
138:25 142:12
143:7 144:7,9
**characterized**
15:23
**chart** 61:7 63:8
86:14 87:6,22
88:9,20 91:23
92:7 102:1,12
**charting** 87:3
**charts** 61:5
63:5,17 71:18
87:3 90:9
**chat** 8:11,15
9:16
**check** 89:1
**choice** 4:11
28:18,24 33:13
34:1 46:11,17
47:10,17,20
50:23 62:3,6
62:17 65:22
88:24 94:17
103:10
**choices** 32:13
32:23 33:14,20
**circuit** 19:12
**circumstances**
11:1 58:21

Veritext Legal Solutions
www.veritext.com 888-391-3376
Case 4:23-cv-00193-D-RN Document 88-4 Filed 10/28/24 Page 46 of 85

cite  19:17
cited  100:11
  105:18
citing  106:24
citizen  115:20
  127:14,19
citizens  43:5
  54:19 117:7,21
civic  2:16
civil  5:13 33:22
  140:3,8 143:5
  144:5
claim  35:20
clarification
  9:22
clarify  30:25
  83:13
clarities  111:4
classical  121:9
clean  11:20
  82:10
clear  6:23,24
  46:14 62:17
  119:9
clearing  49:17
clearly  7:4
  49:17 88:3
cleveland
  141:19 142:2
client  11:20
clients  30:11,17
  30:22 31:1,2,3
  31:13 32:4
close  73:4
  110:7 137:24

138:22
closed  89:3
closer  37:25
cmackie  2:8
coauthor  106:6
code  112:25
codes  113:21
cohesion  51:10
  51:15 52:3
  102:8
cohesive  28:11
  51:19 52:1,6,8
  52:10 65:20
colleague  7:13
collingwood
  1:12 3:7 4:18
  4:20,21 5:11
  6:1,3,9 8:18,21
  8:24 9:4 10:3
  10:11 21:18
  23:21,25 24:3
  25:18 37:18
  46:21 65:16,24
  75:6 96:25
  101:15 102:16
  104:13 107:4
  107:11,19
  111:8 120:8
  127:8 134:8
  139:18 141:7
  142:8 143:4,9
  144:4,13
  145:20
collingwood's
  4:3,4

columbus  2:17
column  89:8,10
  89:19,20,23,23
  90:2 93:4 94:6
  128:16 129:8
  129:20
columns  89:10
combination
  129:13
combine
  131:18
combined
  123:14 129:18
come  11:7 12:9
  20:6 23:4,8
  58:12 66:3
  74:8 120:19
  126:13 129:6
comes  19:13
  59:12
coming  109:22
commission
  141:24 143:19
  144:25 145:25
commissioned
  141:5
commissioner
  69:13
committee
  20:15,16,17,21
common  52:13
  58:16,18 113:8
community
  14:16 46:11,17
  94:18 108:10

130:3
companies
  24:24
compare  33:14
compared
  63:21 66:22
  68:25 115:17
  127:10
comparing
  4:23 42:15
  43:21,25 63:17
competitive
  69:10,20,22,23
  70:4,14,18,23
  71:7,11,13,19
  72:15,21,25
  73:1,2,7,9,14
  73:15
complete  8:7,8
  10:5
completed
  142:15
completely
  33:5
complex  87:3
composition
  35:22,23 82:3
comprise  68:7
comprising
  67:16
computer  8:25
  132:12 141:10
computers
  85:10

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 47 of 85

conceptual 4:8
  101:19
conclude 92:10
  139:9
concluded
  139:22
conclusion
  28:20 29:12,16
  71:5 73:6
conclusions
  44:19
conditions 87:7
conduct 15:17
  15:23 27:7,22
  32:5 34:17,20
  41:25 49:3,10
  49:25 53:24
  59:23 60:20
  75:13 77:19,25
  78:15 81:2,4
  96:10 97:10
  98:6 99:1
  136:11
conducted
  15:15 21:16
  41:16 42:10
  55:8,14 70:18
  74:11,12,21
  77:2,10 78:16
  78:17 96:18
  98:3 133:17
conducting
  55:12 99:21
  100:21 121:19
  121:21,23

122:1,12
conducts 114:3
  114:9
confederacy
  35:11
confidence
  26:10 52:15,16
  52:17 121:7,8
  121:13
confident 26:18
confirm 5:23
  25:13,17
congressional
  69:7
connecticut
  2:12
consider 20:19
  21:23 45:25
  58:8 69:16
  84:7 103:20
  106:12 120:7
  120:13
consideration
  30:7,13,18
considered
  62:18 68:24
considering
  13:22,24
contacted
  38:18
contain 10:17
contained 16:1
contents 18:17
contest 6:16
  61:21 63:19

64:21 69:20,23
  71:10,24,24
  73:19 85:4
  86:3 87:23
  88:9 91:4,5
  92:18 93:15
contests 61:19
  63:10,14 70:19
  71:14 72:25
  73:15 86:15,21
  88:11,21 102:9
context 11:8
  16:17 32:16,20
  36:21 53:15
  58:23 94:25
  114:24
contexts 57:11
  58:22 59:21
  60:23
contextual
  52:14
continue 36:14
contribution
  97:25 98:4
control 8:17,18
  8:20 9:5
conversations
  21:20,22 75:2
  75:7
copy 4:4,6,9,15
  4:19,21,22
  7:18,20 8:6,7
  8:12,24 9:7,8
  10:5 23:15
  107:9,20

core 44:6
correct 5:23,24
  6:12 7:1,18
  8:19 11:11,13
  11:14 20:13
  31:4 43:6,19
  47:1 50:14
  53:4 54:12,13
  54:20 55:9,10
  58:24 63:2,16
  64:20 66:17,25
  67:22 68:1,16
  68:17,22 69:25
  70:1 71:4
  74:24 77:18
  88:8,13 89:5
  89:17,18,22
  91:25 92:1
  97:11 105:23
  105:25 107:12
  112:7 129:10
  130:17 141:11
corrections
  142:12 144:17
correctly 38:9
  40:6 53:3
  62:22,24 64:19
  72:16,22 84:2
  88:7,20 92:7
  106:6 136:2
corresponden...
  22:12
counsel 18:13
  18:17,19 21:20
  21:22 22:2

66:11 75:3,7
102:19 108:4
110:23 140:1
140:11 141:16
**count** 86:18
88:5 89:12,21
89:24 90:3,12
92:1,4,8,24
93:1,4 94:7,10
111:18 113:6
115:17 126:15
126:16,22
127:16
**counties** 67:11
67:16 68:4,5,7
76:1,1,3,12
77:4,17 78:1,3
78:5,10,13,14
81:5,11,13
123:13
**country** 25:9
35:3 95:5
**counts** 35:10
60:12 135:25
**county** 1:24
4:13 13:10,12
17:10 63:15,21
82:13,13,16,22
85:15 103:13
123:11,14
133:8,19 141:3
143:10 144:15
**couple** 81:10
99:12 137:18

**course** 14:13
**court** 1:1 3:14
5:2 6:6,25 7:4
19:1,6,8,13
26:14 27:4,8,9
27:10 30:7,13
30:18 32:12,16
35:7 37:8
49:22 53:8,12
53:14 61:11,22
70:12 74:17
75:12 100:11
143:7
**courts** 30:1
69:11 100:12
**cover** 78:1
**create** 127:18
132:18
**created** 67:18
67:24 130:4
**criteria** 40:18
**cross** 16:17
41:21
**crossing** 51:22
**crossover**
28:25 29:5,14
29:17 50:16
51:1,9,20 53:6
63:19 64:1,3,5
64:13,17 65:5
65:10 80:9
95:10 102:8
**currently** 70:17
73:18

**curriculum**
24:5
**custody** 3:14
**cuyahoga**
141:3
**cv** 1:6
**cvap** 42:15
43:5,21,23
44:4,4,7,17
54:19,22 55:4
55:11,15,19
56:22 57:1,9
57:16,25 58:1
58:8,12,15,21
59:1,11,13,21
59:23 60:14,17
60:23 82:7
110:6,12,14,16
110:20 116:7
116:12,12,12
117:8,22
118:21,22,25
119:3 122:19
122:21 126:3
128:20,21,22
129:12,20
131:1,17,17,20
134:21 135:19
**cvapmoe** 129:9
129:10,16
130:14

**d**

**d** 1:4,6,23 2:15
141:4,23

**d.c.** 2:13
**d1** 128:5
133:20
**darin** 2:12 5:18
**data** 11:1,6,9
12:25 13:12
15:13,19,23
16:22 17:9,9
17:20 25:8,9
26:17 42:11,17
44:14 46:23
47:2 52:15
53:16 55:19
56:6 58:21,22
59:10,22 60:7
60:20,21 67:11
67:15 72:2
77:12 80:3
81:20 82:7,19
82:19 84:3
89:1 90:6 92:3
96:10 106:7
108:9,18,21
111:10,12,16
113:6,9,9,13,13
113:15,16,18
113:20 114:2,6
114:9,16
115:11,11,12
116:20 117:11
117:12,22,24
118:1,4,8,14,21
118:23,25
119:1,3,15
120:5 121:14

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376
Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 49 of 85

122:17,23
123:6,22,23,23
124:21,22,24
124:24 125:4,5
125:10,13
126:4,5,13
127:13,16
128:20 130:1
130:20 131:5
131:11,24
132:2,14,17
133:12 134:12
134:14,17,18
134:20,21
135:19 136:5
**database** 43:1
**dataset** 131:16
**date** 24:9 25:14
45:9,10,12
139:2,3 140:12
142:8 143:3,9
143:19 144:3
144:13,25
145:20,25
**dated** 16:1 39:5
101:17 103:16
105:6 135:13
137:6
**dates** 45:8
**dating** 36:8
**david** 99:6,7
101:23
**day** 49:18
141:20 143:16
144:22 145:22

**days** 142:18
**dc** 2:4
**dealing** 41:10
58:9
**dealt** 87:2
**dear** 142:10
**decade** 41:6
**decennial**
118:19,21,22
119:1,4
**decided** 59:1
**decision** 27:9
113:21
**deed** 143:14
144:20
**deemed** 62:6
142:19
**deep** 15:13,13
36:3
**deeper** 12:13
12:14,17 13:4
13:4,8
**deeply** 13:9
**default** 90:10
**defendant**
17:21
**defendants** 1:8
2:10 4:2 5:8
6:5 22:16,20
32:9
**defense** 18:14
39:19 108:4
110:1
**define** 35:12
50:10

**definitely** 22:7
22:10 91:2
98:23 134:15
**definition**
50:18 51:6
**definitive** 33:5
**definitively**
42:6 70:23
**degree** 51:15
119:8,21
**delay** 9:12
**delivery** 140:10
140:12,13,15
**democrats**
34:25 49:1,23
49:24
**demographer**
79:14
**demographic**
115:18
**demographics**
4:23 44:1
**demonstrated**
29:18,21 36:11
**demonstration**
17:23 54:3,15
58:25 63:14,21
64:2,4,17 65:9
66:23 67:24,25
76:4,7,11,17
77:1 80:9
88:22
**demonstrative**
77:20 80:14,17
81:6 83:2

108:6 122:23
**dense** 132:10
**density** 36:4,5
36:25 114:18
**department**
142:22
**depend** 63:25
**depending** 11:1
35:22 89:2
120:22
**depends** 126:12
**deposed** 5:14
6:10
**deposition** 1:11
5:3,18,22 8:2
8:15 18:11,23
19:3 73:8 80:7
134:8 139:22
142:8,11 143:1
143:3 144:1,3
**derived** 129:21
**describe** 24:4
47:7 110:3
123:9
**described**
16:13 25:1,16
34:10 41:16
43:13,20 44:22
53:24 118:4
**describing**
76:25 132:14
**description** 4:2
**designed** 47:9
**detail** 109:20

details   67:4
detention   24:24
  25:4
determine
  26:19 37:3
  43:23 49:10,15
  53:8,12 74:14
  88:2
developing
  100:16
dick   23:6
difference
  51:13 73:13
  82:2
differences
  14:3 35:21
  37:3,4 138:13
different   14:4
  15:22 17:3
  20:4 26:21
  41:3,9 44:1,20
  47:18 48:8
  49:2,23 50:6
  50:25 53:22
  58:6 68:19
  69:4,5 70:20
  73:21 79:3,4
  80:25 87:12,17
  87:19 102:13
  111:17 114:20
  115:7 126:7,12
  128:20 129:17
  130:6,7 131:22
  132:8,13
  133:15 138:11

differential
  116:15 117:4
  118:6,9,15,18
  118:24
differently   15:5
  53:22
difficult   34:20
  120:23
difficulties
  34:19
digging   15:12
diluted   28:6
direct   102:16
directly   109:18
  124:20 125:3,9
  129:7 131:24
disaggregate
  112:15,20
  113:22
disaggregated
  113:9 136:4,10
disaggregation
  112:9,21
  113:21 114:1,3
  114:10 115:3,9
  116:2 136:11
disaggregatio...
  115:24
discuss   68:4
  75:25
discussed   59:12
  80:7 107:24
  109:16 114:13
discussing
  84:10 101:11

  105:16,22
  113:25 124:11
  125:15
discussion   9:25
  35:6 73:14
  80:10
disentangle
  34:11
dissertation
  20:12
distinct   35:18
distribution
  15:21 60:3
  88:14
distributions
  56:10
district   1:1,1
  6:7 17:5 28:9
  28:25 29:6,7
  29:17 31:19
  32:3 46:10,15
  54:3 56:1
  58:15,20 59:19
  63:15,25 64:3
  64:4,10,12
  68:20 69:17
  70:11,13 71:22
  72:4,12,14
  73:9,23 74:4,6
  74:7,8,17
  75:13 77:5,6,7
  77:9,20 79:17
  79:18,19,20,24
  80:12,15,21,21
  80:24 81:1

  83:2,6,7,20,20
  94:16 95:11
  111:13 112:14
  112:14,17
  118:4 123:13
  125:17,20,25
  126:19,23
  127:3,6 128:4
  128:5,19
  129:11,11,20
  129:23 130:15
  130:23,23
  131:14,23,25
  132:1,4,12,15
  132:18 133:9
districts   4:7
  27:19 29:14,20
  31:24 63:10
  64:2 67:16,20
  68:6,8,11 69:9
  69:25 70:22
  73:17 76:7,11
  76:15 77:2,21
  78:22 79:11,12
  79:13,13 80:2
  80:4 88:22
  99:21,23 100:3
  100:10 101:18
  104:15 105:16
  106:2 110:7,17
  110:21 111:11
  111:17 122:24
  127:1,11,25
  128:4,12 129:6
  132:8 133:15

134:25
**dive** 12:13,14
  12:17 13:4,4,8
  15:14
**diverging**
  44:19
**diversifying**
  41:20
**division** 1:2
**document** 8:18
  16:15 19:5
  102:17 135:7
  136:25
**documentation**
  133:2
**documents**
  9:14 16:8,9,12
  16:16,20 17:18
  18:1 41:3
  134:9
**dog** 66:16
**doing** 21:24
  23:7 36:21
  38:8 53:20
  59:6 75:4
  84:23 85:2
  87:13 106:7
  111:2 113:10
  121:4
**dotted** 89:16
**doublecheck**
  94:12 99:14
**download**
  111:15 131:16

**downloaded**
  19:5 24:2
  115:13 131:21
**dr** 2:16 4:3,4,19
  4:21 6:3 8:18
  8:21,24 9:4
  10:3,11 20:16
  21:2,11,18,23
  22:3,5,12,22,22
  23:21,25 24:3
  25:18 37:18
  46:21 65:16,24
  75:6,13 96:25
  100:20 101:15
  102:16 103:15
  104:13 107:4
  107:10,19
  109:6,9,17
  111:8 120:8
  122:16 123:5
  127:8 134:8,21
  139:18
**draft** 137:3,9
  139:4
**drastically**
  14:20
**draw** 29:14
  80:21 99:22
**drawing** 4:7
  27:8,18 31:2
  31:10,10,18,21
  32:5 58:15,19
  74:13 80:12
  99:20 100:3,10
  101:18 104:15

  105:16 106:1
**drawn** 28:9
  46:15 63:20
  77:7,9 79:14
  81:1 87:15
  88:3,22 94:16
  110:7
**draws** 130:22
**drew** 79:19
**drop** 9:16 86:4
**dropped**
  113:14
**dropping** 25:25
  62:10
**drops** 14:20
**drs** 4:6,17
  100:16 134:19
**due** 5:2 39:19
  47:20 53:9,13
  91:3
**duly** 5:13 141:5
  141:7
**dynamic** 13:25
  13:25 50:21
**dynamics**
  12:22 13:20,21

**e**

**e** 99:3 128:5
**earlier** 12:5
  13:19 21:3
  22:15 34:6
  35:6 38:4
  42:21 53:18,24
  54:25 59:22
  72:13 80:7

  95:20,21 98:2
  123:16 124:12
  133:22 134:8
**early** 39:17
  99:17
**easier** 9:14
  113:12
**eastern** 1:1,2
  6:7
**easy** 111:24
**ecological**
  15:24 44:18
  47:8,16 87:20
**edgecomb**
  81:14
**edition** 138:4,6
**effect** 15:8
  118:25
**effective** 4:7
  99:20,23 100:3
  100:10 101:18
  104:15 105:16
  106:1
**effectively**
  128:24 129:4
**effectiveness**
  73:23 74:9,17
  75:14
**effects** 4:17
  104:25
**either** 9:5,16
  23:5 25:11
  55:13 77:20
  83:2 116:19
  122:2 131:22

elect 4:10 28:17
28:23 29:22
46:16 74:7
88:23 93:16
94:17 95:12
103:10
elected 29:10
41:4
electing 28:14
election 11:6,9
11:10 13:25
16:22 17:2,5
34:23 42:11
49:12,17 54:11
56:2 60:8
61:10 62:3,11
63:1,4 68:18
68:19,20 69:1
71:6,8,22 72:4
72:14 73:3,9
77:14 79:15
80:3 83:20
85:5 86:20
87:23 91:4,13
91:13,14 93:15
93:19 102:13
elections 1:8
6:6 13:13
16:23,25 47:22
47:24 48:2,6,8
48:9,12,16,18
48:19,24 49:4
49:6,8,21
50:21 55:25
68:15,16,23

69:25 70:11,13
70:15,22,25
71:3,16 72:1,7
72:9 73:16
80:4 83:10,11
83:16 86:19,24
88:6,14 90:13
90:17,22,24
94:9,12,13,14
95:25 96:8,11
97:10,11
102:24,24
142:6 143:3
144:3
electoral 21:15
21:23 67:3
78:21 81:2,4
82:3 91:16
96:20 110:17
110:21
electorate 43:8
48:8 58:21
86:2,5
eligible 60:19
elisabeth 2:3
9:2 65:2 104:8
139:19 142:5
elisabeth.the...
2:5
email 9:18,19
22:11 23:20
142:17
emperical
101:19

empirical 4:8
employed
141:16
employee
141:15
employing
104:6
enacted 63:10
63:20 64:3
66:21 67:6,20
70:17 72:3
73:18 79:11
80:2 83:2
111:11,13
123:13 128:3
128:11 129:11
135:24
enburg 23:6
enclosed
142:11
encompassed
112:17
endeavor 6:14
endogenous
83:16
endurance 6:16
ensemble 87:11
88:1
ensure 15:20
91:9,10
ensures 92:19
enter 5:20
entered 144:9
entire 143:5
144:5

entirely 90:10
entity 32:1
enunciated
74:19 129:2,3
equal 88:18
era 41:11,12,23
erika 2:15
errata 142:13
142:18 144:7
144:10,18
145:1
error 107:23
108:2,5 109:21
110:5,12,15,16
110:20 111:16
122:4,9,16,22
123:10,20
124:18,23
125:1,5,11,15
125:17,18,24
126:5,9,10,14
126:16,20,21
127:13,21,25
128:12,23
129:7,12
133:19
eseltine 123:1
esopin 122:24
especially
34:14 36:20
esq 2:3,6,11,12
2:15 142:5
esselstyn
122:25 123:2,4

essentially
125:18 126:4
est 1:16
established
38:16
estimate 15:11
26:19,22 47:9
56:9 57:21
59:16 60:14,17
60:18,24,25
81:19 82:10,22
83:9 84:21
85:20,21
108:15,18
110:6 112:15
113:4 114:20
116:10,11,13
120:3,6,18
121:2,10,13
123:25 124:18
125:5,6,12,24
126:6,21
127:13,20,24
129:14,16
130:5
estimated
61:24 62:20
86:9 133:15,19
estimates 42:15
43:21,23 44:5
44:7,8,17
47:14,17 60:10
82:20 84:19,20
104:1 110:16
111:17 113:4

114:16,17
117:17 123:23
126:7,8,9,9
131:25 132:7
133:6
estimating 4:23
129:19
et 1:8 122:4
142:6 143:3
144:3
events 14:1
eventually 15:4
everybody
104:2
evidence 4:8
12:15 101:19
exact 104:5
124:22,25
125:1,2
exactly 12:8,21
12:24 92:4,16
96:6 117:12
118:7 125:12
examination
3:7 5:12 6:1
67:5
examine 36:1
examined 19:6
41:3 43:9
65:20 66:21
example 48:21
49:2 51:17
67:13 69:7,13
69:19 71:10
81:22 83:19

85:25 86:5
93:14 113:3
122:11 129:11
129:21 134:13
exchange 22:11
excuse 96:17
executed
144:10
execution
143:14 144:19
executive
135:18
exercise 78:24
84:10 91:24
114:5 115:9
exhibit 3:14 4:3
4:4,6,9,15,19
4:21,22 7:11
7:14 10:8,9
23:14,23 24:4
101:10,13
103:3,5,6
104:17,18,21
107:3,6,8
135:2,5 136:20
136:23
exhibits 3:4 4:1
8:11 23:17
exist 37:9
existing 123:23
expect 14:8
20:24
expectation
16:16

expecting
92:12
experience
25:14 29:24
experienced
9:12
expert 4:3,19
4:21 6:23
11:12 18:14
21:3 22:15,25
23:2,4,10,11
27:17 29:13
32:8 37:1
38:13 45:25
74:12 98:14,22
100:19 107:10
108:4 109:7
113:11 115:12
134:23 135:10
expert's 39:19
expertise 12:10
117:3
experts 17:22
18:14 22:20
27:22 48:15
50:19 51:7
69:4 109:11
110:1 112:25
expiration
143:19 144:25
145:25
expires 141:24
explain 42:25
51:13 60:14
76:25 81:16

138:13
**explanation**
13:15 14:21
**explanations**
95:11
**expounded**
13:12
**expressed**
16:12
**extent** 21:16
28:20 29:16
**extreme** 36:6
36:13
**extremely**
34:14 51:19
69:9 132:6

**f**

**facility** 25:4,8
**fact** 59:14
90:23
**failed** 75:13
**failure** 114:22
114:25 115:2,5
115:15
**fair** 6:20,25 7:8
13:6 26:13
27:3 30:23
33:10 35:8
41:24 43:22
47:12 53:5
67:21,23 92:9
100:24 103:20
105:4 119:2
123:9 136:18

**fairly** 69:21
82:10 111:24
111:24
**fall** 71:22 90:13
93:17 94:10
121:11
**fallen** 89:4
**falling** 86:20,21
89:3 93:20
**familiar** 27:11
27:17,21 29:4
83:15 106:17
112:8 114:22
116:14,16
121:15 123:17
**familiarity**
112:11
**family** 45:10
**famous** 36:9
**far** 63:5
**farthest** 94:6
**favorable**
11:16
**fayetteville** 2:7
**feature** 8:16
**featured** 62:11
**february** 14:10
135:13 136:18
**federal** 6:6
**feedback** 20:11
**fell** 86:24
**field** 52:13
**figure** 57:13
61:15 63:9,13
63:18,18 64:5

64:12,16,22
65:8 85:9
86:16 89:10
97:23 113:1
115:4 129:21
129:25 132:18
132:20
**figures** 47:13
57:8,9 64:22
65:4 88:5
117:8 131:19
**file** 23:17 55:24
114:14
**files** 17:4,21
**filter** 135:22
**final** 137:10,14
137:17,22,24
138:12,22,25
**finally** 7:2,2,7
94:5
**financially**
141:17
**find** 50:13,14
142:11
**finding** 26:12
44:15 52:25
**findings** 128:6
**fine** 37:14
**finish** 91:24
**finished** 109:15
**firm** 5:19
**first** 5:13 6:14
7:19 8:17
15:20 20:25
23:17 28:8

37:22 38:8,19
70:3,7 75:21
75:23 92:1
94:21 105:3
108:23,25
109:1,2 113:18
115:10 128:18
**five** 37:13
108:15,17
127:21 139:8
**fix** 84:12,21
85:6
**flipping** 8:19
**florida** 44:11
**focus** 13:9
25:11 33:21
42:4 43:7
44:11 95:25
96:8 106:19,20
**focused** 30:16
49:16 58:2
59:8 91:22
116:22 120:10
**focuses** 34:9
**focusing** 56:24
59:15
**following** 75:25
76:18
**follows** 5:14
**foregoing**
141:11,13
143:13 144:18
**forget** 17:14
122:24

**form** 9:16
11:18 12:2,20
13:7,23 16:7
18:24 21:8,13
21:25 23:3
26:16,25 27:20
28:19 29:15
31:5 32:15
33:15 35:9,19
36:19 42:2
43:24 44:9
46:24 47:15
49:10 50:17
52:4 55:5
57:10 58:4
59:3 60:16
62:8 63:23
64:8 67:1 69:2
72:23 73:11,25
76:19 80:18
81:8 83:12
87:10 91:1
94:19 96:23
97:6 98:1,7,21
99:24 100:13
102:25 106:14
108:19 109:24
110:13,18,22
110:24 111:4
116:3,8 118:10
118:16 119:23
120:14 124:19
125:7,21 127:5
131:2 137:10
139:4

**format** 23:18
131:21,22
**formula** 20:10
122:12,14
125:11 126:5
126:11 129:2
**forth** 130:23
**forthcoming**
24:15
**forward** 33:25
61:7 142:15
**found** 50:16
75:12 106:23
**four** 54:11
58:11 66:23
68:9 102:13
**fourth** 19:12
105:12
**framed** 33:3
**framework** 4:8
101:19
**free** 143:14
144:20
**full** 19:4 67:14
68:4,5 70:3,7
70:20 87:23
106:10,18
131:16,25
132:4
**fully** 112:16
**function**
123:22 124:1,5
128:25
**functional** 4:13
103:12 104:2

**functions**
123:24
**further** 58:7,10
75:7 139:16
141:14
**future** 10:15
13:18 16:5
71:20 72:12

**g**

**gain** 36:12
**gap** 130:19
**geauga** 1:24
**general** 14:1
28:4 34:1
40:20 44:15
48:9,19,19
49:8,12,17,20
49:21 68:10
70:25 71:13,17
77:8 78:6
79:17,18 84:18
94:20 95:3
102:24 110:9
114:12 115:21
117:14
**generals** 48:11
**generate** 29:20
84:20 132:2
**geocoded**
117:25
**geocoding** 43:3
**geographic**
17:4,7 122:13
133:6

**geography**
77:16
**georgia** 44:13
**getting** 24:15
115:14 120:22
120:23
**gibbons** 2:12
5:18
**gingles** 28:1,4
29:18 40:7,7,9
40:12,14,18
55:1 58:15,19
58:23 110:9
**gis** 17:4
**give** 16:18
20:11 23:15
26:9 33:5
57:25 77:13
82:9 85:10
126:15 139:7
140:1,11
**given** 44:14
53:16 77:10
84:18,19
106:10 116:7
120:4 121:14
121:14 124:21
124:24 131:4
131:11 141:12
**gives** 122:14
**glanced** 106:10
**gmt** 1:16
**go** 33:4 37:1,2
41:5 42:3 50:2
52:6,7 54:2,14

55:2,3 57:12
65:13,15,18
66:5,19 75:17
84:25 90:5
92:11 113:18
114:4 115:23
121:1 125:13
128:15 131:9
131:13
**goal** 127:12,15
**goes** 9:13 54:7
54:11 84:24
**going** 8:11
12:24 18:16
21:18 27:10
34:16 35:21
36:23 40:5
44:3 48:10,20
49:2 56:4
59:11 63:24
69:21 71:20
72:12 78:2,22
78:22 80:5
89:13 91:7,8
91:23 93:17
96:16 101:4
102:15,16
114:15,16
116:10,11,13
117:9 121:3
132:24 137:21
138:19,20,22
**gold** 56:7
**good** 6:3 8:9
10:24 14:18

15:23 28:23
37:11 48:14
66:17,18 72:11
77:14 98:4
101:4 117:10
117:17 134:1
**googling**
111:25
**government**
31:25
**governor** 71:12
71:13
**governors** 41:3
**great** 7:10
34:22 42:22
133:13,24
**greater** 90:17
90:23
**grofman** 4:6
97:14 99:2
100:16 101:22
**group** 15:4,5
17:24 43:8
51:24 111:10
112:13,15
113:4,22 114:1
114:10,16
115:18 116:7
122:23 123:6
123:12,14
126:3,13 127:3
127:10,13,17
130:21 133:7
133:12,19
135:19 136:5

**grouping** 4:14
103:13
**groups** 44:20
47:19 110:17
112:9 113:2
115:3 125:16
125:19 132:3
133:23 135:22
136:2,9,9
**guarantee**
28:16,22
**guess** 8:22 9:18
45:22 77:11
83:13 91:14
95:23 125:9
133:2
**guide** 80:1

**h**

**half** 37:22,23
38:8 39:24
40:3 108:25
**hand** 141:19
**handbook**
121:16,19
122:1,3,7,15
129:3
**handful** 55:23
**handley** 4:6,14
98:11 100:16
100:20 101:23
103:15
**happen** 13:5
14:9 15:3
84:21 138:15

**happened**
14:22 137:19
**happens** 13:14
132:19 138:24
**hard** 12:23
97:5,7,8
**harvard** 36:11
**head** 7:5 25:6
94:21 115:22
**headphone**
61:12
**hear** 61:13
72:16 116:24
130:15
**heard** 27:25
41:23 72:13
74:1
**help** 38:19,22
73:12 136:14
**helpful** 57:5
106:23
**hereinafter**
5:14
**hereto** 141:15
**hereunto**
141:18
**heterogeneous**
15:6,7
**hey** 87:18
**high** 36:4,5,25
48:3 94:23
115:19,20
**higher** 80:8,22
91:3,9 94:23
95:5 130:21,21

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 57 of 85

133:7

**hired** 11:17,21
30:12 31:8
32:4,9 37:18
**hispanic** 136:1
136:1
**hispanics** 43:10
**histogram** 87:3
90:7 92:21
**historical** 34:2
53:17,23
**historically**
36:5
**history** 16:24
33:21
**hobbs** 134:24
135:11
**hofstetter** 5:19
**hold** 30:24
42:14 107:14
**homogeneous**
15:6,7,16,17
**hope** 23:16
136:19
**hostetler** 2:11
6:4
**hour** 6:15,17
37:12 40:4
101:5
**hours** 39:1,3
40:1 137:18
**house** 4:13
102:9 103:13
**household**
117:25

**households**
108:11 132:5
**hub** 113:9,13
113:15,21
114:2,7,9
115:11
**huge** 14:13
**huh** 43:18
**hurricane**
14:13
**hypothetical**
79:17,25

**i**

**i.e.** 79:22 95:9
135:23
**identical** 35:16
**identification**
10:10 23:24
33:2,24 101:14
103:7 104:22
107:7 135:6
136:24
**identified** 45:8
80:23 81:6
133:16
**identify** 30:11
47:21 79:6,8
83:1 89:12
**identifying**
99:20,22
**identity** 33:25
**ignore** 120:12
**ii** 40:7
**iii** 29:19 40:7

**illustrative**
40:18 79:12
122:23 123:14
128:4,5
**imagine** 125:9
**immigrant**
24:24 25:4
**imposed** 27:18
**imprints** 15:24
44:18
**improved** 43:2
**include** 25:10
49:1 71:2
75:25 106:11
120:21 134:21
**included** 10:21
19:17 35:11
40:25 43:11
71:16 76:13
78:9 80:24
102:24 142:13
**includes** 16:25
26:17 42:17
77:3 80:13
105:22
**including** 76:4
91:5 108:18
**incorporate**
82:8
**incorporated**
83:5 144:12
**incorporates**
16:24
**incorporating**
57:23 102:8

104:1
**increase** 26:10
**increases** 14:20
**incumbency**
84:7
**independent**
31:18 32:2
**index** 3:1,4 4:1
**indicated** 86:18
**indicates** 89:20
102:12
**indicating** 7:16
8:9 61:12
142:13
**individual**
34:16 72:4
76:14 114:4
117:13,24
128:18 136:6
**individuals**
15:22 17:1
114:20 117:2
126:25 127:17
127:17 132:4
**induce** 69:7
**inference** 47:8
47:16 87:20
**influenced**
100:25
**information**
13:2 16:20
17:4,7,18,24
18:2,6 27:8
38:11 58:8
82:8 117:25

Veritext Legal Solutions
www.veritext.com 888-391-3376
Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 58 of 85

121:19 122:14
130:24 133:11
134:10,12
**informative**
106:12
**initial** 19:11
38:1 39:4 40:4
**injunction**
75:15
**inline** 96:7
**inputs** 44:1
**instruct** 21:19
102:18
**instruction**
85:10 140:1,11
**instructs** 16:18
**intend** 10:18,21
16:2,13
**interested**
31:23 75:4
96:1 126:17
141:17
**interject** 75:6
97:1
**interpretations**
27:22
**interrupt** 8:10
64:23
**interrupted**
133:13
**intertwined**
34:5
**intertwinement**
34:10,12

**interval** 121:7
121:8,13
**intervals** 26:18
**interview** 46:4
132:25
**introducing**
129:17
**inverse** 85:24
90:16
**investigation**
28:10
**involve** 48:8
**involved** 38:12
**involving** 68:11
68:12
**irvine** 97:20
**issue** 57:13
78:19 83:10
107:23,23
108:2 109:21
**issues** 9:9 11:6
12:6,7,9,9
21:14,23 52:15
52:16,17

**j**

**j** 2:12
**j.d.** 20:9
**january** 109:3
**jettered** 116:25
**jiggered** 116:25
**jittered** 116:21
117:1 118:4,5
118:8
**jittering** 118:18

**job** 20:25 45:16
**john** 22:22
**journal** 137:12
137:13 138:1,5
**joy** 121:4
**judge** 16:18
**jumping** 17:13
**june** 101:17
**jurisdiction**
4:12 12:10
31:1,8,17 32:4
44:12 71:19
103:12 125:2
133:7
**jurisdictional**
31:13
**jurisdictions**
15:22 29:13,19
31:2 83:21

**k**

**kate** 6:4 64:24
**katherine** 2:11
**kaye** 2:3
**keep** 6:13 84:23
**kelliann** 1:23
141:4,23
**kept** 78:5
**key** 33:22 53:19
**key's** 36:8
**kidding** 24:17
**kind** 11:3 14:8
15:2 34:7 36:2
36:20 42:4
44:19 46:2
78:24 88:1

91:12,14 98:18
100:7 117:13
119:18 121:4
**kinds** 12:6
13:21 15:14
21:1 133:6
**kmcknight**
2:14
**knew** 124:7
**know** 6:18,24
7:15 8:25 12:8
12:23,24 13:10
13:11,25 14:1
15:20 18:18
19:21,23 20:6
21:7,9,14,16
23:9,10,25
27:1 29:1 30:3
31:6 34:20
35:2 41:10
46:13 48:25
49:16,18 51:5
52:14 56:11,11
57:4,6,7,19
58:5,8,12
62:15 69:11,23
71:11,11 75:2
75:22 77:23
78:4,20 79:21
80:20 81:24
82:1,4,24
84:12 85:15,19
86:6 87:4,14
87:21 90:6,7,8
90:9 91:5,7,11

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 59 of 85

92:16,17,17
96:8,15 97:14
97:15,21 98:11
98:12 99:4,6,7
99:10 100:6,9
101:3 104:5,18
106:16,22,22
107:4 108:21
109:6,21
111:24 113:20
114:24 115:13
116:6 117:3,6
117:12,14,16
117:17,21,23
118:11,12,12
118:20 121:1,5
121:12 124:1,7
124:15,23
126:5 129:17
130:4,18 131:4
132:7,23 133:1
135:3 136:21
137:15 138:5,6
138:7,8 139:5
**knowable**
115:4
**knowledge**
26:1
**known** 45:20
97:23 124:18

**l**

**l** 2:11 99:6,6
**labeled** 86:15
**labeling** 90:10

**lack** 96:10,13
111:4
**laid** 98:2
**large** 14:12
29:8 35:3 48:2
72:7 78:3 87:4
**larger** 76:14
77:5
**late** 18:20 38:1
**latino** 20:1,1
**law** 5:18
**lawful** 5:11
**lawsuit** 23:12
32:10 83:22,23
83:24
**lawsuits** 11:13
11:16,25
**lawyer** 7:3
25:18 26:5
27:14
**lawyers** 25:24
38:22
**layman** 85:12
**ld** 135:23,24
**learned** 8:14
**left** 89:11,24
90:2 91:25
134:3
**legal** 25:20
26:1,4,23 27:2
27:15,17 28:20
29:11,16 32:19
36:21 52:13
142:1 145:1

**legally** 27:4
**legislative**
111:11,13,17
133:9
**legislators** 25:9
**legislature** 4:12
103:11 134:25
**letter** 142:19
**level** 16:24
17:10,10 48:23
49:16 62:5
77:20 82:22,22
84:1 85:6
86:12 111:13
112:16,21
113:7,14 114:1
114:11,21
115:8,17,18
116:20 122:17
123:6,11 127:4
130:3,15,20,25
131:22 136:5,6
**levels** 50:15
87:19 92:18
**lieutenant**
71:13
**likelihood**
87:14
**likely** 11:5 16:9
26:9 71:20
80:4 91:3,9
95:7,11 104:5
**limitations**
52:15

**linberg** 1:23
8:19 10:8 66:6
139:18 141:4
141:23
**line** 52:9,12,18
89:17 142:13
144:7 145:3
**lines** 68:9
**linkages** 34:17
**linked** 34:15
35:3
**lisa** 4:14 98:11
98:12 101:23
103:15
**list** 46:23 47:21
76:1,13 105:13
134:13
**listed** 30:19,21
47:2 101:22
105:3 144:7,17
**listing** 144:7
**literally** 86:23
**literature**
106:7
**litigated** 56:12
**litigation** 30:1
30:8 100:21
109:10,17,23
122:2
**little** 37:12 39:3
49:5,6 55:7
56:15 92:13,14
117:1,5 125:9
**live** 117:7,7,17
117:18

**lived** 45:14
117:21
**lives** 117:13,23
**living** 118:1
**llp** 2:3,6,11
**loaded** 107:3
**localities** 34:7
**locality** 31:9
**locate** 131:14
**located** 69:6
**logic** 71:25
**logical** 44:19
**long** 4:18 20:3
96:2 101:25
**longer** 15:6
62:6 139:12
**look** 7:15 9:1
12:13 15:19
18:4,8 31:25
42:3 53:18
57:5,6,12 60:9
64:16 70:20
71:10,15 72:7
77:11 78:11
79:15 82:6
83:3 90:5,7
92:2,11 95:13
95:20 96:5,7
101:11 102:21
107:1 108:1
111:16,23,24
117:14 125:8
**looked** 33:17
36:15 42:20
43:22 57:7

76:16,17 78:7
78:12 81:10
114:14 134:16
**looking** 8:12
27:15,16 29:11
29:12 31:24
32:18,19 33:22
43:16,25 52:20
53:21 54:15
57:4 58:15,16
58:20 59:18
60:8 61:10,15
61:21 63:8,25
64:12 79:16,19
83:6 87:13
90:21 96:1
104:14 120:17
120:18 125:1
127:9,12
130:13 133:23
135:17 137:16
137:19
**looks** 8:9,9 33:1
59:19 65:12
79:10 90:3,21
92:5,7 93:6,25
94:6 95:17
105:17 107:12
107:21
**loren** 1:12 3:7
4:19 5:11 6:1,9
107:10 141:6
142:8 143:4,9
144:4,13
145:20

**lot** 15:12 20:1
20:22 34:18
69:7,8,21,22
96:16 98:2,3
98:23 108:12
113:10 116:19
116:22 120:10
**low** 49:7 69:19
**lower** 48:13,15
48:17 64:9
71:24 80:16,22
100:12
**lowest** 82:21
**lublin** 4:6 99:6
99:7 100:16
101:23

**m**

**m** 6:3 99:3
**mackie** 2:6
**madam** 142:10
**made** 32:13,23
38:18 90:9
98:4 106:3
143:7
**majority** 28:6,8
28:13 29:8
39:24 46:10
50:4,5,10 77:7
77:9
**make** 6:14 8:6
8:8 27:9,10
30:16 33:13
34:19 35:20
48:24 50:9
71:5 75:22

82:20 85:11
92:6 132:24
139:9
**makes** 11:21
60:7 120:21
**making** 71:21
106:24
**manner** 5:5
**manuscript**
24:20
**map** 31:10,18
31:21 32:4
58:25 74:13
78:7 87:15
135:23
**maps** 31:2,11
40:18 54:15
85:11 87:5,7
87:25 88:2
133:23
**march** 38:1,2
109:4
**margin** 107:23
108:2,5 109:22
110:5,12,15,16
110:21 122:4,8
122:16 123:10
123:20 124:17
124:23,25
125:5,11,15,17
125:25 126:4
126:10,14,16
126:20,21
127:13,20,25
128:12,22

Case 4:23-cv-00193-D-RN Document 88-4 Filed 10/28/24 Page 61 of 85

129:12 133:19
**margins** 111:16
122:22 125:18
129:7
**mark** 10:8 24:3
**marked** 10:9
23:23 101:13
103:3,4,6
104:21 107:6
135:5 136:23
**massachusetts**
2:4
**matt** 19:21,24
**matter** 5:20
10:6 17:16
22:16 24:21
37:1 38:20,23
39:6,9 103:22
107:10,20
134:11
**matters** 38:14
49:19
**matthews** 1:4
**mcknight** 2:11
3:8 5:7,16,25
6:2,4 8:14 9:2
9:3,23 10:2
23:20 37:11,17
65:1 66:5,9
101:6,9 102:18
104:7,12
107:13,17
110:23 111:6,7
134:1,7 139:7
139:16 140:13

**mean** 11:19
13:8 20:22
26:7,24 28:3
29:6 32:17
34:15 41:12
43:11 45:20
46:14 51:10,11
52:5 54:19
67:10,12,12
73:2 76:10,15
76:16 81:16
83:18 84:16
86:23 88:13
89:17 90:21
92:2 94:14
96:21,22
103:24 104:2
106:3,15
108:25 109:3
110:25 114:25
115:5 117:10
117:17 120:2
126:10 127:4
132:10 136:4
137:18
**meaning** 13:3
83:10 126:23
**means** 26:8
27:2 29:1 74:3
97:4
**meant** 67:9
79:6,8
**measure** 57:24
120:24,25

**measures**
120:20
**media** 46:4
**meeting** 18:17
**meetings** 18:12
18:18
**members** 20:22
127:2
**memory** 18:5
37:24 38:8
40:19
**mention** 14:7
**mentioned** 12:5
17:15 55:18
125:3 138:12
**mentor** 20:20
20:22
**met** 29:19
40:18 97:16
98:16 99:8
110:9
**method** 44:3,4
44:4,5 47:9
58:16,18 88:1
99:20 113:10
122:8,10
**methodologies**
104:6
**methodology**
103:21,23
**methods** 4:23
138:3
**mexico** 1:13
31:19 32:3

**mid** 34:6 39:18
**midterm** 91:6,8
95:15,18,21
**midway** 54:6
84:11
**midwest**
142:17 145:1
**mind** 14:6 97:2
134:3
**minimal** 138:13
**minority** 4:16
28:6,9,10,13,22
46:10,16,17
50:6 62:6,11
62:12 101:18
104:15,24
105:16 106:1
110:6 136:2
**minus** 127:21
127:22
**minute** 134:4
**minutes** 37:13
65:15 101:6
139:8
**miority** 4:7
**missed** 117:20
129:8
**missing** 127:7
**mississippi**
37:6
**mobilization**
41:21
**model** 120:5
121:14

models  44:18
moe  123:5
  124:13 127:4
  128:16,25
  129:17,20,22
  130:5,12 131:1
  131:17,20
  133:15
moment  8:4
  10:16 14:6
  107:14
moments  33:22
  53:19
monday  18:21
month  37:23,23
morning  6:3
moses  1:4
motion  38:3
move  18:9
  23:14 107:1
moving  18:10
  33:24 58:10
multicollinea...
  34:19
multiple
  100:12
multiply  85:23

          n

n  99:3,6
name  6:8 23:6
  142:6 143:3,4
  143:15 144:3,4
  144:21
named  5:18
  19:21 32:2

  141:6
naturally  95:3
nature  80:23
navigate  20:25
nc  2:8
ncsbe  17:6
necessarily
  11:21 34:2
  69:18 106:18
necessary  48:5
  57:16 59:5,21
  80:15 99:22
need  5:2 6:14
  6:17 7:12,12
  8:7 9:24 14:21
  14:23 18:3
  23:18 59:5
  77:12 79:14
  82:6 88:23
  90:23 91:9
  101:6 102:21
  126:20 128:24
  139:10,10
needed  38:13
  88:10 102:7
needs  13:11,14
  88:16
neither  100:24
nestled  113:2
never  35:20
  68:22 96:17
  102:17 105:25
  117:23
new  1:13 11:5
  31:19 32:3

  66:2 68:11
  109:25
nice  56:13
niemi  99:2
nods  7:5
noise  117:2
  118:14
non  46:10
  136:1
north  1:1,7
  4:11 6:5,7
  14:14 16:22
  23:1,12 25:1,5
  25:10,11 36:17
  37:3 40:22,24
  41:1,2,8,11,25
  42:7,11,17
  43:14 44:14,23
  45:3,7,14,16,18
  45:20 46:1,3
  51:5 55:23
  56:5 60:11
  67:14 68:21
  81:5 100:20
  103:11
notarized
  142:14
notary  1:23
  141:4,24
  142:25 143:10
  143:18 144:15
  144:23 145:23
note  5:16 47:9
  66:20 95:13
  142:12

notes  7:23
notice  30:22,25
  43:4 50:3 68:3
november
  11:10
number  16:3,3
  30:22 31:1,2
  42:22 43:13
  48:2 52:9
  57:21 62:13
  74:14 82:12,13
  85:23 86:19,20
  86:22,23 87:4
  89:5,8,9,9,21
  90:24 91:7,9
  92:8,13 116:7
  120:6 121:12
  124:18 127:16
  128:23 129:1
  130:9,10,11,12
  130:14 131:1,3
  132:21 138:9
  142:7,13
numbers  47:12
  55:11,12,13
  57:6 58:12
  64:9 80:25
  92:12 123:25
  130:4 132:2
  144:7
numeric  126:14
  129:7
nw  2:4,12

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 63 of 85

| o | | | |
|---|---|---|---|
| **object** 102:15 102:16 | 125:7,21 127:5 131:2 | **ohio** 1:24 5:12 141:2,5,19,24 142:2 | 121:25 123:5 124:1 127:7 128:9 129:25 |
| **objection** 5:21 11:18 12:2,20 13:7,23 16:7 18:24 21:8,13 21:25 23:3 26:16,25 27:20 28:19 29:15 31:5 32:15 33:15 35:9,19 36:19 42:2 43:24 44:9 46:12 47:15 50:17 52:4 55:5 57:10 58:4 59:3 60:16 62:8 63:23 64:8 67:1 69:2 72:23 73:11,25 76:19 80:18 81:8 83:12 87:10 91:1 94:19 96:23 97:1,6 98:1,7 98:21 99:24 100:13 102:25 106:14 108:19 109:24 110:13 110:18,22,24 116:3,8 118:10 118:16 119:23 120:14 124:19 | **objections** 5:5 **observe** 95:14 **obviously** 16:17 51:4 58:11 106:23 **occasionally** 13:13 138:16 **occur** 14:9 118:18,19 **occurred** 13:5 **occurring** 49:15 **occurs** 41:22 48:22,22 49:11 50:4 **october** 141:20 142:4 **offer** 10:18,21 11:17 16:2,13 25:20 26:3 40:6,8,9,11,14 **offered** 32:12 37:8 **office** 49:20 141:19 **official** 143:15 144:21 **officials** 41:4 **oh** 2:17 9:23 42:10 61:13 65:1 89:14,14 132:20 134:15 | **okay** 5:25 6:3 6:13 7:10,23 9:7,10 10:3,20 11:3 12:17 14:7 18:7 19:8 21:10,21 22:19 23:14,19 24:2 24:7,8,21 29:5 31:20 37:13 38:5 43:4,12 45:1,23 46:19 47:6 51:9 52:19 54:2 57:17 61:1,3,4 61:17 64:11 65:3,19 66:4 66:10,19 68:9 70:10 72:19 74:16 75:10,12 75:21 76:3 77:8,15 88:9 89:19 92:6,11 92:23 93:4,7 94:2 96:10 98:13,16 101:8 102:3,5,22,23 103:2,8 104:7 104:20 105:6,9 105:12,21 107:1,5,13,25 109:16,21 110:20 115:1,7 | 130:13,18 133:13,18,24 134:23 135:2,4 136:17,20,22 136:25 137:4,6 137:13 138:1 138:10 139:7 139:13 **older** 109:13 **once** 39:21 68:17 109:14 129:1 **ones** 128:2 **open** 89:3 **opening** 19:18 38:25 39:9 40:15 55:16 59:1 61:16 **operation** 136:8 **opinion** 11:12 11:15,17 16:18 19:4,6,9,13,15 20:2 26:1,4,14 27:15 32:12,22 37:8 40:7,9,11 40:14 46:3 111:9 **opinions** 10:18 10:20 11:2 16:1,11 19:1,3 25:20 40:8 |

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 64 of 85

| | | | |
|---|---|---|---|
| 46:24 | **overspeak** | 138:9 142:13 | **particular** |
| **opponent** 85:18 | 96:24 | 142:15 144:7 | 12:22 17:2 |
| **opportunity** | **overwhelming** | 145:3 | 28:9 34:23 |
| 4:10 5:20 | 48:4 | **pages** 61:1,5 | 35:23 53:15 |
| 28:17,23 88:18 | **overwhelmin...** | 64:21 65:4 | 57:17 62:9 |
| 103:10 | 34:25 | 105:18,21 | 82:10 85:16 |
| **opposed** 8:12 | **own** 8:25 49:11 | **palmer** 134:24 | 86:2,20,21 |
| 32:24 80:2 | 51:13 98:6 | 135:11 | 87:23 |
| 126:22 | 99:1,22 100:16 | **panel** 20:11,14 | **particularly** |
| **opposition** | 103:21 114:3 | **paper** 4:22 7:21 | 34:24 35:4,5 |

| **p** |
|---|

| | | | |
|---|---|---|---|
| 36:11 | **p** 128:16 | 32:17 42:11,13 | 36:24 72:5 |
| **option** 8:22 | **p.m.** 139:22 | 42:17 43:13,20 | **parties** 31:24 |
| **order** 15:23 | **package** 123:17 | 43:22,25 44:6 | 141:15,16 |
| 53:19 59:23 | 136:14,16 | 44:10 137:4,5 | **partisan** 32:23 |
| 77:13 82:19,22 | **packaged** | **papers** 7:23 | 33:2,14,24,25 |
| 88:11,16 90:18 | 132:15,17 | 33:12 117:5 | 53:10,14 88:3 |
| 126:21 132:24 | **page** 4:2 24:7 | 137:3 138:16 | **partisanship** |
| 134:10 | 30:10,11,19 | **paragraph** | 32:18 33:19 |
| **original** 134:18 | 46:19,23 47:5 | 46:23 47:8 | 34:5,11,13 |
| 140:13 | 47:21 50:2 | 52:24 54:6 | 87:15 |
| **oskooii** 109:6,9 | 52:19,24 54:2 | 68:10 70:3,7 | **party** 11:17 |
| 109:17 | 54:7,14 61:10 | 75:23 84:11 | 34:4,8 35:2 |
| **outcome** 80:4 | 61:15 63:8,9 | 135:17 | **past** 42:9 |
| **outside** 14:12 | 63:13 65:8,13 | **pardon** 9:23 | **pattern** 53:9,13 |
| 21:22 31:14,22 | 65:18 66:20 | 10:4 20:9 65:1 | 96:2 |
| 32:5 58:25 | 67:2,10 68:4,9 | 65:24 76:24 | **patterns** 36:14 |
| 77:16 132:19 | 70:2,7 72:19 | 89:14 116:24 | 40:22 43:9 |
| **overall** 48:14 | 75:17,21 81:15 | 117:19 132:9 | 82:17 |
| 71:17 73:16 | 84:9 86:13 | **part** 19:8 48:8 | **pending** 6:19 |
| 85:21 91:12 | 95:13 101:12 | 80:13 106:16 | **people** 15:18 |
| 113:3 115:16 | 102:1,2,3,4,6 | 108:12,23,25 | 38:16 45:20 |
| 127:6,10,18 | 104:14 105:9 | 129:15,19 | 48:15 55:22 |
| **overlap** 78:3,8 | 105:22 128:12 | 144:9 | 56:1 57:19,21 |
| 78:10 | 133:18,23,25 | **participation** | 60:9,10,12,15 |
| | | 5:22 83:9 | 60:17,18,24,25 |

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 65 of 85

69:4,10 80:24
81:24 88:2
94:25 100:8
113:22 117:18
118:1 126:18
126:18
**percent** 51:21
79:20 102:7
128:13
**percentage**
53:6 74:4,5,5
85:16,17 86:11
93:12 94:1
116:1 127:21
127:22
**percentages**
115:18
**perfectly** 95:1
**perform** 66:22
67:6 72:12
78:22,23 80:15
90:18,23
**performance**
21:15,24 59:18
67:3 70:19
71:1,2,6,23
76:21 78:21
79:2,8,10 81:3
81:5 96:20
**performing**
29:25
**performs** 81:3
**period** 14:2,17
42:5

**person** 46:2
49:19,20 139:5
**personal** 52:16
**personally**
143:11 144:15
**perspective**
88:3
**petted** 66:16
**ph** 23:6
**ph.d.** 1:12 3:7
5:11 6:1 20:8,9
120:9 141:7
142:8 143:4,9
144:4,13
145:20
**ph.d.'s** 20:10
**phase** 31:9,10
32:5 135:11
**phone** 142:3
**phrase** 30:2
73:23
**physically** 69:5
**pictorial** 93:20
**picture** 70:20
**piece** 9:24 30:7
**pieces** 109:22
**pierce** 1:4 6:5
142:6 143:3
144:3
**pitt** 81:14
**place** 5:3 48:17
49:8 72:1
83:23,24
141:13

**placement**
68:24
**places** 113:18
**plaintiff** 31:23
31:23
**plaintiff's** 5:10
17:8
**plaintiffs** 1:5
2:2 5:21 66:24
**plan** 17:23
130:22 135:24
**plans** 10:14
17:25 66:23
67:6 108:6
123:15 135:24
**plausible** 13:14
14:21
**play** 12:24
**please** 6:18,24
7:3 23:25
61:14 75:22
131:9 142:11
142:11
**plot** 87:21
93:25
**plug** 44:17
**plus** 50:9 52:5
91:13 127:21
127:22
**point** 13:5 23:9
37:11 57:15
62:16 85:2
87:21,22 120:3
120:18 121:10
126:8,9 127:22

134:2 137:10
138:18
**points** 6:14
66:1 93:13
94:1 127:22
**polarization**
82:23 96:2
**polarized** 4:24
19:25 29:25
36:7,16,18
37:9 38:15
42:12,16 44:2
48:5 50:13,15
51:8 52:21
53:21 56:5
59:9 60:4,20
61:18 63:9,14
81:19 84:19
85:14 87:20
95:1 96:3,19
98:14,24 99:1
121:20,21,23
**polarizing** 30:2
**policy** 34:1
**political** 32:14
35:25 97:20
120:9
**politics** 20:1
36:10 41:11
45:21 46:1,4
**pool** 48:25
**pops** 33:11
**population**
14:2,7,8,12,16
17:8,9 43:5

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 66 of 85

46:16 51:16
54:19 55:21
56:24 57:2,5
57:18 58:9
76:14 77:12
79:20 81:25
87:19 91:11
94:22,23 110:6
111:18 113:3,6
114:19,19
115:16,19,20
116:19 126:15
126:16 127:15
127:19 129:13
135:25
**portal** 104:18
**porter** 2:3
**portion** 78:11
**posed** 119:7
**possible** 14:14
26:9 31:24
46:9 72:9
80:12,19,19,21
82:21 106:4
109:13 125:23
133:2
**post** 70:22 80:1
**posted** 137:20
**potential** 58:17
58:20
**potentially**
11:6,20 14:23
15:9 34:6,20
38:14 52:13
58:7,9,10,14

60:6,25 110:8
120:4
**poyner** 2:6
**poynerspruill...**
2:8
**precinct** 13:11
13:13 15:16,18
16:23 17:4
56:1 60:8
67:11 81:21
82:19 84:1
**precincts** 15:8
44:16 60:3
67:14,15,19,20
67:25
**precise** 132:7
**precisely** 117:7
117:21
**prefer** 9:4
28:12 95:9
**preference**
32:23
**preferences**
32:14,14
**preferred** 9:11
28:14 29:9,22
46:7 49:23
51:2,23 53:1
62:18 63:1
74:7 77:13
78:23 79:21,22
80:5 85:1
87:24 88:11,16
93:16 95:2,9
95:12 122:8,10

**preliminary**
75:15
**preparation**
18:10,23 24:20
100:25 106:13
**prepare** 13:20
16:21 17:19
18:2,11 19:2,3
38:19,23 39:5
39:8 74:25
**prepared** 10:12
21:11 24:1
100:20
**preparing**
103:21
**presence** 141:9
**present** 42:1
**presentation**
93:20
**presented**
12:15 83:4
131:3
**presents** 111:3
120:12
**president** 71:12
**presidential**
91:3,6 95:14
95:18,21
**presumably**
132:1
**pretty** 21:16
72:11 117:9,17
137:21,22
138:22

**prevail** 88:12
**previous** 72:2
**previously**
85:13,14
114:13
**primaries**
48:11,25 49:14
**primarily** 59:8
**primary** 18:5
47:24 48:6,7
48:12,16,17,23
49:3,6,11,15,23
49:25 102:24
**printing** 9:9
**prior** 40:21
42:8 43:14
136:17
**priors** 36:23
**prison** 24:24
**privacy** 47:20
116:15 117:4
118:6,9,15,18
118:25
**private** 24:24
31:1
**privileged**
38:10
**probably** 9:6,8
9:11 14:17
15:20 20:5
23:9 40:4 42:5
45:2,24 109:2
112:10 114:14
**procedure** 5:13
96:4,18 121:12

Veritext Legal Solutions
www.veritext.com 888-391-3376
Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 67 of 85

| | | | q |
|---|---|---|---|

140:8 143:5
144:5
**proceed** 61:8
**process** 68:1
74:13 113:12
114:10,13
115:21 116:2
132:23 138:19
**produce** 16:10
44:5 80:14
130:9,11
138:16
**produced**
26:20 47:13
122:24
**produces** 90:11
130:20
**product** 108:13
130:2
**production**
17:21 134:18
134:19,20,22
142:15,17,22
**profession**
20:24
**professor** 20:7
23:6 36:9
97:19
**professors**
20:11 45:21,23
**program** 85:8
90:11 93:13
136:16
**programmed**
132:12

**promote** 4:16
104:24
**prong** 28:12
**prongs** 28:7
**proportion**
126:18,20,22
126:23,25
127:2,9,9,14,20
128:12
**proportions**
129:2
**protect** 117:2
**prouty** 2:15
7:13 8:20
23:20,22
**provide** 27:8
30:12 31:11
32:22 44:7
91:12 92:17
108:14,17
118:21,22
123:22 124:13
126:6,8 131:5
131:10 132:6
133:5,8,9,10,11
133:18,22
**provided** 5:12
11:12 17:24
33:7 74:16
130:1,14
133:21
**provides** 55:24
55:25 131:24
132:14 133:5

**providing** 4:10
11:4 28:22
103:9
**public** 1:23
20:2 133:11,12
141:4,24
143:10,18
144:15,23
145:23
**publications**
122:6
**publicly** 111:10
111:19 116:20
118:1 131:11
133:3,10
137:23 138:17
138:21 139:3
**published**
99:19 100:3,10
138:2 139:3
**pull** 18:3 23:16
90:6 92:3
**pulled** 42:20
**pulling** 9:7
**purpose** 129:19
**purposes** 75:9
**pursuant** 140:3
140:7
**push** 91:7
**put** 5:16 7:11
48:15 61:7
78:14 139:6
**putting** 96:15

**qualified** 141:6
**quarter** 109:1,2
**quarterly**
138:8
**question** 6:19
10:4 17:14
21:19 61:8,14
64:11 67:8
83:14 102:1
107:18 110:25
111:5 113:24
114:5,8 115:13
117:20 119:7,9
**questions** 6:22
18:16 25:24
27:15 61:4,6
65:14 101:12
104:8 107:22
108:12 128:14
134:3,9 139:17
**quickly** 43:17
**quite** 10:24
33:17 34:21
104:5
**quote** 19:11

| r |
|---|

**r** 136:16
**race** 11:7 12:6
32:24 33:24
34:4,5,11,14
47:18 55:24
56:2,10 57:22
59:17 69:7,17
72:15,17 81:20

www.veritext.com                                                    888-391-3376

84:20 96:6
**races** 53:22
  68:12 69:3,11
  69:12 70:4
  72:21 73:7
**racial** 15:4,5,21
  19:25 32:14
  33:14,20 35:22
  35:23 41:21
  47:19 51:16
  53:9,13 60:3,4
  113:4 114:21
  128:18 129:17
**racially** 4:24
  15:7,7 29:25
  30:2 36:7,16
  36:17 37:9
  38:15 41:20
  42:12,16 44:2
  48:4 50:13,15
  51:7 52:21
  53:21 56:4
  59:8 60:20
  61:18 62:12
  63:9,14 81:18
  84:19 85:14
  87:20 95:1
  96:3,19 98:14
  98:24 99:1
  121:20,21,23
**railroad** 69:13
**raise** 32:19
**raleigh** 2:8
**range** 40:4 41:5
  45:6 53:5

65:10 71:23
93:19,23
105:18,21
121:8 126:6,8
133:8
**ranging** 64:6
  64:13,18 65:5
**rate** 85:22
  94:23 114:23
  114:25 115:2,6
  115:15 116:1
**rates** 49:7 83:1
**raw** 90:6
  126:22 128:23
**reach** 22:5
**read** 14:18
  18:13 19:4,5,8
  33:4 61:25
  62:22 63:3,4
  64:6,14,18
  65:6 71:17,18
  72:11,19,22
  89:21,25 90:4
  90:19 92:9,24
  93:2,5 94:3,7
  98:8 99:4,18
  99:25 100:5
  105:21,23
  106:10,16,18
  117:10 136:2
  139:20 143:5,6
  143:12 144:5,6
  144:17
**reading** 52:24
  54:3 65:11

88:20 90:14,25
92:1,7 142:19
**readme** 114:14
**ready** 24:15
  104:19 136:21
  136:22
**real** 79:13
  91:20
**realignment**
  34:9 35:1
**realistically**
  77:14
**really** 12:8
  13:24 15:12
  24:18 33:11
  34:13,24 43:16
  53:16 57:16,25
  59:4,15 77:24
  116:18 117:9
  121:5 124:9
  132:9
**rearrangement**
  34:3
**reason** 48:15
  91:20 142:14
  144:8 145:3
**reasonable**
  13:14
**reasons** 45:11
  47:20 72:5
  94:16,20
**rebuttal** 4:19
  10:24 16:3
  17:15,19 18:2
  18:3,8 19:10

19:20 38:23
39:7,9,12,16,21
39:22 40:2,13
81:10 107:2,10
107:20 128:7
128:10 133:16
134:11
**recall** 11:24
  17:16 22:17,25
  25:5 56:16
  98:25 104:14
  106:4 108:1
  124:4,9 134:23
  135:15 138:1,4
  139:1
**receipt** 142:18
**receive** 24:1
  117:25
**received** 24:2
**recent** 36:15
  91:21 94:11,13
  95:25 99:13
  100:20
**recently** 100:5
  110:1 134:12
  135:19
**recognize** 7:15
  7:16 135:7
  136:25
**recollection**
  42:19
**record** 5:17,23
  6:8,25 7:5 9:24
  9:25 37:15
  66:5,7 104:10

107:15 134:5
139:14 144:9
**redistricting**
30:1 31:11
32:10 99:16
109:12 113:9
113:13,15,17
113:20 114:2,6
114:9 115:11
130:22
**refer** 30:5 53:5
100:15 121:25
122:3
**reference** 40:16
40:20 43:4
50:9 54:7,18
54:22 67:10
72:20 81:15
84:13 105:12
106:12 142:7
143:2 144:2
**referenced**
53:24 71:1
137:9 143:11
144:15
**references**
105:10,13
**referencing**
68:5
**referred** 107:23
121:18 122:5
**referring** 11:10
12:7 111:22
112:3,5

**refers** 54:11
**reflect** 107:8
**reflection**
48:14
**reflects** 25:14
**reforms** 33:23
**refresh** 42:18
**regarding**
41:17 54:25
140:2,11
**regards** 49:3
73:15
**region** 77:9
82:16,18,22
87:23
**regions** 35:23
**regular** 140:13
140:15
**related** 11:7
12:6 19:9
21:15,23 23:7
25:1 38:15
98:24 109:22
**relative** 64:2
141:14
**relatively** 44:16
73:18
**release** 138:20
**released** 135:19
**relevant** 12:9
12:16 13:1
25:14 68:13
**reliability**
43:23

**reliable** 44:8
115:15 119:8
119:21 120:23
132:7
**relied** 16:22
17:3,6,8,12,20
46:24 98:5
102:13 114:6
115:11
**rely** 16:20
17:19 18:1
47:2 113:13,15
113:17 134:17
136:13,15
**relying** 18:4,6
98:25
**remainder** 59:2
**remedial**
135:11
**remember**
19:14 37:22
41:5 59:24
80:10 81:13
88:6 105:7
106:6
**remembering**
137:19
**remote** 2:1
**remotely** 1:13
1:24 5:3
**repeat** 97:3
**repeatedly**
51:18
**repeating** 10:5

**rephrase** 46:13
113:24 119:10
**replaced** 37:5
**replication**
17:21 44:14
**reply** 107:2
**report** 4:3,19
4:21 7:19,21
8:5,23 10:5,15
10:17,22,24,25
11:4,5 12:22
12:24 13:17,21
15:25,25 16:3
16:4 17:11,15
17:19 18:2,3,8
19:12,18,20
21:3,5,6,7,9,12
23:4 38:14,20
38:23,25 39:2
39:5,6,7,9,9,13
39:16,21,22
40:2,4,13,15
46:19 47:5
50:2 52:20
54:2,10,14,21
55:16 56:14,16
56:20,23 59:1
61:2,16 63:5
65:13,18 66:19
66:20 67:2
72:20 73:6
74:23 75:1,9
75:14,17,23
80:16 81:7,9
81:10,15 83:1

83:3,6 84:4,9
86:13 97:12
100:19 103:4
103:18,21,22
104:5 107:2,2
107:9,10,20,24
108:4 122:5
128:6,7,10
129:3 133:14
134:12 135:11
135:15
**reported**
122:17 123:6
128:10
**reporter** 1:23
3:14 5:2 7:4
9:22 97:3
143:7
**reporter's** 3:11
141:1
**reporting** 5:6
**reports** 11:19
12:3 13:18
16:21 18:13,14
19:11 22:16,19
23:1 39:8,19
40:6 74:12,18
96:16 108:4
109:7 134:11
134:19
**represent**
93:11,14,24
**representation**
4:16 90:8
104:24

**represented**
46:10
**representing**
94:24
**represents** 87:6
94:7
**republican**
35:2
**republicans**
49:1
**request** 144:9
144:11
**requested**
140:1,7,11
**require** 12:11
15:9 90:16
**required** 29:14
29:20 90:17
93:16 142:25
**requirements**
27:18
**requires** 15:12
34:2
**requisite** 26:18
**research** 19:24
34:8 138:3
**resolves** 20:1
**respect** 97:24
111:4
**respective** 68:8
135:23
**respectively**
65:21 67:17
73:20

**response** 11:5
12:11 16:6
21:20
**restate** 61:14
**result** 96:21,24
110:15
**results** 11:20
15:9 44:2,18
48:4 60:22
63:17 66:23
67:4 73:3
79:15 80:14
85:19 87:4,8
111:3 128:10
**resume** 24:13
25:13
**retained** 3:14
**return** 18:7
**returned**
142:18
**returns** 16:24
60:8
**review** 13:1
19:19 21:5
41:25 54:21
100:19 106:8
134:14 138:19
140:2,7 142:12
143:1 144:1
**reviewed** 18:13
19:1 22:15,20
103:18 134:10
134:11
**reviewing**
22:25

**revolves** 19:25
**richard** 99:2
**right** 6:11,23
8:9 9:17 12:19
14:6 20:16
30:17 33:11
42:6 45:13
46:25 50:18
54:23 59:2
61:25 63:15
64:7,14 65:6
65:11,12 66:24
71:3 77:17,19
81:7,18 84:14
88:12,25 89:5
89:6,7,11,16,21
89:25 90:3,14
90:15,18,20,25
91:25 92:5,24
93:2,5 94:3,6,7
95:18 108:3
112:1 114:12
117:22 124:21
130:16 131:20
131:23 132:25
133:3 137:7
**rights** 4:17
27:11,19,23,24
28:16 33:22
58:2 97:22,25
98:3,20 99:11
104:25
**rodney** 1:4
**role** 5:22 33:1

Veritext Legal Solutions
www.veritext.com                                                  888-391-3376
Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 71 of 85

| | | | |
|---|---|---|---|
| **root** 130:5,8 | **sample** 110:14 | 78:1,17,18,20 | 68:13 70:2,5 |
| **roswell** 31:18 | 116:9 121:10 | 80:8,13 84:5 | 71:10,19 72:8 |
| 32:2 | 132:4 | **se** 60:18 117:3 | 73:3 75:19 |
| **rough** 140:13 | **sampling** | **seal** 141:19 | 76:1,8 78:7 |
| **roughly** 14:10 | 121:11 | 143:15 144:21 | 79:19 81:3 |
| 18:18 19:14 | **saying** 57:17 | **sean** 22:22 | 84:12 85:1,3 |
| 41:13,14,14 | 59:24 72:24 | 106:6 115:12 | 86:16,22 87:3 |
| 62:25 74:14 | 73:8 132:20 | **second** 6:22 | 87:20 90:12 |
| 88:5 93:22,23 | **says** 76:6 86:14 | 28:10 37:23 | 92:3,4,16 93:8 |
| 108:7 | 135:18,22 | 47:8 50:3 68:3 | 93:22 95:15 |
| **round** 70:24 | **scenario** 58:6 | 70:2,7 84:11 | 97:12 101:15 |
| **rounds** 95:25 | 62:9 79:25 | 135:17 | 101:20,23 |
| **rpr** 1:23 141:4 | 95:3,8 125:10 | **section** 18:4 | 102:5,6,10,13 |
| 141:23 | **scholars** 103:24 | 27:23 47:7 | 102:22,22,23 |
| **rpv** 30:6,6,12 | **scholer** 2:3 | 52:20 54:3,15 | 103:1,13,16 |
| 30:14,18 31:11 | **school** 31:18 | 55:1 56:14,15 | 104:18,23 |
| 32:5 35:7,13 | 32:2 | 56:17,20,23,25 | 105:1,3,11,12 |
| 50:3 51:3 55:8 | **science** 97:20 | 58:25 66:2 | 105:18,19 |
| 55:12,14,19,20 | 120:9,16 | 67:3,4 74:22 | 115:16 119:20 |
| 63:5 76:21 | **scientists** 35:25 | 74:25 75:18 | 130:13 134:15 |
| 104:1 | 52:11 | 105:10 | 135:4,18,20 |
| **rule** 28:4 48:19 | **scratch** 79:6 | **see** 13:3,19 | 138:10 |
| **rules** 5:12 | **screen** 7:12,13 | 14:12,16 15:9 | **seeing** 51:4 |
| 52:12 118:9,15 | 8:1,13,24 9:5,7 | 15:14 19:14 | 63:18 64:5,12 |
| 118:25 140:3,8 | 9:8,13 | 24:9,9 30:24 | 64:17 65:5,9 |
| 143:5 144:5 | **scroll** 8:5 | 32:21 34:12 | 90:12 94:2 |
| **run** 34:18 | **sd1** 63:20 65:5 | 36:6,8,14 47:8 | 106:4 138:10 |
| 91:15 | 66:21 68:16,17 | 47:10,22 50:7 | **seeks** 28:16 |
| **running** 85:11 | 68:23 70:13 | 50:8,9,10 | **seem** 48:5 |
| | 72:14 76:17 | 52:21,25 54:4 | **seems** 43:19 |
| **s** | 77:21 78:1,17 | 54:7,8,16,18 | 109:25 |
| | 78:18,20 80:8 | 56:14 61:11,19 | **seen** 21:6 74:11 |
| **s** 142:15 144:8 | 80:13 84:5 | 61:22,24 62:20 | 74:12,15 |
| 144:8 145:3 | **sd2** 66:21 68:16 | 63:11 64:9 | 102:17 104:4 |
| **safe** 62:2 | 68:18,23 70:13 | 65:22 67:18,18 | 106:1,9 112:24 |
| **sake** 30:6 | | | |

**select** 4:13
103:12
**selected** 102:8
**senate** 4:13
63:10 68:20
69:9,16,25
70:11,13 71:3
71:6,12,12,22
72:14 73:8,17
73:20 77:5,6
79:18,19 83:10
83:20,20
103:13 123:13
128:11 129:6
129:11,11,20
129:23 130:3
130:23,23
131:14,23,24
131:25 132:8
132:12,15,17
**senators** 41:4
**sense** 11:22
13:8 38:11,18
48:24 60:7
94:9,12,15
100:4,6,7
115:8 120:21
138:11
**senseless** 78:24
**sensible** 60:22
**sent** 23:22
**sentence** 50:3
68:3 70:3,8
76:6

**separate**
128:22
**september** 1:16
24:12 103:4,16
**serious** 50:22
**serve** 20:17
**served** 23:10,11
**serves** 38:9
40:19 59:9
**serving** 134:23
**set** 9:20 17:20
18:5 34:24
50:5,6 51:16
77:23 81:2,22
85:8 87:18
96:20 120:25
124:18 141:18
**sets** 28:5
**several** 41:6
136:1
**shapefile** 17:23
**shapefiles** 17:3
17:5,5,7
**share** 7:12 8:17
9:5,13,14
23:17 46:20
61:24 62:20
63:5,6 72:7
81:24 82:1,3
86:2 127:19
**sharing** 7:13
8:11,15 9:5
38:10
**sheet** 142:13
144:7,10,18

145:1
**short** 14:2
108:10
**shot** 77:14
**show** 44:10
80:3 110:6
128:9
**showed** 80:8
88:22
**showing** 87:22
88:10
**shown** 142:16
**shows** 93:15
**side** 86:10 89:2
112:17
**sign** 139:20
**signature** 140:5
141:23 142:14
**signed** 143:13
144:18
**significance**
26:7,23 27:2
**significant**
26:11,15,21
27:5 31:6
**significantly**
48:12
**signing** 142:19
**similar** 17:7,20
36:17 44:3
63:4 78:4
92:15 103:25
104:6 113:11
137:22

**similarities**
36:24
**simple** 92:21
**simply** 59:18
**simulate** 84:18
88:2
**simulated**
85:11 87:5,7,7
**simulating**
87:25
**simulation**
82:11 84:17
85:6,8 86:14
87:12,17 88:21
93:15
**simulations**
84:10 87:2,2,8
87:13
**sincerely**
142:21
**single** 34:15
113:11 132:11
**sir** 142:10
**sit** 11:3 33:9
115:25
**site** 131:21
**sitting** 5:17
**situation** 14:19
48:21 50:23
72:6 119:25
121:6
**situations**
52:14 68:10
**six** 89:10

Case 4:23-cv-00193-D-RN Document 88-4 Filed 10/28/24 Page 73 of 85

slow   35:1
small   62:11
smaller   44:12
    62:12 76:12
social   52:11
    120:15
socioeconom...
    12:14,18
sociological
    138:3
software
    123:17 136:14
    136:15
soley   58:2
solutions   142:1
    145:1
somebody
    56:12 74:13
someone's
    138:17
somewhat
    106:23 110:1
    116:16
sorry   8:10 9:8
    44:13 53:11
    61:12 64:2,23
    76:21 107:13
    123:2 127:7
    128:14 131:8
sort   9:5 34:18
    35:20 36:25
    57:14,23 71:17
    71:25 74:14
    78:24 88:15
    91:23 94:21

95:24 96:1,7
96:17,18,19
106:17 111:25
114:18 116:12
117:1 120:6,16
120:19 121:3
124:13 134:2
136:14
sorts   93:13
sound   54:22
    112:1
sounded   106:4
sounding   38:17
sounds   29:3
    45:13 92:5
    132:13
sources   100:25
south   34:14,25
    35:4,5,8,11,13
    35:14,16,17
    36:1,3 102:9
southeast   78:8
southeastern
    78:11
southern   36:10
    40:25 41:17
span   93:10
spans   93:7
speak   22:8 50:1
    66:11,13 116:5
spec   106:21
specific   4:12
    13:16,25 14:6
    15:17 25:11
    33:7 36:2 43:7

55:7 63:3 68:6
72:3 73:16
76:14 77:22
80:20,23 85:3
85:5 101:25
103:12 115:13
126:19 136:8
specifically
    13:10 25:2,7
    27:23 29:17
    30:25 34:4
    35:24 40:24
    41:9 50:20
    106:19,20
    112:3 114:25
    116:4
specified
    141:13
speculate   74:2
spell   29:2
spend   40:1
    113:10
spending   69:8
    69:22
spent   41:8
    116:22 137:18
split   112:9
    113:5 114:11
    115:3 136:9
splits   112:14,15
spoiler   23:16
spoken   45:18
    109:9,12,20
spot   30:17

spruill   2:6
square   73:10
    130:5,7
squared   130:8
    130:8
ss   141:2
ss1   78:13
ss2   78:14
stage   21:3
    34:24 75:15
    84:24 137:20
stages   74:13
standard   56:7
start   12:25
    58:8,10 66:2
    84:25 128:14
    131:12
started   7:10
    38:7 39:20
    124:10
starting   34:5
    57:14,15 110:2
starts   75:18
    84:25
state   1:8 4:11
    6:6,8 16:23
    31:9 35:15,17
    35:21,22,22,24
    36:22,22 37:9
    44:21 49:2
    55:25 56:5,7
    56:13 63:10
    65:20 66:20
    67:14,19 68:10
    69:9,16,25

Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 74 of 85

71:3,6,22
72:14 73:8,16
73:17,20 75:24
77:5,5 78:8,12
79:18,18 83:10
83:19,20 84:11
102:9 103:11
110:23 111:18
123:13 130:3
130:15,22
132:13 141:2,5
141:24 142:6
143:3,10 144:3
144:15
**statement** 46:6
50:14 54:10
106:3 143:13
143:14 144:19
144:19
**states** 1:1 4:16
27:18 29:20
31:22 40:25
41:17 48:24
55:23 57:6
60:11 70:3
104:24 108:11
**statewide** 52:21
53:2 61:19
62:25 68:12,16
68:19,21,25
70:14 71:14
72:18,18,22
73:19
**statistical**
14:24 15:1,11

26:6 27:7
34:18 47:16
52:16 119:6
120:1,20,22
136:16
**statistically**
26:11,15,20,21
**statistician**
114:4 120:7
**statistics** 26:18
26:20 119:7,12
119:14 120:10
120:11,15
121:4,9
**stay** 9:24
**ste** 2:16
**stenographic**
1:23
**stenotypy**
141:9
**step** 119:5
**stepping** 73:22
**stick** 23:18
**stipulate** 5:3
**stone** 77:23
81:2
**store** 85:19
**straight** 86:22
**strategy** 110:1
110:3,10
**street** 2:7
**strike** 75:24
**strong** 34:17,25
**strongly** 35:3

**studied** 36:10
40:22 78:10
**studies** 60:4
96:3 97:25
99:11
**study** 35:25
42:7 49:21
69:25 118:3
120:11
**studying** 70:11
**stuff** 33:2 36:1
**subject** 24:21
**submission**
24:16 30:1
**submitted** 10:6
11:15,19,23,25
12:4 17:15
21:2 22:16,20
23:1 24:6,17
30:6,18 35:7
35:13 39:1,4
75:14 107:2,9
107:20 109:6
**subscribed**
143:10 144:14
145:21
**subset** 67:10,12
67:15,19,24
72:3 73:19
76:12 95:8
**subsetting** 68:5
**substance** 40:5
**substantial**
51:1

**suggest** 37:12
**suggested** 16:4
**suggesting** 13:4
**suite** 2:7,13
142:2
**sum** 128:21,24
128:25 130:8
135:25
**summarize**
16:5
**summary**
135:18
**summation**
122:11
**sunday** 18:20
**superior** 59:10
59:23 60:1,2
142:1
**supplemental**
10:25 11:4
13:18,21 16:4
**support** 28:11
51:18,24 65:21
134:10
**supported**
52:25
**supports** 51:16
**suppose** 80:20
121:4 125:12
**supposed**
120:12
**supreme**
100:11
**sure** 5:10 8:6,8
9:19 10:3

11:23 30:16
46:15 53:12
61:15 75:22
81:11 83:15
92:6 113:25
118:7,12,20
121:24 122:5,6
124:16 136:19
137:18,22
139:1,9
**surname** 43:1,2
**surprise** 100:9
100:14
**surrounding**
33:22
**survey** 14:16
108:10,11
110:14 116:9
130:3
**surveys** 132:5
**suspicion**
137:25
**sustained** 96:2
**swear** 5:4
**sworn** 5:13
141:7 143:10
143:13 144:14
144:18 145:21
**system** 34:4,9
**systems** 17:4

**t**

**table** 83:4
102:6,7 103:1
133:16

**tables** 133:17
**tabulation** 56:1
60:3
**tabulations**
56:3
**tact** 109:25
110:3
**take** 5:3 6:15
6:19 7:15 8:4,7
33:6 37:12
65:14 82:8
85:23,24 101:4
101:7 102:20
103:2 104:8
113:3 114:15
126:3 128:18
130:7 134:3
139:11
**taken** 1:15 72:1
135:19 141:9
141:12
**takes** 57:20
**talk** 7:7 18:22
22:2 45:21
99:25
**talking** 53:18
54:25 75:23
83:25 111:1,2
118:24 119:1,3
119:4 127:8,23
**tease** 33:19
**teased** 33:13
**technical** 50:18
51:6

**technique**
47:17
**tell** 22:19 26:14
27:4 49:22
70:12 73:22
119:15 133:1
137:16,21
**telling** 119:15
**tells** 122:10
**tend** 69:14 74:7
95:25
**tenure** 20:25
**term** 6:23
15:13 26:6,23
28:25 29:4,5
74:1 83:15
96:2 114:22
116:14
**terms** 16:8,15
17:11 18:4,5
47:19 48:4
50:22 51:5,9
54:24 55:14
73:14 80:5
83:4 95:5
103:25 114:25
115:14 117:4
118:6 120:23
121:23 131:17
133:21,22
**test** 9:6 28:5,7
**testified** 12:15
98:22 123:7
**testify** 24:1
38:14 104:19

135:3 136:21
141:7
**testimony**
16:17 66:1
118:13,17,17
141:8,12 143:6
143:7 144:6,9
144:12
**texas** 35:10,10
35:13 69:13
**text** 133:21
**thank** 5:16,25
17:13 65:1
88:4 111:6
133:13,24
139:17,18
**thanks** 9:2
**theodore** 2:3
5:9,24 8:10,22
11:18 12:2,20
13:7,23 16:7
18:24 21:8,13
21:18,25 23:3
23:21 26:16,25
27:20 28:19
29:15 31:5
32:15 33:15
35:9,19 36:19
37:14 42:2
43:24 44:9
46:12 47:15
50:17 52:4
55:5 57:10
58:4 59:3
60:16 62:8

63:23 64:8,23
67:1 69:2
72:23 73:11,25
75:5 76:19
80:18 81:8
83:12 87:10
91:1 94:19
96:23,25 97:6
98:1,7,21
99:24 100:13
101:3,8 102:15
102:20,25
106:14 108:19
109:24 110:13
110:18,22,25
116:3,8 118:10
118:16 119:23
120:14 123:4
124:19 125:7
125:21 127:5
131:2 139:20
140:15 142:5
**theoretical**
  57:15 82:24
**theoretically**
  125:23
**thing**   13:17
  15:3,20 51:10
  51:11 67:24
  86:9 96:7
**things**   14:5
  15:14 21:1
  32:19 72:11
  83:8 98:9
  111:19 117:14

137:20
**think**   7:11 8:16
  8:17 9:6 10:24
  12:12 17:22
  19:10,11,13,20
  23:6,13,18
  24:14 25:3,3
  29:2,7,18
  30:20,20 31:6
  32:7,16,25
  33:6,9,11 37:7
  37:10,20 38:7
  39:3,17,18,22
  39:23 40:3
  41:22 42:5
  43:10 45:2
  46:13 48:3
  50:19 51:6,21
  55:1,17 57:13
  58:15 61:13
  62:11 63:24
  64:24,24 65:7
  65:25 69:10,14
  69:15 72:6,24
  74:2 77:25
  78:3,19 80:1
  81:10,14 84:6
  88:25 89:6,6
  90:1,5,15,20
  94:11,13,21
  95:17 99:3,16
  99:17,18 100:6
  100:18 105:24
  106:6 108:3,24
  110:9,25 113:8

115:12 116:18
117:20 120:15
121:22,23
128:3 132:18
133:23 134:1
134:17 139:8
139:11
**thinking**   12:25
  36:3
**thinkings**
  115:22
**third**   28:12
  62:25 89:8,10
  137:5
**thirty**   142:18
**thompson**
  61:25 62:2,5,9
  62:18,21
**thornburg**   28:1
  28:4
**thought**   50:3
  57:4
**three**   16:9,12
  16:16 18:12
  28:7 99:19
  120:1 128:18
  128:19 129:13
  129:17 130:6,6
  130:8
**threshold**   74:3
  87:18
**ticket**   68:13,25
  70:14 71:7,10
  71:24,24 72:15
  72:17,21

**tidy**   112:1
  123:17,20,24
  124:2,5 128:25
**time**   8:7 13:1
  14:2,17 16:5
  30:6 41:8 42:5
  45:6 53:19,19
  54:7,10,22
  60:21 72:10
  88:17 96:13,15
  96:17 101:4
  102:20 113:10
  116:22 120:18
  132:5 139:17
  141:12
**times**   100:12
  119:6 120:21
  120:21 121:12
**timing**   138:5
**title**   42:19
  43:21
**titled**   4:7,9,15
  4:22 41:19
  52:20 54:3,15
  56:16 61:18,21
  63:13 67:3
  74:22 75:18
  101:18 102:6
  103:9 104:15
  104:23 107:10
  134:24
**today**   6:4 11:3
  33:9 36:7,14
  73:7 115:25
  139:17

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376
Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 77 of 85

**today's** 18:10
**together** 33:24
  78:14 96:16
  128:21,25
**took** 132:5
  136:8
**tool** 124:13
**tools** 87:19
**top** 25:6 48:24
  67:10 68:12,25
  70:14 71:7,10
  71:11,23 72:15
  72:17,21 92:8
  92:21 94:21
  115:22
**topic** 100:3
**total** 126:18
  128:21 129:12
  131:17 135:25
  135:25
**totally** 119:9
**touched** 123:16
**tough** 123:3
**towards** 91:7
**tracing** 33:23
**traditional**
  88:1
**transcribed**
  141:10 143:7
**transcript** 3:1
  140:2,7,10,12
  140:13,15
  141:11 142:11
  142:12 143:5
  143:12 144:5

144:11,17
**transfer** 8:17
  8:20
**traveled** 44:23
  45:3
**traveling** 44:21
**treasurer** 69:12
**trend** 72:10
**trende** 22:22
  115:12 122:16
  123:5 134:21
**trende's** 134:19
**trends** 53:18
  120:17,18
**trial** 14:9 16:17
**true** 7:18 8:6
  12:21 15:10
  26:11 27:6
  107:9,19 120:4
  121:10,11
  141:11
**truth** 141:8
**try** 7:7 15:9
**trying** 12:12
  25:3 34:8
  43:22 50:12
  57:13 59:16
  60:5,23 67:9
  73:5,10 74:14
  87:5 89:12
  92:6 115:1
  123:25 126:13
  130:18 132:10
  132:16

**turn** 24:7 30:10
  46:19 47:5
  52:19 61:1
  67:2 75:21
  86:13 102:2
  105:9
**turned** 39:22
  137:10
**turning** 38:25
  64:21
**turnout** 12:13
  12:18 14:20
  48:13 49:7
  57:24 59:14
  69:19 81:16,17
  81:19 82:5,7
  82:23 83:1,3,7
  83:7,25 84:4
  84:20 85:22
  91:3 95:4,5,24
  96:6 104:1
**twice** 63:19,24
  90:24 100:11
**two** 16:4 23:9
  38:2 48:25
  50:20,22,22
  62:10,10,14
  73:10 94:2,20
  95:10 96:8
  97:11 100:25
  138:8
**type** 57:1 69:11
  74:10 80:20
  96:6 103:25
  106:7 115:13

119:24
**types** 14:5
  15:18 69:12
  72:10 79:3,4
  83:8 95:23
  115:23
**typical** 35:12
  35:24 96:4,19
  121:8,13
**typically** 14:3
  26:8 28:13
  33:3,21 36:6
  48:12,13 49:5
  49:7,8 51:3,20
  52:5,12,17
  69:10,15 87:13
  95:4,5,23
  113:17 117:11
  136:16 138:15
  138:19,21,22
  138:24

---

**u**

**u** 99:6
**u.s.** 71:12
  108:13 111:20
  135:20
**uh** 43:18
**ultimately**
  49:18
**unavailable**
  47:20
**unc** 41:15
  44:22 45:9
**uncertain**
  121:3

Veritext Legal Solutions
www.veritext.com 888-391-3376
Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 78 of 85

| | | | v |
|---|---|---|---|

**uncertainty**
119:6 120:1,12
120:16,20,23
120:24 121:2
121:14

**unclear** 111:1
119:11,18,19

**uncompetitive**
70:23 73:18

**under** 24:20
27:19,22 28:10
83:21,22 90:6
91:2 92:14
94:10 95:11
135:17

**underlying**
89:1 92:3
124:21 125:4,4
125:10,13
127:16 132:2

**understand**
5:21 6:10 7:5
27:14 34:8
35:6 40:6
41:24 43:22
50:14 53:3
55:20 60:5
61:6 67:8,9,23
73:12 77:15
84:1 87:5
89:16 96:14
115:1,5 130:19
132:10,16

**understanding**
12:3 21:10

27:16 28:15,21
29:12 31:4
34:3 40:17,20
48:7 50:12
62:24 73:5,23
74:20 76:24
98:19 103:24
112:12 114:9
115:2 116:17
122:18,20
123:8,19

**understood** 8:5
114:2,6

**unique** 13:11
14:4 78:13,13

**unit** 82:19,21
104:8 134:2

**united** 1:1
108:11

**units** 70:20
73:21 81:21
122:13 124:21
125:1 132:8

**university** 20:7
41:2 97:19

**unnecessary**
59:13

**unreliable**
34:21 44:5

**upcoming**
11:10

**updated** 11:2

**updates** 24:13

**use** 6:23 15:13
26:6,23 28:25

29:4 30:2
49:11 55:4,11
55:13,15,18,19
56:6,19,22
59:1,5,11,13
60:19,22 72:1
72:2 74:2
75:24 76:6
82:19 87:19
88:2 96:17
110:2 112:4,25
112:25 113:8
113:11 124:2
124:15 126:20
127:12,15,18

**used** 19:12
42:11 58:22
68:11 77:1
116:24 134:16
135:18

**useful** 13:17
49:6 57:12
58:1,13 72:5
99:21 100:1

**using** 44:3
58:21 82:21
91:15 103:25
112:24 117:11
117:12 120:5
122:17,22
123:6 124:10
124:10 128:25

**usually** 138:20

**v**

**v** 6:5 135:11
142:6 143:3
144:3

**v.o.** 36:8

**vacation** 45:11

**vague** 100:4,6

**validating**
115:23

**value** 94:3

**values** 53:6

**vap** 57:22
58:22

**variables**
122:12

**variety** 72:5
133:22

**various** 17:25
26:18 31:23
32:19 33:5
70:19 74:12
108:6 111:3,18
112:24 115:18
123:23

**vary** 92:12

**vast** 39:23

**vector** 92:18

**verbal** 7:4

**veritext** 8:16
142:1,7 145:1

**veritext.com.**
142:17

**version** 76:12
137:14,17,22
137:24 138:7

138:12,23
**versus** 15:21
  17:1,1 28:1,4
  33:3,14 59:20
  79:12 82:18
  85:22 91:4
  134:24
**vertical** 89:17
**video** 8:2
**videoconfere...**
  5:5
**view** 15:15
  35:15 36:16
  51:25 62:7
  99:21 110:20
**visit** 44:21
**visited** 41:15
**vitae** 24:5
**vote** 16:24 29:8
  33:25 47:10,19
  48:11,22 50:23
  50:25 51:22,25
  53:22 56:1
  60:5,6,7,19,25
  61:24 62:20
  63:5,6 79:23
  82:9,9 85:16
  85:18 86:11
  92:21
**voted** 17:1 56:2
  56:9 57:22
  60:9,10,13,15
  60:18,24 62:25
  81:25 82:2
  94:25

**voter** 12:13,17
  14:19 34:16
  47:17 48:13
  55:24 81:19
  84:19 95:24
  96:6 104:1
**voter's** 53:9,13
**voters** 4:10
  28:6,10,13,14
  28:17,23 29:8
  29:9,9,21
  32:13,23 33:13
  34:24 35:1
  43:8 45:19
  47:14,18 48:11
  49:1 50:4,6,24
  50:25 51:2,17
  51:22,24 52:1
  52:25 53:22
  58:3,17 59:17
  60:4,5,6,7 62:3
  62:25 65:21
  66:22 67:6
  74:5,6 82:3,9,9
  82:12 85:16,17
  86:1,3,4,7,8,9
  95:9 103:9
  127:10
**votes** 28:6
  50:24 62:13
  94:22
**voting** 4:17,24
  11:7 12:6
  19:25 24:23
  27:7,11,18,19

27:23,24 28:16
29:25 30:2
32:13 33:23
35:16 36:1,7
36:12,17,18
37:9 38:15
40:22 41:3
42:8,8,12,16
43:5,9 44:2,20
45:19 46:16
48:5,14 50:13
50:15,16 51:1
51:2,8,9,20
52:21 53:9,13
53:21 54:19
55:20 56:5,24
57:1,5,18 58:2
59:9 60:4,20
61:19 63:10,14
63:19 64:1,3,6
64:13,17 65:5
65:10 77:12
79:20 80:8,9,9
81:19,25 82:1
82:17 84:19
85:15 86:1,3,7
87:18,20 91:11
95:2,6,10 96:3
96:20 97:22,25
98:2,15,19,24
99:1,11 104:25
114:18 115:20
121:20,21,24
127:14,19

**vra** 109:7
**vs** 1:6

## w

**w** 57:22
**wait** 70:24
**waive** 5:5
**waived** 142:19
**walk** 85:7
**walking** 133:14
**want** 8:6 29:2
  46:14 60:9
  81:24 82:1
  91:23 92:2
  96:17 104:8
  138:11
**wanted** 11:21
  53:8,12 91:11
  119:14 125:16
**washington** 2:4
  2:13 20:8
  109:11 134:25
**wave** 99:15
**way** 7:12 14:23
  14:25 25:8
  34:16 35:12,25
  36:2 44:11,19
  51:21 63:3,4
  84:12,15,16,17
  115:7,15 116:1
  124:14 125:19
  137:16
**ways** 14:25
**we've** 91:24
  101:4,11

Veritext Legal Solutions
www.veritext.com 888-391-3376
Case 4:23-cv-00193-D-RN   Document 88-4   Filed 10/28/24   Page 80 of 85

website 17:6
111:15,15,21
111:21 112:6
124:11,13
131:5,14,15
138:18 139:6
week 18:20
38:2
weight 48:15
48:17,20 49:8
114:18
weighting
113:6
welcome 66:10
went 41:2 45:7
45:9
whereof 141:18
white 15:21
17:1 28:13
29:8 35:1
36:11 48:22
49:23 50:4,25
51:2,21,24,25
52:25 58:2
60:6 62:20,25
63:6 65:21
80:8 82:1,9,18
84:25 85:17,22
86:3,6 94:23
95:4,8 116:12
127:17 136:1
whites 43:9
wide 82:22
widely 92:12

wider 76:7 77:1
width 93:22,23
wife 66:14
win 79:22 80:6
85:5 87:24
88:17 95:3
102:8
winning 77:14
wins 28:16,22
49:19
wise 72:7 138:5
wish 56:7
withheld 12:1
witness 5:4
21:21 23:10,11
32:9 75:10
102:19 134:24
139:13 141:6
141:10,12,18
142:8,11 143:1
143:4,11 144:1
144:4,15
witness's 140:2
witnesses 23:2
witness' 142:14
won 59:20,20
wondered 31:3
word 116:24
117:20
words 49:11
51:14 118:5
work 10:12
19:2 21:11,24
22:3,6,8,12
23:7 24:25

30:12 31:7
32:9 33:16,18
36:8 37:19
38:5 39:2,11
39:12,15,24
40:21 41:7,16
42:4,7 43:7,14
43:15 44:22,24
45:9 49:9 61:6
69:24 74:9
77:24 97:21
98:2,3,5,6,18
98:25 99:22
113:19 116:21
121:5,19 122:2
136:17
worked 109:13
109:14,14,19
working 39:20
100:8 109:19
138:16
works 68:2
84:17
write 38:13
73:1 80:2
106:15
writing 33:12
105:7 106:5
written 16:15
22:12 32:22
33:1 98:23
99:12 100:4,15
103:15 117:4
wrong 91:25

wrote 40:25
42:10 99:3,15
99:16,17 137:4
wvap 57:22
85:24

**y**

y 86:18 89:20
yeah 14:11
18:9 19:4
20:13 24:19
27:1 37:7,7
45:13 55:6
57:3 69:23
78:19 87:11
89:6,13 90:5
90:15 91:10
94:15 102:11
105:24 116:10
116:16 123:1,3
132:22 134:15
134:15,16
year 23:9 91:13
91:13 95:18,18
95:21,21
108:12,15,17
124:8,10 138:8
years 20:5,5
23:5 41:25
42:9 53:2
54:11 58:12
91:4,5,8,14,16
91:21 95:15
98:4 102:13
yesterday
18:20

Veritext Legal Solutions
www.veritext.com 888-391-3376
Case 4:23-cv-00193-D-RN    Document 88-4    Filed 10/28/24    Page 81 of 85

| z |
|---|
| **zoom** 1:13 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.