IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| RODNEY D. PIERCE and MOSES MATTHEWS, | |
|---|---|
| Plaintiffs, | Case No. 4:23-cv-193-D |
| v. | |
| THE NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF AUTHORITIES ON ANTICIPATED CONTESTED ISSUES OF LAW AND EVIDENTIARY QUESTIONS**

Plaintiffs Rodney D. Pierce and Moses Matthews, by and through undersigned counsel, and pursuant to Local Civil Rule 39.1, file this Memorandum of Authorities on Anticipated Contested Issues of Law and Evidentiary Questions. This Memorandum is offered for the purpose of complying with Local Civil Rule 39.1(a)(1) and is not intended to comprehensively brief all the legal or evidentiary issues in this case. Nothing in this memorandum is intended to waive any legal, factual, or evidentiary argument. Plaintiffs maintain that the evidence at trial will show that the 2023 enacted Senate map violates Section 2 of the Voting Rights Act (VRA).

**INTRODUCTION**

Northeastern North Carolina includes a number of counties that are part of the "Black Belt," a region that today refers to the counties with the largest Black populations in a number of Southern states, including North Carolina. Thanks to the Voting Rights Act, for the three-plus decades between the U.S. Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986) and the 2020 redistricting cycle, Black voters in North Carolina's Black Belt counties were consistently represented by their candidates of choice in the North Carolina Senate. Following the

2020 redistricting cycle, however, the General Assembly enacted Senate maps that crack Black voters across four different senate districts, ensuring that voters in only one of those districts have an opportunity to elect their preferred candidate. That violates the VRA. It is possible to draw an additional majority-minority district in the Black Belt region, an area where voting is severely polarized along racial lines, and the totality of the circumstances show that the political process is not equally open to Black voters.

## CONTESTED ISSUES OF LAW

The parties set out the legal issues in this case in the proposed pretrial order filed on December 20, 2024. The parties agree that this dispute is governed by Section 2 of the Voting Rights Act as interpreted in the U.S. Supreme Court's decision in *Thornburg v. Gingles* and its progeny. Those cases hold that a state legislature must draw an additional legislative district in which Black voters have the opportunity to elect their candidate of choice when the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," the minority group "is politically cohesive," "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate, and the totality of the circumstances demonstrate that the political process is not equally open to participation by members of the minority group. *Gingles*, 478 U.S. at 46, 50–51. The parties dispute whether the plaintiffs have standing and, if so, whether the enacted plan violates Section 2.

### I. Plaintiffs Have Article III Standing

For purposes of Article III standing, the relevant injury-in-fact in a Section 2 case "goes beyond the boundaries of a single district." *LULAC v. Abbott*, 604 F. Supp. 3d 463, 486 (W.D. Tex. 2022) (quoting *Perez v. Abbott*, 267 F. Supp. 3d 750 (W.D. Tex. 2017), *rev'd in part on other grounds*, 138 S. Ct. 2305 (2018)). The Article III injury is "Defendants' failure to draw the plaintiff into a *hypothetical* opportunity district that was not drawn" in the enacted map. *Id.* Plaintiffs here,

Rodney Pierce and Moses Matthews, both live in the area that Plaintiffs assert should have contained an additional minority-opportunity district, and both would be part of that opportunity district under each of Plaintiffs' demonstration plans. Plaintiffs thus have Article III standing to challenge the enacted map.

## II. Plaintiffs Satisfy All Three *Gingles* Preconditions

The first *Gingles* precondition is satisfied when Plaintiffs offer a demonstration map showing that the minority population is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Wis. Legis.* v. *Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam)). Although Plaintiffs need only introduce one such map to satisfy the first *Gingles* precondition, Plaintiffs have produced at least three.

It should be undisputed that Plaintiffs satisfy the numerosity requirement. Demonstration Districts A and C have Black Voting Age Populations (BVAPs) over 50%, and Demonstration Districts A, C, and D have Black Citizen Voting Age Populations (BCVAPs) over 50%. Legislative Defendants do not contest that Demonstration Districts A and C have BVAPs above 50%. And it is widely recognized that a BCVAP of over 50% is sufficient to satisfy the first *Gingles* precondition. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 429 (2006); *Pope v. Cnty. of Albany*, 2014 WL 316703, at *13 (N.D.N.Y. Jan. 28, 2014). The minority population is thus sufficiently large to satisfy the first *Gingles* precondition.

Plaintiffs' demonstration districts are also reasonably configured and geographically compact. Plaintiffs' districts are more compact than enacted Senate Districts 1 and 2, preserve the Black Belt community of interest better than the enacted map, are contiguous, and divide no VTDs. Demonstration District A splits no counties at all, and Demonstration Districts C and D split only one county. The county clusters drawn around the Demonstration Districts comply with (and are

required by) *Stephenson's* county clustering rule, which means those clusters are by definition reasonably configured under North Carolina law. *Stephenson v. Bartlett*, 562 S.E.2d 377, 396–97 (2002). Plaintiffs thus satisfy the first *Gingles* precondition.

The second and third *Gingles* preconditions are satisfied when the minority group "is politically cohesive" and "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Plaintiffs' racially polarized voting expert will demonstrate, and Legislative Defendants' experts have not disputed, that voting in northeastern North Carolina is polarized along racial lines, and starkly so. Black voters' political cohesion in the region is above 95%, and white voters unite to oppose Black-preferred candidates in Senate District 1 and 2 at rates of between 80 and 85% in recent years, and at rates approaching 90% in the area where most Black voters live and where an opportunity district could be drawn (which Plaintiffs' expert refers to as the Demonstration Area).

Plaintiffs' performance analysis showed that these levels of racial polarization result in blocking Black-preferred candidates from succeeding in almost every single analyzed race, and in every single race in 2018, 2020, and 2022. That is the end of the racial polarization inquiry. Plaintiffs' showing of racially polarized voting cannot be defeated by evidence that a Black-preferred candidate could be elected in a hypothetical district with slightly less than 50% BVAP. *See Gingles*, 478 U.S. at 50–51; *Covington v. North Carolina*, 316 F.R.D. 117, 170 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017); *Cooper v. Harris*, 581 U.S. 285, 306 (2017). The opposite is true: a performing crossover district with a BVAP of less than 50% *can* provide an effective VRA remedy. *Cooper*, 581 U.S. at 306. Plaintiffs satisfy all three *Gingles* preconditions.

### III. The Totality of the Circumstances Supports a VRA Violation

The ultimate inquiry in a Section 2 case, once the *Gingles* preconditions are satisfied, is whether the totality of the circumstances demonstrate that the political process is not equally open

to participation by members of the minority group. *Gingles*, 478 U.S. 46. "It will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Harris v. McCrory*, 159 F. Supp. 3d 600, 623 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285, 137 (2017) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). This is not that unusual case. It is a typical case in which the evidence will show that the totality of the circumstances confirm that the cracking of Black voters between districts denies them equal participation in the political process. The Senate factors uniformly support that conclusion.

## ANTICIPATED EVIDENTIARY QUESTIONS

### I. Redacting Plaintiffs' Expert Reports is Unnecessary

On December 18, 2024, the Court granted Legislative Defendants' Motion to Exclude "Demonstration District E." D.E. 91. Plaintiffs will make an offer of proof at trial and will raise this issue on appeal. Because certain of Plaintiffs' expert rebuttal reports contain information related to Demonstration District E, Plaintiffs propose that the Court simply admit those reports "subject to its prior ruling excluding Demonstration District E," or using similar language. Given that this is a bench trial, Plaintiffs suggest that this approach would avoid the unnecessary creation of redacted copies and avoid the need to enter multiple copies of the reports in the record, some with redactions and some without, which might make review more cumbersome for the Fourth Circuit. Because the Court has already seen the full expert reports in question and will disregard the excluded elements, Plaintiffs suggest that this approach is simplest and will not prejudice any party. Plaintiffs will of course work with Legislative Defendants to agree on redacted versions if the Court requires them, however.

## II. Legislative Defendants' Legislative Hearing Exhibits are Inadmissible Hearsay

Legislative Defendants apparently plan to offer five exhibits containing transcripts of legislative sessions, three exhibits containing transcripts of public comment sessions, along with eight corresponding audio recordings of those sessions. *See* LD005-12; LD63-70. Together, those transcripts span hundreds of pages and contain statements about a wide variety of topics from numerous legislators and members of the public. But these documents contain extensive hearsay. For example, Senator Daniel offered testimony about the purported reasons why the mapmakers concluded that it was unnecessary to draw a VRA district in northeastern North Carolina. LD10 at 23-25. Senator Daniel declined to respond to discovery requests or to be deposed on the ground of legislative privilege, *see* Ex. A at 1, and specifically stated as part of those objections that "he does not speak for the entire Senate Redistricting Committee or any of its other members," *see* Ex. B at 2.

These documents do not fall under the public records exception to hearsay. Statements by members of the public at a comment session or individual legislators at a legislative hearing are not "[a] record or statement of a public office" at all, nor do they set out "the office's activities." Fed. R. Evid. 803(8)(A)(i).[1] Furthermore, the circumstances here—partisan legislative hearings—are not consistent with the trustworthiness considerations that underlie the public records exception. Nor would it be appropriate to allow unsworn statements into the record from legislators who invoked their legislative privilege to refuse to be questioned about those statements. *Singleton v. Merrill*, 576 F. Supp. 3d 931, 940-42 (N.D. Ala. 2021) (stating that legislators cannot "seek to use their unique position as HB1's principal drafters as a sword to defend the law on its merits, but intermittently seek to retreat behind the shield of legislative privilege when it suits them").

---

[1] The exceptions in (ii) and (iii) are also not applicable on their face.

### III. Legislative Defendants' Draft Maps are Irrelevant and Otherwise Inadmissible

Plaintiffs object to Legislative Defendants' exhibits 14 through 18. These documents are unsourced printouts of draft maps that were apparently produced by the General Assembly's legislative staff as part of the redistricting process, many of which contain various percentages layered on top of districts without any indication or explanation of what those percentages even are. These unsourced maps are not relevant for any purpose under Section 2, which centers on the discriminatory effects of the enacted plan. *See Milligan*, 599 U.S. at 25 ("we have reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent."). The draft plans say nothing about the enacted map's discriminatory effects and thus have no legal relevance to Plaintiffs' claims or Legislative Defendants' defenses. Plaintiffs also object to these exhibits on the grounds of hearsay, foundation, and authenticity, and will address those objections as they arise at trial.

### IV. Legislative Defendants' U.S. Census Bureau Reports Lack Foundation and Are Otherwise Inadmissible

Plaintiffs object to Legislative Defendants' exhibits 25 through 28 and 33 through 40. Many of these documents appear to be printouts from the U.S. Census Bureau, but many are not self-explanatory or are likely to confuse, and Plaintiffs do not anticipate that Legislative Defendants have identified a witness who will explain their significance, Fed. R. Evid. 901(a), (b)(1), among other objections.

### V. Other Evidentiary Issues

Plaintiffs have additional objections to Legislative Defendants' proposed exhibits, as indicated on the exhibit list attached to the pre-trial order, but have focused on some key categories in this brief. Plaintiffs will reserve these arguments for trial and will raise them depending how and for what purpose Legislative Defendants' evidence is offered.

Respectfully submitted this, the 27th day of January, 2025.

**POYNER SPRUILL LLP**
By:/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
North Carolina State Bar no. 4112
Caroline P. Mackie
North Carolina State Bar no. 41512
Post Office Box 1801
Raleigh, NC 27602
Telephone: (919) 783-1108
cmackie@poynerspruill.com
espeas@poynerspruill.com

**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
By:/s/ R. Stanton Jones
Robert Stanton Jones*
Elisabeth S. Theodore*
John A. Freedman
Samuel I. Ferenc*
Orion de Nevers*
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
stanton.jones@arnoldporter.com
elisabeth.theodore@arnoldporter.com
sam.ferenc@arnoldporter.com
orion.denevers@arnoldporter.com

*Appeared via Special Notice*
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the cm/ecf system, which will send notification of such filing to all counsel and parties registered in said system.

Respectfully submitted this, the 27th day of January, 2025.

/s/ Orion de Nevers<br>
Orion de Nevers