# <u>Exhibit A</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

RODNEY D. PIERCE and
MOSES MATTHEWS,

               Plaintiffs,

    v.

THE NORTH CAROLINA STATE BOARD
OF ELECTIONS, *et al*.,

               Defendants.

Case No. 4:23-cv-193-D

## **LEGISLATIVE DEFENDANTS' PROPOSED POST-TRIAL CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.    Plaintiffs Seek Relief Beyond This Court's Article III Jurisdiction ....................................... 2

II.   Plaintiffs Failed to Establish the Three *Gingles* Preconditions ......................................... 5

   A.   Plaintiffs Failed To Establish the First Precondition........................................... 5

      1.   Demonstration Districts B and D Fail the Numerosity Standard.................................... 6

      2.   All Demonstration Districts Fail the Reasonable Configuration Standard.................. 12

   B.   Plaintiffs Failed to Establish the Third Precondition ......................................... 23

III.   Plaintiffs' Claim Fails Under the Totality of Circumstances ........................................... 28

   A.   Senate Factors .......................................................................................... 29

      1.   Senate Factor 1 ...................................................................................... 29

      2.   Senate Factor 2 ...................................................................................... 30

      3.   Senate Factor 3 ...................................................................................... 30

      4.   Senate Factor 5 ...................................................................................... 32

      5.   Senate Factor 6 ...................................................................................... 43

      6.   Senate Factor 7 ...................................................................................... 49

      7.   Senate Factor 8 ...................................................................................... 53

      8.   Senate Factor 9 ...................................................................................... 54

   B.   Additional Factors ...................................................................................... 55

      1.   Party Affiliation Explains Divergent Voting Patterns ................................... 55

      2.   Proportionality ........................................................................................ 59

CONCLUSION.................................................................................................................... 62

CERTIFICATE OF SERVICE .......................................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
585 U.S. 579 (2018)...............................................................................5, 14, 29

*Abrams v. Johnson,*
521 U.S. 74 (1997)................................................................................6, 59

*Adarand Constructors, Inc. v. Mineta,*
534 U.S. 103 (2001)....................................................................................2

*Agee v. Benson,*
2024 WL 1298018 (W.D. Mich. Mar. 27, 2024)...........................................4

*Agee v. Benson,*
2023 WL 8826692 (W.D. Mich. Dec. 21, 2023).........................................60

*Ala. Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015).................................................................................25

*Ala. State Conference of the NAACP v. Alabama,*
612 F. Supp. 3d 1232 (M.D. Ala. 2020)..............................................44, 46

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024)....................................................................................32

*Allen v. Milligan,*
599 U.S. 1 (2023)............................................................................ *passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
700 F. Supp. 3d 1136 (N.D. Ga. 2023)..............................41, 43, 44, 45

*Alston v. Butts,*
C.A. No. 875 (E.D.N.C. Temporary Restraining Order, May 8, 1964)................................30

*Bartlett v. Strickland,*
556 U.S. 1 (2009)............................................................................ *passim*

*Benavidez v. Irving Indep. Sch. Dist., Tex.,*
690 F. Supp. 2d 451 (N.D. Tex. 2010) ..............................................8, 10, 11

*Bethune-Hill v. Virginia State Bd. of Elections,*
580 U.S. 178 (2017)..............................................................................16, 22

Case 4:23-cv-00193-D-RN    Document 125-1    Filed 03/14/25    Page 4 of 72

*Black Political Task Force v. Galvin*,
    300 F. Supp. 2d 291 (D. Mass. 2004) .................................................................57

*Brnovich v. Democratic Nat'l Cmte.*,
    594 U.S. 647 (2021) ...............................................................................................33

*Bush v. Vera*,
    517 U.S. 952 (1996) ...............................................................................................21

*Carney v. Adams*,
    592 U.S. 53 (2020) ...................................................................................................2

*City of Mobile, Ala. v. Bolden*,
    446 U.S. 55 (1980) .................................................................................................33

*Cooper v. Harris*,
    581 U.S. 285 (2017) ....................................................................................... *passim*

*Covington v. North Carolina*,
    316 F.R.D. 117 (M.D.N.C. 2016) ................................................................... *passim*

*Dickson v. Rucho*,
    367 N.C. 542, 766 S.E.2d 238 (2014) ...................................................................18

*Fairley v. Hattiesburg Mississippi*,
    662 F. App'x 291 (5th Cir. 2016) ..........................................................................59

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) .................................................................................55

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) .................................................................................................2

*Gill v. Whitford*,
    585 U.S. 48 (2018) ...........................................................................................3, 4, 5

*Growe v. Emison*,
    507 U.S. 25 (1993) .............................................................................................6, 28

*Hakopian v. Mukasey*,
    551 F.3d 843 (9th Cir. 2008) .................................................................................16

*Harding v. Cnty. of Dallas*,
    948 F.3d 302 (5th Cir. 2020) ...............................................................................3, 4

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) .................................................................................14, 16, 59, 61

*Johnson v. DeSoto Cnty. Bd. of Comm'rs,*
    204 F.3d 1335 (11th Cir. 2000) ...........................................................................7

*Johnson v. Halifax Cnty.,*
    594 F. Supp. 161 (E.D.N.C. 1984).......................................................................30

*Johnson v. Hamrick,*
    196 F.3d 1216 (11th Cir. 1999) .........................................................................11

*Kirkpatrick v. Preisler,*
    394 U.S. 526 (1969)..............................................................................................7

*Kitchen v. Herbert,*
    755 F.3d 1193 (10th Cir. 2014) ...........................................................................2

*League of United Latin Am. Citizens v. Abbott,*
    604 F. Supp. 3d 463 (W.D. Tex. 2022)................................................................4

*League of United Latin Am. Citizens v. Clements,*
    999 F.2d 831 (5th Cir. 1993) .............................................................................44

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006).................................................................................... *passim*

*Leandro v. State,*
    346 N.C. 336, 488 S.E.2d 249 (1997).................................................................30

*Lewis v. Alamance Cnty.,*
    99 F.3d 600 (4th Cir.1996) ...................................................................28, 58, 60

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1,*
    56 F.3d 904 (8th Cir. 1995) ...............................................................................59

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)...........................................................................................2, 5

*Magnolia Bar Ass'n, Inc. v. Lee,*
    994 F.2d 1143 (5th Cir. 1993) .............................................................................5

*McNeil v. Springfield Park Dist.,*
    851 F.2d 937 (7th Cir. 1988) ...............................................................................7

*Miller v. Johnson,*
    515 U.S. 900 (1995)............................................................................................61

*Miss. Republican Exec. Cmte. v. Brooks,*
    469 U.S. 1002 (1984).........................................................................................34

*Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*,
    201 F. Supp. 3d 1006 (E.D. Mo. 2016)......................................................................57

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
    894 F.3d 924 (8th Cir. 2018) ...................................................................... *passim*

*NAACP, Inc. v. City of Niagara Falls, N.Y.*,
    65 F.3d 1002 (2d Cir. 1995)..........................................................................53

*Negron v. City of Miami Beach, Fla.*,
    113 F.3d 1563 (11th Cir. 1997) ..........................................................9, 12, 14

*NFIB v. Sebelius*,
    567 U.S. 519 (2012).......................................................................................59

*O'Hare Truck Serv., Inc. v. City of Northlake*,
    518 U.S. 712 (1996).......................................................................................21

*Patino v. City of Pasadena*,
    230 F. Supp. 3d 667 (S.D. Tex. 2017) ...........................................................9

*Pender Cnty. v. Bartlett*,
    361 N.C. 491 (2009) ...............................................................................18, 20

*Perez v. Pasadena Indep. Sch. Dist.*,
    958 F. Supp. 1196 (S.D. Tex. 1997) .........................................................7, 10

*Perez v. Perry*,
    2017 WL 962686 (W.D. Tex. Mar. 10, 2017) ................................................8

*Pico Neighborhood Assn. v. City of Santa Monica*,
    534 P.3d 54 (Cal. 2023), *as modified* (Sept. 20, 2023)................................27

*Pierce v. N.C. State Bd. of Elections*,
    713 F. Supp. 3d 195 (E.D.N.C. 2024)............................................... *passim*

*Pierce v. N.C. State Bd. of Elections*,
    97 F.4th 194 (4th Cir. 2024) ...................................................................... *passim*

*Rios-Andino v. Orange Cnty.*,
    51 F. Supp. 3d 1215 (M.D. Fla. 2014) ........................................................8, 10

*Ruiz v. City of Santa Maria*,
    160 F.3d 543 (9th Cir. 1998) ........................................................................57

*Shaw v. Hunt*,
    517 U.S. 899 (1996).............................................................................4, 16, 22

Case 4:23-cv-00193-D-RN    Document 125-1    Filed 03/14/25    Page 7 of 72

*Shaw v. Reno*,
    509 U.S. 630 (1993)................................................................................62

*Stephenson v. Bartlett*,
    355 N.C. 354, 562 S.E.2d 377 (2002)............................................. *passim*

*Stephenson v. Bartlett*,
    357 N.C. 301, 582 S.E.2d 247 (2003).................................................18

*Teague v. Attala Cnty, Miss.*,
    92 F.3d 283 (5th Cir. 1996) ...............................................................40

*Thornburg v. Gingles*,
    478 U.S. 30 (1986).......................................................................... *passim*

*TikTok Inc. v. Garland*,
    145 S. Ct. 57 (2025)............................................................................48

*United States v. Bullard*,
    645 F.3d 237 (4th Cir. 2011) ................................................................2

*United States v. Charleston Cnty., S.C.*,
    365 F.3d 341 (4th Cir. 2004) .................................................28, 56, 58

*United States v. City of Euclid*,
    580 F. Supp. 2d 584 (N.D. Ohio 2008)..............................................40

*United States v. Hays*,
    515 U.S. 737 (1995)..............................................................................4

*United States v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010)..................................................7

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)............................................................................23

*Walker v. Moss*,
    246 N.C. 196, 97 S.E.2d 836 (1957)..................................................30

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ..........................................................31

## Other Authorities

Bernard Grofman, Lisa Handley, David Lublin, Drawing Effective Minority
    Districts: A Conceptual Framework and Some Empirical Evidence, 79 N.C. L.
    Rev. 1383, 1408–1422 (2001) ..............................................................25

S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), 1982 U.S.C.C.A.N. 177................29, 34, 35, 40

Defendants Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Destin Hall, in his official capacity as Speaker of the North Carolina House ("Legislative Defendants"), pursuant to the (1) Scheduling Order as modified, at D.E. 81 and D.E. 113; (2) the Honorable United States District Judge James C. Dever III's Practice Preferences; and (3) the Local Civil Rules for the Eastern District of North Carolina, hereby submit the following proposed conclusions of law:

## INTRODUCTION

1.     This case under § 2 of the Voting Rights Act comes to this Court after trial on the merits. Plaintiffs are two Black voters who contend that § 2 requires a majority-Black Senate district in northeast North Carolina. At the preliminary-injunction stage, this Court found Plaintiffs unlikely to succeed in that contention, and the Fourth Circuit affirmed. Although the trial record is larger than the preliminary-injunction record, it is not qualitatively different and provides no basis for the Court to reach a different outcome.

2.     As a threshold matter, Plaintiffs reside in only one district they challenge and presented no evidence that they personally cannot elect candidates of their choice (since the record is silent on who their preferred candidates are). Plaintiffs improperly seek relief they lack standing to obtain.

3.     On the merits, it remains the case that a departure from North Carolina's strict county-grouping requirements to hit a racial quota of 50% Black voting-age population (BVAP) is unjustified by observed voting patterns. Moreover, in four tries, Plaintiffs were unable to present a reasonably configured majority-Black district that improves minority opportunity in northeast North Carolina. Two proposals are crossover districts, not majority-Black districts. The other two—if properly implemented—achieve the likely result of dismantling a neighboring district (Senate District 5) that already affords Black opportunity without sacrificing North Carolina's

traditional districting principles to racial goals. Further, the totality-of-circumstances inquiry militates against § 2 liability. Compelling evidence shows that a divergence of voting patterns along racial lines is a political phenomenon and not the product of racial animus. Moreover, many points of evidence reveal substantial Black electoral opportunity and representation, as well as responsiveness to minority needs. These facts reveal this not to be among the rare cases where federal judicial intrusion into state election systems is warranted.

4. Accordingly, the trial record compels that judgment be entered for Legislative Defendants.

## ARGUMENT

### I. Plaintiffs Seek Relief Beyond This Court's Article III Jurisdiction

5. The Court must begin with the issue of standing, which is "an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," *id.* at 560, the Court would be "obliged to examine standing *sua sponte*" even if Plaintiffs' standing were not challenged. *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990) ("Although neither side raises the issue here, we are required to address the issue [of standing] even if the courts below have not passed on it."); *United States v. Bullard*, 645 F.3d 237, 246 (4th Cir. 2011) (similar); *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) ("We first consider the issue of standing, although it was not raised by the parties."). Plaintiffs must therefore prove that they "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted).

2

6.     Here, each Plaintiff resides in SD2, D.E. 105 at 3 (¶¶ 1-4), but they seek a declaration "that SB 758 violates Section 2 of the Voting Rights Act" and an injunction forbidding "Defendants . . . from enforcing or giving any effect to the boundaries of Senate Districts 1 and 2 as drawn in SB 758, including barring Defendants from conducting any Senate elections using those district boundaries." D.E. 15 at 22 (¶¶ A and B). Binding precedent forecloses this request. Where plaintiffs' alleged harm "is the dilution of their votes, that injury is district specific." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). "[A] person's right to vote is 'individual and personal in nature,'" so Plaintiffs must prove "'disadvantage to themselves as individuals.'" *Id.* at 65–66 (citations omitted). Accordingly, a plaintiff may challenge and obtain relief against only the district where he or she resides. *Id.* at 66 ("a plaintiff who alleges that he is the object of a racial gerrymander…has standing to assert only that his own district has been so gerrymandered"); *id.* at 67 (explaining that "malapportionment cases" are district-specific). Although *Gill* addressed allegations of political gerrymandering, the injury of cracking and packing, *see id.*, is the same as cracking or packing alleged under § 2.[1] *See Harding v. Cnty. of Dallas*, 948 F.3d 302, 307-08 (5th Cir. 2020) (applying the standard of *Gill* in § 2 litigation).

7.     Consequently, the Court lacks jurisdiction to declare that an entire redistricting plan (S.B. 758) is unlawful, D.E. 15 at 22, where Plaintiffs reside in only one of its 50 districts. The Supreme Court in *Gill* explicitly rejected the argument that vote dilution caused "statewide harm" warranting "statewide remedies." 585 U.S. at 66, 68. Plaintiffs' claim for declaratory relief is therefore foreclosed. For the same reason, Plaintiffs' separate request for an injunction against both

---

[1] *Gill* held that only the effect element (not the intent element) of a political gerrymandering claim bore on the question of standing, so § 2 claims cannot be differentiated from *Gill*'s holding on the ground that they may be proven without evidence of invidious intent. *See Gill*, 585 U.S. at 70 (injury-in-fact "turns on effect, not intent"). The effect of cracking and packing is identical in both types of cases.

3

SD1 and SD2 is unfounded. Neither Plaintiff resides in SD1, and neither could suffer "individual and personal" "disadvantage" from elections in that district. *Id.* at 65–66 (citations omitted).

8.      There is no merit in Plaintiffs' proposal that they have standing to challenge an "area." D.E. 101 at 2. "An individual voter in [North Carolina] is placed in a single district. He votes for a single representative. The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Gill*, 585 U.S. at 66. North Carolina voters are not placed in *areas* and do not vote in *areas*. An area therefore does not injure them; only *districts* can conceivably have that effect. Moreover, "[t]he remedy that is proper and *sufficient*" in a redistricting case "lies in the revision of the boundaries of the individual's own district." *Id.* (emphasis added). Nearly 30 years of precedent rejects the argument that the interaction of neighboring districts entitles a resident of one district to challenge adjacent districts. *See United States v. Hays*, 515 U.S. 737, 746 (1995) (challenge to district neighboring plaintiffs' failed for lack of jurisdiction); *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (*Shaw II*) (similar); *see also Agee v. Benson*, 2024 WL 1298018, at *4 (W.D. Mich. Mar. 27, 2024) (three-judge court) (overruling as beyond court's jurisdiction objection that districts where no plaintiff resided should have been altered at remedial phase). There is, then, no basis for this Court to forbid "elections" in SD1.[2] D.E. 15 at 22 (¶ B).

9.      Independently, Plaintiffs' trial presentation fell short of establishing "packing or cracking" that "diluted the influence of their votes." *Gill*, 585 U.S. at 69 (quotation and alteration

---

[2] *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463 (W.D. Tex. 2022), is now bad law, given that the Fifth Circuit applied the standard of *Gill* in *Harding*. The decision erroneously applied (without explanation) precedent predating *Gill* addressing vote-dilution standing and failed to see that the dilution at issue in *Gill* is conceptually identical to § 2 vote dilution. *Compare id.* at 486 (explaining that injury in a § 2 claim is shown by "a *hypothetical* opportunity district") *with Gill*, 585 U.S. at 72 (explaining that a political dilution claim would require a "demonstration map" showing what a non-diluted vote could be).

marks omitted). Cracking and packing describe an effect of district lines on votes for a plaintiff's "chosen candidates," *id.* at 66, but Plaintiffs did not identify their candidates of choice at trial or attest that those candidates did not prevail. [Day 1 Tr. 37:21-67:23]. Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At this juncture, the elements of standing "must be supported adequately by the evidence adduced at trial." *Id.* (quotation marks omitted). The evidence here fell short of the mark.

## II. Plaintiffs Failed to Establish the Three *Gingles* Preconditions

10.     Plaintiffs alleging vote dilution under § 2 must prove "three threshold conditions": that the relevant group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; that the group is "politically cohesive"; and that a white majority votes "'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 581 U.S. 285, 301–02 (2017) (citation omitted). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 585 U.S. 579, 614 (2018). Plaintiffs' claim fails at multiple junctures.

### A.     Plaintiffs Failed to Establish the First Precondition

11.     The first precondition set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986) requires proof that the minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (alteration marks omitted). This precondition "specifically contemplates the creation of hypothetical districts." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 n.6 (5th Cir. 1993); [*see also* Day 4 Tr.191:17-19 (cross of Trende) ("[T]he focus of the Gingles I inquiry is a Demonstrative District[.]")]. Under this precondition's numerosity component, the plaintiff most show that the

5

relevant group constitutes a "working majority of the voting-age population." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). Under the compactness component, the plaintiff must present a "reasonably configured" alternative, *Milligan*, 599 U.S. at 20, according to "traditional districting criteria," including maintaining "county lines," *id.*; *Abrams v. Johnson*, 521 U.S. 74, 92 (1997).

12.     Plaintiffs' expert, Mr. Esselstyn, contends that creating a reasonably configured majority-Black district is "quite straightforward," [Day 2 Tr. 49:7-13], but the record proves otherwise. In four attempts, Mr. Esselstyn failed to satisfy the "exacting requirements" of *Gingles*, *Milligan*, 599 U.S. at 30, he twice failed even to meet the straightforward 50% BVAP standard, and his efforts show that there is insufficient minority population in northeastern North Carolina to create a new majority-Black district without the likely outcome of destroying minority opportunity in Pitt and Edgecombe Counties. Plaintiffs' claim therefore fails at the first step. *See Growe v. Emison*, 507 U.S. 25, 41 (1993) (unless all three *Gingles* preconditions "are established, there neither has been a wrong nor can be a remedy").

### 1.     Demonstration Districts B and D Fail the Numerosity Standard

13.     Demonstration Districts B and D fail the numerosity component of the first precondition. The element is unmet where "the minority group makes up less than 50 percent of the voting-age population in the potential election district." *Bartlett*, 556 U.S. at 12 (plurality opinion). Simply put, "§ 2 does not require crossover districts." *Id.* at 23; *see also Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 204 (4th Cir. 2024). Demonstration Districts B and D are crossover districts, not majority-Black districts. The BVAP of Demonstration District B is 48.41%. PX69 at 19. The BVAP of Demonstration District D is 49.22%. PX69 at 24. Because BVAPs in both districts are below 50%, each fails the "objective" and "straightforward" test. *Bartlett*, 556 U.S. at 18–19.

14. Plaintiffs resist this basic application of binding precedent by noting point estimates under the American Community Survey (ACS), which they contend demonstrate a Black citizen voting age population (BCVAP) slightly above 50% in Demonstration Districts B and D. [PX69 at 19, 24; Day 2 Tr. 21:1-4 (Esselstyn)]. As an initial matter, Demonstration District B falls below 50% BCVAP under the most recent (and probative) ACS point estimate, [Day 4 Tr. 159:12-17 (Trende)], and thus fails the first precondition even on Plaintiffs' terms. Moreover, for both districts, Plaintiffs ignore that "[t]he census is presumed accurate until proven otherwise." *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988); *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000) ("The presumption is that census figures are continually accurate."); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010) ("this Court recognizes that Census data is presumptively accurate"). That is because "the Decennial Census counts" are "an enumeration" reported "without any margins of error," and the results "are considered to be the best data available." [Day 1. Tr. 224:8-12 (Esselstyn); *see also* Day 4 Tr. 137:2, 137:17-18 (Trende) ("The Decennial Census is an actual count," so "there are limitations to the ACS that aren't present in the Decennial Census")].

15. Here, the "best data available" by the admission of Plaintiffs own expert, [Day 1 Tr. 224:11 (Esselstyn)], establishes a presumption that Demonstration District B and D are *not* majority-Black districts. *McNeil*, 851 F.2d at 946; *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 932 (8th Cir. 2018). To "override the presumption of correctness of the prior decennial census," Plaintiffs must present "clear, cogent and convincing" evidence that disproves the census figures with "a high degree of accuracy." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999) (collecting cases); *cf. Kirkpatrick v. Preisler*, 394 U.S. 526, 534–35 (1969).

16.     Plaintiffs failed to meet this standard—or even make a serious run at it. They simply cite ACS numbers, but "[t]he ACS is a sample survey" that does not overcome the presumptive accuracy of the decennial census "with any reliable degree of certainty." *Mo. State Conf. of the NAACP*, 894 F.3d at 932; *see also Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010) ("Here, the use of the ACS data does not similarly meet the high standards and thorough coverage of the decennial census."); *Rios-Andino v. Orange Cnty.*, 51 F. Supp. 3d 1215, 1225 (M.D. Fla. 2014) (concluding, based on ACS error, "that Plaintiffs have not met their burden of proof with respect to the numerosity element of the first *Gingles* precondition"); *cf. Perez v. Perry*, No. 11-cv-360, 2017 WL 962686, at *3 (W.D. Tex. Mar. 10, 2017) ("Even with aggregated data, block group estimates may contain large margins of error."). While the trial record reflects some differences (at least initially) concerning the proper way to assess error in the census, [*see, e.g.*, Day 4 Tr. 149:1-7], all experts who addressed the ACS agreed that "the decennial census data has a much deeper and more granular way of looking at the race and ethnicity categories or classifications than the ACS data."[3] [Day 2 Tr. 57:22-58:1 (Esselstyn); Day 4 Tr. 137:8-11 (Trende)]. The ACS estimates are therefore not sufficiently probative to overcome the proof under the decennial census that Demonstration Districts B and D fall short of the mark.

17.     Plaintiffs are unsuccessful in their efforts to persuade the Court to ignore the decennial census and rest its judgment instead on the ACS.

18.     First, Plaintiffs note that the ACS reporting of CVAP is used on occasion in litigation to analyze the first precondition. [*See* Day 4 Tr. 186:3-187:21]. But Plaintiffs misapprehend the proper use of ACS in such cases, where the ACS supplements and checks the decennial census but does not *contradict* the decennial census. The purpose of utilizing CVAP is

---

[3] For that reason, discrepancies in Dr. Trende's report are legally irrelevant.

for "refinement" of VAP figures to account for "a significant difference in the citizenship rates of the majority and minority populations," as often occurs in cases involving Hispanic populations. *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1568 (11th Cir. 1997). But in such cases, the Hispanic voting-age population (HVAP) will invariably be reflected under the decennial census as well *above* the citizenship estimate, so CVAP is not used in these cases to show majority-minority status that the decennial census figures overtly refute. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006) (Hispanic group's majority-minority status under "voting-age population" overridden by low citizenship numbers); *see also, e.g.*, *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 690–91 (S.D. Tex. 2017) (Hispanic VAP consistently above Hispanic CVAP); *Negron*, 113 F.3d at 1568 (same). Because a majority must not only be "numerical," but also "working," *Bartlett*, 556 U.S. at 13, an examination of citizenship is necessary as a supplement to determine whether a district shown to exceed the majority-minority mark under the census is functionally an opportunity district, *LULAC*, 548 U.S. at 429. If the two numbers *align*, the first precondition can be shown. If not, then not.

19.     Plaintiffs' employment of CVAP in this case is fundamentally different. They cite BCVAP figures, not to assess whether a district shown by the decennial census to have majority-minority status maintains majority status in functionality, but to completely disprove what the decennial census shows (where citizenship is not even an issue). Demonstration Districts B and D cannot be deemed majority-minority under the decennial census, but Plaintiffs rely on the ACS for refutation. To succeed in that task, Plaintiffs must satisfy the arduous standard for overcoming the presumption of accuracy in the decennial census. *Mo. State Conf. of the NAACP*, 894 F.3d at 932. They do not even attempt to do so.

20.     Second, Plaintiffs propose that their Black CVAP point estimates are reliable because—although they barely cross the 50% mark—they are "a more conservative count of people that identify as black," given that the ACS does not use the any-part Black measure. [Day 1 Tr. 223:23-24 (Esselstyn)]. That argument only proves why the decennial census is the proper metric. Plaintiffs' demographic expert admits that the BVAP measure he employed from the decennial census uses Plaintiffs' preferred "any part black" figure. [Day 1 Tr. 221:24-222:4]. Accordingly, the limitation in the ACS measure of BCVAP is a problem of Plaintiffs' own making in relying on the ACS. And the way to fix the problem is not to make assumptions about the ACS but to rely on BVAP under the decennial census. The decennial census shows that, under the any-part Black measure, Demonstration Districts B and D both fall *below* 50% BVAP. [PX69 at 19, 24]. It would be entirely illogical for the Court to ignore the decennial census's any-part Black showing in favor of an estimate that does *not* use the any-part Black measure under the theory that the ACS estimate is "conservative" to some unknown degree. That is the very opposite of a "clear, cogent and convincing" refutation of the decennial census with "a high degree of accuracy." *Perez*, 958 F. Supp. at 1210.

21.     Third, Plaintiffs propose that the Court ignore margins of error in the ACS under the theory that the margin of error surrounding the point estimates admits a 50% possibility that the true value exceeds the point estimates. [*See* Day 4 Tr. 110:8-14 (cross of Alford)]. That possibility has never justified ignoring margins of error in the ACS. *See, e.g.*, *Mo. State Conf. of the NAACP*, 894 F.3d at 932; *Benavidez*, 690 F. Supp. 2d at 460–64; *Rios-Andino*, 51 F. Supp. 3d at 1225. The margins of error calculated by Plaintiffs' own expert, Dr. Collingwood, show that values below 50% are within the possible true values reflected in the BCVAP point estimates for Demonstration District B and D. [Day 3 Tr. 83:21-84:8; PX128 at 15; Day 4 Tr. 150:11-15

(Trende); Day 2 Tr. 21:5-11 (Esselstyn); Day 2 Tr. 102:3-12]. Accordingly, the point estimates slightly above 50% BCVAP are insufficient to establish majority-Black status, notwithstanding the *possibility* that the true value lies above 50%. By choosing to rely on CVAP, Plaintiffs necessarily accepted the limitations accompanying that figure, and it would be scientifically improper to consider ACS data without examining margins of error. *See, e.g.*, *Benavidez*, 690 F. Supp. 2d at 464; *Johnson v. Hamrick*, 196 F.3d 1216, 1223 (11th Cir. 1999) (finding error in trial court's choice to ignore margins of error). In any event, Plaintiffs' position ignores that the starting place for the analysis is BVAP figures below 50%. Under such circumstances, it is not "more likely than not" that the districts are majority Black. [Day 4 Tr. 110:10-11]. The BVAP figures below 50% are presumptively accurate, and Plaintiffs have not disproven their accuracy.

22.     Fourth, Plaintiffs undermine the estimates of their own expert by presenting testimony that a margin of error in BCVAP cannot be calculated to a reasonable degree of certainty at all. [*See* Day 2 Tr. 168:4-23 (Collingwood)]. That fact only underscores Plaintiffs' error in relying on BCVAP at all, at least where BVAP figures are readily available, highly accurate, and legally sufficient. Plaintiffs' own experts have not looked to ACS data in their past work where the census provided sufficient information. [Day 2 Tr. 53:2-9]. The only reason they have cited it here is "to suit the exigencies of the moment." *Pierce*, 97 F.4th at 215. BVAP figures are unhelpful to Plaintiffs' case, so they shopped for different figures. While that is understandable, it is unpersuasive.

23.     Finally, Plaintiffs rest on the repeated *ipse dixit* assertions of their expert that the ACS "is considered the gold standard best data out there." [Day 2 Tr. 21; *see also* Day 1 Tr. 224:8-12]. This is simply false. The gold standard in demography is the decennial census, and that point

is so obvious that the census carries a *legal* presumption of accuracy. *Mo. State Conf. of the NAACP*, 894 F.3d at 932. The ACS is less accurate and provides no basis to refute census figures.

## 2. All Demonstration Districts Fail the Reasonable Configuration Standard

24. None of Plaintiffs' demonstration plans are reasonably configured. To satisfy this second component of the first precondition, a district must "comport[] with traditional districting criteria." *Milligan*, 599 U.S. at 20. A district that disregards "traditional districting principles such as compactness, contiguity, and respect for political subdivisions" fails this element. *Id.* at 27. This rule "limit[s] any tendency of the VRA to compel proportionality," and the Supreme Court has made clear that "satisfying traditional districting criteria such as the compactness requirement 'becomes more difficult'" over time, as residential patterns grow less segregated. *Id.* at 28-29 (citation omitted). Moreover, because a court "cannot implement an incomplete plan, containing only a single district, with the rest of the map left blank," a plaintiff must show that a proposed majority-minority district can work with a feasible complete plan. *Negron*, 113 F.3d at 1571. Plaintiffs' demonstration districts fail this test on many fronts.

### a. Demonstration Districts B and D Are Crossover Districts That Do Not Justify Departures from the Whole County Provision

25. Demonstration Districts B and D plainly fail the reasonable configuration element of the first precondition because they are crossover districts that depart from North Carolina's restrictive county-grouping requirements (the Whole County Provision). "Because Section 2 d[oes] not require crossover districts, it [cannot] justify a violation of state law, namely the Whole County Provision." *Pierce*, 97 F.4th at 204; *see Bartlett*, 556 U.S. at 21. The BVAP of each district is below 50%, and each district requires departures from the Whole County Provision. [*See* PX1 at 7-8, 10-11]. These districts are therefore "legally forbidden" under binding Supreme Court and Fourth Circuit precedent. *Pierce*, 97 F.4th at 228.

12

### b. Demonstration District A is Not Reasonably Configured and Cannot Be Implemented in a Plan That Improves Minority Opportunity

26. Demonstration District A fails the first precondition for multiple reasons.

27. To begin, a demonstration district must be "reasonably compact" and honor "county lines" to satisfy this test, *Milligan*, 599 U.S. at 18, 20, but Demonstration District A trades off compactness and county lines to hit a racial target. The reconfiguration reduces compactness scores in districts surrounding the proposed majority-minority district. [PX069 at 29, Tbl. 10]. The configuration also splits Wilson County between A11 and A4 and Carteret County between A2 and A9, [Day 2 Tr. 76:10-16], whereas the 2023 Enacted Plan respects their boundaries, [Day 2 Tr. 76:17-19].[4]

28. Even if those distortions could be overlooked, the configuration wreaks havoc in the region by forcing a grouping comprising 23 counties, almost a quarter of the total number of counties in North Carolina. [Day 2 Tr. 77:5-13]. That debacle certainly violates the spirit of *Stephenson*, even if it can be superficially justified by a mathematical algorithm. *See Stephenson v. Bartlett*, 355 N.C. 354, 366, 562 S.E.2d 377, 386 (2002) (*Stephenson I*) (describing the "long-standing tradition of respecting county lines during the redistricting process in this State"). Plaintiffs point to a 21-county grouping in the 2011 North Carolina House plan as historical precedent for this, [Day 2 Tr. 108:7-25], but that precedent *confirms* how unreasonable their approach is: every majority-Black district in that plan was enjoined as an unconstitutional racial gerrymander. *Covington v. North Carolina*, 316 F.R.D. 117, 132-33, 169 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017). There is no serious basis for Plaintiffs to contend that §

---

[4] Demonstration Districts B and D exhibit similar failings, but the Court need not dwell on those districts, given their failings under the numerosity requirement and status as crossover districts that cannot justify any departure from the Whole County Provision.

13

2 forces the State into the very redistricting scheme deemed unconstitutional just last decade. *Milligan*, 599 U.S. at 30 (Section 2 "never require[s] adoption of districts that violate traditional redistricting principles").

29.     Moreover, Demonstration District A cannot be implemented as part of a feasible complete plan that improves minority opportunity. *Negron*, 113 F.3d at 1571. Because § 2 liability does not exist "if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice," *Abbott*, 585 U.S. at 617, "the first *Gingles* condition requires the possibility of creating *more than the existing number* of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice," *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994) (emphasis added); *LULAC*, 548 U.S. at 435. But Demonstration District A—if configured properly under the Whole County Provision— eliminates one opportunity district to create another. Plaintiffs' expert, Dr. Mattingly, acknowledges that the departure from the Whole County Provision created by Demonstration District A causes a cascade effect among county groupings such that the new grouping requirements of *Stephenson* demand that SD5, which is composed in the enacted plan of Pitt and Edgecombe Counties, be broken apart. [PX114 at 1-2; Day 1 Tr. 192:1-193:15; Day 2 Tr. 13:10-14:13; Day 2 Tr. 103:25-104:25; *cf.* Day 2 Tr. 11:21-12:24]. SD5 in the enacted plan affords Black voters an opportunity to elect their preferred candidates. [Day 2 Tr. 151:11-24 (Collingwood)]. But there is no basis to believe Black voters in SD5 would maintain the opportunity if Pitt and Edgecombe Counties are split into separate districts. In short, the configuration of Demonstration District A dismantles one opportunity district to create another and provides no net improvement.

30.     Likely recognizing this problem, *see Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 224 (E.D.N.C. 2024)  (putting Plaintiffs on notice that these types of objections

14

"have force"), Plaintiffs' counsel directed Dr. Mattingly to artificially freeze SD5 in preparing the county groupings surrounding Demonstration District A. [Day 2 Tr. 69:6-70:8; Day 2 Tr. 13:6-13; Day 1 Tr. 164:19-24]. But the choice to freeze SD5 violates the Whole County Provision. Dr. Mattingly admitted that without that manipulation, his "algorithm would have developed a county grouping option that split Pitt-Edgecombe." [Day 1 Tr. 193:1-15; PX114 at 1-2]. And no justification permits this violation. Because of its BVAP of 40.35%, [D.E. 105 at 12 (¶ 38)], SD5 is a crossover district, not a majority-Black district, *Bartlett*, 556 U.S. at 13. To freeze SD5 in place where the Whole County Provision demands that it be broken up (due to the impact of Demonstration District A) is plainly unlawful. As the Fourth Circuit already explained in *this case*, a crossover district cannot "justify a violation of state law, namely the Whole County Provision." *Pierce*, 97 F.4th at 204; *see also id.* at 228 (explaining that breaking the county-grouping rules for a crossover district is "legally forbidden"). That holding restates *Bartlett*, where the Supreme Court held that, because § 2 does not require crossover districts, the Whole County Provision cannot be breached to create one. 556 U.S. at 7–8, 24–25; *see also Pierce*, 97 F.4th at 228 ("federal law did not require North Carolina to 'override' the Whole County Provision in that case to retain a crossover district"). It is puzzling that, after the Fourth Circuit just reiterated that the Whole County Provision cannot be broken to create or preserve a crossover district, Plaintiffs' counsel directed their expert to violate that directive.

31.     For that reason, Demonstration District A must be considered, not as part of a plan that illegally freezes SD5 in place, but as part of a plan that dismantles SD5 (as reflected in Dr. Mattingly's rebuttal report, PX114 at 1-2). Understood in that context, Demonstration District A does not improve minority opportunity and fails the first precondition for reasons stated: it does not net an opportunity district. This shows "only that lines could have been drawn elsewhere,

nothing more." *Johnson*, 512 U.S. at 1015. Supreme Court precedent rejects proposals that would do nothing but "trade[] off" the "rights of some minority voters…against the rights of other members of the same minority class." *Johnson*, 512 U.S. at 1019. Because "a Section 2 violation is proved for a particular area," *Shaw II*, 517 U.S. at 907, eliminating minority opportunity in some districts (here, SD5) to create minority opportunity in another (here, Demonstration District A) is improper, *see id.* at 917 (rejecting as "a misconception of the vote-dilution claim" the view that a majority-Black district may be drawn "anywhere").

32.      Although § 2 does not mandate crossover districts, states may create them "as a matter of legislative choice or discretion," *Bartlett*, 556 U.S. at 23, and § 2 can "be *satisfied by* crossover districts," *Cooper*, 581 U.S. at 305. Indeed, crossover districts may provide "the most effective way to maximize minority voting strength," *Bartlett*, 556 U.S. at 23 (citation omitted), given that majority-minority districts "rely on a quintessentially race-conscious calculus aptly described as the 'politics of second best.'" *Johnson*, 512 U.S. at 1020 (citation omitted). Here, SD5 resulted under neutral principles by operation of the Whole County Provision and is not the product of any "race-based decision." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189 (2017) (citation omitted).

33.      If more were needed to reject Demonstration District A, Plaintiffs made a judicial admission in their operative complaint that, to be proper, "a minority opportunity district in northeastern North Carolina" must leave "intact the current district comprised of Pitt and Edgecombe Counties." [D.E. 13 at 22 (¶ C)]; *see also Pierce*, 713 F. Supp. 3d at 209 (noting this). "Allegations in a complaint are considered judicial admissions." *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008). Plaintiffs are not free to rely on a demonstration district having the effect of dismantling SD5, as Demonstration District A must do if implemented in a lawful plan.

### c. Demonstration District C Contravenes the WCP and Is Not Reasonably Configured

34.     Demonstration District C is not reasonably configured for similar reasons.

35.     To begin, Demonstration District C sacrifices compactness and county boundaries in much the same fashion as Demonstration District A. The configuration splits Vance County and Wilson Counties, and the city of Henderson, all of which the 2023 Senate Plan preserves. [Day 2 Tr. 80:6-19, 82:12-17]. It also reduces the compactness of Demonstration Districts C-4 and C-11.

36.     Additionally, Plaintiffs have failed to prove that Demonstration District C can be created without dismantling SD5. While Dr. Mattingly claimed that he did not artificially freeze SD5 in the county grouping configuration surrounding Demonstration District C, [*see* PX114 at 1-2], he misapplied the Whole County Provision in a manner that strongly suggests the process was reverse engineered to avoid dismantling SD5. In all events, because the Whole County Provision is not properly implemented, Demonstration District C is not reasonably configured.

37.     The problem for Plaintiffs stems from the manner in which the North Carolina Supreme Court has directed the Whole County Provision be rendered consistent with the VRA. The court explained that "legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Stephenson I*, 355 N.C. at 383. Subsequently, the county groupings are to be built around the VRA districts using "non-VRA districts." *Id.* For example, "[w]hen two or more non-VRA legislative districts may be created within a single county . . . single-member non-VRA districts shall be formed within said county." *Id.* Likewise, "[i]n counties having a non-VRA population pool which cannot support at least one legislative district" or "counties having a non-VRA population pool which, if divided into districts, would not comply with the" equal-population rule, "the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent

'one-person, one-vote' standard." *Id.* at 384; *see also Stephenson v. Bartlett*, 357 N.C. 301, 302, 582 S.E.2d 247, 248 (2003) (*Stephenson II*); *Dickson v. Rucho*, 367 N.C. 542, 571–72, 766 S.E.2d 238, 258 (2014), *vacated on other grounds*, 575 U.S. 959 (2015); *Pierce*, 713 F. Supp. 3d at 219.

38.     By directing that the county groupings be built from "non-VRA districts" and "non-VRA population," this precedent establishes that—as Plaintiffs' counsel and their witnesses understood at trial—the proper method for complying with both the VRA and the Whole County Principle is to "to freeze a VRA district and then cluster the rest of the state." [Day 1 Tr. 163:8-10 (Mattingly); *see also* Day 1 Tr. 158:25-159:2 (Dr. Mattingly explaining that "first you should consider the Voting Rights Act and remove any districts that are needed to satisfy the Voting Rights Act, then you should take the remainder of the state" and apply the WCP); *see also* Day 1 Tr. 163:16-21, 169:22-25, 177:13-18, 186:22-24, 197:4-9]. Senator Blue attested to this process in the same terms. [*See* Day 1 Tr. 71:3-7 ("create the districts that are required by Section 2 that comply with Section 2; and after you do that, after you put those districts in place, the duty then is to comply with the Whole County Provision of the North Carolina Constitution")]; *see also Pender Cnty. v. Bartlett*, 361 N.C. 491, 508 (2009) (indicating shared understanding of legislative and judicial branches that VRA districts are "exempt from the WCP and *Stephenson I* requirements").

39.     But Dr. Mattingly did not freeze Demonstration District C—the alleged VRA district—and then build his county groupings around it with "a non-VRA population pool." *Stephenson I*, 355 N.C. at 383. Instead, he grouped Demonstration District C with non-VRA districts (labelled C-11 and C-4) into a grouping that (conveniently for Plaintiffs) wraps around SD5. [*See* PX69 at 22-23; PX1 at 8-9]. That approach is manifestly *not* "to freeze a VRA district and then cluster the rest of the state." [Day 1 Tr. 163:8-10]. Demonstration District C should have been frozen as a district and groupings built around it. The portion of Vance County not drawn into

Demonstration District C was a non-VRA population pool that should have been treated as part of a different county grouping (i.e., not with Demonstration District C), which should have been built with whatever surrounding districts would create a numerically proper grouping, as the "cascade of changes" flow from the Demonstration District C. *Pierce*, 713 F. Supp. 3d at 223. For all anyone can tell, a proper application of this doctrine may have upended SD5, as Demonstration District A did.

40.     Oddly, Dr. Mattingly testified that his algorithm actually did "remove a frozen district," i.e., Demonstration District C, "along with any split from the clustering exercise [and] treat it as its own district and . . . apply [his] algorithm to the remaining part of the map." [Day 1 Tr. 197:5-9]. But Dr. Mattingly's code revealed that this application simply did not occur: Demonstration District C is plainly grouped with other districts in both methods Dr. Mattingly claims to have applied.[5] [*See* Day 1 Tr. 202:25-203:11; LD74 at 3; LD73 at 3]. Confronted with this fact, Dr. Mattingly stated that he "misspoke" and that his approach "gets a little tricky." [Day 1 Tr. 203:13-14]. The subsequent testimony was more than a little tricky. It was an inscrutable mess. [Day 1 Tr. 203:19-208:22]. Dr. Mattingly stated that his algorithm would "take the part of the county that's remaining and . . . pretend that was its own county" but then reject that very approach because "the state is not interested in some made up split county that you created to run the algorithm." [Day 1 Tr. 205:1-6]. That assertion is baffling. The State does not treat "a non-VRA population pool" as some *made-up* split county; it assumes the WCP must yield to the configuration of a VRA district. *Stephenson I*, 355 N.C. at 383. Accordingly, the split—assuming

---

[5] Dr. Mattingly claims to have run his algorithm in two ways because "there were two different ways to interpret *Stephenson*." [Day 1 Tr. 181:8-9]. It is unclear what Dr. Mattingly meant. As explained, *Stephenson* directs that county groupings be built with "non-VRA districts" and "non-VRA population." *Stephenson I*, 355 N.C. at 383. Moreover, if two different methods had been applied the results would have been apparent in the backup data but they were not. [LD73; LD74].

the VRA requires it—carries the imprimatur of federal law, and the State folds its grouping formula around that split.

41.     Simply put, Dr. Mattingly provided no coherent reason for refusing to apply the Whole County Provision as interpreted by the North Carolina Supreme Court. Dr. Mattingly's testimony was marred by confusion and apparent evasion. Notably, Dr. Mattingly's algorithm has not been peer reviewed for use in configuring VRA districts. [Day 1 Tr. 181:1-19]. No court has accepted it for such use, and it is a mystery how it actually works. The trial testimony shed no light on these basic questions.

42.     Additional failings plague Demonstration District C.

43.     First, even assuming the district was properly grouped with other districts, which Plaintiffs' expert labeled C-11 and C-4, the district lines fail to comply with North Carolina's county-grouping doctrine. Demonstration District C splits Vance County, and Districts C-4 and C-11 are split in Wilson County. [PX69 at 23; Day 2 Tr. 83:2-85:24]. But those are not the most populous counties in the vicinity available to split for equal-population purposes. Franklin and Nash Counties are more populated, and they were available for splits to achieve equal population. [Day 2 Tr. 83:24-85:21]. The North Carolina Supreme Court has indicated that traversals should split the most populous available counties in an area where a split is necessary to achieve equal population. In *Pender County*, the court concluded that a crossover district created in Pender County could not justify departures from the Whole County Provision and then addressed permissible remedies. 361 N.C. at 509. The court considered possible splits in Pender and New Hanover Counties and, noting that New Hanover County was the larger, stated that Pender County should be maintained as a whole county and New Hanover County should be split. *Id.* Demonstration District C and its neighboring districts violate that principle.

44.     Second, Demonstration District C extends a contorted arm into Vance County along racial lines so that 63% of the Black population of Vance County is in Demonstration District C. [Day 2 Tr. 16:11-25, 46:19-47:1; Day 4 Tr. 166:22-167:9; LD60 at 37]. The Supreme Court has explained that it will be "'difficult to find'" a district "sufficiently compact" if it contains "any 'tentacles, appendages, bizarre shapes, or any other obvious irregularities.'" *Milligan*, 599 U.S. at 20 (citation omitted); *see also id.* at 27–30; *see also Bush v. Vera*, 517 U.S. 952, 974 (1996) (plurality opinion). Demonstration District C meets this definition and is not reasonably configured.

### d.     All Demonstration Districts Subordinate Neutral Criteria to Racial Goals

45.     All demonstration districts are unreasonably configured because racial goals predominated over traditional districting principles. Section 2 "never requires adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30 (quotation and alteration marks omitted). Accordingly, the Supreme Court has "long drawn" a line "between consciousness" of race "and predominance." *Id.* at 33 (plurality opinion). A district is reasonably configured only if "race did not predominate." *Id.* at 32 (plurality opinion). Thus, a § 2 plaintiff must "adduce[] at least one illustrative map" in which race did not predominate. *Id.* at 33 (plurality opinion); *see also id.* at 62 (Thomas, J., dissenting) (noting that the four-justice plurality "appears to agree that the plaintiffs could not prove the first precondition . . . by drawing an illustrative map in which race was predominant"); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 718 (1996) (noting that proposition on which "five Justices found common ground" is binding, even if in separate opinions).

46.     Race predominated in every demonstration district for the same reason predominance was found in *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016). There,

mapmakers configuring majority-Black North Carolina legislative districts prioritized a 50% minority racial target, drew VRA districts first, and contravened the Whole County Provision to ensure majority-Black status. *Id.* at 130–142. Here, Mr. Esselstyn began with VRA demonstration districts, prioritized a majority-Black goal, and departed from the Whole County Provision. [*See, e.g.*, Day 1 Tr. 230:7-10; Day 1 Tr. 231:12-238:21; Day 2 Tr. 70:20-74:1]. While Mr. Esselstyn claims to have considered other goals, [Day 1 Tr. 230:11-13], they were only applied if consistent with the predominant racial goals. *Shaw II*, 517 U.S. at 907 (finding predominance where race was "the criterion that . . . could not be compromised" and other goals "came into play only after the race-based decision had been made"); *Bethune-Hill*, 580 U.S. at 189. Race predominates even if there is no actual conflict between racial and non-racial goals, and it is proven all the more clearly where there *is* such a conflict. *See Bethune-Hill*, 580 U.S. at 188–91. In this case, there was an obvious conflict between the State's neutral Whole County Provision and the majority-Black goal, so a finding of predominance is unavoidable. Moreover, as shown above, the demonstration districts sacrifice compactness, introduce political-subdivision splits, and contain bizarre configurations, often along racial lines (as with the split of Vance County in Demonstration District C and the addition of al majority-Black VTDs of Pasquotank County in Demonstration Districts B and D). All of these features confirm that neutral criteria were sacrificed to a predominant racial goal.

47.     Because a district drawn for predominantly racial reasons by definition is not reasonably configured, *Milligan*, 599 U.S. at 30, the first precondition is unmet. Moreover, racial predominance can be justified only if it is narrowly tailored to a compelling interest. *Bethune-Hill*, 580 U.S. at 193. That is not the case here for the independent reason that majority-Black districts are unnecessary to ensure equal Black electoral opportunity. Plaintiffs' own expert concludes that,

at most, a district need only have a BVAP of 47.7% to afford that opportunity, and that figure is much too high. [*See infra* § II.B]. A majority-Black district is not narrowly tailored "if a crossover district would also allow the minority group to elect its favored candidates." *Cooper*, 581 U.S. at 305. None of the demonstration districts satisfies this test, so the VRA cannot be read to require any of them.

### B.  Plaintiffs Failed to Establish the Third Precondition

48.    Plaintiffs failed to establish the third *Gingles* precondition, which requires proof of a "racial bloc voting that is 'legally significant.'" *Pierce*, 97 F.4th at 212 (citation omitted). Indeed, the evidence *disproves* this factor. Plaintiffs demand a majority-Black district in northeast North Carolina that is neither necessary nor justified.

49.    The Supreme Court recognized in *Gingles* that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." 478 U.S. at 49 n.15. It has since reiterated this point. *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993). It has also recognized the other side of that coin: "[i]n areas with substantial crossover voting"—i.e., white voting for minority-preferred candidates—"it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition." *Bartlett*, 556 U.S. at 24 (plurality opinion). Thus, the Fourth Circuit has explained that "[t]he key inquiry under *Gingles'* third factor . . . is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Pierce*, 97 F.4th at 212 (quotation and alteration marks omitted). Because a remedial district is a majority-minority district, *Bartlett*, 556 U.S. at 19, polarization lacks legal significance where a majority-minority district is unnecessary, *id.* at 18; *Pierce*, 97 F.4th at 213 (explaining that a VRA remedy is "a

district in which the BVAP exceeds 50% plus one vote" (quotation and alteration marks omitted));
*Pierce*, 713 F. Supp. 3d at 230.

50.     In this case, there is no dispute that a majority-Black district is unnecessary to enable Black voters in SD2 (or SD1) an equal opportunity to elect their candidates of choice.[6] The most aggressive estimated percent BVAP needed to secure minority opportunity on record is 47.7%, and that number is proposed by *Plaintiffs'* expert, Dr. Collingwood. [PX279 at 20; *see also* PX36 at 2, 25]. And that estimate is itself too high to be credible. Dr. Collingwood calculated the percent needed to win for a "Demonstration Area" comprising 12 counties. [Day 2 Tr. 174:9-175:9; *see also* PX279 at 20]. But SD1 and SD2 do not consist of 12 counties, [*see* D.E. 105 at 11 (¶¶ 31-32)], and in no reconfiguration would they consist of those 12 counties. Moreover, the demonstration district inexplicably excludes 30% of the counties in SD1 (Perquimans, Camden, Currituck, and Dare) and nearly 40% of the counties in SD2 (Carteret, Pamlico, Hyde). [D.E. 105 at 11 (¶¶ 31-32); Day 2 Tr. 178:2-8]. In fact, Dr. Collingwood's 12-county region is noncontiguous—it leaves a hole in the northeast corner by excluding Perquimans County. Dr. Collingwood admits a "localized sort of analysis" is necessary to discern the percent needed to win, [Day 3 AM Tr. 90:3-4], and his analysis is not that.

51.     Voting patterns by race differ across the 12 counties, [Day 3 AM Tr. 39:16-20], and Dr. Collingwood's tables show that white crossover voting in SD1 and SD2 is consistently and meaningfully higher than white crossover voting in the broader Demonstration Area. [Day 3 AM Tr. 34:6-9; Day 3 AM Tr. 24:2-26:21; *see* PX36 at 28, 29, 31, 32, 35-38; PX279 at 24-26]. A

---

[6] Plaintiffs' percent-needed-to-win analysis speaks most directly to the third precondition. Plaintiffs' analysis of polarization levels is insufficient. *Pierce*, 97 F.4th at 216.

district-specific analysis of SD1 and SD2 shows an average BVAP needed to win of 41%. [LD76 at 16, Tbl. 6]. That, of course, is well below 47%.

52.     While Dr. Collingwood notes that reconfiguring SD1 and SD2 would change their territory, his analysis nonetheless "too far downplays the significance of a longtime pattern of white crossover voting in the area that would form the core of the redrawn" SD1 and SD2. *Cooper*, 581 U.S. at 304. To address the *core* of an area to be redrawn—rather than a sprawling area— precedent calls for a district-specific analysis, *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 276 (2015), and the literature likewise examines the question by district, *see* Bernard Grofman, Lisa Handley, David Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence, 79 N.C. L. Rev. 1383, 1408–1422 (2001) (Tbls. 5-10). To exclude large swaths of SD1 and SD2 from the analysis and include large swaths of territory unlikely to be in any reconfigured version of SD1 and SD2 is arbitrary (and suggests manipulation).

53.     Additionally, Dr. Collingwood only analyzed the behavior of Black voters and white voters, and did not consider the voting behavior of non-Black minority voters (i.e., voters other than Black and white voters). [LD76 at 13]. This methodological choice inflated the BVAP needed to win in Dr. Collingwood's analysis because it only considered the crossover voting of white voters alone, and not the higher crossover voting of all non-Black voters (who are often more likely than white voters to support Black-preferred candidates). [LD76 at 13-15]. When the voting behavior of Black voters is measured compared to non-Black voters, the average BVAP needed to win in the Demonstration Area falls to just 42%. [LD76 at 15-16, Tbl. 6].

54.     Moreover, Dr. Collingwood's data—at face value—do not support the 47.7% BVAP estimate. Most of the elections Dr. Collingwood analyzed yield a percent BVAP needed

below 47.7%, and the most common outcome of the analysis shows estimates between 43% and 45% BVAP. [*See* PX279 at 21]. Moreover, few elections yield a 47.7% estimate. The distribution is a bimodal one reflecting that, in most elections, percent BVAPs below 47% are sufficient, but in the remainder, a *higher* BVAP is needed, with some estimates exceeding the bare-majority mark. Plaintiffs themselves do not appear to credit these figures, as they have not proposed VRA remedies exceeding 51.5% BVAP. Of course, that would not make sense where Dr. Collingwood's reconstituted election analysis shows wide margins of victory for Black-preferred candidates in Plaintiffs' demonstration districts. [Day 2 Tr. 181:7-183:7; PX36 at 19-23; Day 3 Tr. 4:8-19; PX279 at 19]. This point only confirms that no estimate above 50% is remotely credible, including those in Dr. Collingwood's percent-needed-to-win analysis. Simply put, the analysis is plainly wrong.[7] There is no reason for the Court to credit results that Plaintiffs mistrust and apparently cite only "to suit the exigencies of the moment." *Pierce*, 97 F.4th at 215. Dr. Collingwood provided no information about what election results showed what outcomes, and that omission suggests an intent to conceal relevant information. In all events, an average is a poor tool for addressing a bimodal distribution because it yields an outcome that very few data points actually support. It is not informative here.

55.     Ample evidence confirms that Black voters in the region can elect candidates of their choice in districts below (even well below) 50% BVAP. North Carolina's Congressional District 1 ("CD1") has elected a Black Democrat for decades with a BVAP below 50%. [*See* D.E. 105 at 22-24 (¶¶ 95-111)]. CD1 currently contains nearly all counties at issue in this case and has a BVAP of 40.42%. [D.E. 105 at 23, 25-16 (¶¶ 110, 117)]. Congressman Don Davis, a Black

---

[7] The very fact that the demonstration districts show guaranteed Black-preferred candidate victories by wide margins proves they are unnecessary to secure minority opportunity.

Democrat, was re-elected to CD1 in 2024, [D.E. 105 at 24 (¶ 111)], and was first elected in 2022 when the district was 41.23% BVAP. [D.E. 105 at 2-3 (¶¶ 108-109)]. SD5 likewise elected a Black Democrat in 2024 and 2022 with a BVAP of 40.35%, [D.E. 105 at 12, 18 (¶¶ 38, 67)], as did HD8 (45.35% BVAP in 2024 and 38.13% in 2022), [D.E. 105 at 14, 18 (¶¶ 45, 73)], HD24 (38.50% BVAP), [D.E. 105 at 15 (¶ 53)], and HD27 (39.50% BVAP), [D.E. 105 at 15 (¶ 55)]. HD32, at 39.64% BVAP, elected a white Democrat in 2024. [D.E. 105 at 16 (¶ 56)].

56.     This case presents the precise fact pattern of *Cooper*. The evidence indicated that North Carolina's first congressional district (CD1) could perform at 48% and even 43% BVAP, *see* 581 U.S. at 294, and this evidence foreclosed the State's contention that CD1 needed to be reconfigured slightly above 50% BVAP, *id.* at 305–06. Plaintiffs' demand that SD1 or SD2 be drawn above 50% BVAP is both unsupported by the VRA and in contradiction to the Constitution for the same reason. Their hyper-inflated BVAP needed to win is 47.7%, and the true value is likely well below that. The thrust of Plaintiffs' position seems to be that this case is a § 2 case, not a racial-gerrymandering case. The Fourth Circuit already considered that view and dismissed it, explaining that "[t]he results of [a district-effectiveness] assessment do not cease being probative for the third *Gingles* precondition simply because the litigation roles are reversed—i.e., here it is Plaintiffs, not the State, who advocate for a majority-minority district drawn on the basis of race." *Pierce*, 97 F.4th at 217–18.

57.     Finally, Plaintiffs err insofar as they persist in their contention that a crossover district is a VRA remedy. The Fourth Circuit has rejected that argument, *id.* at 213, as has the Supreme Court, *Bartlett*, 556 U.S. at 23. "Section 2 'does not require crossover districts.'"[8] *Pierce*,

---

[8] Notably, much of Dr. Collingwood's work is in California, [Day 2 Tr. 172:18-173:1], where the California Voting Rights Act governs redistricting and mandates crossover districts in some circumstances. *Pico Neighborhood Assn. v. City of Santa Monica*, 534 P.3d 54, 65–66 (Cal. 2023),

97 F.4th at 213 (citation omitted). *Cooper* does not counsel otherwise. The decision explained that there was "no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite, 581 U.S. at 302, and the law is clear that, without all three conditions met, "there neither has been a wrong *nor can be a remedy*." *Growe*, 507 U.S. at 41 (emphasis added). *Cooper* held that there was no plausible § 2 liability, *not* that a crossover district would *remedy* a VRA violation. It takes little imagination to see what would have happened if the General Assembly had used Dr. Collingwood's report as Plaintiffs claim it should be used. Had it contravened the Whole County Provision to create a majority-Black district, a successful racial-gerrymandering claim would have followed with the result compelled by *Cooper*. By comparison, had the General Assembly drawn a 47% BVAP district out of compliance with the Whole County Provision, it would have lost a state-court suit identical with *Bartlett*. The General Assembly could not have configured the district Plaintiffs desire. If the General Assembly cannot do it, neither can the Court.

## III.  Plaintiffs' Claim Fails Under the Totality of Circumstances

58.    Plaintiffs failed to make the "ultimate" showing of vote dilution under "the totality of the circumstances." *Gingles*, 478 U.S. at 78. "The ultimate determination of vote dilution under the Voting Rights Act…must be made on the basis of the 'totality of the circumstances.'" *Lewis v. Alamance Cnty.*, 99 F.3d 600, 604 (4th Cir.1996) (quotation marks omitted). "[S]imply clearing the *Gingles* hurdles, while necessary to prove a possible violation of § 2, is not sufficient to establish an actual violation." *United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 348 (4th Cir. 2004). "If these preconditions are met, the court must then determine under the 'totality of circumstances' whether there has been a violation of Section 2." *Lewis*, 99 F.3d at 604 (citation

*as modified* (Sept. 20, 2023). That experience appears to have steered Dr. Collingwood off course in North Carolina, where there is no crossover district requirement.

omitted). These elements are Plaintiffs' "to prove." *Abbott*, 585 U.S. at 614; *see also Pierce*, 97 F.4th at 218. Plaintiffs have failed to show dilution under the totality of circumstances.

## A. Senate Factors

59. A § 2 plaintiff must "prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 585 U.S. at 614. The inquiry is "peculiarly dependent upon the facts of each case" and requires "an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the present and past reality." *Milligan*, 599 U.S. at 19 (citations omitted). The Supreme Court recently clarified that § 2 claims "rarely" succeed because the statute's "exacting requirements…limit judicial intervention to those instances of intensive racial politics where the excessive role of race in the electoral process denies minority voters equal opportunity to participate." *Id.* at 29-30 (quotation and alteration marks omitted).

60. Case law has identified many factors that guide this holistic inquiry, modeled off the Senate Judiciary Committee report accompanying the 1982 amendments to the VRA. *See Gingles*, 478 U.S. at 36–37; S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982), 1982 U.S.C.C.A.N. 177, at 29. These factors, often called the Senate Factors, do not favor a finding of § 2 liability.

### 1. Senate Factor 1

61. The first Senate Factor evaluates the "extent of the state's historical discrimination concerning the right to vote against plaintiffs' minority group," *Pierce,* 97 F.4th at 219, and that analysis properly focuses on "recent history" as more probative than less recent history. *Id.* at 221. Plaintiffs attempted to show evidence regarding the first Senate Factor at the preliminary-injunction phase, which this Court deemed non-probative. *Pierce*, 713 F. Supp. 3d at 234 (criticizing Plaintiffs' showing as focusing on "very old voting practices and cases," including just one from the past 30 years). The Fourth Circuit affirmed this finding. 97 F.4th at 221–222.

62. At trial, Plaintiffs presented no expert evidence concerning Senate Factor 1. Plaintiffs did, however, testify as lay witnesses about certain historical examples of discrimination. For example, Plaintiff Rodney Pierce referenced voting rights cases from before 1985: *Alston v. Butts*, C.A. No. 875 (E.D.N.C. Temporary Restraining Order, May 8, 1964); *Walker v. Moss*, 246 N.C. 196, 97 S.E.2d 836 (1957); *Johnson v. Halifax Cnty.*, 594 F. Supp. 161 (E.D.N.C. 1984). [Day 1 Tr. 44:25-45:12, 51:20-52:4]. Pierce was in high school in Halifax County public-schools when the school funding case *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997), was first filed in 1994. [Day 1 Tr. 38:25-39:4]. But none of this is recent or bears on current voting opportunity in 2025. These examples amount to just more "outdated evidence." *Pierce*, 713 F. Supp. 3d at 234.

### 2. Senate Factor 2

63. Senate Factor 2 analyzes the "extent to which voting in the elections of the state…is racially polarized." *Gingles*, 478 U.S. at 37. As shown above and at trial, majority-Black districts are unnecessary in North Carolina and in the areas relevant to this case, as the evidence reflects the existence of "substantial crossover voting." *Bartlett*, 556 U.S. at 24. Indeed, crossover voting in SD1 and SD2 exceeds crossover voting in neighboring parts of northeast North Carolina. The Fourth Circuit affirmed the preliminary-injunction finding that "Plaintiffs' own evidence demonstrates notably crossover voting statewide and locally," *Pierce*, 97 F.4th at 222, and the trial record provides additional support for that conclusion.

### 3. Senate Factor 3

64. Senate Factor 3 assesses the extent of "other voting practices or procedures that may enhance the opportunity for discrimination against the minority group," such as "unusually

large election districts, majority vote requirements, [or] anti-single shot provisions." *Gingles*, 478 U.S. at 37 (citation omitted). This factor favors Defendants.

65.     As the Fourth Circuit held in *Pierce,* Senate Factor 3 requires an evaluation of "other voting procedures in operation at the time of the suit," 97 F.4th at 220–221, and *not* past practices. Plaintiffs point to past practices they believe were discriminatory, but the question here is whether the challenged districts interact with other mechanisms in the *present* to enhance the discriminatory impact of the challenged system. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1296 (11th Cir. 2020) (finding majority-vote requirement enhanced impact of system lacking in majority-minority districts). Plaintiffs show nothing like that here.

66.     Moreover, Plaintiffs' principal episodes are the racial-gerrymandering cases of last decade, where the General Assembly acted under a sincere (if mistaken) belief about the requirements of § 2. *Covington*, 316 F.R.D. at 124 n.1 ("we make no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts"). This assertion is an exercise in irony. It is Plaintiffs here who demand the majority-Black districts rejected in *Covington* and arguing against the principles announced in *Covington*. If anything, this case proves the General Assembly's good faith: having erred in creating majority-Black districts at the expense of the Whole County Provision, the body accepted the judicial conclusions and

31

changed course. It would take the state *backwards* to accept Plaintiffs' vision of § 2 as demanding what *Covington* condemned.[9]

67.     Further, defense expert Dr. Taylor found that North Carolina has basic election practices typical of the rest of the country. [LD062 at 18]. For example, he testified that the North Carolina General Assembly does not have unusually large election districts, nor do the state's elections have cumulative voting. [Day 4 Tr. 235:7-9]. He also testified that the 11 counties in the Black Belt received a disproportionately higher number of polling places considering their voting-age population, and that 14 of 19 early-voting locations within those counties were located in Census tracts with larger-than-average Black voting-age population. [Day 4 Tr. 238:2-17; LD062 at 19].

### 4.     Senate Factor 5

68.     The fifth Senate Factor evaluates "the extent to which minority group members 'bear the effects of discrimination' in education, employment, or health, hindering their ability to participate in the political process." *Pierce*, 97 F.4th at 222 (quoting *Gingles*, 478 U.S. at 45). At the preliminary-injunction phase, the Fourth Circuit affirmed the Court's finding that "Plaintiffs presented no evidence connecting the [socioeconomic racial] disparities they reported between black and white North Carolinians to official race discrimination or unresponsive elected officials." *Id.* At trial, Plaintiffs attempted to overcome this failing, but their efforts fell short.

69.     While disparities continue to exist between Black and white North Carolinians across a range of socioeconomic factors, Plaintiffs' showing falls short of legal sufficiency for

---

[9] Plaintiffs are wrong to contend *Covington* concerned "packing." [Day 1 Tr. 88:23-89:24]. *See Covington*, 316 F.R.D. at 124 n.1 ("Nor do we consider whether the challenged districts involved any impermissible 'packing' of minority voters, as Plaintiffs acknowledge that they bring no such claim."). Rather, the General Assembly's sole fault in *Covington* was taking the exact course of action that Plaintiffs demand here. *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38–39 (2024) (contrasting racial-gerrymandering and vote-dilution claims).

three principal reasons. First, evidence in the record—comparative statistics between North Carolina and other states—reflects that the "extent" to which socioeconomic disparities by race exist in North Carolina is not more pronounced (and can be less) than in the nation as a whole. Second, Plaintiffs failed to put on evidence establishing a diminished ability of Black North Carolinians to participate in the political process, instead relying on more "ipse dixit." *Pierce*, 97 F.4th at 222. Third, and finally, Plaintiffs provide only incomplete data on socioeconomic disparities in the state, failing to tell the entire story—such as data showing that the disparities within the Black Belt counties at issue in this case are often *less* than the state as a whole.

### a. Comparative Data

70. The first flaw in Plaintiffs' Senate Factor 5 case is that it looks at racial disparities in North Carolina in isolation, rather than comparing North Carolina's conditions to those of the country as a whole. That comparison matters: § 2's "effects" test was only expected to be satisfied in a minority of cases—even in 1982 when race relations were in a worse place than today. Racial disparities are, to an extent, a *national* problem. Because Defendants showed that racial disparities in North Carolina are not more severe than the country as a whole, the Court cannot conclude that the "extent" of such disparities is sufficiently severe as to satisfy the demanding § 2 effects test.

### i. Congress Did Not Intend a One-Size-Fits-All National Finding

71. The § 2 effects test was added to the VRA in the 1982 amendments in a political compromise that was intended to restore a perceived status quo of vote-dilution precedents (arguably) overruled in *City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980); *see Brnovich v. Democratic Nat'l Cmte.*, 594 U.S. 647, 658-59 (2021) (recounting this history). The legislative history of that amendment establishes that § 2's effects test was expected to be satisfied only in a minority of cases. Objectors to the amendment insisted that an effects test would create § 2 liability

in "thousands" of localities nationwide, "they specifically list[ed] a number of states and cities [with] election systems they allege[d] would be vulnerable," and they predicted that a results test would be satisfied based on the absence of proportional representation plus "one other 'factor,' usually the existence of previously de jure segregated schools." S. REP. 97-417, 31, 34, 1982 U.S.C.C.A.N. 177, 209, 212; *see also Miss. Republican Exec. Cmte. v. Brooks,* 469 U.S. 1002, 1010 (1984) (Rehnquist, J., dissenting) (describing concern that original drafting of the "results" test would "lead to requirements that minorities have proportional representation, or devolve into essentially standardless and ad hoc judgments").

72.    While the amendment's proponents *could* have responded that America's ongoing social woes justified that revolution, they instead denied that naysayers' predictions would come to pass. The Senate Report expressly states that in "most communities . . . it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test." S. REP. 97-417, 33, 1982 U.S.C.C.A.N. 177, 211. The Report explained that, under the pre-*Mobile* § 2 standard, "court[s] distinguished between situations in which racial politics play an excessive role in the electoral process, and communities in which they do not"; that, in a sample of 16 court of appeals § 2 cases, defendants prevailed in 10; and that even localities with "underrepresentation plus a history of dual schools" were not vulnerable to § 2 liability. S. REP. 97-417, 33–34, 1982 U.S.C.C.A.N. 177, 211–12. The Report went on to discuss a 1978 Department of Justice study that:

> analyzed more than 200 cities throughout 40 northern and western states to see whether vote dilution cases should be brought in those regions. The standard used by the Department to evaluate the liability of those jurisdictions was the *White* 'results' test which the amended Section 2 would restore. The initial review of most of these cities revealed an insufficient basis for proceeding further. A few were selected for more detailed investigations. Yet, these cities, too, were ultimately found by the Department not to warrant litigation.

34

S. REP. 97-417, 35, 1982 U.S.C.C.A.N. 177, 213.

73.     Needless to say, the United States as a whole stood in a dark place with respect to race relations in 1978. As Dr. Critchlow pointed out, for example, in 1981 just four members of North Carolina's General Assembly were Black. [LD061 at 23-24; Day 5 Tr. 75:9-22]. Yet the legislative history of § 2 established that, even during those times, § 2 liability would be the exception and not the rule. Importantly, most of the so-called Senate Factors considered in vote-dilution cases are analyzed in terms of severity, as the question is the "extent" not the existence of factors tending to show excessive racial politics. *See Gingles*, 478 U.S. at 37 (quoting factors 1, 2, 3, 5, and 7).

74.     Any other approach to the Senate Factors would render § 2 unconstitutional. Justice Kavanaugh explained in *Milligan* that, "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." 599 U.S. at 45 (Kavanaugh, J., concurring). He cited favorably the dissenting opinion of Justice Thomas, *id.*, which explained that race-based remedial action cannot be "unbounded in time, place, and subject matter," or lacking a "nexus to any likely constitutional wrongs." *Id.* at 88 (Thomas, J., dissenting). The Senate Factors are meant to tie § 2 liability to a limited number of cases where a nexus to likely constitutional wrongs is established. To serve that function, they cannot be construed so leniently as to be met in virtually every case. The *Milligan* majority rejected that prospect, *see id.* at 29–30, and this Court must follow its lead to ensure that every application of § 2, including this one, is constitutionally compliant.

### ii. The Evidence Does Not Show North Carolina to Fall Within the Exception

75.     Here, Dr. Burch acknowledged that socioeconomic disparities between Black and white Americans exist across the country, [Day 3 PM Tr. 65:14-17], and that in her previous service as a Senate Factors expert witness, she has never opined that a state lacked socioeconomic disparities between Black and white residents. [Day 3 PM Tr. 65:10-13]. But the inherently national nature of the problem of socioeconomic disparities based on race must be squared with the concept that § 2's effects test was not intended to be satisfied *everywhere* in the country. The way to analyze Senate Factor 5, properly construed, is through a comparative approach, which Dr. Taylor provided.

76.     Dr. Taylor presented comparative and temporal analyses that were intended to provide important *context* for the racial gaps across socioeconomic factors that Dr. Burch identified. Specifically, Dr. Taylor's analysis revealed that since 1982, North Carolina's racial gaps in the areas of education, employment, and healthcare are no worse than the rest of the nation, and indeed are better based on some metrics. [LD062 at 26-28]. Dr. Taylor's comparative analysis with respect to disparities in education, employment, health care, and criminal justice is detailed below, and taken as a whole allow the Court to conclude that the "extent" of socioeconomic disparities in North Carolina are not sufficiently unusual or extreme to establish that Black voters have an unequal opportunity to participate in the electoral process.

77.     ***Education***.  Dr. Taylor found that, using a variety of comparative statistics across multiple measures of educational issues, including segregation, test scores, high school graduation

rates, and the rate of Black residents pursuing higher education, North Carolina compared favorably.

78. For segregation, Dr. Taylor used data from the National Center for Education Statistics compiled from 1990 to 2024 to compute a "Segregation Index," [Day 4 Tr. 206:20-25, 218:4-5; LD062 at 7-8], which showed that North Carolina schools are less segregated compared to the rest of the nation. [Day 4 Tr. 218:21-24; LD062 at 9]. The average white student in North Carolina attends a school that is 30-35% nonwhite, while the average white student in the U.S. nationally attends a school that is 25-30% nonwhite. [Day 4 Tr. 218:16-20; LD062 at 9].

79. For test scores, Dr. Taylor evaluated 2022 data from the National Assessment of Educational Progress's "Nation's Report Card," which publishes proficiency scores in math and reading for grades 4 and 8. This data showed that North Carolina's white and Black students are at the national average for their demographic groups. [Day 4 Tr. 220:19-221:6; LD062 at 10]. Moreover, the racial gaps between white and Black student performance in North Carolina were smaller than in the country as a whole. [Day 4 Tr. 221:5-10; LD062 at 10]. In addition, Dr. Taylor analyzed the University of Wisconsin Population Health Institute test score data that Dr. Burch reviewed, and found that a more comprehensive review of that data reflected that within the eleven Black Belt counties, the racial gap for third graders was relatively small compared to the gaps noted in other national and statewide data sets. [Day 5 Tr. 6:23-8:20; LD062 at 11].

80. A similar story is found when comparing high school graduation rates. Using data from the National Center for Education Statistics from the 2021-22 school year, Dr. Taylor found that the adjusted cohort graduation rate ("ACGR") between white and Black high school students was narrower in North Carolina than the rest of the Nation. [Day 4 Tr. 223:13-24; LD062 at 11]. Specifically, in North Carolina the ACGR difference between whites and Blacks was 7 percentage

points, compared to 9 percentage points nationally, [Day 4 Tr. 223:24-224:1; LD062 at 11], with that narrower gap being attributable to the Black graduation rate in North Carolina being 2% higher (at 83%) than the national average Black graduation rate (of 81%). [Day 4 Tr. 224:1-4; LD062 at 11].

81.     Finally, with respect to the pursuit of higher education, Dr. Taylor found that since 2009, North Carolina has seen an increase in the portion of Black residents who have earned a college degree. [Day 4 Tr. 225:16-23; LD062 at 12]. Dr. Taylor cited to 2020 data from the Lumina Foundation's "Stronger Nation" project showing that the proportion of Black North Carolinians with a bachelor's degree or higher is 0.6 percent higher than the national average: 26.9% versus 26.3%. [Day 4 Tr. 225:16-23; LD062 at 12].

82.     ***Employment Rates***.   Dr. Taylor also provided comparative employment data showing that racial disparities in employment rates between Black and white North Carolina residents are at, or below, the national average. Dr. Taylor showed, using Economic Policy Institute data, that from 2010 to 2023, the Black unemployment rate in North Carolina fell from 17.2% to 5.4%, bringing it from being 1.3% above the national average in 2010 to 5.8% below the national average in 2023. [Day 4 Tr. 230:3-10; LD062 at 12-13]. While North Carolina Office of State Budget and Management ("OSBM") data showed the Black unemployment rate in the eleven Black Belt counties was slightly higher (at 5.6%) than the North Carolina average in 2023, the Black Belt unemployment rate was *still* 0.2% below the national average. [Day 4 Tr. 230:13-16; LD062 at 13]. These data show that from an employment perspective, Black North Carolinians—

including those who live in the Black Belt counties—have above-average rates of employment, and further show that the employment picture for Black North Carolinians has been improving.

83.   **_Health_**.   Dr. Taylor similarly provided life-expectancy data showing that racial disparities in life expectancy are narrower in North Carolina than the nation as a whole, and have improved. Leveraging data from the U.S. Center for Disease Control and Preventions and the Division of Public Health in the North Carolina Department of Health and Human Services, Dr. Taylor showed that in 1990, the difference in life expectancy at birth rate between white and Black individuals was 6.3 years, both in North Carolina and nationally. However, by 2020, the gap in North Carolina narrowed to just 4.5 years, even as the national gap lowered to 5.9 years. [Day 4 Tr. 231:12-17; LD062 at 14]. This pattern held true in the eleven Black Belt counties, where the racial gap in life expectancy was even narrower, at 3.2 years. [Day 4 Tr. 231:23-25; LD062 at 14].

84.   **_Criminal Justice_**.   Finally, Dr. Taylor reported on comparative data on incarceration rates by race. [Day 4 Tr. 232:4-5; LD062 at 15]. Using data from the Prison Policy Initiative and U.S. Census, Dr. Taylor showed that the disparity between Black and white incarceration rates is substantially lower in North Carolina than it is in the nation as a whole. Specifically, he found that while nationally the Black incarceration rate is 6 times greater than the white incarceration rate, in North Carolina the Black incarceration is 3.7 times greater. [Day 4 Tr. 232:11-14; LD062 at 15].

85.   These comparative statistics establish that the "_extent_ to which minority group members 'bear the effects of discrimination' in education, employment, or health," _Pierce,_ 97 F.4th at 222 (emphasis added and citation omitted), in North Carolina is _not_ more severe than prevailing conditions in the country overall. North Carolina is not an outlier or an extreme case. It is average (and in some instances, better than average). Given Congressional intent that in "most

communities . . . it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test," S. REP. 97-417, 33, 1982 U.S.C.C.A.N. 177, 211, the Court cannot find on the basis of this record that socioeconomic disparities in North Carolina are so pronounced as to make North Carolina the rare state in 2025 meriting "judicial intervention" under the VRA. *Milligan*, 599 U.S. at 29-30.

### b. Impairment of Political Participation

86.    Plaintiffs' Senate Factor 5 showing is also deficient because it fails to connect any disparities to a present impediment to Black voters' ability to participate on equal terms in the political process. It is not enough to show a state has "a long and dubious history of discriminating against blacks" and that "grave socioeconomic disparities exist between blacks and whites[.]" *Teague v. Attala Cnty, Miss.*, 92 F.3d 283, 294 (5th Cir. 1996). For Plaintiffs to prevail on Senate Factor 5, "what must be shown is that the effects of past discrimination impede the ability of blacks in [SD-1 and SD-2] to participate in the political process." *Id.* (citing *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993)); *see also Gingles,* 478 U.S. at 45 (evaluation of whether political processes are "equally open" depends on a "searching practical evaluation of the present and past reality, and on a functional view of the political process") (citations and quotation marks omitted).

87.    That showing is usually made through expert analysis showing "that black participation is lower than white participation" in elections and evidence that "these depressed levels of political participation correlate to blacks' socioeconomic status." *Teague*, 92 F.3d at 294. Showings of a dramatic gap between white and Black voter turnout, or other metrics of political participation, have been shown to satisfy this element. *See, e.g., id.* (identifying an almost 20-point voter-registration gap between white and black residents); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 609–610 (N.D. Ohio 2008) (crediting a showing that "the white turnout rate in City

Council elections . . . has often been triple the turnout among African-Americans"); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1279 (N.D. Ga. 2023) (crediting evidence of double-digit voter turnout deficits, a finding that "overall Black turnout has decreased in the past 6-8 years," and evidence of racial disparities in other aspects of political participation like attending political meetings, putting up "political signs," donating money, and contacting elected officials or other voters).

88.     Here, Plaintiffs' expert Dr. Burch did not analyze, or even report on, voter turnout disparities by race in her opening report. [PX21; Day 3 PM Tr. 64:3-7]. Dr. Burch asserts she was not "asked" to report on the existence or magnitude of a voter turnout disparity by race in North Carolina. [Day 3 PM Tr. 64:7]. Dr. Burch did make a passing reference to limited statewide turnout data Dr. Taylor included in his report showing a modest 6-to-8-point turnout difference, [PX117 at 25; Day 3 PM Tr. 61:11-17], but she admitted neither she nor Dr. Taylor analyzed turnout for purposes of a Senate Factor 5 analysis. [Day 3 PM Tr. 64:3-65:2]. Thus, for example, Dr. Burch failed to calculate or analyze voter turnout disparities in the Black Belt counties relevant to this litigation, [PX21; PX117; Day 3 PM Tr. 64:9-13]. And Dr. Burch has done nothing to show what the turnout gap is over time (she looked just at two years and got different numbers), let alone to show a correlation between any socioeconomic disparities she found and political participation. And unlike cases like *Alpha Phi Alpha,* Plaintiffs have not claimed, much less shown, that there is a racial disparity in *other* areas of political participation (like attending political meetings, engaging in voter outreach, or making political contributions).  Plaintiffs' failure to show the extent

to which Black political participation is impaired, let alone that such impairment is correlated to socioeconomic disparities, undermines their Senate Factor 5 case.

### c. Plaintiffs' Data Is Incomplete

89. Plaintiffs' data is incomplete and fails to provide the full context needed to conduct the required "'intensely local appraisal' of the electoral mechanism at issue, as well as a 'searching practical evaluation of the past and present reality,'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

90. Consider Plaintiffs' educational disparity data. For her statewide data, Dr. Burch relied on the 2022 ACS one-year surveys, [Day 3 AM Tr. 112:20-113:4], even though not every county is surveyed each year, and some may be missing in the ACS one-year estimates. [Day 3 AM Tr. 113:15-20]. Dr. Burch's analysis of racial gaps in test scores in the eleven Black Belt counties, but relied on data from the University of Wisconsin that was four years older than the testing data Dr. Taylor relied on, [Day 4 Tr. 221:25-222:4], and missed the impact of COVID-19 on test scores. [Day 4 Tr. 222:11-14]. Likewise, while Dr. Taylor directly considered high-school graduation rates in North Carolina, Dr. Burch instead used data reflecting the percent of white and Black residents who are 25 years or older—data that introduced noise into the analysis (as her data captured individuals who moved into the state without a high school diploma and missed individuals who graduated from high school in North Carolina but then moved out). [Day 4 Tr. 224:10-225:3]. Finally, Dr. Burch did not analyze whether North Carolina exhibited educational funding disparities between white- and minority-majority districts, even though she had done so in prior expert work, [Day 3 PM Tr. 70:11-71:3], and admitted that data existed showing that some

majority-nonwhite school districts in North Carolina received more education funding on a per-pupil basis than majority-white districts in North Carolina. [Day 3 PM Tr. 71:4-10].

91.     Another example of incomplete data was Dr. Burch's analysis of homeownership rates. She argued that racial disparities in homeownership can reduce voter registration and turnout (due to the burdens of keeping one's voter registration during a move), [Day 3 PM Tr. 72:9-13], but she provided no analysis of all the ways North Carolina makes it easy to register and to vote, such as same-day registration, nor did she study the length of rental periods in the Black Belt. [Day 3 PM Tr. 73:19-74:2].

92.     On balance, Plaintiffs have failed to show that Senate Factor 5 supports a finding of § 2 liability.

### 5.     Senate Factor 6

93.     Plaintiffs have failed to prove that Senate Factor 6 favors them. That factor analyzes "whether political campaigns have been characterized by overt or subtle racial appeals." *Pierce*, 97 F.4th at 220; *see also Alpha Phi Alpha*, 700 F. Supp. 3d at 1363.

94.     At the preliminary-injunction phase, this Court concluded Plaintiffs had not met their burden based on their presentation, via a report from Dr. Burch, of three examples of alleged racial appeals: (1) Jesse Helms' campaign tactics in 1984 and 1990, (2) a comment by former Rep. Madison Cawthorn in his 2020 U.S. House race; and (3) an advertisement then-Rep. Ted Budd ran against former North Carolina Chief Justice Cheri Beasley during their 2022 Senate campaign that "blamed Beasley for crimes committed by individuals after early release from prison." *Pierce*, 713 F. Supp. 3d at 235. The Court discounted the Helms example because it occurred "decades" ago, *id.*, and the Budd example because it never "explicitly mention[ed] race." *Id.* (citation omitted). This "left" Plaintiffs with Cawthorn's comment, but as the Court found, that example was insufficient to meet Plaintiffs' burden.

95.     At trial, Plaintiffs attempted to bolster their Senate Factor 6 case with additional examples from Dr. Burch of campaigns in North Carolina that she alleged contained racial appeals between 2018 and 2024. But this effort was unsuccessful for at least three reasons.

96.     First, Plaintiffs failed to show the *prevalence* of racial appeals from which the Court might find that they "characterize" political campaigns in North Carolina (or northeastern North Carolina). Instead, Plaintiffs appear to believe a handful of examples suffice.

97.     Precedent rejects that approach. A showing of "evidence of isolated racial appeals" in recent elections is given very little weight as evidence of whether racial appeals "characterize" elections. *Alpha Phi Alpha*, 700 F. Supp. 3d at 1281 (rejecting showing of six alleged racial appeals as insufficient). Rather, to make that showing, Plaintiffs must provide a way to "meaningfully evaluate whether these appeals 'occur frequently, regularly, occasionally, or rarely'" in election campaigns—specifically, a "systematic or statistical evaluation of the extent to which political campaigns are *characterized* by racial appeals." *Id.* at 1281–1282 (quoting *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1024 (N.D. Ala. 2022), *aff'd sub nom.*, *Allen v. Milligan*, 599 U.S. 1 (2023)); *see also, e.g., Ala. State Conference of the NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1311 (M.D. Ala. 2020) (finding only a few examples of racial appeals "carries no weight in Plaintiffs' favor" given a lack of evidence "demonstrat[ing] a pattern, practice, or routine of racial appeals across the electoral landscape"); *LULAC, Council No. 4434,* 999 F.2d at 879 ("Nothing in the district court's opinion indicates that these racial appeals were anything more than isolated incidents.").

98.     Here, Plaintiffs have provided no systematic or statistical study of racial appeals, [Day 3 PM Tr. 83:5-9 (Dr. Burch)], and their expert Dr. Burch admitted she had a "hard time envisioning" how a statistical study could even be undertaken. [*Id.* at 80:17-22]. But Plaintiffs' failure of proof cannot be excused by a failure of vision or execution.

44

99.     Indeed, Plaintiffs have omitted *half* the prevalence equation. As defense expert Dr. Critchlow observed, Dr. Burch supplied the Court with a numerator (16 campaigns allegedly involving a racial appeal), but no denominator (the number of campaigns for all offices in years she evaluated). [Day 5 Tr. 68:14-23]. While a denominator is impossible to discern, since Dr. Burch kept no records of sources she searched, what search terms she used, or what campaigns she found free from racial appeals, [*see* Day 3 PM Tr. 77:10-12, 77:23-25, 79:13-18], attempts to estimate the denominator revealed it to be large. Dr. Critchlow testified that North Carolina has "hundreds and hundreds upon hundreds" of contests, [Day 5 Tr. 68:14-23], counting statewide and federal offices, all 170 seats in the General Assembly (120 for the House and 50 for the Senate), plus county-level offices across North Carolina's 100 counties and municipal offices across its 70 cities. Dr. Burch admitted the number of election contests could exceed 1,000 during the years she studied, [*see* Day 3 PM Tr. 82:25-83:4], meaning the number of candidates running *campaigns* in those contests could be several thousand. The Court cannot conclude that racial appeals "occur frequently" or "regularly" in North Carolina campaigns, *Alpha Phi Alpha*, 700 F. Supp. 3d at 1363, by anecdotal evidence suggesting that a racial appeal may be made in a campaign in perhaps 1.6% of election contests (i.e., 16 divided by 1,000).

100.     Dr. Critchlow did perform a systematic analysis with an extensive survey of North Carolina newspapers covering 40 political campaigns for Governor, U.S. Senate, and Congressional District 1 from 2008 until June 2024. He found that a charge of racism was raised in the press in just two election campaigns—both from more than a decade ago (gubernatorial campaigns in 2008 and 2012). Dr. Critchlow acknowledged that, based on events post-dating his study, he would have also identified a charge of racism as being raised in Mark Robinson's 2024 gubernatorial campaign against Josh Stein (in the unusual posture where the Black candidate was

accused of racism against Black persons). This amounts to one isolated incident within the past decade, and just three incidents within the full period of Dr. Critchlow's study.[10] But "[t]hree bricks do not a house make." *Alabama State Conference of the NAACP*, 612 F. Supp. 3d at 1310. Dr. Critchlow found no pervasive emphasis on racism in the campaigns he studied, [Day 5 Tr. 65:22-66:2], and instead found that campaigns in North Carolina tended to focus on "bread and butter issues" like the economy, taxes, healthcare, and education—*not* on racial appeals. [Day 5 Tr. 62:4-8; LD061 at 11]. The Court credits Dr. Critchlow's analysis.

101.     Second, Plaintiffs' examples are also insufficient because they are entirely drawn from exogenous elections (i.e., not elections for the North Carolina Senate) and do not arise from northeastern North Carolina. This is important because alleged racial appeals that occurred in exogenous elections or that are "not recent" or "intrinsically racial" are entitled to only "slight weight" in the Senate Factor 6 analysis. *Alabama State Conference of NAACP*, 612 F. Supp. 3d at 1311 (citing *Thomas v. Bryant*, 366 F. Supp. 3d 786, 807 n. 71, 808 n.74 (S.D. Miss. 2019)).

102.     This lawsuit is about Senate representation in northeastern North Carolina, yet Plaintiffs produced not a *single example* of a racial appeal in a North Carolina Senate election, [Day 3 PM Tr. 84:5-11 (Dr. Burch)], or of an appeal in a contest for an office in an electoral district or county in northeastern North Carolina. [Day 3 PM Tr. 83:15-84:4]. While Dr. Burch did identify three alleged racial appeals for the North Carolina House, none were from northeastern North Carolina. [Day 3 PM Tr. 85:6-20].

---

[10] Dr. Critchlow's survey methodology uses a charge of racism as a proxy for a racial appeal, but not all charges of racism amount to racial appeals. For example, the charges of racism he found in the 2008 and 2012 gubernatorial contests tended to be accusations of racism made *against* candidates (e.g., a 2008 charge made against candidate Bev Perdue that she was a KKK sympathizer because of a vote she took against a hate-crime bill), [*see* LD061 at 8-9], which is different than a campaign itself making a racial appeal.

103.	Instead, Dr. Burch's examples are collected from often far corners of the State. The three State House elections where she found alleged racial appeals arose from longshot candidates in HD-48, in southern North Carolina, and in HD-65, north of Greensboro, as well as a candidate in HD-73, in Cabarrus County, outside Charlotte. [LD061 at 20-21]. She also raised alleged comments made by former Rep. Madison Cawthorn in his 2020 U.S. House race in western North Carolina (CD-11), [PX021 at 28], and alleged racial appeals in campaigns for Columbus County Sheriff and Onslow County Board of Education, [PX021 at 27-28], neither of which are in northeastern North Carolina. These examples, such as they are, tell the Court very little about the use of racial appeals as a campaign tactic in northeastern North Carolina and within SD1 and SD2.

104.	Equally notable is Dr. Critchlow's observation that Dr. Burch's evidence did not show that racial appeals were a winning strategy in North Carolina politics. The candidates who made alleged racial appeals in HD-48 and HD-65, for example, were repudiated by the Republican Party, and went on to lose their elections by substantial margins. [LD061 at 20-21; Day 5 Tr. 74:8-75:1]. Dr. Burch also alleged that Mark Robinson engaged in racial appeals in his 2024 gubernatorial contest, but he went on to lose 55-40% (running as a Republican) while President Trump carried the state. [*See* Day 3 PM Tr. 94:8-12]. His approach failed, which suggests racial appeals are a bad approach in North Carolina. That is a good thing. Similarly, Dan Bishop, whom Dr. Burch also accused of making a racial appeal, lost in the 2024 North Carolina Attorney General election. [*See id.* at 94:1-3].

105.	Third, the Court is not convinced that many of Plaintiffs' examples of alleged racial appeals fairly constitute "racial appeals" instead of simple attack ads or issue-advocacy ads. At trial, for example, Dr. Burch discussed the so-called "TikTok ad" published by Dan Bishop against Jeff Jackson in the 2024 Attorney General election, claiming the ad "rel[ied] on specific

stereotypes of Asian American perpetual foreignness" and was an explicit racial appeal. [Day 3 PM Tr. 92:19-93:9]. But neither candidate was Asian (both were white men and incumbent Members of Congress), [Day 3 PM Tr. 91:14-20], and as Dr. Critchlow pointed out, the ad had to do with the Chinese *government*'s ownership of TikTok, and "wasn't an attack on the Chinese people" or "Asian Americans." [Day 5 Tr. 73:1-13; LD061 at 19-20]. The Chinese government's partial ownership of TikTok led to security concerns that motivated Congress to pass bipartisan legislation signed into law by President Biden—the 21st Century Peace Through Strength Act— that compelled the sale of TikTok. LD61 at 20. [*See also* Day 3 PM Tr. 91:21-92:18 (Burch)]. That choice was affirmed by a unanimous Supreme Court, affirming a unanimous D.C. Circuit. *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025). If the totality-of-circumstances inquiry is made so indiscriminate as to condemn a rare and refreshing moment of national bipartisanship and consensus, then it is completely off the rails.

106.    Likewise, Plaintiffs at trial again raised certain ads run against then-Chief Justice Cheri Beasley in her 2022 U.S. Senate race against Ted Budd. The Court had already found at the preliminary-injunction phase that this was "not a racial appeal," *Pierce*, 713 F. Supp. 3d at 235, in part because race was not mentioned in the ads. *Id.* At trial, Dr. Critchlow provided additional evidence showing these ads were not racial appeals: the ads, which accused Justice Beasley of being soft on crime, were criticized in the North Carolina press and by Beasley's campaign for being *factually inaccurate*, not as improper racial appeals. [LD061 at 9-10; Day 5 Tr. 64:4-16]. Because charges of racism are politically potent, both the press and the Beasley campaign had incentive to make the charge if they believed the ads were racial appeals. But they did not. By contrast, Dr. Critchlow testified that crime is a legitimate public policy issue and that North Carolinians were facing increased crime rates in 2022 during that election contest. [LD061 at 17;

48

Day 5 Tr. 70:21-71:22]. The inference the Court draws from these facts is that the disputed ads were garden-variety attack ads on a candidate's record, not racial appeals, and were treated accordingly.

107.    More broadly, Plaintiffs' approach too readily treats political speech on matters of public concern as racial appeals. The TikTok ad and Beasley-Budd ads are examples of this. Additionally, Dr. Burch treats as a potential racial appeal discussion of "sanctuary cities" and illegal immigration, affirmative action, and the teaching of Critical Race Theory, among other topics. [*See* LD061 at 16-17, 19; Day 5 Tr. 70:5-71:22, 72:9-20]. This injects partisanship into § 2. While Dr. Burch asserts that something more than a policy discussion is needed (e.g., a Black exemplar, a racial image, or a racial "code word"), her approach is nonetheless so sweeping as to condemn any discussion of illegal immigration as a racial appeal if an ad depicts immigrants crossing the southern border. [*See* Day 5 Tr. 69:14-16]. But Americans have a right to be concerned about illegal border crossings, and it is not the judiciary's role to condemn them or impose § 2 liability for those concerns. Moreover, Dr. Burch did not conduct any studies of North Carolinians to see if the use of racial "code words" or imagery would prime anti-minority attitudes in the state in 2024. [Day 3 PM Tr. 89:14-90:1].

108.    For all these reasons, Senate Factor 6 favors the defense.

### 6.    Senate Factor 7

109.    Senate Factor 7 also favors Defendants. This factor analyzes "the extent to which members of the minority group have been elected to public office," *Pierce*, 97 F.4th at 220, an inquiry that properly focuses on the "successful election [] of candidates statewide." *Id.* at 221 (citing *Gingles*, 478 U.S. at 40, 74-75) (assessing "the extent to which blacks have been elected to office in North Carolina, both statewide and in the challenged districts"). The focus is not whether Black voters are "underrepresented" under a standard of proportional representation, *Pierce*, 713

F. Supp. 3d at 235–236, but is instead focused on whether "no members," or just a "few," "of a minority group have been elected to office over an extended period of time." *Id.* (quoting S. Rep. 97-417 at 29, n.115 (1982)). "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Milligan*, 599 U.S. at 28.

110.     At the preliminary-injunction phase, Plaintiffs conceded that Black candidates have been elected to the North Carolina General Assembly in large numbers—far more than a "few." *Gingles*, 478 U.S. at 37. Plaintiffs' expert Dr. Burch acknowledged in her preliminary-injunction phase expert report that in 2023, 21.6% of House members and 18% of Senate members were Black, numbers "close to parity" with the Black share of North Carolina's population. [D.E. 17-3, "Burch PI Rep." at 21-23]. At the preliminary-injunction phase, the Court found that Senate Factor 7 favored Defendants, *Pierce*, 713 F. Supp. 3d at 236, on the basis of that record and because of the presence of Black leaders of both parties in the North Carolina legislature and many Black judges elected to "statewide appellate judgeships." *Id.*; *see also Pierce,* 97 F.4th at 220.

111.     The record has only become more adverse to § 2 liability at trial. In the 2024 elections, 38 Black candidates were elected to the General Assembly and are now serving—28 in the House (23.33%) and 10 in the Senate (20%). [Day 3 PM Tr. 96:22-3 (Burch)]. Dr. Burch concedes these figures represent "parity with the population as a whole." [*Id.*]. This represents an *increase* in Black representation from the 2023 numbers the Court already found to favor Defendants. And Dr. Critchlow showed that several North Carolina cities are led by Black mayors, including Charlotte, Durham, and Fayetteville, [Day 5 Tr. 76:2-9; LD061 at 23], and former Governor Roy Cooper recognized the achievements of some 50 Black judges, prosecutors, and other elected officials, [Day 5 Tr. 76:2-9; LD061 at 24-26], breaking the stereotype of "all white" justice in the South. [LD061 at 24].

112.     Moreover, these figures represent a *dramatic* increase from the number of Black members elected to the General Assembly around the time of the 1982 amendment to the Voting Rights Act. As Dr. Critchlow noted, in 1981, only *four* members of the General Assembly were Black, [LD061 at 23-24; Day 5 Tr. 75:9-22], a number that increased to 16 by 1985. [LD061 at 24]. The unmistakable conclusion is that there is a durable pattern of Black electoral success in the General Assembly.

113.     In addition to being elected to the General Assembly, Black members have risen to leadership positions. As noted in the preliminary-injunction phase, Black elected officials in 2023-2024 "occup[ied] significant positions in state government, including Lieutenant Governor, minority leader of the state Senate, minority leader of the state House of Representatives, and state appellate judgeships." *Pierce*, 97 F.4th at 220. In 2025, while Senator Blue is no longer the Senate minority leader, his successor, Senator Sidney Batch (SD17), is a Black woman. [Day 1 Tr. 98:12-17]. Likewise, in the state House, Representative Reives remains the Leader of the North Carolina House Democratic Caucus. [Day 1 Tr. 138:6-15].

114.     The record also shows that Black representation exists in substantial numbers in the region at issue in this case, i.e., northeastern North Carolina, where SD1 and SD2 and the Black Belt are located. The eleven Black Belt counties are all in North Carolina's historic CD1. [Day 4 Tr. 234:8-10]. Since 1990, CD1 has been represented by four Black Representatives: Frank Balance, G.K. Butterfield, Eva Clayton, and Don Davis (current). [Day 4 Tr. 234:3-7; LD062 at 16]. Overall, 191 of the 581 (or approximately 33%) Black elected officials in North Carolina hold an office that represents one of the Black Belt counties. [LD062 at 17]. In addition, within the Black Belt counties, 40 of 62 (65%) county commissioner seats were held by Black

commissioners, a number in excess of the Black share of those counties' population. [LD062 at 17].

115.    Indeed, both Plaintiffs have themselves been elected to public office in northeastern North Carolina. Plaintiff Pierce was elected as a Black Democrat to the state House in HD27 in 2024, a district comprising Halifax, Northampton, and Warren Counties. [Day 1 Tr. 45:18-24]. Plaintiff Matthews served five terms on the Martin County School Board, winning five district-specific elections as a Black Democrat. [Day 1 Tr. 59:15-25].

116.    At trial, Plaintiffs' expert Dr. Burch tried to dismiss this evidence of Black electoral success by claiming that 22 of the 28 House districts that elected a Black member in 2024 were either "majority-Black" or "majority-minority" districts. But the racial composition of districts is not germane to Senate Factor 7, which simply evaluates whether Black candidates were elected to the body. Whether majority-Black districts are needed to elect Black-preferred candidates (which are not always themselves Black) is evaluated as part of the second and third *Gingles* preconditions.

117.    Moreover, Dr. Burch wrongly lumped together two different types of districts: majority-*minority* districts (i.e., districts where a majority of the voting-age population are of races other than white) and majority-*Black* (districts with a majority-Black voting-age population). These district types are not interchangeable, as the VRA can only mandate the remedy of a majority-Black district in this case. *Bartlett,* 556 U.S. at 23 (finding "that § 2 does not require crossover districts"). That distinction matters, as Dr. Burch conceded that of her 22 majority-minority *or* majority-Black districts, just *four* were majority-Black: HD23, HD27, HD58, and HD107. [Day 3 PM Tr. 99:16-100:7]. If one steps back and considers all 28 House districts that elected a Black member in 2024, 24—or more than 85%—were *not* majority-Black districts. In

fact, Dr. Burch also admitted that Black members were elected to the House in 2024 from districts with a wide range of racial compositions, some with BVAPs below 12% like HD54 (11.6% BVAP) and HD58 (11.25% BVAP). [Day 3 PM Tr. 100:15-101:14]. Thus, even if the racial composition of the districts is relevant for Senate Factor 7, this record supports Defendants—not Plaintiffs— because it shows that Black candidates are being elected throughout North Carolina from a wide range of districts, *not* just majority-Black districts.

### 7. Senate Factor 8

118.    Senate Factor 8 evaluates "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. Here, as the Court found at the preliminary-injunction phase, *Pierce*, 713 F. Supp. 3d at 236, the inquiry evaluates the extent of "responsiveness" to minority community concerns—and not merely evidence of "unresponsiveness." *NAACP, Inc. v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1023 (2d Cir. 1995). That "responsiveness" inquiry entails a "review of tangible efforts of elected officials and the impact of these efforts on particular members of the community." *Id.* at n. 24.

119.    At the preliminary-injunction phase, this Court rejected Plaintiffs' effort to ask the Court to "infer" unresponsiveness based on socioeconomic inequality, *Pierce*, 713 F. Supp. 3d at 236. At trial, Plaintiffs presented no affirmative expert evidence to argue that North Carolina officials were not "responsive" to the needs of the Black community—Dr. Burch's opening expert report, PX21, addressed solely Senate Factors 5, 6, and 7.

120.    By contrast, defense expert Dr. Taylor provided quantitative data showing the opposite: that North Carolina officials indeed *are* responsive. He first leveraged a widely known data set from political scientists Devin Caughey and Christopher Warshaw's book, *Dynamic Democracy*, to demonstrate that North Carolina ranked 28th of 50 states in the size of the positive

correlation between public opinion on economic policy and economic policy outputs from 1982 to 2019. [Day 4 Tr. 241:9-11; LD062 at 21]. On cultural issues, the correlation is stronger: North Carolina ranked 25th out of 50 states. [Day 4 Tr. 241:12-18; LD062 at 22]. While these data are not broken down by race, they reflect that North Carolina elected officials are reasonably responsive to their constituents. Section 2 demands nothing more.

121.    Moreover, as set forth in the findings of fact, Dr. Taylor analyzed fiscal expenditures by the General Assembly and local expenditures by the 11 counties in the Black Belt to evaluate the degree of public funding for projects that directly benefited Black North Carolinians. Dr. Taylor found substantial public spending in the Black Belt counties, [*see* LD062 at 22-24], and in the area of educational spending in particular, found that the 11 Black Belt counties had an average ranking of 30.5 out of 100 counties in per-capita expenditures and that all of Dr. Burch's 11 counties received supplemental school funding from the state, with most receiving multiple types of supplemental funding. [Day 4 Tr. 243:3-16; LD062 at 22-23 & n.49; LD032 at 19, 23]. Other spending data reported by Dr. Taylor shows, at a granular level, dozens of appropriations that directly benefited Black North Carolinians.

122.    On the basis of this record, the Court concludes that North Carolina's General Assembly is responsive to the needs of the minority community, and Senate Factor 8 favors Defendants.

### 8.    Senate Factor 9

123.    The ninth Senate Factor examines whether "the policy underlying the state['s] use of" the challenged districts is "tenuous." *Gingles*, 478 U.S. at 37 (citation omitted). As demonstrated, North Carolina's WCP principles are *not* tenuous; they represent a sovereign policy recognized at least as of 1776 and are implemented through objective, neutral, and non-arbitrary means. The State's interest in districts that adhere to county lines to the maximum extent possible

"lies at the heart of representative government and thus must be treated with great respect." *Fusilier v. Landry*, 963 F.3d 447, 460 (5th Cir. 2020). The same is true of the state's desire to comply with federal constitutional principles against racial gerrymandering. *See Pierce*, 97 F.4th at 221 n.10 ("Equally baseless is Plaintiffs' assertion, under the ninth factor, that North Carolina's interests in complying with federal constitutional prohibitions against racial gerrymandering and state constitutional prohibitions against splitting counties are illegitimate considerations."). It is difficult to imagine a more compelling justification for state action than a desire to comply with multiple federal-court rulings condemning the exact race-based redistricting choice demanded in this case. This factor strongly favors Defendants.

### B.    Additional Factors

124.    The Senate Factors are illustrative, not exclusive. *Pierce*, 97 F.4th at 219. Additional factors confirm that § 2 liability is unwarranted in this case.

### 1.    Party Affiliation Explains Divergent Voting Patterns

125.    One factor crucial under the totality of circumstances is "whether partisanship, rather than race, drove polarization." *Pierce*, 97 F.4th at 222. Here, as at the preliminary-injunction phase, "the party affiliation of the candidates is sufficient to fully explain the divergent voting preferences of Black and White voters" in the contests forming Plaintiffs polarization presentation. *Id.* at 223 (citation omitted). As at that prior stage, Dr. Alford examined elections Plaintiffs' expert deems relevant and finds that "white voters were not more likely to oppose a black Democrat compared to a white Democrat" and "black voters' support for black and white Democrats was essentially identical" to their support for Black Democrats. *Id.*; [LD059 at 6-15; LD075 at 2-4]. This "clearly shows partisan polarized voting," not "that the polarization is related to race." [Day 4 Tr. 34:19-22; *see also* Day 4 Tr. 36:18-50:1; LD075 at 2-3]. The 2024 elections showed the polarization based on the party of the candidate: the gap between Black voter support for the

Democratic candidate and white voter support for the Democratic candidate was about 70 to 80% across the relevant geographies, while the impact of the race of the candidate was near zero. [LD076 at 6-7, Tbl. 3-4].

126.    "[A] model that accounts for the candidate's race can provide probative evidence about causation," *Pierce*, 97 F.4th at 223, because it enables "the effects of partisanship and race on voting [to be] isolated and measured," *Charleston Cnty.*, 365 F.3d at 352. In this case, the record isolates race and politics in at least two ways.

127.    First, in partisan contests between white candidates, as noted, voting behaviors are polarized along political lines to the same degree as they are polarized in cases the present a racial choice. [LD059 at 6-15; LD075 at 3, 5, Tbl. 1]. This set of elections controls for race and shows an equal level of polarization regardless of whether a racial choice is present.

128.    Second, the 2016 state supreme court contest presented a racial choice (between Black and white candidates) but not a partisan choice, and polarization disappeared: a majority of white voters in SD1 favored the Black-preferred candidate (who was Black), and crossover voting in the other geographic areas examined (SD2, the demonstration area, and the State) ranged from 43% to 47%. [LD059 at 8; *see* Day 4 Tr. 46:1-12 ("So the white vote becomes completely non-cohesive")]. Plaintiffs' polarization expert found that "the key piece of information that is missing is the partisan identification of the candidate," but illogically failed to reach the obvious conclusion that—without partisanship—there is no polarized voting. [Day 2 Tr. 134:4-6; Day 4 Tr. 44:13-47:1]. While Plaintiffs attempted to dismiss the contest as "a single election," [Day 4 Tr. 89:11-18], it is the only contest on record that presented a racial choice but not a partisan choice that permits these factors to be "isolated and measured." *Charleston Cnty*, 365 F.3d at 352. This evidence is highly probative and uncontradicted by other evidence.

129.    Despite their treatment of this 2016 contest, Plaintiffs' expert Dr. Collingwood placed great weight on the results of the 2024 gubernatorial contest, between Mark Robinson (a Black Republican) and Josh Stein (a white Democrat), in trying to establish that voting in North Carolina is polarized by race. The ultimate point Dr. Collingwood tries to make here is unclear, as he concluded that Governor Stein was the Black-preferred candidate, and *Governor* Stein won the election. Regardless, the success of a minority-preferred candidate is less probative when it arises under "special circumstances" that "demonstrate that the election was not representative of the typical way in which the electoral process functions." *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557 (9th Cir. 1998); *see also Black Political Task Force v. Galvin,* 300 F. Supp. 2d 291, 305 (D. Mass. 2004) (Selya, J.) (finding "scant probative value" in an election where "special circumstances explain the success of the black-preferred candidate"). Such "circumstances" can involve controversies that ensnare Black officeholders or candidates. *See Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1054 (E.D. Mo. 2016) (finding "special circumstance" impacting election of Black-preferred school board candidate was the "controversial resignation," one month earlier, of the district's first Black superintendent). Here, Mark Robinson's campaign suffered what Dr. Alford described as an "implosion" and "highly publicized downturn" of his campaign, [LD076 at 12], following publication of scandalous allegations. The Court finds that this election is much less probative of racial voting patterns in the State.

130.    If more evidence were needed to show that political views (not racial prejudice) explain divergent voting patterns, it comes from Plaintiffs' sponsored witnesses, who testified without contradiction that Black cohesion is not the result of "allegiance" to the Democratic Party but a "policy" choice. [Day 1 Tr. 53:9-16 (Pierce)]. Black voters have policy views on matters like

school funding and Medicaid expansion that differ from the views of Republican voters, who are generally white voters. [*See, e.g.*, Day 1 Tr. 46:4-50:16; Day 1 Tr. 90:14-16 ("democrats currently represent the expressed aspirations of most African Americans"); Day 1 Tr. 91:16-21 ("most black voters vote for the Democratic Party not out of allegiance to the party but out of support for the policies and views on issues expressed by the Democratic Party generally"); Day 3 AM Tr. 33:7-34:5 (Plaintiffs' polarization expert stating at least four times that "policy positions" and "policy issues" explain the divide)]. No evidence shows that racial prejudice has any connection at all to the observed voting patterns.

131.    Plaintiffs seem to believe that different policy views follow from different interests of racial groups, including based on socioeconomic differences. But even if that is true, it only proves Legislative Defendants' point. It is precisely because North Carolina and its northeastern counties are places "where racial animosity is absent although the interests of racial groups diverge" that politics—not race—explains the voting patterns. *Gingles*, 478 U.S. at 100 (opinion of O'Connor, J.); *see also Charleston Cnty.*, 365 F.3d at 347; *Lewis*, 99 F.3d at 615 n.12. "Congress was not unaware that political preference often correlates strongly with socioeconomic status," as "particularized needs clearly give rise to particularized interests," but that "did not . . . lead Congress to soften the line between partisan politics and racial vote dilution established" in vote-dilution decisions codified in the 1982 § 2 amendment. *LULAC, Council No. 4434*, 999 at 863. Section 2 does not entitle a minority group to a judicial enforcement of their position in "interest-group politics" but rather provides "a rule hedging against racial discrimination."[11] *Gingles*, 478 U.S. at 83 (opinion of White, J.).

---

[11] Plaintiffs' emphasis on the issue of Medicaid expansion accentuates their confusion about § 2. The reason North Carolina had the option to choose for or against Medicaid expansion was the Supreme Court's holding that Congress lacked constitutional power to *mandate* state participation

132. Finally, Plaintiffs continue to resist the notion that the Court may examine "partisan affiliation" in the § 2 inquiry. [*See* Day 3 AM Tr. 21:14-15]. The Fourth Circuit already declared *in this case* that Plaintiffs' "argument contradicts our precedent." *Pierce*, 97 F.4th at 223. Because "the reason for polarized voting is a critical factor," *id.* (citation omitted), and because all evidence shows the reason is political differences, not racial animus, there is no § 2 violation.

## 2. Proportionality

133. Another critical analysis is "the proportionality inquiry, comparing the percentage of total districts that are [minority] opportunity districts with the [minority] share of the" population. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006). Proof of the *Gingles* preconditions, "without more, does not make the result vote dilution when the minority group enjoys substantial proportionality." *Johnson*, 512 U.S. at 1015–16. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017. Accordingly, the Supreme Court in *Johnson* held that vote dilution will ordinarily not exist where minority voters in the relevant "area would enjoy substantial proportionality." *Id.* at 1014. This factor merits "great weight." *Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 300–01 (5th Cir. 2016); *see also Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 56 F.3d 904, 912 (8th Cir. 1995) (observing that this consideration "has recently been given special importance by the Supreme Court"). In *Johnson*, the substantial proportionality of Hispanic opportunity districts to Hispanic voting-age population

---

in Medicaid expansion. *See NFIB v. Sebelius*, 567 U.S. 519, 586–89 (2012). Plaintiffs use § 2 as a collateral attack on that holding by suggesting that, where a minority group prefers Medicaid expansion, Congress *does* have power to demand it by using a state's choice against Medicaid expansion as one basis for § 2 liability. That is an abuse of the statute. And, congressional power aside, there is zero reason to believe it actually intended to indirectly controls state policy choices by affording minority-preferred policies favored treatment. *Cf. Johnson*, 512 U.S. at 1020 ("minority voters are not immune from the obligation to pull, haul, and trade to find common political ground").

was so decisive that the Supreme Court reversed a finding of § 2 on that basis alone. *See* 512 U.S. at 1014–15.

134.     The substantial proportionality of Black opportunity districts in North Carolina to the State's BVAP militates against § 2 liability here.

135.     To begin, because "[t]he performance of districts in North Carolina for black voters . . . is simply the Democratic performance of the district," "any Democratic district in North Carolina no matter what its black composition will elect the preferred candidate of Black voters." [Day 4 Tr. 51:13-16, 52:8-11]. It is, then, probative to weigh the State's numerous Democratic-leaning districts in assessing the number of "opportunity districts," *LULAC*, 548 U.S. at 436, for purposes of this case. This is not a case where the challengers assert an inability of Black voters to participate or elect candidates of their choosing in the Democratic primary. *See Lewis*, 99 F.3d at 616 ("the results in these two phases of the single election cycle must be separately considered and analyzed"); *contrast Agee v. Benson*, No. 1:22-cv-272, 2023 WL 8826692, at *53 (W.D. Mich. Dec. 21, 2023) (three-judge court) ("Everyone agrees that the elections in these districts are decided in the Democratic primaries, not the general election."). Instead, Plaintiffs have prominently equated vote dilution with the inability of Black voters in a district to elect Democratic candidates to office in general elections. [*See, e.g.*, PX36 at 33-41; Day 1 Tr. 35:14-15, 53:14-16, 90:11-16, 91:15-24, 144:17-25]. In those elections, the Democratic candidate is the Black-preferred candidate without exception.

136.     Even viewed more narrowly as analysis of the number of districts with sizeable Black populations that elect Black candidates of choice, the proportionality test cuts against §2 liability. No less than 12 North Carolina Senate districts with BVAPs exceeding 25% elected Democratic candidates in 2024 (SD5, SD14, SD19, SD20, SD22, SD27, SD28, SD32, SD38,

SD39, SD40, SD41), constituting 24% of the State Senate. [JX6 at 13-14; 11/05/2024 Official General Election Results – Statewide, North Carolina State Board of Elections, https://er.ncsbe.gov/?election_dt=11/05/2024&county_id=0&office=NCS&contest=0 (last visited Feb. 27, 2025)]. Two more districts of more than 20% BVAP elected Democratic candidates (SD15 and SD18), bringing the opportunity percentage to 28%. [*Id.*]. Meanwhile, 10 Black Democratic Senators serve in the State Senate, a total of 20% of the chamber. [Day 1 Tr. 98:3-99:4]. From every possible vantage point, Black voters have opportunity districts at or exceeding the State's BVAP.

137.    The enacted Senate plan protects Black voters from "political famine," and Plaintiffs sued—not to prevent that—but to obtain a court-ordered "political feast." *Johnson*, 512 U.S. at 1017. But "a failure to leverage minority political strength to the maximum possible point of power is not definitive of dilution in bloc-voting societies." *Id.* at 1017. While the General Assembly did not match the State's BVAP with majority-Black districts, that was because the three-judge court in *Covington* (affirmed by the Supreme Court) rejected that approach, criticizing the General Assembly for having configured a plan "so that African-American voters would have a roughly proportional opportunity statewide to elect their preferred candidates of choice." *Covington*, 316 F.R.D. at 127. There is no colorable basis for Plaintiffs to complain that proportionality of majority-Black districts is absent under these circumstances. The proper measure here is "opportunity districts," *see LULAC*, 548 U.S. at 436, and the enacted plan provides them in abundance.

138.    Plaintiffs' view that the *Gingles* preconditions render a finding of dilution all but inevitable, transforms § 2 into an unconstitutional "policy of maximizing majority-black districts." *Miller v. Johnson*, 515 U.S. 900, 924 (1995). "Forcing proportional representation is unlawful and

inconsistent with th[e] [Supreme] Court's approach to implementing § 2." *Milligan*, 599 U.S. at 28; *see also id.* at 43 (Kavanaugh, J., concurring) ("*Gingles* does not mandate a proportional number of majority-minority districts."). Compelling *more* than proportionality is all the more unlawful and unconstitutional. The Supreme Court has rejected as "a legal mistake" the doctrine that "whenever a legislature *can* draw a majority-minority district, it *must* do so." *Cooper*, 581 U.S. at 305–06, 309. Plaintiffs' contrary view "may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which race no longer matters." *Shaw v. Reno*, 509 U.S. 630, 657 (1993) (*Shaw I*). The Court is obliged to reject that view.

## CONCLUSION

139.    For all these reasons, and those stated in the accompanying findings of fact, Plaintiffs' § 2 claim fails at the threshold jurisdictional stage and on the merits. The record, now fully developed, compels that judgment be entered in favor of Legislative Defendants.

Respectfully submitted, this the 14th day of March, 2025.

**BAKER & HOSTETLER LLP**

By:/s/Katherine L. McKnight
    Katherine L. McKnight*
    D.C. Bar no. 994456
    1050 Connecticut Ave. NW, Suite 1100
    Washington DC 20036
    Ph: (202) 861-1500
    kmcknight@bakerlaw.com

    Patrick T. Lewis*
    Ohio State Bar no. 0078314
    127 Public Square, Suite 2000
    Cleveland, Ohio 44114
    Ph: (216) 621-0200
    plewis@bakerlaw.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
    Phillip J. Strach
    North Carolina State Bar no. 29456
    Alyssa M. Riggins
    North Carolina State Bar no. 52366
    Cassie A. Holt
    North Carolina State Bar no. 56505
    Jordan A. Koonts
    North Carolina State Bar no. 59363
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Ph: (919) 329-3800
    phil.strach@nelsonmullins.com
    alyssa.riggins@nelsonmullins.com
    cassie.holt@nelsonmullins.com

Erika Dackin Prouty*
Ohio State Bar no. 0095821
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
(614) 462-4710
eprouty@bakerlaw.com

* *Appeared via Special Notice*

jordan.koonts@nelsonmullins.com

*Attorneys for Legislative Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day the forgoing document was filed on the Court's electronic case filing system (CM/ECF), and that notice of the filing will be served on all counsel of record by the Court's system.

This the 14th day of March, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
        Phillip J. Strach
        North Carolina State Bar No. 29456