# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

RODNEY D. PIERCE and MOSES
MATTHEWS,

        Plaintiffs,

    *v.*

THE NORTH CAROLINA STATE BOARD
OF ELECTIONS, *et al.*,

        Defendants.

Case No. 4:23-cv-193-D

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ................................................................................................ 1

I.  Factual Background ..................................................................................................... 1

    A.     Northeastern North Carolina's Black Belt Counties................................. 1

    B.     North Carolina's 2023 Redistricting Process ......................................... 4

    C.     The 2023 Enacted Senate Map .............................................................. 5

    D.     Parties................................................................................................... 8

    E.     Procedural History .............................................................................. 10

II.  *Gingles* Precondition One: The Black population in northeastern North Carolina is sufficiently populous and geographically compact to comprise a reasonably configured majority-minority Senate district ................................................................. 11

    A.     Plaintiffs' *Gingles* I Experts are Highly Qualified and Credible and their Testimony is Entitled to Great Weight ................................................. 12

          1.   Mr. Esselstyn.......................................................................... 12

          2.   Dr. Mattingly.......................................................................... 17

    B.     Demonstration District A .................................................................... 18

    C.     Demonstration District B .................................................................... 23

    D.     Demonstration District C .................................................................... 28

    E.     Demonstration District D .................................................................... 33

    F.     Demonstration District E .................................................................... 37

    G.     Dr. Trende Universally Accepted Plaintiffs' Factual Assertions Under *Gingles* I and His Independent Analysis Was Completely Unreliable and Is Entitled to No Weight .................................................................... 37

III.  *Gingles* Precondition Two: The Black population in northeastern North Carolina is politically cohesive................................................................................................. 48

IV.  *Gingles* Precondition Three: The white population in northeastern North Carolina votes sufficiently as a bloc to usually defeat Black voters' candidates of choice ........... 51

    A.     Dr. Collingwood's RPV Analysis......................................................... 52

    B.     Dr. Collingwood's Performance Analysis ............................................ 57

    C.     Additional Evidence of Racially Polarized Voting............................... 72

V.  The Minimum BVAP Necessary for a District to Perform for Black Voters in the Black Belt Region is 47.70%............................................................................................. 74

          1.   Dr. Collingwood's BVAP Analysis........................................ 74

i

2.   Dr. Alford's BVAP Analysis ............................................................ 79

VI. Totality of the Circumstances: The 2023 enacted map denies Black North
Carolinians equal access to the process of electing state Senators ................... 87

A.   Senate Factor One: North Carolina's history of voting-related
     discrimination .................................................................................. 88

B.   Senate Factor Two: The extent of racially polarized voting in northeastern
     North Carolina ................................................................................. 97

C.   Senate Factor Three: North Carolina's voting practices enhance the
     opportunity for discrimination ....................................................... 98

D.   Senate Factor Four: History of candidate slating in local elections.................. 103

E.   Senate Factor Five: North Carolina's discrimination has produced severe
     socioeconomic disparities .............................................................. 103

     1.   Educational Disparities ........................................................... 103

     2.   Socioeconomic Disparities....................................................... 110

     3.   Healthcare Disparities ............................................................ 116

     4.   Criminal Justice Involvement Disparities............................... 118

     5.   Plaintiffs' Lay Witnesses Offered Unrebutted Evidence of Racial Disparities in
          North Carolina ...................................................................... 121

     6.   Dr. Taylor's Testimony Was Unpersuasive and Unhelpful.............. 123

F.   Senate Factor Six: North Carolina political campaigns feature racial
     appeals............................................................................................. 128

     1.   Dr. Burch Offered Extensive Evidence of Racial Appeals.................. 129

          i.    North Carolina Racial Appeals – 2024 Campaign Cycle ............ 130

          ii.   North Carolina Racial Appeals – 2022 Campaign Cycle ............ 134

          iii.  North Carolina Racial Appeals – 2020 Campaign Cycle ............ 136

          iv.   North Carolina Racial Appeals – 2018 Campaign Cycle ............ 137

          v.    North Carolina Racial Appeals – Appeals to White Supremacists............... 138

     2.   Representative Reives Offered Evidence of Racial Appeals............................ 139

     3.   Dr. Critchlow's Testimony Did Not Rebut Dr. Burch's Evidence And was Not
          Credible................................................................................. 140

G.   Senate Factor Seven: Black candidates are underrepresented in public
     office in the jurisdiction................................................................. 146

H.   Other Totality Factors: North Carolina is not responsive to its Black voters..... 153

I.   Other Totality Factors: Any justification for splitting the Black Belt
     counties in the new Senate map is tenuous....................................... 159

J.   Other Totality Factors: The reasons for racially polarized voting..................... 161

      1.   Defendants' Rebuttal Evidence.........................................................................161

      2.   Plaintiffs' Additional Evidence that Racial Polarization in the Black Belt counties is in Fact Connected to Race..........................................................169

PROPOSED CONCLUSIONS OF LAW .............................................................................181

I.   Plaintiffs Have Standing ............................................................................................181

II.  Legal Background......................................................................................................183

    A.     The *Gingles* Framework .................................................................................183

    B.     The *Stephenson* Framework...........................................................................187

III. *Gingles* Precondition One: Plaintiffs have shown that the Black population in northeastern North Carolina is sufficiently large and geographically compact to comprise a reasonably configured majority-Black Senate district .................................188

    A.     Demonstration District A ................................................................................192

    B.     Demonstration District C ................................................................................197

    C.     Demonstration District D................................................................................202

IV. *Gingles* Precondition Two: Plaintiffs have shown that the Black population in northeastern North Carolina is politically cohesive.......................................................209

V.  *Gingles* Precondition Three: Plaintiffs have shown that the white population in northeastern North Carolina votes sufficiently as a bloc to usually defeat Black voters' candidates of choice.........................................................................................210

VI. Totality of the Circumstances: Plaintiffs have shown that the 2023 enacted map denies Black North Carolinians equal access to the process of electing state Senators....................................................................................................................214

    A.     Senate Factor One: North Carolina has an ongoing history of official, voting-related discrimination .................................................................................216

    B.     Senate Factor Two: Voting is severely racially polarized in northeastern North Carolina ...........................................................................................222

    C.     Senate Factor Three: North Carolina's voting practices enhance the opportunity for discrimination ....................................................................224

    D.     Senate Factor Four: History of candidate slating in local elections..................228

    E.     Senate Factor Five: North Carolina's discrimination has produced severe socioeconomic disparities .................................................................228

    F.     Senate Factor Six: North Carolina political campaigns feature racial appeals.........................................................................................................235

    G.     Senate Factor Seven: Black candidates are underrepresented in public office in the jurisdiction..................................................................................238

    H.     Other Totality Factors: North Carolina is not responsive to its Black voters.....242

I.      Other Totality Factors: Any justification for splitting the Black Belt counties in the new Senate map is tenuous................................................... 245

J.      Other Totality Factors: Defendants have not shown that the reasons for polarized voting are unrelated to race................................................................ 247

1.    Defendants Have Not Shown That Racially Divergent Voting in Northeastern North Carolina is Completely Independent of Race ........................................... 249

2.    Plaintiffs Have Shown that Racially Divergent Voting in Northeastern North Carolina is in Fact Connected to Race ................................................................ 256

VII.    Remedy: The remedial plan must contain an additional minority-opportunity district in northeastern North Carolina without intentionally splitting the performing district in Senate District 5.................................................................... 261

CONCLUSION.......................................................................................................................... 263

iv

# INTRODUCTION

Plaintiffs respectfully submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

### I. Factual Background

#### A. Northeastern North Carolina's Black Belt Counties

1. Northeastern North Carolina includes a number of counties that are part of the Black Belt—a crescent-shaped region historically stretching from Virginia to Texas that was originally named for its rich black soil, but over time came to be associated with the slave labor that soil attracted. As Booker T. Washington explained in 1901, the Black Belt was "the part of the South where the slaves were most profitable, and consequently they were taken there in the largest numbers." Booker T. Washington, *Up From Slavery: An Autobiography* 108 (1st elec. ed. 1997), https://docsouth.unc.edu/fpn/washington/washing.html. Today, the Black Belt refers to the counties with the largest Black populations in a number of Southern states, including North Carolina. PX69 at 6 (Esselstyn Report).

2. Eight of North Carolina's 100 counties have a total population that is majority-Black, and all eight are in the Black Belt. *Id.* at 5. Each of these majority-Black counties is adjacent to at least one other such county. *Id.* The eight counties are, in order of decreasing percentage of Black population, Bertie, Hertford, Edgecombe, Northampton, Halifax, Vance, Warren, and Washington. *Id.* Other nearby counties have substantial Black populations, including Martin

1

(42.1%), Chowan (33.62%), and Gates (31.2%). *Id.* at 5, Attachment C.

**Figure 1: Majority-Black North Carolina counties**



3. As the figure below depicts, the concentration of Black voters in these counties is notably greater than in neighboring counties. PX69 at 6-7 (Esselstyn Report).

**Figure 2: Voting districts classified by Black voting age population**



4. "North Carolina's Black Belt counties" are "a significant community of interest," PX69 at 30 (Esselstyn Report); *see* Tr. Day 1 72:24-73:3 (Blue).

5. The Voting Rights Act has historically enabled Black voters in North Carolina's majority-Black counties to elect their candidates of choice in state legislative races. Following the Supreme Court's 1986 decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986), every single one of North Carolina's majority-Black counties was represented by a Black-preferred candidate in the state Senate until 2018. D.E. 105 at 26-28; *see* Tr. Day 4 19:9-13 (Hise). Following the 2018 and 2020 elections, six of the eight majority-Black counties continued to be represented by Black-preferred Senators. *See* JX70; JX71; D.E. 105 at 27-28. Under the maps enacted in 2022 and 2023, however, only Edgecombe County is represented by a Black-preferred candidate; the other seven

majority-Black counties—which make up seven of the State's eight total majority-Black counties—are now represented by Senators whom Black voters opposed. *See* JX1; JX2; D.E. 105 at 28.

**B.     North Carolina's 2023 Redistricting Process**

6.     North Carolina, like all states, engaged in redistricting at the beginning of the decade following the 2020 decennial census. The General Assembly enacted its first new congressional and state legislative maps of the cycle in November 2021. 2021 N.C. Sess. Laws 174 (congressional); 2021 N.C. Sess. Laws 173 (state Senate); 2021 N.C. Sess. Laws 175 (state House). In 2022, the North Carolina Supreme Court enjoined those maps as unlawful partisan gerrymanders under the state Constitution. *Harper v. Hall* (*Harper I*), 868 S.E.2d 499, 551-52, 559-60 (N.C. 2022), *overruled on reh'g by Harper v. Hall* (*Harper III*), 886 S.E.2d 393 (N.C. 2023); *see Harper v. Hall*, 867 S.E.2d 554 (N.C. 2022) (order preceding issuance of *Harper I*). The state Supreme Court directed the General Assembly to submit new maps and remanded the case to the three-judge trial court to assess their constitutionality. *Harper I*, 868 S.E.2d at 559-60.

7.     On February 23, 2022, the trial court issued a remedial order approving the General Assembly's new state House and Senate maps. *See Harper v. Hall* (*Harper II*), 881 S.E.2d 156, 162 (N.C. 2022), *withdrawn and superseded on reh'g by Harper III*, 886 S.E.2d 393. These approved state House and Senate maps were used in the 2022 elections. *Harper III*, 886 S.E.2d at 407. On April 28, 2023, in *Harper III*, the North Carolina Supreme Court overruled *Harper I*, withdrew its decision in *Harper II*, and vacated the trial court's February 23, 2022, order concerning the remedial maps. *Harper III*, 886 S.E.2d at 449. The Court authorized the General Assembly to enact new state House and Senate maps once again. *Id.* at 448-49.

8.     In October 2023, approximately six months after the decision in *Harper III* was released, the General Assembly enacted new maps. 2023 N.C. Sess. Laws 146 (state Senate) (SB 758); 2023 N.C. Sess. Laws 149 (state House) (HB 898). The 2023 Senate map was introduced in

Committee on October 18, 2023, and was passed and ratified one week later, on October 25, 2023. 2023 N.C. Sess. Laws 146.

### C. The 2023 Enacted Senate Map

9.      The 2023 enacted plan divides the Black Belt counties among four districts. It places Northampton, Bertie, Hertford, and Gates Counties in SD1, Warren, Halifax, Martin, Washington, and Chowan Counties in SD2, Edgecombe County in SD5, and Vance County in SD11. JX1. As Figure 6 of Mr. Esselstyn's expert report, PX69, below depicts, SD1 and SD2 in particular crack the core of the Black Belt down the middle.



Figure 6: Selected enacted 2023 North Carolina State Senate districts

10.      Under the 2023 enacted plan, the Black Voting Age Population, or "BVAP," of SD1 is 29.49% and the BVAP of SD2 is 30.01%. D.E. 105 at 12. Under the prior 2022 enacted plan, the counties contained in SD1 and SD2 were divided between SD1 and SD3. *See* JX1; JX2.

The BVAP of SD1 in the 2022 enacted plan was 17.47% and the BVAP of SD3 was 42.33%. D.E. 105 at 17.

11.    The General Assembly had evidence of the impact the 2023 plan would have on Black voters when it adopted the plan. Senator Dan Blue testified in the Senate Redistricting Committee hearing that the failure to draw a majority-Black district in the Black Belt region violated Section 2 of the VRA. Tr. Day 1 81:3-87:20. He also placed on the Senate Redistricting Committee record a letter and memorandum submitted by the Southern Coalition for Social Justice explaining that "***enacting Proposed Senate Districts 1 & 2 would violate the VRA***" and appending a racially polarized voting analysis finding "strong and consistent" racially polarized voting in SD1 and SD2. PX179 at 3, 19 (SCSJ Letter); Tr. Day 1 81:3-82:7 (Blue). The Chair of the Senate Redistricting Committee, Senator Ralph Hise, testified at trial that the Committee had received and distributed the letter and that he was aware of its contents. Tr. Day 4 23:11-27:2 (Hise). When asked about the racially polarized voting analysis, Senator Hise testified that he "did [not] have any basis to disagree with [its] calculations" and that he had "not seen anything in the calculations that determined that they were inaccurate." Tr. Day 4 24:16-19 (Hise).

12.    The Committee also published a statistical analysis of the 2023 plan, known as a "StatPack," before it was passed. Tr. Day 4 16:21-24, 27:16-21 (Hise). The StatPack analyzed how SD1 and SD2, the new districts covering the majority of the Black Belt counties, would perform under the new map. *Id.* at 17:16-18:6. Using vote totals from 23 prior elections, it showed that the Black-preferred candidate would have lost in both SD1 and SD2 in all 23 elections. JX6 at 27-72 (2023 StatPack w/ Race). Senator Hise testified at trial that he was aware the StatPack showed that the Black-preferred candidate would be defeated in SD1 and SD2 "every time," and by substantial margins. Tr. Day 4 20:18-22:4, 23:1-10 (Hise). The legislature was also aware that, under the prior

6

map used in the 2022 elections, the Black-preferred candidates lost in SD1 and SD3, the districts containing the Black Belt counties now contained in SD1 and SD2. *See* D.E. 105 at 17; JX1; JX2. In fact, Senator Hise testified that SD1 and SD2 in the 2023 plan would not perform for Black voters because "[n]either of those districts are majority-Black districts." Tr. Day 4 26:19-27:2 (Hise). The Committee nevertheless chose not to conduct an independent VRA analysis. *Id.* at 10:15-11:23.

13.     The StatPack showed that, unlike SD1 and SD2, the Pitt-Edgecombe District in SD5 would perform for Black voters. JX6 at 27-72 (2023 StatPack w/ Race). The Pitt-Edgecombe District is a majority-minority district. D.E. 105 at 12. Plaintiffs' expert later confirmed that the Pitt-Edgecombe District consistently performs for Black voters, PX128 at 22-26, and that testimony was undisputed in this case. The Pitt-Edgecombe District in fact performed for Black voters in 2022 and in 2024. D.E. 105 at 12, 18.

14.     The General Assembly passed the plan on October 25, 2023, just one week after it was released in Committee. 2023 N.C. Sess. Laws 146; Tr. Day 4 at 4:22-5:2 (Hise). Not a single Black legislator voted for the plan. *See* JX32, JX34, JX50, JX51. That includes the only Black Republican in either chamber at the time the map was passed, who was the only legislator recorded as "not voting." *See* JX32, JX34, JX50, JX51.

15.     The first general elections held under the 2023 enacted plan took place in November 2024. In SD1—which contains Northampton, Bertie, Hertford, and Gates Counties and has a BVAP of 29.49%—the white-preferred candidate, Republican Bobby Hanig (who is white), defeated the Black-preferred candidate, Democrat Susan Harman-Scott (who is white), by a margin of 57.21% to 42.79%. D.E. 105 at 12; PX279 at 16 (Collingwood Suppl. Report). In SD2—which contains Warren, Halifax, Martin, Washington, and Chowan Counties and has a BVAP of 30.01%,

the white-preferred candidate—Republican Norman W. Sanderson (who is white), defeated the Black-preferred candidate, Democrat Tare Davis (who is Black), by a margin of 56.05% to 41.81%. D.E. 105 at 12; PX279 at 17 (Collingwood Suppl. Report). In SD11, which contains Vance County and has a BVAP of 36.65%, the white-preferred candidate, Republican Lisa Stone Barnes (who is white), defeated the Black-preferred candidate, Democrat James Mercer (who is Black), by a margin of 51.29% to 48.71%. D.E. 105 at 13; Tr. Day 4 19:5-13 (Hise). Only in SD5, which contains Edgecombe County and has a BVAP of 40.35%, did the Black-preferred candidate, Democrat Kandie D. Smith (who is Black), defeat the white-preferred candidate, Republican Alexander J. Paschall (who is white), winning by a margin of 55.08% to 44.92%. D.E. 105 at 12; PX279 at 18 (Collingwood Suppl. Report). All told, the Black-preferred candidate was defeated in the districts covering seven of the eight Black Belt counties that are majority-Black. In other words, only one of North Carolina's majority-Black counties is represented by Black voters' candidate of choice.

**D.      Parties**

16.      This case involves two plaintiffs, Representative Rodney Pierce and Moses Matthews, and two sets of defendants, the Legislative Defendants and the State Board Defendants.

17.      Representative Pierce is a registered voter and a lifelong resident of Halifax County, North Carolina. Tr. Day 1 37:21-38:17 (Pierce); D.E. 105 at 3. He is a Democrat who represents Halifax, Northampton, and Warren Counties in the North Carolina House of Representatives as the Representative for the 27th district. Tr. Day 1 45:18-24 (Pierce); D.E. 105 at 15. He was employed as a social studies teacher by Northampton County Schools. Tr. Day 1 42:7-14 (Pierce). Representative Pierce is Black, and registered to vote in Halifax County in 1996 upon reaching his 18th birthday. *Id.* at 38:2-11; D.E. 105 at 3. He has voted in every primary and general election in which he has been eligible to vote since then. Tr. Day 1 38:4-11 (Pierce). He lives in Senate District

2 under the 2023 enacted map, a majority-white district. *Id.* at 38:12-13 (Pierce); D.E. 105 at 3, 12. His residence is contained in each of Plaintiffs' demonstration districts. *See* PX69 at 15, 18, 21, 24 (Esselstyn Report).

18.     Mr. Matthews lives in Martin County, where he has resided since 1974. Tr. Day 1 57:24-58:15 (Matthews); D.E. 105 at 3. He was employed as a chemist by Weyerhaeuser Paper Company for 29 years until his retirement in 2003, and is now engaged in various projects in Martin and neighboring counties. *Id.* at 58:18-59:14. Mr. Matthews is Black and registered to vote in Martin County in 1976. *Id.* at 57:24-58:15; D.E. 105 at 3. He has voted regularly since then. Tr. Day 1 58:14-15 (Matthews). He is registered to vote as a Democrat. *Id.* at 66:16-22. He lives in Senate District 2 under the 2023 enacted map, a majority-white district. *Id.* at 63:22-64:1; D.E. 105 at 3, 12. Mr. Matthews testified that he became a plaintiff in this case because the current legislature was not responsive to the needs of Black citizens, it was unlikely that a Black candidate could win in Senate District 2 under the current map, and he wanted to have a voice in the legislature as he thought northeastern North Carolina had in maps in the last decade. *Id.* at 64:11-17, 65:5-65:23. His residence is contained in each of Plaintiffs' demonstration districts. *See* PX69 at 15, 18, 21, 24 (Esselstyn Report).

19.     The North Carolina Board of Elections is the state agency charged with administering the election laws of the State of North Carolina. The Board and its members, Alan Hirsch, Jeff Carmon III, Stacy "Four" Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen are sued in their official capacities only. These defendants, the "State Board Defendants," presented no evidence at trial and have made no legal or factual contentions. They are excluded from the court's references to "Defendants" here unless specifically noted.

20.     Legislative Defendants Timothy K. Moore and Philip E. Berger, the former Speaker of the North Carolina House of Representatives and the President Pro Tempore of the North Carolina Senate, respectively, are sued in their official capacities only. The Legislative Defendants, referred to here simply as "Defendants," defended the enacted plan at trial.

### E.     Procedural History

21.     Plaintiffs filed their complaint on November 20, 2023, D.E. 1, and their amended complaint on November 22, 2023, D.E. 13. The complaint alleges that the 2023 enacted Senate plan violates Section 2 of the Voting Rights Act because it dilutes the voting power of Black voters in North Carolina's Black Belt counties. D.E. 13 at 20-22. It invokes both Section 2 and 42 U.S.C. § 1983 as causes of action. *Id.* at 20-22. The complaint seeks an injunction barring Defendants from holding elections in SD1 or SD2 of the enacted plan. *Id.* at 22-23.

22.     Plaintiffs filed a motion for a preliminary injunction along with their amended complaint on November 22, 2023. D.E. 16. The court denied the motion on January 26, 2024. D.E. 61. A divided panel of the Fourth Circuit affirmed on March 28, 2024, in *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194 (4th Cir. 2024).

23.     The court held a five-day bench trial from February 3, 2025, to February 7, 2025. Plaintiffs introduced the testimony of five lay witnesses and four expert witnesses, and Defendants introduced the testimony of one lay witness and four expert witnesses. The parties also introduced numerous exhibits to the record, including their experts' reports, which are admitted for their truth. At the close of trial, the court held open the record for the "parties' RPV experts' supplemental reports analyzing the November 2024 election results." D.E. 111, 113. The parties moved those reports for admission to the record on March 10, 2025, noting that "Plaintiffs object to the admission of certain portions of Dr. Alford's supplemental rebuttal report, LD076, as improper supplementation and improper rebuttal." D.E. 122 at 1. Defendants then filed a notice styled as a Rule

10

26(e) supplement on March 13, 2024, the day before proposed findings of fact and conclusions of law were due, noting that Plaintiffs likewise objected to that filing. D.E. 123.

## II. *Gingles* Precondition One: The Black population in northeastern North Carolina is sufficiently populous and geographically compact to comprise a reasonably configured majority-minority Senate district

24.　Plaintiffs offered multiple demonstration districts to show that a reasonably configured majority-Black state Senate district can be drawn in the Black Belt region of northeastern North Carolina to satisfy the first *Gingles* precondition. Plaintiffs' expert Blakeman B. Esselstyn drew Plaintiffs' demonstration districts. Plaintiffs paired their demonstration districts with demonstration maps illustrating the effect of drawing a new demonstration district on the rest of the Senate map. Mr. Esselstyn also drew these maps. His maps apply the county grouping requirements set out by the North Carolina Supreme Court in *Stephenson v. Bartlett*, 562 S.E.2d 377 (N.C. 2002) (discussed *infra* COL's Part II.B), which were generated here by Plaintiffs' expert Dr. Jonathan Mattingly. Defendants offered expert Dr. Sean Trende to rebut Mr. Esselstyn and Dr. Mattingly's evidence on the first *Gingles* precondition. The court credits the testimony of Mr. Esselstyn and Dr. Mattingly, giving their testimony great weight, but does not credit and assigns no weight to the testimony of Dr. Trende, whose analysis was, by his own admission, beset with "material" and "stupid" errors and was thus completely in its entirety. Tr. Day 4 133:6-14, 178:10-15 (Trende). Indeed, as discussed in the conclusions of law below, *supra* COL § III.A, based on the sheer number of errors riddling Dr. Trende's analysis, the Court grants Plaintiffs' trial motion to strike Dr. Trende's testimony and his expert report, LD60, in full. *See* Tr. Day 4 204:22-207:1.[1]

---

[1] Many of Dr. Trende's errors were admitted for the first time at trial. *See, e.g. infra* (describing inconsistencies between Dr. Trende's deposition and trial testimony about what the colors on his maps meant); Trende Dep. 74:4-5 (declining to concede that numbers he reported on page 6 of his report were wrong); Trende Dep. 85:2-4 (declining to admit that he had made multiple errors, rather than just one, in calculating margin of error); Trende Dep. 85:21-22 (stating that "I don't know if it is an error or not" with respect to an error he would later admit to on the stand); Trende

### A. Plaintiffs' *Gingles* I Experts are Highly Qualified and Credible and their Testimony is Entitled to Great Weight

25.     The court begins by discussing the testimony of Plaintiffs' *Gingles I* experts, Mr. Esselstyn and Dr. Mattingly.

#### 1. Mr. Esselstyn

26.     Blakeman B. Esselstyn is a North Carolina native and the founder and principal of Mapfigure Consulting, a boutique consultancy that "provides expert services in the areas of redistricting, demographics, and geographic information systems." PX69 at 1 (Esselstyn Report). Mr. Esselstyn holds "a bachelor's degree in Geology & Geophysics and International Studies from Yale University and a master's degree in Computer and Information Technology from the University of Pennsylvania," as well as professional certifications "as a Geographic Information Systems Professional (GISP) and as a member of the American Institute of Certified Planners (AICP)." *Id.* He has spent nearly 30 years conducting geographic information systems work, that is, creating maps and analyzing geographic data, and at least 20 years working with U.S. Census data, including 10 years as the City of Asheville, North Carolina's, liaison to the U.S. Census Bureau. Tr. Day 1 214:5-17 (Esselstyn). Mr. Esselstyn has taught graduate-level courses in geographic information systems and has presented on redistricting at conferences at Harvard University, Duke University, the University of North Carolina at Chapel Hill, and several others. PX69 at 2 (Esselstyn Report). He has provided nonpartisan redistricting services in numerous counties across the state of North Carolina, including in northeastern North Carolina. Tr. Day 1 212:23-213:4 (Esselstyn). Mr. Esselstyn has served as a testifying expert four times, including in one Section 2 case in which he served as an expert on the first *Gingles* precondition, and has been credited all four times. PX69

---

Dep. 86:19-20 (similar); 87:16-19 (similar); Trende Dep. 95:14-20 (D.E. 88-2) (explaining that he planned to "check … after the deposition" whether he had included the wrong block groups when analyzing the demonstration districts, something he later admitted to).

at 1 (Esselstyn Report); Tr. Day 1 214:20-215:11 (Esselstyn). The court accepted Mr. Esselstyn as an expert in geographic information systems, redistricting, map making, and analysis of census data without objection, and finds that he is highly qualified in each of those fields. Tr. Day 1 216:20-23 (Esselstyn).

27.    Mr. Esselstyn drew Plaintiffs' demonstration districts and accompanying demonstration maps, and provided data on the numerosity, compactness, and configuration of each district. He drew his maps using geographic files, block-level demographic data, block assignment files, special tabulation data, and other resources published by the U.S. Census Bureau. PX69 at Attachment B (Esselstyn Report). He also relied on maps and statistics published by the North Carolina General Assembly, and on citizen voting age population data aggregated by the Redistricting Data Hub (RDH). *Id.* Mr. Esselstyn used three software tools to translate this data into demonstration districts: Maptitude for Redistricting, QGIS, and Dave's Redistricting App. *Id.*

28.    In analyzing the racial demographics of districts, Mr. Esselstyn used two measures of Black population common to Section 2 cases, Black voting age population, or "BVAP," and Black citizen age voting population, or "BCVAP." PX69 at 14-15 (Esselstyn Report). He provided evidence of the potential compactness of a VRA district in northeastern North Carolina using two other measures common to Section 2 cases, the "Reock" score and the "Polsby-Popper" score. *Id.* at 27, Attachment H. Mr. Esselstyn also discussed the General Assembly's 2023 redistricting criteria. *Id.* at 26. The numerosity, compactness, and legislative criteria Mr. Esselstyn reported are widely used by redistricting experts and state and local governments in constructing redistricting plans. *See id.* at 26-28, Attachment B.

29.    Mr. Esselstyn's report placed particular emphasis on two metrics of his districts, numerosity and compactness. He measured numerosity mostly in terms of BVAP and BCVAP. As

13

discussed in more depth below, BVAP refers to the percentage of a voting age population that identifies as Black, while BCVAP refers to the percentage of a citizen voting age population that identifies as Black. Mr. Esselstyn obtained his BVAP and BCVAP data from the U.S. Census Bureau. *Id.* at 4 n.2, Attachment B (Esselstyn Report). BVAP data is drawn from the U.S. Census Bureau's decennial census; BCVAP data is drawn from the U.S. Census Bureau's American Community Survey, or "ACS," 5-year estimates. PX147 at 4 & n.3 (Esselstyn Rebuttal Report).

30.     The decennial census and the ACS collect and report demographic data in somewhat different ways. The U.S. Census is an actual count of the U.S. population. Tr. Day 4 136:25-137:4 (Trende). It thus reports actual population totals. *Id.* The ACS, on the other hand, is a sample survey. *Id.* at 136:25-137:7. It reports point estimates for a given population, along with a margin of error around that estimate. *Id.* at 136:25-139:14, 143:2-146:12. As Defendants' statistical expert, Dr. Alford, credibly explained, the error margin of that point estimate "is roughly normally distributed," meaning that "half the values" in the sample "fall above" it, and "half below." Tr. Day 4 108:14-110:14 (Alford). The census's population figures, including BVAP numbers, and the ACS's point estimates, including BCVAP estimates, are regularly used in redistricting cases to measure population totals in particular geographies.

31.     The census and the ACS also measure the Black population differently, which has implications for how the Black population is captured in the BVAP data as compared to the BCVAP data. The Black population in the U.S. Census (and thus in the BVAP data) is reported as the part of the population that identifies as "Black or African American alone or in combination," a response sometimes referred to as "any part Black." PX69 at 4 n.3 (Esselstyn Report). That data measures the entire Black population. The Black population in the ACS (and thus in the BCVAP data), on the other hand, excludes many categories of people who are Black and another race,

including people who identify as Black and "Hispanic or Latino." *See id.* at 14 n.6. An ACS respondent who otherwise identifies as both Black and Hispanic thus will not be categorized as Black for ACS, or BCVAP, purposes, even though the same respondent would be considered Black in the decennial census and its corresponding BVAP figures. *Id.* The result is that Mr. Esselstyn's BCVAP figures somewhat understate the true Black population of each district.

32.     The BCVAP of a region in North Carolina is typically higher than the BVAP in the same area, because Black adults in North Carolina have higher citizenship rates than other groups of adults, so removing non-citizens from the dataset reduces the denominator of the BCVAP figure more significantly than it reduces the numerator, producing a higher BCVAP number. *Id.*; Tr. Day 1 224:13-225:20 (Esselstyn). "Black CVAP is higher than BVAP whenever the percentage of Black people among all adults is higher than the percentage of Black people among non-citizen adults," and that is generally the case in North Carolina, as elsewhere in the United States. PX69 at 14 n.6 (Esselstyn Report); Tr. Day 1 224:13-225:20 (Esselstyn).

33.     The ACS also publishes data at a different level of granularity than the decennial census. The decennial census reports data at the voting tabulation district, or "VTD," level, also commonly referred to as the "precinct level." PX69 at 6 n.4 (Esselstyn Report). The ACS reports data at the census block group level. PX147 at 4 (Esselstyn Rebuttal Report). That data must be translated into precinct-level data by disaggregating it into block level data and then re-aggregating it into precinct level data. *Id.* at 4 & n.3. This re-aggregated data is published by a resource known as RDH, a "publicly available, well-documented" source relied on by many analysts, including both parties' experts in this case. *Id.* at 4. Mr. Esselstyn relied on RDH data in producing both of his reports. *Id.*

34.     Mr. Esselstyn also relied on two principal measures for assessing compactness. He used compactness scores known as Reock and Polsby-Popper. Reock and Polsby-Popper scores are two of the most widely used metrics for quantifying the compactness of districts, and are the measures used by the North Carolina General Assembly. PX69 at 27 (Esselstyn Report). The two scores are "based on two different ways of comparing the geometry of a district to the geometry of a circle," and "yield resulting scores between zero and one, with a higher score indicating more compactness." *Id.* "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible." *Id.* at Attachment I. "The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter. . . ." *Id.* Mr. Esselstyn provided Reock and Polsby-Popper scores for each district he created, as well as average scores across all the new districts he created within a wider demonstration map, and compared those figures to the scores of corresponding districts in the enacted plan and prior plans. *Id.* at 28-29.

35.     Finally, Mr. Esselstyn considered evidence related to the General Assembly's remaining 2023 redistricting criteria. He examined population equality, county groupings and traversals, contiguity, respect for political subdivisions, and incumbent residence. *Id.* at 27-32. Mr. Esselstyn did not consider partisan data in drawing any of his districts. *Id.* at 31. He credibly testified that he did consider racial data, but that consideration of race did not predominate in his drawing of any districts because he "was constantly evaluating how the districts complied with [] other criteria and what their other characteristics were as well." Tr. Day 1 230:14-17 (Esselstyn).

36.     The court finds that Mr. Esselstyn is highly qualified and credits his testimony in full, giving it great weight.

16

### 2. Dr. Mattingly

37.     Dr. Jonathan Mattingly was raised in Charolotte, North Carolina, and is the Kimberly J. Jenkins Distinguished University Professor of New Technologies in the Mathematics Department at Duke University where he is also a Professor of Statistical Science and was Chair of the Department of Mathematics between 2016 and 2020. PX1 at 1 (Mattingly Report). Dr. Mattingly holds a bachelor's degree in applied mathematics with a concentration in physics from Yale University, a PhD in applied and computational mathematics from Princeton University, and has post-doctoral experience from Stanford University. Tr. Day 1 157:7-12 (Mattingly). He has testified in several redistricting cases, and his testimony has been credited each time. *Id.* at 157:16-20; *see* PX1 at 27 (Mattingly Report).

38.     Dr. Mattingly is known for, among other things, his work developing a peer-reviewed algorithm to implement the *Stephenson* county clustering rules, which are discussed in more depth in the court's conclusions of law. PX1 at 1 (Mattingly Report); Tr. Day 1 159:24-161:10 (Mattingly). Dr. Mattingly and his colleagues published that algorithm, and their source code, online, where it is freely available and enables the public to draw *Stephenson*-compliant redistricting plans. PX1 at 1 (Mattingly Report). The group also published a paper applying the algorithm to the 2020 Census data, and the North Carolina General Assembly relied on that paper in drawing state House and Senate districts during the 2020 redistricting cycle. *Id.*; Tr. Day 1 160:16-161:10 (Mattingly). The paper's application of *Stephenson* to the 2020 Census data did not account for the VRA because the researchers did not "presume" where the General Assembly would draw VRA districts. Tr. Day 1 161:13-19 (Mattingly). The court accepted Dr. Mattingly as an expert in the fields of applied and computational mathematics without objection, and finds that he is highly qualified in both of those fields.

39. Dr. Mattingly applied the *Stephenson* algorithm to each of Mr. Esselstyn's demonstration districts to enable Mr. Esselstyn to draw *Stephenson*-compliant demonstration maps of the entire state incorporating the demonstration districts. He produced *Stephenson* county clusters for the rest of the state for each of Plaintiffs' demonstration districts. PX1 at 5-10 (Mattingly Report). Mr. Esselstyn then relied on Dr. Mattingly's county cluster options to develop *Stephenson*-compliant demonstration maps. PX69 at 9-10 (Esselstyn Report). The court finds that Dr. Mattingly is highly qualified and credits his testimony in full, giving it great weight.

**B. Demonstration District A**

40. First, Plaintiffs offered Demonstration District A. Demonstration District A is depicted in Figure 7 of Mr. Esselstyn's initial report, and reproduced below.

**Figure 7: Map of Demonstration District A**



41. Demonstration District A has the following characteristics. Demonstration District A is composed of eight whole counties, Bertie, Halifax, Hertford, Martin, Northampton, Vance,

Warren, and Washington. PX69 at 14 (Esselstyn Report). It is completely contiguous and has a population that is "at or within plus or minus five percent of the ideal district population," deviating by minus 4.29%. *Id.* at 15, 27, 30. The district has a BVAP of 51.47% and a BCVAP of 52.71%. PX147 at 6 (Esselstyn Rebuttal Report). Its Reock score is 0.30 and its Polsby-Popper score is 0.32, both of which are more compact than existing SD1 and SD2. PX69 at 28 (Esselstyn Report). It preserves more of the Black Belt community of interest in a single district than any district in either the 2022 or 2023 plans. *Id.* at 30. It was drawn without consideration of partisan data. *Id.* at 31. Mr. Esselstyn credibly testified that he did consider race in drawing Demonstration District A, but that race did not predominate in his drawing of the district. Tr. Day 1 230:7-17 (Esselstyn). The court credits that testimony and Mr. Esselstyn's remaining statistics, which Defendants do not dispute. Indeed, Defendants' expert Dr. Trende agreed that Demonstration District A is a majority-Black district and offered no opinion on the district's compactness or its compliance with the legislature's redistricting guidelines. Tr. Day 4 191:20-192:4 (Trende).

42.    The demonstration map Mr. Esselstyn provided to accompany Demonstration District A is Demonstration Map A, and reproduced below. At the instruction of Plaintiffs' counsel, Dr. Mattingly froze Demonstration District A and the existing Pitt-Edgecombe district before running the *Stephenson* algorithm on the rest of the state to create the remaining county clusters. PX69 at 9-10 (Esselstyn Report). Mr. Esselstyn used Dr. Mattingly's county clusters to create Demonstration Map A. *Id.* at 15-16.



Figure 9: Demonstration Map A districts that differ from enacted 2023 plan

43.   Demonstration Map A has the following characteristics. Demonstration Map A "relied on a *Stephenson*-compliant county grouping based on Demonstration District A provided by Dr. Mattingly." *Id.* at 15 (Esselstyn Report). In situations where the county grouping provided multiple clustering options, the demonstration map "uses the same options that were used in the 2023 enacted plan." *Id.* at 15-16. Demonstration Map A includes only "two county groupings that differ from those used in the enacted 2023 maps." *Id.* at 16. Those two groupings contain a total of six districts, one of which is identical to enacted SD12, covering Lee and Harnett Counties, and already exists in the enacted plan. *Id.* Thus, other than Demonstration District A and the four additional districts labeled A-2, A-4, A-9, and A-11 in the map above, Demonstration Map A is identical to the enacted plan.

44.   All of the districts in Demonstration Map A "have populations that are at or within plus or minus five percent of the ideal district population" and are completely contiguous. *Id.* at

17, 27, 30. The new districts created in Demonstration Map A are more compact than the corresponding districts in the 2023 map. *Id.* at 28-29. The average Reock score of the new districts in Demonstration Map A is 0.41, compared to an average of 0.39 in the enacted plan. *Id.* at 29. The average Polsby-Popper score of the new districts in Demonstration Map A is 0.28, compared to an average of 0.27 in the enacted plan. *Id.* Demonstration Map A splits 17 counties, which is the minimum number dictated by the *Stephenson* county grouping requirement, and splits no VTDs. *Id.* at 30, Attachment J; Tr. Day 1 172:2-173:13 (Mattingly); Tr. Day 2 26:10-24 (Esselstyn). As with his approach to drawing Demonstration District A, Mr. Esselstyn credibly testified that he considered racial data, but not partisan data, in designing Demonstration Map A, but that race did not predominate in his drawing of any districts in the map. PX69 at 31 (Esselstyn Report); Tr. Day 1 230:7-17 (Esselstyn). The court credits Mr. Esselstyn's testimony on Demonstration Map A, and his statistics relating to the map, which Defendants do not dispute.

45. Statistics related to Demonstration Map A are provided in Table 4a of Mr. Esselstyn's rebuttal report and Table 10 of Mr. Esselstyn's initial report, and are reproduced below.

**Table 4a: Statistics for additional districts in Demonstration Map A**

| District | Population Deviation | BVAP | 2022 Black-CVAP | Reock | Polsby-Popper |
|----------|---------------------|-------|-----------------|-------|---------------|
| A-2 | -2.00% | 17.31% | 18.05% | 0.43 | 0.33 |
| A-4 | +0.19% | 33.42% | 35.81% | 0.39 | 0.21 |
| A-9 | -2.99% | 19.93% | 20.31% | 0.33 | 0.14 |
| A-11 | -0.62% | 33.58% | 35.80% | 0.59 | 0.38 |

**Table 10: Compactness score comparison for Demonstration Map A**

| Demonstration Districts | A | A-2 | A-4 | A-9 | A-11 | Average |
|---|---|---|---|---|---|---|
| Reock | 0.30 | 0.43 | 0.39 | 0.33 | 0.59 | **0.41** |
| Polsby-Popper | 0.32 | 0.33 | 0.21 | 0.14 | 0.38 | **0.28** |
| | | | | | | |
| Enacted 2023 Districts | 1 | 2 | 4 | 9 | 11 | Average |
| Reock | 0.26 | 0.23 | 0.57 | 0.44 | 0.46 | **0.39** |
| Polsby-Popper | 0.21 | 0.10 | 0.41 | 0.23 | 0.38 | **0.27** |

      46.      After running the *Stephenson* algorithm on Demonstration District A with the Pitt-Edgecombe district frozen in his initial report, Dr. Mattingly ran the algorithm a second time in his rebuttal report, this time without freezing the Pitt-Edgecombe district and leaving only Demonstration District A frozen. PX114 at 1 (Mattingly Rebuttal Report). That application of the algorithm produced a new set of county clusters accompanying Demonstration District A, depicted in Figure 1 of Dr. Mattingly's rebuttal report and reproduced below. The result was a map that was dictated by the *Stephenson* grouping requirement and changed only five total districts from the enacted plan: the demonstration district (the purple cluster in the map below) and four other districts (the green and orange single-district clusters, and the red two-district cluster, adjacent to the purple cluster in the map below). Tr. Day 1 166:18-168:10 (Mattingly).



47.     The first new district is Demonstration District A, the purple district labelled "1" in the map above, and Plaintiffs' illustrative majority-minority district. *Id.* The next two new districts are represented by the green cluster in the map above (made up of Franklin, Nash, and Edgecombe counties) and the orange cluster in the map above (made up of Pitt and Beaufort counties). *Id.* These are single-district county clusters that were dictated by *Stephenson*, providing the mapmaker no discretion in drawing these lines. *Id.*; Tr. Day 2 13:22-14:10 (Esselstyn). The final two districts comprise the red, two-district county cluster on the easternmost side of the map above, which left only one line for the mapmaker to draw to divide the cluster between two districts. Tr. Day 1 166:18-168:10 (Mattingly). The remainder of the map could be drawn identically to the enacted plan. *Id.* at 167:11-168:10. All told, Dr. Mattingly's rebuttal report shows that a map could be drawn around Demonstration District A that does not freeze the Pitt-Edgecombe district, changes a total of only five districts from the enacted plan, and otherwise requires only a single line-drawing decision to implement. The court credits Dr. Mattingly's and Mr. Esselstyn's testimony regarding Demonstration District A.

C.      **Demonstration District B**

48.     Plaintiffs also offered Demonstration District B, not as a majority-Black district, but for remedial purposes only. Demonstration District B is depicted in Figure 10 of Mr. Esselstyn's initial report, and reproduced below.

**Figure 10: Map of Demonstration District B**



49.     Demonstration District B has the following characteristics. Demonstration District

B is "created wholly within the outer boundary of the county groupings" used in the enacted plan.

PX69 at 18 (Esselstyn Report). The district is composed of Bertie, Chowan, Gates, Halifax, Hert-

ford, Martin, Northampton, and Warren Counties in their entirety and a portion of Pasquotank

County. *Id.* The district is completely contiguous and has a population that is "at or within plus or

minus five percent of the ideal district population," deviating by minus 4.93%. *Id.* at 19, 27, 30. It

has a BVAP of 48.41% and a BCVAP of 49.41%. PX147 at 7 (Esselstyn Rebuttal Report). Its

Reock score is 0.35 and its Polsby-Popper score is 0.29, both of which are more compact than

existing SD1 and SD2. PX69 at 28 (Esselstyn Report). It preserves more of the Black Belt com-

munity of interest in a single district than any district in either the 2022 or 2023 plans. *Id.* at 30. It

also preserves as much of the Elizabeth City community of interest as possible, keeping "most of

Elizabeth City [] intact within" the district. *See id.* at 31; Tr. Day 2 24:3-16. It was drawn without

consideration of partisan data. PX69 at 31 (Esselstyn Report). Mr. Esselstyn credibly testified that he did consider race in drawing Demonstration District B, but that race did not predominate in his drawing of the district. Tr. Day 1 230:7-17 (Esselstyn). The court credits that testimony and the remaining statistics, which Defendants do not dispute. Indeed, Defendants' expert Dr. Trende agreed that Demonstration District B "largely tracks the boundary of Elizabeth City" and its pre-cincts, and offered no opinion on the district's compactness or compliance with the legislature's redistricting guidelines. Tr. Day 4 191:23-194:4, 193:10-24 (Trende).

50.     The demonstration map Mr. Esselstyn provided to accompany Demonstration District B is Demonstration Map B, reproduced below.

**Figure 11: Demonstration Map B**



51.     Demonstration Map B has the following characteristics. The new districts in Demonstration Map B exist entirely within the boundaries of the county groupings used in the

enacted plan. PX69 at 18 (Esselstyn Report). Dr. Mattingly "confirmed that the *Stephenson*-compliant county groupings based on Demonstration District B contain only one change from the groupings used in the enacted maps, namely substituting one two-district cluster" in the demonstration map for the two one-district clusters in the enacted plan. *Id.* at 19. That meant Mr. Esselstyn "only needed to design one other district to accompany Demonstration District B." *Id.* Demonstration Map B is thus identical to the enacted plan across 48 of 50 Senate districts, changing only two districts from the enacted plan. *Id.*

52.     Both of the new districts in Demonstration Map B "have populations that are at or within plus or minus five percent of the ideal district population" and are completely contiguous. *Id.* at 19, 27, 30. The new districts created in Demonstration Map B are more compact than the corresponding districts in the 2023 map. *Id.* at 28-29. The average Reock score of the new districts in Demonstration Map B is 0.37, compared to an average of 0.25 in the enacted plan. *Id.* at 29. The average Polsby-Popper score of the new districts in Demonstration Map B is 0.27, compared to an average of 0.16 in the enacted plan. *Id.* Demonstration Map B splits 16 counties, just one more than the enacted plan and the minimum number dictated by the *Stephenson* county grouping requirement, and splits no VTDs. *Id.* at 30, Attachment J; Tr. Day 1 172:2-173:13 (Mattingly); Tr. Day 2 26:10-24 (Esselstyn). As with his approach to drawing Demonstration District B, Mr. Esselstyn credibly testified that he considered racial data, but not partisan data, in designing Demonstration Map B, but that race did not predominate in his drawing of any districts in the map. PX69 at 31; Tr. Day 1 230:7-17 (Esselstyn). The court credits Mr. Esselstyn's testimony on Demonstration Map B, and his statistics relating to the map, which Defendants do not dispute.

53.     Statistics related to Demonstration Map B are provided in Table 5a of Mr. Esselstyn's rebuttal report and Table 11 of Mr. Esselstyn's initial report, and are reproduced below.

## Table 5a: Statistics for Demonstration Districts B and B-2

| District | Population Deviation | BVAP | 2022 Black-CVAP | Reock | Polsby-Popper |
|---|---|---|---|---|---|
| **Demonstration District B** | -4.93% | 48.41% | 49.41% | 0.35 | 0.29 |
| **Demonstration District B-2** | -4.36% | 11.37% | 11.88% | 0.39 | 0.25 |

## Table 11: Compactness score comparison for Demonstration Maps B & D

| Demonstration Districts | B | B-2 | Average |
|---|---|---|---|
| Reock | 0.35 | 0.39 | **0.37** |
| Polsby-Popper | 0.29 | 0.25 | **0.27** |
|  |  |  |  |
| Demonstration Districts | D | D-2 | Average |
| Reock | 0.30 | 0.34 | **0.32** |
| Polsby-Popper | 0.21 | 0.17 | **0.19** |
|  |  |  |  |
| Enacted 2023 Districts | 1 | 2 | Average |
| Reock | 0.26 | 0.23 | **0.25** |
| Polsby-Popper | 0.21 | 0.10 | **0.16** |

### D.    Demonstration District C

54.    Plaintiffs offered Demonstration District C, reproduced below.

**Figure 12: Map of Demonstration District C**



55.    Demonstration District C has the following characteristics. Demonstration District C is composed of Bertie, Chowan, Gates, Halifax, Hertford, Martin, Northampton, Warren, and Washington Counties in their entirety and a portion of Vance County. PX69 at 20 (Esselstyn Report). The district is completely contiguous and has a population that is "at or within plus or minus five percent of the ideal district population," deviating by minus 2.08%. *Id.* at 21, 27, 30. The district has a BVAP of 50.21% and a BCVAP of 51.24%. PX147 at 7 (Esselstyn Rebuttal Report). Its Reock score is 0.37 and its Polsby-Popper score is 0.36, and thus it is more compact than existing SD1 and SD2. PX69 at 28 (Esselstyn Report). It preserves more of the Black Belt community of interest in a single district than any district in either the 2022 or 2023 plans. *Id.* at 30. It also

preserves the community of interest in the City of Henderson and the community of South Henderson by keeping South Henderson entirely whole and keeping 97.81% of the City of Henderson's population in the same district, while also not splitting any precincts. PX147 at 30-31 (Esselstyn Rebuttal Report). It was drawn without consideration of partisan data. PX69 at 31 (Esselstyn Report). Mr. Esselstyn credibly testified that he did consider race in drawing Demonstration District C, but that race did not predominate in the drawing of the district. Tr. Day 1 230:7-17 (Esselstyn). The court credits that testimony, and Mr. Esselstyn's statistics related to Demonstration District C, which defendants do not dispute. Indeed, Defendants' expert Dr. Trende agreed that Demonstration District C is a majority-Black district, agreed that it preserves 98% of Henderson City while following precinct lines, and offered no opinion on the district's compactness or compliance with the legislature's redistricting guidelines. Tr. Day 4 191:23-192:4, 196:14-197:11 (Trende).

56.    The only split county in Demonstration District C is Vance County. Dr. Trende testified that approximately 40% of Vance County's white population is located in Demonstration District C. Tr. Day 4 194:4-10 (Trende). Mr. Esselstyn testified, and Dr. Trende agreed, that Demonstration District C includes 63% of Vance County's BVAP, and excludes 37% of Vance County's BVAP, including excluding VTDs with BVAPs greater than 70%. Tr. Day 4 166:22-25, 194:18-21 (Trende); Tr. Day 2 46:19-47:1 (Esselstyn). Dr. Trende agreed that there are multiple census blocks with greater than 70% BVAP excluded from the district. Tr. Day 4 194:18-21 (Trende). Mr. Esselstyn explained that he chose the configuration of Demonstration District C to preserve as much of the City of Henderson and the community of South Henderson in a single district as possible. Tr. Day 2 109:17-110:5 (Esselstyn). As noted, his efforts succeeded, placing all of South Henderson's population and nearly all of Henderson in the same district. PX147 at 31

(Esselstyn Rebuttal Report). Mr. Esselstyn opted for that configuration of his demonstration district over an alternative configuration that would have had a higher BVAP (50.36% instead of 50.21%) but that "would have substantially divided both the City of Henderson and the community of South Henderson." *Id.* at 30-31. Dr. Trende testified that he did not consider alternative configurations of Demonstration District C and thus had no reason to dispute that Mr. Esselstyn could have drawn Demonstration District C with a higher BVAP. Tr. Day 4 196:25-197:3 (Trende). The court credits Mr. Esselstyn's testimony on these points.

57. The demonstration map Mr. Esselstyn provided to accompany Demonstration District C is Demonstration Map C, and reproduced below.



58. Demonstration Map C has the following characteristics. Demonstration Map C relied on a "*Stephenson*-compliant county grouping generated" based on Demonstration District C by Dr. Mattingly. PX69 at 21 (Esselstyn Report). Demonstration Map C includes only two county

groupings that differ from those used in the enacted 2023 maps. *Id.* at 22. Those two groupings contain a total of four districts, one of which "is entirely determined by the modified county grouping" and the other two of which vary only "slightly" from "their counterparts in the two most recently enacted plans." *Id.* Aside from Demonstration District C itself, and the three additional districts labeled C-2, C-4, and C-11 in the map above, Demonstration Map C is identical to the enacted plan, replicating the enacted plan across 46 of 50 districts.

59.     All of the districts in Demonstration Map C "have populations that are at or within plus or minus five percent of the ideal district population" and are completely contiguous. *Id.* at 21, 27, 30. The new districts created in Demonstration Map C are more compact than the corresponding districts in the 2023 map. *Id.* at 28-29. The average Reock score of the new districts in Demonstration Map C is 0.39, compared to an average of 0.38 in the enacted plan. *Id.* at 29. The average Polsby-Popper score of the new districts in Demonstration Map C is 0.31, compared to an average of 0.28 in the enacted plan. *Id.* Demonstration Map C splits 17 counties, just two more than the enacted plan and the minimum number dictated by the *Stephenson* county grouping requirement, and splits no VTDs. *Id.* at 30, Attachment J; Tr. Day 1 172:2-173:14 (Mattingly); Tr. Day 2 26:10-24 (Esselstyn). As with his approach to drawing Demonstration District C, Mr. Esselstyn credibly testified that he considered racial data, but not partisan data, in designing Demonstration Map C, and that race did not predominate in his drawing of any district in the map. PX69 at 31 (Esselstyn Report); Tr. Day 1 230:7-17 (Esselstyn). The court credits Mr. Esselstyn's testimony on Demonstration Map C, and his statistics related to the map, which Defendants do not dispute.

60.     Statistics related to Demonstration Map C are provided in Table 7a of Mr. Esselstyn's rebuttal report and Table 12 of Mr. Esselstyn's initial report, and are reproduced below.

**Table 7a: Statistics for additional districts in Demonstration Map C**

| District | Population Deviation | BVAP | 2022 Black-CVAP | Reock | Polsby-Popper |
|----------|----------------------|------|-----------------|-------|---------------|
| C-2 | +3.81% | 13.49% | 13.81% | 0.37 | 0.32 |
| C-4 | -4.11% | 36.51% | 38.27% | 0.49 | 0.32 |
| C-11 | -4.46% | 32.52% | 35.07% | 0.33 | 0.23 |

**Table 12: Compactness score comparison for Demonstration Map C**

| Demonstration Districts | C | C-2 | C-4 | C-11 | Average |
|-------------------------|------|------|------|------|---------|
| Reock | 0.37 | 0.37 | 0.49 | 0.33 | **0.39** |
| Polsby-Popper | 0.36 | 0.32 | 0.32 | 0.23 | **0.31** |
| | | | | | |
| Enacted 2023 Districts | 1 | 2 | 4 | 11 | Average |
| Reock | 0.26 | 0.23 | 0.57 | 0.46 | **0.38** |
| Polsby-Popper | 0.21 | 0.10 | 0.41 | 0.38 | **0.28** |

### E. Demonstration District D

61. Plaintiffs offered Demonstration District D, reproduced below.

**Figure 15: Map of Demonstration District D**



62. Demonstration District D has the following characteristics. The district is composed of Bertie, Gates, Halifax, Hertford, Martin, Northampton, Tyrrell, Warren, and Washington Counties in their entirety, and a portion of Pasquotank County. PX69 at 24 (Esselstyn Report). The district is completely contiguous and has a population that is "at or within plus or minus five percent of the ideal district population," deviating by minus 4.67%. *Id.* at 24, 27, 30. It has a BVAP of 49.22% and a BCVAP of 50.14%. PX147 at 7 (Esselstyn Rebuttal Report). Its Reock score is 0.30 and its Polsby-Popper score is 0.21, making the district more compact than existing SD1 and SD2. PX69 at 28 (Esselstyn Report). The district preserves more of the Black Belt community of interest in a single district than any district in either the 2022 or 2023 plans. *Id.* at 30. It also preserves as much of the Elizabeth City community of interest as possible while avoiding splitting

precincts, keeping "most of Elizabeth City [] intact within" the district by taking the "vast majority" of its Pasquotank County precincts from the Elizabeth City community of interest. *See* PX69 at 31 (Esselstyn Report); Tr. Day 2 24:3-16 (Esselstyn). It was drawn without consideration of partisan data. PX69 at 31 (Esselstyn Report). Mr. Esselstyn credibly testified that he did consider race in drawing Demonstration District D, and that race did not predominate in his drawing of the district. Tr. Day 1 230:7-17 (Esselstyn). The court credits that testimony, and Mr. Esselstyn's statistics related to Demonstration District D, which Defendants do not dispute. Indeed, Defendants' expert Dr. Trende agreed that Demonstration District D "largely tracks the boundary of Elizabeth City" and its precincts, and offered no opinion on the district's compactness or its compliance with the legislature's redistricting guidelines. Tr. Day 4 191:23-194:4, 193:10-24 (Trende).

63.     The margin of error for the BCVAP point estimate of 50.14% for Demonstration District D is plus or minus 0.594% at the 90% confidence interval. PX128 at 15 (Collingwood Rebuttal Report).

64.     Defendants' expert Dr. Alford admitted that "if you have a CVAP point estimate [from the American Community Survey] for the percentage of Black CVAP or any other CVAP in the CVAP population, you can assume that 50 percent of the expected values will fall higher than that point estimate and 50 percent will fall lower because the margin of error is based around a normal distribution." Tr. Day 4 109:5-23 (Alford). He further testified that "mathematically [] if you have a CVAP point estimate that [is] above 50 percent it is more likely than not that the actual value is above 50 percent." Tr. Day 4 110:8-14 (Alford). The court credits Dr. Alford's testimony on this specific issue.

65.     The demonstration map Mr. Esselstyn provided to accompany Demonstration District D is Demonstration Map D, reproduced below.

**Figure 16: Demonstration Map D**



66.     Demonstration Map D has the following characteristics. The new districts in Demonstration Map D are entirely within the boundaries of the county groupings used in the enacted plan. PX69 at 23-24 (Esselstyn Report). Dr. Mattingly confirmed that the *Stephenson*-compliant county groupings based on Demonstration District D "contain only one change from the groupings used in the enacted maps, namely substituting one two-district cluster" in the demonstration map for the two one-district clusters in the enacted plan. *See id.* at 19, 23. That meant Mr. Esselstyn "only needed to design one other district to accompany" Demonstration District D. *Id.* at 25. Demonstration Map D is thus identical to the enacted plan across 48 of 50 districts, changing only two districts from the enacted plan.

67.     Both of the new districts in Demonstration Map D "have populations that are at or within plus or minus five percent of the ideal district population" and are completely contiguous. *Id.* at 24, 27, 30. The new districts created in Demonstration Map D are more compact than the

corresponding districts in the 2023 map. *Id.* at 28-29. The average Reock score of the new districts in Demonstration Map D is 0.32, compared to an average of 0.25 in the enacted plan. *Id.* at 29. The average Polsby-Popper score of the new districts in Demonstration Map D is 0.19, compared to an average of 0.16 in the enacted plan. *Id.* Demonstration Map D splits 16 counties, just one more than the enacted plan and the minimum number dictated by the *Stephenson* county grouping requirement, and splits no VTDs. *Id.* at 30, Attachment J; Tr. Day 1 172:2-173:13 (Mattingly); Tr. Day 2 26:10-24 (Esselstyn). As with his approach to drawing Demonstration District D, Mr. Esselstyn testified that he considered racial data, but not partisan data, in drawing Demonstration Map D, and that race did not predominate in his drawing of any districts in the map. PX69 at 31 (Esselstyn Report); Tr. Day 1 230:7-17 (Esselstyn). The court credits Mr. Esselstyn's testimony on Demonstration Map D, and his statistics relating to the map, which Defendants do not dispute.

68. Statistics related to Demonstration Map D are provided in Table 8a of Mr. Esselstyn's rebuttal report and Table 11 of Mr. Esselstyn's initial report respectively, and are reproduced below.

### Table 8a: Statistics for Demonstration Districts D and D-2

| District | Population Deviation | BVAP | 2022 Black-CVAP | Reock | Polsby-Popper |
|---|---|---|---|---|---|
| **Demonstration District D** | -4.67% | 49.22% | 50.14% | 0.30 | 0.21 |
| **Demonstration District D-2** | -4.62% | 10.50% | 11.06% | 0.34 | 0.17 |

**Table 11: Compactness score comparison for Demonstration Maps B & D**

| Demonstration Districts | B | B-2 | Average |
|---|---|---|---|
| Reock | 0.35 | 0.39 | 0.37 |
| Polsby-Popper | 0.29 | 0.25 | 0.27 |
| | | | |
| Demonstration Districts | D | D-2 | Average |
| Reock | 0.30 | 0.34 | 0.32 |
| Polsby-Popper | 0.21 | 0.17 | 0.19 |
| | | | |
| Enacted 2023 Districts | 1 | 2 | Average |
| Reock | 0.26 | 0.23 | 0.25 |
| Polsby-Popper | 0.21 | 0.10 | 0.16 |

### F.  Demonstration District E

69.    The fifth demonstration district Plaintiffs offered is Demonstration District E. The court excluded Demonstration District E in a pretrial ruling. D.E. 91. Plaintiffs made offers of proof regarding Demonstration District E at trial that Dr. Mattingly, Mr. Esselstyn, and Dr. Collingwood would have testified regarding Demonstration District E but for the court's ruling excluding evidence of that district. Tr. Day 1 173:20-174:12 (Mattingly); Tr. Day 2 48:1-12 (Esselstyn); Tr. Day 2 171:9-23 (Collingwood). The court makes no further findings regarding Demonstration District E.

### G.  Dr. Trende Universally Accepted Plaintiffs' Factual Assertions Under *Gingles* I and His Independent Analysis Was Completely Unreliable and Is Entitled to No Weight

70.    Defendants offered Dr. Sean Trende to respond to the testimony of Mr. Esselstyn and Dr. Mattingly on the first *Gingles* precondition. As noted, Dr. Trende accepted Plaintiffs' factual evidence regarding numerosity, compactness, and other redistricting criteria for each demonstration district. He agreed that Plaintiffs' Demonstration Districts A and C are majority-Black districts, offered no opinion about the compactness of any of Plaintiffs' demonstration districts,

and offered no opinion about the extent to which any of Plaintiffs' demonstration districts complied with the legislature's redistricting criteria. Dr. Trende offered limited evidence of his own in response to Plaintiffs' experts. That evidence was, by Dr. Trende's own admission, riddled with errors, including errors Dr. Trende acknowledged were "material." Tr. Day 4 133:6-14 (Trende). The court finds that the independent evidence Dr. Trende offered is completely unreliable and entitled to no weight.

71.     Dr. Trende acknowledged at trial that his expert report was shot through with errors. Dr. Trende's principal responses to Plaintiffs' evidence concerned ACS margin of error calculations and critiques of Plaintiffs' demonstration districts that he based on choropleth and dot density maps. Every single one of Dr. Trende's margin of error calculations was wrong. So were numerous other numbers contained in his report. Dr. Trende also admitted at trial that he did not know what the colors in his choropleth maps signified, and went on to give implausible testimony regarding his dot density maps. These shortcomings completely undermine the credibility of Dr. Trende's opinions.

72.     Dr. Trende offered the opinion in his expert report that Mr. Esselstyn could not "say with a reasonable degree of certainty typical of the social sciences that" Demonstration District D has a majority Black CVAP because, in Dr. Trende's opinion, the ACS survey results that Mr. Esselstyn used to calculate BCVAP have a margin of error that makes it possible that the actual BCVAP of Demonstration District D is less than 50%. LD60 at 23-24 (Trende Report).

73.     Dr. Trende explained that ACS data is the best available source of CVAP data, that experts in VRA cases commonly use ACS CVAP data, and that he himself has previously used CVAP data to calculate the minority population of potential majority-minority districts in his work as an expert. Tr. Day 4 185:5-16 (Trende). Although Dr. Trende criticized the use of a CVAP point

estimate to establish that a district is majority-Black, the Court gives no weight to that criticism because it is inconsistent with Dr. Trende's own approach in past cases. Dr. Trende acknowledged that in his prior work as an expert using CVAP data, he had represented to a federal court that a VRA district with a CVAP point estimate of 50.3% was a majority-minority district, even though he had not calculated the margin of error associated with that point estimate. *Id.* at 186:14-188:14. Though Dr. Trende has testified on *Gingles* I topics in at least eight prior cases, he had never considered or calculated CVAP margins of error before 2024. *Id.* at 189:10-16. He did not offer any opinion that it is standard for experts analyzing the first *Gingles* precondition to consider margins of error when relying on CVAP to establish majority-minority status.

74. All of Dr. Trende's margin of error calculations were wrong. Dr. Trende admitted at trial that "every" BCVAP margin of error he calculated in this case was "incorrect." *Id.* at 171:14-16. He acknowledged that the mistakes in his margin of error calculation were "material," and he "profusely" apologized to his clients and the court for his mistakes. *Id.* at 133:6-14. He confessed that these errors "substantially" increased the margins of error in favor of his client. *Id.* at 178:7-9. He testified further that in the only other case in which he has calculated margins of error associated with BCVAP point estimates, his calculations were also wrong. *Id.* at 171:17-172:9. Both times, in this case and the prior one, Dr. Trende failed to recognize his errors himself, instead appreciating them only once opposing counsel or opposing experts called them to his attention. *Id.* at 172:14-24.

75. Ultimately, Dr. Trende admitted that "in every case in which" he has "offered expert testimony to a court about margins of error for CVAP calculations," his "margins of error have been wrong." *Id.* at 172:6-9.

76.     Dr. Trende attempted to calculate error margins himself in this case because the ACS publishes its error margins at the district, county, and block group level (not the individual block level), units of aggregation that do not map 1:1 on to Plaintiffs' demonstration districts. PX128 at 8 (Collingwood Rebuttal Report); Tr. Day 4 148:4-19 (Trende). Calculating the margin of error at the demonstration district level thus required, in some instances, disaggregating data to the block level and then reaggregating the block-level data across blocks inside the demonstration district. PX128 at 8 (Collingwood Rebuttal Report). It also required aggregating data for the three subcategories of ACS responses that capture Black voting age citizens to ascertain a total BCVAP number for a particular block. *Id.* at 8-9.

77.     Dr. Trende made multiple basic mistakes in calculating his error margins, undermining his credibility as an expert witness on statistical topics. First, Dr. Trende admitted that he failed to square various inputs in the formula used to ascertain the error margin for the raw number of Black voting age citizens in a particular block group, in other words, the formula used to identify an error margin for the aggregated subcategories of Black ACS respondents. Tr. Day 4 178:10-19 (Trende); PX128 at 8-9 (Collingwood Rebuttal Report). That error infected "every single one" of Dr. Trende's block group margin of error estimates and was alone enough to invalidate every margin of error calculation in his report. PX128 at 9 (Collingwood Rebuttal Report). Dr. Trende characterized that mistake as "really stupid." Tr. Day 4 178:10-19 (Trende).

78.     Second, Dr. Trende also acknowledged that he misapplied the formula used to translate the margin of error for the raw number of Black voting age citizens into the margin of error for Black voting age citizens as a percentage of total voting age citizens, that is, the BCVAP margin of error itself, another error that undermined his entire analysis. *Id.* at 177:3-22. He conceded that he both failed to square certain terms in the formula and flipped the numerator and

denominator in the formula, *id.*, basic mistakes that no expert in statistics should make. He agreed at trial that this was a "big mistake." *Id.* at 177:18-22.

79. Third, Dr. Trende inaccurately assigned two additional block groups to Demonstration Districts B and D that are not actually in those districts, even in part. PX128 at 9 (Collingwood Rebuttal Report); Tr. Day 4 178:20-179:9 (Trende). That was also enough to render inaccurate all of the error margins in his report. PX128 at 9 (Collingwood Rebuttal Report).

80. Dr. Trende admitted that his errors "substantially" increased the total margin of error in favor of his client. Tr. Day 4 178:7-9 (Trende).

81. The problems in Dr. Trende's error margin calculations were compounded by a methodological decision underlying his analysis. Because the ACS provides margins of error at the block group and the county level, disaggregating and reaggregating block group data is unnecessary to ascertain the margin of error for a county that is wholly contained within a district, as nine of the ten counties in Demonstration District D are. PX128 at 11 (Collingwood Rebuttal Report). Instead of aggregating block and block group estimates across an entire district, then, the county-level error margin estimates for the whole counties included in a district can be combined with block group level estimates for the portions of a district that split a county. *Id.* Dr. Collingwood opined that such an approach produces a "considerably more accurate" margin of error calculation. *Id.* He validated that opinion by comparing Dr. Trende's disaggregated and reaggregated margin of error for each county in Demonstration District D to the known error margin for each county in Demonstration District D. *See id.* at 11-16. The results show that, even correcting Dr. Trende's mathematical mistakes, Dr. Trende's estimates are still "wildly incorrect," producing estimates many times the true value in favor of Dr. Trende's client. *Id.* at 12-13.

82. Dr. Trende admitted at trial that his methodological decision to apply his block-group level aggregation method, rather than combining county-level and block group-level error margins, would "of course" inflate the margin of error in his clients' favor. Tr. Day 4 179:14-22 (Trende). He also acknowledged that the approach contradicted U.S. Census Bureau instructions. Tr. Day 4 180:22-181:10 (Trende). Specifically, he conceded that the U.S. Census Bureau hand-book directs analysts "to work with the fewest number of estimates possible," but that by choosing to aggregate only block groups, as opposed to block groups and counties, he did not "work with the fewe[st] number of estimates possible" but instead "aggregate[d] … many more different esti-mates" than would have been possible if he used county data. *Id.* at 181:1-9, 180:4-16. He did so even though he could not "think of any reason" why following the Census Bureau's guidance to use fewer estimates would not have been "appropriate." *Id.* at 183:7-11. The court finds that Dr. Trende's decision to use a less accurate methodology at odds with U.S. Census Bureau guidelines and that massively inflated his calculations in favor of his client seriously undermines his credi-bility.

83. Still more numerical errors pervaded Dr. Trende's report. Dr. Trende admitted that the numbers on page 6 of his report, describing a series of basic statistics about census tracts and block groups, were wrong. *Id.* at 177:3-178:6; LD60 at 6 (Trende Report). Dr. Trende acknowl-edged that he incorrectly stated on page 10 of his report that the significance of a 90% confidence interval means that, at that interval, a value will fall within the margin of error "one time out of ten," when he should have said that it will fall within the margin of error nine times out of ten. LD60 at 10 (Trende Report); *see* Tr. Day 4 173:9-16 (Trende). He admitted that all of the numbers informing his margin of error analysis on page of 17 of his report were wrong. LD60 at 17 (Trende Report); Tr. Day 4 173:17-23 (Trende). He agreed that every number in the section of his report

42

entitled "Mr. Esselstyn cannot say with a reasonable degree of certainty that districts B-1 and D-1 have majority Black CVAPs"—except the numbers provided by Mr. Esselstyn—was wrong. LD60 at 23-24 (Trende Report); Tr. Day 4 174:6-176:12 (Trende). He acknowledged that page 25 of his report incorrectly claimed that only five precincts in two counties could be removed from Demonstration District A while maintaining a BVAP of at least 50%, a claim Mr. Esselstyn debunked in his rebuttal report. LD60 at 25 (Trende Report); Tr. Day 4 192:25-193:4 (Trende). Dr. Trende nevertheless stood by the statement in his report that "[a]ll opinions and findings" in the report were "given to a reasonable degree of scientific certainty typical of my field." LD60 at 4 (Trende Report); Tr. Day 4 176:13-177:2 (Trende). The court finds that testimony implausible given the number of errors in Dr. Trende's report and finds that it further discredits Dr. Trende's testimony.

84.    Dr. Trende's trial testimony went on to undermine the reliability of the maps he provided in his expert report. Dr. Trende's report included both choropleth and dot density maps. The report contained eight choropleth maps. Choropleth maps are "area-based" maps that use colorful shading to represent data outputs across a particular geography, here, BVAP levels inside and outside demonstration districts. LD60 at 25 (Trende Report).  Dr. Trende relied on these maps for the purpose of showing the BVAP percentages in census blocks and VTDs within the two counties that were split in Demonstration Districts B, C, and D.  But the choropleth maps use color-coding, the keys Dr. Trende included with the maps were facially unclear, and Dr. Trende admitted on cross-examination that he did not know what the colors mean. Examples of the maps from Dr. Trende's report are depicted below:



85. Specifically, each color is designed to represent a range of BVAPs, but the key for each color doesn't show a range—it just has a single number. *E.g.*, LD60 at 38, Fig. 21 (Trende Report). And Dr. Trende admitted that he didn't know whether the color yellow, which is labeled "30%" in the key, meant a BVAP of zero to 30% or zero to 35%. He testified at his deposition that it was 0% to 35%; he testified on direct examination that it was 0% to 30%; and he testified on cross that he did not know which was correct. Tr. Day 4 194:22-196:9 (Trende) ("I guess."). The same problem—not knowing what range of BVAPs a color represents—necessarily infects all of the colors depicted in his choropleth maps. For example, the green color labeled as 35% in the key might be 30 to 35% or 35% to 40% (or something different). And the teal color labeled as 50% in the key could mean 45% to 50% (i.e., not-majority Black) or 50% to 55% (i.e., majority-Black).

86. Dr. Trende's contradictory and uncertain testimony severely undermines the reliability of Dr. Trende's maps and further impugns his credibility in this case.

87. Because there is no competent evidence of what the colors on Dr. Trende's choropleth maps mean, the Court cannot rely on them for any purpose.

44

88.     Dr. Trende offered different maps, called "dot density maps," to accompany his choropleth maps, but these maps were misleading. Dot density maps account for population size, while choropleth maps do not. LD60 at 27 (Trende Report). The purpose of Dr. Trende's density maps was to display "the number of Black people in an area and the number of White people in the area." Day 4 Tr. 197:12-21 (Trende). But Dr. Trende's maps failed to accurately depict the numbers of white and Black people and thus presented an unreliable characterization of where Black and white people lived in the demonstration maps.

89.     Dr. Trende's maps purported to use orange X's to depict an area with 10 white people and blue dots to depict an area with 10 Black people. *Id.* at 197:22-198:2. As Mr. Esselstyn showed in Figure 4 of his rebuttal report, reproduced below, the orange X's Dr. Trende used in his dot density maps are 3.4 times the area of the corresponding blue dots. PX147 at 24-25 (Esselstyn Rebuttal Report). The orange X's in the map are entirely opaque, while the blue dots are 50% transparent, leading Dr. Trende to admit that orange X's covered up blue dots in some of his maps. *Id.* at 25; Day 4 Tr. 201:12-18 (Trende).

**Figure 4: Details from Dr. Trende Figure 23 (arrows added)**



90.     The result of Dr. Trende's data visualization choices is to give a white population a much more significant visual presence than an equivalent Black population. PX147 at 26 (Esselstyn Rebuttal Report). Mr. Esselstyn illustrates this in Figure 5 of his rebuttal report, reproduced below, which presented a dot density map that corrected the problems in one of Dr. Trende's dot density maps. *Id.* at 27.

**Figure 5: Comparison of two dot density maps by different mapmakers**



91.    The Court finds that Dr. Trende's choices of big X's and little dots to depict White people and Black people was misleading, further undermines his reliability, and discounts the dot density maps.  The point of Dr. Trende's dot density plot depicted in Figure 5 was to suggest that that Demonstration District C left the white people in Vance County out, and thus divided Vance residents on the basis of race.  But Dr. Trende admitted on cross-examination that, by using big X's and little dots, his map gave the appearance that Demonstration District C excluded more white people in Vance County from the district than was reflected under Mr. Esselstyn's recalibrated version of the map, which used dots of the same size to reflect Black and white people. Tr. Day 4 Tr. 199:23-200:2 (Trende). Dr. Trende nevertheless insisted on cross-examination that the orange X's and blue dots in his maps—the areas of which differ by 3.4 times—"are the same size" because they use the same "size parameter." *Id.* at 199:4-17. That is like claiming that a period is the same size as an exclamation point so long as they are both typed in Times New Roman size 12 font. Dr. Trende's misleading data visualization and implausible testimony further belie his credibility.  These same misleading choices affect all of Dr. Trende's dot density maps, all of which use the same misleading X's and dots.

92.    Dr. Trende's dot density plots were also independently misleading because he rounded to the nearest ten.  He testified that a census block "with two orange Xs and one blue dot" was "visually depicting twice as many White people as Black people."  Tr. Day 4 200:23-201:1 (Trende).  But in fact, as a result of his rounding, he admitted that "in reality that census block with two orange X's and one blue dot could have 15 White people and 14 Black people."  Tr. Day 4 201:2-5 (Trende).  He testified further that the one dot density plot in his map that did not have this rounding issue was not useful because it created "giant blobs" of blue dots and orange X's that

47

were "covering each other up." Tr. Day 4 201:2-18 (Trende). For all of these reasons, the Court declines to rely on Dr. Trende's dot density maps.

93. Other courts in other cases have rejected Dr. Trende's opinions. Dr. Trende testified at trial that "many [] courts have declined to credit [his] testimony," observing, "[s]ometimes you're the windshield and sometimes you're the bug." Tr. Day 4 202:4-7 (Trende). He acknowledged that his testimony was excluded by the court in *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 WL 13561757, at *7-8 (N.D. Ga. Nov. 16, 2020). Tr. Day 4 at 201:24-202:3 (Trende). He affirmed that his data visualizations were deemed "misleading" in *Palmer v. Hobbs*, No. 3:22-CV-05035-RSL, 2024 WL 1138939, at *3 (W.D. Wash. Mar. 15, 2024). Tr. Day 4 at 202:8-13 (Trende). He agreed with the court's characterization of his testimony in *Matter of 2022 Legislative Districting of State*, 282 A.3d 147, 185-86 (Md. 2022), as having the "appearance of rigor" but as ultimately "entitled to little weight" given its "superficial quality." Tr. Day 4 202:14-23 (Trende). He confirmed that his *Gingles* I analysis in *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 850 (M.D. La. 2024), was found to be "oversimplistic, unhelpful, fundamentally flawed, and completely useless." Tr. Day 4 203:5-20 (Trende).

94. The court finds that, for all the reasons explained above, Dr. Trende's testimony on CVAP margins of error and his analysis of the demonstration maps is not credible and is entitled to no weight.

### III.  *Gingles* Precondition Two: The Black population in northeastern North Carolina is politically cohesive

95. Plaintiffs offered evidence that the Black population in the Black Belt region votes cohesively primarily through the testimony of their racially polarized voting, or "RPV," expert Dr. Loren Collingwood. Dr. Collingwood opined that "[e]very single contest" he analyzed "shows that

Black voters are extremely cohesive in vote choice." PX36 at 25-26 (Collingwood Report). Legislative Defendants have not disputed that the second *Gingles* precondition is satisfied, and their RPV expert, Dr. John Alford, agreed that "the Gingles II precondition is satisfied in this case." Day 4 Tr. 79:3-5 (Alford).

96.     Dr. Collingwood is a "an associate professor of political science at the University of New Mexico." PX36 at 3 (Collingwood Report). He holds "a Ph.D. in political science with a concentration in political methodology and applied statistics from the University of Washington," and "a B.A. in psychology from the California State University, Chico." *Id.* He has "published two books with *Oxford University Press*, 42 peer-reviewed journal articles, and nearly a dozen book chapters focusing on sanctuary cities, race/ethnic politics, election administration, and RPV." *Id.* Most of his academic scholarship focuses on racial politics, and as part of his academic work, he has previously analyzed RPV in North Carolina. Tr. Day 2 113:2-13, 115:12-20 (Collingwood). He has served as an RPV expert in numerous other cases, PX36 at 3 (Collingwood Report), and his testimony has been accepted in every case, Tr. Day 2 113:17-114:16 (Collingwood). Defendants' expert Dr. Alford testified that Dr. Collingwood's "work in this case [was] extremely competent" and that he was "confident to rely on it." Tr. Day 4 72:24-73:5 (Alford). The court accepted Dr. Collingwood as an expert in the fields of racially polarized voting, redistricting, racial politics, electoral performance, and applied statistics without objection, and finds that he is highly qualified in each of those fields. Tr. Day 2 115:21-25 (Collingwood).

97.     Dr. Collingwood employed a method known as "ecological inference" to assess the political cohesion of Black voters in North Carolina. Ecological inference is a standard and reliable methodology for assessing political cohesiveness and racially polarized voting.  Tr. Day 2 119:7-120:20, 121:19-24 (Collingwood): *see also* PX36 at 4 (Collingwood Report).  Dr. Collingwood

49

49

Case 4:23-cv-00193-D-RN    Document 126    Filed 03/14/25    Page 54 of 270

has developed a package for conducting ecological inference that numerous experts and academics rely on, and he has published numerous peer-reviewed academic papers using the ecological inference methodology that he applied in this case. Tr. Day 2 120:21-121:11 (Collingwood). Dr. Collingwood conducted an ecological inference analysis of all statewide races between 2016 and 2024, and of the state senate races in SD1 and SD2 in 2024. The court finds that Dr. Collingwood's testimony was credible and that his analysis is entitled to great weight.

98. Dr. Collingwood's RPV analysis showed that Black voters in North Carolina are extremely politically cohesive, and that Black voters in the Black Belt are even more cohesive than Black voters across the state as a whole. Dr. Collingwood analyzed RPV statewide, in SD1 and SD2, and in a region he called the "Demonstration Area," which is comprised of the 12 counties in Plaintiffs' demonstration districts. PX279 at 12-13 (Collingwood Suppl. Report). Statewide, between 2016 and 2024, Black voters backed their preferred candidates at an average level of approximately 97.5%. *Id.* at 4. In SD1, SD2, and the Demonstration Area, Black voters backed the same candidates at the same or even greater levels, often 98% or 99%. *Id.* at 4-5.

99. The specific Black cohesion numbers are undisputed. Statewide, Black voters backed the same candidate at an average level of 97.14% in 2016, 98.25% in 2018, 97.68% in 2020, 95.51% in 2022, and 98.78% in 2024, for an average across these five election cycles of 97.5%. *Id.* at 4-5. In SD1, Black voters backed the same candidate at an average level of 96.69% in 2016, 98.08% in 2018, 98.54% in 2020, 93.98% in 2022 and 98.99% in 2024 for an average of 97.25% across the five election cycles. *Id.* at 7-8. In SD2, Black voters backed the same candidate at an average level of 97.97% in 2016, 98.70% in 2018, 98.89% in 2020, 98.95% in 2022, and 98.90% in 2024, for an average of 98.7% across the five election cycles. *Id.* at 10. Finally, in the Demonstration Area, Black voters backed the same candidate at an average level of 97.76% in

2016, 99.08% in 2018, 98.97% in 2020, 97.99% in 2022, and 98.93% in 2024, for an average across the five election cycles of 98.55%. *Id.* at 12-13. These numbers are depicted in Figures 3.1, 4.1, 4.2, and 5.1 of Dr. Collingwood's supplemental report, and are reproduced at *infra* PFOF § 4.

100.    Dr. Alford's own report accepted and relied on Dr. Collingwood's ecological inference analysis. Tr. Day 4 at 73:20-22 (Alford). At trial, Dr. Alford agreed with every single one of Dr. Collingwood's estimates for Black voter support in every single election that Dr. Collingwood analyzed. *Id.* at 73:23-74:1. He similarly agreed with the set of elections Dr. Collingwood chose to analyze in assessing the cohesion of Black voters in North Carolina and the set of geographies Dr. Collingwood selected. *Id.* at 75:20-76:1. Even his supplemental rebuttal report, which purported to offer new opinions on Dr. Collingwood's method and to which Plaintiffs have objected, agreed that he and Dr. Collingwood had reached "substantively similar results" and that none of his RPV "conclusions would be changed based on the relatively slight differences." LD76 at 2 (Alford Suppl. Rebuttal Report). The 2024 numbers from Dr. Alford also confirm the existence of extreme racially polarized voting.  Although Dr. Alford only refers to *statewide* numbers in the text of his report, *id.* at 3, Dr. Alford's tables estimate on average 98% Black support for Black-preferred candidates in the Demonstration Area in 2024, 95 to 96% in SD1, and 97% in SD2, *id.* at 5, Tbl. 2.

101.    Dr. Alford testified that although he "usually hesitate[s] to use adjectives" to describe racially polarized voting, in this case he agreed that Black voters are "extremely politically cohesive." Tr. Day 4 78:4-79:2 (Alford).

## IV.   *Gingles* Precondition Three: The white population in northeastern North Carolina votes sufficiently as a bloc to usually defeat Black voters' candidates of choice

102.    Plaintiffs offered evidence that the white population in enacted SD1 and SD2 votes sufficiently as a bloc to usually defeat Black voters' candidates of choice through the testimony of

51

Dr. Collingwood with corroboration from their fact witnesses. Dr. Collingwood found that white voters vote cohesively for a different candidate than Black voters, and that white voters consistently block Black voters from electing their preferred candidate. PX36 at 26 (Collingwood Report). He characterized the results as "overwhelming." *Id.*

103.     Notably, Defendants' expert Dr. Alford agreed that "white voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate District 1 and Senate District 2." Tr. Day 4 81:25-82:4 (Alford).

### A. Dr. Collingwood's RPV Analysis

104.     Dr. Collingwood demonstrated the political cohesion of white voters through the same RPV analysis he used to demonstrate the political cohesion of Black voters, summarizing his results in four coefficient charts. Dr. Collingwood found that statewide across 2016 to 2024, white voters oppose Black-preferred candidates approximately 71% of the time, on average, and that they oppose Black-preferred candidates at even higher levels in SD1, SD2, and the Demonstration Area. *See* PX279 at 4-10 (Collingwood Suppl. Report). At trial, Dr. Alford agreed that the Court should use Dr. Collingwood's estimates and stated that he was "not in any way relying on [his own] point estimates." Tr. Day 4 75:1-13 (Alford); *see also* Tr. Day 4 79:9-10 (Alford). The court has already credited Dr. Collingwood's RPV analysis with respect to Black voter cohesion, and likewise credits it with respect to white voter cohesion, giving it great weight.

105.     First, in Figure 3.1, Dr. Collingwood analyzed RPV on a statewide basis. He found that statewide, white voters supported the Black-preferred candidate at an average level of 29.05% in 2016, 31.11% in 2018, 25.42% in 2020, 29.41% in 2022, and 28.37% in 2024. PX279 at 5 (Collingwood Suppl. Report). These figures reveal average white support for Black-preferred candidates of 28.7% at a statewide level across all five election cycles. *Id.* at 4.



*Figure 3.1: Racially Polarized Voting coefficient plot. Ecological Inference (EI) results, statewide.*

*Id.* at 5.

106.    Second, in Figure 4.1, Dr. Collingwood analyzed RPV in enacted Senate District 1. He found that in SD1, white voters supported the Black-preferred candidate at an average level of 25.92% in 2016, 25.08% in 2018, 20.06% in 2020, 20.84% in 2022 and 19.92% in 2024. *Id.* at 8. These results show that white voters support the Black-preferred candidate at an average of 22.36% of the time in SD1, well-below the statewide average of 28.7%. *Id.* at 4, 7. The white support for Black-preferred candidates is even lower in recent elections, dropping to nearly 20%

in 2020 and 2022, and below 20% in 2024. *Id.* at 8.



*Figure 4.1: Racially Polarized Voting coefficient plot. Ecological Inference (EI) results, State Senate District 1*

*Id.*

  107. Third, in Figure 4.2, Dr. Collingwood analyzed RPV in enacted Senate District 2. He found that in SD2, white voters supported the Black-preferred candidate at an average level of 22.75% in 2016, 21.07% in 2018, 16.43% in 2020, 16.82% in 2022, and 18.08% in 2024. *Id.* at 10. These results show that white voters support the Black-preferred candidate at an average of 19.03% of the time in SD2, well-below the statewide average of 28.7%. *Id.* at 4-10. The white

support for Black-preferred candidates is even lower in recent elections, dropping from 21-23% in 2016 and 2018 to 16-18% in 2020 through 2024. *Id.* at 10.



*Figure 4.2: Racially Polarized Voting coefficient plot. Ecological Inference (EI) results, State Senate District 2*

*Id.*

108.    Fourth, in Figure 5.1, Dr. Collingwood analyzed RPV in the Demonstration Area. He found that in the Demonstration Area, white voters supported the Black-preferred candidate at an average level of 21.02% in 2016, 17.02% in 2018, 13.32% in 2020, 11.61% in 2022, and 12.74% in 2024. *Id.* at 13. These results show that white voters support the Black-preferred candidate at an

average of 15.1% of the time in the Demonstration Area, well-below the statewide average of 28.7%. *Id.* at 4, 12. The white support for Black-preferred candidates is even lower in recent elections. White voters began the time period supporting the Black-preferred candidate a little over 20% of the time, but dropped in each successive election cycle between 2016 and 2022 and levelled out at 12.74% in 2024. *Id.* at 13.



Figure 5.1: Racially Polarized Voting coefficient plot. Ecological Inference (EI) results, 12-County Demonstration Area

*Id.*

109.    Defendants' RPV expert, Dr. Alford, agreed with Dr. Collingwood's RPV findings with respect to white political cohesion just as he agreed with Dr. Collingwood's findings with respect to Black political cohesion. As noted, Dr. Alford's independent regression analysis "confirmed" Dr. Collingwood's results, and Dr. Alford "accept[ed] and rel[ied] upon Dr. Collingwood's ecological inference analysis" in producing his report, confirming that he was "confident to rely on" Dr. Collingwood's figures. Tr. Day 4 73:4-19 (Alford). At trial, Dr. Alford testified that he agreed with every single one of Dr. Collingwood's estimates for white voter support in every single election Dr. Collingwood analyzed. *Id.* at 73:20-22. He also agreed with the set of elections Dr. Collingwood chose to analyze in assessing the cohesion of white voters in North Carolina, and the set of geographies Dr. Collingwood selected to do so. *Id.* at 75:20-76:1. Dr. Alford ultimately testified that he agreed white voters vote "as a bloc" in SD1 and SD2. *Id.* at 81:25-82:4.

110.    Although Dr. Alford purported to offer a critique of Dr. Collingwood's EI estimates in his supplemental rebuttal report, discussed in more depth below, the court excludes those opinions. Even if it did not, Dr. Alford's supplemental rebuttal report made clear that with respect to his RPV analysis, "[n]othing in [his] conclusions would be changed based on the relatively slight differences" between his and Dr. Collingwood's estimates, and the only place these variations could have a "significant impact" is "on the BVAP analysis." LD76 at 2-3 (Alford Suppl. Rebuttal Report). It thus remains undisputed that white voters vote "as a bloc" in SD1 and SD2. Tr. Day 4 81:25-82:4 (Alford).

## B.  Dr. Collingwood's Performance Analysis

111.    Dr. Collingwood conducted a performance analysis to determine the extent to which white bloc voting prevents Black voters from electing their candidates of choice. His reports examined 65 elections in both SD1 and SD2 across five election cycles, including 43 elections

57

across the last three election cycles. He showed that over the last five election cycles, white voters blocked Black voters from electing their preferred candidate between 88% and 91% of the time in SD1 and SD2, and over the three most recent cycles, white voters blocked Black voters from electing their preferred candidate 100% of the time in SD1 and 98% of the time in SD2. PX279 at 2 (Collingwood Suppl. Report). In these 43 most recent races, "[e]very Black-preferred Black candidate lost . . . the only Black-preferred candidate who was able to prevail across those 43 races was White, and prevailed over an opponent who was Black." *Id.*

112.    Dr. Collingwood conducted his performance analysis by subsetting "the precinct data to the appropriate counties comprising the respective Districts 1 and 2." PX36 at 13 (Collingwood Report).  For SD1, that included Bertie, Camden, Currituck, Dare, Gates, Hertford, Northampton, Pasquotank, Perquimans, and Tyrrell Counties. *Id.* For SD2, that included Chowan, Carteret, Halifax, Hyde, Martin, Pamlico, Warren, and Washington Counties. *Id.* For each contest, he summed the total vote for the Black-preferred candidate and the total vote for the white-preferred candidate before dividing each by the total vote count (which includes other candidates who are not the white or Black-preferred candidate). *Id.* Dr. Alford agreed that Dr. Collingwood selected the best available data for conducting his performance analysis, and identified no criticism of Dr. Collingwood's analysis or results. Tr. Day 4 85:18-86:1 (Alford). The court finds that Dr. Collingwood's performance analysis is credible and entitled to great weight.

113.    Dr. Collingwood's performance analysis started with the 2016 election, which featured 18 statewide election contests. Dr. Collingwood explained that "in situations involving new districts that have not been used before, statewide races involving candidates at the top of the ticket are most relevant and informative for assessing racially polarized voting." PX36 at 16 (Collingwood Report). Consistent with that view, the performance analysis in the General Assembly's

2023 redistricting StatPack analyzed only the five races at the top of the ticket for the 2016 election. *Id.* Dr. Collingwood analyzed all 18 races for the sake of "completeness," but likewise placed particular emphasis on the five most prominent contests. He found that overall, the white-preferred candidate prevailed in SD1 in 12 out of 18 statewide 2016 races, and prevailed in SD2 in 13 out of 18 2016 statewide races. *Id.* at 17. In the five top of the ticket races—Governor, Lieutenant Governor, Attorney General, U.S. Senate, and President—the white-preferred candidate prevailed over the Black-preferred candidate in each race in both SD1 and SD2. *Id.* at 15-16. The Black-preferred candidate lost these top-of-ticket elections in SD 1 and 2 "by significant margins." *Id.* at 16. The results of Dr. Collingwood's performance analysis for the 2016 election are depicted in Figure 8 of his initial report, reproduced below.

**Figure 8.** Electoral Performance Results, 2016, 2023-enacted State Senate Districts 1 and 2.



**North Carolina SS-2023 Enacted Map**
*D1 and D2, 2016*

*Id.* at 18.

114.    Dr. Collingwood next conducted a performance analysis using 2018 election results. The 2018 election cycle included only four statewide elections, three for the North Carolina Court of Appeals and one for the North Carolina Supreme Court. *Id.* at 14. The "Black-preferred candidate did not win a majority of the vote in enacted State Senate Districts 1 and 2 in any statewide race in 2018." *Id.*  In two of these elections (Court of Appeals 1 and the State Supreme Court contest), there was no Republican primary and so two Republicans ran in the general

election. *Id.* at 35, Figure 22. Dr. Collingwood credibly explained that it was appropriate to collapse support for those candidates to evaluate the performance of Districts 1 and District 2 because the goal of the performance anaylsis was to predict results in a typical legislative race where there was one Democrat and one Republican, although he also reported what would happen if those candidates were not collapsed. Tr. Day 3 AM 10:19-11:11, 19:16-22 (Collingwood); PX36 at 6 (Tbl.2), 14-15 (Collingwood Report). If votes for Republican candidates are combined, the White-preferred candidate would block the Black-preferred candidate in all four races in SD1 and SD2. PX36 at 14-15 (Collingwood Report). If they are not, the Black-preferred candidate would succeed with a plurality of the vote in two of the four races. *Id.* The results of Dr. Collingwood's performance analysis for the 2018 election are depicted in Figure 7 of his initial report, reproduced below.

**Figure 7.** Electoral Performance Results, 2018, 2023-enacted State Senate Districts 1 and 2.



*Id.* at 16.

115.    Dr. Collingwood repeated his performance analysis using 2020 election results. The 2020 election cycle consisted of 20 separate contests. *Id.* at 14. The results show the "white-preferred candidate prevailing in every single one of the 20 contests." *Id.* The white candidate prevails by an average of 8 points in SD1 and an average of 10 points in SD2. *Id.* The results of Dr. Collingwood's performance analysis for the 2020 election cycle are depicted in Figure 6 of his initial report, reproduced below.

**Figure 6.** Electoral Performance Results, 2020, 2023-enacted State Senate Districts 1 and 2.



*Id.*

116.    Dr. Collingwood ran the same performance analysis using 2022 election results. The 2022 election cycle consisted of seven separate contests. The results show that the white-preferred candidate wins all seven contests in both SD1 and SD2. *Id.* at 13. The white-preferred candidates win in SD1 by an average of nearly 16 percentage points, and the white-preferred

candidates win in SD2 by an average of over 19 percentage points. *Id.* The results of Dr. Collingwood's performance analysis for the 2022 election cycle are depicted in Figure 5 of his initial report, reproduced below.

**Figure 5.** Electoral Performance Results, 2022, 2023-enacted State Senate Districts 1 and 2.



*Id.*

117.    Finally, Dr. Collingwood conducted a performance analysis of the 2024 election, the most recent election available and the only election conducted under enacted SD1 and SD2. The 2024 election cycle consisted of 15 statewide elections in addition to state Senate elections in

both SD1 and SD2. The results show that, in SD1, "the White-preferred candidate easily wins all 16 contests in 2024 by an average margin of 13 percentage points for a block rate of 100%." PX279 at 15 (Collingwood Suppl. Report). In SD2, "the White-preferred candidate wins 15 of 16 contests with a mean victory of 13.1 percentage points for a block rate of 94%." *Id.* at 16. The single SD2 contest where the Black-preferred candidate received the most votes was in the Gubernatorial race, where enough white voters declined to vote for the Black Republican candidate that the white Democratic candidate prevailed. *Id.* at 16-17. Notably, in the only two endogenous elections in the entire dataset, the 2024 Senate elections in SD1 and SD2, the white-preferred candidate won by a margin of 14.4 percentage points in SD1 and by a margin of 14.3 percentage points in SD2. *See id.* at 15-16. These were the two "most probative contests to analyze for RPV purposes because the election dynamics are precise to the jurisdiction at issue." *Id.* at 3. The results of Dr. Colling- wood's performance analysis for SD1 and SD2 in the 2024 election cycle are depicted in Figures 6.1 and 6.2 of his initial supplemental report, reproduced below.



Figure 6.1: Electoral Performance Results, 2024, 2023-enacted State Senate District 1



Figure 6.2: Electoral Performance Results, 2024, 2023-enacted State Senate District 2

*Id.* at 16-17.

118.    In total, Dr. Collingwood examined 65 separate election contests over five election cycles from 2016-2024 in both SD1 and SD2. The data shows white voters usually blocking Black-preferred candidates from prevailing, and the trend grows starker in recent years, when white voters have blocked Black-preferred candidates from winning in nearly every election in SD1 and SD2.   Over "the last five election cycles, White bloc voting successfully blocked the Black-preferred candidate in Senate District 1 in either 57 of 65 (88%) or 59 of 65 (91%) races depending how the 2018 races … are considered, and in Senate District 2 in 57 of 65 (88%) or 59 of 65 (91%) races."    PX279 at 2 (Collingwood Suppl. Report).   "Over the three most recent, and more

probative, election cycles, White bloc voting successfully blocked the Black-preferred candidate in Senate District 1 in 43 of 43 races (100%) and in Senate District 2 in 42 of 43 races (98%). Every Black-preferred Black candidate lost in these 43 races; the only Black-preferred candidate who was able to prevail across those 43 races was White, and prevailed over an opponent who was Black." *Id.* In the two endogenous elections conducted in 2024, the white-preferred candidate defeated the Black-preferred candidate by 14.4% in SD1 and 14.3% in SD2. *Id.* at 15-16.

119.    Plaintiffs also presented undisputed evidence, through Dr. Loren Collingwood, that in contrast to SD1 and SD2, all of the Demonstration Districts presented in this case would elect the Black-preferred candidate, using the results of past statewide elections. PX36 at 19-23 (Collingwood Report); PX279 at 19 (Collingwood Suppl. Report). That analysis was undisputed and the Court credits it.

120.    Dr. Collingwood summarized his RPV and blocking analyses together in three charts, reproduced below. In addition to displaying the results of Dr. Collingwood's blocking analysis, the charts confirm that racially polarized voting existed in 64 of the 65 elections Dr. Collingwood analyzed in SD1, all 65 elections he analyzed in SD2, and all 64 elections he analyzed statewide. PX36 at 5-6 (Collingwood Report); PX279 at 3-4 (Collingwood Suppl. Report).[2] The charts are Tables 1 and 2 of Dr. Collingwood's intitial report, and Table 2.1 of his supplemental report.

---

[2] Dr. Collingwood analyzed 64 statewide elections, one Senate election in SD1, and one Senate election in SD2, for a total of 64 statewide elections and 65 elections in each district.

*Table 2.1: List of contests analyzed, 2024.*

| Year | Contest | Dem | Rep | Statewide RPV | SS1-RPV | SS2-RPV | SS1-Blocked | SS2-Blocked |
|------|---------|-----|-----|---------------|---------|---------|-------------|-------------|
| 2024 | President | Harris* | Trump | Yes | Yes | Yes | Yes | Yes |
| 2024 | Atty. Gen. | Jackson | Bishop | Yes | Yes | Yes | Yes | Yes |
| 2024 | Auditor | Holmes* | Boliek | Yes | Yes | Yes | Yes | Yes |
| 2024 | Agriculture | Taber | Troxler | Yes | Yes | Yes | Yes | Yes |
| 2024 | Insurance | Marcus | Causey | Yes | Yes | Yes | Yes | Yes |
| 2024 | Labor | Winston II* | Farley | Yes | Yes | Yes | Yes | Yes |
| 2024 | Governor | Stein | Robinson* | Yes | Yes | Yes | Yes | No |
| 2024 | Lieu. Gov | Hunt | Weatherman | Yes | Yes | Yes | Yes | Yes |
| 2024 | SoS | Marshall | Brown | Yes | Yes | Yes | Yes | Yes |
| 2024 | Sup. Inst. | Green* | Morrow | Yes | Yes | Yes | Yes | Yes |
| 2024 | Treasurer | Harris | Briner | Yes | Yes | Yes | Yes | Yes |

| Year | Contest | Dem | Rep | Statewide RPV | SS1-RPV | SS2-RPV | SS1-Blocked | SS2-Blocked |
|------|---------|-----|-----|---------------|---------|---------|-------------|-------------|
| 2024 | Sup. Ct. 06 | Riggs | Griffin | Yes | Yes | Yes | Yes | Yes |
| 2024 | Court Appeals 12 | Thompson* | Murry | Yes | Yes | Yes | Yes | Yes |
| 2024 | Court Appeals 14 | Eldred | Zachary | Yes | Yes | Yes | Yes | Yes |
| 2024 | Court Appeals 15 | Moore* | Freeman | Yes | Yes | Yes | Yes | Yes |
| 2024 | State Senate 1 | Harman-Scott | Hanig | N/A | Yes | N/A | Yes | N/A |
| 2024 | State Senate 2 | Davis* | Sanderson | N/A | N/A | Yes | N/A | Yes |

PX279 at 3-4 (Collingwood Suppl. Report).

**Table 1.** List of contests analyzed, between 2020-2022.

| Year | Contest | Dem | Rep | StatewideRPV | SS1-RPV | SS2-RPV | SS1-Blocked | SS2-Blocked |
|------|---------|-----|-----|--------------|---------|---------|-------------|-------------|
| 2022 | U.S. Senate | Beasley | Budd | Yes | Yes | Yes | Yes | Yes |
| 2022 | NC Supreme Ct. 3 | Inman | Dietz | Yes | Yes | Yes | Yes | Yes |
| 2022 | NC Supreme Ct. 5 | Ervin | Allen | Yes | Yes | Yes | Yes | Yes |
| 2022 | NC Court of Appeals 8 | Thompson | Flood | Yes | Yes | Yes | Yes | Yes |
| 2022 | NC Court of Appeals 9 | Salmon | Stroud | Yes | Yes | Yes | Yes | Yes |
| 2022 | NC Court of Appeals 10 | Adams | Tyson | Yes | Yes | Yes | Yes | Yes |
| 2022 | NC Court of Appeals 11 | Jackson | Stading | Yes | Yes | Yes | Yes | Yes |
| 2020 | President | Biden | Trump | Yes | Yes | Yes | Yes | Yes |
| 2020 | US Senate | Cunningham | Tillis | Yes | Yes | Yes | Yes | Yes |
| 2020 | Governor | Cooper | Forest | Yes | Yes | Yes | Yes | Yes |
| 2020 | Lieutenant Gov | Holley | Robinson | Yes | Yes | Yes | Yes | Yes |
| 2020 | Atty General | Stein | O'Neill | Yes | Yes | Yes | Yes | Yes |
| 2020 | Treasurer | Chatterji | Folwell | Yes | Yes | Yes | Yes | Yes |
| 2020 | Sec of State | Marshall | Sykes | Yes | Yes | Yes | Yes | Yes |
| 2020 | Auditor | Wood | Street | Yes | Yes | Yes | Yes | Yes |
| 2020 | Ag Commish | Wadsworth | Troxler | Yes | Yes | Yes | Yes | Yes |
| 2020 | Insurance | Goodwin | Causey | Yes | Yes | Yes | Yes | Yes |
| 2020 | Labor | Holmes | Dobson | Yes | Yes | Yes | Yes | Yes |
| 2020 | Sup Instruct | Mangrum | Truitt | Yes | Yes | Yes | Yes | Yes |
| 2020 | Chief Justice 01 | Beasley | Newby | Yes | Yes | Yes | Yes | Yes |
| 2020 | Court Seat 02 | Inman | Berger, Jr. | Yes | Yes | Yes | Yes | Yes |
| 2020 | Court Seat 04 | Davis | Barringer | Yes | Yes | Yes | Yes | Yes |
| 2020 | Appeals 04 | Shields | Wood | Yes | Yes | Yes | Yes | Yes |
| 2020 | Appeals 05 | Cubbage | Gore | Yes | Yes | Yes | Yes | Yes |
| 2020 | Appeals 06 | Styers | Dillon | Yes | Yes | Yes | Yes | Yes |
| 2020 | Appeals 07 | Young | Carpenter | Yes | Yes | Yes | Yes | Yes |
| 2020 | Appeals 13 | Brook | Griffin | Yes | Yes | Yes | Yes | Yes |

PX36 at 5 (Collingwood Report).

**Table 2.** List of contests analyzed, between 2016-2018.

| Year | Contest | Dem | Rep | StatewideRPV | SS1-RPV | SS2-RPV | SS1-Blocked | SS2-Blocked |
|------|---------|-----|-----|--------------|---------|---------|-------------|-------------|
| 2018 | State Sup. Court | Earls | Jackson/Anglin | Yes | Yes | Yes | Yes* | Yes* |
| 2018 | Court of Appeals 1 | Arrowood | Heath | Yes | Yes | Yes | Yes | Yes |
| 2018 | Court of Appeals 2 | Hampson | Griffin/Ray | Yes | Yes | Yes | Yes* | Yes* |
| 2018 | Court of Appeals 3 | Collins | Kitchen | Yes | Yes | Yes | Yes | Yes |
| 2016 | President | Clinton | Trump | Yes | Yes | Yes | Yes | Yes |
| 2016 | USS | Ross | Burr | Yes | Yes | Yes | Yes | Yes |
| 2016 | Governor | Cooper | McCrory | Yes | Yes | Yes | Yes | Yes |
| 2016 | LG | Coleman | Forest | Yes | Yes | Yes | Yes | Yes |
| 2016 | Atty. Gen | Stein | Newton | Yes | Yes | Yes | Yes | Yes |
| 2016 | Treasurer | Blue | Folwell | Yes | Yes | Yes | Yes | Yes |
| 2016 | SoS | Marshall | LaPaglia | Yes | Yes | Yes | No | No |
| 2016 | Auditor | Wood | Stuber | Yes | Yes | Yes | No | No |
| 2016 | Agriculture | Smith | Troxler | Yes | Yes | Yes | Yes | Yes |
| 2016 | Insurance | Goodwin | Causey | Yes | Yes | Yes | No | No |
| 2016 | Labor | Meeker | Berry | Yes | Yes | Yes | Yes | Yes |
| 2016 | Public Instruct | Atkinson | Johnson | Yes | Yes | Yes | No | No |
| 2016 | State Supreme Ct. | Morgan** | Edmunds** | Yes | No | Yes | No | No |
| 2016 | NC Court Appeals 1 | Rozier | Dietz | Yes | Yes | Yes | Yes | Yes |
| 2016 | NC Court Appeals 2 | Eagles | Murphy | Yes | Yes | Yes | Yes | Yes |
| 2016 | NC Court Appeals 3 | Jones | Hunter | Yes | Yes | Yes | Yes | Yes |
| 2016 | NC Court Appeals 4 | Stephens | Berger | Yes | Yes | Yes | No | Yes |
| 2016 | NC Court Appeals 5 | Mckoy-Mitchell | Zachary | Yes | Yes | Yes | Yes | Yes |

PX36 at 6 (Collingwood Report).

121.     As noted, Dr. Alford agreed at trial that Dr. Collingwood selected the best available data for conducting his performance analysis, and identified no criticism of Dr. Collingwood's analysis or results. Tr. Day 4 85:18-86:1 (Alford). His supplemental reports similarly contained no criticism of Dr. Collingwood's methodology for conducting his performance analysis. *See* LD75 (Alford Suppl. Report); LD76 (Alford Suppl. Rebuttal Report). Dr. Alford testified at trial that "White voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate District 1 and Senate District 2." Day 4 Tr. 81:25-82:3 (Alford). He offered

no contrary opinion in his supplemental reports, and indeed the data in his supplemental reports is consistent with that view. *See* LD75 (Alford Suppl. Report); LD76 (Alford Suppl. Rebuttal Report). The court credits Dr. Collingwood's performance analysis and gives it great weight.

### C. Additional Evidence of Racially Polarized Voting

122.    Every lay witness who testified in this case confirmed the experts' conclusions that white and black voters in northeastern North Carolina vote as blocs. Congressman Butterfield testified that there is "significant polarization between the races" in northeastern North Carolina. Tr. Day 1 16:12-17:7 (Butterfield). Senator Blue agreed that racially polarized voting is "very prevalent, especially in northeastern North Carolina." *See id.* at 72:5-9 (Blue). Representative Reives testified that voting in the Black Belt region "is racially polarized." *Id.* at 141:5-18 (Reives). Mr. Matthews explained that there is "a weak chance" of a Black candidate "winning with the current map." *Id.* at 64:11-17 (Matthews). Representative Pierce determined that this lawsuit was necessary to give "Black voters the opportunity to elect their preferred candidate" in the Black Belt counties. *Id.* at 51:19-52:4 (Pierce).

123.    Defendants' lone lay witness, Senator Hise, agreed, acknowledging that white-preferred candidates uniformly defeat Black-preferred candidates in SD1 and SD2, often by over 15%, and concluding that a majority-minority district is necessary to elect a Black-preferred candidate in northeastern North Carolina's Black Belt region. Tr. Day 4 21:14-22:4, 26:19-27:2 (Hise). Finally, all five of Plaintiffs' lay witnesses described a divide between Black and white voters in northeastern North Carolina split along issues important to Black voters. *See* Tr. Day 1 19:14-20:21 (Butterfield); *id.* at 53:9-16 (Pierce); *id.* at 65:5-66:4 (Matthews); *id.* at 91:15-24 (Blue); *id.* at 144:17-146:21 (Reives). The court credits each lay witness's testimony on these points.

124.    The North Carolina General Assembly's StatPack analyzing the 2023 redistricting plan, coupled with more testimony from Senator Hise, corroborate the expert testimony that white-

preferred candidates consistently defeat Black-preferred candidates in SD1 and SD2. The General Assembly produces statistical analyses of its redistricting plans during the redistricting process, referred to as StatPacks, and makes them publicly available on the General Assembly website. *See* N.C. General Assembly, *Legislative and Congressional Redistricting*, https://www.ncleg.gov/re-districting/ (last visited Mar. 12, 2025). The parties stipulated to the admission of those StatPacks in this case. D.E. 105 at 2. The StatPack for the 2023 Senate plan was provided to legislators on October 18, 2023, after the 2023 plan was released but before it was passed, and introduced at trial as a joint exhibit and stipulated admission. Tr. Day 4 5:3-6 (Hise); *see* JX6 (2023 StatPack); D.E. 105 at 2. The StatPack contained a performance analysis for SD1 and SD2 based on actual vote totals for 23 statewide election contests between 2016 and 2022. JX6 at 27-72 (2023 StatPack). That performance analysis showed, and Senator Hise agreed at trial, that the white-preferred candidate outperformed the Black-preferred candidate in SD1 and SD2 in every single one of the 23 statewide election contests the General Assembly analyzed. JX6 27-72 (2023 StatPack); Tr. Day 4 23:1-10 (Hise). That is the same result Dr. Collingwood produced for the 2022, 2020, and top-of-ticket 2016 races (the StatPack did not analyze 2018 or down-ballot 2016 races).

125.    The sum of the uncontested *Gingles* III evidence shows that white voters in SD1 and SD2 vote as a bloc of approximately 80% to 82% in recent elections, well-above the statewide average of around 71%. PX279 at 5, 8, 10 (Collingwood Suppl. Report). The effect on performance is undisputed, with white-preferred candidates outperforming Black-preferred candidates in 43 out of 43 elections in the last three cycles in SD1 and 42 out of 43 elections in SD2. *Id.* at 2. Even Defendants' RPV expert testified that "white voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate District 1 and Senate District 2." Tr. Day 4 81:25-82:4 (Alford).

## V. The Minimum BVAP Necessary for a District to Perform for Black Voters in the Black Belt Region is 47.70%.

126.     In light of the Court's preliminary injunction ruling, Dr. Collingwood also conducted an analysis, which he termed a "BVAP Analysis," to estimate the BVAP threshold necessary to produce a likely victory for a Black-preferred candidate in a hypothetical district in the Demonstration Area. Dr. Collingwood explained that, because the approach relies on simulations, the estimates are "thought of as guideposts." PX36 at 4 (Collingwood Report). The court credits this analysis.

### 1.     Dr. Collingwood's BVAP Analysis

127.     Dr. Collingwood conducted his BVAP Analysis by using RPV data and turnout estimates by race to estimate the threshold where changes in Black voting age population within a possible district produce a narrow 50%+1 victory for the Black-preferred candidate, using the results of past statewide elections. PX36 at 23-25 (Collingwood Report). He performed this analysis on the entire Demonstration Area, not a single demonstration district, because that is the complete area "where a performing Black district can be drawn." *Id.* at 24. The Demonstration Area includes Bertie, Chowan, Gates, Halifax, Hertford, Martin, Northampton, Pasquotank, Tyrrell, Vance, Warren, and Washington Counties—the counties concentrated in and around the Black Belt that were in the Demonstration Districts. *Id.*

128.     Dr. Collingwood's BVAP Analysis used data from the 2020, 2022, and 2024 elections because "more recent elections are better predictors of future performance." *Id.*; *see* PX279 (Collingwood Suppl. Rep.) His "method first calculates how white and Black voters vote in a given election using ecological inference," then estimates using turnout figures for each election how a particular BVAP or white VAP level would correspond to the actual composition of the electorate. PX36 at 24 (Collingwood Report). That process permits fixing the BVAP at a certain

percentage, via simulation, and estimating what the corresponding Black composition of the electorate will be at that BVAP level (i.e., how many Black people would actually vote). *Id.* Dr. Collingwood excluded the non-Black, non-white population from his analysis because that population is so small in the Demonstration Area that analyzing it has limited utility. *Id.*

129.    Finally, Dr. Collingwood simulated the electoral demographics across the BVAP range from 0-100. *Id.* Using his RPV estimates and his estimates of the actual White and Black composition of the electorate at any particular BVAP level, he then pinpointed the BVAP necessary for the Black-preferred candidate to narrowly win in the 42 contests that took place between 2020 and 2024. PX279 at 20 (Collingwood Suppl. Report). He displayed the results in a histogram distribution of the estimated BVAP "required in a particular contest for the Black-preferred candidate to win." PX36 at 24 (Collingwood Report). That histogram is depicted in Figure 9.1 of Dr. Collingwood's supplemental report and reproduced below. The mean of the distribution is a BVAP of 47.70%, which is "the best fit BVAP estimate that on average (i.e., not always) would enable Black-preferred candidates to achieve a narrow 50%+1 victory." PX279 at 20 (Collingwood Suppl. Report). He emphasized that the "47.7% estimate is not a guarantee of a victory for the Black-preferred candidate; rather it is a measure of a highly competitive district where the Black-preferred candidate has a good chance of either winning or losing, and would in fact lose many of the 42 elections." *Id.* Importantly, "several contests fall below the mean value of 47.7, whereas several fall above 47.7." *Id.* The median of the distribution was 47. *Id.* at 20 n.18.



*Figure 9.1: BVAP threshold analysis, All 2020-2024 contests.*

*Id.* at 21.

130.    Dr. Alford's initial report in this case, LD59, did not dispute Dr. Collingwood's initial conclusion based on 2020 and 2022 election data that, on average, a BVAP of 47.07% is necessary to elect a Black-preferred state Senator in northeastern North Carolina. Dr. Alford's report did not criticize the method Dr. Collingwood employed to conduct his BVAP analysis. *See* LD59 at 15-18 (Alford Report). Dr. Alford did not challenge Dr. Collingwood's decision to conduct the BVAP Analysis using the Demonstration Area, rather than a particular district, agreed with Dr. Collingwood's decision to use data from the most recent elections, and did not dispute the numerical results in Dr. Collingwood's analysis. Tr. Day 4 111:21-25, 113:7-20 (Alford).

131.     Dr. Alford's own report did not purport to identify a BVAP threshold at which an increase in BVAP within a possible district would produce a victory for a Black preferred candidate. LD59 at 15-18 (Alford Report); Tr. Day 4 115:11-17 (Alford). Although Dr. Alford included scatterplots showing how particular precincts with particular BVAP levels performed in two particular elections, LD59 at 16, he conceded that it would be "incorrect to extrapolate from these charts that a Senate district composed of some of the precincts in these charts could elect a black preferred candidate at a particular BVAP percentage simply because an individual precinct does so at the same BVAP percentage." Tr. Day 4 115:4-10 (Alford). He likewise agreed that it would not be "possible to draw a reliable conclusion about the precise BVAP percentage at which a district in northeastern North Carolina could be expected to elect a black preferred candidate on the basis of" the figures in his report. *Id.* at 115:11-17.

132.     Dr. Alford also offered at trial several opinions that were absent from his expert report, and which the court accordingly gives no weight. First, Dr. Alford criticized Dr. Collingwood's decision to use the mean of the election results, rather than some unspecified other number, in his BVAP Analysis. Tr. Day 4 113:20-115:1 (Alford) ("I don't think the mean is the right value to use."). That opinion was entirely absent from his expert report, which was his designated opportunity to rebut Dr. Collingwood's analysis, and he provided no explanation for it beyond his own say so at trial.  Notably, when Dr. Alford finally purported to perform his own version of Dr. Collingwood's BVAP analysis—which this Court excludes for the reasons in Plaintiffs' brief objecting to that analysis—he himself, without explanation, reports and relies upon the "average," that is, the mean, of the 2024 elections, LD76 at 16—which he had previously testified was not the "right value to use," Tr. Day 4 113:20-115:1 (Alford). These shifting opinions reflect that Dr.

Alford's undisclosed criticisms of Dr. Collingwood were unsupported, noncredible, and opportunistic.

133.    Second, Dr. Alford testified that Dr. Collingwood's BVAP threshold estimate was "conservative" because it was "based on the Demonstration area." Tr. Day 4 52:5-53:3 (Alford). That opinion was equally missing from his expert report. Tr. Day 4 111:7-25 (Dr. Alford confirming that he "didn't offer any opinion in [his] report criticizing Dr. Collingwood's decision to conduct his analysis of the BVAP needed to elect a Black-preferred candidate in this case by analyzing [the] counties" in the Demonstration Area). This opinion too is contrary to Dr. Alford's (excluded) supplemental rebuttal report, which reports virtually identical BVAP estimates for SD1, SD2, and the Demonstration Area. LD76 at 16 (Alford Suppl. Rebuttal Report). The court declines to credit this portion of Dr. Alford's trial testimony.

134.    Third, Dr. Alford appeared to speculate that a district could begin to perform for Black voters at a BVAP of approximately 40%, based on crossover rates in SD1 and SD2. Tr. Day 4 116:10-120:4 (Alford). That opinion was likewise omitted from Dr. Alford's expert report which, as noted, Dr. Alford testified did not provide any basis from which to "extrapolate" the BVAP needed for a district in the region to perform. *Id.* at 115:4-10. And Dr. Alford's speculation is also verifiably wrong: The Black-preferred candidate lost by over five percentage points (47.47% to 52.53%) in the actual Senate election in SD3 in 2022, a 42.33% BVAP district made up of counties in enacted SD1 and SD2. D.E. 105 at 17; PX280 (Collingwood Suppl. Rebuttal Rep.) at 10.  Because Black turnout is so low, PX 280 at 10, the BVAP would have needed to be substantially higher than 42.33% for the Black-preferred candidate to win that election, *id.*  Increasing the BVAP by 2.5% to around 45% BVAP, for example, would not result in performance—even assuming 100% of the Black voters voted for the Black-preferred candidate—because only around 38% of

the Black voting age population actually voted in 2022 in this region. *Id.* The Court does not credit speculative testimony at odds with the actual election results in this area.

135. Fourth, Dr. Alford testified that Dr. Collingwood's BVAP analysis was "unusual"—an opinion that appeared nowhere in his expert report, LD59, and is inconsistent with his subsequent supplemental rebuttal report.

136. The court does not credit any of these undisclosed and unsupported opinions.

### 2. Dr. Alford's BVAP Analysis

137. Dr. Alford offered a BVAP threshold opinion of his own for the first time in his supplemental rebuttal report. The Court excludes that analysis as improper supplemental and rebuttal evidence for reasons explained in separate briefing. The analysis nevertheless bears discussing here because Dr. Alford's BVAP opinion contradicts his prior testimony and is deeply flawed, severely undermining his reliability throughout this case.[3]

138. Dr. Alford's supplemental rebuttal report contains an entirely new BVAP analysis that Dr. Alford performed for the first time after the initial exchange of expert disclosures, expert depositions, and trial in this case, depriving the Plaintiffs of any opportunity to probe or submit expert reports responding to the new opinion. Dr. Alford did not indicate that he had ever performed any similar analysis before or that he has any expertise in performing this sort of analysis. The analysis directly contradicts Dr. Alford's trial testimony, and produces results that are noncredible on their face. That undermines Dr. Alford's credibility wholesale, and deprives the analysis of any probative value. The Court would not credit the analysis even if it were admitted.

---

[3] By discussing Dr. Alford's report in the proposed findings of fact and conclusions of law, Plaintiffs do not waive their objections to the admission of Dr. Alford's improper supplemental report, on which the Court has yet to rule.

139.    The BVAP opinions in Dr. Alford's supplemental rebuttal report represent a 180 degree turn from his opinions at trial, undermining the credibility of the results themselves and of Dr. Alford's testimony more broadly. At trial, Dr. Alford testified clearly that Dr. Collingwood's ecological inference "analysis in this case is extremely competent and so I'm confident to rely on it," and affirmed that Dr. Collingwood "*uses the correct methodology*" for ascertaining EI esti-mates, which was why he was "relying on his findings." Tr. Day 4 73:4-74:1 (emphasis added) (Alford). But in his supplemental rebuttal report, Dr. Alford argues that Dr. Collingwood used an "older version of the EI technique" rather than the purportedly "preferable" "non-iterative" version Dr. Alford claims to use. LD76 at 2-3 (Alford Suppl. Rebuttal Report). That is directly contrary to his prior testimony that Dr. Collingwood used the "correct methodology," Tr. Day 4 73:4-10 (Alford); Dr. Collingwood's methodology did not change at any point in this litigation, PX280 at 5 (Collingwood Suppl. Rebuttal Report). Dr. Alford nevertheless cites nothing beyond his own ipse dixit for the proposition that his EI technique is "preferable," and he has done nothing to substantiate that claim. *See* LD76 at 3 (Alford Suppl. Rebuttal Report). Dr. Alford's contradictory explanations undermine his own reliability in this case—not Dr. Collingwood's.

140.    The EI estimates Dr. Alford produces in his supplemental rebuttal report are also self-contradictory, varying in inexplicable ways that benefit his client and further undermine his credibility. The BVAP analysis in Dr. Alford's supplemental rebuttal report uses EI point estimates that are inconsistent with the EI estimates he produced in his original supplemental report. *Compare* LD75 at 5 with LD76 at 14. Without any explanation, all the Black cohesion estimates change (and generally go up). For example, Dr. Alford originally estimated that 95.8% of Black voters in SD1 voted for Jeff Jackson for AG in 2024. LD75 at 5. That's the number he uses to report racially polarized voting, in a circumstance where it benefits his client to report a lower number. But for

purposes of his BVAP threshold analysis, Dr. Alford apparently conducted a *new* analysis of Black cohesion that resulted in higher numbers—for example, 96.8% Black support for Jeff Jackson in SD1. LD76 at 14. And, without acknowledging the difference, he uses that higher number in a circumstance where it benefits his client to use the higher number—because Dr. Alford is opining in his BVAP analysis that districts in this area will perform at lower BVAP percentages, which would be true if Black voters are more cohesive for Black-preferred candidates. Overall, for example, Dr. Alford finds that nearly 97% of Black voters supported the Black-preferred candidate in 2024 elections in SD1 for purposes of his BVAP analysis, LD76 at 14, but that closer to 95% of Black voters did so in SD1 for purposes of his general racially polarized voting results, LD75 at 5. Dr. Alford's decision to use different EI estimates for black voters for different parts of his analysis undermines his credibility.

141.    More than that, Dr. Alford's alternative set of EI estimates are consistent with Dr. Collingwood's estimates, notwithstanding his last-minute attempt to suggest that Dr. Collingwood's estimates use a method that is not "preferable." For example, Dr. Alford's new EI analysis in the supplemental rebuttal report shows 98.5% Black support for Black preferred candidates in white v. white contests in 2024—a number indistinguishable from Dr. Collingwood's. LD76 at 14. Dr. Alford's other results show the same trend—when he redid his analysis, his Black cohesion numbers looked much more like Dr. Collingwood's. LD76 at 14. (He did not redo his analysis of White cross-over voting). It is troubling that Dr. Alford would file a report implying that Dr. Collingwood's estimates overstate cohesion, LDX76, when he himself conducted an RPV analysis that produced numbers that were indistinguishable from Dr. Collingwood's. That further undermines Dr. Alford's credibility.

142.    Notably, Dr. Alford reports extremely large confidence intervals for his EI estimates in 2024 (and did not report those numbers at all in prior years).  His average confidence intervals were more than 3 to 4 percentage points in the Demonstration Area, SD1, and SD2, compared to around 1.3 to 1.4 percentage points for Dr. Collingwood's estimates.  PX280 at 3 (Collingwood Suppl. Rebuttal Report).  These further undermine any analysis based on Dr. Alford's EI estimates, such as his new BVAP analysis.

143.    Dr. Alford attempted to buttress his opinion by claiming that it was "roughly comparable" to a New York Times exit poll for 2024 estimating Black and White support for candidates.  LD76 at 3.  That poll did not exist, and the court excludes Dr. Alford's attempt to replace it with other polls from other sources. *See* D.E. 123. Not only does this error itself undermine Dr. Alford's testimony, so does his attempt to rely on exit polls at all at this late stage in a post-trial supplemental rebuttal report. Exit polls are notoriously unreliable, and Dr. Alford has not offered any opinion to the contrary.  *See, e.g.*, Molly Ball, *Donald Trump Didn't Really Win 52% of White Women in 2016*, Time Magazine (Oct 18. 2018), https://time.com/5422644/trump-white-women-2016/ ("Ironically, the thing the exits are worst for—determining the demographic breakdown of the electorate—is the thing they're most often cited to illustrate.").  Instead, Dr. Alford has in prior testimony rejected the reliability of a Fox News exit poll, one of the precise sources he cited here.  *See* Transcript of Testimony of John Alford, *Rivera v. Schwab*, No. 2022-cv-89 (Wyandotte Cty. Dist Ct.), at 51:22-52:3 ("Q: Well, we do have this Fox exit poll.  Doesn't that tell us about racially polarizing voting? A: If you could demonstrate in a court on the issue as serious as whether or not voters in Kansas are racially polarized, if you could demonstrate that with a Fox news report, then

82

I wouldn't have a job, frankly, as a consultant."); D.E. 123-1 n.3.[4]  That undermines Dr. Alford's credibility further still.

144.    Even taking Dr. Alford's BVAP estimates on their own terms, they still contradict his trial testimony. He testified at trial that he would expect that, "in SD1 and SD 2, you know that with that [20%] crossover, a district around 40 percent Black will start to perform."  Tr. Day 4 117:5-8. By contrast, he testified that a district composed of the Demonstration Area would perform at around "47 percent mathematically," because crossover voting is "about 10 percent."  Tr. Day 4 117:9-15.  He repeatedly testified that a district in the Demonstration Area would need 47% to perform based on the crossover level, in contrast to a district drawn using the crossover level in SD1 and SD2 (which "will perform at 40 percent").  *See* Tr. Day 4. 118:2-9.  He also reiterated in his original supplemental report that the BVAP needed to elect a Black preferred candidate in SD1 and SD2 "will very likely fall well below" the BVAP based on the "Demonstration Area results." LD75 at 4.  But his supplemental rebuttal analysis of the BVAP needed for a Democrat to win by 50%+1 showed that the BVAP needed to win in the Demonstration Area would be materially indistinguishable from the BVAP needed to win in SD1 and SD2 (42% vs. 41%), LD76 at 16, especially given the large confidence intervals around Dr. Alford's black and white voter support estimates, *supra*, which are incorporated into this analysis. These results make no sense based on Dr. Alford's own testimony and further undermine his credibility.

145.    Dr. Alford's BVAP results are also plainly flawed, lacking any credibility on their face. Most obviously, Dr. Alford's results are demonstrably wrong.  For example, Dr. Alford reports in Table 1 of his supplemental report that Jeff Jackson gets 93.7% of the Black vote statewide. LD75 Tbl. 1.  But he reports in Table 5 of his supplemental rebuttal report—where he reports the

_____

[4] https://www.aclukansas.org/sites/default/files/field_documents/day_4_vol_1.pdf

numbers that he uses for his BVAP analysis—that Jeff Jackson gets 98.2% of the Black vote statewide. LD76 Tbl. 5. Although Plaintiffs have not had the opportunity to respond to Dr. Alford's new BVAP analysis—which is why that analysis is excluded—the Court also finds that these differences call into question the accuracy of his results.

146. Dr. Alford's estimates are also inconsistent with the record. He estimates that a district in the Demonstration Area would perform at 41%. LD76 at 16. But we know that the Black-preferred candidate lost by over five percentage points (47.47% to 52.53%) in the actual Senate election in SD3 in 2022—a 42.33% BVAP district made up of counties in enacted SD1 and SD2. D.E. 105 at 17; PX280 (Collingwood Suppl. Rebuttal Rep.) at 10. This is further evidence that Dr. Alford's calculations are flawed and incorrect, especially in light of the fact that no expert has had any opportunity to examine his code or his data inputs.

147. Dr. Alford's approach would not make sense even if his numbers were accurate. Dr. Alford purports to estimate the BVAP percentage at which "SD1" and "SD2" would elect a Black-preferred candidate with 50%+1 of the vote. LD76 at 16. SD1 and SD2 have a fixed BVAP of around 30%. Using the white crossover figures he calculated for SD1 and SD2, Dr. Alford estimates that those districts would elect a Black-preferred candidate, on average, with a BVAP of 41%. LD76 at 16. But that analysis improperly assumes that White cross-over numbers would *stay the same* in a version of SD1 and SD2 that included more Black people—an assumption that is again demonstrably false. *See* PX280 at 10-12 (Collingwood Suppl. Rebuttal Rep.). Dr. Collingwood comprehensively rebutted that assumption by comparing White cross-over voting in each county in SD1 and SD2 to the BVAP in those counties, establishing that White cross-over voting in this region consistently decreases in counties with more Black people. *Id.* He explained that, "to increase the BVAP of [a version of SD1 or SD2] even to around 42% (like in SD3 in

2022), you would need to exclude the southern counties with relatively high cross-over voting."
PX280 at 12. For example, as a geographical matter, it would not be possible to increase the
BVAP of District 1 to 40% without excluding Dare County, which is the most populous county in
the District and has a BVAP of 3.23%. PX280 at 12. But Dare also has white cross-over voting
at 37.3%--so if it were taken out of District 1, white-cross over voting in District 1 would decrease
significantly.

148. Dr. Alford made another methodological error by excluding votes for third-party
candidates from his analysis. This issue is irrelevant for purposes of Gingles III analysis, because
Dr. Alford is relying on Dr. Collingwood's EI estimates. But Dr. Alford relies on his own EI
estimates for purposes of his BVAP analysis. And without explanation, Dr. Alford's drops all
third-party candidates from consideration, retabulates his white and black support percentages us-
ing only the votes for the Democrats and Republicans as the denominator, and thus attributes white
votes that went to third party candidates as votes for the Black-preferred candidates. *See* PX280
at 4-6 (Collingwood Suppl. Rebuttal Report). The consequence of this approach is to improperly
increase all of Dr. Alford's white cross-over estimates in cases where the third party received a
substantial portion of the vote, as happened in numerous elections in 2024. *Id.* For example, Dr.
Alford estimates that in 2024 white voters gave 44% of their vote to Stein and 56% of their vote
to Robinson statewide, LD75 at 5 (Alford Suppl. Report)—numbers that are obviously incorrect
in light of the fact that third party candidates got over 5% of the vote statewide, NC Board of
Elections, *11/05/2024 Official General Election Results – Statewide*, https://er.ncsbe.gov/?elec-
tion_dt=11/05/2024&county_id=0&office=COS&contest=0. Those votes were disproportion-
ately likely to come from white voters. PX280 at 5 (Collingwood Suppl. Rebuttal Report). This
issue is equally present in Dr. Alford's new EI estimates in his supplemental rebuttal report—he

concludes that no non-Black voters voted for third party candidates in any race, *see* LD76 at 14—which means that all of Dr. Alford's cross-over estimates for non-black voters are too high and all of his BVAP threshold estimates are biased downwards.

149.    Dr. Collingwood, by contrast, does not improperly attribute votes for third party candidates to the Black-preferred or white-preferred candidates. *See, e.g.*, PX279 Figure 11.1 (Collingwood Suppl. Report) (estimating that white voters gave 55.7% of their vote to Robinson and 37.5% of their vote to Stein statewide, which is consistent with the fact that White voters voted for third party candidates in significant numbers, PX280 at 5 (Collingwood Suppl. Rebuttal Report)).

150.    Dr. Alford did not even follow the approach he claimed to model his BVAP analysis after. Dr. Alford states, without justification, that he "follow[ed] the procedure utilized by Dr. Lisa Handley in … a published article." LD76 at 12. He did not. First, the article he cites says that three "factors *must* be considered": relative turnout figures; "the degree to which minority and white voters support minority-preferred candidates"; and the "multi-stage electoral process," which the article says requires incorporation of "primaries, runoffs and general elections into the model." Bernard Grofman, Lisa Handley, David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1403-04 (2001) (emphasis added). But Dr. Alford does not consider the third factor at all. Second, Dr. Handley considers at least four election cycles, *id.* at 1408 Tbl. 5, while Dr. Alford only considers one (2024). Dr. Alford also points to an expert report from Dr. Handley, but it is not in evidence, is not something that he opines an expert would rely on, and the one-sentence unexplained excerpt he offers does not remotely suggest that she "considers black and non-black voting behavior" in the way Dr. Alford does.

151.    Finally, the Court disregards Dr. Alford's new criticism of Dr. Collingwood's BVAP analysis because that criticism is inconsistent with Dr. Alford's deposition testimony.  Dr. Collingwood disclosed and explained in his opening report that he was focusing on white cross-over voting because the non-Black minority populations were so small in the relevant regions that conducting an EI analysis incorporating those populations was of limited utility.  PX36 at 24.  At deposition, Dr. Alford was asked: "You haven't offered any criticism of the method that Dr. Collingwood used to reach the conclusion that 47.07 percent is the BVAP percentage where these counties would on average elect a black preferred candidate, correct?"  And Dr. Alford answered: "I think it's a little abstract, but I'm not criticizing. *I don't think he did it incorrectly*." Dep. 207:1-9.  Dr. Alford is not permitted to change his testimony at this late stage when Dr. Collingwood has no opportunity to respond.  Fed. R. Civ. P. 26(e)(2).

## VI.    Totality of the Circumstances: The 2023 enacted map denies Black North Carolinians equal access to the process of electing state Senators

152.    Plaintiffs presented evidence regarding each relevant Senate factor through an expert witness, Dr. Traci Burch, and their lay witnesses. Defendants rebutted Dr. Burch's evidence through the testimony of Dr. Donald Critchlow and Dr. Andrew Taylor.

153.    Dr. Burch is a Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation. Tr. Day 3 AM 105:17-24 (Burch). She holds a Bachelor's Degree in Politics from Princeton University and a Ph.D. in Government and Social Policy from Harvard University. *Id.* at 105:7-16 (Burch). Dr. Burch has "led several large, long-term quantitative and qualitative research projects on political participation in the United States," has "participated in and coauthored several book chapters and articles that examine race, political participation, and inequality," and is "widely regarded as an expert on political behavior, barriers to voting, and political participation." PX21 at 1 (Burch Report). Her "work has been widely cited

and replicated and has won several awards," and she is routinely enlisted as a peer reviewer for "tenure, scholarly journals, university presses, and grants," and has served as a reviewer for the American Political Science Review, The American Journal of Political Science, Cambridge University Press, and many others. *Id.* She has conducted numerous studies on demographics, political participation, and voter turnout, and has published several articles and a book that rely on North Carolina demographic data. Tr. Day 3 AM 107:24-108:22 (Burch). She has testified as an expert witness in 11 prior cases, including at least six times as an expert on Senate factors in VRA Section 2 cases, and has been accepted as an expert witness every time. Tr. Day 3 AM 108:23-109:14 (Burch). The court accepted Dr. Burch as an expert in race, inequality, political behavior, political participation, and barriers to voting, and finds that she is highly qualified in each of those areas and that her testimony was credible and entitled to great weight. *Id.* at 109:25-110:3 (Burch).

**A. Senate Factor One: North Carolina's history of voting-related discrimination**

154. North Carolina has an extensive history of state-sanctioned racial discrimination against Black people in elections. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (discussing North Carolina's "shameful history of past discrimination" in voting (citation and quotation marks omitted)).

155. Black people had no right to vote in North Carolina until the adoption of the North Carolina Constitution of 1868 and the ratification of the Fourteenth and Fifteenth Amendments in 1870. *See* Tr. Day 1 8:8-22 (Butterfield). Those developments conferred the right to vote on Black men and were implemented alongside a new congressional district, Congressional District 2, that covered most of the majority-Black counties in northeastern North Carolina. *Id.* at 8:13-22. "African American men registered in very large numbers" and were able to exert substantial influence over electoral outcomes, particularly in the Black Belt counties where Black voters outnumbered white voters. *Id.* at 9:1-9. That drove a brief period of political success for Black North Carolinians,

during which four Black candidates were elected to Congress. *Id.* at 8:23-25. The era was characterized in particular by "fusion voting" in the 1890's, when Black and white Republicans, particularly white farmers, began to vote together and elect African American officials. *Id.* at 8:13-10:1.

156.    Black voters' ability to participate in the political process was effectively eliminated in 1900 when North Carolina amended its constitution to add a literacy test and poll tax. The amendment required that "Every person presenting himself for registration shall be able to read and write any section of the constitution in the English language; and before he shall be entitled to vote he shall have paid on or before the first day of May, of the year in which he proposes to vote, his poll tax for the previous year, as prescribed by Article V, Section 1, of the constitution." N.C. Const. of 1868, as amended by the Convention of 1875, and as further amended at the elections of 2 August 1900. A grandfather clause exempted from those restrictions anyone who was a lineal descendant of someone eligible to vote prior to January 1, 1867—that is, before the adoption of the North Carolina Constitution of 1868 and ratification of the Fourteenth and Fifteenth Amendments conferred the right to vote on Black men. *Id.* These provisions spelled the end of Black political participation in North Carolina for some time, and no Black person was elected to Congress for over 90 years until the election of Representative Eva Clayton in 1992. Tr. Day 1 9:19-10:1, 22:16-18 (Butterfield). Although no longer operable under federal law, North Carolina's literacy test remains on the books in Article VI, Section 4 of the North Carolina Constitution.

157.    As a "direct consequence of the poll tax and the literacy test, black citizens in much larger percentages of their total numbers than the comparable percentages of white citizens were either directly denied registration or chilled from making the attempt from the time of imposition of these devices until their removal. After their removal as direct barriers to registration, their chilling effect on two or more generations of black citizens has persisted to the present as at least

one cause of continued relatively depressed levels of black voter registration. Between 1930 and 1948 the percentage of black citizens who successfully sought to register under the poll tax and literacy tests increased from zero to 15%. During this eighteen-year period that only ended after World War II, no black was elected to public office in the state. In 1960, twelve years later, after the Supreme Court decision in *Brown v. Board of Education*[] only 39.1% of the black voting age population was registered to vote, compared to 92.1% of age-qualified whites. By 1971, following the civil rights movement, 44.4% of age-qualified blacks were registered compared to 60.6% of whites. This general range of statewide disparity continued into 1980, when 51.3% of age-qualified blacks and 70.1% of whites were registered, and into 1982 when 52.7% of age-qualified blacks and 66.7% of whites were registered." *Gingles v. Edmisten*, 590 F. Supp. 345, 360 (E.D.N.C. 1984) ("*Edmisten*"), *aff'd in relevant part Thornburg v. Gingles*, 478 U.S. 30 (1986). The Supreme Court affirmed these findings in *Gingles*, 478 U.S. at 38-39, 80.

158.    "Other official voting mechanisms designed to minimize or cancel the potential voting strength of black citizens were also employed by the state during this period. In 1955, an anti-single shot voting law applicable to specified municipalities and counties was enacted. It was enforced, with the intended effect of fragmenting a black minority's total vote between two or more candidates in a multi-seat election and preventing its concentration on one candidate, until declared unconstitutional in 1972 in *Dunston v. Scott*, 336 F. Supp. 206 (E.D.N.C.1972). In 1967, a numbered-seat plan for election in multi-member legislative districts was enacted. Its effect was, as intended, to prevent single-shot voting in multi-member legislative districts. It was applied until declared unconstitutional in the *Dunston* case, *supra,* in 1972." *Edmisten*, 590 F. Supp. at 360; *see Gingles*, 478 U.S. at 38-39, 80.

159. Similar discriminatory laws and practices targeted northeastern North Carolina specifically. A challenge to an anti-single-shot system like the one ultimately invalidated in *Dunston* was first filed, unsuccessfully, in Halifax County in *Walker v. Moss*, 97 S.E.2d 836 (N.C. 1957). Tr. Day 1 45:6-17 (Pierce). An early, unsuccessful challenge to the later invalidated literacy test was filed in Northampton County in *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45 (1959). The at-large County Commissioner scheme in Halifax County was invalidated under VRA Section 2 in 1984 in *Johnson v. Halifax County*, 594 F. Supp. 161, 163 (E.D.N.C. 1984). *See* Tr. Day 1 10:22-12:3 (Butterfield). The at-large system in Wilson County was replaced with single-member districts in 1986 thanks to a consent decree in *Haskins v. Wilson County*, 82-cv-19 (E.D.N.C.)*.* Tr. Day 1 12:4-13:19 (Butterfield).

160. Then, in 1986, the U.S. Supreme Court held that North Carolina's "legacy of official discrimination" had "acted in concert" with the use of multimember state legislative districts "to impair the ability of . . . cohesive groups of black voters to participate equally in the political process and to elect candidates of their choice." *Gingles*, 478 U.S. at 80. Due to this history of discrimination, 40 of the State's counties were subject to preclearance requirements pursuant to Section 5 of the Voting Rights Act until the preclearance regime was invalidated by the Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013). *See McCrory*, 831 F.3d at 215. The "Department of Justice issued over fifty objection letters to proposed election law changes in North Carolina" between 1980 and 2013 "because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *Id.* at 224. "During the same period, private plaintiffs brought fifty-five successful cases under § 2 of the Voting Rights Act." *Id.* In some cases,

"the Department of Justice or federal courts . . . determined that the North Carolina General Assembly acted with discriminatory intent, revealing a series of official actions taken for invidious purposes." *Id.* at 223 (cleaned up) (citation omitted).

161.    More recently, the General Assembly has enacted maps that dilute the votes of Black voters. During the 1990's cycle, the first post-*Gingles*, the Department of Justice rejected the State's congressional plan under Section 5's preclearance regime. The map failed to create a "second majority-minority district" in the southeastern part of the state "to give effect to black and Native American voting strength in this area by using boundary lines no more irregular than those found elsewhere in the proposed plan, but failed to do so for pretextual reasons." *Shaw v. Reno*, 509 U.S. 630, 635 (1993) (cleaned up). The State acquiesced to the objection but then "enacted a revised redistricting plan that included a second majority-black district" in a *different* "part of the State." *Id.* (citations omitted). The Supreme Court later invalidated that plan on different grounds, leaving Black voters throughout the decade without the "second majority-minority district in the south-central to southeastern part of the State" that "the Attorney General [had] suggested" and without an additional majority-minority district anywhere else. *Id.* at 657-58; *see Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (invalidating CD12 and explaining that it did not remedy the "injuries suffered by . . . persons" in "south-central to southeastern North Carolina" where "the Justice Department[] suggested" a geographically compact majority-minority district could be drawn).

162.    The congressional and state legislative maps enacted by the General Assembly following the 2010 census were all struck down by the courts as racially discriminatory. In *Cooper v. Harris*, a three-judge panel found, and the Supreme Court affirmed, that North Carolina had intentionally packed Black voters into two congressional districts for "no good reason to reshuf-

fle voters because of their race." 581 U.S. 285, 322-23 (2017). The same year in *Covington*, another three-judge panel found, and the Supreme Court affirmed, that the State had intentionally gerrymandered "twenty-eight challenged districts in North Carolina's 2011 State House and Senate redistricting plans" on the basis of race, inflicting "severe constitutional harms" that imposed "substantial stigmatic and representational injuries" on Black voters in the racially gerrymandered districts. *Covington v. North Carolina*, 316 F.R.D. 117, 124, 176-77 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017) (*Covington I*). The General Assembly then adopted remedial maps that "preserved" key "features of the previously invalidated 2011 maps" in four districts. *North Carolina v. Covington*, 585 U.S. 969, 974 (2018) (*Covington II*). The Supreme Court invalidated these "inexplicably . . . unconstitutional" districts as impermissible racial gerrymanders for a second time. *Id.* at 974, 978. Before being invalidated and replaced by the courts, the discriminatory state legislative maps were used in three election cycles and the congressional map in two. Tr. Day 4 40:15-42-15 (Taylor).

163.    The State has also continued to engage in racially discriminatory election practices outside the redistricting context. In 2013, "literally within days of North Carolina's release from the preclearance requirements of the Voting Rights Act," North Carolina enacted an omnibus election law that targeted Black voters "with almost surgical precision." *McCrory*, 831 F.3d at 214, 223. The law imposed onerous photo identification requirements, reduced early voting, eliminated same-day voter registration and preregistration, and prohibited out-of-precinct voting. *Id.* at 219. The General Assembly passed the bill after it "requested and received a breakdown by race of DMV-issued ID ownership, absentee voting, early voting, same-day registration, and provisional voting (which includes out-of-precinct voting)." *Id.* at 230. "This data revealed that African Americans disproportionately used early voting, same-day registration, and out-of-precinct voting, and

disproportionately lacked DMV-issued ID," but did "*not* disproportionately use absentee voting." *Id.* The General Assembly relied on this data to "drastically restrict[] all of these other forms of access to the franchise, but exempted absentee voting from the photo ID requirement"—the only one of these restrictions that would have "disproportionately" effected "whites." *Id.*

164.     The Fourth Circuit invalidated the law, concluding that it was "one of the largest restrictions of the franchise in modern North Carolina history" and had been adopted "with discriminatory intent." *Id.* at 215, 242. The court of appeals acknowledged North Carolina's history of official discrimination in voting, including that "state officials continued in their efforts to restrict or dilute African American voting strength well after 1980 and up to the present day." *Id.* at 225. The Fourth Circuit also noted the sequence of events leading to the bill, including "the General Assembly's eagerness to, at the historic moment of *Shelby County*'s issuance, rush through the legislative process the most restrictive voting law North Carolina has ever seen since the era of Jim Crow." *Id.* at 229. The General Assembly's use of racial data to enact legislation that targeted voting practices used disproportionately by Black voters confirmed that race impermissibly motivated the bill. *Id.* at 216. The court could thus "only conclude that the North Carolina General Assembly enacted the challenged provisions of the law with discriminatory intent." *Id.* at 215.

165.     Courts have continued to find racial discrimination in North Carolina election regulations even during the pendency of this lawsuit. In April 2024, a district court invalidated a North Carolina law that imposed criminal penalties on residents who voted while on parole, probation, or post-release supervision for a felony conviction, even if the voter lacked knowledge they were ineligible to vote. *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 730 F. Supp. 3d 185, 203 (M.D.N.C. 2024). The statute was enacted in 1877 to "restore the 'purity of the ballot'

and discriminate 'against certain characteristics of the Black race,'" and "remained virtually un-changed" until 2023. *Id.* at 193 (cleaned up). At the time of the law's enactment, "it was commonly understood that 'nearly every man convicted of a felony was a negro.'" *Id.* (cleaned up). Over a century later, "[a]pproximately 22% of North Carolina's population is Black," but "from 2015 to 2022, approximately 63% of people investigated for violating the Challenged Statute were Black," and "56% of those referred for prosecution were Black." *Id.* North Carolina itself did "not contest that the historical background from the original enactments [were] indefensible" and did "not con-test that the law currently impacts African-Americans at a higher rate than it does other citizens." *Id.* at 194 (citation omitted). The court thus concluded that the law violated the Equal Protection Clause because it "was enacted with discriminatory intent, has not been cleansed of its discrimi-natory taint, and continues to disproportionately impact Black voters." *Id.* at 198.

166.    At trial, fact witnesses discussed the State's history of discrimination against Black people in elections. Congressman Butterfield himself represented the plaintiffs in *Johnson v. Hal-ifax County*, 594 F. Supp. 161 (E.D.N.C. 1984), *Haskins v. Wilson County*, 82-cv-19 (E.D.N.C.), and other voting rights cases across northeastern North Carolina. Tr. Day 1 10:20-14:6 (Butter-field). Senator Blue testified that he has been "involved in redistricting" in North Carolina since he "first got elected" and joined "the redistricting committee" in 1981, has been involved in redis-tricting nearly every cycle since, and endured the "cracking" and "packing" of Black voters fol-lowing the 2010 redistricting cycle. Tr. Day 1 69:17-70:3, 89:23:90-10 (Blue). He likewise de-scribed the General Assembly's voter ID requirements, ultimately invalidated in *McCrory*, as "anathema . . . to Black participation in voting." *Id.* at 88:2-17.

167.    Representative Pierce testified that he became a plaintiff in this case because of North Carolina's history of racial discrimination, documented in cases like *Johnson*, *Alston*, and

*Walker*, which for him is "local history," not history "that happened hundreds [or] thousands of miles away." Tr. Day 1 44:24-45:17 (Pierce). He explained that seeing his state's "voting rights bill[s]" struck down" as "target[ing] Black voters with surgical precision . . . really makes you raise your eyebrows as an African American voter, particularly one in a county with a history of the suppression of voting rights as Halifax is. We were one of those preclearance counties under Section 5 of the VRA." *Id.* at 52:18-53:4.

168.    Dr. Burch confirmed North Carolina's recent history of racial discrimination against Black voters. In 2016, "North Carolina's 2013 election law known as H.B. 589 was struck down for intentionally targeting African Americans 'with almost surgical precision.' Also in 2016, over two dozen state legislative districts enacted by the legislature were struck down as racial gerrymandering to dilute the voting power of African American voters. Several of the remedial state legislative districts enacted by the legislature in response to this court ruling were struck down as once again racially gerrymandered to dilute the voting power of African Americans. Also in 2016, two North Carolina congressional districts enacted by the legislature were struck down for diluting the voting power of African American voters." PX117 at 23-24 (Burch Rebuttal Report) (citations omitted).

169.    Defendants' expert Dr. Taylor agreed that "[h]istorically there has been discrimi-nation against Black North Carolinians in voting specifically." Tr. Day 4 247:2-5 (Taylor). Prior to the Reconstruction Amendments, "Black people in North Carolina couldn't vote at all by law." *Id.* at 247:6-9. After "Black people gained the right to vote, [] in the late 19th century there was a violent backlash against Black North Carolinians gaining political power through elections." *Id.* at 247:10-14. In "the 20th century, there was official legal discrimination in North Carolina against Black people in voting, which included both poll tax[es] . . . and literacy tests with grandfather

clauses." *Id.* at 247:15-19. Although that literacy test is now unenforceable, it "has never been repealed by the General Assembly and is still on the books." *Id.* at 247:20-25. Dr. Taylor also corroborated the testimony of Dr. Burch and others that addressed more recent history, explaining that "the voter ID and general election law enacted by the General Assembly in 2013 was struck down by the courts for targeting African Americans with almost surgical precision." *Id.* at 248:1-6. "The congressional plan" and portions of the state House and Senate plans "enacted by the General Assembly in 2011 [were likewise] struck down by the court because [they were] racial gerrymander[s] that diluted the voting strength of Black voters in this state." *Id.* at 248:7-24.

## B. Senate Factor Two: The extent of racially polarized voting in northeastern North Carolina

170.    As discussed above, voting in northeastern North Carolina is extremely racially polarized, including in SD1 and SD2 in the 2023 enacted map and in the Demonstration Area. *See supra* PFOF §§ III-IV. Even Defendants' RPV expert Dr. Alford testified that Black voters in the Black Belt counties are "extremely politically cohesive," Tr. Day 4 78:4-79:2 (Alford), and that "white voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate district one and Senate District two," Tr. Day 4 81:25-82:4 (Alford).

171.    As detailed, voting in northeastern North Carolina is starkly polarized along racial lines. Dr. Collingwood showed that in North Carolina as a whole, Black voters consistently back the same candidates at a rate of 97.5%, while white voters consistently oppose the Black-preferred candidate by a rate of over 70%. PX279 at 4 (Collingwood Suppl. Report). Voting is even more racially polarized in SD1 and SD2. Black voters in SD1 back the same candidates at a rate of 97.25%, while Black voters in SD2 back the same candidates at a rate of 98.7%. *Id.* at 7, 10. Meanwhile, approximately 80% or more of white voters in those districts typically oppose the Black-preferred candidate. Voting is still more polarized in the Demonstration Area, where Black

voters back the same candidate 98.55% of the time and white voters support the Black-preferred candidate at an average rate of 15.1% of the time. *Id.* at 12. The polarization across all three geographies has only grown starker in recent years. *Id.* at 8, 10, 13.

172.    Dr. Collingwood thus concluded that the "Enacted State Senate Districts 1 and 2 in the 2023-enacted State Senate plan will not perform for Black voters." PX36 at 2 (Collingwood Report). In the five election cycles he examined, "White bloc voting successfully blocked the Black-preferred candidate in Senate District 1 in either 57 of 65 (88%) or 59 of 65 (91%) races depending how the 2018 races discussed in [his] May report are considered, and in Senate District 2 in 57 of 65 (88%) or 59 of 65 (91%) races. Over the three most recent, and more probative, election cycles, White bloc voting successfully blocked the Black-preferred candidate in Senate District 1 in 43 of 43 races (100%) and in Senate District 2 in 42 of 43 races (98%). Every Black-preferred Black candidate lost in these 43 races; the only Black-preferred candidate who was able to prevail across those 43 races was White, and prevailed over an opponent who was Black." PX279 at 2 (Collingwood Suppl. Report). The court continues to credit Dr. Collingwood's testimony showing that voting in the Black Belt region is extremely racially polarized.

### C. Senate Factor Three: North Carolina's voting practices enhance the opportunity for discrimination

173.    The court has already explained, and it is well-documented, that North Carolina has a "shameful history of past discrimination" in voting. *McCrory*, 831 F.3d at 223 (citation and quotation marks omitted). That history is ongoing.

174.    During the last redistricting cycle alone, the U.S. Supreme Court was forced to invalidate North Carolina's redistricting plans in three separate cases as intentional racial gerrymanders against Black people. *See supra* PFOF § VI.A. Those maps were nevertheless used in multiple election cycles before the Supreme Court finally enjoined them. *See supra* PFOF § VI.A. That

same decade, the General Assembly passed an omnibus election reform bill that the Fourth Circuit ultimately invalidated because it targeted Black voters "with almost surgical precision," was "one of the largest restrictions of the franchise in modern North Carolina history," and was adopted "with discriminatory intent." *McCrory*, 831 F.3d at 215, 223, 242 (citation and quotation marks omitted). Courts have continued to find racial discrimination in North Carolina election regulations even during the pendency of this lawsuit. *See supra* PFOF § VI.A.

175.    North Carolina continues to employ a number of practices that enhance the opportunity for discrimination. After the Fourth Circuit invalidated the State's voter identification law in 2016, it adopted a new requirement, this time via constitutional amendment and implementing legislation, requiring "that every voter present a qualifying photo ID before casting a ballot." *N.C. State Conf. of NAACP v. Hirsch*, 720 F. Supp. 3d 406, 414-15 (M.D.N.C. 2024). That law is the subject of ongoing litigation, but whether or not the constitutional amendment is an "intervening circumstance that breaks the link between North Carolina's history of discrimination with a prior photo ID law and the present photo ID law," it remains the case that 10.6% of Black voters in North Carolina lack DMV-issued identifications compared to 6.5% of white voters, meaning the law disproportionately denies the opportunity to participate in the political process to Black voters. *Id.* at 418, 424 (cleaned up). Senator Blue thus testified that "voter ID laws impede" the "equal access to the right to vote . . . of Black citizens." Tr. Day 1 87:21-88:1 (Blue).

176.    North Carolina's Constitution "denies individuals with felony convictions the right to vote unless their citizenship rights are restored." *Cmty. Success Initiative v. Moore*, 886 S.E.2d 16, 23 (N.C. 2023). Though it ultimately upheld this provision, the North Carolina Supreme Court recently found that "African Americans comprise 21% of North Carolina's voting-age population, but over 42% of those denied the franchise due to felony supervision from a North Carolina state

court conviction alone. In comparison, White people comprise 72% of the voting-age population, but only 52% of those denied the franchise. Moreover, in total, 1.24% of the entire African American voting-age population in North Carolina are denied the franchise due to felony supervision, whereas only 0.45% of the White voting-age population are denied the franchise. The result is that African Americans are denied the franchise at a rate 2.76 times as high as the rate of the White population." *Id.* at 35 (cleaned up). North Carolina's felony disenfranchisement law thus disproportionately denies the opportunity to participate in the political process to Black people.

177. North Carolina holds numerous statewide elections with numbered posts. As Dr. Collingwood's reports reflect, North Carolina holds statewide elections with numbered posts for all seven of its seats on the North Carolina Supreme Court and all 15 of its seats on the Courts of Appeals. *See* PX36 at 4 (Collingwood Report). That structure operates to disadvantage Black voters, who make up 21.37% of the statewide population, when white voters crossover to support Black-preferred candidates at a rate of only 28.7% statewide. JX6 at 14 (2023 StatPack w/ Race); PX279 at 4 (Collingwood Suppl. Report). These discriminatory effects today are real. The Black-preferred candidate statewide (the Democrat)[5] lost 3 of 3 court of appeals races in 2024; 4 of 4 races in 2022; and 5 of 5 races in 2020.[6] A Black-preferred candidate has not won a court of appeals race since 2018, and in two of those 3 races, the Black-preferred candidate got a minority of the vote and only won because of unusual circumstances—in one race, the vote for the white-

---

[5] PX36 at 13-14 (Collingwood Report); PX279 at 16-17 (Collingwood Suppl. Report).

[6] *See* 2024 elections (https://er.ncsbe.gov/?election_dt=11/05/2024&county_id=0&office =JUD&contest=0); 2022 elections (https://er.ncsbe.gov/?election_dt= 11/08/2022&county_id=0&office=JUD&contest=0); 2020 elections (https://er.ncsbe.gov/?election_dt=11/03/2020&county_id=0&office=JUD&contest=0);

preferred candidates was split between two Republicans, and in the other race a Libertarian candidate got 4.59% of the vote statewide.[7]

178.    The testimony of Defendants' expert Dr. Andrew Taylor does not rebut Plaintiffs' evidence regarding Senate Factor Three.

179.    Dr. Taylor opined that "North Carolina has basic election practices that are typical of the country." LD62 at 18 (Taylor Report). He further stated that, according to the "Cost of Voting Index"—a measure of a state's performance in nine elements considered essential to accessible voting"—North Carolina was "ranked as the 24th easiest state in which to vote in 2022." *Id.* at 18 & n.38. And he opined that "North Carolina performs better than the country as a whole" when it comes to "statewide racial disparities in voting." *Id.* at 18.

180.    The court's conclusions of law explain why Dr. Taylor's comparative metric is irrelevant to the *Gingles* inquiry. But even if it were relevant, Dr. Taylor ignores the role of the courts in invalidating the General Assembly's discriminatory elections laws. Four of the nine Cost of Voting Index criteria are "voter ID laws"; "early voting"; "registration restrictions," including "same-day registration"; and "preregistration." *Id.* at 18 & n.38. The Fourth Circuit invalidated restrictions in all four of those areas, "photo ID, early voting, same-day registration," and "preregistration," in 2016. *McCrory*, 831 F.3d at 239. The General Assembly has subsequently renewed its efforts to restrict voting access in those areas, prompting a new round of litigation. *See Hirsch*, 720 F. Supp. 3d 406; *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 646 (M.D.N.C. 2024). A federal district court has already granted a preliminary injunction enjoining one of the General Assembly's attempts to impose new restrictions on same day voting, *Voto Latino*, 712 F. Supp. 3d at 684, and additional litigation remains ongoing, *Hirsch*, 720 F. Supp. 3d 406.

---

[7] https://er.ncsbe.gov/?election_dt=11/06/2018&county_id=0&office=JUD&contest=0.

181. Dr. Taylor's analysis suffers from another foundational flaw: he did not account for recent redistricting plans that diluted the votes of Black voters. The Cost of Voting Index, which Dr. Taylor relied on for his analysis, does not consider redistricting at all. LD62 at 18 (Taylor Report). And Dr. Taylor testified at trial that redistricting is not "a voting practice," the subject of the third *Gingles* precondition, and that he was "not here to testify about that because I'm here to testify about Senate Factor 3." Tr. Day 5 40:20-41:12, 42:23-43:16 (Taylor). In Dr. Taylor's view, redistricting is "an election-related matter, but it doesn't really affect the act of voting." *Id.* at 40:20-41:1 (Taylor). He thus explained that "forcing people to vote in racially gerrymandered districts that dilute the electoral influence of Black citizens . . . make[s] absolutely no difference" to "the act of voting." *Id.* at 42:23-43:16 (Taylor). He did acknowledge, however, that redistricting "presumably affects the candidates that you have on the ballot," and that when "you're a Black person and you live in a district that's racially gerrymandered to prevent you from having a reasonable opportunity to elect candidates of your choice, you might not vote at all." *Id.* at 42:23-44:5 (Taylor).

182. As the court's conclusions of law explain, Dr. Taylor's omission of redistricting laws from his analysis misapprehends the scope of Senate Factor Three, rendering his work incomplete and unhelpful. Dr. Taylor acknowledged at trial that in the prior decade, North Carolina conducted two elections "in congressional districts that were racially gerrymandered against Black citizens." *Id.* at 41:18-25 (Taylor). He likewise acknowledged that in the previous decade, the State held three elections in state House and Senate districts that were "illegal racial gerrymanders against Black people." *Id.* at 41:1-22 (Taylor). He maintained only that it was "relatively easy" for Black North Carolinians to vote in these elections that "were racially gerrymandered against Black citizens," *id.* at 41:18-25 (Taylor), and thus that the State "does not [] disproportionately hamper

its general population's capacity to participate in 'voting practices.'" LD62 at 18 (Taylor Report). That implausibly narrow view of Senate Factor Three, as Dr. Taylor ultimately omitted at trial, fails to address the issues at "the center of" what "this case is about." Tr. Day 5 42:23-43:16 (Taylor).

183.    The court thus finds that Dr. Taylor's testimony is too incomplete to credit, and gives it no weight.

### D. Senate Factor Four: History of candidate slating in local elections

184.    The parties did not introduce evidence on Senate Factor Four and agree that it does not apply.

### E. Senate Factor Five: North Carolina's discrimination has produced severe socioeconomic disparities

185.    Plaintiffs provided evidence from Dr. Burch and lay witnesses of historical and contemporary discrimination against Black North Carolinians that has produced extreme racial disparities in areas that impact political participation, including education, socioeconomic indicia, healthcare, and criminal justice involvement. Defendants offered Dr. Taylor to rebut this evidence.

#### 1.    Educational Disparities

186.    Dr. Burch identified substantial racial disparities in North Carolina's educational outcomes that are a product of historical and contemporary discrimination and that have significant effects on voting.

187.    Education is among the most significant causal factors of voter participation. Dr. Burch explained that "[e]ducation is critically important to participation in the political process" PX21 at 4 (Burch Report). "[O]ne of the most widely cited books in American politics, *Voice and Equality*, [explains] that resources such as time, money, and civic skills are important to voting

and other forms of political participation precisely because such resources allow people to surmount the costs of participation more easily. Socioeconomic status is an important factor in an individual's ability to vote because socioeconomic status is related to the available time, money, and civic skills an individual can devote to overcoming the costs of voting. These costs can include the time it takes to acquire information about the candidates and issues or the process of registering, as well as the time or lost wages required to vote in person." *Id.* "Of the components of socioeconomic status, educational attainment is the most important predictor of voting. In fact, [t]he powerful relationship between education and voter turnout is arguably the most well-documented and robust finding in American survey research." The research "also shows that the relationship between education and voting is a causal one." *Id.* Dr. Taylor agreed that "educational attainment affects and is indeed [] important to political participation [and] voting behavior," with higher educational attainment driving "higher voter turnout" and lower educational attainment leading to "lower voter turnout." Tr. Day 4 249:16-23 (Taylor); *see* LD62 at 7 ("Education is believed to be important for political participation.").

188. Dr. Burch demonstrated "large gaps in educational attainment between Black and White North Carolinians, with White people being more advantaged relative to Black people." Tr. Day 3 AM 111:25-112:4-7 (Burch). Looking at test scores, white students in North Carolina have generally outperformed Black students by a factor of approximately three-to-one, a gap that grew to four-to-one during the COVID-19 pandemic. *Id.* at 116:5-117:13. As depicted below in Dr. Burch's Figure 1, during the 2018-2019 school year, 42.9% of white students, grades 3-8, were at or above proficiency in reading and math, compared to 14.3% of Black students. PX21 at 9 (Burch Report). During the 2021-2022 school year, it was 29.4% of white students and 7.4% of Black students. *Id.*



Figure 1: Student Test Scores by Race in North Carolina, 2008-2022. *Source:* North Carolina Department of Public Instruction. "Historical Trends and Results." Available online https://www.dpi.nc.gov/historical-trends-and-results/open. Accessed 16 Nov 2023: 8.



*Id.* at 9.

189. Dr. Burch analyzed reading and math scores at the county level too, focusing on third grade scores in 11 Black Belt counties. In every single one of the Black Belt counties, "White students . . . are outperforming Black students." Tr. Day 3 AM 118:17-20 (Burch). Black students uniformly perform below their grade level in reading and math in each Black Belt county, with only 28% of Black third graders proficient in reading and only 33% proficient in math in 2018. PX117 at 2-5 (Burch Rebuttal Report). By contrast, white students are above or just below grade level in most counties. PX21 at 10-12 (Burch Report). In 2018, approximately 55% of White third graders were proficient in reading and 64% proficient in math. PX117 at 3 (Burch Rebuttal Report). On average in the Black Belt counties, white students by third grade are almost two-thirds of a year ahead of Black students in reading and half a year ahead of Black students in math. Tr. Day 3 AM 120:20-121:9 (Burch). Dr. Taylor did "not dispute" these numbers, Tr. Day 5 7:17-22

(Taylor), and despite opining in that the average disparity across the Black Belt "counties is relatively small" compared to some other counties in North Carolina, LD62 at 11 (Taylor Report), he acknowledged on cross examination that in absolute terms they represent "a big, tremendous troubling racial gap." Tr. Day 5 8:14-10:8 (Taylor).

190.     Dr. Burch also demonstrated racial disparities in educational attainment. "Data from the 2021 5-Year American Community Survey, which is conducted by the U.S. Census Bureau, show that White adults aged 25 and older are far more likely than Black adults in North Carolina to have earned a bachelor's or postgraduate degree. Statewide, 25.6% of Black North Carolinians over the age of 25 have earned a bachelor's or postgraduate degree, compared with 40.0% of White North Carolinians. On the opposite end of the scale, 10.9% of Black North Carolina residents over the age of 25 have not earned a high school diploma or equivalent, compared with 6.7% of White North Carolina residents." PX21 at 11-12 (footnotes omitted) (Burch      Report). "[T]hese patterns are repeated at the county level in the Black Belt counties: Black residents are less likely to have finished high school and less likely to have bachelor's degrees than White residents." *Id.* Dr. Taylor did not dispute this data.

191.     Dr. Burch established that the "racial disparities in education that exist in North Carolina today . . . result from historical and contemporary discrimination." PX21 at 4 (Burch Report). "Black people historically have faced educational discrimination in North Carolina, which has hindered their ability to vote. Although the U. S. Supreme Court ruled segregation in public schools unconstitutional in *Brown v. Board of Education* in 1954, and Congress outlawed segregation in public accommodations in the Civil Rights Act of 1964, districts across the state failed to desegregate for several years after those rulings. For instance, by 1961, the Southern Educational Reporting Service found that in North Carolina only 11 out of the 173 K-12 school districts and 5

of 17 state universities had desegregated. Such 'desegregation' meant that only 203 out of more than 60,000 Black K-12 students attended schools with White children." *Id.* at 4-5. "[D]ue to the slow pace" of desegregation, "many of today's North Carolina voters were educated under these formally segregated educational systems." *Id.* at 5. Today, "19.7% of North Carolina's citizen voting age population is age 55 or older and born in North Carolina, which means that about one-fifth of North Carolina's current electorate is likely to have been educated during the time when the state's districts were racially segregated by law." *Id.* Dr. Taylor agreed that North Carolina has a history of "racial discrimination in education," including a "long" period of official segregation that continued for "a period of years even after" the Supreme Court's 1954 decision in *Brown v. Board of Education*—"North Carolina massively resisted desegregation of its schools." Tr. Day 4 249:24-250:13 (Taylor).

192.    "Younger adults in the electorate also faced and still face educational discrimination. Multiple school districts in North Carolina have been found to provide Black students with unequal education to that provided to White students." PX21 at 5 (Burch Report). "For instance, Duke University researchers found in 2020 that school segregation has *increased* in North Carolina since 1998. Statewide, the index of dissimilarity (a measure of segregation) for North Carolina elementary school segregation was .44, which is considered to be "moderately" segregated. Elementary school segregation is considered high in" several Black Belt counties, including "Halifax, Washington, and Vance Counties, and moderate in Warren and Martin Counties." *Id.* at 6. Bertie County, one of the Black Belt counties at issue here, "was found to have operated a racially identifiable white elementary school in 2003." *Id.* at 5 (quotations omitted).

193.    "Educational segregation persists today in the northeastern part of North Carolina in particular. Statistical evidence in North Carolina shows that resegregation after the discontinuation of court-ordered integration plans is driven by four institutional factors: private schools, charter schools, balkanized school districts, and differences between schools within public school districts and within the charter school or private school sectors. In the northeastern part of the state, private schools served as the principal mechanism for segregation. In Bertie County, nearly all of the racial segregation is due to two nearly all-white private schools that enrolled more than 40% of all the county's white students." *Id.* at 6 (footnotes and quotations omitted). "Northampton and Hertford Counties are similar." *Id.* "Racially distinctive charter schools also contribute to educational segregation in Vance and Martin counties. Racially distinct city districts, such as that in Halifax County, also contributes to educational segregation." *Id.* at 6-7.

194.    Dr. Taylor did not dispute that North Carolina's schools continue to exhibit signs of racial segregation. Tr. Day 4 252:18-259:7 (Taylor). He testified that in 2021, "the typical White student attended a school where 58.9 percent of the students were White, even though White students only comprised 45 percent of the total state enrollment." *Id.* at 255:18-256:3. The typical Black student, meanwhile, "attended a school where 41.2 percent of the students were Black, even though Black students accounted for 25 percent of the state's enrollment." *Id.* at 256:4-13. "In 2021, Black students had the least exposure to White students; the typical Black student attended a school with 28.3 White schoolmates." *Id.* at 256:14-23. "Despite accounting for less than half of the state's enrollment in 2021, 68.6 percent of White students attended majority White schools." *Id.* at 256:24-257:8. Turning to the Black Belt counties specifically, Dr. Taylor testified that the region is "more segregated than the State of North Carolina as whole." *Id.* at 258:24-259:7.

195. "Educational segregation is consequential and prevents minority students from receiving an equal education in North Carolina. Statistical analyses associate school segregation, along with other factors, with student performance on assessment tests. Research on the end of busing in Charlotte-Mecklenburg found that reassignment to neighborhood schools widens educational segregation and thus inequality of outcomes between White and minority students. North Carolina's racially-imbalanced charter school system also increases educational segregation and racial test score gaps." PX21 at 7 (footnotes omitted) (Burch Report). Teacher credentials also "have large effects on student achievement at the high school level," but "the uneven distribution of teacher credentials by race and socioeconomic status of high school students means that minority students and those with less well-educated parents do not have equal access to a high-quality education at the high school level." *Id.* (cleaned up).

196. Dr. Burch summarized her findings by explaining that, "consistent with the political science literature, education is the most important explanatory variable for voting, voter turnout, and there are racial disparities in education attainment and achievement in North Carolina today. And along all the measures that I studied both statewide and for the counties I was asked to examine, those racial disparities existed and they were large." Tr. Day 3 PM 8:1-12 (Burch). These disparities are the result of historical discrimination, affecting a "large proportion of North Carolina's electorate that was subject to Jim Crow schooling," as well as "educational segregation that still plague[s] North Carolina's schools today." *Id.* at 8:13-24. Dr. Taylor did not "contest[]" that "the racial disparities that exist in education" in North Carolina are "in part because of the history of official discrimination" and testified that he was not aware of any academic research disputing that proposition. Tr. Day 5 23:24-24:13 (Taylor). The court credits this testimony.

## 2. Socioeconomic Disparities

197.    Dr. Burch next identified racial disparities in several socioeconomic factors that are a product of historical and contemporary discrimination and that affect voting. She addressed four factors: employment, income, poverty, and homeownership. Tr. Day 3 PM 9:4-7 (Burch).

198.    Dr. Burch explained that socioeconomic status affects participation in the political process because financial resources make it easier to overcome the costs of voting. PX21 at 13 (Burch Report). Voting is "costly," and it is easier for people with salaries "to take time off work" to vote "because they don't have an opportunity cost of losing out on their hourly wages." Tr. Day 3 PM 9:8-15 (Burch). Similarly, obtaining documents is "easier for someone who is not in poverty, who is higher income." *Id.* Dr. Taylor agreed that the socioeconomic factors Dr. Burch analyzed "have a material effect" on "political participation" and "voting behavior." Tr. Day 5 10:25-11:7 (Taylor). Specifically, "people who are not unemployed, people who are not impoverished and, in general, people with higher household incomes tend to turn out and vote more than people who are unemployed, impoverished, or with lower household incomes." *Id.* at 11:8-13.

199.    North Carolina exhibits significant racial disparities across each of the socioeconomic indicators Dr. Burch examined. "Statewide, the Black unemployment rate, at 8.3%, is higher than the White unemployment rate, which is 4.3%." PX21 at 14 (Burch Report). That is a "large" disparity." Tr. Day 3 PM 9:23-10:1 (Burch). County-level unemployment rates in the Black Belt counties are higher for Black residents than White residents as well." PX21 at 14 (Burch Report). The "consistent pattern is that Black people in each of these communities have higher unemployment rates than the White people in these communities, and that is uniform across all of the communities." Tr. Day 3 PM 10:13-16 (Burch). The gap in some of these counties is as much as 13 to 14 percentage points, with Black unemployment exceeding 15% in multiple counties and white unemployment never exceeding 7%. *Id.* at 10:17-11:4. These Black Belt figures are depicted in

Figure 6 of Dr. Burch's report, reproduced below. Dr. Taylor agreed with Dr. Burch's assessment of the unemployment rates in North Carolina as a whole and in the Black Belt counties in particular. Tr. Day 5 11:14-21 (Taylor).

**Figure 6: Unemployment, by Race. Source: U.S. Census Bureau. "Employment Status." American Community Survey, ACS 5-Year Estimates Subject Tables, Table S2301, 2021. Accessed on November 15, 2023.**



200. Similar disparities exist in income levels. The "median income of North Carolina households headed by Black people" is $42,996, "more than $20,000 less than the median income of White households," which is $68,259. PX21 at 15 (Burch Report). That is "a large racial disparity in household incomes," placing Black household income at "about two-thirds" the level of white household income. Tr. Day 3 PM 11:17-19 (Burch). Dr. Burch analyzed the same data in the Black Belt counties, concluding that "White households also have much higher incomes than Black households" in that area. PX21 at 15 (Burch Report). White heads of households earn "tens

of thousands of dollars more than Black head of households across all of these counties," including by more than double in some counties. Tr. Day 3 PM 12:1-14 (Burch). Across "all of these counties, the highest Black median household income is more than $10,000 less than the lowest White median household income." *Id.* at 12:23-13:2. Dr. Burch's analysis of income disparity in the Black Belt counties is depicted in Figure 7 of her chart, and reproduced below. Dr. Taylor agreed that "is a racial disparity between Black and White North Carolinians," testifying that in 2012 "White median household income in North Carolina was roughly 58 percent higher than Black median household income, and that in 2022, "White median household income in North Carolina was [roughly] 45 percent higher than Black median household income." Tr. Day 5 12:1-6 14:18-15:4 (Taylor).



**Figure 7: Median Household Income by Race. Source: U.S. Census Bureau. "Median Income in The Past 12 Months (In 2021 Inflation-Adjusted Dollars)." American Community Survey, ACS 5-Year Estimates Subject Tables, Table S1903, 2021. Accessed on November 15, 2023.**

201. Dr. Burch also identified racial disparities in poverty levels. Statewide, "the poverty rate for families headed by white people is 6.3%, while the poverty rate for Black-headed families is 17.3%." PX21 at 15 (Burch Report). In the Black Belt counties, the rate of Black family poverty "is orders of magnitude higher in all of these counties than White poverty." Tr. Day 3 PM 13:18-25 (Burch). For example, in "Bertie County, White poverty is about four percentage points whereas Black poverty is over 30 percent of families," or "seven times as much." *Id.* at 14:1-3 (Burch). In Washington County, "White poverty is again around between three and four percent, and Black poverty is almost . . . 34 percent," over one-third of the population, and over eight times the white

poverty rate. *Id.* at 14:4-11 (Burch). Across "all of these counties, the lowest level of Black family poverty is [] higher than the highest level of White family poverty." *Id.* at 14:19-22 (Burch). Dr. Burch's analysis of poverty levels in the Black Belt counties is depicted in Figure 8 of her chart, and reproduced below. Dr. Taylor did not dispute Dr. Burch's findings and agreed that "Black North Carolinians experienc[e] higher rates of poverty than White North Carolinians." Tr. Day 5 15:15-19 (Taylor).

**Figure 8: Family Poverty, by Race. Source: 2021 American Community Survey 5-Year Estimates, Table S1702.**



202. Dr. Burch also identified racial disparities in homeownership. Homeownership affects voting "because residency requirements have been shown to reduce voter registration and turnout, largely because residential mobility increases the administrative burden of maintaining registration. Renters are more mobile than owners and are less likely to vote." PX21 at 18 (Burch

Report). To illustrate, renters are less residentially stable than homeowners, and are forced to up-
date their registration and other documents, like driver's licenses, with every move, introducing
recurring obstacles to the political process. Tr. Day 3 PM 15:1-9 (Burch). There is a large gap in
homeownership rates by race in North Carolina: 74.9% of White householders own their homes,
compared with just 47.1% of Black householders." PX21 at 18 (Burch Report). Dr. Taylor did not
analyze homeownership. Tr. Day 5 16:1-4 (Taylor).

203.    Dr. Burch explained that these disparities in socioeconomic factors are attributable
to historical and contemporary racial discrimination in North Carolina. The disparities in socioe-
conomic factors are largely a product of racial disparities in education—and the racial discrimina-
tion that causes those educational disparities, as discussed above. PX21 at 13 (Burch Report).
"Decades of persistent discrimination in employment and access to capital also contribute to the
racial disparities in socioeconomic indicators and their impact on political participation today." *Id.*

204.    "Black people have faced and continue to face discrimination in employment in the
United States, including in North Carolina. For instance, several famous experimental studies (in
which outcomes are compared between applicants who were identical on all factors other than
race) show that racial differences in treatment persist even after controlling for education and hu-
man capital however measured." *Id.* at 13-14. Dr. Taylor agreed that "there has been discrimination
against Black North Carolinians in the area of employment." Tr. Day 5 11:22-25 (Taylor).

205.    Dr. Burch also discussed racial discrimination with respect to housing. "Studies
show that, even after controlling for factors such as down payments and credit scores, minority
homebuyers are denied mortgages at higher rates and, when they are able to get mortgages, pay
more than similarly-situated White borrowers. Such practices still operate in North Carolina."
PX21 at 18 (footnotes omitted) (Burch Report). In 2024, "the U.S. Department of Justice and North

Carolina Attorney General's Office reached an agreement with First National Bank of Pennsylvania for engaging in a pattern or practice of lending discrimination by redlining predominantly Black and Hispanic neighborhoods in Charlotte and Winston-Salem, North Carolina. *Id.* (quotations omitted). Dr. Taylor agreed that "historically there's been discrimination against Black North Carolinians in mortgage lending." Tr. Day 5 16:10-13 (Taylor).

206.    In sum, Dr. Burch offered mostly unrebutted evidence that socioeconomic factors influence political participation, that North Carolina has significant racial disparities in employment, income, poverty, and housing that disadvantages Black voters, and that these disparities are the product of historical and contemporary discrimination in areas like education, the labor market, and the housing market. The court credits that testimony.

### 3.    Healthcare Disparities

207.    Dr. Burch also identified racial disparities in North Carolina's healthcare outcomes that are a product of historical and contemporary discrimination and that affect political participation. She offered unrebutted evidence that health outcomes affect voting, detailed significant racial disparities in health outcomes in North Carolina, and identified several structural barriers to healthcare access that produce those racial disparities in North Carolina.

208.    Dr. Burch relied on thoroughly sourced academic research to show that health status affects political participation. "The effects of health on voting may take many pathways, such as reducing the availability of free time and money that could otherwise be devoted to political involvement. Impaired cognitive functioning or physical disability also may make voting more difficult. Poor health is likely the reason that voter turnout declines in old age. People with disabilities also are less likely to vote; problems with polling place accessibility only partially explain this gap." PX21 at 18-19 (Burch Report). Dr. Taylor did not dispute that "health affects voting participation." Tr. Day 5 19:19-23 (Taylor).

209.     Dr. Burch found "racial gaps in health outcomes in North Carolina, with Black residents, by many measures, suffering worse health outcomes than White residents. There are significant racial gaps in life expectancy at birth, which is a more general measure of overall health. White North Carolinians are expected to live 78.1 years, which is more than 3 years longer than the life expectancy for Black North Carolinians (74.7 years)." PX21 at 19 (Burch Report). There are likewise "large gaps" in life expectancy in the Black Belt counties, gaps that exceed that statewide average in several counties. Tr. Day 3 PM 18:7-24 (Burch). "With respect to specific measures of health, infant mortality among Black babies, at 12.1 per 1,000 live births, is more than twice as high as the mortality rate for White babies (5.1 per 1,000 live births). Moreover, despite lower incidence rates of cancer between Black and White North Carolinians (427.8 per 100,000 vs. 433.9 per 100,000, respectively), Black invasive cancer mortality is higher than that of White North Carolinians (165.1 per 100,000 vs. 148.5 per 100,000). Statewide diabetes rates are higher for Black North Carolinians than White North Carolinians as well (17.4% vs. 9.2% respectively). Health insurance coverage is also lower for Black North Carolinians: 9.1% of Black residents of the state are uninsured, compared with 6.4% of White residents." PX21 at 18-19 (footnotes omitted) (Burch Report). Dr. Taylor agreed that in "all of these health-related metrics, life expectancy . . . , infant mortality, incidence of cancer, incidence of diabetes, health insurance coverage, in every single one of these health-related metrics," statewide and in the Black Belt counties, "there is a racial disparity with White North Carolinians being better off than Black North Carolinians." Tr. Day 5 18:19-25 (Taylor).

210.     Dr. Burch identified structural barriers to "equal health outcomes such as access to healthcare and environmental hazards" that drive these disparities. PX21 at 19 (Burch Report). "In North Carolina, Black people face structural barriers to equal health outcomes such as access to

health care and environmental hazards. For instance, response times make a difference to health outcomes for emergencies such as heart attacks and strokes. However, several counties at issue in this case lack adequate primary care physicians (such as Northampton, Bertie, Martin, Halifax, Edgecombe, Warren, and Vance) and are far from obstetric care providers. Black people also are more likely to live near environmental hazards, which can cause negative health outcomes. And in eastern North Carolina, residents lack access to supermarkets and other vendors of nutritious food . . . . People living in such areas are less likely to eat a healthy, plant-based diet, which matters for overall health." *Id.* at 19-21. In "rural North Carolina census tracts, 81% of census tracts that are at least 60% Black are food deserts, compared with 8.7% of census tracts that are at least 60% White." PX117 at 7 (Burch Rebuttal Report).

211.    Dr. Burch's largely unrebutted testimony thus showed that health outcomes affect political participation, that there are racial disparities in North Carolina across key healthcare indicators, and that those disparities are attributable in part to structural barriers to healthcare access that disproportionately effect Black North Carolinians. The court credits that testimony.

### 4.    Criminal Justice Involvement Disparities

212.    Finally, Dr. Burch discussed racial disparities in North Carolina's criminal justice system that are driven by historical and contemporary discrimination and impact political participation. Dr. Burch catalogued a body of academic literature and research demonstrating that criminal justice involvement affects political participation; identified significant racial disparities in criminal justice involvement in North Carolina; and establish that those disparities result from racial discrimination.

213.    "A growing body of research shows that criminal justice interactions affect participation in the political process." PX21 at 21-22 (Burch Report). Criminal justice involvement in North Carolina has "direct and indirect" effects "on voting and participation." Tr. Day 3 PM 20:17-

22 (Burch). The most direct effect, "of course, is felony disenfranchisement." *Id.* at 20:21-25.

"North Carolina has a felony disenfranchisement law" that bars "people who are convicted of felonies and serve sentences in the community or in prison" from voting. *Id.* at 20:20-21:2. Contact with the criminal justice system also decreases political participation in indirect ways. *Id.* at 21:3-10. "Several studies have shown that, for individuals, contact with the criminal justice system, from police stops, to arrest, to incarceration, directly decreases voter turnout. Primarily, criminal justice contact decreases turnout through the combined forces of stigma, punishment and exclusion which impose barriers to most avenues of influence and diminish factors such as civic capacity, governmental trust, individual efficacy, and social connectedness that encourage activity." PX21 at 21-22 (Burch Report). Dr. Taylor agreed that "criminal justice involvement . . . has been shown to affect voting behavior . . . even beyond the term of incarceration," testifying that "Dr. Burch is probably one of the top experts on this particular subject matter." Tr. Day 5 20:18-21:21 (Taylor).

214. "There are racial disparities in contact with the criminal justice system in North Carolina. Black people make up 20.0% of North Carolina's adult population, but are 44.1% of arrestees, 52.9% of North Carolina's prisoners, and 44.2% of people serving sentences in the community on parole, probation, or post-release supervision. These disparities in arrest and punishment may not be explained solely by disparities in crime rates." PX21 at 22 (Burch Report). Dr. Burch invoked "research that uses large datasets and rigorous controls to look at the impact of race and racial discrimination both nationwide as well as in North Carolina. And researchers have found that Black people are treated worse by the criminal justice system even after you are controlling for legally relevant factors like criminal history, crime type and other kinds of factors." Tr. Day 3

PM 22:10-16 (Burch). Dr. Taylor agreed "that there are racial disparities in various forms of criminal justice involvement in North Carolina including arrests, incarceration, and people serving a sentence on post-release supervision of some form." Tr. Day 5 21:22-1 (Taylor).

215.    "Racial discrimination has been and continues to be an important contributor to the disproportionate representation of Black people in the criminal justice system in North Carolina today. Racial disparities in arrests are caused partially by factors that make it more likely that police will stop or search Black people, such as spatially differentiated policing, racial residential segregation, and discrimination." PX21 at 22 (Burch Report). An extensive study of millions of traffic stops in North Carolina found that "Black North Carolina drivers are more likely to be searched and arrested than White drivers." *Id.* "Black males have the highest likelihood of being searched during a traffic stop in the state." *Id.* at 21-22. "Despite the higher likelihood of being searched, officers were less likely to find contraband when searching Black drivers." *Id.* at 23. "Statistical analyses have shown that racial disparities also exist in bail decisions and in sentencing in federal and state courts. Statistical analyses also show that race affects sentencing in North Carolina even after accounting for legally relevant factors such as criminal history, crime type, or other behavioral factors. Researchers also have shown racial bias in jury selection and deliberation in North Carolina." *Id.* Dr. Burch testified that "[t]here's really nothing left over to explain those racial gaps, except for bias." Tr. Day 3 PM 23:8-9 (Burch). Dr. Taylor did not dispute that racial discrimination plays a role in driving criminal justice disparities between Black and white North Carolinians.

216.    Taking that testimony together, Dr. Burch offered unrebutted evidence that criminal justice involvement has negative effects on political participation, that North Carolina exhibits

racial disparities across its criminal justice system that disadvantage Black people, and that those disparities are driven by racial discrimination. The court credits Dr. Burch's testimony.

5.  Plaintiffs' Lay Witnesses Offered Unrebutted Evidence of Racial Dispari-ties in North Carolina

217.   Plaintiffs' lay witnesses spoke to the racial disparities Dr. Burch identified from their own experience. Congressman Butterfield testified that there is a "stark" disparity between the "educational conditions of Black and White citizens in the Black Belt counties." Tr. Day 1:14-16-24 (Butterfield). Representative Pierce discussed the racial "inequities of the three school sys-tems all in one county" that have been exacerbated by the expansion of voucher programs, which "disproportionately impact[s] Black citizens." *Id.* at 46:10-48:3, 49:13-14 (Pierce). He explained that there are three school systems in Halifax County, Halifax and Weldon, which are "predomi-nantly Black," and Roanoke Rapids, which is "predominantly White." *Id.* at 40:4-8. "[W]e could see through the facilities that Roanoke Rapids had, the economic support they had that we did not . . . in terms of financial support in terms of funding." *Id.* at 40:9-12. There are students "who lived in the city limits of Roanoke Rapids but could not attend Roanoke Rapids Graded Schools simply because of the way the district lines were drawn. Those lines were . . . redrawn in [] 1970 to keep out Black neighborhoods so that Black children who lived in those surrounding neighbor-hoods could not attend Roanoke Rapids Graded Schools." *Id.* at 40:16-24. Those "racial inequi-ties" were his "lived experience in Halifax County." *Id.* at 41:11-15. Mr. Matthews testified that the funding of charter schools was "taking away from public schools and . . . that's hurting Martin County particularly." *Id.* at 62:18-25 (Matthews). Representative Reives cited the lack of funding for public education, testifying that "you've got to invest in public education if you're going to be responsive to the needs of Black voters. There's just no if, ands, or buts about that. You just can't

make up for that by hoping that they're going to go to private or charter schools." *Id.* at 147:17-21 (Reives).

218.    Plaintiffs' lay witnesses also addressed socioeconomic disparities. Congressman Butterfield testified that there is a "stark" disparity between the "economic . . . conditions of Black and White citizens in the Black Belt counties. *Id.* at 14:16-24 (Butterfield). "Every indicator that you would look at, whether it's education, employment, wealth, poverty, any indicator that you would choose to look at there is a stark difference between Black and White in each one of the counties in the Black Belt unfortunately, and it doesn't seem to be improving." *Id.* Representative Reives testified that there are significant economic disparities because "a lot of African Americans [] are still first and second generation . . . professional[s], and so there's not a lot of wealth in Black communities. You have people who are making a good living, but there's a big difference for wealth. Wealth is being able to acquire assets over generations and build that up, and you don't have a lot of that in African American communities." *Id.* at 145:21-146:7 (Reives).

219.    Plaintiffs' lay witnesses also discussed health issues, particularly the General Assembly's years-long delay in expanding Medicaid. Representative Pierce explained that "Medicaid expansion took forever" even though "over 50 percent of the children in" Halifax, Northampton, and Warren counties "are on Medicaid." *Id.* at 48:9-12, 49:1-6 (Pierce). "A child can't learn, they can't prosper, they can't grow if they're unhealthy." *Id.* The same is true when there are "toxins" in the air from plants that are "usually" placed in "minority neighborhoods." *Id.* at 49:7-16. These issues "disproportionately impact Black citizens." *Id.* at 49:13-14. Mr. Matthews testified that there are "tremendous health disparities in eastern North Carolina," recounting that "in Martin County, for instance, we lost our only hospital . . . while we were waiting for Medicaid expansion," inflicting "a detriment to good health in Martin County." *Id.* at 63:3-19, 65:12-13 (Matthews).

Representative Reives discussed disparities in life expectancy harming Black men, observing that "we finally passed Medicaid expansion, but we passed it 10 years late," and discussing the closure of the Office of Minority Health, which had focused on issues like "hypertension" and "sickle cell anemia" that "are more prevalent in Black communities." *Id.* at 145:13-20, 146:21-147:4 (Reives). Congressman Butterfield likewise lamented the delay in Medicaid expansion, which "disproportionately affect[ed] the African American community." *Id.* at 21:5-12 (Butterfield).

220.    Representative Pierce discussed how North Carolina's criminal justice system has imbued him and other Black residents with fear. He testified that he was raised by his maternal grandmother, a former "sharecropper," who taught him as a child "to be careful" visiting the city of Roanoke Rapids "because we were Black." *Id.* at 38:16-39:15 (Pierce). "We were told about how the cops might interact with us differently, how people in authority, a security guard at the local mall, might act differently toward us, a manager in a store. When I was in college initially when I went to North Carolina A & T, when we came home on the weekends . . . we always got pulled over, always. Probably until my thirties . . . when I drove through town when I passed by a police officer I would always look in the rearview mirror, you know, because driving while Black[.] [You] just have that anxiety about it because that's what you were taught and then you experienced it yourself." *Id.* at 39:16-40:3.

221.    The court credits the testimony of each of Plaintiffs' lay witnesses.

6.    Dr. Taylor's Testimony Was Unpersuasive and Unhelpful

222.    With respect to Senate Factor Five, Defendants' expert Dr. Taylor agreed with most of Dr. Burch's analysis and conclusions, including that education, socioeconomic status, health, and criminal justice involvement affect voting, that North Carolina has racial disparities in each of those areas that disadvantage Black people, and that historical discrimination has contributed to

those disparities. Dr. Taylor devoted most of his testimony to explaining that although North Carolina may have large racial disparities in absolute terms, its racial disparities are similar or even better when compared to other states.

223.     Dr. Taylor agreed with Dr. Burch that all four indicators she analyzed—"education," "income," and "poverty," "health," and "criminal justice involvement"—affect voting behavior." Tr. Day 5 20:18-22 (Taylor). He testified that "educational attainment affects and is indeed [] important to political participation [and] voting behavior," with the literature showing that "[p]eople with higher educational attainment tend to have higher voter turnout; people with lower educational attainment tend to have lower voter turnout." *Id.* at 20:16-23; *see* LD62 at 7 ("Education is believed to be important for political participation."). Dr. Taylor likewise testified that socioeconomic factors "have a material effect" on "political participation" and "voting behavior." Tr. Day 5 10:25-11:7 (Taylor). "[P]eople who are not unemployed, people who are not impoverished and, in general, people with higher household incomes tend to turn out and vote more than people who are unemployed, impoverished, or with lower household incomes." *Id.* at 11:8-13. He agreed that "health affects voting participation in the sense of voting behavior." *Id.* at 19:19-23; *see id.* at 20:18-22. Finally, Dr. Taylor acknowledged that "criminal justice involvement . . . has been shown to affect voting behavior . . . even beyond the term of incarceration," characterizing Dr. Burch as "probably one of the top experts on this particular subject matter." *Id.* at 20:18-21:21.

224.     Dr. Taylor also agreed with Dr. Burch that, in absolute terms, there are large racial disparities in North Carolina in the areas of education, socioeconomics, health, and criminal justice. Dr. Taylor testified that there is "a big, tremendous troubling racial gap" in educational outcomes in North Carolina generally and in the Black Belt counties specifically. *Id.* at 8:14-10:8. He

explained that there are racial disparities in employment, income, and poverty across North Carolina, and in the Black Belt counties, that disadvantage Black people. *Id.* at 11:14-21, 12:1-6, 14:18-15:4, 15:15-19. He agreed that across "every single one of the[] health-related metrics" he examined, including "life expectancy . . . , infant mortality, incidence of cancer, incidence of diabetes, health insurance coverage," "there is a racial disparity with White North Carolinians being better off than Black North Carolinians." *Id.* at 18:19-25. He similarly observed "that there are racial disparities in various forms of criminal justice involvement in North Carolina including arrests, incarceration, and people serving a sentence on post-release supervision of some form." Tr. Day 5 21:22-25 (Taylor).

225.     Dr. Taylor confirmed that not only are there racial disparities that affect political participation across each of these categories, North Carolina also has a history of discrimination in each area. Dr. Taylor testified that North Carolina has a long history of "racial discrimination in education," and that "the racial disparities that exist in education" in the State today are "in part because of the history of official discrimination." Tr. Day 4 249:24-250:13 (Taylor); Tr. Day 5 24:21-25:2 (Taylor). Similarly, "there has been discrimination against Black North Carolinians in the area of employment" and "in mortgage lending." Tr. Day 5 11:22-25, 16:10-13 (Taylor). Dr. Taylor did not dispute most of the structural barriers Dr. Burch identified as producing racial disparities in healthcare access. *See* LD62 at 13-15 (Taylor Report). He likewise did not dispute that racial discrimination exists in North Carolina's criminal justice system. *Id.* at 15-16.

226.     Dr. Taylor did not dispute that North Carolina's racial disparities across these metrics are the product of racial discrimination. In particular, he explained that he was "familiar with academic research that has found that in the American South racial disparities in educational attainment today are owing in part to the history of official discrimination against Black people in

education going back to legal school segregation," and that he was "not contesting" that "the racial disparities that exist in education today with White students consistently performing better than Black students on a variety of educational metrics" is "in part because of the history of official discrimination." Tr. Day 5 23:18-24:5 (Taylor). He was not "aware of any research" to the contrary. *Id.* at 24:6-13. He likewise did not offer "any opinion in this case" disputing that racial disparities in education "between Black and White Americans nationally are owing in part to the history of discrimination against Black Americans." *Id.* at 25:14-22. In fact, Dr. Taylor did not dispute that discrimination has played a role in causing the ongoing racial disparities in each of the metrics Dr. Burch discussed.

227. Dr. Taylor's central response to Dr. Burch's testimony was a comparative analysis purporting to show that even though racial disparities exist across each of the areas Dr. Burch analyzed, those racial disparities are consistent with disparities that exist across the nation as a whole. The court explains in its conclusions of law why that metric is irrelevant to the *Gingles* inquiry, and explains here why Dr. Taylor's testimony is, in any event, not credible on its own terms. Put simply, Dr. Taylor conducted his comparative study using a different comparator metric for each category of analysis, he "did not use the same comparator in each instance." Tr. Day 5 26:3-7 (Taylor). He testified that if he had used consistent comparators, his analysis would have shown that North Carolina compares "unfavorably to the country as a whole" on certain metrics— a result directly contrary to his purported conclusions here. *Id.* at 27:18-28:6.

228. Dr. Taylor's report "made a series of comparisons aiming to show that North Carolina compares favorably to the rest of the country or a nation as a whole with respect to the racial disparities" analyzed in this case. *Id.* at 25:23-26:2. Dr. Taylor's comparative analysis used shifting

units of comparison between the categories he analyzed. Dr. Taylor concluded that "North Carolina's Black and white students are at the national average for their demographic groups" by comparing the *gap* in the performance of white and Black North Carolinian students to the *gap* in the performance of white and Black students nationally. LD62 at 10 (Taylor Report); Tr. Day 5 26:8-11 (Taylor). He concluded that North Carolina's Black unemployment rate is "lower than the national average" by comparing the *absolute* Black unemployment rate in North Carolina to the *absolute* unemployment rate nationally. LD62 at 12-13 (Taylor Report); *see* Tr. Day 5 26:12-28:6 (Taylor). He concluded that North Carolina had favorable income and poverty rates by comparing the *change* in income and poverty rates in North Carolina during the post-recession period with the *change* in income and poverty rates over the same period nationally. LD62 at 13 (Taylor Report); Tr. Day 5 28:7-29:13 (Taylor).

229.    Dr. Taylor's shifting methodologies masked the fact that North Carolina's racial disparities are actually worse than the nation as a whole on some important metrics. Dr. Taylor acknowledged that if he had used racial *gaps* as the relevant comparison in examining unemployment, as he had in discussing education, the analysis would have revealed that North Carolina's racial disparities in unemployment are *greater* than racial disparities nationally. Tr. Day 5 27:6-28:6 (Taylor); *see* PX 117 at 6 (Burch Rebuttal Report). Similarly, if he had used racial *gaps* in analyzing disparities in income, the analysis would have shown that "the racial income gap in North Carolina . . . is larger than the national gap." PX 117 at 7 (Burch Rebuttal Report). The same is true of *absolute* comparisons. If Dr. Taylor had conducted an absolute comparison in income rates between Black households in North Carolina and Black households nationally, as he did with unemployment rates, the results would have shown that "North Carolina was worse than the nation

127

as a whole." Tr. Day 5 28:22-30:11 (Taylor). Dr. Taylor offered no defense of shifting methodologies beyond the truism that each is a "different way[]" of "coming at" the data. *Id.* at 27:6-15.

230.    Dr. Taylor's brief comparative analysis of criminal justice statistics is flawed as well. Dr. Taylor concluded that "the national average of Black individuals in state prisons per 100,000 Black residents as a proportion of white individuals" is lower in North Carolina than it is nationwide. LD62 at 15 (Taylor Report). Dr. Burch explained, however, that "it is well-known that Black-White imprisonment disparities in the south generally are lower than those in other parts of the country." PX 117 at 7 (Burch Rebuttal Report). "Comparing apples to apples" across other "southern states, North Carolina's Black-White imprisonment disparity is worse than those in Texas, Tennessee, Mississippi, Kentucky, Georgia, Arkansas, Alabama, and Louisiana. Only Virginia, South Carolina, and Florida are worse." *Id.*

231.    The court finds that Dr. Taylor engaged in unjustified substitution of comparative metrics to produce a conclusion that North Carolina uniformly outperforms the national average across the categories Dr. Burch addressed, when use of consistent metrics would have yielded largely opposite results. That selective approach undermines Dr. Taylor's conclusions and credibility, and deprives his comparative findings of any value in this case, even on their own terms. The court declines to credit Dr. Taylor's comparative analysis and assigns it no weight.

### F. Senate Factor Six: North Carolina political campaigns feature racial appeals

232.    Dr. Burch provided extensive evidence of racial appeals in recent North Carolina political campaigns. Dr. Burch relied on academic literature to define explicit and implicit racial appeals. Dr. Burch applied those definitions in conducting a review of North Carolina political campaigns, identifying numerous instances of explicit and implicit racial appeals. Her work documented a history of racial appeals in North Carolina's political campaigns dating as far back as the infamous Jesse Helms white hands ad during the 1990 U.S. Senate campaign and continuing

128

through today, including in all of the most recent election cycles and at all levels of government. Defendants offered Dr. Donald Critchlow to rebut Dr. Burch's evidence.

1.   Dr. Burch Offered Extensive Evidence of Racial Appeals

233.   Dr. Burch explained that a "deep and robust literature on both implicit and explicit racial appeals in campaigns exists in political science." PX21 at 23-24 (Burch Report). Dr. Burch drew on that literature to create a "rubric" for identifying explicit and implicit racial appeals. Tr. Day 3PM 29:3-16 (Burch). She defined an explicit racial appeal as one that "mentions race or a racial stereotype or racial attitude in order to get a voter to vote based on their racial self-interest." *Id.* at 29:17-24. She defined an implicit racial appeal one that makes "racial attitudes and concerns more salient in the minds of voters, [] without explicitly mentioning or referring to a particular race or group," often by relying "on certain code words or issues, [] images of Black exemplars, or a combination of both, to make race more salient to voters." PX21 at 24 (Burch Report).

234.   Dr. Burch explained the significance of implicit racial appeals in modern political campaigns. She explained that as the "norm of racial equality" . . . gained ascendance in the" United States, "using explicitly racist rhetoric or espousing explicitly racist policy positions would not help, and may even hurt, politicians." *Id.* Still, "because racial attitudes are still a potent force in American politics, candidates still have an incentive to appeal to White racial fears, biases, and stereotypes." *Id.* (quotations omitted). These competing "phenomena, the need to appear racially egalitarian while activating racial attitudes," have led campaigns to "work to activate White voters' negative racial attitudes in more subtle ways, through covert or implicit means such as images or coded language," that is, through implicit racial appeals. *Id.*

235.   White North Carolina Senator Jesse Helms ran campaign ads in the 1990 U.S. Senate race against his Black opponent, Harvey Gantt, that are recognized in the political science

literature as among the most "infamous" racial appeals. *Id.* at 25-26. These ads are useful examples of both explicit and implicit racial appeals under Dr. Burch's definitions.

236.    In one ad, Senator Helms ran this message: "How did Harvey Gantt become a millionaire? He used his position as mayor and his minority status to get himself and his friends a free TV station license from the government. Only weeks later, they sold out—to a white-owned corporation for $3.5 million. The black community felt betrayed, but the deal made the mayor a millionaire. Harvey Gantt made government work for Harvey Gantt." *Id.* at 26 (citation omitted). Dr. Burch explained that this ad was an explicit racial appeal "because it specifically mentions race and it explicitly mentions the race of minority candidates and also talks about how the Black community felt betrayed. So it's mentioning race explicitly." Tr. Day 3PM 32:3-7 (Burch). She explained that it was also an implicit racial appeal because it was "quite clearly talking about another prominent racial stereotype, which is that Black people are taking undeserved advantage of the government," and the ad "call[ed] upon that negative stereotype of a Black person" by accusing Gantt of using his "minority status" to "get something he doesn't deserve." *Id.* at 32:8-16.

237.    In another infamous example, the Helms campaign ran an ad in which a "pair of White hands crumples a job rejection letter with the blame placed on a minority candidate getting [the] job instead." *Id.* at 32:25-33:2. Dr. Burch explained that the ad was appealing to white voters by "saying that minorities again are taking your job[s]." *Id.* at 33:3-8.

238.    Applying her definitions of racial appeals, Dr. Burch found "examples of explicit and implicit racial appeals in multiple recent election years across a wide variety of races, including statewide races, congressional races, state legislative races, and local races." *Id.* at 34:5-9.

    *i.   North Carolina Racial Appeals – 2024 Campaign Cycle*

239.    Dr. Burch identified examples of explicit and implicit racial appeals in several prominent statewide political campaigns in North Carolina's 2024 elections. The Gubernatorial

130

campaign between Republican Mark Robinson, who is Black, and Democrat Josh Stein, who is white, featured Lieutenant Governor Robinson engaging in a number of explicit and implicit racial appeals. *Id.* at 34:10-18.

240.    Lieutenant Governor Robinson wrote in a campaign post: "I'm not African American- just AMERICAN. I stand and pledge allegiance to the flag of the United States of AMERICA & I kneel before nobody but God almighty. The liberal media will tell you that makes me a racist & woke Democrats will call me an 'Uncle Tom.' That's why I need YOUR help to defeat my Democrat opponent in the most important race in the nation!" PX21 at 24 (Burch Report) (citation omitted). Dr. Burch explained that this was a "clearly explicit" racial appeal in which Lieutenant Governor Robinson was "expressly distancing himself from Black voters [by] saying, 'I'm not one of them, I'm more like one of you," to White voters. Tr. Day 3PM 34:13-35:14 (Burch). And then he also talks about the fact that the media will say he's a racist, and then he refers to Uncle Tom which is typically a Black person who's a traitor to their race. So he's making these claims and statements again appealing to White voters by saying he's more like them; he's not African American." *Id.* at 35:6-14.

241.    At the North Carolina Republican Party 2021 State Convention, Lieutenant Governor Robinson argued that Black people themselves owed money for reparations for slavery. "It is at once funny and sad how African Americans need Hollywood to VALIDATE them. I have been bitting [sic] my tongue about this silly Black Panther comic book movie, but I can't any longer. It is absolutely AMAZING to me that people who know so little about their true history and REFUSE to acknowledge the pure sorry state of their current condition can get so excited about a fictional 'hero' created by an agnostic Jew and put to film by satanic marxist. How can this trash, that was only created to pull the shekels out of your Schvartze pockets, invoke any pride?" PX21 at 27

(Burch Report) (citation omitted). Dr. Burch testified that this was another explicit racial appeal in which Lieutenant Governor Robinson was "distancing himself" from Black people by making clear "he doesn't agree with them." Tr. Day 3PM 35:22-25 (Burch).

242.     Lieutenant Governor Robinson's racial rhetoric became especially prominent when "CNN published a news story accusing Lieutenant Governor Mark Robinson of making several anti-Black statements, including expressing support for the reinstatement of slavery and "I'm not in the KKK. They don't let blacks join. If I was in the KKK I would have called him Martin Lucifer Koon!" PX271 at 1 (Burch Corrected Suppl. Report). Dr. Burch characterized there statements as in line with his earlier comments discussed above, *id.*, as well as other derogatory comments he has made about Black people, "including referring to Black Democrats as 'slaves,'" PX21 at 27 (Burch Report).

243.     The 2024 Attorney General's race also featured explicit racial appeals. Republican candidate Dan Bishop released a campaign post calling the Democrat, Jeff Jackson, a 'Chinese Social Media Star,' in a mock statement made to look like it was from Jackson's campaign. *Id.* at 29. The fake statement was "written in Chinese, and included a translation that said Jackson was a 'Tiktok star who wants to make North Carolina soft on crime' and was 'helping China spy on North Carolina.' At the top, it included the logo for Jackson's campaign." *Id.* Bishop posted the mock statement on X writing that it was "for our unamerican friends." *Id.* This ad was a racial appeal because it was "relying on a stereotype that's prominent in [the] literature describing Asian-Americans as perpetual foreigners. So the idea of Asian as being un-American, even though we have Asian-Americans here in the United States who have been here for generations" played into a "stereotype that is prominent." Tr. Day 3PM 37:14-21 (Burch). A copy of the ad, which was

admitted                    as              PX125,                 is              reproduced                below.



244.    Racial appeals likewise appeared in the 2024 statewide race for North Carolina

School Superintendent. In that race, Republican candidate Michelle Morrow, who is white, "re-

posted a video in which her former campaign manager Sloan Rachmuth accused Maurice Green,

Morrow's Black opponent, of having 'spent his professional life going after white people and

Jews.'" PX271 at 1 (Burch Corrected Suppl. Report). The "video Morrow re-posted also accuses

Green of advocating racial preferences for Black students, including the statements "No Suspen-

sions for Black Students" and "First Prefernce [*sic*] To Black Students." *Id.* at 1-2. "Morrow re-

posted the same video twice between October 19 and October 21," and also posted an infographic

on her campaign website echoing the same themes, "comparing herself to Green and accusing

Green of supporting 'discipline policies based on race.'" *Id.* Dr. Burch characterized these posts

as explicit racial appeals. Tr. Day 3PM 38:12-24 (Burch). Images of Morrow's posts, which are

Figures 1 and 2 of Dr. Burch's corrected supplemental report, and a blown-up image of the im-

bedded post, are reproduced below.



Figure 1: Screenshot of October 19, 2024 Reposted Video by Michele Morrow. / Figure 2: Screenshot of October 20, 2024 Reposted Video by Michele Morrow.

PX217 at 2-3 (Burch Report).

245.    "In a campaign ad on his website, Brad Briner, the [2024] Republican candidate for state Treasurer, refers to "woke politics" and "DEI" investing (meaning Diversity, Equity, and Inclusion), and says that "social justice is a radical political movement." The same year, "Representative John Bradford, who represents state House District 98, ran on a promise to clean up 'woke garbage.'" PX21 at 31-32 (Burch Report). "Other candidates campaigned against "woke indoctrination" and the "woke agenda" as well." *Id.* at 32. Dr. Burch explained that the term "woke" has "become a racial code word" used pejoratively to describe the belief that there are systemic racial injustices in American society. *Id.* at 31. The term is particularly "associated with the Black Lives Matter movement." *Id.*

## ii. North Carolina Racial Appeals – 2022 Campaign Cycle

246.    Dr. Burch also identified examples of explicit and implicit racial appeals in North Carolina's 2022 elections.

247.    "There were several racially-charged ads during the 2022 U.S. Senate race between now-Senator Ted Budd, who is White, and former North Carolina chief justice Cheri Beasley, who is Black." *Id.* at 30. One attack ad "attempted to blame Beasley for crimes committed by people after their early release from prison" in an ad that was ultimately "removed from television stations

in North Carolina because 'it contains a false statement' on a 'material issue.'" *Id.* A "Club for Growth ad about crime features a White victim and prominently displays images of Black men in custody on the same screen with an image of Beasley. The imagery of an National Republican Senatorial Committee ad about crime also features White victims and images of Beasley." *Id.* Dr. Burch explained that the Club for Growth ad was an implicit racial appeal that carried "several of the markers that were described in the literature as characterizing racial appeals. For instance, what you saw in the ad is an attempt to discuss a prominent negative stereotype, Black criminality, using photographs of first a newspaper of Black people in orange prison jumpsuits. And then in the next frame, later frames, that ad goes further and even superimposes an image of the Black person in the prison jumpsuit with again an image of the minority candidate, who's Beasley, and it uses that imagery to try and link Beasley to these people; and even the narrator says she tried to get them off." Tr. Day 3PM 39:12-40:1 (Burch). Dr. Burch explained that although "the ads don't explicitly mention race, they do combine several of the markers. So again, playing to a prominent stereotype of minority criminality, using minority exemplars, tying those [] exemplars to the minority candidate," and white victims." *Id.* at 40:3-11. Ted Budd won that Senate race. *Id.* at 40:12-13.

248. Senator Budd also relied on racial appeals in his successful 2022 primary campaign against former Governor Pat McCrory. Senator Budd ran an ad accusing McCrory of pushing "textbooks written by radical, woke professors pushing critical race theory," when he was Governor, "teaching our kids to hate America." *Id.* at 39:12-40:1. Dr. Burch explained that invoking critical race theory is an explicit racial appeal because it has "become another racially coded issue. Critical Race Theory explicitly mentions race and is explicitly about race and racial attitudes. Anti-CRT proponents explicitly understand critical race theory to be about race and racial attitudes."

PX21 at 31 (Burch Report). Senator Budd, for example, "says that CRT is a 'radical far-left ideology' that holds that 'America is systemically racist and that we must define each other solely on race and pass laws that reflect that." *Id.*

249.    Still more racial appeals appeared in Senator Budd's 2022 campaign. "At a 2022 campaign event with Ted Budd . . . President Trump asked if the crowd knew what the 'N-word is' when telling a story about Vladimir Putin. When some people in the crowd reportedly responded by yelling a racial slur that begins with the letter N, President Trump responded, "No, no, no, it's the nuclear word." *Id.* at 28.

250.    There are additional examples of racial appeals from North Carolina's 2022 election cycle from outside the U.S. Senate race. Columbus County Sheriff Jodi Greene's racist comments surfaced during his 2022 reelection campaign, revealing that he reportedly said: "Tomorrow's gonna be a new f**king day. I'm still the motherf**king sheriff, and I'll go up and fire every godd**n [inaudible]. F**k them Black bastards. They think I'm scared? They're stupid." *Id.* at 27. "After making these comments, Greene won reelection by a substantially wider margin (more than 1,500 votes) than his narrow victory in 2018 (37 votes)." *Id.* "Also in 2022, the campaign of Diamond Staton-Williams produced an ad showing a fake mugshot of her opponent, Brian Echevarria, who is Black and Hispanic, accusing him of passing a back check." *Id.* at 30.

*iii.  North Carolina Racial Appeals – 2020 Campaign Cycle*

251.    Dr. Burch also identified explicit and implicit racial appeals in North Carolina's 2020 elections.

252.    "Representative Greg Murphy said, in an October 2020 online post during his campaign for reelection to the U.S. Congress, that Vice-President Kamala Harris was 'Only picked for her color and her race ... is that how we pick our leaders now in America?' implying that she was not qualified to be Vice President. A month after making these comments, Murphy won reelection

136

to North Carolina's Third Congressional District, defeating Daryl Farrow, who is Black, by a margin of 63.4% to 36.6%." *Id.* at 28. Dr. Burch characterized that as an explicit racial appeal. Tr. Day 3PM 41:13-22 (Burch).

253.     In another congressional campaign in 2020, "Representative Madison Cawthorn's campaign[] put up 'A new attack website' that included 'an explicitly racist broadside against his opponent, Moe Davis (D-N.C.), for associating himself with people who want to 'ruin white males.'" PX21 at 31 (Burch Report). Dr. Burch explained that Representative Cawthorn was "making an explicit racial appeal designed to appeal to White voters' self-interest where he says . . . that Moe Davis associates himself with people who want to, quote, 'ruin White males.'" Tr. Day 3PM 42:6-14 (Burch).

254.     At a more local level, "Eric Whitfield won election to the Onslow County Board of Education in November 2020 after he referred to Black people as 'ignorant darkies' in an online post in March 2020. Specifically, Whitfield wrote, during his campaign, that the head of the Onslow County NAACP 'controls the ignorant darkies in his community.'" PX21 at 27-28 (Burch Report). Dr. Burch testified that this was an explicit racial appeal. Tr. Day 3PM 45:5-14 (Burch).

*iv.  North Carolina Racial Appeals – 2018 Campaign Cycle*

255.     Dr. Burch identified explicit and implicit racial appeals in North Carolina's 2018 elections as well.

256.     For example, "when Anita Earls, who is Black, was running for the North Carolina Supreme Court in 2018, the North Carolina State GOP Executive Director posted pictures of Black murderers to social media, accusing Earls of getting their sentences reduced. In the posts, the Executive Director accused Earls of saying that 'jurors were racist' in order to get one of the people off death row. When asked about the posts, the Executive Director acknowledged that Earls was

not the 'attorney of record' in these cases, but 'that doesn't necessarily matter, not in a political sense." PX21 at 30-31 (Burch Report).

*v.   North Carolina Racial Appeals – Appeals to White Supremacists*

257.   Dr. Burch also identified racial appeals made directly to white supremacists in recent North Carolina political campaigns.

258.   "Russell Walker, the Republican candidate for state House District 48 in 2018, asked, 'What is Wrong with Being a White Supremacist? God is A Racist and a White Supremacist.'" *Id.* at 29.

259.   "That same year, Michele Nix, the Vice Chair of the North Carolina GOP, posted to social media the statement 'Jobs not mobs' accompanied by White and Black hands: "Michele Nix posted on Instagram with the image, which features the slogan 'jobs not mobs' and represents the Republican Party with a white 'OK' hand gesture that has recently been appropriated by some white supremacists, while the Democratic Party is represented by a dark-colored fist similar to a design used by the Black Panther Party." *Id.*

260.   "Joseph Gibson III, who ran in 2022 and 2024 in the Republican primary for state House District 65, reportedly 'use[d] a racial slur against Black people in a tirade against an interracial family' in a 2021 online post, and shared 'a white supremacist propaganda video called "Aryan: Our Purpose"' and a link to the manifesto of the National Socialist Movement, a neo-Nazi group.'" *Id.*

261.   In sum, Dr. Burch documented and classified numerous instances of explicit and implicit racial appeals in recent years in North Carolina elections at every level of government. The court credits her testimony.

## 2. Representative Reives Offered Evidence of Racial Appeals

262. Representative Robert Reives, Leader of the House Democratic Caucus and representative for House District 54, has experienced racial appeals in campaign material in his own elections. Tr. Day 1 132:20-24 (Reives).

263. In Representative Reives's 2022 election, mailers were sent that showed Reives and his family in a vehicle that he did not own and could not afford. *Id.* at 133:8-134:9. The photo was taken while Reives was riding in a parade in a "brand-spanking new" convertible Mercedes provided by a local car lot. *Id.* at 133:15-19, 134:13-16. His family was in their "Sunday best" for the parade. *Id.* at 133:19-21. Representative Reives's wife was pictured wearing a coat that, while not actually a fur coat, had the appearance of one. *Id.* at 133:20-22. The ad was part of "a series of mailers" distributed to attack Democrats on the issue of attempting to raise legislators' per diem, but these photos were included only in mailers sent to attack Black Democrats—not white Democrats. *Id.* at 133:10-12, 136:4-9. Representative Reives described the use of the photograph to make his family look like they had more money than they do a "dog whistle," playing into the stereotype that if Black people have economic success, "it must be economic success because of some program or something that [they've] been given." *Id.* at 133:9, 135:3-21. An accurate photo of Representative Reives would have shown that he in fact drives a Honda Accord. *Id.* at 134:17-19.

264. Representative Reives was also the subject of a second, more racially explicit mailer. *Id.* at 136:12-13. The mailer attacked him for donating to a nonprofit formed by his wife's cousin, who is Black, and her husband. *Id.* at 136:13-22, 138:2-3. The nonprofit was launched to provide summertime meals for children in Durham, North Carolina, who depended on receiving free lunch at school throughout the academic year. *Id.* at 136:16-21. As the non-profit grew, it added anti-racism education to its activities. *Id.* at 136:23-25. The goal was to help people, white

and Black, overcome any racial bias they might have. *Id.* at 136:2-7. The campaign mailer never-theless attacked Representative Reives's donation to the organization as "supporting a terrorist organization that taught" critical race theory. *Id.* at 137:8-12. Representative Reives testified that it was "clear" that this mailer's the goal was to appeal to racial sentiments. *Id.* at 137:8-22.

### 3. Dr. Critchlow's Testimony Did Not Rebut Dr. Burch's Evidence And was Not Credible

265.    Defendants offered the testimony of Dr. Donald Critchlow, a history professor at Arizona State University, to rebut Dr. Burch's testimony. Dr. Critchlow did not provide an opinion about the prevalence of explicit and implicit racial appeals in North Carolina political campaigns. He instead offered the opinion that "charges of racism" are rare in North Carolina political cam-paigns, and that they are outweighed by the focus on education, economic development, and tax-ation. Tr. Day 5 81:14-18 (Critchlow); LD61 at 5 (Critchlow Report). "Charges of racism" was a heuristic he developed that he believed would capture the existence of explicit and implicit racial appeals without needing a definition of those terms. Tr. Day 5 81:14-24 (Critchlow). Dr. Critchlow reached his conclusion by conducting a newspaper search of North Carolina newspapers through the online research tool Newspapers.com. LD61 at 6 (Critchlow Report). The court finds that Dr. Critchlow's methodology was fundamentally flawed and that his conclusions are thus unhelpful, unreliable, and entitled to no weight.

266.    Dr. Critchlow acknowledged at the outset that there has been a history of racial appeals in North Carolina elections. Dr. Critchlow testified that it is "very clear that there were explicit racial appeals in North Carolina politics in the late 19th century and early 20th century," some of which "were quite overt." Tr. Day 5 87:2-7 (Critchlow). He agreed there have been "ex-amples or instances of explicit overt racial appeals in North Carolina politics since then." *Id.* at

87:8-15. The Jesse Helms campaign in 1990 was one of those examples, which Dr. Critchlow characterized as a "quite outrageous" explicit racial appeal. *Id.* at 97-12:15.

267.    Turning to more recent elections, Dr. Critchlow conducted a newspaper survey to respond to Dr. Burch's analysis. Dr. Critchlow used Newspapers.com to conduct a "search and analysis of general publication newspapers within North Carolina from 2008 to 2024." LD61 at 6 (Critchlow Report). He searched "three terms: 'racism,' 'bigotry,' and 'issues' for each general election gubernatorial, U.S. Senate, and U.S. House race (in Congressional District 1, in the same geographic area as the two districts challenged in this lawsuit). Newspapers.com produced a list of pages that matched the search terms (candidates plus the search term) for a given campaign." *Id.* The search was designed to ascertain whether there were "charges of racism in a particular campaign." Tr. Day 5 81:14-18 (Critchlow).

268.    Dr. Critchlow's search found only three "charges" of racism over the 16-year period he analyzed, which he characterized as "small passing controversies." LD61 at 7-8 (Critchlow Report). Those charges involved one charge against Democrat Bev Perdue in 2008 and two against Republican Pat McCrory in 2012. *Id.* at 8. Dr. Critchlow found four instances over the same period where "racial issues were discussed in campaigns" without rising to the level of charges of racism. *Id.* at 9-11. Those issues arose during the 2022 U.S. Senate campaign, the 2020 Gubernatorial campaign, the 2018 congressional campaign, and the 2008 U.S. Senate campaign. *Id.* He concluded that "[c]harges of racism were reported in only 5 percent of the races for Governor, U.S. Senate, and Congressional District 1." *Id.* at 12.

269.    Dr. Critchlow's opinions are entirely unhelpful in assessing Senate Factor Six because Dr. Critchlow did not even purport to analyze explicit and implicit racial appeals. Dr. Critchlow testified that his "work in this case focused only on whether there were charges of racism in a

particular campaign rather than searching for explicit or implicit racial appeals in the way that Dr. Burch did." Tr. Day 5 81:14-18 (Critchlow). Dr. Critchlow defined "explicit racial appeal" to "mean a statement to the effect of vote for me because I am White or a particular race." *Id.* at 78:18-25. He did not provide a definition of the term "subtle racial appeal" because he was not "looking at overt versus subtle racial appeals." *Id.* at 81:19-24. Indeed, he was not searching for overt or subtle racial appeals at all, merely charges of racism, and thus he testified that he did not need to define the term "subtle racial appeals" to conduct his analysis. *Id.* at 79:1-25. The scope of "subtle racial appeals" was "not important for [his] methodology and for the report that [he] provided" in this case. *Id.* at 80:16-17. He was "not trying to ascertain whether there were racial appeals." *Id.* at 95:13-25. The scope of Dr. Critchlow's work then, by its own terms did not purport to offer a view of the field of explicit and subtle racial appeals and thus did not even attempt to offer a reliable or helpful opinion on Senate Factor Six.

270. Even if Dr. Critchlow's "charges of racism" analysis were helpful (and it is not), it was fundamentally flawed and demonstrably incomplete on its own terms. Dr. Critchlow's survey inputs were inexplicably and arbitrarily limited in at least three central and irretrievable ways. First, Dr. Critchlow limited his source material to newspapers, and limited that source material further still to North Carolina newspapers. *Id.* at 87:18-88:22. The analysis thus excludes both newspaper reporting from outside the state of North Carolina, and reporting from any other media source, including television reports, magazines, online media, and elsewhere. *Id.* He "did not search in any form of media other than the newspapers and specifically the North Carolina newspapers." *Id.* at 88:19-22. Dr. Critchlow invoked no academic support for his assertion that newspapers are the best sources of data for this type of inquiry, while overlooking "research that finds that newspaper coverage is neither complete nor representative and can demonstrate selection bias

and description bias," with several studies showing "that about half or fewer newsworthy events are covered by newspapers." PX117 at 11-12 (Burch Rebuttal Report).

271. Second, Dr. Critchlow's survey covered only three categories of political campaigns: U.S. Senate, Gubernatorial, and Congressional District 1. Tr. Day 5 88:23-89:2 (Critchlow). It did not search any statewide races outside of U.S. Senate and Gubernatorial races. *Id.* at 89:3-5. It did not search any congressional races outside of Congressional District 1. *Id.* at 89:6-17. It did not "search for any North Carolina General Assembly elections, neither State House nor State Senate elections," including 2024 races for SD1 and SD2 or 2022 races for SD1 or SD3. *Id.* at 89:18-22. It did not search any local races, in the Black Belt counties or elsewhere, and did not research any other races at all. *See id.* at 88:23-89:2.

272. Third, Dr. Critchlow searched an extraordinarily narrow set of terms. Dr. Critchlow's newspaper search was limited to the key words "racism," "bigotry," "issues," and the names of the candidates in the three categories of contests he analyzed. *Id.* at 90:15-91:2. Specifically, for each campaign Dr. Critchlow analyzed, he searched the names of the two candidates in the race along with the term "issues," then the names of the candidates with the term "racism," and finally the names of the candidates with the term "bigotry." *Id.* That approach narrowed Dr. Critchlow's results in peculiarly limited ways. For example, his search returned results for the term "racism," but not "racist." *Id.* at 91:3-10. It returned results for the term "bigotry," but not "bigoted." *Id.* at 91:11-14. And it excluded entirely terms like "discriminatory or discrimination," "prejudice or prejudiced," "bias or dog whistle," and many "other words that could commonly come up in media coverage of the types of racial appeals in political campaigns that are at issue in Senate Factor 6." *Id.* at 91:15-20. Dr. Critchlow did not "deploy any methodology for choosing keywords or themes, or for testing the validity of those keywords for capturing racial appeals in campaigns," despite

best practices making clear "that content should be identified through an examination of previous literature." PX117 at 12 (Burch Rebuttal Report).

273.    The predictable result of Dr. Critchlow's artificially narrow search is that it "failed to turn up several clear instances of racial appeals in North Carolina campaigns." *Id.* Dr. Burch explained that "[r]eexamining just a few of the races Dr. Critchlow purports to research" reveals "numerous examples of racial appeals in North Carolina politics that would count even under his narrow definition of racial appeals as accusations of racism or bigotry that were covered by journalists." *Id.* at 19. "When we add in the racial appeals that Dr. Critchlow excludes through his unreasonably narrow search technique, the portrait of North Carolina politics changes dramatically"; as Dr. Burch showed, "[r]acial appeals appear in nearly every recent statewide race in North Carolina and also in recent congressional, legislative, and local races." *Id.*

274.    Dr. Critchlow's report failed, for instance, to identify the Robinson campaign as involving charges of racial appeals, even though by the time Dr. Critchlow produced his report North Carolina newspapers had covered Robinson's statements calling Martin Luther King Jr. a communist, the Civil Rights Movement a compromise of "free choice," and declaring that he himself was "not African-American." *Id.* at 13. National outlets provided similar coverage, but Dr. Critchlow's search omitted those sources altogether. *Id.* Dr. Critchlow was thus forced at trial to revise the conclusions in his expert report that only two of the races he examined involved racial appeals. Tr. Day 5 103:4-7, 104:22-105:3 (Critchlow). Dr. Critchlow likewise omitted the 2022 U.S. Senate race between Cheri Beasley and Ted Budd, which garnered coverage in national outlets like *The New York Times* and *The Washington Post* "for playing on racial fears," but that was covered in national outlets that Dr. Critchlow excluded from his search. PX117 at 18 (Burch Rebuttal Report). His report also of course missed the numerous racial appeals Dr. Burch identified

that occurred in races Dr. Critchlow excluded, in media sources that Dr. Critchlow omitted, or that provoked characterizations like "dog whistle" that that Dr. Critchlow did not consider. *Id.* at 17-19. These examples "clearly show the bias and methodological flaws in Dr. Critchlow's examination of racial appeals." *Id.* at 19.

275.    The methodological flaws in Dr. Critchlow's report undermined its foundation so severely that he was compelled at trial to substantially revise several of the opinions in his initial report, further undermining his credibility. As noted, Dr. Critchlow revised his opinion with respect to Lieutenant Governor Robinson's Gubernatorial campaign. Dr. Critchlow testified at his deposition that he was not offering an opinion about whether Robinson "referring to himself as a Nazi," "advocating slavery," and "saying that he wanted to own human beings" was a racial appeal. Tr. Day 5 102:9-19 (Critchlow). He revised that opinion on cross-examination, however, acknowledging that although he believed "there could be a different reading on some of" Robinson's statements, he now believed charges of racism were levied in the 2024 Gubernatorial campaign, specifically due to Robinson's pronouncement "that he was a Nazi." *Id.* at 103:4-7, 104:22-105:3.

276.    Dr. Critchlow then revised the bottom-line conclusion of his report. His expert report stated that "[c]harges of racism were reported in only 5 percent of the races for Governor, U.S. Senate, and Congressional District 1." LD61 at 12 (Critchlow Report). That was an error. Dr. Critchlow analyzed 20 elections and initially identified charges of racism in two of those elections, or 10% of the elections he surveyed. Tr. Day 5 107:24-108:16 (Critchlow). He revised those figures at trial to account for the Robinson omission, increasing his total to three of the 20 elections, or 15%. *Id.* at 108:17-19. Despite these revisions, Defense counsel did not ask, and Dr. Critchlow did not address, whether he continued to adhere to his opinion that racial appeals in statewide

campaigns are "rare" in light of his updated conclusion that charges of racism appear in 15%, not 5%, of the campaigns he surveyed. *See id.* at 108:23-25.

277.    Finally, Dr. Critchlow offered troubling testimony implicating the rigor of his analysis. Dr. Critchlow's expert report discussed the infamous Jesse Helms ad, LD61 at 17-18 (Critchlow Report), and Dr. Critchlow testified in his deposition that the ad was not "necessarily" a racial appeal, Tr. Day 5 97:1-11 (Critchlow). He was forced to revise that testimony on cross-examination, admitting that he had not actually viewed the 30-second ad before discussing it in his expert report or testifying about it in his deposition, but explaining that upon watching it after his deposition he reached the conclusion that it was in fact a "quite outrageous" explicit racial appeal. *Id.* at 97:12-98:10. Dr. Critchlow's failure to review the Helms ad before discussing it in his report, and his unfamiliarity with an ad the literature recognizes as one of the paradigmatic examples of a racial appeal, profoundly undermine his credibility.

278.    For all these reasons, the court finds that Dr. Critchlow's report and testimony were unhelpful, unreliable, and otherwise not credible. Indeed, this is not the first time Dr. Critchlow has "offered one-sided opinions," "ignored incidents of discrimination," and been "unfamiliar with" key events relevant to his analysis. *DNC v. Reagan*, 329 F. Supp. 3d 824, 836 (D. Ariz. 2018), *aff'd, DNC v. Hobbs*, 9 F.4th 1218 (9th Cir. 2021). The court gives no weight to Dr. Critchlow's testimony.

### G.  Senate Factor Seven: Black candidates are underrepresented in public office in the jurisdiction

279.    Plaintiffs provided evidence that Black people are underrepresented in public office in North Carolina through Dr. Burch and several lay witnesses. Defendants responded to that evidence through the testimony of Dr. Taylor and Dr. Critchlow.

146

280.    Dr. Burch provided evidence that Black people are underrepresented in key statewide offices. "There have been no Black people elected as Governor or Attorney General of North Carolina. Until 2020, no Black person had been elected as Lieutenant Governor either. Mark Robinson, elected in 2020," served as the first Black Lieutenant Governor of North Carolina, holding the position for one term before unsuccessfully running for Governor in 2024. PX21 at 32 (Burch Report). "No Black people have been elected to the U.S. Senate from North Carolina." *Id.* In other important federal offices, only 11 "Black people have been elected to the U.S. House of Representatives, including 8 since the year 1900." *Id.* No Black person was elected to Congress between 1900 and 1992. Tr. Day 1 9:19-10:1, 22:16-18 (Butterfield).

281.    Although Black members of the state House and Senate are at or near parity with the Black share of the statewide population, Dr. Burch explained that the success of Black candidates in state House and Senate elections has depended largely on running in majority-minority districts across the state. Of the 28 Black people elected to the state House, 22 were elected from majority-minority or majority-Black districts. PX271 at 4 (Burch Corrected Suppl. Report). Of the 10 Black people elected to the state Senate, 8 were elected from majority-minority or majority-Black districts. *Id.* Moreover, 24 Black candidates ran in, but lost, state House races in 2024. *Id.* Of those 24 Black candidates who lost state house races in 2024, "19 lost to White candidates in majority-White districts, two lost to minority candidates in majority-minority districts, one lost to a minority candidate in a majority-White district, and only two lost to a White candidate in a majority-minority district." *Id.* "Of the 15 Black candidates who lost state senate races, 14 lost to White candidates in majority-White districts. One candidate, Semone Pemberton, was defeated by another Black candidate in SD19." *Id.* at 5. "Of the 10 Black people elected to the state senate, only one, Natalie S. Murdock, defeated a White person representing a major political party in . . .

a majority-White district," winning in SD20 which contains "parts of Durham and Chatham Counties." *Id.* at 4-5. "Only one other Black candidate won in a majority-White district: In SD17, which is located in Wake County and contains parts of Raleigh, Cary, and Apex, Sydney Batch, a Black woman, had no major political party opponent; her only opponent was a third-party candidate. All other Black state senators in 2024 were elected from majority-minority districts." *Id.* at 5.

282.    Dr. Burch opined that Black candidates in the Black Belt counties are especially dependent on majority-minority districts to achieve success. "The counties at issue in this case traditionally were spread across two majority-Black state Senate districts. In the 1992 state Senate map, which was used for elections from 1992 to 2000, nearly all counties were split between the 2nd and 6th districts, which were 59.46% and 59.23% Black, respectively. Thereafter, in the 2002 through the 2016 elections, these counties were spread across the 3rd and 4th state Senate districts, both of which were majority-Black as well. In 2018 and 2020, the counties were still mostly spread across the 3rd and 4th districts; although they were no longer majority-Black, SD4 was still majority-minority." PX21 at 33 (Burch Report). The high Black population in these districts enabled Black candidates to succeed there for decades prior to the 2020 redistricting cycle. *Id.* at 33-34. "These representatives include Ed Jones, Robert Lee Holloman, Frank Ballance, Jr., Erica Smith, Angela Bryant, Milton Toby Fitch, and Ernestine Bazemore." *Id.* at 34.

283.    The 2020 redistricting cycle changed that. "[B]eginning with the 2022 cycle, for the first time in decades, none of the counties were in districts with more than 43% Black population, and the Black candidate in the district containing most of these counties, Valerie Jordan in District 3, lost. Meanwhile, Toby Fitch, whose district had included Edgecombe and Halifax Counties in 2020, lost in 2022 after his district (District 4) was redrawn to no longer include any Black belt counties and to be a majority-White district. The people in all but Edgecombe County were

148

represented by White senators. Notably, although District 5 (which includes Edgecombe) elected a Black senator and is not a majority-Black district, it is a majority-minority district (the White population is 48.56%)." *Id.*

284.    "This pattern continued in the 2024 general election" under the redrawn maps. PX271 at 3 (Burch Corrected Suppl. Report). Under the enacted plan, "the counties at issue in this case are spread across House Districts 1, 5, 23, 27, and 326 and Senate Districts 1, 2, 5, and 11." *Id.* In 2024, the first election cycle held under the enacted plan, "Black representatives were elected to the House only from HD23 (Shelly Willingham) and HD27 (Rodney Pierce), which are majority-Black. In HD5, Howard Hunter III, a Black candidate, lost to Bill Ward, a White candidate. In the state senate, a Black woman, Kandie Smith, defeated Alexander Paschell, a White candidate, in SD5, which is majority-minority and about 40% Black. In the other senate districts in the area, which are majority-White, Black candidates Tare Davis and James Mercer were defeated by White opponents in SD2 and SD11, respectively." *Id.* at 3-4. No Black candidate ran in SD1, which has a BVAP of less than 30%, and the white-preferred white candidate defeated the Black-preferred white candidate in that district by nearly 15 percentage points. D.E. 105 at 12.

285.    Recent state House primary elections in the Black Belt counties follow a similar trend. "In the most recent state House primary elections in eastern North Carolina, Black candidates were successful against non-Black opponents in contested elections only when they were competing in majority-Black districts. For example, looking at the 2024 primary outcomes in non-majority-Black districts, Linda Moore, a White candidate, defeated Dorothea White and Cynthia Evans-Robinson (both Black candidates) in the Democratic primary for HD 3; Claire Kempner (a White candidate) defeated Lenton Brown (a Black candidate) in the Democratic primary for HD 9; Katie Tomberlin (White) defeated Melvin Cooper (Black) in the Democratic primary for HD

13; and Allen Chesser (White) defeated Yvonne McLeod (Black) in the Republican primary in HD 25. By comparison, Black candidates won in HD 23 and HD 27, which are majority-Black districts." PX21 at 34 (Burch Report).

286.     The success of Black candidates in North Carolina's General Assembly elections occurs mostly on one side of the ticket. There is not a single Black Republican in the North Carolina Senate, leaving no Black votes in the majority party that has a veto-proof super-majority in the Senate and control over the redistricting process. *See* PX271 at 4-5 & n.10 (Burch Corr. Suppl. Report). There is only one Black Republican in the Party's 71-member delegation in the North Carolina House, where the Republican party also has substantial majority control. *See id.* at 4-5 & n.14 (Burch Corr. Suppl. Report). Dr. Alford examined 65 partisan election contests over the last eight years (48 partisan statewide elections in 2016-2022, and 17 partisan statewide and endogenous elections in 2024). *See* LD59 at 12-15 (Alford Report); LD75 at 5 (Alford Suppl. Report). The Republican Party candidate in only 3 of those races, less than 5%, was Black. *See id.* The candidate in two of those three races was Lieutenant Governor Mark Robinson. *See id.*

287.     Dr. Critchlow responded to Dr. Burch's analysis by verifying some of her data, noting that there are more Black representatives in North Carolina's General Assembly today than there were prior to the enactment of the Voting Rights Act, and providing a list of names of some notable Black North Carolina judges, prosecutors, and Black elected officials. LD61 at 23-26 (Critchlow Report). Dr. Critchlow's report thus corroborates Dr. Burch's opinion that complying with the Voting Rights Act is critical to enabling the election of Black officials in North Carolina.

288.     Dr. Taylor responded to Dr. Burch's analysis with two paragraphs of assorted data-points. LD62 at 16-17 (Taylor Report). Dr. Taylor's first paragraph opined that 5.8% of the Black representatives to serve in the U.S. House since 1870 have been from North Carolina, "roughly

150

the proportion of the U.S. Black population that has been from North Carolina over the past several decades." *Id.* at 16. That does not speak to Black representation as a proportion of total representation, either nationwide, statewide, or in the Black Belt counties. Dr. Taylor further explained that "there have been seven Black North Carolina Supreme Court justices, including the current Justice Anita Earls." *Id.* at 16-17. He omits that the Court is composed of seven Justices, placing Black representation on the Court at 14%, a figure disproportionately low compared to North Carolina's total Black population. He also does not contextualize the seven Black Justices ever to have served on the Court as a percentage of the total Justices ever to have served on the Court, nor does he measure their terms as a percentage of the total number of Supreme Court terms.

289. Dr. Taylor's second paragraph identified Black representation at various other levels of government across the state. He observed that "several large North Carolina cities have Black mayors, including Charlotte (Vi Lyles), Durham (Leo Williams), and Fayetteville (Mitch Colvin)." *Id.* at 17. Those cities are not in the Black Belt region, and "are majority-minority cities." PX117 at 23 (Burch Rebuttal Report). Dr. Taylor stated that, "[a]ccording to the North Carolina Black Alliance, there are currently 581 Black elected officials in North Carolina, 191 of them in the eleven counties highlighted throughout Dr. Burch's report." LD62 at 17 (Taylor Report). He did not provide the total number of elected positions, either in North Carolina or in the Black Belt counties, nor did he identify how many of those officials were elected by majority-minority constituencies. *See id.* Finally, Dr. Taylor estimated that "40 of the 62 county commissioners in [the Black Belt] counties are Black. At 65 percent, this in excess of the counties' Black population. Only the commissions in Chowan and Gates are minority Black." *Id.* He failed to note, however, that "Gates and Chowan counties . . . are the only two clearly majority-White counties in the data (Martin is evenly divided)." PX117 at 23 (Burch Rebuttal Report). That corroborates Dr. Burch's

opinions: Majority-Black counties have majority-Black commissions; majority white counties have majority-white commissions. Majority-minority constituencies remain critical to Black representation at all levels of North Carolina government.

290. On the whole, "both Dr. Taylor and Dr. Critchlow talk about Black representation in all of North Carolina *except* the districts and region of the state in question. They both ignore and do not address at all [Dr. Burch's] statement that 'in the Black belt region at issue here, Black candidates for the state Senate have fared poorly in the most recent election cycle after majority-Black or near-majority Black districts were dismantled.'" *Id.* at 22. "Neither Dr. Critchlow nor Dr. Taylor analyzed the extent to which the Black elected officials they celebrate were elected in majority-minority or near-majority-minority contexts. Such an analysis underscores the importance of majority-minority contexts to Black political representation in North Carolina: after three decades of electing Black senators from majority- or near-majority-minority state Senate districts, in 2022 the counties at issue were, for the first time since 1992, included in districts with a Black population no higher than 43%, and the people in all but Edgecombe County are represented by White senators." *Id.* at 23. The same is true in 2024. D.E. 105 at 12-13. And a "similar pattern emerges in 2024 state House primary elections: Black candidates defeated non-Black opponents only in majority-Black districts, while white candidates defeated Black candidates in other districts." PX117 at 23 (Burch Rebuttal Report).

291. Dr. Burch's testimony that Black candidates have been uniformly unsuccessful in prominent statewide elections, and outside of that largely dependent on majority-minority districts to succeed in General Assembly and other elections both in the Black Belt region and across the state, is unrebutted. The court credits her testimony.

### H.  Other Totality Factors: North Carolina is not responsive to its Black voters

292.    Plaintiffs offered evidence on the responsiveness of the North Carolina legislature through lay witnesses and Dr. Burch. Plaintiffs' witnesses emphasized three areas in particular where the General Assembly has been unresponsive to the needs of Black voters: education, healthcare, and election laws. Dr. Burch offered evidence of racial disparities in those and other areas to confirm their testimony. Defendants responded through Dr. Taylor.

293.    Plaintiffs' lay witnesses uniformly testified that the General Assembly has been unresponsive to the needs of Black voters. Congressman Butterfield testified that the legislature "has been very unresponsive to issues that disproportionally affect the African American community." Tr. Day 1 21:10-12 (Butterfield). Plaintiff Rodney Pierce agreed that the legislature has not been responsive to the Black community. *Id.* at 52:5-10 (Pierce). Plaintiff Moses Mathews testified that the legislature has not been responsive to the needs of Black voters in the Black Belt counties in recent years. *Id.* at 65:5-13 (Matthews). Senator Dan Blue testified that the legislature has in "recent years" passed laws harming Black people on "important" issues. *Id.* at 88:2-89:13 (Blue). Representative Reives testified that, "in my mind," the General Assembly has not been responsive to the "needs of the Black citizens of North Carolina." *Id.* at 146:18-21 (Reives).

294.    Plaintiffs' lay witnesses emphasized that the General Assembly has not been responsive to the educational needs of Black citizens in North Carolina. They explained that investment in public education is among the most important interests of Black voters in the Black Belt region. *See* Tr. Day 1 147:15-21 (Reives). Congressman Butterfield testified that he has been "very disappointed with the responsiveness in education and community investment" in the Black Belt counties, explaining that "schools in northeastern North Carolina are underfunded," have been underfunded "for years," and are "still underfunded." *Id.* at 21:2-19 (Butterfield). "If you were to compare the public schools of Halifax County with the public schools of Orange County, [there is

153

a] vast difference, vast difference, and the legislature can do something about that and they have not." *Id.* Moses Matthews elaborated on that testimony, explaining that investment in public education had been a "major concern" since the 1990's because the legislature has "diverted" funding from public schools to "other education institutions" like "charter school[s]," which "has tak[en] away from public schools and [is] hurting Martin County particularly." *Id.* at 62:13-25 (Matthews). Representative Reives added that "you've got to invest in public education if you're going to be responsive to the needs of Black voters. There's just no if, ands, or buts about that. You just can't make up for that by hoping that they're going to go to private or charter schools." *Id.* at 147:15-21 (Reives). Nevertheless, the General Assembly has passed legislation that reduces funding to public schools, which disproportionately impacts Black children in the Black Belt. *Id.* at 48:17-20 (Pierce).

295.    The fact witnesses were equally concerned with the General Assembly's non-responsiveness to the healthcare needs of Black citizens in North Carolina. Medicaid expansion has been one of the principal issues. Tr. Day 1 21:5-12 (Butterfield); *see id.* at 49:10-17 (Pierce); *id.* at 146:18-22 (Reives). "North Carolina was one of the few states that did not expand the Medicaid program when it was offered under the Affordable Care Act." *Id.* at 21:5-12 at (Butterfield). Instead, the General Assembly refused to pass Medicaid expansion for ten years, despite the Black community's widespread calls to expand the program. *Id.* at 146:21-22 (Reives). The legislature's refusal to expand Medicaid—which would have cost the State nothing—disproportionately impacted Black citizens. Representative Pierce testified that over fifty percent of children in the majority-Black counties of Halifax, Warren, and Northampton are on Medicaid. *Id.* at 49:1-3 (Pierce). Moses Matthew testified that "just in Martin County, for instance, we lost our only hospital" because of the General Assembly's refusal to fund Medicaid, contributing to a "detriment to good

health in Martin County." *Id.* at 63:4-8 (Matthews). Although the legislature "finally passed Medicaid expansion," it "passed it 10 years late." *Id.* at 146:21-22 (Reives). The lay witnesses also cited additional examples of non-responsiveness in healthcare beyond Medicaid expansion. For example, the General Assembly closed the Office of Minority Health, an office that focused on health issues that are prevalent in Black communities, including hypertension and sickle cell anemia. *Id.* at 146:23-147:7 (Reives).

296.    The General Assembly's legislation in the election realm supplied another area of concern. As discussed, the North Carolina General Assembly's redistricting plans were invalidated three separate times in the last decade as unconstitutional racial gerrymanders against Black people. The legislature also passed an omnibus election reform package that was enjoined because it "target[ed] African Americans with almost surgical precision" and was "the most restrictive voting law North Carolina has seen since the era of Jim Crow." *McCrory*, 831 F.3d at 214, 229. Senator Blue addressed both issues, testifying that it is "important to Black voters in North Carolina that their votes carry the same weight as the votes of White citizens," but that the plans struck down following the 2010 redistricting cycle "packed Black voters into [] districts," diluting their value. Tr. Day 1 88:18-89:14 (Blue). He likewise testified that it is "important to Black voters in North Carolina to have equal access to the right to vote," but that the omnibus reform bill invalidated in *McCrory* "went to extensive ends to add" provisions like "voter ID" restrictions that are "anathema . . . to Black participation in voting." *Id.* at 87:21-89:13 (Blue). Representative Pierce described how legislation like this effects Black voters' faith that the legislature is invested in their needs, explaining that "[w]hen you pass a bill and a federal court says that that bill, which is a voting rights bill or voter ID bill, targeted Black voters with surgical precision . . . that really makes you raise your eyebrows as an African American voter." *Id.* at 52:21-53:4 (Pierce).

297.     Dr. Burch's report and testimony corroborates the testimony of Plaintiffs' fact witnesses. Dr. Burch offered unrebutted testimony that North Carolina has large racial disparities in education and health outcomes, as well as in socioeconomic status and criminal justice involvement, that are a product of past and current racial discrimination. Her testimony regarding education and healthcare fits neatly with the testimony of Plaintiffs' fact witnesses. The lay witnesses described a paradigm in which the General Assembly has diverted funding from public schools, which are relied on by Black students, to private schools, which Black students are unable to access. Dr. Burch's data shows that this dynamic has led to racially segregated schools in the Black Belt region and underachievement by Black students. PX21 at 4-18 (Burch Report). The fact witnesses likewise described healthcare disinvestment that harmed the Black population, and Dr. Burch confirmed that Black people in North Carolina experience worse health outcomes across the board than white people. *Id.* at 18-21. Dr. Burch also showed that educational disparities interact with employment prospects to generate corresponding gaps across socioeconomic indicators. *Id.* at 13-18. Finally, Dr. Burch demonstrated that the North Carolina criminal justice system is infected with racial bias, a defect that imperils the interests of Black residents in a state-run institution. *Id.* at 21-23.

298.     Defendants offered no lay witness testimony rebutting Plaintiffs' evidence that the General Assembly has been unresponsive to the needs of Black voters. Defendants instead responded to Plaintiffs' responsiveness evidence through Dr. Taylor. Dr. Taylor offered three central datapoints to show that the North Carolina General Assembly is responsive to the needs of its Black citizens: a dataset on correlation between public opinion and public policy, data on federal government outlays, and a number of state expenditure line items.

299. The first metric Dr. Taylor offered relied on a dataset developed by Professors Devin Caughey and Christopher Warshaw to ascertain correlation between public opinion and public policy, which Dr. Taylor used as a proxy for legislative responsiveness. LD62 at 21-22 (Taylor Report). He compared North Carolina's positive correlation on economic and cultural issues to the same correlation in other states over a period of time. *Id.* North Carolina's correlation was 28th best in the country on economic issues between 1982 and 2019, and has been 25th best in the country on cultural issues since 2011. *Id.* Assuming that the Caughey-Warshaw data is a reliable proxy for responsiveness in some contexts, Dr. Taylor conceded on cross-examination that it is not an accurate proxy here, because it measures "responsiveness to the general population," not responsiveness to "Black residents," and because it is a measure of "the state as a whole," not the "Black Belt counties." Tr. Day 5 33:4-35:12 (Taylor). He explained that "if we wanted to understand the degree or extent to which the state has been responsive to the needs of people in the Black-Belt counties, the Warshaw-Caughey data wouldn't tell us anything about that." *Id.* at 35:1-13. Yet even accepting Dr. Taylor's measurements on their own terms, they put North Carolina in the bottom half of the country. LD62 at 21-22 (Taylor Report). The court also notes that this is another concerning example of Dr. Taylor's self-evident data manipulation. Even within the same metric, Dr. Taylor, without explanation, examines economic policy correlation between 1989 and 2019 and cultural policy correlation between 2011 and today. *Id.* That continues to undermine Dr. Taylor's credibility.

300. Second, Dr. Taylor analyzed "federal government outlays—direct payments, grants, and contracts—at the state and county levels." *Id.* at 22. "In FY 2019, the last full year for which we have data that was undisturbed by the massive spending to tackle COVID-19, the average position in North Carolina of the eleven black belt counties for per capita federal expenditures

was 33 out of 100." *Id.* This data corresponds to the right counties but the wrong government entity. Dr. Taylor does not purport to attribute the federal government's spending in North Carolina to the actions of the state legislature, and indeed, the evidence in this case has shown that the General Assembly is overwhelmingly resistant to offers of federal funding.

301.     Third, Dr. Taylor analyzed state budget line items in the 2022-2023 and 2023-2024 fiscal years that benefitted the Black Belt counties and Black North Carolinians more generally. *Id.* at 23-24. The Black Belt expenditures included line items like funding for public schools in Chowan, Northampton, Washington, Halifax, and Warren Counties, fire cleanup in Edgecombe County, and wastewater projects in Chowan, Edgecombe, Gates, Halifax, Hertford, Northampton, Vance, and Warren Counties. *Id.* at 23. The statewide expenditures included funding for historically Black colleges and universities, various African-American cultural initiatives, and minority economic development programs. *Id.* at 24. Dr. Taylor did not, however, compare the appropriations to Black Belt counties with appropriations to other parts of the state, and did not compare the expenditures on projects addressing the interests of Black North Carolinians to the state's total budget. Tr. Day 5 38:23-39:19 (Taylor). He "does not provide any evidence that the state government spends money meeting the needs of Black citizens in proportion to their presence in the state, or even in proportion to the other special grants given to other cities, counties, and organizations." PX117 at 23 (Burch Rebuttal Report). That deprives Dr. Taylor's "examples of particularized benefits" of needed context. Tr. Day 5 39:13-22 (Taylor).

302.     Considering all this evidence together, the court finds that Plaintiffs offered five lay witnesses who uniformly testified that the North Carolina General Assembly has been unresponsive to the needs of Black voters and who illustrated those opinions through concrete and consistent

examples. Plaintiffs' expert, Dr. Burch, traced that testimony to large and undisputed racial disparities in those and other areas. Defendants offered no lay witness testimony rebutting Plaintiffs' fact witnesses, and relied exclusively on the testimony of Dr. Taylor whose evidence was irrelevant, acontextual, and uninspiring on its own terms. The court credits the testimony of each of Plaintiffs' witnesses and assigns no weight to the testimony of Dr. Taylor.

### I. Other Totality Factors: Any justification for splitting the Black Belt counties in the new Senate map is tenuous

303. Plaintiffs introduced unrebutted evidence that the Black Belt counties are a community of interest through the testimony of Mr. Esselstyn and offered evidence that the legislature's adopted county pairings were puzzling through the testimony of Mr. Matthews. Defendants responded through the testimony of Senator Hise.

304. Mr. Esselstyn opined that the Black Belt counties are "a significant community of interest," and defendants offered no evidence rebutting that proposition. PX69 at 30 (Esselstyn Report). The legislature nevertheless divided the Black Belt counties between four Senate districts under the 2022 plan and the enacted plan, dividing the counties' Black population more sparsely than ever before in both plans, and spreading the Black population even further in the enacted plan than it had in the 2022 plan. *See* D.E. 105 at 26-28; PX69 at 10-14 (Esselstyn Report). The 2023 plan reduced the compactness of the Black Belt districts from their prior 2022 levels, reducing the Reock and Polsby-Popper scores respectively from 0.40 and 0.18 in SD1 in 2022 to 0.26 and 0.21 in SD1 in 2023, and from 0.30 and 0.17 in SD3 in 2022 to 0.23 and 0.10 in SD2 in 2023. PX69 at 11, 13 (Esselstyn Report). Mr. Matthews testified that the maps paired Black Belt counties with coastal counties with whom they do not "have much in common." Tr. Day 1 65:2-4 (Matthews).

305.     Senator Hise did not dispute that the Black Belt counties are a community of interest or that the 2023 plan divided those counties to an unprecedented extent, but offered two justifications for the General Assembly's selection of the 2023 plan. The first justification Senator Hise offered was that the Redistricting Committee "had some testimony on trying to preserve the fingerling counties in the northeast as well as parts of the coastal region," and "District 1 keeps four of the five fingerling counties together within a district." Tr. Day 3PM 116:9-15 (Hise). The second justification Senator Hise offered was that the Committee "had some conversations about" how SD1 in the enacted plan "is in the Norfolk media market," explaining that "they get TV [and] radio" from that market, whereas SD 2 "comes more from the Greenville area." *Id.* at 116:16-20. Those two justifications were the only explanation Senator Hise offered for where the Committee "ultimately landed" in adopting the 2023 plan. *Id.* at 116:21-23. Senator Hise did not explain why preserving the fingerling counties or the Norfolk media market was more important than preserving the Black Belt counties.

306.     The court finds Senator Hise's explanation unconvincing and assigns it no weight. Senator Hise's testimony was exceedingly vague, attributing a critical redistricting decision to "some testimony" about preserving fingerling counties and "some conversations about" preserving the Norfolk media market. *Id.* at 116:9-20. Senator Hise did not explain why those conversations carried so much weight and did not explain why preserving the fingerling counties or the Norfolk media market was important. He also failed to address testimony that favored preserving the Black Belt counties, providing no explanation for why the Committee ultimately decided that preserving the fingerling counties and Norfolk media market was more important than preserving the Black Belt counties, a historic and well-recognized community of interest.

### J. Other Totality Factors: The reasons for racially polarized voting

307.    Plaintiffs' evidence of racially polarized voting, recounted above in PFOF §§ III, IV, and VI.B, itself serves as evidence that northeastern North Carolina's divergent voting patterns are polarized on account of race. Defendants offered the testimony of Dr. Alford to rebut that evidence and to show that partisanship drives racially polarized patterns, but he admitted that his analysis did not establish that, and the Court does not credit his testimony.

#### 1.    Defendants' Rebuttal Evidence

308.    Defendants offered the testimony of Dr. John Alford, who contended that voting in northeastern North Carolina is polarized on account of the candidate's party affiliation. Dr. Alford submitted an expert report in which he reviewed data provided by Dr. Collingwood, accepted the accuracy of that data and the degree of polarization it showed among Black and white voters, and then purported to rely on the same data to draw the conclusion that "party affiliation of the candidates best explains the divergent voting preferences of Black and White voters in North Carolina elections." LD59 at 5, 19 (Alford Report). Dr. Alford reached his conclusion by examining five sets of election data and analyzing the extent to which Black and white voters' partisan voting patterns changed depending on the race of the candidate.

309.    Dr. Alford is a professor of political science at Rice University. *Id.* at 2. In thirty-five years at Rice, he has "taught courses on redistricting, elections, political representation, voting behavior, and statistical methods at both the undergraduate and graduate levels." *Id.* at 2-3. He is "the author of numerous scholarly works on political behavior." *Id.* at 3. He has not, however, published any peer-reviewed work on the Voting Rights Act, racially polarized voting, the voting patterns of Black voters in the United States, or racial politics, and does not consider himself an expert in the political science subfields of racial politics or minority voting behavior. Tr. Day 4 71:2-72:22 (Alford).

310.    Dr. Alford testified at trial that saying "a number of courts have declined to credit" his testimony on the role of partisanship in driving racially polarized voting would be a "polite way" of putting it, and acknowledged that the analysis he conducted in this case was "similar" to the analyses he conducted in those other cases. Tr. Day 4 59:20-24, 65:8-13 (Alford). After testifying on direct examination that his methodology has never "been held to not be reliable," *id.* at 33:24-25, Dr. Alford acknowledged on cross-examination that this very testimony was not reliable: courts considering his analysis on this subject have in fact characterized his opinions as "not reached through methodologically sound means and [] therefore speculative and unreliable," standing "outside accepted academic norms among redistricting experts," and bordering "on *ipse dixit* and [] unsupported by meaningful substantive analysis," *id.* at 59:25-61:6, 62:4-9, 68:13-69:4, 70:8-21.

311.    Dr. Alford conceded that his approach to assessing racial polarization is not "standard practice among redistricting experts." *Id.* at 69:18-24.

312.    The methodology Dr. Alford employed in this case, as in other cases, was to examine the election results in Dr. Collingwood's report and provide a descriptive analysis of whether Black and white votes are more strongly correlated to the party affiliation of a candidate or the race of a candidate. LD59 at 2 (Alford Report).  Dr. Alford conducted this analysis because he believes that the VRA was "passed to deal with the fact that voting was, frankly, racist in North Carolina," and that the relevant legal question was whether "White voters will not support Black candidates in North Carolina" *because* they are Black, i.e., based on racism.  Day 4 Tr. 66:2-7, 67:5-9 (Alford).

313.    Dr. Alford presented a series of tables in which he compared white and black support for white Democrats versus Black Democrats in various North Carolina elections, ultimately

concluding that Black voters are highly supportive of the Democratic candidate and white voters are supportive of the Republican candidate, that "Black voters are no more supportive of the Black Democrat than they are of the White Democrat in any of the areas," and that "White voters are no more likely to oppose a Black Democrat than they are a White Democrat." LD59 at 6 (Alford Report). For example, Dr. Alford's table involving Supreme Court elections across several years is below:

**Table 2: State Supreme Court Elections EI RPV Estimates from Collingwood's Appendix**

| Year | Office | Candidate Name | Party | Race | Statewide Black | Statewide White | Demonstration Area Black | Demonstration Area White | District 1 Black | District 1 White | District 2 Black | District 2 White |
|------|--------|----------------|-------|------|-------|-------|-------|-------|-------|-------|-------|-------|
| 2020 | Seat 2 | Lucy Inman | DEM | White | 98% | 26% | 99% | 14% | 99% | 21% | 99% | 17% |
| 2020 | Seat 2 | Phil Berger, Jr. | REP | White | 2% | 74% | 1% | 87% | 1% | 79% | 1% | 83% |
| 2020 | Seat 4 | Mark Davis | DEM | White | 98% | 25% | 99% | 14% | 98% | 21% | 99% | 17% |
| 2020 | Seat 4 | Tamara Barringer | REP | White | 2% | 75% | 0% | 86% | 1% | 79% | 1% | 83% |
| 2022 | Seat 3 | Lucy Inman | DEM | White | 96% | 30% | 98% | 12% | 94% | 21% | 99% | 17% |
| 2022 | Seat 3 | Richard Dietz | REP | White | 3% | 69% | 1% | 85% | 4% | 77% | 0% | 82% |
| 2022 | Seat 5 | Sam J. Ervin IV | DEM | White | 95% | 30% | 98% | 13% | 94% | 22% | 99% | 18% |
| 2022 | Seat 5 | Trey Allen | REP | White | 3% | 68% | 2% | 84% | 6% | 76% | 1% | 81% |
|  |  | **White vs White** | **Dem. Average** |  | 97% | 28% | 99% | 13% | 96% | 21% | 99% | 17% |
|  |  | **White vs White** | **Rep. Average** |  | 3% | 71% | 1% | 85% | 3% | 78% | 1% | 82% |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| 2018 | Seat 1 | Anita Earls | DEM | Black | 98% | 31% | 99% | 17% | 98% | 25% | 99% | 21% |
| 2018 | Seat 1 | Jackson+Anglin | REP | White | 1% | 69% | 1% | 83% | 3% | 75% | 5% | 78% |
| 2020 | C. J. | Cheri Beasley | DEM | Black | 98% | 27% | 99% | 14% | 98% | 21% | 99% | 18% |
| 2020 | C. J. | Paul Newby | REP | White | 2% | 73% | 1% | 86% | 2% | 79% | 1% | 82% |
|  |  | **Black vs White** | **Dem. Average** |  | 98% | 29% | 99% | 15% | 98% | 23% | 99% | 19% |
|  |  | **Black vs White** | **Rep. Average** |  | 1% | 71% | 1% | 85% | 2% | 77% | 3% | 80% |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| 2016 | Seat 2 | Michael R. Morgan | NON | Black | 75% | 47% | 78% | 44% | 70% | 52% | 83% | 43% |
| 2016 | Seat 2 | Robert H. Edmunds | NON | White | 25% | 53% | 22% | 56% | 30% | 48% | 17% | 57% |

314.    Analyzing this data, Dr. Alford concluded that "the race of the candidates does not appear to have a polarizing impact on vote choice." *Id.* at 7. He opined that these results were "consistent with a polarized response to the party affiliation indicated on the ballot." *Id.* He also

found the 2016 non-partisan race "instructive," because in that race, which excluded "a party in-dication on the ballot" but permitted "candidates themselves" to "express a party preference," "Black voter support for the Black candidate (Democrat Michael Morgan) is, at 75%, significantly lower than Black support for either White or Black Democratic candidates in the succeeding par-tisan election contests." *Id.* at 8. Dr. Alford acknowledged at trial, however, that this election sup-ported the proposition that "even if there's no partisan indication on the ballot the race of the candidate has explanatory value for the cohesion we see in Black voter preferences." Tr. Day 4 91:14-92:16. The single non-partisan race thus confirms that Black voters preferred a Black can-didate over a white candidate.

315. Dr. Alford made similar tables for different race and year combinations. He ulti-mately acknowledged that the 2016 contests "show a[] consistent tendency for White voters to crossover at lower levels for Black Democratic candidates," specifically 2 to 3 percentage points lower. LD59 at 11 (Alford Report). Dr. Alford also agreed at trial that "across all four years . . . it is empirically true that in contests pitting Black candidates against White candidates, White voters overwhelmingly prefer the White candidate and Black voters overwhelmingly prefer the Black candidate." Tr. Day 4 at 97:12-100:7 (Alford).

316. Dr. Alford also examined the results "of the 2024 general elections for the statewide offices plus Senate Districts 1 and 2." LD75 at 2 (Alford Suppl. Report). He concluded that, similar to previous years other than 2016, "Black voters consistently give high levels of support to the Democratic candidate and White voters give high levels of support to the Republican candidate." *Id.* He opined that this was "consistent with a polarized response to the candidate based on the party affiliation indicated on the ballot." *Id.* at 2-3. He opined that in contrast, "the race of the candidates does not appear to have a polarizing impact on vote choice" because in these elections,

"Black voters are no more supportive of the Black Democrat than they are of the White Democrat," and "White voters are no more likely to oppose a Black Democrat than they are a White Democrat." *Id.* at 3-4.

317. This analysis was incorrect. Dr. Alford's opinion on the 2024 elections relegate to a footnote the results of the 2024 gubernatorial race, the only race in Dr. Alford's five-election cycle dataset that featured a Black Republican candidate against a white Democratic candidate. *Id.* at 2 n.2. Dr. Alford acknowledged in a footnote that "Robinson's support from White voters is notably lower than any other Republican candidate." *Id.* Dr. Alford noted that white voters' support for Robinson had been normal in Robinson's 2020 campaign, when he faced a Black candidate, but declined sharply in his 2024 campaign, when he faced a white Democrat, and recognized that this may "reflect[] the impact of Robinson's race on voter behavior." *Id.* In his supplemental rebuttal report, however, Dr. Alford conducted an extensive analysis of what he terms "special circumstance[s]" in the 2024 gubernatorial race. LD76 at 12. But Robinson made numerous scandalous remarks prior to 2024. PX21 at 26-27. Nor does Dr. Alford investigate special circumstances that might have made one candidate more or less popular in a single other contest, even though many of his analyses relied on averages with only a tiny number of races involving Black people, such that special circumstances in a single election might have biased the results.

318. In his supplemental rebuttal report, LD76, Dr. Alford also criticized Dr. Collingwood for focusing on the fact that the 2024 gubernatorial race showed that white voters were less likely to vote for Mark Robinson when he faced a white Democrat than when he faced a Black Democrat in 2020, but this criticism is not persuasive. As Dr. Collingwood explained, PX279 at 5, he conducted this analysis in his supplemental report of the race of the candidate not because he believes that it is persuasive or relevant to the RPV analysis, but because it is the analysis that Dr.

Alford conducts. Dr. Alford, for example, relied extensively on a single race in 2016 because it was the only nonpartisan election in the dataset. LD59 at 8. The Robinson 2024 race is the only election that provides any signal of how white voters who normally prefer Republican candidates might be affected by the race of the candidate, because it is the only election that pits a Black Republican against a white Democrat. Dr. Alford himself highlighted Robinson's defeat of white opponents in the 2024 Republican primary, asserting that those primary results alone show that it is not "likely" that voting in North Carolina is racially polarized, even though Dr. Alford did not analyze *a single other primary*. LD59 at 19. The Court finds Dr. Alford's approach—of relying on unique aspects of the Mark Robinson contests when he believes they support his position, but discounting the Mark Robinson contests when they do not—to be noncredible.

319. In any event, even taking Dr. Alford's analysis at face value, it did not establish that voters in northeastern North Carolina are not motivated by racial considerations. Dr. Alford clearly testified that his own results—showing that Black and white voters voted based on the candidate's party affiliation rather than the candidates race—established that Black voters *were* voting based on their own race. He agreed that "*race of the voter* is strongly connected to the party of the candidate the voter votes for." Tr. Day 4 100:11-14 (emphasis added).

320. From the five sets of elections Dr. Alford analyzed, he wrote that "party affiliation of the candidates *best explains* the divergent voting preferences of Black and White voters in North Carolina elections." LD59 at 19 (Alford Report) (emphasis added). But at trial, Dr. Alford acknowledged his opinion was only that party affiliation of the candidates best explains the divergent voting preferences of Black and white voters as compared to race of the *candidate*. Tr. Day 4 104:19-22 (Alford). In other words, his comparisons of white voter and Black voter support for

Black and white candidates did not establish that party affiliation of the *voter* better explains po-larized voting than race of the *voter*.

321.     Dr. Alford also testified at trial that, while he believed that there was not "evidence in the court record to suggest that [voters'] behavior is altered by the race of candidates," his *own* analysis did not disprove that.  Tr. Day 4 66:14-19.  "[M]y analysis doesn't demonstrate the ab-sence of any racial voting [based on the race of the candidate]; it just demonstrates that the plain-tiffs' evidence does not provide any evidence."  Tr. Day 4 66:14-19.

322.     Indeed, Dr. Alford testified at length that nothing in his analysis assessed the cause of racially polarized voting patterns in North Carolina.  His analysis did not establish "why" Black and white voters consistently support different candidates from different political parties, and he had not even "examined that question."  Tr. Day 4 100:11-18.  He had "done no examination of party affiliation of voters in any area of North Carolina."  *Id.* at 105:9-10.  He testified that he had not "done any work to try to assess whether Black voters consistently support Democratic candi-dates because they're Democrats or whether they consistently support Democratic candidates be-cause Democratic candidates promote policies and values shared by Black voters."  *Id.* at 100:11-18, 101:12-18.

323.     While he did not do any empirical work to assess that question, Dr. Alford opined that it's "very likely to be correct" that Black voters "consistently support Democratic candidates because Democratic candidates promote policies and values shared by Black voters," rather than because the candidates are "Democrats."  *Id.* at 101:12-23.  He testified that "it[s] the party of the candidate [that] tells us a lot about" whether the candidate will do "a better job of advancing the interests of Black voters in North Carolina."  *Id.* at 102:20-103:2. Generally, he testified, "people

are voting by race because they have a common interest and that common interest goes to whoever is representing that philosophy." *Id.* at 104:2-12.

324.    Dr. Alford went a step further in his trial testimony, testifying that not only had he failed to assess the cause of racially polarized voting patterns in North Carolina in this case, he could not have done so. He testified that "it's not possible to establish the cause of voter behavior outside of an experimental setting." Tr. Day 4 103:3-6. Dr. Alford testified that he was "not aware of any study that provides solid evidence of a causal connection for anything related to voting behavior" in political science. *Id.* at 103:3-18. Political scientists "talk about things influencing things or being associated with things or being correlated with things. But cause, causation is a, you know, very specific scientific term and that implies considerable levels of control over an experimental setting which in the case of human behavior, particularly political behavior is neither possible or ethical." *Id.* at 103:20-104:1.

325.    Dr. Alford also did not claim that "White voters constitute the majority of Democratic voters in the demonstration area District 1 or District 2" or that "Republicans aggressively recruit Black candidates to run in elections in North Carolina or in northeastern North Carolina," noting that the Republican Party fielded a Black candidate in only three of the elections he analyzed. *Id.* at 105:6-25; *see* LD75 at 5 (Alford Suppl. Report) (adding one Black candidate to the two referenced at trial).

326.    Given Dr. Alford's trial testimony substantially limiting the conclusion in his expert report that partisanship "best explains" North Carolina's racially polarized voting, his related testimony that he conducted no analysis of what causes this polarization, and his testimony that he believes that Black voters vote for Democrats because Democrats support policies that advance the interests of Black voters, the court finds that Defendants have offered no evidence to suggest

that racially polarized voting in northeastern North Carolina is the product of a candidate's party affiliation rather than the race of the voter. To the contrary, the Court finds that Defendants have offered evidence supporting the view that Black and white voters vote differently in northeastern North Carolina for reasons related to their own race.

2.    <u>Plaintiffs' Additional Evidence that Racial Polarization in the Black Belt counties is in Fact Connected to Race</u>

327.    Plaintiffs offered additional evidence that partisanship and race as determinants of voting are inextricably intertwined in northeastern North Carolina through both fact and expert testimony. All five of Plaintiffs' lay witnesses testified that Black voters tend to support Democratic candidates because Democratic candidates tend to champion issues Black voters care about, and not out of pure party allegiance. Plaintiffs' experts provided statistical support for that testimony and responded to Dr. Alford's expert opinions (which also supported that testimony).

328.    Plaintiffs introduced unrebutted and consistent lay testimony that race and party are interconnected in northeastern North Carolina. Congressman G.K. Butterfield testified that "political polarization in electoral politics" does not "fully explain" racial polarization in politics. Tr. Day 1 19:14-20 (Butterfield). "The attitudes and the opinions of White voters are . . . opposite to some of the views of African American voters, they look at the world differently because their experiences have been different. African American voters are concerned about issues involving education, employment, voting opportunities, and other issues that affect the family. Not to say that that doesn't apply also in White communities, but African American voters are very concerned about economic issues and probably less about social issues. So the attitudes are different between the races and therefore they perform differently at the ballot box and they choose their preferred candidates based upon their needs and their experiences with the political party." *Id.* at 19:21-20:9.

169

"African Americans are not connected with a political party because of . . . any unfounded allegiance. It's not a connection that is unbreakable. It depends on the issues." *Id.* at 20:18-21. The court credits Congressman Butterfield's testimony.

329. Representative Rodney Pierce testified to the same effect. He explained that Black voters do not vote Democratic out of "party allegiance," but because "the Democratic Party . . . speaks more to and presses for policy that addresses issues that are relevant to African American or Black voters." Tr. Day 1 53:9-16 (Pierce). Representative Pierce himself was previously registered unaffiliated at a time when he "didn't think that the Democratic Party was responsive to the issues of Black voters." *Id.* at 49:17-23. He ran against the existing representative in his House district—a white Democrat—because he believed that the representative did not represent the "interests" of his majority-Black district, especially on issues like school vouchers, environmental justice, and Medicaid expansion. *Id.* at 46:3-49:16. These issues are particularly important to Black voters. He explained that the voucher system is "primarily used by White citizens" and that "expanding the voucher program is going to defund the public school system" that is relied on by Black families. *Id.* at 46:20-47:2, 48:17-49:14. He cited hog farms that, in the Black Belt region, "are built in or near neighborhoods that are usually minority neighborhoods" and spew toxins on disproportionately Black communities. *Id.* at 48:4-49:16. He noted that over 50 percent of children in his majority-Black district are on Medicaid. *Id.* at 49:1-16. He testified that the Democratic Party today presses for policies that address more of these issues, and that is why Black voters are more likely to vote for Democrats. *Id.* at 53:9-16. The court credits Representative Pierce's testimony.

330. Plaintiff Moses Matthews testified about the same issues. He explained that the General Assembly has not been "composed of voices that would represent the best interest of

eastern North Carolina" or that understands and responds to the region's "core values." Tr. Day 1 65:5-23 (Matthews). That includes prioritizing issues like "education," "Medicaid expansion," "environmental control," and the "tremendous health disparities in eastern North Carolina" the fall disproportionally on Black residents. *Id.* at 65:8-13. He testified that Black citizens in Martin County do not vote for Democrats "out of allegiance to the Democratic Party," but because they tend to represent these "core values." *Id.* at 65:24-66:4. The region has, however, "had some Democratic Party representatives that voted in ways that we didn't agree on and we let them know so." *Id.* at 66:2-4. The court credits Mr. Matthews's testimony.

331. Senator Blue provided testimony along the same lines. He explained that the "overwhelming majority of Black voters" vote for Democrats because "of the issues that are championed and how the Black community thinks those issues advance their ability to have full citizenship and participation in this country," not "out of allegiance to the party." Tr. Day 1 91:15-24 (Blue). He testified that he himself is a Democrat because in his adult experience, "Democrats currently represent the expressed aspirations of most African Americans. It wasn't always like that, but from roughly the enactment of the Voting Rights Act and the Civil Rights Act in the 1960s, '64 and '65, African Americans have identified with the Democratic Party because they think the party articulates their concerns." *Id.* at 90:11-20. That stands in contrast to the "significant number of the African Americans that [he] knew" "growing up as a youngster," who all "identified with the Republican Party," a trend "that had been the case since the 1860s up through the Reconstruction era, and up to the initiation of Jim Crow laws by democratic legislators in the South," but "started changing significantly in the 1960s." *Id.* at 90:21-91:5. The court credits Senator Blue's testimony.

332. Representative Robert Rieves rounded out the Plaintiffs' testimony on this issue. He explained that "Black voters tend to overwhelming[ly] support the Democratic Party in North

Carolina" because Black voters want the "issues that are important to them" at the "forefront" of a candidate's priorities, which "at this time" is more commonly the case among Democratic candidates. Tr. Day 1 144:17-25 (Reives). "[P]ublic education is a huge issue" for Black voters and "you tend to see more Democratic candidates pushing for more public education support in dollars." *Id.* at 145:1-4. Safety "is a huge thing with African Americans to make sure that they're safe in their communities," and "Democratic candidates tend to be more about trying to get communities together, to work together better, [and] understand[] there's differences." *Id.* at 145:5-12. "Healthcare is a monumental issue" given that the "average age of death for African American[s,] especially African American males is either stagnated or decreased in some areas," and there are issues like that which "are particular to African Americans" and garner more "support . . . with Democratic candidates." *Id.* at 145:13-20. "[E]conomic development and workforce development are huge issues because . . . there's not a lot of wealth in Black communities" that has been built up "over generations . . . in African American communities," so "they want more opportunities for economic development." *Id.* at 145:21-146:7. Representative Reives testified that the Republican Party could "be the party of choice for Black voters," especially given that the Republican Party is "in power" and Black voters "would want to be able to" align with the party that has an opportunity to press issues they care about, but for now "Democratic candidates talk about more" of the "big issues" that matter to Black voters and Republican candidates have made a "choice . . . to advocate for" different "issues." *Id.* at 146:8-17. The result is that the Republican-controlled legislature has not been responsive to the needs of Black voters. *Id.* at 146:18-147:21. The court credits Representative Reives's testimony.

333.    The North Carolina Democratic and Republican Party platforms reinforce the fact witness testimony regarding the alignment of the parties around issues important to Black voters.

The North Carolina Democratic Party platform focuses on investing in public education, eliminating segregation in North Carolina schools, and opposing private school vouchers, PX223 at 27-30 (N.C. Democratic Platform), whereas the North Carolina Republican Party platform focuses on funding private and charter schools, which have contributed to racial segregation in the North Carolina education system, PX222 at 10 (N.C. Republican Platform). The North Carolina Democratic Party platform endorses "comprehensive universal healthcare" and "expanding Medicaid," PX223 at 23 (N.C. Democratic Platform), whereas the North Carolina Republican Party platform endorses "employer-based health insurance models" and "preserving Medicaid's original design," PX222 at 9 (N.C. Republican Platform). The North Carolina Democratic Party platform supports workforce development programs, PX223 at 12 (N.C. Democratic Platform), whereas the North Carolina Republican Party platform supports reducing the role of government in economic development, PX222 at 12 (N.C. Republican Platform). These platform profiles corroborate the precise issue area divergence identified by Plaintiffs' witnesses.

334.    In addition, the North Carolina Democratic Party Platform repeatedly mentions a commitment to "diversity," PX223 at 2, articulates a commitment to "encourage historically underrepresented groups, such as …. minorities, to participate in the party affairs and to seek election to public and party office," PX223 at 6, expresses support for the Voting Rights Act, PX223 at 8, expresses a commitment to combat "structural racism" in banks, "including red lining for loans to communities of color," PX223 at 11, and efforts to increase the number of "minorities" in government employment "where they are under-represented," PX223 at 5.  The North Carolina Republican Party platform does not have comparable language.  This is further evidence that Black voters vote for Democratic candidates for reasons related to the voters' race, and that a Black voter's votes for Democratic candidates cannot be and have not been disentangled from their race.

335. Plaintiffs' fact witnesses drew on history to provide further evidence that Black voters' support for the Democratic party is not a product of partisan allegiance. Congressman Butterfield explained that in the Reconstruction period, Black voters overwhelmingly registered and voted as Republicans. Tr. Day 1 9:1-10:1 (Butterfield). Black voters "were aligned with the Republican Party at" that time "because of the 13th Amendment and the Emancipation Proclamation by Republican President Abraham Lincoln." *Id.* at 20:10-17. Senator Blue elaborated that Black people predominantly supported the Republican Party from the "1860s up through the Reconstruction era, and up to the initiation of Jim Crow laws by democratic legislators in the South." *Id.* at 90:21-91:5 (Blue); *see id.* at 50:17-51:3 (Pierce) (same); *id.* at 20:10-17 (Butterfield) (same). Indeed, Senator Blue testified that his grandfather, his grandfather's friends, his preachers, his teachers, "all of" the older generation in the community were Republicans. *Id.* at 91:8-14 (Blue). That started changing with the New Deal and was "sealed" with the enactment of the Voting Rights Act and the Civil Rights Act in the 1960's. *Id.* at 51:4-10 (Pierce); *see id.* at 90:14-91:5 (Blue); *id.* at 20:10-17 (Butterfield) (same). Since then, "African Americans have identified with the Democratic Party because they think the party articulates their concerns." *Id.* at 90:14-20 (Blue); *see id.* at 20:10-17 (Butterfield) (same). The court credits this testimony.

336. Dr. Burch's expert testimony offered statistical context for the issues Plaintiffs' fact witnesses identified as motivating Black voters, in particular, public education, economic issues, and healthcare. The court continues to credit Dr. Burch's testimony.

337. Plaintiffs' fact witnesses repeatedly emphasized that education is among the most important issues to Black voters in North Carolina. Dr. Burch's report explained that North Carolina has "racial disparities in education" that "result from historical and contemporary discrimination." PX21 at 4 (Burch Report). Her report demonstrates that "about one-fifth of North Carolina's

current electorate is likely to have been educated during the time when the state's districts were racially segregated by law." *Id.* at 5. It also shows that "[y]ounger adults in the electorate . . . still face educational discrimination." *Id.* "Multiple school districts in North Carolina have been found to provide Black students with unequal education to that provided to White students," for example, the "Bertie County Board of Education was found to have operated a 'racially identifiable white elementary school' in 2003." *Id.* In fact, "school segregation has *increased* in North Carolina since 1998," and elementary school segregation is still "considered high in Halifax, Washington, and Vance Counties, and moderate in Warren and Martin Counties." *Id.* at 6. Those results in north-eastern North Carolina are driven in particular by "private schools, charter schools, balkanized school districts, and differences between schools within public school districts and within the char-ter school or private school sectors." *Id.*

338. The fact witnesses likewise testified that economic issues are particularly important to Black voters in northeastern North Carolina. Dr. Burch provided context for that too, explaining in her report the racial disparities in socioeconomic status in North Carolina. The statewide unem-ployment rate for Black people in North Carolina is 8.3%, compared to the white unemployment rate of 4.3%, and the median income for households headed by Black people is $42,996, compared to the median income of households headed by white people of $68,259. *Id.* at 14-15. In the Black Belt counties, "Black family poverty rates . . . can be double, even triple the rate found for White families." *Id.* at 15-16. Dr. Burch concluded that "Black workers in North Carolina face several structural barriers to equal employment" and that "[h]istorical and contemporary discrimination" in the realm of both education and employment "contributes to" these socioeconomic "racial dis-parities" in North Carolina. *Id.* at 13-15.

339.    A third issue area the lay witnesses identified as particularly affecting Black voters was healthcare policy. Dr. Burch discussed North Carolina's healthcare outcomes by race, concluding that "[t]here are racial gaps in health outcomes in North Carolina, with Black residents, by many measures, suffering worse health outcomes than White residents." *Id.* at 19. Her report explains that "White North Carolinians are expected to live 78.1 years, which is more than 3 years longer than the life expectancy for Black North Carolinians, and that these "racial disparities in life expectancy are apparent at the county level as well." *Id.* Moreover, "infant mortality among Black babies . . . is more than twice as high as the mortality rate for White babies," "Black invasive cancer mortality is higher than that of White North Carolinians," and "[h]ealth insurance coverage is also lower for Black North Carolinians." *Id.* Dr. Taylor agreed that "in every single one of these health-related metrics," statewide and in the Black-Belt counties, "there is a racial disparity with White North Carolinians being better off than Black North Carolinians." Tr. Day 5 18:19-25 (Taylor). Dr. Burch attributed these results to "structural barriers to equal health outcomes" that Black people face in North Carolina. PX21 at 19 (Burch Report).

340.    In addition to this testimony, Dr. Burch also offered opinions on the prevalence of racial appeals in North Carolina elections, which the court has already discussed with respect to Senate Factor Six, that are likewise salient to Plaintiffs' evidence that North Carolina's elections are polarized on account of race. For example, in the 2024 statewide election for North Carolina School Superintendent, Republican candidate Michele Morrow, who is white, reposted a video accusing her Democratic opponent Maurice Green, who is Black, of having "spent his professional life going after white people and Jews" and of "advocating racial preferences for Black students." PX271 at 1 (Burch Corrected Suppl. Report). The video included an infographic depicting Green alongside an agenda that included statements like "No Suspensions for Black Students" and "First

Preference to Black Students." *Id.* at 1-3. Dr. Burch explained that these types of racial appeals occur in election cycle after election cycle at every level of North Carolina politics and serve to "make racial attitudes and concerns more salient in the minds of voters." PX21 at 24 (Burch Report).

341.    Dr. Collingwood followed this evidence with specific responses to Dr. Alford's opinions on the role of partisanship in shaping North Carolina's racially divergent voting patterns. Dr. Collingwood, unlike Dr. Alford, is an expert in racial politics. Tr. Day 2 115:21-25 (Collingwood). Dr. Collingwood testified at trial that Dr. Alford's analysis does not "support a conclusion that partisanship rather than race drives the extreme racially polarized voting in" North Carolina because he did not "make a direct comparison" between those two variables or pit them "against one another in" any sort of "causal test." *Id.* at 148:20-25. Dr. Collingwood explained that "there are lots of reasons why [] candidates have certain partisan identifications; that many of them are due to race or racial attitudes embedded within," them, and "that partisanship and race are [] intertwined." *Id.* at 149:10-22. Dr. Alford did not do "any sort of test where he's causally establishing that all of this is really just down to the fact that Black voters are voting for Democratic candidates and not because of Black voters are actually voting for based on their race." *Id.* at 149:13-22. In fact, Dr. Alford "perform[ed] no analysis of that question at all and [did] not explain his conclusion." PX128 at 4 (Collingwood Rebuttal Report). "Even if Dr. Alford were correct that voters do not vote on the basis of the race of the candidate, nothing in his analysis shows or even attempts to show that Black voters in North Carolina in any contest are cohesively voting for a particular candidate because that candidate is a Democrat, as opposed to because Black voters cohesively believe that the particular candidate will advocate for their community." *Id.* at 4-5.

342.     The "actual data analysis" in this case supported only the proposition that "voting in northeastern North Carolina is highly racially polarized based on the race of the voter." Tr. Day 2 149:23-150:10 (Collingwood). The data showed that the "race of the voter," not the race of the candidate, "determines candidates of choice." PX128 at 1 (Collingwood Rebuttal Report). One "cannot [examine] the findings [in this case] where upwards of 98 to 99 percent of Black voters are backing the same set of candidates and between 70 and 80 percent of White voters are backing a different set of candidates and conclude that that has nothing to do with the race of the voter." Tr. Day 2 149:23-150:10 (Collingwood). "If Black voters happen to prefer a white candidate because that white candidate makes strong cross-racial appeals and/or takes policy stances that are in line with the policies and issues Black voters care about, then it is sensible that that candidate is Black voters' candidate of choice." PX128 at 2 (Collingwood Rebuttal Report).

343.     Even accepting Dr. Alford's approach on its own terms, Dr. Collingwood explained that "none of Dr. Alford's analysis supports a conclusion that partisanship, rather than race, drives the extreme racially polarized voting in" northeastern North Carolina. *Id.* "Dr. Alford's own results demonstrate that minority-preferred minority candidates are defeated more often in this area of the state than minority-preferred white candidates." *Id.* Focusing on the 2016 election, "the only year where a Black-preferred candidate won a majority of the vote in Senate District 1 or 2 in any of the election contests" at issue, Dr. Collingwood showed that of the "6 minority-preferred minority candidates [who] ran in 2016 . . . 5 of them, or 83%, were defeated in Senate Districts 1 and 2." *Id.* at 2-3. By contrast, of the "12 minority-preferred White candidates [who] ran in 2016 . . . 7 of them, or 58%, were defeated in Senate Districts 1 and 2. These results reflect that minority-preferred minority candidates are defeated more often in Senate Districts 1 and 2 than minority-preferred white candidates." *Id.*

344.     The year 2024 was the only other year across the five election cycles that the experts analyzed where a Black-preferred candidate was able to win a majority in District 1 or 2, and that candidate was also White.  PX279 at 4.  Black-preferred Black candidates were thus defeated more often than Black-preferred White candidates in 2024 as well.

345.     Dr. Collingwood continued to show that "Dr. Alford's own results demonstrate that white voters offered less cohesive support to minority Democratic candidates than to White Democratic candidates in certain election years." PX128 at 3 (Collingwood Rebuttal Report). In 2016, "white voters in all three relevant areas—the Demonstration Area, Senate District 1, and Senate District 2—were more likely to vote for a White Democrat than a Black Democrat. On average, 21% of White voters in the Demonstration Area, 25% of White voters in District 1, and 22% of White voters in District 2 supported a White Democrat in 2016 races. By comparison, on average, 18% of White voters in the Demonstration Area, 23% of White voters in District 1, and 20% of White voters in District 2 supported a Black Democrat in 2016 races. White voters were slightly less likely across the board to support Black Democrats." *Id.* Dr. Alford likewise acknowledged that the 2016 contests "show a[] consistent tendency for White voters to crossover at lower levels for Black Democratic candidates." LD59 at 11 (Alford Report). Dr. Collingwood observed a similar, if slightly less significant trend, in other cycles. "In 2020 and 2022, Dr. Alford reports in his Table 6 and Table 7 that White voters were sometimes equally likely to support minority Democratic candidates, and sometimes slightly less likely (in District 2 in 2020 and the Demonstration Area in 2022, though the difference is only 1 percentage point)." PX128 at 3 (Collingwood Rebuttal Report).

346.     Dr. Collingwood's RPV analysis showed that, in the 2024 elections, white voters in SD2 were somewhat more likely (a difference of about 1.84 percentage points) to cross over to support the Black-preferred candidate when that candidate was White.  PX279 at 11.

347.     Dr. Collingwood also addressed the nonpartisan 2016 Supreme Court Seat 2 election that Dr. Alford called attention to. Dr. Collingwood observed that for "a non-partisan contest, we do observe a fairly high rate of cohesion among Black voters." PX128 at 4 (Collingwood Rebuttal Report). Dr. Alford agreed with that at trial, testifying that the election supported the proposition that "even if there's no partisan indication on the ballot the race of the candidate has explanatory value for the cohesion we see in Black voter preferences." Tr. Day 4 91:14-92:16.

348.     Finally, Plaintiffs showed what evidence is not present in this case. Plaintiffs demonstrated that this is not a case where white voters constitute a majority of the Republican party and the Democratic party in the relevant counties. *See* Tr. Day 4 105:6-10 (Alford) ("I have . . . done no examination of" whether "White voters constitute the majority of Democratic voters in the demonstration area[,] District 1 or District 2."). Senate District 1 has a white VAP of 64.49% and Senate District 2 has a white VAP of 63.62%. JX6 at 9. At the same time, white voters in SD1 typically vote for the Democratic candidate at a rate of approximately 20% and in Senate District 2 at a rate of approximately 19%, while Black voters support those same candidates at a rate of 97% and 99% in SD1 and SD2 respectively. PX279 at 7, 10 (Collingwood Suppl. Report). That shows that white voters are a substantial minority of Democratic voters in SD1 and SD2.

349.     Plaintiffs also showed that this is not a case where both political parties have equally recruited Black candidates. As explained, Dr. Alford examined 65 partisan election contests over the last eight years, and in only 3 of those races, or 5%, was the Republican candidate Black. *See* LD59 at 12-15 (Alford Suppl. Report); LD75 at 5 (Alford Suppl. Report). In 2024, all

four Republican nominees for state Senate in the Senate districts covering the Black Belt counties were white. D.E. 105 at 12-13. Similarly, in 2022, all four Republican nominees for state Senate in the Senate districts covering northeastern North Carolina were white. D.E. 105 at 17-18. The Republican elected to represent Senate District 1 in 2018 and 2020 was also white. D.E. 105 at 20, 27. There is no record evidence that a Black Republican has ever been elected to the state Senate in northeastern North Carolina. The record is equally empty of any evidence that the Republican Party has attempted to recruit Black candidates for Senate in northeastern North Carolina.

350.    In sum, the court finds that Plaintiffs offered extensive evidence that North Carolina's racially divergent voting patterns occur on account of race. Defendants' evidence purporting to attribute those voting patterns to party allegiance rather than race did not in fact shed light on the cause of racially divergent voting in North Carolina and thus did nothing to rebut Plaintiffs' evidence. The court agrees with the multiple other courts that have concluded that Dr. Alford's conclusions on the role of partisanship in racially divergent voting patterns border on *ipse dixit*, and assigns his testimony on that subject no weight.

## PROPOSED CONCLUSIONS OF LAW

### I.    Plaintiffs Have Standing

351.    The federal courts provide redress to plaintiffs with standing to maintain a claim. Standing is determined under a "familiar three-part test." *Gill v. Whitford*, 585 U.S. 48, 65 (2018). The plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, which "affects the plaintiff in a personal and

individual way." *Gill*, 585 U.S. at 65 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, & n.1 (1992).

352.     A plaintiff has standing to maintain a vote dilution claim under Section 2 when the plaintiff "reside[s] where [a] Section 2 district should have existed," but "was not drawn," and "the district would have made it more likely that the plaintiff could elect a candidate of [] choice." *LULAC v. Abbott*, 604 F. Supp. 3d 463, 486 (W.D. Tex. 2022). The plaintiff's injury flows from the defendant's "failure to draw the plaintiff into a *hypothetical* opportunity district." *Id.* "That harm . . . goes beyond the boundaries of a single district." *Id.* (quotation omitted). Plaintiffs need not live in every challenged district to have standing to assert a vote dilution claim. *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1123 n. 14 (E.D. Cal. 2018) (collecting cases). It is enough that the "harm arises from the particular composition of the voter's own district, which causes his vote— having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 585 U.S. at 67. "Remedying the individual voter's harm, therefore, does not neces- sarily require restructuring all of the State's legislative districts," it "requires revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be." *Id.*

353.     The plaintiffs here are Representative Rodney Pierce and Mr. Moses Mathews. The parties stipulated to most of the details confirming both plaintiffs' standing. Representative Pierce is a registered voter and lifelong resident of Halifax County, where he has voted in every election since 1996. Tr. Day 1 37:21-38:11, 48:4-11 (Pierce); D.E. 105 at 3. Mr. Matthews is a registered voter in Martin County, where he has resided and voted regularly since the 1970's. Tr. Day 1 57:24-58:15 (Matthews); D.E. 105 at 3. The plaintiffs are both Black and both live in Senate Dis- trict 2 under the enacted plan, a majority-white district that does not currently perform for Black-

preferred candidates. D.E. 105 at 3, 12. Their home counties, Halifax and Martin, are in every one of Plaintiffs' demonstration districts, which if enacted likely would perform to elect Black voters' candidates of choice. PX69 at 15, 18, 21, 24 (Esselstyn Report); PX36 at 19-23 (Collingwood Report); PX279 at 19 (Collingwood Suppl. Report). The evidence also showed that the Black Belt region was cracked down the middle, splitting the majority-Black counties between four districts, placing Halifax and Martin Counties in a district that was only 30.01% BVAP and most of the remaining Black Belt counties in neighboring SD1, which had a 29.49% BVAP. D.E. 105 as 12; Tr. Day 1 130:9-21 (Blue); Esselstyn Rep. Figure 6. The unrebutted evidence thus shows that both plaintiffs reside in counties where they assert that a "Section 2 district should have existed," but "was not drawn," and that if adopted their proposed districts "would have made it more likely that the plaintiff[s] could elect a candidate of [] choice." *Abbott*, 604 F. Supp. 3d at 486. The plaintiffs both have standing to maintain their Section 2 vote dilution claims, including to seek an order requiring the adoption of a Black opportunity district in Northeastern North Carolina and forbidding the defendants from conducting elections in Districts 1 or 2, districts that would need to be altered to create a minority opportunity district.

## II.  Legal Background

### A.  The *Gingles* Framework

354.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution. The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v.*

*Gingles*, 478 U.S. 30, 46 n.11 (1986). A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [Black voters] in that [Black voters] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see Allen v. Milligan*, 599 U.S. 1, 24-25 (2023). The Supreme Court set out the standard for a Section 2 vote dilution claim in *Gingles*, explaining that such claims have two components.

355.    First, Plaintiffs must satisfy three preconditions that are necessary conditions precedent to a Section 2 vote dilution claim. The three preconditions are that: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51.

356.    Second, once all three preconditions are established, the court considers whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Judiciary Committee Report ("Senate Report") on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors ("Senate factors") that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2. S. Rep. 97-417, at 28-29 (1982).

357.    A state legislature must comply with Section 2, like any other federal law, when it engages in map-drawing in the first instance. A legislature that "invokes the VRA to justify race-

based districting" in defending against racial gerrymandering must show that it had a "strong basis in evidence" for believing that § 2 was satisfied. *Cooper v. Harris*, 581 U.S. 285, 292-93 (2017). That does not mean that a legislature can immunize itself from Section 2 liability by claiming ignorance. Section 2 is a federal law and the legislature must comply. In any event, Plaintiffs introduced ample evidence, through the SCSJ letter and Senator Blue's testimony, that the General Assembly was on notice that "***enacting Proposed Senate Districts 1 & 2 would violate the VRA***," and Senator Hise confirmed at trial that he was aware of the concerns that a VRA district was required in the Black Belt counties and that racially polarized voting exists in that region. PX179 at 3, 24 (SCSJ Letter).

358. The Supreme Court recently reaffirmed Section 2 "law as it exists" in *Milligan*. 599 U.S. at 23. In particular, the Court reiterated the purposes of each step in the Section 2 inquiry. The first precondition, "focused on geographical compactness and numerosity, is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Id.* at 18 (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). "The second, concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected. *Id.* at 18-19 (quoting *Growe*, 507 U.S. at 40). "The third precondition, focused on racially polarized voting, 'establishes that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Id.* at 19 (brackets omitted) (quoting *Growe v. Emison*, 507 U.S. at 40). Finally, "the totality of circumstances inquiry recognizes that application of the *Gingles* factors is 'peculiarly dependent upon the facts of each case.'" *Id.* (quoting *Gingles*, 478 U.S. at 79).

359. The Court also rejected several arguments that would have remade "§ 2 jurisprudence anew." *Id.* at 23. First, the Court rejected the State's effort to substitute a "single-minded"

neutral benchmark test for the more holistic totality of circumstances framework. *Id.* at 24-26. Second, the Court refuted the argument that the established framework demands racial proportionality. *Id.* at 26-30. Third, the Court rebuffed the proposition that a plaintiff's illustrative district may not be "based" on race. *Id.* at 30-33. Fourth, the Court refused to make plaintiffs show that a race-neutral benchmark would have more majority-minority districts than the enacted plan. *Id.* at 33-37. Fifth, the Court rebuffed the State's attempt to convert Section 2's test from an effects test to an intent test. *Id.* at 37. Finally, the Court reaffirmed that Section 2 applies to single-member redistricting and that it is constitutional as-applied to that context. *Id.* at 38-42.

360. *Milligan*'s refusal "to adopt an interpretation of § 2 that would revise and reformulate the *Gingles* threshold inquiry that has been the baseline of [] § 2 jurisprudence for nearly forty years" confirms that Section 2 confers a private right of action. 599 U.S. at 26 (internal quotation marks omitted). Five Justices agreed in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), that Congress created an individual cause of action under Section 2. 517 U.S. at 232 (opinion of Stevens, J., joined by Ginsburg, J.) (stating that the "private right of action under Section 2 ... has been clearly intended by Congress since 1965" and that VRA § 10 contains an implied private right of action because "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not"); *id.* at 240 (Breyer, J., concurring in the judgment, joined by O'Connor & Souter, JJ.) ("Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5"). Unless and until the Supreme Court says otherwise, this Court must adhere to the extensive history, precedent, and implied Congressional approval of Section 2's private right of action, which has formed the basis for hundreds of cases over six decades, during which time Congress has repeatedly reenacted the VRA without

jettisoning its tradition of private enforcement. Section 2 is also privately enforceable under Section 1983, which creates an express private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws*[.]" 42 U.S.C. § 1983 (emphasis added); *see Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 171-72 (2023)).

361.    The Supreme Court's recently reiterated Section 2 framework governs Plaintiffs' claims here.

## B.  The *Stephenson* Framework

362.    The North Carolina Constitution contains a requirement known the "Whole-County Provision" or the "WCP," that provides that "no county shall be divided in the formation of a senate district." *Stephenson v. Bartlett*, 562 S.E.2d 377, 384 (N.C. 2002) (brackets omitted) (quoting N.C. Const. art. II, § 3(3)).

363.    The North Carolina Supreme Court addressed the interplay between North Carolina Constitution's Whole-County Provision and the VRA in *Stephenson*. The Court explained that "[a]lthough the respective state legislatures maintain primary responsibility for redistricting and reapportionment of legislative districts, such procedures must comport with federal law." *Id.* at 384. "When federal law preempts state law under the Supremacy Clause, it renders the state law invalid and without effect." *Id.* at 388. Federal laws thus "necessarily serve as limitations upon the state legislative redistricting process." *Id.* at 384. *Stephenson* recognized that under the VRA, " an inflexible application of the WCP is no longer attainable." *Id.* at 389. It nevertheless held that "the WCP remains valid and binding upon the General Assembly during the redistricting and reapportionment process . . . except to the extent superseded by federal law." *Id.* at 390.

364.    *Stephenson* outlined a procedure for harmonizing the VRA and the Whole-County Provision. The procedure creates a two-step process for drawing state legislative districts in North Carolina. The first step in the process, "to ensure full compliance with federal law," is to create

"districts required by the VRA." *Id.* at 396-97. The second step in the process, to implement the Whole-County Provision, is to create county groupings, sometimes called "county clusters," to form non-VRA districts from the remaining counties. *Id.* at 397.

365. This county grouping stage of the process follows its own specified sequencing. The legislature must first form "non-VRA" districts from every county that can form a standalone district consistent with population deviation requirements. *Id.* The legislature must next create "non-VRA" districts in every county that can include two or more districts wholly within its boundaries, consistent with the population deviation requirements. *Id.* Finally, in "counties having a non-VRA population pool which cannot support at least one legislative district at or within plus or minus five percent of the ideal population for a legislative district or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the at or within plus or minus five percent 'one-person, one-vote' standard, the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard." *Id.*

366. This case does not directly involve applying *Stephenson* because it concerns only VRA districts, which must be created "prior to creation of non-VRA districts" under the *Stephenson* framework. Understanding the framework nonetheless provides useful context for the parties' arguments and expert testimony.

III. ***Gingles* Precondition One: Plaintiffs have shown that the Black population in northeastern North Carolina is sufficiently large and geographically compact to comprise a reasonably configured majority-Black Senate district**

367. The first *Gingles* precondition is satisfied when the minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. 18 (brackets omitted) (quoting *Wisconsin Legislature v. Wisconsin Elections*

*Comm'n*, 595 U.S. 398, 402 (2022)). The purpose of the first precondition, "focused on geographical compactness and numerosity, is" to "establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Id.* (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). The numerosity requirement is satisfied if the population of the minority group exceeds 50% in a single-member district. *Bartlett v. Strickland*, 556 U.S. 1, 12 (2009) (plurality opinion). The remaining requirements are satisfied if the district "comports with traditional districting criteria, such as being contiguous and reasonably compact." *Milligan*, 599 U.S. 18.

368. A plaintiff satisfies the numerosity requirement when either the BVAP, as measured by the district's any part Black population, or the BCVAP, as measured by the district's ACS point estimate, exceeds 50%. *See, e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1002-04 (N.D. Ala. 2022), *aff'd Milligan*, 599 U.S. 1 (any part Black); *LULAC v. Perry*, 548 U.S. 399, 429 (2006) (CVAP). Although plaintiffs are not "require[d]" to present a district with majority-minority CVAP (as opposed to VAP) absent "evidence of a significant noncitizen population," *Pope v. Cnty. of Albany*, 2014 WL 316703, at *13 (N.D.N.Y. Jan. 28, 2014), CVAP is an appropriate measure of the minority population when plaintiffs do present such a district, as CVAP best "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates." *Perry*, 548 U.S. at 429; *see, e.g.*, *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997) (same).

369. A plaintiff satisfies the reasonably configured requirement when their majority-minority demonstration district "comports with traditional districting criteria, such as being contiguous and reasonably compact." *Milligan*, 599 U.S. at 18. There is "strong[]" evidence that a district is reasonably configured when it is "roughly as compact as the existing plan," is not characterized by "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it

difficult to find" the district sufficiently compact, contains equal populations, is contiguous, and respects existing political subdivisions, such as counties, cities, and towns. *Id.* at 20 (citations omitted). A district that preserves a community of interest—such as "the Black Belt" region—is still more likely to be reasonably configured, even if it comes at the cost of "split[ting] [another] community of interest." *Id.* at 21. *Gingles* I, after all, is not a "beauty contest." *Id.* at 21 (brackets omitted). A demonstration district satisfies the first *Gingles* precondition if it is reasonably configured on its own terms—it need not be a better district than "the State's." *Id.* at 20-21.

370. These numerosity and reasonableness requirements apply to the demonstration "*district*"—not any broader demonstration *map. Milligan*, 599 U.S. at 18 (emphasis added) (quoting *Wisconsin Legislature*, 595 U.S. at 402). That is because the purpose of *Gingles* I has always been to show that "minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice," otherwise, they could not "claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 51 n.17; *see Milligan*, 599 U.S. at 18. Plaintiffs thus "typically attempt to satisfy" the first *Gingles* precondition by "drawing hypothetical majority-minority *districts*." *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1406 (5th Cir. 1996) (emphasis added). These proposed districts are "not cast in stone," but rather are "simply presented to demonstrate that a majority-black district is feasible in" the relevant area. *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994). Presenting a demonstration *district* satisfies that objective—no broader demonstration map is required, and even where Plaintiffs do supply a fully illustrative map, any critique of the broader map is irrelevant to whether the demonstration district within it satisfies *Gingles* I.

371. For similar reasons, the illustrative district a *plaintiff* introduces as evidence of vote dilution under *Gingles* I is not subject to the same equal protection principles that constrain a

*legislature* conducting redistricting in the first instance. The "prohibitions of the [fourteenth] amendment" apply only to state action. *C.R. Cases*, 109 U.S. 3, 13 (1883); *see United States v. Morrison*, 529 U.S. 598, 621 (2000). Section 2 plaintiffs mounting their evidence are not operating as a state actor; they are simply satisfying an evidentiary requirement by demonstrating that a remedy is possible. *Clark*, 21 F.3d at 95. The plaintiff's illustrative districts do not have the force of law and thus are not bound by the Equal Protection Clause. Recognizing this, every circuit court met with a *Shaw* objection to a plaintiff's illustrative plan has dismissed the argument for conflating a plaintiff's burden under *Gingles* with the government's obligations under *Shaw*.[8]

372.     Even if Equal Protection Clause principals did apply, they would not be triggered unless "race-neutral considerations come into play only after the race-based decision had been made." *Milligan*, 599 U.S. at 31 (brackets omitted) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017)). It is, after all, beyond dispute that demonstration districts may be "created with an express target in mind"—indeed, "[t]hat is the whole point of the enterprise." *Id.* at 33. And even then, the racial consideration would be justified because the Supreme Court has "long assumed that one compelling interest" sufficient to satisfy strict scrutiny "is complying with operative provisions of the Voting Rights Act of 1965." *Cooper*, 581 U.S. at 292.

373.     A plaintiff carries their burden under *Gingles* I if just "one" of their demonstration districts satisfies the first *Gingles* precondition. *Milligan*, 599 U.S. at 33. Plaintiffs here nevertheless offered five demonstration districts, Districts A through E, to show that the Black population in the Black Belt region is sufficiently large and geographically compact to constitute a majority

---

[8] *See Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 278 (2d Cir. 1995), *vacated sub nom. on other grounds City of Bridgeport v. Bridgeport Coal. for Fair Representation*, 512 U.S. 1283 (1994); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934-35 (8th Cir. 2018); *Sanchez v. Colorado*, 97 F.3d 1303, 1329 (10th Cir. 1996); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998).

in a reasonably configured district. Plaintiffs offer Demonstration District B as a potential remedial district, and the court excluded Demonstration District E from the evidence in this case. The court discusses the three remaining districts below, and concludes that all three satisfy *Gingles* I. That satisfies the first *Gingles* precondition three times over.

### A.    Demonstration District A

374.    Plaintiffs' Demonstration District A establishes that the Black population in north-eastern North Carolina is sufficiently large and geographically compact to constitute a majority in a reasonably configured district. It is undisputed that the district is sufficiently numerous to constitute a majority-Black district, and the court concludes that the district is also reasonably configured.

375.    The undisputed evidence showed that Demonstration District A exceeds the 50% minority population threshold necessary to satisfy the first *Gingles* precondition. Demonstration District A has a BVAP of 51.47% and a BCVAP of 52.71%. PX147 at 6 (Esselstyn Rebuttal Report). Defendants' expert Dr. Trende agreed that Demonstration District A is a majority-minority district by any measure. Tr. Day 4 191:20-22.[9] There is thus no dispute that Demonstration District A satisfies the *Gingles* I numerosity requirement.

376.    Plaintiffs also showed that Demonstration District A is reasonably configured. The undisputed evidence showed that the district is not just "roughly as compact as the existing plan," *Milligan*, 599 U.S. at 20, it is *more* compact than the existing plan, PX69 at 28 (Esselstyn Report). The district contains no "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to" characterize as sufficiently compact. *Milligan*, 599 U.S. 20. To the

---

[9] Plaintiffs have moved to strike Dr. Trende's testimony and report in light of the numerous errors he admitted during his testimony. The Court grants that motion. *See EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015). The Court also, and alternatively, declines to give any weight to Dr. Trende's testimony for the reasons discussed herein.

contrary, Demonstration District A, and the map Plaintiffs drew around it, replaces the tentacled SD2, which stretches from Warren County on the Virginia border to Carteret County on the Atlantic coast, and the Florida-shaped SD1, which spills from Northampton County on the Virginia line to Dare County in the Outer Banks, with two tightly formed districts in the northeastern part of the state. Dr. Trende did not contest that Demonstration District A is, in relative terms, more compact than the enacted plan, or, in absolute terms, that it is reasonably compact.



*377.* Demonstration District A carries all the other hallmarks of reasonableness. It is "within plus or minus five percent" of the ideal district population, *Stephenson*, 562 S.E.2d at 397, satisfying the "equal population[]" requirement, *Milligan*, 599 U.S. 18, for state legislative districts, *Stephenson*, 562 S.E.2d at 397, *see* JX4 at 1 (2023 Senate Criteria); *Connor v. Finch*, 431 U.S. 407, 418 (1977). It is completely "contiguous." *Milligan*, 599 U.S. 18. It "respect[s] existing political subdivisions, such as counties, cities, and towns," splitting no counties or precincts at all. *Id.* at 20. Defendants introduced no evidence rebutting any of this.

378. Demonstration District A also preserves communities of interest. It is undisputed that "North Carolina's Black Belt counties" are "a significant community of interest," PX69 at 30 (Esselstyn Report). Indeed, the Supreme Court has already recognized that the Black Belt regions of other southern states are communities of interest, because they have "a high proportion of black

voters, who share a rural geography, concentrated poverty, unequal access to government services, lack of adequate healthcare, and a lineal connection to the many enslaved people brought there to work in the antebellum period." *Milligan*, 599 U.S. at 21 (cleaned up). Demonstration District A preserves more of the Black Belt community of interest in a single district than does the enacted plan, which cracks the community apart across four districts. Defendants introduced no evidence disputing Plaintiffs' testimony that the Black Belt region in northeastern North Carolina is a well-recognized community of interest, or that it is preserved far better in Demonstration District A than anywhere in the enacted plan.

379. To the extent Demonstration District A would reunite the Black Belt community of interest at the expense of dividing another community of interest, that is irrelevant. *Gingles* I does not invite courts "to conduct a beauty contest between plaintiffs' maps and the State's." *Milligan*, 599 U.S. at 21 (cleaned up). A plaintiffs' demonstration district is "still [] reasonably configured" when it "join[s] together a different community of interest" than the community preserved in the State's map—there will "be a split community of interest" either way. *Id.* In any event, Senator Hise's testimony that the enacted plan preserved an alternative community of interest was itself "poorly supported." *Id.* (citation omitted). He testified only that there was "*some testimony* on trying to preserve the fingerling counties in the northeast" (which the enacted plan did not in fact entirely do, *see* PFOF § VI.I) and that there were "*some conversations* about" preserving the Norfolk media market (which covered some but not all of enacted SD1). Tr. Day 3PM 116:9-20 (Hise) (emphasis added). That cursory and indefinite testimony hardly established that SD1 preserved an established community of interest.

380. Plaintiffs also introduced an illustrative map to accompany Demonstration District A, even though *Gingles* I imposes no such requirement. To reiterate, demonstration districts are a

tool used under *Gingles* I to demonstrate that a reasonably configured majority-minority *district* can be drawn in the relevant region—the demonstrative district is not a remedial district and plaintiffs have never been required at the liability stage to construct a map around an illustrative district that may never be adopted. Nevertheless, Plaintiffs' Demonstration Map A is reasonably configured. The undisputed evidence showed that every district in Demonstration Map A satisfied the equal population and contiguity requirements, that Demonstration Map A is more compact than the enacted plan, that Demonstration Map A splits the minimum number of counties permitted under *Stephenson* while splitting no VTDs, and that, for the reasons already discussed, it preserves communities of interest. *Supra* PFOF § II.B. Demonstration Map A also changes only two county clusters and five senate districts from the enacted plan. *Id.* Defendants dispute none of that evidence.

381.    Defendants offer only two responses to Demonstration District A under *Gingles* I. They assert that Demonstration Map A improperly depends on freezing the Pitt-Edgecombe senate district, and they contend that Demonstration Map A splits more counties than permitted under *Stephenson*. Those arguments are both legally irrelevant. Defendants criticize Demonstration *Map* A—not Demonstration *District* A—and thus their arguments are beside the point. The arguments are also meritless on their own terms.

382.    Defendants claim first that Plaintiffs cannot draw a reasonably configured demonstration map around Demonstration District A because (they claim) Demonstration Map A depends on freezing the Pitt-Edgecombe Senate district. That district is both a majority-minority district and a performing crossover district (because Black voters are also able to elect their preferred candidates with the help of non-minority voters). Defendants have taken the position in this liti-

gation that federal law prohibits "dismantling" SD5. D.E. 39 at 17-18 ("[D]ismantling one [per-forming] district for some minority voters (in SD5) to create another district for other minority voters (Demonstrative A) is improper" under the Supreme Court's decision in *Shaw*); *see Cooper*, 581 U.S. at 305 (Section 2 can "be satisfied by crossover districts"); *Bartlett*, 556 U.S. at 24 (a state may not draw "district lines in order to destroy otherwise effective crossover districts"); *Covington*, 316 F.R.D. at 133.

383. Plaintiffs have accordingly established that it is possible to draw a Demonstration Map that includes Demonstration District A, does not dismantle Pitt-Edgecombe, and otherwise satisfies redistricting criteria.

384. In any event, constructing a reasonably configured demonstration map around Demonstration District A does *not* depend on freezing Pitt-Edgecombe. Dr. Mattingly demonstrated as much in his rebuttal report. Dr. Mattingly's report generates, using the *Stephenson* algorithm, an alternative demonstration map that contains Demonstration District A and does not freeze Pitt-Edgecombe. PX114 at 2 (Mattingly Rebuttal Report); Tr. Day 1 166:18-168:10 (Mattingly); Tr. Day 2 13:14-14:13 (Esselstyn). That demonstration map changes only five of the 50 districts in the enacted plan. *Id.* Those five districts are Demonstration District A; two single-district county clusters mandated by *Stephenson*, which give the map drawer no discretion in drawing district lines; and one two-district county cluster mandated by *Stephenson*, which leaves only one district line for the mapmaker to draw. *Id.* The map otherwise preserves 45 districts that are identical to the enacted plan. That defeats Defendants' claim that Demonstration District A depends on freezing Pitt-Edgecombe in any corresponding map.

385. To the extent Defendants contend in the alternative that Demonstration Map A is unreasonable because it splits more counties than the enacted plan, that argument is a non-starter.

As noted, *Stephenson*'s county grouping formula is applied only *after* VRA districts are drawn. 562 S.E.2d at 396-97. *Stephenson* specifically instructs that "legislative districts required by the VRA shall be formed prior to creation of non-VRA districts," and it then articulates the process for implementing the Whole County Provision in terms entirely dependent on the antecedent step of drawing VRA districts (first, assign single-county "non-VRA" districts, etc.). *Id.* It is undisputed that Demonstration District A splits no counties, and that Plaintiffs' corresponding demonstration maps split the minimum number of counties permitted under the *Stephenson* algorithm. Tr. Day 1 172:2-173:13; Tr. Day 2 26:10-24. Demonstration Map A cannot be unreasonable on the basis of county splits when the number of county splits it contains is required by state law. County splits thus reinforce that Demonstration District A, and Plaintiffs' accompanying maps, are reasonably configured.

386.     In short, it is undisputed that Demonstration District A is a contiguous majority-minority district that satisfies equal population requirements, is more compact than enacted SD1 and SD2, preserves communities of interest, and minimizes county and precinct splits. Defendants do no dispute any of this, and the responses they do raise are unresponsive to the *Gingles* I inquiry and unsupported on their own terms. The court concludes that Demonstration District A carries Plaintiffs' burden under the first *Gingles* precondition.

### B.     Demonstration District C

387.     Plaintiffs' Demonstration District C independently demonstrates that the Black population in northeastern North Carolina is sufficiently large and geographically compact to constitute a majority in a reasonably configured district. Defendants again do not dispute that the district is sufficiently numerous to constitute a majority-Black district, nor do they dispute most of the reasonableness factors, and the court concludes that the district is indeed reasonably configured.

197

388.    The undisputed evidence showed that Demonstration District C exceeds the 50%

minority population threshold necessary to satisfy the first *Gingles* precondition. Demonstration

District C has a BVAP of 50.21% and a BCVAP of 51.24%. PX147 at 7 (Esselstyn Rebuttal Re-

port). As he did with Demonstration District A, Dr. Trende agreed that Demonstration District C

is a majority-minority district. Tr. Day 4 191:20-22.  There is thus no dispute that Demonstration

District C satisfies the *Gingles* I numerosity requirement.

389.    Plaintiffs also showed that Demonstration District C is reasonably configured. Un-

disputed evidence showed that Demonstration District C is not merely "roughly as compact as the

existing plan," *Milligan*, 599 U.S. 18, it is more compact than the existing plan, PX69 at 28 (Es-

selstyn Report). Every line tracks county or precinct boundaries; the district contains no "tentacles,

appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to"

characterize as sufficiently compact. *Milligan*, 599 U.S. 20. Instead, like Demonstration District

A, it replaces the sprawling, border-to-border districts in SD1 and SD2 with two tightly formed

districts in the northeastern part of the state. Dr. Trende did not dispute that Demonstration District

C is reasonably compact or that it is more compact than the corresponding enacted districts.



390.    Demonstration District C contains all the other indicators of reasonableness. It is

"within plus or minus five percent" of the ideal district population. *Stephenson*, 562 S.E.2d at 397.

It is completely "contiguous." *Milligan*, 599 U.S. 18. It "respects existing political subdivisions, such as counties, cities, and towns," *id.* at 20, splitting only one county and no precincts, and placing all of South Henderson and nearly all of the City of Henderson in the same district. It preserves communities of interest by reuniting the Black Belt counties that were split apart under the current map, an objective that is reasonable even if the result is that another community of interest preserved in the enacted plan is "split" (a proposition that, for the reasons discussed above, continues to lack support). *Milligan*, 599 U.S. at 21.

391.    Plaintiffs offered Demonstration District C alongside a demonstration map, Demonstration Map C. Once again, that exceeded Plaintiffs' *Gingles* I obligations—a demonstration district satisfies (or fails) *Gingles* I irrespective of the demonstration map that accompanies it. Nevertheless, the court concludes that Demonstration Map C is reasonably configured. The undisputed evidence showed that every district in Demonstration Map C satisfied the equal population and contiguity requirements, that Demonstration Map C is more compact than the enacted plan, that Demonstration Map C splits the minimum number of counties permitted under *Stephenson* while splitting no precincts/VTDs, and that it preserves communities of interest. *Supra* PFOF § II.D.  Demonstration Map C changes only two county clusters and four senate districts from the enacted plan, one of which is the demonstration district itself, two of which vary only slightly from the enacted plan, and the fourth of which is determined entirely by the modified *Stephenson* county grouping. *Id.*  The remaining 46 districts are identical to the enacted plan. *Id.* Dr. Trende again disputed none of this. For the reasons already discussed, the court rejects Defendants' position that Demonstration Map C, in splitting the minimum number of counties permissible under *Stephenson*, somehow simultaneously violates *Stephenson*. The court thus concludes that Demonstration Map C is reasonably configured.

392.    Defendants' principal response to Demonstration District C is Dr. Trende's testimony that it contains an "odd-looking arm separat[ing] the Black population of Vance County from the White population." LD60 at 38-39.  That is both legally irrelevant and factually untrue. First, as explained, there is no prohibition on using race even as a predominant factor in drawing demonstration districts.  *See supra* PCOL § II.A.   But it does not matter here because *Milligan* made clear that if race did *not* predominate, then a district is reasonably configured and permissible.  *Milligan*, 599 U.S. at 31-32.  There was no evidence or testimony that race predominated in Mr. Esselstyn's construction of Demonstration District C, and the Court finds that it did not. Mr. Esselstyn testified credibly that race did not predominate in any of his demonstration districts. Tr. Day 1 230:7-17 (Esselstyn). He acknowledged that, "by necessity," he "was considering racial data," but he testified that he was "constantly evaluating how the districts complied" with other redistricting criteria as well. *Id.*; *see Milligan*, 599 U.S. at 31-32 & n.5. Mr. Esselstyn demonstrated that throughout his testimony, explaining that he drew the necessary split in Vance County to incorporate as much of Henderson and South Henderson as possible. Tr. Day 2 109:17-110:5 (Esselstyn). He demonstrated that he could have increased the BVAP of Demonstration District C by opting for an alternate configuration in Vance County, but that he declined that choice in favor of one that preserved Henderson to the maximum possible extent. *Id.* The court has credited Mr. Esselstyn's testimony in full, including his testimony that race did not predominate in his drawing of district lines. *Cf. Milligan*, 599 U.S. at 31-32.

393.    Dr. Trende suggests that one small fraction of the western end of Demonstration District C (depicted on the left-hand side of the image below) contains an "odd-looking arm separat[ing] the Black population of Vance County from the White population" of Vance County (depicted in the blown-up image of the Vance County portion of Demonstration District C on the

200

right-hand side below). LD60 at 38-39 (Trende Report). Dr. Trende's opinion is based entirely on this visual observation.



394. Dr. Trende's opinion that Demonstration District C separates Vance County's white and Black population is baseless. The court has already declined to credit or give any weight to the opinions Dr. Trende based on his ambiguous choropleth maps, but even taking Dr. Trende's testimony at face value, it does not show that the district's boundaries were driven by race. Dr. Trende admitted at trial that Demonstration District C contains approximately 40% of Vance County's white population. Tr. Day 4 194:6-10 (Trende). He testified further that the district contains only 63% of the County's Black population, leaving 37% outside the district. *Id.* at 166:22-25, 194:18-21.That data does not reflect racial separation—it reflects an approaching even split. Dr. Trende also acknowledged at trial that Demonstration District C preserves 98% of the City of Henderson, and that the district entirely follows precinct lines. Tr. Day 4 196:14-197:11 (Trende). And he did not dispute Mr. Esselstyn's testimony that Demonsration District C could have achieved an even greater BVAP had Mr. Esselstyn not prioritized preserving Henderson. *Id.* at 196:25-197:3. To the contrary, he admitted that the district contains VTD's with lower BVAP's

than VTD's that it omits, and that it contains VTD's with higher white voting age populations that VTD's it leaves out. *Id.* at 194:18-21. Dr. Trende's admissions at trial do more to support Mr. Esselstyn's testimony that race did not predominate in his drawing of Demonstration District C than they do to undermine it.

395.    In sum, the undisputed evidence shows that Demonstration District C is a contiguous majority-minority district that satisfies equal population requirements, is more compact than enacted SD1 and SD2, preserves communities of interest, and minimizes precinct splits. The evidence shows further that race did not predominate in Mr. Esselstyn's design of Demonstration District C. The court thus concludes that Demonstration District C satisfies the first *Gingles* precondition.

C.    **Demonstration District D**

396.    Plaintiffs' Demonstration District D provides a third independent demonstration that the Black population in northeastern North Carolina is sufficiently large and geographically compact to constitute a majority in a reasonably configured district. The parties agree that the district has a BCVAP above 50%. Defendants contend that the district nevertheless fails *Gingles* I because the margin of error surrounding the BCVAP point estimate dips below 50% and because they claim that race impermissibly played a role in Mr. Esselstyn's construction of the district. The court disagrees, concluding that the BCVAP of Demonstration District D is more likely than not above 50% and that Mr. Esselstyn's consideration of race in drawing the district was appropriate.

397.    The undisputed evidence showed that Demonstration District D has a BVAP of 49.22% and a BCVAP of 50.14%. PX147 at 7 (Esselstyn Rebuttal Report). The district is more compact than the existing plan and contains no "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to" characterize as sufficiently compact. *Milli-*

*gan*, 599 U.S. 20. Just the opposite. Demonstration District C, as shown in the image below, replaces the meandering SD1 and SD2 with two tightly bound districts in the northeastern part of the state. Dr. Trende did not dispute that Demonstration District C is reasonably compact, or that it is more compact than the corresponding enacted districts.



398.     Demonstration District D, like the districts before it, scores well on all the other indicators of reasonableness. It is "within plus or minus five percent" of the ideal district population. *Stephenson*, 562 S.E.2d at 397. It is completely "contiguous." *Milligan*, 599 U.S. 18. It "respects existing political subdivisions, such as counties, cities, and towns," *id.* at 20, splitting no counties or precincts and preserving as much of Elizabeth City within the district as possible, keeping "most of Elizabeth City [] intact." PX69 at 31 (Esselstyn Report); Tr. Day 2 24:3-16. It again preserves communities of interest by unifying the Black Belt counties that are divided under the current plan, a reasonable objective even if the cost were splitting a different community of interest preserved in the enacted map, which the evidence does not show. *Milligan*, 599 U.S. at 21. Dr. Trende disputed none of these points.

399.     Plaintiffs coupled Demonstration District D with Demonstration Map D. As noted, that map is irrelevant to the *Gingles* I analysis and exceeded Plaintiffs' obligations under *Gingles* I. Demonstration Map D is, nonetheless, reasonably configured. The undisputed evidence showed

that every district in Demonstration Map D satisfied the equal population and contiguity requirements, that Demonstration Map D is more compact than the enacted plan, that Demonstration Map D splits the minimum number of counties permitted under *Stephenson* while splitting no VTDs, and that it preserves communities of interest. *Supra* PFOF § II.E. Demonstration Map D exists entirely within the boundaries of the enacted county groupings, and changes only one grouping configuration within those boundaries, substituting one two-district cluster in the demonstration map for two one-district clusters contained in the enacted plan. *Id.* Mr. Esselstyn thus needed to draw only one additional new district to accompany Demonstration District D, making Demonstration Map D identical to the enacted plan in 48 of 50 districts. *Id.* Demonstration Map D splits one fewer county than Demonstration Maps A and C, complies with *Stephenson*, and is reasonably configured.

400. Defendants offer two responses to Demonstration District D. Defendants first contend that, even though the BCVAP point estimate for Demonstration District D exceeds 50%, the margin of error on that estimate is wide enough that the district's BCVAP may nevertheless be slightly below 50%. As noted, Demonstration District D has a BVAP of 49.22% and a BCVAP point estimate of 50.14%. PX147 at 7 (Esselstyn Rebuttal Report). As the court has also noted, Dr. Trende admitted that every single error margin he reported was materially wrong, and his margin of error testimony is not credible and is entitled to no weight. Dr. Collingwood's margin of error—which Dr. Trende agreed provided the "better estimates"—showed that the margin of error was 0.594% at the 90% confidence level. Tr. Day 4 160:3-9; PX128 at 15 (Collingwood Rebuttal Report). Undisputed testimony showed that that margin of error was an overestimate for a variety of reasons, PX128 at 11-13 (Collingwood Rebuttal Report), and that the CVAP point estimate of 50.14% was an underestimate because it did not include citizens who were Black and Hispanic

and other categories of Black citizens, Tr Day 2 22:6-24:2 (Esselstyn); Tr. Day 4 189:17-190:11 (Trende).

401.    Even if Dr. Trende's error margin testimony were credible, it would still be irrelevant and unpersuasive on its own terms. Dr. Trende testified that American Community Survey CVAP point estimates provide the best available estimate for the CVAP of a district. Tr. Day 4 185:5-16 (Trende). They come from an official government source, the Census Bureau.  The ACS's CVAP point estimates have been used in case after case to demonstrate the CVAP of demonstration districts, irrespective of error margins. *See, e.g.*, *Perry*, 548 U.S. at 429; *Luna*, 291 F. Supp. 3d at 1107. Dr. Trende himself testified that in almost every case in which he has analyzed CVAP to ascertain the minority population of an illustrative district, he has relied on ACS point estimates to determine the district's CVAP without regard to margin of error. Tr. Day 4 189:10-16 (Trende). He has done so even in cases where the CVAP only slightly exceeded 50%. *Id.* at 186:14-188:12. The court concludes that CVAP point estimates are the best available estimate of a district's true CVAP and that a district is sufficiently numerous for purposes of *Gingles* I where, as here, the district's relevant CVAP exceeds 50%.

402.    The court would reach that same conclusion even if CVAP margin of errors were relevant to the *Gingles* I inquiry. Dr. Trende couched his testimony in terms of whether a CVAP point estimate demonstrates a district's CVAP to a "reasonable degree of scientific certainty." LD60 at 5 (Trende Report). The standard of proof in a Section 2 case is not scientific certainty, however; it is "preponderance of the evidence." *Bartlett*, 556 U.S. at 19-20.

403.    The Court concludes that Plaintiffs have shown, by a preponderance of the evidence, that Demonstration District D is majority-Black-CVAP, because the point estimate is above 50%.  Defendants' own statistical expert, Dr. Alford, unequivocally confirmed that when a CVAP

point estimate from the American Community Survey is above 50%, it is "more likely than not" that the "actual value" for that CVAP estimate is above 50%. Defendants' expert Dr. Alford admitted: "[i]f you have a CVAP point estimate [from the American Community Survey] for the percentage of Black CVAP or any other CVAP in the CVAP population, you can assume that 50 percent of the expected values will fall higher than that point estimate and 50 percent will fall below the point estimate because the margin of error is based around a normal distribution." Tr. Day 4 109:5-23 (Alford). He further testified that "mathematically [] if you have a CVAP point estimate that [i]s above 50 percent it is more likely than not that the actual value is above 50 percent." Tr. Day 4 110:8-14 (Alford).

404. Defendants argue in the alternative that Demonstration District D, like Demonstration District C, is based on an improper consideration of race. First, race may predominate in drawing demonstration districts. *Supra* PCOL § II.A. Second, there is no credible evidence that race predominated in the drawing of Demonstration District D. Mr. Esselstyn testified directly that race did not predominate in his construction of the district. Tr. Day 1 230:7-17 (Esselstyn). He considered race to some degree "by necessity," but, as with all his districts, was "constantly evaluating how the districts complied" with other criteria. *Id.*; *see Milligan*, 599 U.S. at 31-32 & n.5. Mr. Esselstyn proved that at trial, explaining that his line through Pasquotank County was drawn to preserve as much of the Elizabeth City community of interest as possible and in fact succeeded in keeping "most of Elizabeth City [] intact within" the district. PX69 at 31 (Esselstyn Report); Tr. Day 2 24:3-16. He accomplished that by taking the "vast majority" of the district's Pasquotank County precincts from Elizabeth City. Tr. Day 2 24:3-16 (Esselstyn). That testimony went unrebutted at trial, and the court has credited Mr. Esselstyn's testimony in full, including his testimony that race did not predominate in his drawing of district lines. *See Milligan*, 599 U.S. at 31-32.

405.     Defendants counter this testimony with Dr. Trende's assertion that the split in Pasquotank County "appears to largely be made on a racial basis." LD60 at 34, 40 (Trende Report). Dr. Trende's opinion is again based purely on visual observation, this time of the northeastern corner of Demonstration District B (depicted on the left-hand side below), and its split of Pasquotank County (blown-up on the right-hand side below), which he opined was similar enough to Demonstration District D to provide the basis for his opinion on both districts.



406.     Dr. Trende's opinion that Demonstration District D splits Pasquotank County on the basis of race is pure ipse dixit. The court has declined to credit or give weight to the opinions Dr. Trende formed based on his choropleth maps or dot density maps, but Dr. Trende's testimony that Demonstration District D draws race-based lines is not only incredible, it is unsubstantiated. Dr. Trende offered no quantitative evidence on direct examination to support his theory, simply reiterating the opinion in his expert report that the district appeared "to kind of scoop out the black population of Elizabeth City." Tr. Day 4 164:16-20 (Trende). He undermined that testimony on cross. He conceded on cross-examination that Demonstration District D's "boundary largely tracks the boundary of Elizabeth City," that the district followed precinct lines without splitting VTD's, and that the district was more compact than the enacted plan. Tr. Day 4 191:23-194:4 (Trende).

On his theory any district that preserves a majority-Black city will be drawn on the basis of race—a theory the Court rejects. He went on to admit that he conducted no independent analysis to determine whether "alternative" configurations of Demonstration District B "would have placed a higher percentage of Pasquotank's Black population" in that district. Tr. Day 4 193:15-24. (Trende). Indeed, he revealed on cross-examination that he did not actually know whether adding more of Elizabeth City to Demonstration District D would have increased or decreased its BVAP, *id.*, fatally undermining his testimony that the district "scoop[ed] out the black population of Elizabeth City." Dr. Trende's say so that Demonstration District D splits Pasquotank County on the basis of race depends on a blinkered view of a choropleth map he could not even fully explain at trial, or on dot density maps that are highly misleading. It falls away as soon as it is confronted with any statistical or geographic evidence.[10]

407.    All told, Demonstration District D is a contiguous majority-minority district that satisfies equal population requirements, is more compact than enacted SD1 and SD2, preserves communities of interest, minimizes precinct splits, and changes only two districts from the enacted plan—the minimum possible disruption in a Section 2 case. The evidence also shows that race did not predominate in Mr. Esselstyn's design of Demonstration District D. The court concludes that Demonstration District D satisfies the first *Gingles* precondition.

408.    All told, the court concludes that Plaintiffs produced not "one" but three illustrative districts demonstrating that it is possible to create a reasonably configured majority-minority district in northeastern North Carolina. *Milligan*, 599 U.S. at 18, 33. Plaintiffs have satisfied the first *Gingles* condition.

---

[10] Plaintiffs offered Demonstration District E to provide further evidence discrediting Dr. Trende's opinion that Demonstration District D splits Pasquotank County on the basis of race, but the court excluded that evidence at trial.

## IV. *Gingles* Precondition Two: Plaintiffs have shown that the Black population in northeastern North Carolina is politically cohesive

409.    The second *Gingles* precondition asks whether the minority group is "politically cohesive," which plaintiffs may demonstrate by "showing that a significant number of minority group members usually vote for the same candidates." 478 U.S. at 51, 56. Courts rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. *See id.* at 52-54. Ecological inference, the methodology Dr. Collingwood deployed here, is the "gold standard" for racially polarized voting analysis. *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020). Courts dating back to *Gingles* itself have recognized that Black voters in northeastern North Carolina's Black Belt counties are politically cohesive. *Gingles*, 478 U.S. at 35 n.2, 41, 80.

410.    Minority-group political cohesion exceeding 90% easily satisfies the second *Gingles* precondition. The Black political cohesion in *Gingles* itself was between 87% and 96%, a level of cohesion the Court characterized as "overwhelming." *Gingles*, 478 U.S. at 59. *Milligan* was similar. Black voters there "supported their candidates of choice with 92.3% of the vote," brooking "no serious dispute that Black voters [were] politically cohesive." *Milligan*, 599 U.S. at 22 (citations omitted). There was equally "evident" cohesion in *Perry*, where 92% of the minority group voted together. *See* 548 U.S. at 427. The trend is consistent across Section 2 cases that have succeeded in recent years. *See, e.g.*, *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs (Miss. NAACP)*, 739 F. Supp. 3d 383, 438 (94.3% in Mississippi); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1265 (N.D. Ga. 2023) (98.4% in Georgia); *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 861 (M.D. La. 2024) (82.7% to 93.2% in Louisiana).

411.    All experts in this case agreed that Black voters in the Black Belt are extraordinarily politically cohesive. Dr. Collingwood demonstrated that Black voters in SD1 and SD2 back the

same candidates at an average level approaching 99%. PX279 at 4, 7, 10 (Collingwood Suppl. Report). Defendants' RPV expert Dr. Alford corroborated Dr. Collingwood's findings. He testified that although he "usually hesitate[s] to use adjectives" in describing racially polarized voting, he agreed in this case that Black voter cohesion in northeastern North Carolina is "extremely politically cohesive." Tr. Day 4 78:4-79:2 (Alford). He ultimately testified outright that "the *Gingles* II precondition is satisfied in this case." *Id.* at 79:3-5.

412. The second *Gingles* precondition is satisfied.

## V. *Gingles* Precondition Three: Plaintiffs have shown that the white population in northeastern North Carolina votes sufficiently as a bloc to usually defeat Black voters' candidates of choice

413. The third *Gingles* precondition examines whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed[]—usually to defeat the minority's preferred candidate." 478 U.S. at 51. The focus of the analysis "is the *challenged* plan," not the illustrative plan. *Robinson v. Ardoin*, 86 F.4th 574, 596 (5th Cir. 2023); *see, e.g.*, *Perry*, 548 U.S. at 427. There is no threshold percentage required to demonstrate bloc voting, because the "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." *Gingles*, 478 U.S. at 56 (citations omitted). Instead, "for racially polarized voting to be 'legally significant,' minority voters must 'usually' vote for the same candidates, and white bloc voting must 'normally' or 'generally' lead to the defeat of minority-preferred candidates." *United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 348 (4th Cir. 2004) (quoting *Gingles*, 478 U.S. at 56). That was true in *Charleston County* where racially polarized voting existed in at least 75% of elections and the defendant's "own expert testified that minority-preferred candidates are usually defeated by white bloc voting." *Id.* at 349.

414.    Plaintiffs introduced overwhelming and uncontested evidence that the white major-
ity in SD1 and SD2 votes sufficiently as a bloc to enable it usually to defeat the minority's pre-
ferred candidate in those districts. Dr. Collingwood's RPV analysis examined five election cycles
across his initial and supplemental reports. His unrebutted testimony showed racially polarized
voting in 98.4% (64 out of 65) of the elections in SD1 and 100% of the 65 elections he analyzed
in SD2.  PX36 at 5-6 (Collingwood Report); PX279 at 3 (Collingwood Suppl. Report). Across
these five election cycles, white voters supported the Black-preferred candidate an average of
22.36% of the time in SD1 and 19.03% of the time in SD2, well-below the statewide average of
28.7%. PX279 at 4, 7, 10 (Collingwood Suppl. Report). That support has declined since 2018. *Id.*
at 8, 10. The results culminate with white support for Black-preferred candidates in 2024 averaging
19.92% in SD1 and 18.08% in SD2. *Id.*

415.    Dr. Collingwood's performance analysis was equally unequivocal. He conducted a
performance analysis of the same five election cycles across his series of reports. In the three most
recent election cycles, SD1 failed to perform for Black voters in a single one of the 43 elections
he analyzed, and SD2 failed to perform for Black voters in 42 out of 43 elections. *Id.* at 2. The
only race in which a district performed for Black voters was the 2024 gubernatorial race, in which
the Black-preferred candidate was white and the white-preferred candidate was Black. *Id.* That is,
the unrebutted evidence showed that in the 43 elections Dr. Collingwood analyzed in SD1 and
SD2 respectively over the last three election cycles, white voters blocked the Black-preferred can-
didate from prevailing in nearly every single race. *Id.* The results were not close. White-preferred
candidates outperformed Black-preferred candidates in these races by an average margin of 13
percentage points, often winning by over 15 points. *Id.* at 15-17. That was true in the two most
probative elections in the entire dataset—the 2024 state Senate elections for SD1 and SD2—where

the white-preferred candidate outperformed the Black-preferred candidate by 14.4 percentage points in SD1 and 14.3 percentage points in SD2. *Id.* at 15-16. Expanding the dataset to include the last five election cycles shows that white voters usually block Black-preferred candidates from succeeding over that time horizon too, taking the total block rate to 88 to 91% in SD1 and SD2 and underscoring that racially polarized voting, and the white blocking that attends it, has only grown starker in northeastern North Carolina over the last decade. *Id.* at 2.

416.     The other witnesses agreed. Dr. Alford testified outright that *Gingles* III was satis-fied, agreeing that "White voters vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate in Senate District 1 and Senate District 2." Tr. Day 4 81:25-82:4 (Alford). Senator Hise offered similar testimony, acknowledging that the white-preferred candi-date outperformed the Black-preferred candidate in every single one of the 23 statewide election contests in the General Assembly's 2023 Senate redistricting StatPack, often by over 15%, and testifying that in his opinion, a majority-minority district is necessary to elect a Black-preferred candidate in northeastern North Carolina. Tr. Day 4 21:14-22:4, 26:19-27:2 (Hise). Every one of Plaintiffs' lay witness corroborated this testimony in some way. *See supra* PFOF IV.C.

417.     To the extent Defendants contend that the level of racially polarized voting in north-eastern North Carolina is legally insignificant because a hypothetical remedial district in the region could perform with less than 50% BVAP, that is wrong. True, "the third *Gingles* inquiry is con-cerned only with 'legally significant racially polarized voting,'" but that "occurs when the 'major-ity group votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candi-date.'" *Covington v. North Carolina*, 316 F.R.D. 117, 170 (M.D.N.C. 2016), *aff'd,* 581 U.S. 1015 (2017) (quoting *Gingles*, 478 U.S. at 51, 55-56). If a plaintiff proves that white bloc voting will usually defeat the minority-preferred candidate, there is no further requirement to prove the precise

BVAP or BCVAP percentage at which a hypothetical remedial district would start to perform for minority voters. The third *Gingles* demands no more, and no less, than it says it does.

418. The requirement Defendants would erect is irreconcilable with Supreme Court precedent. Most importantly, it is directly contrary to the Court's decision in *Cooper*, which held that a crossover district with a BVAP under 50% can be a lawful and effective VRA remedy. 581 U.S. at 306. A performing crossover district could not operate as a remedy if it also operated to defeat VRA claims at the liability stage. And *Gingles* itself found a Section 2 violation even though there was no analysis of whether a remedial district could perform for Black voters at a BVAP of less than 50%. Rather, the evidence in *Gingles* showed that, as here, there was significant white bloc voting, and that "black voters have enjoyed only minimal and sporadic success in electing representatives of their choice" in the relevant districts. 478 U.S. at 60. The same is true of the record before the Supreme Court in *Milligan*. *See Singleton*, 582 F. Supp. 3d at 980-82.

419. Defendants' argument is also contrary to the decisions of lower federal courts. Indeed, the Fourth Circuit has already explained in this litigation that it is "inaccurate" to imply "that a district effectiveness analysis is required for proving a VRA violation." *Pierce*, 97 F.4th at 218. Only one federal case mentioned the phrase "district effectiveness analysis" prior to this litigation, the three-judge court's decision in *Covington*, 316 F.R.D. at 168. *Covington* drops the phrase in a single, passing observation that the legislature's map-drawer "did not conduct any district effectiveness analysis prior to drawing the districts." *Id.* at 168 (cleaned up). That mild observation did not announce a new *Gingles* III requirement. To the contrary, *Covington* emphasized that the "key inquiry under *Gingles*' third factor [] is whether racial bloc voting is operating at such a level that it would actually 'minimize or cancel minority voters ability to elect representatives of their choice,' if no remedial district were drawn." *Id.* (cleaned up) (quoting *Gingles*, 478 U.S. at 56).

420.    In sum, all agree that the white majority in SD1 and SD2 votes sufficiently as a bloc to enable it usually—indeed, almost always in recent years—to defeat the minority's preferred candidate. That is unchanged by the possibility that minority voters might sometimes be able to elect their preferred candidates in a theoretical remedial district that does not exist. The third *Gingles* precondition is satisfied.

## VI.    Totality of the Circumstances: Plaintiffs have shown that the 2023 enacted map denies Black North Carolinians equal access to the process of electing state Senators

421.    Having concluded that Plaintiffs satisfied the three *Gingles* preconditions, the court turns to "the totality of circumstances to determine whether members of a racial group have less opportunity than do other members of the electorate." *Perry*, 548 U.S. at 425-26 (quotations omitted). The "totality of circumstances inquiry recognizes that application of the *Gingles* factors is peculiarly dependent upon the facts of each case," and courts must therefore "conduct an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality," to assess whether "the political process is [] equally open to minority voters." *Milligan*, 599 U.S. at 19 (quotations omitted). "It will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Harris v. McCrory*, 159 F. Supp. 3d 600, 623 (M.D.N.C. 2016), *aff'd*, 581 U.S. 285 (2017) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)).

422.    The court's totality of circumstances inquiry is guided by a series of factors drawn from the Judiciary Committee's report accompanying the 1982 VRA amendments. *Perry*, 548 U.S. at 426. Those factors include: "the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or

procedures that tend to enhance the opportunity for discrimination against the minority group; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *Id.* (cleaned up) (quoting *Gingles*, 478 U.S. at 44-45). In the Fourth Circuit a Section 2 defendant may also at the totality of circumstances stage introduce "evidence of partisanship" to rebut a plaintiff's evidence of racial vote dilution. *See Charleston Cnty.*, 365 F.3d at 352-53.

423.    In considering the totality of circumstances, the Senate factors are "neither comprehensive nor exclusive," and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45. The Supreme Court has explained, however, that "the most important" Senate factors are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Id.* at 48 n.15.

424.    The Senate factors all point the same way here. The two "most important" factors could not be stronger: Defendants admit that there is extreme racial polarization in this case, and the election results and performance analysis show that minority and minority-preferred candidates have no path to elected office in SD1 and SD2. *See Charleston Cnty.*, 365 F.3d at 349-51 (finding vote dilution where two most important factors were not "in any serious dispute"). These factors

operate against the backdrop of North Carolina's "shameful" and ongoing history of official race-based discrimination in voting, stark racial disparities in all walks of public life, continuing proliferation of racial appeals in political campaigns, complete unresponsiveness to Black voters in the Black Belt region, and lack of any tenable justification for the enacted plan. *McCrory*, 831 F.3d at 223. And defendants have not rebutted Plaintiffs' exhaustive evidence that voters in North Carolina are polarized on account of race, not merely along partisan lines. The Senate factors thus uniformly confirm that this is not the "unusual case" in which the political process is equally open to Black voters despite the dilution of their political power—it is the typical case where the cracking of Black voters across districts denies them equal access to the political process.

### A. Senate Factor One: North Carolina has an ongoing history of official, voting-related discrimination

425.    The first Senate factor considers "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36-37. This factor reflects "Congress's concern 'not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system.'" *Luna*, 291 F. Supp. 3d at 1133-34 (quoting *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 778-79 (S.D. Tex. 2013)).

426.    "[C]ontemporary examples of discrimination are more probative than historical examples," but "even long-ago acts of official discrimination give context to the analysis." *Veasey v. Abbott*, 830 F.3d 216, 257 (5th Cir. 2016) (en banc). A long line of historical discrimination may be of less "probative value when considering whether the Legislature acted with discriminatory intent," but "it cannot be ignored in the discriminatory effect analysis, because even these

seemingly remote instances of State-sponsored discrimination continue to produce . . . racial disparities." *Id.* at 257 n.53. Courts weighing Senate Factor One consider Reconstruction-era history, *see, e.g.*, *Alpha Phi Alpha*, 700 F. Supp. 3d at 1269, "contemporary" history from the decades following the Civil Rights Act, *Veasey*, 830 F.3d at 257, and "more recent evidence," *Singleton*, 582 F. Supp. 3d at 1020.

427.    *Alpha Phi Alpha* canvassed history dating back to the Reconstruction Amendments. Discussing Georgia's history of discrimination, the court explained that "Black residents did not enjoy the right to vote until Reconstruction. Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting . . . . Such devices that limited black participation in elections continued into the 1950s." *Alpha Phi Alpha*, 700 F. Supp. 3d at 1269 (quoting *Cofield v. City of LaGrange, Ga.*, 969 F. Supp. 749, 767 (N.D. Ga. 1997)). The district court in *Milligan* was swayed by Department of Justice objections to Alabama voting practices under Section 5's preclearance regime between 1965 and 2013, a series of judicial decisions invalidating the State's redistricting plans following the 2010 census, and the adolescent experience of one of the plaintiffs during the civil rights movement of the 1960's. *Singleton*, 582 F. Supp. 3d at 1020-21; *see Veasey*, 830 F.3d at 257 (discussing discriminatory redistricting plans enacted between 1970 and 2011).

428.    All that history is present here. Black people had no right to vote in North Carolina until the adoption of the North Carolina Constitution of 1868 and the ratification of the Fourteenth and Fifteenth Amendments in 1870. Tr. Day 1 8:8-22 (Butterfield). The enfranchisement of Black men during reconstruction enabled Black voters to "register[] in very large numbers" and enjoy a brief period of political influence. *Id.* at 9:1-9. But that came to an abrupt end when North Carolina amended its Constitution in 1900 to add a literacy test and poll tax. N.C. Const. of 1868, as

amended by the Convention of 1875, and as further amended at the elections of 2 August 1900. The amendments put a decades-long end to Black political participation in the State, and the literacy test remains installed in Article VI, Section 4 of North Carolina's Constitution. *See* Tr. Day 1 9:19-10:1 (Butterfield); *Edmisten*, 590 F. Supp. at 360.

429. Numerous voting practices denied political participation to Black voters throughout the twentieth century. The "poll tax and the literacy test" withheld registration from "black citizens in much larger percentages . . . than the comparable percentages of white citizens." *Edmisten*, 590 F. Supp. at 360. "After their removal as direct barriers to registration, their chilling effect on two or more generations of black citizens [] persisted . . . . Between 1930 and 1948 the percentage of black citizens who successfully sought to register under the poll tax and literacy tests increased from zero to 15%." *Id.* The rate rose to 39% in 1960, less than half the 92% figure for "age-qualified whites." *Id.* "Other official voting mechanisms designed to minimize or cancel the potential voting strength of black citizens" arose to greet the rise in Black registration "during this period." *Id.* The State adopted anti-single shot voting laws and multimember districts with numbered posts "with the intended effect of fragmenting a black minority's total vote between two or more candidates" that remained in place until 1972. *Edmisten*, 590 F. Supp. at 360.

430. This history was sufficient to subject 40 North Carolina counties to preclearance under Section 5. *McCrory*, 831 F.3d at 215. The "Department of Justice issued over fifty objection letters to proposed election law changes in North Carolina" between 1980 and 2013 "because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *Id.* at 224. "During the same period, private plaintiffs brought fifty-five successful cases under § 2 of the Voting Rights Act." *Id.* In some cases, "the Department of Justice or federal courts

218

. . . determined that the North Carolina General Assembly acted with discriminatory intent, revealing a series of official actions taken for invidious purposes." *Id.* at 223 (cleaned up) (citations omitted).

431. North Carolina has also engaged in racial discrimination in redistricting. *Gingles* itself spawned from a challenge to North Carolina's multimember legislative districts, prompting the Supreme Court to hold that the State's "legacy of official discrimination" had "acted in concert" with those districts "to impair the ability of . . . cohesive groups of black voters to participate equally in the political process and to elect candidates of their choice." *Gingles*, 478 U.S. at 80.

432. The most recent cycle featured three federal court rulings invalidating North Carolina's redistricting plans as unconstitutional racial gerrymanders against Black people. The State's congressional plan intentionally packed Black voters into two congressional districts for "no good reason" and "because of their race." *Cooper*, 581 U.S. at 322-23. The State's legislative maps intentionally gerrymandered "twenty-eight challenged districts in North Carolina's 2011 State House and Senate redistricting plans" on the basis of race, inflicting "severe constitutional harms" and "substantial stigmatic and representational injuries" on Black voters. *Covington*, 316 F.R.D. at 124, 176-77. The legislature doubled down on those plans even in the face of the court's order, adopting remedial maps that "preserved" key "features of the previously invalidated 2011 maps" in four districts, forcing the Supreme Court to again invalidate the State's "inexplicably . . . unconstitutional" districts. *Covington II*, 585 U.S. at 974, 978. The maps' adjudicated racial gerrymanders were corrected only after the State had conducted two elections under the congressional maps and three under the legislative maps. The *Singleton* court, writing in 2022 about maps en-

acted following the 2020 census, characterized decisions invalidating maps from the previous cycle as "recent evidence" of discrimination. *Singleton*, 582 F. Supp. 3d at 1020. *Veasey* described plans going back to 1970 as "contemporary." 830 F.3d at 257.

433. Beyond that, the State in 2013, "literally within days of North Carolina's release from the preclearance requirements of the Voting Rights Act," enacted an omnibus election reform bill that targeted Black voters "with almost surgical precision." *McCrory*, 831 F.3d at 214, 223. The Fourth Circuit invalidated the law, calling it "one of the largest restrictions of the franchise in modern North Carolina history," and "the most restrictive voting law North Carolina has ever seen since the era of Jim Crow." *Id.* at 215, 229, 242. Along the way, it acknowledged the history of discrimination in voting laws in North Carolina, including evidence that "state officials continued in their efforts to restrict or dilute African American voting strength well after 1980 and up to the present day," and the fact that "race and party are inexorably linked in North Carolina." *Id.* at 225. The court could "only conclude that the North Carolina General Assembly enacted the challenged provisions of the law with discriminatory intent." *Id.* at 215.

434. Courts have continued to enjoin North Carolina election laws as intentionally racially discriminatory during the pendency of this lawsuit. In April 2024, a court blocked a North Carolina law that imposed criminal penalties on residents who vote while ineligible because they are on parole, probation, or post-release supervision for a felony conviction, even if the voter lacked knowledge that they were ineligible to vote. *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 203. North Carolina *agreed* that the law was enacted for the purpose of discriminating against Black people, and that it did in fact disproportionately burden Black voters. *Id.* at 194. After all, the law was adopted in the nineteenth century for the express purpose of "restor[ing] the 'purity of the ballot' and discriminat[ing] 'against certain characteristics of the Black race,'" was preserved

until 2023, and in recent years "63% of people investigated for violating the Challenged Statute were Black" even though only "22% of North Carolina's population is Black." *Id.* at 193 (cleaned up). The court determined that the law "was enacted with discriminatory intent, has not been cleansed of its discriminatory taint, and continues to disproportionately impact Black voters." *Id.* at 198.

435.    The fact witnesses "recall[ed] firsthand how that history impacted" them. *Singleton*, 582 F. Supp. 3d at 1020. Congressman Butterfield himself spent his career as a practicing attorney representing plaintiffs in anti-discrimination cases like *Johnson v. Halifax County*, 594 F. Supp. 161 (E.D.N.C. 1984) and *Haskins v. Wilson County*, 82-cv-19 (E.D.N.C.), and others. Tr. Day 1 10:22-14:6 (Butterfield). Senator Blue testified that he has been "involved in the [] opposition" to discriminatory redistricting plans since 1981. Tr. Day 1 69:17-70:3 (Blue). Representative Pierce became a plaintiff in this case because of North Carolina's history of racial discrimination, documented in cases like *Johnson*, *Alston*, and *Walker*, which for him is a core piece of his "local history" growing up "in a county with a history of the suppression of voting rights as Halifax is." Tr. Day 1 44:24-45:17, 52:21-53:4 (Pierce). He concluded that when he discusses "racial inequities and the things that you learn about and that you experience, that's my lived experience in Halifax County." *Id.* at 40:16-41:15.

436.    The record details over a century-and-a-half of official voting-related discrimination, spanning from the years preceding the Fifteenth Amendment to the years preceding the enacted plan. The evidence from the antebellum period through the Civil Rights Act "give[s] context to the analysis" that "cannot be ignored," *Veasey*, 830 F.3d at 257, experience "post-dat[ing]" the passage of the Voting Rights Act" is even more "probative," *Singleton*, 582 F. Supp. 3d at 1021,

and the judicial decisions invalidating maps from redistricting cycle immediately preceding this one could not be more "recent," *id.* at 1020-21. The first factor favors Plaintiffs.

### B. Senate Factor Two: Voting is severely racially polarized in northeastern North Carolina

437.    The second Senate factor addresses "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37. It is "the *degree* of racially polarized voting that matters." *Charleston Cnty.*, 365 F.3d at 348. The Fourth Circuit in *Charleston* concluded that a jurisdiction was "severely and characteristically polarized along racial lines" where it experienced racially polarized voting in at least 75% of its elections. *Id.* at 350. *Milligan* characterized polarization as "intense," "very strong," and "very clear" where the gap in Black and white voting for the same candidate was 75 percentage points—Black voters supported their preferred candidates with 92.3% of the vote, while white voters supported those candidates with 15.4% of the vote. *Milligan*, 599 U.S. at 22-23 (cleaned up). The polarization here overtakes both those markers.

438.    As detailed, voting in northeastern North Carolina is starkly polarized along racial lines. Dr. Collingwood showed that in North Carolina as a whole between 2016 and 2024, Black voters consistently back the same candidates at a rate of 97.5%, while white voters consistently support the Black-preferred candidate at a rate of 28.7%. PX279 at 4 (Collingwood Suppl. Report). Voting is even more racially polarized in SD1 and 2. Black voters in SD1 back the same candidates at a rate of 97.25%, while White voters support those same candidates only at a rate of 22.36%. *Id.* at 7-9. Black voters in SD2 back the same candidates at a rate of 98.7%, while White voters back those candidate at a rate of 19.03%. *Id.* at 10-12. Voting is still more polarized in the Demonstration Area, where Black voters back the same candidate 98.55% of the time and white voters support the Black-preferred candidate at an average rate of 15.1% of the time. *Id.* at 12. The

polarization across all three geographies has only grown starker in recent years. *Id.* at 8, 10, 13. Defendants' RPV expert Dr. Alford corroborated these results, testifying that although he "usually hesitate[s] to use adjectives," he agreed in this case that Black voters in the Black Belt counties are "extremely politically cohesive." Tr. Day 4 78:4-79:2 (Alford).

439.    Putting his analysis of white and Black political cohesion together, Dr. Colling-wood identified racially polarized voting in SD1 in 64 out of 65 elections (98%) and in SD2 in 65 out of 65 elections (100%), and in 100% of the 64 elections he analyzed statewide. PX36 at 5-6 (Collingwood Report); PX279 at 3-4 (Collingwood Suppl. Report). Defendants' RPV expert Dr. Alford again agreed, testifying that white voters vote "as a bloc" in SD1 and SD2. Tr. Day 4 81:25-82:4 (Alford).

440.    The performance analysis drove home the consequences of this starkly polarized voting. Dr. Collingwood showed "that over the last five election cycles, White bloc voting suc-cessfully blocked the Black-preferred candidate in Senate District 1 in either 57 of 65 (88%) or 59 of 65 (91%)," and "in Senate District 2 in 57 of 65 (88%) or 59 of 65 (91%) races. PX279 at 2 (Collingwood Suppl. Report). Over the three most recent, and more probative, cycles, White voters successfully blocked the Black-preferred candidate in Senate District 1 in 43 of 43 races (100%) and in Senate District 2 in 42 of 43 races (98%). Every Black-preferred Black candidate lost in these 43 races; the only Black-preferred candidate who was able to prevail across those 43 races was White, and prevailed over an opponent who was Black." PX279 at 2 (Collingwood Suppl. Report). Dr. Alford thus agreed that "White voters vote sufficiently as a bloc to enable them usu-ally to defeat the minority's preferred candidate in Senate District 1 and Senate District 2." Tr. Day 4 81:25-82:4 (Alford). Every lay witness to testify in this case agreed. Tr. Day 1 16:12-17:7

(Butterfield); *id.* at 71:21-72:9 (Blue); *id.* at 141:8-18 (Reives); *id.* at 63:20-64:17 (Matthews); *id.* at 51:19-52:4 (Pierce); Tr. Day 4 21:14-22:4, 26:19-27:2 (Hise).

441.    These data show a degree of polarization that exceeds the polarization evident in *Charleston County* and that is on par with the polarization in *Milligan*. *Charleston County* characterized polarization in at least 75% of elections as "severely and characteristically polarized along racial lines." 365 F.3d at 350 (citation omitted). Here there is polarization in 98% or 100% of elections in SD1 and SD2.  The gap between Black and white support for the same candidates is 75 percentage points in SD1 and 80 percentage points in SD2. That approaches in SD1, and surpasses in SD2 where both Plaintiffs live, the 77 percentage point spread *Milligan* characterized as "intense," "very strong," and "very clear." *Milligan*, 599 U.S. at 22-23 (cleaned up) ("Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4%" (quoting *Singleton*, 582 F. Supp. 3d at 1017)). This second and "important" factor favors Plaintiffs. *Charleston Cnty.*, 365 F.3d at 349.

## C.  Senate Factor Three: North Carolina's voting practices enhance the opportunity for discrimination

442.    The third Senate factor examines "the extent to which the state or political subdivision has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. For purposes of this factor, it "is irrelevant" whether the practice is unlawfully discriminatory. *Edmisten*, 590 F. Supp. at 363 & n.24.

443.    The court has already thoroughly documented North Carolina's "shameful history of past discrimination" in voting. *McCrory*, 831 F.3d at 223 (citation and quotation marks omitted). That tradition began before the adoption of the North Carolina Constitution of 1868 and the ratification of the Fourteenth and Fifteenth Amendments in 1870, extended through the Jim Crow era to the passage of the Civil Rights Act, and has continued in mutating but undeterred form ever

224

since. In the last redistricting cycle alone, federal courts three times invalidated North Carolina's redistricting plans as racial gerrymanders that unconstitutionally targeted Black voters. The same decade, the state passed an omnibus election reform bill that targeted Black voters "with almost surgical precision," was "one of the largest restrictions of the franchise in modern North Carolina history," and was adopted "with discriminatory intent." *Id.* at 214, 242.

444.    On top of these unconstitutionally discriminatory practices are still more ongoing practices that "enhance the *opportunity* for discrimination against the minority group." *Miss. NAACP*, 739 F. Supp. 3d at 446 (emphasis added). After the Fourth Circuit invalidated the State's voter identification law in 2016, North Carolina adopted a new voter ID requirement, this time via constitutional amendment and implementing legislation, requiring "that every voter present a qualifying photo ID before casting a ballot." *Hirsch*, 720 F. Supp. 3d at 414-15. That law is subject to ongoing litigation, but whether or not it is *unconstitutionally* discriminatory in intent, it undeniably increases the *opportunity* for discrimination. Consistent with *McCrory*, the district court in *Hirsch* has already found that 10.6% of Black voters in North Carolina lack DMV-issued identifications compared to 6.5% of white voters. *Id.* at 418, 424. Senator Blue testified at trial that these "voter ID laws impede" the "equal access to the right to vote . . . of Black citizens" and are "anathema . . . to Black participation in voting." Tr. Day 1 87:21-88:12 (Blue).

445.    The North Carolina Constitution likewise enhances the opportunity for discrimination because it "denies individuals with felony convictions the right to vote unless their citizenship rights are restored." *Moore*, 886 S.E.2d at 23. Such laws can have "discriminatory *effects*" that increase the opportunity for discrimination under Section 2, even if they do not have an unconstitutionally "discriminatory *purpose*" under the Equal Protection Clause or analogous state constitutional provisions. *Miss. NAACP*, 739 F. Supp. 3d at 444-45. The North Carolina Supreme Court

recently found that "African Americans comprise 21% of North Carolina's voting-age population, but over 42% of those denied the franchise due to felony supervision from a North Carolina state court conviction alone. In comparison, White people comprise 72% of the voting-age population, but only 52% of those denied the franchise. Moreover, in total, 1.24% of the entire African American voting-age population in North Carolina are denied the franchise due to felony supervision, whereas only 0.45% of the White voting-age population are denied the franchise. The result is that African Americans are denied the franchise at a rate 2.76 times as high as the rate of the White population." *Moore*, 886 S.E.2d at 35 (cleaned up). The law thus "leave[s] a higher percentage of black than white [North Carolinians] ineligible to vote." *Miss. NAACP*, 739 F. Supp. 3d at 444-45; *see also* Tr. Day 3 PM 20:17-21:2 (Burch).

446.    North Carolina also holds a number of statewide elections with numbered posts. At-large elections with numbered seats are a classic tool for diluting minority voting strength. *See, e.g.*, *Singleton*, 582 F. Supp. 3d at 1021. North Carolina nevertheless holds statewide elections with numbered posts not only for all seven of its seats on the North Carolina Supreme Court, but also all 15 of its seats on the Courts of Appeals. *See* PX36 at 4 (Collingwood Report). That structure operates to disadvantage Black voters, who make up 21.37% of the statewide population and vote in a racially polarized voting environment in which white voters crossover at a rate of only 28.7% on a statewide basis. JX6 at 14 (2023 StatPack w/ Race); PX279 at 4 (Collingwood Suppl. Report).  These discriminatory effects today are real.  The Black-preferred candidate statewide (the Democrat)[11] lost 3 of 3 court of appeals races in 2024; 4 of 4 races in 2022; and 5 of 5 races in 2020.[12] A Black-preferred candidate has not won a court of appeals race since 2018, and in two

_____

[11] PX36 at 13-14 (Collingwood Report); PX279 at 16-17 (Collingwood Suppl. Report).

[12] *See* 2024 elections (https://er.ncsbe.gov/?election_dt=11/05/2024&county_id=0&office =JUD&contest=0); 2022 elections (https://er.ncsbe.gov/?election_dt=

of those 3 races, the Black-preferred candidate got a minority of the vote and only won because of unusual circumstances—in one race, the vote for the white-preferred candidates was split between two Republicans, and in the other race a Libertarian candidate got 4.59% of the vote statewide.[13] *See Charleston Cnty.*, 365 F.3d at 352.

447.    Even if the purpose of this system is not "racially discriminatory," that "is irrelevant in assessing its present effect, as a continued mechanism, in the totality of circumstances bearing upon plaintiffs' dilution claim." *Edmisten*, 590 F. Supp. at 363 n.24.

448.    Dr. Taylor failed to rebut this evidence. As noted, Dr. Taylor's primary response was that "North Carolina has basic election practices that are typical of the country." LD62 at 18 (Taylor Report). There is, however, no get-out-of-Section-2 liability free card for showing that other states' have comparable voting restrictions—South Carolina cannot absolve North Carolina of Section 2 liability simply by diluting minority votes in equal measure. Such a rule would be flatly contrary to the *Gingles* demand for "an intensely *local* appraisal" of "other voting procedures that may operate to lessen the opportunity of black voters to elect candidates of their choice." *Gingles*, 478 U.S. at 39, 79 (emphasis added) (quoting *Rogers v. Lodge*, 458 U.S. 613, 622 (1982)).

449.    Dr. Taylor's analysis was, in all events, fundamentally flawed. He excluded from consideration altogether North Carolina's protracted and ongoing history of racially discriminatory redistricting on the theory that redistricting is not "a voting practice" that "affect[s] the act of voting" and thus is irrelevant to his analysis of Senate Factor Three, which considers voting practices and procedures. Tr. Day 5 40:20-41:1 (Taylor). That is wrong. The Supreme Court has held "in an unbroken line of decisions stretching four decades" that Section 2's coverage of voting

_____

11/08/2022&county_id=0&office=JUD&contest=0); 2020 elections
(https://er.ncsbe.gov/?election_dt=11/03/2020&county_id=0&office=JUD&contest=0);
[13] https://er.ncsbe.gov/?election_dt=11/06/2018&county_id=0&office=JUD&contest=0.

"practice[s]" and "procedure[s]" applies to redistricting. *Milligan*, 599 U.S. at 24, 38 (quoting 52 U.S.C. § 10301(a)); *see Singleton*, 582 F. Supp. 3d at 1020-21 (considering racially discriminatory redistricting plans from the 2010 cycle under Senate Factor Three). Dr. Taylor also focused only on a point-in-time snapshot of voting restrictions North Carolina had in place in 2022. That over-looks that the State's voting laws have been kept in check only by the policing of federal courts in the years preceding his selected window. The Fourth Circuit in 2016 invalidated restrictions on nearly half—four out of nine—of the indicators Dr. Taylor considered. *Compare* LD62 at 18 n.38 (Taylor Report), *with McCrory*, 831 F.3d at 239. And the State has now begun to reintroduce similar measures. *See Hirsch*, 720 F. Supp. 3d 406.

450.    North Carolina has a long and unbroken history of voting practices that enhance the opportunity for minority discrimination, including many that are in place today. The third factor favors Plaintiffs.

### D.   Senate Factor Four: History of candidate slating in local elections

451.    The fourth Senate factor considers, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37. The parties agree that North Carolina has no candidate slating process and that the fourth Senate factor therefore does not apply here.

### E.   Senate Factor Five: North Carolina's discrimination has produced severe socioeconomic disparities

452.    The fifth Senate factor addresses "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. Plaintiffs introduced overwhelming and uncontested evidence that North Carolina has an ongoing history of racial discrimination against Black people that has

produced racial disparities in areas of public life directly linked to political participation, specifically education, socioeconomic success, healthcare, and criminal justice involvement.

453. Dr. Burch introduced unrebutted evidence that each of the categories she analyzed, education, socioeconomics, healthcare, and criminal justice, affects political participation. Dr. Burch explained that the "powerful relationship between education and voter turnout is arguably the most well-documented and robust finding in American survey research," and that the research "shows that the relationship between education and voting is a causal one." PX21 at 4 (Burch Report). Dr. Burch explained further that socioeconomic status affects political participation because financial resources make it easier to overcome the costs of voting. *Id.* at 13. She similarly canvassed extensive academic research showing that health outcomes affect participation in the political process through a variety of "pathways." *Id.* at 18-19. She demonstrated last that a "growing body of research shows that criminal justice interactions affect participation in the political process," *id.* at 21-22, in "direct and indirect" ways, ranging from the direct prohibitions of felony disenfranchisement laws to the indirect barriers of stigma and exclusion that attend negative contact with the criminal justice system, Tr. Day 3 PM 20:20-21:10 (Burch); PX21 at 21-22 (Burch Report).

454. Dr. Taylor disputed none of this. Dr. Taylor agreed that "educational attainment affects and is indeed [] important to political participation [and] voting behavior," with higher educational attainment driving "higher voter turnout" and lower educational attainment leading to "lower voter turnout." Tr. Day 4 20:16-23 (Taylor). He agreed too that the socioeconomic factors Dr. Burch analyzed "have a material effect" on "political participation" and "voting behavior." Tr. Day 5 10:25-11:7 (Taylor). Specifically, "people who are not unemployed, people who are not impoverished and, in general, people with higher household incomes tend to turn out and vote

more than people who are unemployed, impoverished, or with lower household incomes." *Id.* at 11:8-13. He likewise concurred that "criminal justice involvement . . . has been shown to affect voting behavior . . . even beyond the term of incarceration," adding that "Dr. Burch is probably one of the top experts on this particular subject matter." *Id.* at 20:18-21:21. He did not dispute that "health affects voting participation." *Id.* 19:19-23

455.    There was equally radical agreement that the State exhibits significant racial disparities across each of these metrics, at least in absolute terms, in ways that disadvantage Black North Carolinians. Dr. Burch showed "large gaps in educational attainment between Black and White North Carolinians, with White people being more advantaged relative to Black people." Tr. Day 3 AM 112:4-7. She demonstrated "large" disparit[ies]" across numerous socioeconomic indicators, Tr. Day 3 PM 9:23-10:1 (Burch), including in unemployment, income, poverty, and homeownership. She identified "racial gaps in health outcomes" across "many measures." PX21 at 18-19 (Burch Report). She cited "racial disparities in contact with the criminal justice system in North Carolina" at almost every touchpoint at rates that cannot "be explained solely by disparities in crime rates." PX21 at 22 (Burch Report). Plaintiffs' lay witnesses offered extensive and poignant testimony relaying their lived experience under these disparities.

456.    Dr. Taylor again agreed. He testified on cross examination that, in absolute terms, North Carolina's racial disparities in educational outcomes represent "a big, tremendous troubling racial gap." Tr. Day 5 8:14-10:8 (Taylor). He acknowledged that there are absolute racial disparities in unemployment, income, and poverty across North Carolina, and in the Black Belt counties in particular, and did not dispute that those disparities extend to homeownership. *Id.* at 11:14-12:6, 14:18-15:19, 16:1-4. He corroborated that in "all" of the prominent "health-related metrics, life

expectancy . . . , infant mortality, incidence of cancer, incidence of diabetes, health insurance coverage . . . there is a racial disparity with White North Carolinians being better off than Black North Carolinians." *Id.* at 18:19-25. He confirmed "that there are racial disparities in various forms of criminal justice involvement in North Carolina including arrests, incarceration, and people serving a sentence on post-release supervision of some form." *Id.* at 21:22-25.

457.    The experts' agreement extended to North Carolina's history of discrimination in these areas, and Dr. Taylor did not dispute that discrimination continues in various forms today. Dr. Burch testified that "Black people historically have faced educational discrimination in North Carolina," with approximately 20% of its electorate having been educated under state-sanctioned segregation. PX21 at 4 (Burch Report). "Younger adults in the electorate also faced and still face educational discrimination," particularly in the Black Belt, where segregation is still "considered high" in several counties. *Id.* Similarly, "Black people have faced and continue to face discrimination in employment in . . . North Carolina." *Id.* at 14. Studies also show that "minority homebuyers are denied mortgages at higher rates" than white borrowers and that such "practices still operate in North Carolina." *Id.* at 18. Black people also "face structural barriers to equal health outcomes such as access to health care and environmental hazards." *Id.* at 19-21. "Racial discrimination has been and continues to" proliferate across "the criminal justice system in North Carolina today." *Id.* at 22.

458.    Dr. Taylor did not dispute North Carolina's history of racial discrimination. He agreed that North Carolina has a history of "racial discrimination in education," including a "long" period of official segregation that continued for "a period of years even after" the Supreme Court's decision in *Brown v. Board of Education*, testifying that "North Carolina massively resisted desegregation of its schools." Tr. Day 4 249:24-250:13 (Taylor). He likewise agreed that historically

"there has been discrimination against Black North Carolinians in the area[s] of employment" and "mortgage lending." Tr. Day 5 11:22-25, 16:10-13 (Taylor). He largely accepted without dispute the structural barriers to healthcare and the racial disparities in criminal justice involvement that Dr. Burch identified as well.

459.    Finally, Dr. Burch offered unrebutted testimony that past and present racial discrimination has caused North Carolina's racial disparities. Dr. Burch opined that the "racial disparities in education that exist in North Carolina today . . . result from historical and contemporary discrimination." PX21 at 4 (Burch Report). As noted, North Carolina had an official policy of segregation when the Supreme Court decided *Brown*, and failed to desegregate for years after those rulings, placing "many of today's North Carolina voters . . . under . . . formally segregated educational systems." *Id.* at 5. Segregation persists at concerning levels today in many of the Black Belt counties. *Id.* This "[e]ducational segregation is consequential and prevents minority students from receiving an equal education in North Carolina. Statistical analyses associate school segregation, along with other factors, with student performance on assessment tests . . . . North Carolina's racially-imbalanced charter school system also increases educational segregation and racial test score gaps." *Id.* at 7. Teacher credentials likewise "have large effects on student achievement at the high school level," but "the uneven distribution of teacher credentials by race and socioeconomic status of high school students means that minority students and those with less well-educated parents do not have equal access to a high-quality education at the high school level." *Id.* (cleaned up).

460.    Discrimination in education carries over to drive socioeconomic disparities, which are compounded by discrimination in employment. Dr. Burch explained that many of the socioeconomic disparities she discussed flow directly from disparities in education. PX21 at 13 (Burch

Report). "Decades of persistent discrimination in employment and access to capital also contribute to the racial disparities in socioeconomic indicators and their impact on political participation today." *Id.* "Black people have faced and continue to face discrimination in employment in . . . North Carolina." *Id.* at 14. Research likewise shows that, "even after controlling for factors such as down payments and credit scores, minority homebuyers are denied mortgages at higher rates and, when they are able to get mortgages, pay more than similarly-situated White borrowers. Such practices still operate in North Carolina." *Id.* at 18 (footnotes omitted).

461.     Dr. Burch showed that discrimination and structural barriers cause disparities in health and criminal justice as well. She identified a range of undisputed structural barriers to "equal health outcomes such as access to healthcare and environmental hazards" that drive racial disparities in health status in North Carolina, including identifying several Black Belt counties where residents lack adequate access to primary care physicians. PX21 at 19-21 (Burch Report). At the same time, "[r]acial discrimination has been and continues to be an important contributor to the disproportionate representation of Black people in the criminal justice system in North Carolina today. Racial disparities in arrests are caused partially by factors that make it more likely that police will stop or search Black people, such as spatially differentiated policing, racial residential segregation, and discrimination." *Id.* at 22. These disparities extend to traffic stops, searches, bail decisions, and sentencing, none of which can be explained by race-neutral factors. *Id.* at 22-23. The only factor that can "explain [these] racial gaps" is "bias." Tr. Day 3 PM 23:8-9 (Burch).

462.     Dr. Taylor either agreed or did not dispute that discrimination is a contributor to North Carolina's vast racial disparities. Dr. Taylor acknowledged that North Carolina's schools continue to exhibit signs of racial segregation. Tr. Day 4 252:18-259:7 (Taylor). He also testified that he was "familiar with academic research that has found that in the American South racial

disparities in educational attainment today are owing in part to the history of official discrimination against Black people in education going back to legal school segregation," and that he was "not contesting" that "the racial disparities that exist in education today with White students consistently performing better than Black students on a variety of educational metrics" is "in part because of the history of official discrimination." Tr. Day 5 23:18-24:4 (Taylor). He was not "aware of any research" to the contrary. *Id.* at 24:6-13. He likewise did not offer "any opinion in this case" disputing that racial disparities in education "between Black and White Americans nationally are owing in part to the history of discrimination against Black Americans." *Id.* at 25:14-22. Indeed, Dr. Taylor never disputed any of Dr. Burch's evidence attributing contemporary racial disparities in North Carolina to past and present racial discrimination in the state.

463.    Instead of disputing that North Carolina is bereft with racial disparities that flow from the state's ongoing history of racial discrimination, Dr. Taylor sought to excuse it by comparing disparities in North Carolina to disparities nationwide. He offered a kaleidoscope of metrics to make the point. Dr. Taylor justified North Carolina's disparities in education by comparing the State's gap in educational outcomes between white and Black students to the nation's gap in educational outcomes between white and Black students. LD62 at 10 (Taylor Report); Tr. Day 5 26:8-11 (Taylor). He justified North Carolina's disparities in unemployment by comparing the State's Black unemployment rate, in absolute terms, to the country's employment rate, in absolute terms. LD62 at 12-13 (Taylor Report); *see* Tr. Day 5 26:12-28:6 (Taylor). And he justified North Carolina's disparities in income and poverty levels by comparing the State's *change* in income and poverty rates since the recession with the national change in income and poverty rates over the same timeframe. LD62 at 13 (Taylor Report); Tr. Day 5 28:7-29:13 (Taylor).

464.     These efforts are unavailing. As discussed, writing off the effects of racial discrimination on North Carolinians, and on residents in the Black Belt in particular, because Black people in other states also bear the effects of racial discrimination is antithetical to the "intensely local appraisal" that *Gingles* demands. *Gingles*, 478 U.S. at 79 (quoting *Rogers*, 458 U.S. at 622). More than that, even if Dr. Taylor's metrics were relevant, he conceded that he used varying units of comparison between each of the metrics he analyzed, and that if he had used a consistent methodology across indicators his analysis would have shown that North Carolina's socioeconomic disparities are in fact greater than national disparities. Tr. Day 5 27:6-28:6 (Taylor); *see* PX 117 at 6 (Burch Rebuttal Report). The court has thus discredited Dr. Taylor's comparative analysis for deploying a carousel of inconsistent metrics designed to engineer a favorable view of North Carolina's nationwide standing that, when corrected, flips his results on their head. His opinions thus only confirm Dr. Burch's conclusions while doing nothing to undermine them.

465.     Taking Dr. Burch and Dr. Taylor's testimony together, the unrebutted evidence showed that North Carolina has a history of racial discrimination in education, employment, healthcare, and criminal justice, that its discrimination has produced significant disparities in each of those areas, and that the effect is to impair Black North Carolinians participation in the political process. The fifth factor favors Plaintiffs.

### F.  Senate Factor Six: North Carolina political campaigns feature racial appeals

466.     The sixth Senate factor considers "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. When "candidates are making race an issue on the campaign trail – especially in a way that demonizes the minority community and stokes fear and/or anger in the majority – the possibility of inequality in electoral opportunities increases." *Soto Palmer*, 686 F. Supp. 3d at 1230. This factor favored the plaintiffs in *Gingles*

when they introduced "specific examples" of racial appeals in recent U.S. Senate and North Carolina Gubernatorial campaigns. *Edmisten*, 590 F. Supp. at 364.

467. Dr. Burch provided extensive evidence of racial appeals in North Carolina political campaigns. She conducted her analysis by setting out a rubric for defining explicit and implicit racial appeals based on an exhaustive review of the academic literature. She applied these definitions to her review of North Carolina political campaign rhetoric and identified numerous instances of explicit and implicit racial appeals, beginning with Jesse Helms's infamous white hands ad and carrying forward to today. Dr. Burch identified racial appeals in each of the most recent election cycles and at every level of North Carolina government. Dr. Critchlow, meanwhile, conducted a remarkably narrow analysis of "charges of racism" that did nothing to rebut Dr. Burch's evidence.

468. Dr. Burch identified numerous racial appeals in North Carolina political campaigns in recent cycles. *See* PFOF § VI.F. In 2024 alone, she identified explicit racial appeals in the state's most prominent races, including the Gubernatorial, Attorney General, and School Superintendent campaigns. Mark Robinson, the Gubernatorial candidate, tried to "distanc[e] himself from Black voters" through statements like, "I'm not African American- just AMERICAN." PX21 at 26 (Burch Report); Tr. Day 3PM 34:19-35:14 (Burch). Attorney General candidate Dan Bishop posted a mock statement calling his Democratic opponent a "Chinese Social Media Star" in a fake post "written in Chinese" and accusing his opponent of "helping China spy on North Carolina." PX21 at 29 (Burch Report). School Superintendent candidate Michelle Morrow, who is white, posted a video accusing her opponent Maurice Green, who is Black, of having "spent his professional life going after white people and Jews," and supporting policies like "No Suspensions for Black Students" and "First Prefernce [*sic*] To Black Students." PX271 at 1-2 (Burch Corrected Suppl. Report). Similar appeals proliferated in the 2022, 2020, and 2018 campaign cycles. *See*

PFOF § VI.F. Dr. Burch even identified an entire category of racial appeals appealing directly to white supremacists through proclamations like "What is Wrong with Being a White Supremacist? God is A Racist and a White Supremacist." PX21 at 29 (Burch Report).

469.    Representative Reives gave a firsthand account of this phenomenon, sharing two racial appeals that were weaponized against him personally. The first attack occurred as part of a series of mailers criticizing Democrats for their position on increasing legislators' per diems. Tr. Day 1 133:7-12 (Reives). The ad targeting Reives depicted him at a parade in a Mercedes Benz he did not own, activating the stereotype of a minority politician benefitting from ill-gotten gains. *Id.* at 133:7-135:21. Analogous mailers targeting white Democrats included no photos of the candidates. *Id.* at 135:22-136:9. The second attack was even more explicit. It accused Reives of "supporting [a] terrorist organization" that taught critical race theory because he donated to a nonprofit run by a relative that provided anti-racism courses as part of a larger educational mission. *Id.* at 136:12-138:3. The persistence of these appeals in both Dr. Burch's analysis and Representative Reives's experience confirms that political parties, campaigns, and other actors throughout North Carolina continue to believe that such appeals effectively associate Black candidates with negative, racist stereotypes, and mobilize white voters by emphasizing racial division in the State's politics.

470.    Dr. Critchlow faulted Dr. Burch for her failure to develop a systematic approach to identifying racial appeals. But *Gingles* has never been invested with such a requirement. 478 U.S. at 40 (relying on "specific examples of racial appeals"). And Dr. Critchlow only underscored the flaws in setting out such a mandate, architecting a bizarrely limited newspaper search that purported to investigate "charges of racism" by querying three search terms in North Carolina newspaper publications covering election contests for three statewide positions. That approach, while

involving a "system," was woefully inadequate both in theory and in practice. Dr. Burch identified numerous examples of racial appeals that Dr. Critchlow failed to uncover, including racial appeals that "would count even under his narrow definition of" that concept. PX117 at 19 (Burch Rebuttal Report). Dr. Critchlow thus ultimately revised his bottom-line conclusion, increasing his measure of racial appeals in the North Carolina political campaigns he analyzed from 5%, LD61 at (Critchlow Report), to 15%, Tr. Day 5 108:7-19 (Critchlow) (3 of 20). As he has in other cases, Dr. Critchlow "offered one-sided opinions," "ignored incidents of discrimination," and was "unfamiliar with" key events effecting his analysis. *Reagan*, 329 F. Supp. 3d at 836. The court has declined to give his evidence any weight.

471.    The upshot is that Dr. Burch documented racial appeals "in nearly every recent statewide race in North Carolina and also in recent congressional, legislative, and local races," PX117 at 19 (Burch Rebuttal Report), and though Defendants criticize her method for failing a requirement that does not exist, they do not deny that the campaign rhetoric she identified indeed qualified as racial appeals, and they offer no plausible alternative method of their own. The sixth Senate factor favors Plaintiffs.

### G. Senate Factor Seven: Black candidates are underrepresented in public office in the jurisdiction

472.    The seventh Senate factor considers "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. This factor "weighs heavily in favor of" liability when the success of Black candidates depends on majority-minority districts. *Alpha Phi Alpha*, 700 F. Supp. 3d at 1282-84; *see Singleton*, 582 F. Supp. 3d at 1019-20; *Miss. NAACP*, 739 F. Supp. 3d at 461-62.

*473.*    The district court in *Milligan* had "little difficulty finding that Senate Factor 7 weigh[ed] heavily in favor of the" plaintiffs where no Black candidate had ever been elected in the

majority-white districts at issue, Black candidates were largely shut out of statewide offices, and "the overwhelming majority of African-American representatives in the [state] Legislature [came] from majority-minority districts." *Singleton*, 582 F. Supp. 3d at 1019 (cleaned up). The state argued there, as Defendants have here, "that Black candidates have enjoyed 'a great deal of electoral success' in 'elections statewide,' by which they [meant] 'districted races for State offices,' including the Legislature." *Id.* at 1019-20 (citation omitted). But that failed to "engage" with the "point that nearly all of that success is attributable to the creation of majority-Black districts to comply with federal law," and that the "overwhelming majority of African-American representatives in the [state] Legislature come from majority-minority districts." *Id.* Senate Factor Seven thus "heavily" favored the plaintiffs.

474.   This case is a dead ringer for *Milligan* and others that have repeatedly rejected the argument that the success of Black candidates in other areas of the state can somehow cure Black candidates' inability to succeed "*in the jurisdiction*." *Gingles*, 478 U.S. at 37 (emphasis added). Most importantly, in the only endogenous elections that have been conducted in SD1 and SD2, the Black candidate in SD2 lost by nearly 15 percentage points, while no Black candidate ran in SD1. D.E. 105 at 12. In districts containing the same counties under the 2022 map, the Black candidate in SD3 lost by over five percentage points, and no black candidate even attempted to run in SD1, leaving the white candidate to run unopposed. *Id.* at 17. SD1, SD2, and SD3 were majority-white in both the 2022 and 2024 election cycles. *Id.* at 12, 17. These losses for Black candidates in the newly formed majority-white districts reflect a sharp departure from the prior two decades, when the Black Belt counties were traditionally spread across two majority-Black Senate districts and Black candidates enjoyed success. PX21 at 33-34 (Burch Report).

475.    The inability of Black candidates to win in majority-white districts holds true throughout the Black Belt region. In the other two 2024 state Senate races in districts covering Black Belt counties, a Black man, James Mercer, was defeated by a white opponent in majority-white SD11, while a Black woman, Kandie Smith, defeated a white candidate in majority-minority SD5. PX271 at 3-4 (Burch Corrected Suppl. Report); D.E. 105 at 12-13. In 2022, Black Senator Toby Fitch, whose district had included Edgecombe and Halifax Counties in 2020, lost to a white candidate by over 15 percentage points after the district was redrawn to exclude the Black Belt counties and become majority-white. PX21 at 34 (Burch Report). The reconfiguration has left the Black Belt residents in all but Edgecombe County—the only county in a majority-minority district—represented by white senators since the 2022 election. *Id.*

476.    The same trend plays out across the state. Of the 28 Black people elected to the state house in 2024, 22 were elected from majority-minority or majority-Black districts. PX271 at 4 (Burch Corrected Suppl. Report). Of the 10 Black people elected to the state senate, 8 were elected from majority-minority or majority-Black districts. *Id.* at 4-5. Moreover, 24 Black candidates ran in, but lost, state House races in 2024. *Id.* Of those 24 Black candidates, "19 lost to White candidates in majority-White districts, two lost to minority candidates in majority-minority districts, one lost to a minority candidate in a majority-White district, and only two lost to a White candidate in a majority-minority district." *Id.* at 4 & n.12. "Of the 15 Black candidates who lost state senate races, 14 lost to White candidates in majority-White districts. One candidate, Semone Pemberton, was defeated by another Black candidate in SD19." *Id.* at 5. "Of the 10 Black people elected to the state senate, only one, Natalie S. Murdock, defeated a White person representing a major political party in . . . a majority-White district," winning in SD20 which contains "parts of Durham and Chatham Counties." *Id.* at 4-5. There is not a single Black Republican in the North

Carolina Senate, and only one in the North Carolina House, leaving Black officials all but absent from the Republican Party's veto-proof supermajority. *See* PX271 at 4-5 & nn.10, 14 (Burch Corr. Suppl. Report).

477. Black candidates are also almost entirely underrepresented in key statewide offices. "There have been no Black people elected as Governor or Attorney General of North Carolina," and one Black person has served one term as Lieutenant Governor. PX21 at 32 (Burch Report). "No Black people have been elected to the U.S. Senate from North Carolina." *Id.* In other important federal offices, only 11 "Black people have been elected to the U.S. House of Representatives, including 8 since the year 1900." *Id.*; *cf. Alpha Phi Alpha*, 700 F. Supp. 3d at 1282 ("Georgia has never elected a Black governor" and "only 12 Black candidates have ever been elected to the Congress").

478. Defendants emphasize the parity between Black officials' share of the General Assembly and share of the broader North Carolina population, and Dr. Taylor and Dr. Critchlow provided assorted examples of Black elected officials across the State. That emphasizes "Black representation in all of North Carolina *except* the districts and region of the state in question." PX117 at 22 (Burch Rebuttal Report). Senate Factor Seven, however, "focuses on 'the extent to which members of the minority group have been elected to public office *in the jurisdiction.*'" *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1295 (11th Cir. 2020) (emphasis added) (quoting *LULAC*, 548 U.S. at 426). And Defendants fail to "engage" with the point that the "overwhelming majority of African-American representatives in the [North Carolina] Legislature come from majority-minority districts," *Singleton*, 582 F. Supp. 3d at 1019, the precise "prerequisite [to] black candidates' success" the Legislature here seeks to avoid, *Miss. NAACP*, 739 F. Supp. 3d at 461. The success of Black candidates in majority-Black and majority-

minority districts underscores that Black political participation relies on such districts—it does not absolve the General Assembly from drawing them. *Singleton*, 582 F. Supp. 3d at 1019-20. The success of Black candidates in majority-Black and majority-minority districts in the state's urban centers cannot remedy the obstacles to Black candidates in majority-white districts in the state's rural Black Belt counties. The seventh factor favors Plaintiffs.

### H. Other Totality Factors: North Carolina is not responsive to its Black voters

479. The eighth Senate factor examines "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. Examples of non-responsiveness can include failing to provide healthcare programs serving the Black community, inadequately funding public education, and engaging in racially discriminatory election practices. *Miss. NAACP*, 739 F. Supp. 3d at 462. The record in this case is replete with evidence that the North Carolina General Assembly is unresponsive to the needs of Black voters in the areas most important to them—and in the same areas Dr. Burch documented substantial racial disparities in the State.

480. Plaintiffs' lay witnesses uniformly testified that the General Assembly has been unresponsive to the needs of Black voters. *See* Tr. Day 1 20:22-21:19 (Butterfield); *id.* at 52:5-20 (Pierce); *id.* at 65:5-13 (Matthews); *id.* at 87:21-90:10 (Blue); *id.* at 146:18-147:21 (Reives). The fact witnesses placed emphasized the legislature's failure to sufficiently fund public education, lamenting that funds are diverted from Black-attended public schools to white-attended charter schools, harming Black students and entrenching segregation in North Carolina's educational institutions. *See id.* at 21:2-19 (Butterfield); *id.* at 48:17-20 (Pierce); *id.* at 62:9-25 (Matthews); *id.* at 147:15-21 (Reives). Dr. Burch's data confirmed that there are high levels of segregation in Black Belt schools, and dramatic disparities in educational outcomes between Black and white students both in the region and throughout the state. PX21 at 4-13 (Burch Report). Dr. Taylor agreed, *see*

Tr. Day 5 7:2-10:15 (Taylor), characterizing the education gap in North Carolina as a "big, tremendous troubling racial gap," *id.* at 9:8-9.

481.    Plaintiffs' fact witnesses also consistently testified that the General Assembly has failed to respond to the healthcare needs of Black people in North Carolina, most egregiously by waiting ten years to approve Medicaid expansion, and also through other steps like shuttering the Office of Minority Health. Tr. Day 1 21:5-12 (Butterfield); *see id.* at 48:21-49:16 (Pierce); *id.* at 65:5-13 (Matthews); *id.* at 146:18-147:7 (Reives). Dr. Burch confirmed that Black people in North Carolina experience worse health outcomes than white people across a host of measures. PX21 at 18-21 (Burch Report). Dr. Taylor testified to the same effect, agreeing that across all "health-related metrics, life expectancy . . . , infant mortality, incidence of cancer, incidence of diabetes, health insurance coverage," statewide and in the Black-Belt counties, "there is a racial disparity with White North Carolinians being better off than Black North Carolinians." Tr. Day 5 18:19-25 (Taylor).

482.    The lay witnesses expressed equal concern with the legislature's treatment of Black voters in the electoral realm. In the last decade alone, the Supreme Court has three times invalidated North Carolina redistricting plans as unconstitutional gerrymanders that intentionally targeted Black voters, and the Fourth Circuit invalidated a separate omnibus election reform bill because it "target[ed] African Americans with almost surgical precision" and was "the most restrictive voting law North Carolina has seen since the era of Jim Crow." *McCrory*, 831 F.3d at 214, 229. As Representative Pierce put it, "[w]hen you pass a bill and a federal court says that that bill, which is a voting rights bill or voter ID bill, targeted Black voters with surgical precision . . . that really makes you raise your eyebrows as an African American voter." Tr. Day 1 at 52:21-53:4 (Pierce). Such laws are "anathema . . . to Black participation in voting." *Id.* at 88:11-12 (Blue).

"Certainly enacting laws that dilute the voting power of Black people does not serve the needs of Black people." PX117 at 24 (Burch Rebuttal Report).

483.     Dr. Burch provided statistical evidence supporting the lay witnesses' experience. Dr. Burch offered unrebutted testimony that North Carolina has large racial disparities in educational attainment, socioeconomic status, health outcomes, and criminal justice involvement. *See supra* PFOF § VI.E. Her testimony regarding education and healthcare mapped directly onto the fact witness testimony. The fact witnesses described how the legislature has diverted funds from public schools relied on by Black students, to private schools overwhelmingly attended by white students, against the interests of Black children. Dr. Burch showed that this dynamic has indeed produced racially segregated schools in the Black Belt region and denied educational opportunities to Black students. PX21 at 4-13 (Burch Report). The lay witnesses also explained how healthcare disinvestment has impaired the interests of the Black population, and Dr. Burch confirmed that Black people in North Carolina experience categorically worse health outcomes than white people. *Id.* at 18-21. Dr. Burch went on to show that educational disparities interact with employment prospects to generate corresponding gaps across socioeconomic indicators. *Id.* at 13-18. She likewise demonstrated that the North Carolina penal system is plagued by racial bias, a phenomenon that in a state-run institution is self-evidently non-responsive to Black residents. *Id.* at 21-23.

484.     As the court has already concluded, Defendants failed to at all rebut this evidence. Dr. Taylor relied heavily on the Caughey-Warshaw data as a proxy for the General Assembly's responsiveness to all North Carolinians, but he acknowledged that "if we wanted to understand the degree or extent to which the state has been responsive to the needs of" Black people in North Carolina, or specifically "in the Black-Belt counties, the Warshaw-Caughey data wouldn't tell us

anything about that." Tr. Day 5 33:4-35:22 (Taylor). Dr. Taylor also emphasized federal government outlays to the Black Belt counties, but that data is irrelevant because this is a case about representation in the state, not federal, legislature. LD62 at 22 & n.48 (Taylor Report). Dr. Taylor closed by identifying two years of state budget line items earmarked for initiatives supporting the Black Belt region, or Black North Carolinians more broadly, but he provided no context for these expenditures within the overall budget. *Id.* at 23-24. Dr. Taylor thus failed to provide any meaningful rebuttal to Plaintiffs' thoroughly documented evidence that the legislature is responsive to the needs of Black voters.

485. The uniform, insistent, and unrebutted testimony of Plaintiffs' five lay witnesses, unanswered by Defendants' expert, is powerful evidence that the North Carolina General Assembly is unresponsive to the needs of Black voters. *Miss. NAACP*, 739 F. Supp. 3d at 462-63. Dr. Burch's documented disparities in the same areas corroborate that testimony and are a testament to the legislature's failure to Black North Carolinians' needs. The eighth factor favors Plaintiffs.

### I. Other Totality Factors: Any justification for splitting the Black Belt counties in the new Senate map is tenuous

486. The ninth factor asks "whether the policy underlying the . . . practice or procedure is tenuous." *Gingles*, 478 U.S. at 37. It is. The enacted plan fans the Black Belt counties, traditionally grouped in two majority-minority districts, across an unprecedented four-district span. The map's cleavage of the minority population, depicted below, is starkly apparent to the naked eye, and radically disperses Black political power in the region. Defendants nevertheless merely gesture at far-fetched justifications for the adopting the map.

487.



488. The division of Black voters between SD1 and SD2 is obvious to the naked eye. As Mr. Esselstyn's unrebutted testimony explained, it divides "a significant community of interest." PX69 at 30 (Esselstyn Report). It does so at the cost of uniformly reducing the compactness scores of the 2022 plan, to say nothing of prior years. PX69 at 11, 13 (Esselstyn Report). And it snakes across the state to pair northeastern Black Belt counties with southeastern coastal counties with which they do not "have much in common." Tr. Day 1 64:18-65:4 (Matthews).

489. Defendants nevertheless offer only Senator Hise's vague and unconvincing testimony to defend the plan. The only justification of the map that Senator Hise could muster was that members of the redistricting committee heard "some testimony" about preserving fingerling counties and had "some conversations about" preserving the Norfolk media market. Tr. Day 3PM 116:9-20 (Hise). He did not attempt to detail why the legislature credited those testimonials and

246

conversations, and did not even begin to explain how such apparently anodyne discussions could warrant splitting a long-recognized and long-preserved community of interest.

490. The court has already declined to credit Senator Hise's non-committal justification for the enacted plan, and thus concludes that Defendants' proffered justification is tenuous. The ninth factor favors Plaintiffs.

### J. Other Totality Factors: Defendants have not shown that the reasons for polarized voting are unrelated to race

491. As far as the Supreme Court is concerned, the cause of racially polarized voting has traditionally been considered "irrelevant" to the Section 2 inquiry. *Gingles*, 478 U.S. at 64 (plurality opinion); *see Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) ("Although only a four-Member plurality joined Section III(C) of the opinion . . . Section III(C) is lengthy, and the dispute that cost Justice White's vote on the section was not over the 'cause' issue); *see generally Milligan*, 599 U.S. (omitting any discussion of causation). Justice Brennan, joined by three other Justices, emphasized in *Gingles* "that the reasons black and white voters vote differently have no relevance to the central inquiry of § 2." *Gingles*, 478 U.S. at 63. That is because Section 2 "itself and the Senate Report make clear that the critical question in a § 2 claim is whether the use of a contested electoral practice or structure *results* in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* (emphasis added). That is true irrespective of "the reasons why black and white voters vote differently." *Id.* "It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in" actionable disparities in Black and white voters' ability "to elect their preferred representatives." *Id.* The Supreme Court has never held otherwise, and Plaintiffs have preserved their argument that causation is irrelevant to the Section 2 inquiry at any stage.

492.     The Fourth Circuit has nevertheless held that "the reason for polarized voting" may be one factor in the *Gingles* "totality" of circumstances inquiry. *Charleston Cnty.*, 365 F.3d at 349. Evidence of racially polarized voting that satisfies the second and third *Gingles* preconditions creates a "strong . . . inference" of unequal "access to the political system on account of race." *Uno*, 72 F.3d at 983. A Section 2 defendant may nonetheless attempt to introduce "evidence of partisanship" to rebut a plaintiff's evidence of racial vote dilution. *See Charleston Cnty.*, 365 F.3d at 352-53. Plaintiffs' evidence of extreme racially polarized voting, *see supra* PFOF §§ III, IV, VI.B; PCOL §§ IV, V, VI.B, creates an inference that voting is polarized in North Carolina on account of race. Defendants have failed to present "systematic proof" rebutting it. *See Charleston Cnty.*, 365 F.3d at 352-53; *Nipper*, 39 F.3d at 1525. They certainly have not shown that "the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." *LULAC v. Clements*, 999 F.2d 831, 837, 850 (5th Cir. 1993) (en banc); *see also Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995) ("high hurdle").

493.     Rebutting the inference that racial polarization occurs on account of race will be an especially tall order in areas where "partisanship and race as determinants of voting are inextricably intertwined." *Charleston Cnty.*, 365 F.3d at 352 (cleaned up). The burden is on the defendants to disaggregate these typically interconnected variables. That is an impossible task when Black voters' political preferences are driven by the issues that link race and party—that is, a party's "support for issues important to black citizens," *Miss. NAACP*, 739 F. Supp. 3d at 453—rather than "just based on the party label," *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1278 (N.D. Ga. 2023). That is the case here.

494.

1. <u>Defendants Have Not Shown That Racially Divergent Voting in Northeastern North Carolina is Completely Independent of Race</u>

495. Defendants can carry their burden by providing "systematic proof," *Charleston Cnty.*, 365 F.3d at 352, "that divergent voting patterns among white and minority voters are best explained by partisan affiliation," not race. *Clements*, 999 F.2d at 861. Defendants turn for that proof exclusively to the testimony of Dr. Alford. His testimony does not supply it.

496. The Fourth Circuit recognized in *Charleston* that race and partisanship are "inextricably intertwined." 365 F.3d at 352. Indeed, Dr. Alford himself confirmed at trial, as he has in other Section 2 cases, that "it's possible for political affiliation to be motivated by race." Tr. Day 4 104:2-5; *see Miss. NAACP*, 739 F. Supp. 3d at 453; *Alpha Phi Alpha*, 700 F. Supp. 3d at 1358; *Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952, 979 (S.D. Tex. 2023), *rev'd and remanded on other grounds*, 111 F.4th 596 (5th Cir. 2024) (en banc). The task of a defendant seeking to rebut evidence of racially polarized voting is thus to examine "*why*" Black voters support Democratic candidates and white voters support Republican candidates. *Miss. NAACP*, 739 F. Supp. 3d at 453 (emphasis added). The defendant must show that the reason for the divergent support is a race neutral one, like pure partisan identity or loyalty, rather than one intertwined with race, like a party's "support for issues important to black citizens." *Id.*; *see Alpha Phi Alpha*, 700 F. Supp. 3d at 1276; *Petteway*, 698 F. Supp. 3d at 979.

497. As a threshold matter, Dr. Alford's conclusions on this precise issue of race versus partisanship in Section 2 cases have repeatedly been rejected, because courts have consistently found that they "were not reached through methodologically sound means and were therefore speculative and unreliable." *Alpha Phi*, 700 F. Supp. 3d at 1210 (collecting cases). Indeed, courts have regularly concluded that Dr. Alford's approach to assessing partisanship is "not the result of [a] commonly accepted methodology in the field" and "border[s] on *ipse dixit*." *Robinson*, 605 F.

Supp. 3d at 840–41; *see Miss. NAACP*, 739 F. Supp. 3d at 454. As Dr. Alford put it at trial, saying that courts have repeatedly declined to credit his testimony on partisanship as a driver of racial polarization, in cases considering analysis "similar" to the analysis he conducted here, would be a "polite way" of putting it. Tr. Day 4 59:20-24, 65:8-13 (Alford). The court accepted Dr. Alford as a witness in the field of redistricting, but agrees with other courts that his testimony on the issue of whether and to what extent partisanship, as distinct from race, drives racially polarized voting patterns in northeastern North Carolina contributes little to answering that question.

498.    Turning to Dr. Alford's conclusions themselves, Dr. Alford opined in his expert report that "party affiliation of the candidates *best explains* the divergent voting preferences of Black and White voters in North Carolina elections," LD59 at 19 (Alford Report) (emphasis added), by which he means best explains *as between* "party affiliation of the candidate and the race of the candidate." Day 4 Tr. 104:13-105:5. But Dr. Alford admitted that he (1) did not conduct any causal analysis that could explain why voting is racially polarized in northeastern North Carolina; (2) his analysis was exclusively focused on the party and the race of the candidate, not the voter; and (3) Black voters most likely supported Democratic candidates because Democratic candidates supported the issues that are important to Black voters. All of those conclusions independently confirm that Dr. Alford has not rebutted (and indeed has supported) the showing that racial considerations in fact drive the starkly different voting patterns of white and Black voters in northeastern North Carolina.

499.    Dr. Alford framed the conclusion in his expert report as a conclusion on the cause of racially polarized voting, but as Dr. Alford ultimately confirmed at trial, he in fact offered no evidence to support that conclusion. Dr. Alford made no attempt, through a multi-variate regres-

sion analysis or otherwise, to survey, test, or isolate the reasons for racial alignment around particular political parties in northeastern North Carolina. Tr. Day 4 100:11-18, 101:12-23 (Alford). He did not analyze primary election data as a tool for disentangling race and politics. *Cf. Petteway*, 698 F. Supp. 3d at 980 (Dr. Alford presenting primary data in unsuccessful attempt to attribute racial voting patterns to partisanship). He presented no data on "party registration information" or "survey research," even though those "are the primary data relied on by political scientists in determining the effect of political partisanship on electoral outcomes." *Charleston Cnty.*, 365 F.3d at 352. Ultimately, Dr. Alford conceded on cross-examination that he had not done "work to try to assess whether Black voters consistently support Democratic candidates because they're Democrats or whether they consistently support Democratic candidates because Democratic candidates promote policies and values shared by Black voters." Tr. Day 4 101:12-23 (Alford).

500.    Not only did Dr. Alford testify at trial that he *did not* in fact conduct an empirical analysis of whether partisanship drives racial voting patterns in northeastern North Carolina, *id.* at 100:20-101:5, he testified that he *could not* have based on the data he reviewed, *cf. Alpha Phi Alpha*, 700 F. Supp. 3d at 1358. He testified that "it's not possible to establish the cause of voter behavior outside of an experimental setting." Tr. Day 4 103:3-6 (Alford). Dr. Alford testified that he was "not aware of any study that provides solid evidence of a causal connection for anything related to voting behavior" in political science. *Id.* at 103:3-18. Political scientists "talk about things influencing things or being associated with things or being correlated with things. But cause, causation is a, you know, very specific scientific term and that implies considerable levels of control over an experimental setting which in the case of human behavior, particularly political behavior is neither possible or ethical." *Id.* at 103:20-104:1.

501. Dr. Alford acknowledged that his analysis exclusively compared the race of the candidate and the party affiliation of the candidate and did not seek to isolate the effect of a voter's party affiliation as compared to a voter's racial group. In other words, he admitted that nothing in his analysis established whether race of the *voter* played a role in polarization. His analysis did not establish "why" Black and White voters consistently supported different candidates from different political parties, and he had not even "examined that question." Tr. Day 4 100:11-18. His "descriptive conclusions based on" Dr. Collingwood's data thus "did not offer additional support for a conclusion that voter behavior [is] *caused* by partisanship rather than race." *Alpha Phi Alpha*, 700 F. Supp. 3d at 1361 (emphasis added).

502. Dr. Alford did not just admit that his statistical analysis failed to address the motivations of the voter, he admitted that he hadn't proven anything about the race of the candidate either. He stated that he believed there was no "evidence in the court record to suggest that [voter] behavior is altered by the race of candidates." Tr. Day 4 66:14-16 (Alford). He then admitted: "my analysis doesn't demonstrate the absence of any racial voting [based on the race of the candidate]; it just demonstrates that the plaintiffs' evidence does not provide any evidence." *Id.* at 66:16-19. That admission means that Defendants have not carried their burden.

503. Dr. Alford then further admitted that, in his expert opinion, racial considerations related to the race of the voter *are* driving the racially divergent voting patterns in northeastern North Carolina. He explained that it's "very likely to be correct" that Black voters "consistently support Democratic candidates because Democratic candidates promote policies and values shared by Black voters," rather than because the candidates are "Democrats." *Id.* at 101:12-23. He testified that it's "the party of the candidate [that] tells us a lot about" whether the candidate will do "a

better job of advancing the interests of Black voters in North Carolina." *Id.* at 102:20-103:2. Indeed, he explained that he "know[s] a lot about voting behavior" and "it is the case" that "candidates who are Democrats may be more likely than candidates who are Republicans to hold particular policy views that Black voters believe will advance the interests of Black people." *Id.* at 101:24-102:12.

504. These concessions establish that, accepting arguendo Dr. Alford's conclusion that the partisan affiliation of the candidate better explains voting behavior than the racial identity of the candidate, that conclusion supports the Plaintiffs' position in this case. If the party affiliation of the candidate is what tells voters whether the candidate will do a good job of advancing race-related interests, then we should *expect* voters who are voting based on their race to end up coalescing around particular parties, regardless of the race of the candidate. In other words, the precise results Dr. Alford describes show that voters *are* voting based on their own racial motivations.

505. Dr. Collingwood confirmed that Dr. Alford's analysis did not support the conclusion that pure partisanship best explains voter behavior in northeastern North Carolina. Dr. Collingwood testified that Dr. Alford's could not assert the "conclusion that partisanship rather than race drives the extreme racially polarized voting in" North Carolina because he did not "make a direct comparison" between those two variables or pit them "against one another in" any sort of "causal test." Tr. Day 2 148:20-25 (Collingwood). Dr. Collingwood explained in his rebuttal report that Dr. Alford "perform[ed] no analysis of that question at all and [did] not explain his conclusion." PX128 at 4 (Collingwood Rebuttal Report). Thus, "[e]ven if Dr. Alford were correct that voters do not vote on the basis of the race of the candidate, nothing in his analysis shows or even attempts to show that Black voters in North Carolina in any contest are cohesively voting for a particular candidate because that candidate is a Democrat, as opposed to because Black voters

cohesively believe that the particular candidate will advocate for their community." *Id.* at 4-5. He thus provides no "evidence" that the "candidate preferred by the minority group" was rejected "for *reasons* other than those which made that candidate the [minority-]preferred choice," *Charleston Cnty.*, 365 F.3d at 347.

506. Even accepting that Dr. Alford's analysis could theoretically have identified the causal forces behind racially polarized voting in northeastern North Carolina, the data he relied on does not in fact support that conclusion. "Dr. Alford's own results demonstrate that minority-preferred minority candidates are defeated more often in this area of the state than minority-preferred white candidates." PX128 at 2 (Collingwood Rebuttal Report). White voters also "offered less cohesive support to minority Democratic candidates than to White Democratic candidates in certain election years." *Id.*; *see* PX279 at 11 (Collingwood Suppl. Report) (finding that white voters were slightly more likely to cross over in 2024 in SD2 to support the Black-preferred candidate if that candidate was white). Even if Dr. Alford's approach could theoretically have shown that partisanship, not race, accounts for North Carolina's racially divergent voting patterns, he would not have shown it here.

507. On top of all that, the "unique" circumstances present in *Clements* are absent here. 999 F.2d at 837. The outcome in *Clements* depended on two distinctive factors unique to that case. "First, white voters constitute[d] the majority of not only the Republican Party, but also the Democratic Party, even in several of the counties in which the former dominates." *Clements*, 999 F.2d at 861. That undermined the proposition that "the Democratic Party [could] be viewed as a vehicle for advancing distinctively minority interests." *Id.* "Second, both political parties, and especially

the Republicans, aggressively recruited minority lawyers to run on their party's ticket. Consequently, white as well as minority voters found themselves not infrequently voting against candidates sharing their respective racial or ethnic backgrounds in favor of their party's nominee." *Id.*

508.    Those factors cut the opposite way here. The Republican Party did not aggressively recruit Black candidates.  Dr. Alford examined 64 partisan election contests over the last eight years, and in only 5% of those races—just three times—was the Republican candidate Black. *See* LD59 at 12-15 (Alford Suppl. Report); LD75 at 5 (Alford Suppl. Report). All four 2024 Republican nominees for state Senate in the Black Belt counties were white, as they were in 2022. D.E. 12-13, 17-18. Indeed, there is no evidence that a Black Republican has ever been elected to the state Senate in northeastern North Carolina, and there is no evidence the Republican Party has attempted to recruit Black candidates to change that fact. Similarly, as discussed, white voters are a minority of Democratic voters in SD1 and SD2. *See supra* PFOF § VI.J.2; Tr. Day 4 105:6-10 (Alford).

509.    Ultimately, the court concludes that Dr. Alford has not "separated race from politics." *Miss. NAACP*, 739 F. Supp. 3d at 454. Dr. Alford curtailed his conclusion that "the party affiliation of the candidates best explains the divergent voting preferences of Black and White voters in North Carolina elections," LD59 at 19 (Alford Report), and stated that he could provide no opinion on the cause of racially divergent voting in North Carolina. The court concludes, like the series of courts that have come before it, that Dr. Alford has failed to rebut the inference that starkly divergent racial voting patterns reflect polarization on account of race. *See, e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 454; *Alpha Phi Alpha*, 700 F. Supp. 3d at 1358-61; *Robinson*, 605 F. Supp. 3d at 840-41; *Petteway*, 698 F. Supp. 3d at 979.  To the contrary, his testimony powerfully

shows that the reason Black voters are voting for Democratic candidates are themselves race-based.

2.    <u>Plaintiffs Have Shown that Racially Divergent Voting in Northeastern North Carolina is in Fact Connected to Race</u>

510.    Plaintiffs offered substantial evidence, apart from the racially polarized voting figures, to establish that race-based considerations are the driver of racially polarized voting in northeastern North Carolina.

511.    Plaintiffs' fact witnesses, many of whom are experienced North Carolina politicians, resoundingly confirmed that voting in North Carolina is polarized on account of race, not blind partisanship, although race and partisanship are intertwined. Congressman Butterfield testified that "African Americans are not connected with a political party because of . . . any unfounded allegiance. It's not a connection that is unbreakable. It depends on the issues." Tr. Day 1 20:18-21 (Butterfield). Representative Pierce testified that Black voters do not vote for Democrats out of "party allegiance," but because "the Democratic Party . . . speaks more to and presses for policy that addresses issues that are relevant to African American or Black voters." Tr. Day 1 53:9-16 (Pierce). Plaintiff Moses Matthews testified that Black citizens in Martin County do not vote for Democrats "out of allegiance to the Democratic Party," but because they tend to represent Black voters' "core values." Tr. Day 1  65:24-66:4 (Matthews). Senator Blue agreed that the "overwhelming majority of Black voters" vote for Democrats because "of the issues that are championed and how the Black community thinks those issues advance their ability to have full citizenship and participation in this country," not "out of allegiance to the party." Tr. Day 1 91:15-24 (Blue). Representative Robert Rieves filled out this testimony, explaining that "Black voters tend to overwhelming support the Democratic Party in North Carolina" because Black voters want the "issues that are important to them" at the "forefront" of a candidate's priorities, which "at this time" is

more commonly the case among Democratic candidates. Tr. Day 1 144:17-25 (Reives). The Plaintiffs explained extensively that Black voters tend to support the Democratic Party because of its alignment with issues uniquely important to Black voters, particularly on issues like public education, health care, and voting rights, and Dr. Burch bore that out with statistical evidence showing dramatic racial disparities in those and other areas.

512.    Evidence of this alignment is spelled out in the North Carolina Democratic and Republican Party platforms. The North Carolina Democratic Party platform focuses on investing in public education, eliminating segregation in North Carolina schools, and opposing private school vouchers, PX223 at 27-30 (N.C. Democratic Platform), whereas the North Carolina Republican Party platform focuses on funding private and charter schools, which have contributed to racial segregation in the North Carolina education system, PX222 at 10 (N.C. Republican Platform). The North Carolina Democratic Party platform endorses "comprehensive universal healthcare" and "expanding Medicaid," PX223 at 23 (N.C. Democratic Platform), whereas the North Carolina Republican Party platform endorses "employer-based health insurance models" and "preserving Medicaid's original design," PX222 at 9 (N.C. Republican Platform). The North Carolina Democratic Party platform supports workforce development programs, PX223 at 12 (N.C. Democratic Platform), whereas the North Carolina Republican Party platform supports reducing the role of government in economic development, PX222 at 12 (N.C. Republican Platform). These platforms corroborate the precise issue areas that Plaintiffs' lay witnesses have identified as driving their support for the Democratic Party along racial lines.  The party platforms also differ starkly from each with respect to their approach to race specifically, with the Democratic platform

257

repeatedly referring to minorities and highlighting minority opportunity efforts, while ethe Republican platform contained no similar language. *Compare* PX222 to PX223; *see supra* PFOF § VI.J.2.

513. The history of Black voters' partisan alignment further corroborates this testimony. Black voters overwhelmingly registered and voted as Republicans in the Reconstruction period. Tr. Day 1 9:1-10:1 (Butterfield). They "were aligned with the Republican Party at" that time "because of the 13th Amendment and the Emancipation Proclamation by Republican President Abraham Lincoln." *Id.* at 20:10-17. They continued predominantly to support the Republican Party from the "1860s up through the Reconstruction era, and up to the initiation of Jim Crow laws by democratic legislators in the South." *Id.* at 90:21-91:5 (Blue); *see id.* at 50:17-51:3 (Pierce) (same); *id.* at 20:10-17 (Butterfield) (same). Senator Blue recalled that his grandfather, his grandfather's friends, his preachers, his teachers, "all of" the older generation in the community were Republicans. *Id.* at 91:8-14 (Blue). That began to change with the New Deal, however, and Black support for the Democratic Party was "sealed" with the enactment of the Voting Rights Act and the Civil Rights Act in the 1960's. *Id.* at 51:4-10 (Pierce); *see id.* at 90:14-91:5 (Blue); *id.* at 20:10-17 (Butterfield) (same). Since then, "African Americans have identified with the Democratic Party because they think the party articulates their concerns." *Id.* at 90:14-20 (Blue); *see id.* at 20:10-17 (Butterfield) (same). That history is a further testament to the fact that Black voters support political parties because of issues that uniquely effect Black voters, not for partisan reasons disconnected from race.

514. Plaintiffs' witnesses also testified that these issues are exacerbated by elected officials' lack of responsiveness to the needs of Black voters in northeastern North Carolina, "a hall-

mark of racial bloc voting." *Miss. NAACP*, 739 F. Supp. 3d at 450. As the court has already determined, the North Carolina General Assembly has been exceedingly unresponsive to the will of Black voters, denying these constituents requests for public education funding, Medicaid expansion, and equal political opportunities. The lay witnesses testified extensively on these points, and Dr. Burch confirmed that troubling racial disparities exist in these and related areas. The resistance of the North Carolina legislature, which is controlled by a Republican supermajority featuring one Black member across both houses, is further evidence that inherently racial issues divide voters between the parties.

515. The prevalence of racial appeals in North Carolina elections is still more evidence of the interplay between race and politics in the state. Dr. Burch concluded in her expert report that "[p]olitical campaigns in North Carolina have historically been and remain marked by implicit and explicit racial appeals. Racial appeals featured prominently in the 2022 U.S. Senate election and other candidates and political organizations have made racial appeals recently as well." PX21 at 3 (Burch Report). For example, in the 2024 statewide election for North Carolina School Superintendent, Republican candidate Michele Morrow, who is white, reposted a video accusing her Democratic opponent Maurice Green, who is Black, of having "spent his professional life going after white people and Jews" and of "advocating racial preferences for Black students." PX271 at 1 (Burch Corrected Suppl. Report). Dr. Burch explained that these types of racial appeals occur in election cycle after election cycle at every level of North Carolina politics and serve to "make racial attitudes and concerns more salient in the minds of voters." PX21 at 24 (Burch Report). This "unfortunate use of racial appeals in political campaigns" is further evidence that "black citizens' failure to elect representatives of their choice . . . is not best explained by partisan politics." *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 497 (2d Cir. 1999).

516.     The sheer "extent of the polarization between races across" the state is more "evidence that the divide is based on race." *Miss. NAACP*, 739 F. Supp. 3d at 451. As discussed, the evidence "establishes a pattern of racially polarized voting that is clear, stark, and intense." *Singleton*, 582 F. Supp. 3d at 1018. The spread between Black and white support for the same candidates in SD1 and SD2 is on par with, or more extreme than, the gap in *Milligan*. And the effect is uncompromising, shutting Black-preferred candidates out in "Senate District 1 in 43 of 43 races (100%) and in Senate District 2 in 42 of 43 races (98%). Every Black-preferred Black candidate lost in these 43 races; the only Black-preferred candidate who was able to prevail across those 43 races was White, and prevailed over an opponent who was Black." PX279 at 2 (Collingwood Suppl. Report). That is stark evidence of a racial divide.

517.     So too is the reality that it is apparently impossible to elect Black candidates in northeastern North Carolina outside of majority-minority districts. *Cf. Alpha Phi Alpha*, 700 F. Supp. 3d at 1360; *Miss. NAACP*, 739 F. Supp. 3d at 451. The evidence showed that dating as far back as 1984, Black voters in northeastern North Carolina successfully elected Black candidates while forming majority-Black districts. That came to an end following the 2020 redistricting cycle, however, when northeastern North Carolina was split between four Senate districts. In 2022, for the first time since at least 1984, three of the districts representing northeastern North Carolina, all of which were majority-white, elected white Republicans, while only one, which was majority-minority, a Black Democrat. D.E. 105 at 17-18, 28. Similarly, in 2024, the three majority-white districts in northeastern North Carolina elected white Republicans, and the lone majority-minority district elected a Black Democrat. D.E. 105 at 12-13, 28. That trend prevails throughout the state: In 2024, 30 of the 38 Black candidates who were elected to the state house and senate were elected from majority-minority districts. *See* PX271 at 4-5 (Burch Corrected Suppl. Report).

518.     Minority-preferred minority candidates are also defeated more often than minority-preferred white candidates in the relevant region, corroborating that race of the candidate plays a role.  Across all of the elections over five election cycles that Dr. Collingwood analyzed, only a single minority-preferred minority candidate (Morgan) won SD1 or SD2, while six minority-preferred White candidates were able to win elections (5 in 2016 and 1 in 2024).  *See* PX128 at 2-3; PX279 at 3-4.

519.     The Mark Robinson race in 2024 also provides further evidence that voting is polarized on the basis of race.  This is the only election across all five cycles where the Republican party fielded a Black candidate against a White Democrat, and the Black candidate got a significantly smaller share of the White vote than did white Republicans, and a significantly smaller share of the White vote than he himself did in 2020 when he was up against a Black Democrat.  PX279 at 1-2, 11.

520.     In the end, the court concludes that Plaintiffs' evidence of stark racial polarization in northeastern North Carolina creates a powerful inference that polarization in the region is on account of race, that Defendants have not rebutted that presumption, and that even if they had, Plaintiffs have carried their ultimate burden of demonstrating that under the enacted plan, voters in northeastern North Carolina lack equal access to the political process on account of race.

## VII.     Remedy: The remedial plan must contain an additional minority-opportunity district in northeastern North Carolina without intentionally splitting the performing district in Senate District 5.

521.     Having concluded that the enacted plan violates Section 2 of the Voting rights Act, the Court turns to the question of remedy. While it is the case that, to establish liability, Plaintiffs must show the ability to draw a majority-Black district, *Bartlett*, 556 U.S. at 18, it is not the case that a remedial map must contain a majority-Black district. Instead, where, as here, Plaintiffs have established a Section 2 violation based on the State's failure to create a district in which Black

voters have an opportunity to elect their preferred candidates, a plan containing that district in which Black voters have a demonstrable opportunity to elect their preferred candidates remedies their injury.

522.     A remedial plan containing a true opportunity district would remedy the current Section 2 violation because it would eliminate the third *Gingles* precondition: such a plan would prevent "the white majority [from] vot[ing] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" in that district. *Gingles*, 478 U.S. at 50 (emphasis added); *cf. Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 565 (E.D. Va. 2016) (adopting plan remedying a successful racial gerrymander claim and explaining that while one of the districts at issue contained a BVAP below 50%, a functionality analysis revealed that the Black-preferred candidate in that district could receive 60% of the vote, meaning "a Section 2 challenge to [that district] would fail"). As a practical matter, Plaintiffs' expert Mr. Esselstyn has offered several illustrative plans that contain majority-Black districts in the Black Belt counties, or at least districts with a BVAP at the 47.70% threshold necessary to create an opportunity district.

523.     The remedial plan in this case must also preserve the current minority-opportunity district in SD5, a majority-minority district. The parties have both agreed in this litigation that SD5 must be preserved in any remedial map.

524.     In the first instance, the court will permit the Legislature 14 days to adopt a remedial plan that complies with federal law, state law, and this order. This timeline balances the relevant equities and serves the public interest by providing the General Assembly with its rightful opportunity to craft a remedy in the first instance, while also ensuring that, if an acceptable remedy is not produced, there will be time for the Court to fashion one. This litigation was initiated in 2023, within weeks of the challenged plans' enactment, and one election cycle has already taken place

under the plan. The public must not endure the extraordinarily serious and entirely preventable harm of a second election cycle using legislative maps that the Court has now determined on a full trial record to be unlawful.

525.     The Court retains jurisdiction to determine whether any remedial plan adopted by the Legislature remedies the Section 2 violation by incorporating an additional state Senate district in which Black voters have a demonstrable opportunity to elect their candidates of choice. A plan will be deemed to remedy the Section 2 violation if it preserves the Pitt-Edgecombe district in SD5 and contains a district with a voting-age population that is at least 47.70% any-part Black.  In the event that the State is unable or unwilling to enact a remedial plan that satisfies the requirements set forth above within 14 days, this Court will adopt either Plaintiffs' Demonstration District B or D, the two illustrative plans that require the fewest changes to the enacted plan.

## CONCLUSION

Plaintiffs have carried their burden of demonstrating the enacted plan violates Section 2 of the Voting Rights Act by denying to Black voters in the Black Belt counties an equal opportunity to participate in the political process. The legislature is permanently enjoined from conducting elections under Districts 1 and 2 of the enacted map and is ordered to submit any compliant maps it enacts within 14 days.

Dated: March 14, 2025

**ARNOLD & PORTER
KAYE SCHOLER LLP**

By: /s/ R. Stanton Jones
Robert Stanton Jones*
Elisabeth S. Theodore*
John A. Freedman*
Samuel I. Ferenc*
Orion de Nevers*
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
stanton.jones@arnoldporter.com
elisabeth.theodore@arnoldporter.com
john.freedman@arnoldporter.com
sam.ferenc@arnoldporter.com
orion.denevers@arnoldporter.com

Respectfully submitted,

**POYNER SPRUILL LLP**

By: /s/ Edwin M. Speas, Jr.
    Edwin M. Speas, Jr.
    North Carolina State Bar No. 4112
    Caroline P. Mackie
    North Carolina State Bar No. 41512
    Post Office Box 1801
    Raleigh, NC 27602
    Telephone: (919) 783-1108
    espeas@poynerspruill.com
    cmackie@poynerspruill.com

    *Attorneys for Plaintiffs*
    *Notices of Special Appearance forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel and parties registered in said system.

Dated: March 14, 2025

/s/ Orion de Nevers
Orion de Nevers
