# ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION**

| | |
|---|---|
| RODNEY D. PIERCE and<br>MOSES MATTHEWS,<br><br>     Plaintiffs,<br><br> v.<br><br>THE NORTH CAROLINA STATE BOARD<br>OF ELECTIONS, *et al*.,<br><br>     Defendants. | Case No. 4:23-cv-193-D |

**PLAINTIFFS' OBJECTIONS TO LEGISLATIVE DEFENDANTS' MOTIONS TO
ADMIT SUPPLEMENTAL OPINIONS OF DR. JOHN ALFORD**

After over a year litigating whether legally significant racially polarized voting exists in northeastern North Carolina, nearly a year after initial expert reports were first exchanged, months after those experts were deposed, weeks after *trial* concluded, and even after supplemental post-trial expert reports were completed, Legislative Defendants now move to introduce entirely new expert opinions that were not only absent from every previous stage of this litigation, but that purport to *withdraw* many of the expert opinions that Legislative Defendants previously offered and replace them with directly contradictory evidence. That is improper.

Following trial, the court entered a modified scheduling order permitting the parties to file post-trial expert reports limited to "*supplemental* reports analyzing the November 2024 election results" and "[r]ebuttals" to those reports. D.E. 113 at 1 (emphasis added). Defendants nevertheless filed a supplemental rebuttal report and document styled as a Rule 26(e) supplement on behalf of their racially polarized voting expert, Dr. John Alford, offering three novel opinions that are an about-face from his prior opinions and sworn testimony in this case. Dr. Alford's new submissions purport to estimate the specific BVAP needed to win statewide, in SD1, SD2, SD5, and the

1

Demonstration Area; introduce the assertion that Dr. Alford's methodology for producing ecological inference point estimates is "preferable" to Dr. Collingwood's; and add a series of exit polls to buttress those opinions.

Dr. Alford's filings do not offer supplemental or rebuttal evidence—they introduce at the eleventh-hour new, belated, and untested opinions that directly contradict his prior reports and testimony in this case. The opinions reflect a battery of errors that Plaintiffs have already identified in the short time since they were filed, underscoring the importance of excluding these new opinions that would otherwise escape responsive expert scrutiny and cross-examination. Plaintiffs respectfully request that the motion to admit as evidence Dr. Alford's supplemental rebuttal opinions, D.E. 122, be denied as to Parts A and C of Dr. Alford's supplemental rebuttal report, LD76 at 2-7, 12-16, and that the motion to admit as evidence Dr. Alford's Rule 26(e) supplement, D.E. 123, be denied, LD77. Plaintiffs do not object to the properly undertaken analysis of 2024 election results in Dr. Alford's initial supplemental report or in the remainder of his supplemental rebuttal report.

## BACKGROUND

### A.    Dr. Alford's Initial Expert Report Accepts Dr. Collingwood's Methodology

Plaintiffs' racially polarized voting, or "RPV," expert Dr. Loren Collingwood filed his initial report on May 31, 2024, offering opinions on three main topics. Dr. Collingwood found racially polarized voting in every statewide election from 2016 through 2022 in SD2, and in all but one election in SD1. PX36 at 5-6. He conducted a performance analysis of the same elections that found that the Black-preferred candidate would win a majority of the vote as few as 6 times out of 49 in SD1 and 5 times out of 49 in SD2. PX36 at 2 & n.1. Finally, he conducted an analysis of the BVAP needed to win in the Demonstration Area that found that the average BVAP needed to enable Black-preferred candidates to achieve a narrow 50%+1 victory was 47.07%. PX36 at 24.

2

Undergirding all of Dr. Collingwood's conclusions was an ecological inference, or "EI," analysis that produced point estimates of vote choice by race in the relevant geographies. PX36 at 4. Dr. Collingwood conducted this analysis using King's EI method and the R software package, eiCompare. PX36 at 4.

In his initial report of August 16, 2024, Dr. Alford replicated Dr. Collingwood's EI analysis, concluding that his and Dr. Collingwood's results were "substantively similar," though they did "not match exactly," which was "not unexpected given the nature of EI analysis." LD59 at 5. Dr. Alford explained that "none of the differences in our results impact in any way my conclusions, and to avoid confusion over whether my conclusions detailed below depend in any way on methodological or data differences, I will confine my analysis to the various numerical EI results produced by Dr. Collingwood." LD59 at 5. Relying on Dr. Collingwood's EI results, Dr. Alford opined that a candidate's party affiliation better explains vote choice than the candidate's race, and that "Black voters do not need to be a majority in a district in order to elect a Democratic candidate." LD59 at 19. Dr. Alford's BVAP opinion was based on his analysis of Dr. Collingwood's BVAP threshold results and on his observation of "precinct-level election results graphed against the precinct-level" BVAP for two elections, the 2016 and 2020 Gubernatorial contests. LD59 at 16. His report did not offer a single criticism of Dr. Collingwood's methodology for estimating a BVAP threshold.

Dr. Alford's trial and deposition testimony reiterated his endorsement of Dr. Collingwood's EI methodology. Dr. Alford confirmed at trial that his opinions "accept[ed] and rel[ied] upon Dr. Collingwood's ecological inference analysis." Tr. Day 4 73:20-22 (Alford). He testified that Dr. Collingwood's ecological inference "analysis in this case is extremely competent and so I'm confident to rely on it," and that Dr. Collingwood "uses the correct methodology" for

ascertaining EI point estimates, which was why he was "relying on his findings." Tr. Day 4 73:4-10 (Alford). He made clear that his "report contains no criticisms of the methodology that Dr. Collingwood used" in his EI analysis. Tr. Day 4 73:6-10 (Alford). Dr. Alford did not "contest[]" any of Dr. Collingwood's EI point estimates. Tr. Day 4 73:23-74:1 (Alford). Similarly, at deposition, Dr. Alford testified that he was "not criticizing" Dr. Collingwood's BVAP analysis, making clear that, "I don't think he did it incorrectly." Alford Dep. 209:1-9 (attached as Exhibit A).

Dr. Alford testified at trial that "it would be incorrect to extrapolate from" his initial report the "particular BVAP percentage" at which a district "could elect a Black-preferred candidate." Tr. Day 4 115:4-10 (Alford). He testified that "it is not possible to draw a reliable conclusion about the precise BVAP percentage at which a district in northeastern North Carolina could be expected to elect a Black-preferred candidate on the basis of" his initial report. Tr. Day 4 115:11-16 (Alford). He "didn't offer any opinion in [his] report criticizing Dr. Collingwood's decision to conduct his analysis of the BVAP needed to elect a Black-preferred candidate" in the Demonstration Area. Tr. Day 4 111:21-25 (Alford). Dr. Alford never offered an opinion on the specific BVAP needed to win in any geography, on alternative methods for conducting a BVAP analysis, or on the relative merits of the various methodologies for ascertaining EI point estimates.

### B. Dr. Alford's Supplemental Filings Introduce New Opinions

Dr. Collingwood's initial supplemental report provided an "updated [] racially polarized voting analysis" with 2024 election data, an "updated performance analysis" adding 2024 election results, and an updated BVAP analysis incorporating 2024 figures. PX279 at 2, 15, 20. He also ran "the type of analysis that Dr. Alford engages in" using the 2024 elections "to show the results under Dr. Alford's type of analysis." PX279 at 5. Dr. Collingwood's supplemental rebuttal report "responds to Dr. John Alford's supplemental report regarding his analysis of the 2024 general

4

elections." PX280 at 1. Defendants did not object to the admission of either of Dr. Collingwood's supplemental reports. D.E. 122 at 2.

Dr. Alford's supplemental report properly updated his prior opinions with 2024 data, and Plaintiffs do not object to its admission. D.E. 122 at 1. Dr. Alford's supplemental rebuttal report and Rule 26(e) notice, however, offer three new opinions to which Plaintiffs do object. D.E. 122 at 1-2. Dr. Alford's supplemental rebuttal report offers, for the first time, an "estimated [] BVAP needed to win" statewide, and in SD1, SD2, SD5, and the Demonstration Area. LD76 at 12, 15-16. He purportedly calculated these estimates using a newly introduced "procedure utilized by Dr. Lisa Handley." LD76 at 12. Dr. Alford's supplemental rebuttal report also, again for the first time, opined that the EI technique he used to generate his BVAP estimates is "preferable" to Dr. Collingwood's in this context, and that the difference in their methodologies "could . . . impact [] the BVAP analysis discussed" in his report. LD76 at 3. Finally, Dr. Alford's supplemental rebuttal report attempted to buttress his newfound EI opinion by comparing his EI results to an uncited "New York Times exit poll" for the 2024 elections. LD76 at 3. He asserted that his EI figures were reliable because his results for one election were "roughly comparable" to the Times' exit poll for the same election. LD76 at 3.

After Plaintiffs requested a citation for the New York Times poll, which did not appear to exist, Ex. B at 2-3, Defendants filed a purported Rule 26(e) supplement on March 13, 2025 explaining that the cited poll in fact did not exist. The exit poll Dr. Alford had relied on was from 2020, not 2024. Dr. Alford's "supplement" stated that the "correct citation should have been to the exit poll conducted in North Carolina by Edison Research," which reported numbers that were completely different from the numbers in the exit poll in Dr. Alford's original supplemental rebuttal report and his own EI estimates.  D.E. 123-1. The supplement also added two other new

5

polls from two other new sources, arguing that these exit polls also supported his analysis even though they too provided completely different results from the original poll. *See* D.E. 123-1.

**ARGUMENT**

**I.      Dr. Alford's Newly Formed Opinions Are Not Supplemental**

The Court's modified scheduling order limited the parties' post-trial expert submissions to "*supplemental* reports analyzing the November 2024 election results" and "[r]ebuttals to the . . . *supplemental* reports." D.E. 113 at 1 (emphasis added). Under Rule 26(e), a supplemental expert report is limited to correcting or completing the initial expert disclosure. D.E. 91 at 6. A supplemental report does not create a "right to produce information in a belated fashion." D.E. 91 at 6 (quoting *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013), *aff'd*, 778 F.3d 463 (4th Cir. 2015)). Updating "a report with information that was not available by the initial disclosure deadline exemplif[ies] proper supplemental reports." D.E. 91 at 6. "Courts, however, distinguish 'true supplementation from gamesmanship.'" D.E. 91 at 6 (cleaned up) (quoting *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008)). "To that end, courts repeatedly reject attempts to provide 'new and improved' expert reports under the guise of supplementation." D.E. 91 at 6 (quoting *Gallagher*, 568 F. Supp. 2d at 631). Dr. Alford's untimely opinions are an unbridled attempt to offer "new and improved" opinions that are not supplemental opinions and exceed the scope of the court's scheduling order.

**A.      Dr. Alford's BVAP Opinion is an Improper Supplemental Opinion**

Dr. Alford's BVAP opinion, offered in Part C of his supplemental rebuttal report, is improper.  It is "not attempting to . . . complete a report with previously unobtainable information," D.E. 91 at 6, that is, it is not attempting to "supplement[]" his prior report with an analysis of "the November 2024 election results," D.E. 113 at 1, but it is instead offering a "new and improved" opinion altogether, D.E. 91 at 6.

6

Dr. Alford's BVAP estimates provide a set of never before seen opinions. Dr. Alford's initial report was limited to observing "precinct-level election results graphed against the precinct-level 2020 census Black Voting Age Population." LD59 at 16. Dr. Alford relied on those graphs to observe that vote share for the "Black preferred candidate[] starts to move above 50% in precincts somewhere around 35% BVAP, with [the Black-preferred candidate] clearly winning in precincts well below 50% BVAP." LD59 at 16. He offered these examples merely to illustrate the BVAP level at which some precincts in some races begin to exceed 50%, which he marshalled for the general conclusion that "Black voters do not need to be a majority in a district in order to elect a Democratic candidate." *See* LD59 at 16-17, 19. Dr. Alford could have "complete[d]" that analysis with a new third chart plotting the "previously unobtainable" precinct-level election results for the 2024 Gubernatorial contest against precinct-level BVAP, D.E. 91 at 6, but he did not. He instead went far beyond that, conducting *an entirely new type of analysis that was absent from his initial report* that purported to offer specific BVAP estimates at the statewide, SD1, SD2, SD5, and Demonstration Area levels. LD76 at 16. A visual comparison of Dr. Alford's two analyses reveals how unrecognizable his new estimates are:



| Alford Initial Report | Alford Supplemental Rebuttal Report |
|---|---|

**Alford Initial Report**

Figure 3: Graph of the 2016 Governor's Election with BVAP and Vote Percentages

NC GOVERNOR
Precincts in 12 County Region
2016
% for Each Candidate within Precinct
% Black in Each Precinct

Figure 2: Graph of the 2020 Governor's Election with BVAP and Vote Percentages

NC GOVERNOR
Precincts in 12 County Region
2020
% for Each Candidate within Precinct
% Black in Each Precinct

LD59 at 16-17.

**Alford Supplemental Rebuttal Report**

Table 6: BVAP Needed to Win Based on Black versus non-Black EI estimates of Cohesion and Crossover.

| Office | BVAP % Needed for Democrat to win 50%+1 | | | | |
|---|---|---|---|---|---|
| | Statewide | SD1 | SD2 | 12-County Demo Area | Edgecombe Pitt |
| A. G. | 19% | 40% | 39% | 40% | 27% |
| Auditor | 24% | 41% | 42% | 42% | 31% |
| Agri. Comm | 29% | 44% | 46% | 46% | 36% |
| Ins. Comm. | 26% | 42% | 44% | 44% | 33% |
| Labor Comm. | 27% | 43% | 44% | 44% | 34% |
| Apps. Ct. 12 | 24% | 41% | 43% | 42% | 32% |
| Apps. Ct. 14 | 26% | 43% | 44% | 43% | 34% |
| Apps. Ct. 15 | 25% | 42% | 44% | 43% | 34% |
| Gov. | 4% | 37% | 31% | 36% | 15% |
| Lt. Gov. | 20% | 40% | 40% | 40% | 28% |
| Sec. of St. | 20% | 39% | 37% | 39% | 25% |
| Super. Pub. Instr. | 20% | 39% | 39% | 39% | 26% |
| S. C. Seat 6 | 22% | 40% | 41% | 41% | 30% |
| Treas. | 26% | 42% | 44% | 43% | 33% |
| Pres. | 24% | 42% | 43% | 43% | 33% |
| **Average** | **22%** | **41%** | **41%** | **42%** | **30%** |

LD76 at 16.

Dr. Alford's all-new BVAP estimates also rely on implementing an all-new methodology and producing all-new code that no one has had any opportunity to vet or review. Dr. Alford's supplemental rebuttal report purports to "follow the procedure utilized by Dr. Lisa Handley in both a published article on the topic and in a report to the court in 2019." LD76 at 12. Claiming to be inspired by "Dr. Handley's approach," Dr. Alford calculated BVAP based on "the Black share of turnout," "the estimated Black support for the Black preferred candidate," and the estimated non-Black "support for the Black preferred candidate." LD76 at 12-13. Dr. Alford's initial report, however, gauged district performance in an entirely different way, using only observations of precinct-level election results in two elections. LD59 at 16. That report never references Dr. Handley, much less her purported BVAP methodology, and the approach Dr. Alford's initial report undertakes does not even resemble Dr. Handley's model.

8

Dr. Alford's supplemental rebuttal report changes methodologies again, altering the approach he himself used in his supplemental report to produce estimates of Black support for the Black-preferred candidate. Dr. Alford's supplemental rebuttal report reruns the EI estimates for 2024 that he had just produced in his supplemental report dated February 28, 2024 and comes up with different, *higher* estimates for Black cohesion that would tend to favor his client's position by decreasing the BVAP threshold needed to elect Black-preferred candidates. *Compare, e.g.*, LD75 at 5, tbl. 1 (estimating 92.2% Black support for Kamala Harris in SD1) with LD76 at 14, Tbl. 5 (estimating 94.9% Black support for Kamala Harris in SD1). Dr. Alford's selection of an entirely new BVAP method relying on different EI estimates for Black cohesion introduces an equally "new and [purportedly] improved" opinion. D.E. 91 at 6.

The contradiction between Dr. Alford's supplemental rebuttal report and his initial report, deposition testimony, and trial testimony, makes all the more clear that Dr. Alford's supplemental report offers a "new and improved opinion," D.E. 91 at 6, and makes it all the more egregious that Dr. Alford offers the opinion at the eleventh-hour. Dr. Alford's initial report, LD59, did not estimate any specific BVAP percentages needed to win. Dr. Alford confirmed that at trial, testifying that "it would be incorrect to extrapolate from [his BVAP analysis] that a Senate district composed of some of the precincts in [his] charts could elect a Black-preferred candidate at a particular BVAP percentage." *See* Tr. Day 4 115:4-10 (Alford). That is because "precincts vary widely in population" and "the performance of each precinct varies widely," yet his initial report says "nothing about the location of the precinct[s] that perform[]" at lower BVAP levels "and whether it is possible to draw a district around [those] precinct[s] that includes other precincts that will also perform at" lower BVAP levels. PX128 at 5-7.

9

Dr. Alford's decision to elect a new BVAP procedure contradicts his prior testimony in equal measure. Dr. Alford's initial report did not dispute Dr. Collingwood's conclusion based on 2020 and 2022 election data that, on average, a BVAP of 47.07% is necessary to elect a Black-preferred candidate in the Demonstration Area. There is not a single sentence in the initial report that criticizes the methodology Dr. Collingwood used to produces those estimates. *See generally* LD59. He confirmed at trial that he did not "offer any opinion in [his] report criticizing Dr. Collingwood's decision to conduct his analysis of the BVAP needed to elect a Black-preferred candidate in this case by analyzing" the Demonstration Area based on "recent . . . election data." Tr. Day 4 111:21-25, 113:7-11 (Alford).

Dr. Alford was asked point blank at his deposition: "You haven't offered any criticism of the method that Dr. Collingwood used to reach the conclusion that 47.07 percent is the BVAP percentage where these counties would on average elect a black preferred candidate, correct?" He answered: "I think it's a little abstract, but I'm not criticizing. I don't think he did it incorrectly." Alford Dep. 209:1-9. Dr. Alford's new supplemental report criticizing Dr. Collingwood's methodology and offering his own competing method contradicts his trial and deposition testimony.

Dr. Alford had every opportunity and incentive to offer these new opinions in his initial report. Dr. Alford could have attempted to estimate the specific BVAP needed to win in his initial report using election data from 2022, 2020, or any other election cycle, just as Dr. Collingwood did. Dr. Collingwood offered a BVAP opinion in his initial report identical to the one in his supplemental report, less the addition of the 2024 election results. Similarly, Dr. Handley's "procedure," which Dr. Alford claims incorrectly to be following, *see infra*, comes from an article published in 2001 and a report filed in 2019, years before Dr. Alford submitted his initial report in

this case. LD76 at 12 & n.9. Dr. Alford thus had ample reason and opportunity to provide specific BVAP estimates at the initial report stage, and to do so using Dr. Handley's technique, but he opted not to until after the conclusion of trial when Plaintiffs could no longer probe his methodology or his qualifications for offering such a methodology. Dr. Alford's failure to provide specific BVAP needed to win estimates based on Dr. Handley's methodology in his prior reports means there is simply no prior opinion to "complete" or to "supplement" on those issues, and his report offers a "new and improved" opinion that may not be introduced at the supplemental stage. D.E. 91 at 6.

**B.     Dr. Alford's EI Methodology Opinion is an Improper Supplemental Opinion**

Dr. Alford's new EI opinions, offered in part A of his supplemental rebuttal report, likewise do not constitute an "attempt[] to . . . complete a report with previously unobtainable information." D.E. 91 at 6. Dr. Alford argues for the first time in his supplemental rebuttal report that his EI methodology is "preferable" to Dr. Collingwood's and that "small differences" between his numbers and Dr. Collingwood's are based on Dr. Collingwood using that less preferable methodology. LD76 at 2-3. Dr. Alford's new take on EI analysis presents a second "new and improved" opinion that directly contradicts his prior testimony, D.E. 91 at 6, and "is an attempt to 'bolster his deficient opinion by employing a new methodology' after the opening report deadline." D.E. 87 at 11 (quoting *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011)).

Dr. Alford's initial report "accept[ed] and rel[ied] upon Dr. Collingwood's ecological inference analysis." Tr. Day 4 73:20-22 (Alford). That report replicated Dr. Collingwood's EI analysis and confirmed that the two experts' results were "substantively similar," though they did "not match exactly," which was "not unexpected given the nature of EI analysis." LD59 at 5. Dr. Alford explained that "none of the differences in our results impact in any way my conclusions,

and *to avoid confusion over whether my conclusions detailed below depend in any way on methodological or data differences, I will confine my analysis to the various numerical EI results produced by Dr. Collingwood*." LD59 at 5 (emphasis added). Dr. Alford's initial report thus relied entirely on Dr. Collingwood's EI estimates without providing any opinions based on his own figures.

Dr. Alford's trial testimony confirmed that he had not disclosed any criticism of Dr. Collingwood's EI technique or argued that differences in their estimates were the result of the use of a less "preferable" methodology. To the contrary, Dr. Alford testified that Dr. Collingwood's ecological inference "analysis in this case is extremely competent and so I'm confident to rely on it," stating that Dr. Collingwood "uses the correct methodology" for generating EI point estimates, which was why Dr. Alford was "relying on his findings." Tr. Day 4 73:4-10 (Alford). Dr. Alford emphasized that his "report contains no criticisms of the methodology that Dr. Collingwood used" to conduct his EI analysis, Tr. Day 4 73:6-10 (Alford), and Dr. Alford did not "contest[]" any of Dr. Collingwood's EI point estimates, Tr. Day 4 73:23-74:1 (Alford). That testimony makes indisputable that Dr. Alford's supplemental rebuttal report is turning to "'a new methodology' after the opening report deadline," D.E. 87 at 11 (quoting *Pluck*, 640 F.3d at 681), not "complet[ing] a [prior] report with previously unobtainable information." D.E. 91 at 6.

Here again, Dr. Alford had every opportunity to critique Dr. Collingwood's methodology in his initial report, but instead he endorsed it. Dr. Collingwood performed the same EI technique in his original and supplemental reports, never changing his methodology at any point in this litigation. PX280 at 5. Dr. Collingwood's EI estimates have always served as the basis for both his RPV opinions and his BVAP opinions. PX36 at 23 (the "BVAP Analysis . . . uses the RPV results"). Dr. Alford's initial report reflects the same small differences between his and Dr.

Collingwood's EI estimates that he now latches onto, confirming that the two experts' estimates have *always* varied in minor ways throughout this case, and that Dr. Alford has never regarded those differences as significant or as suggesting that his numbers were better or more accurate. *Compare, e.g.*, LD59 App'x, tbl. A6 (reporting elections in SD1 in 2020 with 4-6 point differences in estimates), *with* LD76 at 4-5, tbls. 1-2 (reporting elections in SD1 in 2024 with 4-6 point differences in estimates).

Notably, Dr. Collingwood and Dr. Alford applied the EI techniques discussed in Dr. Alford's supplemental rebuttal report to *every single prior election* at issue in this case. That technique is agnostic to the specific election cycle in question. The experts thus both applied it to the 2016, 2018, 2020, and 2022 election cycles. So there is nothing "previously unobtainable" about Dr. Alford's new opinion on EI methodology. D.E. 91 at 6. Dr. Alford's "attempt to 'bolster his deficient opinion by employing a new methodology' after the opening report deadline" should be rejected. D.E. 87 at 11 (quoting *Pluck*, 640 F.3d at 681). Indeed, the *direct contradictions* between Dr. Alford's new opinion and the evidence and testimony that he has repeatedly offered at every stage of this case confirming that Dr. Collingwood uses the correct methodology is an attempt to change his opinions so significantly that it undermines his credibility throughout this case.

### C.    Dr. Alford's Exit Polls are Improper Supplemental Opinion

Defendants filed an unauthorized third supplemental report on March 13, 2025, nearly a week after Dr. Alford's supplemental rebuttal report and the day before the deadline for filing proposed findings of fact and conclusions of law. D.E. 123. That last-minute filing introduces yet more improper new material.

13

Dr. Alford's original supplemental rebuttal report attempted to buttress his newfound EI opinion by claiming that his EI estimates were "roughly comparable" to results from a New York Times exit poll for 2024 estimating Black and White support for Kamala Harris and Donald Trump. LD76 at 3. That itself was improper supplementation, because Dr. Alford never previously relied on exit polls at any point in this case. The supplemental reports authorized here were for updating analysis with 2024 election results, not relying on entirely new data sources.

Worse, however, the poll Dr. Alford cited does not exist. The New York Times appears deliberately not to have published any exit polls for 2024.[1] After Plaintiffs' counsel asked Defendants for a citation for the poll, Ex. B at 2-3, Defendants responded with a document, then termed an "errata," later filed as a "Rule 26(e) Supplement," explaining that Dr. Alford had mistakenly thought the New York Times' exit poll for the 2020 election between Joe Biden and Donald Trump was an exit poll for the 2024 election between Kamala Harris and Donald Trump. *See* Ex. B at 1-2; D.E. 123-1 at 1 & n.1.

After providing the citation to the 2020 poll discussed in Dr. Alford's supplemental rebuttal report, the "Rule 26(e) Supplement" proceeds to offer three *different* exit polls from 2024 from three *different* sources referenced nowhere in Dr. Alford's supplemental rebuttal report. Defendants wrongly claim that the first of these polls, from Edison Research, was the "correct citation" that should have been included in the prior report. D.E. 123-1 at 1. It is not. Dr. Alford's original supplemental rebuttal report discussed in depth a specific poll from the 2020 election. Dr. Alford's report details the results of the New York Times exit poll, explaining that it "showed White support for Harris (sic) at 33%" and "Black voter support for Trump at 7%." LD76 at 3. Those are precisely the figures shown in the 2020 poll for Joe Biden (33%) and Donald Trump

---

[1] *See* Kaleigh Rogers, *Why Exit Polls Are Misleading*, N.Y. Times, Nov. 5, 2024, https://www.nytimes.com/2024/11/05/us/politics/exit-polls-election.html.

(7%). *North Carolina Exit Polls: How Different Groups Voted*, N.Y. Times, https://nyti.ms/4l9hMPl (last visited Mar. 24, 2025). As Dr. Alford acknowledges, the 2020 figures discussed in his supplemental rebuttal report are completely different from the three new polls added in his Rule 26(e) Supplement. D.E. 123-1 at 1. These new polls, all of which were available before the deadline for supplemental and supplemental rebuttal reports, cannot be smuggled into the record under the guise of providing a "correct citation," D.E. 123-1 at 1, because they are not corrected citations, they are brand new and different datapoints from brand new and different sources offered for the first time after the deadline for rebuttal reports and on the eve of proposed findings and conclusions.

Indeed, the difference between the results of the Times' poll and the new polls is so significant that it required Dr. Alford's March 13, 2025 "supplement" to engage in a different kind of analysis from his original supplemental rebuttal report. While his supplemental rebuttal report argued that his EI results were somehow bolstered by being "roughly comparable" to the New York Times exit poll numbers that turned out to be from 2020, his March 13, 2025 report makes the new argument that his EI results should be relied upon because they are "closer" to the new exit polls. That new argument is not mere supplementation.

Contrasting Dr. Burch's supplemental reports with Dr. Alford's illustrates the proper use of a Rule 26(e)(2) supplement. On January 17, 2025, Plaintiffs served a corrected version of Dr. Burch's supplemental report under Rule 26(e)(2), noting a tabulation error in Dr. Burch's report because she had missed a Black representative when she calculated the total number of Black representatives elected in 2024. That was a corrective disclosure that Plaintiffs were required to report under Rule 26(e)(2) and that did not introduce any new evidence or source material into Dr. Burch's report. Defendants, by contrast, went well beyond simply providing the citation omitted

from Dr. Alford's supplemental rebuttal report, instead embarking on a new effort to add substantive evidence to his report from exit polls conducted in a different year by different sources.

## II. Dr. Alford's Newly Formed Opinions are Not Rebuttal

Dr. Alford's three new opinions are independently inadmissible because they are not proper rebuttal. This Court previously held that a "proper rebuttal report responds to the opposing party's expert reports—not its claims or defenses." D.E. 91 at 4. This Court also held that a rebuttal report may not "present 'new arguments, unless presenting those arguments is substantially justified and causes no prejudice.'" D.E. 91 at 4 (quoting *Funderburk v. S.C. Elec. & Gas Co.*, No. 3:15-CV-4660, 2019 WL 3406814, at *4 (D.S.C. July 9, 2019)). "An expert cannot bootstrap new opinions onto a rebuttal when those new opinions were available to the expert at the time of his initial disclosure, even if part of a rebuttal is well-founded." *Snider-Jefferson v. Amigo Mobility Int'l, Inc.*, No. 2:15-CV-406, 2016 WL 4424954, at *4 (E.D. Va. Aug. 17, 2016), *aff'd*, 678 F. App'x 91 (4th Cir. 2017)). "A rebuttal or reply expert report is proper if the intent of the report is 'solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report,'" it "does not, however, permit an expert to correct mistakes based on information that was available to the expert well in advance of the issuance of his report." *Snider-Jefferson*, 2016 WL 4424954, at *4 (citations omitted). For all the reasons already discussed, Dr. Alford's newly formed opinions are outside the scope of the scheduling order's limitation to supplemental opinions, and they would have been improper even if included in his initial supplemental report, but the opinions are especially egregious because Dr. Alford withheld them until his supplemental rebuttal report when Plaintiffs would have no opportunity to respond.

Dr. Alford's supplemental rebuttal report seeks to "bootstrap new opinions onto a rebuttal" even though "those new opinions were available . . . at the time of his initial disclosure." *Snider-Jefferson*, 2016 WL 4424954, at *4. Plaintiffs have already thoroughly detailed that Dr. Alford

16

could have provided all of the opinions disclosed in his supplemental rebuttal report in his initial disclosure. The opinions were also readily available, including with respect to the 2024 election, at the time Dr. Alford submitted his initial supplemental report. Dr. Alford nevertheless either failed to offer opinions, or offered directly contradictory opinions, at every previous stage of this case. There is no excuse for Dr. Alford's failure to furnish his new opinions in his initial report, and even less excuse for his failing to provide them in his initial supplemental report.

More than that, Defendants offer Dr. Alford's opinions not to "respond[] to [Dr. Collingwood's] expert reports," but to make "new argument[s]" putting on their own "defenses." D.E. 91 at 4. Defendants *only* response to the third *Gingles* precondition is "that a majority-Black district is unnecessary to enable Black voters in SD2 (or SD1) an equal opportunity to elect their candidates of choice." D.E. 125-1 ¶ 50 & n.6. Dr. Alford's initial BVAP opinion was introduced for the purpose of demonstrating "that majority Black districts are not necessary to allow the election of Black preferred candidates" in the Black Belt region, LD59 at 2, and the purpose of Dr. Alford's supplemental rebuttal report was "no different," D.E. 91 at 5. Defendants' proposed conclusions of law nevertheless attempt to bolster that defense on the foundation of Dr. Alford's supplemental rebuttal report, claiming that Dr. Alford's "district-specific analysis of SD1 and SD2 shows an average BVAP needed to win of 41%." D.E. 125-1 ¶ 51. That lays plain that Dr. Alford's report simply offers "new arguments" to prove the same "essential element of" Defendants' defense that he has been offered for all along. D.E. 91 at 4-5 (citation omitted). Those new arguments "are not proper rebuttal reports." D.E. 91 at 4.

Neither do Dr. Alford's opinions "directly contradict or rebut" Dr. Collingwood's supplemental report. D.E. 91 at 5. Dr. Collingwood's supplemental report does not discuss his BVAP methodology, *see* PX279 at 20, having described it in his initial report and obtained Dr.

17

Case 4:23-cv-00193-D-RN    Document 127-1    Filed 03/24/25    Page 18 of 26

Alford's agreement that he employed it correctly, Alford Dep. 209:1-9. Dr. Collingwood's discussion of BVAP in his supplemental report states only that the report took "the same approach" as his initial report, "but including all the statewide contests [] from the most recent year." PX279 at 20. Dr. Alford's supplemental rebuttal BVAP opinions do not "directly contradict or rebut" that decision. D.E. 91 at 5. Similarly, Dr. Collingwood's supplemental report does not discuss his EI methodology, having also discussed that in his initial report and obtained Dr. Alford's agreement that he used "the correct methodology." Tr. Day 4 73:1-74:1 (Alford). Dr. Collingwood's supplemental report states only that he used "the same" approach as his initial report for the 2024 election. PX279 at 4 & n.2. Dr. Alford's BVAP opinions do not "directly contradict or rebut" that decision either. D.E. 91 at 5. Last, Dr. Collingwood's BVAP analysis generates a BVAP estimate based on the 2020, 2022, and 2024 elections. PX279 at 20-21. Yet Dr. Alford limits his analysis to the 2024 election, perhaps in an effort to create the air of compliance with the court's scheduling order, and in so doing fails to "directly contradict or rebut" Dr. Collingwood's more fulsome analysis. D.E. 91 at 5.

All told, Dr. Alford offers purely new analysis that, from a rebuttal perspective, "responds to nothing." D.E. 91 at 5. His newly formed opinions should be excluded not only as improper supplemental opinions, but also as improper rebuttal opinions.

## III.     Relying on Dr. Alford's Newly Formed Opinions Would be Perilous

Dr. Alford's newly formed opinions expose the perils of relying on belatedly introduced evidence that has not been probed through the adversarial process. Plaintiffs' Proposed Findings of Fact and Conclusions of Law catalog numerous problems with Dr. Alford's supplemental rebuttal opinions. D.E. 126 at 79-87. As that document spells out, not only are Dr. Alford's new opinions unreliable because they directly contradict his prior opinions and testimony in an abrupt about face that benefits his client, they are also flatly wrong on their face. To recap:

18

- Dr. Alford's supplemental rebuttal report uses different EI point estimates even within the same report that vary in ways that benefit his client. D.E. 126 ¶ 140.

- Dr. Alford's supplemental rebuttal report criticizes Dr. Collingwood's EI estimates with one hand, then relies on EI estimates that are indistinguishable from Dr. Collingwood's with the other when doing so benefits his client. D.E. 126 ¶ 141.

- Dr. Alford's EI estimates produce confidence intervals more than double the size of Dr. Collingwood's. D.E. 126 ¶ 142.

- Dr. Alford relies on exit polls even though exit polls are notoriously unreliable and he himself has testified in the past that if exit polls were reliable, he would be out of a job. D.E. 126 ¶ 143.

- Dr. Alford's supplemental rebuttal report produces results that are demonstrably wrong and internally contradictory within his own report. D.E. 126 ¶¶ 144-45.

- Dr. Alford's BVAP estimate is irreconcilable with the actual 2022 election results. D.E. 126 ¶ 146.

- Dr. Alford's BVAP analysis improperly assumes that crossover voting rates would remain the same in a newly constituted SD1 or SD2 that had Black and white voters from different counties, even though that is demonstrably wrong. D.E. 126 ¶ 147.

- Dr. Alford erroneously excluded third-party candidates from his analysis, improperly inflating his white crossover results. D.E. 126 ¶ 148.

- Dr. Alford did not actually follow the approach prescribed by Dr. Handley that he purported to rely upon. D.E. 126 ¶ 150.

Dr. Alford submitted the newly formed opinions in his supplemental rebuttal report after every opportunity to formally test his opinions had elapsed. Plaintiffs have had no opportunity to have experts review Dr. Alford's new codebase and new opinions or to offer any response, and have had no opportunity to question Dr. Alford about these new opinions. Nevertheless, in the short time since Dr. Alford unveiled his new opinions, Plaintiffs have already exposed that they are beset with reams of contradictions and errors that can only be summarized above. The shortcomings in Dr. Alford's late-breaking opinions underscore the importance of guarding against the admission of untested new evidence and new methodologies offered through unvetted supplemental or rebuttal reports.

19

## IV. Dr. Alford's Supplemental Reports are Unjustified and Prejudicial

Dr. Alford's supplemental rebuttal report and Rule 26(e) supplement have not been admitted to the record, so the court can simply deny Defendants' motions, D.E. 122-23, to move their admission to the extent they seek to introduce improper opinions. Yet even if Federal Rule of Civil Procedure 37 were necessary to sanction Defendants' improper submissions, the Rule 37 analysis only underscores how improper admitting Dr. Alford's newly formed opinions would be.

Under Rule 37(c)(l), improper expert opinions are stricken from the record unless "substantially justified or harmless." D.E. 4 at 7 (quoting *Ali v. WorldWide Language Res.*, LLC, 686 F. Supp. 3d 430, 444-45 (E.D.N.C. 2023)). "The party failing to disclose information," here Defendants, "bears the burden of establishing that the nondisclosure was substantially justified or was harmless." D.E. 91 at 7 (quoting *Bresler v. Wilmington Tr. Co.*, 855 F .3d 178, 190 (4th Cir. 2017)). The court considers "(l) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." D.E. 91 at 7 (quoting *Southern States Rack & Fixture v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003)). These factors favor exclusion.

***First,*** Dr. Alford's new opinions could hardly be more surprising because they "stand[] in conflict with his statement[s] in his" initial report and subsequent testimony. *Seamster v. Taylor*, No. 4:21-CV-00021, 2022 WL 2165545, at *15 (W.D. Va. June 15, 2022). As discussed, Dr. Alford endorsed Dr. Collingwood's BVAP and EI methodologies throughout this case, Alford Dep. 209:1-9; Tr. Day 4 73:1-74:1 (Alford), while expressly disclaiming offering any criticism of his methods, *id.*, or any opinion on the "particular BVAP percentage" needed to win, Tr. Day 4 115:4-10 (Alford). Plaintiffs could only have expected Dr. Alford's prior sworn testimony to

accurately represent his opinions in this case, and "had no reason to expect that [Defendants] would make such a substantial addition through an expert rebuttal report." D.E. 91 at 7. The extraordinary surprise of this "last-minute revelation" is independently sufficient to warrant exclusion. *Goodwin v. Cockrell*, No. 4:13-CV-199-F, 2015 WL 575861, at *6 (E.D.N.C. Feb. 11, 2015).

*Second,* Dr. Alford's disclosure of new opinions after all opportunity to cure elapsed is uniquely egregious. Dr. Alford springs his reimagined and error-ridden opinions on Plaintiffs after initial expert exchanges, depositions, *trial*, and even the first set of post-trial expert reports. That leaves Plaintiffs no opportunity to submit Dr. Alford's new analysis and criticisms to responsive expert examination or testimony, no opportunity to examine his code or test whether he properly implemented his new methodologies, no opportunity to depose Dr. Alford on his new reports, and no opportunity to cross-examine him on the record. "Without the ability to file another expert report"—or respond in any other way—Plaintiffs have no "ability to cure the surprise." D.E. 91 at 8.

This Court previously struck aspects of Plaintiffs' rebuttal reports even though there *would* have been time to submit a response had Defendants sought one, and even though Defendants would have had the opportunity to depose Plaintiffs' experts. D.E. 91. The opinions that this Court previously struck did not involve the use of new code and involved the same methodology that Plaintiffs' experts had previously presented. Here, by contrast, Dr. Alford introduces a *new* methodology without any indication that he even has any expertise in that methodology or has ever performed a similar analysis before. Plaintiffs have never been able to depose Dr. Alford about whether he has *ever* performed the sort of BVAP analysis he presents here or the basis for his new opinions. Plaintiffs have not been able to depose Dr. Alford about *how* that analysis was performed and whether it was performed correctly, even though his report leaves open substantial questions,

including about his apparent reliance on VAP figures for non-Black, non-White voters who have low citizenship rates. Dr. Alford (or more likely, Dr. Randy Stevenson) apparently created all new code for a complicated analysis neither has ever done before in the space of one week between when Dr. Alford received Dr. Collingwood's supplemental report and the date the supplemental rebuttal report was due. It is quite probable that the code has errors—especially in light of the other errors and inattention to detail in the report.

**Third**, trial in this case has already *concluded*. Introducing Dr. Alford's revised expert opinions at this late stage would render "much of [Plaintiffs'] trial preparation . . . obsolete," penalizing Plaintiffs ex-post for constructing their trial strategy around Dr. Alford's prior sworn testimony rather than around the new and contradictory opinions he submits now that trial has passed. *Southern States*, 318 F.3d at 598. That sidesteps the adversarial process, undermining the truth-seeking functioning the trial was undertaken to serve. It also inflicts further delay in a case where, as the court has recognized, Plaintiffs have "repeatedly requested" that a resolution be reached "at the earliest possible opportunity." D.E. 91 at 8.

**Fourth**, Defendants rely on Dr. Alford's supplemental opinions to impugn the credibility of Dr. Collingwood, who Plaintiffs offered for two of the three *Gingles* preconditions that are "essential element[s] of their Section 2 claim." D.E. 91 at 8. Defendants' proposed findings draw heavily on Dr. Alford's supplemental rebuttal report to substantiate this effort. D.E. 124 ¶¶ 248-251, 299-303. Defendants also "hope to use" Dr. Alford's opinions "to prove" what they view as "an essential element of their" defense. D.E. 91 at 8. Indeed, Defendants' only defense to *Gingles* III is that there is no "legally significant" racially polarized voting in the Black Belt region because the "average BVAP needed to win" in SD1 and SD2 is "41%." D.E. 125-1 ¶ 51. Although Plaintiffs maintain that this analysis is irrelevant to the third *Gingles* precondition, to the extent the court

disagrees, Dr. Alford's newly disclosed opinion is Defendants' only evidence on that theory. Defendants "should have included" Dr. Alford's opinions "in their original reports." D.E. 91 at 8.

**Finally,** there is no justification for Dr. Alford's delay. Dr. Alford could have provided specific BVAP opinions in his initial report using prior election data, as Dr. Collingwood did, but he instead expressly disclaimed doing so. Dr. Alford could have critiqued Dr. Collingwood's EI methods and results in his initial report, but he instead endorsed, accepted, and relied on them throughout this litigation. Dr. Alford could have relied on exit polls in his initial reports, but opted not to. Even if Dr. Alford had an excuse for waiting until his supplemental report to offer these opinions—which he resoundingly does not—he would still have no excuse for saving them until his supplemental *rebuttal* report. There is no excuse for withholding this series of material opinions until the final hour.

Dr. Alford's last-minute opinions are both unjustified and prejudicial, and the *Southern States* factors uniformly favor excluding them.

## CONCLUSION

Plaintiffs respectfully request that the motion to admit as evidence Dr. Alford's supplemental rebuttal opinions, D.E. 122, be denied as to Parts A and C of Dr. Alford's supplemental rebuttal report, LD76 at 2-7, 12-16, and that the motion to admit as evidence Dr. Alford's Rule 26(e) supplement, D.E. 123, be denied, LD77.

Respectfully submitted this, the 24th day of March, 2025.

**POYNER SPRUILL LLP**
By:/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
North Carolina State Bar no. 4112
Caroline P. Mackie
North Carolina State Bar no. 41512
Post Office Box 1801
Raleigh, NC 27602

23

Telephone: (919) 783-1108
cmackie@poynerspruill.com
espeas@poynerspruill.com

**ARNOLD & PORTER
KAYE SCHOLER LLP**
By:/s/ R. Stanton Jones
Robert Stanton Jones*
Elisabeth S. Theodore*
John A. Freedman*
Samuel I. Ferenc*
Orion de Nevers*
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
stanton.jones@arnoldporter.com
elisabeth.theodore@arnoldporter.com
john.freedman@arnoldporter.com
sam.ferenc@arnoldporter.com
orion.denevers@arnoldporter.com

*Appeared via Special Notice
Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the cm/ecf system, which will send notification of such filing to all counsel and parties registered in said system.

Respectfully submitted this, the 24th day of March, 2025.

/s/ Orion de Nevers
Orion de Nevers