# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Case No. 4:23-CV-00193-D

RODNEY D. PIERCE and MOSES      )
MATTHEWS,                        )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
THE NORTH CAROLINA STATE         )
BOARD OF ELECTIONS, et al.,      )
                                 )
          Defendants.            )

REMOTE VIA ZOOM

DEPOSITION OF DR. JOHN ALFORD

10:11 A.M.

THURSDAY, SEPTEMBER 19, 2024

By: Denise Myers Byrd, CSR 8340, RPR

---

**APPEARANCES**

For the Plaintiffs:

ARNOLD & PORTER
BY:  ELISABETH S. THEODORE, ESQ.
601 Massachusetts Avenue, NW
Washington, DC  20001-3743
(202) 942-5000
Elisabeth.Theodore@arnoldporter.com

POYNER SPRUILL
BY:  CAROLINA MACKIE, ESQ.
PO Box 1801
Raleigh, NC  27602-1801
(919) 783-6400
CMackie@poynerspruill.com

For the Defendants:

BAKER & HOSTETLER
BY:  KATHERINE McKNIGHT, ESQ.
     ERICA PROUTY, ESQ.
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC  20036
(202) 861-1500
KMcKnight@bakerlaw.com
EProuty@bakerlaw.com

NELSON MULLINS
BY:  ALYSSA RIGGINS, ESQ.
     JORDAN KOONTS, ESQ.
301 Hillsborough Street
Suite 1400
Raleigh, NC  27603
(919) 329-3800
Alyssa.Riggins@nelsonmullins.com
Jordan.Koonts@nelsonmullins.com

2

---

The Reporter:   Discovery Court Reporters
and Legal Videographers, LLC
BY:  DENISE MYERS BYRD, CSR 8340
4208 Six Forks Road
Suite 1000
Raleigh, NC  27609
(919) 424-8242
(919) 649-9998 Direct
Denise@DiscoveryDepo.com
--oOo--

INDEX OF EXAMINATION
Page

By Attorney Theodore....................    5

--oOo--

3

---

INDEX OF EXHIBITS

Exhibit                                  Page
1   Expert Report of John Alford, Ph.D.       9
2   Expert Report of Dr. Loren Collingwood   52
3   Deposition of John Alford, 12/13/2023
    Mississippi State Conference of NAACP
    v State Board of Elections               58
4   Alford Replication Materials             97
5   Alford Replication Readme                98
6   Affidavit of Direct Examination of
    Dr. John Alford, NAACP v East Ramapo
    Central School District                 111
7   Expert Rebuttal of Dr. Loren Collingwood 202
8   Expert Report of Dr. John Alford,
    Johnson v Wisconsin Elections Commission 232

9   Expert Report of Dr. John Alford,
    11/2/2022, Soto Palmer v Hobbs           236
    --oOo--

4

1 (Pages 1 to 4)
Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 2 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

DR. JOHN ALFORD,

having been first duly sworn or affirmed by the

Certified Shorthand Reporter and Notary Public

to tell the truth, the whole truth and nothing

but the truth, testified as follows:

EXAMINATION

ATTORNEY THEODORE:

Q.  Good morning, Dr. Alford.  My name is Elisabeth

Theodore from the law firm of Arnold & Porter,

and I represent the plaintiffs in this case.

Can you please state your full name for

the record.

A.  Yes.  It's John Richard Alford.

Q.  Thank you.  You've been deposed a number of

times before, correct?

A.  I have.

Q.  Approximately how many times?

A.  Certainly more than 50 times.  At some point I

thought I would count all that up, but I got

exhausted and gave up, but more than 50 times.

Q.  All right.  And you've done a Zoom deposition

before.

A.  I have.

Q.  All right.  And you understand the importance of

trying not to talk over each other.  I'll try

not to interrupt you, and I ask that you wait

until my questions are done before answering.

Is that fair?

A.  Yes.

Q.  Okay.  And you understand that if your counsel

objects, you must answer the question unless

your counsel specifically instructs you not to

answer the question, correct?

A.  Yes.

Q.  All right.  Any reason you couldn't give

complete, accurate, and truthful testimony

today?

A.  No.

Q.  All right.  And if you want a break, just let me

know, but I would just ask that you not take any

breaks in the middle of the question.  Is that

fair?

A.  That's fair.

Q.  Okay.  What did you do to prepare for this

deposition?

A.  I looked over the various materials.  I looked

over my reports in the case.  I looked at

Dr. Collingwood's reports.  I had discussion

with the lawyers.

Q.  Did you review any other expert reports besides

your report and Dr. Collingwood's reports?

A.  I don't believe so, no.

Q.  Okay.  Did you bring any documents or notes with

you to this deposition?

A.  I have been provided with a clean copy of my

report, and that's all I have.

Q.  Okay.  Do you have anything up on your screen

besides the Zoom window?

A.  It's actually not -- it's not my screen, but

there's nothing but a Zoom window.  It's not my

laptop.

Q.  There's no documents up on that laptop that's in

front of you?

A.  That's correct.

Q.  Where do you live currently?

A.  I live at 15907 Erin Creek Court in Houston,

Texas.

Q.  Have you ever lived in North Carolina?

A.  I have not.

Q.  Have you ever been to North Carolina?

A.  I have been to North Carolina various times from

when I was young to more recently we've

spent -- recently spent a couple of family

vacations in North Carolina at Airbnb

residences.

Actually, the University of North

Carolina was -- there were two schools I

considered for graduate school, University of

Iowa and University of North Carolina, and came

very close to going to North Carolina for my

graduate training, ended up at -- ended up at

Iowa.  So I have some affinity for

North Carolina.  And I've been various, you

know, over the years conferences, those sorts of

things, but I've never -- I've never lived

there, and I don't think I've ever been involved

in any other business kinds of things related to

North Carolina.

Q.  And business would include your work on racially

polarized voting and the VRA; is that right?

A.  Yeah.  I don't -- I'm trying to think of

what -- if I've been involved in anything prior

to this.  Nothing comes to mind.

But, yeah, broadly, most of my time

spent in North Carolina has been more likely

related to vacation than to business.

Q.  Okay.  And where are you currently employed?

A.  I am employed at Rice University in Houston,

Texas.

Q.  And you teach political science there; is that

5

6

7

8

1    correct?

2    A.  That's correct.

3    Q.  And what courses are you currently teaching?

4    A.  This semester I'm teaching a course called

5    Election 2024 that deals with voting behavior

6    and structural issues in the 2024 election, and

7    I'm teaching Introduction to American Politics.

8    Q.  All right.  And I am going to go ahead and drop

9    in the chat what I'm going to mark as Exhibit 1

10    which is your expert report in this case.

11         (WHEREUPON, Plaintiff's Exhibit 1 was

12    marked for identification.)

13  BY ATTORNEY THEODORE:

14    Q.  Do you recognize this document?

15    A.  Yes.

16    Q.  Okay.  And you can feel free to refer to the

17    print copy that you have if you prefer.

18    A.  Thank you.

19    Q.  And if you scroll to page 31 of the PDF, do you

20    see your c.v. there?

21    A.  Yes.

22    Q.  And can you confirm, this is an current and

23    accurate copy of your c.v.?

24    A.  It is.

25    Q.  Are there any new expert engagements since you

9

---

1    sent us this c.v. in August 2024?

2    A.  Yes.  I believe there are two -- there are two

3    things that I engaged in that I don't see here,

4    at least in the front part.

5         So I've been engaged as an expert on a

6    school board case.  I don't know the case name,

7    but it's the Dumas, D-U-M-A-S, Independent

8    School District in West Texas, and that's a VRA

9    lawsuit against the school district.

10    Q.  A Section 2 lawsuit?

11    A.  Yes.

12    Q.  And what's the second one that you wanted to

13    add?

14    A.  Oh, I'm working as a consulting expert on -- for

15    the State of Arkansas.

16    Q.  Is that also on VRA Section 2 issues?

17    A.  It's not.  So part of the reason I'm consulting,

18    I guess, and not actually a testifying expert,

19    it's not -- at least my recollection at this

20    point, it's a constitutional challenge about

21    minority -- sort of cracking of minority votes

22    related to the congressional redistricting,

23    specifically to the division of section of

24    Pulaski County in the congressional plan.

25    Q.  Thank you.  Okay.

10

---

1         Have you ever published any academic

2    work that relates specifically to North Carolina

3    in any way?

4    A.  No.

5    Q.  All right.  Have you ever published any academic

6    work about the Voting Rights Act?

7    A.  No.

8    Q.  Have you ever published any academic work on

9    racially polarized voting?

10    A.  No.

11    Q.  Have you ever published any academic work about

12    use of the ecological inference method?

13    A.  No.

14    Q.  Have you ever published any academic work using

15    the ecological inference method as a

16    methodology?

17    A.  I don't think so, no.

18    Q.  All right.  And when I say ecological inference,

19    I'm referring to sort of all the variations of

20    ecological inference.  Is that fair?

21    A.  Yes, that's fair.

22    Q.  And that doesn't change your answer?

23    A.  No.

24    Q.  Okay.  Have you ever published any academic work

25    about the use of statistics in the context of

11

---

1    redistricting or the Voting Rights Act?

2    A.  I don't think so, no.

3    Q.  Have you ever taught a statistics course?

4    A.  Yes.

5    Q.  Have you ever performed a regression in your

6    academic work?

7    A.  Yes.

8    Q.  All right.  Have you ever taught any courses on

9    minority politics or voting behavior?

10    A.  Specifically minority politics in voting

11    behavior, no.

12    Q.  Have you ever published any academic work on the

13    voting patterns of black voters in the

14    United States or in any part of the

15    United States?

16    A.  I published work on voting but not specifically

17    on voting patterns of black voters in the

18    United States, no.

19    Q.  Okay.  Have you ever published any academic work

20    on racial politics?

21    A.  No.

22    Q.  Did you consider yourself to be an expert in the

23    area of racial politics?

24    A.  As it's defined as a subfield in American

25    politics, no.

12

1    Q.  Do you consider yourself to be an expert in the
2        are of minority voting behavior?
3    A.  As an academic subfield, no.
4    Q.  Do you teach about the Voting Rights Act in your
5        classes?
6    A.  Yes.  The Voting Rights Act would be something
7        that would come up.  I taught a course on
8        redistricting.  It certainly was something that
9        came up in that context, comes up in
10       Introduction to American Politics possibly.  I
11       teach a course on elections and voting behavior,
12       probably comes up in that course, some context.
13   Q.  And you answered earlier, I think, you don't
14       recall ever previously serving as an expert
15       witness in a case involving North Carolina,
16       correct?
17   A.  I think one way or another I've been involved in
18       something now getting close to 100 cases over
19       39 years, so I can tell you what -- with some
20       accuracy what I've been doing in the last couple
21       of years, but what I was doing -- whether I was
22       involved in a North Carolina case, state or
23       local, in the '80s or '90s, I have no idea.
24   Q.  All right.  But nothing comes to mind.  You
25       can't think of anything in the last -- you know,

13

1    informs this work and work on the elections for
2    this case and what I think was a parallel case,
3    that's what I would say reflect my expertise as
4    relevant to this case.
5    Q.  All right.  For purposes of conducting your work
6        in this case, you applied the standard
7        methodology that you apply sort of regardless of
8        whether a case involves North Carolina or some
9        other region.  Is that fair to say?
10   A.  Yes.
11   Q.  Okay.  And you didn't -- you didn't rely when
12       you were preparing your expert report in this
13       case on any specific expertise regarding
14       North Carolina based on your past work; is that
15       correct?
16   A.  I mean, I certainly think -- I can't help but
17       think of North Carolina in that comparative
18       context sort of where it would fit relative to
19       other states or entities that I've been involved
20       with, but I'm not applying any sort of specific
21       sort of state politics expertise to my analysis.
22   Q.  Okay.  And you don't have any experience or
23       expertise in North Carolina state politics or
24       state elections in particular.  Is that fair to
25       say?

15

1    in the last 20 years?
2    A.  Not off the top of my head.
3    Q.  All right.  Do you believe that you have any
4        particular expertise regarding North Carolina?
5    A.  Just to be clear -- at least I think I'm right
6        about this, but there are two separate
7        North Carolina cases now; is that correct?  I'm
8        in both of them, so I guess technically I'm
9        involved, but prior to this round, I don't
10       recall being involved.
11   Q.  Thanks for the clarification.
12           Do you believe that you have any
13       particular expertise regarding North Carolina?
14   A.  Well, certainly -- well, yes, that's reflected
15       in my report.  So I've done analysis here on a
16       fairly large set of recent North Carolina
17       elections so I think I know something and have
18       something to share with the court about current
19       elections in North Carolina.
20   Q.  All right.  And that's based on your work in
21       this report, correct?
22   A.  My work in this report more broadly and my work
23       over almost 40 years now on issues related to
24       the Voting Rights Act and to redistricting and
25       to elections, so although work in other cases

14

1    A.  Beyond what I've done in the reporting in this
2        case, no, I have no -- I'm not an expert on
3        North Carolina state politics in that
4        substantive sense.
5    Q.  Has your testimony ever been excluded by a
6        court?
7    A.  It's certainly been misliked but never excluded.
8    Q.  All right.  And we'll get to the "misliked" a
9        little bit later.
10           Have you ever been an expert on behalf
11       of a plaintiff in a Section 2 case?
12   A.  I have been an expert for plaintiffs.  I'm not
13       sure exactly how to characterize the particular
14       cases.  I was -- served as an expert for I guess
15       some Texas Democratic congressmen led by Martin
16       Frost in a suit against the State of Texas; also
17       for some Democratic congressman in Florida; also
18       I think involved in congressional redistricting
19       in Florida.  Those are the two cases that come
20       to mind.
21   Q.  Do you recall approximately when those cases
22       were?
23   A.  The Texas case would have been, oh, sort
24       of -- sometime mid decade following the -- in
25       the 2000 redistricting, I think, and Florida

16

4  (Pages 13 to 16)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 5 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

maybe in that same time period.

Q.  Do you recall the name of the Florida case?

A.  I don't.  I could -- if you would like me to dig
it out.  I think it's somewhere in my old files
somewhere I think I've got some reference to it,
but it concerned the -- it was relative to -- if
I'm remembering correctly related to
congressional districts in south Florida, I
think related to Hispanic voters in south
Florida both in the area of -- sort of eastern
area of Miami.

Q.  Have you ever served as an expert on behalf of a
government entity contending that the government
entity was justified in creating a
majority-minority district or a minority
opportunity district?

A.  Yes.

Q.  What cases are those?

A.  I'm just thinking recently, I was an expert for
the City of Miami in defending their city
council district plan.

      I was an expert for the State of
Washington, defending their current -- I can't
remember whether it was -- it was probably state
senate plan maybe.  I'm not really sure.

17

Q.  Is that the Soto Palmer case that you're talking
about in Washington?

A.  Yes.

Q.  Do any others come to mind besides the City of
Miami and the Washington case?

A.  That's what comes to mind.  I sort of -- you
know, I have enough recent stuff that it tends
to crowd out stuff from earlier eras.  Those are
the ones that are in the last four or five years
that come to mind.

Q.  Have you ever taken a position in any expert
report or expert work that a VRA district was
required in a particular instance?

A.  So when I'm hired by -- so for whatever reason,
mostly accidental, I think, I started out
working for entities and then, you know, you
get -- and then entities hire you, so I guess I
have lots of old friends and some new friends on
the plaintiff side.  And we always joke about,
you know, why I'm not working for them, and I
said, "Well, because you don't hire me."  And,
you know, I don't think it's entirely ideal, but
it is the way it works, right, people end up
testifying on one side or the other and that's
who calls.

18

I never sought out employment in this
area in the entire time I've been doing it, so
people come to me and ask me to work on a case,
and if it's something I can be helpful to them,
I work on the case.  As it happens, that's
mostly entities partly again because that's how
I got started and partly because at the local
level, I draw district plans for entities and so
they are often asking me to defend their plans.

      When I'm approached by an entity to do
some analysis that's related to either a
potential legal suit or an existing legal suit,
I do my analysis and share that.  Oftentimes I'm
hired as a consulting expert.  If what I find is
something that wouldn't be helpful to their
position in defending the lawsuit, I share that
with them and then that's sort of that.

      I guess it doesn't surprise me much
that if what I find is not helpful that I'm then
not actually a testifying expert for the entity.
So where an entity actually, you know, follows
through and has me as a testifying expert, it's
because my analysis they believe is helpful to
them.  I've done analysis that is not helpful as
a consulting expert and then I've not been asked

19

to testify.

Q.  All right.  And just specifically, though, have
you ever taken any position -- have you ever
taken a position in expert work or an expert
report that's public that a VRA district was
required in a particular instance?

      ATTORNEY McKNIGHT:  Objection; form.

      THE WITNESS:  Well, I think that's -- I
mean, I've been associated with lawyers, I
guess, for taking all sorts of positions.  I
don't really -- I don't think of my work as
being -- making a conclusion about what the VRA
requires or doesn't require.

      So I certainly have advised numerous
entities over the years that they are
definitely, you know, subject to -- likely to
be -- if they haven't already been sued, they
probably will be sued.  If they have been sued
that I don't think they're likely to prevail.

      I don't think that's -- that's not
because I have a legal conclusion about whether
they're -- whether they are required by the
Voting Rights Act to do something or not
required to do something, but just sort of
realistically does the fact pattern look very

20

5 (Pages 17 to 20)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 6 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  positive for them or -- so, I mean, I have been
2  involved in cases where I was asked to simply
3  look at the demographics and I concluded that
4  you couldn't draw a majority district and so I
5  would tell the entity that I think it's unlikely
6  that they'll lose a VRA suit, although it
7  doesn't mean they won't lose it.
8        I have cases I would say, yes, a
9  district could easily be drawn so you're
10 probably going to be sued and there's a chance,
11 you know, a lawsuit could go either way.  But I
12 don't think I've ever myself specifically told a
13 district -- reached the sort of legal conclusion
14 that they were required by the Voting Rights Act
15 to do something.
16 BY ATTORNEY THEODORE:
17 Q.  Have you ever taken a position in any expert
18 work or any expert report that's public that the
19 three Gingles preconditions are satisfied in a
20 particular instance?
21       I'm just looking for any examples that
22 you can recall in public expert work where you
23 have taken the position that the three Gingles
24 preconditions were satisfied in a particular
25 instance.

21

1  Q.  Did you do in any of these cases any analysis of
2  Gingles Precondition 1 or any analysis of the
3  racial composition of a particular district in
4  any of the cases listed here on your c.v.?
5        ATTORNEY McKNIGHT:  Objection; form.
6        THE WITNESS:  I think I would have done
7  that in the -- or actually, I'm not sure.
8  BY ATTORNEY THEODORE:
9  Q.  I'm sorry.  In which case?
10 A.  I'm sorry.  Shafer v Pearland ISD.
11       I'm trying to remember because in some
12 of these cases there's a demographer hired
13 separately and in which case I try to stay out
14 of that.  In Pearland -- there may be a
15 demographer in Pearland.
16       On page 13, the Elizondo v Spring
17 Branch ISD, I testified about the ability to
18 draw a Gingles one district.
19       I think in that set of -- going from
20 Houston Community College, Lone Star College,
21 Killeen, Houston ISD, Brazosport ISD, Dallas
22 ISD, all of those I think would have involved to
23 some degree the issue about drawing a district.
24       And then where I am consulting and
25 drawing districts Lancaster, City of Baytown,

23

1  A.  Again, not as a legal matter but just as a
2  factual matter, I think my testimony in
3  Washington state was that, you know, again, it
4  depends on how you -- how you treat that pattern
5  for Gingles purposes or for totality purposes,
6  whatever.
7        So if the question is are -- which is,
8  I think, as I understand from the plaintiffs'
9  experts, if the question is whether black and
10 white voters are voting differently in
11 elections, that question, then, I mean, yeah,
12 that is the question I think I was asked to
13 answer in Washington state, and my answer was
14 yes.  In that case Hispanic and Anglo voters
15 were voting differently in elections.
16 Q.  All right.  Can you think of any example beside
17 Washington state?
18 A.  I would have to -- I believe that would
19 be -- would be a fair characterization of my
20 testimony in the Miami case relative to black
21 and white voters.
22 Q.  Okay.  Let's turn back to your c.v. marked as
23 Exhibit 1 and turn to the page that has your
24 recent expert engagements.
25 A.  Yes.

22

1  Good Creek, obviously I'm drawing districts, so
2  that's all I was doing in the district.
3        You know, so Sarasota County, Florida,
4  I think to some degree would have been involved
5  in a district -- issue by district demographics,
6  but I'm not sure whether that was -- whether
7  there was a separate demographer or not.
8        And I think that's it.
9  Q.  Okay.  Thank you.
10       And in the cases that you list on this
11 c.v. where you describe yourself as a
12 consultant, was there any public report or
13 published report that described your work in any
14 of those cases?
15 A.  I would say that I'm working for lawyers
16 representing those -- so two separate things.
17 One, I'm working with lawyers representing the
18 districts with regard to drawing districts or
19 supporting district plans, so I would provide
20 information to the lawyers.
21       In some of those cases, I think the
22 lawyers probably did something -- I don't think
23 there's anything published, but they would have
24 done a presentation at some point for the
25 governing body, but I don't think -- those cases

24

1  where I'm drawing the districts, I would do a
2  presentation to the board, say, in Lancaster
3  about here are some ways to draw districts, but
4  I don't think that would be a published report.
5  It would be simply coming in and making a
6  presentation for the board.
7  Q.  Okay.  Thanks.
8      All right.  So your assignment -- you
9  were retained by the defendants in this case,
10  correct?
11  A.  Correct.
12  Q.  And your assignment was to respond to the
13  analysis of Dr. Collingwood; is that correct?
14  A.  Initially to respond to the analysis of
15  Dr. Barreto, and then when he was replaced with
16  Dr. Collingwood, to respond to Dr. Collingwood.
17  Q.  All right.  Have you reviewed the reports of
18  Mr. Esselstyn, Dr. Burch or Dr. Mattingly?
19  A.  I have not.
20  Q.  And you haven't expressed any opinion about
21  their reports or opinions in your own report,
22  correct?
23  A.  I believe that's correct.
24  Q.  Let's return to Exhibit 1 which I already
25  transmitted which is your August expert report.

25

1  several cases.  I just spent the last entire
2  last week in trial on the Spring Branch case,
3  writing a report right now in the other
4  North Carolina case, testifying in the Miami
5  case and the Florida case, so it's been
6  busy -- continuing to work with Texas and
7  Arkansas, so it's been a very busy time.  And I
8  couldn't tell you with any degree of accuracy
9  how much of that -- my relative time is spent
10  allocated to which of those tasks.
11  Q.  Let's turn to page 3 of your report.  You see a
12  section on Data and Sources?
13  A.  Yes.
14  Q.  And you state there you reviewed
15  Dr. Collingwood's report, you relied on election
16  and voter data from North Carolina, from the
17  North Carolina State Board of Elections, and you
18  relied on materials disclosed by Dr. Collingwood
19  wood.  Is that accurate?
20  A.  Yes, it is.
21  Q.  And you didn't rely on any other facts or data
22  other than the ones listed in that Data and
23  Sources paragraph in forming your opinions,
24  correct?
25  A.  I'm not consulting or analyzing any other data

27

1      You're not planning on offering
2  independent on any topic that is not covered by
3  this report, correct?
4  A.  I always find that to be an odd -- I don't
5  think -- I don't know, an awkward question.
6      I don't plan on offering anything
7  beyond that, but I know from having spent some
8  time as a witness in federal trials that at some
9  point I'm almost always asked questions either
10  by plaintiffs or by the judge that might be
11  somewhere outside the scope of what's in the
12  report, and I do my best if I can to answer
13  those questions appropriately.
14      So I don't -- at this stage, certainly
15  going into court, you know, I plan to talk about
16  my report.  I always hope that's all I have to
17  talk about, but there are occasions
18  when -- particularly when judges ask questions
19  that go beyond the scope of the report, and I do
20  my best to answer those questions.
21  Q.  Do you recall approximately how many hours you
22  spent preparing your August report?
23  A.  I have no idea.
24  Q.  Less than 50?  More than 50?
25  A.  As you can see from this list, I'm involved in

26

1  beyond that.  You know, while I'm forming an
2  opinion, I form the opinion based on everything
3  that's ever happened to me in my life.  I
4  don't -- I can't divorce everything else that I
5  know or everything else that I've been involved
6  in or everything else I've analyzed, but for
7  the -- for the empirical information provided
8  here and the conclusions I draw from that
9  information, this is the data and the sources.
10  Q.  Did you review Dr. Collingwood's code before
11  writing your?
12  A.  Yes, I looked at Dr. Collingwood's code.
13  Q.  And your report does not disclose any opinions
14  about his code, correct?
15  A.  I don't think I made any comment about his code,
16  correct.
17  Q.  You didn't include any criticisms of his code in
18  your report, correct?
19  A.  Correct.
20  Q.  All right.  And did you review Dr. Collingwood's
21  data inputs before writing your report?
22  A.  Yes.
23  Q.  Okay.  And your report does not disclose any
24  opinions or criticisms about his data inputs; is
25  that correct?

28

7  (Pages 25 to 28)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 8 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  A. Yes, that's correct.
2  Q. All right. And I'm going to use the term EI to
3     refer to ecological inference. You'll
4     understand what I mean?
5  A. Yes.
6  Q. Your report contains no criticisms of the
7     methodology that Dr. Collingwood would use for
8     conducting his EI regression analysis to
9     estimate racially polarized voting, correct?
10 A. Correct.
11 Q. And you don't dispute that the results in his
12    report reflecting the percentage of white and
13    black voters who voted for a particular
14    candidate in a particular region for a
15    particular election are the product of accurate
16    and reliable implementation of the EI
17    methodology, correct?
18 A. I certainly can't validate that in a detailed
19    sense, but I don't contest that.
20 Q. You don't contest that his EI regression results
21    are the product of an accurate and reliable
22    implementation of the EI methodology, correct?
23 A. Correct.
24 Q. And you haven't disclosed any opinion disputing
25    any of his EI point estimates, correct?

29

1  A. Correct.
2  Q. And in fact, your report accepts and relies upon
3     his EI analysis, correct?
4         ATTORNEY McKNIGHT: Objection; form.
5         THE WITNESS: Correct.
6  BY ATTORNEY THEODORE:
7  Q. And your report accepts and relies upon all of
8     his white voter support and black voter support
9     estimates for all of the candidates and
10    elections that he analyzes, correct?
11        ATTORNEY McKNIGHT: Objection; form.
12        THE WITNESS: So certainly for
13 everything that I'm discussing in my report, I
14 am utilizing his -- deliberately utilizing his
15 EI estimates, so I'm not contesting those
16 estimates.
17        ATTORNEY THEODORE: Thank you.
18        ATTORNEY McKNIGHT: Pardon me,
19 Elisabeth. I just want to make sure that the
20 court reporter can hear when I am objecting.
21        Can the court reporter confirm that
22 she's hearing my objections.
23        THE REPORTER: I am. I can hear you.
24 BY ATTORNEY THEODORE:
25 Q. And we'll talk about this a little bit later.

30

1         You conducted your own EI regression
2     analysis in this case, correct?
3  A. Correct. As I said, I have an independent EI
4     analysis. The actual programming conducting
5     that, the run is actually done by Dr. Randy
6     Stevenson who I work with on these cases. So
7     the actual production run he does on his
8     computer.
9         But working with him, yes, we did
10 independent analysis that allowed us to confirm
11 that our results within the variation you'd
12 expect in a technique like EI essentially match
13 very closely with Dr. Collingwood's analysis.
14 And to keep this from becoming sort of my data,
15 your data -- actually, Dr. Collingwood -- his
16 testimony in Soto Palmer when he was asked about
17 the analysis seems really similar, and he said
18 the data is the data is the data, which I
19 think -- I was sort of the analysis is the
20 analysis is the analysis.
21        If done correctly, there shouldn't be
22 substantial differences, and to keep from having
23 that fight or forcing the judge to pick one
24 analysis or the other, to the extent that the
25 differences are small enough that I don't think

31

1  they make a substantive difference, I always
2  prefer to use the plaintiff's analysis, the
3  plaintiff's EI estimates rather than my own. I
4  wouldn't reach a different conclusion with the
5  analysis that Dr. Stevenson and I did, but I
6  just think it's helpful to the court not to have
7  to fight that battle.
8  Q. Okay. So you agree for purposes of the analysis
9     in this case, you and the court should use
10    Dr. Collingwood's numbers?
11 A. I'd be perfectly fine with the court using my
12    numbers. I'd be perfectly fine with them using
13    Dr. Collingwood's numbers. I'm just saying I
14    don't think anything that I conclude or
15    Dr. Collingwood concludes or the court needs to
16    reach would be different by having a fight about
17    those numbers. Dr. Collingwood is a competent
18    analyst, and so that's -- in my view at least,
19    with regard to the EI analysis, that's not an
20    issue in this case.
21 Q. All right. What are the dependent and
22    independent variables in the EI analysis that
23    you and Dr. Stevenson conducted in this case?
24 A. So we're dealing with election results at the
25    precinct level as essentially the dependent

32

8 (Pages 29 to 32)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 9 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  variables, so shares of votes for candidates.
2  And on the independent variable side, we're
3  dealing with the information from Secretary of
4  State about the race or ethnicity of voters.  So
5  we're comparing in this case black and white
6  voters to voter support at the precinct level
7  for candidates in the various elections that we
8  considered here.
9  Q.  And that's no different than the dependent and
10  independent variables in Dr. Collingwood's EI
11  analysis, correct?
12  A.  Correct.
13  Q.  And would you agree that the basic point of a
14  regression is to attempt to establish causal
15  relationships between the independent variable
16  and the dependent variable?
17  A.  I don't know.  I guess I would not -- that's a
18  very technical issue.
19  Regression is an attempt to summarize
20  the relationship between the independent and
21  dependent variable in a particular fashion.  In
22  the degree to which there is a linear
23  relationship between two continuous variables
24  and summarizing the nature of that relationship,
25  regression is one technique for doing that.

33

1  Statistical techniques in and of
2  themselves are like statistics that summarize
3  something, whether it's a mean summarizing a
4  single variable or summarizing the relationship
5  between variables, like a correlation or
6  regression, are simply a means of summarizing a
7  body of data that's too large for us to sort of
8  understand that or correctly characterize it by
9  reporting all the data.
10  No -- none of those techniques are
11  causal analysis.  Causal analysis has to do with
12  design of the study, not with the techniques.
13  So constructed properly, you can use a variety
14  of techniques to try to demonstrate causation,
15  even things as simple as just a cross tab or a
16  set of means.  That doesn't mean that the mean
17  or the average is itself a causal technique.  It
18  really has to do with design.
19  Here we're -- even if we were dealing
20  at the individual level, it would not constitute
21  when the social sciences at least -- or the
22  sciences for that matter would be considered a
23  causal framework.  These are not experimental or
24  quasiexperimental studies, and not even at the
25  right level of analysis.

34

1  So this is useful information.  It
2  summarizes a large set of data, but it is -- in
3  and of itself it's I think improper to talk
4  about it as somehow a -- summarizing a causal
5  relationship.  Obviously, there may be a causal
6  relationship in some sense, although certainly
7  not at the aggregate level, but even if at the
8  individual level we want to talk about that, we
9  would have to do something at the design level
10  beyond just a survey of information at the voter
11  level.
12  Q.  When you talked about in your previous answer
13  the difference between the aggregate level and
14  the individual level, what do you mean?
15  A.  So we have an individual-level hypothesis here
16  about how the race of voters relates to the
17  votes cast by voters, and we don't have any
18  individual-level data on that question.  What we
19  have is at the precinct level, we know that a
20  proportion of the voters at the precinct that
21  are in this case black and white and we know the
22  proportion of voters who voted, say, for
23  President Biden, right.
24  That aggregate-level information can
25  tell us about what's the relationship between

35

1  what proportion of a precinct is black and what
2  proportion the vote goes for Biden.  It can't
3  answer the question about what happens at the
4  individual level.  That's the ecological
5  fallacy.
6  Ecological inference is not a technique
7  that settles or solves or addresses the
8  ecological fallacy.  It accepts the ecological
9  fallacy and then tries to do a better job than,
10  say, ordinary regression would do in properly
11  understanding what -- how we can officially
12  extract information at the aggregate level and
13  then how we can properly condition that
14  extracted information in the sense of having a
15  credible or a confidence interval around it.
16  Both of those are failings of
17  ordinarily squares regression that are addressed
18  to some degree or improved upon to some degree
19  by broadly what we call EI, the method of bounds
20  ecological inference developed by Dr. King.
21  But I think it's certainly not the case
22  that using the best possible techniques for
23  ecological inference in any way addresses the
24  fundamental issue here which is that the
25  ecological fallacy is still in operation.  We're

36

9  (Pages 33 to 36)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 10 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com                1-919-424-8242

1  trying to infer something about individual
2  behavior from aggregate behavior, and that
3  disjunction between the level of analysis of
4  concern and the level of analysis of the data is
5  something that cannot be bridged simply by a
6  fancy methodological technique.
7  Q.  All right.  So put a little bit more succinctly,
8      the EI method does not allow you to make causal
9      statements.  Is that fair?
10         ATTORNEY McKNIGHT:  Objection; form.
11         THE WITNESS:  It does not allow you to
12     make causal statements at the individual level,
13     and I'm not sure -- I haven't really thought
14     about what a causal statement at the aggregate
15     level in this case would look like.
16            Given that we assume that behavior
17     takes place at the individual level, although
18     that itself, right, that's a reductionistic
19     assumption that economics and psychology would
20     take.  It's a reduction that sociology might not
21     take.
22            There's a lot of complexity in what
23     you're asking, but I guess a simple answer is on
24     lots of different grounds, none of this is a
25     causal analysis.

                                                    37

1  BY ATTORNEY THEODORE:
2  Q.  Okay.  What do you understand the term black
3      preferred candidate to mean?
4  A.  The candidate preferred by black voters.
5  Q.  All right.  And what about white preferred
6      candidate?
7  A.  Candidate preferred by white voters.
8  Q.  And do you mean preferred by a majority of white
9      voters or black voters?
10 A.  No.
11 Q.  What do you mean?
12 A.  I just mean that in the array of candidates, if
13     there is one, the candidate that has the largest
14     number of votes from that group.
15 Q.  And you agree that in some election contests
16     with both black and white candidates, a white
17     candidate could be the preferred candidate for
18     black voters, correct?
19 A.  Correct.
20 Q.  And what is your understanding of the term
21     racially polarized voting or RPV?
22 A.  So it has sort of just a commonsense kind of
23     meaning, what it suggests, and it has a very
24     different legal meaning.  And so in this
25     context, I think it's important to kind of keep

                                                    38

1  straight what the court means by that so when
2  the court says we find that voting in state of
3  North Carolina is racially polarized, that I
4  think usually means racially polarized as
5  opposed to just racially polarized.
6         So in the broadest sense, racially
7  polarized voting could simply mean that two
8  groups of voters, in this case blacks and
9  whites, vote as polar opposite, that is, that
10 they are polarized in their voting behavior.
11        So I would say that's probably the
12 broadest definition.  I don't think it's
13 the -- it's maybe the starting point for a legal
14 analysis, but I don't think it's what the court
15 means when it finds that voting is racially
16 polarized.
17        So it obviously involves the behavior
18 of the two sets of voters and I believe involves
19 more than just having a different preferred
20 candidate.  So blacks having a different
21 preferred candidate is not in any sense racially
22 polarized voting in and of itself.
23 Q.  So what is your understanding, then, of the term
24     racially polarized voting?
25 A.  So my understanding would be first that -- just

                                                    39

1  in its most generic sense, voting is polarized.
2  When we use the term polar, it's not accidental.
3  Polarized voting comes when voters are
4  polarized.
5         So we know, for example, that
6  traditionally American voters weren't considered
7  to be polarized on the basis of party, and we've
8  entered an era now where everyone, political
9  scientists, politicians agree that we're
10 currently in the year of highly polarized,
11 partisan politics.  And we see that when we look
12 at the voting behavior of self-described
13 Democrats and Republicans.
14        So much to the amazement of my
15 Democratic colleagues, self-described
16 Republicans continue to support Donald Trump at
17 over 90 percent, and much to the surprise of my
18 Republican colleagues, self-described Democrats
19 continue to support Joseph Biden at something
20 close to at least 90 percent.
21        So when 90 percent plus of one group
22 goes one way and 90 percent goes the other way,
23 we have the two groups behaving in polar
24 opposite ways.  Now, this is exactly what we
25 mean by a polarized legislature, when pretty

                                                    40

                              10  (Pages 37 to 40)
Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 11 of 104
DISCOVERY COURT REPORTERS   www.discoverydepo.com         1-919-424-8242

**Page 41**

1  much all the Republicans vote one way and all
2  the Democrats vote the other in the Senate, for
3  example, we'd say voting on that bill was
4  polarized.
5   And again, if Democrats were voting
6  52 percent for Kamala Harris and 48 percent for
7  Trump and the reverse for Republicans, no one
8  would say voting in the United States was
9  polarized on the basis of party. That would be
10  remarkably unpolarized voting. So I think it
11  requires -- obviously, the two groups that
12  you're going to say are polarized would have to
13  be on opposite sides of an issue, but they have
14  to be more on just opposite sides. They
15  actually have to be polarized.
16  Q.  Okay. So and I just want you to focus on racial
17  polarization.
18   The term racially polarized voting, I
19  think you said in your previous answer that just
20  because black and white voters prefer different
21  candidates, in your view, that doesn't mean
22  there is racially polarized voting. Is that
23  what you said?
24  A.  Yeah. I want to be clear, we're talking about
25  in my view because I recognize that maybe the

**Page 42**

1  majority -- at least a decade ago I would say
2  the majority of plaintiffs' experts believe that
3  if 50 percent plus 1 of blacks voted one way and
4  50 percent plus 1 of whites voted the other,
5  that would be racially polarized voting.
6   I think we've moved away from that in
7  the current decade, at least as I read the
8  subset of expert reports that I get to read.
9  What I see increasingly are plaintiffs' experts
10  are saying maybe you need 60 percent voting one
11  way and 60 percent the other to meet some sort
12  of threshold where you have enough cohesion in
13  each of the two groups that makes sense to talk
14  about it as being polarized.
15   I'm not at all sure that's an arbitrary
16  cutpoint, and I appreciate at least it's better
17  than 50 percent plus 1, but I don't think we've
18  come near exhausting the territory across which
19  we might talk about degree of relative cohesion.
20   So in my view, 50 percent plus 1 versus
21  50 percent plus 1 is not racially polarized
22  voting, but I'm not contesting that there are
23  other plaintiffs' experts who would define that
24  as racially polarized voting.
25  Q.  Okay. And we can return to this a bit later.

**Page 43**

1   What is your understanding of the term
2  white bloc voting?
3  A.  White bloc voting is a legal term of art. It
4  doesn't have a social science meaning that I'm
5  aware of, so it's something that is an issue
6  unique to Voting Rights Act litigation. And it
7  refers at least -- I'm not a lawyer, but as I
8  understand it, it refers to a situation in which
9  in Gingles 2 there's -- the court can conclude
10  that minority voters are voting cohesively and
11  that candidate that's being cohesively supported
12  by minority voters, their election is being
13  blocked by cohesive support for the opposing
14  candidate by white voters.
15   And again, that's -- and I'm not
16  talking about legally significant white bloc
17  voting. I'm just talking about white bloc
18  voting.
19  Q.  Understood.
20   And putting aside legally significant
21  white bloc voting, you agree that there is white
22  bloc voting in Senate Districts 1 and 2 in this
23  case, correct?
24   ATTORNEY McKNIGHT: Objection; form.
25   THE WITNESS: I don't recall -- I'm not

**Page 44**

1  sure I looked at that particular issue, so I
2  don't know.
3   I think -- I think that's probably the
4  case, but I'm not -- I'm not sure. I'd have to
5  go back and look and see what the actual -- that
6  would be -- that involves actually looking at
7  the election results to see what happens with
8  those elections. If it's the case that the
9  preference of black voters is being blocked in
10  those district by white voters, the preference
11  of black voters not winning in those districts,
12  then that would meet that definition of white
13  bloc voting although not necessarily reaching
14  legally significant white bloc voting.
15  BY ATTORNEY THEODORE:
16  Q.  You believe that the term white bloc voting
17  itself incorporates a requirement of blocking
18  black preferred candidates?
19  A.  This is where I think it's not obvious to me
20  exactly -- I think you can use the term in a
21  variety of different ways, but I think at the
22  loosest or the broadest sense, sometimes people
23  simply refer to cohesive white voting as white
24  bloc voting, although they don't refer to
25  minority cohesion as minority bloc voting, but

11 (Pages 41 to 44)

Case 4:23-cv-00193-D-RN Document 127-2 Filed 03/24/25 Page 12 of 104
DISCOVERY COURT REPORTERS www.discoverydepo.com 1-919-424-8242

```
 1      if that's the case that this just refers to
 2      cohesive white voting, then it should refer to
 3      minority voting -- it should be the same thing
 4      for minority voting, so we have minority bloc
 5      voting and white bloc voting.
 6              At least as I understand it's a legal
 7      term, it is all connected more broadly to the
 8      application of the Gingles factors.  In that
 9      sense again I think is a legal term of art.
10   Q.  All right.  You were asked to offer an opinion
11      in this case about Gingles Preconditions 2 and
12      3, correct?
13   A.  Correct.
14   Q.  Can you describe briefly your understanding of
15      Gingles Precondition 2.
16   A.  Gingles Precondition 2 is a threshold test that
17      asks the question about whether minority voters
18      are voting cohesively in the elections that we
19      analyze.
20   Q.  And you agree that Gingles 2 doesn't require
21      black voters to cohesively support black
22      candidates, correct?
23   A.  Correct.
24   Q.  They can be cohesively supporting white
25      candidates and still satisfy Gingles 2, correct?
```

45

```
 1      relevant regions of North Carolina or the
 2      regions of interest.  And can we agree that that
 3      would mean the demonstration area, Senate
 4      District 1 and Senate District 2?
 5   A.  Yes.
 6   Q.  Okay.  Do you agree that black voters are
 7      politically cohesive in the demonstration area,
 8      Senate District 1 and Senate District 2?
 9   A.  Yes.
10   Q.  All right.  So you agree that the Gingles 2
11      precondition is satisfied in this case?
12   A.  Yes.
13   Q.  Can you describe briefly your understanding of
14      Gingles Precondition 3.
15   A.  So Gingles Precondition 3, again, assumes that
16      we've made it across the threshold of Gingles 2
17      so we know that we have cohesive voting on the
18      part of minority voters, and the question being
19      asked by Gingles 2 is whether white voters are
20      voting cohesively -- sufficiently cohesively to
21      block the candidate being cohesively supported
22      by black voters and that that behavior is
23      connected to issues related to -- or it is
24      racially discriminatory.
25              There's a lot of ways to think about
```

47

```
 1   A.  As a technical matter, I think that's true,
 2      although I find it -- I think it would be
 3      certainly -- I've never seen a pattern which you
 4      have black and white candidates running in
 5      elections and black voters are voting -- always
 6      voting cohesively for the white candidate in
 7      opposition to the black candidate, but certainly
 8      the basic definition doesn't necessarily
 9      prohibit that possibility, but it certainly I
10      think would be something of interest if that is
11      what were taking place.  I've never seen that
12      fact pattern.
13   Q.  All right.  So when I refer to the demonstration
14      area throughout this deposition, will you
15      understand that I'm referring to the 12 counties
16      that form part of one or more of plaintiffs'
17      demonstration districts?
18   A.  Yes, my understanding and I'm accepting that as
19      defined in Dr. Collingwood's report.
20   Q.  Okay.
21   A.  It's different than Dr. Barreto's area of
22      interest, but I'm accepting Dr. Collingwood's
23      set of counties as the counties that contain the
24      two senate districts of interest.
25   Q.  All right.  And I may sometimes refer to the
```

46

```
 1      what that means, but I think you earlier talked
 2      about or you asked me if black voters were
 3      politically cohesive.  They are.  If white
 4      voters are politically cohesive, I don't think
 5      that's sufficient to meet the definition of
 6      legally significant white bloc voting or white
 7      voters simply being politically cohesive in my
 8      view doesn't mean that.  I understand there are
 9      different views about that, and I find that at
10      least some of the arguments against that
11      position are at least partially persuasive, but
12      I think my view is that legally significant
13      white bloc voting involves discriminatory voting
14      on the part of white voters while both they're
15      voting cohesively, especially as a bloc to
16      defeat the candidate that minority voters are
17      supporting cohesively and that some part of that
18      behavior can be connected to discrimination on
19      the part of voters.
20   Q.  Okay.  Are you planning to express any opinions
21      about other aspects of the VRA besides Gingles
22      Preconditions 2 and 3?
23   A.  I assume that this also entangles us in the
24      other sort of priority Zimmer factors or Senate
25      factors.  So certainly Senate Factor 2 seems to
```

48

12  (Pages 45 to 48)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 13 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  be weirdly duplicative of Gingles 2 and 3 which
2  is the question of whether there's racially
3  polarized voting. That I think is what
4  generates the question of whether this is a
5  Gingles 3 issue or a totality of circumstances,
6  this Zimmer or Senate Factor 2 issue.
7      I guess tangentially, the other -- the
8  other factor that's often cited as the keystone
9  factor is the issue about the election of
10 members of the racial minority to take office.
11 Q.  Does your report contain any analysis of a
12     question about the election of members of the
13     racial minority to office?
14 A.  I don't believe -- not directly, no, it does
15     not.
16 Q.  Do you know the approximate BVAP percentage for
17     Senate Districts 1 and 2?
18 A.  Off the top of my head, no.
19 Q.  Do you have a ballpark?
20 A.  I certainly have seen it at various times, but
21     given the number of other districts I've looked
22     at in the last 48 hours, I'm not going to -- I'm
23     not going to hazard a guess.
24 Q.  Fair enough. All right.
25      So Dr. Collingwood's EI analysis

49

1  focused on statewide elections from 2016, 2018,
2  2020, and 2022, correct?
3  A.  Correct.
4  Q.  And your report does not criticize his choice of
5      elections, correct?
6  A.  Correct.
7  Q.  And as we've discussed, he analyzed racially
8      polarized voting in the demonstration area as
9      well as Senate Districts 1 and 2 and also
10     statewide, correct?
11 A.  That's my recollection, yes.
12 Q.  And your report does not criticize his choice of
13     regions to focus on, correct?
14 A.  Correct.
15 Q.  Do you agree that elections in the demonstration
16     area and in Districts 1 and 2 are highly
17     polarized based on the race of the voter?
18      ATTORNEY McKNIGHT:  Objection; form.
19      THE WITNESS:  Well, yeah, I'm not sure.
20     Let's see. So black voters are voting very
21     cohesively. White voters less cohesively. I
22     mean, it's -- obviously, there's strong
23     differences in how those two groups are voting.
24      I guess I'm a little -- the adjectives
25     always concern me a little bit. Highly

50

1  polarized. Certainly if white voters were
2  voting with the same levels of cohesion as black
3  voters, then I think it would be fair to say it
4  was highly polarized.
5      The crossover voting varies in some of
6  these elections and obviously varies a bit
7  across geography, so I think the two groups are
8  voting very differently. I think you wouldn't
9  be improper to characterize that as some degree
10 polarized, but whether it's highly polarized or
11 not, I'm not sure.
12 BY ATTORNEY THEODORE:
13 Q.  All right. I'm going to transmit in the chat
14     what I'm going to mark as Exhibit 2, which is
15     Dr. Collingwood's expert report.
16      ATTORNEY McKNIGHT:  Elisabeth, if I
17     might, we've been going a little over an hour.
18     If we take a break now, this will give me an
19     opportunity to print a paper copy.
20      ATTORNEY THEODORE:  Sure. You want to
21     take a ten-minute break, five-minute break,
22     however long you want.
23      ATTORNEY McKNIGHT:  Sure. We'll try to
24     be back here -- we'll endeavor for five, you
25     know, maybe a few minutes after.

51

1      (Brief Recess:  11:07 to 11:17 a.m.)
2      (WHEREUPON, Plaintiff's Exhibit 2 was
3     marked for identification.)
4  BY ATTORNEY THEODORE:
5  Q.  Okay. So let's turn to page 9 of
6      Dr. Collingwood's report, which I've marked as
7      Exhibit 2.
8  A.  Yes.
9  Q.  Okay. You see Figure 2 there which is his RPV
10     results for Senate District 1. Do you see that?
11 A.  Yes.
12 Q.  All right. And Dr. Collingwood finds that black
13     voters in Senate District 1 supported the black
14     preferred candidate at average rates of
15     94 percent in 2022 and 97 or 98 percent in 2016,
16     2018, and 2020, correct?
17 A.  Correct.
18 Q.  Let's turn to Figure 3 on page 10.
19      This is the same chart for District 2,
20     correct?
21 A.  Correct.
22 Q.  And Dr. Collingwood finds that black voters
23     supported the black preferred candidate at
24     average rates of 98 percent or 99 percent in all
25     four election years in District 2, correct?

52

13 (Pages 49 to 52)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 14 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

A. Correct.

Q. All right. And let's turn to Figure 4 on page 11. I'm sorry. It's on page 12.

A. Yes.

Q. All right. Same plot for the demonstration area, correct?

A. That is correct.

Q. And Dr. Collingwood finds that black voters supported the black preferred candidate at average rates of 98 percent or 99 percent in all four election years in the demonstration area, correct?

A. Correct.

Q. You agree that these results show that black voters are extremely politically cohesive?

A. Yes.

Q. Okay. And you've worked on a lot of VRA cases. Do you routinely see black voters in large areas supporting black preferred candidates at rates of 98 percent and 99 percent?

A. I would say, you know, we're obviously subject to the fact that we're doing an ecological inference, and I would say almost always in partisan elections black voters will be -- have

53

cohesion levels -- well, typically be 95 percent and up. And I don't think given the methodology that makes a lot of sense to distinguish 95 percent from, say, 98 percent.

And I don't think we need to substantively -- or I guess when voting cohesion is at or above 95 percent, that's very cohesive voting behavior. So I'm not sure that you would necessarily see maybe 98 percent as an estimate, but that can reflect a lot of things that make it easier or harder to do the analysis.

So I don't make much of the fact that it's 98 percent versus 95 percent, but I would say in partisan elections, almost always black voting is in the range of 95 percent or more in terms of cohesion.

Q. Okay.

A. So these are well within the area that you would expect to see for black voting in a partisan election.

Q. Okay. One of the reasons -- well, do you agree with this statement that one of the reasons it's easier to do EI analysis in North Carolina is that the State Board of Elections includes information about the race of the voters in the

54

election results?

A. Yes. Because you have registration by race in North Carolina, they can include that and do include that in the analysis.

So other states where you don't have registration by race, they can't include it and don't include it. So I guess it's a technical issue, but the fact that you have a race question, ethnicity question on the voter registration is what allows this to be reported. And, yes, it is -- it makes -- it improves the quality of the analysis because you're not simultaneously estimating turnout and vote direction, you're estimating only vote direction.

Q. Okay. The RPV results that you independently calculated in your appendix also show that black voters are highly politically cohesive, correct?

A. Correct.

Q. And that's across all elections and all years that you considered?

A. Generally speaking, yes. For the partisan elections, yes, that's true.

Q. Okay. You've stated previously that you believe that 75 percent is a good standard for

55

determining whether white voters are voting cohesively; is that right?

A. It is -- I don't -- I don't even know what the standard should be, quite frankly. I think the court should enunciate a standard. I'm a strong backer of -- disputes about whether Gingles 1 is met or not met have been largely put to bed by the court saying it means 50 percent plus 1 citizen voting age population, bright-line test. Even with that, it continues to be -- as recently as my Spring Branch case continues to be disputed, but at least there's a bright-line test.

And what I see in my experience over the last 40 years is basically all over the map from essentially no cohesion to perfect cohesion being described as satisfying Gingles 2. So I would like to have some standard.

And I will say I'm offering 75 percent only because it is the only non-arbitrary cutoff. So the mathematical sense, 75 percent is a non-arbitrary halfway point between absolute cohesion and perfect cohesion. Obviously, it wouldn't matter here because you're so close to perfect cohesion that I think

56

14 (Pages 53 to 56)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 15 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

anybody would describe that as highly cohesive
voting and it would satisfy I think any test
that you might propose, but, you know, whether
the court wants to go with 80 percent or
90 percent or 60 percent, it just would be
helpful if the court would choose a point.
        And all I'm pointing out is that
60 percent I think is very low threshold for
defining cohesion.  It also is arbitrary.
80 percent might be a more reasonable threshold,
but it is still arbitrary.  75 percent is not
arbitrary.

Q.  Okay.  And you've said before that 75 percent is
the standard that you have applied for judging
whether white voters are voting cohesively,
correct?

A.  I think it's a way of, again, absolute actual
standard.  What we're really doing here is
simply reporting a continuous variable and
leaving it up to the court to figure out what to
do with it.  So I guess I'm reluctant to put
categories or descriptors on cohesion.
        There is no, as I understand it, a
court standard for what it is that makes
something legally cohesive or legally not

57

cohesive for Gingles 2.  So again, I think
75 percent -- at least with 75 percent you can
say that puts you in a range where if you move
above that, you're moving into a range where
voters are more cohesive than not, and below
that you're moving into a range where they're
less cohesive.

Q.  Okay.  Bear with me for one moment.  All right.
        I am going to transmit in the chat and
mark as Exhibit 3 a document which is your
deposition in the case of Mississippi State
Conference of the NAACP versus State Board of
Election Commissioners.
        (WHEREUPON, Plaintiff's Exhibit 3 was
marked for identification.)

BY ATTORNEY THEODORE:

Q.  Do you see that?

A.  We're bringing it up.  All right.  We've got it.

Q.  Thank you.
        You recognize that as your deposition
in that case?

A.  It seems so long ago, but, yes, it looks like my
deposition.

Q.  It was taken in December 2023; is that right?

A.  Yeah, a lifetime ago.  You're right.

58

Q.  All right.  Can you flip to page 94, please.

A.  I do remember this deposition now.  The lawyer
sent me out to the best steak dinner in my
lifetime after this deposition.  That's the part
I remember.  Man, that was a good dinner.

Q.  All right.  Well, I'm going to direct you to a
less memorable part.
        And you see there on line 18 you say:
        "75 percent is just the standard
        for judging whether either black or
        white voters are voting cohesively."
        Did I read that correctly?

A.  Could I -- I just want to understand the -- sort
of the context of this questioning starts
earlier.
        Yeah.  So again, at least as I
understand it, what I'm saying here is, you
know, 75 percent is a non-arbitrary threshold,
and if you apply that, then you can say these
things are above 75 percent and these are below
75 percent.
        I don't take that to mean -- to answer
the question of whether you've met Gingles 2 or
not, but I think it would be at least a
non-arbitrary way of doing that.

59

Q.  So you say there "75 percent is just the
standard for judging whether either black or
white voters are voting cohesively," and I'm
just asking did I read that correctly?

A.  Yes.  And so I'm just commenting on in terms of
the material that they're discussing -- that we
were discussing at that point which was just
sort of using -- understanding that that's a
potential standard and then just applying that
to do a sort of a checkbox for -- for whether
black or white voters are voting cohesively.  So
that -- of course, the cohesion is the Gingles 2
test, not the Gingles 3 test.  White voter
cohesion would be important if the case was
being brought by white voters.
        So I testified in a case in Louisiana
which white voters were suing under the
Voting Rights Act to get a single-member
district, and there the issue would have been
white voter cohesion.  I would assume you would
want to apply the same standard, but Gingles 3
is not a test to whether white voters are
cohesive.

Q.  So just to be clear, 75 percent is a standard
that you applied in the Mississippi case to

60

1  assess whether black or white voters are voting
2  cohesively, correct?
3          ATTORNEY McKNIGHT:  Objection; form.
4          THE WITNESS:  I would say to report in
5  a summary fashion whether they were cohesive or
6  not.
7  BY ATTORNEY THEODORE:
8  Q.  All right.  You said that whether white voters
9      are voting cohesively is not relevant to
10     Gingles 3.
11         Do you regard -- well, let me strike
12     that.
13         Putting aside the term legally
14     significant, do you regard the term white bloc
15     voting as any different than white voters voting
16     cohesively?
17 A.  Yes.
18 Q.  Can you explain how you regard those two things
19     as different?
20 A.  Well, again, maybe they're not meant to refer to
21     anything different, but at least my view is that
22     that term is applied -- right, so we don't say
23     that Gingles 2 -- the question in Gingles 2 is
24     black bloc voting when we talk about there the
25     level of cohesion.  And having established that

61

1          THE WITNESS:  So, yeah, it will depend
2  on a whole host of things, and at least I try to
3  think of sort of what the motivation of the
4  Gingles factors are because I think that's
5  really what these cases are about.  And what
6  motivates Gingles 3 is to understand
7  whether -- so when you think about what 1 and 2
8  established, 1 established that you have a more
9  than 50 percent of the eligible population will
10 be minority and Gingles 2 establishes that
11 they're voting cohesively, and so what's
12 stopping them from prevailing, and the answer is
13 potentially it is white bloc voting.  And if
14 that's the case, then what you've established is
15 if instead you tally the votes up in a district
16 that was 50 percent plus 1 minority, minority
17 voters would prevail.  So it's the interaction
18 of all three of those things that leads to the
19 utility of the Gingles test.
20         And so what you should -- what you're
21 effectively evaluating Gingles 3 is whether the
22 conditions exist that would allow black voters
23 to prevail in a majority district but would not
24 allow them to prevail absent that majority.
25 BY ATTORNEY THEODORE:

63

1  black voters are cohesive, we then ask the
2  question about whether white voters are voting
3  as a bloc to defeat the choice -- the cohesively
4  preferred choice of minority voters.
5          So certainly, obviously, part of
6  that -- part of that question would be the
7  degree of cohesion that you see among white
8  voters, but there the -- at least as I
9  understand it, we're talking about that level of
10 voting defined specifically in context with the
11 level of cohesion that we have already met in
12 Gingles 2 for minority voters.
13         So I say that white bloc voting is a
14 contingent question that's related to Gingles 2,
15 and Gingles 2 is obviously not a contingent
16 question because it's not contingent on
17 Gingles 1 and it can't be contingent on
18 Gingles 3.
19 Q.  And so whether white bloc voting for Gingles 3
20     is sufficient to usually defeat the preferred
21     candidate of minority voters would depend on
22     things like the minority population in the
23     district and the degree of minority cohesive
24     voting; is that correct?
25         ATTORNEY McKNIGHT:  Objection; form.

62

1  Q.  All right.  Let's flip to Figure 16 on page 29
2      of Dr. Collingwood's report.  I'm sorry.  Let's
3      flip to Figure 15 on page 28.
4  A.  Yes.
5  Q.  And this is Dr. Collingwood's RPV results for
6      elections in 2022 in Districts 1 and 2, correct?
7  A.  Yes.
8  Q.  And using a 75 percent standard, we see cohesive
9      white voting in all seven contests in 2022 in
10     Districts 1 and 2, correct?
11 A.  That is correct.
12 Q.  Okay.  Let's flip to Figure 16 on page 29.
13         And this is the same as Figure 15 but
14     in the demonstration area, correct?
15 A.  Correct.
16 Q.  All right.  And using this 75 percent standard,
17     we see cohesive white voting in all seven
18     contests in 2022 in the demonstration area,
19     correct?
20 A.  Yes.
21 Q.  All right.  Let's flip to Figure 18 on page 31.
22         This is the same chart for Districts 1
23     and 2 using the 2020 races?
24 A.  Yes.
25 Q.  All right.  And using the 75 percent standard,

64

16 (Pages 61 to 64)

1  we see cohesive white voting in all 20 contests
2  in 2020 in Districts 1 and 2?
3  A.  It's a little hard to read.  I really don't like
4  these -- I'll just say I'm no fan of bar charts
5  when they're not necessary.  I would much rather
6  see this in a table, but I'm seeing 25-2; 27-2;
7  28-2; 26-7; 26-1; 29-1; 25-6; 28-4, unless I'm
8  reading the wrong numbers here.
9  Q.  I'm sorry.  I'm not sure what you're referring
10  to.  We're on page 31, Figure 18.
11  A.  I'm sorry.  I thought we were on page 30.
12  Q.  No.  I think page 30 is statewide.
13      Page 31, Figure 18.
14      Using the 75 percent standard, we see
15  cohesive white voting in all 20 contests in 2020
16  in Districts 1 and 2, correct?
17  A.  Correct.
18  Q.  Let's flip to Figure 19 on page 32.
19      Using the 75 percent standard, we see
20  cohesive white voting in all 20 contests in 2020
21  in the demonstration area, correct?
22  A.  Correct.
23  Q.  Let's flip to Figure 22 on page 35.
24  A.  Okay.
25  Q.  All right.  And using this 75 percent standard,

65

1  again, you know, if you want to split hairs, you
2  round this and it goes to 75 and then the
3  standard of cohesion is above 75.  That's not
4  above 75, it's at 75, just like Gingles 1 is not
5  at 50 percent, it's above 50 percent.  So you
6  can split hairs about it, but the point is, we
7  don't actually know that number within a degree
8  of accuracy to talk about it that way.
9      So, you know, these are -- all these
10  are very close to -- or indistinguishable from
11  values that would be slightly above 75 percent
12  or slightly below 75 percent.  So I would say
13  that's -- they show what they show.  The
14  cohesion is hovering somewhere around
15  75 percent.
16  Q.  All right.  Let's turn to Figure 24 on page 36.
17  I'm sorry.  Let's turn to -- we're going to
18  Figure 24 on page 37.
19  A.  Yes.
20  Q.  Okay.  And this is the RPV results in 2018 in
21  the demonstration area; is that right?
22  A.  That is correct.
23  Q.  All right.  And using the 75 percent standard,
24  we see cohesive white voting in all four
25  contests in 2018 in the demonstration area; is

67

1  we see cohesive white voting in all four
2  contests in 2018 in District 2, correct?
3  A.  Correct.
4  Q.  All right.  And using the 75 percent standard,
5  we see cohesive white voting in three of the
6  four contests in 2018 in District 1?
7  A.  I'm seeing two of the four.  I see 26-2 and a
8  25-2 at the first and last contest.
9  Q.  Okay.  And you see for that last contest it's
10  74.8 percent, right?  You wouldn't round that to
11  75 percent?
12  A.  Well, yeah, I'm fine with rounding it or not
13  rounding it.  I don't think -- we don't know
14  whether this is above or below 75 percent, but
15  it's around 75 percent, so you can count one way
16  or the other.
17  Q.  And you round in your -- the charts you present
18  in your report all round -- don't include
19  decimals, correct?
20  A.  We don't -- we don't have decimal accuracy here.
21  Q.  Right.  And so in every single chart of EI
22  estimates from your report, you round to the
23  nearest integer, correct, without a decimal
24  point?
25  A.  Yes.  I'm perfectly find with rounding, but

66

1  that right?
2  A.  Correct.
3  Q.  All right.  And for 2016 there's a little bit
4  more variation, so let's flip to Figure 2 on
5  page 9.
6  A.  Okay.
7  Q.  All right.  And here we see cohesive white
8  voting in Senate District 1 in 2016 on average
9  at the 74 percent level; is that right?
10  A.  I guess -- so you're saying on average?
11  Q.  Yeah.  The average level of white voting against
12  the black preferred candidate or white voting
13  for the non-black preferred candidate is
14  74 percent across the 2016 contests in
15  Senate District 1; is that correct?
16      ATTORNEY McKNIGHT:  Objection; form.
17      THE WITNESS:  Yeah.  So I'm assuming
18  that we're looking at that 25.92, so we're going
19  to round.  So, yes, 74 percent.
20  BY ATTORNEY THEODORE:
21  Q.  All right.  Next figure is Figure 3 on page 10.
22      And do you agree that this is showing
23  cohesive white voting in Senate District 2 in
24  the 2016 contests on average at above the
25  75 percent level, correct?

68

17  (Pages 65 to 68)
Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 18 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  ATTORNEY McKNIGHT: Objection; form.
2  THE WITNESS: Yes. So again,
3  obviously, there are elections here where
4  there's not the case and there are elections
5  where that would be the case, and on average you
6  would be at above 75 percent.
7  BY ATTORNEY THEODORE:
8  Q. And then let's turn to Figure 4 on page 11.
9  A. 12.
10  Q. 12. I'm sorry. Thank you.
11  And here we're -- those figures show
12  that there's cohesive white voting in the
13  demonstration area in 2016 on average at above
14  the 75 percent level, correct?
15  A. Yes. And again, there are numerous elections
16  that are above that and elections below that,
17  and on average it's 21 percent or 79 percent.
18  Q. And you're not disputing, considering all of
19  these elections and years, that voting in the
20  relevant regions is polarized based on the race
21  of the voter; is that right?
22  ATTORNEY McKNIGHT: Objection; form.
23  THE WITNESS: Again, I think the level
24  of white cohesion is obviously not as high as
25  the level of black cohesion, so certainly black

69

1  cohesion is sufficient to be polarized on the
2  basis of the voter group. And I think it's less
3  clear in terms of white cohesion whether
4  you -- how exactly you characterize that level
5  of difference. So you've got, you know, sort of
6  across all this something like 20 to 25,
7  30 percent of white voters crossing over. I
8  guess I'm not -- I'm not sure that that -- what
9  the legal importance of that is, but just in
10  terms of talking about polar opposites, they're
11  not polar opposites because the cohesion level
12  of white voters is not in the same region as the
13  cohesion level for black voters.
14  BY ATTORNEY THEODORE:
15  Q. You said across all of this you have something
16  like 30 percent of white voters crossing over.
17  What's the basis for that?
18  A. Yes, in the range of 20 to 30 percent.
19  Q. In fact, it's in the range of about 11 to
20  30 percent, correct?
21  Let's turn to page 12, Figure 4.
22  ATTORNEY McKNIGHT: Objection.
23  ATTORNEY THEODORE: I'm sorry.
24  ATTORNEY McKNIGHT: Pardon me. I
25  thought you had finished, Elisabeth. Go ahead.

70

1  BY ATTORNEY THEODORE:
2  Q. In the demonstration area in 2022, you see
3  whites crossing over only at a rate of
4  11.6 percent, correct?
5  ATTORNEY McKNIGHT: Objection; form.
6  THE WITNESS: Yes. So there in 2022,
7  it would be something in the range of 10 to
8  15 percent; 10 to 20 percent in 2020; 10 to
9  20 percent in 2018; and something like 15 to
10  30 percent in 2016.
11  BY ATTORNEY THEODORE:
12  Q. Okay.
13  A. We've gone through a lot of tables here, and
14  most of those tables we were looking at results
15  that were just above or just below 75, so lots
16  of things in the 20s, some things above 25, so
17  there's a lot of variation here. And we don't
18  see -- in any of the contests, we don't see the
19  level of cohesion we see among black voters.
20  Q. Are you disputing in this case that white voters
21  vote sufficiently as a bloc to enable them
22  usually to defeat the minority's preferred
23  candidate in Senate District 1 and
24  Senate District 2?
25  ATTORNEY McKNIGHT: Objection; form.

71

1  THE WITNESS: No, I'm not.
2  BY ATTORNEY THEODORE:
3  Q. If one were to accept that the cause of racially
4  polarized voting is not relevant to the
5  Gingles 3 condition, would you have any basis to
6  dispute that the Gingles 3 precondition is
7  satisfied in this case?
8  ATTORNEY McKNIGHT: Objection; form.
9  THE WITNESS: I guess I want to be
10  careful because we're stepping into a very
11  difficult area when you use the word cause, and
12  I don't think that's -- I don't believe that's
13  really what we're talking about here.
14  So I would say -- my view is that the
15  evidence provided here does not -- is
16  not -- does not support the view that there is
17  legally significant racially polarized voting in
18  particular, that you have white bloc voting that
19  acts to defeat black preferred candidates in a
20  way that interacts to some degree with
21  discrimination, however you want to characterize
22  that.
23  So I don't think -- we don't have the
24  tools to demonstrate causation in general. We
25  certainly don't in any of this analysis. So I

72

18  (Pages 69 to 72)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 19 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1　think -- in my report I've indicated how I would
2　characterize the results.
3　　　　Again, Dr. Collingwood and I are not
4　disagreeing about the numbers, but in these
5　partisan contests, the analysis simply doesn't
6　indicate that these -- that this degree of
7　separation or the result in terms of election
8　results is connected to race in a way that I
9　think it would have to be to meet the standard
10　for legally significant white bloc voting.
11　BY ATTORNEY THEODORE:
12　Q.　All right.　In order to accept that the
13　existence or not of discrimination by white
14　voters is not relevant to the Gingles 3
15　precondition, would you have any basis to
16　dispute that the Gingles 3 precondition is
17　satisfied in this case?
18　　　　ATTORNEY McKNIGHT:　Objection; form.
19　　　　THE WITNESS:　So to make clear, I don't
20　agree with that.　I've seen that repeated and it
21　continues to be repeated.　Dr. Collingwood
22　repeats it.　I don't think there's any basis for
23　that.　I've discussed this with other experts.
24　　　　So if in fact it makes absolutely no
25　difference, it's not a part of legally

73

1　significant voting, then all you need to
2　establish is -- as Dr. Collingwood says all you
3　need to establish is that blacks and whites vote
4　differently, then that's been established here.
5　BY ATTORNEY THEODORE:
6　Q.　All right.　Let me just repeat -- I appreciate
7　that you don't agree with this, but if one were
8　to accept that the existence or not of
9　discrimination by white voters isn't relevant to
10　the Gingles 3 precondition, would you have any
11　basis to dispute that the Gingles 3 precondition
12　is satisfied in this case?
13　　　　ATTORNEY McKNIGHT:　Objection; form.
14　　　　THE WITNESS:　Again, being clear that I
15　don't believe it's satisfied, you're correctly
16　identifying the key thing that I think needs to
17　be done to satisfy that.　And absent that, if
18　you simply look at the degree of difference
19　between the voting groups, then that has been
20　met here.
21　BY ATTORNEY THEODORE:
22　Q.　I'm just going to ask you again because I think
23　it's a pretty simple question.　And I understand
24　that you don't agree with the premise, but if
25　one were to accept the existence or not of

74

1　discrimination by white voters isn't relevant to
2　the Gingles 3 precondition, would you have any
3　basis to dispute that the Gingles 3 precondition
4　is satisfied in this case?
5　　　　ATTORNEY McKNIGHT:　Objection; form.
6　　　　THE WITNESS:　I just want to make sure
7　that we're not -- we talk about discrimination.
8　I'm not sure how to characterize what it is that
9　I think is important there, but I think if in
10　fact it doesn't matter whether this voting
11　is -- whether this polarization is racial or
12　partisan, then I would agree that that has been
13　met.
14　BY ATTORNEY THEODORE:
15　Q.　Okay.　And when you say if one were to accept
16　that it doesn't matter whether this voting is
17　racial or partisan, you mean if it doesn't
18　matter whether this voting is based on the race
19　of the candidate or the party affiliation of the
20　candidate, correct?
21　　　　ATTORNEY McKNIGHT:　Objection; form.
22　　　　THE WITNESS:　It's not about whether
23　it's based on the race of the candidate.　It
24　is -- has to do with whether there's any
25　evidence provided here that there's anything

75

1　other than partisan polarized voting.
2　　　　My view, you don't meet Gingles 3
3　without some evidence that there is something
4　going on here that is not just partisan voting
5　or policy voting or, you know, preference
6　voting.　I don't think there is -- that you can
7　divorce that from this, but if you -- you know,
8　if you want to -- if you want to make that the
9　legal position that we divorce that from
10　anything to do with what might explain this, in
11　this case, Dr. Collingwood's analysis shows that
12　there is partisan polarized voting.　He doesn't
13　show anything more than that in the results.
14　And so if that's enough to meet the standard, it
15　meets the standard.　If it's not, then it
16　doesn't.
17　　　　I'm not disputing that this is a
18　sufficient separation in voting behavior on the
19　basis of the partisan elections to fit that sort
20　of basic fact pattern you've been talking about.
21　So if that's -- if the demonstration of partisan
22　polarized voting is sufficient to meet
23　Gingles 3, then you've met Gingles 3 here.
24　BY ATTORNEY THEODORE:
25　Q.　Is your view that for Gingles 3 it's important

76

19　(Pages 73 to 76)

Case 4:23-cv-00193-D-RN　　Document 127-2　　Filed 03/24/25　　Page 20 of 104
DISCOVERY COURT REPORTERS　　www.discoverydepo.com　　1-919-424-8242

1    to show that white voters are voting in an
2    intentionally discriminatory manner?  Is that
3    your view?
4    A.  No.
5    Q.  So when you say discriminatory, what do you
6    mean?
7    A.  I'm not exactly sure what we mean there.  All
8        I'm trying to distinguish is that the court
9        going as far as I know through the entire
10       history of litigation on Section 2 and certainly
11       clearly in the Gingles decision which is where
12       this idea of one group voting differently from
13       another sufficient comes from, the court has
14       consistently held that this has to be a voting
15       pattern that interacts with whether it's
16       discrimination or animosity, something, it has
17       to interact with race some way beyond just being
18       an expression of partisan differences, policy
19       differences, geographic preferences.
20           It's true that's why the majority of
21       the court in the Gingles decision did not agree
22       with Brennan's -- Brennan's proposing exactly
23       the standard you're proposing, and the majority
24       of the court disagreed with it.  And as far as I
25       can tell, that was -- that reflects both the

                                                    77

1    cases prior to Gingles and is reflected in cases
2    after Gingles.  And so if that is the standard,
3    then you need to show that there is some
4    connection beyond simply partisan or policy
5    differences, that is, that having partisan or
6    policy -- partisan preferences among white or
7    black voters equally situated doesn't rise to
8    the level of a violation of the
9    Voting Rights Act.
10   Q.  All right.  Bring back to the results,
11       Dr. Collingwood's results show that racially
12       polarized voting is higher in the demonstration
13       area across all four election years than in
14       Senate District 1 and 2, correct?
15           ATTORNEY McKNIGHT:  Objection; form.
16           THE WITNESS:  Again, it looks like
17       there's less white crossover voting in the
18       demonstration area.  I think that would be
19       correct compared to, say, just statewide, for
20       example.
21   BY ATTORNEY THEODORE:
22   Q.  And less white crossover voting in the
23       demonstration area compared to Senate District 1
24       and 2, correct?
25           ATTORNEY McKNIGHT:  Objection; form.

                                                    78

1            THE WITNESS:  I think that's -- yeah, I
2        believe that's correct.
3    BY ATTORNEY THEODORE:
4    Q.  And your results show that as well?
5    A.  My results -- yeah, I think they would show that
6        as well.  Again, I'm not using my results for my
7        report, but they're in the report and I think
8        they would show the same thing.  They should.
9    Q.  Okay.  And Dr. Collingwood's results show that
10       racially polarized voting is higher in the
11       demonstration area and in Senate Districts 1 and
12       2 than it is across the state as a whole,
13       correct?
14           ATTORNEY McKNIGHT:  Objection; form.
15           THE WITNESS:  Again, I just want to
16       make sure -- so the level of partisan
17       polarization is higher statewide than it is in
18       the two senate districts and higher in the two
19       senate districts -- or higher in the
20       demonstration area than in the two senate
21       districts.  So, yes, there's less -- there's
22       less political polarization statewide than there
23       is in the senate districts and -- yeah.
24           So again, I just want to be careful
25       because I'm not saying that that is legally

                                                    79

1    significant racially polarized voting.
2    BY ATTORNEY THEODORE:
3    Q.  All right.  Let me help you out and then ask the
4        question using the term white crossover voting.
5            Dr. Collingwood's results show that
6        white crossover voting is lower in the
7        demonstration area and in Senate Districts 1 and
8        2 than it is across the state as a whole?
9            ATTORNEY McKNIGHT:  Objection to form.
10           THE WITNESS:  Correct.
11   BY ATTORNEY THEODORE:
12   Q.  And that's true across all four years?
13           ATTORNEY McKNIGHT:  Same objection.
14       Go ahead.
15           THE WITNESS:  I'm going -- this is not
16       a comparison I've directly made, but I think
17       that would be true.
18   BY ATTORNEY THEODORE:
19   Q.  Okay.  You agree that an analysis of racially
20       polarized voting and white crossover voting
21       needs to be localized, correct?
22           ATTORNEY McKNIGHT:  Objection; form.
23           THE WITNESS:  I mean, I think it's
24       useful to have a localized analysis.  I don't
25       think it's always possible to have one or if

                                                    80

                                        20  (Pages 77 to 80)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 21 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com         1-919-424-8242

1    it's -- I'm not sure it's necessary to have one,
2    but certainly localized in the sense that you're
3    in the jurisdiction you're talking about
4    certainly helpful, and I think where possible
5    the inquiry should be local rather than global.
6          So I don't think I disagree, but I
7    don't think it -- sometimes it just isn't
8    possible to localize it and so you work in an
9    area that's maybe larger than say, for example,
10   a challenged district in a single-member
11   district system may not be any way of doing
12   that.  So I don't think it has to be, but I
13   think it's probably preferable if the analysis
14   can be done to some level of reliability.
15   BY ATTORNEY THEODORE:
16   Q.   Okay.  And you agree that levels of white bloc
17        voting might be different in different parts of
18        a state, correct?
19   A.   Yes.
20   Q.   And you agree that levels of white crossover
21        voting might be different in different parts of
22        a state, correct?
23   A.   Yes, that's correct.
24   Q.   And you agree that levels of white bloc voting
25        might be different in -- even in neighboring

                                                    81

1    counties or neighboring districts, correct?
2    A.   Yes.  That's not -- in my experience, that's not
3         at all uncommon.
4    Q.   Not at all uncommon?
5    A.   Correct.
6    Q.   Okay.  And same is true for levels of white
7         crossover voting?
8    A.   Yes.
9    Q.   Okay.  And because levels of white bloc voting
10        or white crossover voting differ in different
11        regions of a state, would you agree that the
12        possibility that one district can elect black
13        preferred candidates at a particular BVAP
14        percentage does not indicate that a differently
15        composed district would be able to elect black
16        preferred candidates at a particular BVAP
17        percentage?
18             ATTORNEY McKNIGHT:  Objection; form.
19             Go ahead.
20             THE WITNESS:  The ability to elect is
21        just an issue of the Democratic proportion of
22        vote in the district, and so in different areas,
23        different -- you'll have variation -- you'll
24        have fairly little variation in the proportion
25        of blacks that are voting Democratic, but

                                                    82

1    compared to rural, for example, there's a large
2    variation in the portion of white voters voting
3    Democratic.
4          And since the district's performance is
5    just an issue of whether the district is a
6    Democratic district or not, then what it takes
7    to create a Democratic district out of a mix of
8    black and white voters is going to depend on
9    their relative proportion of Democratic voters
10   and that will vary from one part of the state to
11   another.
12   BY ATTORNEY THEODORE:
13   Q.   Okay.  So to determine whether a particular
14        district is going to perform, you need to
15        consider the level of white crossover voting in
16        that particular district in particular.  Is that
17        fair?
18   A.   I mean, that's one way of looking at it.  I
19        mean, you need to -- you need to assess whether
20        the district is going to be a majority
21        Democratic district.  If it is, then it will
22        perform, and if it isn't, it will not perform by
23        your definition of performance.
24             So you can think a lot of different
25        ways of looking at that, but that's -- the

                                                    83

1    question is ultimately not about white crossover
2    voting per se, it's just about the level of
3    the -- the net level of Democratic voting in the
4    district.  That's the only indicator here of
5    so-called performance of the district is just
6    whether the district is a majority Republican
7    district or a majority Democratic district.
8    Q.   Okay.  And because white crossover voting may
9         differ between districts that are differently
10        composed, even districts that are near each
11        other that are differently composed, you need to
12        look at the particular district to determine
13        whether that district will perform.  Is that
14        fair?
15             ATTORNEY McKNIGHT:  Objection; form.
16             THE WITNESS:  I think it's the case
17        that two adjacent similar districts on a variety
18        of measures will perform -- may perform
19        differently depending, again, on the
20        proportion whether the district is majority
21        Democratic or majority Republican.
22             So two districts can be side by side
23        and one can be majority Democratic and the other
24        majority Republican and one of those will
25        perform and the other one won't.

                                                    84

                              21  (Pages 81 to 84)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 22 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

BY ATTORNEY THEODORE:
Q. And would anything about that answer change if
you were considering two districts that had
overlapping populations but not identical
populations?
    ATTORNEY McKNIGHT: Same objection.
    THE WITNESS: Again, if we're just
talking about what's possible, obviously, it
would depend on the nature of the overlap, but
it is possible for two districts with
overlapping population, for one of those
districts to be a Republican district and one to
be a Democratic district and that would make
them perform differently.
BY ATTORNEY THEODORE:
Q. All right. Do you believe that in analyzing
racially polarized voting, more recent elections
are generally more probative or relevant than
older elections?
A. I think that's generally true, yes.
Q. Let's turn to Dr. Collingwood's performance
analysis.
    Dr. Collingwood conducted a separate
analysis of the performance of certain senate
districts using the results from statewide

85

elections in 2016, 2018, 2020, and 2022,
correct?
A. That sounds correct.
Q. And he also conducted a performance analysis of
the demonstration districts offered by the
plaintiffs, correct?
A. I believe that's correct, yes.
Q. Okay. And you discussed this on page 15 of your
report, correct?
A. Correct.
Q. You're not disputing any conclusion that he
offers relating to performance analysis of any
district, correct?
    ATTORNEY McKNIGHT: Objection; form.
    THE WITNESS: I'm not sure I know
exactly what you're referring to, but I'm not
arguing with what he shows to be the Democratic
performance or the Republican performance of any
of the district.
    I will say where I did some analysis
and made an effort to make sure that we're
basically talking about the same thing with the
EI analysis, I did not replicate his BVAP
analysis, so I'm just taking it at face value.
BY ATTORNEY THEODORE:

86

Q. Okay. And you didn't replicate the performance
analysis of -- he does using statewide elections
for Senate District 1 and 2 or for any of the
demonstration districts, correct?
A. Correct.
Q. And you could have replicated that or analyzed
that, but you chose not to; is that correct?
A. That's correct.
Q. Okay. And for his performance analysis, he
focuses on statewide elections from 2016, 2018,
2020, and 2022, correct?
A. Correct.
Q. And your report does not disclose any criticism
of that choice, correct?
A. Correct.
Q. You yourself do not analyze any additional
elections for any purpose, correct?
A. That's correct.
Q. You could have but chose not to?
A. Correct.
Q. Okay. You agree that there are no endogenous
elections available for analysis in this case
because Senate Districts 1 and 2 have not been
used before in any election; is that correct?
A. No. Truly endogenous elections, general

87

elections haven't taken place in those
districts.
Q. Endogenous primary elections haven't taken place
in those districts either, correct?
A. We're talking about the -- we're talking about
the adopted districts or the demonstration
districts?
Q. The adopted districts.
A. I didn't -- I didn't look at primary elections,
so I don't know. I just know in general
elections. Obviously, the 2024 general
elections haven't taken place because I'm
teaching a course on predicting the 2024
elections.
Q. All right. But if you'll accept my
representation that there were no primaries in
these districts in 2024, that would mean there
were no endogenous elections either general or
primary or Senate Districts 1 and 2 available
for analysis, correct?
A. Yes. I'll just say the court doesn't always
focus as narrowly as they might on the notion of
endogenous elections. So some will talk about
truly or entirely or purely endogenous.
Sometimes the court treats endogenous elections

88

22 (Pages 85 to 88)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 23 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

as the type of elections, so we'd say, well, a
senate election is what we're concerned with
because this is a senate election case or a city
council election is what we're concerned with
because it's a city council case.

Truly endogenous means not just the
type of election but then if you're going to
talk about the district, it means an election
inside the district. I would say more often
than -- maybe as often as not when the court is
talking about endogenous elections, they're
actually referring to elections to the office at
issue. That's -- the usual definition is is
this the election of the office at issue rather
than some higher level election.

But technically, to be entirely the
election on all fours, it would -- you could
narrow the definition to being an election in
the actual district.

Q. All right. You've offered opinions on
performance analysis in prior cases, correct?

A. Correct.

Q. And that's sometimes also called reconstituted
election analysis, correct?

A. Correct.

89

Q. All right. And you agree that when conducting a
performance analysis or a reconstituted election
analysis of a new district using results of
prior elections, it's best to use prior
statewide exogenous elections where the race was
contested throughout the entire district?

A. That's going to be -- I would say that's
generally the case and certainly gives you the
broadest level of comparison because
you're -- you often will not be able to
cover -- not always the case, but you often will
not be able to cover the entire district if
you're dealing with something other than
statewide elections.

So I'd say that's generally the
practice, and I think it's -- I think it's a
general -- it's a generally accepted way of
doing reconstituted elections and more often
than not, that's the way it's done and the way I
would do it.

Q. Okay. And you referenced this a little bit in
your past answer.

If a prior state senate race in a prior
version of a state senate district was
uncontested in a portion of the new district,

90

the one that we're analyzing, it wouldn't be
appropriate to use that prior state senate race
for purposes of a performance analysis of the
new district.

Do you agree with that statement?

ATTORNEY McKNIGHT: Objection; form.

THE WITNESS: I mean, just throwing it
in as is, you know, I guess will depend on what
it is you're trying to assess about the
district, but -- particularly, at a minimum, I
would think you would want a footnote about that
because it does raise questions about what
you're actually comparing apples to oranges,
whatever.

So I don't know. It's not -- in my
view, that would be -- that would be something
that would suggest that you look at that result
with some caution or at least understanding what
it is the result is telling you because you
are -- and I'm not sure it depends entirely on
the election being uncontested, but you're
looking at -- when you're putting two different
elections into a -- into a district context,
there are always issues about the fact that
that's not a -- not the the -- the results don't

91

indicate what all of the voters in the -- in the
new or demonstration district doesn't indicate
they're all facing the same election
environment.

Again, that's one of the reasons why
you -- using the statewide election to avoid
that issue. I don't think it makes the purely
endogenous completely irrelevant, but certainly
something you want to be fully informed about
what it is you were comparing.

BY ATTORNEY THEODORE:

Q. Okay. Let's turn to your RPV analysis that you
conduct in your report, that you conduct with
Dr. Stevenson.

So your report includes tables
reflecting your own EI point estimates for
racially polarized voting in North Carolina
statewide in the demonstration area and in
Senate Districts 1 and 2, correct?

A. What are we looking at? I'm sorry.

Q. I'm sorry. We can flip if you want to. I think
it's the appendix of your report.

A. Yes. I want to make sure we're talking about
the appendix, not the tables.

Q. All right. So the appendix of your report

92

23 (Pages 89 to 92)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 24 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    includes tables reflecting your own EI point
2    estimates for racially polarized voting in
3    North Carolina statewide in the demonstration
4    area and in Senate Districts 1 and 2, correct?
5    A.   Correct.
6    Q.   Okay.  And you said that your colleague Randy
7         Stevenson created the code for this EI analysis;
8         is that correct?
9    A.   Yes.  So we worked together on -- we developed
10        a programming statements that did the analysis
11        the way we think is appropriate.  And they're
12        not identical to the entire program that
13        Dr. Collingwood uses and reported, but they're
14        very, very similar, and they produced very
15        similar estimate.
16   Q.   Okay.  What's the code base and the programs
17        that Dr. Stevenson uses to run your EI
18        estimates?
19   A.   So it's a combination of R code, programming R
20        code, calling the R x C routine in R to do the
21        actual EI analysis, and then some data -- some
22        of the data work is actually done in Stata to
23        get the in the data form to read into the --
24        that the R program needs to read it into the
25        R x C analysis.

93

1    Q.   And did you review Dr. Stevenson's R code before
2         he pressed the button to do the analysis?
3    A.   Yeah.  So we developed that working together
4         over 20 years of cases.  So, yes, I reviewed the
5         code.
6    Q.   Okay.  So when Dr. Stevenson presses the button
7         that outputs the EI analysis, how does the code
8         or Stata, how are the EI point estimates
9         reflected in your report appendix outputted?
10   A.   They are -- they come out as the point
11        estimates, and they're -- he provides them to me
12        in a -- sort of a tabular form in an Excel
13        spreadsheet.
14   Q.   In an Excel spreadsheet.  Okay.
15        Did you turn over that Excel
16        spreadsheet in your backup data in this case?
17   A.   I do not know.  So ultimately the Excel
18        spreadsheet -- in this case, what I asked him to
19        provide me in a spreadsheet was what you see
20        here because I'm not relying on -- my question
21        for him was to perform the analysis, tell me if
22        it's -- if we can confirm what Collingwood is
23        doing, and so he provides me this, what we see
24        here, and on that basis I decided to go with
25        Collingwood so everything I do after that is

94

1    based on Collingwood.
2         So if Collingwood -- if we were
3    analyzing elections Collingwood hadn't analyzed,
4    then what would have been provided to me in a
5    spreadsheet form would have been our results in
6    a spreadsheet form which would then come into
7    the tables in the report, but the purpose here
8    wasn't to provide me with a spreadsheet that I
9    could report for these elections but to provide
10   me with a spreadsheet that merged Collingwood's
11   output with the output coming from our analysis,
12   and that's what you see here.
13        So this is what I -- this is what was
14   provided to me because that's the question I
15   asked Dr. Stevenson to address.
16        If we had added an election, then he
17   would have provided a different spreadsheet, a
18   spreadsheet of the results of our results that I
19   would be using in the report.
20   Q.   And by what you see here, you're referring to
21        the tables in your Appendix A, correct?
22        Dr. Alford, did you hear the question?
23   A.   I thought I said correct.  Sorry.
24   Q.   Okay.  Great.
25        Okay.  So Dr. Stevenson -- so the

95

1    results of your code come in a spreadsheet form
2    that would have just included your results, not
3    Dr. Collingwood's results, correct?
4    A.   I would -- so the results that I'm seeing are
5         the results that are in the appendix.  That's
6         what I asked for him to produce for me because
7         that was the purpose here.
8         Where those results came out or how
9    they were fit into the spreadsheet, I don't know
10   for sure.  Dr. Stevenson would know.
11   Q.   Okay.  But just as a matter of logic, what his
12        code produced would necessarily be a spreadsheet
13        that only contained your EI results, not
14        Dr. Collingwood's EI results, correct?
15   A.   I don't know -- so I asked for the results in a
16        spreadsheet form because that's the way -- it's
17        the most convenient for me to produce tables.
18        Whether -- the output from the program not
19        necessarily sort of coming out as an Excel
20        speed.  It could come out as comma separated
21        values, it could got to a Stata dataset.  So
22        what the immediate form is before this is
23        produced might or might not be an Excel
24        spreadsheet.
25   Q.   And you didn't turn over to us the intermediate

96

24  (Pages 93 to 96)

1  form that the code produced before you -- you or
2  Dr. Stevenson turned it into the document we see
3  here in Appendix A, correct?
4  A.   Again, I would have to look back over what was
5  turned over, but certainly this was -- this was
6  turned over and this is what I had asked for as
7  the output product.
8       Whether the intermediate part exists or
9  how that was done or whether it was disclosed, I
10  don't know without looking back over the
11  disclosure.
12      ATTORNEY THEODORE:  All right.  I'm
13  going to mark -- transmit this document in the
14  chat and mark it as Exhibit 4.
15      (WHEREUPON, Plaintiff's Exhibit 4 was
16  marked for identification.)
17  BY ATTORNEY THEODORE:
18  Q.   All right.  Do you have that open, Dr. Alford?
19  A.   Yes.
20  Q.   And does this -- so this is a screenshot of the
21  folder structure for your backup data with all
22  of the folders under the program -- programs
23  folder expanded.
24      Do you recognize that the folders in
25  the files shown here are the backup files that

97

1  you transmitted in this case?
2  A.   That looks to me to be correct.
3  Q.   Okay.  Do you see in this backup data any of the
4  intermediate production files that we were just
5  talking about?
6  A.   I mean, there are lots of files here with lots
7  of different names.  I don't see something that
8  would immediately jump out to me as being those
9  files, but, again, I would have to go back
10  through and look.
11      So, yeah, I don't know what the status
12  of the intermediate files is or whether they're
13  here or not.  I just know what I asked for was
14  the appendix that's in the report.
15  Q.   Okay.  I'm going to transmit a copy of -- the
16  next exhibit shall mark as Exhibit 5, and this
17  is a copy of the "read me" document that was
18  part of your backup files.
19      Do you see that?
20      (WHEREUPON, Plaintiff's Exhibit 5 was
21  marked for identification.)
22  BY ATTORNEY THEODORE:
23  Q.   Are you there, Dr. Alford?
24  A.   Yes.
25  Q.   And does this look like a copy of the "read me"

98

1  file that you produced as part of your backup
2  materials?
3  A.   Yes.
4  Q.   All right.  And this is explaining how to
5  replicate the EI analysis that you conducted,
6  correct?
7  A.   Correct.
8  Q.   Do you see the sixth bullet?
9  A.   Yes.
10  Q.   And it says:
11      "Next, run one of the following
12  Stata scripts that reads the EI data
13  above and produces EI results.  For
14  example, EI_2016_GE_regional_loop.do."
15      Did I read that correctly?
16  A.   Yes.
17  Q.   Is EI_2016_GE_regional_loop.do the Stata script
18  that runs the EI analysis for 2016 elections for
19  the demonstration area?
20  A.   That's what it suggests, yes.
21  Q.   And after what I just read in the sixth bullet
22  in your read me file, the file says:
23      "This file also relies on an R
24  program that is called by Stata e.g.,
25  GenericRxC_EI_NCarolina_2016GE.R,

99

1  with the specific R script used for
2  any specific run indicated in the call
3  to R at the bottom of the Stata file."
4      Did I read that correctly?
5  A.   Yes.
6  Q.   So first you need the Stata script, and then to
7  replicate your analysis, you need this R program
8  that's called GenericRxC_EI_NCarolina_2016GE.R,
9  correct?
10  A.   That's correct.
11  Q.   And then there's going to be a similar R program
12  to replicate the results for 2018, 2020, and
13  2022 elections; is that correct?
14  A.   Correct.
15  Q.   Okay.  Did you provide any of those R programs
16  in your backup data?
17  A.   The R program should be -- so if the R program
18  is being called by Stata, then the R program
19  should be there.
20  Q.   All right.
21  A.   Everything -- our intention at least was to
22  provide everything, including the detailed
23  instruction to allow anybody who wanted to to
24  modify those scripts to narrowly in the sense of
25  just changing them to point to their own

100

1    computer and then to run them as is and get
2        exactly the analysis we get.
3    Q.  Okay.  And let's turn back to Exhibit 4 which
4        was the index of your backup materials.
5    A.  Yes.
6    Q.  Are you there?
7    A.  Yes.
8    Q.  Do you see the GenericRxC_EI_NCarolina_2016GE.R
9        program anywhere in the list of programs that
10        you transmitted?
11    A.  So I can't tell, is all this fully expanded?  It
12        looks like there are folders that aren't
13        expanded.
14    Q.  I believe the only folders that aren't expanded
15        are the folders under the input data folder.
16    A.  So I don't see the R program that is being
17        called, but I'm also not seeing -- yeah, I'm not
18        seeing the R program that's called.
19    Q.  And you're not seeing the R program that's being
20        called for 2018, 2020, or 2022 either, correct?
21    A.  Correct.
22    Q.  All right.  So the four key files that would
23        allow replication of your EI results were
24        missing from your backup data; is that right?
25    A.  Yeah.  I would want -- you know, I would want to

101

1    go back through -- actually, you know, get the
2        file in front of me and go back through
3        everything to make sure it wasn't -- didn't end
4        up in the wrong place, but at least from what I
5        see here, I'm not seeing those -- the R files
6        that we indicated should be there.
7    Q.  And it's not actually possible to replicate your
8        EI analysis without those R files, right?
9    A.  Yeah, it certainly -- well, it's not impossible,
10        but our intention was to make it as simple and
11        as accurate as possible and therefore to provide
12        those files.  That's why they're in the
13        instructions.
14    Q.  Well, it wouldn't be possible -- I'm sorry.  Go
15        ahead.
16    A.  If they're not provided because of an oversight
17        when things are getting bundled up, well,
18        certainly we would have been happy to address
19        that and we're happy to address that now.
20    Q.  I understand.  I'm just asking a very simple
21        question which is it's not possible to replicate
22        your EI analysis without those R files; is that
23        correct?
24    A.  I guess it depends on what you mean by
25        replication.  It is possible to do a similar R

102

1    analysis or EI analysis without it.  Collingwood
2        has already done that.
3            Our intention was to do something as
4        close as possible to what he did, and that's
5        what you'll see -- or what you would see in that
6        R code.  And again, I'm happy to provide that if
7        it wasn't, if it was for whatever reason
8        inadvertently not included in this very large
9        set of files and folders, but it's certainly
10        possible to -- we could have done this same
11        analysis without Collingwood's R files because
12        we're perfectly capable of doing this and
13        obviously he's capable of doing the analysis
14        because he did it and got the same results.
15    Q.  I'm just asking very simply, it's not possible
16        to replicate the precise numbers that you
17        produced without those R files, correct?
18    A.  That would be correct.
19    Q.  Okay.  All right.  And you have not offered any
20        opinion that your RPV estimates are more
21        accurate or reliable than Dr. Collingwood's,
22        correct?
23    A.  That's correct.
24    Q.  And you agree, based on your experience in
25        previous cases, that Dr. Collingwood's EI

103

1    analysis is trustworthy?
2            ATTORNEY McKNIGHT:  Objection; form.
3            THE WITNESS:  I would say based on the
4        cases I've been involved in in which
5        Dr. Collingwood has provided EI analysis, I've
6        always been able to replicate it.  And I think
7        he's a capable EI analyst, so I -- among other
8        experts, I would put him among the group who I
9        would typically not expect to see any difference
10        between my analysis and his analysis.  I don't
11        believe we've ever had a disagreement on a point
12        of analysis save the first case in which I saw
13        Dr. Collingwood when he was working for
14        Dr. Barreto.
15    BY ATTORNEY THEODORE:
16    Q.  The estimates listed in your tables and your
17        appendix are EI point estimates, correct?
18    A.  Correct.
19    Q.  What's an EI point estimate?
20    A.  It is the -- it's the EI result that's -- I'm
21        not sure exactly how you would want to
22        characterize that, but it's the result that EI
23        analysis produces that indicates the central
24        tendency of the EI analysis across the

104

1    precincts.  So, for example, if it's 98 percent
2    that's telling us that the EI program is having
3    run for some period of time has concluded that
4    that's the point estimate that best represents
5    the -- its analysis across the data you
6    provided.
7    Q.   All right.  You don't report confidence
8    intervals for your EI point estimates in your
9    report, correct?
10   A.   That's correct.
11   Q.   Did you calculate confidence intervals for your
12   EI estimates?
13   A.   I would assume.  I don't think -- our standard
14   program outputs credible intervals, so, yeah, I
15   assume there are credible intervals.
16        I'm not relying on those credible
17   intervals in either my analysis or
18   Dr. Collingwood's, but, yes, the analysis -- I
19   mean, you have to ask for it, but we would
20   typically ask for the credible intervals as well
21   as the point estimate.
22   Q.   Okay.  And the program -- when Dr. Stevenson
23   presses the button, does the program generate
24   confidence intervals automatically?
25   A.   The program -- yes, the program typically

105

1    Harris is small and therefore falls within the
2    confidence interval, and so we can't be
3    sure -- we can't reject the null hypothesis that
4    Trump is the leader or the null hypothesis that
5    Kamala Harris is leading, and so that's sort of
6    a standard.  Again, it's a mathematical
7    calculation based on deviations.
8        Credible intervals, the EI technique is
9    not the same kind of technique and so it
10   doesn't -- it would not be appropriate to rely
11   on the calculated intervals based on deviations
12   within the aggregate data.  And so what the EI
13   does is basically it produces -- actually
14   produces a very large series of point estimates
15   and then you look at the distribution of those
16   point estimates, the center of that distribution
17   is the point estimate, and then you actually
18   look physically at the upper and lower bound
19   that together contain 95 percent of the
20   estimated point estimates in the repeated draws
21   of the EI program.
22        And so the confidence interval is a
23   calculated interval.  A credible interval is an
24   actual distribution of reported point estimates,
25   and it tells you that 95 percent of the point

107

1    extracts both point estimates and credible
2    intervals, not confidence intervals, but
3    credible intervals.
4    Q.   What's the difference between a credible
5    interval and a confidence interval?
6    A.   So a confidence interval -- if you do an
7    ordinary least squares regression where you take
8    a sample mean or something like that, you get a
9    confidence interval which is a mathematical
10   calculation based on the variation that's
11   present and suggests sort of the confidence
12   interval we typically think of that case in
13   social scientist as a 95 percent interval, so
14   we're confident that based on sampling
15   distribution, for example, that in the actual
16   value out in the real world would fall within
17   that upper and lower bound 95 percent of the
18   time and so that less than 5 percent of the time
19   we expect the calculated point estimate to be
20   outside of that -- outside of that range around
21   the action.
22        So we see this all the time in election
23   analysis and currently particularly I think in
24   every one of the states that matter, the
25   difference between Donald Trump and Kamala

106

1    estimates that the EI program has produced in
2    that stage are within that upper and lower
3    bound, so it tells you about how narrowly the
4    estimates are varying in repeated runs of
5    the -- repeated iterations.  So this is an
6    iterative technique that iterates loss of times,
7    10,000 times, a hundred thousand times, a
8    million times, and the question is what does the
9    distribution of possible point estimates look
10   like in that actual world versus some
11   mathematical calculation which would be the case
12   in a technique like ordinary least squares
13   regression.
14        They can be interpreted in similar
15   ways.  They can be used for telling you how
16   stable the estimate is.  They can be used to
17   test the null hypothesis.  So here we're not
18   actually testing a null hypothesis, and we have
19   a fairly large number of elections, fairly large
20   number of precincts.  I don't think there's
21   anything in dispute here about -- that deals
22   with that issue about how stable the estimates
23   are, nor is there the confidence interval -- or
24   sorry -- the null hypothesis that we're testing
25   here, so how likely is it that -- I mean, for

108

27 (Pages 105 to 108)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 28 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1  example, you could test how likely is it that
2  black voters actually prefer Josh Stein in the
3  2016 AG race given that their point estimate is
4  98 percent.  And so, you know, if the point
5  estimate was, you know, 51 percent, you might be
6  interested in what the credible intervals around
7  it because it might very well extend below
8  50 percent in which case you couldn't say for
9  certain whether Josh Stein was the preferred
10  candidate for black voters or not, but at
11  98 percent, I don't think that's really a
12  question.
13  Q.  Okay.
14  A.  So in this particular analysis and what I care
15  about, at least, those credible intervals are
16  not anything that I need to see or make any use
17  of.
18  Q.  Okay.  So your understanding is that the program
19  would have spit out those credible intervals,
20  but you did not look at them for purposes of
21  this report; is that accurate?
22  A.  Again, I don't have the program in front of me,
23  but I would say it does not -- when you say spit
24  it out automatically, it's not automatically
25  produced by the simple call to the Bayesian

109

1  R x C analysis.  You have to capture the
2  distribution and then look at the -- you know,
3  at those distribution points, so you capture the
4  upper and the lower panels to get the
5  95 percent, but that's something we routinely
6  include in the R program we run.  And so -- and
7  I suspect I can't imagine why we would not have
8  included it here.
9  Q.  So you suspect that Dr. Stevenson would have run
10  that and produced that, but you're not sure?
11  A.  I'm not a hundred percent sure because I'm not
12  looking at the actual code, but I would be very
13  surprised if it wasn't involved.
14       I just want to make sure that I'm not
15  saying that any -- any EI run using the R x C
16  technique would not of necessity produce the
17  credible intervals, unlike -- what, if you run
18  OLS, you run ordinary least regression, if you
19  just ask for a regression, it typically will by
20  default produce a set of statistics that would
21  include the confidence interval.  It's not for
22  the most stripped down call to simply produce
23  the point estimates, simply produces the point
24  estimates and then you have to look at the
25  captured variation in the point estimates to get

110

1  the credible interval.
2  Q.  All right.  And your backup data that you
3  produced in your accompanying report does not
4  include any file that contains any credible
5  intervals or confidence intervals or any data
6  associated with credible intervals or confidence
7  intervals; is that correct?
8  A.  I believe that's correct.
9       ATTORNEY THEODORE:  I'm going to
10  transmit another document in the chat that I'm
11  going to mark as Exhibit 6.
12       (WHEREUPON, Plaintiff's Exhibit 6 was
13  marked for identification.)
14  BY ATTORNEY THEODORE:
15  Q.  Do you have this open?
16  A.  Yes.
17  Q.  Okay.  Do you recognize this as an affidavit
18  that you submitted as an expert in the NAACP of
19  Spring Valley Branch versus East Ramapo Central
20  School District case?
21  A.  Yes.
22  Q.  Let's go to page 11, paragraph 38.  Are you
23  there?
24  A.  I'm getting there.  Page 11, yes.
25  Q.  And you say:

111

1       "The standard practice among
2       social scientists and statisticians is
3       to accompany specific EI estimates
4       (referred to as point estimates) with
5       associated confidence intervals."
6       Did I read that correctly?
7  A.  Yes.
8  Q.  Did your report state anywhere that you were not
9  following the standard practice among social
10  scientists and statisticians in using the EI
11  method because you did not accompany your
12  specific EI estimates with confidence intervals?
13  A.  No.
14  Q.  And the reason that you did not report
15  confidence intervals in this case is because you
16  think it's appropriate to simply rely on
17  Dr. Collingwood's estimates.  Is that fair to
18  say?
19       ATTORNEY McKNIGHT:  Objection; form.
20       THE WITNESS:  I think there's -- it's a
21  lengthy subject.  We can talk about all kinds of
22  things related to that, but, yes, in my
23  analysis, I'm not presenting an analysis and
24  asking the court to rely on my EI analysis.
25       I'm simply doing an EI analysis to

112

28  (Pages 109 to 112)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 29 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  check and make sure that I can rely on
2  Dr. Collingwood's analysis, and
3  Dr. Collingwood's analysis, at least in the
4  graphic displayed, includes the -- it's a dot
5  plot, so we have the credible intervals
6  displayed graphically.  And I don't make any use
7  of them, nor does he, but if I wanted to,
8  they're present in the data that I'm relying on.
9          ATTORNEY THEODORE:  All right.  I think
10  this might be a good time to break for lunch if
11  that sounds good.
12  (Lunch Recess:  12:51 to 1:30 p.m.)
13  BY ATTORNEY THEODORE:
14  Q.  All right.  It's Dr. Alford, right, not
15  "Dr. Alford"?
16  A.  Alford, you're correct.
17  Q.  Dr. Alford, most of your report is focused on
18  analyzing the role of the race of the candidate
19  in the polarized voting that we see in the
20  relevant regions.  Is that fair to say?
21  A.  Yes.
22  Q.  And for this analysis, you only considered
23  Dr. Collingwood's EI results, not your own,
24  correct?
25  A.  Correct.

113

1  A.  Yes.
2  Q.  In Excel?
3  A.  Correct.
4  Q.  Okay.  And you didn't turn over the underlying
5  Excel files in your backup data, right?
6  A.  I'm not sure I know what you mean by underlying
7  Excel file.
8  Q.  You didn't turn over any Excel files relating to
9  these reports in your backup data, correct?
10  A.  I think that's correct, yes.
11  Q.  How did you determine the race of the candidate
12  for purposes of these Tables 1 through 7?
13  A.  I think that was a combination that I think some
14  of the information may have come from lawyers,
15  some of it from looking at various sources about
16  the campaigns and about the candidates, so a
17  variety of sources.
18  Q.  You have a recollection for at least some of
19  these candidates the lawyers sent you a list of
20  the race of the candidates?
21  A.  No.  I think there was -- there was some
22  discussion about -- about whether that was
23  available, and I think the lawyers may at some
24  point -- obviously, we've got multiple cases
25  going on so I'm not sure if it was in this case

115

1  Q.  Did you ever conduct a similar analysis using
2  your own EI estimates?
3  A.  No.
4  Q.  Okay.  And for this portion of the report, you
5  offer a number of tables in which you report the
6  race and the party of candidates in various
7  combinations of North Carolina elections between
8  2016 and 2022, correct?
9  A.  Correct.
10  Q.  And you report the race and party of those
11  candidates next to figures that you've taken
12  from Dr. Collingwood's report about the
13  percentage of the white and black vote that
14  those candidates received in four different
15  geographies, correct?
16  A.  Correct.
17  Q.  And that's statewide the demonstration area and
18  Senate Districts 1 and 2?
19  A.  That's correct.
20  Q.  And so Tables 1 through 7 all fall within this
21  category of table, correct?
22          ATTORNEY McKNIGHT:  Objection; form.
23          THE WITNESS:  That's correct.
24  BY ATTORNEY THEODORE:
25  Q.  Okay.  Did you personally prepare these tables?

114

1  or some other case, but I think the lawyers may
2  have looked at the codes that were used here
3  just to verify that they didn't see anything
4  that jumped out at them as mistaken.
5          There was some discussion with the
6  lawyers about using voter registration to
7  validate this particularly for moving beyond the
8  statewide candidates and to legislative races,
9  if that was going to become an issue, but as it
10  happens, that didn't become an issue because
11  Dr. Collingwood would not use any of the state
12  level -- any of the races below the statewide
13  races.
14  Q.  Okay.  So there's no list --
15  A.  The lawyers never transmitted to me anything
16  with a list of candidates and races.
17  Q.  Okay.  Thanks.
18          Is the purpose of the analysis that
19  you're presenting in Tables 1 through 7 to
20  determine whether white voters are choosing not
21  to vote for black candidates because those
22  candidates are black?
23  A.  There's a variety of things that you can draw
24  from this analysis, so I'm not -- I wouldn't say
25  that's the purpose of the analysis, but that

116

29 (Pages 113 to 116)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 30 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    is -- that is something you could draw from.
2         I would say the purpose of the analysis
3    is to demonstrate that the tables and figures
4    produced by Dr. Collingwood that purport to show
5    that voting is racially polarized and that
6    Gingles 2 and 3 have been met, that that
7    analysis doesn't show anything more than
8    partisan voting.
9    Q.   All right.
10   A.   So I see it as illustrating a failure to
11   demonstrate something in the analysis provided
12   by Dr. Collingwood.  That's why my preference is
13   to use, as I did here, Dr. Collingwood's
14   analysis.  It purports to show one thing and
15   actually shows something else that he both
16   doesn't discuss and which is not immediately
17   apparent from his tables.
18   Q.   All right.  Let's turn to your Table 1.  That's
19   on page 6.
20   A.   Yes.
21   Q.   This table considers three elections across
22   three different years and only one of them
23   involves a black candidate; is that correct?
24   A.   That is correct.
25   Q.   And you agree that the overall level of racially

117

---

1    55 is obviously important.  It changes the
2    direction of the vote, but a 10 percent
3    difference I think is -- I guess it is what it
4    is, yeah.
5         In terms of the overall pattern of
6    polarization, I would say I would characterize
7    the overall pattern of polarization here to be
8    that white voting across this entire period is
9    well above 95 percent and that black voting and
10   white crossover voting again varies in that
11   range from 10 to 30 percent, so --
12   Q.   All right.
13   A.   I'm looking here and I'm seeing -- statewide,
14   I'm seeing a 4 percent difference in the area,
15   seeing about a -- what -- so statewide white
16   crossover vote is higher in 2022 than 2016, it's
17   a little bit lower in the demonstration area,
18   it's pretty much the same in District 1, pretty
19   much the same in District 2.  Maybe I'm missing
20   something, but I'm not seeing that.
21   Q.   I'm sorry.  Are you looking at just this table,
22   or are you looking at the overall results for
23   all the elections in 2016 and 2018, 2020 and
24   2022?
25   A.   I'm looking at the table.

119

---

1    polarized voting in the four regions presented
2    in this table is different in 2016, 2020, and
3    2022 which are the three years presented in this
4    table; is that correct?
5         ATTORNEY McKNIGHT:  Objection; form.
6         THE WITNESS:  I guess I'm not seeing
7    what you're seeing.  I don't think --
8    BY ATTORNEY THEODORE:
9    Q.   All right.  Let me ask it a different way.
10        Based on Dr. Collingwood's overall RPV
11   results for 2016, 2020, and 2022, we know that
12   racially polarized voting in those years -- the
13   levels of racially polarized voting in those
14   years changes depending on the year in each of
15   the four regions presented in this table; is
16   that correct?
17        ATTORNEY McKNIGHT:  Objection; form.
18        THE WITNESS:  There's -- I would say
19   there's some modest difference in the levels of
20   crossover voting across those years.
21   BY ATTORNEY THEODORE:
22   Q.   Would you regard a 10 percent difference as a
23   modest difference?
24   A.   Obviously, it depends on where the 10 percent
25   occurs.  A 10 percent difference between 45 to

118

---

1    Q.   I was asking you a question about overall,
2    across all election contests.  Let's just move
3    on.
4         Do you think that this table with only
5    three elections across different years presents
6    sufficient data to draw reliable conclusions
7    about whether the race of the candidate has a
8    polarizing impact on vote choice?
9         ATTORNEY McKNIGHT:  Objection; form.
10        THE WITNESS:  I think it presents
11   useful information.  I obviously go on to
12   present six other tables and cover all of the
13   elections that Dr. Collingwood covered, so I
14   don't think it's the end of the story, but as it
15   happens, it tells -- substantively tells exactly
16   the same story as every other table.
17        It's certainly not drawing my
18   conclusion solely from this table, and it
19   obviously isn't the only table in the report.
20   It just provides a very simple first look that
21   suggests that here when we're simply looking at
22   US Senate elections, they look -- they look
23   remarkably similar when the Democrat and the
24   Republican are white and when the Democrat's
25   black and the Republican's white, so that's

120

30  (Pages 117 to 120)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 31 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com         1-919-424-8242

suggestive.

And then the question is is that unique to these three senate elections or is it the case when we look more broadly at all the elections in the analysis, and there's nothing in this table that's incompatible with what we see in the other six tables that cover all of the elections.

BY ATTORNEY THEODORE:

Q. All right.

A. So we could rely on this table because you wouldn't come to any conclusion you wouldn't come to by looking at all the elections, but I'm not suggesting that the court do that and I'm not suggesting that I did that.

Q. So let's turn to Table 2 on page 7, and this table is a comparison of how white and black voters voted in seven state supreme court elections between 2016 and 2022; is that correct?

A. That is correct.

Q. And you say on page 7:

"If voters were responding to the race of the candidates, we would expect black voters to provide

121

significantly more support to a black candidate."

Did I read that correctly?

A. Yes.

Q. What do you mean there by significantly?

A. Well, not statistically significantly because we're not -- fortunately not in that area at this point.

So substantively significant difference of support, you know, perhaps something that looked not cohesive or only weakly cohesive for white candidates and clearly cohesive for black candidates, for example, would indicate that black voters are responding to the race of the candidate by providing more support to black candidates than to white candidates.

Q. Okay. This table shows that black voters in the demonstration area and in District 2 support white Democrats for state supreme court at a rate of 99 percent, correct?

A. Correct.

Q. So how could we expect that black voters would provide more support to a black Democrat than 99 percent?

A. We wouldn't.

122

Q. Okay.

A. As they would give support to the white candidate.

Q. I'm sorry.

A. We're talking about the difference between their support for the white and the black candidate, correct?

I'm sorry. I'm asking questions. I'm not supposed to. I withdraw the question, Your Honor.

I think I've answered your question, I hope.

Q. I think you have.

Okay. And in fact, this table shows that in Senate District 1 where black voters supported the white Democratic supreme court candidates at rates of 96 percent, they supported the black Democratic supreme court candidates at 98 percent, correct?

A. Correct.

Q. So this table reflects that black voters are more supportive of the black Democrat in Senate District 1 than of the white Democrat, correct?

A. I don't think that's correct.

123

Q. Well, 98 percent is more than 96 percent, correct?

A. Yes.

Q. So this table reflects that black voters are more supportive of the black Democrat in Senate District 1 than of the white Democrat, correct?

A. There's an EI point estimate that in one case is 96 and the other 98. Again, this is ecological inference at the wrong level of analysis, and to say that we know on the basis of that that black voters provided more support to the black candidate than the white candidate, first of all, it's extremely marginal difference, and it may or may not be real. And so I don't think we can draw that conclusion that -- with a difference that small in a technique that's this remote from what we're trying to analyze, you can argue that there is a -- there is a two point difference in the point estimate provided by the EI analysis, but to say that we therefore can convert that to saying there's a two point difference in the actual behavior of black voters in those two elections, we can't. That's simply beyond what this technique can do.

124

31 (Pages 121 to 124)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 32 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

Q.  Have you reviewed the --

A.  The 98 percent difference between the black voters' support for the Democratic and the Republican candidate, there's the party.  The party effect here is 99 percent Democrat, 1 percent Republican; or 98 percent Democrat, 2 percent Republican; 96 percent versus 3 percent.  That's the party difference.

    If the race difference is 96 versus 98, even if that's a real difference, you're talking about what are we comparing here.  The effect of party is a difference of over 95 percent, then the effective race at best in one area is 2 percentage points.

    I think it's pretty clear what this table tells us.  It tells us about both partisan cohesion and polarization.

Q.  Did you review Dr. Collingwood's confidence intervals associated with the estimates it got for District 1?

A.  I am sure that at some point I looked at those, but I don't recall them off the top of my head.

Q.  Okay.  And sitting here today, you can't say that this difference would be within the range of the confidence intervals.  Is that fair?

125

A.  The difference may be -- it's possible that the difference is outside of the -- it's possible that we don't have overlapping credible intervals here.  It wouldn't seem very likely to me, but it's possible.  It wouldn't change my answer.

Q.  All right.  So in your view, in a district where black voters show cohesive support at a level of, you know, 98 percent for particular white candidates, your view is that it is impossible to demonstrate on the basis of ecological inference that black voters are motivated by the race of the candidate?

    ATTORNEY McKNIGHT:  Objection; form.

    THE WITNESS:  No, I would not agree with that.

BY ATTORNEY THEODORE:

Q.  What do you disagree with about that statement?

A.  I'm not saying that anything is impossible.  Again, all I'm saying is that this analysis, these numbers which are Dr. Collingwood's numbers, show us that party is having a very, very large effect on how people vote, both black and white, and it doesn't show that race is having an effect on how people vote that's in

126

any sense in the same order of magnitude, much less being a more powerful force.

    So given that all this table tells us is that -- for example, that blacks vote overwhelmingly for Democratic candidates is insufficient to establish that blacks are -- that black voting is in any sense affected by the fact that blacks are voting on something related to race and similarly that white crossover is being structured by race.

    So it's the insufficiency.  It's not the impossibility of showing that, it's just the absolutely plain fact when you look at this table is that if you say, okay, this table clearly shows partisan polarization, absent the partisan polarization, what are we really seeing here.

    What the table doesn't do, what Dr. -- the entirety of Dr. Collingwood's report doesn't do is show any evidence of racially polarized voting and a repeated abundance of party polarization.

Q.  And your answer there is talking about the race of the candidate; is that correct?

A.  At this level --

127

    ATTORNEY McKNIGHT:  Objection; form.  Go ahead.

    THE WITNESS:  Again, I didn't choose this analysis form.  This is just the analysis form that is the most commonly by far -- I'd say 99 percent of all the analysis on Gingles 2 and 3 is based on exactly this kind of analysis, both mine and Dr. Collingwood's and everybody else's.

    This is an analysis that's provided, and in this analysis, once you add in -- which Dr. Collingwood did not do -- the party of the candidates, and once you add in -- which Dr. Collingwood did not do -- the race of the candidates, it's possible just by looking at what he's produced to tell easily, with no statistical expertise at all, what on the face the table actually shows.

    It's obscured in his report because you can't look at the table and tell whether this is party voting or whether the voting in anyway implicates race.

    Once you put those -- that information back in, it tells you that the table is entirely compatible with the party of the candidates, not

128

32 (Pages 125 to 128)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 33 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

with the race of the candidate.  That doesn't
prove the negative.  It doesn't exclude the
possibility of something else happening.  It
just excludes the ability of his analysis to any
way establish that there's empirical data here
to support the position that voting is racially
polarized in North Carolina.

BY ATTORNEY THEODORE:

Q.  And by voting is racially polarized in
North Carolina, you mean that voting is racially
polarized in North Carolina on the basis of the
race of the candidate, correct?

        ATTORNEY McKNIGHT:  Objection; form.
        THE WITNESS:  Yes.  I'm saying that --
I use the term racially polarized voting more
carefully than most people do.  It's a
pejorative thing to say about voters.  It's an
unfortunate things to say about voters.  It's an
unfortunate place to be as a society, and so
what this table shows is that black and white
voters, like voters in general, are highly
polarized with regard to how they cast their
vote based on the party of candidates.

        It does not show anything beyond that.
It certainly doesn't show -- or it certainly

129

isn't proper to characterize that as a situation
in which white voters are voting for -- are
voting on the basis of race or black voters are
voting on the basis of race.  This is not about
black candidates favoring -- or black voters
favoring black candidates over white or white
voters favoring white candidates over black.
That's an implication you can draw from the
table, but it is not in fact what the table
shows.

BY ATTORNEY THEODORE:

Q.  Do you believe that a black candidate
necessarily will advance the goals or interests
of black voters better than a white candidate
would?

        ATTORNEY McKNIGHT:  Objection; form.
        THE WITNESS:  That's a very broad
question.  There are multiple forms of
representation, so in theory, representation --
one kind of representation is called reflective
representation.  So am I better represented as a
resident of Houston by having a fellow resident
of Houston.  I am better represented in the
sense of reflective representation.  Does it
mean they will do a better job of providing

130

policy representation, not necessarily.  I think
that's more to my point than yours.

        All right.  If what we're talking about
is what matters is not the race of the candidate
but the policy positions of candidates, then
we're talking about democratic politics.  People
vote for candidates that represent their policy
interests.  That's not racially polarized
voting.  That's policy polarized voting.

BY ATTORNEY THEODORE:

Q.  Let me just repeat the question.
        Do you believe that a black candidate
necessarily will advance the goals or interests
of black voters better than a white candidate
would?

        ATTORNEY McKNIGHT:  Same objection;
form.
        THE WITNESS:  No, I do not.

BY ATTORNEY THEODORE:

Q.  Let's turn to Table 4 on page 12 of your report.
        So this is the table reflecting RPV
estimates from Dr. Collingwood's report from the
2016 statewide races in the four regions,
correct?

A.  Correct.

131

Q.  And you've added the race of the candidate,
correct?

A.  That is correct.

Q.  All right.

A.  And the party.

Q.  And the party.  Thank you.
        If you go to the row for black versus
white Democratic average, do you see that row?

A.  Black versus white, Democratic average, okay.

Q.  And all the black candidates who ran in the 2016
elections or in the 2016 partisan elections were
Democrats, and all the white candidates who ran
in the 2016 -- I'm sorry.  Let me start again.
        All the black candidates who ran in the
2016 partisan elections were Democrats and none
of the black candidates were Republicans; is
that correct?

A.  That is correct.

Q.  Okay.  And that row in Table 4, the black versus
white Democratic average row, reflects that in
contests between black and white candidates,
black voters gave 99 percent of their vote to
the black candidate in the demonstration area
and in enacted Districts 1 and 2; is that
correct?

132

33 (Pages 129 to 132)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 34 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    A.  That is correct.
2    Q.  And by contrast, white voters gave between 77
3         and 82 percent of their vote to the white
4         candidate in those 2016 election; is that
5         correct?
6    A.  That is correct.
7    Q.  All right.  Let's go to Table 5, page 13.
8              And this is the same table but for
9         2018, correct?
10   A.  That is correct.
11   Q.  And here there's only one race involving a black
12        candidate, correct?
13   A.  That is correct.
14   Q.  And Table 5 reflects that in the one contest
15        between black and white candidates, black voters
16        gave between 98 and 99 percent of their vote to
17        the black candidate in the demonstration area
18        and enacted Districts 1 and 2, correct?
19   A.  That is correct.
20   Q.  And there are two white candidates in that one
21        election between black and white candidates, and
22        you've combined them in the row; is that right?
23   A.  That is correct.
24   Q.  And in that election between black and white
25        candidates, white voters gave between 75 and

                                                    133

1    three elections; is that correct?
2    A.  That's correct.
3    Q.  All right.  Let's go to Table 7, page 15.
4              And this is the same table but for 2022
5         races?
6    A.  That is correct.
7    Q.  And there are three races in 2022 pitting a
8         black candidate against a white candidate; is
9         that correct?
10   A.  That's correct.
11   Q.  And Table 7 reflects that in contests between
12        black and white candidates, in 2022, black voters
13        give between 94 and 99 percent of their vote to
14        the black candidate in the demonstration area
15        District 1 and District 2?
16   A.  Yes, that is correct.
17   Q.  And in comparison, in the three contests between
18        a black and white candidate in 2022, white
19        voters gave between 77 and 85 percent of their
20        vote to the white candidates; is that correct?
21   A.  That's correct.
22   Q.  All right.  So across all four years, it is
23        empirically true that in contests pitting black
24        candidates against white candidates, white
25        voters overwhelmingly prefer the white candidate

                                                    135

1         83 percent of their vote to the white candidates
2         in the demonstration area in Districts 1 and 2?
3    A.  That is correct.
4    Q.  All right.  Let's go to Table 6, page 14.
5              This is the same table but for the 2020
6         races; is that right?
7    A.  That is correct.
8    Q.  Okay.  And here there are -- here there are
9         three races pitting a black candidate against a
10        white candidate; is that right?
11   A.  I'm sorry.  Three, you're correct.
12   Q.  And you have the Gore-Cubbage race in the black
13        versus white category, but that's an error in
14        the table; is that correct?
15   A.  Correct.
16   Q.  Because both Gore and Cubbage are black?
17   A.  That's correct.
18   Q.  So Table 6 reflects that in the three contests
19        between black and white candidates, black voters
20        give between 98 and 99 percent of their vote to
21        the black candidate in the demonstration area in
22        enacted Districts 1 and 2; is that correct?
23   A.  That is correct.
24   Q.  And white voters gave between 80 and 86 percent
25        of their vote to the white candidates in those

                                                    134

1         and black candidates [sic] overwhelmingly prefer
2         the black candidate.  Is that true?
3              ATTORNEY McKNIGHT:  Objection; form.
4              THE WITNESS:  Yeah, I think that's
5         true.
6    BY ATTORNEY THEODORE:
7    Q.  Okay.  All right.  I'm going to refer to a
8         statewide contest between a white candidate and
9         a black candidate as a biracial race.  Is that
10        fair?
11   A.  Yes.
12   Q.  And would you agree that in every single
13        biracial statewide contest in 2018, 2020, and
14        2022, white voters voted cohesively against the
15        black candidate?
16              ATTORNEY McKNIGHT:  Objection; form.
17              THE WITNESS:  No.
18   BY ATTORNEY THEODORE:
19   Q.  Why do you disagree with that statement?
20   A.  At a 2016 Supreme Court race, white voters not
21        voting cohesively in opposition to the black
22        candidate.
23   Q.  Let me ask the question again.
24              You'd agree that in every single
25        biracial statewide contest in 2018, 2020, and

                                                    136

34  (Pages 133 to 136)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 35 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    2022, white voters voted as a bloc against the
2    black candidate; is that correct?
3              ATTORNEY McKNIGHT:  Objection; form.
4              THE WITNESS:  Again, I don't want to
5    quibble about vote as a bloc, but --
6    BY ATTORNEY THEODORE:
7    Q.  I'm sorry.  Let me just interrupt you.
8              I'm excluding 2016 from my question.
9    A.  Okay.  In 2018, 2020, and 2022, all of the
10   elections show white voters voting at 70 to 80
11   some percent for the white candidate.
12   Q.  All right.  So let me just repeat it again.
13             You'd agree that in every single
14   biracial statewide contest in 2018, 2020, and
15   2022, white voters voted cohesively against the
16   black candidate?
17             ATTORNEY McKNIGHT:  Objection; form.
18             THE WITNESS:  Again, with some level
19   of -- some level of cohesion, yes, I agree.
20   BY ATTORNEY THEODORE:
21   Q.  Well, not just at some level of cohesion, but at
22   the 75 percent level of cohesion that we talked
23   about earlier.  Is that true?
24   A.  Essentially, yes.
25   Q.  Okay.  And that's true across the demonstration

137

1    area, District 1 and District 2, correct?
2    A.  That's correct.
3    Q.  All right.  And of the six biracial statewide
4    contests in 2016, white voters voted cohesively
5    against the black candidate in at least five of
6    the six; is that correct?
7    A.  Yes.  At that 75 percent level, yes, that would
8    be correct.
9    Q.  Okay.  Let's turn to page 11 of your report.
10             You state there:
11             "The 2016 contests are the only
12        ones that show any consistent tendency
13        for white voters to crossover at lower
14        levels for black Democratic candidates."
15             Did I read that correctly?
16   A.  Yes.
17   Q.  So you agree in 2016, at least, there is a
18   consistent tendency for white voters to cross
19   over at lower levels for black Democratic
20   candidates?
21   A.  Again, I stand by what I said there.  It is
22   consistent, that is, it occurs across each of
23   the areas of analysis, but again, the magnitude
24   is very slight.  And what exactly that means, I
25   don't know, but it is at least consistent.

138

1    Q.  Okay.  And turning to 2018, which is on page 13
2    of your report -- all right.  Skip that,
3    actually.  Sorry.
4              Turn to 2020 which is on page 14 of
5    your report.
6    A.  Yes.
7    Q.  White voters are slightly more likely to vote
8    for the white Democrat than the black Democrat;
9    is that right?
10   A.  Not consistently, no.
11   Q.  On average, in District 2, white voters are
12   slightly more likely to vote for the white
13   Democrat than the black Democrat in 2020; is
14   that correct?
15   A.  I guess I want you to point me to what -- what
16   numbers we're talking about here that you say
17   reflect that.
18   Q.  It's the number -- the average in the white
19   versus white Democratic average row for white
20   voters in District 2.  You see that 17 percent?
21   A.  17 percent, yes.
22   Q.  And the black versus white row, Democratic
23   average in District 2 for white voters is
24   16 percent.  Do you see that?
25   A.  Yes.

139

1    Q.  Okay.  So in 2020, white voters are slightly
2    more likely in District 2 to vote for the white
3    Democrat than the black Democrat?
4    A.  Again, the point estimate is one percentage
5    point difference.  I don't know that I can say
6    that the voters themselves are consistently or
7    more likely to -- I can't say what that means
8    about the behavior of the voters.  It's too
9    small a difference for this technique to tell us
10   if there's actually a difference in what the
11   voters are doing in terms of how they're casting
12   their vote.  There are other factors that could
13   be leading to that very light difference beyond
14   the voting behavior of the voters.
15             It's -- that difference is not
16   consistent across the table.  There's no
17   difference in District 1.  There's no difference
18   in the demonstration area.  There's essentially
19   no difference in the statewide.  So, yeah, if
20   that's -- taking them together, the table shows
21   that maybe there's a one percentage point
22   difference in the behavior in District 2 and
23   maybe that means something real or maybe it
24   doesn't, but that's the best you can do.
25   Q.  Okay.  And I'm going to ask you a similar

140

1  question about Table 7 on page 15.
2      In 2022, white voters are slightly more
3  likely in the demonstration area to vote for the
4  white Democrat than the black Democrat; is that
5  correct?
6  A.  Let me make sure I'm looking at the right
7  numbers here.
8  Q.  I'm looking at the 12 percent versus 11 percent.
9  A.  Yes, 12 percent versus 11 percent.
10     I'm sorry.  Where is the -- back here.
11  Demonstration area, 12 versus 11, yes.
12  Q.  Okay.  So in 2022, white voters are slightly
13  more likely in the demonstration area to vote
14  for the white Democrat than the black Democrat?
15  A.  Again, with the same caveat that we're now
16  talking about what voters do rather than what
17  the numbers are.  The numbers are what they are.
18  I don't think they tell us that about the
19  voters.
20     And I don't think -- I don't think the
21  statewide -- it's the case that we know that
22  white voters are more likely to vote for black
23  candidates than white candidates despite the
24  fact that there's a one point increase when we
25  move to the black candidates.  I don't think the

141

1  voters are less likely when we move between 12
2  and 11.
3  Q.  Okay.  Do you agree that a 1 percent difference
4  in white voter support could make the difference
5  for black candidate success in a particular
6  election?
7  A.  Actual -- the actual difference in voting of
8  1 percent, yes.
9  Q.  Did you identify any year or region -- strike
10  that.
11     For any year in the demonstration area
12  of District 1 or District 2, did you identify
13  any example in which white voters were less
14  likely to vote for a white Democrat than a black
15  Democrat?
16  A.  So we're confining it to a demonstration area
17  only?
18  Q.  We're confining it to the demonstration area
19  District 1 and District 2.  We're excluding the
20  statewide.
21  A.  I think that's correct.
22  Q.  In other words, it's correct that you did not
23  identify any example in the demonstration area
24  District 1 or District 2 in which white voters
25  were less likely to vote for a white Democrat

142

1  than a black Democrat?
2  A.  Correct.
3  Q.  Okay.  So every time there is a difference in
4  the averages you are reporting in these tables
5  in the demonstration area District 1 and
6  District 2, it is a difference in the direction
7  of white voters preferring the white Democrat
8  over the black Democrat; is that correct?
9  A.  That's the direction of the point estimate.
10  Again, we don't know whether these differences
11  reflect any real difference in the behavior of
12  white voters or not.
13  Q.  But just looking at the numbers you report in
14  your table, every time there is a difference in
15  the averages in the table for our demonstration
16  area for District 1 or for District 2, it's a
17  difference in the direction of white voters
18  preferring the white Democrat over the black
19  Democrat.
20     ATTORNEY McKNIGHT:  Objection; form.
21     THE WITNESS:  The difference in the
22  numbers, yes.
23  BY ATTORNEY THEODORE:
24  Q.  You said earlier that the independent variable
25  in the EI analysis and Dr. Collingwood's EI

143

1  analysis was the race of the voter; is that
2  correct?
3  A.  Basically, yes.
4  Q.  Okay.  Was the race of the candidate an
5  independent variable that was included in your
6  EI analysis?
7  A.  No, it's not.
8  Q.  And it's not included in Dr. Collingwood's
9  analysis either, right?
10  A.  That's correct.
11  Q.  Was the party of the candidate an independent
12  variable that was included in your EI analysis
13  or Dr. Collingwood's EI analysis?
14  A.  It was not.
15  Q.  And would you agree that you can't draw
16  conclusions about the causal effect of the
17  candidates' party or race if it was not an
18  independent variable in the EI analysis?
19  A.  No, I would not agree with that.  I don't think
20  you can draw a causal inference from the EI
21  analysis, period.
22     So broadly, yes, but if your question
23  is -- if you're framing the question to suggest
24  that if that was in the EI analysis, we would be
25  able to draw a causal conclusion and we can't.

144

36 (Pages 141 to 144)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 37 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

So you can't draw causal conclusions, but it's
not because about whether a variable is or isn't
in the EI model.  It's about whether this
analysis is capable of drawing -- can draw a
causal conclusion about the variables that are
in the EI analysis.
     It doesn't produce -- Dr. Collingwood's
analysis does not show the causal -- does not
demonstrate a causal connection between the race
of the candidate and the vote.  Or I'm sorry --
between the race and the voters and the vote.
It's suggestive of it or compatible with it, but
we're not doing a causal analysis here.  We're
doing an ecological inference on ecological
data.
Q.  All right.  Let me frame it slightly
differently.
     Would you agree with Dr. Collingwood's
analysis because the race of the voter is the
independent variable, the EI analysis shows that
the polarized voting results can be explained by
the race of the voter.  Would you agree with
that statement?
A.  So, yes, you can use the race of the voters to
predict party voting because apparently to

145

almost completely explained here and the
difference with regard to the race of candidates
is almost completely unexplained by the race of
the voters.  I don't know how much clearer I can
make that.
     All this analysis shows is that black
and white voters in North Carolina show
different levels of support for Democratic and
Republican candidates, full stop.
Q.  All right.  You're not contending that the
partisanship or party affiliation of the voter
rather than the race of the voter is what
explains or causes polarized voting results that
we see here; is that correct?
A.  Half correct.
Q.  All right.  Which half?
A.  We have no measure of the partisan affiliation
of the voters, so we're not analyzing the party
affiliation of the voters.
Q.  Okay.
A.  We're analyzing the race, and the race of the
voter is strongly connected to the party they
vote for, not strongly connected to the racial
characteristics of the candidates they vote for.
     So again, what we demonstrated here is

147

the -- we haven't delved into what that means,
whether it's party ID or policy or something
else, but apparently there is a connection
between the race of the voter and their party.
That's what the analysis show.
     I don't know if it's a causal
connection because this isn't a causal analysis,
but what the conclusion you can draw, the
reliable conclusion you can draw from this
analysis is that there's a connection between
the independent variable, the race of the voter,
and the dependent variable which is whether they
vote Democrat or Republican in a partisan
election by connections established here.
Q.  So you're not offering any opinion that the
polarized voting results that we see can't be
explained by the race of the voter; is that
right?
A.  Again, the party -- the difference in party
support can be explained by the race of the
voters.  The difference in the support for black
and white candidates cannot be explained by the
race of the voters.  That just seems like a
pretty simple fact pattern to me.
     The difference in party voting just

146

that the race of voters is strongly connected to
the party of candidates.  Why that's the case
hasn't been demonstrated here or analyzed here
by Dr. Collingwood or by me.
Q.  Okay.
A.  This is about what isn't demonstrated.
Q.  So you've done no analysis of the question of
whether a voter's party affiliation or
partisanship accounts for the EI results that we
see?
A.  There's been no analysis presented here that
looks at the partisanship of voters by either
Dr. Collingwood or myself.  It is certainly the
case, given these results, that one might
suspect this had something to do with what has
over the last 50 years been demonstrated without
exception to be the most powerful effect on
voting -- the single most powerful effect on
voting in the United States in partisan
elections, and that is the partisan leanings of
the voters.
     Now, maybe that's an exception in
North Carolina, but you would have to bring some
pretty strong evidence to convince me that
voters in North Carolina are not voting on the

148

37 (Pages 145 to 148)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 38 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

basis of their partisan affiliation. Every poll
I've ever seen for North Carolina or any other
state in the country shows that voters
overwhelmingly vote on the basis of
partisanship.

I don't have data for this analysis.
Dr. Collingwood didn't seem to think it was
important. I would agree. I don't think we
need analysis to establish the fact that there
is heavy partisan polarization in North Carolina
and everywhere else in the United States today.
Q. All right. Do you agree that candidates who are
Democrats may be more likely to hold particular
policy views that black voters support or that
black voters believe will advance the interests
of black people?
ATTORNEY McKNIGHT: Objection; form.
THE WITNESS: I prefer to stick to what
is in the analysis, and there's no analysis here
from Dr. Collingwood and no response from me
about whether this is policy representation or
party representation. My point is just that
if -- if this is about differences in policy,
then -- and again, differences in policy are not
what's protected by the Voting Rights Act.

149

BY ATTORNEY THEODORE:
Q. All right. But do you agree that candidates who
are Democrats may be more likely to hold
particular policy views that black voters
believe will advance the interest of black
people?
ATTORNEY McKNIGHT: Objection; form.
THE WITNESS: In that form, I agree,
they may be. We haven't seen that. We have no
evidence for that. I'm not presenting it,
Dr. Collingwood isn't, but that may be. But
you're right, it may be.
BY ATTORNEY THEODORE:
Q. So, for example, a Democratic candidate may be
more likely to focus when campaigning on
combatting mortgage discrimination or redlining,
for example?
A. Maybe.
Q. Maybe more likely to support the Black Lives
Matter movement?
A. Maybe.
Q. Fair to say there are other issues of particular
salience to black voters that a Democratic
candidate may be more likely to focus on?
ATTORNEY McKNIGHT: Objection; form.

150

THE WITNESS: I want to make it clear,
I'm not suggesting that either black or white
voters are blindly following parties -- party
sentiment, although they have strong party
sentiment from all the research I've seen. They
may also have very substantial policy reasons
for supporting one party over the other, and
that distinction between partisan forces and
policy forces is sometimes made, but I don't
think that it's a distinction that's meaningful
given that the same sort of analysis is applied
to nonpartisan elections, and there obviously
it's not necessarily partisanship but might in
fact be entirely policy differences, and the
court discusses exactly that. If these are just
policy differences, then this is not a violation
of the Voting Rights Act.
BY ATTORNEY THEODORE:
Q. All right. Other than simply observing that the
black preferred candidates are consistently
Democrats, you haven't done any work in this
report or for this case to try to assess why the
black preferred candidates are consistently
Democrats; is that correct?
A. Yes. All I'm commenting on here is what it is

151

that Dr. Collingwood's analysis has
demonstrated. I'm not trying to take that apart
or try to understand anything deeper about it
except to say that the analysis he presented
makes it very clear that these voting
differences are at least as related to the party
affiliation of the candidates, not the race of
the candidates.
Q. Okay. And you haven't done any work to try to
assess whether black voters consistently support
Democratic candidates because they're Democrats
or whether they consistently support Democratic
candidates because Democratic candidates
consistently promote policies and values shared
by black voters; is that correct?
A. There's no analysis here on that issue in my
report or Dr. Collingwood's.
Q. You haven't done any analysis of that issue?
A. For this case, no.
Q. All right. Did you investigate any common
characteristics other than party and race shared
by any candidate discussed in your report?
A. No.
Q. All right. You agree that candidates who are
Republicans may be less likely to hold policy

152

38 (Pages 149 to 152)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 39 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com       1-919-424-8242

views that back voters believe will advance
their interests?
        ATTORNEY McKNIGHT:  Objection; form.
        THE WITNESS:  They may be.
BY ATTORNEY THEODORE:
Q.  Well, in fact, Dr. Alford, you know, you teach
    classes about American politics.  Don't you know
    that Democratic candidates are more likely than
    Republican candidates to support the Black Lives
    Matter movement, for example?
A.  Black Lives Matter, yes, I would say that's
    probably an issue where that would be fair to
    say that, produced fairly substantial initial
    split.  I'd say that split has declined
    somewhat, but, yeah, I think that would be fair.
Q.  All right.  And it's fair to say that you know
    that there are other issues of particular
    salience to black voters that a Democratic
    candidate is more likely to focus on?
A.  I mean, it's possible.  I know that -- for
    example, that black voters are less likely to
    support abortion than white voters, and despite
    their positions in the Republican and Democratic
    Party, that doesn't appear to have affected
    the -- at least to date affected the tendency of

153

black voters to vote Democratic.
Q.  All right.  But there are other issues, you
    would agree, of particular salience to black
    voters where a Democratic candidate is going to
    be more likely to share the view of black voters
    than the Republican candidate.  Is that true?
        ATTORNEY McKNIGHT:  Objection; form.
        THE WITNESS:  Again, we're -- because
    we have two major parties, were on a party
    system, there are things that people share and
    don't share, certainly there are a lot of
    issues, gay marriage, transgender rights,
    abortion rights, where black voters are not
    particularly in harmony with the Democratic
    Party, there are other issues where they may be
    more in harmony with the party.
        So, yeah, there -- there is
    partisanship here and there are policy issues
    here that voters used in deciding where they
    belong in this political spectrum, and
    that's -- that's true of black voters as it is
    of white voters.  I'm a Democrat because --
    partly because -- in my case fairly specifically
    because I support policies of the Democratic
    Party.  My father was a Republican, my mother

154

was a Democrat, and so I had a choice to make,
that's the direction I went.
        I think that's true of voters in
general.  And again, I don't think that -- I
think that's just part of, you know, Democratic
politics.  You know, if I -- I happen to live in
a Republican district so I'm represented by a
Republican member of congress, to the extent
that's representation.  I can move to another
part of Houston and I'd be represented by a
Democratic member of congress.  So my district
could be one in which I would elect someone who
would represent my interest or not, and that
reflects the fact that if you live in a
Republican district, you're likely to have a
Republican representative and vice versa.
BY ATTORNEY THEODORE:
Q.  What are some other examples that you can think
    of other than the Black Lives Matter movement
    where Democratic candidates are more likely to
    support policies that black voters also support?
A.  I'd say I haven't actually looked at that
    issue -- particularly looked at it in
    North Carolina which is not a place I've ever
    lived or studied.  So off the top of my head, I

155

don't know what that profile would look like.
Q.  Okay.  You would agree that it is possible for
    political affiliation to be motivated by race,
    correct?
A.  Yes.
Q.  Let's turn to Table 14 of your report, page 6.
    I'm sorry.  I think I mean Table 6 of your
    report, page 14.
A.  I was getting confused.  Much better.
Q.  Okay.  One of the biracial contests here is the
    2020 race between Cheri Beasley and Paul Newby
    for State Supreme Court, correct?
A.  Yes.
Q.  All right.  And white voters gave -- white
    voters cohesively gave 86 percent to Justice
    Newby in the demonstration area, correct?
A.  Correct.
Q.  And they gave only 14 percent of their support
    to Cheri Beasley, correct?
A.  Correct.
Q.  Okay.  And, you know, we've covered some of this
    ground, I think, but nothing in your analysis
    here purports to identify the reason that white
    voters supported Justice Newby; is that correct?
A.  I'm not exactly sure.  So we're off the issue of

156

39  (Pages 153 to 156)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 40 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com              1-919-424-8242

1    causation, and I'm happy about that, but when we
2    take a single election and look at it and we say
3    why would Paul Newby be getting 86 percent of
4    the white vote and then we look at all of the
5    other tables, I don't think that's a difficult
6    question to answer.  He's getting something
7    around 80 percent of the vote which would put
8    him in precisely the same position as every
9    other Republican in the 49 elections.
10        So, yes, the table -- the analysis does
11   provide a very simple explanation for why Paul
12   Newby might be getting 86 percent of the vote
13   because he's a Republican and every other
14   Republican is getting 86 percent of the vote in
15   essence.  So if you just treat that why is he
16   getting strong support from Republicans, it's
17   not because he's white, clearly, because we can
18   see lots of other white candidates here who are
19   getting exactly the opposite; they're getting
20   18 percent.
21        I mean, maybe just that the tables show
22   something so strongly that it almost disappears,
23   but if you looked at these tables and I changed
24   the terms from race and party and told you this
25   had to do with ice cream or something, you would

157

1    here, but the fact that there is virtually no
2    variation across elections, across time, across
3    place, across office, that all of these show
4    almost identical patterns with no explanatory
5    variable except the party of the candidates
6    strongly suggest unless there is some other
7    characteristic that is universally true of the
8    Republican candidates, universally true at the
9    same level of the Democratic candidates, and if
10   so, it would be interesting to know what that
11   is, but it's not my job to figure out what it
12   is.  My job is to tell you what Dr. Collingwood
13   has demonstrated.  He's demonstrated that
14   Democratic and Republican candidates get highly
15   similar, highly consistent levels of support
16   from black and white voters, period.
17        And one thing we know from this table
18   is that the characteristic we're most interested
19   in here which is the role of race in this voting
20   is included in this table, and it does not make
21   a difference.  So maybe there's a difference in
22   hair style or maybe there's a difference in
23   policy positions, although policy positions vary
24   wildly among Democrats and Republicans these
25   days, but one thing we know is it is not the

159

1    look at the tables and there's no question what
2    the conclusions you should reach.  There's a
3    dependable force operating here, and that force
4    is party of the candidate on the vote of black
5    and white voters in North Carolina.
6    Q.   All right.  But you're -- and unfortunately,
7    we're not yet off the topic of causation.
8         Okay.  I think we've covered this, but
9    the only characteristics for candidates
10   reflected on this table are their race and their
11   party, correct?
12   A.   Yes, which is two more things that are reflected
13   than Dr. Collingwood's table.
14   Q.   There are no other characteristics of the
15   candidates that are reflected here?
16   A.   That's correct.
17   Q.   Do you believe that you can testify to a
18   reasonable degree of scientific certainty that
19   the pattern of racially polarized voting here is
20   caused by the party affiliation of the
21   candidates rather than some other characteristic
22   of the candidate that makes the candidate
23   relatively more attractive to black voters or to
24   white voters?
25   A.   So again, we don't have any causal analysis

158

1    difference in the race of the candidates.  That
2    does not make this -- that does not produce this
3    difference, it does not alter this basic
4    pattern.
5         So if you put those in a competition
6    with each other, there isn't any issue that for
7    whatever reason the race variable does not tell
8    us what is happening when we talk about the
9    characteristics of a candidate.  The party of
10   the candidate is very important.  The race of
11   the candidate is not.
12   Q.   You did not consider any other potential
13   explanatory characteristics of the candidate
14   besides party and race, correct?
15   A.   Again, I'm considering two characteristics that
16   are available for candidates unambiguously that
17   are not considered by Dr. Collingwood, although
18   they drive his results and that are critical to
19   understanding of what the table shows and what
20   the case is about.
21        And if there are other policy or
22   candidate characteristics driving this that are
23   not race, then I am not showing what their
24   influence is and it in no way alters my view of
25   what this means in terms of carrying the

160

40 (Pages 157 to 160)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 41 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    plaintiffs' burden in a Section 2 Voting Rights
2    Act case.
3         I guess another way to put it is what
4    variance are you trying to get me to explain?
5    The variance in 97, 98, and 99 percent black
6    support, all of the characteristics of the
7    candidates that could be causing difference are
8    not causing more than a 3 percentage point
9    difference in the black vote, from nearly
10   unanimous to unanimous. So I don't know what
11   all those characteristics are, but that's not
12   going to give you much explanatory power here.
13   Q.  Would it be possible to design a regression to
14   try to isolate whether white voters would be
15   less likely to vote for a particular candidate
16   if that candidate held particular policy views
17   even while holding party affiliation constant?
18   A.  Again, whatever difference that is making in the
19   aggregate, there's very little difference in the
20   behavior of either black or white voters to
21   explain here. Whatever it is, it's not -- it's
22   not breaking in a way that is consistent with
23   race because that would produce big racial
24   differences here, and we're not seeing them.
25        I don't know if, first of all,

161

1         Isn't it possible that if you had
2    considered other potential explanatory factors
3    for the difference in white and black voting,
4    those other potential explanatory factors would
5    be just as explanatory as the party affiliation
6    of the candidate?
7         ATTORNEY McKNIGHT:  Objection; form.
8         THE WITNESS:  I don't know whether it's
9    possible or not. These are fairly extreme
10   results. Maybe it's possible. Again, whatever
11   those characteristics are, if they're related to
12   policy differences or geographic differences, it
13   doesn't change my position at all. It just
14   happens that we have a clear ability to look at
15   a party difference here.
16        So I'm not in any sense -- I don't
17   believe in any sense that this is somehow
18   magically either partisanship or race. Those
19   are two things that we have a measure of.
20   Partisanship is very important. Maybe that's
21   the result of all kinds of other factors that
22   are not race.
23        But again, my job is to address the
24   adequacy of Dr. Collingwood's empirical analysis
25   so that the court has a solid, empirical basis

163

1    regression is the only technique, but if it's
2    possible to devise that kind of analysis,
3    then -- again, I'm not sure what variation
4    you're trying to explain, but if you want to
5    explain -- you might be able to account for some
6    very modest difference, but none of these
7    results -- in none of these cases are you trying
8    to sort of push this into a different range.
9    You don't have results here that are, you know,
10   showing differences in either preferred
11   candidate or particularly strong differences in
12   the level of support in either black or white
13   voters.
14        So I'm not sure exactly what variance
15   you'd be explaining there. I haven't done that
16   analysis, Dr. Collingwood hasn't done it, and
17   again, if those characteristics are independent
18   of the characteristic of race, which is a
19   characteristic we do have here for both voters
20   and candidates, then again it just falls into
21   that -- all those characteristics that motivate
22   Democratic elections and cause some people to
23   win and some people to lose.
24   Q.  So I want you to put aside the question of
25   variance in results for a moment.

162

1    for concluding that voting is polarized on the
2    basis of race and that data which is all that I
3    have in my report is not sufficient to establish
4    anything close to that.
5    BY ATTORNEY THEODORE:
6    Q.  All right. Dr. Alford, are you aware that
7    Democratic Party platforms have endorsed the
8    Black Lives Matter movement in the past?
9         ATTORNEY McKNIGHT:  Objection; form.
10        THE WITNESS:  I have not seen the
11   North Carolina Democratic Party platform so I
12   have no idea.
13   BY ATTORNEY THEODORE:
14   Q.  Okay. I just want you to assume with me that
15   the Democratic Party platform -- well, let's
16   strike that.
17        Are you aware that the national
18   Democratic Party platform has in past election
19   years endorsed the Black Lives Matter movement?
20   A.  I actually haven't seen the Democratic Party
21   platform in past election years so I don't know.
22   Q.  Let's just assume -- take Black Lives Matter as
23   an example that the Democratic Party platform
24   contains a statement supporting Black Lives
25   Matter and the Republican Party platform

164

41 (Pages 161 to 164)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 42 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1    contains no such statement.
2    A.   Okay.
3    Q.   If the column on -- I'm just going to use your
4         Table 6 as an example.
5              If the column on Table 6 where you said
6         "Party" was replaced with a column that said
7         whether the candidate has endorsed a platform
8         that supports the Black Lives Matter movement,
9         this table would show that the column explains
10        divergent voting preferences just as well as the
11        column that you have here reflecting the party.
12        Is that true?
13   A.   In a technical sense, maybe.  They're not in any
14        sense equivalent.
15   Q.   Why aren't they in any sense equivalent?
16   A.   Well, because the party of the candidate is on
17        the ballot, and the position, whether it exists
18        or not about Black Lives Matter or any other
19        policy issue is not on the ballot, and so there
20        are things that voters might likely be aware of
21        and there are things that they might be less
22        aware of.
23             Your example is Black Lives Matter, but
24        party platforms -- actually, I read a book once
25        about party platforms.  Luckily, it doesn't

                                                    165

1    include any party platforms now because I was in
2    graduate school a long time ago.
3             There's an astonishing array of issues
4    in party platform.  In your example, it wouldn't
5    surprise me at all if we could pick out a
6    hundred different things that are in the
7    Democratic platform and not in the Republican or
8    in the Republican and not in the Democratic.
9             And, yes, if they're perfectly aligned
10   with that party's split, we could replace
11   Democrat and Republican here, and every one of
12   those issues, no matter how trivial, would
13   seemingly explain this except, first of all,
14   there are still policy issues so it doesn't
15   change the fact that when we substitute race, we
16   see no effect, and when we put in party, we see
17   party.
18            And in and of itself it wouldn't tell
19   us if they -- you know, maybe the two parties at
20   some point probably had different party platform
21   positions on daylight savings time, but I don't
22   think that would suggest that an adequate
23   explanation for voting behavior in
24   North Carolina was the position of the parties
25   on daylight savings time.

                                                    166

1    Q.   That wouldn't be based on anything you could
2         determine from the table, though.  That would be
3         based on your -- well, sorry.  Go ahead.
4    A.   I would say if that was what was in the table,
5         then it would establish that the simple policy
6         difference like the party's different positions
7         on daylight savings time would do a better job
8         of predicting how people vote than the race of
9         the candidate.
10             So again, if you just want to continue
11        to pile up other things that this kind of a
12        table would show is more important than race,
13        it's correct because race makes almost no
14        difference at all in these votes.  Almost
15        anything you can put it on the other side will
16        do a better job.
17   Q.   All right.  I'm going to make a statement and
18        then I'm going to ask you a question about that
19        statement.  Okay.
20             Here's the statement:
21             Black voters in the relevant regions of
22        North Carolina cohesively agree on which
23        candidate's policies will better advance the
24        interests of black people and cohesively vote
25        for the same candidate based on that

                                                    167

1    determination.
2             ATTORNEY McKNIGHT:  Objection; form.
3             THE WITNESS:  I have no evidence on
4    that issue.
5    BY ATTORNEY THEODORE:
6    Q.   Okay.  The evidence that you've reviewed in this
7         case is consistent with that statement, correct?
8    A.   I guess depends on what you mean by consistent.
9         The evidence that's been presented here, which
10        is limited and focused, as it should be, on the
11        issues in the case, doesn't contradict that, it
12        doesn't prove that's incorrect, but it doesn't
13        prove that it's correct either.
14   Q.   Okay.  And nothing in your report attempts to
15        falsify that statement, correct?
16   A.   I'm not addressing -- neither Collingwood or I
17        are addressing that issue.
18   Q.   And nothing in your report shows that a
19        candidate's party affiliation is a better
20        explanation for black voting behavior than the
21        statement that I read, correct?
22             ATTORNEY McKNIGHT:  Objection; form.
23             THE WITNESS:  In this analysis, in
24        Dr. Collingwood's and my analysis, no.
25             I mean, what I know about American

                                                    168

42  (Pages 165 to 168)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 43 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    voting behavior, what you're suggesting is very
2    unlikely to be true, but that's not what this
3    analysis -- that's not what Dr. Collingwood is
4    attempting to show, it's not what I am
5    attempting to analyze. We could analyze that,
6    but neither of us are.
7           I don't think that's what the analysis
8    would show, but having not done it, I can't say
9    the analysis we've done demonstrates that.
10   BY ATTORNEY THEODORE:
11   Q. All right. Let me turn to page 19 of your
12   report. You see about midway through the page:
13          "With the addition of this
14      candidate information, the election
15      analysis provided by Dr. Collingwood
16      clearly demonstrates that the party
17      affiliation of the candidates best
18      explains the divergent voting
19      preferences of black and white voters
20      in North Carolina elections."
21          Did I read that right?
22   A. Yes.
23   Q. And the candidate information you're referring
24   to again is race and party identification of the
25   candidate?

169

1    A. Okay.
2    Q. And would a more accurate version of that
3    sentence be that the election analysis provided
4    by Dr. Collingwood in your opinion clearly
5    demonstrates that the party affiliation of the
6    candidates better explains than the
7    racial -- than the race of the candidate the
8    divergent voting preferences of black and white
9    voters in North Carolina?
10   A. I mean, I'm not sure I'm understanding what the
11   difference is between your sentence and my
12   sentence.
13   Q. The sentence you wrote uses the word "best"
14   without a comparator, correct?
15   A. Well, there are only two pieces of information
16   about the candidate. We have race and party,
17   and so "best" explains -- yes, "best" explains
18   relative to race.
19   Q. Okay. So what you mean in that sentence is that
20   in your view the analysis demonstrates that
21   party affiliation of the candidate best explains
22   in comparison to racial affiliation of the
23   candidate the divergent voting preferences of
24   black and white voters in North Carolina
25   elections?

170

1    A. At a minimum, that's true.
2           What is also true because the table
3    itself shows that there are very consistent
4    patterns of voting for Democrat and Republican
5    for black and white voters. It also
6    demonstrates that on its own feet, it's a very
7    powerful explanation because it's producing
8    extremely fixed results across elections time
9    and offices. That's unusual.
10          So we know that when we look across
11   these elections, we're looking at different
12   points in time. We're looking at things as
13   diverse of being governor versus being a court
14   judge. We're looking at candidates who are
15   different people who presumably have different
16   characteristics, pluses and minuses, all of
17   which appears to be compressed out of the
18   explanation by just looking at the amazingly
19   stable results by party.
20          As it happens, we can also look at the
21   race of the candidate, and that's one thing we
22   can take out. How other things would fair, it's
23   not clear, but it is not just that party is
24   strong compared to race. It's that party is
25   structuring these results in a very durable way

171

1    and race is not altering that structure.
2    Q. Okay. But you're not making the claim that
3    you've analyzed or concluded that party
4    affiliation of the candidates best explains in
5    comparison to other possible explanations the
6    divergent voting preferences of black and white
7    voters in North Carolina because you only
8    analyzed the role of party affiliation of the
9    candidate versus race of the candidates for this
10   report, correct?
11   A. Again, there are lots of results that might
12   suggest that we need a lot more information and
13   there could be a lot more going on here, but it
14   certainly doesn't preclude the possibility that
15   something else is important here, but it's very
16   clear that from the analysis we have here, all
17   the empirical information we have here, that a
18   party is a very powerful explanation for voting
19   behavior in North Carolina as it is everywhere
20   in the country.
21          The party affiliation of candidates
22   matters, but I don't know how else to -- I don't
23   know how else to say that. It's not always been
24   true to the degree it is now, but currently
25   partisanship in terms of the -- the party of the

172

43 (Pages 169 to 172)

candidate is -- Democratic districts elect
Democrats, Republican districts elect
Republicans.  We're down to seven states where
there's anything really anything up for grabs in
this election.  We're down in the US Congress,
we're down to less than 50 congressional
districts where there's much chance of anything
happening, and that's simply because in most
parts of the country and most districts in the
country and most states in the country, the
party of the candidate is tantamount to
election.

In Texas, the real contest is in the
Republican primary because for most of Texas
that's the answer as to who is going to be your
governor, your lieutenant governor, your
senator, your president.

Q.  All right.  Moving on, your report does not
offer any opinion or evidence that white voters
constitute the majority of Democratic voters in
the demonstration area District 1 or District 2,
correct?

A.  Correct.  I did no demographic analysis.

Q.  And you haven't offered any opinion in your
report that Republicans aggressively recruit

173

black candidates to run in elections in
North Carolina or in this area; is that correct?

ATTORNEY McKNIGHT:  Objection; form.

THE WITNESS:  Yeah, I don't think
either Dr. Collingwood or I looked at candidate
recruitment, although obviously there are
Republicans -- I don't know whether Republicans
are recruiting black candidates or not, but
they've got a candidate in a statewide office
and have -- had one earlier as well.  So I don't
know what that's the result of, but I haven't
studied the recruiting practices of the parties
in North Carolina.

BY ATTORNEY THEODORE:

Q.  In fact, of the 49 elections over the four years
that you and Dr. Collingwood analyzed, the
Republican Party fielded a black candidate in
only two of those elections; is that right?

A.  I believe that's correct.  And again, I'm not
saying the table explains everything, but
Dr. Collingwood's table will give you a pretty
nice idea of why that might be.  If he's right
and 99 percent of black voters vote for the
Democrat candidate, then it's going to be
slightly that the Democratic Party is going to

174

be fielding more black candidates than
Republican parties because if the analysis is
correct, virtually all of the black voters in
North Carolina are Democrats.

Q.  You haven't offered any opinion in your report
that elected candidates preferred by white
voters are responsive to the needs of black
constituents in Senate Districts 1 or 2; is that
correct?

ATTORNEY McKNIGHT:  Objection; form.

THE WITNESS:  Neither Dr. Collingwood
nor I did any analysis of responsiveness of
candidates or representatives in any of the
districts.

BY ATTORNEY THEODORE:

Q.  Okay.  And you haven't offered any opinion that
elected candidates who are white are responsive
to the needs of black constituents in Senate
Districts 1 and 2, correct?

ATTORNEY McKNIGHT:  Objection; form.

THE WITNESS:  I don't think -- again,
all I can tell you is what the table shows, and
the table shows a lot of stuff.  Among other
things, it shows that black voters are just as
likely to support a white candidate as a black

175

candidate when they run as a Democrat.

And again, if you're saying that white
Democrats are no more responsive to the issue of
black candidates than are black Democrats or
they're not responsive at all, I'm not sure what
you're saying.

You're asking me if a white candidate
or a white elected official can be responsive to
black issues, most of the white -- most of the
Democratic candidates are white.  I assume
they're responsive to black issues or they
wouldn't be getting 100 percent of the black
vote.

BY ATTORNEY THEODORE:

Q.  All right.  Your aware that Senate District 1 or
2 are majority white districts?

A.  I believe that's correct.

Q.  Okay.  And that means that every white voter in
Senate District 1 and 2 lives in a majority
white senate district, correct?

A.  I think that makes sense.

Q.  And no black voter in Senate District 1 and 2
lives in a majority black senate district?

A.  I think that's correct.

Q.  Okay.  None of your analysis suggests that in

176

44  (Pages 173 to 176)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 45 of 104
DISCOVERY COURT REPORTERS          www.discoverydepo.com          1-919-424-8242

1    the future candidates preferred by black voters
2    in the demonstration area District 1 or
3    District 2 are likely to attract greater white
4    support than they did in the elections that you
5    and Dr. Collingwood looked at; is that correct?
6          ATTORNEY McKNIGHT:  Objection; form.
7          THE WITNESS:  I don't think either
8    Dr. Collingwood or I made any speculation about
9    future trends in this.
10   BY ATTORNEY THEODORE:
11   Q.  Okay.  None of your analysis suggests that in
12   the future, candidates preferred by black voters
13   in the relevant regions are likely to attract
14   greater white support than they have in the
15   past; is that correct?
16         ATTORNEY McKNIGHT:  Objection; form.
17         THE WITNESS:  Yeah.  I would assume
18   that the pattern we're seeing now at least in
19   the short term is relatively stable, relative
20   support for Democrat and Republican candidates
21   is not going to change in the short term.
22   Majority Republican districts are going to
23   mostly elect Republicans and majority Democratic
24   districts will mostly elect Democrats.
25   ATTORNEY THEODORE:

177

1    thing as the presence of party as an issue in
2    the election or -- it's the easiest way for
3    voters to be aware of the party affiliation of
4    candidates, but there are lots of examples all
5    the way down to school board elections where the
6    party affiliation of candidates is very clear to
7    voters.  So it's certainly one mechanism for
8    assessing that, but it's not exclusive in the
9    sense that -- I see lots of nonpartisan
10   elections that were dominated by party
11   affiliation of candidates even where it's not
12   indicated on the ballot.
13   Q.  Okay.  You say here "The final Supreme Court
14   contest in 2016 is also instructive."
15         Did I read that correctly?
16   A.  Yes.
17   Q.  Okay.  And the reason you're offering this as a,
18   quote, unquote, instructive election is because
19   it's the last election for the State Supreme
20   Court that did not have an official partisan
21   structure; is that correct?
22   A.  I think there are two -- two reasons why -- to
23   focus on it and talk about it, and one is there
24   are no partisan labels on the ballot and the
25   other is that it just doesn't look like any of

179

1    Q.  And in fact, the trend with respect to white
2    crossover voting is moving in the direction in
3    this area, in this region -- let me strike that.
4          In fact, in this region, white
5    crossover voting has been decreasing since 2016;
6    is that correct?
7    A.  The point estimates are -- yeah, show a modest
8    trend in that direction whether it's -- you
9    know, whether it's a continuous trend or what it
10   reflects, I don't know, but, yes, that area
11   seems to be voting slightly more Republican than
12   it has previous.
13   Q.  All right.  Let's turn to page 8 of your report.
14         You comment here on the election
15   between Michael Morgan and Bob Edwards for the
16   State Supreme Court in 2016.
17   A.  Yes.
18   Q.  And do you believe that the absence of any party
19   indicator on the ballot makes this a
20   particularly instructive election to look at to
21   test whether the candidate's race is responsible
22   for polarization as opposed to the candidate's
23   party?
24   A.  It's potentially something to look at.  The
25   presence of party on the ballot is not the same

178

1    the other elections.
2          You can look at Dr. Collingwood's dot
3    plot or whatever, it's wildly different from all
4    the other elections, so that suggests that
5    something different is operating there.
6    Q.  And this is the only nonpartisan statewide
7    election that's available in the elections that
8    you and Dr. Collingwood looked at, correct?
9    A.  Yes.  And it's in the recent time period 2016
10   forward, this is the only nonpartisan election
11   that's in that pool of elections.
12   Q.  Okay.  And let's turn -- I'm going to talk about
13   some of the numbers on in Table 2 on page 7, if
14   you want to turn to that.
15         All right.  In the demonstration area,
16   Morgan gets 78 percent of the black vote,
17   correct?
18   A.  Correct.
19   Q.  And you agree that reflects cohesive black
20   voting?
21   A.  Reflects what?
22   Q.  Reflects cohesive black voting.
23   A.  Again, if we're going to use 75 percent as the
24   line which is at least a possibility, it's above
25   75 percent.

180

1   Q.  And again, 75 percent is a line that you
2       yourself have used in the past, correct?
3   A.  I have used that, yes.
4   Q.  And he gets 83 percent of the black vote in
5       Senate District 2 and 70 percent in
6       Senate District 1, correct?
7   A.  Correct.
8   Q.  So on average in our three areas of interest,
9       he's getting above 75 percent of the black vote;
10      is that correct?
11  A.  I'm not sure why we're averaging across -- I
12      mean, the demonstration area is not different
13      from District 1 and District 2.  It's -- the
14      demonstration area contains -- by definition is
15      intended to contain roughly the area of
16      District 1 and 2, so averaging them together is
17      kind of an odd thing to do.  From that sense, if
18      you want to know an overall level, you know, you
19      could look at the demonstration area, you could
20      compare the two districts there.
21          I don't think we need to summarize them
22      to say that they both show either a little bit
23      above or a little bit below 75 percent so they
24      show substantial cohesion, and also they are
25      clearly substantially different, not 1 point or

181

1       2 points, but 20 points or more different from
2       any level in any of the partisan elections for
3       black voters.
4   Q.  And you say on page 8 that black voter support
5       for Morgan is at 75 percent, correct?
6   A.  Yes.
7   Q.  Okay.  So you agree that this election shows
8       that black voters are still voting cohesively
9       for a black candidate even when there are no
10      partisan signals on the ballot?
11  A.  That would be correct.
12  Q.  Okay.  So isn't this inconsistent with the view
13      that party affiliation on the ballot is
14      sufficient to explain black voter cohesion?
15  A.  No.
16  Q.  Why not?
17  A.  Because we have -- there is no party affiliation
18      on the ballot, and absent that party
19      affiliation, we can see that being the black
20      candidate versus the white candidate made a
21      difference, although substantially less
22      difference than what we see when party is on the
23      ballot.
24          And so the question is not sort of does
25      that mean that party has not -- is not enough to

182

1       explain -- how much more you can explain than 98
2       or 99 percent.  That's what party explains.  The
3       party on the ballot and virtually every black
4       voter is going to vote for the Democrat.  Take
5       it off the ballot and that drops down to
6       75 percent will favor the black candidate.  I
7       think that tells you -- that also tells you in
8       terms of the general elections in North Carolina
9       what's driving the behavior of black voters.
10      You certainly don't see 25 percent crossover in
11      any of the other elections among black voters
12      for a candidate -- or a Republican candidate.
13  Q.  Well --
14  A.  If we're talking about nonpartisan elections,
15      this is some evidence that -- for Gingles 2,
16      some evidence that black voters might -- if they
17      have only one election, but in that one election
18      black voters are showing decided preference for
19      the black candidate and that might suggest that
20      in nonpartisan elections there may be cohesion
21      among black voters in favor of black candidates.
22  Q.  This shows that even in the absence of a
23      partisan indication black voters cohesively
24      prefer a black candidate, correct?
25  A.  You say even in the absence of a party, black

183

1       voters prefer the black candidate.
2   Q.  Cohesively prefer the black candidate.
3   A.  Even in the absence of party, black voters
4       prefer the black candidate, right?
5   Q.  I'm asking --
6   A.  Maybe I misunderstood the question.  I thought
7       that's what you were saying.  Because with the
8       presence of party, black voters don't prefer the
9       black candidate, they prefer the white candidate
10      or the black candidate at equal levels.  Absence
11      party, there's some evidence in one election
12      that black voters might have a preference --
13      reduced but a preference for the black
14      candidate, and then white voters -- the white
15      bloc voting has completely disappears.  White
16      bloc voters showing no cohesion at all.
17          So again, most of the point of this
18      analysis is not about white -- I'm sorry -- not
19      about black cohesion, it's about Gingles 3 about
20      whether there's legally significant white bloc
21      voting.  And here, as soon as you take away the
22      party indicator, suddenly you have white voters
23      voting at levels for the black candidate that
24      equals their vote for the white candidate and
25      that tells you something I think about the

184

46 (Pages 181 to 184)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 47 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    influence of race absent party for white voters
2    and for white bloc voting, and that's the
3    critical -- that's the critical issue here.
4         It's not about black cohesion. It's
5    about white voting, it's about Gingles 3, and
6    it's about whether white voters on account of
7    race are unwilling to support black candidates
8    or black preferred black candidates, and there's
9    just no evidence here that the behavior of white
10   voters as being affected in any way that's
11   legally significant with regard to the fact that
12   one of these candidates is black and one of them
13   is white or that one of them is preferred.
14   Q.  Dr. Alford, we don't have that much time left,
15   so I would just ask if you can keep the answers
16   a little more precise.
17        You offer a number of opinions in your
18   report not just about the explanation for white
19   cohesive voting but also the explanation for
20   black cohesive voting, don't you?
21   A.  Yes.
22   Q.  And so putting aside what this election shows
23   about white cohesive voting, isn't it true that
24   this election shows that the race of the
25   candidate independent of the party of the

185

1    candidate has some explanatory value for black
2    voter preferences?
3         ATTORNEY McKNIGHT:  Objection; form.
4         THE WITNESS:  Again, I would like to
5    point out that this is a single election in
6    which the preferences might well have been the
7    reverse of this and it would still just be a
8    single election.  So we can't really say --
9    doesn't stand out well as a piece of evidence
10   against 48 other elections.
11        So certainly in this election, the
12   results show black voters prefer the black
13   candidate.  Whether that would be the opposite
14   and if there was a second election, we don't
15   know, so we don't have a lot of evidence there
16   and we have a lot of evidence about what
17   difference it makes to black voters whether the
18   candidate is white or black in the partisan
19   elections.
20   BY ATTORNEY THEODORE:
21   Q.  Dr. Alford, you're the one who focused on this
22   election in your report; isn't that true?
23   A.  That's correct.
24   Q.  Okay.  So you're offering this election as an
25   instructive election, correct?

186

1    A.  Yes.
2    Q.  And this election shows -- this election shows
3    that even if there's no partisan indication on
4    the ballot, the race of the candidate has
5    explanatory value or cohesion we see in
6    black voter preferences, correct?
7    A.  In this election, yes.
8    Q.  All right.  Let me turn to page 16 of your
9    report.
10   A.  Yes.
11   Q.  On page 16, you reproduce a plot taken from the
12   preliminary injunction stage report of
13   Dr. Barreto, correct?
14   A.  Correct.
15   Q.  Would you call this a scatterplot or a dot plot?
16   A.  I would call it a scatterplot.
17   Q.  Okay.  Did Dr. Barreto's report state that one
18   could draw conclusions from this scatterplot
19   about the minimum BVAP percentage required to
20   elect a black preferred candidate at the level
21   of a district?
22   A.  I do not recall.
23   Q.  Okay.  Sitting here today, you can't state that
24   you understood Dr. Barreto to be suggesting that
25   this scatterplot provided any information about

187

1    the minimum BVAP required to elect a black
2    preferred candidate at the level of a district;
3    is that correct?
4         ATTORNEY McKNIGHT:  Objection; form.
5         THE WITNESS:  All I remember is that
6    Dr. Barreto for some reason thought it was
7    important to include it, so I thought it was
8    useful and I think the judge commented on it.
9    There was some issue about whether this was even
10   the right county to be looking at, so I just
11   brought this forward with the right
12   candidates -- I'm sorry -- with the right
13   counties, and I think the plot pretty much
14   speaks for itself.
15   BY ATTORNEY THEODORE:
16   Q.  I just want to repeat, you do not understand,
17   based on your knowledge here today, Dr. Barreto
18   to have been suggesting that this scatterplot
19   was useful for determining the BVAP percentage
20   needed to elect a black preferred candidate in a
21   particular district; is that correct?
22   A.  I do not -- I do not know whether he intended it
23   to be useful for that or not.  I do not know
24   what he intended to be useful.  I don't recall.
25   Q.  Let's turn to page 18.  Sorry.  17.

188

47  (Pages 185 to 188)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 48 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

---

**189**

1     And this is a scatterplot that you
2 created based on Dr. Collingwood's data; is that
3 correct?
4 A.  That's correct.
5 Q.  Can you walk me through what this scatterplot is
6 Figure 2 is showing, you know, X axis, Y axis,
7 the dots, et cetera.
8 A.  I'm sorry.  So it's showing you the percentage
9 vote for the candidates, Democrat and
10 Republican, on the vertical axis, and on the
11 horizontal axis it's just the BVAP percentage.
12     So again, as you go up, you can see
13 sort of in the middle there where you have .5,
14 those are all the precincts that are clustered
15 around 50 percent BVAP.  At the far right of the
16 graph, you have precincts that are more than 80,
17 85 percent black, and then the far left you have
18 precincts that are less than 10 percent black.
19 Q.  All right.  So if a dot -- there's a horizontal
20 line at .5 percent of the vote for a particular
21 candidate.  Do you see that?
22 A.  Yes.
23 Q.  If a dot is like straddling that horizontal line
24 at .5, so how do you tell from the chart whether
25 the dot represents a precinct that gave more

---

**190**

1 than 50 percent to the candidate?
2 A.  If it's straddling, you could query the dot, but
3 if it's straddling, it's telling you that
4 basically that's a precinct that's pretty evenly
5 divided between two candidates.
6 Q.  And if more than half the dot is above the line,
7 does that mean that the precinct gave more than
8 50 percent to the candidate?
9 A.  That's correct.
10 Q.  That's correct.  Okay.
11     So if some portion of the dot is above
12 the line but the center of the dot is below the
13 line, that would mean that the precinct gave
14 less than 50 percent of the vote to the
15 candidate?
16 A.  That would be correct.
17 Q.  One thing this plot shows is that there is a
18 fairly linear relationship between the BVAP
19 percentage in each precinct and a percentage of
20 the vote for the black preferred candidate
21 within the precinct; is that correct?
22 A.  Yes.
23 Q.  And the red dots are fairly tightly clustered
24 around the red line and the blue dots are fairly
25 tightly clustered around the blue line?

---

**191**

1 A.  That's correct.
2 Q.  And that tight fit is what you expect to see
3 when there is highly polarized voting on the
4 basis of the race of the voter; is that right?
5 A.  This is -- we're talking about the Democratic
6 and the Republican candidate, so this is what
7 you would expect if black and white voters vote
8 differently with regard to Democratic and
9 Republican candidates, exactly what we've
10 already seen exhaustively in the tables.
11 Q.  You conclude that the vote for Cooper, who's the
12 black preferred candidate in 2020, starts to
13 move above 50 percent in certain precincts
14 somewhere around 37 percent BVAP with Cooper
15 clearly winning in precincts well below
16 50 percent BVAP.
17     Do you see that on page 16?
18 A.  Yes.
19 Q.  All right.  You would agree a district is
20 composed of many precincts, correct?
21 A.  I think that's correct, yes.
22 Q.  Do you know how many precincts are in Senate
23 Districts 1 and 2 in the 2023 North Carolina
24 Senate map?
25 A.  Off the top of my head, no.

---

**192**

1 Q.  Probably at least dozens, would you say?
2 A.  At least.
3 Q.  Each of those precincts has a different
4 population, right?
5 A.  That's correct.
6 Q.  And your dot plots don't reflect the population
7 differentials, right?
8 A.  They do not.
9 Q.  So let's imagine you have a district composed of
10 two districts, so the first precinct has 100
11 voters and a BVAP of 37 percent and it gives
12 52 percent of its vote to the black preferred
13 candidate.
14 A.  Yes.
15 Q.  So that's -- it gets 52 votes to the black
16 preferred candidate, correct?
17 A.  Correct.
18 Q.  Precinct 2 has 200 voters and a BVAP of
19 37 percent and gives 47 percent of its vote to
20 the black preferred candidate.
21     Are you with me?
22 A.  Yes.
23 Q.  So Precinct 2 gives 47 percent times 200 to the
24 black preferred candidate which is 95, right?
25 If I'm adding correctly.  Or 94.  Apologies.

---

48  (Pages 189 to 192)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 49 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

1    A.  I won't quibble about 1 percentage point
2        difference with you.
3    Q.  Thanks.  All right.
4            So you have a total of 300 votes.  You
5        have 52 votes for the black preferred candidate
6        in Precinct 1 and 94 from Precinct 2, and that's
7        146 out of 300 votes, correct?
8    A.  Correct.
9    Q.  Okay.  So the black preferred candidate loses
10       that district, correct?
11   A.  That's correct.
12   Q.  And that's true even though there was a precinct
13       that had a BVAP of 37 percent that was giving
14       more than 50 percent of its vote to the black
15       preferred candidate, correct?
16   A.  Correct.
17   Q.  All right.  So you have to take population of
18       precincts into account before drawing any
19       conclusions from a scatterplot like this about
20       whether a district could elect a black preferred
21       candidate, correct?
22   A.  I'm not -- so, yeah, there are a lot of things
23       being taken into account.  I'm not drawing a
24       district here.  And, yes, what this suggests is
25       that there are -- unlike districts which are

193

1        large and don't give us a lot of numerosity,
2        precincts give us lots of numerosity and lots of
3        variation.  And one of the questions you might
4        ask about whether you need to be at 50 percent
5        black in order to be able to win would be are
6        there -- what are geographies in which you're at
7        that level at which also have numerosity where
8        we can look at that, and that's what this does.
9            It is intended as I assume Dr. Barreto
10       intended it, but I don't know, simply to be
11       illustrative of another setting in which you can
12       look at the ability of black preferred
13       candidates to win in relationship to the BVAP of
14       that jurisdiction or that geography I guess
15       would be better to say about precincts.  Whether
16       they can ultimately be collected into compact,
17       contiguous, populated enough district is really
18       another question, but that's not my purpose
19       here.  Again, I don't think it was Dr. Barreto's
20       purpose, but it was not my purpose here.
21   Q.  And so it's incorrect to say that simply because
22       an individual precinct in northeast
23       North Carolina at somewhere around 37 percent
24       BVAP votes to elect a black preferred candidate
25       that the same would be true of a senate district

194

1        in northeastern North Carolina that has
2        somewhere around 37 percent BVAP, correct?
3    A.  Again, that would depend on -- that would depend
4        on the -- obviously, it is not the case that
5        every precinct that is 37 percent black votes
6        majority for the black preferred candidate, it
7        would not be true of every senate district at
8        37 percent black.
9    Q.  Okay.  And you're not offering any opinion in
10       this case that a senate district in the
11       northeastern region of North Carolina could
12       typically elect black candidates at a BVAP at
13       around 37 percent, are you?
14   A.  Obviously, it depends what you mean by
15       typically.  I'm using this to sort of inform as
16       I think the judge took it to be what we see in
17       the bar chart, in this case the bar chart that
18       was produced by Dr. Collingwood, and bar charts
19       lump a lot of things together and can be
20       difficult to understand.
21           At least as I understand what
22       Dr. Collingwood concluded from his bar chart was
23       that you did not need to be at 50 percent BVAP
24       to create a successful district that would elect
25       a black preferred candidate.

195

1    Q.  And we'll get there.
2    A.  Okay.  So my view is I'm just showing something
3        that the judge had mentioned previously in the
4        case updated so that it could be applied in this
5        case with the right counties.  And again, I
6        think it's consistent -- entirely consistent
7        with Dr. Collingwood's bar chart.
8    Q.  But you were not offering an opinion in this
9        case that a senate district in the northeastern
10       region of North Carolina could elect black
11       candidates at a BVAP of around 37 percent, are
12       you?
13   A.  Well, let me see.  The conclusion I'm offering
14       you, it also demonstrates that black voters do
15       not need to be majority in a district in order
16       to elect a Democratic candidate.
17   Q.  All right.  So I'm just going to say again, you
18       were not offering an opinion in this case that a
19       senate district in northeastern region in
20       North Carolina could elect black candidates at a
21       BVAP up somewhere around 37 percent, are you?
22   A.  I'm not saying that that's necessarily true.
23       I'm not saying it's not true.  I'm just saying
24       this demonstrates I think fairly clearly that
25       cross point between these lines is not at

196

1    50 percent, it's well below 50 percent, and
2    that's compatible with Dr. Collingwood's
3    conclusion that it doesn't need to be majority,
4    and this bar chart that shows lots of districts
5    that are not majority that perform, and that
6    leads to my conclusion that you do not need to
7    have a majority district for it to perform.
8         How far below majority, I'm not saying
9    it necessarily goes all the way to 37 percent
10   but clearly goes below 50 percent and at least
11   in some instances based on, again, both this and
12   Dr. Collingwood's chart fairly substantially
13   below 50 percent.
14   Q.  Okay.  Do you agree that it would be incorrect
15   to extrapolate from this chart that a senate
16   district composed of some of the precincts in
17   this chart could elect a black preferred
18   candidate at a particular BVAP percentage simply
19   because an individual precinct does so at the
20   same BVAP percentage?
21        ATTORNEY McKNIGHT:  Objection; form.
22        THE WITNESS:  Yes, I would agree.
23   Again, I don't conclude that you can draw a
24   37 percent district.  I don't intend this to
25   indicate that this would necessarily mean you

                                                197

1    could draw that.  So if you're going to draw
2    from this and you're going to extrapolate from
3    this and say you can draw a 37 percent
4    performing district, this doesn't say that's
5    true, it doesn't say it's not true, and it's not
6    what you I conclude.
7    BY ATTORNEY THEODORE:
8    Q.  All right.  And this scatterplot on Figure 2
9    also only reflects results of one election,
10   correct?
11   A.  That's correct.
12   Q.  And that's the election for governor in 2020?
13   A.  Figure 2, yes.
14   Q.  Are you aware that Governor Cooper generally
15   outperforms other black preferred candidates
16   among white voters?
17   A.  I'd have to look at the table.  It's in the
18   table.
19   Q.  It sure is.  All right.  Let's turn to your
20   Table 6 on page 14 of your report.
21   A.  Yes.
22   Q.  You report that Governor Cooper got 15 percent
23   of the white vote in 2020 in the demonstration
24   area compared to 13 percent on average for black
25   preferred candidates?

                                                198

1    A.  That's correct.
2    Q.  All right.  Figure 3 is the same as Figure 2
3    just for the 2016 North Carolina governor race;
4    is that right?
5    A.  That's correct.
6         ATTORNEY McKNIGHT:  Elisabeth, if we're
7    going into a new topic or a new area, we're
8    going close to two hours without a break.  It
9    may sense to take a short break.
10        ATTORNEY THEODORE:  Yes.  That's fine.
11   Let's take a break.
12        (Brief Recess:  3:28 to 3:37 p.m.)
13   BY ATTORNEY THEODORE:
14   Q.  So I think we were looking at your Table 3 --
15   your Figure 3 on page 18 of your report.
16   A.  Yes.
17   Q.  Okay.  Do you believe that you can draw reliable
18   conclusions about the BVAP percentage at which a
19   district in northeastern North Carolina could be
20   expected to elect a black preferred candidate on
21   the basis of your Figure 3?
22   A.  Yes.
23   Q.  What conclusions can you draw on the basis of
24   your Figure 3 about the BVAP percentage at which
25   a district could be expected to elect a black

                                                199

1    preferred candidate?
2    A.  You can draw a conclusion that according to this
3    graph, these precinct level results don't
4    suggest that a district would have to be above
5    50 percent to be effective.
6    Q.  Okay.  Do you believe that you can draw a
7    reliable conclusion about the precise BVAP
8    percentage at which a district in northeastern
9    North Carolina could be expected to elect a
10   black preferred candidate on the basis of your
11   Figure 3?
12   A.  No.
13   Q.  Okay.  All right.  And let's turn to page 12 of
14   Dr. Collingwood's report.
15        All right.  And are you there?
16   A.  Yep, just about.  Yes.
17   Q.  All right.  And Dr. Collingwood's RPV numbers in
18   the demonstration area show that only
19   11.61 percent of white voters voted for black
20   preferred candidates in the 2022 elections
21   compared to 21.02 percent in the 2016 elections;
22   is that correct?
23   A.  That's correct.
24   Q.  Okay.  And is that an additional reason --
25   strike that.

                                                200

50  (Pages 197 to 200)

Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 51 of 104
DISCOVERY COURT REPORTERS          www.discoverydepo.com          1-919-424-8242

1    Is that a reason why the 2016 elections
2    are not likely to be a good predictor of how a
3    black preferred candidate -- strike that.
4         Is that a reason why the 2016 elections
5    are not likely to be a good predictor of the
6    BVAP percentage at which a district would elect
7    a black preferred candidate in 2024 and future
8    years?
9         ATTORNEY McKNIGHT:  Objection; form.
10        THE WITNESS:  If you were performing an
11   analysis to figure out what that number would
12   be, you would probably be better off going with
13   more recent rather than older data.
14   BY ATTORNEY THEODORE:
15   Q.  Okay.  And if the percentage of white voters in
16   a majority white precinct voting for the black
17   preferred candidate drops by about 10 points
18   from 2016 to 2022, then the overall vote for the
19   black preferred candidate in that precinct is
20   going to drop by at least 5 points; is that
21   correct?
22        ATTORNEY McKNIGHT:  Objection; form.
23        THE WITNESS:  And again, that's going
24   to depend when you're talking about a 12-county
25   demonstration area.  Just as you can't assume

1    that you can draw a district that looks like a
2    precinct, you can't assume that when you're
3    drawing a district that everything that you draw
4    is going to look like a random sample of a
5    12-county area, so within the 12-county area
6    there are variations.  You're using sub
7    geography.
8         This would be roughly correct if you
9    were trying to draw a district that basically
10   contained those 12 counties, but you're not.
11   You're trying to draw two districts that are
12   less than the 12 counties so both individually
13   and collectively.  So as you said, it's hard to
14   say what's going to happen when you start
15   putting precincts together.  It's not the case
16   that the multiple precincts within this
17   12-county area are all either 21 percent average
18   or 11 percent average, a lot of variations.
19        ATTORNEY THEODORE:  Okay.  I'm going to
20   drop Dr. Collingwood's rebuttal report into the
21   chat, and I'm going to mark that as Exhibit 7.
22        (WHEREUPON, Plaintiff's Exhibit 7 was
23   marked for identification.)
24   BY ATTORNEY THEODORE:
25   Q.  Have you reviewed Dr. Collingwood's Rebuttal

1    Figure Number 1 on page 6 of his rebuttal
2    report?
3    A.  Yes.
4    Q.  Okay.  And this is a reproduction of your
5    scatterplot Figure 2, but each dot is weighted
6    based on the population of the precinct it
7    represents, correct?
8    A.  Correct.
9    Q.  And Dr. Collingwood turned over the code and
10   backup materials for this figure, correct?
11   A.  I don't know.
12   Q.  Okay.  So you didn't review those?
13   A.  No.
14   Q.  Sitting here today, can you identify any errors
15   in Rebuttal Figure 1?
16   A.  No.
17   Q.  Did you review Dr. Collingwood's Rebuttal
18   Table 1 on page 7?
19   A.  Yes.
20   Q.  And this is a table that looks at how the four
21   precincts with BVAP between 37 to 40 percent in
22   the demonstration area performed in the 2020
23   governor and presidential contests, correct?
24   A.  Correct.
25   Q.  Sitting here today, can you identify any errors

1    in Rebuttal Table 1?
2    A.  No.
3    Q.  All right.  Let's turn to Dr. Collingwood's
4    analysis of this issue in his initial report.
5         You -- and this is -- well, you
6    understand that Dr. Collingwood conducted an
7    analysis included that across all the 2020 and
8    2022 statewide contests the counties in the
9    demonstration area would on average elect a
10   black preferred candidate with a BVAP of
11   47.07 percent?
12   A.  That's my recollection.
13   Q.  All right.  And you don't offer -- and the
14   demonstration area as we've discussed refers to
15   the 12 counties that form part of the
16   plaintiffs' various Gingles 1 demonstration
17   districts, correct?
18   A.  That is my recollection.  Let me make sure I'm
19   not misstating something here.
20        The analysis is the counties in the
21   demonstration area, yes.
22   Q.  All right.  The demonstration area refers to the
23   12 counties in the northeast region that form
24   part of the plaintiffs' various Gingles 1
25   demonstration districts, correct?

51  (Pages 201 to 204)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 52 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1   A.  That's correct.
2   Q.  And you don't offer any opinion in your report
3       criticizing Dr. Collingwood's decision to
4       conduct his analysis of the BVAP needed to elect
5       a black preferred candidate for this case by
6       analyzing those counties, correct?
7   A.  That's correct.
8   Q.  All right.  You say in your report on page 15,
9       "As he notes," and you're referring to
10      Dr. Collingwood, "a BVAP of 47.07 percent is the
11      mean for black preferred candidate success."
12          Did I read that correctly?
13  A.  Yes.
14  Q.  Okay.  So you agree that a BVAP of 47.07 percent
15      is the BVAP that would be required in the
16      demonstration area for a black preferred
17      candidate to narrowly win the average election;
18      is that correct?
19  A.  I'm not sure I would go quite that far, no.
20  Q.  What did you mean when you stated "As he notes a
21      BVAP of 47.07 percent is the mean for black
22      preferred candidate success"?
23  A.  Well, again, as he's majoring this which is
24      fairly indirectly through using EI estimates and
25      applying them to BVAPs and so forth, so given

205

1   A.  Well, that's -- I mean, I mentioned about the
2       bar charts, and I talk about what the
3       scatterplot show.  I'm not endorsing
4       the -- although the 47 percent is below
5       50 percent, so certainly he's conceding that
6       this will work below 50 percent, but I think the
7       substance of what I'm saying in my report that
8       we've got a lot of bars here and the bars below
9       that 40 percent line represent districts that
10      perform presumably.
11          And again, I mean, I wasn't criticizing
12      it for being theoretical as opposed to actually
13      creating a district.  I'm not the one that
14      believes that you need to create a district.
15      Apparently, that's something he believes, which
16      he didn't do.
17  Q.  I'm sorry.  Can you repeat what you just said.
18  A.  I said I'm not saying that he not necessarily
19      had to create a district to demonstrate this
20      which he didn't do, but he seems to be critical
21      of me for not creating a district to demonstrate
22      what I was saying.  So maybe it is important to
23      create a district, but he hasn't done that.
24          So again, I'm not particularly critical
25      of this analysis.  I think the bar chart makes

207

1       all that methodology that's what he shows as the
2       mean needed to reach 50 percent plus 1.
3           When you're evaluating districts,
4       you -- for example, you would -- an
5       opportunity-to-elect district is not a district
6       where you basically have a majority in all the
7       elections.  It's a district where you could
8       expect to win more than half of the elections,
9       so we're not sure that these are equal
10      opportunity districts.  I'm not sure that
11      they're actual districts.
12          So I'm not entirely sure how this
13      directly connects to district formation any more
14      than the scatterplots connect directly to
15      district formation, but I do see that in
16      the -- in this bar chart that there are
17      substantial -- substantial number of districts
18      below that that seem to be performing.
19          So I'm not sure exactly what to make of
20      the mean -- when you're trying to translate the
21      mean back into saying that you'd have to have a
22      district that was above 47 percent to perform,
23      this doesn't demonstrate that.
24  Q.  You don't offer any of the opinions you just
25      stated in your report, do you?

206

1       clear that what he's showing is that whatever
2       the mean is, it's below 50 percent and that
3       there are things that fall well below
4       50 percent.  And I think that's the same point I
5       was making with my scatterplot which is just a
6       reproduction or an update of Dr. Barreto's
7       scatterplot, so I think we're all on the same
8       page here.
9   Q.  Well, your scatterplot doesn't speak to a
10      district's BVAP percentage, correct?  It just
11      speaks to a district's BVAP percentage?
12  A.  It speaks to the issue, as did Dr. Barreto's,
13      about are there precincts in which this is
14      taking place and therefore can we believe --
15      sort of as a matter of reality, could we believe
16      something, for example, is abstract as
17      Dr. Collingwood's analysis, and I think the
18      answer is we can.
19          How is it that we have successful
20      districts well below the 47 line, and the answer
21      is it's not unrealistic because we know that in
22      a non-arbitrary geography like precincts we see
23      that as well.  Again, neither of us drawing
24      districts here, but I think we're drawing the
25      same conclusion.

208

1  Q.  You haven't criticized -- you haven't offered
2      any criticism of the method that Dr. Collingwood
3      used to reach the conclusion that 47.07 percent
4      is the BVAP percentage where these counties
5      would on average elect a black preferred
6      candidate, correct?
7  A.  I think it's a little abstract, but I'm not
8      criticizing.  I don't think he did it
9      incorrectly.  Again, I can't verify it, but I
10     wasn't concerned enough about it to want to
11     replicate it because I don't disagree with what
12     his Figure 13 shows.  And I think another way of
13     looking at that, at least the judge mentioned as
14     being useful was the scatterplot.  In turn,
15     Dr. Collingwood says my scatterplot doesn't show
16     anything because I should have drawn a district
17     to show what the minimum level was, but -- and
18     so, yeah, I didn't criticize him for not drawing
19     a district, but if he thinks it's critical to
20     draw a district, he should have drawn one.
21 Q.  He should have drawn a district to show what?
22 A.  Well, he said I would have to draw a district to
23     show that it was possible to elect at whatever
24     level, that there's no way to do that without
25     actually drawing a district, and then he turns

209

1      around and says he's got the level here and he
2      didn't draw a district.
3          So again, I'm not saying you have to do
4      that.  I'm just saying, you know, fair is fair.
5      If he thinks that is a critical issue, that
6      someone, in order to testify about what's
7      possible, needs to actually draw that district,
8      then he needs to actually draw that district.
9  Q.  Dr. Alford, you did no work to determine the
10     BVAP percentage at which a senate district in
11     the demonstration area could elect a black
12     preferred candidate, correct?
13         ATTORNEY McKNIGHT:  Objection; form.
14         THE WITNESS:  Again, the scatterplot,
15     which is something taken from Dr. Barreto's
16     report, is relevant to that and that's what I
17     did.  I updated that, put it in the right
18     counties to show that it confirms what Figure 13
19     in Dr. Collingwood's report shows.
20         I did not say that Dr. Collingwood was
21     defective for not producing a district, but in
22     response to what I said, which I think
23     reenforces his analysis, he seemed to take
24     exception to that and believe that what I should
25     have done, which he didn't do, was draw some

210

1      exhaustive senate district to find out what was
2      possible here.  I don't think he should be
3      required to do that.  I certainly didn't think I
4      was required to do it.  I'm not trying to
5      disprove what Dr. Collingwood says.  I'm
6      supporting what Dr. Collingwood says.  I'm
7      supporting his Figure 13.
8  BY ATTORNEY THEODORE:
9  Q.  Okay.  And you haven't offered any competing
10     methodology for determining the BVAP at which a
11     senate district in a demonstration area or some
12     other area could elect a black preferred
13     candidate, correct?
14         ATTORNEY McKNIGHT:  Objection; form.
15         THE WITNESS:  Correct.  Again, I'm not
16     disputing that you can draw an effective
17     district at below 50 percent.  I'm agreeing with
18     Dr. Collingwood on that.
19         I don't think that in order to make
20     that point you need to do more necessarily than
21     what Dr. Collingwood did, but if Dr. Collingwood
22     is correct in his rebuttal insistence that you
23     can't say that that's true that a district could
24     elect at 37 percent until you drew one, then I
25     must confess I'm confused as to how he can say

211

1      it will work at 47 percent when he hasn't drawn
2      one, nor has he drawn one to see if he could do
3      it at 46 or 42 or 40.  So I suspect he's giving
4      us an upper bound here.  He's certainly not
5      testing a lower bound.
6          I wasn't intending by any sense to say
7      the upper bound was true at 37 percent, just to
8      point out that the precinct level results are
9      completely consistent with the notion that you
10     can create a district that would elect a
11     minority candidate of choice, a Democrat, at
12     below 50 percent and according to his analysis
13     at below 47 percent, but neither of us have
14     drawn a district.
15 BY ATTORNEY THEODORE:
16 Q.  When you were using the term upper bound and
17     lower bound in your answer, can you explain what
18     you mean by that?
19 A.  Well, if we were trying to explore sort what is
20     the -- how -- sort of what the -- what the range
21     of possible performing districts are, then we
22     would -- you know, we would need to understand
23     sort of where that might occur.
24         So by my pointing out that the lines
25     cross at 50 percent, somewhere between in the

212

53  (Pages 209 to 212)

1    high 30s, I'm not suggesting -- I mean, in some
2    sense that becomes a technical lower bound, but
3    I'm not suggesting that that means that you
4    could necessarily draw a district at that point,
5    but certainly it explains why you can draw a
6    district somewhere above that point, and
7    Dr. Collingwood's analysis suggests you can draw
8    districts below 50 percent and below 47 percent.
9    So somewhere in that range between 37 percent
10   and 47 percent there are going to be apparently
11   effective districts.
12          But if the question is whether someone
13   has drawn that district, I don't know whether
14   Dr. Collingwood has drawn it, but he didn't
15   include it in his rebuttal or his report. I
16   haven't drawn it.
17   Q. All right. And if you turn to Figure 13 in
18   Dr. Collingwood's report, it shows that there
19   are six elections in which you need more than
20   51 percent BVAP to achieve a narrow 50 plus 1
21   victory; is that correct?
22   A. Correct.
23   Q. All right. In your report, you state on
24   page 15:
25          "Based on his Figure 13, it

213

1    appears that 22 out of 29 of the
2    2020 to 2022 contests he analyzed
3    would result in the election of
4    black preferred candidates of below
5    50 percent black BVAP."
6          Do you see that on page 15?
7    A. We're back at my report at page 15.
8    Q. Correct.
9    A. Yes.
10   Q. All right. Did you mean 20 out of 27 there?
11   A. Well, let me see.
12          Yes. Either 20 or 21 would be correct.
13   Q. Because there's only 27 elections in 2020 and
14   2022, correct?
15   A. Correct. So 27 total, and either 20 or 21 of
16   them are below 50 percent.
17   Q. Do you agree that black voters have
18   significantly lower turnout rate than white
19   voters?
20          ATTORNEY McKNIGHT: Objection; form.
21          THE WITNESS: That varies substantially
22   according to geography. I haven't studied
23   turnout in North Carolina so I couldn't speak to
24   that, but more broadly, while there's a very
25   substantial gap, for example, in Anglo and

214

1    Hispanic turnout or Anglo and Asian turnout, the
2    gap is much narrower for Anglo and black
3    turnout. I think black turnout may still lag a
4    bit behind white turnout, but in models where
5    you take, you know, multi variable models of
6    turnout of black, white, it's not a particularly
7    influential predictor any more. Historically,
8    that had been dramatically true, but that gap
9    has been shrinking over time, so I don't know
10   where it is now in North Carolina.
11   BY ATTORNEY THEODORE:
12   Q. All right. Can you pull up your Exhibit 6 -- or
13   the exhibit that I marked as Exhibit 6. That's
14   your affidavit from the Ramapo case. Would you
15   pull up page 6 of that, paragraph 24.
16          You see there, the last sentence:
17          "Typically, black and Latino
18          populations have significantly lower
19          turnout than white voters."
20   A. Yes.
21   Q. I read that correctly?
22   A. Yes.
23   Q. That was a pretty recent report, correct?
24   A. That was -- yeah, that was fairly recent report,
25   yes.

215

1    Q. All right. So you still agree today with what
2    you said there, that typically black populations
3    have significantly lower turnout than white
4    voters?
5    A. It certainly was true in that area. Again, I
6    don't know what the situation is in
7    North Carolina, but I would not make the
8    assumption that -- simply make the assumption
9    that the turnout of blacks, whites, and
10   Hispanics were equal in any population. You'd
11   be better off actually analyzing.
12   Q. And that's something you need to take into
13   account when determining the level -- the black
14   BVAP level that you would need to elect a black
15   preferred candidate, correct?
16   A. No. No, I don't believe so.
17   Q. Why not?
18   A. I mean, certainly -- that may be one of the
19   things you want to take into account, but if a
20   district is drawn to create as an
21   equal-opportunity-to-elect district and there's
22   not some mechanism that's making it difficult
23   for blacks to register or to vote, then
24   presumably part of the reason -- as I understand
25   at least, part of the reason to create a

216

54 (Pages 213 to 216)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 55 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1  single-member district is that if you create a
2  single-member district where blacks constitute a
3  majority and therefore if they register, turnout
4  and vote and control the district, then they
5  have the opportunity to do that and they might
6  well do so. There's certainly literature that
7  suggests that minority participation can be in
8  some circumstances increased by drawing
9  minority-majority districts which is part of the
10 reason for doing it.
11      The question is what turnout would be
12 in a district where minorities have the
13 opportunity to elect without -- could not be
14 blocked by majority voters, and if in that
15 district the opportunity to turnout is not some
16 disadvantage where either registration or
17 turnout itself is discriminatory, then the
18 district setting provides an opportunity, but
19 that opportunity requires a turnout the vote.
20      And that's from an opportunity
21 perspective. If you want to talk about if
22 everything stays the same will the district
23 perform, then you're going to have to look at
24 turnout, but the old rule of thumb for building
25 turnout into districts is not -- to my knowledge

217

1  case conducted an analysis of the BVAP
2  percentage needed for a black preferred
3  candidate to win in a hypothetical district that
4  hasn't yet been drawn?
5  A. Too many cases, too much time. I have no idea
6  whether -- I'm certain that issues related to
7  that must have come up in the old days and
8  particularly in Section 5 where issues like that
9  were central to a retrogression.
10     I'd say in the current cycle where
11 retrogression is no longer a standard, I don't
12 recall having done that.
13 Q. You've relied on citizen voting age population
14 data from the Census Bureau American Community
15 Survey in your work as an expert in voting
16 rights cases, correct?
17 A. Correct.
18 Q. And I can call that ACS CVAP data and you'll
19 understand what I mean?
20 A. Yes.
21 Q. What are the cases in which you have relied on
22 ACS CVAP data?
23 A. I would say --
24 Q. And you can feel free to refer to your c.v.
25 A. I would just say sort of -- if I can kind of

219

1  not practiced widely any longer.
2  Q. Your report does not contain any criticism of
3  Dr. Collingwood's decision to factor turnout
4  into the analysis that he conducted of the black
5  BVAP percentage at which these counties would on
6  average narrowly achieve a 50 percent plus 1
7  victory for a black preferred candidate; is that
8  correct?
9      ATTORNEY McKNIGHT: Objection; form.
10     THE WITNESS: That's correct.
11 BY ATTORNEY THEODORE:
12 Q. Okay. And you're not planning to criticize
13 Dr. Collingwood for incorporating turnout into
14 that analysis; is that correct?
15     ATTORNEY McKNIGHT: Objection; form.
16     THE WITNESS: I'm not planning to.
17 BY ATTORNEY THEODORE:
18 Q. Well, you didn't disclose such an opinion in
19 your report, correct?
20 A. Correct.
21 Q. And you haven't conducted an analysis without
22 incorporation of turnout that would produce
23 different results, correct?
24 A. Correct.
25 Q. All right. Have you ever yourself in a prior

218

1  classify.
2      So cases that involved -- that took
3  place in states where there's voting
4  registration by race, then in terms of doing
5  Gingles 2 and 3 analysis, I would have been
6  using the proportion of the voting -- actual
7  voters that were black or Hispanic and not use
8  CVAP.
9      In states like Texas where you don't
10 have that, then I would have been -- for an
11 Hispanic case, I would have used Spanish surname
12 analysis of the voter rolls, for a black case I
13 would have used maybe BVAP but also possibly
14 CVAP.
15     If I was drawing a district and
16 concerned about whether it was majority-minority
17 or not, I would use CVAP for any type of
18 district.
19     So I would say in some -- if a case
20 involves -- if a case involves black voters in a
21 state where voter registration is not by race, I
22 wouldn't -- for the most part, I think
23 historically would not have much cared whether
24 that was using BVAP or CVAP because BVAP tends
25 not to vary that much from CVAP.

220

Where there's a substantial Hispanic population, you know, BVAP will tend to underreport black concentration relative to CVAP so it might matter somewhat there.

There are advantages of using HVAP or BVAP. There are advantages to using black CVAP or black or Hispanic CVAP, but I've used both, and I don't think you can say that one is always superior to the other, but there are certainly situations in which CVAP is probably closer to what you're looking for and other cases where it doesn't matter.

Q. You said you used CVAP when you're drawing a demonstration district for Gingles 1; is that correct?

A. Yes, that's correct.

Q. And can you identify the cases in which you have relied on CVAP?

A. So I would have used CVAP in my Gingles 2 and 3 analysis, probably in some of the Texas cases, possibly elsewhere, but I primarily rely on CVAP for the Gingles 1 inquiry, and then the recent cases I've largely stopped doing demographic work or GIS work and focused on 2 and 3.

So certainly I would look at CVAP if I

221

was drawing districts for a jurisdiction. The issue of CVAP came up regarding -- most recently regarding the demonstration district in the Spring Branch ISD case that I just testified in. The question there was about whether the error rate in CVAP was -- made it difficult to say whether a district was -- had a CVAP majority or not and then that turned into other issues about proportions -- proportion of voters in the district, but I wasn't the demographer for the case. I was just commenting in on that CVAP percentage of whether it meant that there was clearly a Hispanic voter majority in the demonstration district.

I suspect CVAP would have been involved in the Miami case, but I was not -- lots of discussion there about exact percentage black in the black city council district there, but once again, I was not the demographer.

So I would say cases in this decade, I'm not really the one who's really producing or consuming CVAP, but I don't know what else to tell you. There are good things and bad things with CVAP. There are particular kinds of analysis where it's useful and others where

222

you've got to be careful about it.

Q. Do you regard the ACS five-year CVAP population as a reliable source of information for identifying that proportion of CVAP in a particular region that is black?

ATTORNEY McKNIGHT: Objection; form.

THE WITNESS: So again, I mostly would consult CVAP for a Hispanic district because there are large differences in citizenship across areas of Hispanic population varies dramatically by geography.

You have to evaluate that in a particular circumstance that you're using it in. It is a statistical estimate. It has -- you know, you can -- it comes with and you can calculate the confidence intervals around it. I would certainly pay attention to the confidence interval.

It's not, you know, the full count information that you get in BVAP or HVAP. So it's a survey, but, you know, we do lots of work with surveys. As long as you're careful about the confidence intervals, but I'll confine this to what we're talking about here.

With regard to BVAP, I think the main

223

issue is you've got to deal with the sampling variability.

BY ATTORNEY THEODORE:

Q. When you've relied on the ACS five-year survey CVAP calculations in your past expert work to estimate the minority CVAP population in a district or a demonstration district, have you provided confidence intervals or margins of error with those black CVAP percentage estimates?

A. We're talking about a case which I'm the person drawing the demonstration district, that's going back a long way. I'm not even sure what case that would be.

That issue has come up in cases I've been involved in, came up in several of the local redistricting cases a decade ago. It came up again, as I said, in the Spring Branch Independent School District case. And the dispute was about -- precisely about what you could conclude given that the confidence interval stretch below 50 percent.

So I'm aware of that. It's a controversy that's been -- it's been a controversy that's been aired in cases that I've

224

56 (Pages 221 to 224)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 57 of 104
DISCOVERY COURT REPORTERS        www.discoverydepo.com        1-919-424-8242

1   been involved in, but it sort of -- I'm not sure
2   how far back I would have to go to get to a case
3   where the issue turned on the ability to draw a
4   narrow 50 percent majority district.  I was the
5   demographer, and I was using CVAP.  That may be
6   an empty set for all I know.
7   Q.   What opinion did you express about this issue in
8        the Spring Branch case?
9   A.   The issue that because the confidence interval
10       included -- I think something more than
11       25 percent of the confidence interval was
12       estimates below 50 percent that that it was
13       possible that the district was in fact not a
14       majority CVAP Hispanic district and that all of
15       the election data showed that within the area
16       that the district had been drawn, the voter
17       turnout never exceeded 21 percent Spanish
18       surname.
19            So the fact that there was some
20       question about whether the district was a CVAP
21       majority or not was certainly -- there was no
22       question that there was not a -- that the voter
23       turnout in that area of that district was going
24       to be -- would be something in excess of
25       75 percent non-Hispanic, and there also was no

225

1   evidence to suggest that there was even a
2   registered vote majority Hispanic, so...
3   Q.   Was your opinion in the Spring Branch case about
4        Gingles -- CVAP use in Gingles 1 or CVAP use in
5        Gingles 2 and 3?
6   A.   We weren't using CVAP for Gingles 2 and 3.  It
7        was a Hispanic case where we were using a
8        Spanish surname voter analysis.
9            CVAP was only an issue in Gingles 1.
10       And again, I wasn't the one doing the
11       demonstration district.  I was just asked to
12       comment on that because when we looked at the
13       proportion of voters Hispanic, it wasn't
14       apparent that there was any particular
15       concentration in the area where the district was
16       drawn.
17            The two voting precincts that were used
18       to create the demonstration district both
19       typically had less than 20 percent of the voters
20       Hispanic.  Again, that's the input into my EI
21       analysis for Gingles 2 and 3 so I was aware that
22       the voting precincts that were used to create
23       the demonstration district had typically been
24       less than 20 percent Hispanic and turned out
25       vote, and that basically buttressed the fact

226

1   that the confidence interval on the CVAP
2   estimate included the possibility that the CVAP
3   proportion was below 50 percent as well.
4   Q.   Is the CVAP point estimate the most likely
5        number for the actual CVAP percentage in a
6        particular district?
7   A.   So, yes, in a way that's different from the
8        point estimate in the EI analysis.  Because
9        we're talking about sample variability here, the
10       sampling distribution we assume is reasonably
11       well behaved, meaning that the center point that
12       the estimate around which we're constructing the
13       confidence interval, the confidence interval
14       will be symmetric and will center on that point,
15       and that means that that point estimate is the
16       most likely value.
17            So that characteristic -- so if that's
18       all you care about is the most likely value,
19       you're done.  If you want to ask the social
20       science question which is -- the social science
21       question would be I've drawn this district, I
22       think it's a majority district, what do you
23       think, then the way we would test that is social
24       scientists using the information we get from the
25       Census Bureau and the ACS survey.  We would say,

227

1   okay, so the null hypothesis is that the
2   district is not majority and then we would ask
3   whether we can reject that null hypothesis, and
4   we would reject the null hypothesis based on the
5   5 percent outer band of a 95 percent confidence
6   interval.
7        So in the case of the Spring Branch
8   case where I think 25 percent of the -- there
9   was a 25 percent probability that the actual
10  value -- not the sample value, the actual value
11  was below 50 percent, in the social science
12  sense we would say that CVAP 52 percent is
13  insufficient to conclude that the district is
14  not in fact a non-majority district.
15       If you're just going to say, look, all
16  that matters is central tendency because that's
17  the single most likely point, then what do you
18  care about the confidence interval.
19       The point of the confidence interval is
20  there's a very real probability and
21  sometimes a very substantial probability that
22  your conclusion that this is a majority district
23  is wrong, and that's what is -- all we're trying
24  to do that and all we do when we do confidence
25  testing is we don't report a conclusion --

228

57  (Pages 225 to 228)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 58 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

regardless of what the mean is or the point
estimate is, we don't report that as a
conclusion if we can't substantiate that by
saying it's statistically significant with
regard to a particular null hypothesis, or if we
do report it, we say this is what we -- this is
at least an interesting possible finding, but we
can't within normal standards of social science
accuracy, we can't reject the hypothesis that in
fact the opposite is true.

So again, this is no different than,
you know, a poll in Georgia that shows that
Trump has 49 percent and Kamala Harris has
48 percent confidence interval. You know, it's
3 and a half percent, then the question is are
we sure that one of those candidates -- do we
know which candidate is ahead in Georgia, and
the answer is we don't know which candidate is
ahead in Georgia.

Q. Would you agree that confidence intervals that
accompany the ACS five-year survey CVAP data,
those are reported by ACS as plus or minus the
same number, correct?

A. Yes. They're sampling -- they're based on
sampling theory so they are symmetric around the

229

center point of the distribution and pulling the
point estimate. Confidence intervals are not
symmetric, but true traditional confidence
intervals are symmetric.

Q. Right. And the Census Bureau ACS confidence
intervals assume a normal distribution; is that
correct?

A. Typically, sampling distributions assume a
normal distribution. I am not -- I trust the
Census Bureau and the folks at ACS who are
regularly engaged in one of the largest survey
samples in the world to figure out what the
appropriate -- but it's not a pure random sample
of the population. There's a whole bunch of
clustering and things going on in there, so it's
complicated, and I trust them to do whatever
they do correctly, and I accept their confidence
intervals at face value.

Q. And it's --

A. For my -- one of the tools to compute your own
confidence interval when you're doing something
other than using something they actually report,
like the population parameters for a city of
50,000 people. When you're trying to do that
for a precinct, there's a way -- they provide

230

the tools for computing that yourself, but
again, all of that is based on the parameters
they've established, and I simply accept that.

Q. All right. And it's true that if you have a
CVAP point estimate for the percentage of a
black CVAP or any other CVAP in the CVAP
population, you can assume that 50 percent of
the expected values will fall higher than that
point estimate and 50 percent will fall lower
because the margin of error is based around a
normal distribution. Is that true?

A. That's true.

Q. Okay. And does that mean mathematically that if
a -- you have a CVAP point estimate that's above
50 percent, it is more likely than not that the
actual value is above 50 percent?

A. Correct.

Q. Okay.

A. But that's not anybody's test of statistical
significance, but you're correct. You at least
have the advantage of knowing that the area
above the point estimate is 50 percent of the
distribution and then whatever part of it lies
between the estimate and exactly 50 percent is
also above 50 percent and together, so any

231

estimate that's above -- bigger than exactly
50 percent will have slightly or perhaps
profoundly more likely to be above 50 percent
than below it.

But again, that would -- that's sort of
the equivalent of kind of a 50 percent
confidence interval or something where one tail
50 percent confidence interval, we don't use
that in the social sciences, we use 95 percent
confidence interval.

ATTORNEY THEODORE: Okay. I am going
to transmit another exhibit. I am going to mark
this as Exhibit 8.

(WHEREUPON, Plaintiff's Exhibit 8 was
marked for identification.)

BY ATTORNEY THEODORE:

Q. Dr. Alford, do you recognize this as a report
you filed in the Johnson versus Wisconsin
Elections Commission case?

A. It looks like it has my name on it. I have a
vague recollection of doing something for
Wisconsin.

Q. This is a -- you say on page -- the first
substantive page of the report, you say you were
retained by the Wisconsin legislature to provide

232

58 (Pages 229 to 232)
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 59 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    VRA analysis; is that right?
2    A.  That's correct.
3    Q.  Okay.  And let's scroll down.
4        Well, you were expressing an opinion in
5    this case that the Wisconsin legislature's plan
6    complied with the VRA; is that correct?
7    A.  I would have to look at the report, but I think
8    it was filed on behalf of the legislature.  I
9    guess that was probably true.
10   Q.  And let's go to page 12 of the report.  And
11   you're conducting an analysis here comparing the
12   percentage of black elected officials in various
13   regions of the state to the black CVAP
14   percentage from the ACS for various regions of
15   the state.  Is that true?
16   A.  I'm sorry.  What page?
17   Q.  It's paragraphs 34 and 35 on page 12.
18   A.  Yes.  I'm sorry.  I skipped ahead.  I was
19   looking for a table.
20   Q.  Okay.  And you're presenting an opinion, for
21   example, that the number of black officeholders
22   in Milwaukee County is almost exactly
23   proportional to the black CVAP percentage in
24   Milwaukee County; is that correct?  That's in
25   paragraph 34.

233

1    Q.  And in that paragraph you also don't present any
2    confidence intervals or margins of error before
3    relying on these ACS CVAP figures, correct?
4    A.  That's correct.  So this is a setting where that
5    would be something that was important.
6    Q.  Okay.  But you believe that you could draw
7    conclusions about the ACS CVAP data being almost
8    exactly proportional even without computing
9    margins of error, correct?
10   A.  Again, if there was an issue about whether the
11   CVAP percentages are above or below a particular
12   point, if there was some -- we were testing
13   something here like a Gingles 1 district, that
14   would certainly be important, but all I'm
15   assessing is the accuracy of the statement
16   that's quoted here, the number of black
17   officeholders has been far below the number
18   proportional to the black population.
19       So all you need are the point estimates
20   to say that the proportion of black
21   officeholders does not appear to be far below
22   the proportion of the population.
23   Q.  Well, you also say that the proportion of black
24   officeholders -- that the number of black
25   officeholders in Milwaukee County is almost

235

1    A.  Correct.
2    Q.  And you do that by comparing the 25.9 black CVAP
3    percentage to the two out of the eight black
4    elected officials or 25 percent of black elected
5    officials, correct?
6    A.  That's correct.
7    Q.  And you don't report any confidence interval in
8    this report relating to the black CVAP
9    percentage from the ACS; is that correct?
10   A.  That's correct.
11   Q.  And you regarded your analysis here as reliable,
12   correct?
13   A.  Yes, absolutely.
14   Q.  And same thing in paragraph 35, you're arguing
15   here that the ACS data shows that black voters
16   are 6 percent of the state CVAP; is that
17   correct?
18   A.  That's correct.
19   Q.  And then you say that because the six black
20   districts in the legislative plan represents
21   6.06 percent of the 99 total assembly seats, the
22   number of black districts in the state assembly
23   is almost exactly proportional to the black
24   population; is that correct?
25   A.  That's correct.

234

1    exactly proportional to the black CVAP
2    population, correct?
3    A.  Yes.
4    Q.  And so that's a comparison that requires some
5    precision; is that correct?
6        ATTORNEY McKNIGHT:  Objection; form.
7        THE WITNESS:  The black population
8    appears to be about a quarter, and the black
9    officials make up about a quarter of the
10   representation.
11       Again, we're not -- we're not looking
12   at a bright-line test for whether the district
13   is 50 percent or not 50 percent.  Here we're
14   just talking about, again, proportionality is
15   not required.  The plaintiffs are asserting that
16   something is not close to proportionality.  I'm
17   just showing that with regard to at least a CVAP
18   that these things are proportion.
19       ATTORNEY THEODORE:  All right.  I'm
20   going to put another exhibit in the chat which
21   I'm going to mark as Exhibit 9.
22       (WHEREUPON, Plaintiff's Exhibit 9 was
23   marked for identification.)
24   BY ATTORNEY THEODORE:
25   Q.  Do you recognize this exhibit as a copy of your

236

59 (Pages 233 to 236)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 60 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1  expert report filed in the Soto Palmer case?
2  A.  Correct.
3  Q.  Okay.  And this is a VRA Section 2 case; is that
4  right?
5  A.  That's correct.
6  Q.  Relating to legislative districts in the state
7  of Washington?
8  A.  That's correct.
9  Q.  Okay.  And let's turn to page 4 of your report.
10         And you opine on page 4 that the first
11  Gingles prong seems to be met here because the
12  Hispanic CVAP percentage exceeds 50 percent in
13  the enacted district and then three alternative
14  legislative districts, correct?
15  A.  Correct.
16  Q.  And these CVAP numbers are from the 2016 to 2020
17  is your tabulation; is that right?
18  A.  I believe that's correct.
19  Q.  Okay.  And one of the districts you discuss had
20  a Hispanic CVAP of 50.2 percent, correct?
21  A.  Correct.
22  Q.  And this is a situation where in your view it is
23  important to know whether the point estimate is
24  above 50 percent, correct?
25  A.  Yes.

237

1  fact that CVAP says 50 percent in both the
2  current legislative district as enacted and all
3  these other reports discuss other forms
4  discussed by Professor Collingwood, so we've got
5  multiple people drawing districts.
6         So in my experience as -- in drawing
7  districts, if you've got the drawn form of the
8  district and you've got alternative forms of the
9  district and no one seems to have struggled
10  particularly getting above 50 percent CVAP, then
11  there's probably -- if you drew a max CVAP
12  district, it's more than likely that you'll be
13  able to draw a district at a higher CVAP.
14         Nobody seems to be trying to do that,
15  but if that was the issue here, then I would
16  stand by my conclusion that it seems to be met.
17  And if that was in dispute, I would sit down
18  with a mapping program and I would draw a
19  district that -- including looking at the
20  confidence interval, draw a district that
21  outside the bounds of the confidence interval
22  was a CVAP Hispanic majority.
23         And again, I'm assuming that the fact
24  that it's been drawn that way by multiple
25  different people with multiple different

239

1  Q.  Okay.  And you don't discuss the margin of error
2  for these estimates in this report, do you?
3  A.  I do not.
4  Q.  And you don't suggest in this report that an
5  expert in a VRA case needs to report margin of
6  error for minority CVAP estimates before relying
7  on those estimates from the ACS, do you?
8  A.  I don't see anything here that says that.
9  Q.  In fact, you rely on those estimates without
10  discussing margin of error at all; is that
11  right?
12  A.  So I'll tell you, I didn't create these
13  districts.  I'm not the demographer.  I didn't
14  produce the CVAP analysis.
15         So all I'm reporting here is that there
16  are apparently multiple ways of drawing a
17  district, all of which find the ability to
18  create a CVAP majority, including one as high as
19  53.6, and the fact that you've got multiple
20  demonstrations all of which suggest that you're
21  above 50 percent suggests that you can -- again,
22  I'm not saying that I've drawn this or that it's
23  there.
24         I think I'm saying the first Gingles
25  prong seems to be met here as evidenced by the

238

1  purposes and doing it without making it a
2  regular district makes this a pretty simple
3  thing to do.
4  Q.  All right.  But sitting here today, you can't
5  identify any case in which you yourself have
6  been a demographer and taken the position that
7  CVAP percentages do not satisfy Gingles 1
8  without reporting on the margin of error,
9  correct?
10         ATTORNEY McKNIGHT:  Objection; form.
11         THE WITNESS:  Again, I've been involved
12  in cases that I've dealt with this, including
13  this last week about this issue in
14  Spring Branch, and I know that I was involved in
15  another case where I was not the demographer,
16  but this was exactly the issue that came up and
17  the judge says all the matter is the point
18  estimate as a matter of law, so maybe that's
19  true as a matter of law, maybe it isn't true as
20  a matter of law.  I don't know what else I can
21  tell you.
22  BY ATTORNEY THEODORE:
23  Q.  Okay.  All right.  But the bottom line is in
24  this particular report, you are analyzing
25  Gingles 1, you agree that the Gingles prong

240

60  (Pages 237 to 240)
Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 61 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com          1-919-424-8242

1    seems to be met based on CVAP point estimates
2    that do not include a margin of error; is that
3    right?
4    A.  I would say I'm declining to analyze Gingles 1.
5    Q.  You believe that -- sorry.  Go ahead.
6    A.  The first Gingles prong here seems to be met as
7    evidenced by the fact that et cetera, et cetera,
8    et cetera, and so I'm going on to Gingles 2 and
9    3.  I don't think -- I mean, my view was --
10   again, I didn't see that -- I didn't see that
11   that pattern of evidence across multiple plans
12   of CVAP majorities suggested that it would be
13   difficult to draw a majority CVAP district, and
14   so I'm not -- I did no analysis.  I did not draw
15   a district.  I didn't test any of these other
16   things.
17           I just -- that looks to me like that's
18   not going to be an issue, so I'm declining -- I
19   wasn't asked to draw a district or to analyze
20   this, and so I'm just basically saying it looks
21   as though Gingles Prong 1 is probably met and
22   I'm moving on to 2 and 3.  I'm not the
23   demographer here, and I don't have a plan here.
24   Q.  Okay.  All right.  Let's turn -- I want to turn
25   back to some of your past testimony.

                                            241

1    A.  Yes.
2    Q.  What cases are those?
3    A.  So what would have been Paris v Abbott, the
4    court accepted this testimony and declined to
5    order the Supreme Court and Court of Appeals of
6    Texas to be elected in districts instead of at
7    large.
8           A sort of variant of this is accepted
9    in parts of the -- I hesitate to say which Texas
10   decision, but one of the -- maybe the last Texas
11   congressional decision where the court wrestled
12   with issue authority and both in the sense of
13   parties polarization but also in the sense of
14   whether voting for the same party amounted to
15   cohesion for different racial groups, and so the
16   testimony -- my testimony that what was -- what
17   we saw was party cohesion and not racial or
18   ethnic cohesion was accepted there in some
19   parts.
20   Q.  Any others come to mind?
21   A.  I don't think so.  I think other places where
22   this has come up or the courts either go in the
23   other direction or it was decided on some other
24   basis or hasn't been decided yet.
25   Q.  What are the cases where the court has -- that

                                            243

1           ATTORNEY McKNIGHT:  Elisabeth, we've
2    been going for over an hour.  If we're going to
3    a new topic --
4           ATTORNEY THEODORE:  I think I may have
5    only five more minutes, but I'm happy to take a
6    break.
7    (Brief Recess:  4:45 to 4:54 p.m.)
8    BY ATTORNEY THEODORE:
9    Q.  You conducted the analysis that you offer in
10   this case arguing that racially polarized voting
11   simply reflects partisan polarization in many
12   case as an expert witness.  Is that fair to say?
13   A.  Yes.
14   Q.  And fair to say that a number of courts have
15   declined to credit your testimony on that topic?
16   A.  That would be fair to say.  That would be a
17   polite way of saying that, yes, I agree.
18   Q.  All right.  Fair to say that a number of courts
19   have expressly rejected your testimony on this
20   topic?
21   A.  Yes.
22   Q.  Can you recall a case in which a court has
23   accepted or relied upon this type of analysis by
24   you as a reason to deny relief in a Section 2
25   case?

                                            242

1    you recall where the court has rejected this
2    sort of argument by you?
3    A.  So most recently I'd say that would be
4    Mississippi, Louisiana, and Georgia.
5    Q.  And the Mississippi case is the Mississippi
6    State Conference of the NAACP versus Board of
7    Elections?
8    A.  If you say so.  I'm not -- citations were never
9    my thing, even academic citation, much less --
10   Q.  Fair.
11   A.  So for a recent big case in Mississippi where
12   the court spent a lot of time not agreeing with
13   me, that would be the right case.
14   Q.  And that case -- is it fair to say that the
15   analysis you conducted in that case was similar
16   to the analysis you've done in this case with
17   respect to the issue of, you know, racial versus
18   partisan polarization?
19   A.  Yes.
20   Q.  Any differences you can think of?
21   A.  I'm sure there are some minor differences.  I'm
22   responding to -- there I was responding to, if
23   I'm remembering it correctly, Professor Hanley
24   rather than Professor Collingwood, they do
25   analysis a little bit differently so there may

                                            244

**61 (Pages 241 to 244)**

1 have been some differences, but in terms of the
2 broad outline, it's very similar analysis, very
3 similar conclusions.
4 Q.  All right.  Fair to say that in the Georgia
5 case, the analysis that you did and that the
6 court rejected was also similar to the analysis
7 that you did here?
8 A.  That's correct.
9 Q.  And you mentioned a Louisiana case.  Fair to say
10 that -- is that the Louisiana versus Ardoin
11 case?
12 A.  There are several Louisiana cases, but that one
13 would probably do as good as any.  Somewhere
14 there was a Louisiana case where the judge did
15 not agree with me about partisanship versus
16 race.
17 Q.  In that case, also fair to say the analysis you
18 did there was similar to the analysis you are
19 doing in this case?
20 A.  That's correct.
21 Q.  All right.  And in the East Ramapo Central
22 School District case, the court also rejected
23 your analysis; is that correct?
24 A.  That is correct.
25 Q.  And is it fair to say that the -- I'm sorry.  Go

245

1 ahead.
2 A.  I was just saying I didn't mention that because
3 I wouldn't characterize it as the same kind of
4 case or the same kind of analysis.  There was a
5 lot more -- involved a lot more in dispute in
6 Ramapo than would be the case in these others.
7 These others are more straightforward cases.
8 Q.  The others are more straightforward cases?
9 A.  Yes.
10 Q.  And I'm going to help you -- I hope you'll thank
11 me because I'm going to spare you going through
12 those cases.
13 A.  I'll be happy to go through them, but I would
14 also be happy not to go through them.
15     I will say -- just so in my view, in
16 each of those cases, I don't view my testimony
17 to have been -- or my analysis, I will say, to
18 have been rejected because my analysis in those
19 cases, as here, is essentially the same as the
20 analysis from the plaintiff's expert.  So my
21 view of what that analysis can tell us or can't
22 tell us in various ways the different judges
23 have declined to make that the basis of their
24 ruling, but they -- but not because my analysis
25 was incompetent or inappropriate but rather that

246

1 my analysis which was comported with the
2 analysis of the plaintiff's expert they took to
3 be either not at all applicable to Section 2
4 cases or they sort of understood how it might
5 factor into the case in a different way, so they
6 may -- like I said, they didn't agree with my
7 conclusions, they didn't base their ruling on
8 what I view to be reasonable conclusions from
9 the -- the most reasonable conclusions from the
10 data, but they were not rejecting the analysis
11 itself either methodologically or in terms of
12 the data it was based.
13 Q.  Okay.  We may have covered this before, but it's
14 been a long deposition so I just want to
15 make -- ask you again, just to be clear, nothing
16 in your analysis speaks to the reason why black
17 voters in the relevant areas prefer Democratic
18 candidates, correct?
19 A.  I'm not trying to probe into what underlies that
20 preference, but to say nothing speaks to it, you
21 have to remember that there are two candidate
22 characteristics that are being examined here,
23 the race of the candidate and the party of the
24 candidate.  And so the analysis does speak to
25 the question about whether candidate preference

247

1 is centered on the race of the candidate
2 comporting or not comporting with the race of
3 the voters.
4     And so that is a different -- that is a
5 factor that is different than the factor of the
6 partisan affiliation of the candidate, and so
7 the analysis does -- as lots of your questioning
8 and lots of Dr. Collingwood's response where
9 Dr. Collingwood is going through this is a two
10 point difference, he's saying this speaks to the
11 issue of race and here's the difference I see on
12 race.
13     So, yeah, the analysis speaks to the
14 issue of race and the issue of party affiliation
15 of candidates, and that's -- so it isn't just
16 about what's the source of the -- it doesn't
17 address the issue of why voters are voting on
18 the basis of the party or the candidate rather
19 than race, but it does address the issue of
20 whether voters are voting on the basis of the
21 party or the candidate or the race of the
22 candidate.
23     ATTORNEY THEODORE:  All right.  Let me
24 just take a five-minute break.  It may be that I
25 have no more questions, although I probably have

248

62  (Pages 245 to 248)
Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 63 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

1    a couple more, but I think we'll be done very,
2    very soon.
3          (Brief Recess:  5:05 to 5:08 p.m.)
4    BY ATTORNEY THEODORE:
5    Q.  All right.  Hopefully, just one more question,
6        which is:  Is it fair to say that you have not
7        analyzed the issue of whether black voters
8        prefer Democrats for reasons related to a
9        voter's race?
10         ATTORNEY McKNIGHT:  Objection; form.
11         THE WITNESS:  Again, I would say that
12   we do have some information about that because
13   we -- if voters -- whether black voters are
14   voting for Democrats because of issues related
15   to race or whether white voters are voting
16   Republicans for issues related to race, we know
17   that those issues don't appear to disturb the
18   voting patterns when the race of the candidate
19   is a prominent signal.
20         So I'm not looking at the origins for
21   why they might favor Democrats or Republicans,
22   but whatever the origins of those to the degree
23   that are racial, they don't display themselves
24   with regard to the variation in the signal of
25   the race or the candidate.  So there's

249

1    information there, but not necessarily about the
2    origins of their -- directly about the origins
3    of their party preference.
4    BY ATTORNEY THEODORE:
5    Q.  Right.  So you haven't analyzed the issue of
6        whether black voters have a preference for
7        Democrats for reasons that are related to the
8        race of the voter?
9          ATTORNEY McKNIGHT:  Objection; form.
10         THE WITNESS:  Again, except to the
11   extent that when we say related to the race of
12   the voter that a preference for same race
13   representation are a tendency to vote against
14   people of a particular race on the part of white
15   voters is not evident in the data.
16         Beyond that, I've looked at nothing at
17   the individual level, correct.
18   BY ATTORNEY THEODORE:
19   Q.  Okay.  And you also have not looked at anything
20       at the aggregate level as to whether black
21       voters prefer Democrats for reasons relating to
22       the race of the voter even if not the race of
23       the candidate.  Is that fair?
24         ATTORNEY McKNIGHT:  Objection; form.
25         THE WITNESS:  Again, except to the

250

1    degree we're talking about how the race of the
2    voter interacts with the race of the candidate,
3    I've not looked at that issue.
4    BY ATTORNEY THEODORE:
5    Q.  And so to the extent that black voters prefer
6        Democrats whether black or white for reasons
7        relating to the race of the voter, your analysis
8        does not analyze that question at all?
9          ATTORNEY McKNIGHT:  Objection; form.
10         THE WITNESS:  Again, to the -- except
11   to the extent that black voters show no
12   particular preference for white candidates over
13   black candidates.
14   BY ATTORNEY THEODORE:
15   Q.  But you can see there may be reasons unrelated
16       to the race of the candidate but related to the
17       race of the voter why black voters prefer
18       Democrats?
19   A.  That's possible.
20   Q.  Okay.  And you haven't done any analysis of
21       whether there are such reasons here?
22         ATTORNEY McKNIGHT:  Objection; form.
23         THE WITNESS:  Again, the only analysis
24   would be relevant to the issue of race itself as
25   opposed to a policy preference of some sort or

251

1    another.  If the preference has to do with race
2    itself, then I think we would -- it would be
3    reasonable to expect that we would see a
4    difference in preferences for black candidates
5    over white candidates among black voters or for
6    white candidates over black candidates among
7    white voters.
8          To the extent that we don't see that,
9    then what we're saying is the extent to which
10   race itself is implicated, we don't see any
11   evidence of that.
12   BY ATTORNEY THEODORE:
13   Q.  And again, when you refer to race itself in
14       that -- in that answer, you're referring to the
15       race of the candidate?
16   A.  Because that's the measure that we have, right.
17   We're comparing voter preferences to across
18   candidates and the information we have to the
19   race of the candidate, which is important.
20   It's -- I mean, it's the other important
21   totality factor.
22         So, yes, we have that information.  We
23   learn a lot from seeing that.  We don't learn
24   what other -- sort of what sort of policy things
25   might buttress or reduce party preferences, but

252

63  (Pages 249 to 252)

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 64 of 104
DISCOVERY COURT REPORTERS       www.discoverydepo.com           1-919-424-8242

again, this is the analysis we have and this is
what Dr. Collingwood's analysis demonstrates.
    ATTORNEY THEODORE:  Okay.  I have no
further questions.
        [SIGNATURE RESERVED]
        [DEPOSITION CONCLUDED AT 5:16 P.M.]

253

---

COURT REPORTER'S CERTIFICATE

    I, DENISE MYERS BYRD, Court Reporter, CSR 8340, the
officer before whom the foregoing deposition of Dr. John
Alford was conducted, do hereby certify that the witness's
testimony was taken down by me in stenotype to the best of
my ability and thereafter transcribed under my supervision;
and that the foregoing pages, inclusive, constitute a true
and accurate transcription of the testimony of the witness.
    Before completion of the deposition, review of the
transcript [X] was [ ] was not requested.  If requested, any
changes made by the deponent (and provided to the reporter)
during the period allowed are appended hereto.
    I further certify that I am neither counsel for,
related to, nor employed by any of the parties to this
action, and further, that I am not a relative or employee of
any attorney or counsel employed by the parties thereof, nor
financially or otherwise interested in the outcome of said
action.  Signed this 8th day of October 2024.


            Denise Myers Byrd
            CSR 8340, RPR

254

---

ACKNOWLEDGEMENT OF DEPONENT

    I, DR. JOHN ALFORD, declare under the penalties of
perjury that I have read the foregoing pages, which contain
a correct transcription of answers made by me to the
questions therein recorded, with the exception(s) and/or
addition(s) reflected on the correction sheet attached
hereto, if any.
    Signed this the      day of          , 2024.


            DR. JOHN ALFORD

255

---

ERRATA SHEET

Case Name:  Pierce v The NC State Board of Elections
Witness Name:  Dr. John Alford
Deposition Date:  Thursday, September 19, 2024

Page/Line    Reads        Should Read
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |
    /    |            |

Signature            Date

256

64  (Pages 253 to 256)

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 65 of 104
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242

**A**

**a.m** 1:16 52:1
**Abbott** 243:3
**ability** 23:17
82:20 129:4
163:14 194:12
225:3 238:17
254:7
**able** 82:15 90:10
90:12 104:6
144:25 162:5
194:5 239:13
**abortion** 153:22
154:13
**absence** 178:18
183:22,25
184:3,10
**absent** 63:24
74:17 127:15
182:18 185:1
**absolute** 56:23
57:17
**absolutely** 73:24
127:13 234:13
**abstract** 208:16
209:7
**abundance**
127:21
**academic** 11:1,5
11:8,11,14,24
12:6,12,19
13:3 244:9
**accept** 72:3
73:12 74:8,25
75:15 88:15
230:17 231:3
**accepted** 90:17
242:23 243:4,8
243:18
**accepting** 46:18
46:22
**accepts** 30:2,7
36:8
**accidental** 18:15
40:2
**accompany**
112:3,11
229:21
**accompanying**
111:3

**account** 162:5
185:6 193:18
193:23 216:13
216:19
**accounts** 148:9
**accuracy** 13:20
27:8 66:20
67:8 229:9
235:15
**accurate** 6:11
9:23 27:19
29:15,21
102:11 103:21
109:21 170:2
254:9
**achieve** 213:20
218:6
**ACS** 219:18,22
223:2 224:4
227:25 229:21
229:22 230:5
230:10 233:14
234:9,15 235:3
235:7 238:7
**Act** 11:6 12:1
13:4,6 14:24
20:23 21:14
43:6 60:18
78:9 149:25
151:17 161:2
**action** 106:21
254:16,19
**acts** 72:19
**actual** 31:4,7
44:5 57:17
89:19 93:21
106:15 107:24
108:10 110:12
124:23 142:7,7
206:11 220:6
227:5 228:9,10
231:16
**add** 10:13
128:11,13
**added** 95:16
132:1
**adding** 192:25
**addition** 169:13
**addition(s)**
255:7

**additional** 87:16
200:24
**address** 95:15
102:18,19
163:23 248:17
248:19
**addressed** 36:11
**addresses** 36:7
36:23
**addressing**
168:16,17
**adequacy**
163:24
**adequate** 166:22
**adjacent** 84:17
**adjectives** 50:24
**adopted** 88:6,8
**advance** 130:13
131:13 149:15
150:5 153:1
167:23
**advantage**
231:21
**advantages**
221:5,6
**advised** 20:14
**affidavit** 4:9
111:17 215:14
**affiliation** 75:19
147:11,17,19
148:8 149:1
152:7 156:3
158:20 161:17
163:5 168:19
169:17 170:5
170:21,22
172:4,8,21
179:3,6,11
182:13,17,19
248:6,14
**affinity** 8:7
**affirmed** 5:2
**AG** 109:3
**age** 56:9 219:13
**aggregate** 35:7
35:13 36:12
37:2,14 107:12
161:19 250:20
**aggregate-level**
35:24

**aggressively**
173:25
**ago** 42:1 58:22
58:25 166:2
224:17
**agree** 32:8 33:13
38:15 40:9
43:21 45:20
47:2,6,10
50:15 53:14
54:21 68:22
73:20 74:7,24
75:12 77:21
80:19 81:16,20
81:24 82:11
87:21 90:1
91:5 103:24
117:25 126:15
136:12,24
137:13,19
138:17 142:3
144:15,19
145:18,22
149:8,12 150:2
150:8 152:24
154:3 156:2
167:22 180:19
182:7 191:19
197:14,22
205:14 214:17
216:1 229:20
240:25 242:17
245:15 247:6
**agreeing** 211:17
244:12
**ahead** 9:8 70:25
80:14 82:19
102:15 128:2
167:3 229:17
229:19 233:18
241:5 246:1
**Airbnb** 7:24
**aired** 224:25
**al** 1:8
**Alford** 1:12 4:3
4:5,7,8,9,12,13
5:1,8,13 95:22
97:18 98:23
113:14,15,16
113:17 153:6

164:6 185:14
186:21 210:9
232:17 254:5
255:3,11 256:3
**aligned** 166:9
**allocated** 27:10
**allow** 37:8,11
63:22,24
100:23 101:23
**allowed** 31:10
254:13
**allows** 55:10
**alter** 160:3
**altering** 172:1
**alternative**
237:13 239:8
**alters** 160:24
**ALYSSA** 2:18
**Alyssa.Riggin...**
2:21
**amazement**
40:14
**amazingly**
171:18
**American** 9:7
12:24 13:10
40:6 153:7
168:25 219:14
**amounted**
243:14
**analysis** 14:15
15:21 19:11,13
19:23,24 23:1
23:2 25:13,14
29:8 30:3 31:2
31:4,10,13,17
31:19,20,20,24
32:2,5,8,19,22
33:11 34:11,11
34:25 37:3,4
37:25 39:14
49:11,25 54:11
54:23 55:4,12
72:25 73:5
76:11 80:19,24
81:13 85:22,24
86:4,12,20,23
86:24 87:2,9
87:22 88:20
89:21,24 90:2

257

90:3 91:3
92:12 93:7,10
93:21,25 94:2
94:7,21 95:11
99:5,18 100:7
101:2 102:8,22
103:1,1,11,13
104:1,5,11,11
104:13,24,25
105:5,17,18
106:23 109:14
110:1 112:23
112:23,24,25
113:2,3,22
114:1 116:18
116:24,25
117:2,7,11,14
121:5 124:10
124:21 126:20
128:4,4,6,7,10
128:11 129:4
138:23 143:25
144:1,6,9,12
144:13,18,21
144:24 145:4,6
145:8,13,19,20
146:5,7,10
147:6 148:7,11
149:6,9,19,19
151:11 152:1,4
152:16,18
156:22 157:10
158:25 162:2
162:16 163:24
168:23,24
169:3,7,9,15
170:3,20
172:16 173:23
175:2,12
176:25 177:11
184:18 201:11
204:4,7,20
205:4 207:25
208:17 210:23
212:12 213:7
218:4,14,21
219:1 220:5,12
221:20 222:25
226:8,21 227:8
233:1,11

234:11 238:14
241:14 242:9
242:23 244:15
244:16,25
245:2,5,6,17
245:18,23
246:4,17,18,20
246:21,24
247:1,2,10,16
247:24 248:7
248:13 251:7
251:20,23
253:1,2
analyst 32:18
104:7
analyze 45:19
87:16 124:18
169:5,5 241:4
241:19 251:8
analyzed 28:6
50:7 87:6 95:3
148:3 172:3,8
174:16 214:2
249:7 250:5
analyzes 30:10
analyzing 27:25
85:16 91:1
95:3 113:18
147:18,21
205:6 216:11
240:24
and/or 255:6
Anglo 22:14
214:25 215:1,2
animosity 77:16
answer 6:6,8
11:22 22:13,13
26:12,20 35:12
36:3 37:23
41:19 59:22
63:12 85:2
90:22 126:6
127:23 157:6
173:15 208:18
208:20 212:17
229:18 252:14
answered 13:13
123:11
answering 6:2
answers 185:15

255:5
anybody 57:1
100:23
anybody's
231:19
anyway 128:21
apart 152:2
Apologies
192:25
apparent 117:17
226:14
apparently
145:25 146:3
207:15 213:10
238:16
Appeals 243:5
appear 153:24
235:21 249:17
appears 171:17
214:1 236:8
appended
254:13
appendix 55:17
92:22,24,25
94:9 95:21
96:5 97:3
98:14 104:18
apples 91:13
applicable 247:3
application 45:8
applied 15:6
57:14 60:25
61:22 151:11
196:4
apply 15:7 59:19
60:21
applying 15:20
60:9 205:25
appreciate 42:16
74:6
approached
19:10
appropriate
91:2 93:11
107:10 112:16
230:13
appropriately
26:13
approximate
49:16

approximately
5:17 16:21
26:21
arbitrary 42:15
57:9,11,12
Ardoin 245:10
area 12:23 17:10
17:11 19:2
46:14,21 47:3
47:7 50:8,16
53:6,11 54:18
64:14,18 65:21
67:21,25 69:13
71:2 72:11
78:13,18,23
79:11,20 80:7
81:9 92:18
93:4 99:19
114:17 119:14
119:17 122:7
122:18 125:13
132:23 133:17
134:2,21
135:14 138:1
140:18 141:3
141:11,13
142:11,16,18
142:23 143:5
143:16 156:16
173:21 174:2
177:2 178:3,10
180:15 181:12
181:14,15,19
198:24 199:7
200:18 201:25
202:5,5,17
203:22 204:9
204:14,21,22
205:16 210:11
211:11,12
216:5 225:15
225:23 226:15
231:21
areas 53:19
82:22 138:23
181:8 223:10
247:17
argue 124:19
arguing 86:17
234:14 242:10

argument 244:2
arguments
48:10
Arkansas 10:15
27:7
Arnold 2:4 5:9
array 38:12
166:3
art 43:3 45:9
Asian 215:1
aside 43:20
61:13 162:24
185:22
asked 19:25 21:2
22:12 26:9
31:16 45:10
47:19 48:2
94:18 95:15
96:6,15 97:6
98:13 226:11
241:19
asking 19:9
37:23 60:4
102:20 103:15
112:24 120:1
123:8 176:7
184:5
asks 45:17
aspects 48:21
assembly 234:21
234:22
asserting 236:15
assess 61:1
83:19 91:9
151:22 152:10
assessing 179:8
235:15
assignment 25:8
25:12
associated 20:9
111:6 112:5
125:19
assume 37:16
48:23 60:20
105:13,15
164:14,22
176:10 177:17
194:9 201:25
202:2 227:10
230:6,8 231:7

258
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 67 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**assumes** 47:15
**assuming** 68:17
  239:23
**assumption**
  37:19 216:8,8
**astonishing**
  166:3
**attached** 255:7
**attempt** 33:14
  33:19
**attempting**
  169:4,5
**attempts** 168:14
**attention** 223:17
**attorney** 3:11
  5:7 9:13 20:7
  21:16 23:5,8
  30:4,6,11,17
  30:18,24 37:10
  38:1 43:24
  44:15 50:18
  51:12,16,20,23
  52:4 58:16
  61:3,7 62:25
  63:25 68:16,20
  69:1,7,22
  70:14,22,23,24
  71:1,5,11,25
  72:2,8 73:11
  73:18 74:5,13
  74:21 75:5,14
  75:21 76:24
  78:15,21,25
  79:3,14 80:2,9
  80:11,13,18,22
  81:15 82:18
  83:12 84:15
  85:1,6,15
  86:14,25 91:6
  92:11 97:12,17
  98:22 104:2,16
  111:9,14
  112:19 113:9
  113:13 114:22
  114:24 118:5,8
  118:17,21
  120:9 121:9
  126:14,17
  128:1 129:8,13
  130:11,16

131:10,16,19
  136:3,6,16,18
  137:3,6,17,20
  143:20,23
  149:17 150:1,7
  150:13,25
  151:18 153:3,5
  154:7 155:17
  163:7 164:5,9
  164:13 168:2,5
  168:22 169:10
  174:3,14
  175:10,15,20
  176:14 177:6
  177:10,16,25
  186:3,20 188:4
  188:15 197:21
  198:7 199:6,10
  199:13 201:9
  201:14,22
  202:19,24
  210:13 211:8
  211:14 212:15
  214:20 215:11
  218:9,11,15,17
  223:6 224:3
  232:11,16
  236:6,19,24
  240:10,22
  242:1,4,8
  248:23 249:4
  249:10 250:4,9
  250:18,24
  251:4,9,14,22
  252:12 253:3
  254:17
**attract** 177:3,13
**attractive**
  158:23
**August** 10:1
  25:25 26:22
**authority**
  243:12
**automatically**
  105:24 109:24
  109:24
**available** 87:22
  88:19 115:23
  160:16 180:7
**Avenue** 2:5,14

**average** 34:17
  52:14,24 53:10
  68:8,10,11,24
  69:5,13,17
  132:8,9,20
  139:11,18,19
  139:23 181:8
  198:24 202:17
  202:18 204:9
  205:17 209:5
  218:6
**averages** 143:4
  143:15
**averaging**
  181:11,16
**avoid** 92:6
**aware** 43:5
  164:6,17
  165:20,22
  176:15 179:3
  198:14 224:23
  226:21
**awkward** 26:5
**axis** 189:6,6,10
  189:11

**B**
**back** 22:22 44:5
  51:24 78:10
  97:4,10 98:9
  101:3 102:1,2
  128:24 141:10
  153:1 206:21
  214:7 224:13
  225:2 241:25
**backer** 56:6
**backup** 94:16
  97:21,25 98:3
  98:18 99:1
  100:16 101:4
  101:24 111:2
  115:5,9 203:10
**bad** 222:23
**BAKER** 2:12
**ballot** 165:17,19
  178:19,25
  179:12,24
  182:10,13,18
  182:23 183:3,5
  187:4

**ballpark** 49:19
**band** 228:5
**bar** 65:4 195:17
  195:17,18,22
  196:7 197:4
  206:16 207:2
  207:25
**Barreto** 25:15
  104:15 187:13
  187:24 188:6
  188:17 194:9
**Barreto's** 46:21
  187:17 194:19
  208:6,12
  210:15
**bars** 207:8,8
**base** 93:16 247:7
**based** 14:20
  15:14 28:2
  50:17 69:20
  75:18,23 95:1
  103:24 104:3
  106:10,14
  107:7,11
  118:10 128:7
  129:23 167:1,3
  167:25 188:17
  189:2 197:11
  203:6 213:25
  228:4 229:24
  231:2,10 241:1
  247:12
**basic** 33:13 46:8
  76:20 160:3
**basically** 56:15
  86:22 107:13
  144:3 190:4
  202:9 206:6
  226:25 241:20
**basis** 40:7 41:9
  70:2,17 72:5
  73:15,22 74:11
  75:3 76:19
  94:24 124:11
  126:11 129:11
  130:3,4 149:1
  149:4 163:25
  164:2 191:4
  199:21,23
  200:10 243:24

246:23 248:18
  248:20
**battle** 32:7
**Bayesian** 109:25
**Baytown** 23:25
**Bear** 58:8
**Beasley** 156:11
  156:19
**becoming** 31:14
**bed** 56:7
**behalf** 16:10
  17:12 233:8
**behaved** 227:11
**behaving** 40:23
**behavior** 9:5
  12:9,11 13:2
  13:11 37:2,2
  37:16 39:10,17
  40:12 47:22
  48:18 54:8
  76:18 124:23
  140:8,14,22
  143:11 161:20
  166:23 168:20
  169:1 172:19
  183:9 185:9
**believe** 7:2 10:2
  14:3,12 19:23
  22:18 25:23
  39:18 42:2
  44:16 49:14
  55:24 72:12
  74:15 79:2
  85:16 86:7
  101:14 104:12
  111:8 130:12
  131:12 149:15
  150:5 153:1
  158:17 163:17
  174:19 176:17
  178:18 199:17
  200:6 208:14
  208:15 210:24
  216:16 235:6
  237:18 241:5
**believes** 207:14
  207:15
**belong** 154:20
**best** 26:12,20
  36:22 59:3

259

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 68 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

90:4 105:4
125:13 140:24
169:17 170:13
170:17,17,21
172:4 254:6
**better** 36:9
42:16 130:14
130:21,23,25
131:14 156:9
167:7,16,23
168:19 170:6
194:15 201:12
216:11
**beyond** 16:1
26:7,19 28:1
35:10 77:17
78:4 116:7
124:25 129:24
140:13 250:16
**Biden** 35:23
36:2 40:19
**big** 161:23
244:11
**bigger** 232:1
**bill** 41:3
**biracial** 136:9
136:13,25
137:14 138:3
156:10
**bit** 16:9 30:25
37:7 42:25
50:25 51:6
68:3 90:21
119:17 181:22
181:23 215:4
244:25
**black** 12:13,17
22:9,20 29:13
30:8 33:5
35:21 36:1
38:2,4,9,16,18
41:20 44:9,11
44:18 45:21,21
46:4,5,7 47:6
47:22 48:2
50:20 51:2
52:12,13,22,23
53:8,9,14,18
53:19,25 54:14
54:19 55:17

59:10 60:2,11
61:1,24 62:1
63:22 68:12
69:25,25 70:13
71:19 72:19
78:7 82:12,15
83:8 109:2,10
114:13 116:21
116:22 117:23
119:9 120:25
121:17,25
122:1,12,14,15
122:17,22,23
123:6,15,18,21
123:22 124:4,5
124:11,12,23
125:2 126:8,12
126:23 127:7
129:20 130:3,5
130:5,6,7,12
130:14 131:12
131:14 132:7,9
132:10,14,16
132:19,21,22
132:23 133:11
133:15,15,17
133:21,24
134:9,12,16,19
134:19,21
135:8,12,12,14
135:18,23
136:1,2,9,15
136:21 137:2
137:16 138:5
138:14,19
139:8,13,22
140:3 141:4,14
141:22,25
142:5,14 143:1
143:8,18
146:21 147:6
149:14,15,16
150:4,5,19,23
151:2,20,23
152:10,15
153:9,11,18,21
154:1,3,5,13
154:21 155:19
155:21 158:4
158:23 159:16

161:5,9,20
162:12 163:3
164:8,19,22,24
165:8,18,23
167:21,24
168:20 169:19
170:8,24 171:5
172:6 174:1,8
174:17,23
175:1,3,7,18
175:24,25
176:4,4,9,11
176:12,22,23
177:1,12
180:16,19,22
181:4,9 182:3
182:4,8,9,14
182:19 183:3,6
183:9,11,16,18
183:19,21,21
183:23,24,25
184:1,2,3,4,8,9
184:10,12,13
184:19,23
185:4,7,8,8,12
185:20 186:1
186:12,12,17
186:18 187:6
187:20 188:1
188:20 189:17
189:18 190:20
191:7,12
192:12,15,20
192:24 193:5,9
193:14,20
194:5,12,24
195:5,6,8,12
195:25 196:10
196:14,20
197:17 198:15
198:24 199:20
199:25 200:10
200:19 201:3,7
201:16,19
204:10 205:5
205:11,16,21
209:5 210:11
211:12 214:4,5
214:17 215:2,3
215:6,17 216:2

216:13,14
218:4,7 219:2
220:7,12,20
221:3,6,7
222:17,18
223:5 224:9
231:6 233:12
233:13,21,23
234:2,3,4,8,15
234:19,22,23
235:16,18,20
235:23,24
236:1,7,8
247:16 249:7
249:13 250:6
250:20 251:5,6
251:11,13,17
252:4,5,6
**blacks** 39:8,20
42:3 74:3
82:25 127:4,6
127:8 216:9,23
217:2
**blindly** 151:3
**bloc** 43:2,3,16
43:17,21,22
44:13,14,16,24
44:25 45:4,5
48:6,13,15
61:14,24 62:3
62:13,19 63:13
71:21 72:18
73:10 81:16,24
82:9 137:1,5
184:15,16,20
185:2
**block** 47:21
**blocked** 43:13
44:9 217:14
**blocking** 44:17
**blue** 190:24,25
**board** 1:8 4:6
10:6 25:2,6
27:17 54:24
58:12 179:5
244:6 256:2
**Bob** 178:15
**body** 24:25 34:7
**book** 165:24
**bottom** 100:3

240:23
**bound** 106:17
107:18 108:3
212:4,5,7,16
212:17 213:2
**bounds** 36:19
239:21
**Box** 2:8
**Branch** 23:17
27:2 56:11
111:19 222:4
224:18 225:8
226:3 228:7
240:14
**Brazosport**
23:21
**break** 6:14
51:18,21,21
113:10 199:8,9
199:11 242:6
248:24
**breaking** 161:22
**breaks** 6:16
**Brennan's** 77:22
77:22
**bridged** 37:5
**Brief** 52:1
199:12 242:7
249:3
**briefly** 45:14
47:13
**bright-line** 56:9
56:12 236:12
**bring** 7:3 78:10
148:23
**bringing** 58:18
**broad** 130:17
245:2
**broadest** 39:6,12
44:22 90:9
**broadly** 8:19
14:22 36:19
45:7 121:4
144:22 214:24
**brought** 60:15
188:11
**building** 217:24
**bullet** 99:8,21
**bunch** 230:14
**bundled** 102:17

260

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 69 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**Burch** 25:18
**burden** 161:1
**Bureau** 219:14
  227:25 230:5
  230:10
**business** 8:12,14
  8:21
**busy** 27:6,7
**button** 94:2,6
  105:23
**buttress** 252:25
**buttressed**
  226:25
**BVAP** 49:16
  82:13,16 86:23
  187:19 188:1
  188:19 189:11
  189:15 190:18
  191:14,16
  192:11,18
  193:13 194:13
  194:24 195:2
  195:12,23
  196:11,21
  197:18,20
  199:18,24
  200:7 201:6
  203:21 204:10
  205:4,10,14,15
  205:21 208:10
  208:11 209:4
  210:10 211:10
  213:20 214:5
  216:14 218:5
  219:1 220:13
  220:24,24
  221:2,6 223:20
  223:25
**BVAPs** 205:25
**Byrd** 1:25 3:2
  254:3,21

**C**

**C** 2:1 93:20,25
  110:1,15 255:1
**c.v** 9:20,23 10:1
  22:22 23:4
  24:11 219:24
**calculate** 105:11
  223:16

**calculated** 55:17
  106:19 107:11
  107:23
**calculation**
  106:10 107:7
  108:11
**calculations**
  224:5
**call** 36:19 100:2
  109:25 110:22
  187:15,16
  219:18
**called** 9:4 89:23
  99:24 100:8,18
  101:17,18,20
  130:20
**calling** 93:20
**calls** 18:25
**campaigning**
  150:15
**campaigns**
  115:16
**candidate** 29:14
  38:3,4,6,7,13
  38:17,17 39:20
  39:21 43:11,14
  46:6,7 47:21
  48:16 52:14,23
  53:9 62:21
  68:12,13 71:23
  75:19,20,23
  109:10 113:18
  115:11 117:23
  120:7 122:2,15
  123:3,6 124:13
  124:13 125:4
  126:13 127:24
  129:1,12
  130:12,14
  131:4,12,14
  132:1,23 133:4
  133:12,17
  134:9,10,21
  135:8,8,14,18
  135:25 136:2,8
  136:9,15,22
  137:2,11,16
  138:5 142:5
  144:4,11
  145:10 150:14

  150:24 152:22
  153:19 154:4,6
  158:4,22,22
  160:9,10,11,13
  160:22 161:15
  161:16 162:11
  163:6 165:7,16
  167:9,25
  169:14,23,25
  170:7,16,21,23
  171:21 172:9
  173:1,11 174:5
  174:9,17,24
  175:25 176:1,7
  182:9,20,20
  183:6,12,12,19
  183:24 184:1,2
  184:4,9,9,10
  184:14,23,24
  185:25 186:1
  186:13,18
  187:4,20 188:2
  188:20 189:21
  190:1,8,15,20
  191:6,12
  192:13,16,20
  192:24 193:5,9
  193:15,21
  194:24 195:6
  195:25 196:16
  197:18 199:20
  200:1,10 201:3
  201:7,17,19
  204:10 205:5
  205:11,17,22
  209:6 210:12
  211:13 212:11
  216:15 218:7
  219:3 229:17
  229:18 247:21
  247:23,24,25
  248:1,6,18,21
  248:22 249:18
  249:25 250:23
  251:2,16
  252:15,19
**candidate's**
  167:23 168:19
  178:21,22
**candidates** 30:9

  33:1,7 38:12
  38:16 41:21
  44:18 45:22,25
  46:4 53:20
  72:19 82:13,16
  114:6,11,14
  115:16,19,20
  116:8,16,21,22
  121:24 122:12
  122:13,16,16
  123:17,19
  126:10 127:5
  128:13,15,25
  129:23 130:5,6
  130:7 131:5,7
  132:10,12,14
  132:16,21
  133:15,20,21
  133:25 134:1
  134:19,25
  135:12,20,24
  135:24 136:1
  138:14,20
  141:23,23,25
  146:22 147:2,9
  147:24 148:2
  149:12 150:2
  151:20,23
  152:7,8,11,13
  152:13,24
  153:8,9 155:20
  157:18 158:9
  158:15,21
  159:5,8,9,14
  160:1,16 161:7
  162:20 169:17
  170:6 171:14
  172:4,9,21
  174:1,8 175:1
  175:6,13,17
  176:4,10 177:1
  177:12,20
  179:4,6,11
  183:21 185:7,8
  185:12 188:12
  189:9 190:5
  191:9 194:13
  195:12 196:11
  196:20 198:15
  198:25 200:20

  214:4 229:16
  247:18 248:15
  251:12,13
  252:4,5,6,6,18
**candidates's**
  144:17
**capable** 103:12
  103:13 104:7
  145:4
**capture** 110:1,3
**captured** 110:25
**care** 109:14
  227:18 228:18
**cared** 220:23
**careful** 72:10
  79:24 104:8
  223:1,22
**carefully** 129:16
**Carolina** 1:1,7
  2:8 7:18,20,21
  7:24 8:2,4,5,8
  8:13,20 11:2
  13:15,22 14:4
  14:7,13,16,19
  15:8,14,17,23
  16:3 27:4,16
  27:17 39:3
  47:1 54:23
  55:3 92:17
  93:3 114:7
  129:7,10,11
  147:7 148:23
  148:25 149:2
  149:10 155:24
  158:5 164:11
  166:24 167:22
  169:20 170:9
  170:24 172:7
  172:19 174:2
  174:13 175:4
  183:8 191:23
  194:23 195:1
  195:11 196:10
  196:20 199:3
  199:19 200:9
  214:23 215:10
  216:7
**carrying** 160:25
**case** 1:2 5:10
  6:22 9:10 10:6

261

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 70 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

10:6 13:15,22
15:2,2,4,6,8,13
16:2,11,23
17:2 18:1,5
19:3,5 22:14
22:20 23:9,13
25:9 27:2,4,5,5
31:2 32:9,20
32:23 33:5
35:21 36:21
37:15 39:8
43:23 44:4,8
45:1,11 47:11
56:11 58:11,21
60:14,16,25
63:14 69:4,5
71:20 72:7
73:17 74:12
75:4 76:11
84:16 87:22
89:3,5 90:8,11
94:16,18 98:1
104:13 106:12
108:11 109:8
111:20 112:15
115:25 116:1
121:4 124:8
141:21 148:2
148:14 151:22
152:19 154:23
160:20 161:2
168:7,11 195:4
195:10,17
196:4,5,9,18
202:15 205:5
215:14 219:1
220:11,12,19
220:20 222:4
222:11,16
224:11,13,19
225:2,8 226:3
226:7 228:7,8
232:19 233:5
237:1,3 238:5
240:5,15
242:10,12,22
242:25 244:5
244:11,13,14
244:15,16
245:5,9,11,14

245:17,19,22
246:4,6 247:5
256:2
**cases** 13:18 14:7
14:25 16:14,19
16:21 17:18
21:2,8 23:1,4
23:12 24:10,14
24:21,25 27:1
31:6 53:17
63:5 78:1,1
89:21 94:4
103:25 104:4
115:24 162:7
219:5,16,21
220:2 221:11
221:17,20,23
222:20 224:15
224:17,25
240:12 243:2
243:25 245:12
246:7,8,12,16
246:19 247:4
**cast** 35:17
129:22
**casting** 140:11
**categories** 57:22
**category** 114:21
134:13
**causal** 33:14
34:11,11,17,23
35:4,5 37:8,12
37:14,25
144:16,20,25
145:1,5,8,9,13
146:6,7 158:25
**causation** 34:14
72:24 157:1
158:7
**cause** 72:3,11
162:22
**caused** 158:20
**causes** 147:13
**causing** 161:7,8
**caution** 91:18
**caveat** 141:15
**Census** 219:14
227:25 230:5
230:10
**center** 107:16

190:12 227:11
227:14 230:1
**centered** 248:1
**central** 4:10
104:24 111:19
219:9 228:16
245:21
**certain** 85:24
109:9 191:13
219:6
**certainly** 5:18
13:8 14:14
15:16 16:7
20:14 26:14
29:18 30:12
35:6 36:21
46:3,7,9 48:25
49:20 51:1
62:5 69:25
72:25 77:10
81:2,4 90:8
92:8 97:5
102:9,18 103:9
120:17 129:25
129:25 148:13
154:11 172:14
179:7 183:10
186:11 207:5
211:3 212:4
213:5 216:5,18
217:6 221:9,25
223:17 225:21
235:14
**certainty** 158:18
**CERTIFICATE**
254:1
**Certified** 5:3
**certify** 254:5,14
**cetera** 189:7
241:7,7,8
**challenge** 10:20
**challenged**
81:10
**chance** 21:10
173:7
**change** 11:22
85:2 126:5
163:13 166:15
177:21
**changed** 157:23

**changes** 118:14
119:1 254:12
**changing** 100:25
**characteristic**
158:21 159:7
159:18 162:18
162:19 227:17
**characteristics**
147:24 152:21
158:9,14 160:9
160:13,15,22
161:6,11
162:17,21
163:11 171:16
247:22
**characterizati...**
22:19
**characterize**
16:13 34:8
51:9 70:4
72:21 73:2
75:8 104:23
119:6 130:1
246:3
**chart** 52:19
64:22 66:21
189:24 195:17
195:17,22
196:7 197:4,12
197:15,17
206:16 207:25
**charts** 65:4
66:17 195:18
207:2
**chat** 9:9 51:13
58:9 97:14
111:10 202:21
236:20
**check** 113:1
**checkbox** 60:10
**Cheri** 156:11,19
**choice** 50:4,12
62:3,4 87:14
120:8 155:1
212:11
**choose** 57:6
128:3
**choosing** 116:20
**chose** 87:7,19
**circumstance**

223:13
**circumstances**
49:5 217:8
**citation** 244:9
**citations** 244:8
**cited** 49:8
**citizen** 56:9
219:13
**citizenship**
223:9
**city** 17:20,20
18:4 23:25
89:3,5 222:18
230:23
**claim** 172:2
**clarification**
14:11
**classes** 13:5
153:7
**classify** 220:1
**clean** 7:5
**clear** 14:5 41:24
60:24 70:3
73:19 74:14
125:15 151:1
152:5 163:14
171:23 172:16
179:6 208:1
247:15
**clearer** 147:4
**clearly** 77:11
122:12 127:15
157:17 169:16
170:4 181:25
191:15 196:24
197:10 222:13
**close** 8:5 13:18
40:20 56:25
67:10 103:4
164:4 199:8
236:16
**closely** 31:13
**closer** 221:10
**clustered** 189:14
190:23,25
**clustering**
230:15
**CMackie@po...**
2:10
**code** 28:10,12,14

262
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 71 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

28:15,17 93:7
93:16,19,20
94:1,5,7 96:1
96:12 97:1
103:6 110:12
203:9
**codes** 116:2
**cohesion** 42:12
42:19 44:25
51:2 54:1,6,16
56:16,16,23,23
56:25 57:9,22
60:12,14,20
61:25 62:7,11
67:3,14 69:24
69:25 70:1,3
70:11,13 71:19
125:17 137:19
137:21,22
181:24 182:14
183:20 184:16
184:19 185:4
187:5 243:15
243:17,18
**cohesive** 43:13
44:23 45:2
47:7,17 48:3,4
48:7 53:15
54:7 55:18
57:1,25 58:1,5
58:7 60:23
61:5 62:1,23
64:8,17 65:1
65:15,20 66:1
66:5 67:24
68:7,23 69:12
122:11,11,12
126:8 180:19
180:22 185:19
185:20,23
**cohesively** 43:10
43:11 45:18,21
45:24 46:6
47:20,20,21
48:15,17 50:21
50:21 56:2
57:15 59:11
60:3,11 61:2,9
61:16 62:3
63:11 136:14

136:21 137:15
138:4 156:15
167:22,24
182:8 183:23
184:2
**colleague** 93:6
**colleagues** 40:15
40:18
**collected** 194:16
**collectively**
202:13
**College** 23:20,20
**Collingwood** 4:4
4:11 25:13,16
25:16 27:18
29:7 31:15
32:15,17 52:12
52:22 53:8
73:3,21 74:2
85:23 93:13
94:22,25 95:1
95:2,3 103:1
104:5,14
116:11 117:4
117:12 120:13
128:12,14
148:4,13 149:7
149:20 150:11
159:12 160:17
162:16 168:16
169:3,15 170:4
174:5,16
175:11 177:5,8
180:8 195:18
195:22 203:9
204:6 205:10
209:2,15
210:20 211:5,6
211:18,21,21
213:14 218:13
239:4 244:24
248:9
**Collingwood's**
6:23 7:1 27:15
28:10,12,20
31:13 32:10,13
33:10 46:19,22
49:25 51:15
52:6 64:2,5
76:11 78:11

79:9 80:5
85:21 95:10
96:3,14 103:11
103:21,25
105:18 112:17
113:2,3,23
114:12 117:13
118:10 125:18
126:21 127:19
128:8 131:22
143:25 144:8
144:13 145:7
145:18 152:1
152:17 158:13
163:24 168:24
174:21 180:2
189:2 196:7
197:2,12
200:14,17
202:20,25
203:17 204:3
205:3 208:17
210:19 213:7
213:18 218:3
248:8 253:2
**column** 165:3,5
165:6,9,11
**combatting**
150:16
**combination**
93:19 115:13
**combinations**
114:7
**combined**
133:22
**come** 13:7 16:19
18:4,10 19:3
42:18 94:10
95:6 96:1,20
115:14 121:12
121:13 219:7
224:15 243:20
243:22
**comes** 8:18 13:9
13:12,24 18:6
40:3 77:13
223:15
**coming** 25:5
95:11 96:19
**comma** 96:20

**comment** 28:15
178:14 226:12
**commented**
188:8
**commenting**
60:5 151:25
222:11
**Commission**
4:12 232:19
**Commissioners**
58:13
**common** 152:20
**commonly** 128:5
**commonsense**
38:22
**Community**
23:20 219:14
**compact** 194:16
**comparative**
15:17
**comparator**
170:14
**compare** 181:20
**compared** 78:19
78:23 83:1
171:24 198:24
200:21
**comparing** 33:5
91:13 92:10
125:11 233:11
234:2 252:17
**comparison**
80:16 90:9
121:17 135:17
170:22 172:5
236:4
**compatible**
128:25 145:12
197:2
**competent** 32:17
**competing** 211:9
**competition**
160:5
**complete** 6:11
**completely** 92:8
147:1,3 184:15
212:9
**completion**
254:10
**complexity**

37:22
**complicated**
230:16
**complied** 233:6
**comported**
247:1
**comporting**
248:2,2
**composed** 82:15
84:10,11
191:20 192:9
197:16
**composition**
23:3
**compressed**
171:17
**compute** 230:20
**computer** 31:8
101:1
**computing**
231:1 235:8
**conceding** 207:5
**concentration**
221:3 226:15
**concern** 37:4
50:25
**concerned** 17:6
89:2,4 209:10
220:16
**conclude** 32:14
43:9 191:11
197:23 198:6
224:21 228:13
**concluded** 21:3
105:3 172:3
195:22 253:6
**concludes** 32:15
**concluding**
164:1
**conclusion**
20:12,21 21:13
32:4 86:11
120:18 121:12
124:16 144:25
145:5 146:8,9
196:13 197:3,6
200:2,7 208:25
209:3 228:22
228:25 229:3
239:16

263
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 72 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

conclusions 28:8
120:6 144:16
145:1 158:2
187:18 193:19
199:18,23
235:7 245:3
247:7,8,9
condition 36:13
72:5
conditions 63:22
conduct 92:13
92:13 114:1
205:4
conducted 31:1
32:23 85:23
86:4 99:5
204:6 218:4,21
219:1 242:9
244:15 254:5
conducting 15:5
29:8 31:4 90:1
233:11
Conference 4:5
58:12 244:6
conferences 8:9
confess 211:25
confidence
36:15 105:7,11
105:24 106:2,5
106:6,9,11
107:2,22
108:23 110:21
111:5,6 112:5
112:12,15
125:18,25
223:16,17,23
224:8,21 225:9
225:11 227:1
227:13,13
228:5,18,19,24
229:14,20
230:2,3,5,17
230:21 232:7,8
232:10 234:7
235:2 239:20
239:21
confident
106:14
confine 223:23
confining

142:16,18
confirm 9:22
30:21 31:10
94:22
confirms 210:18
confused 156:9
211:25
congress 155:8
155:11 173:5
congressional
10:22,24 16:18
17:8 173:6
243:11
congressman
16:17
congressmen
16:15
connect 206:14
connected 45:7
47:23 48:18
73:8 147:22,23
148:1
Connecticut
2:14
connection 78:4
145:9 146:3,7
146:10
connections
146:14
connects 206:13
consider 12:22
13:1 83:15
160:12
considered 8:3
33:8 34:22
40:6 55:21
113:22 160:17
163:2
considering
69:18 85:3
160:15
considers
117:21
consistent
138:12,18,22
138:25 140:16
159:15 161:22
168:7,8 171:3
196:6,6 212:9
consistently

77:14 139:10
140:6 151:20
151:23 152:10
152:12,14
constant 161:17
constituents
175:8,18
constitute 34:20
173:20 217:2
254:8
constitutional
10:20
constructed
34:13
constructing
227:12
consult 223:8
consultant 24:12
consulting 10:14
10:17 19:14,25
23:24 27:25
consuming
222:22
contain 46:23
49:11 107:19
181:15 218:2
255:4
contained 96:13
202:10
contains 29:6
111:4 164:24
165:1 181:14
contending
17:13 147:10
contest 29:19,20
66:8,9 133:14
136:8,13,25
137:14 173:13
179:14
contested 90:6
contesting 30:15
42:22
contests 38:15
64:9,18 65:1
65:15,20 66:2
66:6 67:25
68:14,24 71:18
73:5 120:2
132:21 134:18
135:11,17,23

138:4,11
156:10 203:23
204:8 214:2
context 11:25
13:9,12 15:18
38:25 59:14
62:10 91:23
contiguous
194:17
contingent
62:14,15,16,17
continue 40:16
40:19 167:10
continues 56:10
56:11 73:21
continuing 27:6
continuous
33:23 57:19
178:9
contradict
168:11
contrast 133:2
control 217:4
controversy
224:24,25
convenient
96:17
convert 124:22
convince 148:24
Cooper 191:11
191:14 198:14
198:22
copy 7:5 9:17,23
51:19 98:15,17
98:25 236:25
correct 5:15 6:8
7:14 9:1,2
13:16 14:7,21
15:15 25:10,11
25:13,22,23
26:3 27:24
28:14,16,18,19
28:25 29:1,9
29:10,17,22,23
29:25 30:1,3,5
30:10 31:2,3
33:11,12 38:18
38:19 43:23
45:12,13,22,23
45:25 50:2,3,5

50:6,10,13,14
52:16,17,20,21
52:25 53:1,6,7
53:12,13 55:18
55:19 57:16
61:2 62:24
64:6,10,11,14
64:15,19 65:16
65:17,21,22
66:2,3,19,23
67:22 68:2,15
68:25 69:14
70:20 71:4
75:20 78:14,19
78:24 79:2,13
80:10,21 81:18
81:22,23 82:1
82:5 86:2,3,6,7
86:9,10,13
87:4,5,7,8,11
87:12,14,15,17
87:18,20,24
88:4,20 89:21
89:22,24,25
92:19 93:4,5,8
95:21,23 96:3
96:14 97:3
98:2 99:6,7
100:9,10,13,14
101:20,21
102:23 103:17
103:18,22,23
104:18,19
105:9,10 111:7
111:8 113:16
113:24,25
114:8,9,15,16
114:19,21,23
115:3,9,10
117:23,24
118:4,16
121:20,21
122:20,21
123:7,19,20,24
123:25 124:2,7
127:24 129:12
131:24,25
132:2,3,17,18
132:25 133:1,5
133:6,9,10,12

264
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 73 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

133:13,18,19
133:23 134:3,7
134:11,14,15
134:17,22,23
135:1,2,6,9,10
135:16,20,21
137:2 138:1,2
138:6,8 139:14
141:5 142:21
142:22 143:2,8
144:2,10
147:14,15
151:24 152:15
156:4,12,16,17
156:19,20,24
158:11,16
160:14 167:13
168:7,13,15,21
170:14 172:10
173:22,23
174:2,19 175:3
175:9,19
176:17,20,24
177:5,15 178:6
179:21 180:8
180:17,18
181:2,6,7,10
182:5,11
183:24 186:23
186:25 187:6
187:13,14
188:3,21 189:3
189:4 190:9,10
190:16,21
191:1,20,21
192:5,16,17
193:7,8,10,11
193:15,16,21
195:2 198:10
198:11 199:1,5
200:22,23
201:21 202:8
203:7,8,10,23
203:24 204:17
204:25 205:1,6
205:7,18
208:10 209:6
210:12 211:13
211:15,22
213:21,22

214:8,12,14,15
215:23 216:15
218:8,10,14,19
218:20,23,24
219:16,17
221:15,16
229:23 230:7
231:17,20
233:2,6,24
234:1,5,6,9,10
234:12,17,18
234:24,25
235:3,4,9
236:2,5 237:2
237:5,8,14,15
237:18,20,21
237:24 240:9
245:8,20,23,24
247:18 250:17
255:5
**correction** 255:7
**correctly** 17:7
31:21 34:8
59:12 60:4
74:15 99:15
100:4 112:6
122:3 138:15
179:15 192:25
205:12 215:21
230:17 244:23
**correlation** 34:5
**council** 17:21
89:4,5 222:18
**counsel** 6:5,7
254:14,17
**count** 5:19 66:15
223:19
**counties** 46:15
46:23,23 82:1
188:13 196:5
202:10,12
204:8,15,20,23
205:6 209:4
210:18 218:5
**country** 149:3
172:20 173:9
173:10,10
**county** 10:24
24:3 188:10
233:22,24

235:25
**couple** 7:23
13:20 249:1
**course** 9:4 12:3
13:7,11,12
60:12 88:13
**courses** 9:3 12:8
**court** 1:1 3:1
7:16 14:18
16:6 26:15
30:20,21 32:6
32:9,11,15
39:1,2,14 43:9
56:5,8 57:4,6
57:20,24 77:8
77:13,21,24
88:21,25 89:10
112:24 121:14
121:18 122:19
123:16,18
136:20 151:15
156:12 163:25
171:13 178:16
179:13,20
242:22 243:4,5
243:5,11,25
244:1,12 245:6
245:22 254:1,3
**courts** 242:14,18
243:22
**cover** 90:11,12
120:12 121:7
**covered** 26:2
120:13 156:21
158:8 247:13
**cracking** 10:21
**cream** 157:25
**create** 83:7
195:24 207:14
207:19,23
212:10 216:20
216:25 217:1
226:18,22
238:12,18
**created** 93:7
189:2
**creating** 17:14
207:13,21
**credible** 36:15
105:14,15,16

105:20 106:1,3
106:4 107:8,23
109:6,15,19
110:17 111:1,4
111:6 113:5
126:3
**credit** 242:15
**Creek** 7:16 24:1
**critical** 160:18
185:3,3 207:20
207:24 209:19
210:5
**criticism** 87:13
209:2 218:2
**criticisms** 28:17
28:24 29:6
**criticize** 50:4,12
209:18 218:12
**criticized** 209:1
**criticizing** 205:3
207:11 209:8
**cross** 34:15
138:18 196:25
212:25
**crossing** 70:7,16
71:3
**crossover** 51:5
78:17,22 80:4
80:6,20 81:20
82:7,10 83:15
84:1,8 118:20
119:10,16
127:10 138:13
178:2,5 183:10
**crowd** 18:8
**CSR** 1:25 3:2
254:3,22
**Cubbage** 134:16
**current** 9:22
14:18 17:23
42:7 219:10
239:2
**currently** 7:15
8:22 9:3 40:10
106:23 172:24
**cutoff** 56:21
**cutpoint** 42:16
**CVAP** 219:18
219:22 220:8
220:14,17,24

220:25 221:3,6
221:7,10,13,18
221:19,21,25
222:2,6,7,11
222:15,22,24
223:2,4,8
224:5,6,9
225:5,14,20
226:4,4,6,9
227:1,2,4,5
228:12 229:21
231:5,6,6,6,14
233:13,23
234:2,8,16
235:3,7,11
236:1,17
237:12,16,20
238:6,14,18
239:1,10,11,13
239:22 240:7
241:1,12,13
**cycle** 219:10

**D**

**D** 1:4 255:1,1
**D-U-M-A-S** 10:7
**Dallas** 23:21
**data** 27:12,16,21
27:22,25 28:9
28:21,24 31:14
31:15,18,18,18
34:7,9 35:2,18
37:4 93:21,22
93:23 94:16
97:21 98:3
99:12 100:16
101:15,24
105:5 107:12
111:2,5 113:8
115:5,9 120:6
129:5 145:15
149:6 164:2
189:2 201:13
219:14,18,22
225:15 229:21
234:15 235:7
247:10,12
250:15
**dataset** 96:21
**date** 153:25

265

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 74 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

256:4,25
**day** 254:19
  255:9
**daylight** 166:21
  166:25 167:7
**days** 159:25
  219:7
**DC** 2:5,15
**deal** 224:1
**dealing** 32:24
  33:3 34:19
  90:13
**deals** 9:5 108:21
**dealt** 240:12
**decade** 16:24
  42:1,7 222:20
  224:17
**December** 58:24
**decided** 94:24
  183:18 243:23
  243:24
**deciding** 154:19
**decimal** 66:20
  66:23
**decimals** 66:19
**decision** 77:11
  77:21 205:3
  218:3 243:10
  243:11
**declare** 255:3
**declined** 153:14
  242:15 243:4
  246:23
**declining** 241:4
  241:18
**decreasing**
  178:5
**deeper** 152:3
**default** 110:20
**defeat** 48:16
  62:3,20 71:22
  72:19
**defective** 210:21
**defend** 19:9
**defendants** 1:9
  2:11 25:9
**defending** 17:20
  17:23 19:16
**define** 42:23
**defined** 12:24

46:19 62:10
**defining** 57:9
**definitely** 20:16
**definition** 39:12
  44:12 46:8
  48:5 83:23
  89:13,18
  181:14
**degree** 23:23
  24:4 27:8
  33:22 36:18,18
  42:19 51:9
  62:7,23 67:7
  72:20 73:6
  74:18 158:18
  172:24 249:22
  251:1
**deliberately**
  30:14
**delved** 146:1
**Democrat**
  120:23 122:23
  123:22,23
  124:5,6 125:5
  125:6 139:8,8
  139:13,13
  140:3,3 141:4
  141:4,14,14
  142:14,15,25
  143:1,7,8,18
  143:19 146:13
  154:22 155:1
  166:11 171:4
  174:24 176:1
  177:20 183:4
  189:9 212:11
**Democrat's**
  120:24
**democratic**
  16:15,17 40:15
  82:21,25 83:3
  83:6,7,9,21
  84:3,7,21,23
  85:13 86:17
  123:16,18
  125:3 127:5
  131:6 132:8,9
  132:20 138:14
  138:19 139:19
  139:22 147:8

150:14,23
152:11,12,13
153:8,18,23
154:1,4,14,24
155:5,11,20
159:9,14
162:22 164:7
164:11,15,18
164:20,23
166:7,8 173:1
173:20 174:25
176:10 177:23
191:5,8 196:16
247:17
**Democrats**
  40:13,18 41:2
  41:5 122:19
  132:12,15
  149:13 150:3
  151:21,24
  152:11 159:24
  173:2 175:4
  176:3,4 177:24
  249:8,14,21
  250:7,21 251:6
  251:18
**demographer**
  23:12,15 24:7
  222:10,19
  225:5 238:13
  240:6,15
  241:23
**demographic**
  173:23 221:23
**demographics**
  21:3 24:5
**demonstrate**
  34:14 72:24
  117:3,11
  126:11 145:9
  206:23 207:19
  207:21
**demonstrated**
  147:25 148:3,6
  148:16 152:2
  159:13,13
**demonstrates**
  169:9,16 170:5
  170:20 171:6
  196:14,24

253:2
**demonstration**
  46:13,17 47:3
  47:7 50:8,15
  53:5,11 64:14
  64:18 65:21
  67:21,25 69:13
  71:2 76:21
  78:12,18,23
  79:11,20 80:7
  86:5 87:4 88:6
  92:2,18 93:3
  99:19 114:17
  119:17 122:18
  132:23 133:17
  134:2,21
  135:14 137:25
  140:18 141:3
  141:11,13
  142:11,16,18
  142:23 143:5
  143:15 156:16
  173:21 177:2
  180:15 181:12
  181:14,19
  198:23 200:18
  201:25 203:22
  204:9,14,16,21
  204:22,25
  205:16 210:11
  211:11 221:14
  222:3,14 224:7
  224:12 226:11
  226:18,23
**demonstrations**
  238:20
**Denise** 1:25 3:2
  254:3,21
**Denise@Disco...**
  3:5
**deny** 242:24
**depend** 62:21
  63:1 83:8 85:9
  91:8 195:3,3
  201:24
**dependable**
  158:3
**dependent** 32:21
  32:25 33:9,16
  33:21 146:12

**depending** 84:19
  118:14
**depends** 22:4
  91:20 102:24
  118:24 168:8
  195:14
**deponent** 254:12
**deposed** 5:14
**deposition** 1:12
  4:5 5:21 6:20
  7:4 46:14
  58:11,20,23
  59:2,4 247:14
  253:6 254:4,10
  256:4
**describe** 24:11
  45:14 47:13
  57:1
**described** 24:13
  56:17
**descriptors**
  57:22
**design** 34:12,18
  35:9 161:13
**despite** 141:23
  153:22
**detailed** 29:18
  100:22
**determination**
  168:1
**determine** 83:13
  84:12 115:11
  116:20 167:2
  210:9
**determining**
  56:1 188:19
  211:10 216:13
**developed** 36:20
  93:9 94:3
**deviations** 107:7
  107:11
**devise** 162:2
**differ** 82:10 84:9
**difference** 32:1
  35:13 70:5
  73:25 74:18
  104:10 106:4
  106:25 118:19
  118:22,23,25
  119:3,14 122:9

266

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 75 of 104
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

123:5 124:14
124:17,20,23
125:2,8,9,10
125:12,24
126:1,2 140:5
140:9,10,13,15
140:17,17,19
140:22 142:3,4
142:7 143:3,6
143:11,14,17
143:21 146:19
146:21,25
147:2 159:21
159:21,22
160:1,3 161:7
161:9,18,19
162:6 163:3,15
167:6,14
170:11 182:21
182:22 186:17
193:2 248:10
248:11 252:4
**differences**
31:22,25 50:23
77:18,19 78:5
143:10 149:23
149:24 151:14
151:16 152:6
161:24 162:10
162:11 163:12
163:12 223:9
244:20,21
245:1
**different** 32:4,16
33:9 37:24
38:24 39:19,20
41:20 44:21
46:21 48:9
61:15,19,21
81:17,17,21,21
81:25 82:10,22
82:23 83:24
91:22 95:17
98:7 114:14
117:22 118:2,9
120:5 147:8
162:8 166:6,20
167:6 171:11
171:15,15
180:3,5 181:12

181:25 182:1
192:3 218:23
227:7 229:11
239:25,25
243:15 246:22
247:5 248:4,5
**differentials**
192:7
**differently**
22:10,15 51:8
74:4 77:12
82:14 84:9,11
84:19 85:14
145:17 191:8
244:25
**difficult** 72:11
157:5 195:20
216:22 222:6
241:13
**dig** 17:3
**dinner** 59:3,5
**direct** 3:4 4:9
59:6
**direction** 55:14
55:15 119:2
143:6,9,17
155:2 178:2,8
243:23
**directly** 49:14
80:16 206:13
206:14 250:2
**disadvantage**
217:16
**disagree** 81:6
126:18 136:19
209:11
**disagreed** 77:24
**disagreeing** 73:4
**disagreement**
104:12
**disappears**
157:22 184:15
**disclose** 28:13
28:23 87:13
218:18
**disclosed** 27:18
29:24 97:9
**disclosure** 97:11
**Discovery** 3:1
**discrimination**

48:18 72:21
73:13 74:9
75:1,7 77:16
150:16
**discriminatory**
47:24 48:13
77:2,5 217:17
**discuss** 117:16
237:19 238:1
239:3
**discussed** 50:7
73:23 86:8
152:22 204:14
239:4
**discusses** 151:15
**discussing** 30:13
60:6,7 238:10
**discussion** 6:23
115:22 116:5
222:17
**disjunction** 37:3
**display** 249:23
**displayed** 113:4
113:6
**disprove** 211:5
**dispute** 29:11
72:6 73:16
74:11 75:3
108:21 224:20
239:17 246:5
**disputed** 56:12
**disputes** 56:6
**disputing** 29:24
69:18 71:20
76:17 86:11
211:16
**distinction**
151:8,10
**distinguish** 54:3
77:8
**distribution**
106:15 107:15
107:16,24
108:9 110:2,3
227:10 230:1,6
230:9 231:11
231:23
**distributions**
230:8
**district** 1:1,1

4:10 10:8,9
17:15,16,21
18:12 19:8
20:5 21:4,9,13
23:3,18,23
24:2,5,5,19
44:10 47:4,4,8
47:8 52:10,13
52:19,25 60:19
62:23 63:15,23
66:2,6 68:8,15
68:23 71:23,24
78:14,23 81:10
81:11 82:12,15
82:22 83:5,6,7
83:14,16,20,21
84:4,5,6,7,7,12
84:13,20 85:12
85:13 86:13,19
87:3 89:8,9,19
90:3,6,12,24
90:25 91:4,10
91:23 92:2
111:20 119:18
119:19 122:18
123:15,23
124:6 125:20
126:7 135:15
135:15 138:1,1
139:11,20,23
140:2,17,22
142:12,12,19
142:19,24,24
143:5,6,16,16
155:7,11,15
173:21,21
176:15,19,20
176:22,23
177:2,3 181:5
181:6,13,13,16
187:21 188:2
188:21 191:19
192:9 193:10
193:20,24
194:17,25
195:7,10,24
196:9,15,19
197:7,16,24
198:4 199:19
199:25 200:4,8

201:6 202:1,3
202:9 206:5,5
206:7,13,15,22
207:13,14,19
207:21,23
209:16,19,20
209:21,22,25
210:2,7,8,10
210:21 211:1
211:11,17,23
212:10,14
213:4,6,13
216:20,21
217:1,2,4,12
217:15,18,22
219:3 220:15
220:18 221:14
222:3,7,10,14
222:18 223:8
224:7,7,12,19
225:4,13,14,16
225:20,23
226:11,15,18
226:23 227:6
227:21,22
228:2,13,14,22
235:13 236:12
237:13 238:17
239:2,8,9,12
239:13,19,20
240:2 241:13
241:15,19
245:22
**district's** 83:4
208:10,11
**districts** 17:8
23:25 24:1,18
24:18 25:1,3
43:22 44:11
46:17,24 49:17
49:21 50:9,16
64:6,10,22
65:2,16 79:11
79:18,19,21,23
80:7 82:1 84:9
84:10,17,22
85:3,10,12,25
86:5 87:4,23
88:2,4,6,7,8,17
88:19 92:19

267

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 76 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

93:4 114:18
132:24 133:18
134:2,22 173:1
173:2,7,9
175:8,14,19
176:16 177:22
177:24 181:20
191:23 192:10
193:25 197:4
202:11 204:17
204:25 206:3
206:10,11,17
207:9 208:20
208:24 212:21
213:8,11 217:9
217:25 222:1
234:20,22
237:6,14,19
238:13 239:5,7
243:6
**disturb** 249:17
**divergent**
165:10 169:18
170:8,23 172:6
**diverse** 171:13
**divided** 190:5
**division** 1:2
10:23
**divorce** 28:4
76:7,9
**document** 9:14
58:10 97:2,13
98:17 111:10
**documents** 7:3
7:12
**doing** 13:20,21
19:2 24:2
33:25 53:23
57:18 59:25
81:11 90:18
94:23 103:12
103:13 112:25
140:11 145:13
145:14 217:10
220:4 221:23
226:10 230:21
232:21 240:1
245:19
**dominated**
179:10

**Donald** 40:16
106:25
**dot** 113:4 180:2
187:15 189:19
189:23,25
190:2,6,11,12
192:6 203:5
**dots** 189:7
190:23,24
**dozens** 192:1
**Dr** 1:12 4:4,9,11
4:12,13 5:1,8
6:23 7:1 25:13
25:15,16,16,18
25:18 27:15,18
28:10,12,20
29:7 31:5,13
31:15 32:5,10
32:13,15,17,23
33:10 36:20
46:19,21,22
49:25 51:15
52:6,12,22
53:8 64:2,5
73:3,21 74:2
76:11 78:11
79:9 80:5
85:21,23 92:14
93:13,17 94:1
94:6 95:15,22
95:25 96:3,10
96:14 97:2,18
98:23 103:21
103:25 104:5
104:14,15
105:18,22
110:9 112:17
113:2,3,14,15
113:17,23
114:12 116:11
117:4,12,13
118:10 120:13
125:18 126:21
127:19,19
128:8,12,14
131:22 143:25
144:8,13 145:7
145:18 148:4
148:13 149:7
149:20 150:11

152:1,17 153:6
158:13 159:12
160:17 162:16
163:24 164:6
168:24 169:3
169:15 170:4
174:5,16,21
175:11 177:5,8
180:2,8 185:14
186:21 187:13
187:17,24
188:6,17 189:2
194:9,19
195:18,22
196:7 197:2,12
200:14,17
202:20,25
203:9,17 204:3
204:6 205:3,10
208:6,12,17
209:2,15 210:9
210:15,19,20
211:5,6,18,21
211:21 213:7
213:14,18
218:3,13
232:17 248:8,9
253:2 254:4
255:3,11 256:3
**dramatically**
215:8 223:11
**draw** 19:8 21:4
23:18 25:3
28:8 116:23
117:1 120:6
124:16 130:8
144:15,20,25
145:1,4 146:8
146:9 187:18
197:23 198:1,1
198:3 199:17
199:23 200:2,6
202:1,3,9,11
209:20,22
210:2,7,8,25
211:16 213:4,5
213:7 225:3
235:6 239:13
239:18,20
241:13,14,19

**drawing** 23:23
23:25 24:1,18
25:1 120:17
145:4 193:18
193:23 202:3
208:23,24
209:18,25
217:8 220:15
221:13 222:1
224:12 238:16
239:5,6
**drawn** 21:9
209:16,20,21
212:1,2,14
213:13,14,16
216:20 219:4
225:16 226:16
227:21 238:22
239:7,24
**draws** 107:20
**drew** 211:24
239:11
**drive** 160:18
**driving** 160:22
183:9
**drop** 9:8 201:20
202:20
**drops** 183:5
201:17
**duly** 5:2
**Dumas** 10:7
**duplicative** 49:1
**durable** 171:25

——————————
**E**
**E** 2:1,1 255:1,1,1
255:1,1 256:1
256:1,1
**e.g** 99:24
**earlier** 13:13
18:8 48:1
59:15 137:23
143:24 174:10
**easier** 54:11,23
**easiest** 179:2
**easily** 21:9
128:16
**East** 4:9 111:19
245:21
**eastern** 1:1,2

17:10
**ecological** 11:12
11:15,18,20
29:3 36:4,6,8,8
36:20,23,25
53:23 124:9
126:11 145:14
145:14
**economics** 37:19
**Edwards** 178:15
**effect** 125:5,11
126:23,25
144:16 148:17
148:18 166:16
**effective** 125:13
200:5 211:16
213:11
**effectively** 63:21
**effort** 86:21
**EI** 29:2,8,16,20
29:22,25 30:3
30:15 31:1,3
31:12 32:3,19
32:22 33:10
36:19 37:8
49:25 54:23
66:21 86:23
92:16 93:1,7
93:17,21 94:7
94:8 96:13,14
99:5,12,13,18
101:23 102:8
102:22 103:1
103:25 104:5,7
104:18,20,21
104:23,25
105:2,8,12
107:8,12,21
108:1 110:15
112:3,10,12,24
112:25 113:23
114:2 124:8,21
143:25,25
144:6,12,13,18
144:20,24
145:3,6,20
148:9 205:24
226:20 227:8
**EI_2016_GE_...**
99:14,17

268

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 77 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

eight 234:3
either 19:11
  21:11 26:9
  59:10 60:2
  88:4,18 101:20
  105:17 144:9
  148:12 151:2
  161:20 162:10
  162:12 163:18
  168:13 174:5
  177:7 181:22
  202:17 214:12
  214:15 217:16
  243:22 247:3
  247:11
elect 82:12,15,20
  155:12 173:1,2
  177:23,24
  187:20 188:1
  188:20 193:20
  194:24 195:12
  195:24 196:10
  196:16,20
  197:17 199:20
  199:25 200:9
  201:6 204:9
  205:4 209:5,23
  210:11 211:12
  211:24 212:10
  216:14 217:13
elected 175:6,17
  176:8 233:12
  234:4,4 243:6
election 9:5,6
  27:15 29:15
  32:24 38:15
  43:12 44:7
  49:9,12 52:25
  53:11 54:20
  55:1 58:13
  73:7 78:13
  87:24 89:2,3,4
  89:7,8,14,15
  89:17,18,24
  90:2 91:21
  92:3,6 95:16
  106:22 120:2
  133:4,21,24
  142:6 146:14
  157:2 164:18

164:21 169:14
170:3 173:5,12
178:14,20
179:2,18,19
180:7,10 182:7
183:17,17
184:11 185:22
185:24 186:5,8
186:11,14,22
186:24,25
187:2,2,7
198:9,12
205:17 214:3
225:15
elections 1:8 4:6
  4:12 13:11
  14:17,19,25
  15:1,24 22:11
  22:15 27:17
  30:10 33:7
  45:18 46:5
  50:1,5,15 51:6
  53:25 54:14,24
  55:20,23 64:6
  69:3,4,15,16
  69:19 76:19
  85:17,19 86:1
  87:2,10,17,22
  87:25 88:1,3,9
  88:11,12,14,18
  88:23,25 89:1
  89:11,12 90:4
  90:5,14,18
  91:23 95:3,9
  99:18 100:13
  108:19 114:7
  117:21 119:23
  120:5,13,22
  121:3,5,8,13
  121:19 124:24
  132:11,11,15
  135:1 137:10
  148:20 151:12
  157:9 159:2
  162:22 169:20
  170:25 171:8
  171:11 174:1
  174:15,18
  177:4 179:5,10
  180:1,4,7,11

182:2 183:8,11
183:14,20
186:10,19
200:20,21
201:1,4 206:7
206:8 213:19
214:13 232:19
244:7 256:2
eligible 63:9
Elisabeth 2:4
  5:8 30:19
  51:16 70:25
  199:6 242:1
Elisabeth.The...
  2:6
Elizondo 23:16
else's 128:9
empirical 28:7
  129:5 163:24
  163:25 172:17
empirically
  135:23
employed 8:22
  8:23 254:15,17
employee 254:16
employment
  19:1
empty 225:6
enable 71:21
enacted 132:24
  133:18 134:22
  237:13 239:2
endeavor 51:24
ended 8:6,6
endogenous
  87:21,25 88:3
  88:18,23,24,25
  89:6,11 92:8
endorsed 164:7
  164:19 165:7
endorsing 207:3
engaged 10:3,5
  230:11
engagements
  9:25 22:24
entangles 48:23
entered 40:8
entire 19:2 27:1
  77:9 90:6,12
  93:12 119:8

entirely 18:22
  88:24 89:16
  91:20 128:24
  151:14 196:6
  206:12
entirety 127:19
entities 15:19
  18:16,17 19:6
  19:8 20:15
entity 17:13,14
  19:10,20,21
  21:5
enunciate 56:5
environment
  92:4
EProuty@bak...
  2:16
equal 184:10
  206:9 216:10
equal-opportu...
  216:21
equally 78:7
equals 184:24
equivalent
  165:14,15
  232:6
era 40:8
eras 18:8
ERICA 2:13
Erin 7:16
error 134:13
  222:5 224:9
  231:10 235:2,9
  238:1,6,10
  240:8 241:2
errors 203:14,25
especially 48:15
ESQ 2:4,8,13,13
  2:18,18
Esselstyn 25:18
essence 157:15
essentially 31:12
  32:25 56:16
  137:24 140:18
  246:19
establish 33:14
  74:2,3 127:6
  129:5 149:9
  164:3 167:5
established

61:25 63:8,8
63:14 74:4
146:14 231:3
establishes
  63:10
estimate 29:9
  54:9 93:15
  104:20 105:4
  105:21 106:19
  107:17 108:16
  109:3,5 124:8
  124:20 140:4
  143:9 223:14
  224:6 227:2,4
  227:8,12,15
  229:2 230:2
  231:5,9,14,22
  231:24 232:1
  237:23 240:18
estimated
  107:20
estimates 29:25
  30:9,15,16
  32:3 66:22
  92:16 93:2,18
  94:8,11 103:20
  104:17,18
  105:8,12 106:1
  107:14,16,20
  107:24 108:1,4
  108:9,22
  110:23,24,25
  112:3,4,12,17
  114:2 125:19
  131:22 178:7
  205:24 224:10
  225:12 235:19
  238:2,6,7,9
  241:1
estimating 55:13
  55:14
et 1:8 189:7
  241:7,7,8
ethnic 243:18
ethnicity 33:4
  55:9
evaluate 223:12
evaluating 63:21
  206:3
evenly 190:4

269

Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 78 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

everybody 128:8
evidence 72:15
  75:25 76:3
  127:20 148:24
  150:10 168:3,6
  168:9 173:19
  183:15,16
  184:11 185:9
  186:9,15,16
  226:1 241:11
  252:11
evidenced
  238:25 241:7
evident 250:15
exact 222:17
exactly 16:13
  40:24 44:20
  70:4 77:7,22
  86:16 101:2
  104:22 120:15
  128:7 138:24
  151:15 156:25
  157:19 162:14
  191:9 206:19
  231:24 232:1
  233:22 234:23
  235:8 236:1
  240:16
Examination
  3:9 4:9 5:6
examined
  247:22
example 22:16
  40:5 41:3
  78:20 81:9
  83:1 99:14
  105:1 106:15
  109:1 122:13
  127:4 142:13
  142:23 150:14
  150:17 153:10
  153:21 164:23
  165:4,23 166:4
  206:4 208:16
  214:25 233:21
examples 21:21
  155:18 179:4
exceeded 225:17
exceeds 237:12
Excel 94:12,14

94:15,17 96:19
96:23 115:2,5
115:7,8
exception
  148:17,22
  210:24
exception(s)
  255:6
excess 225:24
exclude 129:2
excluded 16:5,7
excludes 129:4
excluding 137:8
  142:19
exclusive 179:8
exhausted 5:20
exhausting
  42:18
exhaustive
  211:1
exhaustively
  191:10
exhibit 4:2 9:9
  9:11 22:23
  25:24 51:14
  52:2,7 58:10
  58:14 97:14,15
  98:16,16,20
  101:3 111:11
  111:12 202:21
  202:22 215:12
  215:13,13
  232:12,13,14
  236:20,21,22
  236:25
EXHIBITS 4:1
exist 63:22
existence 73:13
  74:8,25
existing 19:12
exists 97:8
  165:17
exogenous 90:5
expanded 97:23
  101:11,13,14
expect 31:12
  54:19 104:10
  106:19 121:25
  122:22 191:2,7
  206:8 252:3

expected 199:20
  199:25 200:9
  231:8
experience
  15:22 56:14
  82:2 103:24
  239:6
experimental
  34:23
expert 4:3,4,11
  4:12,13 6:25
  9:10,25 10:5
  10:14,18 12:22
  13:1,14 15:12
  16:2,10,12,14
  17:12,19,22
  18:11,12 19:14
  19:20,22,25
  20:4,4 21:17
  21:18,22 22:24
  25:25 42:8
  51:15 111:18
  219:15 224:5
  237:1 238:5
  242:12 246:20
  247:2
expertise 14:4
  14:13 15:3,13
  15:21,23
  128:17
experts 22:9
  42:2,9,23
  73:23 104:9
explain 61:18
  76:10 161:4,21
  162:4,5 166:13
  182:14 183:1,1
  212:17
explained
  145:21 146:17
  146:20,22
  147:1
explaining 99:4
  162:15
explains 147:13
  165:9 169:18
  170:6,17,17,21
  172:4 174:20
  183:2 213:5
explanation

157:11 166:23
168:20 171:7
171:18 172:18
185:18,19
explanations
  172:5
explanatory
  159:4 160:13
  161:12 163:2,4
  163:5 186:1
  187:5
explore 212:19
express 48:20
  225:7
expressed 25:20
expressing
  233:4
expression
  77:18
expressly 242:19
extend 109:7
extent 31:24
  155:8 250:11
  251:5,11 252:8
  252:9
extract 36:12
extracted 36:14
extracts 106:1
extrapolate
  197:15 198:2
extreme 163:9
extremely 53:15
  124:14 171:8

_____

**F**

F 255:1
face 86:24
  128:17 230:18
facing 92:3
fact 20:25 30:2
  46:12 53:23
  54:12 55:8
  70:19 73:24
  75:10 76:20
  91:24 123:14
  127:8,13 130:9
  141:24 146:24
  149:9 151:14
  153:6 155:14
  159:1 166:15

174:15 178:1,4
185:11 225:13
225:19 226:25
228:14 229:10
238:9,19 239:1
239:23 241:7
factor 48:25
  49:6,8,9 218:3
  247:5 248:5,5
  252:21
factors 45:8
  48:24,25 63:4
  140:12 163:2,4
  163:21
facts 27:21
factual 22:2
failings 36:16
failure 117:10
fair 6:3,17,18
  11:20,21 15:9
  15:24 22:19
  37:9 49:24
  51:3 83:17
  84:14 112:17
  113:20 125:25
  136:10 150:22
  153:12,15,16
  171:22 210:4,4
  242:12,14,16
  242:18 244:10
  244:14 245:4,9
  245:17,25
  249:6 250:23
fairly 14:16
  82:24 108:19
  108:19 153:13
  154:23 163:9
  190:18,23,24
  196:24 197:12
  205:24 215:24
fall 106:16
  114:20 208:3
  231:8,9
fallacy 36:5,8,9
  36:25
falls 107:1
  162:20
falsify 168:15
family 7:23
fan 65:4

270

Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 79 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

fancy 37:6
far 77:9,24
  128:5 189:15
  189:17 197:8
  205:19 225:2
  235:17,21
fashion 33:21
  61:5
father 154:25
favor 183:6,21
  249:21
favoring 130:5,6
  130:7
federal 26:8
feel 9:16 219:24
feet 171:6
fellow 130:22
fielded 174:17
fielding 175:1
fight 31:23 32:7
  32:16
figure 52:9,18
  53:2 57:20
  64:1,3,12,13
  64:21 65:10,13
  65:18,23 67:16
  67:18 68:4,21
  68:21 69:8
  70:21 159:11
  189:6 198:8,13
  199:2,2,15,21
  199:24 200:11
  201:11 203:1,5
  203:10,15
  209:12 210:18
  211:7 213:17
  213:25 230:12
figures 69:11
  114:11 117:3
  235:3
file 99:1,22,22
  99:23 100:3
  102:2 111:4
  115:7
filed 232:18
  233:8 237:1
files 17:4 97:25
  97:25 98:4,6,9
  98:12,18
  101:22 102:5,8

102:12,22
103:9,11,17
115:5,8
final 179:13
financially
  254:18
find 19:14,19
  26:4 39:2 46:2
  48:9 66:25
  211:1 238:17
finding 229:7
finds 39:15
  52:12,22 53:8
fine 32:11,12
  66:12 199:10
finished 70:25
firm 5:9
first 5:2 39:25
  66:8 100:6
  104:13 120:20
  124:13 161:25
  166:13 192:10
  232:23 237:10
  238:24 241:6
fit 15:18 76:19
  96:9 191:2
five 18:9 51:24
  138:5 242:5
five-minute
  51:21 248:24
five-year 223:2
  224:4 229:21
fixed 171:8
flip 59:1 64:1,3
  64:12,21 65:18
  65:23 68:4
  92:21
Florida 16:17,19
  16:25 17:2,8
  17:10 24:3
  27:5
focus 41:16
  50:13 88:22
  150:15,24
  153:19 179:23
focused 50:1
  113:17 168:10
  186:21 221:24
focuses 87:10
folder 97:21,23

101:15
folders 97:22,24
  101:12,14,15
  103:9
folks 230:10
following 16:24
  99:11 112:9
  151:3
follows 5:5
  19:21
footnote 91:11
force 127:2
  158:3,3
forces 151:8,9
forcing 31:23
foregoing 254:4
  254:8 255:4
Forks 3:2
form 20:7 23:5
  28:2 30:4,11
  37:10 43:24
  46:16 50:18
  61:3 62:25
  68:16 69:1,22
  71:5,25 72:8
  73:18 74:13
  75:5,21 78:15
  78:25 79:14
  80:9,22 82:18
  84:15 86:14
  91:6 93:23
  94:12 95:5,6
  96:1,16,22
  97:1 104:2
  112:19 114:22
  118:5,17 120:9
  126:14 128:1,4
  128:5 129:13
  130:16 131:17
  136:3,16 137:3
  137:17 143:20
  149:17 150:7,8
  150:25 153:3
  154:7 163:7
  164:9 168:2,22
  174:3 175:10
  175:20 177:6
  177:16 186:3
  188:4 197:21
  201:9,22

204:15,23
210:13 211:14
214:20 218:9
218:15 223:6
236:6 239:7
240:10 249:10
250:9,24 251:9
251:22
formation
  206:13,15
forming 27:23
  28:1
forms 130:18
  239:3,8
forth 205:25
fortunately
  122:7
forward 180:10
  188:11
four 18:9 52:25
  53:11 66:1,6,7
  67:24 78:13
  80:12 101:22
  114:14 118:1
  118:15 131:23
  135:22 174:15
  203:20
fours 89:17
frame 145:16
framework
  34:23
framing 144:23
frankly 56:4
free 9:16 219:24
friends 18:18,18
front 7:13 10:4
  102:2 109:22
Frost 16:16
full 5:11 147:9
  223:19
fully 92:9 101:11
fundamental
  36:24
further 253:4
  254:14,16
future 177:1,9
  177:12 201:7

_____
G
_____
G 255:1

gap 214:25
  215:2,8
gay 154:12
general 72:24
  87:25 88:10,11
  88:18 90:17
  129:21 155:4
  183:8
generally 55:22
  85:18,20 90:8
  90:15,17
  198:14
generate 105:23
generates 49:4
generic 40:1
GenericRxC_...
  99:25 100:8
  101:8
geographic
  77:19 163:12
geographies
  114:15 194:6
geography 51:7
  194:14 202:7
  208:22 214:22
  223:11
Georgia 229:12
  229:17,19
  244:4 245:4
getting 13:18
  102:17 111:24
  156:9 157:3,6
  157:12,14,16
  157:19,19
  176:12 181:9
  239:10
Gingles 21:19,23
  22:5 23:2,18
  43:9 45:8,11
  45:15,16,20,25
  47:10,14,15,16
  47:19 48:21
  49:1,5 56:6,17
  58:1 59:23
  60:12,13,21
  61:10,23,23
  62:12,14,15,17
  62:18,19 63:4
  63:6,10,19,21
  67:4 72:5,6

271

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 80 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

73:14,16 74:10
74:11 75:2,3
76:2,23,23,25
77:11,21 78:1
78:2 117:6
128:6 183:15
184:19 185:5
204:16,24
220:5 221:14
221:19,22
226:4,4,5,6,9
226:21 235:13
237:11 238:24
240:7,25,25
241:4,6,8,21
**GIS** 221:24
**give** 6:10 51:18
123:2 134:20
135:13 161:12
174:21 194:1,2
**given** 37:16
49:21 54:2
109:3 127:3
148:14 151:11
205:25 224:21
**gives** 90:8
192:11,19,23
**giving** 193:13
212:3
**global** 81:5
**go** 9:8 21:11
26:19 44:5
57:4 70:25
80:14 82:19
94:24 98:9
102:1,2,14
111:22 120:11
128:2 132:7
133:7 134:4
135:3 167:3
189:12 205:19
225:2 233:10
241:5 243:22
245:25 246:13
246:14
**goals** 130:13
131:13
**goes** 36:2 40:22
40:22 67:2
197:9,10

**going** 8:5 9:8,9
21:10 23:19
26:15 29:2
41:12 49:22,23
51:13,14,17
58:9 59:6
67:17 68:18
74:22 76:4
77:9 80:15
83:8,14,20
89:7 90:7
97:13 98:15
100:11 111:9
111:11 115:25
116:9 136:7
140:25 154:4
161:12 165:3
167:17,18
172:13 173:15
174:24,25
177:21,22
180:12,23
183:4 196:17
198:1,2 199:7
199:8 201:12
201:20,23
202:4,14,19,21
213:10 217:23
224:12 225:23
228:15 230:15
232:11,12
236:20,21
241:8,18 242:2
242:2 246:10
246:11,11
248:9
**good** 5:8 24:1
55:25 59:5
113:10,11
201:2,5 222:23
245:13
**Gore** 134:16
**Gore-Cubbage**
134:12
**governing** 24:25
**government**
17:13,13
**governor** 171:13
173:16,16
198:12,14,22

199:3 203:23
**grabs** 173:4
**graduate** 8:3,6
166:2
**graph** 189:16
200:3
**graphic** 113:4
**graphically**
113:6
**Great** 95:24
**greater** 177:3,14
**ground** 156:22
**grounds** 37:24
**group** 38:14
40:21 70:2
77:12 104:9
**groups** 39:8
40:23 41:11
42:13 50:23
51:7 74:19
243:15
**guess** 10:18 14:8
16:14 18:17
19:18 20:10
33:17 37:23
49:7,23 50:24
54:6 55:7
57:21 68:10
70:8 72:9 91:8
102:24 118:6
119:3 139:15
161:3 168:8
194:14 233:9

───────────
**H**
───────────
**H** 256:1
**hair** 159:22
**hairs** 67:1,6
**half** 147:15,16
190:6 206:8
229:15
**halfway** 56:22
**Hanley** 244:23
**happen** 155:6
202:14
**happened** 28:3
**happening**
129:3 160:8
173:8
**happens** 19:5

36:3 44:7
116:10 120:15
163:14 171:20
**happy** 102:18,19
103:6 157:1
242:5 246:13
246:14
**hard** 65:3
202:13
**harder** 54:11
**harmony** 154:14
154:16
**Harris** 41:6
107:1,5 229:13
**hazard** 49:23
**head** 14:2 49:18
125:22 155:25
191:25
**hear** 30:20,23
95:22
**hearing** 30:22
**heavy** 149:10
**held** 77:14
161:16
**help** 15:16 80:3
246:10
**helpful** 19:4,15
19:19,23,24
32:6 57:6 81:4
**hereto** 254:13
255:8
**hesitate** 243:9
**high** 69:24 213:1
238:18
**higher** 78:12
79:10,17,18,19
89:15 119:16
231:8 239:13
**highly** 40:10
50:16,25 51:4
51:10 55:18
57:1 129:21
159:14,15
191:3
**Hillsborough**
2:19
**hire** 18:17,21
**hired** 18:14
19:14 23:12
**Hispanic** 17:9

22:14 215:1
220:7,11 221:1
221:7 222:13
223:8,10
225:14 226:2,7
226:13,20,24
237:12,20
239:22
**Hispanics**
216:10
**historically**
215:7 220:23
**history** 77:10
**Hobbs** 4:14
**hold** 149:13
150:3 152:25
**holding** 161:17
**Honor** 123:10
**hope** 26:16
123:12 246:10
**Hopefully** 249:5
**horizontal**
189:11,19,23
**host** 63:2
**HOSTETLER**
2:12
**hour** 51:17
242:2
**hours** 26:21
49:22 199:8
**Houston** 7:16
8:23 23:20,21
130:22,23
155:10
**hovering** 67:14
**hundred** 108:7
110:11 166:6
**HVAP** 221:5
223:20
**hypothesis**
35:15 107:3,4
108:17,18,24
228:1,3,4
229:5,9
**hypothetical**
219:3

───────────
**I**
───────────
**ice** 157:25
**ID** 146:2

272
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 81 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

**idea** 13:23 26:23
77:12 164:12
174:22 219:5
**ideal** 18:22
**identical** 85:4
93:12 159:4
**identification**
9:12 52:3
58:15 97:16
98:21 111:13
169:24 202:23
232:15 236:23
**identify** 142:9
142:12,23
156:23 203:14
203:25 221:17
240:5
**identifying**
74:16 223:4
**illustrating**
117:10
**illustrative**
194:11
**imagine** 110:7
192:9
**immediate** 96:22
**immediately**
98:8 117:16
**impact** 120:8
**implementation**
29:16,22
**implicated**
252:10
**implicates**
128:22
**implication**
130:8
**importance** 5:24
70:9
**important** 38:25
60:14 75:9
76:25 119:1
149:8 160:10
163:20 167:12
172:15 188:7
207:22 235:5
235:14 237:23
252:19,20
**impossibility**
127:12

**impossible**
102:9 126:10
126:19
**improper** 35:3
51:9
**improved** 36:18
**improves** 55:11
**inadvertently**
103:8
**inappropriate**
246:25
**include** 8:14
28:17 55:3,4,6
55:7 66:18
110:6,21 111:4
166:1 188:7
213:15 241:2
**included** 96:2
103:8 110:8
144:5,8,12
159:20 204:7
225:10 227:2
**includes** 54:24
92:15 93:1
113:4
**including**
100:22 238:18
239:19 240:12
**inclusive** 254:8
**incompatible**
121:6
**incompetent**
246:25
**inconsistent**
182:12
**incorporates**
44:17
**incorporating**
218:13
**incorporation**
218:22
**incorrect** 168:12
194:21 197:14
**incorrectly**
209:9
**increase** 141:24
**increased** 217:8
**increasingly**
42:9
**independent**

10:7 26:2 31:3
31:10 32:22
33:2,10,15,20
143:24 144:5
144:11,18
145:20 146:11
162:17 185:25
224:19
**independently**
55:16
**index** 3:9 4:1
101:4
**indicate** 73:6
82:14 92:1,2
122:13 197:25
**indicated** 73:1
100:2 102:6
179:12
**indicates** 104:24
**indication**
183:23 187:3
**indicator** 84:4
178:19 184:22
**indirectly**
205:24
**indistinguisha...**
67:10
**individual** 34:20
35:8,14 36:4
37:1,12,17
194:22 197:19
250:17
**individual-level**
35:15,18
**individually**
202:12
**infer** 37:1
**inference** 11:12
11:15,18,20
29:3 36:6,20
36:23 53:24
124:10 126:12
144:20 145:14
**influence** 160:24
185:1
**influential** 215:7
**inform** 195:15
**information**
24:20 28:7,9
33:3 35:1,10

35:24 36:12,14
54:25 115:14
120:11 128:25
169:14,23
170:15 172:12
172:17 187:25
223:3,20
227:24 249:12
250:1 252:18
252:22
**informed** 92:9
**informs** 15:1
**initial** 153:13
204:4
**Initially** 25:14
**injunction**
187:12
**input** 101:15
226:20
**inputs** 28:21,24
**inquiry** 81:5
221:22
**inside** 89:9
**insistence**
211:22
**instance** 18:13
20:6 21:20,25
**instances** 197:11
**instruction**
100:23
**instructions**
102:13
**instructive**
178:20 179:14
179:18 186:25
**instructs** 6:7
**insufficiency**
127:11
**insufficient**
127:6 228:13
**integer** 66:23
**intend** 197:24
**intended** 181:15
188:22,24
194:9,10
**intending** 212:6
**intention** 100:21
102:10 103:3
**intentionally**
77:2

**interact** 77:17
**interaction**
63:17
**interacts** 72:20
77:15 251:2
**interest** 46:10,22
46:24 47:2
150:5 155:13
181:8
**interested** 109:6
159:18 254:18
**interesting**
159:10 229:7
**interests** 130:13
131:8,13
149:15 153:2
167:24
**intermediate**
96:25 97:8
98:4,12
**interpreted**
108:14
**interrupt** 6:1
137:7
**interval** 36:15
106:5,5,6,9,12
106:13 107:2
107:22,23,23
108:23 110:21
111:1 223:18
224:22 225:9
225:11 227:1
227:13,13
228:6,18,19
229:14 230:21
232:7,8,10
234:7 239:20
239:21
**intervals** 105:8
105:11,14,15
105:17,20,24
106:2,2,3
107:8,11 109:6
109:15,19
110:7 111:5,5
111:6,7 112:5
112:12,15
113:5 125:19
125:25 126:4
223:16,23

273

224:8 229:20
230:2,4,6,18
235:2
**Introduction** 9:7
13:10
**investigate**
152:20
**involved** 8:11,17
13:17,22 14:9
14:10 15:19
16:18 21:2
23:22 24:4
26:25 28:5
104:4 110:13
220:2 222:15
224:16 225:1
240:11,14
246:5
**involves** 15:8
39:17,18 44:6
48:13 117:23
220:20,20
**involving** 13:15
133:11
**Iowa** 8:4,7
**irrelevant** 92:8
**ISD** 23:10,17,21
23:21,22 222:4
**isolate** 161:14
**issue** 23:23 24:5
32:20 33:18
36:24 41:13
43:5 44:1 49:5
49:6,9 55:8
60:19 82:21
83:5 89:13,14
92:7 108:22
116:9,10
152:16,18
153:12 155:23
156:25 160:6
165:19 168:4
168:17 176:3
179:1 185:3
188:9 204:4
208:12 210:5
222:2 224:1,15
225:3,7,9
226:9 235:10
239:15 240:13

240:16 241:18
243:12 244:17
248:11,14,14
248:17,19
249:7 250:5
251:3,24
**issues** 9:6 10:16
14:23 47:23
91:24 150:22
153:17 154:2
154:12,15,18
166:3,12,14
168:11 176:9
176:11 219:6,8
222:8 249:14
249:16,17
**iterates** 108:6
**iterations** 108:5
**iterative** 108:6

**J**

**job** 36:9 130:25
159:11,12
163:23 167:7
167:16
**John** 1:12 4:3,5
4:9,12,13 5:1
5:13 254:4
255:3,11 256:3
**Johnson** 4:12
232:18
**joke** 18:19
**JORDAN** 2:18
**Jordan.Koont...**
2:21
**Joseph** 40:19
**Josh** 109:2,9
**judge** 26:10
31:23 171:14
188:8 195:16
196:3 209:13
240:17 245:14
**judges** 26:18
246:22
**judging** 57:14
59:10 60:2
**jump** 98:8
**jumped** 116:4
**jurisdiction** 81:3
194:14 222:1

**Justice** 156:15
156:24
**justified** 17:14

**K**

**K** 255:1
**Kamala** 41:6
106:25 107:5
229:13
**KATHERINE**
2:13
**keep** 31:14,22
38:25 185:15
**key** 74:16
101:22
**keystone** 49:8
**Killeen** 23:21
**kind** 38:22,25
107:9 128:7
130:20 162:2
167:11 181:17
219:25 232:6
246:3,4
**kinds** 8:12
112:21 163:21
222:24
**King** 36:20
**KMcKnight@...**
2:16
**know** 6:15 8:9
10:6 13:25
14:17 18:7,16
18:20,22 19:21
20:16 21:11
22:3 24:3 26:5
26:7,15 28:1,5
33:17 35:19,21
40:5 44:2
47:17 49:16
51:25 53:22
56:3 57:3
59:18 66:13
67:1,7,9 70:5
76:5,7 77:9
86:15 88:10,10
91:8,15 94:17
96:9,10,15
97:10 98:11,13
101:25 102:1
109:4,5 110:2

115:6 118:11
122:10 124:11
126:9 138:25
140:5 141:21
143:10 146:6
147:4 153:6,7
153:16,20
155:5,6 156:1
156:21 159:10
159:17,25
161:10,25
162:9 163:8
164:21 166:19
168:25 171:10
172:22,23
174:7,11 178:9
178:10 181:18
181:18 186:15
188:22,23
189:6 191:22
194:10 203:11
208:21 210:4
212:22 213:13
215:5,9 216:6
221:2 222:22
223:15,19,21
225:6 229:12
229:14,17,18
237:23 240:14
240:20 244:17
249:16
**knowing** 231:21
**knowledge**
188:17 217:25
**KOONTS** 2:18

**L**

**L** 255:1
**labels** 179:24
**lag** 215:3
**Lancaster** 23:25
25:2
**laptop** 7:11,12
**large** 14:16 34:7
35:2 53:19
83:1 103:8
107:14 108:19
108:19 126:23
194:1 223:9
243:7

**largely** 56:7
221:23
**larger** 81:9
**largest** 38:13
230:11
**Latino** 215:17
**law** 5:9 240:18
240:19,20
**lawsuit** 10:9,10
19:16 21:11
**lawyer** 43:7 59:2
**lawyers** 6:24
20:9 24:15,17
24:20,22
115:14,19,23
116:1,6,15
**leader** 107:4
**leading** 107:5
140:13
**leads** 63:18
197:6
**leanings** 148:20
**learn** 252:23,23
**leaving** 57:20
**led** 16:15
**left** 185:14
189:17
**legal** 3:1 19:12
19:12 20:21
21:13 22:1
38:24 39:13
43:3 45:6,9
70:9 76:9
**legally** 43:16,20
44:14 48:6,12
57:25,25 61:13
72:17 73:10,25
79:25 184:20
185:11
**legislative** 116:8
234:20 237:6
237:14 239:2
**legislature** 40:25
232:25 233:8
**legislature's**
233:5
**lengthy** 112:21
**let's** 22:22 25:24
27:11 50:20
52:5,18 53:2

274
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 83 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

64:1,2,12,21
65:18,23 67:16
67:17 68:4
69:8 70:21
85:21 92:12
101:3 111:22
117:18 120:2
121:16 131:20
133:7 134:4
135:3 138:9
156:6 164:15
164:22 178:13
180:12 188:25
192:9 198:19
199:11 200:13
204:3 233:3,10
237:9 241:24
**level** 19:8 32:25
33:6 34:20,25
35:7,8,9,11,13
35:14,19 36:4
36:12 37:3,4
37:12,15,17
61:25 62:9,11
68:9,11,25
69:14,23,25
70:4,11,13
71:19 78:8
79:16 81:14
83:15 84:2,3
89:15 90:9
116:12 117:25
124:10 126:8
127:25 137:18
137:19,21,22
138:7 159:9
162:12 181:18
182:2 187:20
188:2 194:7
200:3 209:17
209:24 210:1
212:8 216:13
216:14 250:17
250:20
**levels** 51:2 54:1
81:16,20,24
82:6,9 118:13
118:19 138:14
138:19 147:8
159:15 184:10

184:23
**lies** 231:23
**lieutenant**
173:16
**life** 28:3
**lifetime** 58:25
59:4
**light** 140:13
**limited** 168:10
**line** 59:8 180:24
181:1 189:20
189:23 190:6
190:12,13,24
190:25 207:9
208:20 240:23
**linear** 33:22
190:18
**lines** 196:25
212:24
**list** 24:10 26:25
101:9 115:19
116:14,16
**listed** 23:4 27:22
104:17
**literature** 217:6
**litigation** 43:6
77:10
**little** 16:9 30:25
37:7 50:24,25
51:17 65:3
68:3 82:24
90:21 119:17
161:19 181:22
181:23 185:16
209:7 244:25
**live** 7:15,16
155:6,14
**lived** 7:18 8:10
155:25
**lives** 150:19
153:9,11
155:19 164:8
164:19,22,24
165:8,18,23
176:19,23
**LLC** 3:1
**local** 13:23 19:7
81:5 224:17
**localize** 81:8
**localized** 80:21

80:24 81:2
**logic** 96:11
**Lone** 23:20
**long** 51:22 58:22
166:2 223:22
224:13 247:14
**longer** 218:1
219:11
**look** 20:25 21:3
37:15 40:11
44:5 74:18
84:12 88:9
91:17 97:4
98:10,25
107:15,18
108:9 109:20
110:2,24
120:20,22,22
121:4 127:13
128:20 156:1
157:2,4 158:1
163:14 171:10
171:20 178:20
178:24 179:25
180:2 181:19
194:8,12
198:17 202:4
217:23 221:25
228:15 233:7
**looked** 6:21,21
6:22 28:12
44:1 49:21
116:2 122:11
125:21 155:22
155:23 157:23
174:5 177:5
180:8 226:12
250:16,19
251:3
**looking** 21:21
44:6 68:18
71:14 83:18,25
91:22 92:20
97:10 110:12
115:15 119:13
119:21,22,25
120:21 121:13
128:15 141:6,8
143:13 171:11
171:12,14,18

188:10 199:14
209:13 221:11
233:19 236:11
239:19 249:20
**looks** 58:22
78:16 98:2
101:12 148:12
202:1 203:20
232:20 241:17
241:20
**loosest** 44:22
**Loren** 4:4,11
**lose** 21:6,7
162:23
**loses** 193:9
**loss** 108:6
**lot** 37:22 47:25
53:17 54:3,10
71:13,17 83:24
154:11 172:12
172:13 175:23
186:15,16
193:22 194:1
195:19 202:18
207:8 244:12
246:5,5 252:23
**lots** 18:18 37:24
71:15 98:6,6
157:18 172:11
179:4,9 194:2
194:2 197:4
222:16 223:21
248:7,8
**Louisiana** 60:16
244:4 245:9,10
245:12,14
**low** 57:8
**lower** 80:6
106:17 107:18
108:2 110:4
119:17 138:13
138:19 212:5
212:17 213:2
214:18 215:18
216:3 231:9
**Luckily** 165:25
**lump** 195:19
**lunch** 113:10,12

_____
**M**

**M** 255:1
**MACKIE** 2:8
**magically**
163:18
**magnitude**
127:1 138:23
**main** 223:25
**major** 154:9
**majoring** 205:23
**majorities**
241:12
**majority** 21:4
38:8 42:1,2
63:23,24 77:20
77:23 83:20
84:6,7,20,21
84:23,24
173:20 176:16
176:19,23
177:22,23
195:6 196:15
197:3,5,7,8
201:16 206:6
217:3,14 222:7
222:13 225:4
225:14,21
226:2 227:22
228:2,22
238:18 239:22
241:13
**majority-mino...**
17:15 220:16
**making** 20:12
25:5 161:18
172:2 208:5
216:22 240:1
**Man** 59:5
**manner** 77:2
**map** 56:15
191:24
**mapping** 239:18
**margin** 231:10
238:1,5,10
240:8 241:2
**marginal** 124:14
**margins** 224:8
235:2,9
**mark** 9:9 51:14
58:10 97:13,14
98:16 111:11

275
Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 84 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

202:21 232:12 236:21
**marked** 9:12 22:22 52:3,6 58:15 97:16 98:21 111:13 202:23 215:13 232:15 236:23
**marriage** 154:12
**Martin** 16:15
**Massachusetts** 2:5
**match** 31:12
**material** 60:6
**materials** 4:7 6:21 27:18 99:2 101:4 203:10
**mathematical** 56:21 106:9 107:6 108:11
**mathematically** 231:13
**matter** 22:1,2 34:22 46:1 56:24 75:10,16 75:18 96:11 106:24 150:20 153:10,11 155:19 164:8 164:19,22,25 165:8,18,23 166:12 208:15 221:4,12 240:17,18,19 240:20
**matters** 131:4 172:22 228:16
**MATTHEWS** 1:4
**Mattingly** 25:18
**max** 239:11
**McKNIGHT** 2:13 20:7 23:5 30:4,11,18 37:10 43:24 50:18 51:16,23 61:3 62:25 68:16 69:1,22 70:22,24 71:5

71:25 72:8 73:18 74:13 75:5,21 78:15 78:25 79:14 80:9,13,22 82:18 84:15 85:6 86:14 91:6 104:2 112:19 114:22 118:5,17 120:9 126:14 128:1 129:13 130:16 131:16 136:3 136:16 137:3 137:17 143:20 149:17 150:7 150:25 153:3 154:7 163:7 164:9 168:2,22 174:3 175:10 175:20 177:6 177:16 186:3 188:4 197:21 199:6 201:9,22 210:13 211:14 214:20 218:9 218:15 223:6 236:6 240:10 242:1 249:10 250:9,24 251:9 251:22
**mean** 15:16 20:9 21:1,7 22:11 29:4 34:3,16 34:16 35:14 38:3,8,11,12 39:7 40:25 41:21 47:3 48:8 50:22 59:22 75:17 77:6,7 80:23 83:18,19 88:17 91:7 98:6 102:24 105:19 106:8 108:25 115:6 122:5 129:10 130:25 153:20 156:7 157:21 168:8 168:25 170:10

170:19 181:12 182:25 190:7 190:13 195:14 197:25 205:11 205:20,21 206:2,20,21 207:1,11 208:2 212:18 213:1 214:10 216:18 219:19 229:1 231:13 241:9 252:20
**meaning** 38:23 38:24 43:4 227:11
**meaningful** 151:10
**means** 34:6,16 39:1,4,15 48:1 56:8 89:6,8 138:24 140:7 140:23 146:1 160:25 176:18 213:3 227:15
**meant** 61:20 222:12
**measure** 147:17 163:19 252:16
**measures** 84:18
**mechanism** 179:7 216:22
**meet** 42:11 44:12 48:5 73:9 76:2,14 76:22
**meets** 76:15
**member** 155:8 155:11
**members** 49:10 49:12
**memorable** 59:7
**mention** 246:2
**mentioned** 196:3 207:1 209:13 245:9
**merged** 95:10
**met** 56:7,7 59:23 62:11 74:20 75:13 76:23 117:6 237:11

238:25 239:16 241:1,6,21
**method** 11:12,15 36:19 37:8 112:11 209:2
**methodological** 37:6
**methodologic...** 247:11
**methodology** 11:16 15:7 29:7,17,22 54:2 206:1 211:10
**Miami** 17:11,20 18:5 22:20 27:4 222:16
**Michael** 178:15
**mid** 16:24
**middle** 6:16 189:13
**midway** 169:12
**million** 108:8
**Milwaukee** 233:22,24 235:25
**mind** 8:18 13:24 16:20 18:4,6 18:10 243:20
**mine** 128:8
**minimum** 91:10 171:1 187:19 188:1 209:17
**minor** 244:21
**minorities** 217:12
**minority** 10:21 10:21 12:9,10 13:2 17:15 43:10,12 44:25 44:25 45:3,4,4 45:17 47:18 48:16 49:10,13 62:4,12,21,22 62:23 63:10,16 63:16 212:11 217:7 224:6 238:6
**minority's** 71:22
**minority-majo...**

217:9
**minus** 229:22
**minuses** 171:16
**minutes** 51:25 242:5
**misliked** 16:7,8
**missing** 101:24 119:19
**Mississippi** 4:5 58:11 60:25 244:4,5,5,11
**misstating** 204:19
**mistaken** 116:4
**misunderstood** 184:6
**mix** 83:7
**model** 145:3
**models** 215:4,5
**modest** 118:19 118:23 162:6 178:7
**modify** 100:24
**moment** 58:8 162:25
**Morgan** 178:15 180:16 182:5
**morning** 5:8
**mortgage** 150:16
**MOSES** 1:4
**mother** 154:25
**motivate** 162:21
**motivated** 126:12 156:3
**motivates** 63:6
**motivation** 63:3
**move** 58:3 120:2 141:25 142:1 155:9 191:13
**moved** 42:6
**movement** 150:20 153:10 155:19 164:8 164:19 165:8
**moving** 58:4,6 116:7 173:18 178:2 241:22
**MULLINS** 2:17
**multi** 215:5

276

multiple 115:24
  130:18 202:16
  238:16,19
  239:5,24,25
  241:11
Myers 1:25 3:2
  254:3,21

**N**

N 2:1 255:1,1,1
  255:1
NAACP 4:5,9
  58:12 111:18
  244:6
name 5:8,11
  10:6 17:2
  232:20 256:2,3
names 98:7
narrow 89:18
  213:20 225:4
narrower 215:2
narrowly 88:22
  100:24 108:3
  205:17 218:6
national 164:17
nature 33:24
  85:9
NC 2:9,20 3:3
  256:2
near 42:18 84:10
nearest 66:23
nearly 161:9
necessarily
  44:13 46:8
  54:9 96:12,19
  130:13 131:1
  131:13 151:13
  196:22 197:9
  197:25 207:18
  211:20 213:4
  250:1
necessary 65:5
  81:1
necessity 110:16
need 42:10 54:5
  74:1,3 78:3
  83:14,19,19
  84:11 100:6,7
  109:16 149:9
  172:12 181:21

194:4 195:23
  196:15 197:3,6
  207:14 211:20
  212:22 213:19
  216:12,14
  235:19
needed 188:20
  205:4 206:2
  219:2
needs 32:15
  74:16 80:21
  93:24 175:7,18
  210:7,8 238:5
negative 129:2
neighboring
  81:25 82:1
neither 168:16
  169:6 175:11
  208:23 212:13
  254:14
NELSON 2:17
net 84:3
never 8:10,10
  16:7 19:1 46:3
  46:11 116:15
  225:17 244:8
new 9:25 18:18
  90:3,25 91:4
  92:2 199:7,7
  242:3
Newby 156:11
  156:16,24
  157:3,12
nice 174:22
non-arbitrary
  56:20,22 59:18
  59:25 208:22
non-black 68:13
non-Hispanic
  225:25
non-majority
  228:14
nonpartisan
  151:12 179:9
  180:6,10
  183:14,20
normal 229:8
  230:6,9 231:11
North 1:1,7 7:18
  7:20,21,24 8:1

8:4,5,8,13,20
  11:2 13:15,22
  14:4,7,13,16
  14:19 15:8,14
  15:17,23 16:3
  27:4,16,17
  39:3 47:1
  54:23 55:3
  92:17 93:3
  114:7 129:7,10
  129:11 147:7
  148:23,25
  149:2,10
  155:24 158:5
  164:11 166:24
  167:22 169:20
  170:9,24 172:7
  172:19 174:2
  174:13 175:4
  183:8 191:23
  194:23 195:1
  195:11 196:10
  196:20 199:3
  199:19 200:9
  214:23 215:10
  216:7
northeast
  194:22 204:23
northeastern
  195:1,11 196:9
  196:19 199:19
  200:8
Notary 5:3
notes 7:3 205:9
  205:20
notion 88:22
  212:9
null 107:3,4
  108:17,18,24
  228:1,3,4
  229:5
number 5:14
  38:14 49:21
  67:7 108:19,20
  114:5 139:18
  185:17 201:11
  203:1 206:17
  227:5 229:23
  233:21 234:22
  235:16,17,24

242:14,18
numbers 32:10
  32:12,13,17
  65:8 73:4
  103:16 126:21
  126:22 139:16
  141:7,17,17
  143:13,22
  180:13 200:17
  237:16
numerosity
  194:1,2,7
numerous 20:14
  69:15
NW 2:5,14

**O**

O 255:1,1,1
o0o-- 3:6,13 4:15
objecting 30:20
objection 20:7
  23:5 30:4,11
  37:10 43:24
  50:18 61:3
  62:25 68:16
  69:1,22 70:22
  71:5,25 72:8
  73:18 74:13
  75:5,21 78:15
  78:25 79:14
  80:9,13,22
  82:18 84:15
  85:6 86:14
  91:6 104:2
  112:19 114:22
  118:5,17 120:9
  126:14 128:1
  129:13 130:16
  131:16 136:3
  136:16 137:3
  137:17 143:20
  149:17 150:7
  150:25 153:3
  154:7 163:7
  164:9 168:2,22
  174:3 175:10
  175:20 177:6
  177:16 186:3
  188:4 197:21
  201:9,22

210:13 211:14
  214:20 218:9
  218:15 223:6
  236:6 240:10
  249:10 250:9
  250:24 251:9
  251:22
objections 30:22
objects 6:6
obscured 128:19
observing
  151:19
obvious 44:19
obviously 24:1
  35:5 39:17
  41:11 50:22
  51:6 53:22
  56:24 62:5,15
  69:3,24 85:8
  88:11 103:13
  115:24 118:24
  119:1 120:11
  120:19 151:12
  174:6 195:4,14
occasions 26:17
occur 212:23
occurs 118:25
  138:22
October 254:19
odd 26:4 181:17
offer 45:10
  114:5 173:19
  185:17 204:13
  205:2 206:24
  242:9
offered 86:5
  89:20 103:19
  173:24 175:5
  175:16 209:1
  211:9
offering 26:1,6
  56:19 146:15
  179:17 186:24
  195:9 196:8,13
  196:18
offers 86:12
office 49:10,13
  89:12,14 159:3
  174:9
officeholders

277

233:21 235:17
235:21,24,25
**officer** 254:4
**offices** 171:9
**official** 176:8
179:20
**officially** 36:11
**officials** 233:12
234:4,5 236:9
**Oftentimes**
19:13
**oh** 10:14 16:23
**okay** 6:5,19 7:3
7:7 8:22 9:16
10:25 11:24
12:19 15:11,22
22:22 24:9
25:7 28:23
32:8 38:2
41:16 42:25
46:20 47:6
48:20 52:5,9
53:17 54:17,21
55:16,24 57:13
58:8 64:12
65:24 66:9
67:20 68:6
71:12 75:15
79:9 80:19
81:16 82:6,9
83:13 84:8
86:8 87:1,9,21
90:21 92:12
93:6,16 94:6
94:14 95:24,25
96:11 98:3,15
100:15 101:3
103:19 105:22
109:13,18
111:17 114:4
114:25 115:4
116:14,17
122:17 123:1
123:14 125:23
127:14 132:9
132:19 134:8
136:7 137:9,25
138:9 139:1
140:1,25
141:12 142:3

143:3 144:4
147:20 148:5
152:9 156:2,10
156:21 158:8
164:14 165:2
167:19 168:6
168:14 170:1
170:19 172:2
175:16 176:18
176:25 177:11
179:13,17
180:12 182:7
182:12 186:24
187:17,23
190:10 193:9
195:9 196:2
197:14 199:17
200:6,13,24
201:15 202:19
203:4,12
205:14 211:9
218:12 228:1
231:13,18
232:11 233:3
233:20 235:6
237:3,9,19
238:1 240:23
241:24 247:13
250:19 251:20
253:3
**old** 17:4 18:18
217:24 219:7
**older** 85:19
201:13
**OLS** 110:18
**once** 128:11,13
128:23 165:24
222:18
**ones** 18:9 27:22
138:12
**open** 97:18
111:15
**operating** 158:3
180:5
**operation** 36:25
**opine** 237:10
**opinion** 25:20
28:2,2 29:24
45:10 103:20
146:15 170:4

173:19,24
175:5,16 195:9
196:8,18 205:2
218:18 225:7
226:3 233:4,20
**opinions** 25:21
27:23 28:13,24
48:20 89:20
185:17 206:24
**opportunity**
17:16 51:19
206:10 217:5
217:13,15,18
217:19,20
**opportunity-t-**
206:5
**opposed** 39:5
178:22 207:12
251:25
**opposing** 43:13
**opposite** 39:9
40:24 41:13,14
157:19 186:13
229:10
**opposites** 70:10
70:11
**opposition** 46:7
136:21
**oranges** 91:13
**order** 73:12
127:1 194:5
196:15 210:6
211:19 243:5
**ordinarily** 36:17
**ordinary** 36:10
106:7 108:12
110:18
**origins** 249:20
249:22 250:2,2
**outcome** 254:18
**outer** 228:5
**outline** 245:2
**outperforms**
198:15
**output** 95:11,11
96:18 97:7
**outputs** 94:7
105:14
**outputted** 94:9
**outside** 26:11

106:20,20
126:2 239:21
**overall** 117:25
118:10 119:5,7
119:22 120:1
181:18 201:18
**overlap** 85:9
**overlapping**
85:4,11 126:3
**oversight** 102:16
**overwhelmingly**
127:5 135:25
136:1 149:4

---

**P**

**P** 2:1,1 255:1
**p.m** 113:12
199:12 242:7
249:3 253:6
**page** 3:9 4:2
9:19 22:23
23:16 27:11
52:5,18 53:3,3
59:1 64:1,3,12
64:21 65:10,11
65:12,13,18,23
67:16,18 68:5
68:21 69:8
70:21 86:8
111:22,24
117:19 121:16
121:22 131:20
133:7 134:4
135:3 138:9
139:1,4 141:1
156:6,8 169:11
169:12 178:13
180:13 182:4
187:8,11
188:25 191:17
198:20 199:15
200:13 203:1
203:18 205:8
208:8 213:24
214:6,7 215:15
232:23,24
233:10,16,17
237:9,10
**Page/Line** 256:6
**pages** 254:8

255:4
**Palmer** 4:14
18:1 31:16
237:1
**panels** 110:4
**paper** 51:19
**paragraph**
27:23 111:22
215:15 233:25
234:14 235:1
**paragraphs**
233:17
**parallel** 15:2
**parameters**
230:23 231:2
**Pardon** 30:18
70:24
**Paris** 243:3
**part** 10:4,17
12:14 46:16
47:18 48:14,17
48:19 59:4,7
62:5,6 73:25
83:10 97:8
98:18 99:1
155:5,10
204:15,24
216:24,25
217:9 220:22
231:23 250:14
**partially** 48:11
**participation**
217:7
**particular** 14:4
14:13 15:24
16:13 18:13
20:6 21:20,24
23:3 29:13,14
29:15 33:21
44:1 72:18
82:13,16 83:13
83:16,16 84:12
109:14 126:9
142:5 149:13
150:4,22
153:17 154:3
161:15,16
188:21 189:20
197:18 222:24
223:5,13

278

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 87 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

226:14 227:6
229:5 235:11
240:24 250:14
251:12
**particularly**
26:18 91:10
106:23 116:7
154:14 155:23
162:11 178:20
207:24 215:6
219:8 239:10
**parties** 151:3
154:9 166:19
166:24 174:12
175:2 243:13
254:15,17
**partisan** 40:11
53:25 54:14,19
55:22 73:5
75:12,17 76:1
76:4,12,19,21
77:18 78:4,5,6
79:16 117:8
125:16 127:15
127:16 132:11
132:15 146:13
147:17 148:19
148:20 149:1
149:10 151:8
179:20,24
182:2,10
183:23 186:18
187:3 242:11
244:18 248:6
**partisanship**
147:11 148:9
148:12 149:5
151:13 154:18
163:18,20
172:25 245:15
**partly** 19:6,7
154:23
**parts** 81:17,21
173:9 243:9,19
**party** 40:7 41:9
75:19 114:6,10
125:4,5,8,12
126:22 127:22
128:12,21,25
129:23 132:5,6

144:11,17
145:25 146:2,4
146:19,19,25
147:11,18,22
148:2,8 149:22
151:3,4,7
152:6,21
153:24 154:9
154:15,16,25
157:24 158:4
158:11,20
159:5 160:9,14
161:17 163:5
163:15 164:7
164:11,15,18
164:20,23,25
165:6,11,16,24
165:25 166:1,4
166:16,17,20
168:19 169:16
169:24 170:5
170:16,21
171:19,23,24
172:3,8,18,21
172:25 173:11
174:17,25
178:18,23,25
179:1,3,6,10
182:13,17,18
182:22,25
183:2,3,25
184:3,8,11,22
185:1,25
243:14,17
247:23 248:14
248:18,21
250:3 252:25
**party's** 166:10
167:6
**pattern** 20:25
22:4 46:3,12
76:20 77:15
119:5,7 146:24
158:19 160:4
177:18 241:11
**patterns** 12:13
12:17 159:4
171:4 249:18
**Paul** 156:11
157:3,11

**pay** 223:17
**PDF** 9:19
**Pearland** 23:10
23:14,15
**pejorative**
129:17
**penalties** 255:3
**people** 18:23
19:3 44:22
126:23,25
129:16 131:6
149:16 150:6
154:10 162:22
162:23 167:8
167:24 171:15
230:24 239:5
239:25 250:14
**percent** 40:17,20
40:21,22 41:6
41:6 42:3,4,10
42:11,17,20,21
52:15,15,24,24
53:10,10,20,21
54:1,4,4,7,9,13
54:13,15 55:25
56:8,19,21
57:4,5,5,8,10
57:11,13 58:2
58:2 59:9,18
59:20,21 60:1
60:24 63:9,16
64:8,16,25
65:14,19,25
66:4,10,11,14
66:15 67:5,5
67:11,12,15,23
68:9,14,19,25
69:6,14,17,17
70:7,16,18,20
71:4,8,8,9,10
105:1 106:13
106:17,18
107:19,25
109:4,5,8,11
110:5,11
118:22,24,25
119:2,9,11,14
122:20,24
123:17,19
124:1,1 125:2

125:5,6,6,7,7,8
125:12 126:9
128:6 132:22
133:3,16 134:1
134:20,24
135:13,19
137:11,22
138:7 139:20
139:21,24
141:8,8,9,9
142:3,8 156:15
156:18 157:3,7
157:12,14,20
161:5 174:23
176:12 180:16
180:23,25
181:1,4,5,9,23
182:5 183:2,6
183:10 189:15
189:17,18,20
190:1,8,14
191:13,14,16
192:11,12,19
192:19,23
193:13,14
194:4,23 195:2
195:5,8,13,23
196:11,21
197:1,1,9,10
197:13,24
198:3,22,24
200:5,19,21
202:17,18
203:21 204:11
205:10,14,21
206:2,22 207:4
207:5,6,9
208:2,4 209:3
211:17,24
212:1,7,12,13
212:25 213:8,8
213:9,10,20
214:5,16 218:6
224:22 225:4
225:11,12,17
225:25 226:19
226:24 227:3
228:5,5,8,9,11
228:12 229:13
229:14,15

231:7,9,15,16
231:22,24,25
232:2,3,6,8,9
234:4,16,21
236:13,13
237:12,20,24
238:21 239:1
239:10
**percentage**
29:12 49:16
82:14,17
114:13 125:14
140:4,21 161:8
187:19 188:19
189:8,11
190:19,19
193:1 197:18
197:20 199:18
199:24 200:8
201:6,15
208:10,11
209:4 210:10
218:5 219:2
222:12,17
224:9 227:5
231:5 233:12
233:14,23
234:3,9 237:12
**percentages**
235:11 240:7
**perfect** 56:16,23
56:25
**perfectly** 32:11
32:12 66:25
103:12 166:9
**perform** 83:14
83:22,22 84:13
84:18,18,25
85:14 94:21
197:5,7 206:22
207:10 217:23
**performance**
83:4,23 84:5
85:21,24 86:4
86:12,18,18
87:1,9 89:21
90:2 91:3
**performed** 12:5
203:22
**performing**

279

Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 88 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

198:4 201:10
206:18 212:21
**period** 17:1
  105:3 119:8
  144:21 159:16
  180:9 254:13
**perjury** 255:4
**person** 224:11
**personally**
  114:25
**perspective**
  217:21
**persuasive**
  48:11
**Ph.D** 4:3
**physically**
  107:18
**pick** 31:23 166:5
**piece** 186:9
**pieces** 170:15
**Pierce** 1:4 256:2
**pile** 167:11
**pitting** 134:9
  135:7,23
**place** 37:17
  46:11 88:1,3
  88:12 102:4
  129:19 155:24
  159:3 208:14
  220:3
**places** 243:21
**plain** 127:13
**plaintiff** 16:11
  18:19
**plaintiff's** 9:11
  32:2,3 52:2
  58:14 97:15
  98:20 111:12
  202:22 232:14
  236:22 246:20
  247:2
**plaintiffs** 1:5 2:3
  5:10 16:12
  26:10 86:6
  236:15
**plaintiffs'** 22:8
  42:2,9,23
  46:16 161:1
  204:16,24
**plan** 10:24 17:21

17:25 26:6,15
233:5 234:20
241:23
**planning** 26:1
  48:20 218:12
  218:16
**plans** 19:8,9
  24:19 241:11
**platform** 164:11
  164:15,18,21
  164:23,25
  165:7 166:4,7
  166:20
**platforms** 164:7
  165:24,25
  166:1
**please** 5:11 59:1
**plot** 53:5 113:5
  180:3 187:11
  187:15 188:13
  190:17
**plots** 192:6
**plus** 40:21 42:3
  42:4,17,20,21
  56:8 63:16
  206:2 213:20
  218:6 229:22
**pluses** 171:16
**PO** 2:8
**point** 5:18 10:20
  24:24 26:9
  29:25 33:13
  39:13 56:22
  57:6 60:7
  66:24 67:6
  92:16 93:1
  94:8,10 100:25
  104:12,18,20
  105:4,8,21
  106:1,19
  107:14,16,17
  107:20,24,25
  108:9 109:3,4
  110:23,23,25
  112:4 115:24
  122:8 124:8,20
  124:20,22
  125:21 131:2
  139:15 140:4,5
  140:21 141:24

143:9 149:22
161:8 166:20
178:7 181:25
184:17 186:5
193:1 196:25
208:4 211:20
212:8 213:4,6
227:4,8,11,14
227:15 228:17
228:19 229:1
230:1,2 231:5
231:9,14,22
235:12,19
237:23 240:17
241:1 248:10
**pointing** 57:7
  212:24
**points** 110:3
  125:14 171:12
  182:1,1 201:17
  201:20
**polar** 39:9 40:2
  40:23 70:10,11
**polarization**
  41:17 75:11
  79:17,22 119:6
  119:7 125:17
  127:15,16,22
  149:10 178:22
  242:11 243:13
  244:18
**polarized** 8:15
  11:9 29:9
  38:21 39:3,4,5
  39:7,10,16,22
  39:24 40:1,3,4
  40:7,10,25
  41:4,9,12,15
  41:18,22 42:5
  42:14,21,24
  49:3 50:8,17
  51:1,4,10,10
  69:20 70:1
  72:4,17 76:1
  76:12,22 78:12
  79:10 80:1,20
  85:17 92:17
  93:2 113:19
  117:5 118:1,12
  118:13 127:21

129:7,9,11,15
129:22 131:8,9
145:21 146:16
147:13 158:19
164:1 191:3
242:10
**polarizing** 120:8
**policies** 152:14
  154:24 155:21
  167:23
**policy** 76:5
  77:18 78:4,6
  131:1,5,7,9
  146:2 149:14
  149:21,23,24
  150:4 151:6,9
  151:14,16
  152:25 154:18
  159:23,23
  160:21 161:16
  163:12 165:19
  166:14 167:5
  251:25 252:24
**polite** 242:17
**political** 8:25
  40:8 79:22
  154:20 156:3
**politically** 47:7
  48:3,4,7 53:15
  55:18
**politicians** 40:9
**politics** 9:7 12:9
  12:10,20,23,25
  13:10 15:21,23
  16:3 40:11
  131:6 153:7
  155:6
**poll** 149:1
  229:12
**pool** 180:11
**populated**
  194:17
**population** 56:9
  62:22 63:9
  85:11 192:4,6
  193:17 203:6
  216:10 219:13
  221:2 223:2,10
  224:6 230:14
  230:23 231:7

234:24 235:18
235:22 236:2,7
**populations**
  85:4,5 215:18
  216:2
**Porter** 2:4 5:9
**portion** 83:2
  90:25 114:4
  190:11
**position** 18:11
  19:16 20:3,4
  21:17,23 48:11
  76:9 129:6
  157:8 163:13
  165:17 166:24
  240:6
**positions** 20:10
  131:5 153:23
  159:23,23
  166:21 167:6
**positive** 21:1
**possibility** 46:9
  82:12 129:3
  172:14 180:24
  227:2
**possible** 36:22
  80:25 81:4,8
  85:8,10 102:7
  102:11,14,21
  102:25 103:4
  103:10,15
  108:9 126:1,2
  126:5 128:15
  153:20 156:2
  161:13 162:2
  163:1,9,10
  172:5 209:23
  210:7 211:2
  212:21 225:13
  229:7 251:19
**possibly** 13:10
  220:13 221:21
**potential** 19:12
  60:9 160:12
  163:2,4
**potentially**
  63:13 178:24
**power** 161:12
**powerful** 127:2
  148:17,18

280
Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 89 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

171:7 172:18
**POYNER** 2:7
**practice** 90:16
112:1,9
**practiced** 218:1
**practices** 174:12
**precinct** 32:25
33:6 35:19,20
36:1 189:25
190:4,7,13,19
190:21 192:10
192:18,23
193:6,6,12
194:22 195:5
197:19 200:3
201:16,19
202:2 203:6
212:8 230:25
**precincts** 105:1
108:20 189:14
189:16,18
191:13,15,20
191:22 192:3
193:18 194:2
194:15 197:16
202:15,16
203:21 208:13
208:22 226:17
226:22
**precise** 103:16
185:16 200:7
**precisely** 157:8
224:20
**precision** 236:5
**preclude** 172:14
**precondition**
23:2 45:15,16
47:11,14,15
72:6 73:15,16
74:10,11 75:2
75:3
**preconditions**
21:19,24 45:11
48:22
**predict** 145:25
**predicting** 88:13
167:8
**predictor** 201:2
201:5 215:7
**prefer** 9:17 32:2

41:20 109:2
135:25 136:1
149:18 183:24
184:1,2,4,8,9
186:12 247:17
249:8 250:21
251:5,17
**preferable** 81:13
**preference** 44:9
44:10 76:5
117:12 183:18
184:12,13
247:20,25
250:3,6,12
251:12,25
252:1
**preferences** 44:8
77:19 78:6
165:10 169:19
170:8,23 172:6
186:2,6 187:6
252:4,17,25
**preferred** 38:3,4
38:5,7,8,17
39:19,21 44:18
52:14,23 53:9
53:19 62:4,20
68:12,13 71:22
72:19 82:13,16
109:9 151:20
151:23 162:10
175:6 177:1,12
185:8,13
187:20 188:2
188:20 190:20
191:12 192:12
192:16,20,24
193:5,9,15,20
194:12,24
195:6,25
197:17 198:15
198:25 199:20
200:1,10,20
201:3,7,17,19
204:10 205:5
205:11,16,22
209:5 210:12
211:12 214:4
216:15 218:7
219:2

**preferring** 143:7
143:18
**preliminary**
187:12
**premise** 74:24
**prepare** 6:19
114:25
**preparing** 15:12
26:22
**presence** 178:25
179:1 184:8
**present** 66:17
106:11 113:8
120:12 235:1
**presentation**
24:24 25:2,6
**presented** 118:1
118:3,15
148:11 152:4
168:9
**presenting**
112:23 116:19
150:10 233:20
**presents** 120:5
120:10
**president** 35:23
173:17
**presidential**
203:23
**pressed** 94:2
**presses** 94:6
105:23
**presumably**
171:15 207:10
216:24
**pretty** 40:25
74:23 119:18
119:18 125:15
146:24 148:24
174:21 188:13
190:4 215:23
240:2
**prevail** 20:19
63:17,23,24
**prevailing** 63:12
**previous** 35:12
41:19 103:25
178:12
**previously** 13:14
55:24 196:3

**primaries** 88:16
**primarily**
221:21
**primary** 88:3,9
88:19 173:14
**print** 9:17 51:19
**prior** 8:17 14:9
78:1 89:21
90:4,4,23,23
91:2 218:25
**priority** 48:24
**probability**
228:9,20,21
**probably** 13:12
17:24 20:18
21:10 24:22
39:11 44:3
81:13 153:12
166:20 192:1
201:12 221:10
221:20 233:9
239:11 241:21
245:13 248:25
**probative** 85:18
**probe** 247:19
**produce** 96:6,17
110:16,20,22
145:7 160:2
161:23 218:22
238:14
**produced** 93:14
96:12,23 97:1
99:1 103:17
108:1 109:25
110:10 111:3
117:4 128:16
153:13 195:18
**produces** 99:13
104:24 107:13
107:14 110:23
**producing** 171:7
210:21 222:21
**product** 29:15
29:21 97:7
**production** 31:7
98:4
**Professor** 239:4
244:23,24
**profile** 156:1
**profoundly**

232:3
**program** 93:12
93:24 96:18
97:22 99:24
100:7,11,17,17
100:18 101:9
101:16,18,19
105:2,14,22,23
105:25,25
107:21 108:1
109:18,22
110:6 239:18
**programming**
31:4 93:10,19
**programs** 93:16
97:22 100:15
101:9
**prohibit** 46:9
**prominent**
249:19
**promote** 152:14
**prong** 237:11
238:25 240:25
241:6,21
**proper** 130:1
**properly** 34:13
36:10,13
**proportion**
35:20,22 36:1
36:2 82:21,24
83:9 84:20
220:6 222:9
223:4 226:13
227:3 235:20
235:22,23
236:18
**proportional**
233:23 234:23
235:8,18 236:1
**proportionality**
236:14,16
**proportions**
222:9
**propose** 57:3
**proposing** 77:22
77:23
**protected**
149:25
**PROUTY** 2:13
**prove** 129:2

281

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 90 of 104
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

168:12,13
**provide** 24:19
94:19 95:8,9
100:15,22
102:11 103:6
121:25 122:23
157:11 230:25
232:25
**provided** 7:5
28:7 72:15
75:25 95:4,14
95:17 102:16
104:5 105:6
117:11 124:12
124:20 128:10
169:15 170:3
187:25 224:8
254:12
**provides** 94:11
94:23 120:20
217:18
**providing**
122:15 130:25
**psychology**
37:19
**public** 5:3 20:5
21:18,22 24:12
**published** 11:1,5
11:8,11,14,24
12:12,16,19
24:13,23 25:4
**Pulaski** 10:24
**pull** 215:12,15
**pulling** 230:1
**pure** 230:13
**purely** 88:24
92:7
**purport** 117:4
**purports** 117:14
156:23
**purpose** 87:17
95:7 96:7
116:18,25
117:2 194:18
194:20,20
**purposes** 15:5
22:5,5 32:8
91:3 109:20
115:12 240:1
**push** 162:8

**put** 37:7 56:7
57:21 104:9
128:23 157:7
160:5 161:3
162:24 166:16
167:15 210:17
236:20
**puts** 58:3
**putting** 43:20
61:13 91:22
185:22 202:15

## Q

**quality** 55:12
**quarter** 236:8,9
**quasiexperim...**
34:24
**query** 190:2
**question** 6:6,8
6:16 22:7,9,11
22:12 26:5
35:18 36:3
45:17 47:18
49:2,4,12 55:9
55:9 59:23
61:23 62:2,6
62:14,16 74:23
80:4 84:1
94:20 95:14,22
102:21 108:8
109:12 120:1
121:2 123:9,11
130:18 131:11
136:23 137:8
141:1 144:22
144:23 148:7
157:6 158:1
162:24 167:18
182:24 184:6
194:18 213:12
217:11 222:5
225:20,22
227:20,21
229:15 247:25
249:5 251:8
**questioning**
59:14 248:7
**questions** 6:2
26:9,13,18,20
91:12 123:8

194:3 248:25
253:4 255:6
**quibble** 137:5
193:1
**quite** 56:4
205:19
**quote** 179:18
**quoted** 235:16

## R

**R** 2:1 93:19,19
93:20,20,24,25
94:1 99:23
100:1,3,7,11
100:15,17,17
100:18 101:16
101:18,19
102:5,8,22,25
103:6,11,17
110:1,6,15
256:1,1
**race** 33:4 35:16
50:17 54:25
55:2,6,8 69:20
73:8 75:18,23
77:17 90:5,23
91:2 109:3
113:18 114:6
114:10 115:11
115:20 120:7
121:24 122:14
125:9,13
126:13,24
127:9,10,23
128:14,22
129:1,12 130:3
130:4 131:4
132:1 133:11
134:12 136:9
136:20 144:1,4
144:17 145:9
145:11,19,22
145:24 146:4
146:11,17,20
146:23 147:2,3
147:12,21,21
148:1 152:7,21
156:3,11
157:24 158:10
159:19 160:1,7

160:10,14,23
161:23 162:18
163:18,22
164:2 166:15
167:8,12,13
169:24 170:7
170:16,18
171:21,24
172:1,9 178:21
185:1,7,24
187:4 191:4
199:3 220:4,21
245:16 247:23
248:1,2,11,12
248:14,19,21
249:9,15,16,18
249:25 250:8
250:11,12,14
250:22,22
251:1,2,7,16
251:17,24
252:1,10,13,15
252:19
**races** 64:23
116:8,12,13,16
131:23 134:6,9
135:5,7
**racial** 12:20,23
23:3 41:16
49:10,13 75:11
75:17 147:23
161:23 170:7
170:22 243:15
243:17 244:17
249:23
**racially** 8:14
11:9 29:9
38:21 39:3,4,5
39:6,15,21,24
41:18,22 42:5
42:21,24 47:24
49:2 50:7 72:3
72:17 78:11
79:10 80:1,19
85:17 92:17
93:2 117:5,25
118:12,13
127:20 129:6,9
129:10,15
131:8 158:19

242:10
**raise** 91:12
**Raleigh** 2:9,20
3:3
**Ramapo** 4:9
111:19 215:14
245:21 246:6
**ran** 132:10,12
132:14
**random** 202:4
230:13
**Randy** 31:5 93:6
**range** 54:15 58:3
58:4,6 70:18
70:19 71:7
106:20 119:11
125:24 162:8
212:20 213:9
**rate** 71:3 122:20
214:18 222:6
**rates** 52:14,24
53:10,20
123:17
**reach** 32:4,16
158:2 206:2
209:3
**reached** 21:13
**reaching** 44:13
**read** 42:7,8
59:12 60:4
65:3 93:23,24
98:17,25 99:15
99:21,22 100:4
112:6 122:3
138:15 165:24
168:21 169:21
179:15 205:12
215:21 255:4
256:6
**reading** 65:8
**Readme** 4:8
**reads** 99:12
256:6
**real** 106:16
124:15 125:10
140:23 143:11
173:13 228:20
**realistically**
20:25
**reality** 208:15

282

really 17:25
20:11 31:17
34:18 37:13
57:18 63:5
65:3 72:13
109:11 127:16
173:4 186:8
194:17 222:21
222:21
reason 6:10
10:17 18:14
103:7 112:14
156:23 160:7
179:17 188:6
200:24 201:1,4
216:24,25
217:10 242:24
247:16
reasonable
57:10 158:18
247:8,9 252:3
reasonably
227:10
reasons 54:21,22
92:5 151:6
179:22 249:8
250:7,21 251:6
251:15,21
rebuttal 4:11
202:20,25
203:1,15,17
204:1 211:22
213:15
recall 13:14
14:10 16:21
17:2 21:22
26:21 43:25
125:22 187:22
188:24 219:12
242:22 244:1
received 114:14
Recess 52:1
113:12 199:12
242:7 249:3
recognize 9:14
41:25 58:20
97:24 111:17
232:17 236:25
recollection
10:19 50:11

115:18 204:12
204:18 232:21
reconstituted
89:23 90:2,18
record 5:12
recorded 255:6
recruit 173:25
recruiting 174:8
174:12
recruitment
174:6
red 190:23,24
redistricting
10:22 12:1
13:8 14:24
16:18,25
224:17
redlining 150:16
reduce 252:25
reduced 184:13
reduction 37:20
reductionistic
37:18
reenforces
210:23
refer 9:16 29:3
44:23,24 45:2
46:13,25 61:20
136:7 219:24
252:13
reference 17:5
referenced
90:21
referred 112:4
referring 11:19
46:15 65:9
86:16 89:12
95:20 169:23
205:9 252:14
refers 43:7,8
45:1 204:14,22
reflect 15:3
54:10 139:17
143:11 192:6
reflected 14:14
78:1 94:9
158:10,12,15
255:7
reflecting 29:12
92:16 93:1

131:21 165:11
reflective 130:20
130:24
reflects 77:25
123:21 124:4
132:20 133:14
134:18 135:11
155:14 178:10
180:19,21,22
198:9 242:11
regard 24:18
32:19 61:11,14
61:18 118:22
129:22 147:2
185:11 191:8
223:2,25 229:5
236:17 249:24
regarded 234:11
regarding 14:4
14:13 15:13
222:2,3
regardless 15:7
229:1
region 15:9
29:14 70:12
142:9 178:3,4
195:11 196:10
196:19 204:23
223:5
regions 47:1,2
50:13 69:20
82:11 113:20
118:1,15
131:23 167:21
177:13 233:13
233:14
register 216:23
217:3
registered 226:2
registration 55:2
55:6,10 116:6
217:16 220:4
220:21
regression 12:5
29:8,20 31:1
33:14,19,25
34:6 36:10,17
106:7 108:13
110:18,19
161:13 162:1

regular 240:2
regularly 230:11
reject 107:3
228:3,4 229:9
rejected 242:19
244:1 245:6,22
246:18
rejecting 247:10
related 8:12,21
10:22 14:23
17:7,9 19:11
47:23 62:14
112:22 127:9
152:6 163:11
219:6 249:8,14
249:16 250:7
250:11 251:16
254:15
relates 11:2
35:16
relating 86:12
115:8 234:8
237:6 250:21
251:7
relationship
33:20,23,24
34:4 35:5,6,25
190:18 194:13
relationships
33:15
relative 15:18
17:6 22:20
27:9 42:19
83:9 170:18
177:19 221:3
254:16
relatively 104:8
158:23 177:19
relevant 15:4
47:1 61:9
69:20 72:4
73:14 74:9
75:1 85:18
113:20 167:21
177:13 210:16
247:17 251:24
reliability 81:14
reliable 29:16,21
103:21 120:6
146:9 199:17

200:7 223:3
234:11
relied 27:15,18
219:13,21
221:18 224:4
242:23
relief 242:24
relies 30:2,7
99:23
reluctant 57:21
rely 11:15 27:21
107:10 112:16
112:24 113:1
121:11 221:21
238:9
relying 94:20
105:16 113:8
235:3 238:6
remarkably
41:10 120:23
remember 17:24
23:11 59:2,5
188:5 247:21
remembering
17:7 244:23
remote 1:11
124:18
repeat 74:6
131:11 137:12
188:16 207:17
repeated 73:20
73:21 107:20
108:4,5 127:21
repeats 73:22
replace 166:10
replaced 25:15
165:6
replicate 86:23
87:1 99:5
100:7,12 102:7
102:21 103:16
104:6 209:11
replicated 87:6
replication 4:7,8
101:23 102:25
report 4:3,4,12
4:13 7:1,6 9:10
14:15,21,22
15:12 18:12
20:5 21:18

24:12,13 25:4
25:21,25 26:3
26:12,16,19,22
27:3,11,15
28:11,13,18,21
28:23 29:6,12
30:2,7,13
46:19 49:11
50:4,12 51:15
52:6 61:4 64:2
66:18,22 73:1
79:7,7 86:9
87:13 92:13,15
92:22,25 94:9
95:7,9,19
98:14 105:7,9
109:21 111:3
112:8,14
113:17 114:4,5
114:10,12
120:19 127:19
128:19 131:20
131:22 138:9
139:2,5 143:13
151:22 152:17
152:22 156:6,8
164:3 168:14
168:18 169:12
172:10 173:18
173:25 175:5
178:13 185:18
186:22 187:9
187:12,17
198:20,22
199:15 200:14
202:20 203:2
204:4 205:2,8
206:25 207:7
210:16,19
213:15,18,23
214:7 215:23
215:24 218:2
218:19 228:25
229:2,6 230:22
232:17,24
233:7,10 234:7
234:8 237:1,9
238:2,4,5
240:24
**reported** 55:10

93:13 107:24
229:22
**reporter** 3:1 5:3
30:20,21,23
254:3,12
**REPORTER'S**
254:1
**Reporters** 3:1
**reporting** 16:1
34:9 57:19
143:4 238:15
240:8
**reports** 6:22,23
6:25 7:1 25:17
25:21 42:8
115:9 239:3
**represent** 5:10
131:7 155:13
207:9
**representation**
88:16 130:19
130:19,20,21
130:24 131:1
149:21,22
155:9 236:10
250:13
**representative**
155:16
**representatives**
175:13
**represented**
130:21,23
155:7,10
**representing**
24:16,17
**represents** 105:4
189:25 203:7
234:20
**reproduce**
187:11
**reproduction**
203:4 208:6
**Republican**
40:18 84:6,21
84:24 85:12
86:18 120:24
125:4,6,7
146:13 147:9
153:9,23 154:6
154:25 155:7,8

155:15,16
157:9,13,14
159:8,14
164:25 166:7,8
166:11 171:4
173:2,14
174:17 175:2
177:20,22
178:11 183:12
189:10 191:6,9
**Republican's**
120:25
**Republicans**
40:13,16 41:1
41:7 132:16
152:25 157:16
159:24 173:3
173:25 174:7,7
177:23 249:16
249:21
**requested**
254:11,11
**require** 20:13
45:20
**required** 18:13
20:6,22,24
21:14 187:19
188:1 205:15
211:3,4 236:15
**requirement**
44:17
**requires** 20:13
41:11 217:19
236:4
**research** 151:5
**RESERVED**
253:5
**residences** 7:25
**resident** 130:22
130:22
**respect** 178:1
244:17
**respond** 25:12
25:14,16
**responding**
121:23 122:14
244:22,22
**response** 149:20
210:22 248:8
**responsible**

178:21
**responsive**
175:7,17 176:3
176:5,8,11
**responsiveness**
175:12
**result** 73:7 91:17
91:19 104:21
104:23 163:21
174:11 214:3
**results** 29:11,20
31:11 32:24
44:7 52:10
53:14 55:1,16
64:5 67:20
71:14 73:2,8
76:13 78:10,11
79:4,5,6,9 80:5
85:25 90:3
91:25 95:5,18
95:18 96:1,2,3
96:4,5,8,13,14
96:15 99:13
100:12 101:23
103:14 113:23
118:11 119:22
145:21 146:16
147:13 148:9
148:14 160:18
162:7,9,25
163:10 171:8
171:19,25
172:11 186:12
198:9 200:3
212:8 218:23
**retained** 25:9
232:25
**retrogression**
219:9,11
**return** 25:24
42:25
**reverse** 41:7
186:7
**review** 6:25
28:10,20 94:1
125:18 203:12
203:17 254:10
**reviewed** 25:17
27:14 94:4
125:1 168:6

202:25
**Rice** 8:23
**Richard** 5:13
**RIGGINS** 2:18
**right** 5:21,24
6:10,14 8:15
9:8 11:5,18
12:8 13:24
14:3,5,20 15:5
16:8 18:23
20:2 22:16
25:8,17 27:3
28:20 29:2
32:21 34:25
35:23 37:7,18
38:5 45:10
46:13,25 47:10
49:24 51:13
52:12 53:2,5
56:2 58:8,18
58:24,25 59:1
59:6 61:8,22
64:1,16,21,25
65:25 66:4,10
66:21 67:16,21
67:23 68:1,3,7
68:9,21 69:21
73:12 74:6
78:10 80:3
85:16 88:15
89:20 90:1
92:25 97:12,18
99:4 100:20
101:22,24
102:8 103:19
105:7 111:2
113:9,14,14
115:5 117:9,18
118:9 119:12
121:10 126:7
131:3 132:4
133:7,22 134:4
134:6,10 135:3
135:22 136:7
137:12 138:3
139:2,9 141:6
144:9 145:16
146:18 147:10
147:16 149:12
150:2,12

284

151:19 152:20
152:24 153:16
154:2 156:14
158:6 164:6
167:17 169:11
169:21 173:18
174:18,22
176:15 178:13
180:15 184:4
187:8 188:10
188:11,12
189:15,19
191:4,19 192:4
192:7,24 193:3
193:17 196:5
196:17 198:8
198:19 199:2,4
200:13,15,17
204:3,13,22
205:8 210:17
213:17,23
214:10 215:12
216:1 218:25
230:5 231:4
233:1 236:19
237:4,17
238:11 240:4
240:23 241:3
241:24 242:18
244:13 245:4
245:21 248:23
249:5 250:5
252:16
**rights** 11:6 12:1
13:4,6 14:24
20:23 21:14
43:6 60:18
78:9 149:25
151:17 154:12
154:13 161:1
219:16
**rise** 78:7
**Road** 3:2
**RODNEY** 1:4
**role** 113:18
159:19 172:8
**rolls** 220:12
**roughly** 181:15
202:8
**round** 14:9

66:10,17,18,22
67:2 68:19
**rounding** 66:12
66:13,25
**routine** 93:20
**routinely** 53:18
110:5
**row** 132:7,8,19
132:20 133:22
139:19,22
**RPR** 1:25
254:22
**RPV** 38:21 52:9
55:16 64:5
67:20 92:12
103:20 118:10
131:21 200:17
**rule** 217:24
**ruling** 246:24
247:7
**run** 31:5,7 93:17
99:11 100:2
101:1 105:3
110:6,9,15,17
110:18 174:1
176:1
**running** 46:4
**runs** 99:18 108:4
**rural** 83:1

_____
**S**

**S** 2:1,4 256:1
**salience** 150:23
153:18 154:3
**sample** 106:8
202:4 227:9
228:10 230:13
**samples** 230:12
**sampling** 106:14
224:1 227:10
229:24,25
230:8
**Sarasota** 24:3
**satisfied** 21:19
21:24 47:11
72:7 73:17
74:12,15 75:4
**satisfy** 45:25
57:2 74:17
240:7

**satisfying** 56:17
**save** 104:13
**savings** 166:21
166:25 167:7
**saw** 104:13
243:17
**saying** 32:13
42:10 56:8
59:17 68:10
79:25 110:15
124:22 126:19
126:20 129:14
174:20 176:2,6
184:7 196:22
196:23,23
197:8 206:21
207:7,18,22
210:3,4 229:4
238:22,24
241:20 242:17
246:2 248:10
252:9
**says** 39:2 74:2
99:10,22
209:15 210:1
211:5,6 238:8
239:1 240:17
**scatterplot**
187:15,16,18
187:25 188:18
189:1,5 193:19
198:8 203:5
207:3 208:5,7
208:9 209:14
209:15 210:14
**scatterplots**
206:14
**school** 4:10 8:3
10:6,8,9
111:20 166:2
179:5 224:19
245:22
**schools** 8:2
**science** 8:25
43:4 227:20,20
228:11 229:8
**sciences** 34:21
34:22 232:9
**scientific** 158:18
**scientist** 106:13

**scientists** 40:9
112:2,10
227:24
**scope** 26:11,19
**screen** 7:7,9
**screenshot** 97:20
**script** 99:17
100:1,6
**scripts** 99:12
100:24
**scroll** 9:19 233:3
**se** 84:2
**seats** 234:21
**second** 10:12
186:14
**Secretary** 33:3
**section** 10:10,16
10:23 16:11
27:12 77:10
161:1 219:8
237:3 242:24
247:3
**see** 9:20 10:3
26:25 27:11
40:11 42:9
44:5,7 50:20
52:9,10 53:18
54:9,19 56:14
58:17 59:8
62:7 64:8,17
65:1,6,14,19
66:1,5,7,9
67:24 68:7
71:2,18,18,19
94:19,23 95:12
95:20 97:2
98:3,7,19 99:8
101:8,16 102:5
103:5,5 104:10
106:22 109:16
113:19 116:3
117:10 121:7
132:8 139:20
139:24 146:16
147:14 148:10
157:18 166:16
166:16 169:12
179:9 182:19
182:22 183:10
187:5 189:12

189:21 191:2
191:17 195:16
196:13 206:15
208:22 212:2
214:6,11
215:16 238:8
241:10,10
248:11 251:15
252:3,8,10
**seeing** 65:6 66:7
96:4 101:17,18
101:19 102:5
118:6,7 119:13
119:14,15,20
127:16 161:24
177:18 252:23
**seemingly**
166:13
**seen** 46:3,11
49:20 73:20
149:2 150:9
151:5 164:10
164:20 191:10
**self-described**
40:12,15,18
**semester** 9:4
**senate** 17:25
41:2 43:22
46:24 47:3,4,8
47:8 48:24,25
49:6,17 50:9
52:10,13 68:8
68:15,23 71:23
71:24 78:14,23
79:11,18,19,20
79:23 80:7
85:24 87:3,23
88:19 89:2,3
90:23,24 91:2
92:19 93:4
114:18 120:22
121:3 123:15
123:23 124:6
175:8,18
176:15,19,20
176:22,23
181:5,6 191:22
191:24 194:25
195:7,10 196:9
196:19 197:15

285
Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 94 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

210:10 211:1
211:11
**senator** 173:17
**sense** 16:4 29:19
35:6 36:14
39:6,21 40:1
42:13 44:22
45:9 54:3
56:21 81:2
100:24 127:1,7
130:24 163:16
163:17 165:13
165:14,15
176:21 179:9
181:17 199:9
212:6 213:2
228:12 243:12
243:13
**sent** 10:1 59:3
115:19
**sentence** 170:3
170:11,12,13
170:19 215:16
**sentiment** 151:4
151:5
**separate** 14:6
24:7,16 85:23
**separated** 96:20
**separately** 23:13
**separation** 73:7
76:18
**September** 1:17
256:4
**series** 107:14
**served** 16:14
17:12
**serving** 13:14
**set** 14:16 23:19
34:16 35:2
46:23 103:9
110:20 225:6
**sets** 39:18
**setting** 194:11
217:18 235:4
**settles** 36:7
**seven** 64:9,17
121:18 173:3
**Shafer** 23:10
**share** 14:18
19:13,16 154:5

154:10,11
**shared** 152:14
152:21
**shares** 33:1
**sheet** 255:7
**short** 177:19,21
199:9
**Shorthand** 5:3
**show** 53:14
55:17 67:13,13
69:11 76:13
77:1 78:3,11
79:4,5,8,9 80:5
117:4,7,14
126:8,22,24
127:20 129:24
129:25 137:10
138:12 145:8
146:5 147:7
157:21 159:3
165:9 167:12
169:4,8 178:7
181:22,24
186:12 200:18
207:3 209:15
209:17,21,23
210:18 251:11
**showed** 225:15
**showing** 68:22
127:12 160:23
162:10 183:18
184:16 189:6,8
196:2 208:1
236:17
**shown** 97:25
**shows** 76:11
86:17 117:15
122:17 123:14
127:15 128:18
129:20 130:10
140:20 145:20
147:6 149:3
160:19 168:18
171:3 175:22
175:23,24
182:7 183:22
185:22,24
187:2,2 190:17
197:4 206:1
209:12 210:19

213:18 229:12
234:15
**shrinking** 215:9
**sic** 136:1
**side** 18:19,24
33:2 84:22,22
167:15
**sides** 41:13,14
**signal** 249:19,24
**signals** 182:10
**Signature** 253:5
256:25
**Signed** 254:19
255:9
**significance**
231:20
**significant** 43:16
43:20 44:14
48:6,12 61:14
72:17 73:10
74:1 80:1
122:9 184:20
185:11 229:4
**significantly**
122:1,5,6
214:18 215:18
216:3
**similar** 31:17
84:17 93:14,15
100:11 102:25
108:14 114:1
120:23 140:25
159:15 244:15
245:2,3,6,18
**similarly** 127:9
**simple** 34:15
37:23 74:23
102:10,20
109:25 120:20
146:24 157:11
167:5 240:2
**simply** 21:2 25:5
34:6 37:5 39:7
44:23 48:7
57:19 73:5
74:18 78:4
103:15 110:22
110:23 112:16
112:25 120:21
124:25 151:19

173:8 194:10
194:21 197:18
216:8 231:3
242:11
**simultaneously**
55:13
**single** 34:4 66:21
136:12,24
137:13 148:18
157:2 186:5,8
228:17
**single-member**
60:18 81:10
217:1,2
**sit** 239:17
**sitting** 125:23
187:23 203:14
203:25 240:4
**situated** 78:7
**situation** 43:8
130:1 216:6
237:22
**situations**
221:10
**six** 3:2 120:12
121:7 138:3,6
213:19 234:19
**sixth** 99:8,21
**Skip** 139:2
**skipped** 233:18
**slight** 138:24
**slightly** 67:11,12
139:7,12 140:1
141:2,12
145:16 174:25
178:11 232:2
**small** 31:25
107:1 124:17
140:9
**so-called** 84:5
**social** 34:21 43:4
106:13 112:2,9
227:19,20,23
228:11 229:8
232:9
**society** 129:19
**sociology** 37:20
**solely** 120:18
**solid** 163:25
**solves** 36:7

**somewhat**
153:15 221:4
**soon** 184:21
249:2
**sorry** 23:9,10
53:3 64:2 65:9
65:11 67:17
69:10 70:23
92:20,21 95:23
102:14 108:24
119:21 123:4,8
132:13 134:11
137:7 139:3
141:10 145:10
156:7 167:3
184:18 188:12
188:25 189:8
207:17 233:16
233:18 241:5
245:25
**sort** 10:21 11:19
15:7,18,20,21
16:23 17:10
18:6 19:17
20:24 21:13
31:14,19 34:7
38:22 42:11
48:24 59:13
60:8,10 63:3
70:5 76:19
94:12 96:19
106:11 107:5
151:11 162:8
182:24 189:13
195:15 208:15
212:19,20,23
219:25 225:1
232:5 243:8
244:2 247:4
251:25 252:24
252:24
**sorts** 8:9 20:10
**Soto** 4:14 18:1
31:16 237:1
**sought** 19:1
**sounds** 86:3
113:11
**source** 223:3
248:16
**sources** 27:12,23

286

28:9 115:15,17
**south** 17:8,9
**Spanish** 220:11
  225:17 226:8
**spare** 246:11
**speak** 208:9
  214:23 247:24
**speaking** 55:22
**speaks** 188:14
  208:11,12
  247:16,20
  248:10,13
**specific** 15:13,20
  100:1,2 112:3
  112:12
**specifically** 6:7
  10:23 11:2
  12:10,16 20:2
  21:12 62:10
  154:23
**spectrum** 154:20
**speculation**
  177:8
**speed** 96:20
**spent** 7:23,23
  8:20 26:7,22
  27:1,9 244:12
**spit** 109:19,23
**split** 67:1,6
  153:14,14
  166:10
**spreadsheet**
  94:13,14,16,18
  94:19 95:5,6,8
  95:10,17,18
  96:1,9,12,16
  96:24
**Spring** 23:16
  27:2 56:11
  111:19 222:4
  224:18 225:8
  226:3 228:7
  240:14
**SPRUILL** 2:7
**squares** 36:17
  106:7 108:12
**stable** 108:16,22
  171:19 177:19
**stage** 26:14
  108:2 187:12

**stand** 138:21
  186:9 239:16
**standard** 15:6
  55:25 56:4,5
  56:18 57:14,18
  57:24 59:9
  60:2,9,21,24
  64:8,16,25
  65:14,19,25
  66:4 67:3,23
  73:9 76:14,15
  77:23 78:2
  105:13 107:6
  112:1,9 219:11
**standards** 229:8
**Star** 23:20
**start** 132:13
  202:14
**started** 18:15
  19:7
**starting** 39:13
**starts** 59:14
  191:12
**Stata** 93:22 94:8
  96:21 99:12,17
  99:24 100:3,6
  100:18
**state** 1:7 4:5,6
  5:11 10:15
  13:22 15:21,23
  15:24 16:3,16
  17:22,24 22:3
  22:13,17 27:14
  27:17 33:4
  39:2 54:24
  58:11,12 79:12
  80:8 81:18,22
  82:11 83:10
  90:23,24 91:2
  112:8 116:11
  121:18 122:19
  138:10 149:3
  156:12 178:16
  179:19 187:17
  187:23 213:23
  220:21 233:13
  233:15 234:16
  234:22 237:6
  244:6 256:2
**stated** 55:24

205:20 206:25
**statement** 37:14
  54:22 91:5
  126:18 136:19
  145:23 164:24
  165:1 167:17
  167:19,20
  168:7,15,21
  235:15
**statements** 37:9
  37:12 93:10
**states** 1:1 12:14
  12:15,18 15:19
  41:8 55:5
  106:24 148:19
  149:11 173:3
  173:10 220:3,9
**statewide** 50:1
  50:10 65:12
  78:19 79:17,22
  85:25 87:2,10
  90:5,14 92:6
  92:18 93:3
  114:17 116:8
  116:12 119:13
  119:15 131:23
  136:8,13,25
  137:14 138:3
  140:19 141:21
  142:20 174:9
  180:6 204:8
**statistical** 34:1
  128:17 223:14
  231:19
**statistically**
  122:6 229:4
**statisticians**
  112:2,10
**statistics** 11:25
  12:3 34:2
  110:20
**status** 98:11
**stay** 23:13
**stays** 217:22
**steak** 59:3
**Stein** 109:2,9
**stenotype** 254:6
**stepping** 72:10
**Stevenson** 31:6
  32:5,23 92:14

93:7,17 94:6
  95:15,25 96:10
  97:2 105:22
  110:9
**Stevenson's** 94:1
**stick** 149:18
**stop** 147:9
**stopped** 221:23
**stopping** 63:12
**story** 120:14,16
**straddling**
  189:23 190:2,3
**straight** 39:1
**straightforward**
  246:7,8
**Street** 2:19
**stretch** 224:22
**strike** 61:11
  142:9 164:16
  178:3 200:25
  201:3
**stripped** 110:22
**strong** 50:22
  56:5 148:24
  151:4 157:16
  162:11 171:24
**strongly** 147:22
  147:23 148:1
  157:22 159:6
**structural** 9:6
**structure** 97:21
  172:1 179:21
**structured**
  127:10
**structuring**
  171:25
**struggled** 239:9
**studied** 155:25
  174:12 214:22
**studies** 34:24
**study** 34:12
**stuff** 18:7,8
  175:23
**style** 159:22
**sub** 202:6
**subfield** 12:24
  13:3
**subject** 20:16
  53:22 112:21
**submitted**

111:18
**subset** 42:8
**substance** 207:7
**substantial**
  31:22 151:6
  153:13 181:24
  206:17,17
  214:25 221:1
  228:21
**substantially**
  181:25 182:21
  197:12 214:21
**substantiate**
  229:3
**substantive** 16:4
  32:1 232:24
**substantively**
  54:6 120:15
  122:9
**substitute**
  166:15
**success** 142:5
  205:11,22
**successful**
  195:24 208:19
**succinctly** 37:7
**suddenly** 184:22
**sued** 20:17,18,18
  21:10
**sufficient** 48:5
  62:20 70:1
  76:18,22 77:13
  120:6 164:3
  182:14
**sufficiently**
  47:20 71:21
**suggest** 91:17
  144:23 159:6
  166:22 172:12
  183:19 200:4
  226:1 238:4,20
**suggested**
  241:12
**suggesting**
  121:14,15
  151:2 169:1
  187:24 188:18
  213:1,3
**suggestive** 121:1
  145:12

287

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 96 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

suggests 38:23
99:20 106:11
120:21 176:25
177:11 180:4
193:24 213:7
217:7 238:21
suing 60:17
suit 16:16 19:12
19:12 21:6
Suite 2:14,19 3:3
summarize
33:19 34:2
181:21
summarizes
35:2
summarizing
33:24 34:3,4,6
35:4
summary 61:5
superior 221:9
supervision
254:7
support 30:8,8
33:6 40:16,19
43:13 45:21
72:16 122:1,10
122:15,18,23
123:2,6 124:12
125:3 126:8
129:6 142:4
146:20,21
147:8 149:14
150:19 152:10
152:12 153:9
153:22 154:24
155:21,21
156:18 157:16
159:15 161:6
162:12 175:25
177:4,14,20
182:4 185:7
supported 43:11
47:21 52:13,23
53:9 123:16,18
156:24
supporting
24:19 45:24
48:17 53:19
151:7 164:24
211:6,7

supportive
123:22 124:5
supports 165:8
supposed 123:9
supreme 121:18
122:19 123:16
123:18 136:20
156:12 178:16
179:13,19
243:5
sure 16:13 17:25
23:7 24:6
30:19 37:13
42:15 44:1,4
50:19 51:11,20
51:23 54:8
65:9 70:8 75:6
75:8 77:7
79:16 81:1
86:15,21 91:20
92:23 96:10
102:3 104:22
107:3 110:10
110:11,14
113:1 115:6,25
125:21 141:6
156:25 162:3
162:14 170:10
176:5 181:11
198:19 204:18
205:19 206:9
206:10,12,19
224:13 225:1
229:16 244:21
surname 220:11
225:18 226:8
surprise 19:18
40:17 166:5
surprised
110:13
survey 35:10
219:15 223:21
224:4 227:25
229:21 230:11
surveys 223:22
suspect 110:7,9
148:15 212:3
222:15
sworn 5:2
symmetric

227:14 229:25
230:3,4
system 81:11
154:10

_____

**T**
_____

T 255:1,1 256:1
256:1
tab 34:15
table 65:6
114:21 117:18
117:21 118:2,4
118:15 119:21
119:25 120:4
120:16,18,19
121:6,11,16,17
122:17 123:14
123:21 124:4
125:16 127:3
127:14,14,18
128:18,20,24
129:20 130:9,9
131:20,21
132:19 133:7,8
133:14 134:4,5
134:14,18
135:3,4,11
140:16,20
141:1 143:14
143:15 156:6,7
157:10 158:10
158:13 159:17
159:20 160:19
165:4,5,9
167:2,4,12
171:2 174:20
174:21 175:22
175:23 180:13
198:17,18,20
199:14 203:18
203:20 204:1
233:19
tables 71:13,14
92:15,24 93:1
95:7,21 96:17
104:17 114:5
114:20,25
115:12 116:19
117:3,17
120:12 121:7

143:4 157:5,21
157:23 158:1
191:10
tabular 94:12
tabulation
237:17
tail 232:7
take 6:15 37:20
37:21 49:10
51:18,21 59:22
106:7 152:2
157:2 164:22
171:22 183:4
184:21 193:17
199:9,11
210:23 215:5
216:12,19
242:5 248:24
taken 18:11 20:3
20:4 21:17,23
58:24 88:1,3
88:12 114:11
187:11 193:23
210:15 240:6
254:6
takes 37:17 83:6
talk 5:25 26:15
26:17 30:25
35:3,8 42:13
42:19 61:24
67:8 75:7
88:23 89:8
112:21 160:8
179:23 180:12
207:2 217:21
talked 35:12
48:1 137:22
talking 18:1
41:24 43:16,17
62:9 70:10
72:13 76:20
81:3 85:8
86:22 88:5,5
89:11 92:23
98:5 123:5
125:10 127:23
131:3,6 139:16
141:16 183:14
191:5 201:24
223:24 224:11

227:9 236:14
251:1
tally 63:15
tangentially
49:7
tantamount
173:11
tasks 27:10
taught 12:3,8
13:7
teach 8:25 13:4
13:11 153:6
teaching 9:3,4,7
88:13
technical 33:18
46:1 55:7
165:13 213:2
technically 14:8
89:16
technique 31:12
33:25 34:17
36:6 37:6
107:8,9 108:6
108:12 110:16
124:17,25
140:9 162:1
techniques 34:1
34:10,12,14
36:22
tell 5:4 13:19
21:5 27:8
35:25 77:25
94:21 101:11
128:16,20
140:9 141:18
159:12 160:7
166:18 175:22
189:24 222:23
238:12 240:21
246:21,22
telling 91:19
105:2 108:15
190:3
tells 107:25
108:3 120:15
120:15 125:16
125:16 127:3
128:24 183:7,7
184:25
ten-minute

288

Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 97 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

51:21
**tend** 221:2
**tendency** 104:25
  138:12,18
  153:25 228:16
  250:13
**tends** 18:7
  220:24
**term** 29:2 38:2
  38:20 39:23
  40:2 41:18
  43:1,3 44:16
  44:20 45:7,9
  61:13,14,22
  80:4 129:15
  177:19,21
  212:16
**terms** 54:16 60:5
  70:3,10 73:7
  119:5 140:11
  157:24 160:25
  172:25 183:8
  220:4 245:1
  247:11
**territory** 42:18
**test** 45:16 56:9
  56:13 57:2
  60:13,13,22
  63:19 108:17
  109:1 178:21
  227:23 231:19
  236:12 241:15
**testified** 5:5
  23:17 60:16
  222:4
**testify** 20:1
  158:17 210:6
**testifying** 10:18
  18:24 19:20,22
  27:4
**testimony** 6:11
  16:5 22:2,20
  31:16 241:25
  242:15,19
  243:4,16,16
  246:16 254:6,9
**testing** 108:18
  108:24 212:5
  228:25 235:12
**Texas** 7:17 8:24

10:8 16:15,16
  16:23 27:6
  173:13,14
  220:9 221:20
  243:6,9,10
**thank** 5:14 9:18
  10:25 24:9
  30:17 58:19
  69:10 132:6
  246:10
**Thanks** 14:11
  25:7 116:17
  193:3
**Theodore** 2:4
  3:11 5:7,9 9:13
  21:16 23:8
  30:6,17,24
  38:1 44:15
  51:12,20 52:4
  58:16 61:7
  63:25 68:20
  69:7 70:14,23
  71:1,11 72:2
  73:11 74:5,21
  75:14 76:24
  78:21 79:3
  80:2,11,18
  81:15 83:12
  85:1,15 86:25
  92:11 97:12,17
  98:22 104:16
  111:9,14 113:9
  113:13 114:24
  118:8,21 121:9
  126:17 129:8
  130:11 131:10
  131:19 136:6
  136:18 137:6
  137:20 143:23
  150:1,13
  151:18 153:5
  155:17 164:5
  164:13 168:5
  169:10 174:14
  175:15 176:14
  177:10,25
  186:20 188:15
  198:7 199:10
  199:13 201:14
  202:19,24

211:8 212:15
  215:11 218:11
  218:17 224:3
  232:11,16
  236:19,24
  240:22 242:4,8
  248:23 249:4
  250:4,18 251:4
  251:14 252:12
  253:3
**theoretical**
  207:12
**theory** 130:19
  229:25
**thereof** 254:17
**thing** 45:3 74:16
  79:8 86:22
  117:14 129:17
  159:17,25
  171:21 179:1
  181:17 190:17
  234:14 240:3
  244:9
**things** 8:10,12
  10:3 24:16
  34:15 54:10
  59:20 61:18
  62:22 63:2,18
  71:16,16
  102:17 112:22
  116:23 129:18
  154:10 158:12
  163:19 165:20
  165:21 166:6
  167:11 171:12
  171:22 175:24
  193:22 195:19
  208:3 216:19
  222:23,23
  230:15 236:18
  241:16 252:24
**think** 8:11,16
  11:17 12:2
  13:13,17,25
  14:5,17 15:2
  15:16,17 16:18
  16:25 17:4,5,9
  18:15,22 20:8
  20:11,19,20
  21:5,12 22:2,8

22:12,16 23:6
  23:19,22 24:4
  24:8,21,22,25
  25:4 26:5
  28:15 31:19,25
  32:6,14 35:3
  36:21 38:25
  39:4,12,14
  41:10,19 42:6
  42:17 44:3,3
  44:19,20,21
  45:9 46:1,2,10
  47:25 48:1,4
  48:12 49:3
  51:3,7,8 54:2,5
  56:4,25 57:2,8
  57:17 58:1
  59:24 63:3,4,7
  65:12 66:13
  69:23 70:2
  72:12,23 73:1
  73:9,22 74:16
  74:22 75:9,9
  76:6 78:18
  79:1,5,7 80:16
  80:23,25 81:4
  81:6,7,12,13
  83:24 84:16
  85:20 90:16,16
  91:11 92:7,21
  93:11 104:6,7
  105:13 106:12
  106:23 108:20
  109:11 112:16
  112:20 113:9
  115:10,13,13
  115:21,23
  116:1 118:7
  119:3 120:4,10
  120:14 123:11
  123:13,25
  124:15 125:15
  131:1 136:4
  141:18,20,20
  141:25 142:21
  144:19 149:7,8
  151:10 153:15
  155:3,4,5,18
  156:7,22 157:5
  158:8 166:22

169:7 174:4
  175:21 176:21
  176:24 177:7
  179:22 181:21
  183:7 184:25
  188:8,13
  191:21 194:19
  195:16 196:6
  196:24 199:14
  207:6,25 208:4
  208:7,17,24
  209:7,8,12
  210:22 211:2,3
  211:19 215:3
  220:22 221:8
  223:25 225:10
  227:22,23
  228:8 233:7
  238:24 241:9
  242:4 243:21
  243:21 244:20
  249:1 252:2
**thinking** 17:19
**thinks** 209:19
  210:5
**thought** 5:19
  37:13 65:11
  70:25 95:23
  184:6 188:6,7
**thousand** 108:7
**three** 21:19,23
  63:18 66:5
  117:21,22
  118:3 120:5
  121:3 134:9,11
  134:18 135:1,7
  135:17 181:8
  237:13
**threshold** 42:12
  45:16 47:16
  57:8,10 59:18
**throwing** 91:7
**thumb** 217:24
**Thursday** 1:17
  256:4
**tight** 191:2
**tightly** 190:23
  190:25
**time** 8:19 17:1
  19:2 26:8 27:7

289

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 98 of 104
DISCOVERY COURT REPORTERS   www.discoverydepo.com   1-919-424-8242

27:9 105:3
106:18,18,22
113:10 143:3
143:14 159:2
166:2,21,25
167:7 171:8,12
180:9 185:14
215:9 219:5
244:12
**times** 5:15,17,18
5:20 7:21
49:20 108:6,7
108:7,8 192:23
**today** 6:12
125:23 149:11
187:23 188:17
203:14,25
216:1 240:4
**told** 21:12
157:24
**tools** 72:24
230:20 231:1
**top** 14:2 49:18
125:22 155:25
191:25
**topic** 26:2 158:7
199:7 242:3,15
242:20
**total** 193:4
214:15 234:21
**totality** 22:5
49:5 252:21
**traditional**
230:3
**traditionally**
40:6
**training** 8:6
**transcribed**
254:7
**transcript**
254:11
**transcription**
254:9 255:5
**transgender**
154:12
**translate** 206:20
**transmit** 51:13
58:9 97:13
98:15 111:10
232:12

**transmitted**
25:25 98:1
101:10 116:15
**treat** 22:4
157:15
**treats** 88:25
**trend** 178:1,8,9
**trends** 177:9
**trial** 27:2
**trials** 26:8
**tries** 36:9
**trivial** 166:12
**true** 46:1 55:23
77:20 80:12,17
82:6 85:20
135:23 136:2,5
137:23,25
154:6,21 155:3
159:7,8 165:12
169:2 171:1,2
172:24 185:23
186:22 193:12
194:25 195:7
196:22,23
198:5,5 211:23
212:7 215:8
216:5 229:10
230:3 231:4,11
231:12 233:9
233:15 240:19
240:19 254:8
**truly** 87:25
88:24 89:6
**Trump** 40:16
41:7 106:25
107:4 229:13
**trust** 230:9,16
**trustworthy**
104:1
**truth** 5:4,4,5
**truthful** 6:11
**try** 5:25 23:13
34:14 51:23
63:2 151:22
152:3,9 161:14
**trying** 5:25 8:16
23:11 37:1
77:8 91:9
124:18 152:2
161:4 162:4,7

202:9,11
206:20 211:4
212:19 228:23
230:24 239:14
247:19
**turn** 22:22,23
27:11 52:5,18
53:2 67:16,17
69:8 70:21
85:21 92:12
94:15 96:25
101:3 115:4,8
117:18 121:16
131:20 138:9
139:4 156:6
169:11 178:13
180:12,14
187:8 188:25
198:19 200:13
204:3 209:14
213:17 237:9
241:24,24
**turned** 97:2,5,6
203:9 222:8
225:3 226:24
**turning** 139:1
**turnout** 55:13
214:18,23
215:1,1,3,3,4,6
215:19 216:3,9
217:3,11,15,17
217:19,24,25
218:3,13,22
225:17,23
**turns** 209:25
**two** 8:2 10:2,2
14:6 16:19
24:16 33:23
39:7,18 40:23
41:11 42:13
46:24 50:23
51:7 61:18
66:7 79:18,18
79:20 84:17,22
85:3,10 91:22
124:19,22,24
133:20 154:9
158:12 160:15
163:19 166:19
170:15 174:18

179:22,22
181:20 190:5
192:10 199:8
202:11 226:17
234:3 247:21
248:9
**type** 89:1,7
220:17 242:23
**typically** 54:1
104:10 105:20
105:25 106:12
110:19 195:12
195:15 215:17
216:2 226:19
226:23 230:8

**U**

**ultimately** 84:1
94:17 194:16
**unambiguously**
160:16
**unanimous**
161:10,10
**uncommon** 82:3
82:4
**uncontested**
90:25 91:21
**underlies** 247:19
**underlying**
115:4,6
**underreport**
221:3
**understand** 5:24
6:5 22:8 29:4
34:8 38:2 43:8
45:6 46:15
48:8 57:23
59:13,17 62:9
63:6 74:23
102:20 152:3
188:16 195:20
195:21 204:6
212:22 216:24
219:19
**understanding**
36:11 38:20
39:23,25 43:1
45:14 46:18
47:13 60:8
91:18 109:18

160:19 170:10
**understood**
43:19 187:24
247:4
**unexplained**
147:3
**unfortunate**
129:18,19
**unfortunately**
158:6
**unique** 43:6
121:2
**United** 1:1 12:14
12:15,18 41:8
148:19 149:11
**universally**
159:7,8
**University** 8:1,3
8:4,23
**unpolarized**
41:10
**unquote** 179:18
**unrealistic**
208:21
**unrelated**
251:15
**unusual** 171:9
**unwilling** 185:7
**update** 208:6
**updated** 196:4
210:17
**upper** 106:17
107:18 108:2
110:4 212:4,7
212:16
**use** 11:12,25
29:2,7 32:2,9
34:13 40:2
44:20 72:11
90:4 91:2
109:16 113:6
116:11 117:13
129:15 145:24
165:3 180:23
220:7,17 226:4
226:4 232:8,9
**useful** 35:1
80:24 120:11
188:8,19,23,24
209:14 222:25

290

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 99 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

uses 93:13,17
  170:13
usual 89:13
usually 39:4
  62:20 71:22
utility 63:19
utilizing 30:14
  30:14

**V**

v 4:6,9,12,14
  23:10,16 243:3
  256:2
vacation 8:21
vacations 7:24
vague 232:21
validate 29:18
  116:7
Valley 111:19
value 86:24
  106:16 186:1
  187:5 227:16
  227:18 228:10
  228:10,10
  230:18 231:16
values 67:11
  96:21 152:14
  231:8
variability 224:2
  227:9
variable 33:2,15
  33:16,21 34:4
  57:19 143:24
  144:5,12,18
  145:2,20
  146:11,12
  159:5 160:7
  215:5
variables 32:22
  33:1,10,23
  34:5 145:5
variance 161:4,5
  162:14,25
variant 243:8
variation 31:11
  68:4 71:17
  82:23,24 83:2
  106:10 110:25
  159:2 162:3
  194:3 249:24

variations 11:19
  202:6,18
varies 51:5,6
  119:10 214:21
  223:10
variety 34:13
  44:21 84:17
  115:17 116:23
various 6:21
  7:21 8:8 33:7
  49:20 114:6
  115:15 204:16
  204:24 233:12
  233:14 246:22
vary 83:10
  159:23 220:25
varying 108:4
verify 116:3
  209:9
versa 155:16
version 90:24
  170:2
versus 42:20
  54:13 58:12
  108:10 111:19
  125:7,9 132:7
  132:9,19
  134:13 139:19
  139:22 141:8,9
  141:11 171:13
  172:9 182:20
  232:18 244:6
  244:17 245:10
  245:15
vertical 189:10
vice 155:16
victory 213:21
  218:7
Videographers
  3:1
view 32:18 41:21
  41:25 42:20
  48:8,12 61:21
  72:14,16 76:2
  76:25 77:3
  91:16 126:7,10
  154:5 160:24
  170:20 182:12
  196:2 237:22
  241:9 246:15

246:16,21
  247:8
views 48:9
  149:14 150:4
  153:1 161:16
violation 78:8
  151:16
virtually 159:1
  175:3 183:3
vote 36:2 39:9
  41:1,2 55:13
  55:14 71:21
  74:3 82:22
  114:13 116:21
  119:2,16 120:8
  126:23,25
  127:4 129:23
  131:7 132:22
  133:3,16 134:1
  134:20,25
  135:13,20
  137:5 139:7,12
  140:2,12 141:3
  141:13,22
  142:14,25
  145:10,11
  146:13 147:23
  147:24 149:4
  154:1 157:4,7
  157:12,14
  158:4 161:9,15
  167:8,24
  174:23 176:13
  180:16 181:4,9
  183:4 184:24
  189:9,20
  190:14,20
  191:7,11
  192:12,19
  193:14 198:23
  201:18 216:23
  217:4,19 226:2
  226:25 250:13
voted 29:13
  35:22 42:3,4
  121:18 136:14
  137:1,15 138:4
  200:19
voter 27:16 30:8
  30:8 33:6

35:10 50:17
  55:9 60:13,20
  69:21 70:2
  116:6 142:4
  144:1 145:19
  145:22 146:4
  146:11,17
  147:11,12,22
  176:18,22
  182:4,14 183:4
  186:2 187:6
  191:4 220:12
  220:21 222:13
  225:16,22
  226:8 250:8,12
  250:22 251:2,7
  251:17 252:17
voter's 148:8
  249:9
voters 12:13,17
  17:9 22:10,14
  22:21 29:13
  33:4,6 35:16
  35:17,20,22
  38:4,7,9,9,18
  39:8,18 40:3,6
  41:20 43:10,12
  43:14 44:9,10
  44:11 45:17,21
  46:5 47:6,18
  47:19,22 48:2
  48:4,7,14,16
  48:19 50:20,21
  51:1,3 52:13
  52:22 53:8,15
  53:18,25 54:25
  55:18 56:1
  57:15 58:5
  59:11 60:3,11
  60:15,17,22
  61:1,8,15 62:1
  62:2,4,8,12,21
  63:17,22 70:7
  70:12,13,16
  71:19,20 73:14
  74:9 75:1 77:1
  78:7 83:2,8,9
  92:1 109:2,10
  116:20 121:18
  121:23,25

122:14,17,22
  123:15,21
  124:4,12,24
  126:8,12
  129:17,18,21
  129:21 130:2,3
  130:5,7,14
  131:14 132:22
  133:2,15,25
  134:19,24
  135:12,19,25
  136:14,20
  137:1,10,15
  138:4,13,18
  139:7,11,20,23
  140:1,6,8,11
  140:14 141:2
  141:12,16,19
  141:22 142:1
  142:13,24
  143:7,12,17
  145:11,24
  146:21,23
  147:4,7,18,19
  148:1,12,21,25
  149:3,14,15
  150:4,23 151:3
  152:10,15
  153:1,18,21,22
  154:1,4,5,13
  154:19,21,22
  155:3,21
  156:14,15,24
  158:5,23,24
  159:16 161:14
  161:20 162:13
  162:19 165:20
  167:21 169:19
  170:9,24 171:5
  172:7 173:19
  173:20 174:23
  175:3,7,24
  177:1,12 179:3
  179:7 182:3,8
  183:9,11,16,18
  183:21,23
  184:1,3,8,12
  184:14,16,22
  185:1,6,10
  186:12,17

291

Case 4:23-cv-00193-D-RN    Document 127-2    Filed 03/24/25    Page 100 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

191:7 192:11
192:18 196:14
198:16 200:19
201:15 214:17
214:19 215:19
216:4 217:14
220:7,20 222:9
226:13,19
234:15 247:17
248:3,17,20
249:7,13,13,15
250:6,15,21
251:5,11,17
252:5,7
**voters'** 125:3
**votes** 10:21 33:1
35:17 38:14
63:15 167:14
192:15 193:4,5
193:7 194:24
195:5
**voting** 8:15 9:5
11:6,9 12:1,9
12:10,13,16,17
13:2,4,6,11
14:24 20:23
21:14 22:10,15
29:9 38:21
39:2,7,10,15
39:22,24 40:1
40:3,12 41:3,5
41:8,10,18,22
42:5,10,22,24
43:2,3,6,10,17
43:18,21,22
44:13,14,16,23
44:24,25 45:2
45:3,4,5,5,18
46:5,6 47:17
47:20 48:6,13
48:13,15 49:3
50:8,20,23
51:2,5,8 54:6,8
54:15,19 56:1
56:9 57:2,15
59:11 60:3,11
60:18 61:1,9
61:15,15,24
62:2,10,13,19
62:24 63:11,13

64:9,17 65:1
65:15,20 66:1
66:5 67:24
68:8,11,12,23
69:12,19 72:4
72:17,18 73:10
74:1,19 75:10
75:16,18 76:1
76:4,5,6,12,18
76:22 77:1,12
77:14 78:9,12
78:17,22 79:10
80:1,4,6,20,20
81:17,21,24
82:7,9,10,25
83:2,15 84:2,3
84:8 85:17
92:17 93:2
113:19 117:5,8
118:1,12,13,20
119:8,9,10
127:7,8,21
128:21,21
129:6,9,10,15
130:2,3,4
131:9,9 136:21
137:10 140:14
142:7 145:21
145:25 146:16
146:25 147:13
148:18,19,25
149:25 151:17
152:5 158:19
159:19 161:1
163:3 164:1
165:10 166:23
168:20 169:1
169:18 170:8
170:23 171:4
172:6,18 177:9
178:2,5,11
180:20,22
182:8 184:15
184:21,23
185:2,5,19,20
185:23 191:3
201:16 219:13
219:15 220:3,6
226:17,22
242:10 243:14

248:17,20
249:14,15,18
**VRA** 8:15 10:8
10:16 18:12
20:5,12 21:6
48:21 53:17
233:1,6 237:3
238:5
**vs** 1:6

---

## W

**W** 255:1
**wait** 6:1
**walk** 189:5
**want** 6:14 30:19
35:8 41:16,24
51:20,22 59:13
60:21 67:1
72:9,21 75:6
76:8,8 79:15
79:24 91:11
92:9,21,23
101:25,25
104:22 110:14
137:4 139:15
151:1 162:4,24
164:14 167:10
180:14 181:18
188:16 209:10
216:19 217:21
227:19 241:24
247:14
**wanted** 10:12
100:23 113:7
**wants** 57:4
**Washington** 2:5
2:15 17:23
18:2,5 22:3,13
22:17 237:7
**wasn't** 95:8
102:3 103:7
110:13 207:11
209:10 212:6
222:10 226:10
226:13 241:19
**way** 11:3 13:17
18:23 21:11
36:23 40:22,22
41:1 42:3,11
57:17 59:25

66:15 67:8
72:20 73:8
77:17 81:11
83:18 90:17,19
90:19 93:11
96:16 118:9
129:5 160:24
161:3,22
171:25 179:2,5
185:10 197:9
209:12,24
224:13 227:7
227:23 230:25
239:24 242:17
247:5
**ways** 25:3 40:24
44:21 47:25
83:25 108:15
238:16 246:22
**we'll** 16:8 30:25
51:23,24 196:1
249:1
**we're** 32:24 33:2
33:5 34:19
36:25 40:9
41:24 53:22,23
57:18 58:18
62:9 65:10
67:17 68:18,18
69:11 72:10,13
75:7 85:7
86:21 88:5,5
89:2,4 91:1
92:23 102:19
103:12 106:14
108:17,24
120:21 122:7
123:5 124:7
131:3,6 139:16
141:15 142:16
142:18,19
145:13,13
147:18,21
154:8 156:25
158:7 159:18
161:24 171:11
171:12,14
173:3,5,6
177:18 180:23
181:11 183:14

191:5 199:6,7
206:9 208:7,24
214:7 223:24
224:11 227:9
227:12 228:23
236:11,11,13
242:2 251:1
252:9,17
**we've** 7:22 40:7
42:6,17 47:16
50:7 51:17
58:18 71:13
104:12 115:24
156:21 158:8
169:9 191:9
204:14 207:8
239:4 242:1
**weakly** 122:11
**week** 27:2
240:13
**weighted** 203:5
**weirdly** 49:1
**went** 155:2
**weren't** 40:6
226:6
**West** 10:8
**white** 22:10,21
29:12 30:8
33:5 35:21
38:5,7,8,16,16
41:20 43:2,3
43:4,16,17,21
43:21 44:10,12
44:14,16,23,23
45:2,5,24 46:4
46:6 47:19
48:3,6,6,13,14
50:21 51:1
56:1 57:15
59:11 60:3,11
60:13,15,17,20
60:22 61:1,8
61:14,15 62:2
62:7,13,19
63:13 64:9,17
65:1,15,20
66:1,5 67:24
68:7,11,12,23
69:12,24 70:3
70:7,12,16

292

71:20 72:18
73:10,13 74:9
75:1 77:1 78:6
78:17,22 80:4
80:6,20 81:16
81:20,24 82:6
82:9,10 83:2,8
83:15 84:1,8
114:13 116:20
119:8,10,15
120:24,25
121:17 122:12
122:16,19
123:2,6,16,23
124:6,13 126:9
126:24 127:10
129:20 130:2,6
130:6,7,14
131:14 132:8,9
132:12,20,21
133:2,3,15,20
133:21,24,25
134:1,10,13,19
134:24,25
135:8,12,18,18
135:20,24,24
135:25 136:8
136:14,20
137:1,10,11,15
138:4,13,18
139:7,8,11,12
139:18,19,19
139:22,23
140:1,2 141:2
141:4,12,14,22
141:23 142:4
142:13,14,24
142:25 143:7,7
143:12,17,18
146:22 147:7
151:2 153:22
154:22 156:14
156:14,23
157:4,17,18
158:5,24
159:16 161:14
161:20 162:12
163:3 169:19
170:8,24 171:5
172:6 173:19

175:6,17,25
176:2,7,8,9,10
176:16,18,20
177:3,14 178:1
178:4 182:20
184:9,14,14,15
184:18,20,22
184:24 185:1,2
185:5,6,9,13
185:18,23
186:18 191:7
198:16,23
200:19 201:15
201:16 214:18
215:4,6,19
216:3 249:15
250:14 251:6
251:12 252:5,6
252:7
**whites** 39:9 42:4
71:3 74:3
216:9
**widely** 218:1
**wildly** 159:24
180:3
**win** 162:23
194:5,13
205:17 206:8
219:3
**window** 7:8,10
**winning** 44:11
191:15
**Wisconsin** 4:12
232:18,22,25
233:5
**withdraw** 123:9
**witness** 13:15
20:8 23:6 26:8
30:5,12 37:11
43:25 50:19
61:4 63:1
68:17 69:2,23
71:6 72:1,9
73:19 74:14
75:6,22 78:16
79:1,15 80:10
80:15,23 82:20
84:16 85:7
86:15 91:7
104:3 112:20

114:23 118:6
118:18 120:10
126:15 128:3
129:14 130:17
131:18 136:4
136:17 137:4
137:18 143:21
149:18 150:8
151:1 153:4
154:8 163:8
164:10 168:3
168:23 174:4
175:11,21
177:7,17 186:4
188:5 197:22
201:10,23
210:14 211:15
214:21 218:10
218:16 223:7
236:7 240:11
242:12 249:11
250:10,25
251:10,23
254:9 256:3
**witness's** 254:5
**wood** 27:19
**word** 72:11
170:13
**words** 142:22
**work** 8:14 11:2
11:6,8,11,14
11:24 12:6,12
12:16,19 14:20
14:22,22,25
15:1,1,5,14
18:12 19:3,5
20:4,11 21:18
21:22 24:13
27:6 31:6 81:8
93:22 104:8
151:21 152:9
207:6 210:9
212:1 219:15
221:24,24
223:21 224:5
**worked** 53:17
93:9
**working** 10:14
18:16,20 24:15
24:17 31:9

94:3 104:14
**works** 18:23
**world** 106:16
108:10 230:12
**wouldn't** 19:15
32:4 51:8
56:24 66:10
91:1 102:14
116:24 121:12
121:12 122:25
126:4,5 166:4
166:18 167:1
176:12 220:22
246:3
**wrestled** 243:11
**writing** 27:3
28:11,21
**wrong** 65:8
102:4 124:10
228:23
**wrote** 170:13

**X**

**x** 93:20,25 110:1
110:15 189:6
254:11

**Y**

**Y** 189:6
**yeah** 8:16,19
22:11 41:24
50:19 58:25
59:16 63:1
66:12 68:11,17
79:1,5,23 94:3
98:11 101:17
101:25 102:9
105:14 119:4
136:4 140:19
153:15 154:17
174:4 177:17
178:7 193:22
209:18 215:24
248:13
**year** 40:10
118:14 142:9
142:11
**years** 8:9 13:19
13:21 14:1,23
18:9 20:15

52:25 53:11
55:20 56:15
69:19 78:13
80:12 94:4
117:22 118:3
118:12,14,20
120:5 135:22
148:16 164:19
164:21 174:15
201:8
**Yep** 200:16
**young** 7:22

**Z**

**Zimmer** 48:24
49:6
**Zoom** 1:11 5:21
7:8,10

**0**

**1**

**1** 4:3 9:9,11
22:23 23:2
25:24 42:3,4
42:17,20,21
43:22 47:4,8
49:17 50:9,16
52:10,13 56:6
56:8 62:17
63:7,8,16 64:6
64:10,22 65:2
65:16 66:6
67:4 68:8,15
71:23 78:14,23
79:11 80:7
87:3,23 88:19
92:19 93:4
114:18,20
115:12 116:19
117:18 119:18
123:15,23
124:6 125:6,20
132:24 133:18
134:2,22
135:15 138:1
140:17 142:3,8
142:12,19,24
143:5,16
173:21 175:8

293

Case 4:23-cv-00193-D-RN   Document 127-2   Filed 03/24/25   Page 102 of 104
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

175:19 176:15
176:19,22
177:2 181:6,13
181:16,25
191:23 193:1,6
203:1,15,18
204:1,16,24
206:2 213:20
218:6 221:14
221:22 226:4,9
235:13 240:7
240:25 241:4
241:21
**1:30** 113:12
**10** 52:18 68:21
71:7,8,8
118:22,24,25
119:2,11
189:18 201:17
**10,000** 108:7
**10:11** 1:16
**100** 13:18
176:12 192:10
**1000** 3:3
**1050** 2:14
**11** 53:3 69:8
70:19 111:22
111:24 138:9
141:8,9,11
142:2 202:18
**11.6** 71:4
**11.61** 200:19
**11/2/2022** 4:14
**11:07** 52:1
**11:17** 52:1
**1100** 2:14
**111** 4:10
**12** 46:15 53:3
69:9,10 70:21
131:20 141:8,9
141:11 142:1
200:13 202:10
202:12 204:15
204:23 233:10
233:17
**12-county**
201:24 202:5,5
202:17
**12/13/2023** 4:5
**12:51** 113:12

**13** 23:16 133:7
139:1 198:24
209:12 210:18
211:7 213:17
213:25
**14** 134:4 139:4
156:6,8,18
198:20
**1400** 2:19
**146** 193:7
**15** 64:3,13 71:8
71:9 86:8
135:3 141:1
198:22 205:8
213:24 214:6,7
**15907** 7:16
**16** 64:1,12
139:24 187:8
187:11 191:17
**17** 139:20,21
188:25
**18** 59:8 64:21
65:10,13
157:20 188:25
199:15
**1801** 2:8
**19** 1:17 65:18
169:11 256:4

————————

**2**

**2** 4:4 10:10,16
16:11 43:9,22
45:11,15,16,20
45:25 47:4,8
47:10,16,19
48:22,25 49:1
49:6,17 50:9
50:16 51:14
52:2,7,9,19,25
56:17 58:1
59:23 60:12
61:23,23 62:12
62:14,15 63:7
63:10 64:6,10
64:23 65:2,16
66:2 68:4,23
71:24 77:10
78:14,24 79:12
80:8 87:3,23
88:19 92:19

93:4 114:18
117:6 119:19
121:16 122:18
125:7,14 128:6
132:24 133:18
134:2,22
135:15 138:1
139:11,20,23
140:2,22
142:12,19,24
143:6,16 161:1
173:21 175:8
175:19 176:16
176:19,22
177:3 180:13
181:5,13,16
182:1 183:15
189:6 191:23
192:18,23
193:6 198:8,13
199:2 203:5
220:5 221:19
221:24 226:5,6
226:21 237:3
241:8,22
242:24 247:3
**20** 14:1 65:1,15
65:20 70:6,18
71:8,9 94:4
182:1 214:10
214:12,15
226:19,24
**200** 192:18,23
**2000** 16:25
**20001-3743** 2:5
**20036** 2:19
**2016** 50:1 52:15
68:3,8,14,24
69:13 71:10
86:1 87:10
99:18 109:3
114:8 118:2,11
119:16,23
121:19 131:23
132:10,11,13
132:15 133:4
136:20 137:8
138:4,11,17
178:5,16
179:14 180:9

199:3 200:21
201:1,4,18
237:16
**2018** 50:1 52:16
66:2,6 67:20
67:25 71:9
86:1 87:10
100:12 101:20
119:23 133:9
136:13,25
137:9,14 139:1
**202** 2:6,15 4:11
**2020** 50:2 52:16
64:23 65:2,15
65:20 71:8
86:1 87:11
100:12 101:20
118:2,11
119:23 134:5
136:13,25
137:9,14 139:4
139:13 140:1
156:11 191:12
198:12,23
203:22 204:7
214:2,13
237:16
**2022** 50:2 52:15
64:6,9,18 71:2
71:6 86:1
87:11 100:13
101:20 114:8
118:3,11
119:16,24
121:19 135:4,7
135:12,18
136:14 137:1,9
137:15 141:2
141:12 200:20
201:18 204:8
214:2,14
**2023** 58:24
191:23
**2024** 1:17 9:5,6
10:1 88:11,13
88:17 201:7
254:19 255:9
256:4
**20s** 71:16
**21** 69:17 202:17

214:12,15
225:17
**21.02** 200:21
**22** 65:23 214:1
**232** 4:12
**236** 4:14
**24** 67:16,18
215:15
**25** 70:6 71:16
183:10 225:11
228:8,9 234:4
**25-2** 65:6 66:8
**25-6** 65:7
**25.9** 234:2
**25.92** 68:18
**26-1** 65:7
**26-2** 66:7
**26-7** 65:7
**27** 214:10,13,15
**27-2** 65:6
**27602-1801** 2:9
**27603** 2:20
**27609** 3:3
**28** 64:3
**28-2** 65:7
**28-4** 65:7
**29** 64:1,12 214:1
**29-1** 65:7

————————

**3**

**3** 4:5 27:11
45:12 47:14,15
48:22 49:1,5
52:18 58:10,14
60:13,21 61:10
62:18,19 63:6
63:21 68:21
72:5,6 73:14
73:16 74:10,11
75:2,3 76:2,23
76:23,25 117:6
125:8 128:7
161:8 184:19
185:5 199:2,14
199:15,21,24
200:11 220:5
221:19,24
226:5,6,21
229:15 241:9
241:22

294
Case 4:23-cv-00193-D-RN     Document 127-2     Filed 03/24/25     Page 103 of 104
DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

3:28 199:12
3:37 199:12
30 65:11,12 70:7
70:16,18,20
71:10 119:11
300 193:4,7
301 2:19
30s 213:1
31 9:19 64:21
65:10,13
32 65:18
329-3800 2:20
34 233:17,25
35 65:23 233:17
234:14
36 67:16
37 67:18 191:14
192:11,19
193:13 194:23
195:2,5,8,13
196:11,21
197:9,24 198:3
203:21 211:24
212:7 213:9
38 111:22
39 13:19

**4**

4 4:7 53:2 69:8
70:21 97:14,15
101:3 119:14
131:20 132:19
237:9,10
4:23-CV-0019...
1:2
4:45 242:7
4:54 242:7
40 14:23 56:15
203:21 207:9
212:3
42 212:3
4208 3:2
424-8242 3:4
45 118:25
46 212:3
47 192:19,23
206:22 207:4
208:20 212:1
212:13 213:8
213:10

47.07 204:11
205:10,14,21
209:3
48 41:6 49:22
186:10 229:14
49 157:9 174:15
229:13

**5**

5 3:11 4:8 98:16
98:20 106:18
133:7,14
189:13,20,24
201:20 219:8
228:5
5:05 249:3
5:08 249:3
5:16 253:6
50 5:18,20 26:24
26:24 42:3,4
42:17,20,21
56:8 63:9,16
67:5,5 109:8
148:16 173:6
189:15 190:1,8
190:14 191:13
191:16 193:14
194:4 195:23
197:1,1,10,13
200:5 206:2
207:5,6 208:2
208:4 211:17
212:12,25
213:8,20 214:5
214:16 218:6
224:22 225:4
225:12 227:3
228:11 231:7,9
231:15,16,22
231:24,25
232:2,3,6,8
236:13,13
237:12,24
238:21 239:1
239:10
50,000 230:24
50.2 237:20
51 109:5 213:20
52 4:4 41:6
192:12,15

193:5 228:12
53.6 238:19
55 119:1
58 4:6

**6**

6 4:9 111:11,12
117:19 134:4
134:18 156:6,7
165:4,5 198:20
203:1 215:12
215:13,15
234:16
6.06 234:21
60 42:10,11 57:5
57:8
601 2:5
649-9998 3:4

**7**

7 4:11 114:20
115:12 116:19
121:16,22
135:3,11 141:1
180:13 202:21
202:22 203:18
70 137:10 181:5
74 68:9,14,19
74.8 66:10
75 55:25 56:19
56:21 57:11,13
58:2,2 59:9,18
59:20,21 60:1
60:24 64:8,16
64:25 65:14,19
65:25 66:4,11
66:14,15 67:2
67:3,4,4,11,12
67:15,23 68:25
69:6,14 71:15
133:25 137:22
138:7 180:23
180:25 181:1,9
181:23 182:5
183:6 225:25
77 133:2 135:19
78 180:16
783-6400 2:9
79 69:17

**8**

8 4:12 178:13
182:4 232:13
232:14
80 57:4,10
134:24 137:10
157:7 189:16
80s 13:23
82 133:3
83 134:1 181:4
8340 1:25 3:2
254:3,22
85 135:19
189:17
86 134:24
156:15 157:3
157:12,14
861-1500 2:15
8th 254:19

**9**

9 4:3,13 52:5
68:5 236:21,22
90 40:17,20,21
40:22 57:5
90s 13:23
919 2:9,20 3:4,4
94 52:15 59:1
135:13 192:25
193:6
942-5000 2:6
95 54:1,4,7,13
54:15 106:13
106:17 107:19
107:25 110:5
119:9 125:12
192:24 228:5
232:9
96 123:17 124:1
124:9 125:7,9
97 4:7 52:15
161:5
98 4:8 52:15,24
53:10,20 54:4
54:9,13 105:1
109:4,11
123:19 124:1,9
125:2,6,9
126:9 133:16
134:20 161:5

183:1
99 52:24 53:10
53:21 122:20
122:24 125:5
128:6 132:22
133:16 134:20
135:13 161:5
174:23 183:2
234:21