# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION

| | |
|---|---|
| RODNEY D. PIERCE and<br>MOSES MATTHEWS,<br><br>                  Plaintiffs,<br><br>   v.<br><br>THE NORTH CAROLINA STATE BOARD<br>OF ELECTIONS, *et al*.,<br><br>               Defendants. | Case No. 4:23-cv-193-D |

## LEGISLATIVE DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO SUPPLEMENTAL OPINIONS OF DR. JOHN ALFORD

Plaintiffs' objections to the motion to admit supplemental opinions of Dr. Alford are an untimely attack on this Court's Scheduling Order that governs post-trial matters. (*See* D.E. 113). Plaintiffs complain that Dr. Alford presented new information "after *trial* concluded," (Pls' Obj. at 1), but seem to forget that experts for *both* sides presented information after trial concluded because the Court's Scheduling Order expressly directed two simultaneous exchanges of post-trial expert reports as the parties had jointly proposed (D.E. 112). Plaintiffs contend that the supplemental reports to be filed after trial had to be limited in scope to the types of analyses each respective expert performed before trial, but this misreads the order, which contains no such limit, and Plaintiffs' expert presented new analyses unlike those previously performed. Moreover, Dr. Alford's opinions directly contradict and rebut the analyses offered by Plaintiffs' expert, Dr. Collingwood, and therefore were properly submitted at the rebuttal stage. Rebuttal opinions are not normally restricted by the types of analyses in a rebuttal expert's prior reports, and Plaintiffs provide no good reason why such a restriction should apply here. Finally, Dr. Alford's Rule 26(e) Supplement corrected an inadvertent error in his Supplemental Rebuttal Report, as required by the

rules. For these reasons, and those addressed below, Plaintiffs' objections should be overruled, and LD76 and LD77 should be admitted.

## ARGUMENT

### I.     Parts A and C of Dr. Alford's Supplemental Rebuttal Reports Are Proper Rebuttal Opinions.

Plaintiffs object to the opinions contained in Parts A and C of Dr. Alford's Supplemental Rebuttal Report. But they concede the Court's Scheduling Order directed the parties to serve "[r]ebuttals to the . . . supplemental reports" on March 7, 2025. (D.E. 113 at 1). Plaintiffs do not deny that Dr. Alford's supplemental rebuttal report was served on March 7. Parts A and C (and the remainder of the Supplemental Rebuttal Report) present admissible evidence. Plaintiffs' objections lack merit.

"Pursuant to Fed. R. Civ. P. 26(a)(2)(D)(ii), a party shall disclose any rebuttal or surrebuttal reports solely to contradict or rebut evidence on the same subject matter identified by the other party." *United States v. Thompson*, No. 5:15-HC-2253-FL, 2015 WL 13857160, *2 (E.D.N.C. Oct. 29, 2015). The scope of "rebuttal" evidence "is defined as 'evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party.'" *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (quoting Black's Law Dictionary 1267 (6th ed.1990c)). Accordingly, "[a] rebuttal or reply expert report is proper if the intent of the report is 'solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report.'" *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001 (D. Del. 2013) (citation omitted).

Dr. Alford's opinions directly contradict and rebut Dr. Collingwood's opinions. For his March 7, 2025, Supplemental Rebuttal Report, Dr. Alford was "asked by counsel to examine and respond to the February 28, 2025, Supplemental Report provided by the plaintiffs' expert, Dr. Loren Collingwood (the 'Supplemental Report'), and the associated data and materials provided

in that disclosure, concerning the 2024 elections in North Carolina." (LD76 at 2, D.E. 122-1 at 12). Part C of Dr. Alford's report rebuts Dr. Collingwood's BVAP analysis, and Part A of his report explains the differences between his EI estimates and Dr. Collingwood's EI estimates.

1. **Part C.** Part C of Dr. Alford's Supplemental Rebuttal Report directly contradicts opinions in Dr. Collingwood's Supplemental Report. In that report, Dr. Collingwood offered the new opinion, based on 2024 election data, that "the BVAP estimate required to, on average, narrowly elected a Black-preferred candidate is updated to 47.7%." (PX279 at 20, D.E. 122-2 at 21). Dr. Alford reviewed Dr. Collingwood's updated analysis, and in response he "estimated the BVAP needed to win based on the 2024 elections" using a methodology published and used by other experts in voting rights cases. (LD76 at 12, D.E. 122-1 at 22). Dr. Alford's BVAP analysis showed an average of 42% BVAP needed to win in Dr. Collingwood's 12-County Demonstration Area. (LD76 at 15-16, D.E. 122-1 at 25-26).

That analysis directly contradicts Dr. Collingwood's estimate of 47.7%, and contradiction is the *sole* purpose for which it is offered. Legislative Defendants have explained that, if a majority-Black district is unnecessary, the third *Gingles* precondition is unmet. (D.E. 125-1 ¶¶ 49-50). Dr. Collingwood's figure shows that a majority-Black district is not required, and Legislative Defendants do not have the burden of proving this any further. The point of introducing an estimate below 47.7% is to contradict Dr. Collingwood's estimate and show it is too high. (*See id.* ¶ 50 ("And that estimate is too high to be credible….")). That is rebuttal opinion in its purest form.

The difference between Dr. Alford's figure and Dr. Collingwood's arises because Dr. Collingwood only considered the voting behavior of Black and white voters, whereas Dr. Alford analyzed the voting behavior of Black and non-Black voters. (*See* LD76 at 13, D.E. 122-1 at 23). Dr. Alford's choice is methodologically superior because it better reflects the true reality of

3

electoral environments: white and Black voters do not square off in two-race elections. All voters of *all* races can participate in all elections. Accounting for this reality made a significant difference in the estimate because the crossover voting of white voters alone (roughly 15%) was significantly lower compared to the crossover voting of all non-Black voters (roughly 23%). (LD76 at 15, D.E. 122-1 at 25). When the crossover voting of all non-Black voters is considered, the average BVAP needed in the Demonstration Area is 42%, several points lower than Dr. Collingwood's estimate of 47.7%. (LD76 at 15-16, D.E. 122-1 at 25-26).

Plaintiffs advance several arguments in support of excluding this analysis, but none of them are availing.

First, Plaintiffs incorrectly argue that Dr. Alford could have provided these opinions "in his initial disclosure" or in "his initial supplemental report." (Pls.' Obj. at 17). Not so. Dr. Alford's BVAP analysis responds to the BVAP analysis presented with Dr. Collingwood's Supplemental Report, which was served February 28, 2025. Dr. Alford could not respond to that updated analysis until it was produced. Dr. Alford "directly address[ed] the methods" used by Dr. Collingwood, and he "could not fully form" his opinions about Dr. Collingwood's updated BVAP analysis "until [Dr. Collingwood] produced his report and the data underlying it." *McKiver v. Murphy-Brown LLC*, No. 7:14-CV-180-BR, 2018 WL 1832964, at *2 (E.D.N.C. Apr. 17, 2018).

Second, Plaintiffs argue that Dr. Alford performed a "new analysis." (Pls.' Obj. at 18). But "rebuttal and reply reports 'may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert.'" *Withrow*, 967 F. Supp. 2d at 1002 (quoting *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013)); *In re Genetically Modified Rice Litig.*, No. 4:06MD1811 CDP, 2010 WL 4483993, at *3 (E.D. Mo. Nov. 1, 2010) ("An expert may

introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert."); *Kirola v. City & Cnty. of S.F.*, No. C-07-3685 SBA (EMC), 2010 WL 373817, at *2 (N.D. Cal. Jan. 29, 2010). As explained, Dr. Alford's analysis was not intended to prove anything affirmative about case issues; it makes no sense other than as an effort to impeach Dr. Collingwood's opinions.

Third, Plaintiffs erroneously argue that Dr. Alford's BVAP analysis improperly seeks to "make 'new arguments'" that put on Legislative Defendants' "'defenses.'" (Pls.' Obj. at 17 (quoting D.E. 91 at 4)). It is true that "[a] proper rebuttal report responds to the opposing party's expert reports—not its claims or defenses." *Pierce v. N.C. State Bd. of Elections*, No. 4:23-CV-193-D, 2024 WL 5170738, at *2 (E.D.N.C. Dec. 18, 2024) (citing *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, No. 2:14-CV-8, 2021 WL 1555776, at *2 (E.D.N.C. Apr. 20, 2021)). "[R]ebuttal evidence may be used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (citation omitted).

But that did not happen here. It was Plaintiffs who first offered a BVAP analysis in their case-in-chief to make their showing under the third *Gingles* precondition. (*See* PX36; Pls.' PFOF ¶¶ 126-129, D.E. 126). Legislative Defendants do not have the burden of proof on any of the *Gingles* preconditions. Dr. Alford's opinions instead "respond directly to" Dr. Collingwood's new analysis, *Pierce*, 2024 WL 5170738, at *3, and "attack[] the theories offered by" Plaintiffs, *Funderburk v. S.C. Elec. & Gas Co.*, No. 3:15-CV-04660-JMC, 2019 WL 3406814, at *3 (D.S.C. July 9, 2019) (citation omitted). Specifically, Dr. Alford responds directly to Plaintiffs' claim that "[t]he minimum BVAP necessary for a district to perform for Black voters in the Black Belt region is 47.7%." (D.E. 126 at 74). Dr. Alford's BVAP analysis showing an average of 42% BVAP to

5

provide equal opportunity directly contradicts Dr. Collingwood's assertion that 47.7% is needed instead.[1]

Fourth, Plaintiffs analogize this situation with their own misguided effort to present a new demonstration plan in a rebuttal report, which this Court correctly rejected. (*See* Pls.' Obj. at 16-18 (citing D.E. 91)). The analogy fails. Plaintiffs' new demonstration district was improper because it "respond[ed] to nothing." *Pierce*, 2024 WL 5170738, at *3. Legislative Defendants' expert, Dr. Trende, made criticisms and cited deficiencies in four demonstration districts presented in Mr. Esselstyn's opening report. Rather than address those criticisms regarding the four existing plans, Mr. Esselstyn presented a *new* plan that was alleged to prove the first *Gingles* precondition standing alone. This Court correctly held that evidence making an affirmative case showing should have been in the opening reports. Notably, however, Dr. Trende did not offer an opinion, as Plaintiffs had claimed, on whether "it is possible to draw a reasonably configured majority-Black district using 2022 figures." (D.E. 88 at 9). Dr. Trende criticized the four districts previously presented. Thus, a *new* district did not respond to Dr. Trende.

The present scenario is different. Dr. Collingwood offered the opinion that the BVAP needed to provide equal opportunity for the Black-preferred candidate in the 12-County Demonstration Area is 47.7%. Dr. Alford's Supplemental Rebuttal Report directly contradicts that

---

[1] Dr. Alford also conducted his BVAP analysis on SD1, SD2, the Pitt-Edgecombe grouping, and statewide to show how the BVAP estimate of Dr. Collingwood's Demonstration Area compared to the BVAP needed at the district-level, the county-grouping level, and across the state. (LD76 at 16, D.E. 122-1 at 26). He found "[a]cross the area of the state, the BVAP needed to win for Black preferred candidates (Democrats) is in the low 40% range, well below the high 40% range that Dr. Collingwood reports for his Black versus white analysis." (LD76 at 15, D.E. 122-1 at 25). This further contradicts Dr. Collingwood's view that 47.7% BVAP represents the BVAP needed to create equal electoral opportunity.

opinion by showing the BVAP needed is actually 42%. Contradiction is the sole point of this analysis.

**2.     Part A.** Part A of Dr. Alford's Supplemental Rebuttal Report also responds to opinions offered by Dr. Collingwood. That section explained that Dr. Alford had offered his own EI estimates of the 2024 elections in his Supplemental Report, and now was "provid[ing] a comparison of" those estimates "to those reported by Dr. Collingwood in his Supplemental Report." (LD76 at 2, D.E. 122-1 at 12). This approach differed from that of Dr. Alford's initial report, where he relied on Dr. Collingwood's EI estimates because Dr. Alford's "replication produced substantively similar results." (*Id*.). Dr. Alford explained that "[t]he same can be said for the 2024 EI results" and that his conclusions were not changed "based on the relatively slight differences." (*Id*.). However, Dr. Alford explained the differences were "noticeable," and while they "may not have any significant impact on the comparisons between Black and White candidates discussed below, they could have a larger impact on the BVAP analysis discussed later in this report." (*Id*. at 3, D.E. 122-2 at 13).

Because Dr. Alford had offered and relied on his own estimates, and because Dr. Collingwood's estimates were showing slight but noticeable differences, Dr. Alford offered an explanation for the cause of those differences. He explained that "the small differences between the results in [his] reports and those in Dr. Collingwood's reports are not random; they appear to be due to a difference in choice of methodology." (*Id*. at 2, D.E. 122-1 at 12). Specifically, Dr. Alford explained that Dr. Collingwood's estimates were based on an older version of the EI technique, while Dr. Alford relied on the "preferable non-iterative RxC technique" developed by Dr. King and colleagues for estimating "larger (RxC) tables, like what we have here." (*Id*. at 2-3, D.E. 122-1 at 12-13).

Dr. Alford's opinions regarding EI estimates are plainly admissible. As an initial matter, Plaintiffs have *not* objected to the EI estimates of Dr. Alford's Supplemental Report, so it is a mystery how Dr. Alford's subsequent explanation of the differences between his EI estimates and Dr. Collingwood's could be improper. This is the most pedestrian of rebuttal opinions—to explain to the Court why the numbers in the prior reports, running a similar analysis, do not match. One can only imagine the confusion that would result if such quotidian observations were banned. In all events, Dr. Alford's opinions directly respond to Dr. Collingwood's by explaining why Dr. Alford's approach is "preferable" to Dr. Collingwood's. That opinion serves no purpose but a response to Dr. Collingwood.

Plaintiffs claim this opinion contradicts Dr. Alford's prior testimony and reliance on Dr. Collingwood's estimates at other junctures of this case. (Pls.' Obj. at 11-13). This is incorrect. As an initial matter, Dr. Alford's opinions would be proper rebuttal in any event, regardless of what occurred at prior junctures, for reasons explained below (§ III). Moreover, there is not a contradiction between Dr. Alford's opinions in Part A and his prior approach.

First, Dr. Alford's use of RxC is not new, (*see* LD59 at 4-5), and Dr. Alford has always disclosed his methodology and underlying data. In fact, he explained in detail the evolution of the EI methodology, and that he was relying on a version of "EI R x C" that "implemented the fully Bayesian estimation procedure outlined by" Dr. Gary King that was "a more advanced theoretical approach." (*Id.*).

Second, Dr. Alford was not in a position at this juncture to adhere to his prior approach of relying on Dr. Collingwood's estimates because Dr. Alford did not have them. Dr. Alford relied on Dr. Collingwood's EI estimates in his August 16, 2024, initial report to "avoid confusion over whether [his] conclusions detailed below depend in any way on methodological or data

8

differences." (*Id.* at 5). That same approach was not possible here because the supplemental reports relating to the 2024 elections were exchanged simultaneously on February 28, 2025. Dr. Alford did not have, and therefore could not rely on, Dr. Collingwood's estimates at the time of his Supplemental Report. Dr. Alford instead affirmatively presented his own EI estimates in that report and based his opinions on those figures. He then compared his EI estimates with those of Dr. Collingwood's, observed there were "slight" yet "noticeable" differences, and offered a methodological explanation for those differences. (LD76 at 2-3, D.E. 122-1 at 12-13). Dr. Alford also concluded that his conclusions about the impact of the race of the candidate were not changed based on these differences. (*Id.* at 2, D.E. 122-1 at 12).

The 2024 supplemental reports thus presented different circumstances than the prior reports—each expert had simultaneously submitted their own EI estimates, and there were "noticeable" differences between the estimates that required further explanation. There is nothing improper about a rebuttal expert opinion given to "explain" evidence by the opposing party. *Stitt*, 250 F.3d at 897.

Dr. Collingwood apparently agreed that these "slight" differences warranted explanation. Dr. Collingwood admitted at trial that he did not find errors in Dr. Alford's "mathematical calculations" in his initial report, (Day 3 AM Tr. 76:17-22), and Dr. Collingwood did not previously offer any criticisms of Dr. Alford's methodology. Yet, in his Supplemental Rebuttal Report, Dr. Collingwood offered his own explanations of the differences in estimates and criticisms of Dr. Alford's methodologies. (*See* PX280 at 3, 4-5, D.E. 122-2 at 30, 31-32). Plaintiffs cannot immunize Dr. Collingwood's supplemental reports from scrutiny while at the same time offering new criticisms of Dr. Alford.

Notably, Plaintiffs move to exclude the entirety of Part A of Dr. Alford's Supplemental Rebuttal Report, but they only address the portions of Part A relating to the EI methodology. Plaintiffs do not address the remainder of Part A comparing the experts' EI estimates and conclusions about the impact of candidate party versus candidate race. (*See* LD76 at 4-7, D.E. 122-1 at 14-17). There is no basis to exclude these opinions, and they should be admitted.

## II. Dr. Alford's Rule 26(e) Supplement Was Required by Rule 26.

Plaintiffs also object to Dr. Alford's Rule 26(e) Supplement, but it was not only permissible but also required. Rule 26 requires a party to "supplement or correct its disclosure" when "the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A); *see also* Fed. R. Civ. P. 26(e)(2) (extending the party's duty to supplement to information in expert reports).

As discussed above, there were "slight" but "noticeable" differences between Dr. Alford's EI estimates and those provided by Dr. Collingwood. (*See* LD76 2-3, D.E. 122-1 at 12-13). Dr. Alford observed that there was a "general tendency for Dr. Collingwood's estimates to show slightly higher Black cohesion and slightly lower White crossover when compared to my estimates." (*See id*. at 3, D.E. 122-1 at 13). Dr. Alford's Supplemental Rebuttal Report then referenced an exit poll conducted by the New York Times as a comparison, explaining that the exit poll's estimates for the 2024 Presidential Election between Kamala Harris and Donald Trump were "roughly comparable" to Dr. Alford's estimates, while Dr. Collingwood's estimates showed lower white support for Harris and lower Black support for Trump. (*Id*.).

After Legislative Defendants learned the reference to the New York Times exit poll was incorrect—because it was for the 2020 election, not the 2024 election—they immediately corrected

the error and provided the correct 2024 polls and figures to Plaintiffs.[2] Dr. Alford's Rule 26(e) Supplement explained that the correct exit polls were "still closer" to Dr. Alford's EI estimates than Dr. Collingwood's for the 2024 Presidential Election, as had been the case in the Supplemental Rebuttal Report. (LD77 at 1, D.E. 121-1 at 2). The Supplement also made clear that "[t]he incorrect citation in no way alters my analysis or conclusions reached in my Supplemental Rebuttal Report." (*Id*.).

Once Legislative Defendants learned that there was an "incorrect" reference in Dr. Alford's Supplemental Rebuttal Report, they had a duty to "supplement or correct" that reference. Fed. R. Civ. P. 26(e)(1)(A). "Correcting an inadvertent error" is plainly within the scope of a proper supplemental report. *Pierce*, 2024 WL 5170738, at *3 (citing *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013), *aff'd in part sub nom. EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015)); *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008) ("Supplementation of an expert report permits a party to correct inadvertent errors or omissions.").

Plaintiffs object to the addition of "new polls" in the Rule 26(e) Supplement, (*see* Pls.' Obj. at 15), but "Rule 26(e) envisions supplementation 'to add additional or corrective information.'" *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012) (quoting *Sharpe v. United States*, 230 F.R.D. 452, 462 (E.D. Va. 2005)); *see also Webber v. Virmani*, No. 5:18-CV-0042, 2019 WL 1030546, at *3 (W.D. Va. Mar. 4, 2019) ("[S]upplementation is appropriate to add or correct information[.]") (citation omitted). It was proper for Dr. Alford to substitute new

---

[2] The corrected polls were first provided in an "errata" on March 11, 2025, less than 24 hours after Plaintiffs inquiry into the citation and four days after the Supplemental Rebuttal Report was originally served. (*See* D.E. 127-3 at 2). Legislative Defendants then offered the corrected polls as a Rule 26(e) Supplement (revising only the title of the document) on March 12, 2025. (*See* Ex. A Mar. 13, 2025 Email Correspondence at 2-3). Legislative Defendants were prepared to file the Rule 26(e) Supplement that day, but waited to file until March 13, 2025, when Plaintiffs responded to Legislative Defendants and provided their position to be included with the filing. (*Id*. at 1).

polls to correct the reference to the incorrect polls. *See Hamilton Cnty. Emergency Commc'ns Dist. v. Level 3 Commc'ns, LLC*, No. 1:14-CV-376-CLC-SKL, 2019 WL 5445295, at *4 (E.D. Tenn. Oct. 23, 2019) (finding expert's report was a proper supplement because "[t]he estimated figures [the expert] used in his first two reports were inaccurate; by substituting the figures from the WARs, [the expert] corrected that inaccuracy."); *Capitol Just. LLC v. Wachovia Bank*, N.A., 706 F. Supp. 2d 34, 39 (D.D.C. 2009) (finding revised report was proper supplement because the expert "did not wholly rework his damages claim" but instead "used the same methodology" as in his initial report and "only changed the inputs and calculations to produce a. [sic] more complete and accurate report.").

Plaintiffs' attempts to distinguish the corrected supplements they served on behalf of Dr. Burch are unavailing. (*See* Pls.' Obj. at 15-16). Dr. Burch incorrectly calculated the number of Black members elected to the North Carolina General Assembly in 2024 in her November 22, 2024, Supplement. Plaintiffs served corrected supplements on November 25, 2024, replacing the incorrect number of Black Senators with the correct number, and on January 17, 2025, replacing the incorrect number of Black House members with the correct number. (*See* Ex. B, Nov. 25, 2024 Email Correspondence; Ex. C, Jan. 18, 2025 Email Correspondence). The latter supplement was served nearly two months after Dr. Burch's original supplement and a little over two weeks before trial. Those were *new* numbers. If the logic Plaintiffs apply to Dr. Alford were applied to Dr. Burch, she would have been required to *strike* the represented number of Black members and replace that figure with *nothing*. Plaintiffs' position on Dr. Alford's Rule 26(e) Supplement is completely inconsistent with their own conduct of serving supplements that replace incorrect information with the correct information. Their objection to LD77 should be overruled.

### III. Plaintiffs' Interpretation of the Permissible Scope of Supplemental Reports on the 2024 Elections is Incorrect.

Plaintiffs' objection to Dr. Alford's Supplemental Rebuttal Report is largely based on an incorrect interpretation of the Court's Scheduling Order and the rules governing rebuttal reports. Plaintiffs argue that Dr. Alford's supplemental reports relating to the 2024 elections were limited to "complet[ing]" the exact same types of analyses in his initial report, and that new analyses and opinions could not be offered. (*See, e.g.*, Pls.' Obj. at 7, 11). That interpretation is wrong.

To begin, the Scheduling Order set deadlines for "the parties' RPV experts' supplemental reports analyzing the November 2024 election results" and "[r]ebuttals to the parties' RPV experts' supplemental reports." (D.E. 113 at 1). Nothing in that Order or elsewhere in the record limited those reports to the exact same analyzes or methodologies used in prior reports. The limitation was that the reports address "the November 2024 election results," and Dr. Alford's post-trial reports do that.

Plaintiffs read into the term "supplemental" in the Scheduling Order all the limits of supplemental disclosures under Rule 26(e). This is incorrect, and Plaintiffs presumably know it. Supplementation within the meaning of Rule 26(e) is limited to "correcting inaccuracies, or filling the interstices of an incomplete report," *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015), but the Scheduling Order contemplates more than that by directing new reports. It is doubtful that any of the post-trial analyses meet the Rule 26(e) standard. But "supplemental" has a more generic meaning of "[s]upplying something additional," *Supplemental*, Black's Law Dictionary (7th Ed. 2009), and that meaning better accords with the Scheduling Order. *Cf.* Walter Wheeler Cook, *"Substance" and "Procedure" in the Conflict of Laws*, 42 YALE L.J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and

should have precisely the same scope in all of them . . . . has all the tenacity of original sin and must constantly be guarded against.").

Indeed, Plaintiffs' own conduct proves they did not comply with the limitation they seek to impose on Dr. Alford. Dr. Collingwood offered new opinions and performed two brand-new analyses in his supplemental reports that he had never performed before in this case. In his February 28, 2025, Supplemental Report, Dr. Collingwood attempted to analyze the impact of the race and party of the candidate. (PX279 at 4-8, 10, 13, D.E. 122-2 at 5-9, 11, 14; *see also* Pls.' Obj. at 4 (Plaintiffs highlighting that in his supplemental report, Dr. Collingwood "also ran 'the type of analysis that Dr. Alford engages in' using the 2024 elections 'to show the results under Dr. Alford's type of analysis'")). But Dr. Collingwood had never conducted "Dr. Alford's type of analysis" before in this case. (*See* PX36, PX128). Dr. Collingwood also performed a brand-new turnout analysis in his March 7, 2025, Supplemental Rebuttal Report that he had never previously performed. (PX280 at 6-12, D.E. 112-2 at 33-39). Under the view Plaintiffs now seek to impose on Dr. Alford, these analyses would be inadmissible simply because Dr. Collingwood had not performed them in his initial reports. Plaintiffs' attempt to apply this limitation on Dr. Alford while offering brand new analyses from Dr. Collingwood should be rejected.

Regardless, Plaintiffs object only to portions of Dr. Alford's *rebuttal* report, and the doctrine they propose finds no support in rebuttal rules. Notably, Plaintiffs ask the Court to impose at the rebuttal stage restrictions that do not ordinarily govern rebuttal reports. As explained above, rebuttal reports are limited to opinions responding to other experts, but they are *not* limited to opinions contained in an expert's *own* prior opinions. Indeed, where courts direct simultaneous exchanges, the project of *responding* to another expert may require that a rebuttal expert use a new method that expert did not previously use. For example, if an expert utilizes an algebraic method

in his opening report, but the other side's expert runs an analysis based in calculus, the first expert will not be required to rest on the algebraic method in his rebuttal: he can rebut the calculus-based approach with calculus. So too here: there would be no reason for Dr. Alford's rebuttal reports *not* to use the methods in Dr. Collingwood's supplemental reports.

Plaintiffs do not explain why the rule should be different here. While they contend that Dr. Alford did not take the same rebuttal approach in the pre-trial disclosures, the Scheduling Order did not limit him to those approaches. Nor do Plaintiffs explain why it would makes sense that, once Dr. Collingwood presented certain types of analysis (such as the percent-needed-to-win analysis) in the pre-trial litigation, rebuttal should be deemed forever out of bounds because Dr. Alford did not run a percent-needed-to-win analysis at prior stages. In all events, Dr. Alford's post-trial reports both analyzed the 2024 elections, which was the sole restriction imposed by the Court's Order.

## IV. Dr. Alford's Opinions Are Reliable.

Plaintiffs' claims that Dr. Alford's opinions are unreliable mischaracterize the evidence and omit relevant facts. They should be rejected.

**1.    Dr. Alford's EI Estimates.** Plaintiffs first claim various issues with Dr. Alford's EI estimates. They contend that Dr. Alford purposefully used different EI point estimates within his Supplemental Rebuttal Report and relied on EI estimates "indistinguishable from Dr. Collingwood's" despite Dr. Alford criticizing Dr. Collingwood's estimates, stating that his EI estimates produce credible intervals larger than Dr. Collingwood's, and  excluding third-party candidates from his analysis. (*See* Pls.' Obj. at 19 (citing D.E. 126 ¶¶ 140-142, 148)). None of these criticisms render Dr. Alford's opinions unreliable.

Dr. Alford clearly explained why his Supplemental Rebuttal Report included different EI point estimates. Tables 1 and 2 of his Supplemental Rebuttal Report show his "Black/White

15

analysis" comparing the voting behavior of Black and white voters, while Table 5 show his "Black/non-Black EI analysis" comparing the voting behavior of Black and non-Black voters. (LD76 at 13, D.E. 122-1 at 23). Dr. Alford explained that the difference between these analyses did not impact his polarization analyses, and that his "earlier RPV analysis followed Dr. Collingwood's choice of Black versus White" voters "in order to keep things compatible across experts." (*Id.*). However, Dr. Alford noted that the distinction between these estimates did matter for his BVAP analysis. (*Id.*). As discussed above, the approach he followed "'consider[ed] black and non-black voting behavior,'" rather than just Black and white voting behavior, because "the crossover proportion among White voters might well be different from the level of crossover support among voters that are neither Black nor White." (*Id.*). That difference was significant in the 2024 elections, where "estimates for crossover voting for non-Black voters are systematically higher than the estimates of crossover voting focusing on Whites alone." (*Id.* at 13-14, D.E. 122-1 at 23-24).

Plaintiffs completely ignore that these estimates were used for different analyses. They instead focus on small differences in Black cohesion between the two analyses, such as the statement that Dr. Alford's Supplemental Rebuttal Report "finds that nearly 97% of Black voters supported the Black-preferred candidate in 2024 elections in SD1 for purposes of his BVAP analysis," (D.E. 126 at ¶ 140 (citing LD76 at 14)), whereas in his Supplemental Report he finds "closer to 95% of Black voters did so in SD1 for purposes of his general racially polarized voting analysis." (*Id.* (citing LD75 at 5)). The difference between 96.5% (LD76 at 14) and 95.1% (LD75 at 5) is *de minimis*, and as Dr. Alford explained (at LD76 at 13), is attributable to the difference in how he constructed his EI model (Black vs. non-Black) in his Supplemental Rebuttal Report. And in all events, Table 5 in the Supplemental Rebuttal Report was used to support Dr. Alford's *BVAP*

*Analysis,* not his general-election racially polarized voting analysis. (*See* LD76 at 14 (Tbl. 5), D.E. 122-1 at 24).

Plaintiffs next point to Dr. Alford's confidence intervals and his treatment of third-party candidates. But Plaintiffs offered these criticisms through Dr. Collingwood to discredit Dr. Alford's opinions in his Supplemental Report, not the Supplemental Rebuttal Report challenged here. (*See* PX280 at 3, 6, D.E. 122-2 at 30, 33). Plaintiffs fail to mention that the difference between Dr. Collingwood's confidence intervals and Dr. Alford's are a few percentage points at most. Moreover, it cannot be assumed that Dr. Collingwood's confidence intervals are correct given the experts' use of different versions of EI. Plaintiffs also overstate the impact of third-party candidates, who were present in just 6 out of the 14 elections analyzed and who failed to obtain a substantial level of support in most of those contests. (PX280 at 6, D.E. 122-2 at 33). Most importantly, Plaintiffs ignore that Dr. Alford explained that the slight differences between his estimates and Dr. Collingwood's estimates did not change his conclusions. (LD76 at 2, D.E. 122-1 at 12).[3]

**2. Dr. Alford's BVAP Analysis.** Plaintiffs next claim Dr. Alford's BVAP analysis is "demonstrably wrong and internally contradictory," is inconsistent with 2022 election results, makes improper assumptions, and does not "actually follow" Dr. Handley's approach. (*See* Pls.' Obj. at 19 (citing D.E. 126 ¶¶ 144-147)). On the first point, Plaintiffs argue that Dr. Alford's

---

[3] Plaintiffs appear to argue that these differences mean Dr. Collingwood's estimates should be credited over Dr. Alford's. But, there are several examples of Dr. Collingwood's estimates exceeding 100%—for example, the Superintendent of Public Instruction Race shows 99.3% Black support for the Democratic candidate statewide, and 1.2% for the Republican candidate, for a total of 100.5%. (PX279 at 23; *see also id.* (Black support totaling 100.3% in the Secretary of State race, 100.1% in the Treasurer race, 100.4% in Supreme Court 6 race, 100.1% in the Court of Appeals 14 race, and 100.1% in the Labor Commissioner race)). These discrepancies indicate that the Court should not blindly accept Dr. Collingwood's estimates over Dr. Alford's.

testimony that the BVAP needed in the Demonstration Area would likely be several points higher than the BVAP needed in SD1 and SD2 is inconsistent with his analysis showing an average of 42% in the Demonstration Area and 41% in SD1 and SD2. (D.E. 126 ¶ 144). This mischaracterizes Dr. Alford's trial testimony.

In response to a question from Plaintiffs' counsel on cross-examination, Dr. Alford explained the general concept of the impact of the level of crossover voting on a BVAP analysis using different levels of crossover voting and levels of BVAP in a district. (*See* Day 4 Tr. 115:11-117:15). He explained that based on an assumption of 10% crossover voting in the Demonstration Area versus 20% crossover voting in SD1 and SD2, the BVAP needed in the Demonstration Area would likely be higher. (*Id*. at 117:5-15).

Dr. Alford's BVAP analysis is consistent with that testimony. His Table 5 shows higher levels of crossover voting in SD1 and SD2 as compared to the Demonstration Area, resulting in a higher BVAP estimate in the Demonstration Area. (LD76 at 14-16, D.E. 122-1 at 24-26). But the difference is not as significant as Dr. Alford's example at trial because the actual crossover voting of all non-Black voters in the Demonstration Area based on the 2024 elections was much higher than 10%—it was consistently in the 20% range, and as high as 28.1% in the Governor's contest. (*Id*. at 14, D.E. 122-1 at 24). This increased level of crossover voting, combined with lower Black cohesion in SD1 and SD2, narrowed the gap between the BVAP estimates across the three areas.

Plaintiffs next claim that Dr. Alford's estimates are "inconsistent with the record" because the Black-preferred candidate lost in 2022 in SD3, which had a BVAP of 42.33%. (D.E. 126 ¶ 146). But SD3 in the 2022 plan was a *different district* with a *different configuration* than either SD1 or SD2. Plaintiffs also ignore that Dr. Alford's analysis provides the average "estimates of the BVAP needed to provide an equal opportunity for Black voters to elect their preferred

candidate," not a guaranteed victory. (LD76 at 15, D.E. 122-1 at 25). Dr. Collingwood's analysis does the same. (PX279 at 20, D.E. 122-2 at 21) ("Therefore, the 47.7% estimate is not a guarantee of a victory for the Black-preferred candidate; rather it is a measure of a highly competitive district where the Black-preferred candidate has a good chance of either winning or losing, and would in fact lose many of the 42 elections."). Dr. Collingwood's BVAP analysis also shows two elections where the Black-preferred candidate would win between 41 and 43% BVAP, which is "inconsistent with the record" on SD3 according to Plaintiffs. (PX279 at 21, D.E. 122-2 at 22).

Plaintiffs next contend that Dr. Alford's approach does "not make sense" because it assumes the crossover vote "would stay the same in a version of SD1 and SD2 that included more Black people." (D.E. 126 ¶ 147). But this criticism is one of district-effectiveness analyses themselves, not with the way Dr. Alford conducted his analysis.

Finally, Plaintiffs erroneously argue that Dr. Alford did not follow Dr. Handley's approach. (D.E. 126 ¶ 150). Dr. Alford did not consider "primaries, runoffs, and general elections" or multiple election cycles because supplemental reports were limited to "the November 2024 election results." (D.E. 113). He properly limited his analysis to the November 2024 General Election results as the Scheduling Order required. Plaintiffs also claim that Dr. Handley's 2019 report "is not in evidence" and is not something "an expert would rely on." (D.E. 126 ¶ 150). This is an incredulous assertion given Plaintiffs were the ones that filed Dr. Handley's report on the docket in this case. (D.E. 20-1).

**3.      Exit Polls.** Plaintiffs claim it was improper for Dr. Alford to rely on exit polls. (*See* Pls.' Obj. at 19 (citing D.E. 126 ¶ 143)). Plaintiffs again mischaracterize Dr. Alford's opinions on the topic. Dr. Alford was not offering the exit polls in place of any expert's EI estimates, or to prove whether polarization exists in North Carolina. Instead, Dr. Alford was offering the exit polls

as a comparison to the EI estimates offered in this case. As discussed above, those estimates differed "slightly," including in the 2024 Presidential election. Dr. Collingwood's estimates showed higher Black cohesion and lower white crossover in that election than Dr. Alford's estimates, and Dr. Alford offered the exit polls as a point of comparison to those estimates. (LD76 at 3, D.E. 122-1 at 13; LD77 at 1-2).

Ultimately, these criticisms do not warrant exclusion of Dr. Alford's opinions. Plaintiffs have not even attempted to make the required showing under Federal Rule of Evidence 702 to exclude Dr. Alford's opinions as unreliable. Moreover, because this is a bench trial, "'the Court can freely accept or reject an expert's testimony at trial as the trier of fact' without excluding evidence under Fed. R. Evid. 702." *Pender v. Bank of Am. Corp.*, No. 3:05-CV-00238- GCM, 2016 WL 7320894, at *7 (W.D.N.C. Dec. 15, 2016) (citation omitted); *see also Goodwin v. Cockrell*, No. 4:13-CV-199-F, 2014 WL 6630105, at *1 (E.D.N.C. Nov. 21, 2014) (applying the reasoning of another district court that declined to exclude expert testimony "because this is a bench trial and the Court is capable of accessing [sic] the credibility of a witness's expertise, determining what evidence is helpful and what weight the evidence should be given at the time testimony is heard") (citations omitted); *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) ("[B]ecause the district court was also the trier of facts, the district court's evidentiary gatekeeping function was relaxed, and the district court was in the best position to decide the proper weight to give the expert opinions.").

**CONCLUSION**

Dr. Alford's opinions in his Supplemental Rebuttal Report are proper rebuttal opinions, and his Rule 26(e) was required by the Federal Rules.[4] The Court should overrule Plaintiffs' objections and admit LD76 and LD77 in their entirety.

This the 7th day of April, 2025.

BAKER & HOSTETLER LLP

By:/s/Katherine L. McKnight
    Katherine L. McKnight*
    D.C. Bar no. 994456
    1050 Connecticut Ave. NW, Suite 1100
    Washington DC 20036
    Ph: (202) 861-1500
    kmcknight@bakerlaw.com

    Patrick T. Lewis*
    Ohio State Bar no. 0078314
    127 Public Square, Suite 2000
    Cleveland, Ohio 44114
    Ph: (216) 621-0200
    plewis@bakerlaw.com

    Erika Dackin Prouty*
    Ohio State Bar no. 0095821
    200 Civic Center Drive, Suite 1200
    Columbus, OH 43215
    (614) 462-4710
    eprouty@bakerlaw.com

  * *Appeared via Special Notice*

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ Phillip J. Strach
    Phillip J. Strach
    North Carolina State Bar no. 29456
    Alyssa M. Riggins
    North Carolina State Bar no. 52366
    Cassie A. Holt
    North Carolina State Bar no. 56505
    Jordan A. Koonts
    North Carolina State Bar no. 59363
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Ph: (919) 329-3800
    phil.strach@nelsonmullins.com
    alyssa.riggins@nelsonmullins.com
    cassie.holt@nelsonmullins.com
    jordan.koonts@nelsonmullins.com

    *Attorneys for Legislative Defendants*

---

[4] Because Dr. Alford's opinions are within the scope of Rule 26 and the Scheduling Order, the Court need not decide whether the opinions must be excluded under Rule 37. Notably, the opinions in dispute are of minimal importance at this stage. Dr. Collingwood's own analysis shows that Plaintiffs cannot meet the third *Gingles* precondition. Dr. Alford's BVAP analysis in Part C simply shows that figure is lower than Plaintiffs admit. Dr. Alford also concluded in Part A that his opinions about polarization were unchanged despite the methodological differences between he and Dr. Collingwood opinions. Finally, Dr. Alford's Rule 26(e) Supplement simply corrects exit polls that were referenced as a comparison in three sentences in Dr. Alford's report.

## CERTIFICATE OF SERVICE

I hereby certify that on this day the forgoing document was filed on the Court's electronic case filing system (CM/ECF), and that notice of the filing will be served on all counsel of record by the Court's system.

This the 7th day of April, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
        Phillip J. Strach
        North Carolina State Bar No. 29456