# ATTACHMENT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# EASTERN DIVISION

RODNEY D. PIERCE and
MOSES MATTHEWS,

        Plaintiffs,

    v.

THE NORTH CAROLINA STATE BOARD
OF ELECTIONS, *et al.*,

        Defendants.

Case No. 4:23-cv-193-D

**PLAINTIFFS' REPLY IN SUPPORT OF OBJECTIONS TO
LEGISLATIVE DEFENDANTS' MOTIONS TO ADMIT
<u>SUPPLEMENTAL OPINIONS OF DR. JOHN ALFORD</u>**

This dispute turns on whether an expert authorized to file a supplemental report on a narrow, specified topic may seize that opening to introduce a supplemental rebuttal report long after initial expert reports, depositions, trial, and any other opportunity to test the report's assertions have passed, offering a series of new opinions that could have been, but were not, offered in the expert's initial report. The obvious answer to that question is no, and because that is what happened here, Defendants' motions to introduce Dr. Alford's new opinions should be denied.

## ARGUMENT

### I. Dr. Alford's New Opinions Are Inadmissible

Two simple and all but uncontested propositions resolve this dispute.

*First*, an expert may not introduce "new arguments" after the deadline for initial reports. D.E. 91 at 4 (citation omitted). This Court has already explained that to prevent "unfair surprise," a party's initial expert report must provide "a *complete* statement of *all opinions* the witness will express and the basis and reasons for them." *Id.* at 3-4 (emphasis added) (citations omitted). Experts may not "bootstrap new opinions onto a rebuttal when those new opinions were available to the expert at the time of his initial disclosure, even if part of a rebuttal is well-founded." *Snider-Jefferson v. Amigo Mobility Int'l, Inc.*, No. 2:15-CV-406, 2016 WL 4424954, at *4 (E.D. Va. Aug. 17, 2016), *aff'd*, 678 F. App'x 91 (4th Cir. 2017). Experts likewise may not "provide 'new and improved' expert reports under the guise of supplementation." D.E. 91 at 6 (citation omitted). Those two rules fortify one principle: a party may not manipulate the scheduling order by introducing new opinions after the initial expert report deadline has passed. *Id.*

*Second,* Defendants hardly dispute that Dr. Alford's supplemental rebuttal report offers new opinions that were available at the initial report stage. Defendants concede (at 15) that Dr. Alford's BVAP needed to win opinion introduces an entirely new category of analysis Dr. Alford

1

never previously disclosed. Defendants concede too (at 7-10) that Dr. Alford's opinion on "preferable" EI methodologies is new. And Defendants do not dispute that Dr. Alford used exit polls as an external source of validation for EI point estimates for the first time in his supplemental rebuttal report. None of these opinions is tied to any particular election year, much less the 2024 election results that were the topic of the supplemental reports agreed to by the parties and permitted by the Court after trial, and these new opinions were all available to Dr. Alford at the initial report stage. Dr. Alford nevertheless failed to offer them, and in most cases offered directly contradictory opinions, until every opportunity to probe his testimony elapsed. Dr. Alford's new opinions are pure gamesmanship, rendering his new evidence inadmissible supplementation and rebuttal. Nothing more is needed to resolve these motions.

## II. Defendants' Justifications for Dr. Alford's New Opinions Are Unavailing

### A. Dr. Alford's New Opinions are Improper Supplementation

Defendants do not dispute that Dr. Alford's new opinions in his March 7 supplemental rebuttal report would be improper supplementation under Rule 26(e). But they contend that the scheduling order's directive to submit "supplemental" reports implicitly used that term to authorize some new form of supplementation not contemplated by Rule 26(e) or the discovery rules at all. Opp'n 13. That is implausible. The Court's scheduling orders throughout this case have made clear that the purpose of the supplemental deadlines has always been to accept Rule 26(e) supplementation completing the parties' initial reports with data from the 2024 elections. The text of the Court's initial scheduling order limited the parties' post-trial submissions to "supplemental" reports, D.E. 81 at 1-2, and the text of the modified order did too, D.E. 113 at 1. That terminology reproduces the text of Rule 26(e) and replicates its meaning in equal measure. The *only* reason the Court authorized an unorthodox *post-trial* supplementation deadline was so the parties could file Rule 26(e) disclosures updating their initial reports with 2024 data. The Court has already

2

explained that "completing a report with information that was not available by the initial disclosure deadline exemplif[ies] proper supplemental reports" under Rule 26(e), D.E. 91 at 6, and that is precisely what the supplemental reports here were designed to do.

Defendants ask the Court to read that text and context out of the order. In their view, the word "supplemental" in the scheduling order means only "supplying something additional." Opp'n 13 (brackets and citation omitted). That would deprive the term of all meaning. It is self-evident that the post-trial round of reports was an "additional" round of reports, so interpreting "supplemental" to mean "additional" would reduce it to pure surplusage. Defendants admit as much, asserting (at 15) that "the sole restriction imposed by the Court's Order" was that Dr. Alford "analyze[] the 2024 elections." This Court has explained, however, that scheduling orders are not so blithely written, cautioning that a "trial court's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Hexion Specialty Chemicals, Inc. v. Oak-Bark Corp.*, No. 7:09-CV-105-D, 2011 WL 4527382, at *8 (E.D.N.C. Sept. 28, 2011) (Dever, J.) (citation omitted). Yet that is how Defendants treat the word "supplemental." Defendants also cast aside the order's context, pressing a reading that would have authorized the parties to introduce any relevant opinion—after the close of initial expert reports, depositions, and trial—so long as it could in some way be connected to "the 2024 elections." That would enable gamesmanship by supplementation. D.E. 91 at 6.

Defendants' only other justification for their reading is the unexplained conjecture (at 13) that "[i]t is doubtful that any of the post-trial analyses meet the Rule 26(e) standard." That is just not true. As noted, Rule 26(e) permits parties to "complete a report with previously unobtainable information." D.E. 91 at 6. Dr. Collingwood's two supplemental reports, and Dr. Alford's initial supplemental report, did exactly that. If Defendants wrongly believed Dr. Collingwood's opinions

3

exceeded those bounds, they should have objected to them and explained why. They did not. They cannot now insulate Dr. Alford's improper opinions from objection by arguing that they could have, but failed to, lodge objections of their own. The scheduling order limited the parties' post-trial reports to supplementation as that term is understood under federal law governing discovery, and Defendants do not dispute that Dr. Alford transgressed those limits. His opinions should be excluded as improper supplementation.

### B. Dr. Alford's New Opinions are Independently Inadmissible Because They are Improper Rebuttal

**1. Dr. Alford's BVAP Opinions.** Defendants do not and could not dispute that Dr. Alford had every opportunity to introduce a BVAP needed to win opinion at the initial expert report stage but declined to do so, and his BVAP opinion is inadmissible for that reason alone. Defendants sidestep that barrier by repeating, over and over, that Dr. Alford's BVAP analysis "directly contradicts" Dr. Collingwood's analysis. Opp'n 3, 6. Dr. Alford's opinion would be improper rebuttal even if that were true, but it is not. Dr. Collingwood's supplemental report estimated BVAP needed to win based on *2020, 2022, and 2024* election data, and only in the *Demonstration Area*. PX279 at 20. Dr. Alford estimates BVAP needed to win based *only* on 2024 election data, and goes on to provide estimates for a *series of ancillary geographies*. LD76 at 12-16. Defendants make no attempt to explain how a BVAP estimate for one election cycle could "directly contradict" an estimate for three cycles, because it does not, and Dr. Alford's estimates for geographies Dr. Collingwood does not address run even further afield. The opinion is improper on Defendants' own terms.

Defendants then offer a series of backup arguments. ***First***, Defendants claim (at 3) they introduced the BVAP analysis not for the affirmative purpose of showing BVAP needed to win, but for the "*sole* purpose" of contradiction. That "directly contradicts" the record. Defendants'

4

proposed findings ask the Court to credit Dr. Alford's BVAP "analysis as more reliable and accurate than Dr. Collingwood's" and find that "the average BVAP needed to win is 42%." D.E. 124 ¶ 255. Defendants' proposed conclusions of law ask the Court to rely on that BVAP finding to draw specific legal conclusions that they say should result in judgment in their favor. D.E. 125-1 ¶¶ 51, 53. That reflects affirmative evidence that should have been offered at the initial report stage.[1]

**Second**, Defendants claim (at 4) that Dr. Alford was unable to respond to the methods in Dr. Collingwood's supplemental report until it was produced. Dr. Collingwood's supplemental report employed the *same* methods he used at the prior stages, however, so when that became clear Dr. Alford had no reason to conduct an *entirely new analysis* offering an *entirely new opinion* in response. That goes well beyond responding to Dr. Collingwood's "methods," which Dr. Alford endorsed at every previous stage of this case, and is a category of opinion Dr. Alford could have provided at the initial report stage or, at minimum, at the initial supplemental stage (where it would have been improper supplementation, but would not have independently violated restrictions on rebuttal evidence).

**Third**, Defendants argue that "rebuttal and reply reports 'may cite new evidence and data.'" Opp'n 4-5 (citation omitted). That is true but beside the point. Dr. Alford's supplemental rebuttal report does not merely cite *new data*, it introduces a *new category of opinion*. The new opinion, *not* the new data, makes Dr. Alford's BVAP analysis inadmissible.

**Fourth**, Defendants argue (at 5) that the BVAP needed to win analysis does not support their "defenses." Yet Defendants' *only* response to *Gingles* III is that a majority-Black district is unnecessary to elect a Black-preferred candidate in the Black Belt region, and Dr. Alford is their

---

[1] In the event the Court admits Dr. Alford's BVAP opinion, it should admit it as contradiction evidence only, not substantive evidence, as Defendants suggest.

*only* evidence on that point. The dispositive point is that Defendants could not at the initial report stage withhold the key opinion underlying their response, only to unveil it in a supplemental rebuttal report.

*Finally*, Dr. Alford's BVAP opinion introduces magnitudes more "new argument" than Mr. Esselstyn's excluded opinion. Mr. Esselstyn's rebuttal report conducted the *same form of analysis* as his initial report, changing only *four precincts* from the district provided in that report, and modifying it in *direct response* to the criticisms of Dr. Trende. He offered that district *before* depositions and trial, which would have guaranteed Defendants an opportunity to probe his analysis. Defendants nevertheless moved to exclude Mr. Esselstyn's opinion and the Court granted the motion because his report introduced a "new argument" that inflicted "unfair surprise." D.E. 91 at 4 (citation omitted). Dr. Alford's BVAP opinion, meanwhile, is an entirely *new form of analysis* that introduces a *completely new opinion* that *contradicts his prior testimony* and lands *after* depositions and trial have concluded. That eleventh-hour turn imposes far more "new argument" and "unfair surprise" than Mr. Esselstyn's report could have.

**2. Dr. Alford's EI Opinions.** It is equally beyond dispute that Dr. Alford could have characterized his EI estimates as preferable to Dr. Collingwood's at the initial expert report stage, but instead *agreed* that Dr. Collingwood's EI approach used the "correct methodology" and was "extremely competent." Tr. Day 4 73:4-10 (Alford). Dr. Collingwood used the *same* methodology throughout his reports—there is no reason Dr. Alford could not have critiqued it before now.

*First,* Dr. Alford's report offers far more than (at 8) "quotidian observations" explaining "the differences between his EI estimates and Dr. Collingwood's." Dr. Alford *was* permitted to explain the "small differences" between his estimates and Dr. Collingwood's, LD76 at 2, as he has throughout this case, LD59 at 5. Dr. Alford *was not* licensed to unfurl the new and previously

6

available opinion that his EI method is "preferable" to Dr. Collingwood's. LD76 at 3. There is nothing unique about the 2024 election results that provoked a sudden need to stack rank methods; to the contrary, Dr. Alford's initial report characterized the two methods as yielding "substantively similar" estimates, LD59 at 5, and the "same can be said for the 2024 EI results," LD76 at 2.

***Second,*** it is irrelevant that (at 8) "Dr. Alford's use of RxC is not new." Plaintiffs do not object to Dr. Alford's EI opinions because he *used* RxC, Plaintiffs object because he claims his use of RxC is *preferable* to Dr. Collingwood's use of King's EI. That opinion *is* undeniably new, could have been offered in the initial report and probed through deposition and trial, but was not.

**3. Dr. Alford's exit polls.** Plaintiffs objected to Dr. Alford's reliance on exit polls as an external source of validation for his EI estimates as improper rebuttal evidence. D.E. 127-1 at 16 ("Dr. Alford's three new opinions are independently inadmissible because they are not proper rebuttal."). Dr. Alford could have opined that exit polls serve this purpose at any prior stage, but did not. Defendants apparently agree, offering (at 2-10) no response to this objection. Defendants have "conceded these arguments by failing to address them," and Dr. Alford's exit polls should be excluded as improper rebuttal evidence regardless whether they are proper supplementation. *McLean v. Leonard*, No. 5:14-CV-718-FL, 2015 WL 5725818, at *6 (E.D.N.C. Sept. 30, 2015).

## III. Dr. Alford's "Rule 26(e) Supplement" was Improper

Even if Dr. Alford's exit polls were initially admissible in the March 7 supplemental rebuttal report, the unauthorized March 13 report (styled a "Rule 26(e) Supplement") is inadmissible. That filing was not error correction: it introduced *three new polls* referenced nowhere in Dr. Alford's supplemental rebuttal report *and* the *new opinion* that not only do "roughly comparable" exit polls provide a source of external validation, LD76 at 3, exit polls that are "closer" to one expert's estimates than another's do too, D.E. 123-1 at 1. A proper Rule 26(e) supplement would not have been required to "*strike*" the original polls and replace them with

7

"*nothing*," Opp'n 12, but to cite the poll Dr. Alford *actually* discussed in his report and correct his description of it. The supplement instead impermissibly remade Dr. Alford's opinion altogether. Dr. Burch, by contrast, added no new source material and simply corrected a few isolated counting errors.

## IV. Dr. Alford's New Opinions Are Unreliable

Dr. Alford's new opinions show why courts do not accept new arguments under the guise of supplemental or rebuttal evidence without subjecting them to the rigors of the adversarial process. Plaintiffs have already identified, without the benefit of cross-examination or expert scrutiny of Dr. Alford's opinions or new codebase, a host of problems with his new opinions. Defendants *do not dispute a single one* of these issues, choosing to minimize their importance instead. That completely undermines the reliability and credibility of Dr. Alford's opinions.

- Defendants admit (at 15-16) that Dr. Alford uses different EI point "estimates . . . for different analyses" within the same report that vary to his client's benefit. D.E. 126 ¶ 140. Defendants claim (at 15-16) Dr. Alford explained the difference between his estimates and Dr. Collingwood's, but nowhere explain why Dr. Alford's *own* estimates for the *same thing*—Black support—vary between his RPV and BVAP analyses.

- Defendants do not dispute, or attempt to justify, that Dr. Alford criticizes Dr. Collingwood's EI estimates as inflated in Part A of his report before relying on *indistinguishable* estimates in Part C of his report. *See* D.E. 126 ¶ 141.

- Defendants admit (at 17) that Dr. Alford's confidence intervals are two to three times greater than Dr. Collingwood's. *See* D.E. 126 ¶ 142. They minimize this (at 17) as reflecting only "a few percentage points," but a few percentage points *is all that separates* Dr. Alford's point estimates from Dr. Collingwood's. LD76 at 3.

- Defendants do not dispute (at 19-20) that exit polls are notoriously unreliable or that Dr. Alford has previously testified they cannot be used to ascertain racially polarized voting. D.E. 126 ¶ 143. They are silent (at 19-20) on how using an unreliable baseline as a point of "comparison" could provide any source of validation.

- Defendants do not dispute (at 18-19) that Dr. Alford's BVAP analysis is evidently wrong and contradictory. D.E. 126 ¶¶ 144-45. Defendants do not respond (at 18-19) to the observation that Dr. Alford reports different crossover voting for different candidates even within his own report. *Compare* LD76 Tbl. 1, *with* LD76 Tbl. 5.

8

- Defendants only response is to concede (at 18) that Dr. Alford's report contradicts his trial testimony and to recharacterize that testimony as merely "explain[ing] the general concept of the impact of the level of crossover voting on a BVAP analysis." In addition to excluding Dr. Alford's new analysis, the Court should thus take Defendants at their word and decline to credit Dr. Alford's "general" trial testimony speculating about BVAP needed to win, as Plaintiffs' proposed findings of fact suggested. D.E. 126 ¶ 134.

- Defendants admit (at 18-19) that Dr. Alford's BVAP needed to win estimate of 41% for SD1 and SD2 is lower than the SD3 BVAP of 42% that produced a five-point loss for the Black-preferred candidate in 2022, but excuse this result because SD3 was configured differently than SD1 and SD2. *See* D.E. 126 ¶ 146. But *any* new district with a 42% BVAP would be configured differently than SD1 and SD2, and the data from SD3 shows that a *real* legislative district made up of the *actual* counties that would comprise a 42% BVAP district in this area—unlike the *hypothetical* districts Dr. Alford analyzes—would not come close to performing. The fact that Dr. Alford's estimates show the opposite undermines his analysis. And it is hardly an endorsement of his estimates to argue (at 18-19) that his projected *average* BVAP needed to win resembles *outliers* that were enough to win in 2 of 27 elections—neither of which took place in 2024. PX279 at 20-21.

- Defendants (at 19) offer no substantive response to the observation that Dr. Alford's BVAP analysis improperly assumes that crossover voting rates would remain the same in a differently constituted SD1 or SD2, writing it off as a feature "of district-effectiveness analyses themselves." *See* D.E. 126 ¶ 147. This implicitly endorses the Demonstration Area-wide approach Plaintiffs have taken throughout this litigation, which properly accounts for the reality that to comply with the VRA, a new district would necessarily replace current counties in SD1 and SD2 with counties that have lower white crossover voting. D.E. 126 ¶ 147.

- Defendants admit (at 17) that Dr. Alford excluded third-party votes from his analysis, skewing all of his point estimates in Defendants' favor and affecting nearly half the elections Dr. Alford examined. D.E. 126 ¶ 148. Defendants assert (at 17) that Plaintiffs "overstate the impact of third-party candidates," but that assertion is based on nothing because Dr. Alford did not consider it, and the actual data refutes it. D.E. 126 ¶ 148.

- Defendants concede (at 19) that Dr. Alford did not follow Dr. Handley's methodology, which calls for incorporating primaries, runoffs, and general elections, because he "limited his analysis to the November 2024 General Election results." It is true that the scheduling order constrained Dr. Alford to that data, but that does not mean he followed Dr. Handley's approach. It simply underscores another reason why it was improper to undertake a new BVAP analysis at the post-trial stage. And Defendants badly mischaracterize the parties' prior treatment of a Dr. Handley report. After Defendants mischaracterized the report in a brief, plaintiffs corrected the misrepresentation in a reply brief relating solely to expedition. D.E. 20 at 2-3. Plaintiffs have never offered that report as evidence in this case at any stage, nor have they suggested that an expert may rely on as evidence a different expert's prior report from a different case.

9

## V. Dr. Alford's New Opinions Are Unjustifiably Prejudicial

Defendants offer only a footnote on Rule 37, effectively conceding that the *Southern States* factors favor Plaintiffs. That footnote *does not dispute* four of the five factors, a dispositive concession because, as Defendants do not contest, the surprise of Dr. Alford's "last-minute revelation[s]" is independently sufficient to warrant exclusion. *Goodwin v. Cockrell*, No. 4:13-CV-199-F, 2015 WL 575861, at *6 (E.D.N.C. Feb. 11, 2015). Defendants' only response (at 21 n.4) is that "the opinions in dispute are of minimal importance at this stage" because "Dr. Alford's BVAP analysis in Part C simply shows that figure is lower than Plaintiffs admit." That is irreconcilable with Defendants' repeated assertions that the purpose of Dr. Alford's evidence is to "directly contradict" and "impeach" Dr. Collingwood's opinions, and with Defendants' proposed findings and conclusions urging the Court to adopt Dr. Alford's BVAP estimates. *See* Opp'n 5-6. To the extent Dr. Alford's evidence is relevant to Dr. Collingwood's credibility and the Court's BVAP determination, that evidence is important, and either way, the weight of the factors favors Plaintiffs. Dr. Alford's new opinions should be excluded.

## CONCLUSION

Defendants' motion to admit Part A and Part C of Dr. Alford's supplemental rebuttal report, and to admit Dr. Alford's Rule 26(e) supplement, should be denied.[2]

---

[2] The Court should exclude Part A in its entirety because Dr. Alford's new opinions pervade that section of the report, but at minimum, the Court should exclude from Part A Dr. Alford's opinions that his EI methodology is preferable to Dr. Collingwood's and Dr. Alford's discussion of exit polls. The Court should exclude Part C and the Rule 26(e) supplement entirely, regardless how it treats Part A.

10

Respectfully submitted this, the 14th day of April, 2025.

**POYNER SPRUILL LLP**
By:/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
North Carolina State Bar no. 4112
Caroline P. Mackie
North Carolina State Bar no. 41512
Post Office Box 1801
Raleigh, NC 27602
Telephone: (919) 783-1108
cmackie@poynerspruill.com
espeas@poynerspruill.com

**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
By:/s/ R. Stanton Jones
Robert Stanton Jones*
Elisabeth S. Theodore*
John A. Freedman*
Samuel I. Ferenc*
Orion de Nevers*
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
stanton.jones@arnoldporter.com
elisabeth.theodore@arnoldporter.com
john.freedman@arnoldporter.com
sam.ferenc@arnoldporter.com
orion.denevers@arnoldporter.com

*Appeared via Special Notice
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the cm/ecf system, which will send notification of such filing to all counsel and parties registered in said system.

Respectfully submitted this, the 14th day of April, 2025.

/s/ Orion de Nevers
Orion de Nevers